**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                *Plaintiff*,

     v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                *Defendants*.

Case No.  1:24-cv-815

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Committee on the Judiciary of the United States House of Representatives

(Judiciary Committee or Committee) brings this civil action against Defendants Mark Daly and

Jack Morgan to enforce duly authorized, issued, and served Congressional subpoenas

(Subpoenas) to Daly and Morgan, respectively, which are attached as Exhibits A and B.[1]  House

---

[1] The Committee issued subpoenas to both Daly and Morgan on two different occasions. The first was in September 2023, and the second was in February 2024.  Exhibits A and B are the subpoenas the Committee issued in February 2024.  For convenience, we use Subpoena when referring to a single subpoena issued on either date, and we use Subpoenas when discussing the pair of subpoenas issued on either date.

Resolution 917, which the full United States House of Representatives (House) adopted, expressly authorized this lawsuit.  The Judiciary Committee alleges as follows:

## INTRODUCTION

1.      The Judiciary Committee is investigating whether the U.S. Department of Justice (DOJ) is committed to impartial justice in light of evidence that it has given Robert Hunter Biden (Hunter Biden), President Joseph Biden's son, favorable treatment.  For years, the Internal Revenue Service (IRS) and DOJ have been investigating Hunter Biden for tax crimes.  In the spring of 2023, two IRS whistleblowers who were intimately involved in that investigation came forward and exposed several ways that DOJ had deviated from its standard processes during the Hunter Biden investigation.[2]  A few months later, more irregularities spilled into public view when Hunter Biden stood inside a federal courtroom in Delaware ready to admit publicly and under oath that he had committed federal misdemeanor tax crimes.  During that hearing, a DOJ prosecutor admitted that DOJ had offered Hunter Biden a diversion agreement that was unlike any other he was aware of: an agreement that, in the presiding judge's words, would have given Hunter Biden broad immunity over "crimes that have nothing to do with the case or the charges being diverted."[3]  The agreement ultimately fell apart, and the prosecution is ongoing.

2.      The Committee is thus investigating whether DOJ, which is supervised by the President, Hunter Biden's father, has given Hunter Biden special treatment.  Through its

---

[2] Transcript of Interview of Gary Shapley, Supervisory Special Agent, IRS (May 26, 2023) (Shapley Interview) (attached as Ex. C); Transcript of Interview of Joseph Ziegler, Special Agent, IRS (June 1, 2023) (Ziegler Interview) (attached as Ex. D); *Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight and Accountability*, 118th Cong. (July 19, 2023), https://perma.cc/NXG7-3BGU.

[3] Transcript of Hearing at 46, *United States v. Biden*, No. 1:23-cr-61-MN (D. Del. July 26, 2023), ECF No. 16 (Transcript of July 26, 2023 Hearing) (attached as Ex. E).

investigation, the Committee seeks to develop legislative reforms, such as reforming DOJ's Tax Division and the Tax Division's interactions with the IRS. The Committee is also considering whether to modify the federal statute that permits DOJ to appoint a special counsel, including when a conflict of interest may affect an investigation.

3.      Additionally, the Committee is investigating whether President Biden has attempted to obstruct or influence in any way the investigation into his son. President Biden has already made numerous public statements about subject matter relevant to DOJ's pending investigation, raising the concern that he is influencing, or attempting to influence, the course of DOJ's investigation. In light of these statements and the control that a president exercises over DOJ, the Committee's investigation is part of an impeachment inquiry that is assessing, among other things, whether President Biden has abused his power as President to impede, obstruct, or otherwise influence investigations into his son.

4.      The Committee cannot, however, do these things in the dark. To craft effective legislative reforms and to determine whether President Biden has committed an impeachable offense, it must have all the facts. And to uncover all the facts, the Committee requires testimony from both Mark Daly and Jack Morgan, two current or former Tax Division attorneys who have firsthand knowledge of the irregularities in DOJ's investigation that appear to have benefited Hunter Biden. For example, as members of the team that recommended what charges to bring against Hunter Biden, Daly and Morgan initially agreed that DOJ should file charges for tax crimes related to 2014 and 2015. But months later, they gave a key presentation and argued just the opposite—that Hunter Biden should *not* be charged for tax crimes related to those years.

DOJ ultimately allowed the statute of limitations for those charges to lapse.  Daly and Morgan are thus crucial to the Committee's investigation.[4]

5.      After DOJ refused to make Daly and Morgan available for voluntary interviews with the Committee, the Committee subpoenaed them to appear for depositions.  But they defied the Subpoenas because their employer, DOJ, directed them not to appear.  By refusing to appear, Daly and Morgan are frustrating Congress's ability to conduct oversight and investigate Executive Branch corruption—a critical part of Congress's Article I powers.  Because this investigation is also part of an impeachment inquiry, Daly and Morgan are likewise frustrating the Committee's ability to determine whether President Biden has committed an impeachable offense.  They are thus preventing the House from discharging its solemn power of impeachment, a power the Constitution vests exclusively in the House.

6.      Daly, Morgan, and DOJ have not disputed that the Committee's investigation is lawful.  Nor have they disputed that Congress has the authority to pass legislation addressing the topic of the Committee's investigation, or that it is entitled, as part of an impeachment inquiry, to investigate whether the President has abused his powers.  Indeed, multiple other DOJ officials have appeared before the Committee as part of its inquiry.  Rather, DOJ has directed Daly and Morgan to defy the Committee's Subpoenas only because, under House Rules, agency counsel (a lawyer who represents the Executive Branch's interests, not Daly's or Morgan's) cannot attend.  Despite the Constitution's clear command that each chamber of Congress "may determine the Rules of its Proceedings,"[5] DOJ contends that subpoenas compelling testimony about an agency

---

[4] Ex. D (Ziegler Interview) at 32-39; Ex. C (Shapley Interview) at 142.

[5] U.S. Const. art. I, § 5, cl. 2.

employee's official duties, without agency counsel present, are unconstitutional and thus unenforceable.

7.     The House's legal authority and rationale for adopting the rule at issue are straightforward.  A rule that dictates who may attend committee depositions is a rule that governs House proceedings and thus easily falls within its rulemaking authority under the Constitution. The House has decided to exercise its constitutional authority in this manner because it protects the integrity of its investigations: a witness may be less willing to share information that reflects poorly on his employing agency if a lawyer representing that agency is sitting right next to him.

8.     The deposition rule is not new.  Indeed, the House has adopted variations of this rule since the 1980s, when it first began delegating deposition authority to select committees and task forces.  And to date, more than 175 Executive Branch witnesses have appeared for depositions without agency counsel.

9.     The Committee has diligently tried to get the information that it needs from other witnesses but has been unable to do so.  For example, the Committee has asked both the lead prosecutor and a former senior member of the prosecution team about DOJ's decision to let the statute of limitations lapse for charges against Hunter Biden related to the 2014 and 2015 tax years.  Both refused to answer those questions.  Daly and Morgan were personally involved in that decision and thus have information that the Committee needs.  The Committee has also asked two U.S. Attorneys—whom President Biden appointed—about their decisions not to partner with the prosecution team (which at the time was necessary because of venue requirements) to bring charges against Hunter Biden.  One of them refused to tell the Committee why he declined to partner, and the other refused to answer specific questions about the materials he reviewed before making his decision.  Daly and Morgan either personally interacted with

these U.S. Attorney's Offices or have knowledge of the prosecution team's interactions with them and can thus shed light on whether political interference played a role in these decisions.

10.     Daly and Morgan may share this information with the Committee—indeed, they have a legal obligation to do so.  Other witnesses who have refused to answer the Committee's questions about many critical issues have generally claimed that they are unable to discuss those topics because they implicate an ongoing investigation.  But such an assertion is not grounded in law or fact.  Among other things, there is no ongoing-investigation privilege that permits witnesses to refuse to answer questions from Congress.

11.     In sum, the failure of Daly and Morgan to comply with their respective Subpoenas is impeding the Committee's impeachment inquiry and its oversight of DOJ's handling of the Hunter Biden investigation, matters of significant public concern.  The Executive Branch's purported reasons for frustrating this investigation lack merit, and the Committee asks this Court to compel both Daly and Morgan to appear before the Committee and to testify about the decision to allow the statute of limitations to lapse and the failure of two U.S. Attorneys (appointed by President Biden) to partner with the Hunter Biden prosecution team.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction pursuant to 28 U.S.C. § 1331.  This case arises under Article I of the Constitution of the United States and implicates Article I, Section 1, which vests "[a]ll legislative Powers" in the Congress of the United States, and Article 1, Section 2, Clause 5, which provides the House of Representatives with "the sole Power of Impeachment."

13.     This Court has authority to issue a declaratory judgment and order other just and proper relief pursuant to 28 U.S.C. §§ 2201(a) and 2202.

14.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and 1391(e)(1).

## PARTIES

15.     Plaintiff Committee on the Judiciary of the United States House of Representatives is a standing committee of the House that, among other duties, conducts oversight of DOJ.

16.     Defendant Mark Daly serves as a Senior Litigation Counsel in DOJ's Tax Division.

17.     Defendant Jack Morgan served as a Trial Attorney in DOJ's Tax Division.  He currently serves as an Assistant U.S. Attorney in the United States Attorney's Office for the Eastern District of Virginia.

## ALLEGATIONS

**I.     The Committee's constitutional authority to conduct investigations, including an impeachment inquiry, and to issue subpoenas to advance its investigations**

18.     Article I of the Constitution vests Congress with "[a]ll legislative Powers."[6] Those powers include the authority to investigate matters relating to subjects within its broad legislative purview; conduct oversight of Executive Branch agencies; examine whether Executive Branch agencies are faithfully, effectively, and efficiently executing the laws; and determine whether changes to federal law are necessary and proper.  For nearly a century, the Supreme Court has recognized that the Constitution vests the House with the "power of inquiry—with process to enforce it"—commensurate with the House's Article I legislative authority to investigate any subject on which "legislation could be had."[7]

---

[6] U.S. Const. art. I, § 1, cl. 1.

[7] *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927).

19.     The Constitution commits to each chamber of Congress the authority to "determine the Rules of its Proceedings."[8]  Pursuant to this authority, the 118th House of Representatives adopted the Rules of the House of Representatives (House Rules) to govern itself during the current Congress.[9]  The House Rules establish various standing committees, including the Judiciary Committee, and delegate to each committee "jurisdiction and related functions."[10]

20.     The Judiciary Committee's legislative and oversight jurisdiction includes, among other subjects, "judicial proceedings, civil and criminal," as well as "[c]riminal law enforcement and criminalization."[11]  Thus, the Judiciary Committee exercises jurisdiction (among other matters) over legislation relating to criminal proceedings and law enforcement matters.[12]  The House Rules further mandate that "[a]ll bills, resolutions, and other matters relating to" subjects within the Judiciary Committee's jurisdiction be referred to the Judiciary Committee for its consideration.[13]

---

[8] U.S. Const. art. I, § 5, cl. 2.

[9] *See* H. Res. 5, 118th Cong. § 1 (2023) (adopting House Rules for the 118th Congress), https://perma.cc/28AM-XD4R; *see also* House Rules, 118th Congress (Jan. 10, 2023), https://perma.cc/3UX4-2YG5.

[10] House Rule X.1.

[11] House Rule X.1(*l*)(1), (7).

[12] For example, the Committee previously worked on the First Step Act, *see generally* H. Rep. No. 115-699 (2018) (reporting H.R. 5682, the First Step Act, favorably to the House), https://perma.cc/5HJ9-2ENX, and as part of that law, Congress requires "the Attorney General [to] submit a report to the Committees on the Judiciary of the Senate and the House of Representatives" on an annual basis assessing various metrics on how well the law is being implemented, *see* 18 U.S.C. § 3634.

[13] House Rule X.1.

21.     As a standing committee, the Judiciary Committee also has "general oversight responsibilities," including regarding the "operation of Federal agencies and entities" within its areas of jurisdiction.[14]  As such, the Judiciary Committee exercises oversight of the structure and functions of DOJ.[15]  Among other responsibilities, the Judiciary Committee is charged with reviewing "on a continuing basis … the application, administration, execution, and effectiveness of laws and programs … within its jurisdiction."[16]  The Judiciary Committee must determine whether such laws are being "implemented and carried out in accordance with the intent of Congress" and if there are "any conditions or circumstances that may indicate the necessity or desirability of enacting new or additional legislation."[17]

22.     The House Rules empower all standing committees, including the Judiciary Committee, to "conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities" over matters within its jurisdiction.[18]  To aid these inquiries, the Judiciary Committee, like all standing committees, is authorized to issue subpoenas for testimony and documents.[19]

---

[14] House Rule X.2(a), (b)(1)(B).

[15] *See, e.g., Oversight of DOJ: Hearing Before the H. Comm. on the Judiciary*, 118th Cong. (Sept. 20, 2023) (oversight hearing conducted with Attorney General Merrick Garland appearing as a witness), https://perma.cc/3UQU-WW3H.

[16] House Rule X.2(b)(1)(A).

[17] House Rule X.2(b)(1)(C).

[18] House Rule XI.1(b)(1).

[19] *See* House Rule XI.2(m)(1)(B), (3)(A)(i); *see also* Rule IV(a), Rules of the Committee on the Judiciary of the U.S. House of Representatives, 118th Cong. (2023) (Judiciary Committee Rules) ("A subpoena may be authorized and issued by the Chair, in accordance with clause 2(m) of rule XI of the House of Representatives, in the conduct of any investigation or activity or

23.     Separate from Congress's legislative authority, the power of impeachment is textually committed by the Constitution to the House and the House alone.[20]  This power is far-reaching.  Indeed, in "an impeachment investigation involving the President of the United States[,] [i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information."[21]  Even prior presidents have admitted that an impeachment inquiry "would penetrate into the most secret recesses of the Executive Departments" and would include the authority to "command the attendance of any and every agent of the Government, and compel them to produce all papers, public or private, official or unofficial, and to testify on oath to all facts within their knowledge."[22]

24.     The Committee's jurisdiction includes impeachment.[23]  Resolutions that call for impeachment of eligible officials are normally referred by the Speaker of the House to the

---

series of investigations or activities within the jurisdiction of the Committee, following consultation with the Ranking Minority Member."), https://perma.cc/6UUS-LYEH.

[20] U.S. Const. art. I, § 2, cl. 5 ("The House of Representatives … shall have the sole power of impeachment.").

[21] *In re Rep. & Recommendation of June 5, 1972*, 370 F. Supp. 1219, 1230 (D.D.C. 1974).

[22] 4 J. Richardson, *A Compilation of the Messages and Papers of the Presidents*, H. Misc. Doc. 53-210, at 434 (1897) (statement of President James K. Polk), https://perma.cc/82XR-DWJ2.

[23] *Constitution, Jefferson's Manual, and Rules of the House of Representatives of the United States*, H. Doc. 117-161, § 605, at 329 (2023) ("[R]esolutions … that directly call for the impeachment of an officer have been referred to the Committee on the Judiciary …."), https://perma.cc/6JDB-H6C3.  As *Jefferson's Manual* explains, "[i]n the House various events have been credited with setting an impeachment in motion," including "charges made on the floor;" "a resolution introduced by a Member and referred to a committee;" or "facts developed and reported by an investigating committee of the House."  *Id.* § 603, at 327.

Committee[24] and are eligible for consideration pursuant to applicable House and Committee Rules.[25]

     25.     On September 12, 2023, Speaker Kevin McCarthy directed the Judiciary Committee, among other committees, to open a formal impeachment inquiry into President Joseph Biden.[26]  The scope of the inquiry includes whether President Biden obstructed DOJ's investigation of his son, Hunter Biden.[27]  On December 13, 2023, the House adopted House Resolution 918,[28] which directs three committees, including the Judiciary Committee, "to continue their ongoing investigations as part of the House of Representatives inquiry into whether sufficient grounds exist for the House of Representatives to exercise its Constitutional power to impeach Joseph Biden, President of the United States of America."[29]  The full House has also confirmed that the Committee has the "authority to issue subpoenas … [to] further[] the

---

[24] *See, e.g.*, 169 Cong. Rec. H2809 (daily ed. June 12, 2023) (referring to the Judiciary Committee House Resolution 493, setting forth articles of impeachment against President Biden), https://perma.cc/CA8S-BXDJ; 169 Cong. Rec. H4181 (daily ed. Aug. 11, 2023) (referring to the Judiciary Committee House Resolution 652, setting forth articles of impeachment against President Biden), https://perma.cc/8GM8-JXBF; 162 Cong. Rec. H4926 (daily ed. July 13, 2016) (referring to the Judiciary Committee House Resolution 828, setting forth articles of impeachment against John Andrew Koskinen, Commissioner of the IRS), https://perma.cc/D22N-YEMN; 133 Cong. Rec. 6522 (1987) (referring to the Judiciary Committee House Resolution 128, setting forth articles of impeachment against Judge Alcee Hastings), https://perma.cc/TV7V-JXVK.

[25] *See* House Rule XI.2(b), (c)(1); *see also* Judiciary Committee Rule II(c).

[26] Memorandum from Rep. James Comer, Chairman, H. Comm. on Oversight & Accountability, et al., to Members of the H. Comm. on Oversight & Accountability, et al., at 2 (Sept. 27, 2023) (Impeachment Memorandum) (attached as Ex. F).

[27] *See id.* at 21-29.

[28] 169 Cong. Rec. H6922-23 (daily ed. Dec. 13, 2023), https://perma.cc/ATQ9-27VV.

[29] H. Res. 918, 118th Cong. (2023), https://perma.cc/69QX-U332.

impeachment inquiry."[30]  This sequence of events is consistent with other impeachment investigations.  In 1973, for example, the Judiciary Committee "began the 'preliminary phases of an inquiry into [the] possible impeachment' of President Richard Nixon months before" the House voted to authorize such an inquiry by the Committee.[31]

26.     In sum, the Judiciary Committee has plenary authority—under its constitutional authority to conduct legislative oversight and an impeachment inquiry—to investigate DOJ's handling of the investigation and prosecution of Hunter Biden, including whether President Biden abused his power to interfere with that investigation, and to compel Defendants Daly and Morgan to appear and provide testimony.

## II.     The Judiciary Committee's investigation into DOJ's handling of the Hunter Biden case

27.     DOJ's central mission is to "uphold the rule of law, to keep our country safe, and to protect civil rights," "without prejudice or improper influence."[32]  Despite this clear dictate, the Committee has uncovered troubling information that DOJ officials have impeded, delayed, and obstructed the criminal investigation of Hunter Biden in an unusual manner.[33]  Worse yet, President Biden himself has repeatedly weighed in on the subject of his son's investigation while

---

[30] *Id.* § 6 (adopting House Resolution 917); H. Res. 917, 118th Cong. § 2 (2023) (confirming subpoena authority), https://perma.cc/B3JT-WEZT.

[31] Todd Garvey, Cong. Rsch. Serv., LSB11051, *Legal Issues in Impeachment Investigations, Part I: Authorization* 2 (2023) (alteration in original).  *See also* H. Res. 803, 93d Cong. (1974) (instructing the Judiciary Committee to investigate grounds for impeachment against President Nixon).

[32] *Our Mission*, DOJ (last visited Mar. 12, 2024), https://perma.cc/3V5Z-QSW4.

[33] *See generally* Staff of the Comm. on the Judiciary, et al., 118th Cong., *Interim Staff Report: The Justice Department's Deviations from Standard Processes in Its Investigation of Hunter Biden* (2023) (Interim Staff Report) (attached as Ex. G).

serving as President, raising the specter that he has abused his power as the head of the Executive Branch to influence the decisions of DOJ, an Executive Branch agency under his control.[34]

A. **IRS whistleblowers expose irregularities that suggest DOJ gave Hunter Biden preferential treatment and raise concerns about potential political interference**

28.    The investigation of Hunter Biden began in November 2018 when the IRS opened an investigation into potential tax crimes arising out of his business dealings and spending habits after bank reports and public reporting showed that he was living "lavishly" while also owing a "substantial tax debt."[35]  The IRS investigation was then followed by a Federal Bureau of Investigation (FBI) inquiry in 2019, which was subsequently merged with the IRS investigation.[36]

29.    In April and May 2023, two IRS whistleblowers voluntarily appeared for interviews before the House Committee on Ways and Means, and then testified publicly at a hearing before the House Committee on Oversight and Accountability (Oversight Committee).[37] Both whistleblowers were intimately involved in the Hunter Biden investigation.  One was the agent who opened the investigation and served as the lead IRS agent.[38]  The other was the lead

---

[34] *Id.* at 56-57.

[35] *Id.* at 5.

[36] *Id.*

[37] *See supra* note 2.

[38] Ex. G (Interim Staff Report) at 6.

agent's supervisor on the investigation.[39]  Both testified about their grave concerns over DOJ's

conduct of the investigation, including DOJ's apparent preferential treatment of Hunter Biden.[40]

30.     Specifically, both whistleblowers identified numerous DOJ deviations from

normal investigative and prosecutorial protocols, such as allowing the statute of limitations to

lapse on certain felony tax charges despite defense counsel's willingness to enter into an

agreement to toll the statute of limitations for those charges, prohibiting investigators from

referring to or asking about President Biden during witness interviews, withholding evidence

from investigators, excluding investigators from meetings with the defense team, and tipping off

the defense team about anticipated search warrants.[41]  This testimony raised substantial concerns

that political interference may have obstructed DOJ's investigation of Hunter Biden.

**B.     The Committee's investigation of DOJ's commitment to impartial justice and
its inquiry into whether President Biden committed an impeachable offense
by meddling in DOJ's investigation of his son**

31.     During almost the entirety of the 118th Congress, the Committee has been

investigating DOJ's commitment to impartial justice, and it has focused especially on DOJ's

handling of the Hunter Biden investigation.

32.     Under House Rules, the Committee has legislative and oversight jurisdiction over

"[c]riminal law enforcement" as well as civil and criminal judicial proceedings.[42]  And DOJ's

handling of the Hunter Biden investigation has highlighted the potential need for several

legislative reforms.  For example, as part of the Committee's investigation, it is considering these

---

[39] *Id.*

[40] *See generally* Ex. C (Shapley Interview); Ex. D (Ziegler Interview).

[41] *See generally* Ex. G (Interim Staff Report).

[42] House Rule X.1(*l*)(1), (7).

legislative proposals: "reforming the 'special attorney' statute, codifying the special counsel regulations, reforming the Tax Division of [DOJ] and its interactions with the IRS, and expanding the ability of the IRS, including whistleblowers, to share certain tax information with Congress."[43]

33.     Even before the IRS whistleblowers came forward, the Committee was concerned that the DOJ criminal investigation of Hunter Biden was not being led by a special counsel. Besides the appearance of impropriety, without the appointment of a special counsel, such an investigation ran the risk of an actual conflict of interest given that important decisions regarding the possible prosecution of President Biden's son would be made by officials who answer to and serve at the pleasure of the President.  Consequently, on February 28, 2023, the Committee sent a letter to DOJ requesting documents that would shed light on why Attorney General Merrick Garland had not appointed a special counsel to oversee the Hunter Biden investigation.[44]

34.     In the summer of 2023, the Committee's investigation had become focused more specifically on how, exactly, DOJ was handling the Hunter Biden matter.  By that point, the IRS whistleblower testimony had "raise[d] serious questions about the Department's commitment to evenhanded justice."[45]  And DOJ's willingness to offer Hunter Biden an "atypical" plea and diversion agreement, which ultimately fell apart, "raise[d] serious concerns … that [DOJ] ha[d]

---

[43] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ, at 1-2 (July 21, 2023) (Garland July 21, 2023 Letter) (attached as Ex. H).

[44] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick Garland, Att'y Gen., DOJ, at 1-2 (Feb. 28, 2023) (attached as Ex. I).

[45] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ, at 1 (June 29, 2023) (Garland June 29, 2023 Letter) (attached as Ex. J).

provided preferential treatment toward Mr. Biden in the course of its investigation and proposed resolution of his alleged criminal conduct."[46]

35.     Under the deal that DOJ offered Hunter Biden, he would have pled guilty to only two misdemeanor counts of failing to pay taxes, and DOJ would have dismissed a separate charge that alleged Hunter Biden had unlawfully possessed a firearm, so long as he complied with certain conditions for two years (a diversion agreement).[47]

36.     Beyond simply giving Hunter Biden immunity from the gun charge, the diversion agreement also would have given him immunity for any crimes associated with conduct completely unrelated to the gun charge.[48]  At the hearing on the diversion and plea agreements, when the judge asked the prosecutor whether he "ha[d] any precedent for agreeing not to prosecute crimes that have nothing to do with the case or the charges being diverted," the prosecutor said that he was "not aware of any."[49]

37.     Beyond that, if the government ever believed that Hunter Biden violated the terms of the diversion agreement, DOJ could not bring charges unless the judge herself concluded there had been a breach.[50]  Typically, however, DOJ can bring charges anytime it believes a criminal defendant has violated a diversion agreement, without first getting a determination from a

---

[46] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al., to Merrick Garland, Att'y Gen., DOJ, at 1, 4 (July 31, 2023) (Garland July 31, 2023 Letter) (attached as Ex. K).

[47] Ex. E (Transcript of July 26, 2023 Hearing) at 4, 6.

[48] *See id.* at 46.

[49] *Id.*

[50] *Id.* at 92-93.

judge.[51]  The judge questioned whether such a provision—which "puts [the Judicial Branch] in the middle of a decision as to whether to bring a charge," a decision that belongs to the Executive Branch—was even constitutional.[52]  The judge again asked the prosecutor about precedent for this sort of provision, and, to use her words, "I asked if there is any precedent for this, I was told no.  I was asked if there is any authority for this, I was told no."[53]

38.     As the Committee explained, taking these two provisions together, DOJ "shifted a broad immunity provision, which benefits Mr. Biden, from the plea agreement to the pretrial diversion agreement apparently to prevent the District Court from being able to scrutinize and reject that immunity provision.  And then, [DOJ] has benefitted Mr. Biden by giving up its unilateral ability to bring charges against him if it concludes that he has breached the pretrial diversion agreement."[54]  To make matters worse, this one-of-its-kind deal apparently came after DOJ initially decided not to bring charges at all, a position that DOJ changed around the same that the IRS whistleblowers came forward.[55]  The plea and diversion agreements ultimately fell apart after questioning from the judge overseeing the matter exposed that the two sides disagreed

---

[51] *See* Ex. K (Garland July 31, 2023 Letter) at 1.

[52] Ex. E (Transcript of July 26, 2023 Hearing) at 95.

[53] *Id.* at 103.

[54] *See* Ex. K (Garland July 31, 2023 Letter) at 3.  The plea and diversion agreement ultimately fell apart, and the prosecution is ongoing.

[55] *See* Michael S. Schmidt et al., *Inside the Collapse of Hunter Biden's Plea Deal*, N.Y. Times (Aug. 19, 2023), https://www.nytimes.com/2023/08/19/us/politics/inside-hunter-biden-plea-deal.html (attached as Ex. L).

on the meaning of the diversion agreement's immunity provision.[56]  Hunter Biden and DOJ were

ultimately unable to reach an agreement, and the prosecution is ongoing.[57]

39.    By the fall of 2023, the Committee's investigation into DOJ's handling of the

Hunter Biden matter became part of a broader impeachment inquiry into President Biden.  After

Speaker McCarthy directed the Judiciary Committee (and others) "to open a formal

impeachment inquiry into" the President, the relevant committees released an Impeachment

Memorandum on September 27, 2023, that, among other things, outlined the scope of the

impeachment inquiry.[58]

40.    The Impeachment Memorandum explained that the inquiry was examining, as

relevant here, whether "Joe Biden abuse[d] his power as President to impede, obstruct, or

otherwise hinder investigations (including Congressional investigations) or the prosecution of

Hunter Biden."[59]  The Impeachment Memorandum further discussed the troubled DOJ

investigation of Hunter Biden, and set forth how President Biden has made repeated public

statements about his son's innocence while serving as President, such as when he told a reporter

in May 2023 that "my son has done nothing wrong."[60]  These statements  "could represent

---

[56] *See id.*

[57] *See, e.g.*, Sara Dorn, *Hunter Biden Claims DOJ Backtracked On Plea Deal*, Forbes (Aug. 14, 2023, 12:13 PM), https://perma.cc/XJ68-NMD4; Lindsay Whitehurst & Claudia Lauer, *Hunter Biden pleads not guilty to gun charges after plea deal fails*, PBS (Oct. 3, 2023, 10:38 AM), https://www.pbs.org/newshour/politics/hunter-biden-pleads-not-guilty-to-gun-charges-after-plea-deal-fails (attached as Ex. M).

[58] Ex. F (Impeachment Memorandum) at 2.

[59] *See id.* at 29.

[60] *Id.* at 26-27.

attempts to use the authority of his office to influence the Department's actions and decision-making in the criminal investigation of his son."[61]

41.     The full House ultimately formalized the impeachment inquiry by adopting House Resolution 918.[62]  It directs the Committee to continue its "ongoing" inquiry into whether sufficient grounds, including those "set forth in the" September 27, 2023 Impeachment Memorandum, exist to impeach President Biden.[63]

42.     Thus, at this point, the Committee's investigation is not only considering the need for legislative reforms; it serves the dual purpose of determining whether President Biden has committed an impeachable offense by attempting to obstruct directly or indirectly the criminal investigation of his son.[64]

43.     Congress must understand the full extent of any wrongdoing in connection with DOJ's handling of the Hunter Biden investigation before it can determine whether legislative proposals are necessary, and if so, the nature of any required legislative reforms, or whether President Biden has committed an impeachable offense.  Indeed, as the Supreme Court has explained, "[a] legislative body cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."[65]

---

[61] *See id.* at 29.

[62] *See* 169 Cong. Rec. H6922-23.

[63] *See* H. Res. 918, 118th Cong. (2023).

[64] *See* Ex. F (Impeachment Memorandum) at 21.

[65] *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (alteration in original) (quoting *McGrain*, 273 U.S. at 175).

Additionally, "[i]mpeachment based on anything less than all relevant evidence would compromise the public's faith in the process."[66]

44.     Although the Executive Branch has attempted to shield much of its investigation into Hunter Biden from the Committee's oversight, the Committee has worked diligently to understand DOJ's handling of the Hunter Biden case.

45.     The Committee has released a nearly eighty-page interim staff report that documents the status of the investigation.  Thus far, the Committee's investigation has revealed serious deviations from standard DOJ protocol even beyond the flawed plea and diversion deal.[67] It has also uncovered information that raises questions about potential political interference.

46.     For example, witness testimony and documents reveal how DOJ slow-walked the investigation by requiring unprecedented higher-level approvals for basic investigatory tasks, such as requiring approvals from seventeen different officials every thirty days to even continue the assignment of vetting certain information that was being provided to DOJ and related to Hunter Biden.[68]  And one whistleblower noted that "every single time the process could be bogged down by deferring to some other approval level, [DOJ's Tax Division] took full advantage of that."[69]

47.     DOJ also prevented investigators from pursuing promising leads and interviewing crucial witnesses.  For example, DOJ did not allow investigators to interview Hunter Biden's adult children because, according to DOJ, "they would be in 'hot water' if they interviewed 'the

---

[66] *In re Application of Comm. on Judiciary*, 414 F. Supp. 3d 129, 176 (D.D.C. 2019).

[67] *See generally* Ex. G (Interim Staff Report).

[68] *Id.* at 2, 30, 68-69.

[69] Ex. C (Shapley Interview) at 59.

President's grandchildren,'" even though investigators determined that Hunter Biden had impermissibly taken tax deductions for payments he made to his adult children.[70]  Both IRS whistleblowers stated that they were unable to get a search warrant for a guest-house of then-candidate Joseph Biden, even though Hunter Biden often stayed there and DOJ prosecutors admitted that there was more than enough probable cause to believe that evidence would be found there.[71]

48.     DOJ even withheld crucial information from investigators and sought to cabin the investigation.  For example, the U.S. Attorney's Office for the Western District of Pennsylvania was tasked with vetting information provided to DOJ not only about corruption in Ukraine generally, but also Hunter Biden and his role on the board of Burisma, a Ukrainian company that was under investigation for corruption.[72]  The Hunter Biden prosecution team did not share with that office the fact that it had Hunter Biden's laptop, which contained information regarding Hunter Biden's activities on the board of Burisma, in its possession.[73]  That office only learned of the laptop's existence through media reports.[74]  Additionally, the Hunter Biden prosecution team did not even share information internally: the FBI withheld the contents of Hunter Biden's laptop and hard drive from IRS agents working on the same investigation, even though they notified the IRS that those devices contained evidence of tax crimes.[75]

---

[70] Ex. G (Interim Staff Report) at 29 (citations omitted).

[71] *Id.* at 27.

[72] *Id.* at 16, 19-20.

[73] *Id.* at 19-20.

[74] *Id.*

[75] *Id.* at 5.

49.     In perhaps the biggest variations from investigative protocol, DOJ tipped off defense counsel about potential search warrants and allowed the statute of limitations on charges to lapse.  Both IRS whistleblowers testified that they had sought a search warrant for a storage unit owned by Hunter Biden that could have contained incriminating evidence.[76]  However, before they were able to secure a warrant, Daly and another prosecutor told Hunter Biden's lawyers about the investigators' plan to search the storage unit, thus permitting him a chance to remove any evidence from that unit.[77]  Both whistleblowers also testified that DOJ allowed the statute of limitations to lapse for the 2014 and 2015 tax years notwithstanding a willingness on the part of the defense team to execute a tolling agreement.[78]

50.     President Biden's political appointees appear to have frustrated DOJ's ability to bring tax charges against Hunter Biden, including charges related to the 2014 and 2015 tax years, which reinforces the concern that political interference may have impeded DOJ's investigation.  Such criminal charges must be filed in the judicial district where the defendant resides or where the tax return is prepared or filed.[79]  This meant that charges against Hunter Biden related to the 2014 and 2015 tax years would have needed to be filed in the District of Columbia, where

---

[76] *Id.* at 27-28.

[77] *Id.*

[78] *Id.* at 31-35.

[79] Under the federal criminal venue statute, "any offense … begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a). That means for the tax offenses relevant to Hunter Biden, that is, 26 U.S.C. § 7201 (tax evasion), § 7203 (failure to file or pay a return), and § 7206(1) (filing a false return), venue is proper in any district where the return was, or should have been, prepared or filed.  *See generally* Tax Div., DOJ, *Criminal Tax Manual* § 6.2 (2022), https://perma.cc/DC8Y-M7XP.

Hunter Biden lived until 2017, and for later years, in the Central District of California, where Hunter Biden moved in 2017.[80]

51.    The lead prosecutor assigned to the case is David Weiss, the U.S. Attorney for the District of Delaware.  Before his appointment as Special Counsel on August 11, 2023, Weiss could not have filed charges outside of his district and would have needed to partner with Matthew Graves, the U.S. Attorney for the District of Columbia, and/or Martin Estrada, the U.S. Attorney for the Central District of California, to bring charges against Hunter Biden in those districts.[81]  In February or March 2022, and August 2022, Weiss approached Graves and then-Acting U.S. Attorney Stephanie Christensen (whom Estrada succeeded when he was confirmed in September 2022), respectively, to ask them to partner with him to bring charges against Hunter Biden in their respective districts.[82]  But Graves and Estrada declined to partner with Weiss and his team,[83] notwithstanding Attorney General Garland's public claim that Weiss "would have the necessary authority [to bring charges in any district] and that no U.S. attorney could block him."[84]  Both of these U.S. Attorneys were appointed by President Biden, thus raising questions about whether political interference played a role in their decisions not to partner with Weiss and his team.

---

[80] *See* Ex. C (Shapley Interview) at 100.

[81]  Weiss has had the authority to file charges in districts outside the District of Delaware since he was appointed to serve as a special counsel on August 11, 2023.  *See* Press Release, Off. of the Att'y Gen., *Appointment of a Special Counsel* (Aug. 11, 2023), https://perma.cc/24SD-KYJC.

[82] Ex. G (Interim Staff Report) at 44-49.

[83] *Id.*

[84] Transcript of Testimony of Merrick Garland, Att'y Gen., DOJ (Sept. 20, 2023), https://perma.cc/M7CW-VEGQ.

52.     The U.S. Attorney for the District of Columbia's decision not to partner with Weiss to bring charges related to the tax years 2014 and 2015 is especially concerning. According to one of the IRS whistleblowers, prosecutors initially supported charging Hunter Biden for tax offenses related to those years, and DOJ's Tax Division authored an extensive prosecution memo recommending as such.[85]  According to one of the whistleblowers, Tax Division representatives, including Daly, presented the memorandum to the U.S. Attorney's Office for the District of Columbia in March 2022;[86] Daly reported that the first assistant in that office, a non-presidentially-appointed (presumably career) prosecutor, was optimistic about bringing charges and stated she would assign a prosecutor to assist.[87]  However, just a couple of days later, Daly told the other IRS whistleblower that U.S. Attorney Graves had personally reviewed the report and indicated that he did not support the charges or the investigation as a whole and would not allow charges to proceed in his district.[88]  When the Committee asked Graves himself about this incident, he told a different story.  According to Graves, he relied on a recommendation from his team and never reviewed the relevant materials himself.[89]  Following Graves's decision, the statute of limitations related to tax years 2014 and 2015 ended up lapsing notwithstanding defense counsel's willingness to enter into a tolling agreement.[90]

---

[85] Ex. C (Shapley Interview) at 23-25.

[86] *Id.* at 24.

[87] *Id.*

[88] *Id.* at 24.

[89] Ex. G (Interim Staff Report) at 47.

[90] *See id.* at 33.

53.     Although the Committee has now uncovered examples of how DOJ seemingly operated by different rules during the Hunter Biden investigation, it must still determine what motivated DOJ's irregular conduct and whether the legal and organizational framework in place facilitated unequal treatment under the law.  Indeed, to effectively craft legislative solutions to prevent future abuse or maladministration, the Committee must understand how the current framework failed.  And to uncover whether President Biden was involved directly or indirectly, and whether he may have committed an impeachable offense, the Committee must understand exactly why DOJ decided to deviate from its standard protocols.  Likewise, the Committee must understand whether political interference played any role in the investigation, including the refusal of two U.S. Attorneys—whom President Biden appointed—to partner with the Hunter Biden prosecution team and the decision to let the statute of limitations for charges involving the tax years 2014 and 2015 lapse.  To do this, the Committee requires testimony from witnesses with firsthand knowledge of DOJ's investigation; Daly and Morgan, who were assigned to DOJ's investigative team, have information the Committee needs.

**C.      Daly and Morgan were assigned to the team that was tasked with investigating Hunter Biden and thus have firsthand knowledge that is critical to the Committee's investigation**

54.     The Tax Division of DOJ handles all criminal proceedings "arising under the internal revenue laws."[91]  "The Tax Division must approve any and all criminal charges that a United States Attorney's Office intends to bring against a defendant for conduct arising under the internal revenue laws, regardless of which criminal statute(s) the United States Attorney's Office proposes to use in charging the defendant."[92]  Presumably because of these requirements, the Tax

---

[91] 28 C.F.R. § 0.70.

[92] DOJ, *Justice Manual* § 6-4.200 (2018), https://perma.cc/9A99-RH9H.

Division was, and is, closely involved with the Hunter Biden investigation, which deals with tax-related crimes.  As a result, Daly, a Tax Division Senior Litigation Counsel, and Morgan, then a Tax Division Trial Attorney, were assigned to work on the Hunter Biden matter.[93]

55.    Based on the information the Committee has developed to date, Daly and Morgan have "knowledge of the day-to-day operation of the Hunter Biden investigation [that] is critical to" its investigation.[94]

56.    For example, both were present at an October 2021 "tax summit" where all the prosecutors, including Daly and Morgan themselves, agreed to move forward with generating a prosecution memorandum that would recommend charges against Hunter Biden for tax years 2014 to 2019, with felony charges for 2014 and 2018.[95]  In line with this agreement, the IRS finalized a Special Agent Report on January 27, 2022, which recommended charges for 2014 to 2019.[96]  Prosecutors, including Daly, agreed with the report's recommendation.[97]   However, in an apparently abrupt about-face, Daly and Morgan then gave a presentation on June 15, 2022, arguing that Hunter Biden should *not* be charged for the 2014 and 2015 tax years, the same tax years for which DOJ ultimately allowed the statute of limitations to lapse without bringing charges.[98]

---

[93] Ex. C (Shapley Interview) at 36; Ex. D (Ziegler Interview) at 134.

[94] Ex. G (Interim Staff Report) at 75.

[95] Ex. D (Ziegler Interview) at 32-33.

[96] Ex. C (Shapley Interview) at 42-43.

[97] *Id.* at 43.

[98] Ex. G (Interim Staff Report) at 33 (citing Ex. D (Ziegler Interview) at 160, 164).

57.     The Committee intends to ask Daly and Morgan about these decisions, including why they initially agreed with bringing charges for the 2014 and 2015 tax years, why they then reversed their opinion just a few months later, what additional (if any) information they received that changed their minds, and whether they were in any way pressured to change their views by other people inside or outside of DOJ, and if so, by whom.

58.     Moreover, Morgan told one IRS whistleblower that the investigation was "not a typical case" due to it involving Hunter Biden, raising the specter that Morgan gave Hunter Biden preferential treatment.[99]

59.     The Committee intends to ask Morgan about his statement.  For example, Morgan can explain whether he treated the case differently, including by applying the law to the facts in a way that he would not in a run-of-the-mill case.  Morgan can also shed light on whether he arrived at this view on his own or was influenced or directed by someone else.  The Committee also intends to ask if the Hunter Biden investigation was handled differently than other investigations within the Tax Division, such as there being additional reviews by superiors that are not present in other investigations.

60.     Daly's behavior, according to one whistleblower, is even more suspicious: he flat out told Hunter Biden's counsel about potential plans for searching a storage unit and thus ruined any chance of getting valuable evidence from that unit.[100]

61.     The Committee intends to ask Daly about his decision, including why he tipped off Hunter Biden's counsel, what he intended to accomplish by doing so, whether he came to this decision on his own or was influenced by others, and if so, by whom, whether he discussed his

---

[99] *Id.* at 32 (citing Ex. C (Shapley Interview) at 59).

[100] *Id.* at 28 (citing Ex. C (Shapley Interview) at 21); Ex. D (Ziegler Interview) at 28.

decision with others, and if so, whom, and whether this is something that typically happens in criminal investigations.

62.     Daly also has unique insight into the decision to let the statute of limitations for the 2014 and 2015 tax charges lapse.  As discussed above, according to one of the IRS whistleblowers, Daly was part of the team of prosecutors that participated in a March 2022 meeting with the U.S. Attorney's Office for the District of Columbia.  During that meeting, the Hunter Biden prosecutors discussed partnering with the U.S. Attorney's Office for the District of Columbia to prosecute the 2014 and 2015 tax offenses.[101]  After the meeting, Daly called the other IRS whistleblower and informed him that the first assistant at the U.S. Attorney's Office for the District of Columbia was optimistic about moving forward and would be assigning a prosecutor to assist.[102]  However, Daly called the other IRS whistleblower just a few days later to tell him that U.S. Attorney Graves had personally reviewed the relevant materials and did not support bringing any charges.[103]

63.     The Committee intends to ask Daly about his participation in the March 2022 meeting with the U.S. Attorney's Office for the District of Columbia.  Specifically, the Committee intends to ask, among other things, whether the first assistant in that office informed Daly that she would be assigning a prosecutor to assist the Hunter Biden prosecution team, what other matters were discussed at the meeting, whether Graves was present at that meeting, and if so, what he said and how he reacted to the presentation, what materials Graves reviewed as part of that presentation, how Daly heard a few days later that Graves did not support bringing

---

[101] Ex. C (Shapley Interview) at 24.

[102] *Id.*

[103] *Id.*; *see also* Ex. D (Ziegler Interview) at 36, 153.

charges against Hunter Biden, and Daly's view as to why Graves decided not to partner with Weiss to bring charges against Hunter Biden in the District of Columbia.

64.    The Committee also intends to question Daly about his interactions with the U.S. Attorney's Office for the Central District of California.  According to one of the IRS whistleblowers, Daly gave a presentation to that office about bringing charges against Hunter Biden for the 2016 through 2019 tax years.[104]  However, that presentation did not happen until mid-September 2022.[105]  The Committee intends to question Daly about his presentation, including what he presented and discussed with that office, and what caused the delay in approaching that office as compared to when prosecutors discussed bringing charges with the U.S. Attorney's Office for the District of Columbia.

65.    The Committee's investigation raises serious questions about how DOJ conducted, and continues to conduct, its investigation of the President's son.  Daly and Morgan have firsthand knowledge of many of the potential improprieties that occurred during DOJ's investigation of Hunter Biden because they engaged in and/or directly observed those alleged improprieties.  They are therefore uniquely positioned to aid the Committee's investigation, and the Committee must obtain their testimony.

66.    The Committee has attempted to get this information from other sources but has been unable to do so.  For example, the Committee interviewed Weiss, the special counsel DOJ appointed to oversee the Hunter Biden matter after the plea agreement collapsed in August 2023. But he "declined to answer a host of questions about decisions he has made during the

---

[104] Suppl. Produc. of Gary Shapley, Supervisory Special Agent, IRS (Sept. 22, 2022) (attached as Ex. N).

[105] *Id.*

investigation," including why DOJ permitted the statute of limitations to lapse for charges related to tax years 2014 and 2015.[106]  Weiss told the Committee he would address many of the questions in a report that he is legally required to write *after* the investigation concludes.[107]

67.    The Committee also interviewed Lesley Wolf, a former senior member of the prosecution team, but she too "refused to answer most of the [C]ommittee's questions."[108] Indeed, Wolf " testified 79 times … that she was 'not authorized' by [DOJ] to answer questions about the case."[109]  Wolf, like Weiss, refused to answer questions about DOJ permitting the statute of limitations to lapse for charges related to tax years 2014 and 2015.

68.    The Committee has also interviewed Stuart Goldberg, the Acting Deputy Assistant Attorney General of DOJ's Tax Division, but he, unlike Daly and Morgan, was not involved in the Hunter Biden investigation on a day-to-day basis and thus lacks the familiarity that Daly and Morgan have.[110]  And although the Committee has interviewed FBI agents who worked on the investigation, they are not familiar with all of the legal issues that inform charging decisions.  For example, when the Committee asked one FBI witness about the statute of limitations expiring for charges related to 2014 and 2015, the witness said "as the FBI … I have

---

[106] *See* Betsy Woodruff Swan, *What Hunter Biden's prosecutor told Congress: Takeaways from closed-door testimony of David Weiss*, Politico (Nov. 10, 2023, 2:05 PM), https://perma.cc/4Q2X-3XBM.

[107] *See id.*

[108] *See* Rebecca Kaplan, *Prosecutor Lesley Wolf defends herself in House testimony about Hunter Biden*, NBC News (Dec. 14, 2023, 5:11 PM), https://perma.cc/84EZ-ZQRJ.

[109] Steven Nelson, *Prosecutor who allegedly shielded Joe, Hunter Biden testified 79 times she's 'not authorized' by DOJ to give answers*, N.Y. Post (Dec. 21, 2023, 9:14 PM), https://perma.cc/NQ6L-X3LY.

[110] Transcript of Interview of Stuart Goldberg, Assistant Att'y Gen., Tax Division, DOJ, at 18 (Oct. 25, 2023) (attached as Ex. O).

no general knowledge of what the IRS charges are as far as when they lapse or when they don't lapse."[111]

69.     Finally, although the Committee has interviewed Graves, the U.S. Attorney for the District of Columbia, and Estrada, the U.S. Attorney for the Central District of California, they either refused to answer the Committee's questions or gave testimony that heightened the Committee's need to hear from Daly and Morgan.

70.     For example, Graves declined to elaborate on his decision to not partner with Weiss to bring charges against Hunter Biden for tax years 2014 and 2015, citing that the investigation was ongoing.[112]  He also claimed that he did not review any of the underlying source materials related to bringing charges for the 2014 and 2015 tax years.[113]  But this is inconsistent with the testimony of the IRS whistleblower who claimed that Graves personally reviewed the prosecution memorandum before declining to bring charges.[114]  Given Graves's stonewalling and the discrepancy between his testimony and the whistleblower's, it is critical that the Committee talk with another witness, such as Daly, who, according to one of the whistleblowers, was present at the March 2022 meeting and can shed light on Graves's role in declining the charges.

---

[111] Transcript of Interview of Thomas J. Sobocinski, Special Agent in Charge, Baltimore Field Off., FBI, at 9 (Sept. 7, 2023) (attached as Ex. P).

[112] Transcript of Interview of Matthew M. Graves, U.S. Att'y for D.C., DOJ, at 24 (Oct. 3, 2023) (Graves Deposition) (attached as Ex. Q).

[113] Ex. G (Interim Staff Report) at 47.

[114] Ex. C (Shapley Interview) at 24.

71.     Estrada, when asked about his decision not to partner with Weiss to bring charges against Hunter Biden, pointed to resource constraints.[115]  But he refused to answer specific questions about the materials he reviewed.[116]  Beyond that, he would not have insight into why DOJ waited until September 2022 to approach the office about partnering to bring charges. Estrada also testified that one of his predecessors appointed prosecutors from Weiss's office to serve as Special Assistant U.S. Attorneys in the U.S. Attorney's Office for the Central District of California.[117]  If so, those prosecutors presumably could have filed charges against Hunter Biden in the Central District of California.[118]  But Estrada was unaware of how many prosecutors were appointed and when they were appointed.[119]  And Weiss did not remember any particulars about this issue.[120]  The Committee thus plans to ask Daly whether he knew about these Special Assistant U.S. Attorneys, whether they ever came up in his communications with the U.S. Attorney's Office for the Central District of California, and if they did exist, why Weiss needed to partner with Estrada to file charges against Hunter Biden in the Central District of California.

72.     In sum, Daly and Morgan have personal knowledge of information that is critical to the Committee's investigation, information the Committee has diligently tried, unfortunately without success, to obtain from other sources.

---

[115] Transcript of Interview of Esteban Martin Estrada, U.S. Att'y for Cent. Dist. of Cal., DOJ, at 33-34 (Oct. 24, 2023) (Estrada Deposition) (attached as Ex. R).

[116] *Id.* at 20, 29.

[117] *Id.* at 42.

[118] *See id.* at 42-43.

[119] *Id.* at 18.

[120] Transcript of Interview of David Weiss, Special Couns., DOJ, at 102 (Nov. 7, 2023) (Weiss Deposition) (attached as Ex. S); Ex. G (Interim Staff Report) at 49.

**D.      The Judiciary Committee's attempts to get testimony from Daly and Morgan**

73.      On June 29, 2023, the Committee sent a letter to DOJ where it sought voluntary transcribed interviews with several DOJ employees involved in the Hunter Biden investigation, including Daly and Morgan.[121]  There, the Committee explained that it "must obtain the first-hand testimony from these individuals to fully assess the serious allegations raised by these brave IRS whistleblowers."[122]

74.      A voluntary transcribed interview is one method that Congressional committees use to obtain and document oral testimony from witnesses.  Generally speaking, transcribed interviews, while still on the record, are a less formal investigative method than depositions. Unlike a person who is subpoenaed to appear for a deposition, witnesses asked to appear for a transcribed interview have no legal obligation to do so.

75.      On July 13, 2023, DOJ responded to the Committee's June 29 letter.[123]  DOJ agreed to make only Special Counsel Weiss available and failed to address the Committee's request to interview the other nine DOJ employees, including Daly and Morgan.  While DOJ's letter did not directly explain why it ignored the Committee's request to speak with the other DOJ employees, it did state that DOJ's policy is to ensure "that appropriate supervisory personnel, rather than line attorneys and agents, answer Congressional questions."[124]

---

[121] Ex. J (Garland June 29, 2023 Letter) at 1.

[122] *Id.*

[123] Letter from Carlos Uriarte, Assistant Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 13, 2023) (attached as Ex. T).

[124] *Id.* at 3-4.

76.     On July 21, 2023, the Committee wrote back to DOJ, again requesting interviews with all the "witnesses identified in [its] June 29 letter."[125]  The Committee further explained that DOJ's supposed policy of offering only supervisory personnel has no basis in precedent as DOJ "has made available non-Senate-confirmed and line-level employees for testimony to Congress in the past."[126]  Indeed, the Committee's initial letter to DOJ listed numerous line-level DOJ employees who have given testimony to Congress, going as far back as 2011.[127]

77.     While DOJ technically responded to the Committee's July 21, 2023 letter three days later, the response again entirely failed to mention, much less address, the Committee's request to interview the remaining employees.[128]

**E.     The Committee subpoenas Daly and Morgan to advance its investigation**

78.     Although DOJ eventually agreed over the summer to make a few other employees available for voluntary transcribed interviews, it did not make Daly and Morgan available. Therefore, on September 14, 2023, the Committee exercised its delegated authority and subpoenaed Daly and Morgan for depositions on September 27 and 28, 2023, respectively.[129]

---

[125] Ex. H (Garland July 21, 2023 Letter) at 3.

[126] *Id.*

[127] *See* Ex. J (Garland June 29, 2023 Letter) at 2 n.2.

[128] *See generally* Letter from Carlos Uriarte, Assistant Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 24, 2023) (attached as Ex. U).

[129] Subpoena from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Mark Daly, Senior Litig. Couns., Tax Division, DOJ (Sept. 14, 2023) (attached as Ex. V); Subpoena from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Jack Morgan, Trial Att'y, Tax Division, DOJ (Sept. 14, 2023) (attached as Ex. W).

79.     Daly and Morgan have a legal obligation to comply with their Subpoenas.[130]

80.     The cover letters that accompanied the Subpoenas noted how critical Daly's and Morgan's testimony is to the Committee's investigation because of their "first-hand" knowledge.[131]  The letters explained how Congress has "'broad and indispensable' power to conduct oversight, which 'encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys in our social, economic or political system for the purpose of enabling Congress to remedy them.'"[132]  It then explained how some of the "potential legislative reforms" it is studying include "strengthening laws protecting whistleblowers from retaliation, reforming the 'special attorney' statute, codifying the special counsel regulations, and reforming the Department's Tax Division."[133]  The Committee believes that Daly and Morgan "have unique information that is relevant and necessary to inform [its] oversight and potential legislative reforms."[134]  Among other examples, the letter explained that Daly and Morgan gave a presentation in June 2022 where they discussed why DOJ should not bring charges against

---

[130] *See, e.g.*, *Watkins v. United States*, 354 U.S. 178, 187-88 (1957) (noting the "unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigation").

[131] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Mark Daly, Senior Litig. Couns., Tax Division, DOJ, at 1 (Sept. 14, 2023) (Daly Sept. 14, 2023 Letter) (attached as Ex. X); Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Jack Morgan, Trial Att'y, Tax Division, DOJ, at 1 (Sept. 14, 2023) (Morgan Sept. 14, 2023 Letter) (attached as Ex. Y).

[132] Ex. X (Daly Sept. 14, 2023 Letter) at 2 (citation omitted); Ex. Y (Morgan Sept. 14, 2023 Letter) at 2 (citation omitted).

[133] Ex. X (Daly Sept. 14, 2023 Letter) at 2 (citations omitted); Ex. Y (Morgan Sept. 14, 2023 Letter) at 2 (citations omitted).

[134] Ex. X (Daly Sept. 14, 2023 Letter) at 2 (citation omitted); Ex. Y (Morgan Sept. 14, 2023 Letter) at 2 (citation omitted).

Hunter Biden, charges that DOJ prosecutors and investigators recommended bringing just months before.[135]

81.     Further, as the full House confirmed by adopting House Resolution 917,[136] the Subpoenas to secure Daly's and Morgan's testimony are also critical to the impeachment inquiry. Indeed, House Resolution 917 confirms that the Committee had authority to issue subpoenas to further the impeachment inquiry from the beginning of that inquiry and empowers the Committee to take legal action to enforce its impeachment-related subpoenas, including specifically the Subpoenas issued to Daly and Morgan.[137]  Their testimony will help the Committee determine whether President Biden abused his power by obstructing, or attempting to obstruct, the DOJ investigation into his son.[138]  In sum, Daly's and Morgan's deposition testimony is critical to the Committee's ability to craft legislative solutions and to determine whether President Biden committed an impeachable offense.

82.     Under House Resolution 5, which was adopted by the full House, and regulations promulgated by the House Committee on Rules (Rules Committee) that govern Committee depositions, agency counsel could not attend Daly's or Morgan's deposition.[139]  As explained

---

[135] Ex. X (Daly Sept. 14, 2023 Letter) at 2 (citation omitted); Ex. Y (Morgan Sept. 14, 2023 Letter) at 2 (citation omitted).

[136] By adopting House Resolution 918, the House also adopted House Resolution 917. *See* H. Res. 918, 118th Cong. § 6 (2023) ("House Resolution 917 is hereby adopted.").

[137] H. Res. 917, 118th Cong. §§ 2, 4(a)(1) (2023).  House Resolution 917 also "ratifies and affirms any subpoenas" that had been issued pursuant to the impeachment inquiry.  *Id.* § 3.

[138] Ex. F (Impeachment Memorandum) at 29.

[139] H. Res. 5, 118th Cong. § 3(k)(3) (2023); 169 Cong. Rec. H147 (Jan. 10, 2023), https://perma.cc/ZUK8-CECR.

below, the decision of the 118th Congress to not allow agency counsel to attend depositions is consistent with the House's longstanding approach to this issue.

83.     After the Subpoenas were issued, DOJ and Committee staffers communicated about scheduling.  Specifically, DOJ requested that Daly's and Morgan's depositions be moved back due to "a few timing conflicts for Morgan/Daly."[140]  After some back-and-forth, DOJ "confirm[ed] there are no scheduling conflicts for Daly on October 26 or Morgan on October 30 (or later that week), [and] so [] would appreciate the Committee moving the return dates to those days," which the Committee ended up doing.[141]

84.     On October 24, 2023, two days before Daly was scheduled to testify, Daly's personal attorney wrote to the Committee stating that Committee staff "were exceedingly gracious and professional regarding the [S]ubpoena," and that Daly would abide by the Subpoena, with the caveat that if DOJ directed Daly to ignore the Subpoena, he would "follow whatever instructions are clearly given by the Justice Department."[142]  In essence, Daly made clear that but for DOJ directing him to ignore the Committee's Subpoena, he would abide by it.

85.     The next day, October 25, 2023, DOJ directed Daly not to obey the duly authorized and lawful Congressional Subpoena.[143]  The only reason proffered by DOJ to Daly was that because agency counsel could not accompany Daly to the deposition, the Subpoena

---

[140] Email from Sara Zdeb, Off. of Legis. Affs., DOJ, to Stephen Castor, Gen. Couns., H. Comm. on the Judiciary (Sept. 23, 2023, 1:14 PM) (attached as Ex. Z at 2).

[141] Email from Sara Zdeb, Off. of Legis. Affs., DOJ, to Stephen Castor, Gen. Couns., H. Comm. on the Judiciary (Sept. 26, 2023, 1:35 PM) (attached as Ex. Z at 1).

[142] Letter from Robert Driscoll, Couns. for Mark Daly, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, at 2 (Oct. 24, 2023) (attached as Ex. AA).

[143] *See generally* Letter from Bradley Weinsheimer, Assoc. Deputy Att'y Gen., DOJ, to Robert Driscoll, Couns. for Mark Daly (Oct. 25, 2023) (attached as Ex. BB).

lacked legal effect.[144]  As support for its view, DOJ's letter cited a single source: a 2019 opinion

issued by DOJ's Office of Legal Counsel (OLC).[145]  According to DOJ, because the Committee

would "ask questions regarding information Mr. Daly learned within the scope of his official

duties, including potentially privileged information," without agency counsel present, the

Subpoena "lacks legal effect and cannot constitutionally be enforced."[146]

86.     The same day, DOJ also wrote a letter to the Committee.[147]  It too declared that

the Subpoenas sent to lower-level DOJ employees lacked legal effect due to the agency counsel

issue and cited the same OLC Opinion.[148]  Daly did not appear for his scheduled deposition the

next day, on October 26, 2023.  At the deposition, Committee staff noted Daly's noncompliance

with the Subpoena and entered the Subpoena as well as other documentary evidence into the

record as exhibits.[149]

87.     By this time, Morgan also acquired personal counsel, and his deposition was

moved again to November 6, 2023.  In communications to the Committee, Morgan's personal

counsel also stated that Morgan had no "per se" objection to appearing for the deposition, but

---

[144] *Id.* at 2.

[145] *Id.* (citing *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __ (May 23, 2019) (OLC Opinion)).

[146] *Id.* (citing OLC Opinion, *supra* note 145, at *2).

[147] Letter from Carlos Uriarte, Assistant Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Oct. 25, 2023) (attached as Ex. CC).

[148] *Id.* at 8.

[149] *See generally* Transcript of Deposition of Mark Daly, Senior Litig. Couns., Tax Division, DOJ (Oct. 26, 2023) (attached as Ex. DD).

that he too would follow DOJ's guidance.[150]  On November 2, 2023, DOJ directed Morgan to not appear for his deposition for the same reasons it offered to Daly: the Subpoena purportedly lacks legal effect.[151]  Morgan did not show up to his November 6, 2023 deposition.  At the deposition, Committee staff noted Morgan's noncompliance with the Subpoena and entered the Subpoena as well as other documentary evidence into the record as exhibits.[152]

88.    Although the full House authorized the Committee to file suit to enforce the Subpoenas issued to Daly and Morgan when it passed House Resolution 917 on December 13, 2023,[153] the Committee made a final attempt to obtain Daly's and Morgan's testimony without having to resort to litigation.

89.    On February 22, 2024, the Committee again exercised its delegated authority and issued new Subpoenas that required Daly and Morgan to appear for depositions on March 1, 2024.[154]

90.    The cover letters that accompanied the Subpoenas noted that Daly's and Morgan's testimony is critical to the impeachment inquiry: it "is necessary to assist the Committee in determining whether sufficient grounds exist to draft articles of impeachment against President

---

[150] Email from Catherine Duval, Couns. for Jack Morgan, to Betsy Ferguson, Deputy Gen. Couns., H. Comm. on the Judiciary, et al. (Nov. 3, 2023, 1:52 PM) (attached as Ex. EE at 1).

[151] Letter from Bradley Weinsheimer, Assoc. Deputy Att'y Gen., DOJ, to Catherine Duval, Couns. for Jack Morgan, at 2 (Nov. 2, 2023) (attached as Ex. FF).

[152] *See generally* Transcript of Deposition of Jack Morgan, Trial Att'y, Tax Division, DOJ (Nov. 6, 2023) (attached as Ex. GG).

[153] H. Res. 917, 118th Cong. § 4(a)(1) (2023).

[154] *See* Ex. A at 1; Ex. B at 1.

Joseph R. Biden."[155]  The letters explained how "[a]s part of its impeachment inquiry, the

Committee is investigating, among other things, whether President Biden 'abuse[d] his power as

President to impede, obstruct, or otherwise hinder investigations or the prosecution of Hunter

Biden.'"[156]  It then noted that "[s]ome of the information the Committee has uncovered

suggest[s] that political interference may have impeded the Hunter Biden investigation and

prosecution."[157]  Given their "firsthand knowledge of the investigation's day-to-day operations,"

the Committee believes that Daly and Morgan will help them determine " whether President

Biden (directly or through his political appointees) has in any way attempted to meddle in the

investigation" of his son.[158]  The Committee stressed that it "has attempted to get this

information from other sources but has been unable to do so."[159]

91.      The letters, like the earlier ones, highlighted the presentation that Daly and

Morgan gave in June 2022 where they argued that DOJ should not bring charges against Hunter

Biden for the 2014 and 2015 tax years, despite their team writing a prosecution memorandum

three months earlier recommending bringing such charges for those years.[160]  Given their

---

[155] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Mark Daly, Senior Litig. Couns., Tax Division, DOJ, at 1 (Feb. 22, 2024) (Daly Feb. 22, 2024 Letter) (attached as Ex. HH); Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Jack Morgan, Trial Att'y, Tax Division, DOJ, at 1 (Feb. 22, 2024) (Morgan Feb. 22, 2024 Letter) (attached as Ex. II).

[156] Ex. HH (Daly Feb. 22, 2024 Letter) at 1; Ex. II (Morgan Feb. 22, 2024 Letter) at 1.

[157] Ex. HH (Daly Feb. 22, 2024 Letter) at 2; Ex. II (Morgan Feb. 22, 2024 Letter) at 2.

[158] Ex. HH (Daly Feb. 22, 2024 Letter) at 2; Ex. II (Morgan Feb. 22, 2024 Letter) at 2.

[159] Ex. HH (Daly Feb. 22, 2024 Letter) at 3; Ex. II (Morgan Feb. 22, 2024 Letter) at 3.

[160] Ex. HH (Daly Feb. 22, 2024 Letter) at 2-3; Ex. II (Morgan Feb. 22, 2024 Letter) at 2-3.

"personal knowledge of this aspect of the investigation," the Committee believes that Daly and Morgan will be able to provide insight as to why DOJ ultimately declined to bring charges for those years, "including whether [DOJ's decision] was impacted by political interference."[161]  The Committee also believes Daly and Morgan "may be able to shed light on why the U.S. Attorney for the District of Columbia and the U.S. Attorney for the Central District of California"—whom President Biden appointed—"refused to partner with the prosecution team to bring charges against Hunter Biden," including, again, whether political influence played any role in their failure to partner.[162]  After all, Daly, according to whistleblower testimony, communicated with each U.S. Attorney's Office about potentially partnering, and Morgan was a member of the team that needed to partner.[163]

92.     Beyond assisting the Committee's impeachment inquiry, the Committee noted that Daly's and Morgan's testimony "is … related to several of the Committee's legislative and oversight objectives" and "will inform potential legislation" the Committee is considering.[164]

93.     The Committee also explained that "concerns about revealing information related to an ongoing investigation or the deliberative process privilege"—which other witnesses cited when refusing to answer the Committee's questions—"have no factual or legal basis" and thus do not prevent Daly and Morgan from providing the information the Committee needs.[165]

---

[161] Ex. HH (Daly Feb. 22, 2024 Letter) at 2; Ex. II (Morgan Feb. 22, 2024 Letter) at 2.

[162] Ex. HH (Daly Feb. 22, 2024 Letter) at 2-3; Ex. II (Morgan Feb. 22, 2024 Letter) at 2-3.

[163] Ex. HH (Daly Feb. 22, 2024 Letter) at 3; Ex. II (Morgan Feb. 22, 2024 Letter) at 3.

[164] Ex. HH (Daly Feb. 22, 2024 Letter) at 5; Ex. II (Morgan Feb. 22, 2024 Letter) at 4-5.

[165] Ex. HH (Daly Feb. 22, 2024 Letter) at 3-4; Ex. II (Morgan Feb. 22, 2024 Letter) at 3-4.

94.     Finally, the Committee emphasized that the House's decision not to allow agency counsel to attend depositions is a legitimate exercise of its constitutional authority to adopt its own rules and procedures.[166]  But in its February 22, 2024 letters, the Committee nonetheless offered "an extraordinary accommodation" to allow the Executive Branch to protect its purported interests and avoid the need for the Committee to initiate litigation: it stated that it will "allow agency counsel to remain physically present just outside the Committee room in which the deposition will occur and will permit a recess at any time for [Daly and Morgan] and/or [their] counsel to consult with agency counsel about any matters that may arise during the deposition."[167]  This accommodation will allow Daly, Morgan, and their personal counsel "to consult with agency counsel as necessary and alleviates the concerns that DOJ has articulated about proceeding without agency counsel."[168]

95.     On February 24, 2024, Daly's personal attorney told the Committee, among other things, that he and Daly planned to appear at the deposition, with the caveat that he "will counsel Mr. Daly to follow any instructions from his employer, the Department of Justice, with respect to whether to appear or whether to limit his testimony in any respect due to the pending prosecution."[169]  In essence, Daly again made clear that if not for DOJ directing him to ignore the Committee's Subpoena, he would comply with it.

---

[166] Ex. HH (Daly Feb. 22, 2024 Letter) at 5; Ex. II (Morgan Feb. 22, 2024 Letter) at 5.

[167] Ex. HH (Daly Feb. 22, 2024 Letter) at 5; Ex. II (Morgan Feb. 22, 2024 Letter) at 5.

[168] Ex. HH (Daly Feb. 22, 2024 Letter) at 5; Ex. II (Morgan Feb. 22, 2024 Letter) at 5.

[169] Letter from Robert Driscoll, Couns. for Mark Daly, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, at 2 (Feb. 24, 2024) (attached as Ex. JJ).

96.     On February 29, 2024, the day before the scheduled depositions, DOJ directed

both Daly and Morgan not "to appear before the Committee pursuant to the [S]ubpoena[s]."[170]

As it did when it directed them not to comply with the original Subpoenas, DOJ again claimed

that, per the OLC Opinion, the latest Subpoenas lacked legal effect because agency counsel

could not attend the depositions.[171]  Morgan's personal counsel wrote to the Committee the same

day and explained that Morgan would follow DOJ's guidance and would not appear to testify.[172]

Neither Daly nor Morgan appeared for their scheduled depositions the next day.  At the

depositions, Committee staff noted Daly's and Morgan's noncompliance with the Subpoenas,

despite the Committee's accommodation efforts, and entered the Subpoenas and other

documentary evidence into the record as exhibits.[173]

97.     On February 29, 2024, the same day that DOJ directed Morgan and Daly not to

appear for their depositions, it also wrote to the Committee.[174]  DOJ claimed that the cover letters

accompanying the Subpoenas to Daly and Morgan (and to two other witnesses the Committee

---

[170] *See generally* Letter from Bradley Weinsheimer, Assoc. Deputy Att'y Gen., DOJ, to Robert Driscoll, Couns. for Mark Daly, at 3 (Feb. 29, 2024) (Daly Feb. 29, 2024 Direction Letter) (attached as Ex. KK); Letter from Bradley Weinsheimer, Assoc. Deputy Att'y Gen., DOJ, to Catherine Duval, Couns. for Jack Morgan, at 3 (Feb. 29, 2024) (Morgan Feb. 29, 2024 Direction Letter) (attached as Ex. LL).

[171] Ex. KK (Daly Feb. 29, 2024 Direction Letter) at 3; Ex. LL (Morgan Feb. 29, 2024 Direction Letter) at 3.

[172] Letter from Catherine Duval, Couns. for Jack Morgan, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, at 1-2 (Feb. 29, 2024) (attached as Ex. MM).

[173] *See generally* Transcript of Deposition of Mark Daly, Senior Litig. Couns., Tax Division, DOJ (Mar. 1, 2024) (attached as Ex. NN); Transcript of Deposition of Jack Morgan, Trial Att'y, Tax Division, DOJ (Mar. 1, 2024) (attached as Ex. OO).

[174] *See generally* Letter from Carlos Uriarte, Assistant Att'y Gen., DOJ, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Feb. 29, 2024) (attached as Ex. PP).

subpoenaed) "identify no evidence of any efforts by President Biden or the White House to interfere with the ongoing investigation or prosecution."[175]  The letter conceded, of course, that the testimony the Committee has received thus far from DOJ witnesses "was necessarily scoped"[176]—meaning DOJ permitted the witnesses to address only certain topics.  DOJ repeated its view that the Subpoenas lack legal effect due to the agency counsel issue and asked the Committee to instead send interrogatories so that DOJ could "assess whether additional information can be provided at this time."[177]  To do so, however, DOJ claimed that the Committee would need to send it "copies of the transcripts of the testimony in this matter."[178]  DOJ failed to acknowledge the accommodations the Committee offered to allow agency counsel to sit outside the room where the deposition would be conducted and to allow the Daly and Morgan to request a recess at any time to confer with agency counsel.

98.     The Committee responded to DOJ on March 7, 2024.  It explained that DOJ's position—"that because voluntary transcribed interviews with the Department's approved witnesses—who were subject to the Department's unilateral and arbitrary scoping limitations—did not meet the Department's self-selected threshold for wrongdoing, the Committee is not entitled to obtain any additional testimony"—"is … absurd on its face" and ignores Congress's broad investigative authority.[179]  Although "the Committee has been able to document numerous

---

[175] *Id.* at 3.

[176] *Id.* at 2.

[177] *Id.* at 4-5.

[178] *Id.*

[179] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick Garland, Att'y Gen., DOJ, at 2 (Mar. 7, 2024) (Garland Mar. 7, 2024 Letter) (attached as Ex. QQ).

irregularities in the Department's handling of its investigation into the President's son," the Committee explained, no DOJ witness has provided any explanation for those irregularities.[180] The Committee emphasized that Daly and Morgan "are in a prime position to know why these irregularities occurred," and it is not enough for the Committee to hear only from DOJ-approved witnesses who answer only questions DOJ approves.[181] Next, the Committee explained its view that not only are written interrogatories a less effective tool than live depositions, but DOJ's request that the Committee send those interrogatories to DOJ—rather than Daly and Morgan—suggests DOJ "intends to exert a degree of influence or control over the substance of the witnesses' answers,"[182] which is precisely why agency counsel have historically been prevented from attending depositions under the relevant rules.[183]  Finally, the Committee explained why it would not send transcripts from previous interviews: "[w]itnesses do not need to review the testimony of others to provide truthful information about their own knowledge of the matters at issue," and DOJ "is insisting on a condition that it would not accept in its own investigations."[184]

99.     In sum, Daly and Morgan each violated his legal duty to comply with the Committee's lawfully issued Subpoenas, and their defiance is obstructing the Committee's investigation.  The parties' negotiations are at an impasse, and judicial intervention is necessary.

---

[180] *Id.*

[181] *Id.* at 2-3.

[182] *Id.* at 5.

[183] *See infra* Section III.E.

[184] Ex. QQ (Garland Mar. 7, 2024 Letter) at 5.

House Resolution 917 expressly authorizes the Committee to take legal action against Daly and Morgan—indeed, it mentions them by name—to secure their compliance with the Subpoenas.[185]

100.    DOJ's position that the Subpoenas are unenforceable because they do not permit agency counsel to attend has no merit.  The Constitution empowers the House to adopt its own rules.  It has had a version of this deposition rule for decades, and numerous Executive Branch employees have testified in Congressional depositions without agency counsel present.

### III.    The House has delegated deposition authority to committees for over thirty years, and the relevant rules have never allowed agency counsel to attend depositions

101.    The Constitution grants the House the authority to adopt its own rules and procedures.[186]  Promulgating a rule that dictates who may and may not attend depositions is a valid exercise of that authority.

#### A.    Decades ago, the House began delegating deposition authority to committees charged with investigating a discrete subject, and the relevant rules did not allow agency counsel to attend depositions

102.    In the 1980s and 1990s, the House delegated the authority to conduct depositions to the Select Committee to Investigate Covert Arms Transactions with Iran and to the Task Force of Members of the Foreign Affairs Committee to Investigate Certain Allegations Concerning the Holding of Americans as Hostages by Iran in 1980.[187]

---

[185] H. Res. 917, 118th Cong. § 4(a) (2023).  And the Speaker of the House has approved the Committee's decision to do so here.  *See id.*

[186] U.S. Const. art. I, § 5, cl. 2.

[187] *See, e.g.*, H. Res. 12, 100th Cong. §§ 1, 6 (1987) (attached as Ex. RR); H. Res. 258, 102d Cong. §§ 1, 6 (1991) (attached as Ex. SS).

103.    In providing this authority, the House permitted the select committee and the task force to adopt rules regulating depositions, including regulations regarding who could attend.[188]

104.    In turn, the select committee and task force adopted rules that allowed personal counsel to accompany witnesses to advise them of their rights but did not allow agency counsel to attend.[189]

105.    The rules alleviated the concern that the presence of agency counsel could hinder investigations by pressuring a witness not to disclose information relevant to a committee's investigation, particularly when an investigation involved issues of agency corruption or abuse or when the witness's interests diverged from the agency's interests.

---

[188] *See, e.g.*, Ex. RR (H. Res. 12, 100th Cong. § 2 (1987)) (authorizing the committee to adopt rules that "may govern the conduct of the depositions, … including the persons present"); Ex. SS (H. Res. 258, 102d Cong. § 2 (1991)) (same).

[189] *See, e.g.*, Rule 7.3, Rules of the Select Committee to Investigate Covert Arms Transactions with Iran of the U.S. House of Representatives, 100th Cong. (Comm. Print 1987) ("Witnesses may be accompanied at a deposition by personal counsel to advise them of their rights …; observers or *counsel for other persons or for the agencies under investigation may not attend*." (emphasis added)) (attached as Ex. TT); Rule 7.3, Rules of the Task Force to Investigate Certain Allegations Concerning the Holding of American Hostages by Iran in 1990 of the U.S. House of Representatives, 102d Cong. (Comm. Print 1992) ("Witnesses may be accompanied at a deposition by counsel representing the witness to advise them of their rights …; observers or *counsel for other persons or for agencies may not attend*." (emphasis added)) (attached as Ex. UU).

Years later, in 2014, the House established the Select Committee on the Events Surrounding the 2012 Terrorist Attack in Benghazi and delegated it deposition authority, subject to regulations issued by the Rules Committee, *see* H. Res. 567, 113th Cong. §§ 1, 4(c)(4)-(5) (2014), https://perma.cc/ZB5U-Z4F7, and the Rules Committee issued regulations that said "[n]o one may be present at depositions except … the witness[] and the witness's counsel.  Observers or *counsel for other persons, or for agencies under investigation, may not attend*."  160 Cong. Rec. H4056 (daily ed. May 9, 2014) (emphasis added), https://perma.cc/5Y5G-27GW.

B.     **The House delegated deposition authority to the Oversight Committee, and the Oversight Committee continued the tradition of not allowing agency counsel to attend**

106.    Beginning in 2007, the House delegated deposition authority to the Oversight Committee and gave it the authority to adopt its own rules "authorizing and regulating" depositions.[190]

107.    Under this authority, the Oversight Committee adopted a rule not allowing "[o]bservers or counsel for other persons, or for agencies under investigation," to attend depositions.[191]

108.    Since 2007, the House, under both Democratic and Republican leadership, has continued to delegate general deposition authority to the Oversight Committee each Congress, including this one, the 118th Congress.[192]

109.    The Oversight Committee in each Congress has continued to adopt a rule that does not permit agency counsel to attend depositions.[193]

───────────────

[190] H. Res. 6, 110th Cong. § 502 (2007), https://perma.cc/6PJ6-8TD3; House Rule X.4(c)(3)(A), 110th Cong. (2007), https://perma.cc/V4GZ-FDVH.

[191] *See* Rule 22, Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 110th Cong. (2007), https://perma.cc/FA5E-NJH8.

[192] *See* House Rule X.4(c)(3)(A), 111th Cong. (2009), https://perma.cc/L2NY-7975; House Rule X.4(c)(3)(A), 112th Cong. (2011) (attached as Ex. VV); House Rule X.4(c)(3)(A), 113th Cong. (2013) (attached as Ex. WW); House Rule X.4(c)(3)(A), 114th Cong. (2015), https://perma.cc/939M-WJMW; House Rule X.4(c)(3)(A), 115th Cong. (2017) (attached as Ex. XX); House Rule X.4(c)(3)(A), 116th Cong. (2020), https://perma.cc/N76S-TM98; House Rule X.4(c)(3)(A), 117th Cong. (2022), https://perma.cc/HH35-VJKY; House Rule X.4(c)(3)(A), 118th Cong. (2023).

[193] *See* Rule 22, Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 111th Cong. (Comm. Print 2009) ("Observers or counsel for other persons, or for agencies under investigation, may not attend."), https://perma.cc/5JVT-S8JT; Rule 15(d), Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 112th Cong. (2011) (same), https://perma.cc/3F3E-5XQW; Rule 15(d), Rules of

### C.   Next, the House delegated deposition authority to more standing committees, including the Judiciary Committee, and the governing regulations and rules still did not allow agency counsel to attend

110.    In 2015, the House provided deposition authority to four more committees: the Committees on Energy and Commerce; Financial Services; Science, Space, and Technology; and Ways and Means.[194]  The authorizing resolution that delegated this authority said that depositions "shall be subject to regulations issued by the chair of the Committee on Rules and printed in the Congressional Record."[195]

111.    The Rules Committee then published Regulations for the Use of Deposition Authority (Deposition Regulations) stating that "[o]bservers or counsel for other persons, or for agencies under investigation, may not attend" depositions.[196]

---

the Committee on Oversight & Government Reform of the U.S. House of Representatives, 113th Cong. (2013) (same), https://perma.cc/WD3D-26VE; Rule 15(d), Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 114th Cong. (2015) (same), https://perma.cc/BX67-292H; Rule 15(e), Rules of the Committee on Oversight & Government Reform of the U.S. House of Representatives, 115th Cong. (2017) (same), https://perma.cc/5VLJ-4FYC; Rule 15(e), Rules of the Committee on Oversight & Reform of the U.S. House of Representatives, 116th Cong. (2019) (same), https://perma.cc/2U7N-UXTQ; Rule 15(e), Rules of the Committee on Oversight & Reform of the U.S. House of Representatives, 117th Cong. (2021) (same), https://perma.cc/CHD7-NTJ9; Rule 15(e), Rules of the Committee on Oversight & Accountability of the U.S. House of Representatives, 118th Cong. (2023) ("No one may be present at depositions except members, Committee staff designated by the Chair of the Committee or the Ranking Minority Member of the Committee, an official reporter, the witness, and the witness's two designated attorneys.  Other persons, including government agency personnel, may not attend."), https://perma.cc/3PRQ-GDJW.

[194] H. Res. 5, 114th Cong. § 3(b) (2015), https://perma.cc/G85G-QPG9.

[195] *Id.* § 3(b)(2).

[196] 161 Cong. Rec. E21 (daily ed. Jan. 7, 2015), https://perma.cc/UF2U-DQ94.

112.     In 2017, the House delegated deposition authority to all standing committees, except for the Committee on House Administration and the Rules Committee.[197]  The House has continued to delegate general deposition authority (subject to the Deposition Regulations) to these committees, under Democratic and Republican leadership, each Congress since 2017, including this one (the 118th Congress).[198]

113.     During each Congress from 2017 to 2023, the Deposition Regulations adopted by the Rules Committee have not permitted government agency counsel to attend depositions.[199]

**D.     In the current Congress, the full House adopted a provision as part of its rules package that does not permit agency counsel to attend depositions**

114.     In the 118th Congress, rather than relying solely on the Rules Committee's Deposition Regulations, the full House adopted language as part of its rules package that expressly prevents agency counsel from attending depositions.[200]

115.     Additionally, in the 118th Congress, the Rules Committee again promulgated Deposition Regulations that do not allow agency counsel to attend depositions.[201]  The Judiciary

---

[197] H. Res. 5, 115th Cong. § 3(b) (2017), https://perma.cc/45K6-PTF3.

[198] H. Res. 6, 116th Cong. § 103(a) (2019), https://perma.cc/V5X8-GQ5C; H. Res. 8, 117th Cong. § 3(b) (2021), https://perma.cc/HU3Y-TDMS; H. Res. 5, 118th Cong. § 3(k)(1)-(2) (2023).

[199] 163 Cong. Rec. H536 (daily ed. Jan. 13, 2017), https://perma.cc/52VG-3MMB; 165 Cong. Rec. H1216 (daily ed. Jan. 25, 2019), https://perma.cc/VJ8J-N9TN; 167 Cong. Rec. H41 (daily ed. Jan. 4, 2021), https://perma.cc/3F9B-DHDL; 169 Cong. Rec. H147.

[200] H. Res. 5, 118th Cong. § 3(k)(3) (2023) ("Deponents may be accompanied at a deposition by two designated personal, nongovernmental attorneys to advise them of their rights. Only members, committee staff designated by the chair or ranking minority member, an official reporter, the witness, and the witness's two designated attorneys are permitted to attend.  Other persons, including government agency personnel, may not attend.").

[201] 169 Cong. Rec. H147.

Committee's Rules also specifically note that the Deposition Regulations govern its depositions.[202]

116.    Thus, in the 118th Congress, language adopted by the full House, the Rules Committee's Deposition Regulations, and the Judiciary Committee's Rules all make clear that the longstanding rule continues to apply, and agency counsel are not permitted to attend depositions.

### E.    The House, under both Democratic and Republican control, has concluded that the presence of agency counsel in depositions could interfere with investigations

117.    Under both Democratic and Republican leadership, the House has concluded that agency counsel's presence in depositions could interfere with investigations, especially when the investigation involves issues of agency corruption or abuse.[203]

118.    A committee's right to exclude agency counsel is especially important when a witness's personal interests depart from the interests of the agency employing the witness.  A witness may be less willing to divulge information that reflects poorly on his employing agency if the agency's lawyer is in the room.

---

[202] Judiciary Committee Rule XI (2023).

[203] *See, e.g.*, H. Rep. No. 116-125, at 33 (2019) (report from the Oversight Committee, which was under Democratic control), https://perma.cc/2NQH-KUXP; H. Comm. on the Judiciary, *Abuse of Power, Waste of Resources, and Fear: What Internal Documents and Testimony From Career Employees Show About the FTC Under Chain Lina Khan* 5 (Feb. 22, 2024) ("Repeatedly during the Committee's transcribed interviews of FTC staff, the FTC officials present at the interview—who were there to represent the interests of the FTC and Chair Khan, not the witnesses—attempted to impede the Committee's fact-finding.  For example, the Committee's questioning of FTC witnesses was repeatedly interrupted by FTC counsel, and witnesses were directed not to answer the Committee's questions on a number of topics ….") (Khan Report), https://perma.cc/77JH-Q3M3; Oversight Comm. Democrats, *Committee Depositions in the House of Representatives: Longstanding Republican and Democratic Practice of Excluding Agency Counsel* 4-5 (last visited Mar. 12, 2024) (*Longstanding Practice*), https://perma.cc/3ZS3-4EEX.

119.    Here, this interest is not abstract, either.  Both Daly and Morgan have represented that they personally have no objections to being interviewed by the Committee.  Yet DOJ has instructed them not to testify, even though it has permitted other officials involved in the Hunter Biden investigation to speak with the Committee.  This at least raises the possibility that the presence of DOJ counsel next to Daly and Morgan is meant to chill whatever they have to say to the Committee.

120.    Beyond protecting the integrity of investigations, excluding agency counsel also helps protect witnesses from the possibility of threats, abuse, or coercion from their employers.[204]

121.    The House rule thus aims to protect agency witnesses who may share information that is damaging to their employing agency just as federal law aims to protect whistleblowers who disclose information that could reflect poorly on their employing agency.[205]

**F.      House committees have deposed more than 175 Executive Branch witnesses without agency counsel**

122.    More than 175 Executive Branch witnesses have appeared for depositions—under both Democratic and Republican control of the House—without agency counsel present.[206]

---

[204] *See* H. Rep. No. 116-125, at 33; Khan Report, *supra* note 203, at 5 ("With FTC officials closely monitoring their testimony, it is reasonable that these witnesses feared retaliation for negative testimony …."); *Longstanding Practice*, *supra* note 203, at 1; Morton Rosenberg, *When Congress Comes Calling: A Study on the Principles, Practices, and Pragmatics of Legislative Inquiry* 38 (2017), https://perma.cc/HM9G-87E9.

[205] *Cf.* 5 U.S.C. § 2302(b)(8)(C) ("Any employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority … take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of … any disclosure to Congress (including any committee of Congress) ….").

[206] *See generally Longstanding Practice*, *supra* note 203.

123.    Indeed, despite DOJ's current position, the OLC Opinion on which it relies was not published until 2019—decades after Congress's practice of excluding agency counsel began.

124.    And Wolf, one of the lead prosecutors on the Hunter Biden investigation, appeared for her transcribed interview before the Committee without agency counsel present. Although Wolf was no longer a DOJ employee when she appeared, according to the same OLC Opinion that DOJ relied on to prevent Daly and Morgan from testifying, Wolf was still "disclosing the Executive Branch's information."[207]  DOJ's unprincipled approach here lacks merit and, as its own practice shows, is unnecessary to protect the Executive Branch's purported interests.

125.    Given that the Supreme Court has long held that "the respective powers of those who are equally the representatives of the people[] are to be adjusted . . . by the practice of the government [and] ought to receive a considerable impression from that practice,"[208] the OLC Opinion attempts to impede Congress's ability to discharge its constitutional authority and elevates the Executive Branch's interests over a power expressly delegated to Congress in the Constitution.  The Court should reject this self-interested gambit and order that Daly and Morgan comply with the lawful Congressional Subpoenas.

---

[207] *See* OLC Opinion, *supra* note 145, at *10 n.3 (citing *Assertion of Executive Privilege Concerning the Dismissal and Replacement of U.S. Attorneys*, 31 Op. O.L.C. 1 (2007) (concluding that the President may assert executive privilege with respect to testimony by two former White House officials)).

[208] *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819); *see also PHH Corp. v. CFPB*, 839 F.3d 1, 21-25 (D.C. Cir. 2016) (summarizing Supreme Court cases using historical practices as a method of constitutional interpretation in separation-of-powers cases).

IV.     **Beyond simply appearing before the Committee, Daly and Morgan must answer the Committee's questions**

126.    The Subpoenas are lawful, and Daly and Morgan have a legal obligation to appear before the Committee without agency counsel present, as the House Rules require.

127.    But they must do more than that: Daly and Morgan must also answer the Committee's questions, especially questions related to the decision to let the statute of limitations lapse for tax years 2014 and 2015 and the U.S. Attorneys' failure to partner with Weiss's prosecution team to bring charges against Hunter Biden.

128.    To date, the other witnesses who have spoken to the Committee have refused to answer questions about certain topics—including the decision to allow the statute of limitations to lapse for charges related to tax years 2014 and 2015 and deliberations surrounding the U.S. Attorneys' failure to partner with Weiss to bring charges against Hunter Biden—because they purportedly implicate an ongoing criminal investigation and prosecution or involve internal DOJ deliberations.[209]  There is no legal support for these witnesses' refusal to discuss these topics.

129.    For starters, there is no ongoing investigation into or prosecution of Hunter Biden for tax crimes related to tax years 2014 or 2015.  Given DOJ's decision to let the statute of limitations for those charges lapse, any investigation into those issues has necessarily ended, and the Committee's questions about DOJ's decision not to bring charges, as well as questions about U.S. Attorney Graves's decision not to partner with Weiss to bring those charges, do not implicate an ongoing investigation.

---

[209] *See, e.g.*, Transcript of Interview of Lesley Wolf, Former Assistant U.S. Att'y, DOJ, at 16, 19, 21 (Dec. 14, 2023) (attached as Ex. YY); Ex. S (Weiss Deposition) at 22-24, 29, 31; Ex. R (Estrada Deposition) at 23, 25-26, 34; Ex. Q (Graves Deposition) at 22, 24, 110.

130.     But even if the Committee's questions did implicate an ongoing investigation, the

Committee is legally entitled to that information.  Indeed, neither the Constitution, nor federal

statutes, nor the common law recognizes a privilege for materials that could implicate an

ongoing investigation.  There is no ongoing-investigation privilege, and this objection is a

political one, not a legal one.[210]  As the Supreme Court has explained, "a congressional

committee … engaged in legitimate legislative investigation need not grind to a halt" in the face

of an ongoing criminal investigation.[211]  In fact, DOJ has provided materials related to ongoing

criminal investigations to Congress many times in the past.[212]

131.     Attempts to rely on a purported deliberative-process privilege fare no better.

Indeed, that "privilege disappears altogether when there is any reason to believe government

misconduct occurred."[213]  That is exactly what the Committee is investigating here: it is

investigating why DOJ deviated from standard investigative procedures and how, under the

existing legal framework, it was able to do so.  It is also investigating whether President Biden

---

[210] *See* William McGurn, Opinion, *The 'Ongoing Investigation' Dodge on Hunter Biden*, Wall St. J. (July 10, 2023, 6:36 PM) (quoting former Assistant U.S. Attorney Andrew McCarthy as stating "[t]he executive branch response of 'ongoing investigation' is really a political objection, rather than a legal one" and noting that "[t]here is no 'ongoing investigation' privilege"), https://www.wsj.com/articles/the-ongoing-investigation-dodge-hunter-biden-david-weiss-bribe-question-informant-67c31868 (attached as Ex. ZZ).

[211] *See Hutcheson v. United States*, 369 U.S. 599, 618 (1962); *see also* Christopher R. Smith, *I Fought the Law and the Law Lost: The Case for Congressional Oversight Over Systemic Department of Justice Discovery Abuse in Criminal Cases*, 9 Cardozo Pub. L. Pol'y & Ethics J. 85, 107 (2010) ("To preclude Congress from investigating prosecutorial misconduct because of open investigations would completely undermine Congress's constitutional duty to investigate government misconduct, an important legislative branch check on the executive branch.").

[212] *See, e.g.*, Rosenberg, *supra* note 204, at 75-82 (listing numerous examples of Congress obtaining testimony related to an ongoing criminal investigation).

[213] *See In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997).

committed an impeachable offense, including by using his political appointees to obstruct DOJ's investigation.

132.     In sum, Daly and Morgan must appear before the Committee, and they must answer, among others, questions about the decision to let the statute of limitations for charges related to 2014 and 2015 lapse and about the U.S. Attorneys' failure to partner with Weiss and his team.

## SPECIFIC CLAIM FOR RELIEF

## COUNT I

133.     The Judiciary Committee incorporates by reference and realleges the preceding paragraphs, as if set forth fully here.

134.     The Subpoenas were duly authorized, issued, and served pursuant to the Judiciary Committee's legislative and impeachment powers under Article I of the Constitution of the United States.

135.     The Subpoenas required Daly and Morgan to appear to testify at depositions before the House Judiciary Committee on March 1, 2024, yet they did not appear as required.

136.     The Judiciary Committee has attempted to make reasonable accommodations for Daly's and Morgan's testimony, but those efforts are at an impasse, and Daly and Morgan continue to refuse to appear for their depositions.

137.     There is no lawful basis for Daly's and Morgan's refusals to appear before the Judiciary Committee for their depositions.

138.     Daly and Morgan have violated and continue to violate their legal obligations by refusing to appear before the Judiciary Committee as required by their Subpoenas and by

refusing to answer questions when there has been no assertion of privilege by the Executive Branch.

139.    As a result, the Judiciary Committee has been, and will continue to be, injured by Daly's and Morgan's actions.

## PRAYER FOR RELIEF

WHEREFORE, the Judiciary Committee respectfully prays that this Court:

A.    Pursuant to 28 U.S.C. §§ 2201 and 2202, enter declaratory and injunctive relief as follows:

1.    Declare that Daly's and Morgan's refusal to appear before the Committee in response to their respective Subpoenas lacks legal justification;

2.    Issue an injunction ordering Daly and Morgan to appear and testify immediately before the Committee;

3.    Issue an injunction ordering Daly and Morgan to testify about the decision to allow the statute of limitations to lapse for charges against Hunter Biden related to the 2014 and 2015 tax years, including but not limited to (i) why they apparently changed their views about whether charges should be brought for those years, (ii) whether they were pressured in any way to argue in their June 15, 2022 presentation that charges should not be brought for those years, and (iii) whether Hunter Biden's lawyer offered to toll the statute of limitations for those years and, if so, why DOJ did not accept that offer;

4.    Issue an injunction ordering Daly and Morgan to testify about the refusal of the U.S. Attorney's Office for the District of Columbia to partner with Weiss, including but not limited to (i) any discussions Daly had about that office's plans to assign an assistant U.S. attorney to the Hunter Biden matter, (ii) whether that office's views and willingness to partner

with Special Counsel Weiss changed after U.S. Attorney Graves became personally involved in the matter, and (iii) whether political interference played any role in that office's ultimate decision not to partner with Weiss; and

5.      Issue an injunction ordering Daly and Morgan to testify about the refusal of the U.S. Attorney's Office for the Central District of California to partner with Weiss, including but not limited to (i) why the prosecution team approached that office in September 2022, (ii) any discussions that Daly had with that office, including with U.S. Attorney Estrada himself, (iii) whether Special Assistant U.S. Attorneys worked in that office and could have filed charges against Hunter Biden in the Central District of California, and, if so, why Weiss's team did not pursue that avenue, and (iv) whether political interference played any role in that office's ultimate decision not to partner with Weiss.

B.      Retain jurisdiction to review any disputes that may arise over compliance with the Court's order.

C.      Grant the Committee such other and further relief as may be just and proper under the circumstances.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
    *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
    *Deputy General Counsel*
Bradley Craigmyle (IL Bar No. 6326760)
    *Associate General Counsel*
Andy T. Wang (D.C. Bar No. 1034325)
    *Assistant General Counsel*
Rachel A. Jankowski (D.C. Bar No. 1686346)
    *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL[214]
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, DC 20515
Telephone: (202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

March 21, 2024

---

[214] Attorneys for the Office of General Counsel for the U.S. House of Representatives are "entitled, for the purpose of performing the counsel's functions, to enter an appearance in any proceeding before any court of the United States or of any State or political subdivision thereof without compliance with any requirements for admission to practice before such court." 2 U.S.C. § 5571(a).