**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

              *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

              *Defendants*.

Case No. 1:24-cv-815

# Exhibit P

1

2

3

4

5    COMMITTEE ON THE JUDICIARY,

6    U.S. HOUSE OF REPRESENTATIVES,

7    WASHINGTON, D.C.

8

9

10

11

12

13    INTERVIEW OF:    THOMAS J. SOBOCINSKI

14

15

16

17

18                              Thursday, September 7, 2023

19

20                              Washington, D.C.

21

22

23          The interview in the above matter was held in room 2237, Rayburn House Office

24    Building, commencing at 10:02 a.m.

25          Present:    Representative Jordan.

1    Appearances:

2

3

4

5    For the COMMITTEE ON THE JUDICIARY:

6

7    CLARK ABOURISK, COUNSEL

8    STEVE CASTOR, GENERAL COUNSEL

9    DILLON CHEPP, COUNSEL

10    SEAN CLERGET, COUNSEL

11    BRITTANY HAVENS, PROFESSIONAL STAFF MEMBER

12    CAROLINE NABITY, CHIEF COUNSEL FOR OVERSIGHT

13    ██████████████, MINORITY CHIEF OVERSIGHT COUNSEL

14    ██████████████, MINORITY OVERSIGHT COUNSEL

15    ████████████████, MINORITY STAFF ASSISTANT

16

17

18

19

20        For the U.S. DEPARTMENT OF JUSTICE:

21

22    SARA ZDEB, DEPUTY ASSISTANT ATTORNEY GENERAL,

23    OFFICE OF LEGISLATIVE AFFAIRS

24

25

1

2          For the FEDERAL BUREAU OF INVESTIGATION:

3

4     MEGAN L. GREER, ASSISTANT GENERAL COUNSEL,

5     OFFICE OF GENERAL COUNSEL

1        Mr. <u>Castor.</u>   Good morning.

2        This is a transcribed interview of Special Agent in Charge Thomas Sobocinski of the

3        Baltimore Field Office of the FBI.   Chairman Jordan has requested this interview as part

4        of the committee's oversight of the Department of Justice commitment to impartial

5        justice and integrity of the Hunter Biden prosecution of which numerous irregularities

6        have been reported.

7        Mr. -- or, Agent Sobocinski, would you please state your name for the record?

8        Mr. <u>Sobocinski.</u>   Thomas J. Sobocinski.

9        Mr. <u>Castor.</u>   And you are joined here today with agency counsel as opposed to

10       personal counsel?

11       Mr. <u>Sobocinski.</u>   Correct.

12       Mr. <u>Castor.</u>   Would agency counsel please state their names.

13       Ms. <u>Greer.</u>   Megan Greer from the FBI's Office of General Counsel.

14       Ms. <u>Zdeb.</u>   Sara Zdeb from the Department of Justice.

15       Mr. <u>Castor.</u>   And you understand that agency counsel represents the Department

16       and the FBI, not you personally.

17       Mr. <u>Sobocinski.</u>   I do.

18       Mr. <u>Castor.</u>   And you're comfortable with proceeding that way.

19       Mr. <u>Sobocinski.</u>   I am.

20       Mr. <u>Castor.</u>   Okay.

21       On behalf of the committee, I want to thank you for appearing here today to

22       answer our questions.   The chairman also appreciates your willingness to appear

23       voluntarily.

24       Initially, a deposition subpoena had been issued for today, and we have

25       withdrawn that in lieu of today's voluntary transcribed interview.   Obviously, if we don't

1    get very far and you're not able to answer the questions we have, we may have to revisit

2    the subpoena for a deposition.

3        My name is Steve Castor.    I'm with Mr. Jordan's Judiciary Committee staff.    I'll

4    have the staffers here in the room introduce themselves.

5        Ms. <u>Nabity.</u>    Caroline Nabity with Mr. Jordan's staff.

6        Mr. <u>Clerget.</u>    Sean Clerget, Mr. Jordan's staff.

7        Ms. <u>Havens.</u>    Brittany Havens, Mr. Jordan's staff.

8        ███████    ████████████, Ranking Member Nadler's staff.

9        ███████    ███████, Ranking Member Nadler's staff.

10       Mr. <u>Chepp.</u>    Dillon Chepp, Mr. Jordan's staff.

11       Mr. <u>Abourisk.</u>    Clark Abourisk, Mr. Jordan's staff.

12       Mr. <u>Castor.</u>    I'll go over the ground rules and guidelines that we will follow during

13   today's interview.

14       Our questioning will proceed in rounds.    The majority will ask questions first for

15   an hour.    Then the minority will have a chance to ask their questions for an equal period

16   of time.    We'll alternate back and forth.    They'll actually come over and sit in these

17   seats to help the court reporter best capture what we're saying.

18       Ordinarily we take a break at the end of each hour if you need it, but it's entirely

19   up to you.    We will only take breaks if you need them.    The same goes for if you need

20   lunch, if it's going too long.    It's up to you.    A lot of times we power through.

21   Sometimes we don't.    So it's your call.

22       If you need to confer with agency counsel, just let us know, and we'll just go off

23   the record.

24       There's an official court reporter taking down everything we say and make a

25   written record, so every now and then we need to prompt witnesses to give a verbal

1    response if you had just nodded your head and so forth.

2          We'll do our best to limit the number of people questioning you at once during

3    any given hour.    Usually it's just one staff person.    And if the members join us, of

4    course, we defer to the members to ask their questions.    So then it would be a situation

5    where it's more than one person asking the questions.    But that's the way it works with

6    the Members of our Congress.

7          We ask you, of course, to please speak clearly so the court reporter can accurately

8    make a record and so that the people at the end of the table can hear.

9          We want you to answer our questions in the most complete and truthful manner

10   possible, so we'll take our time.    If you have any questions or if you don't understand

11   one of our questions, please let us know.    Our questions may cover a range of topics.

12   So if you need clarification at any point, please let us know.

13         If you don't honestly know the answer to a question or do not remember, it's best

14   not to guess.    However, if you do remember and you say you don't remember, that of

15   course is a problem when it comes to 18 United States Code 1001, which I'm sure you're

16   familiar with.

17         Witnesses that knowingly provide false testimony could be subject to criminal

18   prosecution for making false statements.    You understand that, correct?

19         Mr. Sobocinski.    I do.

20         Mr. Castor.    And we say that to all witnesses, so certainly mean no disrespect of

21   somebody of your caliber here today.

22         We try to keep the information that we talk about during these sessions

23   confidential.    We don't have anything like Rule 6(e) that makes it unlawful to discuss.

24         What we discuss, however, we do our best to keep it confidential.    So to the

25   extent we mark exhibits, we will retain those exhibits.    And sometimes if a witness

1    provides us a document and then we want to keep it, it gets a little awkward, but you

2    haven't provided us any documents.    But just for the sake of mentioning it, we will

3    collect the exhibits.

4         That's the end of my welcoming remarks.

5         ████████, do you have anything?

6         ████████.    Not at this time.    Thank you.

7         Ms. Zdeb.    Steve, would you mind if I jumped in with a couple quick things --

8         Mr. Castor.    Of course.

9         Ms. Zdeb.    -- before you start your round?

10        Mr. Castor.    Of course.

11        Ms. Zdeb.    Thank you.

12             As you noted, Mr. Sobocinski is here voluntarily, and we really appreciate the

13    committee's willingness to proceed with a voluntary transcribed interview and in

14    particular the work that the staff did jointly with the Department and the Bureau to get us

15    to this point.

16             As you know, your inquiry implicates an ongoing criminal investigation.    We've

17    talked about this.    We've also talked about the fact that at this point Mr. Sobocinski is

18    going to be able to address questions that can be answered without compromising the

19    ongoing investigation and prosecution.

20             Specifically, the Department has authorized him to discuss U.S. Attorney Weiss'

21    authority, as well as the October 7th, 2022, meeting, subject to some constraints around

22    the ongoing investigation issue.    There may be some additional information he can share

23    as well, depending on the questions and, again, consistent with our need to protect the

24    ongoing investigation.

25             We understand the committee may have a broader universe and does have a

1      broader universe of information that you're interested in.     To the extent you have

2      questions that go beyond the scope of what he has been authorized to get into at this

3      juncture, we reiterate our willingness to continue the discussion with the committee on

4      those topics and our willingness to consider additional accommodations down the line.

5               That said, our goal today is very much to facilitate Mr. Sobocinski in sharing as

6      much information as he can, consistent with his authorization.

7               So I just wanted to put all of that on the record before we get started.

8               Mr. Castor.     Okay.

9                                          EXAMINATION

10                   BY MR. CASTOR:

11     Q       Mr. Sobocinski, did the Department send you a letter --

12     A       They did.

13     Q       -- about what you can or can't speak to?

14     A       They did.

15     Q       And is that a letter that -- would that be helpful for us to have, or are we not

16     allowed to have that letter?

17              Ms. Zdeb.     The letter is consistent with what I just described and what we have

18     talked about before.     I'm not sure the letter adds anything to that.     But if you're asking

19     for a copy of the letter, I don't have it with me today.

20              Mr. Castor.     Okay.

21              Ms. Zdeb.     But we can talk about getting that to you.

22              Mr. Castor.     Okay.

23              Chairman Jordan.     When did they send that to you?

24              Mr. Sobocinski.     Yesterday.

25              Mr. Castor.     And I understand you're not allowed to talk about ongoing matters,

1    and it would be helpful for us to know exactly what's ongoing.    There's the tax charges

2    from 2014 and '15.    The statute of limitations has expired for that, correct?

3        Mr. Sobocinski.    I'm not -- as the FBI I'm not -- I have no general knowledge of

4    what the IRS charges are as far as when they lapse or when they don't lapse.

5        Mr. Castor.    Okay.

6        Ms. Zdeb.    And, Steve, I think -- we may well have a difference of opinion on

7    what does and does not relate to the ongoing matter.    So what I can say is when

8    we -- when and if we get to those points, we may jump in and convey that that is a thing

9    that we believe involves the ongoing matters.

10        Mr. Castor.    Okay.

11        Ms. Zdeb.    But, again, we're happy to continue working with the committee

12    going forward.

13        Mr. Castor.    Okay.    But just at the top, I was just going to ask a couple questions

14    about is the 2014 tax matter, is that something you can help us understand about?

15        Mr. Sobocinski.    At this point I'm not in a position to talk about that.

16        Mr. Castor.    Okay.    So that is -- even though the statute of limitations has

17    expired, you can't help us with that?

18        Mr. Sobocinski.    Not today.

19        Chairman Jordan.    Is that specifically in the letter saying you couldn't talk about

20    that?

21        Mr. Sobocinski.    I don't recall the specifics, if it said that.    It was a general

22    overview of what is ongoing or not.    Those -- what were being discussed right there,

23    those are tax charges --

24        Mr. Castor.    By the way, I started the clock.

25        Ms. Greer.    I would just say, on the particular tax charges, I don't want to talk

1   past what information the witness may or may not have on that, particularly as it relates

2   to Mr. Weiss' authority.     So if there are questions about his authority, the witness can

3   answer what he knows --

4        Mr. Castor.   Okay.

5        Ms. Greer.    -- regardless of the charge.

6        Mr. Castor.   Okay.

7             BY MR. CASTOR:

8        Q   But the fact that the 2014 and '15 tax years were subject to a tolling

9   agreement, you're aware of that, correct?

10       A   What do you mean by that?

11       Q   That the Department entered into an agreement with defense counsel to toll

12   the statute of limitations.

13       A   I'm not aware of the specifics of any -- of that agreement.

14       Q   Okay.   You're aware it was discussed at a 6/15/22 meeting that you

15   attended, correct?

16       A   Can you be more specific on that meeting?

17       Q   Well, there was a June 15th, 2022, meeting --

18       A   Correct.

19       Q   -- at Department headquarters with DOJ Tax Division officials, Mr. Goldberg,

20   Mr. Daly, Mr. Morgan.     You attended, I believe, and there was IRS personnel there as

21   well, correct?

22       A   Correct.   I now know which meeting you're talking about.

23       Q   Okay.   And so at that meeting, it's our understanding, that a discussion of

24   the statute of limitations expiring for the 2014, 2015 tax years was discussed.   Is that

25   correct?

1        Ms. <u>Zdeb.</u>    I'm sorry.    Before the witness answers, the meeting you're

2    describing is outside the scope of his authorization --

3        Mr. <u>Castor.</u>    Okay.

4        Ms. <u>Zdeb.</u>    -- unless you have some basis to think that there was a discussion

5    about the issue of Mr. Weiss' authority at that meeting --

6        Mr. <u>Castor.</u>    Okay.

7        Ms. <u>Zdeb.</u>    -- in which case he's welcome to talk about it.    But --

8        Mr. <u>Castor.</u>    Okay.    And we flagged that in our email, that we were interested in

9    that meeting, and that meeting was the subject of -- it was discussed in the Ziegler and

10    Shapley transcripts.

11        Ms. <u>Zdeb.</u>    Right.    And we understand.    And that's an example of what I mean

12    when I said that we may just have to agree to disagree in the room today on our

13    respective views on what is and is not encompassed in the ongoing matter.

14        Mr. <u>Castor.</u>    Okay.

15        Ms. <u>Zdeb.</u>    But I also want to emphasize that Mr. Sobocinski is here to talk to

16    some of the issues that the committee has identified as being kind of a central interest

17    and focus, and I don't -- I don't want to spend too much time getting into what he can't

18    address since he is here to answer --

19        Mr. <u>Castor.</u>    Well, I understand that.    But I'm just trying at the top here to figure

20    out what I can and can't have productive Q&A with him on.

21            BY MR. CASTOR:

22        Q    And so, as I understand it, the fact that the 2014 and '15 tax years expired,

23    you can't help us here today with facts relating to that?

24        A    Yeah, I'm not in a position to talk about the ongoing investigation.

25        Q    Okay.    So, in your mind, that's considered part of the ongoing investigation,

1    even though the statutes expired?

2         A      Without addressing that question directly, as the FBI, IRS tax charges are

3    not -- those are not my violations that I was investigating.    So I'm not in a position to

4    discuss the minutia of that.

5         Q      Okay.    But during the 6/15 meeting, you did have some communications

6    with Gary Shapley, correct, sort of offline?

7         A      Yeah, Gary was in the meeting.    Mr. Shapley was in the meeting.

8         Q      And did you speak with him on the sidelines of that meeting?

9         Ms. Zdeb.    And, Steve, again, I'm sorry, but this meeting is outside the scope of

10    and particularly deliberations that may have happened at that meeting, discussions

11    around --

12        Mr. Castor.    Okay.

13        Ms. Zdeb.    -- the status of the investigation that may have happened at that

14    meeting.

15        Mr. Castor.    Okay.

16        Ms. Zdeb.    The Department views all of that as part of the ongoing matter.

17        Mr. Castor.    Fair enough.    But asking the witness whether he attended a

18    meeting doesn't implicate any ongoing investigation.

19        Ms. Zdeb.    And he just answered that question.

20        Mr. Castor.    Asking a witness whether he remembers whether Agent Shapley

21    was at the meeting implicate any ongoing investigation.

22        Asking whether the witness had communications with Agent Shapley at the

23    meeting, on the sidelines of the meeting, that doesn't implicate any ongoing

24    investigations, correct?

25        Ms. Zdeb.    It all involves an ongoing investigation.

1          Mr. <u>Castor.</u>    Okay.

2          Ms. <u>Zdeb.</u>    He has answered those types of logistical questions --

3          Mr. <u>Castor.</u>    Okay.

4          Ms. <u>Zdeb.</u>    -- that you just asked him.

5          Mr. <u>Castor.</u>    Okay.    I'll just ask one more time.    I don't want to be

6    argumentative here.    I'm just trying to get the lay of the land here so we can be as

7    efficient with our time as possible.    I've got a whole lot of questions about the

8    2014-2015 tax year.    I've got a whole lot of questions about meetings that happened.

9    And I guess I'm not going to answer them because we've had this preliminary back and

10    forth.

11          BY MR. CASTOR:

12          Q    So I'll just ask one more time.    Do you recall having communications with

13    Agent Shapley at the 6/15/22 meeting sort of the sidelines of that meeting?

14          A    I was in a meeting with a bunch of people.    In a general sense I would have

15    talked -- I don't necessarily remember it, but it's not abnormal that I would.

16          Q    Okay.    So if Agent Shapley remembered something vividly and told us

17    about it, you would have no basis to suggest that was inaccurate, right?

18          A    I'm not going to comment on what Agent Shapley said or didn't say about

19    that meeting.

20          Q    Okay.

21          Sir?

22          Chairman <u>Jordan.</u>    Can I just go back to the letter?    You got the letter yesterday

23    from the Department of Justice.    Who signed the letter?

24          Mr. <u>Sobocinski.</u>    I don't know.

25          Chairman <u>Jordan.</u>    Was it the Attorney General, was it the DAG, was it the

1    counsel's office?    Who sent you the letter?

2         Mr. Sobocinski.    I just don't remember who --

3         Mr. Castor.    Was it FBI or DOJ?

4         Mr. Sobocinski.    It was a DOJ letter.

5         Mr. Castor.    Was it Weinsheimer.

6         Mr. Sobocinski.    I don't remember who sent the letter.

7         Chairman Jordan.    Special Counsel David Weiss' office?

8         Mr. Sobocinski.    No.

9         Mr. Castor.    Sara, do you know who signed the letter?

10         Ms. Zdeb.    We are happy to get you a copy of the letter, but it was a letter signed

11    by the Department.

12         Mr. Castor.    Okay.    But you won't tell us who signed it.

13         Ms. Zdeb.    It was Mr. Weinsheimer.

14         Mr. Castor.    It was Mr. Weinsheimer.    Okay.    We got an answer there.

15         BY MR. CASTOR:

16    Q    So sort of the next -- I understand the tax years 2017, '18, and '19 are part of

17    the ongoing investigation and you can't talk about that.    Is that correct?

18    A    I can't talk about the ongoing case.

19    Q    Okay.    The prospect of bringing FARA charges, is that something that is part

20    of the ongoing investigation?

21    A    I cannot comment on anything about potential ongoing investigative activity.

22    Q    Okay.    If I ask you questions about FARA then, are you going to be able to

23    help us?    I mean, if it's not part of an ongoing probe, then I would hope that the answer

24    would be yes.

25    A    Are you asking about my understanding of FARA and what FARA charges

1    look like, or are you asking is it relating to an ongoing investigation?

2         Q    Well, I don't know in if it's ongoing or not.    That's the question.

3              Are the questions about Hunter Biden and FARA, is that part of the ongoing

4    investigation?

5         A    I'm not going to classify what is and what isn't currently involved in a

6    potential ongoing investigation.

7         Q    Okay.    But if I ask you questions about Hunter Biden and FARA, are you

8    going to be able to answer them here today?

9         A    Let's see.

10        Q    Okay.    Are you aware of any FARA investigation currently ongoing?

11        A    Yeah.    Once again, that is something I cannot talk about.    You're asking

12   me about a potential ongoing case.

13        Q    Okay.

14             All right.    When did you -- you're currently the special agent in charge of the

15   Baltimore Field Office?

16        A    I am.

17        Q    And when did you commence those duties?

18        A    July of 2021.

19        Q    And how involved have you been in this particular case since you joined the

20   office?

21        A    This, like every other -- all the other cases in Maryland and Delaware, I have

22   responsibility for as the senior leader for the FBI.

23        Q    And is that the Baltimore Field Office's jurisdiction, Baltimore and -- I'm

24   sorry, Maryland and Delaware?

25        A    It is.

1    Q    The whole State of Maryland?

2    A    Correct.

3    Q    And as it relates to the Hunter Biden investigation, did you receive any

4    transition meetings or communications when you took over the office from, I believe it

5    was the special agent in charge, Boone?

6    A    So when I came in, yes, I received updates, verbal and in written material,

7    reviewed written materials about what investigations were currently open.

8    Q    And what were you told about this particular case?

9    A    Because it's ongoing, I can't go into the specifics other than it existed and

10    that I was made aware of it.

11    Q    And how often did you join prosecution team meetings on this case?    Was

12    it regular or was it just a handful that you can recall?

13    Ms. Greer.    Could we cabin to a time period perhaps to help him to start to

14    answer?    Are you talking about when he first joined the Baltimore Field Office?

15    Mr. Castor.    Since July 2021.

16    Chairman Jordan.    Yeah.

17    Mr. Sobocinski.    Yeah, I don't -- less than 12.

18        BY MR. CASTOR:

19    Q    Okay.    And would that include meetings in Delaware with the U.S. attorney

20    and Main Justice?

21    A    Yeah.    So let's talk about that.

22    So what do you mean by investigative -- what are you asking for in investigative

23    meetings?

24    Q    Meetings with the -- investigative or prosecutorial meetings with the U.S.

25    Attorney's Office about this case, with Main Justice about this case.

1      A     So I regularly meet with all of my team on a fairly regular basis.     So

2    meetings with the U.S. Attorney's Office and my team in certain instances, I'm going to

3    say less than 20.

4      Q     Okay.     But I'm talking about specific meetings just about this case, like the

5    10/7 meeting that Mr. -- Agent Shapley identified.

6      A     I don't have a real sense of what that number looks like.

7      Q     Okay.     And when you communicate with Main Justice -- I'm sorry -- FBI

8    headquarters, who at the headquarters do you ordinarily communicate with?     Like if

9    headquarters is contacting you to ask about a particular investigation, how would that

10   communication work generally?

11     A     Unfortunately, it runs the gamut.     So depending on what I'm working, it

12   could be the deputy director.     It could be assistant directors in charge of various lines of

13   authority that they have.     It could be their follow-on agents.     I mean, so it's a mixture

14   of folks that will contact me.

15     Q     Okay.     As it relates to this particular case, who at FBI headquarters would

16   contact you for updates and potentially give you guidance on the case?

17     A     This case was managed out of our Criminal Investigative Division, and so it

18   would have been probably at a deputy assistant director level for the majority of it,

19   potentially a section chief level.

20     Q     And who were those folks?

21     A     The DAD at the time was Aaron Tapp.     The section chief would have been

22   Joe Rothrock.

23     Q     And how frequently did headquarters reach out to you about this particular

24   investigation?

25     A     I don't know how -- whether I precipitated it or whether they called me.

1    It's fuzzy.    I just don't know.    We talked fairly regularly around this and other cases.

2         Q    Okay.    Was it any more common -- or any more frequently for this case

3    than any of your other cases?

4         A    In the recent few months, it's gotten more and more communication.

5         Q    Okay.    But largely that communication is at the DAD level?

6         A    Correct.

7         Q    Have you had communications with the deputy director or anyone more

8    senior than the DAD?

9         A    I have.

10         Q    And how frequently?

11         A    Yeah, I mean, the numbers for me are -- I just don't have a clear, consistent

12    number that you're looking for.

13         Q    Okay.

14         A    But it's something I talk to them about.

15         Q    But did they have their pulse on the case?

16         A    I can't comment on whether -- they absolutely had awareness of the case.

17         Q    Uh-huh.    Witnesses have testified -- and I'm sure you're aware -- Agent

18    Shapley and Agent Ziegler, that during the entire pendency of the investigation their

19    efforts to conduct what they considered ordinary investigative techniques were curtailed,

20    and sometimes they said they were curtailed by FBI officials.

21         Do you have any awareness of that?

22         A    I'm not aware of that at all.

23         Q    Okay.    So to the extent they were curtailed by FBI officials, you wouldn't

24    know who that was or how that originated?

25         A    I have no knowledge of FBI curtailing their investigative activity.

1     Q     Okay.    And when you have communications with Main Justice, different

2   from FBI headquarters, who is your point of contact that you normally speak with?

3     A     So the way we work, I do not go direct with the Department of Justice.

4   Procedurally, in general, that's a headquarters function.    I go to headquarters.

5   Headquarters then facilitates that communication with the Department of Justice.

6     Q     Okay.    So you don't ordinarily have incoming phone calls from Main

7   Justice?

8     A     I do not.

9     Q     Okay.    So Stuart Goldberg doesn't call you?

10    A     I'm trying to be as open as I can.

11    Q     Sure.

12    A     I don't know who he is.

13    Q     Okay.

14    A     And so then that's an easy one.    But I don't want to get into specifics of,

15  like, is somebody from the Department talking to me about this case.    I don't know that

16  person.

17    Q     During the pendency of the case, did you have communications with the Tax

18  Division lawyers, Jack Morgan or Mark Daly?    Is that something that happened at the

19  SAC level, at your level?

20    A     Who are those people?    Do you know -- can you describe their roles for

21  me?

22    Q     They're lawyers in the Tax Division of Main Justice.

23    A     So without going into specifics of the ongoing case, you brought up that

24  meeting that we had this discussion about --

25    Q     Right.

1        A      -- I don't have an ability to talk about.    If they were in that meeting, then

2    they would have been in that meeting.

3        Q      Okay.

4        A      I may have met them there.

5        Q      But outside of a meeting like that, you don't have regular communications

6    with the Tax Department officials?

7        A      I do not.

8        Q      Okay.    Can you help us understand -- this particular case had IRS

9    investigators and had FBI investigators -- how that was split up and how the duties were

10   divided and how they work together?

11       A      So, once again, cannot talk about this particular case, but I can talk about in

12   general how cases like this work.

13       Q      Okay.

14       A      And depending on what the thing we're looking at is, whether it's an

15   investigation or an intelligence operation, different agencies have different authorities.

16   The FBI regularly partners with these folks.

17          I think at a basic level we have task force officers.    Those are officers, State and

18   local partners, that are given authorities for the FBI.    They sit in our office.    They work

19   our investigations.

20          We also have joint investigations where components are assigned to work a

21   similar case.    They vary from -- all these cases vary.    But in general you split up based

22   upon what your organization does most.

23          And so, hypothetically, if it was -- if this was a tax case, IRS is going to usually work

24   the tax component of a joint investigation.    Terrorism, which is what I mostly worked my

25   career, you would then -- we would be in charge of the terrorism side charges.

1      Q     Okay.

2      A     And at some point they'd come together for prosecution, close the case,

3    move on, resolution.

4      Q     Okay.    But it's fair to say sometimes IRS criminal investigators are working

5    hand in hand with FBI agents to go interview witnesses and conduct investigative activity?

6      A     Yes.

7      Q     And when that's happened, is there any rules of the road about how those

8    duties are split, or do they just operate as a team?

9      A     You know, in a general sense you want to record those information in one

10   place.    So my hope is that before that meeting, that interview, or whatever happens,

11   they've agreed in advance that one of the persons is going to make the -- to record what

12   just was discussed.    One person is going to take items, evidence, things like that.

13     Q     Okay.    Agent Shapley talked about a day of action, for example, that was

14   scheduled to occur in I believe it was December of 2020.    And he spoke about how Joe

15   Gordon, an FBI official, and himself were on the ground in California and were getting

16   ready to go do interviews.

17           How would something like that, how would the duties be split?

18     A     You know, so, once again, can't talk about that.    I wasn't even in this

19   position during that frame.

20     Q     Fair enough.

21     A     But, yeah, we regularly send agents over.    And from my current position

22   other levels would discuss in advance, "Hey, we're sending you to Milwaukee."    "Why

23   are you going to Milwaukee?    Why couldn't Milwaukee handle it if we are sending

24   agents out together?"    I mean, at this point that's an agent-level decision on how that

25   usually gets split when they're doing it.

1    Q    Okay.    Now, if there's an investigative decision about whether they're going

2    to approach a witness cold, who makes that decision?    Is that IRS or FBI or is that made

3    jointly, knock on a door and just try to get a witness in a candid moment to talk?

4    A    Yeah, that's an agent decision.

5    Q    Okay.    And if there was a plan to talk to a particular witness -- I'm just

6    talking generally -- if there was a plan to talk to a particular witness and catch that

7    witness cold, if someone at FBI or a different -- or Main Justice tipped off that witness

8    that the FBI agent and the IRS agent were going to talk to cold, would you consider that

9    to be problematic?

10    A    There are different strategies for interviews.    And in my almost 30-plus

11    years of law enforcement, I've done different things.

12    Q    But if the game plan was to catch a witness cold, knock on his door and see if

13    he's willing to talk, would you consider it problematic if someone else in the mix alerted,

14    say, the defense attorney for that witness that perhaps the FBI was going to knock on

15    their door the next morning?

16    Ms. Zdeb.    Are you asking him to speculate on an actual thing that you believe

17    happened in this specific case?

18        BY MR. CASTOR:

19    Q    I'm just saying generally.    You know, you've been with the FBI how many

20    years?

21    A    25, going on 25.

22    Q    So you have an incredible wealth of experience about best practices for

23    conducting investigative work, correct?

24    A    At this point I'm dangerous enough to kind of know what I'm doing a little

25    bit.

1    Q    So if the plan -- generally speaking, not talking about anything specific -- but

2    if the plan generally was to catch a witness by surprise, which you do from time to time,

3    correct, you try to get witnesses to talk to you, right, without the benefit of their lawyer,

4    without the benefit of too much opportunity to think things through, correct?

5    A    Have I done that in the past?    Sure.

6    Q    But that's something the FBI and IRS criminal investigators do all the time,

7    correct?

8    A    Interview people?    Absolutely.

9    Q    And try and take them by surprise and get them in a candid moment?

10    A    You know, I've done hundreds of interviews, and there are a hundred

11    different ways I come about each one of those interviews.

12    Q    But that's one of the regular ways, right?

13    A    Trying to surprise people?    It may very well be, but --

14    Q    Maybe "surprise" is the wrong word, but just try to visit with them and see if

15    they'll talk?

16    A    I and my agents every day are visiting with people trying to get them to

17    talk --

18    Q    Right.

19    A    -- and get information from the community.

20    Q    And sometimes the game plan is try to get them to talk without them

21    knowing you're coming, correct?

22    A    Sure, that's absolutely an option.

23    Q    Okay.    And if that was the plan with a particular witness -- generally

24    speaking -- and someone at DOJ or somebody else at FBI tipped that witness off, that

25    would not be a best practice, would it?

1        A     You're asking me to speculate.     There may have been a justifiable reason of

2    why that happened that I wasn't aware about in your hypothetical situation.

3        Q     Okay.     Do you know Agent Gordon that I mentioned?     He was in the --

4        A     Can I go off, have a moment here?

5    Mr. Castor.     Sure.

6    [Discussion off the record.]

7    Mr. Sobocinski.     Yes, I know Joe Gordon.     I would ask that he is not an executive

8    in the FBI and that as best as we can we keep his identity as it relates to my testimony

9    here anonymous.

10    Mr. Castor.     Okay.     At the end of the interview, we'll give you a -- I'm going to

11    stop the clock here for recordkeeping purposes.     At the end of the interview, the court

12    reporters, they'll turn it around pretty quickly, you can come in and review the transcript

13    for accuracy.

14    Mr. Sobocinski.     Okay.

15    Mr. Castor.     And agency counsel, those that are in the room, can come in and

16    look at the transcript.     And if there's any inaccuracies, you can identify them for us.     If

17    there's any proposed redactions, we'll take that into consideration.

18    And also, just when you're reviewing the transcript, if you realize that you got

19    something wrong or you remembered something, you can tell us.     You can tell us at that

20    time.

21    And so if you or FBI, DOJ counsel thinks that a particular name needs to be

22    redacted, they can propose it, and then we'll consider it.     A lot of times we're okay with

23    that redaction.     Sometimes we're not.

24    With Agent Gordon in particular, he's testified for a different committee, so --

25    Ms. Greer.     The committee did redact his name and not released his name,

1    however, so I think that's --

2            Mr. Castor.    Oh, you already did that?

3            Ms. Greer.    Yeah.

4            Mr. Castor.    Is that true, Clark?

5            Mr. Abourisk.    Correct.

6            Mr. Castor.    Okay.    All right.

7            Ms. Zdeb.    And I think there were -- just on this point -- there were a few of the

8    Tax Division attorney names also fall into this category.

9            But appreciate the offer, and we're happy to look at that after the fact.

10            Mr. Castor.    Yeah, just so you understand how the transcript review works.

11    Usually the court reporters give it to us pretty quickly too.    They're awesome.

12            Anyway, we'll go back on the clock here.

13            Ms. Zdeb.    Got to praise the court reporter.

14            Mr. Castor.    Absolutely.

15                BY MR. CASTOR:

16    Q    So Agent Gordon, he was under your purview?

17    A    He was a supervisor that worked for me for a time, yeah.

18    Q    Okay.    And how long did he work for you?

19    A    I think maybe a year.

20    Q    Okay.    And was he based in Wilmington?

21    A    He was.

22    Q    Okay.    And he was one of the main agents on this case?

23    A    He was a supervisor in the office.

24    Q    How many folks are in the office up in Wilmington?

25    A    Yeah, I can't -- we don't regularly give out the numbers of our office.

1       Q    Okay.   So you know the answer, but you're not going to tell me the

2    answer?

3       A    I have a general sense of the answer.

4       Q    Okay.

5       A    I would say I would love more.   But I don't have a --

6       Q    So you know the answer, but you're not going to give me the answer.   Is

7    that what you're saying?

8       A    I have a general sense of the numbers, yes.

9       Q    I want to turn our attention to the October 7th meeting.

10       A    Uh-huh.

11       Q    And we'll mark as an exhibit -- it will be exhibit 1 for us, but it was exhibit 10

12    for Agent Shapley's deposition.

13                 [Sobocinski Exhibit No. 1

14                 Was marked for identification.]

15         BY MR. CASTOR:

16       Q    Is this the first time you've seen this document?

17       A    It's not.

18       Q    And when have you seen this document before?

19       A    Sometime in the last week.

20       Q    Okay.   So these are contemporaneous notes prepared by Agent Shapley of

21    the IRS summarizing a meeting that happened on Friday, October 7th, 2022.   And it's my

22    understanding you attended this meeting?

23       A    I attended a meeting around that date, yes.

24       Q    And do you remember who was in that meeting?

25       A    Yeah, in a general sense I do.

1       Q       Okay.    And can you tell us who?

2       A       So, yeah.    Myself, would have been my assistant special agent in charge.

3       Q       And who is that?

4       A       She is not an SES employee, so right now I'm not going to give you her name.

5       Q       Is that Agent Holley?

6       A       I'm not going to discuss her name right now.

7       Q       Okay.    I mean, we sent a subpoena to her.    She's slated to testify on

8    Monday.    So, okay.

9       A       The SAC for IRS.    Other SACs --

10      Q       And who was that?

11      A       I believe it was Darrell Waldon.

12      Q       Okay.

13      A       And then other IRS employees.    I don't have a -- I don't know the specifics

14   of who there was in there.    I do believe Mr. Shapley was one of them.    David Weiss,

15   the U.S. attorney, was in there, and then members of his staff.    But, once again, it's just

16   a general sense of who they were.    Specifics I don't recall from that.

17      Q       And what was the purpose of the meeting?

18      A       You know, the purpose -- why I showed up for the -- why I went to this

19   meeting is there had been a media leak reported in one of the papers, and I was there to

20   discuss the media leak.

21      Q       What do you remember about the leak?

22      A       That it was -- it appeared to reference ongoing investigative activity in this

23   case.

24      Q       Do you remember what publication it was in?

25      A       I believe it was The Washington Post.

1          Q     And what was the gist of the article or the gist of the concern?

2          A     That potentially somebody was working -- a law enforcement investigation

3    was talking to a reporter.

4          Q     Did you have an idea who that was?

5          A     Yeah, I didn't speculate at that point.    It could have been quite a few

6    people.

7          Q     Like who do you -- this case obviously has been the subject of a lot of

8    reporting and leaks, whether they're authorized or unauthorized.    Who's talking to the

9    press on this case?

10         A     Yeah, you're asking me to speculate.    I don't know.

11         Q     But you're not?

12         A     I am not.

13         Q     Okay.    And, to the best of your understanding, nobody at the FBI is,

14    correct?

15         A     I'm not aware of -- I can't speculate on who the leaks are.

16         Q     Okay.    So the meeting was called to talk about the leak?

17         A     Yeah, to reference the leak and to make sure we were focused on the

18    investigation and moving it forward to a resolution.

19         Q     Did U.S. Attorney Weiss, did he exhibit concern about the leaks?

20               Do you know who called the meeting?    Was it a regularly scheduled meeting or

21    was it a --

22         A     Yeah, I don't --

23         Q     You don't remember?

24         A     I don't have a sense of whether it was previously scheduled or it was we

25    were showing up because of that.    My memory is it was -- I was there because of the

1      timing as it related to that leak.

2            Q      But you drove up to Baltimore?

3            A      Wilmington.

4            Q      I'm sorry.    You drove from Baltimore to Wilmington?

5            A      Correct.

6            Q      Did you drive specifically to Wilmington for the meeting, or did you have

7      business there that you were already scheduled to be there?

8            A      Yeah, I don't know.    I regularly go up.    It's part of my -- I have teams there.

9      I try to go there regularly.    I try to do as much -- to cram as much in as I can.

10           Q      Okay.    And do you remember any other purpose that the meeting was

11     called?

12           A      Other than what I just talked about, no.

13           Q      Yeah.    Looking at -- let me just ask you one question.

14                 FBI Form 302s are reports of interviews that FBI agents prepare, correct?

15           A      Correct.

16           Q      For the most part, do you think FBI 302s are reliable documents?

17           A      I do.

18           Q      And why are they reliable?

19           A      Because it is by which the way the FBI records -- and has for some

20     time -- records interviews.

21           Q      Okay.    So FBI investigators are trained to interview witnesses, correct?

22           A      Correct.

23           Q      And write up the contents of their interview in a contemporaneous fashion,

24     correct?

25           A      Correct.

1    Q    And the same goes for IRS criminal investigators.    They write up their

2    interview summaries and reports much in the same fashion, correct?

3    A    Yeah, I can't comment on what their process is.    But I think law

4    enforcement worldwide writes up interviews of --

5    Q    And from your perspective the 302s are reliable because they're

6    contemporaneous, and they're written by a professional whose job it is to conduct

7    interviews and write reports about those interviews, correct?

8    A    Yes.

9    Q    Okay.    So exhibit 10 here is a contemporaneous report, in effect, of the

10    October 7th meeting prepared by Agent Shapley.    And Agent Shapley identifies in this

11    particular document that Mr. Waldon, the special agent in charge, asked him for this

12    report.

13        So, for the most part, this type of contemporaneous capture of a meeting is, in

14    essence, a reliable document, correct?

15    A    I can't comment on the veracity of this.    You have what looks like an email

16    chain.    I really don't know who wrote it.    I was not referenced in it.    But I can talk

17    about what it states.

18    Q    Uh-huh.    But you don't have any evidence to suggest --

19    A    No.

20    Q    -- that Mr. Shapley didn't write this, correct?

21    A    No.    But we are in a conversation.    You're asking me to be truthful, and I

22    just don't know the veracity and when this was written.

23    Q    Okay.

24    A    And I do see regularly emails that are manipulated in my course of business.

25    Q    Okay.

1        A    And so I just want to put that out there.

2        Q    Okay.    Fair enough.    I mean, for the record, Agent Shapley testified under

3    oath.    He brought this document to that deposition.    And he articulated that he

4    prepared this email contemporaneously because his special agent in charge asked him to.

5        So with that sort of stipulated to, there's no reason that these notes would be

6    unreliable?

7        A    Okay.

8        Q    So you understand that, you don't have any evidence or suggestion that

9    these are unreliable?

10        A    No.    I appreciate your statement, yeah.

11        Q    Okay.    And so this is a two-page document, and it talks about six

12    enumerated items.

13        Number 2 on here is:    "Weiss stated that he is not the deciding person on

14    whether charges are filed.    I believe this to be a huge problem -- inconsistent with DOJ

15    public position and Merrick Garland's testimony."

16        You were in the meeting.    Did that -- do you remember that occurring?

17        A    I don't.

18        Q    So you do not remember the U.S. attorney stating that he is not the deciding

19    person on whether charges are filed?

20        A    Yeah, I do not.

21        Q    Okay.    Now, at this point in time in the investigation, who did you think had

22    authority to bring charges?

23        A    David Weiss.

24        Q    Okay.    And if David Weiss wanted to bring charges outside of his

25    jurisdiction, who had authority to make that happen?

1        A    David Weiss.

2        Q    Okay.    So if David Weiss brought the 2014-2015 tax cases to D.C., to the

3    U.S. attorney, Matthew Graves, whose call was it to bring those charges?

4        A    Once again, I'm not aware of that discussion.    I was consistently aware that

5    David Weiss had the authority in the U.S. to bring the charges where venue presented

6    itself.

7        Q    Okay.    Wherever he wanted?    He could bring it in California?    He could

8    bring it in D.C.?

9        A    Correct.

10    Chairman Jordan.    And on what basis did you understand he had that authority?

11    Because that's not normal.    He can bring them in his district.    On what basis did you

12    understand he had that authority?

13    Mr. Sobocinski.    So from when -- the minute I got there in July of '21, it was

14    always the understanding and the communication between David Weiss and myself is

15    that he had that authority to bring it on behalf of the Department.

16    Chairman Jordan.    So you believed that he had this authority when, where, and

17    whether?

18    Mr. Sobocinski.    Yeah.

19    Chairman Jordan.    Okay.

20            BY MR. CASTOR:

21        Q    And so you are aware that charges were brought to Matthew Graves in D.C.,

22    correct?

23        A    I am not.

24        Q    So you don't remember being at any meeting or at any point during the

25    investigation where you learned that the U.S. attorney for D.C. denied David Weiss the

1    ability to bring charges?

2          A       Without getting into the specifics of an ongoing case, it did come -- it was

3    brought to me at some point -- probably the summer that I arrived, maybe a little bit

4    later -- that they had been exploring where to bring charges, and one of those locations

5    was D.C.

6          Q       Okay.

7          A       I'm not aware of a declination.    I'm not aware of what that -- that occurred

8    prior to me getting involved.    But I was aware that there had been discussions.

9          Q       Right.    Well, I don't think it happened -- I think it happened during your

10   pendency that the 2014 and '15 tax charges were brought to D.C.    But you don't

11   remember that?

12         A       You know, as we started, the tax charges were IRS.    And so for me and my

13   role, yeah, I didn't have visibility into that.

14         Q       Okay.

15         Ms. Greer.    Could we go off the record for just one second?

16         Mr. Castor.    Okay.

17         [Discussion off the record.]

18         Mr. Sobocinski.    So, yeah, I want to give you context on what we talked about,

19   what the cases look like.    So I want to be as expansive as I can so you have an

20   understanding of this.

21         So for us, when it comes to charging decisions, that's not an FBI role.    I always

22   assume that the U.S. Attorney's Office that I am working with has some authority to do it

23   in their venue.    And if they don't, there are administrative ways in which cases are

24   brought to other districts in the U.S.    That's something I've worked with regularly

25   throughout my career.

1          There are various ways that happens.    We can transfer a case.    I have a general

2    sense that David could go to -- Mr. Weiss could go to another district.    He could ask to

3    have that joined.    If it's not, then he goes back for an administrative authority to bring

4    the case on his own.

5          But it's administrative in nature.    At no point did I think he did not have that

6    authority to do all of those steps with all that we were looking at.

7          Mr. Castor.    So as I understand your testimony, you were unaware that in March

8    of 2022 -- this is after you, you know, this is after you joined the Baltimore Field Office, in

9    March of 2022 they brought -- the prosecution team brought the case to Matthew

10   Graves, the U.S. attorney for D.C., and asked him to prosecute the tax years of 2014 and

11   2015.

12          You're saying you're unaware of that?

13          Mr. Sobocinski.    Once again, I can't comment on the specifics of an investigation.

14   But I know that from my role, I was looking to support David Weiss' office to bring a

15   resolution to this, whether it's charges or whatever it may be.

16          Mr. Castor.    I mean, you have responsibility to this case.    Certainly you were

17   curious whether this was going to be brought in D.C., in Delaware, in California, correct?

18   You were tracking that.    You were managing that.    You're the manager here.

19          Mr. Sobocinski.    I was not curious as to, like, the minutia of this process.    It's not

20   something that fell to me.    I absolutely wanted to get a resolution in this investigation.

21          Chairman Jordan.    You always thought that Mr. Weiss had the authority to bring

22   charges wherever and whenever he wanted to?

23          Mr. Sobocinski.    Correct.

24          Chairman Jordan.    You thought that the entire time?

25          Mr. Sobocinski.    Correct.

1          Chairman <u>Jordan.</u>    From July 2021 when you got there all the way through, you

2     thought he could bring them wherever he wanted to bring them?

3          Mr. <u>Sobocinski.</u>     Correct.    And that there was an administrative process that I

4     don't know the minutia of that the Department -- then he would work within the

5     Department to have that authority to do that within whatever venue this ultimately

6     resided in.

7               BY MR. CASTOR:

8          Q     And do you ever remember David Weiss stating that he was denied by the

9     U.S. attorney in D.C. to bring those charges?

10         A     Once again, I don't want to go -- I'm not going to -- I can't go -- I don't want

11    to go into deliberative process about what he did or didn't.    It was my general sense is

12    I'm aware that there had been conversations with venues and then we were continually

13    looking to support him as he was trying to figure those venue issues out.    But it was my

14    understanding that he had the authority -- ultimate authority to work through the

15    administrative process to bring these cases.

16         Q     To bring a case in D.C.?

17         A     To bring a case where he deemed appropriate.

18         Q     If that's the case, why did he feel the need to ask for any special authority in

19    August of this year?

20         A     You'll have to ask Mr. Weiss that.

21         Q     Uh-huh.    So when did you learn that the 2014 and 2015 tax cases which

22    had venue in D.C. weren't going to be able to go forward?

23         A     Once again, I cannot comment on the specifics of the case.    I will say I'm an

24    FBI agent.    I'm not an IRS agent.    Those charges solely were lied within IRS.    And I was

25    looking on bringing the totality of this investigation to a close.

1      Q      Right.    But this is a high-profile investigation.    It's the son of the President

2  of the United States.    You were managing it.    You were following it.    Okay?    You've

3  got to be able to tell us when you realized you can't bring the 2014 and '15 tax charges in

4  D.C. and how you learned that.

5      A      I can't get into the minutia of the actual case.    I will say if you've ever sat in

6  a room with IRS agents and lawyers talking about taxes, unless you're an expert and you

7  are engrossed in the minutia of that, they get very complicated.

8      Q      Okay.    Fair enough.

9             But he had millions of dollars in income from Burisma, right, for a no-show board

10  appearance.    Okay?    And that income was about to escape taxation because the

11  statute of limitations were expiring.    I mean, you as the head of the relevant FBI field

12  office had to be tracking this, correct?

13      A      Tracking -- when you -- by "this," what do you mean "this"?

14      Q      That millions of dollars of income subject to the 2014 and '15 tax years were

15  about to expire that needed to be prosecuted, otherwise the statute of limitations would

16  be -- would lapse.    You had to be tracking this.    So what can you tell us about it?

17      A      Without going into specifics of the actual investigation, I was focused on

18  bringing this case to a resolution.

19      Q      Okay.    I mean which case?    Like the whole case or the tax part?

20      A      I was focused on bringing cases -- everything -- you know, the hundreds of

21  cases I have, we want to get them to end.    Whatever those charges ultimately end up is

22  not up to me as the FBI.    I'm putting the evidence together, providing it to a prosecutor.

23      Q      Okay.

24      A      They're working those issues on what charges actually are brought.

25      Q      Okay.    At some point you learned that the 2014-'15 cases couldn't be

1    prosecuted in D.C. and couldn't be prosecuted at all.    When was that?

2            A      I'm not commenting on the specifics of ongoing cases.

3            [Outside interruption.]

4            Q      Sorry.

5            A      Yeah, I'm not going to comment on the dialogue of what we were discussing

6    as the case is --

7            Q      Is it because you know and you're not going to tell me, or is it because you

8    don't know?

9            Ms. Zdeb.    I think it's -- Steve, it's the reason we said earlier, the 2014 and 2015

10   tax years, and these questions get at issues that are outside the scope of what --

11           Mr. Castor.    This is at the heart of what we're looking into, Weiss' ability to bring

12   charges in D.C., Weiss' ability to bring charges in California, his authority to do that.    He

13   tried to do that, he tried to bring it in D.C., and he was denied.    And I'm simply trying to

14   ask the witness when he learned that.

15           Ms. Zdeb.    You were asking him about specific tax years, and I think he's spoken

16   to your question.

17               BY MR. CASTOR:

18           Q      Well, I think we can stipulate that '14 and '15 are D.C.    So, I mean, this is at,

19   like, the heart of our, like, interest, the heart of Weiss' authority.

20           So, I mean, I think we're going to be disappointed if you're not able to tell us about

21   that.    And if you're not going to tell us about it, I'd like to know whether you know the

22   answer and you're just not telling us or whether you just don't know the answer.

23           A      Are you asking me that question?

24           Q      Yes.

25           A      I am not going to specifically talk about prosecutorial decisions.

1          Q      Okay.

2          A      What charges are brought or not brought, that's up to the U.S. Attorney's

3    Office.

4          Q      But my question is, do you know the answer of when you learned they

5    weren't bringing the case in D.C. for 2014 and 2015 tax years?

6          Ms. Greer.    Can we pause, go off the record?

7          Mr. Castor.    Sure.

8          [Discussion off the record.]

9          Mr. Sobocinski.    Yeah, so as I mentioned earlier, I was around the tax portion of

10   this case.    The minutia of what years, what not years had been discussed throughout

11   that process.    I have no real direct knowledge of how they ultimately were resolved and

12   the time frame of when they ultimately resolved.

13                BY MR. CASTOR:

14         Q      Okay.    Are you aware that the 2014 and '15 tax years had a lot of money

15   coming in from Burisma?

16         A      I cannot comment on ongoing aspects of this case.

17         Q      And, again, do you know the answer to my question or do you -- and you're

18   not willing to tell me because of the direction from the Department, or do you not know

19   the answer?

20         A      I have a -- can you rephrase that question for me?

21         Q      I'm just wondering whether you know the answer to my question about the

22   2014 and '15 tax years encompass, like, millions of dollars untaxed income coming in from

23   Burisma, which he was sitting on the board in case you haven't -- are you aware that he

24   was sitting on the Burisma board?

25         A      I have seen open-source media reporting that he sat on a Burisma board.

1    Q    Okay.    And he was paid a handsome annual fee to sit on that board.    Are

2    you aware of that?

3    A    I can't comment on what I know about his financial activity as it relates to

4    this investigation.

5    Q    Okay.    And is it because you don't know the answer to that or you're not

6    able to comment because it's an ongoing investigation?

7    A    I'm not able to comment because it's an ongoing investigation.

8    Q    Okay.    Fair enough.

9         So my question about the 2014 and '15 tax years, when that statute of limitations

10   was about to expire, there's, like, millions of dollars in untaxed income that was just

11   about to go away.    And I'm just asking you if you were tracking that.

12   A    I had a very high-level sense of IRS charges.    IRS and the U.S. Attorney's

13   Office were in the weeds on what that process would like and what the minutia of their

14   ability to charge would be.

15   Q    Okay.    But at some point there was a resolution that they're not charging

16   2014 and 2015 and they can't charge it because the statute has expired, correct?

17   A    I can't comment on a charging decision by the U.S. Attorney's Office.

18   Q    But did you know that was happening?

19   A    I have an ongoing case.    I cannot talk about aspects of that case that might

20   be continuing.

21   Q    Okay.

22        Ms. Greer.    Do you have a specific recollection that goes to the question?

23        Mr. Sobocinski.    Yeah, I don't.    You're asking me about tax years, and I go back

24   to I'm not -- I and my agents are not tax agents.    The minutia of tax law is very

25   complicated.    We have the -- there's a whole government entity.    There's various

1  lawyers that specialize in this.    I had a general sense of this.

2        Chairman Jordan.    Yeah, but this is simple.    He got a boatload of money and

3  didn't pay -- this wasn't complicated.    This is, like, he just failed to pay the taxes on a

4  boatload of money he got.    So this is as simple as it gets.    And this has got to be the

5  highest profile -- well, one of the highest profile investigations your office is doing.

6        And Steve is asking a simple question.    Did you know when they decided not to

7  do it?

8        Mr. Sobocinski.    No, I have no direct date or knowledge of when any of those

9  decisions may or may not have happened.

10              BY MR. CASTOR:

11      Q    But you know that the decision did happen, correct?

12      A    When -- once again, I refer -- I'm not going to speculate on what they

13  decided as far as potential charges in an ongoing investigation.

14      Q    But you knew, for example, they couldn't bring those charges in Delaware,

15  right?

16      A    It is my understanding, based upon the U.S. Attorney's Office and

17  prosecutors making that determination, that Delaware was not the appropriate venue.

18      Q    That they had to go to D.C. or California to do the tax charges, right?

19      A    That they were actively exploring other locations.

20        Chairman Jordan.    And you thought they had the authority to do so?

21        Mr. Sobocinski.    Correct.

22        Chairman Jordan.    You were always under that assumption?

23        Mr. Sobocinski.    Correct.

24        Chairman Jordan.    Which sort of begs the question Steve asked earlier.    If they

25  already had it, why does he need it?    If they already had the authority to bring it, which

1     you thought they did, why does he need the special counsel designation now?

2          Mr. <u>Sobocinski.</u>    That's a conversation with somebody else other than me.    I

3     was not a part of that.

4          Chairman <u>Jordan.</u>    Okay.

1              BY MR. CASTOR:

2       Q     You said that you weren't tracking these tax -- the tax part because you're

3    FBI, not IRS.

4              What were you tracking?    Like, what part of the investigation were you tracking?

5       A     I can't comment on ongoing portions of this investigation.

6       Q     Okay.

7       A     But I was regularly working with the U.S. Attorney's Office.

8       Q     Okay.

9              Ms. Greer.    At a general level?

10             Mr. Sobocinski.    Meaning?    Excuse me.

11             [Discussion off the record.]

12             Mr. Sobocinski.    Yeah.    So as I talked about earlier with moving forward, is that

13    regardless of what the U.S. Attorney's Office chose to charge, my team and I were

14    collecting information to be used however he deemed to use it for whatever specific

15    charges he wanted to use.    I wanted to keep that momentum going so that we got to an

16    end point, whatever that end point would be.

17             BY MR. CASTOR:

18       Q     Okay.    And what were the venues that that end point could have been that

19    you were tracking so carefully?

20       A     So I had awareness of previous discussions in D.C. and then I did have

21    awareness in L.A.

22       Q     Okay.    And then there was a point where Graves said no, correct?

23       A     I'm not personally aware of that, of what actually happened.

24       Q     Okay.    Did you know that they stopped working towards prosecuting a case

25    in D.C. at any point in time?

1   A  You know, that's a question for David Weiss. I don't know what his -- what

2 they were doing on their side.

3   Q  But at some point you're managing this and you're thinking, "Hey, this case

4 that I'm managing, I'd like to bring it to a resolution," and that resolution is either going to

5 happen in D.C., Delaware, or L.A., right?

6   A  That -- I -- well, first, it wasn't up to me, and I didn't -- I didn't care about

7 what venue we wanted to. I just wanted to bring it forward to resolve this case.

8   Q  But you said you'd been in meetings, in 12 or 20 -- I forget the number -- but,

9 obviously, you were tracking where the cases were going to be, how they were going to

10 be put together, and where they were going to be brought, right?

11   A  Yes.

12   Q  Okay. And you knew it was either D.C., L.A., or Delaware, right? There's

13 no other venue I'm missing, is there?

14   A  I can't go into the specifics of what DOJ and the U.S. Attorney's Office

15 explored as far as potential venues.

16   Q  But as far as your awareness, those are the three venues, right?

17   A  Those were three venues that were discussed.

18   Q  Okay. And at some point D.C. dropped off the map, it wasn't an option,

19 right?

20   A  I think the dropped off the map is clear.

21   Q  Okay. And did you ever have any communications with David Weiss about

22 that?

23   A  I can't go into specifics. But, once again, conversations with David Weiss

24 always were focused on he had the authority to bring this case wherever he felt the

25 venue was most appropriate.

1      Q      Okay.    And did David Weiss ever explain to you why he was just going to let

2   go of the 2014 and 2015 tax years?

3      A      You know, I have no -- that was -- no, that was not a discussion.     Taxes

4   were not a discussion that Dave and I regularly had.     It was whatever the full case

5   resolution would look like.    And so, yeah, the tax years was not something that David

6   and I regularly talked about.

7      Q      Okay.    Turning back to this exhibit 1.

8      Number 2:    "Weiss stated that he is not the deciding person on whether charges

9   are filed."

10     2a:    "I believe this to be a huge problem -- inconsistent with DOJ public position."

11     So you don't remember Weiss saying that at the 10/7 meeting?

12     A      That he was not the deciding person?

13     Q      Correct.

14     A      Correct.    I do not remember -- I don't -- he didn't say that.    In my

15   recollection, if he would have said that, I would have remembered it.

16     Q      Okay.    So you're saying in your recollection that didn't happen?

17     A      Correct.

18     Q      Okay.    "Process for decision:    Needs DOJ Tax approval first -- stated that

19   DOJ Tax will give 'discretion.'    (We explained what that means and why that is

20   problematic)."

21     Do you remember that part of the discussion?

22     A      Without going into specifics, there were discussion about taxes and venue.

23   And, once again, Mr. Weiss had the authority to bring it.

24     Q      So he didn't need DOJ Tax's approval?

25     A      There was, like, a bureaucratic administrative process he had to work

1    through, but I never viewed it as or talked about it as approval.    I don't remember David

2    saying approval.    It was solely a process that he had to work through.

3           Q    And we've discussed a good bit that -- Shapley writes here:    "U.S. Attorney

4    Weiss requested Special counsel authority when it was sent to D.C. and Main DOJ denied

5    his request and told him to follow the process."

6           Do you have any awareness of that?

7           A    I don't.

8           Q    Flipping the page.

9           "Mid-September they sent the case to the central district of California" -- Los

10   Angeles -- "coinciding with the confirmation of the new Biden-appointed U.S.

11   attorney" -- Martin Estrada.

12          Do you have any recollection of that being discussed at the meeting?

13          A    Once again, I can't get into the specific conversations as it relates to the

14   ongoing case.    But, yeah, I had a general sense that there were discussions in California,

15   as we talked about.

16          Q    Okay.    But my question was do you remember this being discussed at the

17   10/7 meeting?

18          A    I don't, but it wouldn't be abnormal.

19          Q    Okay.    So you don't remember it being discussed, but there's no reason to

20   believe that it wouldn't if Shapley writes this up?

21          A    In most of the meetings I was -- let me be really clear here.    Most of the

22   meetings I was in with David and everybody else, it was the process of moving this

23   forward, that that's what my focus was, to move this case to a resolution.

24          Q    What would a resolution look like in your mind?

25          A    You know, the case is going to close, we're going to have charges or we're

1    not going to have charges.    That's up to the U.S. Attorney's Office.    But to do

2    everything within the FBI's power to get the evidence we need to have somebody

3    else -- the prosecutors -- make those charging decisions.

4         Q    Okay.    I want to jump down.    Number 3 was:    "They are not going to

5    charge the 2014/2015 tax years."

6         Do you have any recollection of that topic being discussed at this meeting?

7         A    I'm not trying to be argumentative, but when it comes to the -- we talk about

8    whether this was simple or not.

9         Q    Uh-huh.

10        A    I have found in my time that every time IRS and tax attorneys talk, it

11   becomes overly complicated.    And so for me, I have no general sense of tax years, when

12   and when we discussed those.

13        Q    But there's -- fair enough.    And I admit that's a point I'll concede there.

14        But, generally speaking, the issues with 2014 and '15 related to the Burisma

15   income, correct?

16        A    I cannot comment on an ongoing case.

17        Q    Do you know the answer, or are you just not --

18        A    Do I know the answer of those years --

19        Q    Yes.

20        A    -- were there Burisma income?

21        Q    Yes.

22        A    I can't comment on that.

23        Q    Okay.    And, for example, in 2018, he was expensing sex clubs and

24   prostitutes.    Are you aware of that allegation?

25        A    I can't comment on any of that.

1    Q    Okay.    So, again, you don't -- you're not going to comment or you don't

2    know the answer?    You know the answer and you're not going to tell me or --

3    A    I'm not going to comment.

4    Ms. Greer.    The question was, are you aware of the allegation?

5    Mr. Sobocinski.    That -- I'm sorry?    That I was aware of the allegation of

6    Burisma, that I was aware of the allegation of prostitutes, which --

7         BY MR. CASTOR:

8    Q    Well, he expensed, like, a sex club on his 2018 tax return, and that, as you

9    can imagine, is a problematic deduction.

10    A    I am aware of the allegation.

11    Q    And there were a lot of deductions like that in 2018.    And so if you're trying

12    to identify the different issues of the different tax years, 2018 is, like, there's a lot of

13    issues of that sort.    I'm asking you whether you're aware of that.

14    A    Once again, I can't talk about ongoing cases.    However, I'm not in the

15    minutia of what --

16    Q    Number 4 on here:    "The FBI SAC" -- presumably that's you -- "asked the

17    room if anyone thought the case had been politicized."

18         Do you remember saying that?

19    A    I do.

20    Q    And what do you mean by that?    I mean, in general that's somewhat

21    ambiguous.    So can you tell us what you meant by that?

22    A    Yeah.    At the time I hope it wasn't ambiguous.

23         There was the media leak.    Obviously, that was incredibly troubling to me and

24    any potential investigation that we were going to continue to do.    I think -- I have a

25    general sense that that was part of it, is that this was being politicized.

1    I, at the time -- I did not think that it was.    And so I wanted to go on record in the

2    room of the leaders who were involved in this investigation, I wanted to say I didn't, offer

3    my team the opportunity to do that, to say it there, and offer the other individuals in the

4    room this was the appropriate venue to bring that up and let's discuss it.    Because if it

5    was, that was going to be a problem, and we needed to work through it because, for me, I

6    wanted to get this case resolved.

7        Q    At that point were you aware that the day of action -- which, in fairness, was

8    before you joined the office, it was December 8th, 2020 -- that the day of action the

9    investigators, Joe Gordon, Gary Shapley, wanted to go talk to Hunter Biden?

10        And were you aware that somebody in the U.S. Attorney's Office or somebody in

11    the FBI tipped off the transition team, the political transition team?    Were you aware of

12    that fact?

13        A    I was not in this role at that time.

14        Q    But were you aware of that fact, or is it the first time you're hearing about

15    it?

16        A    Can I go off the record?

17        Mr. Castor.    Sure.

18        [Discussion off the record.]

19        Mr. Sobocinski.    Yeah.    At some point when I came onto the job, I was aware

20    that there had been an attempt to interview Hunter Biden in California.    The minutia of

21    what that process was, approvals, things like that, I was not directly involved in.

22            BY MR. CASTOR:

23        Q    But would you agree -- and this will be my last question, my hour is up

24    here -- would you agree that if somebody had tipped off the transition team, the political

25    transition team, that that would have politicized the investigation?

1          A     I can't comment about specifically this case.     But you haven't asked, but I'll

2     say it.     I was a Secret Service agent.     And it would have been expected for me, and I

3     would expect an investigative entity if they were going to want to interview a protectee

4     of mine, to come directly to me.

5          And so I don't know what that process would look like during that moment in time

6     to get to that protectee.     I just don't know what that would look like.

7          Q     Okay.

8          A     But it would definitely be of concern to me if I was a Secret Service agent

9     and somebody's knocking on my door -- an armed individual claiming to be somebody is

10     knocking on my door.     Yeah, that would have been a concern for me.

11          Q     Okay.     But when you asked whether the case had been politicized, in

12     essence, is it fair to say you were asking whether there had been any political favoritism?

13          A     I was asking in a room of leaders on this case to say, "Hey, we are working

14     together.     We're moving this thing forward.     Do you think there's any manipulation

15     from the outside that's stopping us from what we're doing?"

16          Q     And you thought at that point the answer was no?

17          A     Thought that it was no, and nobody in that room raised their voice to say

18     anything other.

19          Q     Okay.

20          A     Because I -- because that -- like, that's what we do, and our job is to make

21     sure we are leading groups of people who feel that they're doing the right things.

22          Q     Okay.

23          A     And if you as a leader, no matter what your rank is, sitting in that room are

24     choosing not to do that, then that's of concern to me.     That's what I wanted that space

25     to be, like, communication is really important to me amongst teams working cases like

1     this.

2           Mr. Castor.    Okay.    My hour is up.

3           Ms. Greer.    Take 5 minutes?

4           Mr. Castor.    Yeah, take as much time as you need.

5           [Recess.]

6           ███████.    It is 11:26.    And we can go back on the record.

7           Thank you again for joining us.    I'm ███████.    I'm the Democrats'

8     oversight counsel in this case.

9                                         EXAMINATION

10              BY ███████:

11          Q     Mr. Sobocinski, I want to take a step back from where we were and talk

12    about your background.    And I think at the end of the last hour you mentioned your

13    prior work as a Secret Service agent.

14              When did you actually -- when did you join the FBI?

15          A     1998.

16          Q     Okay.    And before you joined the FBI, were you working?    Were you in

17    school?

18          A     I was a Secret Service agent.    And then before that I was a police officer for

19    a few years.

20          Q     Okay.    Where were you a police officer?

21          A     Here in Washington, D.C., with the U.S. Park Police.

22          Q     Okay.    And then what was your first position with the FBI?

23          A     I was a case agent in North Carolina.

24          Q     Okay.    And what kind of cases did you have?    What were your

25    responsibilities?

1          A     So when I first started, it was rural North Carolina.     It was drugs, violence,

2     things like that.

3                9/11 happened, and then I found myself at the Pentagon for digging through the

4     rubble.     And then my entire career was counterterrorism and working overseas on those

5     type of cases.

6          Q     Okay.

7          A     And working and living overseas on those type of cases.

8          Q     And then you were actually named deputy assistant director of the FBI's

9     International Operations Division in 2019, right?

10         A     Correct.

11         Q     What did that position entail?

12         A     I ran operations for -- FBI's worldwide operations, their employees, facilities,

13     hiring operations.

14         Q     And that's a pretty big office, right?

15         A     It was COVID, so it was even more complicated than I expected.

16         Q     How many employees does that office have?

17         A     You know, in a general sense, there are over a thousand, I think, worldwide.

18         Q     Okay.     And the annual operating budget is, like, $170 million, right?

19         A     Sounds about right.

20         Q     Okay.     So you had a lot of people and a lot of budget under your purview.

21     Is that fair to say?

22         A     Correct.

23         Q     Okay.     And then you said that you were named special agent in charge in

24     Baltimore in July of 2021?

25         A     Correct.

1     Q     So not great at math, but that's about 25 years as a career FBI employee,

2     correct?

3     A     Correct.

4     Q     Okay.     And it's fair to say that you've done everything from being a line

5     attorney -- or I'm sorry -- a line agent investigating matters to supervising line agents and

6     then actually managing pretty large components -- or large divisions?

7     A     Yeah, that's fair.

8     Q     Okay.     Have you been awarded any awards or commendations during your

9     time with the FBI?

10    A     I have.

11    Q     What are those?

12    A     Internally, monetary awards, letters of commendations.     I've received

13    awards from various U.S. Attorney's Offices, from the Department of Defense, from the

14    CIA, from the State Department, and other foreign governments, partners, governments.

15    Q     Okay.     Is there anything you can tell us about that, or is that kind

16    of -- because I know you're doing counterterrorism.

17    A     Yeah.     No, I mean, that's pretty much a good summary of what that is.

18    Q     Okay.     Now I want to focus more on the Baltimore Field Office specifically.

19    A     Sure.

20    Q     The Baltimore Field Office is one of the larger field offices geographically

21    speaking.     Is that right?

22    A     It's considered one of the largest -- one of our large offices.

23    Q     Okay.     And I think you said earlier it's all of Maryland and all of Delaware is

24    the territory it covers?

25    A     Correct.

1    Q    How many -- I know you can't talk about specifics for number of employees

2    in an office, but can you talk about writ large how many employees the FBI Baltimore

3    Field Office has?

4    A    Hundreds.

5    Q    Hundreds.    Okay.

6         Is it possible for you to estimate how many individual criminal matters the

7    Baltimore Field Office handles in a year?

8    A    Hundreds.    And they're rotating.    I mean, regularly they open, they close,

9    they open, they close.    So I would say as a general sense hundreds.

10   Q    Okay.    And that's in addition to counterintel work, right?

11   A    Correct.

12   Q    I want to introduce as exhibit -- I guess we're on exhibit 2, a February 6th,

13   2023, Baltimore Field Office press release entitled "Maryland Woman and Florida Man

14   Charged Federally for Conspiring to Destroy Energy Facilities."

15        We'll mark this as exhibit 2.

16                              [Sobocinski Exhibit No. 2

17                              Was marked for identification.]

18        BY ▮▮▮▮▮▮▮:

19   Q    And I know this is a potentially an ongoing matter, so I'm not going to ask

20   you about anything that's nonpublic.    I just kind of want to get a sense of the work that

21   your office does and the work that it did around this case in particular.

22        Are you familiar with this matter?

23   A    I am.

24   Q    And can you broadly describe what happened in this case?

25   A    In general there were two racially motivated -- racially and ethnically

1    motivated individuals who were looking to conspire to destroy an energy station in and

2    around Baltimore.

3        Q    Was this a domestic terrorism case?

4        A    It was.

5        Q    What role did the FBI play in disrupting this plot?

6        A    Without getting into the specifics of what we did, we were -- this was our

7    investigation where we worked with our State and local partners to fully identify these

8    people and to be able to figure out what they were trying to do and then ultimately get

9    the evidence to charge them, working with the U.S. Attorney's Office in Baltimore.

10        Q    And can you talk about, broadly speaking, the type of resources your office

11    had to devote to this case?

12        A    Yeah, in a general sense this or anyone else who I've talked about.    So

13    we've had case agents.    We've had analysts, analytical support on this.    There's

14    technology that we use that is incredibly time-consuming, cumbersome to go through.

15    There are surveillance assets.

16            We worked this one with multiple field offices throughout the U.S., working with

17    State and local partners to assist us with this, and then also with our local power industry,

18    had to work really closely with them.

19        Q    Are you proud of the work that your team did on this case?

20        A    I am.    This is a good one, but this is just one that you're seeing about.

21    There's plenty that we're not talking about today, and there's even more that don't make

22    the news because we're able to disrupt them in other ways.

23        Q    Can you estimate what percent of your office's work is focused on Delaware

24    as opposed to Maryland?

25        A    Percentages are going to be fuzzy, but it's a smaller footprint for us, and it's

1    a -- geographically it's a smaller population, so it's -- Maryland definitely dwarfs it.

2         Q    I want to turn back, I want to go, move on to the October 7th meeting that

3    we were talking a little bit about earlier, and I want to turn back to what was marked as

4    exhibit 1.

5         We walked through this email a little bit in the prior hour.    I want to go through it

6    just a little -- in a little more detail.

7         So if you recall that number 2 on the first page of this -- "Weiss stated that he is

8    not the deciding person on whether charges are filed" -- you were asked about that

9    statement, and you said:    I don't recall him saying that.

10        Do you recall that?

11        A    Correct.

12        Q    And you said:    If he had said that, I would have remembered it.

13        Do you recall that?

14        A    I do.

15        Q    Okay.    So I want to go through some of the other statements in here and

16   ask if you have a specific recollection, if you think you would have recalled them.

17        A    Uh-huh.

18        Q    Under 2b -- well, the very last sentence.    I'm not going to try and do the

19   math there.

20        A    Yeah.

21        Q    But it says:    USA Weiss requested Special counsel authority when it was

22   sent to D.C. and Main DOJ denied his request and told him to follow the process."

23        Do you see where it says that?

24        A    I do.

25        Q    Do you have any recollection of Mr. Weiss saying that?

1      A      I don't have a recollection with him saying that there or at any point in my

2      communication with Mr. Weiss.

3      Q      Okay.      And you think that if he had said that, here or otherwise, you would

4      have remembered that?

5      A      Yeah.      That would have been a total 180 from all our previous

6      conversations about authorities.

7      Q      Okay.      Turning the page, it's Roman numeral v.1, I guess, it's the third bullet

8      down, it says:      "He" -- which refers to Mr. Weiss -- "would have had to request

9      permission to bring charges in California from the Deputy Attorney General or the

10     Attorney General (unclear on which he said)."

11            Do you see where it says that?

12     A      No -- oh, got it.      Yep.

13     Q      Do you recall Mr. Weiss saying that?

14     A      No.      Like, this, like several other meetings I have had with Mr. Weiss, there

15     was a process within the Department of Justice that he would have to go through to bring

16     charges outside of his assigned district, which was Delaware.

17            You know, we had high-level conversations of what that looked like.      But as far

18     as seeking approval or permission, I don't ever remember that.      And my memory of this

19     is that it was a process or a bureaucracy thing he moves through, not a permission or

20     authority issue.

21     Q      And do you think that if he had been said that he needed to seek permission

22     or to obtain permission, that's something you would have remembered?

23     A      Yeah, I would have thought I would have remembered something like that.

24     Q      Okay.      You were asked a little bit ago about number 4, which is when you

25     asked the room whether anyone thought the case had been politicized.

1          A    Uh-huh.

2          Q    And just again for the record, you do recall saying that?

3          A    I do.

4          Q    And do you recall anybody responding in the affirmative?

5          A    No.

6          Q    Okay.    And do you recall if there was a discussion around that?

7          A    There was.    I mean, I opened it, I talked about my personal view, once

8    again talked about on the need for us to come together, there's a media leak.

9    Obviously, media leaks are very important for us in the FBI.    We have a process we go

10   through then to make a referral so that other entities within the Department will look

11   into that.    It's not my responsibility.

12          My responsibility is to work this with my team to continue moving it forward,

13   although I had -- you know, the FBI were my direct reports.    I felt we were working as a

14   team on this case.    We each had our own role.    And if we wanted to move this forward,

15   now was the time to talk about any concerns at the U.S. attorney, the SAC for IRS, and

16   myself to at least, at our level, discuss if there were concerns.

17          And so I took the lead at that and opened it up and said, "Hey, I didn't, but I want

18   to hear if anybody else does and let's move through that."

19          Q    And did anybody say that they had concerns that the investigation had been

20   politicized?

21          A    No.

22          Q    And you, sitting here today, you would recall if somebody had said that,

23   correct?

24          A    I would have.

25          Q    And if somebody had raised such a concern, what specific steps do you think

1    you might have taken in response to that?

2         A    I would have tried to get a better understanding of what they thought.

3    Obviously, people can have different perspectives for things that are going on.

4         But for me, in the time I've spent in law enforcement, it's important for us to be

5    apolitical.    That is what makes the FBI so good at what we do.    We work these cases to

6    resolution regardless of what that target is, and it's important to replicate that in a

7    nonpolitical way.    That's a core function of what we do.    And so if something is

8    interfering with that, then I find that to be incredibly troubling.

9         Q    Okay.    And so, again, you asked if anyone in the room had concerns.    Mr.

10   Shapley did not say he had concerns, for example?

11        A    He did not.

12        Q    Okay.    And so to the extent that there are I guess what could be described

13   as concerns expressed in this email, this email is the first time that you're hearing of that.

14   Is that fair to say?

15        A    There are things in -- so I can't speak into the mind of Shapley, but I do -- you

16   know, there is one part in here where he talks about communication issues.    That is

17   something I and my team regularly talked about in this group, which was, "Hey, we need

18   to communicate more.    We need to make sure we're all on the same page."

19        So when we talk about the politicization of this, I'm also talking about

20   communication.    I'm, like, "Hey, let's continue to talk.    If there are problems, if there

21   are problems within your team, this is the venue to do that."

22        Q    And is it fair to say that in a case like this where there's an IRS investigative

23   team, there's an FBI investigative team, there's the U.S. attorney from Delaware, a case

24   where there's a lot of players, I guess is the point, is communication something that can

25   be a challenge in these kind of cases?

1          A     Yes.

2          Q     Okay.     And so it's not specific to this; it's this is a big investigation with a lot

3     of moving pieces.     Is that fair to say?

4          A     Correct.

5          Q     Okay.     I want to introduce -- I'm going to change subjects a little bit here.

6          You've said repeatedly that you were always under the impression that Mr. Weiss

7     had authority to bring charges, that there perhaps would be a process, an administrative

8     process, but that he had that authority.

9          Broadly speaking, what do you mean by an administrative process?

10          A     There were steps that he was going to have to take with -- originating in

11     districts he was looking to explore.     I think I mentioned earlier he goes to that district.

12     He asks if they want to join with them.     I don't know what that looks like.     I don't know

13     what the reasons for and against are.     But that's what happens.

14          Then, if they agree, then I think it's a joint case.     They bring USAs.     But if they

15     don't, then it goes back to the Department.     The Department can then give them some

16     type of status that allows them to bring this case in other venues.

17          Q     Okay.     So, one way or the other, he could bring the case.     It's just a matter

18     of how you get to that point?

19          A     Correct.

20          Q     Okay.     Are you aware that Chairman Jordan and other Members of

21     Congress wrote to Attorney General Garland about the scope of Mr. Weiss' authority

22     earlier this year?

23          A     I have a general sense.     I don't know if I read the actual letter, but I'm

24     familiar with, in general, with that.

25          Q     And are you aware that Mr. Weiss responded directly to a number of these

1    letters?

2         A    Yes.

3         Q    Okay.    I'm going to walk through those letters.    And I know some of them

4    you may have seen.    Some you might not have.    So I'm happy to give you, as I walk

5    through them seriatim, if you need a minute to review, you have that.

6         A    Great.

7         Q    On May 25th, 2023, Chairman Jordan wrote to the Attorney General about

8    individuals from the IRS who testified before the Ways and Means Committee.    That

9    letter was forwarded to Mr. Weiss, who responded on June 7th, 2023.

10         And I want to introduce that June 7th, 2023, response as exhibit 3.

11         A    Okay.

12                        [Sobocinski Exhibit No. 3

13                        Was marked for identification.]

14              BY ▮▮▮▮▮▮▮:

15         Q    Have you seen this before?

16         A    Yeah, I believe so.

17         Q    Take as long as you need to review.

18         A    Yes.

19         Q    Do you understand this to be a letter in response to questions about the

20    matter involving, among others, Robert Hunter Biden, or Hunter Biden as he's more

21    commonly known?

22         A    I am.

23         Q    Okay.    And that's the matter to which Mr. Weiss was ultimately appointed

24    special counsel, correct?

25         A    Yes.

1          Q     The second paragraph of this letter reads, quote:     "While your letter does

2     not specify by name the ongoing investigation that is the subject of the Committee's

3     oversight, its content suggests your inquiry is related to an investigation in my District.

4     If my assumption is correct, I want to make clear that, as the Attorney General has stated,

5     I have been granted ultimate authority for this matter, including responsibility for

6     deciding where, when, and whether to file charges and for making decisions necessary to

7     preserve the integrity of the prosecution, consistent with federal law, the Principles of

8     Federal Prosecution, and Departmental regulations."

9          Do you see where it says that?

10          A     Do you have the page number?

11          Q     Sorry.

12          A     Oh, sorry.     Got it.     Yes, I do.

13          Q     Okay.     And specifically with respect to, "I want to make clear that, as the

14     Attorney General has stated, I have been granted ultimate authority for this matter," to

15     the end of that sentence, are you aware of any information that contradicts Mr. Weiss'

16     statement that he was granted ultimate authority over this matter?

17          A     No, I have no direct knowledge that counteracts that.

18          Q     And do you believe that to be a true statement?

19          A     I do.

20          Q     Are you aware of any information that contradicts Mr. Weiss' statement that

21     his authority over this matter includes responsibility to decide where, when, and whether

22     to file charges?

23          A     No, I have no direct knowledge that would contradict that.

24          Q     And do you believe that to be a true statement?

25          A     I do.

1    Q    Are you aware of any information that contradicts Mr. Weiss' statement that

2    his authority over this matter includes making all decisions necessary to preserve the

3    integrity of the prosecution?

4    A    No.    I believe that to be true.

5    Q    Okay.    And I want to turn to the very last paragraph of this letter, right

6    above the signature block.

7        Is says:    "In February 2021, I was asked to remain as United States Attorney for

8    the District of Delaware to continue my oversight of the matter.    Since that time, I have

9    fulfilled my responsibilities, consistent with Department practices and procedures, and

10   will continue to do so.    Throughout my tenure as U.S. Attorney my decisions have been

11   made -- and with respect to the matter must be made -- without reference to political

12   considerations."

13       Did I read that correctly?

14   A    You did.

15   Q    And are you aware of any information that contradicts Mr. Weiss' statement

16   that his decisions in this matter have been made without reference to political

17   considerations?

18   A    I'm not.

19   Q    And do you believe that to be a true statement?

20   A    I do.

21   Q    So following Mr. Weiss' June 7th response, Chairman Jordan then wrote to

22   Mr. Weiss directly -- this was actually in response to a letter, this June 7th response was in

23   response to a May 25th letter to the Attorney General.    Chairman Jordan then wrote to

24   Mr. Weiss directly.

25       Mr. Weiss responded on June 30th, 2023, and I'm going to introduce that as

1    exhibit 4.

2                              [Sobocinski Exhibit No. 4

3                              Was marked for identification.]

4            BY ███████:

5        Q    And I'll give you a minute to review.

6        A    Okay.

7        Q    Have you seen this before?

8        A    I have.

9        Q    Okay.    The third paragraph on the first page reads:    "First, the Department

10    of Justice did not retaliate against 'an Internal Revenue Service ("IRS") Criminal

11    Supervisory Special Agent and whistleblower, as well as his entire investigative team...for

12    making protected disclosures to Congress.'"

13            Do you see where it says that?

14        A    I do.

15        Q    Are you aware of any information that contradicts this statement?

16        A    I'm not.

17        Q    Okay.    Do you believe that to be a true statement?

18        A    I have no -- nothing to disprove it.

19        Q    Weiss' June 30th letter then quotes the statement that I read earlier from his

20    June 7th letter stating that he's been granted ultimate authority over this matter.    He

21    then states that:    "I stand by what I wrote and wish to expand on what this means."

22            So if you can turn to the following page.    And I'm going to go through this top

23    paragraph sentence by sentence, but before I do that, I do want to note for the record,

24    you're not an attorney, correct?

25        A    That's correct.

1          Q    Okay.    So -- but notwithstanding that, given your 25-plus years with the

2    Bureau and your time in law enforcement before that, it's fair to say that you've been

3    involved in discussions regarding whether to charge somebody, right?

4          A    Uh-huh.

1    [11:48 a.m.]

2            BY ████████:

3        Q    And those decisions sometimes involved discussion about what jurisdiction

4    an individual can be charged in, correct?

5        A    Correct.

6        Q    And that's generally known as venue, correct?

7        A    Correct.

8        Q    Okay.    So turning back to this paragraph, the first sentence of the

9    paragraph reads, quote, As the U.S. Attorney for the District Attorney of Dela- -- for the

10    District of Delaware, my charging authority is geographically limited to my home district.

11            Do you see where it says that?

12        A    I do.

13        Q    What's your understanding of what that sentence means?

14        A    That U.S. attorneys are appointed for a specific geographical area to

15    prosecute cases, and if various elements of a crime occur within that, they have the

16    authority to prosecute in that area, that district.

17        Q    And then the second sentence for that reads:    If venue for a case lies

18    elsewhere, common departmental practice is to contact the United States Attorney's

19    Office for the district in question and determine whether it wants to partner on the case.

20            What's your understanding of what that sentence means?

21        A    That if a U.S. Attorney's Office, I think, comes to a resolution in a particular

22    matter and they find that venue either does not exist in their own district or the case

23    would be a stronger case in another district, they contact that district to work through

24    how that case would be prosecuted.

25        Q    And specifically the term "partner."    Are you familiar with that term as used

1      in this context?

2          A      In a general sense.

3          Q      What's your understanding of what that term means?

4          A      That they would both have AUSAs assigned to the particular case.

5          Q      Okay.    And partnering is different than seeking permission, for example,

6      right?

7          A      I believe it is.

8          Q      Okay.    And is it fair to say that partnering means that both of those U.S.

9      Attorney's Offices will work together on a case as opposed to one kind of ceding

10     prosecutorial authority to another?

11         A      I believe so.

12         Q      Okay.    Have you been involved in matters in which one U.S. Attorney's

13     Office investigated a matter but partnered with another for purposes of prosecution?

14         A      I have.

15         Q      And that's not uncommon, maybe it doesn't happen in every case, but it

16     happens, right?

17         A      Correct.

18         Q      Okay.    And is it fair to say that when a particular United States Attorney's

19     Office or an FBI field office begins investigating a matter, they might not actually know

20     where venue may ultimately lie, correct?

21         A      That's correct.

22         Q      And that's because, in investigations, you follow the facts where they lead,

23     correct?

24         A      Correct.

25         Q      Okay.    Going back to this paragraph.    The third sentence reads, If

1    not -- meaning if another U.S. Attorney's Office does not wish to partner on the

2    case -- quote, I may request special attorney status from the Attorney General pursuant

3    to 28 U.S.C. Section 515.

4         Do you see where it says that?

5    A    I do.

6    Q    Are you familiar with 28 U.S.C. Section 515?

7    A    I'm not familiar with the actual -- with that code in specifics, but what it's

8    referencing in that process, I am familiar with.

9    Q    And what's your understanding of that?

10    A    That the Attorney General or somebody within that chain has the authority

11    to provide authority for somebody to prosecute that -- to prosecute that case in another

12    venue that's not an AUSA assigned to that.    And I do have experience that that's not

13    abnormal.

14    Q    Okay.    And just so we have a complete record, I'm actually going to

15    introduce the statute.

16    A    Okay.

17         ▮▮▮▮▮▮▮.    That'll be exhibit 5.

18                        [Sobocinski Exhibit No. 5

19                        Was marked for identification.]

20         BY ▮▮▮▮▮▮ :

21    Q    So 28 U.S.C. Section 515 is entitled "Authority for legal proceedings;

22    commission, oath, and salary for special attorneys."

23         And I do want to note this is special attorneys, not special counsel, right?

24    A    Yes.

25    Q    So it's different.    It's two different provisions.

1          Paragraph A of this section says:    The Attorney General or any other officer of the

2   Department of Justice, or any attorney specially appointed by the Attorney General under

3   law, may, when specifically directed by the Attorney General, conduct any kind of legal

4   proceeding, civil or criminal, including grand jury proceedings, and proceedings before

5   committing magistrate judges, which United States attorneys are authorized by law to

6   conduct, whether or not he is a resident of the district in which the proceeding is brought.

7          Did I read that correctly?

8      A    Yes.

9      Q    Okay.    So this provision specifically permits anybody who's appointed as a

10  special attorney to conduct any kind of legal proceeding; it's not limited, correct?

11     A    I believe so.

12     Q    Which U.S. attorneys are authorized to conduct, quote, whether or not he is

13  a resident of the district in which the proceeding is brought, correct?

14     A    Yes.

15     Q    Okay.    So if the Attorney General -- if Mr. Weiss had requested status,

16  Section 515 status, and if the Attorney General had granted that to him, Mr. Weiss would

17  have been permitted to bring a case in, for example, Washington, D.C.?

18     A    Based on what you're showing me, that looks like the bureaucratic process

19  that I had mentioned earlier.

20     Q    Okay.    And the same, he could have brought a case in the Central District of

21  California under this authority, correct?

22     A    It appears so, yes.

23     Q    Okay.    The last sentence -- going back to the June 30th letter.    The very

24  last sentence of that third paragraph reads:    Here, I have been assured that, if necessary

25  after the above process, I would be granted Section 515 authority in the District of

1      Columbia, the Central District of California, or any other district where charges could be

2      brought in this matter.

3              Are you aware of any information that would contradict that statement?

4      A     I'm not.

5      Q     Do you believe that to be a true statement?

6      A     I do.

7      Q     To your knowledge, did Mr. Weiss ever actually request Section 515

8      authority?

9      A     Yeah, I'm not aware.

10     Q     You don't know?

11     A     I don't know.

12     Q     And is it fair to say that Mr. Weiss would be the better witness to testify as

13     to that point?

14     A     It would.

15     Q     And are you aware that he's said he's willing to come before the committee

16     when he's able to?

17     A     I am.

18     Q     So finally, Senator Lindsey Graham -- and moving on from this

19     letter -- Senator Lindsey Graham, who is the Republican ranking member on the Senate

20     Judiciary Committee, wrote to Mr. Weiss on June 28th, 2023, and Mr. Weiss responded

21     on July 10th, 2023.

22             ████████.  I want to introduce that as well as exhibit 6.

23                             [Sobocinski Exhibit No. 6

24                             Was marked for identification.]

25             BY ████████:

1          Q     Okay.    Have you seen this before?

2          A     I have.

3          Q     Okay.    The first sentence of the third paragraph, which is on the first page,

4     it reads:    To clarify an apparent misperception and to avoid future confusion, I wish to

5     make one point clear:    In this case, I have not requested special counsel designation

6     pursuant to 28 CFR Section 600 et seq.

7                You see where it says that?

8          A     I do.

9          Q     That's the regulation that gives the Attorney General the authority to

10     appoint a special counsel, correct?

11          A     I believe so.

12          Q     Are you aware of any information that contradicts Mr. Weiss' statement that

13     as of July 10th, 2023, he had not requested that special counsel designation?

14          A     I don't.

15          Q     Okay.    The letter continues, rather -- quote, Rather, I had discussions with

16     departmental officials regarding potential appointment under 28 U.S.C. Section 515,

17     which would have allowed me to file charges in the district outside my own without the

18     partnership of the local U.S. attorney.    I was assured that I would be granted this

19     authority if it proved necessary.    And this assurance came months before the

20     October 7th, 2022, meeting referenced throughout the whistleblowers' allegations.

21                Did I read that correctly?

22          A     You did.

23          Q     So you just, a couple minutes ago, already confirmed that you have no

24     information to contradict Mr. Weiss' statement that he was assured that he would be

25     granted 515 authority if it proved necessary.    But looking specifically at the statement

1     that this assurance came months before October 7th, 2022, do you have any information

2     to contradict that statement?

3          A     I don't.

4          Q     And to the best of your knowledge, is that accurate based on --

5          A     It is.

6          Q     So looking quickly back at exhibit 1, which is that -- so the -- I'm sorry, the

7     Shapley email, that what I just read to you from that response to Senator Graham, that

8     would seem to directly contradict Mr. Shapley's statement that USA Weiss requested

9     special counsel authority when it was sent to D.C.

10          Do you see where it says --

11          A     Yes, I do.

12          Q     Okay.     And it would likely seem to contradict the statement that he would

13     have to request permission to bring charges in California, correct?

14          A     It does.

15          Q     Okay.     In -- turning back to the July 10th letter.     In -- Mr. Weiss' letter

16     continues:     In this case, I followed the process outlined in my June 30th letter and have

17     never been denied the authority to bring charges in any jurisdiction.

18          To the best of your knowledge, is it accurate that Mr. Weiss was never denied the

19     authority to bring charges in any jurisdiction?

20          A     I have nothing to re -- personal knowledge to refute that.

21          Q     Okay.     So do you believe that to be an accurate statement?

22          A     I do.

23          Q     So in March of -- in March 2023, the Attorney General testified before the

24     Senate Appropriations Subcommittee on Commerce, Justice, and Science.     Senator

25     Grassley, who is also on the Senate Judiciary Committee, asked the Attorney General to

1    address concerns that, if Mr. Weiss was not given special counsel authority, he might

2    need permission from another U.S. attorney to bring charges outside of the District of

3    Delaware.

4            The Attorney General responded, quote, the U.S. Attorney in Delaware has been

5    advised that he has full authority to make those kinds of referrals that you are talking

6    about or bring cases in other jurisdictions if he feels it's necessary, and I will assure you

7    that if he does, he will be able to do that.

8            To the best of your knowledge, was that an accurate statement by the Attorney

9    General?

10           A    I believe so.

11           Q    Okay.    The Attorney General also told Senator Grassley that Mr. Weiss,

12   quote, has been advised that he is not to be denied anything he needs, and if that were to

13   happen, it should ascend through the Department's ranks, but I have not heard anything

14   from that office to suggest that they're not able to do everything the U.S. attorney wants

15   to do.

16           To the best of your knowledge, did any Justice Department official ever prevent

17   U.S. Attorney Weiss from taking any steps or from accessing any resources he requested

18   for this investigation?

19           A    Not that I'm aware of.

20           Q    Okay.    Did anybody at FBI headquarters ever prevent U.S. Attorney Weiss

21   from taking any steps or accessing any necessary resources?

22           A    Not that I'm aware of.

23           Q    Okay.    Did anybody else, to the best of your knowledge, ever prevent U.S.

24   Attorney Weiss from taking any investigative steps or from accessing any resources that

25   he might need for this investigation?

1          A     Not that I'm aware of.

2                                [Sobocinski exhibit No. 7

3                                Was marked for identification.]

4                 BY █████████ :

5          Q     Okay.     I want to introduce as exhibit 7 remarks that Attorney General

6    Garland delivered on Friday, August 11th, 2023, in which he announced that he was

7    appointing Mr. Weiss as special counsel in the investigation concerning allegations of

8    certain criminal conduct by, among others, Robert Hunter Biden.

9                 Do you know if you're familiar with those remarks?

10         A     I am.

11         Q     So not to make you count, but the eighth paragraph down -- and I realize this

12   is printed off from the website and I think the formatting's a little funky, but these are the

13   remarks as delivered.

14                In the eighth paragraph down, the Attorney General said, quote, On Tuesday of

15   this week -- which I will represent to you was August 8th, 2023 -- Mr. Weiss advised

16   me -- meaning the Attorney General -- that in his judgment, his investigation has reached

17   a stage at which he should continue his work as a special counsel, and he asked to be so

18   appointed.

19                To the best of your knowledge, is it accurate that Mr. Weiss first requested special

20   counsel status on August 8th, 2023?

21         A     Yeah, I have no direct knowledge on when he requested that status.

22         Q     Okay.     But to the best of your knowledge, that's approximately the

23   timeframe?     In other words --

24         A     Yes.

25         Q     So you don't have any knowledge of him having requested it, for example, in

1    March of 2023?

2         A     I don't.

3         Q     Okay.    So August 2023 is approximately the right time?

4         A     Sounds about right.

5         Q     Okay.    Do you recall how you learned that Mr. Weiss had requested this

6    special counsel status?

7         A     I officially learned from the AG's remarks, but I had had a conversation

8    earlier in the day with Mr. Weiss where it was discussed but not confirmed that he was

9    going to be given the status.

10        Q     Okay.    The Attorney General's remarks continue in the following paragraph:

11   Upon considering his request -- meaning David Weiss' request -- as well as the

12   extraordinary circumstances relating to this matter, I have concluded that it is in the

13   public interest to appoint him as special counsel.

14             And I'm just going to -- to make a complete record, I'm going to introduce the

15   actual appointment order.

16        A     Okay.

17   ███████.    We'll mark that as exhibit -- it'll be exhibit 8.

18                                [Sobocinski exhibit No. 8

19                                Was marked for identification.]

20             BY ███████:

21        Q     Have you seen this before?

22        A     I have not.

23        Q     Okay.    Is it your unders- -- I'm sorry, I'll give you a second to review.

24        A     I'm good.

25        Q     Okay.    So this is signed August 11th, 2023, correct?

1          A     Yes.

2          Q     And it's signed by the Attorney General?

3          A     It is.

4          Q     So -- and this appoints David Weiss as special counsel over the matter -- the

5    investigation and prosecutions referenced and described in United States v. Robert

6    Hunter Biden, and it provides the case numbers, correct?

7          A     Correct.

8          Q     Okay.    So, in fact, Mr. Weiss first requested special counsel authority

9    approximately on or about August 8th, 2023.    On August 11th, so roughly 3 days later,

10   the Attorney General granted him that authority, correct?

11         A     Yeah, that's my general understanding.

12         Q     Okay.    So just to sum up kind of what we just talked about.    Do you have

13   any reason to believe that David Weiss lied to Congress about the extent of his authority

14   that he had been granted by the Attorney General?

15         A     I don't.

16         Q     Okay.    Do you have any reason to believe that the Attorney

17   General prevented -- that Attorney General Garland prevented Mr. Weiss from taking any

18   particular investigative step in this case?

19         A     No, I don't.

20         Q     Do you have any reason to believe that Attorney General Garland denied

21   Mr. Weiss any resources for this investigation?

22         A     No.

23         Q     Okay.    Do you have any reason to believe President Biden interfered in this

24   investigation in any way?

25         A     No.

1      Q      There have been allegations that the FBI and the Delaware U.S. Attorney's

2   Office handling of this case is an example of two-tiered system of justice.     What's your

3   reaction to those allegations?

4      A      Speaking on my behalf of my team, we've worked this as diligently as we

5   work all the cases we do.     And as we referenced my discussion about politics and my

6   belief of where that should play in our cases, it has no role.     And so my goal as the

7   leader of this team has been focused on getting a resolution in that case.

8      Q      Thank you.

9           I want to turn back to there was conversation earlier about trying to surprise a

10   witness, to conducting interviews, whether it might be advantageous to surprise a

11   witness.    And I think you had said that you had -- as a former Secret Service agent

12   yourself, there are certainly certain particular considerations to be taken into account.

13   Do you recall that?

14      A      I do.

15      Q      And can you explain a little bit further what those considerations may be?

16      A      So it's been over 25 years, but, you know, as a Secret Service agent, you

17   know, you're there to protect individuals as designated by law.     And so that is a full

18   encompassing protection of them.     Depending on the proctectee, you prohibit people

19   from coming in contact with them or restrict that or protect them.     And so as a Secret

20   Service agent, anybody knocking on their door is somebody that they're interested in, and

21   somebody interested who is obviously carrying a gun and potentially in an adversarial

22   issue is something that they would want to know about in advance.

23      Q      And is it fair to say that that's for the safety of everybody involved?

24      A      Correct.

25      Q      Because if somebody who's carrying a gun shows up at the home of a

1    proctectee, the instinct of the Secret Service officer would be to protect the proctectee,

2    correct?

3        A    Correct.

4        Q    Okay.    And it's also the case -- again, you talked about having -- over your

5    course of your 25 years, you've been involved in many interviews, you've supervised

6    agents who have done many interviews, correct?

7        A    Correct.

8        Q    Is it fair to say that each one of those interviews is different?

9        A    Yes, it is.

10       Q    And the facts in each one of those interviews is different?

11       A    Yes.

12       Q    Okay.    And so there's a question about taking a witness, quote/unquote, by

13   surprise.    That could be a tactic in some cases, and in some cases it might be ill advised.

14   Is that fair to say?

15       A    Correct.

16       Q    So, for example, in the case where an individual has security?

17       A    Correct.

18       Q    Okay.    Is it also the case that even if you take a wit- -- even when an FBI

19   agent takes a witness by surprise, that witness can still decline to talk to them, correct?

20       A    Correct.

21       Q    And if somebody is an attorney who has an understanding of the law, they

22   might be more inclined to decline to have that voluntary conversation?

23       A    I have found that to be true.

24       Q    And if somebody is represented by counsel, they might also decline to take

25   part in a voluntary interview without counsel present?

1      A      Corre -- yeah, I find that to be true as well.

2      Q      Okay.    And so, again, these are all fact-specific situations, but the idea of

3      taking somebody by surprise doesn't necessarily mean that, even if that was the plan,

4      that that would have played out anyways, right?

5      A      Yeah.    You never know how those are going to end.

6      Q      Okay.    All right.    You spoke earlier -- in the earlier hour, we talked a little

7      bit about who has ultimate charging decision -- and I'm talking about within a case, not

8      different venues, but -- and you said that the ultimate charges are up to the prosecutors.

9      Do you recall that conversation?

10     A      I do.

11     Q      Okay.    And, again, you're not an attorney, but in your experience, have you

12     been in situations where you thought that prosecutors -- that you hoped prosecutors

13     would bring charges that they ultimately decided not to bring?

14     A      Yes.

15     Q      And without getting into specifics, can you describe any of the circumstances

16     around those?

17     A      Yeah.    In a general sense, I mean, the FBI opens cases on people we think

18     think -- criminal cases on people we think have broken the law.    We put a lot of time,

19     effort, and energy into gathering the evidence.    And when we get to a point where we

20     think there's enough evidence for an arrest and an ultimate prosecution, yeah, we

21     are -- you know, our goal is to get that there.    But as I said, the U.S. Attorney's Office or

22     State prosecutors are the ones that make that ultimate decision, and they may have a

23     difference of opinion.

24     Q      And is it fair to say that -- and I want to get back to that difference of opinion

25     in a second.    But you said that you put -- your agents put a lot of work into these cases.

1      Is it fair to say that they in some cases get kind of personally invested in these cases?

2          A     Yes.

3          Q     And so if somebody spent a lot of time, a lot of energy working on a

4    particular case, they might be disappointed if a prosecutor decides not to bring a

5    particular charge, correct?

6          A     Yeah, if they feel it should be, yeah, there is that.

7          Q     And as a supervisor, have you experienced instances in which agents you

8    manage have had disagreements with prosecutors about investigative steps?

9          A     Yes.

10         Q     And is that sometimes a challenging issue to manage as a supervisor?

11         A     It is.

12         Q     And why is that?

13         A     Becau- -- first of all, each circumstance is different, but this is something I

14   regularly have dealt with in my career, if weekly, if not daily.     And listen, we are putting

15   time and effort into this.    We think we've gotten to certain standards, but ultimately it's

16   not our decision.

17         And so I have two-pronged approaches.     The first is to support my investigative

18   team, the employees that are working this case that are actually out there putting in

19   times, putting their lives in danger to do this.     And so part of that is to hear what they

20   have to say and advocate on their behalf, as each leader in my office does.     And then

21   there are times when I will have conversations with U.S. attorneys on these cases.

22   There are times when I have to communicate, you know, bad news to these teams even

23   before the communication.    I may agree with the prosecutors in certain circumstances.

24   So all of these are varied, but, yeah, those can be tough conversations.

25         Q     And they happen often?

1  A They happen often.

2  Q Okay. Ultimately, you said this earlier, it's up to the prosecutors to decide

3 what charges to bring, correct?

4  A Correct.

5  Q And that's because prosecutors are best positioned to understand the

6 relative strength of the evidence, right?

7  A Yes, as it relates to going to court. Absolutely.

8  Q Right. And prosecutors are best positioned to evaluate the weaknesses a

9 case might have if it is tried before a jury, right?

10  A Yes.

11  Q Okay. And is it fair to say that sometimes prosecutors and agents -- when

12 an agent disagrees with a prosecutor, sometimes the prosecutor will sit down with the

13 agent and will talk through and explain here's the strengths and weaknesses, here's why

14 I'm unable to pursue this particular charge, right?

15  A Correct.

16  Q And some prosecutors don't do that, some just don't have that relationship,

17 right?

18  A Correct.

19  Q Okay.

20  A Can I say that my -- as I talk to my --

21  Q Yeah.

22  A -- communication earlier, my hope and what I try to lead and what the U.S.

23 attorneys and I talk about are that communication. And it's really important to have

24 that at that level so that there's no misunderstanding about what's going on. That is

25 something that I personally strive for and I hold my leaders responsible for that. But

1    there are always personalities, and sometimes that just doesn't happen, but it does

2    create problems when it doesn't.

3        Q    And sometimes prosecutors are busy or overwhelmed and don't have the

4    time in the moment to sit down with an agent and explain a charging decision too,

5    correct?

6        A    Sure.

7        Q    There was a discussion earlier about whether the 2014 and 2015 tax cases

8    were open/shut.    And I don't want to get into the specifics of that.    I do want to note,

9    though, you are not a tax investigator, right?

10        A    I am not.

11        Q    And you've never done tax investigations?

12        A    I have not.

13        Q    Okay.    And in general, that's actually not something that the FBI generally

14    would do, right?

15        A    Correct.    We would prefer to have the IRS do those cases.

16        Q    Okay.    And so there was a comment made earlier that Hunter Biden had

17    received a, quote, boatload of money and he didn't pay taxes, I guess suggesting that that

18    was an open/shut case.    But in reality, tax cases can be complicated, right?

19        A    Yes.

20        Q    And, in fact, they're so complicated that when you're in the meetings,

21    sometimes you don't necessarily track all of the discussion.    Is that fair to say?

22        A    That is more than fair, yes.

23        Q    Okay.    And so it's not necessarily a simple charge or don't charge; you

24    know, there might be defenses to a case, for example?

25        A    Yeah, to every case.    Correct.

1      Q      And so in tax cases in particular, there might have been deductions that

2   were taken that have to be assessed whether they were legitimate or not, right?

3      A      Once again, that's getting into the weeds of something that -- in a general

4   sense I understand that that is an issue.

5      Q      Okay.    I'm just -- my point is just that these tax cases are not simple.

6   There's a lot that there are defenses that defendants can raise, correct?

7      A      Correct.    And IRS and prosecutors and DOJ attorneys are trained in that,

8   and they do it.    But I want to bring that back full circle here, which is, you know, as I said,

9   I'm not an absent leader when it comes to this.    I was focused on bringing whatever

10   charges this team thought we could bring with the evidence that we've accumulated to

11   get to a resolution.    That was the full focus of almost every phone -- every conversation

12   meeting I had with the U.S. Attorney's Office.

13      Q      And the -- on that note about -- comment you just made about the evidence

14   and gathering the evidence.    Evidence in any case, and it might -- it's fact specific, it

15   could be hard to prove, it could be hard to use to convince a jury, right?

16      A      Correct.    Absolutely.

17      Q      And is it fair to say that prosecutors generally only bring cases where they're

18   reasonably confident that they can obtain a conviction?

19      A      I find that to be true.

20      Q      Prosecutors like to win, right?

21      A      Yes, they do.

22      Q      Okay.

23      ███████.    Just one second.    I think we can wrap up my hour, but -- we can go

24   off the record.    Thanks.

25      [Recess.]

1    [12:23 p.m.]

2        Mr. Castor.    Back on the record.    It's 12:23.

3            BY MR. CASTOR:

4    Q    Go back to exhibit 1.    Your recollection of the 10/7 meeting had a

5    component where -- discussing the leak -- had a component where you remember

6    discussing whether the case had been politicized, and then you remember talking about

7    coordination and communication issues.    From your perspective, was that the only stuff

8    talked about at that meeting?

9    A    That was the just of what I remembered from that meeting.

10    Q    Do you remember how long the meeting was?

11    A    No.    It wasn't hours, but it wasn't like a 15-minute meeting.

12    Q    Okay.    Longer than an hour maybe?

13    A    Yeah, give or take.

14    Q    Okay.    And you have no recollection of discussion about whether Weiss

15    stated that he's not the deciding person on whether charges are filed?

16    A    I've never heard Weiss say that he was not the decider or anything other

17    than he had the authority to bring these charges.

18    Q    Okay.    And do you remember anything in that meeting about the fact that

19    D.C. had declined to bring a case?

20    A    I don't remember that portion of this meeting, no.

21    Q    So it's possible it came up or you just have no recollection of it?

22    A    I was really focused on -- my memory of this meeting is of my concern over

23    the media leak and how to move this case forward.

24    Q    How did you think the case needed to move forward?

25    A    I just thought that we needed -- the U.S. Attorney's Office needed to use the

1      information he had to make a charging decision.    And then short of that, what else

2      would the FBI need to bring them that would help him assist in whatever his decision

3      would ultimately be.

4              Q      And at that point, what were the options for bringing the case in terms of

5      venue?

6              A      The venue was what it always was, what has been talked about, is wherever

7      he felt that he ultimately had the -- was going to make that decision.

8              Q      Okay.    But at that point in time, the October 7th meeting, you didn't

9      believe that D.C. was off the table?

10             A      Yeah, I don't have a sense of that.    Without getting into specifics, I think

11     we've talked about California I think around this timeframe, it might have been that.

12     But that was -- what he -- what and who he was talking to was his decision.    I was

13     looking for resolution.

14             Q      When the case was presented to the U.S. attorneys in D.C. and California, do

15     you have any awareness who did that?

16             A      No.    It wasn't the FBI.

17             Q      Was the FBI involved at all in the meeting?

18             A      In the present -- not that I was aware of, in presentations, no.    That's -- my

19     understanding of that that's an internal department process.

20             Q      Do you know if it was U.S. attorneys from the Delaware office that did it or

21     the Tax Division?

22             A      I don't know.

23             Q      And then Shapley's contemporaneous notes from this meeting, number 6

24     states:    Both us and the FBI brought up some general issues to include:

25     communication issues, update issues and, C, these issues were surprisingly contentious.

1          What do you recall from that discussion about issues being contentious?

2          A        Yeah.    I can't comment on what he stated, but, for me, it was -- I would

3     describe this as, you know, we were talking about something that was uncomfortable.    I

4     mean, there was a media leak in an investigation.    We were all -- my belief was that

5     we're all working towards the resolution of this case.    And so areas that I had control

6     over were, hey, communication, let's talk more.    Part of that was the politics comment,

7     or discussion that I brought up, and then way forward, how were the teams going to

8     continue to talk about this case for the things -- if and where there were more things we

9     needed to do on the investigation.

10          Q        Where did the issues of contention lie?    Was it IRS and the U.S. Attorney's

11     Office?    Was it the IRS and the FBI?

12          A        Yeah, I didn't use the word "contentious."    I think you'd have to ask him

13     why he chose that.

14          Q        Okay.    But from your recollection, the communication issues, was that

15     communication issues between IRS and the FBI or was it between IRS and the U.S.

16     Attorney's Office?    I mean, what was the nature of the communication issues?

17          A        You know, I think that we as in -- we in general need to communicate -- it's

18     important for us to communicate more.    And so I was just -- I reinforce over and over

19     again, there's this media leak, now more than ever we need to all be on the same page to

20     work an investigation that was and continues to be open so that we can move towards

21     that resolution.

22          Q        Was Lesley Wolf at that meeting?

23          A        I don't have a sense of her being there, but if somebody says she was, I

24     wouldn't disagree.

25          Q        Did you ever witness U.S. Attorney Weiss admonish Lesley Wolf?

1     A     Yeah, I'm not going to get into any comments of their internal discussions.

2     Q     That wasn't the question.     The question was whether you witnessed U.S.

3     Attorney Weiss admonish Lesley Wolf.     You did, didn't you?

4     A     I'm going to take -- I'm going to go off record here.

5     Mr. Castor.     Okay.

6     [Discussion held off the record.]

7     Mr. Sobocinski.     Yeah.     I've never seen David Weiss admonish anybody.

8          BY MR. CASTOR:

9     Q     Okay.     Do you know if David Weiss communicated in front of you to Lesley

10     Wolf his frustration about the statute of limitations lapsing?

11     A     No.

12     Q     You didn't witness that?

13     A     I have no memory of that.

14     Q     You have no memory of that.     Okay.     But if someone said you did, then

15     maybe you did?

16     A     Depends on the circumstances.     I don't want to speculate.

17     Q     Okay.     Did anyone at the FBI, to your awareness, express concern to David

18     Weiss or the Department of Justice that a special counsel needed to be appointed or

19     David Weiss needed special counsel authority?

20     A     Yeah, I'm not in a position to talk about ongoing issues within the

21     Department as it relate -- or in the Bureau as it relates to this case.

22     Q     That's one of the core things we -- we're here today to talk about is David

23     Weiss' authority and whether he needed special counsel authority and so forth.     So --

24     A     Yeah.     I appreciate that.     But I'm being very clear that I as the leader of

25     the field office running this investigation am clear that David -- it was my understanding

1      that David Weiss had the authority, and at no point did I ever differ from that.     There's

2      never been anything in my view that changed that.

3            Q     Right.     According to Shapley's testimony, Joe Gordon told him that his field

4      office thought they should push this case to be given special counsel authority.     Do you

5      have any awareness of what Joe Gordon was referring to?

6            A     I have no knowledge of that.

7            Q     Okay.     To the extent Joe Gordon was representing that his office, meaning

8      the Baltimore office of the FBI, was pushing for that, that didn't include you?

9            A     Yeah, I have no idea what Joe Gordon meant by that.

10           Q     Okay.     Are you aware of any documents that Joe Gordon prepared or

11     advocacy that he put together for -- around the special counsel topic?

12           A     No.     I have no memory of him putting anything together about that.

13           Q     We have testimony that in May of 2022, FBI Supervisory Special Agent Joe

14     Gordon reportedly told IRS Supervisory Special Agent Shapley that, my leadership is

15     wondering why your leadership isn't asking for a special counsel in this investigation.

16           I know that's a similar question, but do you have any awareness of that type of --

17           A     I don't.

18           Q     At any point in time, were you wondering why IRS wasn't pushing for a

19     special counsel?

20           A     That's not something that I was -- that's an IRS issue.

21           Chairman Jordan.     Let me ask you this.     So U.S. Attorney Weiss sent the

22     committee two pieces -- two letters this summer, and I want to see how you reconcile it.

23     Because you've been very clear that you said that he had authority to bring charges

24     wherever.     And he said that in his June 7th letter to the committee -- maybe you had

25     chance to review this -- I've been granted ultimate authority over this matter, including

1    responsibility for deciding where, when, and whether to file charges.

2         Are you familiar with that letter?

3         Mr. Sobocinski.    I am.

4         Chairman Jordan.    And then he wrote me -- wrote the committee 3 weeks later,

5    and said, I stand by what I wrote, but I want to expand on what this means.    My

6    charging authority is geographically limited to my home district.

7         Which one is accurate?

8         Mr. Sobocinski.    So one is the January 7th, and what was the other one?

9         Chairman Jordan.    Oh, excuse me.    June 7th, June 30th.

10        Mr. Sobocinski.    Yeah.    I have no personal knowledge about -- about him

11   writing that.    I was not involved in this.    So the best of my knowledge, both were -- he

12   was truthful in both.    I have nothing that disproves that to me.

13        Chairman Jordan.    But the first one is -- the first letter on June 7th is the one

14   that, I guess, would give you the reason to believe what you've said now multiple times,

15   which is that you thought he had ultimate authority to bring charges where he wants.

16   The letter on June 30th, where he says my authority is limited to my home district is -- it

17   can't be both of them.    So -- but you said all along you felt he had the authority to bring

18   it.    There was no distinction there.    That's what I'm trying to reconcile.

19        Mr. Sobocinski.    Yeah.    You know, my interpretation of these letters are he's

20   expanding upon and providing more information to help you -- that would help you

21   understand what his intent was.    That's the bureaucracy, the nuance of what he thought

22   his authority was.    And in general, the intent of both letters confirms with my belief,

23   which is he had the authority to bring the case.

24        Chairman Jordan.    Well, obviously, he didn't, because it says his charging

25   authority is limited to his home district, and 3 weeks earlier, he had told us, I've been

1    granted ultimate authority -- can't be any stronger language -- including responsibility for

2    deciding where to file charges.

3         So he got ultimate authority to file charges wherever he wants.    That's a lot

4    different than I can only do it in my home district.

5         Mr. Sobocinski.    Yeah.    I refer you to Mr. Weiss to get a more clear answer on

6    that.

7         Chairman Jordan.    We're going to ask him too.    But we've got you today, that's

8    why I'm asking.

9         Mr. Sobocinski.    Yeah.

10              BY MR. CASTOR:

11    Q    Have you had any communications with Mr. Weiss about this?

12    A    About -- specifically "this" --

13    Q    About your testimony here today.

14    A    He knows I'm testifying.

15    Q    And you had a conversation with him about your testimony here today?

16    A    That I am going to be testifying, not about the contents of the testimony.

17    Q    When did you talk to him about that?

18    A    You know, without going into specifics of an investigation, I'm continuing to

19    lead an office that is working with David Weiss and his team on multiple issues.    I talk to

20    him regularly.

21         Chairman Jordan.    Did you have any conversations him or anyone else at DOJ

22    regarding the correspondence that was just cited in the June 7th, 2023, letter to the

23    committee and the June 30th, 2023, letter?

24         Mr. Sobocinski.    No.

25              BY MR. CASTOR:

1          Q     Did you have any communications with him about the 10/7 meeting?

2          A     Yes.

3          Q     And what were they?

4          A     As it relates to his author- -- A, that it existed.    I think it was -- yeah, that we

5     knew we were in a room together talking about it.    I don't remember specifically

6     going -- yeah, I have not gone back with him and outlined certain things or --

7          Q     Like, when did you have that conversation?

8          A     Yeah, I have no -- it wasn't like it stuck in my mind.    I talk to David Weiss

9     and potentially folks in his office regularly.

10          Q     Yeah.    Just when did you talk to him about the 10/7 meeting?

11          A     Obviously, on 10/7, and maybe it would have come up in some other

12     meeting as the leak and the whistleblowers unfolded.    I mean, I still had a case to

13     manage.

14          Q     Have you talked to him about the 10/7 meeting in the last couple weeks?

15          A     Not that I'm aware of.

16          Q     The fact that you've got to come to Congress to testify about

17     the -- potentially the 10/7 meeting?

18          A     Yeah, I think he had awareness in that, yeah.

19          Q     Like, when's the last time you talked to David Weiss?

20          A     Sometime this week.    It might even have been yesterday.

21          Q     Okay.    You talked to him yesterday, did you tell him you were coming to

22     testify here today?

23          A     He knows.    Whether I told him yesterday or another date, I think it's pretty

24     well out there that I'm here today.

25          Chairman Jordan.    But you talked to him about the 10/7/22 meeting after the

1     whistleblowers' testimony went public, the transcript went public?

2          Mr. Sobocinski.     Yeah.     I don't have a sense of when I would have or that it was

3     a specific thing.

4          Chairman Jordan.     But it's recent?

5          Mr. Sobocinski.     I don't have a sense of that.     I mean, I am talking to David

6     about moving this case forward and what does my team need to do to move this case

7     forward as a resolution.     That's my sole focus on this.

8               BY MR. CASTOR:

9          Q     But what Agent Shapley says in his notes and his testimony is pretty different

10    than what you're saying here today.     And first, you said you didn't remember, and then

11    you said if it did -- if it did happen, you would have remembered.     But I'm just wondering

12    whether you had any conversations with David Weiss to the extent -- to the effect of can

13    you believe what Shapley is saying?

14         A     I don't believe I had that type of conversation with David Weiss.

15         Q     Okay.     But you would agree what you're saying about the 10/7 meeting and

16    what Shapley's saying about the 10/7 meeting are pretty different?

17         A     They are.

18         Q     Have you had any conversations with anybody else about the 10/7 meeting

19    and, specifically, how your recollections differ from Shapley's?

20         A     Yes.

21         Q     Who?

22         A     Various members of the team I was working with.

23         Q     Okay.     Anyone that was in the meeting?

24         A     Probably.     I mean, the sense was I wanted to make sure that if my team felt

25    that there was any difference in -- if they view this differently, then that becomes an

1    operational matter for me to want to get -- getting resolution.    And that's what I was

2    focused on.    So not as a he said/she said; as a, hey, did I miss -- did I miss something that

3    you think that may have happened that's going to prohibit or interfere with how we're

4    going to conduct this investigation.

5         Q    If Gary Shapley's version of events, if that did happen, would that have

6    interfered with the way you're conducting the investigation?

7         A    What about his --

8         Q    If what Gary Shapley said happened on October 7th in his contemporaneous

9    notes, if it went down that way, would that impact how the investigation --

10         A    I mean, he said a lot.    Do you want to identify line by line what you mean?

11    Or is there a general sense of what -- there's a lot in his email.

12         Q    I mean, it's two pages.    It's not that much.

13         So if Weiss had stated that he's not the deciding person on whether charges are

14    filed -- I mean, if Weiss had said that -- you say you don't remember that.    If that was

15    said, would that impact the way this investigation was handled?

16         A    If Weiss didn't have authority to bring this case forward, yeah.    Absolutely,

17    that would have impacted this case from where I sat at that moment in time.

18         Q    Okay.    Did you have any communications with Ryeshia Holley about this?

19    Did you tell her what you were going to say when asked about the 10/7 meeting?

20         A    Here in this -- here?    No.

21         Q    She's aware you were coming today to testify?

22         A    She's my direct support.    I talk to her every day.    She's got dozens of very

23    complicated cases that she's leading.    And so, yeah, I talk to her every day, and she's

24    very much aware that I'm here today and she's here on Monday.

25         Ms. Zdeb.    And I believe the committee made the two subpoenas public, which

1    included the dates.

2              BY MR. CASTOR:

3        Q    So I'm just asking you whether you had communications with Ms. Holley

4    about what you were going to say about the 10/7 meeting?

5        A    As -- you know, as my direct support, when this kind of percolated up, she

6    was somebody that I had a conversation about my concerns about authority of, hey, of

7    prosecution, can we do it, do you have a differing opinion of it?    When it came to the

8    subpoena and the testimony, no, we've been fairly clear on not having those

9    conversations.

10       Q    Okay.    Did you have any communications with Weiss or Holley about, hey,

11   what Gary Shapley's saying happened didn't happen?

12       A    I don't have a concrete mem- -- like a date and a time where I've done it but,

13   yes, I have said that because that is a difference of opinion than what I remember from

14   that meeting.

15       Q    Okay.    And you had that with Holley and Weiss?

16       A    Yeah.

17       Q    Any other witnesses?    Or any other people involved with the 10/7

18   meeting?

19       A    Yeah, not necessarily with the 10 -- not that I'm aware of with the 10/7

20   meeting, but in general with my investigative team, I want to make sure that

21   if -- something like this would have been important for us.    And so leading a team of

22   investigators in an open case, if all of a sudden somebody found out we don't

23   have the -- there's not an authority issue, yeah, that's going to be an issue.    So yeah, we

24   talked about it in that sense.

25       Q    Do you have regular communications with Lesley Wolf?

1          A     No.

2          Q     Do you have regular communications with anyone in the U.S. Attorney's

3    Office other than the U.S. attorney?

4          A     Mostly the U.S. attorney and others are very remote.

5          Q     Okay.    Have you talked to anyone else in the office about this 10/7

6    meeting?

7          A     No.

8          Q     Just Mr. Weiss?

9          A     [No verbal response.]

10         Q     I want to go back to testimony from both Ziegler and Shapley about what

11   they have represented their FBI counterparts felt, to see if it rings any bells.

12         Ziegler testified:    I recall discussions with our FBI counterparts on the case, the

13   same issue, and I thought they were just trying to raise the special counsel issue up

14   through their leadership.    On that note, I just want to let you guys know that the way

15   the FBI and their leadership -- their leadership was very, very involved in this

16   investigation.    I heard of multiple times that they were reporting up to their leadership,

17   meeting with their leadership, they had to -- they had to advise them on this.

18         And I'm just, you know, wondering whether that rings any bells.

19         A     No.

20         Q     So -- and you would have been part of that leadership, right?    The FBI

21   counterparts Ziegler's talking about, that would have been people that report to you,

22   right?

23         A     I can't speculate on what he meant by that.

24         Q     But it would have been folks that reported to you, right?

25         A     I have no idea who he was referencing.

1          Q    Okay.

2          A    I am an FBI official within Baltimore.    Yeah, I mean, that's obviously why I'm

3    here.

4          Q    Right.

5          A    But I have no idea what he meant by that.

6          Q    But, I mean, the testimony is that Gordon told Ziegler that they raised it

7    through their chain of command for at least half of the time the case was going on.

8    That's you.

9          A    I have no direct awareness of that.

10         Q    And were you aware whether Gordon had, you know, previously, prior to,

11   you know, under your predecessor, had expressed any --

12         A    I'm not aware of that.

13         Q    Okay.    And did your predecessor, Ms. Boone, did she tell you about the

14   interest in getting a special counsel appointed by any of the folks in your office?

15         A    She had left the FBI months before I took the role.    So I had no direct

16   conversation with her about any operational matter within the FBI.

17         Q    Okay.    So you didn't have a real transition with her?

18         A    No.

19         Q    When did you become aware that the U.S. Attorney for Central District of

20   California wasn't going to be able to bring charges?

21         A    Yeah, I have no direct awareness of that to this day other than you say that.

22   I was aware that there were conversations out there.

23         Q    And so that was a big part of, you know, Shapley and Ziegler's testimony,

24   that that's become public.    Was that the first time you heard that?

25         A    No.    I had known -- I knew that David Weiss and attorneys were talking

1    with California.

2         Q    But you didn't know the resolution of that matter?

3         A    Uh-uh.

4         Chairman Jordan.    Back up a second, Steve.

5         Mr. Castor.    Sure.

6         Chairman Jordan.    When you took the position in '21, summer of '21, who

7    briefed you up on the case then?

8         Mr. Sobocinski.    Would have been employees within the division; supervisors,

9    case agents.

10        Chairman Jordan.    Some of the people that work for you now?

11        Mr. Sobocinski.    Uh-huh.

12        Chairman Jordan.    Okay.

13             BY MR. CASTOR:

14        Q    Do you remember who that was?

15        A    I don't.

16        Q    Okay.    Was it Joe Gordon?

17        A    It very easily could have been, but I don't have a direct memory of that.

18        Q    Do you remember how many FBI officials were working on this case as a -- as

19   one of their primary duties?    Are we talking two?    Are we talking 20?

20        A    When you say officials, we have a -- we in the -- we have a very -- I'm the

21   only FBI official in Baltimore, so it would be solely me.    Employees is a different answer,

22   and as we talked about, I'm not going to get into the specific numbers.

23        Q    Somebody like Agent Gordon, like, how many folks were in his -- similarly

24   situated to him?

25        A    Yeah, so he's a supervisor.    We have dozens of squads throughout

1      Maryland and Delaware.     On each squad, in general, there are 8 to 10 agents and

2      analysts, other support staff working that.

3             Q      Was Agent Gordon highly respected?

4             A      Yeah, I thought so.

5             Q      So you had no reason to disbelieve his trustworthiness?

6             A      Yeah.     I'm not going to get into the specifics of that.     But Joe Gordon, as

7      we talked about, retired and he retired in good standing as an FBI supervisor.

8             Q      Okay.     So I mean, if he retired in good standing as an FBI supervisor, he's

9      inherently a reliable person, right?

10            A      I would hope so.

11            Q      I want to turn to the June 15th meeting.     Do you remember, you know,

12     who attended the meeting?     And if you don't, I can give you some names and maybe

13     that jogs your memory.

14            Ms. Zdeb.     Didn't we go over this in your first round?

15            Mr. Castor.     A little bit, yes.

16            Mr. Sobocinski.     Once again, I'm not in the position to talk about the specifics of

17     that meeting.

18                   BY MR. CASTOR:

19            Q      Okay.     If I ask you, like, who was there or who wasn't there, can you tell

20     me?

21            A      No.     I mean, I was there.     And there were FBI employees and DOJ

22     employees.

23            Q      Okay.     Was there U.S. Attorney's Office employees from Delaware?

24            A      Yes.

25            Q      Okay.     And do you remember Jack Morgan and Mark Daly gave a pretty big

1    presentation?

2        A    I'm not going to go into the specifics of what transpired in that conversation.

3    But once again, I don't know those -- the names of those people don't ring a bell to me.

4        Q    Okay.    But two Tax Division lawyers made a presentation?

5        A    I'm not going to go into the specifics of that.

6        Q    Okay.    But you know the answer to my question, you're just not willing to

7    go into specifics, or you don't know the answer to my question?

8        A    You had U.S. Attorney's Office, you had FBI, you had IRS, and you had DOJ

9    officials in there discussing what is still an ongoing case.

10       Q    Okay.    But in terms of among that group, whether any subset of that was

11   doing a huge presentation?

12       A    There -- obviously, when you get a group of people in a room to discuss an

13   ongoing case, you're talking about things.

14       Q    You remember who called that meeting?

15       A    I don't.

16       Q    Okay.    Do you remember what the purpose of the meeting was?

17       A    To discuss an ongoing investigation.    But in general -- I mean, I'm not -- I'm

18   literally not trying to be evasive.    I want you to know that my role in that meeting was

19   continually to be -- to essentially corral or provide input in a way that provided the FBI

20   and what we represented to bring this to resolution.

21       Q    Fair enough.    It was just represented to us that you were -- you were -- you

22   asked a lot of pointed questions, it was represented to us, of the Tax Division lawyers,

23   that, you know, you were not necessarily a protagonist to the presentation that the tax

24   lawyers were making, you were asking some tough questions.

25       A    So once again, I'm not going to talk about the specifics, but I do -- but

1    my -- but I was trying to move this forward.    And I'm trying to get resolution and work

2    with a team of very different individuals to move a case forward.

3         Chairman Jordan.    Was this case moving slow?    You said like at least --

4         Mr. Sobocinski.    Yup.

5         Chairman Jordan.    -- three dozen times you wanted to get this thing to

6    resolution.    And so that sort of suggests that it wasn't getting to resolution and you

7    thought it should be moving a little faster pace.

8         Mr. Sobocinski.    I would have liked for it to move faster.

9              BY MR. CASTOR:

10        Q    It was represented to us that at that meeting the FBI special agent in charge

11   asked several questions about the tax case and presented rebuttals to DOJ tax attorneys

12   who were presenting on the defenses raised by Hunter Biden's defense lawyers.    Does

13   that ring any bells?

14        A    Yeah, I'm not going to get in the specifics of the content of what those

15   conversations were.

16        Q    But earlier you said that when it came to the tax charges, you were -- that

17   was not your bailiwick, is my term, but that, you know, the FBI was not experts with tax

18   matters?

19        A    Yeah, I am not an expert with tax matters.

20        Q    But, you know, it was represented to us that you were presenting rebuttals

21   to the DOJ tax attorneys.    And so I'm just trying to see if there's anything you remember

22   from that back and forth.

23        A    I'm not going to get into the specifics of that, but I will just reiterate once

24   again is that all my conversations were about moving this forward.

25        Q    Do you remember having -- I'm not asking for the content, but do you

1    remember having that back and forth?

2        A    I'm not going to get in discussion about that.    I'm just giving you what my

3    motivation was during that meeting.

4        Ms. Greer.    Can we go off the record for 1 minute?

5        Mr. Castor.    Yes.

6        [Discussion held off the record.]

7        Mr. Sobocinski.    So, yeah, getting back to that meeting, you know, my focus on

8    that was trying to bring a variety of folks together, leaders and other entities, in a way

9    that, like, this isn't -- I'm not going to say overstepped my boundary, but I was definitely

10    talking about something that I would have much preferred another organization to bring

11    up.    It wasn't being brought up, so I as just a general investigator wanted to ask

12    questions so that I could help at least understand what I thought was a very complicated

13    process to move it forward, so that when we came out of that meeting, that wasn't just a

14    meeting to have a meeting, that that was a meeting with clear understanding of where

15    we were going to move forward on it and what the -- in particular what the FBI and my

16    team's role and things that we needed to do to continue to move this forward.

17        BY MR. CASTOR:

18        Q    Okay.    Do you remember telling Special Agent Shapley during a break in

19    that meeting that the issues raised by DOJ tax that might result in not charging are

20    nonsense?

21        A    I'm not going to go into the specifics with the individual conversations with

22    anybody in that meeting.    But in -- as the chairman said, I was focused on moving the

23    case to a resolution.

24        Q    Okay.    And again, sorry to ask this.    It seems like you hate when I ask this

25    question.    But do you know the answer and you're not going to tell us here, or do you

1    not know the answer about whether you used the term "nonsense" to Shapley in relation

2    to characterizing the DOJ tax lawyers' presentation?

3         A    I have no recollection of using the word "nonsense."

4         Q    Okay.    Or a similar word, expressing frustration or crankiness about the

5    presentation you were seeing?

6         A    I was in a room full of tax lawyers and other investigators focus on very

7    intricate tax laws.    That is not some place I enjoy being.    It took much longer than what

8    I expected.    But literally, it could have lasted a half an hour; it felt like forever.    And I

9    was focused on trying to bring it together so that a layman like me and my team could

10   then understand what we needed to do and what the team needed to do to continue to

11   move this forward and not just have a meeting to have a meeting.

12        Q    Okay.    At that point, was it just the tax charges that were on the table?

13        A    I can't get into the specifics of what was discussed during that meeting.

14        Q    If it were just the tax charges, what would be the FBI's role in that?    Like, if

15   they decided to just pursue the tax charges, would the FBI still be involved?

16        A    Can I go off the record?

17        Q    Sure.

18        [Discussion held off the record.]

19        Mr. Sobocinski.    If it was just a tax charge, the FBI wouldn't be -- the FBI wouldn't

20   be there.

21             BY MR. CASTOR:

22        Q    Okay.    Let's go back to the 10/7 meeting.    In Shapley's contemporaneous

23   notes, on the first page of the exhibit, under B, process for decision, the email states that

24   Weiss needs approval first from DOJ tax.

25             Was that your understanding, that before Weiss was going to bring a case, that

1    part of the administrative approval process inside of DOJ required him to get the okay

2    from the Tax Division?

3        A    So I want to start with one thing.    You keep saying contemporaneous notes.

4    This is an email that appears to be written hours after that.    So I know it's semantics but,

5    for me, contemporaneous notes are something that's generated as it's ongoing.    And so

6    for me, I want to say that this was more of a -- I would describe this more of a summary

7    email than contemporary notes.    And then, I'm sorry, if you could give me that question

8    again.

9        Q    Well, let me -- now that you raise that, did you take any notes during that

10    meeting?

11        A    I did not.

12        Q    Did you write any emails about what happened in the meeting?

13        A    Not that I'm aware of.

14        Q    Okay.    So going back to the first page -- and this is from the notes prepared

15    the same day that the meeting happened.    These notes are the same day the meeting

16    happened, right, Friday, October 7th?

17        A    Yeah.    I'm not fighting you on this.    This is an email that appears --

18        Q    Okay.

19        A    -- that you keep referring to the notes.    I don't remember him in a room

20    with a laptop taking these as this was ongoing.    And that would have been abnormal if I

21    saw that amongst investigators, so --

22        Q    But it's not abnormal to type up summaries of meetings?

23        A    And send emails, absolutely not.

24        Q    Okay.    So this is the type of, you know, record that would expected to be

25    produced in the ordinary course, right?

1    A    Yeah, an email of record, yes.    But to keep calling it contemporaneous

2    notes is just not -- you know, I'm just telling you I disagree with that assumption of that,

3    not that it's an email.

4    Q    Okay.    So I'll just refer to it as an email prepared the same day the meeting

5    happened.

6    A    Sure.

7    Q    Under the 2.b.i., the needs DOJ tax approval first, states that Weiss needs

8    approval first.    Did you understand that he had to go on a tax case to get the approval of

9    the Tax Division officials?

10    A    The word "approval" is -- I've never felt that he needed approval.    He's -- it

11    was my understanding he had the authority to bring whatever he needed to do.    There

12    was administrative charge -- or administrative process, not within DOJ, but also within

13    tax.    I don't know the intricacies of that, but it definitely seemed very cumbersome.

14    Q    But going back to the June meeting with the DOJ tax lawyers, it's obvious

15    that if you're having like a really long meeting and the DOJ tax lawyers are making a huge

16    presentation and you're rebutting them, you know, it's obvious that these DOJ tax

17    lawyers have a role here.    I mean, isn't that fair to say, and they've got to clear this

18    before Weiss can prosecute it?

19    A    I have no idea what -- when you say "clear this," I don't know what that

20    looks like.    I mean, obviously, DOJ has multiple specialty attorneys, trial attorneys that

21    are involved in a wide variety of cases.

22    Q    But you'd agree that Weiss had to get approvals, whether they were

23    administrative or whether they would be a foregone conclusion, that he needed to

24    get -- he needed approvals to bring charges outside of his district, right?

25    A    I am not -- approval is not what I thought.    He needed some type of

1    author -- some type of something within the Department of Justice.    I don't know what

2    it was.    Approval means, to me, that's more like, hey, I can say no.    I never thought that

3    anybody was there above David Weiss to say no.

4        Q    Okay.    Do you know if he needed to go through that exercise if he was

5    going to bring the tax charges in Delaware?    Did he have to come to Main Justice in

6    Washington D.C. and have that type of meeting?

7        A    I, unfortunately, have had experience with this in multiple districts where

8    the process when you work with IRS is there are multiple back and forth within IRS, then

9    there are multiple sideways within the Department to IRS tax attorneys.    And it is a

10    circular thing that just keeps churning and churning for long periods of time.

11        Q    And just given your substantial experience on that, what's your view of like

12    the DOJ Tax Division?    Do they need to sign off on it?    Do they need to concur?    Like,

13    how do you get through that hurdle?    It's obviously a hurdle if you have to come to D.C.

14    and sit in a long meeting.

15        A    Yeah, in a general sense, not this case, yes, I think there is an approval

16    process in place, I think different than this.    I think this one was clear in all of our

17    discussions that that approval had been delegated to Mr. Weiss.    He's had the ability to

18    do it.    And then it was just the movement of whatever the specific issues were back and

19    forth to get to that point.

20        Q    Do you think the DOJ Tax Division lawyers were trying to convince Mr. Weiss

21    not to bring the tax charges?

22        A    I couldn't comment on that.

23        Q    Okay.    But you know the answer to that question, right, because you were

24    in the meeting and it was long?

25        A    I'm not going to talk about the specifics of what was going on amongst those

1    deliberations.

2          Q     Okay.     But it's not something you forget.     It's something you know the

3    answer to and you're not able to tell me here today?

4          A     I'm not going to say that either way of whether -- I'm just not going to

5    comment on that.

6          Q     Okay.

7          Mr. Castor.     We can go off the record.

8          [Discussion held off the record.]

9          Mr. Castor.     So when I asked you if you know the answer and you're just not able

10   to tell me, is it because you don't remember or is it because you believe the Department

11   won't let you?

12         Back on the clock here.

13         Ms. Greer.     Do you know what the precise question is?

14         Mr. Sobocinski.     Yeah, no.     Let's get that question again.

15               BY MR. CASTOR:

16         Q     So at the June 2022 meeting, there was -- it's been related to us -- I wasn't in

17   the meeting -- so it's been related to us that the Tax Division lawyers presented a huge

18   presentation, that you asked some pointed followups, some rebuttals, that on the

19   sidelines you mentioned that you thought it was nonsense or words to that effect.

20         And so I asked you about that.     And you said that you're unable to comment on

21   that because -- due to the ongoing investigation, due to the instructions from the

22   Department.

23         And my follow-up question was, okay, do you know the answer, and you're not

24   willing to tell me because of the instructions, or do you not know the answer?

25         A     I have very limited more information I could get if given authorization by the

1    Department, but it would not be specifics, nor would it be -- it would be context.

2         Q     Okay.

3         A     And I do not believe it would in any way get you where you wanted to go

4    with the question, like get the answers you're wanting.

5         Q     After it became public that Gary Shapley was going to come to Congress and

6    he gave, I think, an interview on CBS in the -- at the end of May before his congressional

7    testimony, who did you discuss that with?

8         A     My team within Baltimore, probably folks within the Criminal Investigative

9    Division.    Definitely David Weiss.

10        Q     And what was the nature of your conversation with David Weiss?

11        A     I need to go off the record for a minute.

12        Mr. Castor.    Okay.

13        [Discussion held off the record.]

14        Mr. Sobocinski.    Yeah.    In general, it was concerns about how this was going to

15   affect the ongoing case and were there issues we needed to take into at least from the

16   FBI side to move forward.

17             BY MR. CASTOR:

18        Q     After Shapley's testimony became public in June, did you have any

19   conversations with David Weiss about that?

20        A     We acknowledged it, but it wasn't -- I mean, we didn't sit there with the

21   transcript going back and forth.    We both acknowledged that it was there and that it

22   would have had -- it had an impact on our case.

23        Q     Okay.    Did any of your conversations with David Weiss, you know, have

24   anything to do with like, can you believe what Shapley's saying, this is totally 100 percent

25   untrue?

1          A     I don't remember that level of it.

2          Q     If it was --

3          A     I was more concerned about how this is affecting my employees.     I now

4    have FBI employees that names are out there.     I have FBI employees and former FBI

5    retired agents who've served for 20-plus years whose parents are getting phone calls,

6    whose photos with their girlfriends, who their children who are being followed.     That is

7    not something that we were prepared for, and I was concerned about having that

8    continue or expand to other one of my employees.

9          Q     If what Shapley and Ziegler had testified to was totally fictitious, totally false,

10   totally off base, you would concede you probably would have a conversation with David

11   Weiss about, can you believe these guys are just making up all these facts?

12         A     Yeah, I'm not going to go into specifics of what I had or had not as it relates

13   to them.     My focus with David was how are we going to move this case forward.

14         Q     And likewise, then they testified in July before the Oversight Committee.

15   What types of conversations did you have with David Weiss about that?

16         A     Once again, it was -- I'm not going to get into specifics, but in general it was,

17   okay, David, where are we going?     Let's move this case forward.     What do you need

18   from the FBI and my team that will enable us to continue to move a case?

19         Q     Okay.     But those conversations didn't involve, can you believe Shapley and

20   Ziegler are totally lying about this?

21         A     Yeah, I'm not going to comment on what his opinions was, and I don't

22   remember having what you just said with him.

23         Q     You don't remember that?

24         A     Yeah, I don't.

25         Q     Okay.     Presumably, you would remember it if you and Weiss had like a big

1    conversation about, everything Ziegler and Shapley are saying is totally false, they're

2    making this stuff up?

3         A    As you're probably aware that -- you know, I joined the FBI 25 years ago.   I

4    joined for a reason:   to protect the American people and uphold the Constitution.   I've

5    been to war.   My family's been in bad places.   My kids have been evacuated from war

6    zones or quasi-war zones.   I've been in some bad things.

7         Q    This is --

8         A    I've accepted that.   No, no, this is important to me.   And so when you ask

9    what I remember, what I not, I am solely focused on two things, and they're not mutually

10    exclusive.   The first thing is, like every investigation, I want to get to a resolution in a fair,

11    apolitical way.   The second thing, and it's becoming more important and more relevant,

12    is keeping my folks safe.   And the part that I never expected is keeping their families

13    safe.   So that, for me, is becoming more and more of a job that I have to do and take

14    away from what I was -- what I signed up to do, which was investigate and do those

15    things.

16         So when you talk about potential frustrations with communication, I am

17    personally frustrated with anything that places my employees and their families in

18    enhanced danger.   Our children, their children didn't sign up for this.

19         Chairman Jordan.   No, and we certainly appreciate that and your service to our

20    country.   And there's no place for those kind of threats and that kind of thing.   But I'll

21    just point out, Mr. Castor has faced the same kind of thing when -- as our chief counsel a

22    few years ago during the impeachment proceedings that Democrats brought against

23    President Trump.   So no place for any of that.   We appreciate what you do.

24             BY MR. CASTOR:

25         Q    So again, you know, the question was, if Shapley and Ziegler are fabricating

1    this entire thing, you probably would have had a conversation with somebody about that.

2    Have you had a conversation with anybody about Shapley and Ziegler fabricating the gist

3    of what their testimony was?

4         A    I'm not going to go into speculative content of what I -- I was frustrated with

5    some --

6         Q    No, I didn't ask you to speculate.    I just said, did you have any conversations

7    with anybody?    First I said Weiss, and now I'm expanding it to anybody, about

8    like -- about saying that Shapley and Ziegler are just lying about everything?

9         A    No.    I've never said those words.

10        Q    Okay.

11        Ms. Greer.    I would just note for the record, I don't think the witness has stated

12   that they are lying about everything either.

13        Mr. Castor.    Okay.

14             BY MR. CASTOR:

15        Q    Are you -- I'm going to turn to some of the allegations that the agents were

16   obstructed in their investigation.    So if you can help us, we appreciate it.    If you can't,

17   I'll probably ask you if you know the answer and don't want to tell me or that type of

18   thing.

19             In August of 2021, that's after you became the special agent in charge of the

20   Baltimore field office, correct?

21        A    Yes.

22        Q    Okay.    Shapley and his team told prosecutors about other interviews they

23   would like to conduct, and they were denied.    Are you aware of that?

24        A    Can we go off the record?

25        Q    Okay.

1          [Discussion held off the record.]

2                    BY MR. CASTOR:

3          Q     All right.    Do you need me to repeat the question?

4          A     I do.

5          Q     So in August of 2021, after you became the special agent in charge of the

6     Baltimore field office, Shapley and his team told prosecutors about other interviews that

7     they wanted to conduct, and they were blocked from doing that.    Do you have any

8     awareness of that?

9          A     Yeah, I'm not going to talk about ongoing investigative activity.

10         Q     If you were permitted to talk about ongoing investigative activity, would you

11    be able to answer that question?

12         A     In a general sense.

13         Q     You would be able to answer it?

14         A     I would be able to respond differently.

15         Q     In September, Lesley Wolf emailed Shapley and his team saying, I do not

16    think you are going to be able to do these interviews as planned, adding that they would

17    require approval from the DOJ Tax Division.

18               Was that a fact you were aware of?

19         A     Once again, it's ongoing investigative matters.

20         Q     If David Weiss had complete authority to do -- to bring the cases that he

21    wanted, but yet investigators still had to get DOJ Tax's permission to do like basic

22    investigative steps, aren't those contradictory?

23         A     Yeah, I think it's semantics and word choice.    I think it was clear to me, as

24    I've stated over and over again, is that I believed and still do that David Weiss had the

25    authority to bring the charges.    There was administrative process that people may have

1    referred to as approval within the IRS.   I don't know.   I don't know what the IRS -- I

2    mean, because that's -- there are ways things rise up.   I'm aware of that in a general

3    sense and then they're referred via prosecution reports to prosecutors to prosecute.   I

4    don't know what that looks like in the IRS.   And so that might be the word choice they

5    use in this, but I am not aware of     approval --

6         Chairman Jordan.   You've dealt with other tax cases before?

7         Mr. Sobocinski.   Yes.

8         Chairman Jordan.   Numerous?

9         Mr. Sobocinski.   More than I would have liked.

10        Chairman Jordan.   Yeah.   I mean, I can appreciate that.   But again, you've said

11    so many times you were looking to get this resolved as quickly as possible.   And yet you

12    tell us time and time again you don't how the process works to get it resolved.   So those

13    seem to be contradictory to me.

14        If you wanted this resolved, you would think -- and you've dealt with the IRS time

15    and time again in cases, you would sort of know how the process works to get to

16    resolution.   So I don't know how you can say both things, which you've said numerous

17    times here to the committee.

18        Mr. Sobocinski.   Yeah.   And I've also said that it's a very complex internal

19    process.   I don't expect IRS to understand the internal processes of the FBI either.   And

20    so for me it is I knew they had things they had to work through, as I've worked with them

21    previously, and I know that takes a long time.

22        Chairman Jordan.   Yeah.   But this was -- this was not -- this was a pretty darn

23    important case.   Again, we can have the court reporter at some point figure out how

24    many times you've said you want to get to resolution as soon as possible.   I asked you

25    was this case going slow, and you said yes.   So that -- I think all that would, I think,

1    would compel you to say, how does this thing actually work?    And you would think you

2    would know that because you've dealt with all kinds of cases, working agents at the FBI

3    with agents at the IRS before, but yet you don't know how process works and/or you

4    won't answer Mr. Castor's questions when he gets into how that process worked.

5        Mr. Sobocinski.    So I understand what my role was and what I needed to do as

6    the SAC of the FBI to move that process and continually talked about ways in which or if

7    there was things we needed to do within my control.    I had a general sense of what

8    other individuals needed to do, but I also knew that I as the FBI SAC didn't have a role in

9    that and there was no administrative way for me to interject myself into that.

10        Ms. Greer.    Can we go off the record for 1 minute?

11        [Discussion held off the record.]

12            BY MR. CASTOR:

13    Q    So back to my question.    Lesley Wolf emailed Shapley and his team saying, I

14    do not think you're going to be able to do those interviews, adding that they would

15    require approval from DOJ Tax Division.

16        How do you reconcile on one hand David Weiss says he's got authority to

17    do -- charge whatever he wants, but on the other hand, basic interview steps -- you know,

18    basic investigative steps, such as conducting interviews, appear to be blocked?

19    A    I wasn't a participant of that.    I have no awareness of that.

20    Q    You have no awareness of that?

21    A    [No verbal response.]

22    Q    In October, Wolf emailed Shapley and his team saying that it will get us into

23    hot water if we interview the President's grandchildren, after investigators determined

24    that talking to grandchildren was pertinent to the investigation.    Were you aware of

25    that?

1      A    Once again, this line does appear that I am unable to -- because this is an

2  ongoing case, I am unable to talk -- to answer that question.

3      Q    Okay.   So, generically speaking, if you're working a tax case and there's a

4  deductions claim for children's education, is it fair to go and interview the beneficiary of

5  that deduction?

6      A    Once again, thankfully, I don't work tax cases.   I work adjacent to them.

7  And you'd have to ask the IRS that.

8      Q    Okay.   Were you aware that they were blocked from interviewing the

9  grandchildren?

10     A    Yeah, I'm not in a position to talk about investigative steps and what did or

11  didn't happen.

12     Q    Do you know the answer to that question or are you just not able to talk

13  about it?

14     A    I have an answer to that question.

15     Q    You know the answer to that question?

16     A    I have an answer to that question from my -- from where I sit in this chair.

17     Q    Okay.

18     A    But I'll go back to there's nothing nefarious in what that answer would be,

19  and there's nothing in my answer that would bear on whether David Weiss had authority

20  to or not bring this case forward or the investigative steps in this case forward.

21     Q    Were you aware of the instance where a search warrant was going to be

22  executed on a storage unit?

23     A    Can you be more -- like in this case?

24     Q    Yes.

25     A    I'm not going to talk about ongoing things in this investigative matter.

1       Q       So Hunter Biden had a storage unit, and there was a request for documents

2    that everybody knew was in the storage unit.     And so there was a plan to monitor the

3    storage unit and see if anybody from the Biden camp went to look for it.     And if they

4    didn't look for it, that would be telling that they weren't complying with the records

5    request.

6            Do you have any recollection of that?     Was that during your tenure?

7       A       Do you have a date?

8       Q       I don't have a date handy.     But I'm just asking you whether that was

9    something that you remember happening during your tenure?

10       A       Well, I think the first step is if we have a date, I could tell you whether it was

11    during -- whether it's something happened in my tenure.

12       Q       Fair enough.     Do you remember that?

13       A       Once again, I'm not in a position to talk about ongoing investigative steps.

14       Q       Okay.     Once again, do you know the answer to the question and you're just

15    not willing to talk about it, or would you need to rack your brain a little bit more and have

16    your memory jogged?

17       A       No.     I think that I -- this is going to be a repetitive process where I am going

18    to say I'm unable to answer that question because of an ongoing investigative matter.

19    You're asking me yes or no questions.     So obviously, all of these are going to a resolve to

20    a different answer than that.

21       Q       Okay.     Were you aware on the day of action, which was before your tenure,

22    okay, this is December of 2020, there were specific guidelines given to the investigators

23    about what they can and can't ask witnesses they were going to go interview?     Were

24    you aware of that?

25       A       Once again, I can't comment on any investigative activity in this case.

1          Q       If investigators were told that they couldn't ask about President Biden or

2    couldn't ask about what 10 percent for the big guy meant, if that happened, do you think

3    that would have an impact on the investigation?

4          A       I have no comment.    I don't know what that really -- what that is.

5          Q       You don't know what what is?

6          A       What you're asking me.    I have no idea the context of what that is.    I don't

7    know what you're referencing.    And if it is an ongoing investigation, I'm going to be

8    unable to discuss it.

9          Q       Okay.    In the runup to the day of action, U.S. Attorney's Office, specifically

10   Lesley Wolf, provided instruction to Agent Gordon and Agent Shapley and other agents

11   that were going to be participating in the day of action, that they were prohibited from

12   asking questions about Joe Biden.    They were prohibited from asking questions about

13   what 10 percent for the big guy meant.

14          Do you -- if that's the case, do you believe that impacts the integrity of the

15   investigation?

16          A       You know, first off, that didn't happen.    That was before my tenure.

17   And --

18          Q       It didn't happen or it didn't happen during your tenure?

19          A       So two issues.    The date you referenced was before I was in this position.

20   The second thing is you keep referring to the day of action.    What do you mean by that?

21          Q       So in 2020, it was an election year, they were -- the agents told us they were

22   prevented from taking any overt acts until after the election.    After the election, they

23   wanted to go and interview people, take overt action.    They wanted to go to Hunter

24   Biden's house in California and see if he'd be willing to talk to them.    They wanted to go

25   visit Rob Walker in Arkansas, see if he was willing to talk to them.    Turns out Rob Walker

1    was willing to talk to them.    So they got some information out of Rob Walker.

2    But they had a day of action planned.    That's how they characterized it.    It was

3    December 8th, 2020.    And in the runup to the day of action, they were given all these

4    guidelines about you can't ask about Joe Biden, you can't ask about 10 percent for the big

5    guy.

6    And so what I'm asking you as a real experienced FBI person, whether you have a

7    problem with that type of limiting apparatus being placed on the investigation?

8    A    So once again, wasn't there during that timeframe.    I'm not in a position to

9    talk about any investigative steps that may or may not.    However, it's a regular course of

10    levels of authority within an organ -- within the FBI of when we do or do not authorize

11    certain investigative steps.    And so I can't opine to this parti- -- I'm not going to opine to

12    this particular one, but in general, I regularly have conversations and make decisions on

13    investigative steps that agents may be or other employees may be conducting.

14    Chairman Jordan.    Were you comfortable with the proposed plea agreement?

15    Mr. Sobocinski.    Yeah, that's a U.S. Attorney's Office decision.    DOJ.

16    Chairman Jordan.    I understand it's their decision.    I'm asking were you

17    comfortable.    You told us you weren't comfortable with the pace of the investigation.

18    I'm asking, were you comfortable with the plea agreement as proposed to the judge?

19    Mr. Sobocinski.    This is an ongoing case.    And so with that, I'm just going to

20    defer my personal opinion on that.

21    Chairman Jordan.    You can give us a personal opinion on the pace of the

22    investigation, but you can't give us a personal opinion on what was going to be the

23    outcome of the investigation.    And you've said, again, at least a dozen times, probably

24    multiple times, that you were focused on resolving this case.    And I'm asking -- that was

25    your focus, you said it time and time again -- were you comfortable with how it was going

1       to be resolved if the judge had not declined?

2                  Ms. <u>Zdeb.</u>    I think the distinction between those two personal opinions is that he

3       has been providing his personal opinion on the pace as it relates to the questions that he

4       has been asked about some of the meetings and the issue of his authority which he is

5       authorized to discuss.    But questions about his personal view on a potential plea

6       agreement relates directly to the underlying investigation, and it's not within the scope of

7       what he has been authorized to talk about today.

1    [1:28 p.m.]

2         Chairman <u>Jordan.</u>    This plea agreement was put forward.    The whole country

3    knew about the plea agreement.    I'm just asking the guy who did the work, the guy who

4    oversees the people doing the work, what he thought of it.    That seems like an entirely

5    appropriate question, particularly in light of the fact he was willing to tell us he was not

6    comfortable with the pace of the investigation.

7         Mr. <u>Sobocinski.</u>    This isn't resolved.    I mean, this is an ongoing issue that I am

8    currently managing, and I do not think it's appropriate for me to discuss my opinion of

9    that right now.

10        Mr. <u>Castor.</u>    I went 1 minute over last time, so I will stop short 1 minute.

11        ███████.    For the record, I think I stopped 10 minutes early last time.

12        Chairman <u>Jordan.</u>    You can keep doing that.

13        [Recess.]

14        ███████.    It is 1:40 in the afternoon.    We can go back on the record.

15            BY ███████:

16        Q    Before I get going, Mr. Sobocinski, did you have something you wanted to

17    say?

18        A    Yeah, I did.

19        So with majority counsel, when they were talking to me about my meetings with

20    David Weiss, I think -- I continue to have this case as an ongoing investigation, but I am

21    running an office that has ongoing cases with David.

22        And so I don't want to give it the perception of we are having these one-off

23    conspiratorial conversations about anything.    He is my main point of contact for the

24    prosecution's office in Delaware.    My team is working with him.    Our teams are

25    working together every day.    I talk to him regularly about our ongoing cases.    And so I

1    just want to make sure that that's the intent of what those meetings look like.

2          I also to be clear, I did not talk about what I was going to -- my testimony here

3    today with him or anyone else about that.

4          Q      Thank you for that.

5          I want to talk -- elaborate a little further on something you said in the prior hour

6    about exhibit 1, which is the Shapley October 7th email.

7          You said -- made the point earlier about the distinction between

8    contemporaneous notes and a summary written up after the meeting, right?

9          A      Uh-huh.

10         Q      And you said that, to the best of your recollection, Mr. Shapley was not in

11   there taking notes during the meeting.    Is that fair to say?

12         A      Yeah, I can't comment of whether he was taking notes.    I don't have a

13   distinct memory of him with a laptop open creating this email.

14         Q      Okay.

15         A      And so that's really more what I was meaning.

16         Q      And so he wasn't taking notes on the computer at least?

17         A      Not that I'm aware of.

18         Q      Okay.    And you would have probably remembered that, if he'd had a

19   computer open in front of him?

20         A      Yeah, if he had.    In the Federal Government, that's still pretty rare.

21         Q      Okay.    Do you know if anybody else had a computer open and was taking

22   notes?

23         A      Not that I'm aware of.

24         Q      Okay.    And this meeting was largely in person, right?    There was not -- it

25   wasn't partially over Zoom, was it?

1        A    No, I believe everybody was in the room.

2        Q    Okay.    In the prior hour you said -- and I think the chairman picked up on it

3    as well -- you said that you wanted to keep the case moving forward.

4        Do you recall saying that?

5        A    I do.

6        Q    You said that a couple of times?

7        A    I have.

8        Q    What does that mean, keep the case moving forward?

9        A    So the FBI, we have more than enough work, and what we do is really

10    important.    And so for me it is about prioritizing our time and the time and energy of

11    what the FBI does.

12        And so for me when we open a case is we don't open them up forever.    There's a

13    variety of reasons why we want to get to a resolution.

14        And so for me, without going into specifics, I -- but I will when I talk about this

15    case, which is what does the FBI need to do or provide to a prosecutor that's going

16    to -- they're going to use and they need as far as information to bring the case to

17    prosecution or not.

18        Q    Okay.    And actually you just said there are a variety of reasons you want to

19    bring the case to a resolution, and that's across all cases, right?    Not just this case, it's

20    every case that you work on?

21        A    Correct.

22        Q    And what are those reasons?    You don't have to give me the exhaustive list,

23    but can you explain some of them for the record?

24        A    Yeah.    In general what we do is we arrest bad people who are doing bad

25    things.    And that may be anything from white collar crime, like what we're talking about

1    here today.    It's nation-state actors coming after us.    It is, especially in Maryland and

2    Delaware, it is violent folks killing people on a regular basis.

3        And so it's really important for us to get involved and to get involved quickly and

4    have that immediate impact to protect the American people and save lives.

5        Q    And if a case -- when a case is going forward, you have resource -- I mean

6    people, employees -- that are tasked to it that then maybe can't be working on other

7    matters as well, right?

8        A    Correct.

9        Q    And so it may be the case that you also want to move a case forward

10    because you have other matters that you need to focus on?

11        A    Correct.

12        Q    Okay.    Over the course of your 25 years with the FBI, you've worked with a

13    number of different U.S. Attorney's Offices, correct?

14        A    Correct.

15        Q    So you've worked with -- now you work with Maryland?

16        A    Correct.

17        Q    And you work with the U.S. Attorney's Office in Delaware?

18        A    I do.

19        Q    You've worked with the U.S. Attorney's Office in Washington, D.C.?

20        A    I have.

21        Q    Any other jurisdiction that I'm not thinking of?    North Carolina, I guess?

22        A    Yeah.    Two or three in North Carolina, EDVA, a couple in New York.    And

23    then when I was overseas there were dozens more that I would work with that had

24    international nexus.

25        Q    And is it fair to say that each office -- each U.S. Attorney's Office that you've

1    worked with has had a different approach to how it handles cases?

2         A    Yeah, I think there was -- the approach was always the same, the intent was

3    the same, but they had different cultures.

4         Q    What do you mean by different cultures?

5         A    I think just really in a concrete way.    Some were slower; some were faster.

6         Q    Okay.    So some office maybe are more deliberative.    They take a longer

7    time to mull over decisions.    Is that fair to say?

8         A    Yes.

9         Q    And how would you describe the pace at, for example, the U.S. Attorney's

10   Office for Maryland?

11        A    They're fast.

12        Q    They're fast?

13        A    Uh-huh, they're responsive.

14        Q    So they make decisions quickly?

15        A    Uh-huh.

16        Q    And Washington, D.C.?

17        A    Fast -- yeah, they're in the middle.    I'll say they're in the middle.

18        Q    Okay.    Are there any jurisdictions that you've worked with that you'd

19   consider a little more deliberative, like they take a little longer to make a decision?

20        A    Delaware would fall under that.

21        Q    Okay.    And that's in all the cases that you work on with Delaware.    Is that

22   fair to say?

23        A    It is.

24        Q    Okay.    Thank you.

25             I want to go back to the discussion about the Tax Division meeting.    And I

1    know -- I understand you can't get into the specifics of that meeting, so I'm going to try

2    and stay away from that.    But if you can answer a question, I don't want to put you in a

3    position you can't answer.

4        A    Uh-huh.

5        Q    There was a suggestion made that there was a -- some presentation made by

6    the Tax Division attorneys.

7             Do you recall that suggestion being made by the Republican staff?

8        A    I do.

9        Q    Okay.    And the claim was that that was because the Tax Division had to

10    clear the charges.    Do you recall that?

11       A    I believe that's what he said.

12       Q    Okay.    So in that case would it be logical for the entity that has to clear to

13    provide a presentation to try and persuade somebody?

14       A    Yeah.    Taking it out of the context of that case, sure, that sounds -- that's

15    the process, you're trying to persuade somebody.

16       Q    Right.    But if you actually had sign-off authority, you wouldn't need to

17    persuade anybody, right?    If you were the ultimate decisionmaker, you wouldn't need to

18    persuade anybody?

19       A    Yeah, I don't -- I think they're not mutually exclusive.    I think that, at least

20    now in the environment we live in, yes.    So for me, in particular, I'm the SAC.    I can

21    make a decision, and people are going to have to live with it.

22       Q    Right.

23       A    My hope is that not only am I providing information as to why I'm making

24    that decision, but I'm also getting my employees the ability to give their counternarrative

25    of what that is.

1          And so two things.    There's, one, for them they are -- they have an

2    understanding of my thought process and so what I -- my expectations; and, two, I

3    actually am still learning, and so I do get information that changes my mind.

4          Q    Okay.    And so in that case you might actually solicit that information

5    because, for example, you want to know what the weaknesses in an investigation might

6    be, correct?

7          A    Correct.

8          Q    And that might help you formulate a stronger case.    Is that fair to say?

9          A    Correct.

10          Q    Okay.    I want to move on to a discussion about leaks.    And you talked

11    earlier about the concerns about -- around the October 7th meeting and potential leaking

12    in that case.    But I want to talk about just leaks, take a step back and leaks more

13    generally.

14          Are you familiar with the term "law enforcement sensitive information"?

15          A    I am.

16          Q    And what's your understanding of what that term means?

17          A    It is one of several classification levels.

18          Q    It's not actually classified material, right, necessarily?

19          A    Wow, now you're going to get me in -- I better not fail this test.

20          You know, there's top secret, compartmented secret, confidential, and law

21    enforcement sensitive is the bottom of those four.

22          Q    Right.    And you don't need to be in, for example, a SCIF to do law

23    enforcement sensitive information?

24          A    That's correct.

25          Q    Okay.    Law enforcement sensitive information often encompasses

1    information about ongoing investigations, right?

2        A    Correct.

3        Q    So information maybe isn't classified, but it could still be law enforcement

4    sensitive?

5        A    Correct.

6        Q    And is it fair to say that the FBI works to keep such things close-hold or

7    works to keep them from being broadly released even if the information itself isn't

8    actually classified?

9        A    Yes.

10       Q    Why is that?

11       A    As it relates to ongoing cases, I mean, we're doing certain things in our

12   investigations against people that we don't want them to know about what we're doing.

13   And so for us, twofold.    It is -- it keeps what we're trying to do protected, but then also

14   there are safety issues with that information getting out and potentially could have

15   negative consequences on our employees.

16       Q    And is it fair to say that if the information gets out, your employees could be

17   at personal risk?

18       A    Yeah.    Some of this, yeah.

19       Q    Okay.    And is it fair to say that if that information got out, it could actually

20   compromise the investigation?

21       A    Yes.

22       Q    How so?

23       A    In a perfect world, people don't know we're investigating them.    That's why

24   they -- unless they're engaged in immediate violence, we watch them and gather

25   evidence that's going to enable us to work with the U.S. Attorney's Office or State and

1    locals to prosecute them.    And if people know we're watching them, they have a

2    tendency to stop doing that.

3        Q    Okay.    And so it actually might prevent you from completing an

4    investigation or it might prevent prosecutors even from obtaining a conviction.    Is that

5    fair to say?

6        A    Yes.

7        Q    Okay.    And is it fair to say that the release of information about ongoing

8    investigation also creates a risk that the reputation of the individuals involved in the

9    investigation -- I'm not talking about the agents, but, like, the witnesses or the targets or

10   even the subjects -- that those reputations could be impacted even if ultimately there are

11   no charges brought?

12       A    Correct.

13       Q    So that's another reason that the FBI works to keep that type of information

14   from being broadly released?

15       A    It is.

16       Q    Okay.    Without getting into the -- and I'm not asking about this case

17   specifically, but over the course of your career, have you ever worked on an investigation

18   where there were leaks of information to the press?

19       A    I don't recall ever being an investigator investigating the leaks, but I've been

20   involved in investigations that had information leaked about what I was doing.

21       Q    And has that impacted those cases in those situations?

22       A    Yeah.    Yeah, me personally, without going into details, it was a

23   counterterrorism case and a foreign government, and specific things about what we were

24   doing and descriptions of things about us was released at a time I was investigating

25   people that had killed Americans and were very interested in probably harming more

1    Americans and now to include myself.   So, yes, I was very upset by it.

2         Q    So those are pretty serious?

3         A    That was not a happy day.

4         Q    And that sounds like a pretty serious leak.   But even leaks in -- I don't want

5    to say lesser cases, but cases that don't necessarily involve counterterrorism, that can still

6    potentially impact the case.

7         It can also impact how agents work together on a case, right?   Could it

8    potentially sow distress among a case team?

9         A    Yeah, I think that's fair.

10        Q    Okay.   When a leak occurs, does the FBI conduct an investigation to

11   determine what happened?

12        A    The FBI, amongst many, the executive branch entities will do that

13   investigation.   But yes.

14        Q    Okay.   And that investigation sometimes takes -- could take a long time to

15   complete, right?

16        A    Correct.

17        Q    And while that investigation is ongoing, it's possible that the person or the

18   persons who did the leaking, if they still have access to the information, could continue to

19   leak more information, right?

20        A    Yes.

21        Q    Okay.   So there are circumstances in which a concern about a leak might

22   justify removing an investigative team, for example, to protect the integrity of the

23   investigation?

24        A    Yeah, in a general sense I could see that happening.

25        Q    Okay.   And ultimately when the FBI or whoever is investigating the leak

1  determines the source of the leak, there are likely to be ramifications for the individual

2  involved, correct?

3          A     Correct.

4          Q     For example, somebody who leaks sensitive information to the media could

5  lose his or her security clearance, right?

6          A     Yes.

7          Q     And FBI employees are required to maintain a security clearance to do their

8  jobs, right?

9          A     Yes.

10         Q     Do you know if IRS investigators are likewise required to maintain a security

11  clearance to do their jobs?

12         A     I don't know, but I would assume so.

13         Q     Okay.    So if they are, if someone is at risk of losing his or her clearance and,

14  accordingly, his or her job, then it would make sense for them to try to take steps to

15  prevent that from happening, correct?

16         A     Yes.

17         Q     Moving on, are you familiar with the term "sensitive investigative matter"?

18         A     I am.

19         Q     Sometimes abbreviated as a SIM, correct?

20         A     Uh-huh.

21         Q     What's your understanding of what a SIM is?

22         A     SIM is a category of or a designation that we give to certain investigative

23  matters that put a higher level of scrutiny or oversight approvals, process in motion.

24         Q     Are you familiar with the FBI's Domestic Investigations and Operations

25  Guide?

1       A       I am.

2       Q       Sometimes referred to as the DIOG, correct?

3       A       Yes.

4       Q       Can you explain for the record what the DIOG is?

5       A       DIOG is based upon the Attorney General guidelines that dictate how the FBI

6   does what it does and our authorities.    The DIOG then goes into more granular detail on

7   how we do things, the process of doing things, and then the corresponding authorities

8   that we need to do the things we do.

9       Q       I'm going to introduce section 10 of the DIOG.    This is the section on

10  sensitive investigative matters.    And I should say I think the DIOG itself -- the current

11  DIOG is law enforcement sensitive.    This is the 2021 version, which is available online.

12                              [Sobocinski Exhibit No. 9

13                              Was marked for identification.]

14              BY ███████:

15      Q       And I'm not going to ask you about the whole thing.    I think it's 17 pages as

16  printed.

17      A       Okay.

18      Q       Okay.    Just on the very first page, under "Sensitive Investigative Matters,"

19  the overview section, that very first paragraph on that first page says that:    "Certain

20  investigative matters should be brought to the attention of FBI management and

21  Department of Justice officials because of the possibility of public notoriety and

22  sensitivity."

23              Do you see where it says that?

24      A       I do.

25      Q       What's your understanding of what "public notoriety and sensitivity" means?

1    A    I think things that would, if the general public knew we were doing them,

2    would raise concern.

3    Q    And I want to be clear here.    This says that -- this sentence says certain

4    matters should be brought to the attention of management.    It does not say that they

5    require additional approval from management, right?

6    A    It does not say that.

7    Q    Okay.    It does.    And then it says:    "Assessments and predicated

8    investigations involving 'sensitive investigative matters'" do have "special approval and

9    reporting requirements," right?

10    A    You have now lost me.    Where are we on this?

11    Q    The second sentence of the first paragraph.

12    A    Okay.    Yes.

13    Q    Continues on, and it defines -- under 10.1.2.1, there's the definition of a

14    sensitive investigative matter, and I'm just going to summarize it quickly.

15        Among other things, it says members of the news media, religious and domestic

16    political organizations, academic -- matters with an academic nexus.    And it also says the

17    activities of a domestic public official or domestic political candidate and, quote, "any

18    other matter which, in the judgment of the official authorizing the assessment, should be

19    brought to the attention of FBI HQ and other DOJ officials."

20        Do you see where it says that?

21    A    I do.

22    Q    Is all of this generally consistent with your understanding of what a SIM is?

23    A    It is.

24    Q    Okay.    And then in the next paragraph it says that, while the definition of a

25    SIM generally pertains to the behaviors and/or activities of the subject, target, or subject

1    matter, quote, "This definition does not, however, prohibit a determination that the

2    status, involvement, or impact on a particular witness or victim would make the

3    Assessment or predicated investigation a SIM," right?

4        A    Uh-huh.

5        Q    So, in other words, a matter could be classified as a SIM even if the target is

6    not -- the subject of the investigation is not necessarily a protected person.    It's if one of

7    the witnesses or somebody that's potentially involved in it could be enough to trigger the

8    SIM designation.    Is that fair to say?

9        A    Yes.

10       Q    Okay.    Who actually designates a matter as a SIM?

11       A    Yeah, that's a bureaucratic question.    I think the authority, depending on

12   what the case type is, resolves at different levels.

13           I think, with everything, it comes into a first-line employee, a special agent, an

14   intelligence analyst, or other employee.    They recognize this as a potential.

15           Sometimes it's very clear-cut.    So then they look within the updated version of

16   DIOG and make a decision and put it into, like, essentially a chart and say, "Okay, I need

17   to do that," depending on what level of investigation it is.

18           And then other times that it's not as clear-cut.    And so you may bring in your

19   supervisor.    You may bring in our chief division counsel, which is the lawyers within a

20   field office.    Sometimes that, the discussions go to headquarters, OGC.    And at times

21   we discuss that with the U.S. Attorney's Office as well on occasion.

22           But the approval -- the actual approval really depends on what's the facts of the

23   individual case and then what's the case type and what we're being asked to do.

24       Q    And regardless of who actually signs off on the designation or makes the

25   designation, the FBI is required to notify both FBI headquarters and DOJ leadership that

1    that designation has been made, right?

2         A    Yes.

3         Q    Okay.    So the investigation into Hunter Biden was opened in

4    November 2018, correct?

5         A    I don't have a -- I don't know what the date was.

6         Q    Okay.

7         A    I do know that it was years ago.

8         Q    I'll represent to you that it was in -- according to the testimony from Mr.

9    Shapley, it was November 2018.

10        In 2018 -- in November of 2018, the Department of Justice was under the

11   leadership of first Attorney General Jeff Sessions and then Acting Attorney General Matt

12   Whitaker, correct?

13        A    Give me the years again.

14        Q    November 2018.    So we're looking at -- it would have been right around the

15   midterm elections?

16        A    Yeah, that sounds about right.

17        Q    Okay.    And both Attorney General Jeff Sessions and Acting Attorney

18   General Matt Whitaker were appointees of President Trump, correct?

19        A    I believe so.

20        Q    Okay.    And then Attorney General Bill Barr was confirmed by the Senate in

21   February 2019, if you recall?

22        A    That sounds about right.

23        Q    Okay.    And Attorney General Barr was appointed by President Trump as

24   well, correct?

25        A    Yes.

1    Q    So any notifications, for example, about a sensitive investigative matter,

2    2019, 2020, those would have ultimately gone up to Attorney General Barr, who was a

3    President Trump appointee, right?

4    A    Yeah.    I don't know the internal process of where the -- how that

5    notification goes within the Department.

6    Q    But he was the head of the Justice Department?

7    A    Yes.

8    Q    I want to turn to section 10.1.3, which I realize this would be easier if it had

9    page numbers, but take that back to FBI leadership.    It's on the -- I think it's on 10-4.

10    A    Okay.

11    Q    And about halfway through, so under section 10.1.3, there's a list of factors

12    regarding the authorization of SIMs.

13    And then immediately after that list of factors there's a short paragraph, and it

14    says:    "In the context of a SIM, particular care should be taken when considering

15    whether the planned course of action is the least intrusive method if reasonable based

16    upon the circumstances of the investigation?"

17    Do you see that?

18    A    I do.

19    Q    What's your understanding of what that means?

20    A    I think the difference with this one is "particular care."    I mean, in general

21    least intrusive method is the way we work our cases.    We want to do this as

22    unintrusively as we can.    When it becomes a SIM, it's just highlighting that you need to

23    even do more for that, that it's more important.

24    Q    Okay.    I want to move on from the DIOG and turn to the Justice

25    Department Tax Division's Criminal Tax Manual.    And I know this is probably not

1    something you've reviewed before because you are not a tax -- you don't do a lot of tax

2    investigations.    But we'll have -- we'll walk you through the document.

3        A    Sounds good.

4        Q    And this will be exhibit 10.

5                                [Sobocinski Exhibit No. 10

6                                Was marked for identification.]

7                ▮.    I've got too much paper in front of me.

8            And we're going to look at 9.4.9.3.3.3, which is at the bottom of the page and on

9    to the next page.    There's got to be a better way to do this.

10        Ms. Zdeb.    Which is the --

11                ▮.    Oh, I'm sorry.    I actually just gave you the IRS.    We're going to look

12    at both of them, but if I can pull those back.

13        Mr. Sobocinski.    Okay.

14                ▮.    That is the IRS manual.    This is the DOJ manual.

15        Ms. Greer.    What's that number?

16                ▮.    So this will be exhibit 10 and the next one will be -- end up being

17    exhibit 11.    I'm sorry about that.

18                BY ▮:

19        Q    All right.    So we are looking at section 1.05[3][b].    This is "Exclusive

20    Authority Retained by the Tax Division."    And this is from the DOJ's Criminal Tax Manual.

21            So the section immediately above this -- this is 1.05[3][a] -- provides U.S.

22    Attorneys with authority to execute search warrants in tax investigations, but that's

23    qualified by the following section, which is 1.05[3][b], which provides that the Tax

24    Division, meaning the Tax Division of the Department of Justice, "retains exclusive

25    authority to approve a search warrant that is directed at offices, structures, or premises

1    owned or controlled by the following," and then there's a list.

2            Do you see that list?

3        A    I do.

4        Q    Okay.    Number two on that list is a lawyer, correct?

5        A    It is.

6        Q    And number four on that list is a local, State, Federal, or foreign public

7    official or political candidate, correct?

8        A    Correct.

9        Q    And so in the case of both an attorney -- and I will represent to you that the

10    storage unit in Virginia was owned by an attorney, Hunter Biden -- or controlled by an

11    attorney or property owned by a political official -- such as, for example, a garage owned

12    by the then Vice President -- that would -- to execute a search warrant on either one of

13    those, the Tax Division would have to clear that search warrant, right?

14        A    Yeah, I'm not going to comment on the specifics of the investigation.

15    However, yeah, Hunter -- my awareness is Hunter Biden is a lawyer and Joe Biden is the

16    President of the United States.

17        Q    And if you turn the page to page 23 -- it's just the back side of the papers I've

18    given you -- it lists a number of factors that the Tax Division should consider before

19    approving a warrant.    Do you see where it has that list that's in the paragraph itself?

20        A    Got it.

21        Q    The third factor is "whether the particular evidence at issue can be secured

22    without a warrant (i.e., whether a search warrant is the 'least intrusive means' to obtain

23    the evidence)" correct?

24        A    It does.

25        Q    And so the Tax Division is required to consider if, for example, a subpoena

1    that an individual could voluntarily comply with might be an option.

2    A    Yeah, I think that would fit the definition of least intrusive.

3    Q    Or I guess there are --

4    A    Or less intrusive.

5    Q    Or they could just ask for it without a subpoena, right?

6    A    Yes.

7    Q    Okay.    So under this the Tax Division is -- this is a guideline that's been in

8    place for a long time, and in the case of property owned by an attorney or a public official,

9    the Tax Division must sign off on it, and the Tax Division must consider less intrusive

10   means, right?

11   A    It does appear to say that.

12   Q    Okay.    Now we're turn to the Tax Division's -- the IRS guidelines.

13                     [Sobocinski Exhibit No. 11

14                     Was marked for identification.]

15               BY ███████:

16   Q    And we're not going to spend a long time on this, but we're going to look

17   quickly at 9.4.9 -- I'm sorry, that is not where I'm going to go quickly -- at 9.4.9.3.3.3.

18   A    Okay.

19   Q    I think I can see why you get frustrated in tax meetings.

20   A    Right.    It's all becoming clear.    Yeah.

21   Q    This section -- have you ever reviewed this before?

22   A    I have not.

23   Q    Okay.    So paragraph 1 of this section says that the DOJ, Tax Division retains

24   exclusive authority to approve search warrants directed at offices, structures, or premises

25   owned or controlled by a lawyer or a Federal official, among others, right?

1          A     Okay.     Where is that on this?

2          Q     So that is on -- we have the wrong number in front of us.

3          A     Okay.

4          Q     I will represent to you that the IRS manual mirrors the Tax Division Code.

5     And actually we'll come back to this because there's a line that I do not have printed off

6     here.

7          A     Okay.

8          Q     Sorry.

9          All right.     You would agree in general that property owned by an attorney, for

10    example, there are additional factors to consider beyond just probable cause when

11    seeking a search warrant?

12         A     In a general sense, yes.

13         Q     In a general sense.

14         And the Tax Division in particular has to consider less intrusive means?

15         A     Outlined in these memos -- or in these manuals, yes.

16         Q     Okay.     And that's because searches of attorneys actually present particular

17    challenges, right?

18         A     Correct.

19         Q     For example, it might involve coming into contact with material that's

20    protected by attorney-client privilege, right?

21         A     Correct.

22         Q     And can you explain briefly what your understanding is of attorney-client

23    privilege material?

24         A     Yeah.     It's protected information that is restricted -- you know, that is

25    protected.     It is only the attorney and his client and then other people can get -- can be

1    included in that.

2        But from an investigative standpoint we -- there may be needs to get that type of

3    information.    That information may be included in a larger gathering of a bulk of

4    information.    And so there are processes that we apply to preserve that protection

5    when we obtain it.

6        Q    And is it problematic if an agent working on a case is exposed to material

7    that's protected by attorney-client privilege?

8        A    Yeah.    From an FBI perspective, if an ongoing case and he was exposed to

9    it, yes, there would be issues with that, administrative issues with that.

10       Q    Okay.    That attorney -- or I'm sorry -- that agent could potentially be

11   removed from the investigation.    Is that right?

12       A    I think that's one logical step.

13       Q    Okay.    And if the prosecutor on a case is inadvertently exposed to

14   attorney-client protected information, that's also potentially problematic, right?

15       A    I would think so.

16       Q    It's possible that that attorney -- that prosecutor might be removed from the

17   case, correct?

18       A    Yeah, I think so.

19       Q    And it's possible that, I guess worst-case scenario, that a case actually could

20   be dismissed or potentially charges not brought because of that, right?

21       A    Yeah, I believe so.

22       Q    Okay.    So you mentioned that there are specific steps that you take to

23   prevent against the risk of exposure to attorney-client privilege material.    And is it fair to

24   say that the FBI takes this pretty seriously?

25       A    Yes.

1    Q    So, for one example, if -- even if -- the first option is likely to pursue a less

2    intrusive means in a search warrant, correct?

3    A    Correct.

4    Q    So, for example, even if a prosecutor has probable cause to seek a search

5    warrant, the prosecutor might instead go with a subpoena or just ask the attorney to

6    produce the information so that presumably that attorney will know it's privileged and

7    can remove it from the production?

8    A    Yes.

9    Q    And even -- and if the prosecutor determines that a search warrant is

10    necessary, the FBI and the Department of Justice then might create a filter team, right?

11    A    Correct.

12    Q    And what's your understanding of what a filter team is?

13    A    So depending on what the process was to get the documents, it would come

14    to a group of attorneys and/or FBI employees, agents, and others that are separated from

15    the case team.

16        And so they will get those -- the information.    They obviously can review

17    the -- whatever the means of what we're looking for, the affidavit, the items of interest.

18    But then they also have a general understanding of what would look like attorney-client

19    material.

20        They would work through it.    So essentially then you have two bulk -- two

21    groupings of items.    One is agreed that it is not attorney-client privilege, and then the

22    second item is then potential.    And then there's -- and I don't know what that next

23    review is -- but then there is yet another review or two to confirm to agree.

24        I think it's then passed to potentially opposing counsel.    They talk about it.    And

25    then in the times in an ongoing trial I think this can come up again and those

1      determinations can be relooked at.

2          Q      Can this process sometimes take some time?

3          A      Yes.

4          Q      And sometimes it can take a lot of time?

5          A      Yes.

6          Q      Because I think you just talked through about five or six different steps,

7      correct?

8          A      Correct.

9          Q      And the goal of this process is to ensure that any privileged information is

10     sequestered, correct?

11         A      Correct.

12         Q      This is a pretty typical process when a search warrant is executed for

13     property belonging to an attorney, correct?

14         A      Yes.

15         Q      There's nothing unusual about it?

16         A      No.

17         Q      And the goal is not to slow down the case, right?

18         A      Yeah.     This is a mandated process that we have to go through.

19         Q      Okay.     The goal, as I said, is to protect privileged information?

20         A      Correct.

21         Q      All right.     I want to get back now to something that you talked a little bit

22     about in the earlier hour, but I want to explore it a little more.

23             This investigation has been fairly prominent in the press.     Is that fair to say?

24         A      Yes.

25         Q      And just taking a step back, if you had to put a number on it, how many

1    investigations do you think you've worked on during your time with the Bureau?    Is it

2    hundreds, thousands?

3        A    It would be -- I've touched thousands of cases.

4        Q    Okay.    In your experience, has this investigation received more press

5    attention than others you've worked on?

6        A    Yes.

7        Q    Can you -- do you have anything further to say on that?

8        A    Yeah.    I think that this investigation, without going into specifics of the

9    investigation, is something that people regularly bring up to me.    I am outward facing.

10   I go to media events.    I work with State and local partners.    People talk and bring this

11   case up.    And then in talking with other FBI employees, SACs in particular, they get

12   similar questions about this.

13       Q    Have the names of the FBI employees working on this case been made

14   public?

15       A    They have.

16       Q    And has that had -- is it common for employees' names or agents' names to

17   be made public?

18       A    Yes and no.    I mean, we are affiants on various processes that go into court.

19   You get to a certain level like myself where I am giving press releases and press

20   conferences.    But as a general rule we're not in the media.    Most of my 25 years

21   nobody would know who I was.

22       Q    In fact, it's fair to say that -- well, thinking about kind of line agents as

23   opposed to supervisors.    But the FBI generally works to keep agents' names out of the

24   public eye?

25       A    Correct.

1        Q       Why is that?

2        A       There's a variety of reasons, but I think the main ones are our anonymity of,

3        like, our faces.    We're investigating cases, and so if people know who we are and it's

4        during the workday, they kind of know we're doing something for what we do.

5                And then, secondarily, that's becoming more and more prevalent, is there has

6        been a massive increase in personal threats against FBI personnel and the facilities.

7        Q       And on that note, in this particular case have the agents or other employees

8        working on it suffered any personal impact based on the fact that their names have been

9        in the press and that this is a very public-facing investigation?

10       A       I'm not going to talk about individual people, but in general, yes.    There's a

11       large grouping of people, as I talked about earlier, that their names are now out there,

12       and then on social media things are being directed at them.    We can handle that.    But

13       when their identities, their families, things towards their families, that has absolutely

14       increased.

15       Q       And so in this case individuals' families have actually been the target of

16       threats?

17       A       I'm not going to get into the specifics of that.    I mean, like, there's legal

18       definitions of threats and all that other stuff.    I will say the sense of the employees and

19       especially the sense of their families is, yes, they feel threatened.

20       Q       Do you have concerns for their safety?

21       A       I do.

22       Q       Are you taking any steps -- and I don't want to compromise any law

23       enforcement protected information -- but are you taking steps to protect your

24       employees?    Do you feel the need to do that?

25       A       Yeah, them and family members.

1    Q    So there are very specific things that you're doing to ensure the safety of

2    those involved?

3    A    Yes.

4    Q    Okay.    And your name has also been in the press.    Your name was on the

5    letter that Chairman Jordan publicly released.    Have you personally faced any impacts

6    from this investigation?

7    A    Yes.

8    Q    Are you comfortable describing any of those?

9    A    You know, as a general sense of -- you know, we do this job for a reason.

10    We are -- you know, I have a goal.    I talk about the process.    I'm trying to move things

11    forward.    That's a -- it sounds very administrative and bureaucratic, but it's not.

12        I mean, I wanted to do this job to protect people in an apolitical way to keep this

13    country safe.    And that changed throughout the career of what that looked like and

14    expanded into counterterrorism and more worldwide operations, and that was a great

15    opportunity that the Bureau gave me and I'm proud to do it.

16        But for the first time in recent years I have people coming up to me recognizing

17    me or showing up at events and questioning my personal ethics and the ethics of the

18    team and the ethics of the FBI.    It's just different.    We can handle that.    Like I said, I'm

19    comfortable with that.    It's when you start looking at family members that it becomes

20    more disconcerting.

21    Q    Do you have any concerns for your safety?

22    A    Sure.

23    Q    Do you have concerns for the safety of your family?

24    A    I do.

25        ██████.    We can go off the record.

1          [Recess.]

2          Mr. Castor.    Back on the record.    It's 2:23.

3                  BY MR. CASTOR:

4          Q      You mentioned that Shapley's email wasn't what you considered

5    contemporaneous notes, and you said you didn't know -- you didn't see him taking notes

6    at the meeting.    Is that right?

7          A      I don't have a remembrance of him with a -- of anybody with a laptop.

8          Q      But if he had contemporaneous notes, would that be more reliable than this

9    email?

10         A      I don't know.

11         Q      But you did take issue with the terminology "contemporaneous."    And so I

12   guess my question is, if there was a snapshot in time, like if he had notes, is that

13   something that you would find more valuable than his email?

14         A      Not necessarily.    They might be the exact same thing.    I just don't know.

15                And you just kept using "contemporaneous notes."    I just wanted the record to

16   show that it was an email, and it appeared to be hours after that meeting.    And so for

17   me that was not contemporaneous --

18         Q      But if it were --

19         A      -- and it didn't appear to be notes.

20         Q      -- if it were contemporaneous, it would be better?

21         A      No, I don't know.

22         Q      Do you think it was reasonable for any attendee in the 10/7 meeting to

23   conclude that U.S. Attorney Weiss wasn't the deciding official?

24         A      Yeah, I can only speak for myself, and I believed him to be the -- I went in

25   believing he was the deciding official, and I left believing the same.

1    Q    But the question was, do you believe it would be reasonable for other

2    attendees in the meeting to determine otherwise?

3    A    Yeah, I'm not going to comment on what they -- I don't know what they

4    heard, speculate on that, or how they perceived the conversation.

5    Q    Right.    But if the tax years couldn't be charged in 2014 and 2015, and that

6    was announced at the 10/7 meeting, doesn't that call into question whether David Weiss

7    had ultimate authority?

8    A    You know, I'm not going to comment on ongoing discussions of this case.    I

9    will say in a general sense the meetings I'm involved with are discussing things about

10    cases throughout them, and you're not at the end until you're at the end.

11    Q    You said a number of times that the case was moving very slowly, you had

12    concerns about that, that your focus was bringing the case to resolution.    You also said

13    that you talk to David Weiss all the time.

14    So I'm wondering, what did you do to bring the case to resolution as the top FBI

15    official here?

16    A    So without going into specifics about this particular case, what I do in every

17    case is try to identify if there are any barriers or things that need to be done that's within

18    the responsibilities of FBI Baltimore, which is what I -- which incorporates Delaware, and

19    if there are, identify them, assign folks to work that, and then move that forward and get

20    the prosecution the information they needed to make that decision.

21    Q    But you were concerned about the pace, and you were concerned about

22    bringing the case to resolution, and you talk to Weiss all the time, but you never had

23    discussions with David Weiss about bringing the case in D.C. and what the impediments

24    were to doing that?

25    A    That was David's decision to make.    And whatever decision he made that

1    was going to get us there, that's the decision I was going to live with.

2        Q    But you never had discussions with Mr. Weiss about his efforts to bring the

3    case in D.C.?

4        A    I'm not going to discuss my -- you know, the ongoing deliberative discussions

5    about this.    But it is David -- I new it was David Weiss' decision to make that decision.

6    It wasn't mine.

7        Chairman Jordan.    It was his decision, but did you recommend it?    What did you

8    recommend?

9        I see how investigations work.    You guys are doing the investigating.    You're

10    looking at the facts, the evidence, and you're making recommendations to prosecutors.

11    Did you recommend that he go to D.C. particularly about these particular tax years that

12    Mr. Castor is talking about?

13        Mr. Sobocinski.    I --

14        Ms. Zdeb.    I'm sorry.    He can answer that question if there's a way to do so

15    without getting into particular deliberations around charging decisions or the ongoing

16    investigation.

17        Mr. Sobocinski.    Yeah, I recommended he make whatever decision with

18    whatever venue he needed to do to move it.

19        Mr. Castor.    But if you're so focused about bringing the case to resolution, it's

20    hard to believe you didn't have a conversation with him like, "David, what are you going

21    to do?    Are you going to bring it in D.C.?    Are you going to bring it in Delaware?    Are

22    you going to bring it in California?"

23        Chairman Jordan.    Or all three.

24        Mr. Sobocinski.    My conversations were, like, bring it, and I'm in control of giving

25    him the information he needed to bring it, and it was up to him to bring it where he felt

1     he had the best opportunity or the venue to do that.

2          BY MR. CASTOR:

3     Q     I mean, at some point -- and it was way earlier than October 7th, 2022 -- the

4     investigators have told us that there were no other investigative actions needed to bring

5     the case.

6          So if that's the case, then for you to bring the case to resolution it would seem

7     that you would be talking to U.S. Attorney Weiss and trying to figure out, like, where's the

8     case going to be brought, since nothing else has to be done.

9     A     Not going to get into the weeds back and forth with David Weiss.     My thing

10    was, "Do you need anything from the FBI that would help you make your prosecutorial

11    decision?"     And it's with him.

12    Q     Like, if you're hyperfocused on bringing the case to resolution, if you're

13    hyperfocused on the fact that the case was moving slowly, and you talked to Weiss all the

14    time, it just seems hard to believe that you didn't know they brought the case to D.C. and

15    it was denied, that they brought the case to California and it was denied.

16    A     Is there a question?

17    Q     Yeah.     It's hard to believe.     Like, so you have no recollection of talking to

18    David Weiss about bringing the case to D.C., having it be denied?     No recollection of

19    talking to David Weiss about bringing the case to the Central District of California and

20    having it be denied?

21    A     Once again, I'm not going to discuss the internal deliberative process.     But I

22    will state, once again, I believed, and still believe, David Weiss had the authority to bring

23    the charges.

24         I, as the SAC for the FBI, was responsible for providing him information and

25    evidence for the things that I was involved in.     And if there were things he needed as it

1 related to whether he was going to make the prosecution decision and the venue he was

2 going to choose, that was up to him.

3   Q Do you remember when you came on board in 2021 there was -- we've been

4 told David Weiss was hyperfocused on the statute of limitations running out, and he

5 admonished Lesley Wolf in front of, we're told, you and other people that you need to

6 bring this case, we need to bring this case before the statute expires.

7   Do you have any recollection of that?

8   Ms. Zdeb. And we've already gone over the fact that he can't get into specifics of

9 any internal deliberations that may or may not have occurred about investigative and

10 prosecutorial decisionmaking on this case. It's the same response as the last time you

11 asked that question.

12    BY MR. CASTOR:

13   Q Yeah, the question is, I'm just asking, do you remember the Weiss-Wolf

14 discussion in front of you about the statute of limitations expiring?

15   A And I'm going to be consistent. I'm not going to talk about the deliberative

16 discussions we had on -- which is now -- which is an open investigation, which I'm still

17 leading, and I still have a team that's out there doing this to move this forward to get --

18   Q Isn't there a way to bring charges on these -- on the statutes that have

19 expired?

20   A I'm not going to -- that's a decision for the U.S. Attorney's Office and IRS to

21 discuss whether things have expired or not and whether you're allowed to use that in

22 court right now, whether it's a legal charge.

23   Q Okay. You said you were doing your best to push the case forward. Can

24 you just tell us, like, specifically what you were doing, other than attend meetings? Like,

25 what were you doing from a leadership standpoint to get your -- to get this initiative

1    moving, to bring this case to a close?

2        A    Once again, I'm not going to talk about the deliberative process.    But it's a

3    general sense of -- as the chairman mentioned, I'll say -- I'm going to say it again -- which

4    is I had a -- we, the FBI, had a role in this investigation.

5        I asked -- I have a clear understanding of what that role was.    I asked if there was

6    things that needed to be done within what the FBI's purview was, made in general

7    communication about if there was anything needed, and that's what that was.

8        And so things that needed to be followed on with other entities or decisions by

9    other people, I wish the FBI SAC had that authority to make things happen, but,

10    unfortunately, we don't.

11        Chairman Jordan.    When did you first learn of the FD-1023 form?

12        Ms. Zdeb.    That's also outside of the scope of what he's authorized to get into.

13        Chairman Jordan.    I'm not asking him to get into it.

14    I'm just asking, when did you learn of it?

15        Ms. Zdeb.    And I'm indicating that he is not authorized to answer questions

16    about the 1023.

17        Mr. Weiss has said in a recent letter that that is part of an ongoing investigation,

18    and so the Department is not able to authorize this witness or any other witness to speak

19    about anything having to do with a 1023 at this point.

20        But, again, the Department is happy to continue these discussions, and to the

21    extent we can share additional information at some future date, we are happy to

22    continue talking.

23        Chairman Jordan.    Can I ask this?    Have you reviewed the 1023 form?

24        Mr. Sobocinski.    As counsel just stated, I'm not able to answer that question.

25            BY MR. CASTOR:

1    Q    Do you know the answer or do you -- do you know the answer to that

2    question?

3    A    As counsel stated, I'm not at liberty to discuss that 1023.

4    Q    You don't have to discuss it by saying you know the answer to the question.

5    A    You're asking for a response that means -- you're asking me a question.

6    You're asking for a response.    That's a discussion I cannot --

7    Q    Well, either you read it or you didn't read it, and then you know the answer

8    to that question.

9    A    Yeah, I'm not at liberty to talk about that.

10    Chairman Jordan.    What about the laptop?    When did you first become aware

11    of that?

12    Mr. Sobocinski.    Once again, there is an ongoing criminal investigation and I'm

13    not at liberty to discuss that.

14    Chairman Jordan.    How about the -- was the Baltimore Field Office in any way

15    involved with the memorandum from the Richmond Field Office regarding radical

16    traditional Catholics?

17    Mr. Sobocinski.    Not that I'm aware of.    And -- yeah, not -- what are you

18    referencing?

19    Chairman Jordan.    It's been in press reports about the memorandum put out of

20    the domain perspective of the Richmond Field Office.    Other field offices we've

21    subsequently learned were involved.    Originally we were told by the FBI it was just the

22    Richmond Field Office.    I'm just curious if Baltimore had any involvement with the

23    development of that product.

24    Mr. Sobocinski.    I have no awareness into that.

25    Chairman Jordan.    Okay.

1          BY MR. CASTOR:

2          Q     Any communications you had with David Weiss or anyone involved with the

3    10/7 meeting about the veracity of the whistleblower's testimony?

4          A     No.    I'm not going to get into, like, specifics of what that looked like.    But

5    in general, regardless of what they said, usually they were doing -- somebody was

6    providing information to motivate folks.    And so for me it was the results of it.    What

7    do I -- it's out there.    Something is there.    How's that going to affect us?    How do we

8    move forward?

9          Q     But you didn't have any discussions about the veracity of the testimony

10   being true or false?

11         A     Yeah, I'm not going to get into the specifics of that.

12         Q     And who, again, did you have those discussions with among the 10/7

13   meeting participants?

14         A     You're saying -- by your question, you're saying I answered that I had

15   discussions.    I'm not saying that.    I'm saying I'm not going to be discussing that, those

16   aspects of that meeting.

17         Q     I thought you did tell us that you had discussions, at least with David Weiss,

18   about the whistleblower testimony.    Certainly you've had it with ASAC Holley.

19         A     The purpose of that meeting -- part of that meeting was to discuss the

20   whistleblower.    When you say specifics of it --

21         Q     At the 10/7 meeting?

22         A     Correct.    When you say specifics, I'm not going to get into specifically what I

23   said or didn't say and with who and with the team.

24              Did I -- obviously, I've said in general that's what at least my intent of that meeting

25   was because I was concerned that it was jeopardizing what was and continues to be an

1    ongoing criminal investigation.     And so I was looking to get those folks together so that

2    we could attempt to continue to get a resolution on that.

3           Q     But you're not providing any testimony here today that you raised veracity

4    issues with anyone following the publication of the whistleblower testimony?

5           A     Yeah, I'm not going to go into specifics of what I did or didn't say in that

6    meeting like that.

7           Q     Are you aware of anyone calling into question the veracity of the testimony?

8           A     Yeah, I'm not going to speculate on other people's opinions.

9           Q     No.    I'm just asking if you're aware.

10          A     I'm not going to speculate on that.

11          Q     So you're not aware?

12          A     I'm not going to speculate on that.

13          Q     I'm not asking you to speculate.    I'm saying, are you aware of anyone calling

14   into question the veracity of the testimony?

15          A     Want to go off the record?

16          [Discussion off the record.]

17          Mr. Sobocinski.    Yeah, as we've talked about earlier, this is all over the media.

18   So I've seen media reporting on whether this was or wasn't true.    And so, yeah, I'm

19   aware of those conversations.

20          Chairman Jordan.    Did you have any conversations with U.S. Attorney Weiss

21   about -- we briefly touched on this, I think, the first hour -- about the two pieces -- the

22   two letters he sent to the committee, the June 7th letter and the June 30th letter, where

23   he said he had ultimate authority to determine where, when, and whether to file

24   charges?    And then he follows up 3 weeks later and says, I can only do charges in -- bring

25   charges in the Delaware U.S. attorney's district.

1          Did you have any conversation with him about those conflicting things?    And it's

2    been in the press that the Attorney General said one thing.    David Weiss seems to

3    indicate two different things there.    Any discussions with Mr. Weiss about that issue?

4          Mr. <u>Sobocinski.</u>    I'm not going to go into specifics.    However, I think the

5    Attorney General, David Weiss, and these two letters to my -- you know, and I just saw

6    them -- all fit.    I don't see differences in the three of those.

1    [2:39 p.m.]

2        Chairman Jordan.    But that's not what I asked.    I said, did you have any

3    discussions about what Mr. Weiss conveyed to the committee, what's been reported in

4    the press about this concern, whether he could bring charges anywhere, when, where,

5    and whether, or whether he couldn't and was limited to his U.S. attorney's district?

6        Mr. Sobocinski.    So I -- as to the letters, I'll take those piece -- the letters, I never

7    had conversations with David about his letters.    Beforehand, he may have made -- I'm

8    not -- in a general sense, he may have made reference to them.    I saw them in the media

9    like a lot of other people.

10        And then the second piece is his -- in a general sense, he's been consistent with

11    he's had authority to bring this case, where the venue -- whatever venue that is, if he

12    chooses to bring the case forward.

13        Chairman Jordan.    Well, it took him three letters to tell us that he had -- you

14    know, to be consistent.    So, I mean, I've done a lot of correspondence with the agencies

15    over the years, 17 years.    Steve and I have written the DOJ and the FBI tons of time, and

16    this was the most unusual correspondence.    So it's been anything but consistent.    You

17    can describe it that way, but that is certainly not the case.    Because he wrote a third

18    letter to Senator Graham and said something different in that letter as well 2 weeks after

19    the June 30th letter.

20        And I'm just asking, did you have a discussion with him regarding -- not the letter

21    specifically, but about that issue and whether he had been consistent and whether he had

22    this authority?    Even the Attorney General said in his August 11th statement, as I said

23    before, David Weiss has always had the authority to do this.    So that's what -- I keep

24    coming back to that fundamental question:    If he always had the authority, why does he

25    need it now?

1    And I can't -- you can't give us an answer.    You've been trying, but -- maybe

2    you've been trying, but you haven't given us one.    I want to know what the answer to

3    that question is.    And we'll ask the Attorney General when he's here in a week and a

4    half, but I kind of like to know what you know.

5    Mr. Sobocinski.    Yeah, I refer to the -- I think the Attorney General is an

6    appropriate person.    The FBI does not have a role in that designation.

7    Chairman Jordan.    As I've said before, Mr. Weiss would be permitted to continue

8    his investigation, take any investigative steps he wanted, and make the decision whether

9    to prosecute in any district.

10    Well, obviously he didn't have that authority or he wouldn't need special counsel

11    authority.    So how is it all consistent?

12    Three different things he's said to Congress, two to our committee, one to Senator

13    Graham.    And then this statement on August 11th.    It makes no sense to anyone with

14    common sense.    And I'm asking the guy who ran the investigation.    And you say it's

15    consistent?    It's anything but.

16    Mr. Sobocinski.    So I appreciate that.    But it is -- I felt and still believe that David

17    Weiss had the authority to bring a case forward, whether -- what determination or

18    what --

19    Chairman Jordan.    Well, that's different.    That's different.    A case forward is

20    different than I can bring a case in any jurisdiction I want to bring it.    That's different.

21    Mr. Sobocinski.    Then I'll use your words.    I still think and thought then and

22    throughout this investigation that he had the authority delegated to him to bring this case

23    forward in any prosecutorial district within the Federal system of the United States of

24    America.

25    Chairman Jordan.    Do you think it was -- do you think that he needed special

1    counsel designation?

2         Mr. Sobocinski.    That's a decision that you're going to have to refer to the DOJ on

3    that one.

4         Chairman Jordan.    And we will.    We'll ask them.    But we have you here today.

5    I want to ask you.    You've been willing to answer about the pace of the investigation,

6    given us somewhat of an answer on another question about how the plea agreement

7    worked.

8         I'm asking you:    Do you think the special counsel designation was warranted

9    after 4.5 years?

10        Mr. Sobocinski.    I'm not a lawyer, and I don't think it's appropriate for me to give

11   my opinion on that.    It's an ongoing case that I'm continuing to work.

12        Chairman Jordan.    And that's to speed up the resolution of this case, which you

13   talked about numerous times, or slow it down?

14        Mr. Sobocinski.    My goal is to make this thing go fast.    If that's one thing you get

15   after this testimony is I am trying to move this as fast as we can using all of the effort

16   we -- all of our authorities to do that in a professional and apolitical way.

17        Chairman Jordan.    Has your involvement and your investigation changed now

18   that there's a new distinction for the U.S. attorney as special counsel?    You guys still

19   investigating?

20        Mr. Sobocinski.    I'm going to have to go off the record on that.

21        [Discussion held off the record.]

22        Mr. Sobocinski.    Yeah, without getting into specifics, I still have -- I'm still leading

23   a team of agents that have an ongoing investigation.

24        Chairman Jordan.    So 6 weeks ago, there was a plea agreement, which would

25   indicate the investigation was complete.    Both sides decided here we're going to take

1    this to the court.    Plea agreement.

2            What new things are you investigating?

3            Mr. Sobocinski.    I am not at liberty to discuss the ongoing investigation.

4            Mr. Castor.    You ever discuss with David Weiss what a mess this case has

5    become?

6            Mr. Sobocinski.    I'm not going get into direct -- you know, I'm not going to go into

7    the details of what David Weiss and I did or didn't say as this thing's moving forward.

8            Mr. Castor.    I mean, you're trying to bring the case to a close you said, but you

9    have a case involving the President of the United State's son.    It just seems that this case

10    presents some unique challenges that have never really been dealt with before by a

11    Justice Department.    And just asking about your discussions with David Weiss about

12    navigating that.

13            Ms. Zdeb.    And he, the witness, is not authorized to talk about the ongoing case,

14    his discussions and deliberations on the ongoing case.

15                BY MR. CASTOR:

16        Q    Are you happy with, are you proud with the way the case been conducted

17    from an investigative standpoint?

18        A    I'm not going talk about the details.    When I'm talking about the

19    performance of my employees, yeah, I am -- they have worked hard on this matter.

20    They continue to work hard, regardless of what obstacle has come in front of them, with

21    potentially great personal issues being brought up.    So yeah, I'm proud of their actions.

22        Q    A lot of the investigative techniques that they tried to implement were

23    blocked by, whether it be the Tax Division or the U.S. Attorney's Office in Delaware.    Do

24    you have concerns about that?

25        A    I'm not going to agree or disagree with that statement.    I'm not at liberty to

1    talk about the ongoing investigative matter.

2         Q    Do you think the volume of issues raised about that type of thing has been a

3    little bit larger than any other case you've been involved with?

4         A    No.

5         Q    So this is an ordinary case for you?

6         A    You want to talk about cases, I'll talk about what we're doing in a general

7    sense every day.    I mean, I've got hundreds of cases that are going on.

8         Q    Having the U.S. attorney like tip off the defense counsel --

9         A    And so I'm continually managing this.    And so my team is continually

10   managing it.    Let's look at today, or the last week, I've had guns pulled on agents.    I've

11   had agents that are going into buildings this morning attempting to arrest -- no, this is

12   important.    You're asking me how this is in context of what my life looks like and what

13   this office looks like.    That's what we're doing every day.    I have folks that are going

14   after foreign nation-state actors, spies that are trying to do bad things with us today, this

15   week.    We're doing those things.

16        And so, for me, I think that's important that this is in perspective of what my office

17   and the team in this office are doing every day.    And so, yes, this is important, but it is

18   also important to recognize everything else that they're doing and putting their, you

19   know, family lives, their personal safety, you know, out there every day.

20        Chairman Jordan.    You ever have a case where the subject of the investigation's

21   defense counsel tells you if you continue to press charges, they're going to put the

22   President of the United States on the witness stand?

23        Mr. Sobocinski.    You know, as it relates to other cases, no.    And I don't know

24   that -- you know, as it relates to this case, I don't know anything about that.

25        Mr. Castor.    You haven't had any discussions with defense counsel, have you?

1          Mr. Sobocinski.    I'm going go off the record.

2          [Discussion held off the record.]

3          Mr. Sobocinski.    No, I have not.

4          Chairman Jordan.    Were you aware that defense counsel had made that threat?

5          Mr. Sobocinski.    I had no direct conversations with defense counsel.

6          Chairman Jordan.    We didn't ask that.    I said, are you aware that that

7    was -- that was something they had conveyed to the U.S. Attorney's Office?

8          Ms. Zdeb.    To the extent that is true, which we are not saying whether it is or

9    whether it isn't, but that relates directly to the ongoing case, and he's not authorized to

10   talk about it.

11          BY MR. CASTOR:

12          Q    You'd acknowledge notifying defense counsel of a pending search warrant

13   would be a problem in an ordinary investigation?

14          A    I'm not going to talk about the specifics of this case, but there are moments

15   in time.    Every case is different.    And there are times I've done that and been aware of

16   that previously.

17          Q    That you've notified defense counsel in advance of an upcoming search

18   warrant?    I mean, the whole purpose of a search warrant, correct me if I'm wrong, I'm

19   not an FBI official, but the whole purpose of a search warrant is to go in and grab

20   evidence because you're afraid it's going to get away.    Someone's going to throw it

21   away, right?

22          A    The purpose is to gather evidence, correct.

23          Q    Right.    But you're concerned that you can't just ask for it voluntarily.    You

24   need to go in and take it, right?    That's why you have to go to court and get a search

25   warrant.

1        A      The search warrant allows us to legally get evidence.     Each situation is very

2    different.    There are reasons why we may go through defense attorneys.     There are

3    reasons why we go directly to the subject of cases.     So each case is very different.

4        Q      Okay.    So as a general matter, you don't have any issue with notifying

5    defense counsel of a pending search warrant?

6        A      As a general matter, I hope that the investigative team was reviewing the

7    facts of that particular investigation, and they are doing what they need to do to keep

8    agents safe as well as balancing getting the evidence we need.

9        Mr. Castor.    Let's go off the record.

10       [Discussion held off the record.]

11       Mr. Castor.    Go back on the record.

12       Mr. Sobocinski.    Sure.

13              BY MR. CASTOR:

14       Q      What can you tell us about the removal of the investigative team from the

15   case?

16       A      I'm not going to talk about any administrative actions with this investigation.

17   And I'm not going to -- I'm also not stipulating that I know that that's true or not true.

18       Q      Okay.    Are you aware that Shapley and Ziegler have said that they've been

19   taken off the team?

20       A      I've seen that in media reporting.

21       Q      And have they been taken off the team?

22       A      I'm not going to comment on administrative matters relating to this

23   investigation.

24       Q      How does it work?    The IRS has said that this is a DOJ decision.    How does

25   it work, in theory, taking investigators off a case that don't belong to Justice Department

1    components?

2         A    Yeah.    In theory, I couldn't tell you that.    I know from an FBI perspective, I

3    think I have sole authority on who I designate to be the investigators on cases.    There's a

4    variety of reasons why or why not they would be on there, but I -- from the FBI's

5    perspective, I think that solely resides with me.

6         Q    And the person you communicate with from IRS standpoint is Waldon.    Is

7    that correct?

8         A    Waldon is the correspon- -- was at the time the SAC for a certain amount of

9    time, but I'm -- and so he was my counterpart.

10        Q    Did you have any communications with Waldon about taking Shapley and

11   Ziegler off the case?

12        A    I'm going to go off the record on that.

13        [Discussion held off the record.]

14        Mr. Sobocinski.    Yeah, I've had maybe three or four conversations with him.    So

15   without getting into specifics, I think the last one would've -- I think the last time I talked

16   to him was that October meeting.

17               BY MR. CASTOR:

18        Q    Okay.    Do you have any idea why Lesley Wolf has been taken off the

19   pleadings?

20        A    Once again, I'm not going to talk about ongoing personnel matters.

21        Q    Do you know the answer?

22        A    I'm not going to talk about ongoing personnel matters.

23        Q    That's not the question.    I said, do you know the answer?    I guess you're

24   not going to answer my question, right?

25        A    Based on guidance from the Department, I'm not allowed to discuss

1   ongoing --

2          Q     I'm not asking you to discuss.   I'm asking you if you know the answer.   Do

3   you know why Lesley Wolf was taken off the pleadings?

4          A     I don't -- you're asking me to -- I don't know that your statement is factually

5   correct.

6          Q     Okay.   Well, I don't think her name's on the pleadings, is she?

7          You -- sorry.

8          Chairman Jordan.   In the Attorney General's statement on August 11th, you said

9   on Tuesday of that week, August 8th, Mr. Weiss advised me that in his judgment, his

10  investigation has reached a stage at which he should continue his work as special counsel

11  and asked to be so appointed.   What stage of the investigation are you in?

12         Mr. Sobocinski.   I'm not at liberty to discuss where I am in this case.   We've

13  acknowledged there's an ongoing criminal investigation.

14         Chairman Jordan.   But that's not what the Attorney General said.   He

15  said -- there's a statement David Weiss asked him about.   He says we're in a stage where

16  I need to be special counsel.

17         I just would kind of like to know, are we in the beginning stage, in the middle

18  stage?   Are we in the I don't know what's going on?   What kind of stage are we in?

19         Mr. Sobocinski.   I'm not at liberty to discuss the ongoing investigation.

20         Chairman Jordan.   You think you're close to being done?

21         Mr. Sobocinski.   I'm not at liberty to discuss the ongoing case.   But I will say, as

22  you've heard me say over and over again, I on behalf of the FBI and my team is doing

23  everything we can and using all of our resources to effectively investigate this case, bring

24  it forward to the Department of Justice, to the lawful person we think currently has that,

25  which is now special counsel.   And we're doing everything we need to get there.

1          Chairman Jordan.    I'm just curious.    I think the country would like to know when

2     the Attorney General and the U.S. attorney, who is now special counsel, use the term

3     "stage," they'd like to know what stage we're in.    But we'll have to wait for someone

4     else to give us that answer, I guess.

5                          BY MR. CASTOR:

6          Q     In the October 7th notes, exhibit 1, I just want to be clear that my

7     understanding's correct.    When Shapley writes that Weiss stated that he's not the

8     deciding person on whether charges are filed, you don't have a recollection of that being

9     said, correct?

10         A     I'm sorry.    We've gone through this one again.    Can you point out here

11    which part you're talking about?

12         Q     Yeah, it's on the exhibit 1.

13         A     Yup.

14         Q     Page 1.

15         A     Yup.

16         Q     Item No. 2.

17         A     Yup.

18         Q     Weiss stated that he is not the deciding person on whether charges are filed.

19         A     As I think I've said almost as much as I've said I'd move this case forward,

20    that is not what I heard.    I went into that meeting believing he had the authority, and I

21    have left that meeting believing he had the authority to bring charges.

22         Q     But is it not what you heard or is it not what you remember?

23         A     You have continually asked me in various ways of whether or not what my

24    perception of his authority was.

25         Q     Right.    Is that discussed at all or is this part of a meeting just --

1          A       My perception of his authority was he had the authority to the bring

2    charges.

3          Q       But at the 10/7 meeting, did this -- was this discussed or was this just not

4    part of the meeting?    Are you surprised that that shows up in the notes?

5          A       As it relates to this meeting and his authority, without going into

6    specific -- nothing was said in that meeting by anybody that led me to believe that David

7    Weiss did not have the authority to bring this case.

8          Q       Was he talking about his authority in that meeting?    Squarely in the scope

9    of the -- today's interview.

10         A       Yeah.    I -- it's kind of like, are we breathing air?    We all were working

11   under the impression that he had the authority.    Whether -- I don't have a memory of

12   that particular moment, bringing it up.    But like I've said, I've talked to David quite a bit.

13   I talk to him regularly.    And throughout that, I've assumed he's had and believe he has

14   authority.

15         Q       I guess, last question I said was, did it surprise you that this showed up in the

16   notes, that you didn't remember it from the meeting?    You said it was a long meeting

17   and, you know, it's two pages of notes.    There's not that much stuff here.

18         A       Once again, it's an email, 6, 7 -- 5 or 6 hours afterwards.    I -- there was

19   nothing in that meeting that changed my belief that David Weiss had the authority to

20   bring this case forward.

21         Q       Okay.    But the question was:    Are you surprised it showed up in the notes,

22   then, if you don't remember it being discussed at the meeting?

23         A       Yeah, these aren't my notes.    This is not my email.

24         Mr. Castor.    I think we're all done on our side.

25         Chairman Jordan.    Thank you.

1          Mr. <u>Castor.</u>   Go off the record.

2          [Recess.]

1    [2:57 p.m.]

2    ████.    We're going to go back on the record.    It's 2:57 p.m.

3    BY ████:

4    Q    You were asked I don't know if it was in the earlier hour or 2 hours ago at

5    this point, but if you had any discussion with anybody about the testimony that

6    Mr. Shapley gave?

7    A    Yeah.    Can I just go back to one thing, because as we just shifted here, I just

8    want to make it clear is that, you know, I've talked to David regularly.    This is part of

9    what I do.    I hope you would expect the SAC of the FBI to have regular conversations

10    with his U.S. Attorney counterpart.

11    And so when you asked for specific moments of time and specific things, all I'm

12    going to give you is that I, you know, unfortunately at this point in my career, you have

13    dozens of meetings.    Something as significant as this would be memorable.    I don't

14    remember a specific meeting, but I do not have any memory of David altering or changing

15    his ability or discussion about his ability or anybody in his office to have the authority to

16    bring this case forward.    That's it.

17    Q    Thank you for that.

18    You were asked earlier if you had discussions about Mr. Shapley's testimony.    Do

19    you recall that conversation?

20    A    I do.

21    Q    Okay.    And I think the statement was made that if you totally disagreed

22    with it or if you thought it was offensive, you and him would probably would have had a

23    discussion about that.    Do you remember that statement being made?

24    A    Yeah, in general.

25    Q    Is it fair to say that following -- after you learned about Mr. Shapley's

1    testimony, your number one concern was the integrity of the case and the ability for it to

2    move forward?

3         A    Combined with, you know, the morale and safety of my folks, yeah.

4         Q    And that was my second question.    And your secondary concern, maybe

5    equal concern, was the safety of your employees?

6         A    Correct.

7         Q    So that was your real focus, not the veracity of the testimony?

8         A    Correct.

9         Q    Okay.    You were asked some questions about statements allegedly made

10   by a defense attorney --

11        A    Yes.

12        Q    -- in this prior -- just a couple minutes ago.    Without getting into those

13   statements specifically, would you agree that the job of the defense attorney is to

14   zealously represent their clients?

15        A    Yes.

16        Q    And in your experience, are defense attorneys sometimes unpleasant to

17   work with?

18        A    Yes.

19        Q    They can be jerks, right?

20        A    Yes, they can.

21        Q    Okay.    And that's pretty standard.    I'm not saying that all defense

22   attorneys are jerks, but it's standard that, you know, there may be headbutting?

23        A    Yeah.    Let's be fair, there are prosecutors that are jerks.    So, yes, it's

24   very -- there are even -- I'll even admit FBI agents that might be jerks as well.

25        Q    You were asked different questions about Lesley Wolf and whether she's still

1    assigned to the case or not.    You are not a supervisor for Ms. Wolf, correct?

2         A    I am not.

3         Q    Okay.    To the best of your knowledge, does Ms. Wolf primarily -- outside of

4    this case, does she primarily handle tax cases?    Is that fair to say?

5         A    I'm not aware of her role.

6         Q    Okay.    Do you know if Ms. Wolf has faced threats personally because of this

7    investigation?

8         A    There has been greater interest in her and things about her.

9         Q    Okay.    So is it fair to say she may have concerns for her own safety?

10        A    I think that's fair.

11        Q    Okay.    One --

12        A    And let me -- you know, when you talk to the FBI about threats, it's a very

13    legal definition and things like that.    We -- without going into specifics, my office and the

14    FBI have done things and initiated things to ensure that she remains safe.

15        Q    I want to turn quickly back to these June 7th and June 30th and July 10th

16    letters.    And I don't want to talk through them in detail.    I think we did that during my

17    first hour of questioning.    But I did want to just note for the record that in this -- you had

18    said that you don't see inconsistencies between these letters, correct?

19        A    Correct.

20        Q    And I do want to note that in the June 30th letter, and we talked through

21    this earlier, that the first sentence of the first paragraph on the second page says that

22    the -- my charging authority is geographically limited.    But then it does go on to discuss

23    his ability to obtain authority in other districts under that 28 U.S.C. Section 515, correct?

24        A    It does.

25        Q    And as we talked through earlier, that Section 515 authority is the special

1     attorney status, correct?

2          A    Yes.

3          Q    And you said that you had no reason to disagree with his statement that he

4     would have authority -- he would be able to be granted that authority if he had so

5     requested it?

6          A    Correct.

7          Q    And you believe that to be a true statement?

8          A    I do.

9          ███████.    Thank you.    We don't have anything further.    We can go off the

10    record.

11          [Whereupon, at 3:03 p.m., the interview was adjourned.]

1                          Certificate of Deponent/Interviewee

2

3

4          I have read the foregoing _____ pages, which contain the correct transcript of the

5     answers made by me to the questions therein recorded.

6

7

8

9                          _____

10                                   Witness Name

11

12

13                          _____

14                                        Date

15