IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                    *Plaintiff*,

          v.                                        Case No. 1:24-cv-815

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                    *Defendants*.

# Exhibit Q

1

2

3

4

5      COMMITTEE ON THE JUDICIARY,

6      U.S. HOUSE OF REPRESENTATIVES,

7      WASHINGTON, D.C.

8

9

10

11

12          INTERVIEW OF:    MATTHEW M. GRAVES

13

14

15

16

17                                    Tuesday, October 3, 2023

18

19                                      Washington, D.C.

20

21

22              The interview in the above matter was held in room 2237, Rayburn House Office

23      Building, commencing at 10:00 a.m.

24              Present:    Representatives Jordan, Gaetz, Biggs, and Swalwell.

1    <u>Appearances:</u>

2

3

4    For the COMMITTEE ON THE JUDICIARY:

5

6    CLARK ABOURISK, COUNSEL

7    STEVE CASTOR, GENERAL COUNSEL

8    DILLON CHEPP, COUNSEL

9    SEAN CLERGET, COUNSEL

10   BETSY FERGUSON, DEPUTY GENERAL COUNSEL

11   BRITTANY HAVENS, PROFESSINAL STAFF MEMBER

12   RACHEL JAG, COUNSEL

13   CAROLINE NABITY, CHIEF COUNSEL FOR OVERSIGHT

14   ███████████, MINORITY CHIEF OVERSIGHT COUNSEL

15   ██████████████, MINORITY STAFF ASSISTANT

16   ████████████, MINORITY OVERSIGHT COUNSEL

17   ███████████████, MINORITY PROFESSIONAL STAFF MEMBER

18

19

20   For the U.S. DEPARTMENT OF JUSTICE:

21

22   GRETA GAO, SPECIAL COUNSEL, OFFICE OF LEGISLATIVE AFFAIRS

23   SARA ZDEB, DEPUTY ASSISTANT ATTORNEY GENERAL, OFFICE OF LEGISLATIVE AFFAIRS

1

2          Mr. Castor.    Good morning.

3          Mr. Graves.    Good morning.

4          Mr. Castor.    This is a transcribed interview of United States Attorney for the

5  District of Columbia Matthew Graves.

6          Chairman Jordan has requested this interview as part of the committee's oversight

7  of the Justice Department's handling of the Hunter Biden investigation.

8          Would you just please state your name for the record?

9          Mr. Graves.    Matthew Graves.

10         Mr. Castor.    And you're joined here with agency counsel.    I'll have them

11  introduce themselves.

12         Ms. Zdeb.    Sarah Zdeb, Department of Justice.

13         Ms. Gao.    Greta Gao, Department of Justice.

14         Mr. Castor.    And you understand agency counsel has a fiduciary duty to the

15  Department and not you personally?

16         Mr. Graves.    Yes.

17         Mr. Castor.    And you've decided to proceed with agency counsel as opposed to

18  personal counsel, correct?

19         Mr. Graves.    That is correct.

20         Mr. Castor.    Okay.

21         On behalf of the committee, I want to thank you for appearing here today

22  voluntarily to answer our questions.

23         My name is Steve Castor.    I'm with Mr. Jordan's Judiciary Committee staff.    I'll

24  have the staffers here in the room introduce themselves.

25         Ms. Nabity.    Caroline Nabity, with Chairman Jordan's staff.

1          Mr. <u>Clerget.</u>    Sean Clerget, Chairman Jordan's staff.

2          ███████  ██████████, Ranking Member Nadler's staff.

3          ███████   █████████, Ranking Member Nadler's staff.

4          ███████  ██████████, Ranking Member Nadler's staff.

5          Ms. <u>Havens.</u>    Brittany Havens, Chairman Jordan's staff.

6          Mr. <u>Abourisk.</u>    Clark Abourisk, Chairman Jordan's staff.

7          Ms. <u>Ferguson.</u>    Betsy Ferguson, Chairman Jordan.

8          Ms. <u>Jag.</u>    Rachel Jag, Chairman Jordan's staff.

9          Mr. <u>Chepp.</u>    Dillon Chepp, Chairman Jordan's staff.

10         ████████   ██████████, Ranking Member Nadler's staff.

11         Mr. <u>Castor.</u>    The staff participation here is limited to the committee staff, so we

12    won't have additional staffers -- if other folks come in the room, we might stop and have

13    them announce themselves for the record.

14         I'll go over the ground rules and guidelines that we'll follow during today's

15    interview.

16         Our questioning will proceed in rounds.    The majority will ask questions first for 1

17    hour, and then the minority will have an opportunity to also ask questions for an hour.

18    We will alternate back and forth until the interview is complete.

19         Ordinarily, we take a break at the end of each hour, but if you'd like to take a

20    break apart from that, just let us know.

21         As you can see, there's an official House reporter taking down everything we say.

22    So we will, from time to time, need to make sure you give a verbal response, if you nod

23    your head and that type of thing.

24         Do you understand that?

25         Mr. <u>Graves.</u>    Yes.

1          Mr. <u>Castor.</u>    We want you to answer our questions in the most complete and

2     truthful manner possible, so we'll take our time.    If you don't understand our question,

3     just ask, and we can go back.

4          The Rules of Evidence don't apply, and so if a question calls for hearsay, you can

5     just tell us that you didn't learn something firsthand, but maybe you could just tell us how

6     you did learn it.    Is that okay?

7          Mr. <u>Graves.</u>    Yes.

8          Mr. <u>Castor.</u>    You understand you're required to answer questions before

9     Congress truthfully?

10         Mr. <u>Graves.</u>    Yes.

11         Mr. <u>Castor.</u>    And 18 United States Code, 1001, covers false statements before

12    Congress and proceedings like this.    You understand that, correct?

13         Mr. <u>Graves.</u>    Yes.

14         Mr. <u>Castor.</u>    We try to keep the information that we talk about confidential.    A

15    lot of times that doesn't happen.    Sometimes the transcripts come in and they get sent

16    to The Washington Post.    So we don't like the fact that that happens, but we do try to

17    keep things confidential.    So, to the extent we mark exhibits, we'll collect them.

18         That's the end of my welcoming remarks.

19         ████, do you have anything?

20         ████.    We just thank the witness for joining us today.

21         Mr. <u>Graves.</u>    Thank you.

22         Mr. <u>Castor.</u>    Ms. Zdeb, do you have any welcoming remarks?

23         Ms. <u>Zdeb.</u>    I do.    Thank you --

24         Mr. <u>Castor.</u>    Okay, good.

25         Ms. <u>Zdeb.</u>    -- Steve.

1        As you're aware, the committee's inquiry implicates an ongoing criminal

2    investigation and prosecution.    At this juncture, Mr. Graves is going to be able to

3    address questions that can be answered without compromising the ongoing matter.

4        Specifically, the Department has authorized him to discuss U.S. Attorney and

5    now-Special Counsel Weiss's authority.    And that would include the committee's interest

6    in whether Mr. Graves and his office prevented or denied Mr. Weiss the ability to bring

7    charges related to his investigation in the District of Columbia.

8        There may be some additional information Mr. Graves can share, depending on

9    the question, but, again, consistent with the Department's need to protect the ongoing

10    investigation.

11        I think you know, but to the extent you have questions that are outside the scope

12    of what Mr. Graves has been authorized to discuss at this point, we reiterate our

13    willingness to take those questions back and consider further accommodations at the

14    appropriate time.

15        All that said, our goal today is very much to facilitate Mr. Graves sharing as much

16    information as he can consistent with the scope of his authorization.

17        Mr. Castor.    Great.

18        We'll start the clock.    It's 10:05.

19                            EXAMINATION

20        BY MR. CASTOR:

21    Q    When were you nominated to be the U.S. attorney for D.C.?

22    A    I was nominated in July of 2021.

23    Q    And you were confirmed by the United States Senate when?

24    A    October of 2021, I believe.

25    Q    Okay.    And then you were sworn in as the U.S. attorney?

1     A    In November of 2021.

2     Q    Okay.

3     Prior to joining the U.S. Attorney's Office in November of 2021, what was your

4    experience with the Justice Department?

5     A    I had been a career prosecutor at the Justice Department, serving both as a

6    line assistant and as a career supervisor.

7     Q    Okay.   And for how many years?

8     A    Collectively, a little bit under 10.

9     Q    Okay.   And in what sections or what divisions of the Department did you

10   work?

11     A    So I worked in the U.S. Attorney's Office for the District of Columbia in a

12   number of different capacities.

13     Q    Okay.   But never Main Justice?

14     A    That is correct; I never worked at Main Justice.   Some of my investigations

15   involved me working with Main Justice, though.

16     Q    Okay.

17    And your office right now, how many attorneys work in your organization?

18     A    Counting temporary attorneys and attorneys on detail to us, ballpark,

19   roughly 450.

20     Q    Okay.

21    And can you articulate for us your interactions with Main Justice?   Do you

22   consider the DAG your supervisor or your direct -- the person you report to?

23     A    And just to be clear, we're talking in my current capacity?

24     Q    Yes.

25     A    I think the way that it's articulated is, my direct supervisor is the Attorney

1      General --

2           Q      Uh-huh.

3           A      -- but there's a dotted line reporting to the Deputy Attorney General --

4           Q      Okay.

5           A      -- in her capacity as chief operating officer of the Department.

6           Q      Okay.    And in your day-to-day report, like, who do you ordinarily

7      communicate with at Main Justice?    Is it Ms. Monaco or Mr. Miller?

8           A      So I think the question assumes a level of coordination or communication

9      that doesn't necessarily exist.

10          Q      Uh-huh.

11          A      As U.S. attorneys, in general, we don't have day-to-day communication with

12     either the Office of the Deputy Attorney General or the Office of the Attorney General.

13          Q      Okay.    How often do you speak with Ms. Monaco?

14          A      Ms. Monaco herself?

15          Q      Uh-huh.

16          A      Probably once a month, once every other month.

17          Q      Okay.    And Mr. Miller, Marshall Miller, the PADAG?

18          A      Probably the same.

19          Q      Okay.

20          A      And it's changed over time in the role.    I would say less now.

21          Q      Okay.    And is there anyone in the DAG's Office that you talk to more than

22     that, on a frequent basis?

23          A      Yes.    I talk to and members of my team talk to people on their staff more

24     than we talk to the principals.

25          Q      Okay.    And for you personally, who's the person in the DAG's Office that

1          you have the most frequent communications with?

2          A       So it varies depending on the issue that's covered.

3          Q       Okay.

4          A       They're kind of divided into subject-matter expertise.

5          Q       Okay.

6          A       So at different times it's been different people, depending on the issue being

7      discussed.

8          Q       Okay.    With regard to the Hunter Biden matter, who in the DAG's Office did

9      you have communications with?

10         A       To the best of my recollection, I don't think I had communications with

11     anybody in the DAG's Office.

12         Q       Okay.    So you didn't speak with Lisa Monaco about the Hunter Biden case?

13         A       Certainly not --

14         Q       Okay.

15         A       -- her.

16         Q       And Marshall Miller?

17         A       No.

18         Q       How about Mr. Weinsheimer, Brad Weinsheimer?

19         A       I mean, other than --

20         Q       About the Hunter Biden case.

21         A       No.

22         Q       Zero communications with Brad Weinsheimer?

23         A       None.

24         Q       Okay.    Any other official in the DAG's Office that you had communications

25     with about the Hunter Biden case?

1        A        So I can't recall.    At that point in time, we were having more conversations

2    than we typically were with members of the Office of the Deputy Attorney General, given

3    what was occurring in our office at that point in time.

4        Q        Okay.

5        A        It is possible that the subject came up, but I have no recollection of it in one

6    of those communications.

7        Q        So you have no specific recollection of any communications with anybody in

8    the DAG's Office about the Hunter Biden case.

9        A        That is correct.

10       Q        How about anybody in the Attorney General's Office?

11       A        No.

12       Q        About the Hunter Biden case.

13       A        Absolutely not.

14       Q        Okay.    So you didn't speak to the Attorney General?

15       A        That is correct.

16       Q        Okay.

17    The chairman has joined us.

18    Mr. Graves.    Chairman.

19    Chairman Jordan.    Mr. Graves, thank you.    Thanks for being here.

20    Mr. Graves.    Thank you for having me.

21            BY MR. CASTOR:

22       Q        Along the same lines, how often do you interact with the Tax Division in your

23    current role?

24       A        Attorneys from the Tax Division?

25       Q        Uh-huh.

1    A    To the best of my recollection, I don't think I've interacted with them at all in

2    my current role.

3    Q    Okay.    But to bring a tax case, the lawyers in your department have

4    interactions with the Tax Division, correct?

5    A    That is correct.

6    Q    And how would you describe that?

7    A    I'm sorry.    Can you reframe the question?

8    Q    How would you describe the communications on an ordinary basis that your

9    U.S. attorneys, your AUSAs, would communicate with the Tax Division lawyers?

10    A    Yeah, so it depends on a variety of factors.    And I did this when I was a

11    career prosecutor.

12    Q    Uh-huh.

13    A    There are cases where you're jointly prosecuting matters with them.    The

14    contact looks different in that context than cases where you're prosecuting the case on

15    your own but, per the Justice Manual, there are certain authorizations you need to obtain

16    from the Tax Division in connection with those prosecutions.

17    Q    Okay.    And so it is fair to say, in Federal criminal tax cases, approval from

18    DOJ Tax is required before a U.S. attorney's office may issue subpoenas or undertake

19    other investigative actions?

20    A    There are various steps along the investigative process that have to be

21    approved by the Tax Division in connection with the prosecution or investigation of tax

22    charges.

23    Q    Okay.    And so, if a U.S. attorney, whether it's yourself or Mr. Weiss, wanted

24    to bring tax charges against an individual, it would require the approval of the Tax

25    Division, correct?

1        A        That is correct.

2        Q        Under the Justice Manual.

3        A        That is correct.

4        Q        Okay.

5                 If there is a disagreement, ordinarily, between a U.S. attorney's office and DOJ

6        Tax, in your experience, how is that sorted out?    If, for example, the AUSA or the

7        U.S. attorney wants to bring tax charges and the Tax Division is balking, how does that

8        ordinarily get sorted out?

9        A        So, first and foremost, in my experience -- and I'm drawing on my experience

10       as a career prosecutor, not my current role -- that is handled at the line level.    And if

11       things need to be elevated, they're elevated in normal order up the career supervisory

12       chain.

13       Q        Uh-huh.

14       A        In my experience, generally, the Department arrives at consensus on --

15       Q        Okay.

16       A        -- how we should proceed.

17       Q        Are there ever instances that you're aware of where the DOJ tax lawyers

18       wanted to bring a tax case but the local U.S. attorney or the AUSA assigned to it did not?

19       A        To the best of my recollection, when I was on the line and when I was

20       supervising line attorneys, I can't recall that situation occurring.

21                But an important caveat to that is, I can't remember many cases where we

22       actually partnered with the Tax Division, as opposed to interacting with the Tax Division --

23       Q        Okay.

24       A        -- to get their approval.

25       Q        Okay.    And how is that different?    If there's a tax prosecution in D.C. that

1       your AUSAs are working, how does the partnership work with the Tax Division?

2              A       So, in general, when we're partnering with any Main Justice component, Tax

3       Division or otherwise, they're fully fledged on the case; both supervisory chains have to

4       approve all actions --

5              Q       Okay.

6              A       -- that are taken in connection with the prosecution.

7              Q       Okay.    Are there ever instances where you'll bring a tax case without the

8       assistance of the Tax Division lawyers?

9              A       Yes.    So that's what I was saying before.    All of the cases that I can recall

10      that I worked on or supervised where there were tax charges, we were doing those cases

11      on our own without the Tax Division.

12             Q       Okay.    And why was that, or why would that occur, where you wouldn't

13      lean on Tax Division resources to prosecute a case?

14             A       It's actually fairly normal --

15             Q       Okay.

16             A       -- in my experience.    There is, unfortunately, lots of tax evasion out there,

17      and the Tax Division, it isn't structured to have prosecutors --

18             Q       Okay.

19             A       -- in all of them.    The idea is that the U.S. attorney's offices in general will

20      handle a lot of those cases.

21             Q       Okay.    So the Tax Division reviews the charges, okays them, and then your

22      office would move forward?

23             A       Correct.

24             Q       Okay.

25             Has there ever been an instance where a U.S. attorney from a different district

1    came to you with a case that needed to be prosecuted in D.C.?

2        A    So I think, outside of this situation, the technical answer to your question is

3    no, because it's assuming that those communications are occurring at the U.S. attorney

4    level.

5        There have been instances where other offices have reached out to career people

6    in my office and said, for a variety of reasons, there's this investigation that we have here,

7    where it's actually -- the venue is appropriate in your jurisdiction.

8        Q    Okay.   And so how does that ordinarily work?   The line AUSAs talk to each

9    other and reach a conclusion?

10       A    That's correct, the line AUSAs or -- usually, the interaction is at the line level.

11   It's a career supervisor reaching out to another career supervisor, because people in

12   general know each other.

13       This most commonly happens, in my experience, for our office with the Eastern

14   District of Virginia and Maryland --

15       Q    Uh-huh.

16       A    -- because you can be in an investigation in one jurisdiction and realize,

17   because of our proximity, that, actually, the better venue is another jurisdiction.

18       Q    Okay.   And so, ordinarily, those types of decisions don't make their way up

19   to the U.S. attorney for approval?

20       A    What I would say is, they certainly don't require U.S. attorney approval

21   necessarily.   I am briefed when those happen as part of my normal briefing on what is

22   happening in our Criminal Division.

23       Q    And when these types of situations occur, how does the prosecution move

24   forward?   Let's say it's an AUSA in Maryland that realizes venue's appropriate in D.C.,

25   wants to bring a tax case, confers with your line AUSAs, decide that they will take the

1    case.    How does that work?

2         A    It varies, and it's very case-specific.    It can be what you just described, that

3    we actually take the case and then we try it with our prosecutors.    It can be that

4    assistant United States attorneys from other jurisdictions get designated as special

5    assistant United States --

6         Q    Okay.

7         A    -- attorneys in our jurisdiction --

8         Q    Okay.

9         A    -- and then prosecute the case that way.

10        Q    Okay.    And how often would you say it happens?    What's the more

11   ordinary situation?    Is it your prosecutors taking the case, or is it you, your office,

12   designating the lawyers from Maryland or Virginia as special AUSAs?

13        A    It's -- I'm sorry, I just want to clarify.    Are you saying, what's more

14   common --

15        Q    Yeah.

16        A    -- for prosecutors from another jurisdiction to come here and try the cases

17   or for us to take the case in its entirety?    Is that the question?

18        Q    Yes.

19        A    Okay.    I think, in general, in my experience, it's prosecutors from other

20   jurisdictions coming or --

21        Q    Okay.

22        A    -- us going out and trying.    But it depends.

23        Q    Uh-huh.

24        A    A big factor is going to be, like, how far along are you in the investigation.

25        Q    Right.    Okay.

1          Is there a difference in the DOJ Tax world between approval of charges and

2    discretion?    Are you aware of that distinction?

3          A    No.

4          Q    Okay.    So, as far as you're concerned, DOJ Tax, they either approve or

5    decline to recommend charges?

6          A    In my experience, that's been the case --

7          Q    Okay.

8          A    -- yes.    You either get approval or you don't get approval.

9          Q    Okay.    So there's no middle ground, something called "discretion"?

10         A    In my experience.    I can't claim that I've seen every iteration possible of a

11   tax case.

12         Q    Okay.    Fair enough.

13         Now, as far as the Hunter Biden case is concerned, what is your awareness of DOJ

14   Tax's position on that?

15         A    I have no knowledge from within the Department.

16         Q    Okay.

17         A    I mean, there are things that I've seen in public reporting, but I have no

18   job-related knowledge of what the Tax Division's position is.

19         Q    So you're unaware of whether the Tax Division recommended charges or not

20   in the Hunter Biden case?

21         A    That is correct.

22         Q    Okay.

23         Can you walk us through your recollection of how the Hunter Biden case was

24   brought to your office?

25         A    Yes.    To the best of my recollection, in late February or early March of

1    2022, then-U.S. Attorney Weiss, now-Special Counsel Weiss, called me directly.

2    Q    Okay.    And what did he say?

3    A    To my recollection, he said that he had a case where there was a component

4    of that case that he had deemed he wanted to bring in the District of Columbia.

5    Q    Okay.    And what did you say?

6    A    So, at a high level, without getting into the case specifics, my recollection

7    was generally saying -- asking him whether he was just looking for the kind of normal

8    administrative support that any U.S. attorney would need if they were going to come and

9    bring a case in another jurisdiction or have their people bring a case in another

10    jurisdiction, or whether he was asking for us to join the investigation.

11    Q    And what was his answer?

12    A    To the best of my recollection, his answer was that, at a minimum, it was

13    providing the support but we could discuss further joining or not.

14    Q    And what happened next after that telephone call?    Did you resolve

15    anything on the call?

16    A    Nothing other than a high-level commitment that we would provide

17    whatever logistical support that he needed, and I would work with my career people to

18    put them in touch with his career people.

19    Q    Okay.    And that was the end of the call?

20    A    Yes.

21    Q    And do you remember how long that lasted?

22    A    Best recollection, roughly 10 minutes.

23    Q    And then what did you do next?

24    A    I went to the then-head of our Criminal Division.

25    Q    And who's that?

1    A    Well -- so, in general, I would prefer, in the context of this interview, given

2    what you referenced before about, despite all of our best efforts, some of these

3    transcripts becoming public, giving positions as opposed to names.    We can work with

4    OPA if this really does become --

5    Q    I mean, we'd ask you for the name of the head of the Criminal Division; we

6    might ask, you know, your first assistant.    I think we're looking for those two names, but

7    about other than that, I think we can --

8    A    So can we -- my request to you would be that we kind of work this through

9    OLC as opposed to putting it in an official transcript.    I'm already dealing with enough

10    threats and harassment of my assistant United States attorneys --

11    Q    Okay.

12    A    -- who are career prosecutors.

13    Q    So you're unwilling to tell us who the head of the Criminal Division is?

14    A    So --

15    Q    I mean, we can probably look that up on the internet, can't we?

16    A    So I'm not sure that you could look it up at that point in time.    But what I

17    am saying is, I would like to work this out so that it's not in the official transcript.

18    Q    Okay.

19    So you had a telephone call with the head of the Criminal Division?

20    A    No.    I went to the head of the Criminal Division's office.

21    Q    Okay.    And what did you say, to the best of your recollection?

22    A    To the best of my recollection, I relayed what had just been conveyed to me.

23    I asked the head of the Criminal Division to have some of our career prosecutors work

24    with their counterparts in Delaware to get a briefing on the case --

25    Q    Uh-huh.

1       A      -- to make a recommendation about how we should proceed, in terms of

2    whether we would continue to seek to potentially join the investigation.

3       Q      And did you have any communications with your first assistant on this

4    matter?

5       A      My first assistant was present for a number of these conversations -- well,

6    sorry.    Strike that.

7              I just want to be crystal-clear.    Technically, we don't have a first assistant.

8    There's no one who had that title in our office.

9       Q      Okay.    So what title does the person who serves effectively -- effectively as

10   the first assistant?

11      A      It's the principal assistant.

12      Q      Okay.    So it's just a different name, principal assistant as opposed to a first

13   assistant?

14      A      It's a different name and -- it's a different name.

15      Q      Okay.

16             So tell us about the communications you had with your principal assistant.

17      A      So my principal assistant, to the best of my recollection, was present for this

18   meeting and a couple other limited meetings that occurred, but my principal assistant

19   didn't take any active role in moving anything forward in our office or having

20   communications with anyone outside of our office.

21      Q      Okay.

22             Now, you indicated that you went down the hall to speak with the head of the

23   Criminal Division, correct?

24      A      That is correct.

25      Q      Now, was it just a -- was it an official meeting, in your view, or was it just a

1    conversation?

2         A    I'm not sure of the distinction you're trying --

3         Q    Well, was something on a calendar that you scheduled?

4         A    No, there was no calendar invite.

5         Q    Okay.   So you just walked down the hallway and the head of the Criminal

6    Division was able to talk to you about this?

7         A    That is correct.

8         Q    And do you remember any other communications or meetings like this that

9    you had on the case?

10        A    So I -- there was one other meeting that I recall.

11        Q    Okay.   With the head of the Criminal Division?

12        A    Just in general, there's one other meeting that I recall.

13        Q    Okay.

14             And so what was the next step after you had this discussion with the Criminal

15   Division head?

16        A    So the next step was for the Criminal Division head to reach out to the

17   appropriate section within our office that does tax investigations to have the matter

18   staffed for an assessment and to get back to me quickly with their recommendation.

19        Q    Okay.   And what did they do, as far as you know, next?   Did they go to

20   Delaware?   Did they communicate with the AUSAs in Delaware on the phone?   How

21   did they conduct their assessment?

22        A    My understanding at a high level is, there was some interaction with the

23   AUSAs in Delaware.   They got some case-related or investigation-related material.   I

24   don't know specifically who the individuals were that they interacted with or what

25   materials they reviewed or gathered.

1      Q    Okay.   Now, did you review any materials?

2      A    To the best of my recollection, no, I didn't review any underlying case

3 materials.

4      Q    Okay.

5      So you had the conversation with Mr. Weiss; then you had that conversation with

6 the head of the Criminal Division.   The head of the Criminal Division, as far as you know,

7 instructed the AUSAs in your office to communicate with the AUSAs in Delaware.   Some

8 materials were exchanged, but you don't know what materials they were?

9      A    That is correct.

10     Q    Okay.   And then what happened?

11     A    Well, during the course of all of this, we're taking steps to facilitate whatever

12 then-U.S. Attorney Weiss would need in terms of bringing a case in the District --

13     Q    Okay.

14     A    -- separate and apart from whether we would join the investigation.

15     Q    Okay.   And tell us what that is.

16     A    So some of it is protected, but what I can say at a high level, in general:

17 Whenever you're trying to return an indictment, if it's a felony charge, we can't just bring

18 those charges on our own.   We have to present evidence to a grand jury, and a grand

19 jury has to --

20     Q    Of course.

21     A    -- vote those charges.   So that's a key step that's done in any case where

22 someone wants to bring charges, and kind of facilitating that process.

23     Q    Okay.   And did you facilitate that process?

24     A    So I can't speak specifically about the case, but what I'm telling you generally

25 is that that's what we would do when we receive requests to help with returning an

1    indictment in our jurisdiction.

2         Q    Okay.    And what else?

3         A    At a high level, without getting into case specifics, I think that generally

4    describes what was occurring at that point in time.

5         Q    Okay.

6              What feedback did you receive from your people after the interactions that they

7    had with the U.S. Attorney's Office in Delaware?

8         A    To my recollection, they had a meeting with the relevant career supervisors

9    and the career prosecutor who was assigned to the matter, where they provided their

10   assessment.

11        Q    And what was their assessment?

12        A    So I can't get into what their assessment was, because it concerns an

13   ongoing investigation.

14        Q    Okay.

15             So is that the universe of meetings you had in this case?    You had the -- or,

16   meetings or calls?    You had the call with Mr. Weiss.    You had the drop-by meeting with

17   the head of your Criminal Division.    And then now you said you had a meeting with your

18   AUSAs.

19        A    Those are the most prominent.

20        Q    Uh-huh.

21        A    It's possible -- because, I mean, my Criminal Division chief and I, at that point

22   in time, were in daily contact --

23        Q    Uh-huh.

24        A    -- I mean, multiple times per day.

25        Q    Right.

1          A       So it's possible, in any one of our other various times that we were together,

2     the issue came up.

3                 But those are kind of the three most prominent events that I recall.

4          Q       And -- go ahead.

5                 Chairman Jordan.    Earlier, Mr. Graves, you said you had one other meeting, 2

6     minutes ago, and you described it as a general meeting.    Is that related to all this?    Or

7     tell me about that meeting.

8                 Mr. Graves.    That is the meeting that I was describing where I met with the

9     career prosecutor, yep, yes.

10                Chairman Jordan.    Fine.

11                    BY MR. CASTOR:

12         Q       And when was that?

13         A       I think it was March 19, 2022.

14         Q       And was a decision made at that meeting?

15         A       Yes.

16         Q       Okay.    And the decision was made not to move forward with the case,

17    correct?

18         A       So I wouldn't describe it that way.

19         Q       The decision was made not to partner with the U.S. Attorney's Office from

20    Delaware, correct?

21         A       So I think what has obviously been publicly reported and is known -- and I'm

22    trying to be careful, given that there's an ongoing investigation -- is that we ultimately did

23    not join.

24                And recall, when this came up, to my recollection, I was the first person to raise

25    whether they wanted a local counsel on the case.    And I think the best way of

1   characterizing the decision was, we instructed -- I instructed to say that we weren't going

2   to pursue being a local counsel on the case.

3      Q    So the meeting that you had on March 19th, the decision was made not to

4   join.

5      A    So, not to continue to pursue to see if they'd be willing to allow us to serve

6   as local counsel, but to provide all assistance that was necessary for them to do whatever

7   they wanted to do in our jurisdiction.

8      Q    So the decision was made to invite them into your jurisdiction and let them

9   prosecute the case?

10     A    That decision had been made when then-U.S. Attorney Weiss called me.

11     Q    Okay.

12     A    Then I made the decision, we were going to do whatever he needed --

13     Q    Okay.

14     A    -- done logistically in our jurisdiction.

15     Q    Okay.   So you were going to welcome the prosecutors from Delaware into

16   D.C. and let them prosecute the case?

17     A    Yes.   The only issue was whether we were going to seek to join their

18   investigation or not.

19     Q    Okay.   And you decided not to join their investigation.

20     A    That is correct.

21     Q    And can you tell us why?

22     A    So I unfortunately cannot get into the why without getting into the case

23   specifics of an ongoing investigation.

24     Q    Okay.

25          And how was the decision not to partner or not to join -- everyone's got a

1    different way of saying it -- how was that communicated to the Delaware U.S. Attorney's

2    Office?

3          A    Instructed it to occur at the line level.

4          Q    At the line level?

5          A    Yes.

6          Q    Did you have any telephone calls or anything of that nature with Mr. Weiss?

7          A    To the best of my recollection, no.   I only recall that first conversation.   It's

8    possible that we had one.   I'm talking about, like, a year and a half ago.   But that's all I

9    recall.

10         Q    Okay.

11              And in the March 19th meeting, were all the officials in the meeting your staff?

12         A    That's correct.

13         Q    Okay.   And who was in that meeting?

14         A    The --

15         Q    How many people?

16         A    Roughly, to the best of my recollection, five or six.

17         Q    And who were those five or six people?

18         A    The principal assistant; Criminal Division chief; the head of our fraud, public

19   corruption, and civil rights practice; the head of our Fraud and Public Corruption Unit; and

20   a line assistant, I believe.

21         Q    And can you tell us anything more about the March 19th meeting, about

22   what was communicated to you and what decision -- what types of things led to the

23   ultimate decision?

24         A    So I understand the question, and in the constraints we're operating under, I

25   can't answer it directly.

1          What I can say generally, in terms of how I run these meetings, is, if it's a decision

2    that rises to my level, I make everyone present give their view of how we should proceed.

3          Q     And was the view unanimous?

4          A     So I can't get into this case specifically.    I will say, in general, in my

5    experience, most of the things that come to me, the overwhelming majority are

6    unanimous.

7          Q     Uh-huh.

8          A     There are some times where there's disagreement among various

9    supervisors, and that's where I have to decide with one camp or another.

10         Q     Okay.    But this is a very unusual case, correct?    I mean, this doesn't fall

11   into the ordinary type of matter, right?

12         A     In what sense?

13         Q     Well, it's the son of the President of the United States.

14         A     So I understand where you're coming from, and I get your point.    Being in

15   D.C., we have a good number of cases that involve very prominent individuals.

16         Q     Okay, but nothing like the son of the President of the United States.

17         A     I would actually -- I mean, I can't get into all of it, but I'd actually disagree.    I

18   think there are things of that level that --

19         Q     So this was common?

20         A     I didn't say "common."

21         Q     Uh-huh.

22         A     I didn't say "common" at all.

23         Q     Right.

24         A     But it's not unusual or a one-of-a-kind to have a family member of someone

25   who is prominent, or someone who is prominent themselves, under investigation in our

1    office.

2    Chairman Jordan.    When did U.S. Attorney Weiss call you?    In March of 2022?

3    Mr. Graves.    So, to the best of my recollection, it was late February or early

4    March.

5    Chairman Jordan.    So, in 3 weeks' time -- so you've got the U.S. attorney calling

6    you about an important case, as Steve just talked about, a somewhat unusual case.    He

7    calls you and asks that you partner with them and assist them, right?    I think you made

8    those two distinctions.

9    And -- go ahead.    Correct me if I'm wrong.

10    Mr. Graves.    So I just want to clarify.    He asked for assistance.    I asked if he

11    needed us to partner or if he wanted us to partner.    And he said he was open to a

12    conversation about that --

13    Chairman Jordan.    Okay.

14    Mr. Graves.    -- but needed the assistance.

15    Chairman Jordan.    Okay.

16    But in 3 weeks' time, you decide not to partner.    On March 19th you have the

17    meeting, and the determination is made you were not going to partner with the

18    U.S. attorney.

19    Mr. Graves.    We decided that we were not going to join the investigation.    And,

20    again, the context here is, I was the one who brought it up, not them.    And I understood,

21    for a variety of reasons, it was important for us to move quickly.

22    Chairman Jordan.    And then you didn't call David Weiss; you just let your

23    assistant attorneys let Delaware know.

24    So the only conversation you had with David Weiss was, he calls you up about a

25    pretty important case and asks for your assistance.    You raise the issue of whether you

1    can partner or not.    Three weeks later, you decide you're not going to.    And then you

2    don't communicate back to him.

3            Mr. Graves.    So --

4            Chairman Jordan.    You, personally, don't.

5            Mr. Graves.    So me, personally?    No.    I instructed my career prosecutors to

6    convey the decision and the basis for the decision to his career prosecutors.

7            Chairman Jordan.    Okay.

8                    BY MR. CASTOR:

9        Q    Now, you're a big-time Democrat, correct?

10       A    I wouldn't describe it that way, but okay.

11       Q    You were nominated by the President of the United States to be the U.S.

12   Attorney for D.C., correct?

13       A    That is correct.

14       Q    You worked on the Biden campaign, right?

15       A    That is -- I understand where your question is coming from.    I actually

16   wouldn't characterize it that way.

17       Q    You had a role with the Biden campaign?

18       A    So do you want me to actually clarify what that was?

19       Q    Sure.

20       A    So I knew someone who had some affiliation to the campaign; said that I was

21   interested in criminal justice issues.    I got put on this committee, and my

22   responsibilities, being on this committee, consisted of receiving emails from the

23   committee that anybody -- basically, almost anybody who contributed.    I had no direct

24   interaction --

25       Q    Okay.

1          A       -- or indirect interaction with anybody on the campaign.

2          Q       Contributed money?

3          A       I did contribute money.

4          Q       Okay.

5          Mr. Swalwell.    Sorry, what was it?

6          Mr. Graves.    I did contribute money.

7                  BY MR. CASTOR:

8          Q       And you also had a role with the Kerry campaign, as I understand it?

9          A       So the firm that I was working with at the time provided some support to the

10    Kerry campaign in connection with its vetting process for Vice Presidential candidates.

11         Q       Anything else with the Kerry campaign?

12         A       No, that was it.    And I had no direct interaction or indirect interaction with

13    anyone from the Kerry campaign.    It was strictly working for people within the firm.

14         Q       Okay.

15                 I mean, this isn't surprising.    I mean, you know, you're the U.S. attorney pick for

16    President Biden.

17         A       Yes.

18         Q       Obviously you're aligned with his political party and so forth.    So, you know,

19    you shouldn't be, you know, alarmed that we're asking these questions or that the

20    answers are, yes, I'm somebody that's been affiliated with the Biden campaign, the Kerry

21    campaign, and also the Clinton-Gore campaign.    Is that correct?

22         A       Yes.    The Clinton-Gore campaign, my sophomore -- junior year of college, I

23    took off my fall semester to work advance for that campaign.

24         Q       Okay.    And did you ever work on any Republican campaigns?

25         A       I did not work on any Republican campaigns.    I worked for a Republican

1    State senator.

2        Q    Okay.    Any other bipartisan elected work, work for elected officials?

3        A    Other than -- I mean, I had very limited work for elected officials.    And,

4    again, the only time that I worked directly for an elected official, not in the campaign

5    context, was when I worked for a Republican State senator.

6        Q    Okay.

7            Now, let me take a step back.    In the Hunter Biden case, do you think a

8    special-counsel situation would've made sense from the outset?

9        A    So, you know, I've been authorized to discuss U.S. Attorney Weiss's authority

10   and the circumstances around his interaction with our office about bringing charges.

11   That kind of goes outside of it.    And, candidly, I don't know that I have enough

12   information about the investigation to make that kind of assessment.

13       Q    Uh-huh.    But you understand the perception problem.    You're an

14   appointee of President Biden, and, here, you've been asked to weigh in on a prosecution

15   involving his son.    I mean, certainly, there's an obvious perceived -- at least the

16   perceived conflict of interest, correct?

17       A    I don't -- I don't see it that way.

18       Q    Okay.    And why is that?

19       A    So we have investigations all the time --

20       Q    Uh-huh.

21       A    -- the Department does, of individuals who are members of the

22   administration.

23       Q    Uh-huh.

24       A    A family member of the administration?    I don't see it as necessarily a

25   conflict of interest or perception of a conflict of interest.

1    Q    Uh-huh.    So you don't believe you should've recused yourself?

2    A    No.

3    Q    And in your communications with Mr. Weiss, did he alert you that he

4 believed he had ultimate authority to bring this case?

5    A    The subject of his authority never came up, to the best of my recollection,

6 because it was just assumed that, from the moment I got on the call, he was gonna be

7 able to do whatever he needed to do in our jurisdiction to bring the case, if that was his

8 prerogative.

9    Q    And do you know if, ultimately, the line -- when your line AUSAs were talking

10 to his line AUSAs, do you know if they made any requests of -- like, what did they need

11 from your office other than help with the grand jury --

12    A    So --

13    Q    -- to bring the case?

14    A    Yeah.    So, again, it's hard to get into this without getting into the specifics

15 of the case.    But I would say, in any case, the primary thing you need, once you're at the

16 stage where a charging decision has ostensibly been made, is the logistical support and

17 the grand jury -- getting before a grand jury, securing time in a grand jury --

18    Q    Right.

19    A    -- presenting evidence to a grand jury, and ultimately asking a grand

20 jury -- presenting charges to the grand jury, and ultimately asking a grand jury to return

21 an indictment.

22    Q    And so your testimony is, your office was willing to facilitate that fully.

23    A    Those were my instructions from the first.

24    Q    And do you know if your staff communicated that to the Delaware U.S.

25 Attorney's Office?

1          A      My understanding is, that was communicated instantly.

2          Q      Uh-huh.

3          And after the March 19th meeting where the decision was made not to join, not

4    to partner, did you give any instructions to your staff to go back and tell the Delaware

5    U.S. Attorney's Office that, while you weren't joining and you weren't partnering, you

6    wanted to make all the resources available?

7          A      So we had already made that clear at the outset, so I didn't feel like I needed

8    to give the instruction.    And based on what was happening, I knew that there was no

9    reason that I needed to give that instruction again.

10         Chairman Jordan.   So, then, tell me what the distinction is.    In this March 19th

11   meeting, when you decide that you're not going to do some things but you are going to

12   do others, what is the actual distinction?    What did you decide not to do?

13         Mr. Graves.    So let me take a step back and just talk about this in general.

14         So, as we were talking about before, there are some times, where we have

15   neighboring jurisdictions, where they realize that, for whatever reason, something they

16   were investigating is better venued in D.C.    We work with them all the time -- not "all

17   the time."    It comes up not infrequently, and we have mechanisms for working with

18   them to be able to, like, get their charges brought in the District.    And we work through

19   that.    We often don't join those cases, but we support them.

20         We also have Main Justice components that will come into our jurisdiction and

21   want to bring cases, where, for a variety of reasons, either because we don't want to or

22   they don't want to, we don't partner and they just do it in our jurisdiction.    They have all

23   kinds of questions -- because they don't prosecute here -- about the practicalities.    Like,

24   what do the templates look like?    Who do you contact in the clerk's office?    Like, all of

25   those things are the questions that come up.    Just as, if I went into Delaware, like, I

1   would have no clue.   I couldn't just go in and say, "Hey, I'm a U.S. attorney from D.C.   I

2   want to enter in a grand jury."   I would need Delaware to facilitate that.

3         Chairman Jordan.   I just want to -- you told the Delaware U.S. attorneys that "we

4   don't want to join, but we'll assist with the grand jury."   Does that cut to the chase?

5         Mr. Graves.   No.   Cutting to the chase is, "We'll do whatever you need done to

6   bring this case.   And we're kind of withdrawing our request or our interest -- the

7   question we asked about whether you want local counsel, we're kind of tabling that issue

8   and not interested in pursuing that."

9         Mr. Castor.   So you weren't willing to offer your AUSAs to sit at the table?

10        Mr. Graves.   So -- I want to be clear on this.   I had raised -- and let me take a

11  step back --

12        Chairman Jordan.   Is there a distinction between not being local counsel and

13  joining the case, or are those one and the same?

14        Mr. Graves.   Those are one and the same, in response to your question.

15        Chairman Jordan.   Okay.

16        Mr. Graves.   Going back a question, I want to be clear about this from, like, what

17  is happening here.

18        So, in general, putting this case aside, U.S. Attorney's Offices don't partner with

19  other U.S. Attorney's Offices.   Each U.S. attorney is the chief law enforcement officer in

20  his or her jurisdiction.   They generally stick in their jurisdiction.

21        If there is something that happens where we have, kind of, these venue problems

22  or you realize a case initiated in one jurisdiction has to be brought in another, usually it is

23  the AUSAs from those jurisdictions going to the other jurisdiction and handling it that

24  way.

25        When our office, in general, decides to join with another Department of Justice

1   component, that's usually done at the beginning of an investigation.    It's exceedingly

2   rare for an ongoing investigation for someone to join as a partner afterwards.

3          There are a lot of issues.    First of all, the component that has been conducting

4   the investigation generally doesn't want another component coming on at the 11th hour.

5          Mr. Castor.    Fair enough.

6          Mr. Graves.    The challenge is -- particularly when you're talking about U.S.

7   attorney and U.S. attorney -- is you're bringing in another chain of command.    And once

8   you're partnered, you have to reach consensus.    So, as a manager, in general, we don't

9   want to do that.

10          And on our end of it, if it's an ongoing investigation, there is no way, whether it's 3

11   weeks, 3 months, if it's been a multiyear investigation, that we can get up to speed on

12   everything that has occurred beforehand.    So you're kind of buying a mansion without

13   an inspection, and whatever problems exist, you are buying those.

14          Chairman Jordan.    I understand.

15          But you said earlier, U.S. attorneys don't partner with other U.S. attorneys.    But

16   that's not what the Attorney General told us; that's not what David Weiss told us.

17   We've got all kinds of correspondence that uses that exact language, that you do partner.

18   And that was the question.    And that's why we're asking the questions we're asking.

19          Mr. Graves.    So I've seen some of the correspondence.    I don't quite read it the

20   way that you do.    I'm telling you, just in general, it would be difficult to find a single

21   prosecution where there are two U.S. attorneys operating in one of their jurisdictions.

22                   BY MR. CASTOR:

23      Q    So what happened next after the March 19th meeting, to the best of your

24   knowledge?    Your staff went and communicated the decision to --

25      A    The staff went and communicated the decision that we weren't going to

1    seek to join but would continue to support whatever they needed in the jurisdiction.

2    And I don't recall any other subsequent calls.

3          Q      Okay.

4                 Did your staff, before the March 19th meeting, have any communications that

5    you're aware of with Main Justice?

6          A      Who do you mean by "Main Justice"?

7          Q      Anybody in the Tax Division, anybody in the DAG's Office, anybody in the

8    AG's Office, anybody in any other office at Main Justice.

9          A      So the Tax Division, potentially, though I don't know.

10         Q      Uh-huh.

11         A      The AG's Office, certainly not.

12                And I am not aware of the Deputy Attorney General's Office.    But, at that point in

13   time, I would point out that we were kind of, as I said before, in daily contact with them

14   related to some other prosecutions, so it's possible that it came up.

15         Q      Okay.    So it's possible.

16                Now, of all the people in the meeting -- the principal assistant; the Criminal

17   Division chief; the head of the fraud, civil division; the head of the public corruption

18   division; or the line assistant -- of that universe of people, who would be the individual

19   having communications with the DAG's Office?

20         A      So, after myself, the person who had the most independent -- at that point

21   in time, the most independent conversations with the DAG's Office would've been the

22   Criminal Division chief.

23         Q      Okay.    So, if anyone was having communications with the DAG's Office on

24   this issue, it was either you or the Criminal Division chief?

25         A      I'd be speculating -- I'm speculating now.

1          Q      Right.

2          A      But I'm just telling you who had the most contact with the Office of --

3          Q      Okay.

4          A      -- the Deputy Attorney General at that point in time.

5          Q      And do you know if the Criminal Division chief -- and you won't give us the

6     name of that person?    Is that right?

7          A      In the context of the transcribed interview, I am requesting not to.

8          Q      Okay.

9          A      If this is something that you're interested in, we can work through OLC.

10         Ms. Zdeb.    OLA.

11         Mr. Graves.    Oh, sorry.    Sorry.    OLA.

12         Mr. Castor.    Okay.    OLC definitely doesn't want to do this.

13         Mr. Graves.    Yeah.    That would be a very slow process, if we worked through

14    OLC.

15              BY MR. CASTOR:

16         Q      So the Criminal Division chief, what do you know about the

17    communications -- can we -- is it a he or she?    Can we --

18         A      Sure.    At that point in time, it was a he.

19         Q      Okay.    So do you know what communications he had with the DAG's Office

20    on this case?

21         A      I am not aware of him having any communications.    I am just not

22    foreclosing the possibility that the subject --

23         Q      Okay.

24         A      -- maybe came up.

25         Q      Okay.    So, to the best of your knowledge, nobody on your team, including

1      yourself, had any communications with the DAG's Office on the Hunter Biden case.

2              A      Correct.

3              Q      Or anybody at Main Justice, other than the Tax Division.

4              A      Correct.

5              Q      And who from your office was working with the Tax Division at Main Justice?

6              A      So I'm not aware.      Given the -- it is possible that individuals, either career

7      supervisors or the career prosecutor, had communications.      I just don't know.

8              Q      Okay.

9              Now, are you aware that the whistleblower testimony from the IRS

10     whistleblowers -- Mr. Shapley, Mr. Ziegler -- tell of a conversation that Mark Daly -- Mark

11     Daly is a Tax Division lawyer.      Mark Daly related to Mr. Ziegler that he had conversations

12     with -- it was described as your first assistant, but presumably it was the principal

13     assistant.

14             Are you aware of that testimony?

15             A      I've generally seen some public reporting around that testimony.

16             Q      And do you know if that's accurate?

17             A      So, again --

18             Q      At the time, was your principal assistant -- is it a he or a she?

19             A      A she.

20             Q      Okay.    So do you know if your principal assistant had communications with

21     Mark Daly on this topic?

22             A      So, again, we're kind of straying very close to the subject matter of the

23     investigation.    What I can say at a high level with respect to the principal assistant:    I do

24     not recall her doing anything other than attending meetings that I happened to be at in

25     connection with this case.

1      Q    Okay.   So you're not aware of her having a conversation with Mark Daly on

2  this issue?   That wasn't reported back to you?

3      A    That is correct.

4      Q    Okay.   Is it possible the Criminal Division chief was the one talking with

5  Mark Daly?

6      A    So, sure, anything is possible.   And this is why I was saying earlier the

7  principal assistant versus first assistant wasn't, like, a distinction without a meaning.

8      Q    Okay.

9      A    I do not think the principal assistant was involved.   So if whoever this

10  conversation --

11      Q    But who do you think was talking to Mark Daly?

12      A    I don't know.   It could've been -- with the people that were involved, I think

13  there could've been a lot of assumptions that they were the first assistant when they

14  weren't the first assistant.   I don't know.   I'm --

15      Q    Fair enough.

16      A    -- speculating.

17      Q    But it was someone from your office.

18      A    Someone from my office, sure.

19      Q    Like, who do you think that was?

20      A    One of the people that I just described --

21      Q    Okay.

22      A    -- that was at that March 19th meeting.

23      Q    Okay.

24           Chairman Jordan.   One of those five to six people --

25           Mr. Graves.   Yeah.

1          Chairman <u>Jordan.</u>    -- at the March 19th --

2          Mr. <u>Graves.</u>    Yes.

3          Chairman <u>Jordan.</u>    -- meeting?    Okay.

4          Mr. <u>Graves.</u>    Yes.

5                    BY MR. CASTOR:

6          Q     And did you learn about that communication from them?    Or did you learn

7     about that apparent communication from Mr. Ziegler's testimony or Mr. Shapley's

8     testimony?

9          A     The first time I heard about the communication was the public reporting.

10         Q     Okay.    And did you go back and circle up with your staff to see what they

11    remembered when that became public?

12         A     No.

13         Q     You did not.

14         A     No.

15         Q     Okay.

16         After the whistleblower testimony became public and there was news stories

17    about it, did you read the whistleblower testimony?

18         A     The whole testimony?    No.    I've seen news coverage.

19         Q     Okay.    So you didn't read any of the transcripts?

20         A     I mean, I might have seen portions of transcripts in news --

21         Q     In news stories.

22         A     -- coverage, but I did not, like, pull a transcript and read it from beginning to

23    end.

24         Q     Okay.

25         And did you talk with any of the people that were in this meeting about what the

1    public reporting was?

2          A     Not in any great substance.

3          Q     I mean, were you surprised by the public reporting?

4          A     Yes.

5          Q     And why is that?

6          A     I'm trying to think of how to best answer this without getting into the

7    substance.

8               So let me take a step back and talk about why I was surprised and why I was not

9    surprised.

10              So why I was not surprised is that I have worked, personally, a number of

11   whistleblower investigations and kind of understand how these things can unfold and the

12   garble that can happen when you layer hearsay on top of hearsay on top of hearsay.

13   And when you look at a lot of this, it's someone said that someone said that someone

14   said.   So, not surprised that these things can happen.

15         Q     Uh-huh.

16         A     But definitely surprised by the allegation, because it's not consistent with my

17   recollection.

18         Q     Which allegation?

19         A     Well, the allegations, as I understand them, have evolved over time.

20         Q     Okay.    So what do you understand are the allegations?

21         A     So, in the first, it was that the U.S. Attorney's Office in the District of

22   Columbia blocked charges.

23         Q     Okay.

24         A     I understand from the public reporting that that has shifted --

25         Q     Uh-huh.

1        A     -- and I've seen the letters from USA Weiss denying that that occurred.

2    So -- so there's that.

3        Q     Okay.

4              I mean, witnesses have phrased it, you know, in different ways -- that the U.S.

5    Attorney's Office in D.C. declined to partner, that they rejected the case.     But, at the end

6    of the day, it's consistent that your office didn't want to move forward as a partner on the

7    case.

8        A     I would describe those as radically different, right?     If we are taking steps to

9    stop an investigation from going forward, that is markedly different from whether we are

10   facilitating --

11       Q     Uh-huh.

12       A     -- whatever another U.S. attorney wants to do and giving them all of the

13   logistical support they would need to do that.

14       Q     Okay.    And so you maintain here today that your office was willing to give

15   the Delaware U.S. Attorney's Office all the logistical support they needed to come into

16   your district and prosecute that case.

17       A     Yes.

18       Q     Now, did you ever follow up to make sure something wasn't lost in

19   translation between your office and the Delaware U.S. Attorney's Office?

20       A     No.

21       Q     Okay.    I mean, is it possible that after the March 19th meeting your staff

22   communicated to Mr. Weiss's staff and something got lost in translation, that they

23   interpreted the message incorrectly?

24       A     I mean, anything is possible.

25       Q     Uh-huh.

1      A      I was very clear in my initial conversation with U.S. Attorney Weiss that we

2  would provide support.

3      Q      Uh-huh.

4      A      I know that we took steps that would signal that we were very clear in that

5  commitment.    And I was very clear with my staff about what they should communicate

6  about our decision about whether we would seek to join the investigation and the basis

7  for our decision to their counterparts.

8      Q      Okay.

9      This is in March of 2022.    As it reached, like, later parts in the year 2022, did you

10  ever have any followups with your staff, like, "Hey, are you sure that we haven't assured

11  the Delaware U.S. Attorney's Office that they have the green light to walk into our

12  jurisdiction and we'll help them with the logistical aspects?"

13      A      I did have a conversation or two along those lines.    I can't really get into the

14  specifics of the conversation.

15      Q      When were they?

16      A      Best of my recollection, that spring.

17      Q      Okay.    Like, April/May?

18      A      That timeframe, yes.

19      Q      Okay.    And who were they with?

20      A      The Criminal Division chief and potentially the principal assistant.

21      Q      Okay.    And what do you remember saying to them, at a high level?

22      A      So I can't get into the specifics of, or even at a high level, what it was,

23  because it would implicate ethical rules that we operate --

24      Chairman Jordan.    What did you say to them?    "Hey, what's going on with this

25  case that David Weiss called me about a month ago?    What's happening?    I know we

1    made a decision on the 19th that we were going to say, you guys can come on in but we

2    ain't joining."   Was that the nature of the conversation?

3            Mr. Graves.   It was them flagging an issue for me.

4            Chairman Jordan.   So they brought up to you that there was still a concern

5    with --

6            Mr. Graves.   Not a --

7            Chairman Jordan.   -- what was decided on the 19th?

8            Mr. Graves.   No, not a concern.

9            Chairman Jordan.   Okay.

10           Mr. Graves.   Not a concern with what was decided on the 19th.   Just kind

11   of -- I'm trying to think of how to do this.

12           I could just say at a high level, they alerted me to something about the status of

13   Delaware's investigation.

1    [11:00 a.m.]

2                    BY MR. CASTOR:

3         Q    Did they say that the investigation was moving forward, or not moving

4    forward?

5         A    So --

6         Q    Obviously they mentioned it to you that they needed to raise it to your

7    level?

8         A    So -- yeah.    And, again, I can't get into the specifics.    The reason they

9    raised it with me had nothing to do with the investigation itself and more in terms of my

10   situational awareness for managing relationships with the court.

11        Chairman Jordan.    Can we go back to the initial call from U.S. Attorney Weiss,

12   now Special Counsel Weiss?    Tell me what happened in that call again exactly.

13        Mr. Weiss calls you and says:    We want to bring charges in D.C.

14        Tell me what happens.

15        Mr. Graves.    Sure.    So Mr. Weiss said that he had an investigation that he had

16   been conducting.    Some of the charges related to that investigation needed to be

17   venued out of the District, and he described the logistical support that he needed.

18        I told him we would provide the logistical support and asked him if he was also

19   interested in us joining the investigation as effectively local counsel once charges are

20   brought.

21        Chairman Jordan.    You said a couple times you brought that up.

22        Mr. Graves.    Yes.

23        Chairman Jordan.    Okay.    And then what did he say again?

24        Mr. Graves.    He said:    Definitely need the logistical support, and we can talk

25   about joining the investigation.

1          Chairman Jordan.   But then you never talked to him about that.    But you and

2   your team, your chief of the Criminal Division, the principal assistant, and one other

3   individual in the next 3 weeks, looked at whether you're going to become local counsel

4   and join.    And then, on the 19th, you have a meeting, and you decide you're not going to

5   do that?

6          Mr. Graves.    So trying to -- there was a lot in the question.    I just want to make

7   sure.

8          So let me just state it to make sure that we're on the same page.

9          Chairman Jordan.    Sure.

10          Mr. Graves.    I tasked our Criminal Division chief with immediately taking steps to

11   provide the logistical support, asked him to assign the section leadership and an AUSA

12   from the relevant section to do a quick assessment because time was of the essence, and

13   we had to make a decision quickly, and --

14          Chairman Jordan.    Why did you have to make a decision quickly?

15          Mr. Graves.    For a variety -- I can say, at a high level, we needed to make a

16   decision quickly.    I understand your question about the 3-week timeframe --

17          Mr. Castor.    He can't answer that.

18          Mr. Graves.    -- but why specifically, I can't get into.

19          Chairman Jordan.    I get it.

20          Mr. Graves.    So we had to make a decision quickly, and I instructed my team to

21   move with all speed, and they did.

22          Chairman Jordan.    And then, on the 19th, the day you decided, is that the day

23   you also communicated?

24          Mr. Graves.    I don't know if it was the exact day.    And I'm saying the 19th.    I'm

25   relying on my calendar for that being the day.    It's possible that I'm looking at the wrong

1    meeting, but it would have been sometime then, like mid- to late March.

2              BY MR. CASTOR:

3        Q    Were you aware around that time that the White House Communications

4    Office was issuing public statements --

5        A    No.

6        Q    -- about this case, that -- so you don't remember anything that was said from

7    the podium at the White House?

8        A    Sorry.   I should have let you finish your question.

9    No, I do not.

10       Q    Okay.   Do you remember anything that was said on the Sunday shows?

11       A    No.

12       Q    Okay.   Were you aware of the President's position that, you know, he didn't

13   think his son had done anything wrong?

14       A    I don't -- I actually don't think so.   Yeah.

15       Q    Did you hear him at the debate?

16       A    Which debate?

17       Q    You know, during the debate.

18       A    Oh, like during the --

19   Chairman Jordan.   Campaign.

20   Mr. Graves.   -- campaign?

21   Chairman Jordan.   Yeah.

22   Mr. Castor.   Yeah.

23   Mr. Graves.   I watched the debates, so I'm sure that I did.   That's not something

24   that sticks out in my mind.

25              BY MR. CASTOR:

1      Q    So, after March 19th, your office communicates to Weiss' office that you're

2    not going to join the case.    You said that there were two other times that this case sort

3    of was brought to your attention by the Criminal Division chief, right, in the spring of

4    2022?

5      A    No.    I was saying there were two times total that I recall --

6      Q    After the 19th?

7      A    Not after the 19th.    Including the 19th.    The 19th and the original

8    conversation --

9      Q    Okay.

10      A    -- were the two meetings that I recall.    I'm sure there was intervening

11    where we talked about it.

12      Q    But didn't you say -- and maybe I misunderstood, but didn't you say

13    subsequent to the 19th --

14      A    Oh --

15    Chairman Jordan.    The conversation with the Criminal Division and during the --

16    Ms. Zdeb.    Can we go off the record for one second?

17    [Discussion off the record.]

18    Mr. Castor.    Go ahead.

19    Mr. Graves.    Yes.    So yes.    They were not full-blown meetings.    It was in the

20    context of another conversation or meeting, something that I was told for my situational

21    awareness about aspects of the support that we had agreed to provide to Delaware and,

22    in fact, had provided to Delaware.

23                BY MR. CASTOR:

24      Q    And did you instruct anyone to call Weiss' office and say, "Hey, to be sure,

25    you can do whatever you need, and we will assist you"?

1      A      I did not because I was incredibly clear in my conversation -- and I know the

2    subsequent steps that we took would have left no doubt that they knew they had all the

3    support they needed in D.C.

4      Q      My time is up, but the subsequent steps you took, you're not willing to tell

5    us what they are?

6      A      I'm not able to tell you what they are.

7      Q      Okay.

8    Mr. Castor.   Our time is up, so we'll --

9    Ms. Nabity.   Off the record.

10    [Recess.]

11    ██████.   All right.   It is 11:15.   We can go back on the record.

12                                EXAMINATION

13                BY ████████:

14      Q      Mr. Graves, before we get into our case in chief, or most of our questioning,

15    I wanted to clarify.   In the prior hour, you had previously referenced the Criminal

16    Division.   Do you recall that?

17      A      Yes.

18      Q      Was that a reference to the Criminal Division at Main Justice, or was that a

19    reference to the Criminal Division at the U.S. Attorney's Office?

20      A      Thank you for clarifying that.   That was a reference to the Criminal Division

21    within the D.C. U.S. Attorney's Office, not Main Justice.

22      Q      Okay.   And, just to put a finer point on this, the head of the Criminal

23    Division at Main Justice at that time period would have been Kenneth Polite.   It wasn't

24    Kenneth Polite that you were having conversations with, correct?

25      A      That is correct.

1    Q    Okay.    In the prior hour, we also talked about the Tax Division's

2    responsibility over certain matters and the way that you would consult with Tax Division

3    in certain instances, and I want to return to that discussion.

4        The responsibility that you're referring to is actually -- it's laid out in the Justice

5    Manual, correct?

6    A    Correct.

7    Q    So it's not specific to any particular case.    It's guidance that applies to any

8    case?

9    A    That is correct.

10    Q    Okay.    What's your understanding of why the Justice Manual grants the Tax

11    Division responsibility over these matters?

12    A    So, at a high level, my understanding is that the Tax Code is one of the most

13    complicated criminal regimes that we have.    It has, among the various levels of scienter,

14    kind of mental intent, the highest mental intent.    There are all kinds of violations of the

15    Tax Code that don't rise to the criminal level.    And you want a centralized group that is

16    very much steeped in these issues and able to make sure that tax prosecutions across the

17    country are being implemented uniformly.

18        ████████.    I want to introduce -- I think this is actually exhibit 1, Justice Manual

19    section 6-1.000, which is entitled "Department of Justice Policy and Responsibilities, Tax

20    Division."

21                        [Graves Exhibit No. 1

22                        Was marked for identification.]

23        ████████████.    There is a couple copies.

24        ████████.    Oh, I think you have a couple copies there.

25    Mr. Graves.    Oh, I have a couple copies.    Sorry.

1               ▉.   If you can pass them down.

2                    BY ▉:

3          Q    Have you had a minute to review?

4          A    I have reviewed exhibit No. 1, yes.

5          Q    And have you seen this before?

6          A    I have, yes.

7          Q    So I want to look at specifically the very first sentence here.    It reads:    The

8    Assistant Attorney General for the Tax Division, subject to the general supervision of the

9    Attorney General and under the direction of the Associate Attorney General, is

10   responsible for conducting, handling, or supervising the following matters, correct?

11         A    Correct.

12         Q    And it specifically uses the word "responsible," correct?

13         A    Correct.

14         Q    It doesn't say "has authority over."    It says "he's responsible for doing these

15   things"?

16         A    Correct.

17         Q    And then there is a list of seven bullet points?

18         A    Yes.

19         Q    Okay.    So, while the Tax Division is responsible for conducting, handling, or

20   supervising these matters, the entire division is actually directed by the Associate

21   Attorney General, correct?

22         A    Correct.

23         Q    And the Attorney General himself, or herself, I guess, has supervisory

24   authority over all the matters, correct?

25         A    Yes.

1   Q   And that's true actually for everything the Department of Justice does, right?

2   A   Correct.

3   Q   So, if a U.S. attorney disagrees with the decision that the Tax Division makes,

4   they can appeal that to the Attorney General, correct?

5   A   Correct.

6   Q   And, if the Attorney General has, for example, assured a U.S. attorney that

7   that U.S. attorney will have full authority over a matter, then the Attorney General could

8   overrule the Tax Division and grant the U.S. attorney whatever it is he's seeking?

9   A   Yes.    That is correct.

10   Q   Okay.

11          BY ████████████:

12   Q   I mean, just to be clear, prosecuting authority in the Department of Justice

13   ultimately lies with the Attorney General in all cases.    Is that fair to say?

14   A   Correct.

15   Q   And he can delegate -- he or she can delegate that authority as he wishes

16   within the Department of Justice or the U.S. Attorney's Offices as he chooses?

17   A   That's my understanding.

18   Q   Okay.    So, when we had some discussion in the previous hour about

19   approvals or responsibilities of the Tax Division, all of that authority is ultimately derived

20   from the Attorney General himself, correct?

21   A   That's correct.

22   Q   And, if the Attorney General says that someone -- in this case,

23   Mr. Weiss -- has the authority to make charging decisions, do you have any reason to

24   believe that Mr. Weiss did not have that authority?

25   A   I have no reason to believe Mr. Weiss did not have that authority, and, yes,

1  the Attorney General can supersede anything in terms of the structure that's laid out in

2  the Justice Manual.

3       Q    Okay.

4            BY ███████:

5       Q    Thank you.

6            I want to take a step back.    You talked a little bit about your background in the

7  first hour, but I want to talk about that in a little more depth.    So I understand that you

8  were appointed U.S. attorney in 2021, but way back in the 2000s, you actually worked at

9  the U.S. Attorney's Office as a career employee, correct?

10      A    That is correct.

11      Q    When did you actually first join the District of Columbia U.S. Attorney's

12 Office?

13      A    May 2007.

14      Q    And what was your role at that time?

15      A    I was a line assistant in our Superior Court Division.

16      Q    What type of cases did you prosecute in that role?

17      A    Started off prosecuting misdemeanors.    We have a rotation system in the

18 U.S. Attorney's Office for the District of Columbia because we are responsible for

19 prosecuting local crimes as well as Federal crimes, and you kind of work your way up from

20 misdemeanors all the way up to very serious felonies.

21      Q    You stayed at the D.C. U.S. Attorney's Office for a fair number of years,

22 correct?

23      A    Yes.    I left in October 2016, so 9.5 years.

24      Q    So almost a decade.    Is that fair --

25      A    Yes.

1      Q      -- to say?

2             And, during that entire time, you were a career prosecutor?

3      A      That's correct.

4      Q      During that time, did you have the opportunity to try cases before a jury?

5      A      Yes.

6      Q      How many cases did you try before a jury?

7      A      Roughly two dozen.

8      Q      Okay.    And, during your time as a line prosecutor, did you hold any

9      supervisory positions?

10     A      Yes, I did.

11     Q      So I guess at that point you're not a line prosecutor; you're a supervisory --

12     A      Yes.

13     Q      -- prosecutor?

14            Could you describe those positions?

15     A      I was an acting assistant chief of our Fraud and Public Corruption Section in

16     our Criminal Division, which is what we refer to as our division that prosecutes Federal

17     crimes as opposed to local crimes.    And then I ultimately became the acting chief of that

18     section.

19     Q      And when did you become the acting assistant chief?

20     A      Acting assistant chief, I believe that was in 2015.

21     Q      Okay.    And then when did you become the acting chief?

22     A      That would have been early spring of 2016.

23     Q      Okay.    What type of cases did you oversee as a supervisor?

24     A      The whole gamut of fraud, public corruption, and civil rights cases.    So,

25     in -- I can expand on that if you want, or --

1   Q   Yeah.   I mean, I think what I'm -- did you oversee white-collar crime cases

2   specifically?

3   A   Yeah.   It was exclusively what -- well, it was almost exclusively what people

4   would call white-collar crime cases.   The only one that was different is civil rights, which

5   involved officer -- which a component of that involved use of force and use of deadly

6   force by officers, which we conceptualize as a public corruption crime.

7   Q   And did your duties sometimes involve overseeing or prosecuting tax fraud

8   cases specifically?

9   A   Yes.

10   Q   Okay.   And, in fact, you were the lead prosecutor in United States v. Jesse

11   Jackson, Jr., and Sandra Stevens Jackson, correct?

12   A   That is correct.

13   Q   Who was Jesse Jackson, Jr., or who is Jesse Jackson, Jr.?

14   A   Jesse Jackson, Jr., is a prominent political figure and, at the time of the

15   investigation, was an elected Member of Congress.

16   Q   What political party does he belong to?

17   A   Democrat.

18   Q   And, in that case, Sandra Jackson actually pleaded guilty to filing false tax

19   returns, didn't she?

20   A   That is correct.

21   Q   So that was actually a tax fraud case involving a Democratic politician that

22   you prosecuted?

23   A   Two Democratic politicians.   She was a local alderman.

24   Q   A Democratic alderman?

25   A   Correct.

1       Q       And you also prosecuted Neil Rodgers, correct?

2       A       That is correct.

3       Q       Who was Mr. Rodgers?

4       A       Mr. Rodgers was a staffer to a D.C. Council member, D.C. Council member

5   Harry Thomas.

6       Q       And what political party was Mr. Thomas a member of?

7       A       Mr. Thomas was a member of the Democratic Party.

8       Q       And can you briefly describe the facts of that case?

9       A       Yes.    Mr. Thomas, who I also was part of that prosecution team, because he

10  also was prosecuted, had directed city funds to charitable organizations that he was

11  affiliated with and then had conduits at those charitable organizations who funneled the

12  money back to him.

13      Q       And was that around the time of President Obama's first inaugural?

14      A       Yes.    That would -- the conduct occurred around the time of the first

15  inaugural.

16      Q       And was some of the money actually used to fund an event of the first

17  inaugural?

18      A       Yes.    He had like -- yes.    There are -- obviously a number of people have

19  events associated with the inaugurals that might not be official inaugural event but in

20  honor of the inauguration, and some of the money was used to fund an inaugural party,

21  celebrating President Obama's first inaugural.

22      Q       So these were Democratic political figures who were using money to fund an

23  event around President Obama's first inauguration, correct?

24      A       That's correct.

25      Q       And you were the -- you prosecuted that case?

1      A      That is correct.

2      Q      Okay.    So, taking a step back, it's fair to say you've had experience

3  overseeing white-collar cases and, specifically, tax fraud cases, both as a line prosecutor

4  and as a supervisor, correct?

5      A      Yes.    And if I could just add one thing --

6      Q      Sure.

7      A      -- to your finer point, I also was part of the prosecution team that

8  prosecuted another Democratic member of the D.C. Council for bank fraud.

9      Q      Who was that?

10     A      Kwame Brown.

11     Q      And what timeframe was that?

12     A      The same timeframe as the -- it happened around the exact same time as

13  the Harry Thomas, so kind of the 2012-2013 timeframe.

14     Q      Thank you for that?

15     A      Yeah.

16     Q      Is it fair to say, talking about white-collar cases specifically, that they can be

17  complex in nature?

18     A      Yes.

19     Q      Are you familiar with the complexities that are associated with white-collar

20  cases?

21     A      Yes.

22     Q      And with tax fraud cases as well?

23     A      Yes.

24     Q      Okay.    And so you are familiar specifically with the considerations that

25  might arise when deciding whether to bring charges in a white-collar case, correct?

1          A      Yes.

2          Q      And in tax fraud cases specifically?

3          A      Yes.

4          Q      So I want to turn to some of those considerations and the considerations

5     that prosecutors take into account when deciding whether to bring charges in any matter,

6     but especially in complex matters like white-collar case and tax fraud cases.

7          We discussed the Justice Manual earlier.    Are you familiar with the principles of

8     Federal prosecution in the Justice Manual?

9          A      Yes.

10         Q      Okay.    It's section 9-27.

11         A      Yes.

12         Q      Okay.

13         ████.   Let me introduce as exhibit 2 section 9-27.220.

14                            [Graves Exhibit No. 2

15                             Was marked for identification.]

16         Mr. Graves.    Okay.    Thank you.

17                BY ████:

18         Q      And this is the section entitled "Grounds for Commencing or Declining

19     Prosecution."

20         A      Yes.

21         Q      And I believe it's on the second page.

22         A      I'm very familiar, yes.

23         Q      Okay.    And I'm actually -- we're going to look at the very first paragraph

24     under 9-27.220.    That section reads:    The attorney for the government, which is the

25     prosecutor, right?

1      A     Uh-huh.

2      Q     -- should commence or recommend Federal prosecution if he or she believes

3  that the person's conduct constitutes a Federal offense and that the admissible evidence

4  will probably be sufficient to obtain and sustain a conviction unless, number one, the

5  prosecution would serve no substantial Federal interest; number two, the person is

6  subject to effective prosecution in another jurisdiction; or, number three, there exists an

7  adequate, noncriminal alternative to prosecution.

8      Did I read that correctly?

9      A     Yes.   I'm very -- I know that off the top of my head, but I was struggling to

10  find exactly where you were reading from at first, but yes.   You --

11     Q     But -- so I read that correctly?

12     A     You read it correctly, yes.

13     Q     So, under these principles, prosecutors should only bring charges when,

14  among other considerations, they believe that the admissible evidence will probably be

15  sufficient to obtain and sustain a conviction, correct?

16     A     Correct.

17     Q     In layperson's terms, what does "admissible evidence" mean?

18     A     "Admissible evidence" means that, when you get to trial, you're going to be

19  able to introduce witness statements or documents that a court is going to say:   Yes, this

20  can come in at this trial.

21     Q     And it's evidence that meets the standards of the Federal Rules of Evidence.

22  Is that fair to say?

23     A     Correct.   Yes.

24     Q     Okay.   What type of considerations might a prosecutor take into account

25  when weighing whether the admissible evidence will probably be sufficient to obtain and

1    sustain a conviction?

2        A    Their experiences with similar cases comparing it to other cases.    They'll

3    look at defenses, particularly in the white collar context, where usually, unlike the violent

4    crime context, in the white collar context, there is actually a complete agreement on

5    what factually occurred and it's all about what is in a person's head, which is what makes

6    white-collar cases so difficult, but kind of what the defenses might be and how you're

7    going to prove beyond a reasonable doubt the significant scienter or mens rea

8    requirements.

9        Q    And are you familiar with the term "sufficiency of the evidence"?

10       A    Yes.

11       Q    What does that term refer to?

12       A    So, I mean, in general, "sufficiency of the evidence" is whether you have a

13   sufficient -- whether you have enough evidence to get over whatever the evidentiary

14   burden is at that point in the process.

15       Q    Is that something that prosecutors would take into account when

16   considering whether to bring charges?

17       A    Yes.    It's whether you have sufficient evidence to prove the case beyond a

18   reasonable doubt, which is obviously the highest standard in the legal system.

19       Q    Okay.    And I want to turn back to that in a minute.    But, along with

20   sufficiency of the evidence, does a prosecutor also consider the ability to explain the

21   charges and the evidence to a jury?

22       A    Yes.

23       Q    Why is that important?

24       A    Because of the nature of the trial process, you don't get to often kind of

25   cleanly put in, from beginning to end in a logical fashion:    This is what happens.

1          You have to introduce evidence through witnesses, and witnesses usually only

2     know a portion.    So, as you're talking about, in the white collar context, a complex fraud

3     scheme, you're constantly thinking through how am I going to prove this in a way that a

4     lay jury is going to understand, assuming as -- you know, take the same approach that the

5     journalism industry takes, that you're talking to people with a middle school education.

6          Q     And that's because jurors are any -- they're anybody, right?    They're drawn

7     from the people of the community, right?

8          A     Correct.

9          Q     And they maybe are not lawyers?

10         A     Correct.

11         Q     They maybe aren't accountants?

12         A     That is correct.

13         Q     They may not be familiar with the rules of evidence, for example?

14         A     That is correct.

15         Q     Okay.

16         A     Or, because we actually do tend to have a lot of lawyers and accountants in

17    this jurisdiction in particular that practice in areas other than the area that is the subject

18    of the case, they think they know things about the law that they actually don't know --

19         Q     And that's --

20         A     -- which is another complication for trying these cases.

21         Q     In a tax case specifically, might it be relevant if the potential defendant had

22    actually paid the taxes due?

23         A     Yes.

24         Q     Why would that be relevant?

25         A     So, in tax cases, as I was saying earlier, the Tax Code, as we probably know

1  through all of our limited experiences and then jurors would know from their limited

2  experiences, is incredibly complex, so there is lots of room for good-faith mistakes.    And

3  that's why people have all kinds of experience with people who either come under audit

4  or get a notice of tax deficiency, just paying it and it never amounting to a crime.

5      So, when someone immediately turns around and pays, you have to deal with the

6  defense, as soon as they're alerted to an issue, that this was a good-faith mistake that

7  does not rise to the level of intentionality required for a criminal violation.

8      Q     Again, speaking of things that a prosecutor might consider with respect to

9  bringing a case before a jury, might it be something to consider if the potential defendant

10  has a sympathetic personal story?

11     A     Yes.

12     Q     How can that impact a prosecutor's thinking?

13     A     So it can impact on at least two levels in the context of a tax prosecution.

14     One, you're always worried in these kinds of cases, where no one was actually

15  hurt, about juror nullification, and you have to guard against that, just because they feel

16  bad for the defendant.    But, more importantly, depending on what the sympathetic

17  nature of the story might be, that can get intertwined with the intent issue.

18     Q     How so?

19     A     So, like, hypothetically speaking, the person is going through some kind of

20  trauma or some -- or there is documented evidence of substance abuse, right?    Now

21  you're getting into defenses of:    My client was so distracted by X, or my client was under

22  the influence of Y, that, when they were filling out -- when they were working with their

23  return preparer, they just were, like, not focused on this.    That's why this was wrong,

24  not because they were trying to be evasive.

25     Q     And, to obtain a conviction in a tax fraud case, for example, is the prosecutor

1      required to prove intent?

2          A      Yes.

3          Q      And can you briefly describe in layperson's terms what that means?

4          A      It's that you knew exactly what the Tax Code required and you intentionally

5      didn't do that, which is exceedingly hard to prove in tax cases because of how complex

6      the Tax Code is.

7          Q      Thank you for that.

8              We just talked through many concerns or many issues that prosecutors should

9      consider when deciding whether to bring charges.    How do prosecutors learn to assess

10     and evaluate these types of concerns?

11         A      Some of it is through experience and supervisors who have been through

12     these cases before who will say, you know:    Well, this is how I would defend this case.

13     What are you going to do in response if that's the defense, and kind of talking through

14     those kinds of issues.

15             But, in my view, there is nothing -- no greater teacher than experience, which is

16     why, like, the supervisory chain is so important, because they've seen these cases before.

17         Q      And prosecutors -- you don't start out prosecuting white-collar crime, right?

18         A      That is correct.    Well, I mean, I should say that, in our office, you don't start

19     off prosecuting white-collar crime.    There are places within the Department you can go

20     where you can specialize in white-collar crime.

21         Q      But, in the U.S. Attorney's Office in particular, you might start off

22     prosecuting misdemeanors, right?

23         A      Yes.

24         Q      And you learn from experience doing misdemeanors, right?

25         A      Yes.

1      Q    And then you may be assigned to progressively more complex cases,

2  correct?

3      A    Yes.

4      Q    And you may be paired up with a more senior attorney to have them mentor

5  you on a more complex case, right?

6      A    Yes.

7      Q    And so my point is that there is learning -- there is a learning process that is

8  garnered through experience as a prosecutor?

9      A    That is correct, and that's just on the violent crime.    And then, when you

10  get over to the fraud and public corruption, you're not immediately by yourself doing

11  multimillion-dollar fraud cases.    It's like 100,000, 200,000, $300,000 embezzlement.

12  And then you kind of start the process all over again in the white collar context of learning

13  those cases, because prosecuting white collar is like a different animal than violent crime.

14      Q    So it's fair to say that prosecutors have fairly unique training, learn on the

15  job, and experience in assessing things like the sufficiency of admissible evidence?

16      A    That is correct.

17      Q    And it's fair to say that prosecutors have unique training and experience in

18  assessing the likelihood that the admissible evidence will be persuasive to a jury, correct?

19      A    Correct.

20      Q    So it's fair to say that prosecutors have unique training and experience in

21  assessing whether the admissible evidence is reasonably likely to result in a conviction

22  ultimately, correct?

23      A    Yes.

24      Q    In your experience, is it fair to say that investigators, whether they're from

25  the FBI or from the IRS or some other investigative entity, don't have the same

1    experience specifically with regard to assessing the admissible evidence and whether it

2    would be persuasive to a jury?

3          A     Yes.

4          Q     And is it fair to say that one unique difference between investigators and

5    prosecutors is that investigators generally do their work -- so investigators do their work

6    before the stage when the evidence is tested by trial, and prosecutors are looking at it

7    specifically with respect to the trial itself?

8          A     In general, yes.

9          Q     In some cases, the investigation might continue?

10         A     Yes.    So, I mean, just to expand on your point, I agree with the premise

11   behind the question.    So the investigators are gathering evidence and often don't see

12   how the evidence plays out in court.    Even when they themselves are called to testify,

13   they're only there for their period of when they're testifying and maybe closing

14   arguments.    So they don't see the trial process and how all this plays out, with the

15   limited exception of sometimes, in Federal cases and white-collar cases, you can have an

16   agent sitting with you -- a law enforcement agent sitting with you for the entire trial.

17         And I only raise that because that is one of the best experiences that a law

18   enforcement officer can get, because sometimes they sit through the whole trial and they

19   say:    Oh, now I see why we were having those conversations before that I didn't

20   understand.

21         Q     And, if they don't sit through that, or if they haven't had the opportunity to

22   sit through that, they might not really understand how the trial process works?

23         A     Correct.

24         Q     And they might not really understand the prosecutor's thinking?

25         A     Correct.

1      Q    Given the difference in roles between investigators and prosecutors, it's not

2  surprising that there might be differences in opinion among investigators and prosecutors

3  about the strength of the evidence and the likelihood of success at trial, correct?

4      A    Not only is it not surprising, but, in my experience, in Federal charges, blue

5  collar or white collar, it's kind of more often than not that there is some disagreement,

6  with the agents usually thinking that more charges should be brought than the attorneys.

7      Q    And, in those cases where the agents think more charges should be brought

8  than the attorneys do, the prosecutors have the final say, correct?

9      A    They have -- yes.   Well, yes.   I -- in my office, we try to do things

10  collaboratively because the agents have spent so much time and we try to talk through

11  the issues and explain to them, like:   This is -- these are the challenges we see.

12        And you hope to be able to get and we often do get to a consensus of:   Yeah, I

13  wanted to do A, B, C, X, Y, and Z before, but now I understand A, B, C.

14        There are some times where they are like:   I still think X, Y, Z, but I respect the

15  decision that you're making.

16      Q    And I appreciate that.

17      A    Yeah.

18      Q    But, ultimately, if there is -- if you can't get them to see your point of view,

19  at the end of the day, it is the prosecutors whose word goes, right?

20      A    Yes.

21      Q    And that's because prosecutors have that specialized experience we talked

22  through, correct?

23      A    Yes.   And that's our role in the process.

24      Q    Right.   They're the ones that have to present the case to the jury?

25      A    Yes.   Yes.

1        Q       So, when Mr. Weiss approached you at the end of February in 2022 and

2    asked you to consider or asked you to support -- provide administrative support in the

3    potential tax-related or potential prosecution of Hunter Biden and you asked if he wanted

4    you to join the case, he said, "We can talk about that," and then you went back and had

5    some further conversations, right, or your investigator -- your staff looked into the case a

6    little bit more, correct?

7        A       Yes.

8        Q       As they were doing that additional look into the case, was there examination

9    guided by the consideration of the Justice Manual principles we just talked through, so

10   sufficiency of the evidence, the ability to present the charge to the jury, for example?

11       A       Yeah.    I think, at a high level, I can say -- I can say yes to that.

12       Q       Okay.    Without revealing any of the actual deliberations, realizing this is an

13   ongoing case, did they consider whether there was sufficient admissible evidence such

14   that prosecutors could probably sustain a conviction from a jury in the District -- in your

15   district.

16       Ms. Zdeb.     And I think, before he answers, he can certainly talk in general about

17   the types of considerations in any case, but obviously not the specifics.

18       █████████.    Understood.

19              BY ████████:

20       Q       And I'm asking, you know, if these are considerations that apply to every

21   case, were they applied here?

22       A       So I am trying to thread this needle.    I think I am authorized to say, in any

23   case, we are going to go through these Justice Manual factors, like sufficiency of the

24   evidence.    In terms of making an assessment about whether we should proceed with the

25   case, join a case, whatever, is kind of like the process, and the normal order is that starts

1    at the line level, and that recommendation makes its way up the supervisory chain.

2        Q    And, in this case, like in any case, the prosecutors would have to show that

3    the evidence was probably sufficient to convince a D.C. jury of the defendant's guilt

4    beyond a reasonable doubt, correct?

5        A    Correct.

6        Q    So the burden of proof, we've said earlier, is beyond a reasonable doubt.

7    That's actually the highest evidentiary standard in the law, correct?

8        A    That is correct.

9        Q    Can you briefly describe what beyond a reasonable doubt is?

10       A    Yes.    It's not beyond any doubt, not beyond imagined or a fantastical

11   doubt, but beyond any doubt that any reasonable person would have about the outcome;

12   as our very good public defender service says, it's a higher standard than what you need

13   to take a child away from his or her mother.

14       Q    And it's also a higher standard than probable cause, correct?

15       A    Much higher than probable cause.

16       Q    So what's the standard for probable cause?

17       A    Probable cause is, is it likely?

18       Q    And beyond a reasonable doubt is a higher standard than the

19   preponderance of the evidence standard that's needed to obtain a judgment in a civil

20   case, correct?

21       A    Yes.    It -- yes.    Exactly.

22       Q    And --

23       A    Probable cause, preponderance of the evidence, reasonable doubt.

24       Q    And so preponderance -- what is preponderance of the evidence?

25       A    Preponderance means majority.

1    Q    So it's more than 50 percent?

2    A    Yeah.

3    Q    In your experience as a Federal prosecutor, is it fair to say that it can be

4    difficult to convince a jury, quote, "beyond a reasonable doubt," even when you have a

5    significant amount of evidence that a defendant may have actually committed a crime?

6    A    It certainly can be, yes.

7    Q    And, in order to obtain a criminal conviction, you need to not only establish

8    that the defendant is guilty beyond a reasonable doubt, but you also have to convince 12

9    jurors that you've met that standard, correct?

10   A    Correct.

11   Q    And that jury's decision has to be unanimous, correct?

12   A    Correct.

13   Q    That means that, if even one single juror has a doubt or has what he or she

14   considers to be a reasonable doubt about the sufficiency of the evidence that you've

15   presented, then that juror will be instructed to find your defendant not guilty, correct?

16   A    So what will happen is, if the jury cannot reach unanimity, if 11 jurors agree

17   a conviction and one doesn't, eventually a mistrial will be declared.

18   Q    Have you ever had the experience as a prosecutor where you felt very

19   strongly that you had presented the jury with sufficient evidence to prove a case beyond

20   a reasonable doubt, but there was one juror who didn't agree, and so the defendant

21   wasn't convicted?

22   A    Yes.

23   Q    Can you describe broadly the circumstances of that case --

24   A    Yes.

25   Q    -- or cases?

1    A    Yes.    I can.    Case or cases.    One that comes to mind, one of my first jury

2    trials, an individual was riding in the back of a car that got stopped.    Officers see in plain

3    sight a bag that contains 20 Ziplocks of an illicit substance by his feet.    They step him out

4    of the car, and they search him, and they find additional illegal drugs on him.    That was

5    an 11-1 hang for conviction.

6    Q    And, in that case, there had been evidence found in the car?

7    A    Yes.

8    Q    There had been --

9    A    Two officers testified in basically unimpeached fashion that:    I saw drugs

10    sitting next to the person.    I stepped him out of the car and found additional drugs.

11    The jury was shown those drugs.    The jury was shown photos from the scene of where

12    the drugs were, and there was one juror who held out.

13    Q    So it can be difficult to convince 12 jurors to convict a defendant?

14    A    That is correct.

15    Q    Okay.    And prosecutors, as we talked through a couple minutes ago, have

16    to consider the perspective of jurors when they make charging decisions?

17    A    That's correct.

18    Q    How do those considerations play out in your experience when prosecutors

19    are making those decisions?

20    A    I'm sorry.    In what sense?

21    Q    So, for example, might prosecutors have discussions with other prosecutors

22    to assess how the evidence might play out before a jury?

23    A    Yes.    Particularly in the white collar context, you'll have discussions with

24    your supervisors, in our office, at both the indictment phase and at the trial phase.

25    We'll assemble other people who haven't worked on the case.    We try to -- really try to

1    bring in professional staff who are not lawyers, particularly at the trial phase, to say:

2    Hey, is this all making sense?

3         Q    And, among other things, the prosecutors might discuss what's happened in

4    other similar cases, right?

5         A    That is correct.

6         Q    So, using the drug case as an example, you might say:    Well, I had a case

7    where the officers found drugs on the person of this defendant, and we still had an 11-1

8    split.

9         Right?

10        A    Yes.

11        Q    And that would inform the prosecutors as to their charging decisions?

12        A    Yes.

13        Q    Okay.    In addition to the probability of obtaining a conviction at trial, the

14   Justice Manual's principles of Federal prosecution also instruct that prosecutors must

15   consider whether there exists an adequate noncriminal alternative to prosecution,

16   correct?

17        A    That's correct.

18        Q    Was this something that you were required to consider or that your career

19   prosecutors were required to consider when deciding whether to join Mr. Weiss' case?

20        A    So it's in the Justice Manual, so on any case -- I wouldn't limit it to

21   Mr. Weiss' -- we would be required to consider that.

22        Q    And so they would be required to consider the fact that, in tax-related cases,

23   there are alternatives to criminal prosecution that are routinely pursued, such as the

24   payment of civil penalties?

25        A    So what I -- yeah.    What I can say in general is this is a regular conversation

1    that we have in the context of tax cases and other cases where there is a regulatory or

2    civil remedy.    Why are we doing this criminally as opposed to regulatory or civil?

3          ████.    And I want to introduce as exhibit No. 3 the civil complaint in a case.

4    It's United States of America v. Robert J. Shaughnessy and Susan J. Shaughnessy.

5                    [Graves Exhibit No. 3

6                    Was marked for identification.]

7          BY ████████:

8        Q    And this is a 2022 civil case from the United States District Court for the

9    District of Columbia.

10        A    Okay.

11        Q    Do you recall this case?

12        A    I don't, and I don't think that this is a case that our office brought.

13        Q    So this was actually brought by the Tax Division, correct?

14        A    I believe so, although, as luck would have it, we have a member of our team

15    who is also named Emily Miller, but I believe it is a different Emily Miller.

16        Q    And we'll ask to redact that from the transcript --

17        A    Yeah.

18        Q    -- because I believe that's a line attorney.

19        A    Okay.

20        Q    But it is a tax case --

21        A    Yes.

22        Q    -- that was brought in the District of Columbia Federal district court, correct?

23        A    Yes, correct.

24        Q    In 2022?

25        A    Correct.

1      Q    And, if you look at page 2 of this complaint, the civil complaint, there is a

2  table, right?

3      A    Yes.

4      Q    And, at the table, it says that the total outstanding balance or -- refers to the

5  total outstanding tax balance as of April 18th, 2022, was almost $7 million, correct?

6      A    Yes.

7      Q    And then, on page 3, paragraph No. 8, it says that the defendants in this

8  case, despite being given notice of those taxes due, they neglected or refused to make full

9  payments of those assessments to the United States, correct?

10     A    Yes.

11     Q    And then, further down on page 3, under the prayer for relief, it says that

12  the United States respectfully prays that this court enter judgment in favor of the United

13  States.   And then it says in the amount of roughly $7 million, plus interest, correct?

14     A    Yes.   Yes.

15     Q    So this is an example of a tax case where taxes were not paid, correct?

16     A    Correct.

17     Q    And the government did bring a case, but it brought a civil case?

18     A    Correct.

19     Q    And the demand for relief was that the defendants pay the taxes due?

20     A    Correct.

21     Q    All right.    So you've explained that, when Mr. Weiss first contacted you in

22  February of 2022 and that you raised the possibility of joining the case, that your team's

23  consideration as they were evaluating that was guided, as in all cases, by consideration of

24  the Justice Manual's principles of Federal prosecution, correct?

25     A    Yes.

1      Q      Was their consideration influenced in any way by personal or political or

2   partisan considerations?

3      A      I -- it's across the board, no.    In none of our cases does that ever come up.

4      Q      Was the evaluation of the case influenced in any way by people outside of

5   your office, such as individuals at Main Justice, the White House, or elsewhere, who

6   sought to impact your decision?

7      A      No.

8      Q      And you said that you did offer to provide any and all logistical support,

9   correct?

10     A      Correct.

11     Q      And you instructed your team to provide any and all logistical support?

12     A      Correct.

13     Q      In light of that, what impact do you believe that your decision not to actually

14  join the case would have had on Mr. Weiss' efforts to prosecute Mr. Biden in the District

15  of Columbia if he chose to do so?

16     A      I, at the time, believed that my decision had no impact, and the first time

17  that I heard concerns about the decision that we reached was in the public reporting

18  around the whistleblowers' allegation.

19     Q      So in the past couple months?

20     A      Yes.

21     Q      And, if anything, your determination that you would provide him with any

22  and all administrative and logistical support actually would have made it easier for him to

23  bring the case if he so chose?

24     A      Yes.    I believe we had done everything we needed to do in order for him to

25  bring a case if he chose to bring a case.

1      Q    Okay.   And it was never your intent to block Mr. Weiss from pursuing

2  charges that he, meaning Mr. Weiss, wished to pursue against Hunter Biden, correct?

3      A    Absolutely not.

4      Q    Okay.

5         BY ███████:

6      Q    Mr. Graves, Mr. Weiss never actually asked you directly to be local counsel in

7  the Hunter Biden case.   Is that fair to say?

8      A    That's my recollection, that I was the first one to raise it.   And that kind of

9  informed my thinking that that was an ask from me as opposed to an ask from him.

10     Q    Okay.   So it's fair to say that Mr. Weiss, no one on his staff, as far as you

11  know, asked anyone at the U.S. Attorney's Office in D.C. to be a local prosecutor and was

12  denied that request?

13     A    As far as I am aware, yes.

14     Q    Okay.

15     ████.  Yes, that's accurate, what ███ said?

16     Mr. <u>Graves.</u>   Yes.   What you said is accurate as far as I am aware.

17     ████.   Thank you for that clarification.

18         BY ███████:

19     Q    And, also to be clear, you personally, in your position as the United

20  States attorney for the District of Columbia, never took any action to block Mr. Weiss or

21  anyone from his office from bringing any charges against Hunter Biden within the District

22  of Columbia?

23     A    No.

24     Q    And you indicated that you had some familiarity based on press reporting of

25  what the whistleblower allegations in this case have suggested, and that is generally that

1    you did block Mr. Weiss in some manner from bringing charges in the District against

2    Hunter Biden.

3              Are you aware of that allegation generally?

4         A    I am generally aware of that allegation.

5         Q    Okay.    And what is your response to it as you sit here today based on

6    everything that you know and you can share with us?

7         A    So my -- allegation or my response or my position is that that is not accurate.

8    I want to be careful and respectful, because I've worked with whistleblowers my entire

9    career.    I believe these people are saying what they believe to be true.    But, if you look

10   at a lot of the communications, it's second or thirdhand, never direct communication with

11   us after a decision was made.

12        Q    Is it fair to say that you think there may be some confusion on the part of the

13   whistleblowers as to what you did in this case in your communications with Mr. Weiss?

14        A    So I don't want to get into the specifics of this case, but I have been around

15   large institutions -- and the Department is a large institution enough -- to see the garbles

16   that can occur when there are communications across different components and people

17   aren't talking directly to each other.

18        Q    Okay.    But, to the extent that there has been public reporting that the

19   whistleblowers have said that you blocked Mr. Weiss in some manner in bringing charges

20   against Mr. Biden in the District, that is incorrect.    Is that fair to say?

21        A    The -- I'm just -- there is -- constitutionally, I don't like taking issue with what,

22   like, whistleblowers are saying.    I'd rather speak directly.    I did not take steps to block

23   any investigation by Mr. Weiss in the District of Columbia.    I offered to help.

24        Q    Okay.    And, Mr. Graves, do you know who Ken Wainstein is?

25        A    Yes, I do.

1        Q      How do you know him?

2        A      He was the U.S. attorney for the District of Columbia during the kind of -- the

3    early part of the George W. Bush administration.

4        Q      Did he happen to hire you when you became a prosecutor at the

5    U.S. Attorney's Office?

6        A      So it's -- it's funny.    He was the U.S. attorney when I started the process.    I

7    knew him from before.    We had multiple rounds of interviews.

8             He saw me at the first-round interview, and he asked what I was doing there.

9             And I told him I was interviewing.

10             And he asked if he wanted me to hire him on the spot.

11             And I said, I don't think it works that way.    I think we have to go through this

12    process.

13             By the time I got to the third round, which is the interview with the U.S. attorney,

14    he had actually transitioned out of that role, and Jeff Taylor was in that role.

15        Q      Okay.    Mr. -- sorry.    Go ahead.

16        A      Yeah.    Mr. Taylor is a lifelong Republican, had worked in the White House

17    and had worked in Senate Judiciary Committee, and so I had my final interview with him.

18        Q      And Mr. Taylor hired you then?

19        A      Yes.

20        Q      Did you have any concerns about becoming a prosecutor under a Republican

21    U.S. attorney?

22        A      So not necessarily, but a little bit of context and a story that I think goes to

23    your question.    So this was right around the period of the point when there were a lot of

24    inquiries into whether there was political influence on career hires.    And we were kind

25    of the first U.S. attorney class coming up, and the person who had just put in this -- been

1    put in this role and had no connection to D.C. -- and Mr. Wainstein had had a connection

2    to D.C. and had all of this political background in addition to being a career

3    prosecutor -- was the person I was interviewing with.

4           So I didn't quite know what to expect.    I tell this story all the time.    We got in.

5    He saw my resume, saw that I had done advance for Clinton-Gore and started asking

6    about politics.

7           And I was like:    Oh, no, here we go.

8           And he said:    I don't care about your political background.    I'm a lifelong

9    Republican.    When we do this job as prosecutors, we prosecute.    Can you check politics

10   at the door whenever you do anything?

11          I said:    Absolutely.

12          He's like:    You're hired.

13          So -- well, he didn't say it in the interview, but, like, that was the question -- the

14   real question he wanted to ask.    And he was one of the greatest U.S. attorneys I served

15   under, and it's a conversation that I remember and I repeat often.

16          Q     And so, when you became a prosecutor at the U.S. Attorney's Office, it was

17   your intention to be a career prosecutor and not to be influenced in any way by politics of

18   the person who was at the head of the office.    Is that fair to say?

19          A     That is correct.

20          Q     And, in your experience in that office for 10 years as a career prosecutor, is

21   that the way you were allowed to do your work?

22          A     Absolutely.

23          Q     Nonpartisan?

24          A     Absolutely.

25          Q     And, as a U.S. attorney currently, do you have anything that you would like

1   to share about how partisanship does or doesn't influence the decisions that you make?

2          A     It doesn't influence in any way whatsoever.    As you pointed out in the

3   earlier questioning, every elected official that we've ever ultimately prosecuted was a

4   Democrat.    That is irrelevant to us.    It is simply these Justice Manual requirements and

5   whether they are met.

6          Q     Okay.    So there has been an allegation made that Mr. Weiss, quote, "went

7   to D.C. U.S. Attorney's Office in early summer to request to charge there," and the, quote,

8   "Biden-appointed U.S. attorney," end quote, said that you couldn't charge in the district.

9          Do you have any response to being referred to in that context as the, quote,

10  "Biden-appointed United States Attorney"?

11         A     I mean, it is true, like every other presidentially appointed, Senate-confirmed

12  U.S. attorney that is currently serving, that I was appointed by the President.    But the

13  fact that I was appointed by the President, if this is the insinuation, has absolutely nothing

14  to do with the charging decisions that we make in any case.

15         Q     I'm sorry.    Mr. Graves, let me just -- one last set of questions.

16         You were asked a little bit about your experience as a prosecutor when there was

17  a disagreement between what investigators saw in the evidence and what prosecutors

18  might see in the evidence.    Do you have any opinion based on your experience as to why

19  investigators tend to sometimes overvalue evidence as compared to what prosecutors

20  might think?

21         A     It's because they're looking at it -- in my experience, first, they're kind of not

22  seeing how all this plays out in trial.    Second, their job is to kind of assemble facts and

23  build a narrative, and they do a great job of that in general, by the way.    But they

24  don't -- because this isn't their job or their training, they don't see the ways in which that,

25  you know, house they assembled can be taken apart brick by brick.

1  Q Does it surprise you when investigators complain that prosecutors are trying

2 to block them, for example, or not allowing them to take investigative steps that they

3 think that they should be able to take?

4  A That can happen from time to time, for sure, in all kinds of different cases.

5  Q It's not that uncommon for that kind of complaint to happen, right, in the

6 context of a criminal investigation, that an investigator might think that the prosecutor is

7 holding them back in a sense?

8  A Yes. That can happen, particularly in complex cases. There are all kinds

9 of really complex strategy decisions you have to make, and looking at a proposed action

10 in isolation, you might have one view of it. But, if you're the attorney and you're

11 thinking about how this might play out before a court or before a jury, you might have a

12 different view of it.

13  Q And often the investigators are not lawyers. Is that right?

14  A That is correct. They are often not. They are typically not.

15  Q And they may not have the same responsibility as prosecutors to consider a

16 defendant's constitutional rights, for example?

17  A I think they have a duty to consider the constitutional rights, but I don't think

18 they are as necessarily attuned to all the nuances because they're not attorneys.

19  Q Understood.

20  ██████. Thank you. We can go off the record.

21 [Recess.]

22   BY MR. CASTOR:

23  Q I want to go back to that 3-week period that you testified about, in March

24 of 2022.

25  First, Mr. Weiss called you, and you told him that you'd be able to assist with

1    whatever he needed, correct?

2        A    That is correct.    And I just want to clarify.    I'm going off my best of my

3    recollection.    Roughly 3 weeks.

4        Q    Okay.    And then you went through a process where your principal assistant,

5    the Criminal Division chief, the head of the Fraud Civil Division and the Public Corruption

6    Division, and your line AUSAs evaluated something, correct?

7        A    Correct.

8        Q    And do you know if those meetings occurred in person that they had?

9        A    I do not know.

10        Q    Do you know if Lesley Wolf, the AUSA in Delaware, came to D.C.?

11        A    I don't know.    But, just to reorient, that's at a time when we are still under

12    maximal telework, so that would -- I could speculate.    That would -- a lot was probably

13    done virtually.

14        Q    Okay.    Do you know if any of your personnel went to Delaware?

15        A    I am not aware of that.

16        Q    And do you know what type of paper was exchanged?

17        A    I do not know.

18        Q    Do you know if your team reviewed the special agent report prepared by

19    Agent Ziegler?

20        A    So I know they have reviewed investigative material.    What investigative

21    material specifically, I don't know.

22        Q    And were you aware that DOJ Tax had also prepared a report recommending

23    charges?

24        A    Not aware.

25        Q    Okay.    So you didn't review that report?

1          A     I did not review any underlying case material.

2          Q     Okay.     And you didn't review any PowerPoint presentations that may or

3     may not have been made?

4          A     No.

5          Q     Okay.     So you didn't evaluate any paper?

6          A     No.     My briefing from my team was oral.

7          Q     Okay.     Now, there is a little bit of a disconnect.     I mean, during the last

8     hour, there was some back and forth about how D.C. juries are very tough, and you

9     walked us through a case that I believe you said you were involved with where they found

10    all the evidence you would ordinarily need to --

11         A     Yes.

12         Q     -- convict somebody, and yet you were unable to get that conviction.

13         A     Correct.

14         Q     Did your team communicate that to the Delaware U.S. Attorney's Office, that

15    D.C. juries are real tough?

16         A     I think what I can say at a high level was that I told my team to explain why

17    we weren't going to seek to join the investigation.

18         Q     Now, earlier this morning, you said that joining an investigation after it's

19    already started, like halfway through, would be very unusual, correct?

20         A     In my experience, yes.     Usually, if you join or partner, it's at the beginning

21    of an investigation, not the end.

22         Q     Right.     So the Hunter Biden investigation began in -- at least the IRS portion

23    of it began in 2018, and then the Justice Department portion began in 2019.     So several

24    years had unfolded by the time you evaluated whether to join, correct?

25         A     So I am not tracking all those details.     What I can say at a high level --

1          Q      Right.

2          A      -- was that I was aware that U.S. Attorney Weiss had been a U.S. attorney in

3    the prior administration, and he was one of two of those U.S. attorneys held over because

4    he had an ongoing investigation involving Hunter Biden.    But, prior to him calling me, I

5    think I don't know much -- I didn't know much more than that.    So whether it started

6    in -- by definition, it would have had to have started before the current administration

7    came in.    How long he was doing it, I don't know.

1      [12:12 p.m.]

2              BY MR. CASTOR:

3      Q    Now, the fact that he was held over, was it your understanding that he was

4  held over particularly for this case?

5      A    So I'm just going off of public reporting, nothing internal, but that was my

6  understanding from public reporting.

7      Q    And why do you think whoever made that decision wanted to hold Mr.

8  Weiss over?

9      A    I couldn't -- I mean, I could only speculate.

10     Q    Is it because he was a Republican-appointed U.S. attorney and the

11  investigation involved the son of a Democrat Presidential --

12     A    So, I mean, anything is possible.    It's also, if there is a long-running

13  investigation, there's continuity in keeping the entire --

14     Q    Uh-huh.

15     A    -- supervisory chain in place.

16     Q    Right.    Have you heard the Attorney General state, though, that the reason

17  he was kept was that he was a Republican-appointed U.S. attorney?

18     A    I certainly haven't heard the Attorney General say that, and I haven't seen

19  that in any of the reporting.

20     Q    So, no?

21     A    Yeah, no.    I mean, like, I've had no conversations with the Attorney General

22  about this issue generally, and in public reporting I don't recall seeing anything along

23  those lines.

24     Q    Have you recalled anyone at the Justice Department touting the fact that

25  Weiss was a Trump appointee that made him a good prosecutor for this case, because

1     he's supposedly not aligned with President Biden?

2     A    No, I don't -- no.   No.

3     Q    No?

4     A    No.

5     Q    So the only reason, in your mind, that Mr. Weiss was held over was because

6     he had this investigation ongoing.

7     A    So that's the thing I knew for certain.   I could speculate about other

8     reasons.   I'm not saying what you're saying is necessarily unreasonable.   I just don't

9     know that.   I've never heard that.

10    Q    Do you think there's a perception that maybe Weiss could be viewed as

11    more fair because he's not a Democrat-appointed U.S. attorney to begin with?

12    A    Um --

13    Q    It's a good look, isn't it?   It's certainly a good look.

14    A    I understand what you're saying.   I understand what you're saying.

15    Q    You knew it was a good look, right?

16    A    I mean, kind of in the way "good look" -- I mean, I understand the optics

17    issue there, yes.

18    Q    And it's a good look optically, right?

19    A    Well, you're leaving in place the person who was in charge of the

20    investigation before you were -- before the administration changed.

21    Q    Okay.

22    And along the same lines, I mean, you can certainly understand how some

23    Republicans might have concerns that a U.S. attorney appointed by President Biden might

24    have some conflict-of-interest types of issues, weighing in on a case against the

25    President's son.

1          A      I mean, people can have whatever concerns they might have.      I do not view

2    it that way.      And I'm not aware of any ethical canon that says that U.S. attorneys have

3    an obligation to recuse whenever --

4          Q      But you can --

5          A      -- a family member of the President is implicated.

6          Q      But you can certainly understand a reasonable person might wonder

7    whether a U.S. attorney appointed by President Biden can fairly make a decision on a

8    case involving his son.

9          A      So, kind of -- I mean, I wouldn't -- I don't even know that I would necessarily

10   go that narrow.      I understand that people have questions when we make

11   determinations about matters of significant public consequence all the time about the

12   basis.

13         Q      What would be the process in your office today if you did have a conflict of

14   interest?      Who would be the decision-maker?

15         A      So we have an ethics officer within our office who is the first line that we run

16   potential conflicts of interest past.      That can lead to -- from there, it can go to the

17   General Counsel's Office of the Executive Office for United States Attorneys.      And the

18   Associate Deputy Attorney General who's responsible for ethical matters can also become

19   involved when there are questions about whether recusal is required.

20         Q      So, hypothetically, let's say you did have a conflict of interest.      You ran it

21   through that process --

22         A      Yes.

23         Q      -- and it was determined that, in fact, you did have a conflict of interest.

24   Who would then be the decision-maker in your office?

25         A      So --

1        Q      Who would you defer to?

2        A      -- I mean, it depends.    I mean, sometimes the conflict is resolved by -- it

3    could be deemed a district-wide conflict, and it's taken away from the district and

4    assigned to another U.S. Attorney's Office.

5        Q      Uh-huh.

6        A      In other instances, it could be -- you know, within our office, it

7    would typically become -- the Principal Assistant United States Attorney would be the

8    final decision-maker.    And if she had a conflict like me, then it would go --

9        Q      Okay.

10        A      -- to one of our division chiefs.

11        Q      So, in your office, is the principal assistant considered the number two?

12        A      The principal assistant is the number two, yes.

13        Q      Okay.    And did you ever contemplate deferring this matter to her?

14        A      No.

15        Q      Why not?

16        A      Because there was no conflict of interest and no reason for me to do so.

17        Q      You may have felt that way, but others looking from the outside optically

18    might have felt differently, that a U.S. attorney appointed by President Biden wasn't a fair

19    arbiter of a case involving President Biden's son.

20        A      So --

21        Q      I mean, that's not an outlandish thing to suggest.

22        A      I understand what you're saying.

23        Q      Uh-huh.

24        A      I am saying there is no ethical reason for me to put this decision on someone

25    else.    And, in my experience, when you start trying to do things that aren't required to

1    placate people on the outside --

2         Q     Uh-huh.

3         A     -- you still wind up with those accusations despite what you did.

4         Q     Okay.    Do you think U.S. Attorney Weiss was kept in his position to placate

5    people on the outside?

6         A     No.

7         Q     No?

8         Do you know who kept U.S. Attorney Weiss on, whose decision that was?    Was

9    that the decision of the Justice Department, or was that the decision of the White House?

10        A     I don't know.

11        Q     Now, during the last hour, counsel asked you questions about the types of

12   considerations that you went through, citing the Justice Manual.    And I was a little,

13   guess, confused, because it seemed like you were walking us through potentially the

14   decision-making process that your office made with respect to this particular case.

15        And that just struck me as a little bit different than what you had said in the first

16   hour when we were speaking with you, that this was a decision for the U.S. attorney in

17   Delaware to make.    Could you help us resolve that?

18        A     So what I was trying to do in the last hour when I was getting asked

19   questions about specifically was this factor considered in the context of this case, to say,

20   in general, in all cases, the principles of Federal prosecution, factors like sufficiency of the

21   evidence, are things that we are considering at all points, and taking it out of the context

22   of an assessment about whether we should seek to join this particular case.

23        Q     Right.    But you also have said that the decision whether you would join this

24   case would be unusual, because the case had been ongoing for a number of years.

25        And so I took -- and maybe you can correct me if I misunderstood what you were

1   saying.   But I took what you said this morning, in the first hour, that after the case had

2   been up and running for a couple years, it would be very unusual for you to join.   In your

3   experience, you hadn't had any case in your experience where after a number of years

4   had unfolded that you would decide to join it.

5        A   It would be -- so, yes, it would be unusual to -- in my experience, it would be

6   unusual to join an investigation, just in general, that is late in the process.   In my

7   experience, if a component has been conducting an investigation for a period of time,

8   they, in general, don't want to bring in another supervisory chain, because they've

9   already gotten all the sweat equity and now you're just adding additional layers of

10  supervision.

11       Q   So --

12       A   In --

13       Q   Go ahead.   I'm sorry.

14       A   In terms of the jurisdiction in which the case is gonna be brought, it's a really

15  complicated analysis.   There's, in general, all the concerns I was talking about before

16  about, kind of, buying an investigation largely sight unseen.   On the other side, people

17  are gonna be in your jurisdiction litigating potentially complex issues that could result in

18  case authority that you are then subsequently stuck with.

19       So there's, like, a whole host of complications that weigh for and against in any of

20  these cases where you're considering getting involved.

21       Q   Right.   But, you know, you told us about that you spent 3 weeks going

22  through this analysis.   And I'm just confused, why you didn't tell Mr. Weiss from the

23  beginning, hey, whatever you need, you just come into D.C. and we will help you get the

24  grand jury set up and we'll give you a copy of the local rules, that type of stuff.   Like, you

25  went through a 3-week process that ended in either a declination or a decision not to

1   partner.

2          So I'm just trying to reconcile those two things.

3          A    That's a good question that it's hard to get into without case-specific, but I

4   think you are absolutely right.    If one were inclined not to join from the outset, that

5   conversation could've gone a very different way.

6          Q    Right.

7          A    I could've not even brought up joining, and I could have simply said, we'll

8   provide you whatever support you need.

9          Q    Right.    So don't you think going through the process, the 3-week process,

10  you know, sends the message to Delaware that this is a loser of a case and you shouldn't

11  bring it?

12         A    No.    I mean, I've told you I didn't know anything factually about the case

13  before that call.

14         Q    But I'm talking about the end of the 3-week process.

15         A    I'm sorry.    Can you repeat the question then?

16         Q    At the end of the 3-week process, you told Delaware that you didn't want to

17  partner or you didn't want to join, whatever words you want to use.    Don't you think

18  that may have had the effect of trying to convince them not to bring the case?

19         A    No, not -- no.    No, I don't.    And that certainly, just to be clear, was not the

20  intent of why we went through the 3-week process.

21         Q    Okay.

22         A number of witnesses -- and it's not just Ziegler and Shapley.    We've heard from

23  two FBI officials.    We've heard from IRS officials.    If there's one thing that's clear,

24  nobody thinks that your office was willing or interested to partner on this case.    You

25  know, whatever semantics you want to use -- you either denied the case, you didn't want

1    to partner, you neglected to join, like, whatever.    And Shapley and Ziegler testified that

2    Weiss himself, you know, characterized your decision as, you know, a failure to partner.

3         And that's very different than, "Hey, you can have anything you need, and you're

4    welcome to bring a prosecution, and we'll help you."

5         A      So, I mean, I can't get into and I'm not tracking the details of what everyone

6    said.    I can just tell you -- and lay out the chronology again.

7         And one thing I want to be clear on:    A lot of your questions are assuming that

8    the conclusion of that process was known at the outset.    And --

9         Q      Right.

10        A      -- that's not the case.

11        Chairman Jordan.    Why'd you --

12        Mr. Castor.    Go ahead, sir.    Sorry.

13        Chairman Jordan.    Well, why'd you offer it on the front end, then?

14        You said earlier that U.S. attorneys don't like to partner, you don't want two cooks

15    in the kitchen.    But this is a -- they'd already done 3 years of investigation.    And he calls

16    you and says, hey, we're looking to bring this case.    And then he said you volunteered to

17    partner with him or potentially partner with him.

18        So why'd you offer it on the front end?

19        Mr. Graves.    So I just want to clarify something you said.    In general, if you're

20    the U.S. attorney who has been conducting an investigation for a long period of time, you,

21    in general, don't want to bring another U.S. attorney into the decision-making chain.

22    The calculus is different if you're the recipient of the request, if the investigation is

23    coming to your jurisdiction.

24        And, I mean, what I can say at a high level, I think, is, I made the ask because it

25    was something I wanted to explore.

1                    BY MR. CASTOR:

2           Q      And at the end of the 3-week process, you communicated to Delaware,

3    through your staff, that you didn't want the case to be brought.    Is that correct?

4           A      I had my staff reach out and explain that we weren't going to seek to join

5    and explain why.

6           One other point that hasn't come up:    I did follow up to confirm that that

7    conversation occurred, and I asked if --

8           Q      Which conversation?

9           A      The conversation I just described, my staff communicating our decision --

10          Q      Okay.

11          Chairman Jordan.    After the 19th meeting.

12          Mr. Graves. -- to them --

13          Chairman Jordan.    Got it.

14          Mr. Graves.    -- to ask how the meeting went or if any additional information was

15   learned.

16                   BY MR. CASTOR:

17          Q      And what did they tell you?

18          A      They told me how the meeting went.    And I did not receive any additional

19   information.

20          Q      And that communication you had was with your first assistant or who -- head

21   of the Criminal --

22          A      I can't remember whether it was the head of the Criminal Division or --

23          Q      Or your principal assistant?

24          A      -- lower-level supervisors.    It might've been directly with the lower-level

25   supervisors.

1      Chairman Jordan.    And how did that meeting go?    What was the feedback?

2      Mr. Graves.    I can't get into specifics, but, like, at a high level, I think I am

3  authorized to say that they conveyed that we weren't going to seek to join, our rationale

4  and our thought process about why we weren't going to seek to join, and we did not

5  receive any information back that would cause us to change our analysis.

6          BY MR. CASTOR:

7      Q     And, during the course of that, did your staff communicate to Delaware that

8  they were welcome to bring the case themselves, that you would do everything possible

9  to facilitate that?

10      A     So I don't know if that happened during the course of that conversation,

11  because I didn't participate in that conversation.    Based on what I know was occurring at

12  that time in terms of what we were facilitating, there is no doubt in my mind that they

13  understood they could bring whatever charges they wanted in the District.

14      Q     And do you know why they later characterized your decision as blocking the

15  case?

16      Ms. Zdeb.    Who is "they"?    The whistleblowers?

17      Mr. Graves.    So I think -- and this is what I was referring to earlier.    I think I have

18  seen the whistleblowers initially use language of "blocking."    I've definitely seen

19  correspondence from now-Special Counsel Weiss saying there was no blocking, and then

20  this shifting to "partnering" and "not partnering."

21          BY MR. CASTOR:

22      Q     What was your understanding of Mr. Weiss's authority to bring this case?

23      A     So, from my perspective, I never thought about it in terms of his authority.

24  It's a fellow U.S. attorney that has a matter that he believes needs to be brought.

25      Q     Uh-huh.

1      A      I'm not saying, "What is your basis for doing so in D.C.?"    I'm immediately

2    shifting to, "What do you need from us?"

3      Q      Uh-huh.    Did he ever communicate to you that the Attorney General had

4    given him authority to bring the cases he needs?

5      A      I don't recall if that came up in our conversation.    And, again, that would be

6    of no significance to me.    The last thing I'm thinking when he's calling is, "Well, what is

7    your basis for doing these charges in D.C.?"    It's, "You're doing an investigation that you

8    say you've realized you have to bring charges in D.C.    Let's talk about how you get it

9    done."

10      Q      Uh-huh.    So you didn't have a discussion with Mr. Weiss about special

11    counsel authority?

12      A      No.

13      Q      When was the first time you learned that he was interested in special

14    counsel authority?

15      A      Through the public reporting of the Attorney General naming him to be

16    special counsel.

17      Q      Okay.    But before that, there was -- I mean, the Attorney General testified

18    on a couple different occasions.    I'm sure you were watching the letter exchange that

19    Mr. Weiss sent to the Hill, correct?

20      A      That is correct.    And, like, at a high level, my understanding was, the

21    Attorney General was of the position that then-U.S. Attorney Weiss had not asked to be

22    special counsel.    And I hadn't seen anything from then-U.S. Attorney Weiss saying that,

23    at a point in time earlier to him being named special counsel, he needed to be named

24    special counsel.

25      Q      Right.    But, during that letter exchange, didn't it strike you as maybe a

1    point in time that you needed to call and clarify to Mr. Weiss that if he needed to bring

2    anything in D.C. that he would have your support?

3          A    During the letter exchange?   No.   And my chronology could be off,

4    because I am following this as a recipient of news, but, like, in the middle of all this, there

5    was a negotiated resolution as well.

6          Q    Uh-huh.

7          Well, in June of this year -- that was before any negotiated resolution -- Weiss

8    wrote to Mr. Jordan and stated, "I've been granted ultimate authority over this matter,

9    including responsibility for deciding where, when, and whether to file charges and for

10    making decisions necessary to preserve the integrity of the prosecution."

11          Is that, like, accurate?

12          A    To my understanding, yes.

13          Q    Because before getting special counsel authority, for Mr. Weiss to bring

14    some of these charges, he would've needed, as we discussed this morning, the approval

15    of the Tax Division.

16          A    So, again, I don't know the specifics of this case.   The way the Justice

17    Manual is set up, certainly Tax Division approval would be required.

18          Q    Uh-huh.

19          A    But the Justice Manual exists under the Attorney General's authority.   So, if

20    he wants to say in a particular case that consultation and approval is not going to be

21    required, he can say consultation and approval is not required.

22          Q    But doesn't he have to go through the 28 United States Code 515 process?

23          A    Well, I guess that's a process one could go through.   I'm not sure that 515

24    would necessarily take you out of Tax Division approval necessarily.

25          Q    Is there another way the Attorney General can grant Weiss ultimate

1  authority?

2       A      So I'm not sure of all the ways.    I mean, from my perspective -- because I

3  can tell you, as U.S. attorney, 515 is not something that I have ever dealt with --

4       Q      Right.

5       A      -- these are just worked out more informally, which is my frame of reference

6  of, "Okay, you have charges you want to bring.    We'll work it out.    You'll get charges

7  brought here."

8       Q      When Weiss said, "I've been granted ultimate authority over this matter,

9  including responsibility for deciding where, when, and whether to file charges," did that

10  strike you as a little odd?    I mean, he's essentially saying he can walk right into D.C. and

11  file charges without your input.

12       A      In the context of the investigation, no, it didn't strike me as odd.    And, like I

13  said, it's an -- it was a preexisting investigation, and I understand the reasons for having

14  him continue to run it.

15       Q      But as of June 7th, that's a totally untrue statement, what Weiss said here.

16  I mean, he did not have ultimate authority.    He had to go through the Tax Division.

17  And if he was going to bring charges in Los Angeles or D.C., he had to go through the U.S.

18  attorney.

19       A      So I don't know that that's -- again, I don't know that that's an untrue

20  statement.    I mean, again, I never got to the intellectual point of what happens if I just

21  say, no, we're not going to facilitate you doing anything in here, what's going to happen

22  next, because it never crossed my mind to do that.

23       Q      Right.

24            But then he follows up on June 30th, okay -- this is well before the special counsel

25  status in August -- and he essentially acknowledges that his June 7th letter was incorrect.

1          And he writes, "I stand by what I wrote" -- which, of course, is an euphemism for

2  "I need to correct it" -- "but wish to expand.    As the U.S. Attorney for the District of

3  Delaware, my charging authority is geographically limited to my home district."    Okay?

4          So, going back to what he said on June 7th, he did not have ultimate authority to

5  bring cases in D.C.    Isn't that correct?

6      A    I'm not sure.

7      Q    He didn't have the ultimate authority to bring cases in Los Angeles, right?

8      A    I don't know.

9      Q    Well, I mean, he now, on June 30th, he's saying that is, in fact, the case,

10  which totally contradicts the June 7th letter.

11          "If venue for a case lies elsewhere, common departmental practice is to contact

12  the United States Attorney's Office for the district in question and determine whether it

13  wants to partner on the case."

14          Now, you've testified that you went through a 3-week process and determined

15  that you did not want to partner on the case, correct?

16      A    So I'm not sure what he means by "partner" in that context, but, yes, we

17  weren't going to join.

18      Q    Right.

19      A    Now, if he means, by "partner," are they going to support us, then we'd

20  already said in the initial call, we'll support you guys returning whatever charges you want

21  to return in our district.

22      Q    Right.

23          "If not, I may request special attorney status," which, as of June 30th, he didn't

24  request special attorney status, pursuant to 28 United States Code 515.

25          "Here I have been assured that, if necessary, after the above process, I would be

1    granted 515 authority in the District of Columbia."

2          So isn't he saying that, for him now to bring charges, he needs 515 authority in

3    D.C.?

4          A    So I'm -- I can hear the words you're saying as you're reading it.    I have no

5    firsthand knowledge, so I can just kind of surmise, in the way that you can surmise, what

6    he is saying.

7          Q    But what he says in the June 30th letter, in fairness, contradicts what he said

8    in the June 7th letter and contradicts what you've told us.

9          A    So, I don't see it that way.

10         Q    Okay.

11         A    I mean, I see the June 30th letter as a clarification of the June 7th letter,

12    which is consistent with --

13         Q    Uh-huh.

14         A    -- my understanding of where things were, which is that he is running an

15    investigation and he has authority to bring the charges, and the Attorney General is going

16    to work to make sure, if it comes to it, that he can bring charges in whatever jurisdiction

17    he wants.

18         Q    But --

19         Chairman Jordan.    Could you tell him "no"?

20         Mr. Graves.    So, could I have told him, "No, we're not going to support you, I'm

21    not going to make my grand jury available"?    I mean, I never considered it, but I guess I

22    could've told him "no."

23         Chairman Jordan.    Okay.    So, then, where's the authority coming from?

24         Mr. Graves.    Because I could get a call from the Office of Attorney General

25    saying, "You are going to."

1          Chairman Jordan.   Well, based on what Steve just read you, what authority does

2     he have that says he can bring the case when, where, and whether he decides to bring

3     charges at all?   What authority is that?

4          Mr. Graves.   So, as I --

5          Chairman Jordan.   And how does he get that authority?   Because you said it's

6     not 515, so what is it?

7          Mr. Graves.   So, as I understand the letters and the public reporting, he was

8     given assurance by the Attorney General, who heads our department, that he is going to

9     be able to bring whatever charges wherever he wants to bring charges that he thinks are

10    appropriate.

11         So, I mean, I can -- this has never happened, but I can make all kinds of

12    determinations I want to make on my own.    If the Deputy Attorney General or the

13    Attorney General calls me up and says, you are going to do the opposite of what you said,

14    I am going to do the opposite of what I said.    That's the way the Department works.

15              BY MR. CASTOR:

16    Q     If this was real, if this was actually the case, don't you think the Deputy

17    Attorney General's Office or the Attorney General's Office would've looped you in before

18    these letters were sent?

19         Like, if Weiss was really going to bring a case in D.C., okay, if that was a genuine

20    possibility, okay, don't you think they would've looped you in, rather than just, like, have

21    you learn about this in the letter exchange?

22    A     No, not really.   I mean, I think this is --

23    Q     No?

24    A     Again, while the situation is unique, it is not uncommon for cases to start in

25    one jurisdiction and venue to lie in another jurisdiction, and we all just work it out

1   amongst each other.    We're not saying, what authority are you acting pursuant to?

2   We are one Department.    And if we have someone else who is, you know, the head of

3   an office, and in this case a Presidentially appointed Senate confirmed head of his office,

4   that wants to bring charges --

5        Q    Uh-huh.

6        A    -- the immediate mindset is, we're going to support it.

7             And I think the Attorney General and the Deputy Attorney General know that's

8   out there, and they don't need to kind of lay the groundwork for the request that's

9   coming in.

10       Q    Right.

11            But isn't it likely that your office, when you communicated back in March of '22,

12  on March 19th -- subsequent to March 19th, that the message received from Mr. Weiss

13  was, no, you can't do it in D.C.?

14       A    I cannot -- I don't know, since I didn't have conversations with him, what

15  message he heard when he got briefed.

16       Q    Right.

17       A    I'm presuming he got briefed by his team.

18       Q    Right.

19       A    It would be hard for me to believe that, given the steps that we had taken,

20  but anything is possible.

21       Q    Okay.

22            Weiss sent another letter in July, July 10th --

23       A    Uh-huh.

24       Q    -- a couple weeks later, and he asserted to Senator Graham, "I have not

25  requested special counsel designation pursuant to 28" -- the CFR -- "CFR section 600.

1    Rather, I had discussions with departmental officials regarding potential appointment

2    under 28 U.S.C. 515, which would have allowed me to file charges in a district outside my

3    own without the partnership of a local U.S. attorney."

4          So Weiss is now saying that, for him to bring a case outside of the District of

5    Delaware, he needed to go through, you know, 515 or at least through senior officials of

6    the Department.

7          A     Sorry, what's the question?

8          Q     So this -- I mean, these words indicate, in Weiss's own mind, he didn't have

9    the ability to bring the case in D.C. like you've testified.

10         A     So I don't read the correspondence that way.

11         Q     Okay.    So your testimony is, if Weiss wanted to bring a case in D.C., he

12   could've done it and you would've assisted, without 515 authority.

13         A     So let me take a couple steps back.

14         My understanding, which was largely informed by public statements, is that the

15   Attorney General had given his assurance to U.S. Attorney Weiss that he would get

16   whatever he needed from the Department in order to bring the charges that he thought

17   was appropriate in the venue that he thought was appropriate.

18         Which would include, from my reading of the public statements and what I've

19   heard, if he ultimately needed it, a grant of 515 authority to act outside of Delaware.

20   There are all kinds of ways short of 515 that these charges could have been brought in

21   D.C.

22         Q     Right.    But, according to your testimony, he didn't need 515 authority,

23   because you were gonna let him come into D.C. and do it if he really wanted to.    You

24   weren't gonna partner --

25         A     So we didn't --

1        Q      -- but you were gonna facilitate.

2        A      Yeah, so we didn't have conversations along those lines.    But, like, what

3    one could do, right, if you wanted to proceed, is, he could ask to have all of his trial team

4    designated as special assistant United States attorneys in D.C., and they would be

5    designated as such, and --

6        Q      And did you tell him you were willing to do that?

7        A      Never -- that never came up.    But they would be designated as such, and

8    then a grand jury indictment would be returned under my name.

9        Q      Right.    But your conversation in March of 2022, you said you told him that

10    he could have whatever he needed to bring the charges.    And there was a question of

11    whether you'd officially partner or join --

12        A      Uh-huh.

13        Q      -- but, regardless of whether you'd officially partner or join, you'd still

14    facilitate him bringing a case.

15        A      Correct.

16        Q      Okay.    But that's, like, totally different than what he says in the July 2023

17    letter and these letters where he says, if I need to bring charges outside of my district,

18    without the partnership of a local U.S. attorney, you know, I had to go through either 515

19    authority or some other, you know, process.

20              So does he misunderstand, like, what you communicated to him?

21        A      I mean, I can only speculate as to what is going on in his mind.

22        Q      Uh-huh.

23        A      The solution that I just laid out, if we weren't going to put our own AUSAs on

24    the trial team, he might've deemed that inadequate and he might've preferred 515 over

25    that solution.

1          Q      Uh-huh.

2          A      I don't know.    We never had that conversation.

3          Q      Okay.

4          How frequently, in your experience, do you decline to partner when a U.S.

5    attorney from -- you know, AUSA from Maryland or AUSA from Virginia or some other

6    State asks you to partner?

7          A      So it doesn't happen -- it happens; it doesn't happen all that -- well, let me

8    strike that.

9          It's not framed that way.    It is framed as -- and, again, this doesn't happen all that

10   often -- "We have this case that we need to bring," and they're usually not looking for us,

11   in those instances, to staff the cases.    They're usually looking to figure out a way of

12   getting the cases charged in our district.    And we work with them on that, as we offered

13   to work with --

14         Q      Okay.

15         A      -- U.S. Attorney Weiss here.

16         Q      So is it fair to say there's, sort of, two tracks when venue lies outside of your

17   district?    Track one is you join, you partner, you team up; and then, if you join, if you

18   partner, if you team up, you put your AUSAs on the trial team.    Correct?

19         A      No.    I thought you were going to describe two different tracks.

20         Q      Okay.    Well, what are the two tracks, in your mind?

21         A      The two tracks, in my mind, are the AUSAs from the other jurisdiction just

22   come in and handle everything themselves --

23         Q      Okay.

24         A      -- or the other jurisdiction just transfers the case to us and then we

25   prosecute it.

1      Q      Okay.

2      A      I can't think of a situation where it's the hybrid model that you just --

3      Q      Okay.

4      A      -- described, where it's two offices joining --

5      Q      So what was Weiss looking for here?

6      Chairman Jordan.      Yeah.    Was he track one, track two, or hybrid?

7      Mr. Graves.    So, again, this wasn't explicitly said, but he was talking about -- my

8  recollection of the conversation was, he was immediately talking about what he needed

9  to do and the support that he needed to complete that.    So my frame of --

10      Chairman Jordan.    Was it track one or track two?

11      Mr. Graves.    -- my frame of reference, how I'm hearing it, is, he is most focused

12  on getting his charges brought by his people in the District.

13      I am the one that introduces the idea of, "Hey, can we maybe join up with this?"

14  And he says, "We can discuss that."

15      Chairman Jordan.    Well, why would you do that?    If that's not one of the two

16  tracks, why would you do that?

17      And you just told us earlier that U.S. Attorney's Offices, when they're on the

18  receiving end, someone's coming in, they don't like that.    The investigation's been going

19  for 3 years; you've got, as I said before, two cooks in the kitchen then.

20      Why would you offer that?

21      Mr. Graves.    So the giving end, in my experience, rarely -- the end that already

22  has the case very rarely wants to do that, for all of the reasons you just articulated.

23      Chairman Jordan.    Right.

24      Mr. Graves    The end that's on the receiving end of it is looking at things

25  differently.    And I laid out some of the considerations before.

1        Like, you know, particularly in complex matters where there's gonna be a lot of

2    litigation, you can have authority generated in the course of those cases that you're stuck

3    with.   And if you have a bunch of people who aren't from the jurisdiction litigating those

4    issues -- and this has happened to us with Main Justice components before -- that can

5    have massive programmatic consequences for you.

6        Chairman Jordan.   And 3 weeks later, you decided you didn't want to go that

7    route.

8        Mr. Graves.   Yes, that is correct.

9        Chairman Jordan.   Okay.   So you can't have it -- I guess the point we're making

10    is, you can't have it every way.   You can't say there's two tracks, but then you

11    offered -- and you don't like the second track, necessarily, or you do like the second track

12    because it's gonna be in your district and you're gonna work with them, and then 3 weeks

13    later decide you don't want to do it and there's this hybrid model.

14        I mean, that's what's creating all the confusion, not to mention the three different

15    things we got from U.S. Attorney Weiss in the correspondence to Congress.

16        Mr. Graves.   So let me try to unpack everything.   So what I'm talking

17    about -- because we are talking about two tracks in a different context.

18        Putting aside this investigation, the cases that I've typically seen where there has

19    been a venue issue -- a gun case where someone is going back and forth over Eastern

20    Avenue, which is the dividing line between us and Maryland in one quadrant, and the

21    case actually should've been brought in a different jurisdiction -- those cases, the

22    conversations are, are we gonna bring people in as SAUSAs, special assistant United

23    States attorneys, or are we going to transfer the case to the right jurisdiction?   Like, how

24    are we logistically gonna make it work?

25        I agree that, in general, I can't think of a time where in an ongoing case U.S.

1   Attorney's Offices have teamed up.

2          As a career prosecutor, I had a case where I had an investigation, the Southern

3   District of New York had an investigation; the same company was the target of the

4   investigation.    We ultimately agreed that we should do it in one jurisdiction and we

5   would team up and have our resolution together.    But that wasn't talking about trying a

6   case together, which is a different animal.

7          There are a host of reasons not to join an existing -- any existing investigation.

8   There are also countervailing reasons to join an investigation that is gonna come into your

9   jurisdiction that might be of some significance and likely will lead to the creation of

10   binding authority.    And those weigh against each other.    And that's what we had to

11   weigh against each other on an incredibly short and compressed timeframe.

12              BY MR. CASTOR:

13   Q     It's very unusual for Weiss to call you directly, right?    You've only had one

14   conversation during this saga, right?

15   A     So, I mean, I don't know that I'd characterize it as unusual.    I would say, in

16   the past, that when these issues have come up, they've kind of started at the line level

17   and worked their way up.    There are some obvious sensitivities around this one --

18   Q     But, clearly, Weiss called you because he wanted to bring a case in D.C.,

19   right?

20   A     Yes.

21   Q     So he wanted to bring a case in D.C.    And, you know, as I understand what

22   you're saying, there are two tracks:    Either you take over the case for him, or you

23   facilitate him prosecuting the case.

24   A     Yes.

25   Q     So that 3-week process, was that an evaluation of whether you were gonna

1    take the case over for him?

2    A    It was an evaluation of whether we would continue the conversation that I

3    started about whether he'd be open to us joining the case.

4    Q    Okay.    And so would that have been a hybrid model?

5    A    That would've been the rare hybrid model that we were proposing --

6    Q    Okay.

7    A    -- yes.

8    Q    So there are three tracks.

9    A    I've never seen track three before, in all candor.

10    Q    Okay.

11    So Weiss wanted, though -- Weiss wanted to bring the case.    Did he tell you he

12    needed your help, your partnership?    Did he need that hybrid model?

13    A    No.    And that was after our communication -- after we communicated that

14    we were not gonna explore potentially joining the investigation, I never heard anything

15    about that decision.

16    Q    So I think we're just wondering why you couldn't have just facilitated track

17    one and let Weiss bring the case himself with his own U.S. attorneys.

18    A    We could have started in that position.    And that's where we ultimately

19    landed of what we were going to do.    From my perspective, we were back in what we

20    are now calling track one.

21    Q    Uh-huh.    But, unquestionably, I mean, Weiss believed that you had denied

22    him the ability to bring a case in D.C.

23    A    I don't know what he believed, and that's not my read of the letters,

24    necessarily.

25    Q    It's not just what he wrote in the letters.    It's what was related to the

1   witnesses that we have subsequently spoken with -- I mean, all the witnesses, from, you

2   know, the two FBI officials, who aren't whistleblowers by any stretch --

3       A     Uh-huh.

4       Q     -- you know, in addition to the two whistleblowers, and then the IRS officials

5   who are more senior than the whistleblowers, who had direct communication with Weiss.

6       A     Uh-huh.

7       Q     I mean, universally, their understanding was, the D.C. U.S. Attorney's Office

8   denied us the ability to bring the case, or declined to partner, or whatever word you want

9   to use.

10      Ms. Zdeb.   I think those are two separate things.   And I am concerned that what

11  you just said mischaracterizes at least some of the testimony that witnesses have

12  provided.

13      Mr. Graves.   So I have never heard that the ability to go forward was predicated

14  on our decision of whether we should assign one of our own AUSAs to the case or not.

15  Which is essentially what we're talking about:   Are we gonna have an assistant United

16  States attorney from the District of Columbia on the case?

17      Chairman Jordan.   I just want to make -- we can simplify this.   Like, it's either

18  they bring the case or you take over the case.   That's how it's always worked, until this

19  one.

20      And, in this one, there was this hybrid model put forward where -- and it was

21  offered by you.   And you said, we can partner with you, you know, like we're a partner,

22  whatever, we can join with you, we can -- this different model than what's ever been

23  used, this different model.   And then you take 3 weeks to discuss it and decide, no,

24  we're not gonna do that, and it's back to they bring the case.

25      Mr. Graves.   So --

1        Chairman Jordan.   Is that summarizing it?

2        Mr. Graves.   Yeah, so let me clarify.   When I'm saying "not used," it's not

3   something we typically do with other U.S. attorneys -- it's not something we do generally

4   with other U.S. Attorney's Offices, because, in general, U.S. Attorney's Offices don't work

5   together.

6        What I had in the back of my mind and what I've definitely seen before is, when

7   Main Justice components come into our jurisdiction, special counsel's offices come into

8   our jurisdiction, it's not uncommon for us to assign an assistant if that component wants

9   an assistant on those cases as special counsel.

10       Chairman Jordan.   But that wasn't this case.   This is just another U.S. attorney.

11   This wasn't Main Justice; this wasn't a special counsel.

12       Mr. Graves.   It is another U.S. attorney, but it is another U.S. attorney -- this isn't

13   some gun case that happened to go across Eastern Avenue.   This is a white-collar case

14   where they're -- this is a white-collar case where, based on the nature of the charges

15   contemplated, you could expect that there is gonna be a lot of litigation and litigation

16   that might create binding precedent in our jurisdiction.

17            BY MR. CASTOR:

18   Q    Were you aware that a statute of limitations was about to expire?

19   A    I don't think I'm allowed to get into that, given the contours of what I've

20   been authorized to discuss.

21   Q    Were you aware of the nature of the 2014 and 2015 income at issue here

22   that was not reported?

23   A    Yeah, I don't think I'm allowed to get into that, given the contours of what I

24   have been allowed to discuss.

25   Q    But do you know the answer?

1      A      So, again, if I get into that I know the answer, then that's a backdoor way of

2   getting into --

3      Q      I don't think so.    You either know the answer or you don't know the

4   answer, but that doesn't get into the substance.

5      A      Um --

6      Q      If all the restrictions the Justice Department has imposed on you were lifted,

7   would you be able to answer my question?

8      A      So, to be clear, the reason the restrictions exist is because we are trying to

9   protect the integrity of an investigation that is very much ongoing.    Like, what is and is

10  not in that investigation I don't know, and I, candidly, in my role, should not know.

11           So I'm trying to be very careful not to say anything which we acknowledged at the

12  outset might become public that could be deleterious to that investigation.

13     Q      Okay.

14          Can I have that exhibit?

15          This is exhibit 4?

16          The Reporter.    Uh-huh.

17          Mr. Graves.    Well, this is convenient.

18          Mr. Castor.    Yeah.

19                              [Graves Exhibit No. 4

20                              Was marked for identification.]

21          BY MR. CASTOR:

22     Q      This is an email from Eric Schwerin, one of Hunter Biden's business

23  associates.

24     A      Uh-huh.

25     Q      In the fourth paragraph -- take your time reading it.    I'm gonna direct your

1      attention to the fourth paragraph, though, when you're ready.

2           A     Okay, I've read it.

3           Q     Page 2 is an easier one to read.

4           A     Yes, page 2 was very easy to read.

5           Q     Were you aware that, in 2014 and 2015, in the Hunter Biden case -- we're

6      talking about the Burisma income.     I mean, he's making, like, a million bucks a year for

7      doing nothing except, potentially, political favors.

8           Were you aware that the 2014 and 2015 income hadn't been captured for tax

9      purposes?

10          A     So, again, I appreciate -- and I'm reviewing the exhibit.     Again, I can't get

11     into the ongoing investigation and facts that were considered and not considered during

12     the course of it, because it gets into our internal deliberations.

13          Q     Last hour, Democratic counsel asked you -- you know, you were talking

14     about how intent is very tricky with tax cases sometimes.     Is that right?

15          A     Yes, it can be, in general.

16          Q     Okay.     But if you have an email from your business partner whose -- you

17     know, Eric Schwerin's job was to manage this money for Hunter Biden.     If you have an

18     email to the potential defendant which states, "In 2014" -- this is the fourth paragraph

19     down, second sentence of the fourth paragraph.

20          "In 2014 you joined the Burisma board and we still need to amend your 2014

21     returns to reflect the unreported Burisma income.     That is approximately $400,000 extra

22     so your income in 2014 was closer to [$1.2 million]."

23          This is a pretty good piece of evidence that goes to intent, isn't it?

24          A     So what I can say in general, in the context of -- in general about tax returns

25     is, in my experience, individuals who have businesses and complicated taxes are not

1    preparing their tax returns themselves.    There is a tax-return preparer.    So, in tax cases

2    in general, it often comes down to what was and was not communicated to the tax

3    preparer --

4             Q    Okay.

5             A    -- and what the taxpayer directed others to tell.

6             Q    Uh-huh.

7             A    So it could be that you have a communication where someone is talking

8    about income.    Well, then you have to trace down, did the taxpayer expect that person

9    to tell the tax preparer?    Did the person actually forward the --

10            Q    Okay.

11            A    -- document to the tax preparer and it --

12            Q    I mean, you sound --

13            A    -- got lost?

14            Q    -- like a defense attorney for Hunter Biden.

15            A    No, but this is -- but, like, this is very serious.    This is what you have to do as

16   a prosecutor.

17            Q    Right.

18            A    You have to think through all the defenses and how we're going to disprove

19   it.

20            I have to go down and deal with, if I'm in a tax case like this, saying, "In addition,

21   you reported a million dollars of income that all went to RSB, and you report 180,616 --

22            Q    Right.

23            A    -- in income that also went to RSB.    You didn't receive this in cash, and it is

24   really phantom income.    So, like, I have questions about, did you over-report?"    And all

25   of that gets complicated in a tax-evasion scheme.

1     So that's just one example of --

2     Q     But Schwerin is telling Hunter Biden, "You didn't report your Burisma

3  income."   He's getting a million bucks a year -- you know, $83,000, I think, a month.   I

4  mean, isn't this at least a good piece of evidence that goes to intent?

5     A     I can't judge from the outside of the investigation.   I'd also note that this is

6  in 2017, so it's clearly some retrospective.   I'd have questions about whether the taxes

7  were paid, because that could be consistent with a good-faith mistake.   So it's very

8  complicated.

9     Q     Okay.

10     During your discussions with your team in March of 2022, was statute of

11  limitations brought up?

12     A     Again, I can't get into internal deliberations.   What I can say at a very high

13  level -- and I have acknowledged today, we were -- I instructed my team to operate on a

14  very tight and compressed timeframe and to do the best we could do.   And that wasn't

15  arbitrary, that we were doing that.

16     Q     Do you think Weiss and his team believed you had a gatekeeper role here?

17     A     I don't know.   I had always assumed not, because of the steps we were

18  taking to facilitate the bringing of charges.

19     Q     What did your team tell you about the result of the -- you had your meeting

20  March 19th.   Your team then communicated to the U.S. Attorney's Office in Delaware

21  the outcome of that meeting, that you weren't gonna join, you weren't gonna partner.

22  What feedback did you get from your team about how Weiss reacted?

23     A     So, to my understanding, U.S. Attorney Weiss was not part of that

24  conversation that occurred at the career level.

25     Q     Okay.

1          A      At a high level, what I can say is, there certainly weren't concerns raised

2    about an inability to go forward if we didn't assign an assistant to the case.

3          Q      Uh-huh.

4          A      And to the extent substance of the investigation and that kind of stuff was

5    discussed, there was nothing that I learned that was new --

6          Q      Okay.

7          A      -- that was from that conversation.

8          Q      Do you think Weiss thought he needed a D.C.-based U.S. attorney from your

9    office on the trial team?

10         A      So I'd always been under the impression -- my belief was, no, he didn't think

11   that.

12         Q      Okay.

13         A      Because, remember, when I raised, would you be open to us adding

14   someone, he said that's something we would discuss.    It wasn't, like, "Absolutely.    We

15   can't go forward without you adding someone."

16         Q      Right.

17         A      That was not the response that I recall.

18         Q      Okay.    So, then, were you surprised when you saw his letters, which -- you

19   know, the plain language of the letters indicates that he thought he needed you.

20         A      I don't read the letters that way, necessarily, collectively.    I read the letters

21   as saying either I was gonna partner with them, whatever partnership looks like --

22         Q      Uh-huh.

23         A      -- whether that's just them kind of making my people special assistants or

24   them adding an assistant to the case so that we're full-fledged partners --

25         Q      Uh-huh.

1          A      -- or I was gonna get authority under 515.    And I knew that I would get

2    authority under 515, because the Attorney General told me, if it came to that, he would

3    do that.

4          Q      Uh-huh.

5                 Who is J.P. Cooney?

6          A      He is a career prosecutor who was in our office.

7          Q      Is he one of the people involved with the March 19th meeting?

8          A      So, again, I'm gonna go through Office of Legislative Affairs in, kind of,

9    providing specific names.

10         Q      I mean, I just want to know if he was involved with this particular meeting.

11   Was he one of the four -- he was not the principal assistant, we know that, right?

12         A      So --

13         Ms. Zdeb.    I'm sorry.    I think what Mr. Graves has said a couple of times now is

14   that, to the extent you have questions about individuals --

15         Mr. Castor.    I do.

16         Ms. Zdeb.    -- who participated, that we are happy to discuss those with you

17   offline, but, given the concerns he has expressed about the safety of his prosecutors, that

18   we would prefer not to discuss names --

19         Mr. Castor.    Yeah.    I'm very sensitive --

20         Ms. Zdeb.    -- in a transcript -- in a transcript.

21                BY MR. CASTOR:

22         Q      I'm very sensitive to safety concerns, but come on.    I'm asking you whether

23   J.P. Cooney was in the March 19th meeting.    Let's get real.    That's not going to, you

24   know, invoke safety concerns here.

25         A      What I can tell you is, I've unfortunately had way too many instances of

1   documents getting into the public domain that have our prosecutors' names in them and

2   me receiving what we call urgent reports about security concerns because of threatening

3   or harassing behavior that they're receiving --

4          Q       Uh-huh.

5          A       -- and that we've had to take steps for a number of people in our office to

6   mitigate the risk.

7          Q       Okay.   So you're refusing to acknowledge whether he was in this March

8   19th meeting?

9          A       I am laying forward what I would believe to be a very reasonable

10  accommodation, not to have this in a transcript which we all acknowledge might become

11  public at some point in time.

12         Q       Okay.   Do you want to go off the record and tell us?

13         Ms. Zdeb.   Are you going to redact his name?

14         Mr. Castor.   I said go off the record and you can tell us.

15         Ms. Zdeb.   Why don't we take this question back, Steve?

16         Mr. Castor.   So you're not willing to go off the record and tell us; then it wouldn't

17  be in the transcript.    And then -- so it's like a totally different answer now.

18         Mr. Graves.   So --

19         Mr. Castor.   I'm inviting you to go off the record, and then it's not in the

20  transcript.

21         Ms. Zdeb.   The scope of what he's here to talk about and --

22         Mr. Castor.   That's a whole different topic.

23         Ms. Zdeb.   Well, I understand, but he has been here for some time now

24  discussing --

25         Mr. Castor.   It's 1 o'clock.   It's not been that long.

1        Ms. Zdeb.    -- the scope of Mr. Weiss's authority and --

2        Mr. Castor.    Right.

3        Ms. Zdeb.    -- the issue of the perception or lack thereof of him being blocked in

4    the District.

5        Mr. Castor.    Uh-huh.

6        Ms. Zdeb.    It does not explicitly include the name and identity of every person in

7    his office or any other office that may have participated in that process.

8        Mr. Castor.    But when I first started asking about the 3/19 meeting, I was told

9    that, yeah, you can have the names, you just can't do it on the record.

10        So now I'm inviting everyone to go off the record to give us the name, and now I'm

11    getting a different answer, correct?

12        Ms. Zdeb.    I think what he said was, let's confer -- why don't you confer with the

13    Office of Legislative Affairs.

14        Mr. Castor.    I'm conferring with you right now.

15        Ms. Zdeb.    And we are happy to continue conferring after the interview is done.

16        Mr. Castor.    Okay.    So you're not willing to go off the record and tell us.

17        Ms. Zdeb.    I'm not willing to do that right now, given the concerns that have

18    been expressed.

19        Mr. Castor.    Okay.

20        We've got, like, a minute left, boss.    Got anything else?

21        Chairman Jordan.    Off the record.

22        Mr. Castor.    Okay.    We're done with our hour.

23        Mr. Graves.    Great.

24        [Recess.]

25        ██████.    It is 1:16.    We can go back on the record.

1           BY ███████:

2           Q     U.S. Attorney Graves, we had talked through the letters that Mr. Weiss sent

3    to Congress in the prior hour pretty extensively, but I don't think the letters were actually

4    put in front of you at any stage.    So I want to walk through the letters themselves and

5    just ask you if you have any information that contradicts them.

6           So we will start with the June 7, 2023, letter from Mr. Weiss to Chairman Jordan.

7    We'll mark that as exhibit 5.

8                             [Graves Exhibit No. 5

9                             Was marked for identification.]

10          Mr. Graves.    Okay, I'm prepared.

11          BY ███████:

12          Q     Have you seen this letter before?

13          A     I have.

14          Q     Okay.    And so you know that this letter, it's actually -- it's a response that

15   Mr. Weiss sent to a May 25th letter from Chairman Jordan.

16          A     I see that in the body of the letter.    I have not seen the May 25th letter.

17          Q     Okay.    And this letter is a response to Chairman Jordan's letter about the

18   matter involving, among others, Robert Hunter Biden, correct?

19          A     That is my understanding from reading the June 7th letter, correct.

20          Q     Okay.

21          The second paragraph of this letter reads, quote, "While your letter does not

22   specify by name the ongoing investigation that is the subject of the Committee's

23   oversight, its content suggests your inquiry is related to an investigation in my District.

24   If my assumption is correct, I want to make clear that, as the Attorney General has stated,

25   I have been granted ultimate authority over this matter, including responsibility for

1    deciding where, when, and whether to file charges and for making decisions necessary to

2    preserve the integrity of the prosecution, consistent with federal law, the Principles of

3    Federal Prosecution, and Departmental regulations."

4             Did I read that correctly?

5        A    You read that correctly.

6        Q    Are you aware of any information which contradicts Mr. Weiss's statement

7    that he was granted ultimate authority over this matter?

8        A    No.

9        Q    Are you aware of any information that contradicts Mr. Weiss's statement

10   that his authority over this matter includes responsibility to decide where, when, and

11   whether to file charges?

12       A    No.

13       Q    And are you aware of any information that contradicts Mr. Weiss's

14   statement that his authority over this matter includes making all decisions necessary to

15   preserve the integrity of the prosecution?

16       A    No.

17       Q    And I want to turn to the last paragraph of this letter, which is actually on

18   page 3 of the letter.

19            That paragraph reads, quote, "In February 2021, I was asked to remain as United

20   States Attorney for the District of Delaware to continue my oversight of the matter.

21   Since that time, I have fulfilled my responsibilities, consistent with Department practices

22   and procedures, and will continue to do so.    Throughout my tenure as U.S. Attorney my

23   decisions have been made -- and with respect to the matter must be made -- without

24   reference to political considerations."

25            Did I read that correctly?

1          A     You read that correctly.

2          Q     Are you aware of any information that contradicts Mr. Weiss's statement

3    that his decisions in this matter have been made without reference to political

4    considerations?

5          A     I am not aware of any such information.

6          Q     Okay.

7          So, following Mr. Weiss's June 7, 2023, letter, Chairman Jordan wrote to Mr. Weiss

8    directly.    Mr. Weiss responded on June 30, 2023, and I'm going to introduce that letter

9    as exhibit 6.

10                                    [Graves Exhibit No. 6

11                                    Was marked for identification.]

1      [1:21 p.m.]

2              Mr. <u>Graves.</u>    All right.

3                      BY █████████:

4      Q     Have you seen this letter before?

5      A     I have.

6      Q     Okay.    The third paragraph of this letter reads:    First, the Department of

7   Justice did not retaliate against, quote, an Internal Revenue Service, IRS, criminal

8   supervisory special agent and whistleblower, as well as his entire investigative team, for

9   making protected disclosures to Congress.

10            Are you aware of any information that contradicts this statement?

11     A     I am not.

12     Q     The June 30th letter then quotes his June 7th letter.    That's at the bottom

13   of the first page.

14     A     Yeah.

15     Q     And then it continues on, on the second page.    As the U.S. attorney -- I'm

16   sorry.

17            It says that:    I stand by what I wrote and wish to expand on what this means.

18            And then it continues:    As the U.S. attorney for the district of Delaware, my

19   charging authority is geographically limited to my home district.    If venue for a case lies

20   elsewhere, common departmental practice is to contact the United States Attorney's

21   Office for the district in question and determine whether it wants to partner on the case.

22   If not, I may request special attorney status from the Attorney General pursuant to 28

23   U.S.C., section 515.    Here, I have been assured that, if necessary after the above process,

24   I would be granted section 515 authority in the District of Columbia, the Central District of

25   California, or any other district where charges could be brought in this matter.

1          Did I read that correctly?

2     A     You read that correctly.

3     Q     Are you aware of any information that contradicts Mr. Weiss' statement that

4     he was assured that he would be granted by section 515 authority if another U.S.

5     Attorney's Office declined to partner with him on the case?

6     A     I am not aware of anything that contradicts that statement.

7     Q     And, finally, Senator Lindsey Graham, who is the Republican senior ranking

8     member on the Senate Judiciary Committee, wrote to Mr. Weiss on June 28, 2023, and

9     Mr. Weiss responded on July 10th, 2023.

10          █████████.   We'll introduce that as exhibit 7.

11                              [Graves Exhibit No. 7

12                              Was marked for identification.]

13          Mr. Graves.    Okay.

14     Q     The first sentence of the third paragraph on the first page of this letter

15     reads, quote:    To clarify an apparent misperception and to avoid future confusion, I wish

16     to make one point clear.    In this case, I have not requested special counsel designation

17     pursuant to 28 C.F.R., section 600, et seq.

18          28 C.F.R., section 600, et seq, gives the Attorney General authority to appoint a

19     special counsel, correct?

20     A     Yes.

21     Q     Okay.    Are you aware of any information that contradicts Mr. Weiss'

22     statement that, as of July 10th, 2023, the date of this letter, he had not requested special

23     counsel designation pursuant to 28 C.F.R., section 600, et seq?

24     A     I am not.

25     Q     Okay.    The July 10 letter continues, quote:    Rather, I had discussions with

1    departmental officials regarding potential appointment under 28 U.S.C., section 515,

2    which would have allowed me to file charges in a district outside my own without the

3    partnership of the local U.S. attorney.    I was assured that I would be granted this

4    authority if it proved necessary.    And this assurance came months before the October 7,

5    2022, meeting referenced throughout the whistleblower's allegations.    In this case, I've

6    followed the process outlined in my June 30 letter and have never been denied the

7    authority to bring charges in any jurisdiction.

8         Did I read that correctly?

9    A    Yes, you did.

10    Q    To the best of your knowledge, is it accurate that Mr. Weiss was never

11    denied the authority to bring charges in any jurisdiction?

12    A    Yes.

13    Q    And is it true specifically with respect to the District of Columbia that Mr.

14    Weiss was never denied authority to bring charges in the District of Columbia?

15    A    Yes.

16    Q    Okay.

17         BY ▓▓▓▓▓▓▓:

18    Q    Okay.    Mr. Graves, on September 20th of this year, Attorney General

19    Garland testified before the House Judiciary Committee, and he told the committee that,

20    quote:    Mr. Weiss has full authority to conduct his investigation however he wishes,

21    unquote.

22         Do you have any information to contradict that portion of the Attorney General's

23    statement?

24    A    No.

25    Q    The Attorney General also said, quote:    Mr. Weiss had, as I said from the

1    beginning -- at the very beginning -- that he had authority over all matters that pertain to

2    Hunter Biden, end quote.

3         Do you have any information to contradict the Attorney General's statement in

4    that respect?

5         A    No.

6         Q    To sum up, do you have any reason to believe that David Weiss lied to

7    Congress about the extent of the authority -- excuse me, not Weiss -- but that the

8    Attorney General had lied to Congress about the extent of the authority he had been

9    granted?

10        A    Absolutely not.

11        Q    I want to ask you just a little bit -- there's some confusion, I think, on this

12   committee and in the public about the authority that Mr. Weiss had.

13        And do you understand, just generally as a prosecutor, the difference between a

14   factual question and a legal question?

15        A    Yes.

16        Q    And generally, witnesses who are involved in testimony like you are today

17   are asked factual questions, correct?

18        A    Correct.

19        Q    But we may have to ask you a legal question, if you wouldn't mind giving me

20   a little bit of latitude here, because it seems to me that the confusion is a legal question

21   and not so much a factual question.

22        There, in the previous hour, were suggestions that the Attorney General may not

23   have had the authority in some respect under statutes to allow Mr. Weiss to bring

24   charges in the District of Columbia.    Do you recall those questions or suggestions from

25   the previous hour?

1       A      Yes.

2       Q      Okay.

3       A      Yes.

4       Q      And, I mean, as you sit here before us, you don't have a statute in front of

5   you, but you do have the experience of being a United States attorney in the District of

6   Columbia, correct?

7       A      Correct.

8       Q      Okay.

9       ██████.    I'm going to show you what we're going to mark as exhibit 8, and this

10  is a statute.

11                              [Graves Exhibit No. 8

12                              Was marked for identification.]

13              BY ██████:

14      Q      It's 20 U.S.C., section 509.    Just the first page, I think, is what you'll have in

15  front of you.

16              Let me ask you first, are you familiar with this statute, Mr. Graves?

17      A      I am not.

18      Q      Okay.    Just direct your attention to section 509, which is the bold part of

19  the first column.    It's entitled "Functions of the Attorney General."

20              If you just want to review that brief section.

21      A      Yes.

22      Q      Let me know when you've had a chance to see it.

23      A      Yes.

24      Q      Okay.    Now, this statute says, quote:    All functions of other officers of the

25  Department of Justice and all functions of agencies and employees of the Department of

1    Justice are vested in the Attorney General except these functions.

2         And then it lists, under paragraph 1 there, vested -- those vested by subchapter 2

3    of chapter 5 of title 5, administrative law judges?

4    A    Yes.

5    Q    And then it accepts certain responsibilities in the Federal Prisons Industries,

6    correct?

7    A    Correct.

8    Q    And, finally, it accepts certain responsibilities in the board of directors and

9    offices of the Federal Prison Industries, Inc., correct?

10   A    Correct.

11   Q    But everything else, at least according to this statute, is vested in the

12   Attorney General by 28 U.S.C 509, correct?

13   A    Correct.

14   Q    Okay.    Based on your experience as a lawyer and particularly a United

15   States attorney in your reading of the statute, is there any reason that you would have to

16   believe that Attorney General Garland did not have the authority to delegate to Mr.

17   Weiss the ability to bring any criminal charges against Hunter Biden anywhere in the

18   United States in any venue he chose?

19   A    I'd have no reason to doubt that the Attorney General has that authority,

20   and it is my belief that the Attorney General has that authority.    We all act at the

21   direction of the Attorney General unless the Attorney General directs us to do something

22   illegal, immoral, or unethical.    We have an obligation to file.    And, to be clear, the

23   Attorney General has never directed me or anyone else, to my knowledge, to do anything

24   illegal, immoral, or unethical.

25   Q    Okay.    So we talked at length about certain policies of the Department of

1    Justice and certain, I guess, procedures that are outlined in the Justice Manual.    For

2    example, in tax cases that you might have to go to the Tax Division to get certain

3    approvals or permissions.

4        All of that approval or permission of policy, those are policies that are at the

5    discretion of the Attorney General of the United States.    Is that fair to say?

6    A    That is my understanding, yes.

7    Q    Okay.    So, if he promises to Congress -- the Attorney General, that is -- that

8    Mr. Weiss is going to have the authority to bring any charge anywhere in the United

9    States in any district, there's no reason, as far as you understand it, that that was not the

10   case here?

11   A    Correct.    And he has the authority to deliver on that -- he uniquely has the

12   authority to deliver on that commitment.

13   Q    Okay.    And I think that when Mr. Castor earlier was going through his

14   interpretation of Weiss' letters before we had entered them into the record, he was

15   suggesting to you that Attorney General Garland couldn't have promised Weiss the

16   authority that he said he did because of section 515, for example, or because of these

17   policies in the Justice Manual that talk about approvals from the Tax Division.

18       But Mr. Garland has explained that what he meant was:    Mr. Weiss had the

19   authority because I said I would give it to him.

20       Do you have any reason to believe that Mr. Garland was being insincere in that

21   respect when he said that Mr. Weiss did have that authority?

22   A    Absolutely not.

23   Q    Okay.

24       BY ███████:

25   Q    There was discussion earlier about option one, option two, option three.

1    And I lost a little track of it, but I think option one was just offering administrative

2    assistance, and that's it.

3            And there was a statement made that, ultimately, you did offer administrative

4    assistance, but it came at the end of this 3-week period.    But that wasn't accurate, right?

5        A    That is -- that is correct that that was inaccurate.

6        Q    Okay.    So when did you agree to provide any logistical or administrative

7    support that Mr. Weiss could need?

8        A    From the first call that Mr. Weiss made to me, we immediately began taking

9    steps on providing support.

10        Q    And he was aware that you were doing that?

11        A    My understanding is, yes, his people were made aware of what we were

12    doing and -- yes, of what we were doing.

13        Q    Okay.    And I think you said you could have declined to do that, correct?

14        A    Yes.

15        Q    And you used the phrase:    You could have said I wasn't going to give him

16    my grand jury, for example.

17        A    Yes.    Yes.    In theory, yes.

18        Q    Okay.    Can you explain broadly how it works when you let another U.S.

19    Attorney's Office or somebody or a Main Justice component use the grand jury?

20        A    So we often refer to the grand jury.    In actuality, at least in the District,

21    there are multiple grand juries sitting at any point in time.    We maintain a schedule of

22    the grand jury.    So, if you want time before a grand jury, you have to go to the

23    scheduler.    If you're coming from our office and they know who you are, you can

24    request your time, and that's how you get authority to enter the grand jury.

25            If you're coming from a Main Justice component and we've what we call

1    deconflicted with them, and they're going it alone in our jurisdiction, they can reach out

2    to our coordinator, and our coordinator knows that it is a case that has been authorized

3    to be brought in our district.    That's generally the process you have to follow.

4          You can't just show up at the Federal courthouse and say:    I'm a Federal

5    prosecutor and I'd like to go into a grand jury now.

6          Q      So, in addition to potentially making it possible for Mr. Weiss to schedule

7    time before the grand jury, was there any other logistical or administrative support that

8    you were offered to provide or, you know, could have provided?

9          A      So I can't get into the specifics here.    I think one thing I could generally note

10   is the extremely high number of Federal district court cases that were being brought in

11   that period of time.    There were a lot of logistical demands on the court.    So taking

12   steps to find available time is not -- was not necessarily an easy thing.

13         Q      Okay.    And so by saying "I will give you whatever support you need," what

14   you meant is:    If you need time before a grand jury, we will make that happen.    If you

15   need trial time or if you need time before a judge, we can make that happen.    Right?

16         Ms. Zdeb.    And I'm sorry.    But I think he can answer that hypothetically with

17   respect to such a conversation with any prosecutor looking to come into here, but I want

18   to be very careful not to get into specific steps that he may or may not or that his team

19   may or may not have offered to make available in this case.

20         Mr. Graves.    Yeah.    And so -- and I think I can clear this up even without going

21   to the hypothetical to more just, like, general.

22         As I recall the conversation, my question is -- was:    What do you need?

23         And my attitude was:    Of course we're going to provide it to you.

24         So, you know, how he heard it, what he expected, and the long litany of things

25   one could need in returning, I don't know, but I could just say my immediate response is,

1    "What do you need"; I was trying to signal we will give you whatever you need logistically.

2         BY ██████████:

3    Q    And you never heard anything from Mr. Weiss directly suggesting that he

4    thought he would not get the support that he needed from your office?

5    A    I never heard anything from him directly, and I never indirectly heard they

6    thought that something we were doing in D.C. was preventing them from taking some

7    step that they wanted to take.

8    Q    Okay.   And you said that, after the March 19th meeting or the meeting that

9    took place approximately on March 19th -- after your team made the decision not to join

10   the case, that was relayed back to Mr. Weiss?

11   A    So I didn't get into the specifics because I'm precluded of what happened at

12   the March 19th and what the decision was.

13        I said what my direction to the team was when they were tasked.   I said that

14   there was a conversation.   And then after that meeting was when we conveyed to the

15   District that we would not be looking -- when we conveyed to Delaware that we wouldn't

16   be looking to add our own prosecutor to the case.

17   Q    Thank you for that clarification.

18   A    Yeah.

19   Q    So that information was relayed back to Delaware late March 2023

20   approximately?

21   A    I believe so.

22   Q    Or 2022.   I'm sorry.

23   A    2022.   Yes.   I believe so.   And I'm kind of going off of a calendar entry for

24   the March 19th date to help me kind of -- whatever it is -- a year and a half after the

25   fact -- kind of repiece together the chronology.

1       Q      Okay.   And you said, based on what was occurring at that time -- again,

2   getting back to the question of logistical support.

3          You said, based on what was occurring at that time, there could be no doubt that

4   Weiss knew he had the administrative and logistical support that he needed?

5       A      So, from my perspective, based on what we were doing, I would be surprised

6   if he didn't think he had -- I would be surprised if he didn't know that we were serious

7   about providing the support that he needed to get the case indicted if he wanted to indict

8   the case.

9       Q      And is that because support had been provided at that stage?

10      A      It was because of specific steps that we had taken, yes.

11      Q      Okay.   Have you ever had a case where -- and I'm sorry.   I'm talking about

12  grand juries broadly, not with respect to this or any other case.

13         Grand juries serve a number of functions, right?

14         So they can return a true bill?

15      A      Correct.

16      Q      But grand juries can also authorize certain investigative steps to be taken,

17  right?

18      A      So you would technically need to have an open grand jury matter to cut

19  grand jury subpoenas, for instance.   Yes.

20      Q      Okay.   Have you ever had a case where a grand jury has declined to issue

21  an indictment?

22      A      I am sure, at some point in time, I've seen a no-true bill.   I can't think of a

23  specific instance off the top of my head.

24      Q      But it does happen?

25      A      It does happen.

1      Q      And if the grand jury declines to take that step, then the case is effectively

2   over, right?

3      A      It's a little bit more complicated than that, but that would be a serious

4   impediment to overcome.

5      Q      And short of returning a true bill, as you said, you have to have an open

6   grand jury to take certain investigative steps, correct?

7      A      Yes.    You are supposed to have an open grand jury before you issue any

8   grand jury subpoenas in connection with that investigation.

9      Q      And so, if a grand jury subpoena -- sometimes those grand jury subpoenas

10   are issued, and that brings back returns with relevant information for the case, correct?

11     A      Correct.

12     Q      And that can help inform whether to move forward with the case, correct?

13     A      That is correct.

14     Q      Okay.    All right.    I want to move on to something else that you've referred

15   to a couple times over the course of today.

16         In the very first hour, you said that you were already dealing with enough threats

17   to your career prosecutors?

18     A      Yes.

19     Q      And, in the last hour, you referenced urgent concerns being brought to your

20   attention about threats to the prosecutors.    And I want to go through both of those

21   statements in a little bit of detail.

22         What is an urgent concern?

23     A      So we have a mechanism within the Department for filing what we call

24   urgent reports, which is when something of significance needs to be elevated.    And one

25   of those things is when there is a threat on prosecutors.

1        Q        And, when you receive an urgent concern, what's the response in your

2    office?

3        A        So we have a district office security manager -- DOSM is what we call

4    them -- who helps to ensure our safety.    We also have Federal 1811 agents who are in

5    our office.    We, in general --

6        Q        Sorry to interrupt you, but what is an 1811 agent?

7        A        Sorry.    They are agents who are authorized to -- with arrest authority and

8    to carry firearms.

9        Q        Thank you.

10        A        They will often be alerted -- an assessment will be done of a security

11    situation in terms of, like, how credible the threat is, and then there will be mitigation

12    measures that are put in place depending on how credible the threat is.

13        Q        When you previously served in the U.S. Attorney's Office as a line attorney,

14    were you aware of urgent concerns being brought to the office?

15        A        Yes.    I mean, we prosecute -- in, like, violent crime context -- cartels and

16    gang members, and there have been times when people who have done violent crime

17    cases where an assessment has been done that security measures had to be

18    implemented.

19        Q        In your time now as a U.S. attorney, would you say that there are more

20    urgent concern matters being brought to your attention than in your time previously as a

21    line attorney?

22        A        So, in my prior role, I wouldn't have had visibility into the totality and all of

23    that.    I mean, from what I hear from those that did, though, yes, there are

24    greater -- there are a greater number of threats, and the nature of the threat is more

25    pervasive than what we've seen in the past.

1        Q       What do you mean by "more pervasive"?

2        A       So, in what I was used to and what I saw before, if you were prosecuting a

3    gang, a threat potentially could emanate from that gang, right?    And so there is one set

4    of mitigation measures for that.

5              What we're seeing now is individuals from across the country who are not directly

6    affiliated with any of the subjects of our investigation engaging in threatening and

7    harassing conduct, which is harder to get your arms around because you know you're

8    seeing effectively the tip of the iceberg.    You know that this is -- the sentiment is out

9    there.    That people are trying to fuel the sentiment of stoking ire against these

10   dedicated civil servants.    And you really don't even know the extent of it because it's not

11   group-affiliated.

12             If I am prosecuting a crew, I know the people -- you generally know who is in the

13   crew, and it's easier to take mitigation measures there.

14       Q       Have you had to take specific mitigation measures to protect the

15   prosecutor -- and I don't want to get into specific cases, but have you had to take broadly

16   mitigation measures to protect the prosecutors in your office?

17       A       Yes.    We've had to do that, and I personally have had to do that.

18       Q       For yourself?

19       A       Yes.

20       Q       Do you have concerns sitting here today for the safety of your office's

21   employees?

22       A       Yes.    Yes.    Absolutely, which is why I am so hesitant to put on a public

23   record of a document -- that we all acknowledged at the outset might become

24   public -- individual names because, given the subject matter, the trajectory I've seen is as

25   soon as those individual names get out in the public, there's immediately, at a minimum,

1    harassing, if not legally threatening conduct that ensues.

2         Q    And, sitting here today, do you have concerns for your own personal safety?

3         A    Less of concerns for my safety than for my people's safety.    More concerns

4    for my family's safety than my safety.

5         ██████.    Okay.    All right.

6    We can go off the record.    Thank you.

7    [Discussion off the record.]

8    Mr. Castor.    Back on the record.    It's 1:45.

9              BY MR. CASTOR:

10        Q    A couple questions about January 6 cases.

11             How many prosecutors do you have working on January 6 cases?

12        A    So we have less than 3 percent of our full-time prosecutors working on

13   January 6 cases currently.

14        Q    What's that number?    3 percent of 400?

15        A    So it's 3 percent of, like, 370.    We have less -- we have fewer than 10

16   people who all they do full time is work on January 6.    There are a number of term

17   AUSAs who are specially designated for a brief period of time who we otherwise wouldn't

18   have and people who are on detail from other components that are prosecuting those

19   cases.

20        Q    Can you give us any insight into the Ray Epps case and why he's only been

21   charged with one count of disorderly -- or disruptive conduct?

22        A    So I obviously can't get into an ongoing investigation.

23        Q    Okay.    There's been some public outcry over some of the defendants, little

24   old ladies, that have been sentenced to long prison terms.    What's your response to

25   that?

1       A       So, without getting into any specific case, what I can say is, to my knowledge,

2   every sentence that we have asked for in the context of our January 6 cases has been

3   compliant with the United States sentencing guidelines, which is where we start our

4   analysis and, in this context, end our analysis.

5       Q       So the age of a defendant isn't something you consider?

6       A       So you, under what we call the 3553 factors, can consider personal

7   characteristics of a defendant, but the sentencing guidelines themselves -- which is where

8   we're supposed to begin our sentencing analysis -- do not take into account the

9   individual's age.

10      Q       January 6 defendants haven't been awarded time served.    Why is that?

11      A       I am not aware of that.    I think they have.

12      Q       They have been awarded time served?

13      A       Yes.

14      Q       So they've been held pending trial?

15      A       Yes.    It should be automatic.    Yes.

16      Q       Okay.    How many individuals are you currently trying to hunt down for

17  January 6-related crimes that you haven't indicted yet?

18      A       So the FBI has received numerous tips about individuals who illegally -- not

19  only illegally entered the Capitol Grounds that day because the grounds outside the

20  Capitol are restricted, but the building itself -- and/or engaged in acts of violence or

21  destruction.    There are estimates that there were thousands of individuals who might

22  fall into that category.

23          The Attorney General said we will seek to hold individuals accountable for their

24  conduct.    Those -- FBI continues to investigate those leads, and we continue to assess

25  the results of their investigative fruits.

1    Q    So how many people are you currently in the process of hunting down or

2    collecting that you haven't indicted yet?

3    A    So there's no, like, set figure out there of we have to get this many people.

4    We are getting cases and considering cases as they're being presented to us, and if we

5    think -- consistent with the principles of Federal prosecution that we discussed

6    today -- the prosecution is warranted, we're going to go forward.

7    Q    Okay.   Have you been prosecuting individuals that were on the Capitol

8    Grounds but not -- that did not enter the building?

9    A    Usually, for those prosecutions, it's only if there is some type of what we

10   would call aggravating factor:    assaultive conduct, destructive conduct, interfering with

11   police officers, inciting others to enter the building even if you haven't yourself entered

12   the building.

13   Q    And what's the charge for somebody that is accused of inciting others to

14   enter the building?

15   A    So everybody -- to be clear, everybody who was on Capitol Grounds in the

16   context of January 6 -- there is probable cause that they have violated 18 U.S.C. 1752, and

17   we are exercising our prosecutorial discretion not to charge most of them.

18   Q    But there's an intent element, if they didn't know the Capitol Grounds were

19   closed?

20   A    Oh, absolutely.    We have to prove that in all the cases.    But in those

21   cases -- and it is the most photographed crime scene ever.    There are bike racks that are

22   overturned, snow fencing that's overturned, officers that are trying to restrict, alarms

23   blaring.   It's not that difficult to prove.

24   Q    What's the charge for inciting others to enter the building?

25   A    So, again, we're choosing to -- I mean, you can charge a number of different

1    of things, but you have to come back to the first principle of, just by being out there, even

2    if you weren't inciting anyone else, there is a valid 1752 charge there.

3         Q    But what are some of the charges one could be charged with for inciting

4    others to enter the building?

5         A    It depends on the evidence.    It could be -- depending on the fact-specific

6    evidence, you could have an 18 U.S.C. 231.    You could also have an 18 U.S.C. 1512.    It

7    just depends.

8         Q    And what are they?    What are those two?

9         A    1512 is obstruction of an official proceeding, and 231 is civil disorder.

10        Q    And what are the penalties for those?

11        A    Well, there are statutory maximums, and then there's guidelines.    The 231,

12   the statutory maximum is a 5-year penalty.    18 U.S.C. 1512 is a 20-year maximum.    But

13   the guidelines in general are nowhere near the maximums, particularly for the 1512.

14        Q    Mr. Epps was, you know, photographed on video -- captured on video

15   encouraging people to go into the Capitol.    It's pretty demonstrative.    Have you seen

16   that video?

17        A    I believe I've seen some video, but to where your ultimate question is, I can't

18   get into the specifics of Mr. Epps' prosecution.

19        Q    Have you seen the public video, though, about Mr. Epps?

20        A    I believe I've seen some at some point in time.

21        Q    But he hasn't been charged with 1512 obstruction?

22        A    No.    That is not the current charge.    That is not the charge.

23        Q    And he hasn't been charged with 231, has he?

24        A    No.    That is not the charge.

25        Q    Okay.    So he's not facing a 5-year penalty or a 20-year penalty?

1     A     No.    That's not the statutory maximum.

2     Q     But others in similar circumstances have been facing those?

3     A     Again, I can't get into the specifics of his prosecution.    But I would say, in

4     general, we take great pains to try -- even though there was collective action that was

5     engaged on in that day -- to look at the individual and what they specifically did because

6     there's a pretty wide range of conduct, and it's a fact-intensive inquiry as to where people

7     should fall on the spectrum.

8     Q     There's been a lot of criticisms from our Members that the January 6

9     defendants have been held pending trial unfairly.    What's your response to that?

10    A     We seek detention where we're lawfully able to do so and we believe it is

11    appropriate.    I'd also note, in terms of our overall Federal prosecutions -- and I could get

12    you the specific numbers, but just kind of knowing our docket -- the percentage of

13    January 6 defendants that are detained or have been detained pretrial is greatly smaller

14    than, in general, our Federal defendants who are detained pretrial.

15    Q     Okay.    I mean, there's no bail in the Federal system.    But what is the

16    analysis that goes through to determine whether someone is held over to trial?

17    A     In general, it comes down to, are they at risk of flight, or are they a danger?

18    Q     Okay.    And everyone that's been held is either one or the other?

19    A     Correct.

20    Q     Is there any opportunity for those defendants waiting trial to appeal?

21    A     Yes.    And, to be clear, we don't unilaterally make the determination.    We

22    seek detention.    It goes to a magistrate judge.    A magistrate judge makes the

23    determination.    That magistrate judge's determination can be appealed by either party

24    to the Article III district court judge.    The district court judge then can hear an appeal.

25          And defendants who are still detained after that process have the ability to take

1    an expedited appeal to the D.C. Circuit, which several defendants have done in the

2    January 6 context.

3        Q    Do you believe some of the reporting on the January 6 cases and some of

4    the criticism you've received has been unfair?

5        A    I'm not sure what you're talking about, like, with the reporting generally.

6        Q    Just about individuals being treated more harshly because of their role in

7    January 6 than they would in a similarly situated crime.

8        A    What I can say generally is I am not aware of a similarly situated crime to

9    January 6.

10       Q    I want to call your attention to exhibit 5.

11       A    Is that the June 7 letter?

12       Q    Yeah.    I just wanted to point out for the record the procedural history for

13   this letter is remarkably odd.

14            Mr. Weiss responds to Mr. Jordan -- he responds to -- Mr. Jordan writes the

15   Attorney General in May, and apparently, the Attorney General forwarded it to Mr. Weiss

16   to respond.    Have you ever seen anything like that before?

17       A    I mean, I don't know, with the caveat that I, in general, don't track filings

18   going back and forth between Congress and the Department.

19       Q    No, but has the Attorney General ever asked you to respond to a letter

20   directly?

21       A    Me to directly respond?    No.

22       Q    To Congress?

23       A    Yeah.

24       Q    The first sentence of the second paragraph states:    While your letter does

25   not specify by name the ongoing investigation that is the subject of the committee's

1    oversight, its content suggests your inquiry is related to an investigation in my district.

2         Isn't that a weird sentence?

3    A    I don't know.

4    Q    It's sort of jumping to a conclusion that, although your letter doesn't specify

5    by name an ongoing investigation, I'm going to answer it anyway.    I'm going to answer a

6    letter that's not written to me.

7    A    [Nonverbal response.]

8    Q    The letter goes on to -- are you familiar with the Linder letter?

9    A    Not the letter itself.

10    Q    The concept of it?

11    A    The principle, yeah.

12    Q    And the Linder letter lays out all the reasons Congress doesn't want to -- or

13    the executive branch and Justice Department doesn't want to give information to

14    Congress, right?

15    A    I mean, I think specifically, it's about the dangers of ongoing investigations,

16    as I understand it.    But I haven't reviewed the letter.

17    Q    But there are other -- I mean, I can represent to you there's other topics in

18    there --

19    A    Yeah.    Okay.

20    Q    -- that sort of covers the whole list of reasons why DOJ doesn't cooperate

21    with Congress.    And a lot of that is included in this letter.

22         And I was just curious as to whether letters of this sort -- do you have any idea

23    who prepares them?    Is it drafted by somebody in Main Justice?

24    A    These kinds of letters, I have no -- I don't know.

25    Q    You've been on the receiving end of letters from Congress?

1      A      Yes.

2      Q      How does the process normally work to respond?

3      A      So, as with all things with elected Representatives, our responses are

4      coordinated through the Office of Legislative Affairs.

5      Q      And do they just take that off your plate and handle it for you?

6      A      I mean, no.   I mean, while they take the lead on it, by definition, there's

7      information that only the component knows, so they have to work with the component

8      sometimes.

9      Q      So how does it ordinarily work?   Would you or your staff draft the response

10      for the Office of Legislative Affairs?

11      A      So I don't know that I can speak to how it ordinarily works because, while

12      I've gone through this, my experience has been pretty limited.

13      Q      Okay.   In the limited experience that you do have, how has it worked?

14      A      It was a collaborative effort in the limited experience I do have.

15      Q      And who writes the first draft?

16      A      I can't recall --

17      Q      Okay.

18      A      -- about who -- I can't recall.

19      Q      During your prep for today, how many prep sessions did you have before

20      you came here today?

21      A      I think that we had three sessions where the subject of the meeting was

22      today's appearance.

23      Q      Okay.   And were you shown any documents?

24      A      I was not shown any documents in those meetings.

25      Q      Okay.   And did Department counsel tell you the types of questions we have

1    asked other witnesses?

2         A    No.

3         Q    Okay.    Did they give you any guidance as to whether the interview would

4    proceed if there was a government shutdown?

5         A    We did discuss that at one point in time.    We did discuss that at a couple

6    points in time last week.

7         Q    Okay.    And what was the plan?    Were you going to be appearing?

8         A    Well, I was ready to follow the direction.    I understood, I mean, like --

9         Q    What was the direction, I guess?

10        A    Whatever ultimately was reached with the committee.    I mean, I think

11   there were practical questions about, if we were going to shut down, whether, for

12   instance, we'd be authorized to have a court reporter here.    Things like that.

13        Q    We would.    We would.

14        A    Yeah.    So I think those were the kinds of practical things that people were

15   wondering about, but it wasn't -- I mean, I was ready to appear one way or another.

16        Q    Of course.    I appreciate that.

17             But, if there was a government shutdown, was it your -- did you believe you would

18   not be appearing today?

19        Ms. Zdeb.    This is getting into internal deliberations at the Department around

20   the impacts of a potential shutdown that didn't ultimately materialize.    He's here today

21   voluntarily, and beyond that --

22        Mr. Castor.    It's not a hard question.    He can either answer it or not.    It's a

23   voluntary question.    A voluntary interview.

24        Mr. Graves.    I agree with the scope.    I hope this puts it to an end.    I thought it

25   was a possibility, like all of us, up until late Saturday night.    It was uncertain as to what

1    was going to happen this week on a number of different fronts.

2                    BY MR. CASTOR:

3          Q    So there was a possibility if there was a shutdown you wouldn't be able to

4    come?

5          A    I thought that that was a possibility.    I thought it was a possibility that I

6    would be able to come.    You're asking, like, my view.

7          Q    Okay.    But you didn't receive ultimate guidance before the shutdown?

8          A    To my recollection, it was still -- we were trying to work through the issue

9    over the weekend.

10         Q    Okay.    I think I understood what you were saying before that you have

11   worked with special counsels in your role as U.S. attorney.    Probably not Mueller, but

12   Durham.    Is that right?

13         A    I can't get into --

14         Q    Well, the Durham matter is over with.

15         A    Yeah.    So -- but, again, it would be internal deliberations.

16         Q    Okay.    Any other special counsels?    How many special counsels have you

17   worked with?    The number, not names.

18         A    So, I mean, it depends.    I've had interactions with, I guess, now four special

19   counsel's offices.

20         Q    And would that be Hur, Durham, Smith, and what's the fourth?

21         A    We're getting into, like, specifics now, and this is so far beyond my

22   conversations with then-U.S. Attorney Weiss about proceeding in my jurisdiction.

23         Q    Okay.    I mean, it has a relationship here because of Weiss' special counsel

24   status.

25         A    Yes.

1    Q    So I'm just asking for your experience, like -- okay.   So it's four or five

2  special counsels that you've worked with?

3    A    Yes.   To my best recollection, it was four that I've had interactions -- I want

4  to be very clear --

5    Q    Right.

6    A    -- that I or my office have had interactions with.

7    Q    And so how does it work with the special counsels?   Do they have their

8  own prosecution teams, or do they use AUSAs from D.C.?

9    A    Special counsels, in general, form their own prosecution teams.   But, I

10  mean, they often go to preexisting people who are already prosecutors within the

11  Department to form their teams.

12    Q    Okay.   And so what types of coordination has to happen with your office

13  for a special counsel to bring a case?

14    A    That is -- well, coordination to bring a case?

15    Q    You know, you used the grand jury.

16    A    A special counsel in general?   They don't have to coordinate --

17    Q    Well, the ones you've worked with.

18    A    They don't have to do anything with our office to bring a case.   That's the

19  virtue of special counsel in terms of --

20    Q    So they have to coordinate with the grand jury?

21    A    They have to coordinate with grand jury, yes.

22    Q    Okay.   Have you proposed with any of the special counsels you worked

23  with -- other than Weiss -- that they should form a hybrid type of prosecution team?

24    A    So I'm not going to get into the deliberation and the ongoing -- and the

25  communications we've had with the special counsel in the ongoing investigations.

1      Q     Okay.    So the situation that you were working through with Weiss'

2  office -- which I guess we resolved after a bunch of back-and-forth -- that it was a bit of a

3  hybrid that you were evaluating?

4      A     I think it is fair to say that -- I think the easiest way to say it to get past, like,

5  the labeling issues that we're all struggling with -- is whether we were going to cross-staff

6  the investigation or the investigation would just be his existing investigators.

7      Q     Are you cross-staffing any other investigation with special counsels?    Or

8  have you?

9      Ms. Zdeb.    That's a little outside the scope of what he's authorized to talk about,

10  staffing of other special counsel investigations.

11          BY MR. CASTOR:

12     Q     So you're not going to answer?

13     A     I agree it's outside the scope.    I could say it's a matter of public record that

14  the office has cross-staffed with other special counsels.

15     Q     Okay.    Have you ever recommended to another special counsel that they

16  shouldn't move forward with a case?

17     A     I could say, in general, I don't recall weighing in or opining on a matter that is

18  not in my office what that component head should or should not do, special counsel or

19  regardless.    That's for them to decide.

20     Q     Okay.    Do you recall any discussions about a campaign finance charge

21  related to the Hunter Biden tax matter?

22     Ms. Zdeb.    Just even answering yes or no to that question, as I think you know,

23  gets into questions associated with the ongoing investigation and prosecution, and it's

24  outside the scope of what he's authorized to discuss.

25          BY MR. CASTOR:

1          Q      And do you know the answer to the question?

2          A      So, again, if I said I knew the answer to the question, that would be a

3    backdoor way of answering a question I have not been authorized to cover.

4          Q      No, it wouldn't because your answer might be no.    So your answer to my

5    subsequent question is, do you know the answer, is yes.    And so I don't think that is a

6    backdoor way of getting information here.

7          A      So, I mean, I guess we just see it differently.

8          Q      So you're not willing to testify whether you're aware of a campaign finance

9    allegation that some -- you know, a Democrat donor paid off Hunter Biden's taxes?

10   Whether that was a campaign finance issue?

11         A      I am not authorized to discuss anything substantively to the case because

12   this is an ongoing investigation, and none of us want to do anything that in any way

13   compromises the ongoing investigation.

14         Mr. Castor.    Okay.    I think we're done.

15         We can go off the record.

16         [Discussion off the record.]

17         ██████.  It is 2:08.    We can go back on the record.

18              BY ██████████:

19         Q      I actually want to clarify my own line from the previous round.

20              We were talking about grand jury and steps that they might take, and you said you

21   didn't actually know if you'd ever been in a situation where a grand jury had declined to

22   indict, correct?

23         A      I was saying I couldn't recall a specific case.    I generally recall that having

24   happened and having to deal with it.    I don't think it was -- I mean, it was not one of my

25   cases.

1    Q    So it's pretty rare that a grand jury doesn't indict somebody when a true bill

2    is sought?

3    A    That is correct.

4    Q    Okay.    And we also said that grand juries can issue subpoenas.    There can

5    be grand jury subpoenas that bring back relevant information?

6    A    That is correct.

7    Q    And it may be the case that a grand jury subpoena produces relevant

8    information that could help the prosecutors decide not to move forward and seek a true

9    bill, correct?

10   A    That is correct.

11   Q    And so just the process of having the grand jury can help to inform the

12   investigation?

13   A    Yes.    The grand jury, in most investigations, is the main investigative tool.

14   Q    Okay.    Thank you.

15        You were asked some questions just now about the potential for a government

16   shutdown and what may or may not have happened.

17        You're appearing today willfully of your own accord, correct?

18   A    That is correct.

19   Q    Voluntarily, I should say.

20   A    Voluntarily, yes.    Correct.

21   Q    And you've sat here for 5, 6 hours and answered, to the best of your ability

22   and consistent with your authorization, every question presented to you?

23   A    That's correct.    I think we're -- what are we -- a shade over 4 now.    Yes.

24   Q    I'm terrible at math.

25   A    Yes.

1    Q    Okay.    And so it was never your intent to obstruct this investigation,

2    correct?

3    A    That is correct.

4    Q    Okay.    The fact of the matter is, there was a lot of news about a

5    government shutdown, and nobody really knew what might happen?

6    A    That is correct.

7    Q    Okay.    You were asked a number of questions just now about Ray Epps?

8    A    Yes.

9    ██████.    I want to introduce as exhibit 9 an AP News article dated September

10    20th, 2023.

11                                    [██    Exhibit No. 9

12                                    Was marked for identification.]

13            BY ████████:

14    Q    It's entitled "Ray Epps, Trump supporter targeted by January 6 conspiracy

15    theory, pleads guilty to Capitol riot charge."

16    A    Yes.

17    Q    Have you seen this before?

18    A    I have not seen this article before.

19    Q    I'll give you a minute to review it.

20    A    Do you want me to read the whole --

21    Q    I can tell you, I'm going to focus on -- actually, I'll just ask the question.

22    A    Okay.

23    Q    On page 2 of this article, the -- I guess it's the third full paragraph down, it

24    says:    After the riot, Epps -- meaning Ray Epps -- became the focus of a conspiracy

25    theory echoed by right wing news outlets that he was a secret government agent who

1    incited the Capitol attack.

2          Are you familiar with that conspiracy theory?

3    A    I am familiar with that conspiracy theory.

4    Q    Do you have any information to suggest that Mr. Epps is, in fact, a secret

5    government agent who incited the Capitol attack?

6    A    No.    And, in fact, at his plea hearing, we put on the record that he -- and in

7    as a clear and unambiguous fashion as we could -- that he has never been a source,

8    government agent, or anything of that nature.

9    Q    And, in fact, that's reflected in this article at the bottom of this page,

10   correct?

11         It says:    Assistant U.S. Attorney -- it provides the name of the U.S. attorney --

12   A    Yeah.

13   Q    -- said during the hearing that Epps was not a confidential source for the FBI

14   or any other law enforcement agency.

15   A    Yes.    That's correct.

16   Q    And that is a true statement that was made by that assistant U.S. attorney?

17   A    Yes.    That's correct.

18   Q    And, in fact, on the next page, about halfway down, it says:    A barrage of

19   death threats would force Epps and his wife to sell their home in Mesa, Arizona, and live

20   in a recreational vehicle in the Rocky Mountains, he said in an interview this year on CBS'

21   60 Minutes.

22         Are you aware of the fact that Mr. Epps has had to sell his home because of the

23   conspiracy theory and the impact that's had on him?

24   A    I was not aware that he had to sell his home.    I was aware that he was the

25   subject of harassment and threats.

1       Q    Okay.    And, in fact, as reflected here, he has said publicly that, because of

2    those threats which resulted from that conspiracy theory, he's had to sell his home, and

3    it's had a pretty profound impact on him and his wife, correct?

4       A    I am generally aware that he has made public statements describing the

5    impact that these false allegations have had on his life.

6       Q    Okay.    Thank you.

7    I don't have any further questions, but I did want to ask, do you have anything

8    that you wanted to add based on the questions that you have not been able to address?

9       A    I don't think there's anything else that we want to add that we haven't

10    covered in the last 4 or so hours.

11       ███████.   Great.    All right.    Thank you.

12    We can go off the record.

13    [Whereupon, at 2:13 p.m., the interview was concluded.]

1               Certificate of Deponent/Interviewee

2

3

4        I have read the foregoing _____ pages, which contain the correct transcript of the

5    answers made by me to the questions therein recorded.

6

7

8

9                        _____

10                              Witness Name

11

12

13                        _____

14                                  Date

15