**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

　　　　　　　　　*Plaintiff*,

　　　v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

　　　　　　　　　*Defendants*.

Case No. 1:24-cv-815

# Exhibit S

1

2

3

4

5     COMMITTEE ON THE JUDICIARY,

6     U.S. HOUSE OF REPRESENTATIVES,

7     WASHINGTON, D.C.

8

9

10

11

12

13     INTERVIEW OF:    DAVID WEISS

14

15

16

17

18                                    Tuesday, November 7, 2023

19

20                                    Washington, D.C.

21

22

23          The interview in the above matter was held in room 5480, O'Neill House Office

24     Building, commencing at 10:03 a.m.

25          Present:    Representatives Jordan, Armstrong, Gaetz, Biggs, Fry, McClintock,

1       Tiffany, Spartz, Nadler, Lieu, Scanlon, Neguse, Dean, Ivey, Balint, and Goldman.

1    Appearances:

2

3

4

5    For the COMMITTEE ON THE JUDICIARY:

6

7    CLARK ABOURISK, COUNSEL

8    STEVE CASTOR, GENERAL COUNSEL

9    DILLON CHEPP, COUNSEL

10   SEAN CLERGET, COUNSEL

11   RUSSELL DYE, COMMUNICATIONS DIRECTOR AND COUNSEL

12   BETSY FERGUSON, DEPUTY GENERAL COUNSEL

13   BRITTANY HAVENS, PROFESSIONAL STAFF MEMBER

14   RACHEL JAG, COUNSEL

15   LILLIAN MEADOWS, COUNSEL

16   CAROLINE NABITY, CHIEF COUNSEL FOR OVERSIGHT

17   ███████████, MINORITY OVERSIGHT COUNSEL

18   ███████████, MINORITY CHIEF OVERSIGHT COUNSEL

19   █████████, MINORITY INTERN

20   ██████████, MINORITY CHIEF COUNSEL

21   AND DEPUTY STAFF DIRECTOR

22   ████████████, MINORITY LEGAL INTERN

23   █████████████, MINORITY STAFF ASSISTANT

24   ██████████, MINORITY OVERSIGHT COUNSEL

25   ███████████████, MINORITY PROFESSIONAL STAFF MEMBER

1    For the SUBCOMMITTEE ON CRIME AND

2    FEDERAL GOVERNMENT SURVEILLANCE:

3

4    ███████████, MINORITY DETAILEE

5

6    For the U.S. DEPARTMENT OF JUSTICE:

7

8    GRETA GAO, SPECIAL COUNSEL,

9    OFFICE OF LEGISLATIVE AFFAIRS

10   SARA ZDEB, DEPUTY ASSISTANT ATTORNEY GENERAL,

11   OFFICE OF LEGISLATIVE AFFAIRS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Mr. <u>Castor.</u>    Good morning.    This is a transcribed interview of Special Counsel

2    David Weiss.    Chairman Jordan has requested this interview as part of the committee's

3    oversight of the Justice Department's commitment to impartial justice in its handling of

4    the Hunter Biden investigation.

5          We're also investigating protected disclosures made by two whistleblowers who

6    were an integral part of the investigative team before, as we understand it, you asked for

7    their removal.

8          Would the witness please state your name for the record?

9          Mr. <u>Weiss.</u>    David Weiss.

10         Mr. <u>Castor.</u>    And you're joined here with agency counsel?

11         Mr. <u>Weiss.</u>    Correct.

12         Mr. <u>Castor.</u>    State your name for the record.

13         Ms. <u>Zdeb.</u>    Sarah Zdeb, Department of Justice.

14         Ms. <u>Gao.</u>    Greta Gao, Department of Justice.

15         Mr. <u>Castor.</u>    And, Mr. Weiss, you understand that agency counsel has a legal duty

16    to protect the interests of the Department and not you personally?

17         Mr. <u>Weiss.</u>    I do.

18         Mr. <u>Castor.</u>    And you've decided to go forward with that arrangement?

19         Mr. <u>Weiss.</u>    I have.

20         Mr. <u>Castor.</u>    Okay.    On behalf of the committee, I would like to thank you for

21    appearing here today to answer our questions, and we appreciate you coming down from

22    Delaware voluntarily.

23         My name is Steve Castor.    I'm with Chairman Jordan's Judiciary Committee staff.

24         I'll have the staffers in the room introduce themselves, starting with my colleague

25    Ms. Nabity.

1          Ms. <u>Nabity.</u>    Caroline Nabity with Chairman Jordan's staff.

2          Chairman <u>Jordan.</u>    Jim Jordan.

3          Mr. <u>Armstrong.</u>    Kelly Armstrong.

4          Mr. <u>Nadler.</u>    Jerry Nadler.    Not staff.

5          ████████   ███████████, Ranking Member Nadler's staff.

6          ███████████   ██████████, Ranking Member Nadler's staff.

7          █████████   ████████, Ranking Member Nadler's staff.

8          Ms. <u>Scanlon.</u>    Mary Gay Scanlon, PA-5.

9          Mr. <u>Ivey.</u>    Glenn Ivey, member of the committee.

10         Ms. <u>Havens.</u>    Brittany Havens, Chairman Jordan's staff.

11         Ms. <u>Ferguson.</u>    Betsy Ferguson, Chairman Jordan's staff.

12         Mr. <u>Chepp.</u>    Dillon Chepp, Chairman Jordan's staff.

13         Ms. <u>Meadows.</u>    Lillian Meadows, Chairman Jordan's staff.

14         Mr. <u>Clerget.</u>    Sean Clerget, Chairman Jordan's staff.

15         Mr. <u>Abourisk.</u>    Clark Abourisk, Chairman Jordan's staff.

16         ███████████████   ███████████████, with Ranking Member Nadler's staff.

17         █████████   ██████████, Ranking Member Nadler's staff.

18         █████████   ██████████, with Mr. Nadler.

19         Mr. <u>Castor.</u>    Now there's going to be a quiz about each of their names.

20         Mr. <u>Weiss.</u>    I'll fail miserably.

21         Mr. <u>Ivey.</u>    Read the transcript.

22         Mr. <u>Castor.</u>    I would like to go over the interview process that we'll follow today.

23         Our questioning will proceed in rounds.    The majority will ask questions first for

24    an hour, and then the minority will have a chance to ask questions for an hour as well.

25    We'll alternate back and forth until we're done.

1      We often take a short break at the end of each hour, but if you need to take a

2  break apart from that to confer with counsel or for any other reason, let us know.

3      As you can see, there's an official House reporter taking down everything we say

4  to make a written record, so we will do our best to go slowly and give verbal responses.

5  Are you comfortable with that?

6      Mr. Weiss.   Yes, I am.

7      Mr. Castor.   We'll do our best to limit the number of people directing questions

8  to you during any given hour.   Usually, it's just one staffer.   But, of course, the

9  members -- and we're joined here by five members.   The Republican members may

10  jump in during my questioning, and the Democratic members may jump in during their

11  hour as well.

12      We want you to answer our questions in the most complete and truthful manner

13  possible.   If you honestly don't know the answer to a question or don't remember, it's

14  best not to guess.   Please do give us your best recollection.   And it's okay to tell us if

15  you learned something from a third party.   The rules of hearsay don't apply in this

16  setting.   Just indicate how you came to know the information.

17      And, if there are things you don't know or can't remember, just say so.   And we

18  would appreciate it if you, to the extent you don't remember an entire set of facts, that

19  you just help us with as much as you do remember.

20      You also understand that, by law, you are required to answer questions before

21  Congress truthfully.   Do you understand that?

22      Mr. Weiss.   I do understand that.

23      Mr. Castor.   And this applies to questions posed by congressional staffers in an

24  interview.   Do you understand that as well?

25      Mr. Weiss.   Yes.

1        Mr. <u>Castor.</u>    Witnesses that knowingly provide false testimony could be subject

2   to criminal prosecution for making false statements under 18 United States Code 1001.

3   Do you understand that?

4        Mr. <u>Weiss.</u>    I am familiar with that.

5        Mr. <u>Castor.</u>    Thank you.    Is there any reason you're unable to provide complete

6   and truthful answers to today's questions?

7        Mr. <u>Weiss.</u>    There is not.

8        Mr. <u>Castor.</u>    Okay.    That's the end of my opening remarks.

9        Ms. Zdeb, do you have anything?

10       Ms. <u>Zdeb.</u>    I don't, but Mr. Weiss has a couple of brief remarks.

11       Mr. <u>Castor.</u>    Okay.    Let me ask ██████ if she wants to --

12       ██████.    Yeah.    We just thank the Special Counsel for taking time out of your

13   very busy schedule to come in and join us today.

14       Mr. <u>Weiss.</u>    Thank you.

15       Mr. <u>Castor.</u>    Or any of the members, did you have anything you would like to

16   say?

17       Okay, sir.

18       Mr. <u>Weiss.</u>    Thank you.

19       I have voluntarily agreed to appear before this committee.    To my knowledge, I

20   am the first Special Counsel to testify before the submission of the special counsel's

21   report.    I have done so out of respect for the committee's oversight responsibilities and

22   to respond to questions raised about the scope of my authority.

23       I am in the midst of conducting an ongoing investigation and prosecution and will

24   be limited as to what I can say at this point.    I will prepare a report at the conclusion of

25   the work by the Special Counsel's Office and will be able to share more information at

1    that time.

2          Today, I am prepared to address misunderstandings about the scope of my

3    authority to decide where, when, and whether to bring charges in this matter.    I do not

4    intend to answer questions that could jeopardize the ongoing litigation, our

5    investigations, or the rights of defendants or other individuals involved in these matters.

6          I am and have been the decisionmaker in this case.    I do not, however, make

7    these decisions in a vacuum.    I am bound by Federal law, the principles of Federal

8    prosecution, and DOJ guidelines.

9          As a result, there are processes that I must adhere to in making investigative and

10   charging decisions.    These processes did not interfere with my decisionmaking authority.

11   At no time was I blocked or otherwise prevented from pursuing charges or taking the

12   steps necessary in the investigation by other U.S. Attorneys, the Tax Division, or anyone

13   else in the Department of Justice.

14         As I have said previously, I did not request Special Counsel status until August of

15   2023.    When I made that request, it was promptly granted.    Throughout this

16   investigation, the career prosecutors on my team and I have made decisions based on the

17   facts and the law.    Political considerations played no part in our decisionmaking.

18         Our analysis has been moored to the principles of Federal prosecution, and going

19   forward, my team and I will continue to abide by these same principles as we try to bring

20   this matter to a just conclusion.    Thanks.

21         Mr. Castor.    Thank you.

22         Just at the top, I'm going to mark three letters that you sent to Congress.

23         The first is exhibit 1, a June 7th letter.

24                              [Weiss Exhibit No. 1

25                              Was marked for identification.]

1        Mr. <u>Castor.</u>    Exhibit 2 is a June 30th letter, both to Chairman Jordan.

2                              [Weiss Exhibit No. 2

3                              Was marked for identification.]

4        Mr. <u>Castor.</u>   And the third is a July 10th letter.

5                              [Weiss Exhibit No. 3

6                              Was marked for identification.]

7        Mr. <u>Castor.</u>    We'll get into the specifics of these later, but I just thought it would

8    be helpful to have it marked as exhibits 1, 2, and 3 right at the top.

9        Mr. <u>Weiss.</u>   Thank you.

10        Mr. <u>Castor.</u>   I'll start the clock.    It's 10:11.

11                                 EXAMINATION

12             BY MR. CASTOR:

13        Q    When were you nominated to be the U.S. Attorney for the District of

14   Delaware?

15        A    I believe in late 2000- -- sometime in 2017, I believe, to the best of my

16   recollection.

17        Q    Okay.    And you were confirmed by the Senate?

18        A    I was.

19        Q    And when was that?

20        A    That was several months thereafter.    2018.

21        Q    Okay.    And then you began your tenure as U.S. Attorney when?

22        A    I was acting for some time since the spring, I believe, of 2017.    And I was

23   confirmed, as I said, in the spring of 2018, I believe, or there so.

24        Q    Okay.    And you were supported by both Democratic Senators from

25   Delaware.   Is that correct?

1          A      That is correct.

2          Q      Are you familiar with the Blue Slip Process?

3          A      Generally.

4          Q      Okay.    What's your understanding of that?

5          A      My understanding is you -- in all jurisdictions, you are typically

6      recommended or not by your local Senators.

7          Q      Okay.

8          A      And the Senators -- my understanding is the senators supported my position

9      as U.S. Attorney.

10         Q      Okay.    So both Senators Coons and Carper recommended you to the White

11     House?

12         A      That's my understanding.

13         Q      Okay.    Now, after the conclusion of the previous administration in January

14     of 2021, you were asked to stay on?

15         A      I believe it was end of January, early February.    And, yes, I was asked to

16     stay on.

17         Q      And who asked you to stay?

18         A      It was a telephone call, and it was the Acting Attorney General at that point

19     in time that asked me to stay.

20         Q      And was that Mr. Wilkinson?

21         A      Yes, it was.

22         Q      And what do you remember from that call?

23         A      Just that.    That he asked if I would be willing to continue to serve as U.S.

24     Attorney for the District of Delaware.

25         Q      And did you expect that call?

1        A       I wouldn't say that I expected it, nor would I say I was shocked by it.

2        Q       Okay.    So you had prepared your resignation just like the rest of the U.S.

3    Attorneys?

4        A       I don't know that I had actually prepared my resignation.

5        Q       Okay.

6        A       I mean, I understood the process that was going on, and there were other

7    U.S. Attorneys that either resigned or would be asked to end their tenure at some point.

8    But I had not prepared a resignation letter.

9        Q       So you generally didn't know what was going to happen?

10       A       I didn't know what was going to happen.

11       Q       Okay.    But you suspected maybe they'd ask you to stay on?

12       A       I suspected that it was a possibility.

13       Q       Okay.    Before Mr. Wilkinson called you and asked you to stay on, had you

14   had any conversations with Department officials or White House officials or transition

15   team officials about staying on?

16       A       I had not.

17       Q       Okay.    So, when Mr. Wilkinson called you, that was the first time that you

18   were talking to somebody in a position of authority about staying on?

19       A       In the new administration, yes.

20       Q       Okay.    And these decisions are ultimately made by the President, correct?

21       A       I don't know who made this decision, to tell you the truth.    I know what

22   was communicated to me during that conversation.

23       Q       But U.S. Attorneys serve at the pleasure of the President, correct?

24       A       U.S. Attorneys serve at the pleasure of the President.    That is correct.

25       Q       So currently you serve at the pleasure of President Biden, correct?

1          A     I do.

2          Q     And, when the decision was made to ask you to stay on, that was a decision

3     made by President Biden, correct?

4          A     Again, I can't speak to that.     All I can say is, as I have said before, that it was

5     communicated to me by the Acting Attorney General.

6          Q     Okay.    But certainly, if President Biden didn't want you to stay on, you

7     would have been removed like all U.S. Attorneys are when a President wants that to

8     happen, correct?

9          A     As we discussed a moment ago, I serve at the pleasure of the President.

10         Q     Okay.    How many attorneys are in your office?

11         A     Approximately --

12         Q     I know, obviously, it changes.

13         A     Yeah.    We just had two additions.    So I think we're at 24, 25, including the

14    U.S. Attorney.

15         Q     Okay.    And how many work on criminal matters?

16         A     So I have six in the Civil Division.    About 14.

17         Chairman Jordan.    Did Mr. Wilkinson give you any specific reason why he wanted

18    you to stay?

19         Mr. Weiss.    He did not.

20              BY MR. CASTOR:

21         Q     When you have interactions with Justice Department Headquarters or Main

22    Justice, how does that ordinarily happen?    Who is your primary point of contact?

23         A     I don't know that there is an ordinary.    I don't know that I would designate

24    anyone in particular.

25         Q     Under the reporting structure, though, you report up through the Deputy

1      Attorney General.    Is that correct?

2           A      That's correct.

3           Q      And how often do you talk with Ms. Monaco?

4           A      I have never spoken with Ms. Monaco.

5           Q      You've never spoken to her?

6           A      Never.

7           Q      Okay.    And do you have communications with someone else in the office?

8      Maybe the PADAG?

9           A      I have -- my point of contact for the last year, year and a half has been

10     Associate Deputy Attorney General Weinsheimer.

11          Q      Okay.    So you're not in contact on a regular basis with the PADAG, Mr.

12     Miller?

13          A      I am not.

14          Q      Have you ever had communications with him?

15          A      I have not.

16          Q      Okay.    So you've never had any communications with Marshall Miller or

17     Lisa Monaco?

18          A      I have not.

19          Q      Okay.    And how often do you have communications with

20     Mr. Weinsheimer?

21          A      It varies depending upon what's going on.    But I would say we've spoken,

22     before August of 2023, approximately once a month, sometimes more frequently.

23          Q      And was it related to the Hunter Biden case, or was it related to your

24     ordinary duties?

25          A      Generally, it was related to the Hunter Biden case investigation.

1      Q      Okay.    And when did Mr. Weinsheimer first start having communications

2   with you about the Hunter Biden case?

3      A      I think we first spoke about the case in the spring of 2022.

4      Q      And, to the extent you can tell us, what were the nature of those

5   discussions?

6      A      In 2022?

7      Q      Yeah.

8      A      Actually, more accurately, February of 2022, I think, was the first time we

9   spoke.    And I would have reached out because we were looking to bring certain portions

10  of our investigation to either D.C. or L.A.    At that time, D.C.

11     Q      Okay.    Did you call him, or did he call you?

12     A      I reached out by email to the Principal Deputy Attorney General at that time,

13  John Carlin.

14     Q      Okay.    So he was the PADAG before Mr. Barr?

15     A      Correct.

16     Q      And how often had you spoken with Mr. Carlin?

17     A      Before this?    Never.

18     Q      Okay.    So you initiated email contact with Mr. Carlin, and he referred you

19  to Mr. Weinsheimer?

20     A      I initiated email contact with Mr. Carlin, and I subsequently had a

21  conversation with John Carlin, and I believe Brad Weinsheimer was on the call.

22     Q      Okay.    And what did they tell you about bringing the case in D.C. or

23  different jurisdictions from yours?

24     A      We discussed the fact that I would -- they wanted me to proceed in the way

25  it would typically be done, and that would involve ultimately reaching out to the U.S.

1 Attorney in the District of Columbia.

2  I raised the idea of 515 authority at that time because I had been handling the

3 investigation for some period of time. And, as I said, they suggested let's go through the

4 typical process and reach out to D.C. and see if D.C. would be interested in joining or

5 otherwise participating in the investigation.

6  Q Okay. And you mentioned 515 authority, and in your June 30th letter, you

7 refer to that as Special Attorney status?

8  A I don't know that I referred to it as Special Attorney status at that time. I

9 typically referred to it as 515 authority.

10  Q Okay.

11  A For whatever reason, that's the way -- my recollection is that's the way I

12 referenced it.

13  Q Okay. I mean, the text of the statute talks about Special Attorney.

14  A Special Attorney. That's correct.

15  Q So, from your point of view, is there a difference between being a Special

16 Attorney under 515 and being a Special Counsel?

17  A Yes, there is a difference.

18  Q And what's that difference, as you understand it?

19  A As I understand it, the Special Attorney under 515 was for the purpose of

20 allowing me, as a U.S. Attorney in one jurisdiction, to possibly proceed with charges in

21 another jurisdiction.

22  Q Okay.

23  A It has to be approved by the Attorney General or his designee.

24  Q Okay. And what's your understanding then of Special Counsel authority?

25  A Special Counsel is permitted to bring charges in any jurisdiction in which

1   Special Counsel determines -- which Special Counsel determines is appropriate,

2   consistent with the order and the authority bestowed on Special Counsel through that

3   order.

4        Q    Okay.

5        A    You know, which describes, in general terms, my investigative authority.

6        Q    Okay.    But it's all 515 authority, right?

7        A    It's all 515 authority?

8        Q    Are both the Special Attorney and the Special Counsel status that we've

9   been discussing here flow from the 28 United States Code 515?

10       A    I think perhaps in -- there's the 500 series, but there are also regulations that

11   attend these Special Counsel --

12       Q    Okay.

13       A    -- authority.

14       Q    Okay.    So, when you initially were pursuing or discussing 515 authority or

15   considering it, you know, when you were speaking with Mr. Weinsheimer, in your mind,

16   that was different from Special Counsel authority?

17       A    Absolutely.

18       Q    Okay.    And what did Mr. Weinsheimer or Mr. Carlin say about 515

19   authority?

20       A    As I said, they said let's proceed as we would in the normal process.    We

21   talked a bit about the fact that it's often the case in D.C. that a DOJ component, whether

22   it's Tax Division or Public Integrity, would develop a case and reach out to the U.S.

23   Attorney's Office in D.C. and give them an opportunity to participate.    So the discussion

24   was let's proceed in a typical fashion.

25            And, as you know, ultimately -- this didn't happen in this conversation, but down

1       the road -- I was given the authority to proceed if I chose to do so.

2               Q       Okay.    Are you familiar with the term "SAUSA"?

3               A       I am familiar with the term "SAUSA."

4               Q       Okay.    What does that term mean to you?

5               A       It's a special assistant United States attorney.

6               Q       Okay.    And what's the difference between, you know, SAUSA status and

7       515 status?

8               A       You know, to the extent -- I want to make sure I fully understand it.

9               Q       Of course.

10              A       Look, SAUSA doesn't have to be part and parcel of a 515 authority situation.

11              For instance, if we have a case in Delaware -- a drug investigation, let's say -- that,

12      during the course of the investigation takes us to a neighboring jurisdiction, and both

13      jurisdictions -- we'll start talking with agents and AUSAs in that other jurisdiction to

14      ensure we're deconflicting, proceeding in a safe fashion.

15              And, if we ultimately -- so we'll pursue that investigation in conjunction with one

16      another, and if there comes a time when we're talking about charges, we'll decide how

17      we're going to proceed in the case.    We might both move forward.    Delaware might

18      take it.    It could proceed in any number of fashions.

19              If we chose to continue to play a role in prosecuting a piece of that case in, let's

20      say, the Eastern District of Pennsylvania, we could have an attorney designated as a

21      SAUSA to allow that attorney to participate in the case in the Eastern District of

22      Pennsylvania.

23              Q       Okay.    So, after your discussion with Mr. Weinsheimer and Mr. Carlin in

24      February of 2022, what was your next step in terms of initiating contact with the D.C. U.S.

25      Attorney's Office?

1       A       Ultimately -- and I think it was in early March -- I reached out to Matt Graves,

2    who was the U.S. Attorney in D.C. at that time.

3       Q       And, before you reached out to Mr. Graves, had your staff been working

4    with Mr. Graves' staff?

5       A       No.

6       Q       Okay.   So the first contact Mr. Graves' office had from your office was when

7    you telephoned him?

8       A       That's my understanding, yes.

9       Q       And what's your recollection of that call?

10      A       It was about, I think, a 5-, 10-minute call.   I had never met or spoken with

11   Mr. Graves before.   I explained the situation.   I talked a little bit about the

12   investigation, some of the background of the investigation.

13          I mentioned that I had a conversation with the Office of the Deputy Attorney

14   General, that I had raised 515 authority, because I wanted him to know, you know, what I

15   was thinking and that I intended to proceed in any event.

16          And we agreed that we would -- I think we first talked about putting the criminal

17   chiefs together and our staffs so that we would proceed from there.

18      Q       And what did Mr. Graves say to that?

19      A       He was -- you know, he was receptive.   Like I said, we agreed that my

20   criminal chief, I think, would reach out to his, and we would move forward.

21      Q       And then what happened next?

22      A       I know that the teams met, but ultimately, I received word from my staff

23   that the U.S. Attorney's Office in the District of Columbia had decided not to join the case

24   as a partner or co-counsel moving forward.

25      Q       Okay.   And what did that mean for the case proceeding?

1       A     That meant that I would follow up with respect to the 515 authority --

2       Q     Okay.

3       A     -- which, ultimately, I did.    And I had a conversation with -- again, this

conversation, I believe, was with John Carlin and Brad Weinsheimer.

5       Q     Okay.

6       A     I think it was, best of my recollection, in early May.

7       At that time, we were talking about where we would proceed.    There were

8  questions about where we would proceed.    I mentioned before that we were

9  considering D.C., which is where we went first, and the Central District of California in L.A.

10      I told Messrs. Carlin and Weinsheimer that D.C. had decided not to join the

11  investigation, that we were reviewing matters, and had not decided whether we would

12  proceed in D.C.    And my recollection is that John Carlin at that time said, "Look, if you

13  decide to proceed in D.C., you have the authority to do so, and you have the authority

14  to -- under 515, to bring whatever charges you deem appropriate."

15      Q     Mr. Carlin said that?

16      A     Mr. Carlin said that.

17      Q     And did you have any discussion with Mr. Graves about SAUSA status?

18  About having your lawyers from the District of Delaware come to D.C. and just get a

19  special assistant United States attorney designation?

20      A     I don't recall.    It may have been.    I just don't recall the specifics of that.

21      Q     And, at this point in time, we're talking about the 2014 and 2015 tax years

22  for Mr. Biden; is that correct?

23      A     I'm not going to comment on, you know, what we were talking about.    No.

24  I'm sorry.    I'm not going to talk about the merits, the investigation, or any aspect of that.

25      Q     Okay.    But the 2014 and 2015 tax years, the statute of limitations was

1       about to expire, correct?

2           A       Again, I'm not going to talk about something that touches on the

3       investigation.

4           Q       Okay.    It's our understanding that the statute of limitations had been tolled

5       by a tolling agreement.    Is that your understanding?

6           A       Again, I'm not going to talk about any aspect of the investigation or what

7       could crop up in the litigation that we're currently involved in.

8           Q       Okay.    And that the tolling agreement was set to expire in September of

9       2022.    Is that your understanding?

10          A       Again, I'm not at liberty to discuss the particulars of the investigation or what

11      could impact the litigation.    However, look, there will come a time at the preparation

12      and submission of the report when I expect I would address matters such as that.

13          Chairman Jordan.    What was the date that you had the conversation with the

14      U.S. Attorney in the District of Columbia?

15          Mr. Weiss.    I believe that conversation was in early March of 2022.

16          Chairman Jordan.    And then when did he decline to partner with you?    Same

17      time?

18          Mr. Weiss.    I think we received their feedback within a month.

19          Chairman Jordan.    So late March, early April?

20          Mr. Weiss.    Yes.

21          Chairman Jordan.    And then you had a subsequent conversation with

22      Mr. Weinsheimer and Mr. Carlin?

23          Mr. Weiss.    I had a subsequent conversation with Mr. Weinsheimer and

24      Mr. Carlin.

25          Chairman Jordan.    So you wanted to partner with him, and he said no.    Why

1    didn't you just ask for 515 status right then?

2          Mr. Weiss.    I did.    In my next conversation with Carlin and Weinsheimer, I did

3    ask for 515 authority.

4          Chairman Jordan.    And then why didn't they give it?

5          Mr. Weiss.    They did.    They said if I intended to proceed -- as I just described,

6    John Carlin told me that if I intended to or was interested in moving forward in D.C., I had

7    the authority to do so, and I had the authority to bring whatever charges I determined

8    were appropriate.

9          Chairman Jordan.    But you didn't want to proceed?

10         Mr. Weiss.    Excuse me?

11         Chairman Jordan.    But you didn't want to proceed, then, in D.C.?

12         Mr. Weiss.    I'm not going to talk about what matters are clearly part of the

13   investigation and the deliberative process.

14               BY MR. CASTOR:

15         Q    What type of paper flow occurred between your staff and Mr. Graves' staff?

16   I mean, was there an exchange of documents, paper?

17         A    We provided them with information so that they could make an informed

18   judgment on deciding whether to participate in the investigation.    But I'm not going to

19   get into particulars of documentation.    All of that would be matters that are part of the

20   investigation and relevant to the merits of the ongoing litigation.

21         Q    Okay.    Can you at least tell us, you know, what types of documents were

22   shared?

23         A    No.

24         Q    Or can you identify them at a privileged level?

25         A    No.    I can't get into the particulars of documentation that was shared.

1       Again, these would have been part of an ongoing investigation, and this would deal with

2       the deliberative process between ourselves and D.C.

3              Q      Okay.    Did your staff have in-person meetings with Mr. Graves' staff?

4       Was it all done over the telephone?

5              A      I'm not sure.    I know they had a detailed discussion at some point in time.

6              Q      Was it more than one?

7              A      I don't know for sure.

8              Q      And was it essentially your staff trying to convince Mr. Graves' staff to

9       partner or to co-counsel?

10             A      No.    I don't think it was an effort in persuasion.    I think it was just an

11      attempt to appropriately inform them.

12             Q      Okay.    But, obviously, you had an interest in prosecuting a case in D.C.    I

13      mean, you wouldn't have called the DAG's office and you wouldn't have initiated contact

14      with Mr. Graves if you didn't want to move forward with the prosecution, correct?

15             A      I think it's fair to say there was an interest in moving forward in either D.C.

16      or L.A. or wherever the facts and the law took us.

17             Q      Right.    Or both, correct?    I mean, if you're looking at a tax case, the venue

18      is --

19             A      Again, I don't want to get too far into investigation, deliberative process, or

20      the merits.    But certainly these were things that were being contemplated.

21             Q      Okay.    But, if a taxpayer failed to pay the taxes willfully, I mean, the venue

22      for that is where?

23             A      If a taxpayer --

24             Q      If there's a potential tax -- a criminal tax charge for failure to file, where is

25      venue for that?

1       A    It depends where -- you know, where the taxpayer is residing, where the

2   returns are filed, where the returns are prepared.    I know there are all kinds of

3   considerations that one has to evaluate in determining appropriate venue.

4       Q    But the team had evaluated that and had decided where venue was

5   appropriate for the different tax years, correct?

6       A    Again, I'm not going to get into, you know, merits, deliberative process, or

7   matters that are clearly part of the investigation.    I'll speak to my authority.

8       Q    We're dealing with the tax years of 20- -- for Mr. Biden, 2014 through 2019;

9   is that correct?

10      A    You're asking me matters that are not part of the question of authority and

11  clearly go to the merits of the investigation and the litigation.

12      Q    Okay.    But you know the answer to my question, correct?    If you were

13  free from the Department's admonishment that you can't talk about this, you would

14  know the answer to my question; is that correct?

15      A    Look, Counsel, I appreciate the question.    It's not an admonishment.    I am

16  very sensitive to a matter that we are currently investigating.    The last thing I want to do

17  here while I am trying to provide answers -- the last thing I want to do is to say or suggest

18  anything that's going to be used against the government in our ongoing litigation or in

19  any investigation.

20       You know, I'm trying to tiptoe and provide what information I can relative to my

21  authority, but I'm not going to get into the other matters.

22      Q    In 2022, after a man in Delaware was sentenced to 6 months in prison for tax

23  evasion, you stated, "Tax dodging represents an affront to every member of the taxpaying

24  public, and we will continue to prosecute tax cheats aggressively."

25       Do you remember making that statement?

1      A      I don't have a specific recollection.

2      Q      Okay.    But do you believe in that?

3      A      I believe that the laws of the United States, including tax laws, should be

4    enforced.

5      Q      In 2021, after a man was sentenced to 1 year in prison in order to pay

6    $192,529 in restitution for tax evasion, you made the following statement in conjunction

7    with announcing that:    "The financial loss in tax cases is shared by every member of the

8    taxpaying public.    Our Nation's ability to operate and serve its citizenry depends on

9    voluntary compliance with its tax obligations."

10          Do you remember making that statement?

11     A      I don't have a specific recollection, but nor would I divorce myself from any

12    statement of that nature.

13     Q      Do you still believe that financial loss in tax cases is shared by every member

14    of the taxpaying public?

15     A      I still believe that, yes.

16     Q      Do you believe that public figures are exceptions to that?

17     A      Nobody is an exception to the tax laws.    We have a system that's built on

18    the notion of voluntary compliance.

19     Q      All right.    Shifting gears a little bit, on politically-sensitive investigations,

20    what policies does DOJ have to prevent a politically-motivated employee from being

21    involved with an investigation that might touch on political sensitivities?

22     A      I am not aware of a policy that you're referring to.    So, if you could show

23    me something, I'm happy to review it.

24     Q      I guess the question is, is there such a policy?

25     A      I'm not aware of such a policy, and I haven't run into this situation.

1     Q    Okay.   Now, if your office was prosecuting, hypothetically, a political figure

2  in Delaware, say an elected official, and someone on your staff, you know, demonstrated

3  a political ideology consistent with the person you're prosecuting, what would be the

4  process to sideline them or --

5     A    It's a hypothetical with all kinds of variables, and it's not something I'm going

6  to speculate about.

7     Q    Okay.   If you're aware, on a politically-sensitive investigation, what

8  protocols does DOJ have to prevent politically-motivated decisions from being made on a

9  particular investigation?

10     A    I'm not aware of protocols.   And look, my interest and the interest of

11  prosecutors in my office is pursuing cases, and we should be pursuing cases based on the

12  laws and the facts, period.

13     Q    But you're not aware of any Department processes or protocols for dealing

14  with --

15     A    Look, no, I'm not aware of any policies, and I haven't experienced, to my

16  knowledge, a situation in which I had to deal with the hypothetical that you're describing.

17     Q    Okay.   On a politically-sensitive investigation, if an investigator or

18  prosecutor makes what is believed to be a politically-motivated statement or decision,

19  how is that reviewed in your office?

20     A    There is no policy or practice or procedure.   And, again, I'm not aware of

21  such a situation.

22     Q    For example, on the Hunter Biden case, if one of your assistant United States

23  attorneys was exhibiting favoritism towards the Biden family or towards Hunter Biden,

24  and that was brought to your attention, what would be the process to sort that out?

25     A    Again, I'm not going to comment on any aspect of the investigation or a

1    prosecution, and from my perspective, the prosecutors who participated in this case

2    followed the law and the facts.    That was the motivation.

3        Q    So your office doesn't have a process or protocol for dealing with that?

4        A    My office has no process or protocol for dealing with something like that.

5    It's not something we have engaged in, participated in, or that I have experienced.

6        Q    Okay.    If a member of the investigative team believes such a thing has

7    occurred, what is their course of action?

8        A    Again, you're talking about hypotheticals, and I'm not going to speculate on

9    what their course of action might be.

10       Q    Is there an independent review within DOJ that can address that?    If a

11   member of the investigative team believes that a politically-motivated decision is being

12   made to protect a target of investigation or a potential defendant, is there somebody in

13   DOJ that can review that?

14       A    Again, I don't have an answer for the question, and it calls for a hypothetical

15   or a speculative response on my part.    I'm just not going to express an opinion on it.

16       Q    Well, it's not that speculative.    I mean, we have two whistleblowers that

17   testified about what they asserted was political -- politically-motivated decisions made in

18   the Hunter Biden case, correct?

19       A    I am aware that you have two whistleblowers who have testified.    That's

20   correct.

21       Q    So you're not aware of any independent review within DOJ that can evaluate

22   concerns raised by members of the investigative team?

23       A    As I sit here today, I'm not aware of any such reviews.

24       Q    Okay.    If a special agent assigned to an investigation had concerns with the

25   objectivity of the Justice Department, unethical conduct of DOJ employees assigned to a

1    case, or DOJ employees who have provided preferential treatment to a taxpayer, how

2    would that agent or employee raise those concerns?

3        A    Again, that calls for speculation on my part.    You're talking about agents or

4    agency-related matters.    It's not something I'm going to speculate about.

5        Q    I mean, it's not that hypothetical.    I mean, we have two senior, you know,

6    criminal investigators that have bravely come forward to Congress and identified what

7    they consider is preferential treatment that was afforded to Hunter Biden.

8            And, you know, I'm just asking you what the process would ordinarily be when a

9    member of the investigative team believes that that's occurred.    What's the process

10   inside your office or inside of DOJ?    Is there any process?

11       A    I've told you.    I have no such process.    We haven't experienced it in our

12   office.    And to generally -- I don't have an answer.    I don't --

13       Q    Okay.

14       A    It's not something I experienced.    I understand what your representation is

15   with respect to these whistleblowers, and that would have me commenting on specifics

16   relative to this investigation and this case.

17       Q    Okay.    What's your understanding of the word "retaliation"?

18       A    In the context of retaliation vis-a-vis whistleblowers?

19       Q    Uh-huh.

20       A    I'm not going to get into anything along those lines.

21       Q    Okay.    Are you familiar with what a protected disclosure to Congress is?    If

22   a whistleblower believes that they've exhausted all avenues and they'd like to come to

23   Congress?

24       A    Again, that's not something for me to speak to.    I'm here to talk about my

25   authority.    I'm not going to get into these other matters.

1      Q      Okay.    But you are aware that there are avenues for whistleblowers to

2   come to Congress and to make legally-protected disclosures, correct?

3      A      As I think I indicated in my first letter to the chairman, I am aware of and

4   appreciate the whistleblower rights.    I do.    I understand them generally, and I

5   appreciate the importance of those rights.

6      Q      Prior to the March of 2022 discussion that you had with Mr. Graves -- and it

7   was March of 2022.    Did I get that date right?

8      A      That's correct.

9      Q      Had the matters that you had brought to Mr. Graves' office -- had they

10   already been approved by the Tax Division?

11     A      My recollection is that -- Tax Division?

12     Q      Yes.

13     A      Right.    I'm not going to comment on Tax Division approvals relative to this

14   case.    It would entail the deliberative process.

15     Q      I mean, you're aware that the Tax Division needs to okay criminal tax

16   charges, right?

17     A      I am aware of the Tax Division responsibilities under title -- under the Code

18   of Federal Regulations and the manual.

19     Q      Okay.    So, under the manual, the final authority for the prosecution or

20   declination of all criminal matters arising under the Internal Revenue laws rest with the

21   Tax Division, correct?

22     A      I am aware that Tax Division approves the charging of title 26 offenses.

23     Q      Okay.    How do you reconcile what the manual says?    I mean, the Tax

24   Division also has to approve if you're going to issue, you know, a search warrant and if

25   you're going to go to a grand jury.    Before you do that, the Tax Division needs to okay

1    that, correct?

2         A      There are certain types of search warrants that require Tax Division

3    approval, to my understanding.

4         Q      Okay.    But, if you're working a tax case, there's specific investigative steps

5    that need the okay or approval of the Tax Division before you can initiate, correct?

6         A      That's my understanding.

7         Q      Okay.    Would you agree that someone who has ultimate authority does not

8    require someone else's permission to act with regard to the matter over which they have

9    ultimate authority?

10        A      Again, I didn't need anybody's permission.    I made the decision.    From my

11   perspective, the Tax Division was more than comfortable with me making the decision.

12        Q      Okay.

13        A      I think they wanted me to be the one making the decision.

14        Q      Okay.

15        A      And, in this case, I never experienced a situation where I ran into any issues

16   with respect to Tax Division approval.    If I had, I would have dealt with it.

17        Q      Okay.    So you believe you had the ultimate authority over the Tax Division

18   officials in this instance?

19        A      I believe I was the decisionmaker in the case, as I said in my opening

20   statement.

21        Q      Okay.    So, even if the Tax Division disagreed, you felt that you could have

22   proceeded anyway?

23        A      If Tax Division -- if we came to an impasse -- which, as I said, didn't happen in

24   this case -- and I felt that my position was the one I wanted to pursue, and I felt that my

25   course of action was the appropriate one, I could have appealed to the Deputy Attorney

1    General or the Attorney General.

2         Q    I mean, the whistleblowers testified that there were a series of

3    disagreements over, you know, whether the 2014 and 2015 -- the 2014 and 2015 tax

4    years, by the way, with Hunter Biden are pretty crucial years because that's all the

5    Burisma income.    That's all the income that flowed from the official acts of the former

6    Vice President.

7         And so, 2014 and 2015, those tax years were crucial to the Hunter Biden

8    prosecution.    Isn't that correct?

9         A    Again, that's a matter you know I can't comment on, and I shouldn't be

10   commenting on because it implicates the investigation and my ongoing litigation.

11        Q    And we heard from the whistleblowers that, during the course of the

12   investigative work, the Tax Division and everyone prosecuting it that was on the

13   prosecution team was in favor of moving forward on the 2014 and 2015 tax years until

14   they weren't.    Are you aware of that?

15        A    I'm not going to comment on that.    That's deliberative process.    There will

16   come a time, however, when I look forward to having the opportunity in the submission

17   of a report to address matters such as the one you just spoke to.

18        Q    Okay.    Are you aware of the special agent report that was prepared by

19   Mr. Ziegler?

20        A    I am aware that IRS prepared a report.

21        Q    And do you remember when that was?

22        A    I believe the report was completed in early 2022, I believe.    That's my best

23   recollection.

24        Q    And, as we understand it, there was a series of meetings in the fall of 2021

25   with everyone on the prosecution team -- the assistant United States attorneys in your

1   office, you were involved, the Tax Division officials were involved, FBI officials were

2   involved, IRS investigators were involved -- in the fall of 2021 about how to proceed on

3   charging Mr. Biden.    Do you remember that?

4       A    No, I don't.

5       Q    Okay.    And, from that, the special agent report resulted -- and Mr. Ziegler

6   testified that, after meetings in October of 2021, he left that meeting with the

7   understanding that he was to prepare the first draft of the special agent report, and he

8   began that over the November timeframe of 2021.    Is that your understanding?

9       A    I have no idea what Mr. Ziegler's understanding was, nor could I speak to it,

10  nor should I be speaking to it, given the scope of my testimony and the implications to the

11  investigation and the deliberative process.

12      Q    But you're aware a special agent report was prepared in this case, correct?

13      A    As I said a moment ago, yes, I am aware a special agent report was prepared,

14  and as you have suggested, that's something that apparently should be prepared by the

15  special agent.

16      Q    Okay.    And you indicated that it was finalized in the beginning part of 2022,

17  correct?

18      A    That's the best of my recollection.

19      Q    Which was right around the same time that you initiated communications

20  with Mr. Carlin and Mr. -- and ultimately Mr. Weinsheimer, right, and then Mr. Graves?

21      A    It is right about the time, or I initiated contact sometime after that.

22      Q    Okay.    So, before you initiated contact with Mr. Carlin and

23  Mr. Weinsheimer, the team had reached a consensus that that was what it was going to

24  do, correct?

25      A    Before I reached out, as I mentioned a moment ago, the special agent's

1    report had been completed.

2         Q    Okay.   What was the next step after the special agent report was

3    completed?

4         A    What do you mean what was the next step?   I'm not sure -- I want to make

5    sure I fully understand your question.

6         Q    Well, the special agent -- the IRS prepared a special agent report, correct?

7         A    Yes.

8         Q    And the next step, as we understand it, was that report was analyzed by DOJ

9    officials both in the Tax Division and in your office, correct?

10        A    I'm not going to talk about the review, analysis of that report, or any other

11   report that would necessarily get into the deliberative process.   That's something I

12   shouldn't be addressing.

13        Q    Okay.   Was a memo prepared subsequent to the receiving of the special

14   agent report by the Tax Division lawyers?

15        A    I'm not going to talk about any memoranda that was prepared during the

16   course of this investigation.   That would entail deliberative process.

17        Q    Okay.   But, before you called Mr. Graves, was there any disagreement

18   about your plan to call Mr. Graves and to proceed in D.C.?

19        A    Again, that would entail discussions regarding deliberative process among

20   prosecutors, agents, others.   So, no, it's not a matter I can discuss.

21        Q    Okay.   At that point in time, had the Tax Division given you discretion to

22   move forward on all the tax years or just 2014 and 2015?

23        A    Again, those are matters that are related to the deliberative process, go to

24   the investigation, and are matters that, at this point in time, I'm just not in a position to

25   discuss.   I would expect that I would be in a position at the conclusion of our

1    investigation where I can address it in the submission of the report.

2         Q    Okay.   I'm going to turn to the letter that we marked as exhibit 1, the June

3    7th letter.   And this is your first letter to Mr. Jordan.

4         Initially, Mr. Jordan had written the Department, and we were a little surprised

5    that you replied to Mr. Jordan's initial letter.   Could you help us understand how that

6    came to be?

7         A    Mr. Jordan's letter -- I can't really get into the particulars -- the who, what,

8    when, and where -- because, again, that gets into deliberative process in responding to

9    the chairman's letter.

10        But I'd say that these were matters that clearly addressed circumstances, given

11   the case I thought was being referenced, and the questions posed matters within my

12   purview.   So it seemed appropriate for me to respond.

13        Q    Okay.   So did the Department ask you to respond, or did you ask the

14   Department if you could respond?

15        A    There were discussions.   Again, I don't want to get into the particulars, but

16   there were discussions with members of the Department about the response.

17        Chairman Jordan.   We actually sent two letters.   We sent a letter in February to

18   the Attorney General, who didn't respond.   He didn't respond.   You didn't respond.

19   No one responded.   And then we sent the letter on May 25th to the Attorney General

20   that you responded to.

21        And I guess what Steve is asking is, did the Attorney General call you up and say,

22   "Hey, David, I want you to respond to this letter"?   How did that work?

23        Mr. Weiss.   He did not.

24        Chairman Jordan.   Who told you to respond?

25        Mr. Weiss.   No one told me to respond.   As I said --

1    Chairman Jordan.   Well, how did you know -- if the letter didn't go to you, how

2    did you find out?

3    Mr. Weiss.   The letter was shared with me because -- well, I shouldn't say.   I

4    don't know.   The letter was shared with me because it seemed to concern a matter with

5    the Hunter Biden investigation.   So it was shared with me.

6    And there were discussions with members from ODAG and others.   And I agreed

7    to send the letter -- I agreed to sign the letter.   And --

8    BY MR. CASTOR:

9    Q   So you didn't write the letter?

10   A   Look, I --

11   Q   Your office didn't write it, though?

12   A   No, that's not true.   I'm not going to get into the particulars because it's a

13   deliberative process.

14   But, as you guys have noted, I had never previously responded to a letter from the

15   chairman.   I wasn't going to sign off on any communication with Congress that I didn't

16   fully endorse.   So these are matters that I addressed that I was comfortable saying in

17   response to the chairman's letter.

18   Q   Okay.   Are you familiar with the Linder Letter?

19   A   Am I familiar with it?

20   Q   Yeah.

21   A   I mean, I know it's referenced here.

22   Q   But, before this, did you know anything about the Linder Letter?   I mean,

23   this is pretty arcane.

24   A   I wasn't intimately familiar with the Linder Letter.

25   Q   Of course not.   Of course not.   Unless you're involved with congressional

1    investigations, the Linder Letter is not something that really anybody knows about, right?

2    You know, it's --

3         A    I don't know that.    But I'm telling you, I wasn't intimately familiar with the

4    Linder Letter.

5         Q    Okay.    And there's all sorts of, you know, text in here about the Linder

6    Letter stuff.

7              Is that the first time you became familiar with the Linder Letter?

8         A    I'm not going to get into the deliberative process.

9              But my understanding was, whether it was the Linder Letter or any other aspect

10   referenced here, these are matters that speak to investigative oversight, congressional

11   responsibilities.    It was certainly part of the education and something that is

12   appropriately addressed when responding to --

13        Q    I mean, the Linder Letter is a list of, like, every reason the Department can

14   think of not to reply to Congress.    Is that a fair assessment?

15        A    I'm not going to characterize it.    My intention wasn't -- look, I was

16   responding for the first time.

17        Q    Right.

18        A    I wasn't intending to offer a response that was nonresponsive.

19        Q    Right.    I mean, anytime Congress asks the Department something, they've

20   got, like, a menu of, like, a million reasons they can't give us the answers we want.    Are

21   you aware of that?

22        A    I am not -- I am not fully conversed in the exchange of the letters Congress

23   writes and the back-and-forth between the Department and Congress, and I shouldn't

24   say.

25             Chairman Jordan.    Our letter goes to the Main Justice.    It goes to the Attorney

1    General, and then someone shares it with you.    Who shared it with you?    How did you

2    find out?

3         Mr. <u>Weiss.</u>    I can say that I had -- I spoke to others, but, again, I don't want to get

4    into the particulars because it will get in -- necessarily get into the deliberative process.

5         Chairman <u>Jordan.</u>    Well, someone had to -- like, it just didn't, like, appear.

6    Someone had to say, like, "Hey, Mr. Weiss, we have this letter regarding a case that we

7    think you're dealing with," and then there's a response put together that you sign off on.

8         Mr. <u>Weiss.</u>    There's a response that was prepared that I signed --

9         Chairman <u>Jordan.</u>    Was it prepared by Main Justice, or was it prepared by the

10   U.S. Attorney's Office in Delaware?

11        Mr. <u>Weiss.</u>    I will say, globally, it was prepared by the U.S. Attorney's Office in

12   Delaware.

13        Chairman <u>Jordan.</u>    What does that mean?

14        Mr. <u>Weiss.</u>    That means that it was generated by the U.S. Attorney's Office in

15   Delaware.

16        Chairman <u>Jordan.</u>    With consultation from the people at Main Justice?

17        Mr. <u>Weiss.</u>    People -- again, now we're getting further and further into the

18   deliberative process, and I'm not going to do that.

19        I'm saying that it was, as I said, prepared primarily in my office, and I signed the

20   letter.    The first time signing a letter to the chairman or anyone else affiliated with

21   Congress, so I wasn't going to do it until and unless I was fully comfortable.

22        Chairman <u>Jordan.</u>    You know, the first sentence sort of says it all:    "The May

23   25th letter to Attorney General Garland was forwarded to me."

24        Mr. <u>Weiss.</u>    Yes.

25        Chairman <u>Jordan.</u>    So someone gave it to you.

1          Mr. Weiss.    Yes.

2          Chairman Jordan.    "With a request that I respond."

3          So they said you're going to -- so Main Justice said, "Hey, Mr. Weiss, we got this

4    letter.    We don't want to respond.    We're giving it to you.    You write them back."

5          Mr. Weiss.    Forwarded to me with the request that I respond.    I was asked to

6    respond.    Nobody directed me.    Nobody ordered me.    Nobody -- you know, so I can't

7    endorse that aspect of things.

8          Chairman Jordan.    Okay.

9                    BY MR. CASTOR:

10         Q      And did they give you all the Linder Letter lingo?

11         A      Again, as part of the deliberative process, I became more familiar than I

12   historically had been with the Linder Letter.

13         Q      Right.    I mean, ordinarily, U.S. Attorneys don't engage with us.    I mean, we

14   frequently will write U.S. Attorneys and ask them questions about important matters,

15   and --

16         Mr. Ivey.    That was the old days.

17                   BY MR. CASTOR:

18         Q      -- you know, almost uniformly, we get a letter back, or we don't get a letter

19   back.    Like, you know, in February, we didn't get a letter back.    We get a letter back

20   from the Justice Department thanking us for our interests and so forth.

21         So the fact that you responded to this letter was remarkable, and so we're just

22   curious how that came to be.

23         A      Again, I think I've tried to address it as best I can.

24         Q      Okay.    In the letter, you asserted, "I have been granted ultimate authority

25   over this matter, including responsibility for deciding where, when, and whether to file

1    charges and for making decisions necessary to preserve the integrity of the prosecution

2    consistent with Federal law, the principles of Federal prosecution, and departmental

3    regulations."

4         Was that something that you added in the letter or your staff, or was that

5    something that emanated from Main Justice?

6         A    That came from us.    The District of Delaware.

7         Q    Okay.    Can you tell us at least what offices were involved with the

8    preparation of that?    We have the Office of Legislative Affairs; you said the Office of

9    Deputy Attorney General, your office in the District of Delaware.    Any other components

10   of the Department involved in that?

11        A    No, not -- no.

12        Q    Okay.    So nobody from OLC?

13        A    I'm unaware of anyone else being involved in this.

14        Q    Okay.    And did you have telephone calls about it?    Was it email

15   exchanges?

16        A    I'm not going to get into particulars.

17        Q    Okay.    Were there email exchanges?

18        A    I don't recall, and I'm not going to get into specifics.

19        Q    Okay.    So you don't even know the answer if you were allowed to answer?

20        A    I'm allowed to answer.

21        Q    Okay.

22        A    But it doesn't mean that it's appropriate that I answer.    But I'm permitted

23   to answer, but it goes to deliberative process.    So nobody is precluding me from

24   responding.

25        Q    So you can answer my question.

1       Were there emails?

2       A     No.    I can't answer it because it gets into the deliberative process of

3    responding to the letter.

4       Q     Okay.    So you're saying that you know the answer to the question, but you

5    just are not going to give me the answer?

6       A     I'm saying that it's part of the deliberative process, and I'm not going to dive

7    into the particulars.

8       Q     All right.    You sent a subsequent letter to us on June 30th.    We marked

9    that as exhibit 2.

10      Did the decision to have you send a second letter to Congress on June 30th -- did

11   that follow the same process as the first letter in terms of the Department forwarding you

12   information?    Or how did it come to be that you responded on June 30th to the

13   chairman?

14      A     I don't have the letter that the chairman issued the second time.    I don't

15   know if it was directed to me.    I just don't recall off the top of my head.    But, certainly,

16   yeah, in the general sense, without getting into particulars --

17      Q     I can give it -- it's in response to the June 22nd letter?

18      A     All I was interested in was whether it was addressed to me.

19      Q     Right.

20      Chairman Jordan.    It was.

21          BY MR. CASTOR:

22      Q     It was.

23      A     Yeah.    So it would have sort of short-circuited a bit.    But otherwise, yes.

24      Mr. Castor.    So we'll mark it as exhibit 4 for you.

25                             [Weiss Exhibit No. 4

1          Was marked for identification.]

2          BY MR. CASTOR:

3          Q     Your June 30th letter states -- this is in response to your June 22nd letter,

4     and this is responding to Mr. Jordan.

5          The second paragraph -- I'll call your attention to the second paragraph:     "At the

6     outset, I would like to reaffirm the contents of the June 7 letter drafted by my office and

7     reiterate that I'm not at liberty to provide the materials you seek.     The whistleblowers'

8     allegations relate to a criminal investigation that is now being prosecuted in the United

9     States District Court for the District of Delaware."

10          And the question I have for you is, as of June 30th, 2023, you had decided to pivot

11     back to Delaware for prosecuting this case?

12          A     As of June 30th --

13          Q     2023.

14          A     -- 2023, there had been a filing in the District of Delaware.

15          Q     Okay.    And what was that filing?

16          A     A filing of a -- an information and plea agreement with respect to the tax

17     matters and a diversion agreement with respect to the firearm charges.

18          Q     Okay.    Going down to the last paragraph on the first page, starting with the

19     last sentence on the page, "I stand by what I wrote and wish to expand on what this

20     means."

21          A     Yes.

22          Q     And flipping over to the second page, "As the United States Attorney for the

23     District of Delaware, my charging authority is geographically limited to my home district.

24     If venue for a case lies elsewhere, common departmental practice is to contact the United

25     States Attorney's Office for the district in question and determine whether it wants to

1    partner on the case.    If not, I may request Special Attorney status from the Attorney

2    General pursuant to 28 United States Code 515.    Here, I have been assured that, if

3    necessary after the above process, I would be granted 515 authority in the District of

4    Columbia, Central District of California, or any other district where charges could be

5    brought in this matter."

6            Isn't it also true that your lawyers could have been afforded SAUSA status?

7        A    SAUSA status solely as -- in a supporting way to the District of Columbia?

8        Q    Well, it's our understanding -- and maybe I misunderstood what you said

9    earlier -- that one of the ways you could have prosecuted a case in D.C. was to have

10   Mr. Graves appoint your lawyers Special Assistant United States Attorneys for the District

11   of Columbia to prosecute the case?

12       A    I don't know -- I don't recall describing it that way.

13       Q    Okay.

14       A    You know, I didn't envision a circumstance in which this would proceed

15   without me continuing to be involved in a supervisory way.    Regardless of whether D.C.

16   chose to partner or not, my expectation and intention was that I would continue to

17   participate in a supervisory capacity as the case moved forward.

18       Q    Okay.    Do you agree that the June 7th letter and the June 30th letter are

19   sort of describing two separate situations?

20       A    No, I don't.

21       Q    Okay.    Because, in the June 7th letter, you indicate that you've been

22   granted ultimate authority over this matter, including the responsibility for deciding

23   where, when, and whether to file charges.

24       A    Uh-huh.

25       Q    But, in the June 30th letter, you walk us through how you have got to confer

1    with, you know, the various U.S. Attorneys in the different districts.

2        A     Yeah.

3        Q     Could you help us understand the difference there?

4        A     Yeah.    I don't see it as an inconsistency.    It doesn't mean I don't have the

5    authority.    And, again, you read it the first time.    You didn't this last time.

6        In the June 7th letter, I say -- I talk about my authority, and I say "consistent with

7    Federal law, the principles of Federal prosecution, and departmental regs," which means

8    I'm not operating in a vacuum.

9        There's a basic structure and a framework that, as a U.S. Attorney, I'm operating

10   within.    And that means that, if I go outside my jurisdiction, I've got to do certain things.

11   And, in this situation, if I go outside the jurisdiction, I'm describing in the second letter the

12   process that I adhered to.

13       It doesn't mean that anybody blocked my authority or prevented me from

14   pursuing charges.    I'm just trying to describe the process that references the consistent

15   language in the June 7 letter.

16       Q     But, in the June 7th letter, if you had been granted indeed ultimate

17   authority, you didn't need to ask Matthew Graves whether he wanted to partner with

18   you, correct?

19       A     There would have never been a situation where I'm granted ultimate

20   authority and all the processes that are part of DOJ's framework and the Department

21   within which I operate are -- suddenly disappear.    I had the authority, but still, I had to

22   proceed consistent with departmental processes.    I'm describing one of those processes

23   here.

24       Nobody blocked me.    Nobody prevented me.    I still had the authority, and I had

25   the ability to make the decision.

1     [11:04 a.m.]

2               BY MR. CASTOR:

3        Q    But on June 7th you hadn't been afforded 515 authority.    And so you didn't

4    have ultimate authority to bring a case in D.C., correct?

5        A    On June 7th, I knew, because I had the conversations that I've previously

6    described with Carlin and Weinsheimer where they said --

7        Q    Right.

8        A    -- if you want to proceed in D.C., you have the authority to do so, and you

9    can file whatever charges you deem appropriate.

10       Q    Right.

11       A    To me, it didn't require that I then do it.    It had been represented to me

12   that I had the authority.    So it was a done deal, as far as I was concerned.

13       Q    Right.    But the Attorney General would've had to confer that authority to

14   you.    I mean, you didn't have it at that time.

15       A    The Attorney General --

16       Q    You were advised that you'd be getting that authority if you really wanted it.

17       A    No.    I was advised at that time, if I decided to proceed in D.C., I had the

18   authority to do so.    That's the way -- I'm telling you what I understand, what I believed.

19       Q    So you didn't need a 515 designation from the Attorney General?

20       A    No.    In order to put this into place, in order to execute on the

21   representation that I've just described a couple times --

22       Q    Right.

23       A    -- that would've required an order signed, and that would've ultimately

24   conferred the authority.    Yes, there would've been a documentation of the --

25            Chairman Jordan.    So you go to D.C., you ask them to partner, and they say no.

1    Then you have the meeting with Carlin and Weinsheimer at Main Justice, and they said,

2    you can have the authority if you want it.    But you never asked for it.    And yet you

3    conveyed to us you had it all along.

4         Mr. Weiss.    Yeah, they con- -- first of all, it wasn't a meeting in D.C.; it was a

5    phone call.    And I had -- the conver- --

6         Chairman Jordan.    But after you had the conversation with Weinsheimer and

7    Carlin -- you meet with them, phone call, email, whatever -- phone call, you meet with

8    them, or you talked to them --

9         Mr. Weiss.    I talk to them.    They say, if you want to proceed in D.C., you have

10   the authority to move forward.    That's correct.

11        Mr. Armstrong.    Is there any written affirmation of that, or just the phone call?

12        Mr. Weiss.    At that time?

13        Mr. Armstrong.    Yeah.

14        Mr. Weiss.    No.

15             BY MR. CASTOR:

16   Q        Before our hour's up, I want to refer you to exhibit 3, which is the third

17   letter.    This is a letter you sent to Senator Lindsey Graham.

18   A        Yes.    Yes.

19   Q        You state, "To clarify an apparent misperception and avoid future confusion,

20   I wish to make one point clear:    in this case, I have not requested Special Counsel

21   designation pursuant to" the CFR -- I'm paraphrasing here.    "Rather, I had discussions

22   with Departmental officials regarding...appointment under...515, which would have

23   allowed me to file charges in a district outside my own without the partnership of the

24   local U.S. Attorney."

25             What did you mean when you wrote that you would be granted this authority if it

1    proved necessary?    And this is on July 10th.

2        A    Again, this is the same back-and-forth we've been having -- I had with you,

3    counsel --

4        Q    Right.

5        A    -- and with the chairman, where, if I decided to move forward -- it was just a

6    question of whether I decided to move forward --

7        Q    Right.

8        A    -- and where that would occur.

9        Q    Right.

10        A    That's all that the focus was, in my mind.

11        Q    Uh-huh.

12        A    I wasn't -- the authority, to the best of my belief, that had been resolved.    I

13    was going to have the authority; just a question of where I was going to move forward

14    with respect to that.

15        Q    Right.    But you agree that the term "would be" refers to a plan or intention

16    to do something in the future, correct?

17        A    I hadn't made a decision as to where the case would proceed or how the

18    case would proceed.    The focus --

19        Q    And if it --

20        A    The focus was on the case.

21        Q    Okay.    And the words "if it proved necessary" refers to a condition that had

22    not been fulfilled at the time you wrote the letter, correct?

23        A    The "if it proves necessary" refers to the fact that, as I've described on

24    multiple occasions now, I had the conversation, I had previously requested the authority,

25    and it was made clear to me, if you decide to move forward, you have the authority to do

1    so and to bring whatever charges you deem appropriate.

2         Q    Right.

3         A    So, to me, as I said a moment ago, that issue had been resolved.

4         Q    By the time we had this letter series, though, you had already asked

5    Matthew Graves to partner, you had asked Martin Estrada to partner, and both had said

6    no.

7         And so, at that point in time, it's hard for us to understand, as we sit here today,

8    how didn't it prove necessary?    I mean, this is before you were afforded, you know,

9    Special Counsel status in August of 2023.    You write, you know, "if it proved necessary."

10        A    Yes, if -- as I said, if the decision was made to proceed, I knew I had the

11   authority to do so.    So, you know, why didn't it prove necessary?    The question speaks

12   to deliberations --

13        Q    Right.

14        A    -- charging decisions.    Those are things I just can't get into.

15        Q    But in, you know, July of 2023 and at the end of this letter series that we're

16   discussing, you know, over a year had elapsed since you'd gone to D.C. and D.C. said no,

17   you'd gone to Los Angeles and Los Angeles said no.

18        And so it's just hard for us, as we sit here today, to understand how, in fact, you

19   did have ultimate authority to bring a case wherever you, you know, deemed fit.

20        A    Yeah.    I appreciate your question.    I can't get into the specifics of the

21   charging decision or the deliberative process.    I reaffirm what I've said about my

22   authority --

23        Q    Uh-huh.

24        A    -- and that's all I can --

25        Q    Okay.

1        A      I don't want to be too repetitive.

2        Q      But you do understand that a potential appointment -- a potential

3    appointment as of July of 2023 indicates that you had not been afforded that authority,

4    correct, under 515?

5        A      I'm sorry.    Could you -- I didn't understand your question.    A potential?

6        Q      A potential appointment as a Special Attorney or as a Special Counsel, as you

7    reference in the Lindsey Graham letter, that is -- you know, indicates that you had not

8    been actually appointed at that point in time.

9        A      I had not -- the execution of the authority had not taken place, that's correct.

10    But it wasn't a function of the authority or lack thereof; it was the decision as to where or

11    how to proceed.

12        Q      Okay.

13        The hour's up.

14        Chairman Jordan.    We'll take a 5-minute break, 10-minute break, whatever you

15    guys need.

16        The Reporter.    Off the record?

17        Ms. Nabity.    Yes.

18        Mr. Castor.    Yes.

19        [Recess.]

20        ██████.    It is 11:27.    We can go back on the record.

21        Special Counsel Weiss, thank you again for joining us today.

22        Mr. Weiss.    Sure.

23                              EXAMINATION

24            BY ████████:

25        Q      At the start, I just want to clarify a couple things from the last round.

1          You're appearing here today voluntarily, correct?

2      A    I am.

3      Q    And nobody from the Department is preventing you from answering any

4      question, correct?

5      A    They are not.

6      Q    Okay.

7          At the end of the last round, there was some conversation about whether it would

8      prove necessary for you to seek 515 authority.    Do you recall that conversation?

9      A    I do.

10     Q    Okay.    I want to explore that a little bit further.

11         Before I do, could you briefly describe in layperson's terms what the term "venue"

12     means?

13     A    "Venue" is where -- there has to be a nexus with jurisdiction to file charges.

14     And, in any given case, there are -- depending upon the nature of the case, there are

15     certain facts that tell you where venue lies.

16         And, as counsel for the majority explored, there are a number of factors that will

17     determine appropriate venue in a tax case.    It could be the residence of the taxpayer, it

18     could be where the tax returns are filed, things of that sort.

19     Q    And if prosecutors do not bring a case or a charge in an appropriate

20     jurisdiction or an appropriate venue, then the court can dismiss the charges, correct?

21     A    Certainly, I would expect, as a general matter, a defense counsel to seek

22     dismissal.    I don't know that that would terminate the prosecution, but certainly could

23     give rise to motion to dismiss.

24     Q    Understood.

25         And all of that said, though, a defendant can waive his or her right to challenge

1      venue as part of a plea agreement, correct?

2              A      A defendant can waive venue.

3              Q      And if a defendant has agreed to waive venue as part of a plea agreement,

4      then the prosecutor would not need to seek authority to bring charges in any other

5      jurisdiction.    Is that correct?

6              A      A prosecutor would not seek to, yeah, to receive approval to bring charges in

7      that jurisdiction in which venue had been waived, yes.

8              Q      All right.

9              I want to move on.    And we talked about your background at the very beginning

10     of the last hour.    I want to go through that in a little bit more detail.

11             So can you say again, when did you first join the District of Delaware United States

12     Attorney's Office?

13             A      I started -- originally?   A long time ago.    I started at the U.S. Attorney's

14     Office in Delaware in '86.

15             Q      And what was your role?    What kind of cases did you prosecute?

16             A      I was an Assistant United States Attorney, and I prosecuted drug cases,

17     firearm cases, public corruption cases, economic crime cases, tax cases.    Whatever the

18     district had to offer I was more than happy to work on.

19             Q      And how long were you a career prosecutor during your first stint with the

20     District of Delaware's office?

21             A      About 3-1/2 years.

22             Q      Okay.    And then you left the U.S. Attorney's Office, correct?

23             A      I did.

24             Q      And at some point did you return to the U.S. Attorney's Office?

25             A      I did.

1       Q       When was that?

2       A       That was in 2007.

3       Q       And what led you to return to the U.S. Attorney's Office in 2007?

4       A       I had been in private practice for some time, and then I went with a client of

5   mine and was in private industry -- both positive experiences, experiences that I enjoyed.

6   But public service is different.

7       Q       And when you returned in 2007, who was the U.S. Attorney in the District of

8   Delaware?

9       A       Colm Connolly.

10      Q       And who was Mr. Connolly an appointee of?

11      A       Mr. Connolly was -- he was an appointee -- I don't know which President.    A

12   Republican -- a Republican President.

13      Q       Is it fair to say, if he was the U.S. Attorney in 2007, he was likely an

14   appointee of President George W. Bush?

15      A       Yes.

16      Q       Okay.

17      A       I wasn't tracking.

18      Q       When you returned to the District of Delaware in 2007, what was your role?

19      A       When I returned, I was FAUSA and I was chief of the Civil Division.

20      Q       And, for the record, what is FAUSA?

21      A       First Assistant United States Attorney.    Sorry for that.

22      Q       And what is the role of the FAUSA?

23      A       The FAUSA is the number-two -- at least as our office is structured and has

24   historically been structured, the FAUSA is the number-two in the District of Delaware.

25      Q       Okay.

1          And then you stayed at the District of Delaware for a period of time, correct?

2          A     Until now.

3          Q     Okay.     So, in fact, you returned to the District of Delaware under President

4     George W. Bush; you stayed throughout President Obama; and now you've stayed

5     through President Trump and, again, President Biden, correct?

6          A     That is correct.

7          Q     Okay.

8          In the earlier hour, you were asked about the blue-slip process and whether you

9     had been recommended by the Senators from Delaware.

10          As part of the process for being nominated as U.S. Attorney, did you have any

11     conversations with the White House Counsel's Office?

12          A     I don't recall whether I did, in all candor.

13          Q     Did you have conversations with the Justice Department?

14          A     Yes, I did.

15          Q     And do you recall who you had conversations with?

16          A     I would've been interviewed by -- I was definitely interviewed by Rod

17     Rosenstein.     I was interviewed by Scott Schools, I believe, and a group of folks in a

18     conference room.

19          Q     And Mr. Rosenstein and Mr. Schools were both Republican appointees,

20     correct?

21          A     Mr. Rosenstein was.     I just don't know about Scott Schools.     I thought

22     Mr. Schools was the senior career official in the Department at that time.     I have no idea

23     who he was appointed by.

24          Q     Okay.

25          And then you were ultimately nominated to serve as U.S. Attorney by

1       President Trump, correct?

2           A       I was.

3           Q       Okay.

4       I want to introduce as exhibit 5 -- is that right? -- exhibit 5, the November 17,

5       2017, statement from President Trump announcing your appointment.

6                                   [Weiss Exhibit No. 5

7                                   Was marked for identification.]

8               BY ███████████:

9           Q       And I'll give you a minute to review.    I can tell you, we're going to look at

10      the first paragraph on the first page.    And I think your nomination is actually on the

11      second page.

12          A       Okay.

13          Q       Are you ready to proceed?

14          A       I think so.    It appears that I got most of my background information correct.

15          Q       So this statement from President Trump actually announces the nominations

16      of four U.S. Attorneys and four U.S. Marshals.    And, as I said, your name is on the second

17      page of this announcement as printed.

18      I want to read from the first paragraph, which relates to all of the individuals who

19      are nominated on November 17th, you and the others.

20      In relevant part, it says, "The United States Attorney serves as the chief Federal

21      law enforcement officer within his or her Federal judicial district."    It then describes the

22      role of the U.S. Marshals.    And then it says, "These candidates share the President's

23      vision for 'Making America Safe Again.'"

24      Is this consistent with your recollection of why you were nominated for this role

25      by President Trump?

1       A      I can't really speak to that.    From -- I can't say why I was nominated.    I

2    really don't know, I mean, other than I believe I was a credible candidate in whom the

3    folks that I interacted with had confidence that I could perform the job.    That's all I could

4    say, based on my understanding.

5       Q      Okay.

6              Is it fair to say that you've served under both Republican and Democratic

7    administrations?

8       A      I have.

9       Q      And, in fact, for the majority of your time at the U.S. Attorney's Office, you

10   were a career prosecutor, not a political appointee, correct?

11      A      That is correct.    I consider myself first and foremost a prosecutor.

12      Q      Okay.    During the course of your career, have you tried cases before a jury?

13      A      Yes.

14      Q      Approximately how many cases have you tried before a jury?

15      A      I think, the best I can recall, as I described in my background work-up,

16   somewhere in the neighborhood of 17 or so cases.

17      Q      Okay.    And you've supervised many more cases that have been tried before

18   juries; is that fair to say?

19      A      I have.

20      Q      And so you have a good understanding of the considerations a prosecutor

21   might take into account when considering whether to bring a case before a jury.    Is that

22   fair to say?

23      A      I hope that I do.

24      Q      Okay.

25              I want to move on to your interactions with the U.S. Attorney's Office in D.C.

1     and -- yeah, focus on the U.S. Attorney's Office in D.C.

2         You said that you first approached Mr. Graves in either late February or early

3     March of 2022, correct?

4         A     The conversation I had with Mr. Graves, I believe, was in early March, yes.

5         Q     Okay.    And when you approached Mr. Graves, did you ask him to provide

6     administrative support as you were exploring the possibility of bringing charges in the

7     District of Columbia?

8         A     I don't know whether I did or not, to tell you the truth.    It was one

9     conversation, 5 or 10 minutes, and I don't recall the particulars with respect to the need

10    for administrative support.

11        Q     Was it ever a concern of yours that Mr. Graves might not provide you with

12    administrative support if you chose to move forward in the District of Columbia?

13        A     Ultimately, no, it wasn't.    I understood, at the conclusion of the process,

14    not necessarily from Mr. Graves, but that we would have a logistical support if we were to

15    proceed.

16        Q     And what do you mean by "logistical support"?

17        A     I mean that we were -- we were interested in someone who could work with

18    us from an administrative standpoint, somebody who could help us in working with the

19    court and the processes that are required, the practices, local practice, things of that

20    nature -- provide some guidance as to the local logistics.

21        Q     And was it your impression that Mr. Graves and his team would, in fact,

22    provide you with that support?

23        A     It was my understanding that D.C. would've supported us in that regard

24    generally.

25        Q     Okay.

1      There were some questions earlier about Mr. Graves's decision not to join the

2    case, or not to have his office join the case.

3      You said that you provided him with the information -- or your team provided him

4    with the information they needed so he could make an informed decision.   Do you recall

5    saying that?

6      A    I recall saying something along those lines, yes.

7      Q    And can you explain what you mean by "so he could make an informed

8    decision"?

9      A    Well, not -- I wasn't directing this to Mr. Graves per se.   I don't know

10    who -- I mean, I know that career folks in Mr. Graves's office and my own office

11    interacted and discussed things.   I don't know anything about the particular

12    decision-making process itself.

13      Q    Understood.   But when you're saying "informed decision," that means that

14    you thought that it was up to Mr. Graves to make the choice, right?   It wasn't -- you

15    weren't directing him to make any particular decision.

16      A    I wasn't directing him to make a decision.   My folks were trying to provide

17    them with what we determined -- what information was necessary in order to make a

18    decision.   Of course, that couldn't have been anything like the information that we had

19    in our possession that we had developed over the course of 2-plus years or more.

20      Q    What do you mean by that?

21      A    I mean that we had been conducting an investigation for an extended period

22    of time, so we weren't about to share everything that we had.

23      Q    Okay.

24      When you approached Mr. Graves, were you under the impression that you

25    needed Mr. Graves to join the case in order to proceed in the District of Columbia?

1       A    I was not under the impression either way that I needed -- no.   I wasn't

2  asking for his permission or anything along those lines.

3       Q    Okay.

4       Did Mr. Graves tell you why he didn't want to join the case?

5       A    I never had a conversation with Mr. Graves about that.   I had the one

6  conversation when I reached out, told him what we were interested in doing, and

7  basically inquired as to whether his office would be willing to join us or participate in this

8  case.   We never had a subsequent conversation.   That was done at the line level.

9       Q    Okay.

10      When the decision was relayed to the line officials, did you have any reason or did

11  your team have any reason to believe that Mr. Graves's decision not to join the case was

12  motivated in any way based on partisan, political considerations?

13       A    I don't have -- I have -- I don't know what the basis of the decision was in

14  that regard, no.   I understand that they chose not to proceed.   I don't want to get into

15  particulars, as I said to counsel.   That involves deliberative-process types of

16  consideration, so I'm not going to speak to that.

17       Q    Did Mr. Graves take any steps to block or prevent you from bringing charges

18  in the District of Columbia?

19       A    No.   He wasn't in a position to block me.

20       Q    Did anyone on Mr. Graves's staff take any steps to block or prevent you from

21  bringing such charges?

22       A    No.

23       Q    And I think you said you did not believe that you needed permission from

24  Mr. Graves to move forward in the District of Columbia, correct?

25       A    That's correct.

1       Q    In the earlier hour, you were asked some questions about your interactions

2  with the Tax Division, and I want to return to those questions.

3       In this case, did you welcome the Tax Division's assistance?

4       A    I did.

5       Q    Why was that?

6       A    Because they're the experts in tax matters.    They have the experience; they

7  have the expertise.    And, from my perspective, the prosecution team would only benefit

8  from their input.

9       Q    Is it fair to say that tax cases can be uniquely complicated?

10      A    Yeah.    I'm not a tax expert, but yes.    They're a particular type of

11  white-collar case, and, like other white-collar cases, they can be complicated, involving

12  extensive documentations, tax returns, things of that nature.    So, yes, they can be

13  complicated.

14      Q    Okay.    And the Tax Division handles these kind of cases all the time,

15  correct?

16      A    That's my understanding, yes.

17      Q    Okay.

18      Are you familiar with the term "sufficiency of the evidence"?

19      A    Yes.

20      Q    In layman's terms, what does that mean?

21      A    That means that you have to have a certain modicum of evidence in order to

22  proceed with charges.    There has to be sufficient evidence to move forward.

23      Q    Is it fair to say that, in tax cases, in particular, which can, as you've just said,

24  be uniquely complicated, Tax Division prosecutors tend to have more experience in

25  understanding when evidence is likely to be sufficient for purposes of convincing a jury

1    that they've proven charges beyond a reasonable doubt?

2    A    I expect that Tax Division prosecutors, because this is the only type of work

3    that they do, would be uniquely qualified to weigh in on all aspects of a tax prosecution,

4    whether it's sufficiency of the evidence or other matters.

5    Q    And would that include Tax Division prosecutors having unique expertise in

6    the viability of potential defenses to charges?

7    A    Yeah.    All aspects of the case.    Yes.

8    Q    Okay.

9    The comment was made earlier about, I think, Tax Division could approve or deny

10   charges.    In fact, the Tax Division has three options, correct?    It can approve charges, it

11   can deny charges, or it can grant discretion.

12   A    That -- I'm not intimately familiar with all the intricacies of the Tax Division

13   process, but that's my understanding.

14   Q    Okay.    And when charges are approved, the U.S. Attorney's Office doesn't

15   have any discretion; it has to bring the charges that have been approved, correct?

16   A    My understanding -- and, again, I'm no expert -- is, if charges are approved

17   by the Tax Division, the charges are going to proceed.    If the U.S. Attorney's Office

18   decides not to be part of the case, Tax Division, on its own, will proceed with charges.

19   Q    Okay.    And when charges are denied, that means the U.S. Attorney's Office

20   absolutely cannot proceed with charges, correct?

21   A    That would be my understanding.

22   Q    Unless, obviously, the -- the U.S. Attorney's Office could appeal that decision.

23   A    Yeah, I mean -- yes.    Again, as I discussed with majority counsel, that's not

24   something that I experienced in this case, but, yes, I was always aware of the fact that if

25   there was a difference of opinion with respect to the appropriateness of charges, that

1    ultimately it's either the ODAG or the AG that makes the call as to whether a case would

2    proceed if there's an impasse between a U.S. Attorney's Office and a component.

3          Q    Okay.

4          And, finally, what does it mean when the Tax Division grants "discretion" to a

5    U.S. Attorney's Office over whether to bring charges?

6          A    My understanding would be, it's telling the U.S. Attorney's Office that it can

7    decide whether to proceed or not.    And then Tax Division, on its own, will decide

8    whether to be part of that case or not.

9          Q    Okay.    So, in effect, granting discretion gives a U.S. Attorney full

10    decision-making authority over whether to bring those charges.    Is that right?

11          A    That's my understanding, that, yes, then the U.S. Attorney's Office can

12    decide whether to move forward.

13          Q    Okay.    In this case, the Tax Division granted your office discretion, correct?

14          A    I'm not going to talk about what Tax Division did or did not do in this case.

15          Q    Okay.

16          You alluded to this just a minute ago, but if there had been a dispute over whether

17    to bring charges, for example, between line prosecutors at the District of Delaware and

18    line prosecutors from the Tax Division, how do you expect that might've been resolved?

19          A    Again, that calls for speculation, and, the way I understood the question, it

20    gets into the particulars of this case, which, for reasons I've discussed previously, I'm just

21    not at liberty to discuss at this point in time.    Perhaps at the time of the submission of a

22    report I could address some things like that.

23          Q    Okay.    But you've said that, ultimately, nothing rose to the level that you

24    felt you needed to intervene.    Is that fair to say?

25          A    Nothing rose to the level that I felt I needed to intervene in what respect?

1      Q      Or that you needed to seek approval from the Deputy Attorney General or

2      the Attorney General to move forward, correct?

3      A      I've mentioned -- I have stated that I don't recall a situation in this case

4      where I was at an impasse with Tax Division and we required the participation of the

5      Office of the Deputy Attorney General in order to resolve a difference of opinion as to

6      how to proceed.

7      Q      Okay.

8             I want to move on and talk about the letters that you sent to Congress.    I know

9      we went through them in some detail in the last hour, but I think we're going to take

10     another spin through them.

11            Before I get into them, though, I do want to introduce the Linder letter.    We'll

12     introduce that as exhibit 6.

13            Voice.    It's already introduced.

14            █████.    Is it introduced?

15     Mr. Castor.    No, I --

16            █████.    I don't think it was introduced.

17     Mr. Weiss.    No.

18                              [Weiss Exhibit No. 6

19                              Was marked for identification.]

20            BY █████:

21     Q      You've seen this letter before, correct?

22     A      Which letter?

23     Q      The Linder letter.

24     A      I have -- I have seen it before.

25     Q      Okay.

1        And I just want to make the record clear, this is a letter from Robert Raben, who

2    was the Assistant Attorney General for the Office of Legislative Affairs at the Department

3    of Justice, to the Honorable John Linder, who at that time was the chairman of the

4    Subcommittee on Rules and Organization of the House for the House Committee on

5    Rules.

6        That's what it says on the face of the letter, correct?

7    A    That is what it says on the face of the letter.

8    Q    What is the date on the Linder letter?

9    A    January 27, 2000.

10   Q    Okay.    So this letter has actually been in effect for 23 years at this point.

11   Is that fair to say?

12   A    This letter was written on January 27, 2000.    The effectiveness I can't really

13   speak to.

14   Q    So my point is, it's not something that was given to you as a new product

15   when you were looking at responding to these letters, correct?

16   A    It does not appear to be a new product.    As I suggested to counsel, I don't

17   know that I had previously reviewed the Linder letter.

18   Q    Okay.

19       Looking at your June 7th letter, which is marked as exhibit 1, you said earlier you

20   wrote -- you signed this letter.

21   A    I signed this letter, yes.

22   Q    And, in doing so, these are your words, correct?

23   A    These -- I am -- yes, these are my words.

24   Q    Okay.

25       The first paragraph reads -- I'm sorry, the first full paragraph; I guess it's actually

1    the second paragraph -- reads, "I want to make clear that, as the Attorney General has

2    stated, I have been granted ultimate authority over this matter, including responsibility

3    for deciding where, when, and whether to file charges and for making decisions necessary

4    to preserve the integrity of the prosecution, consistent with federal law, the Principles of

5    Federal Prosecution, and Departmental regulations."

6         Correct?

7         A    Correct.

8         Q    Your letter specifically notes that your decision and authority are, quote,

9    "consistent with federal law, the Principles of Federal Prosecution, and Departmental

10   regulations."    Why was it important for you to include this language in this letter?

11        A    As I said previously, it was important because I wanted to make it clear that I

12   have the authority but, like other U.S. Attorneys, I am subject to certain processes.

13   There's a framework within the Department of Justice.    I'm not operating in a vacuum,

14   and there are certain requirements that exist with respect to particular actions.

15        Q    The reference here to the Principles of Federal Prosecution is a reference to

16   the Principles of Federal Prosecution in the Justice Manual, correct?

17        A    Yes.

18        Q    And, briefly, for the record, could you explain what the Justice Manual is?

19        A    The Justice Manual is a set of rules, regulations, procedures that basically

20   provides guidance to Department of Justice personnel.

1   [11:49 a.m.]

2            BY ▮▮▮▮▮ :

3       Q    Okay.    And what are the Principles of Federal Prosecution themselves?

4       A    The Principles of Federal Prosecution provide guidance with respect to, in

5   particular, charging decisions.    They speak to the proof, that if you're going to proceed

6   with charges, there are certain guidelines that you should look to.    And the first section

7   of that deals with sufficiency.    The second part of it deals with whether the matter

8   you're pursuing is an appropriate Federal case.    And there are factors that attend

9   Federal case analysis.

10      Q    Okay.

11           I'm going to introduce as exhibit 7 an excerpt from the Justice Manual, section

12  9-27.000.    This is the Principles of Federal Prosecution.

13                              [Weiss Exhibit No. 7

14                              Was marked for identification.]

15           BY ▮▮▮▮▮ :

16      Q    And we're going to look at the preface, which is section 9-27.001.

17           You've seen this before?

18      A    I suspect that I have.

19      Q    Under the preface, the fourth paragraph down, it states that the purpose of

20  the Principles of Federal Prosecution -- sorry -- that there are two important purposes for

21  the Principles of Federal Prosecution:    quote, "ensuring the fair and effective exercise of

22  prosecutorial discretion...by attorneys for the government, and promoting confidence on

23  the part of the public and individual defendants that important prosecutorial decisions

24  will be made rationally and objectively based on an individualized assessment of the facts

25  and circumstances of each case."

1          Did I read that correctly?

2          A      Yes.

3          Q      Okay.    Taking this clause by clause, what is your understanding of what

4    "ensuring the fair and effective exercise of prosecutorial discretion...by attorneys for the

5    government" means?

6          A      It means that we're charged with making decisions based on the applicable

7    facts and the law.

8          Q      Okay.    In layman's terms, what does "prosecutorial discretion" mean?

9          A      All prosecutors have discretion, so they are required to exercise their best

10   judgment based on their experience and expertise in trying to seek a just conclusion of

11   the matter that's before them.

12         Q      Why is it important for prosecutorial discretion to be exercised fairly and

13   effectively?

14         A      Because prosecutors have tremendous authority whether to pursue a matter

15   that curtails someone's liberty.    I mean, we send people to jail.    That's a huge

16   responsibility.    And prosecutors are required to exercise that discretion in a judicious

17   fashion.

18         Q      And so is it fair to say that the Principles of Federal Prosecution, which you

19   cite in your June 7th letter, part of the purpose is to ensure that defendants are treated

20   fairly under the law by prosecutors?

21         A      Absolutely.    We're trying to defeat -- "defeat" -- to treat everyone, the

22   person in this case or people that we're dealing with in this case and all other matters

23   that we prosecute in my district -- you're trying to treat everyone equally and fairly under

24   the law, yes.

25         Q      Okay.

1        And the second clause in the sentence I read earlier says "promoting confidence

2    on the part of the public and individual defendants that important prosecutorial decisions

3    will be made rationally and objectively based on an individualized assessment of the facts

4    and circumstances of each case."

5        What's your understanding of why it's important to promote confidence in the

6    public and in individual defendants in this way?

7        A    Well, the rule of law is key.    And the rule of law only survives and flourishes

8    if the public believes that folks responsible for enforcing the law are doing that in a fair

9    fashion.

10       Q    So is it fair to say that, by noting in your June 7th letter that your authority

11    would be exercised consistent with all relevant laws and regulations and the Principles of

12    Federal Prosecution, you were actually noting that you would be treating this matter in

13    accordance with the guidelines applicable to all Federal cases in order to ensure that

14    prosecutorial discretion would be fairly exercised and the public could have confidence in

15    your decision-making?

16       A    That's what we're trying to accomplish, yes.

17       Q    Okay.    And, in fact, if you were not adhering to the Principles of Federal

18    Prosecution and Federal law and Departmental regulations, you would've actually been

19    treating this matter different than other Federal prosecutions, correct?

20       A    Yes.    We would only -- we would adhere to the Principles of Federal

21    Prosecution.    We're required to.    It would be inappropriate to diverge from those basic

22    principles.

23       Q    Okay.

24       I want to move on to your June 30th letter, which is exhibit 2.

25       In the prior hour, it was suggested that the June 30th letter and the June 7th letter

1    were somehow inconsistent, and you said you did not agree with that assessment,

2    correct?

3         A    I did say that.

4         Q    Okay.    And, in fact, your June 7th letter states that your authority is to be

5    exercised consistent with Federal law, Principles of Federal Prosecution, and

6    Departmental regulations, and then you reiterate that on your June 30th letter at the

7    bottom of the first page, correct?

8         A    I did.

9         Q    Okay.

10        And, then, at the top of page 2 of your June 30th letter, you state that your

11   "charging authority is geographically limited to my home district."

12        Can you briefly explain what you meant by that?

13        A    Yes.    There are 94 U.S. Attorneys around the country.    We can't just go

14   gallivanting around and prosecute cases wherever we decide we'd like to do so.    We're

15   responsible for our home districts.    You know, I am U.S. Attorney for the District of

16   Delaware only, and if I have an interest in pursuing a matter elsewhere, there are certain

17   procedures that have to be followed.

18        Q    Okay.    And that's true for all U.S. Attorneys, correct?

19        A    Yes.

20        Q    And that is set by statute and also by Departmental regulations, correct?

21        A    Yes.

22        Q    Okay.

23        I want to introduce -- actually -- so I want to introduce as exhibit 8 section

24   515 -- sorry.    We're going to introduce 28 U.S.C. 515.

25                                    [Weiss Exhibit No. 8

1                        Was marked for identification.]

2                 BY ███████:

3       Q     Have you seen this before?

4       A     I have.

5       Q     Paragraph (a) -- section 515(a) reads, "The Attorney General or any other

6    officer of the Department of Justice, or any attorney specifically appointed by the

7    Attorney General under law, may, when specifically directed by the Attorney General,

8    conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings

9    and proceedings before committing magistrate judges, which United States attorneys are

10   authorized by law to conduct, whether or not he is a resident of the district in which the

11   proceeding is brought."

12              Did I read that correctly?

13      A     Yes, I believe you did.

14      Q     Okay.    28 U.S.C. section 515 is a Federal statute, correct?

15      A     Yes.

16      Q     And it describes the process by which a U.S. Attorney, or any other attorney

17   for that matter, can be granted authority to bring charges outside of their district,

18   correct?

19      A     Yes.

20      Q     Okay.

21              So, in your June 7th letter, you referred to "subject to applicable statutes."    You

22   said that it's statute and regulation that limited your geographical charging authority, but

23   also it's section 515, which is a Federal statute, which is the process by which you can

24   obtain authority to charge outside your district, correct?

25      A     Yes.

1        Q       So that is, in fact -- so the reference in your June 30th letter to section 515

2    authority is fully consistent with the reference to Federal statute and regulation in your

3    June 7th letter, correct?

4        A       I thought it was consistent.    And that's what I intended to do -- refer back

5    to the language in my prior letter.

6        Q       Okay.

7                And before we move on from your June 30th letter, the third paragraph on the

8    first page reads, "First, the Department of Justice did not retaliate against 'an Internal

9    Revenue Service ("IRS") Criminal Supervisory Special Agent and whistleblower, as well as

10   his entire investigative team...for making protected disclosures to Congress.'"

11               Was that a true and accurate statement at the time that you signed this letter?

12       A       Yes.

13       Q       And is it true and accurate to this day?

14       A       Yes.

15       Q       Okay.

16               And I want to turn, to complete the record, to the July 10th letter to Senate

17   Judiciary Committee Ranking Member Lindsey Graham.    This is exhibit 3.

18               You said that, as of July 10, 2023, you had not asked to be designated Special

19   Counsel.    Was that an accurate statement?

20       A       Yes.

21       Q       Do you recall when you first requested to be made Special Counsel?

22       A       The only time was in August of 2023.

23       Q       Do you recall the date?

24       A       I think it's August 11th, as best I can recall, but that's my best recollection.

25       Q       Okay.    And when you made the request, you were made Special Counsel

1      within days, correct?

2           A      In fact, I'm not sure whether I'm confusing the date on which I made the

3      request with the date on which the request was granted.     So it was in proximity to

4      August 11th.

5           Q      Is it fair --

6           A      So, yes, once I made the request, in response to your question, it was, I

7      believe, 2 days later that the request was granted.

8           Q      Okay.

9           On September 20th of this year, Attorney General Garland testified before the

10     House Judiciary Committee.     He told the committee that, quote, "Mr. Weiss has

11     authority to conduct his investigation however he wishes."

12          Is it true that you have full authority to conduct your investigation however you

13     wish?

14          A      I believe I have the authority to conduct the investigation as I determine is

15     appropriate, yes.

16          Q      And the Attorney General said that you have authority over all matters that

17     pertain to Hunter Biden.     Is it accurate that you have authority over all matters

18     pertaining to Hunter Biden?

19          A      I believe that I have the authority to proceed with respect to my

20     investigation or any charging decisions with respect to the Hunter Biden matter as I deem

21     appropriate, yes.

22          Q      Okay.    Has the Attorney General ever blocked you from taking any step that

23     you wish to take in this investigation?

24          A      No one has ever blocked me with respect to taking any step that I perceived

25     was appropriate.

1        Q        Has the Deputy Attorney General ever blocked you from taking any step you

2    wish to take in this investigation?

3        A        No one has blocked me from taking appropriate steps.

4        Q        Okay.

5             Are you familiar with an individual named Lesley Wolf?

6        A        I am.

7        Q        Who is Ms. Wolf?

8        A        Ms. Wolf is an AUSA who works in my office.

9        Q        There have been allegations that Lesley Wolf acted out of bias or was

10   motivated by political considerations.    What's your response to that allegation?

11       A        Yeah, I'm not going to discuss any particular allegations.    Lesley Wolf has

12   been a dedicated public servant for more than 16 years.    I believe she is an excellent

13   lawyer and is a person of integrity.

14       Q        There have been arguments made in other transcribed interviews we've held

15   that the Biden family is, quote/unquote, "royalty in Delaware" and that it would,

16   therefore, be impossible for your office to be impartial in matters related to the Biden

17   family.

18             What is your response to those allegations?

19       A        Look, our responsibility as prosecutors is to follow the evidence and the law,

20   regardless of the circumstances, regardless of the defendant.    And that's what

21   we're responsible for doing, and that's the only way the public is going to have confidence

22   in the process, if we proceed in accordance with that principle.

23       Q        In the earlier hour, you were asked about a special agent report supposedly

24   prepared by Special Agent Ziegler.

25             Without getting into the specifics of that report itself, are you familiar generally

1      with what special agent reports are?

2            A      I'm familiar with -- I mean -- with reports that are prepared by agents who

3      work on Federal cases, yes.    I am generally familiar with those, yes, reports.

4            Q      And are you familiar with prosecution memos?

5            A      I am familiar with prosecution memos.

6            Q      Can you describe what a prosecution memo is?

7            A      At least in the District of Delaware, as a general matter, a prosecution memo

8      sets out the basis to proceed in a prosecution and will address key components that are

9      required in the decision-making process.

10           Q      Are special agent reports or memos prepared by investigators different than

11     prosecution memos?

12           A      Well, I want to make sure we're clear on, I don't know if you're talking about

13     the report in this case that was prepared in early 2022 versus reports or memoranda of

14     interview or in the FBI 302s that are prepared in the course of an investigation.

15           Q      Fair.    So what I'm looking at -- and I don't want to get into the specifics of

16     this case necessarily, but I wanted --

17           A      I would be unable to do so.

18           Q      I understand that.    I want to explore the differences between what might

19     be contained in an investigative memo and a prosecution memo, because they're

20     different, right?

21           A      Well, if we're talking about the typical report, the typical report prepared by

22     an agent describes the facts that he or she has developed on a particular matter.    It

23     might be based on an interview, a surveillance that the agent conducted, or something of

24     that nature, and that's always reduced to a report in the course of an investigation.

25           Q      And that's different than a prosecution memo, correct?

1       A     Yeah.     A prosecution memo serves a different function; that's correct.

2       Q     And what's the function of a prosecution memo?

3       A     To evaluate the evidence and to explain to the reader why there's a basis to

4 proceed with a prosecution.

5       Q     Okay.     And a prosecution memo actually analyzes the facts against the law,

6 correct?

7       A     Absolutely, yes.

8       Q     And it also looks at potential defenses?

9       A     Yes.     If it's done appropriately, it takes into account potential defenses and

10 the risks/reward and the -- and handicapping the case.

11       Q     Okay.     And those are the type of things that wouldn't be in a special agent

12 report, which just describes the pure facts that have been developed, correct?

13       A     From my perspective, no, they wouldn't be in an investigative report; that's

14 correct.

15       Q     Okay.

16       And I want to look at some of the considerations that prosecutors take into

17 account that might be included in a prosecution memo or might just be things they take

18 into account when they're considering whether to charge a case.

19       I want to turn back to the Principles of Federal Prosecution and look at section

20 9-27.220, which is the section entitled "Grounds for Commencing or Declining

21 Prosecution."

22       The section reads, "The attorney for the government should commence or

23 recommend federal prosecution if he/she believes that the person's conduct constitutes a

24 federal offense, and that the admissible evidence will probably be sufficient to obtain and

25 sustain a conviction, unless (1) the prosecution would serve no substantial federal

1 interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3)

2 there exists an adequate non-criminal alternative to prosecution."

3   Did I read that correctly?

4  A You did.

5  Q Okay. So, under these principles, prosecutors should only bring charges

6 when, among other considerations, they believe that the admissible evidence will

7 probably be sufficient to obtain and sustain a conviction, correct?

8  A That's correct.

9  Q And in layperson's terms, what does "admissible evidence" mean?

10  A It means evidence that you're going to get to the jury.

11  Q Okay.

12   The burden of proof for a criminal prosecutor to obtain a conviction at trial is

13 "beyond a reasonable doubt," correct?

14  A Correct.

15  Q "Beyond a reasonable doubt" is the highest evidentiary standard in law,

16 correct?

17  A Correct.

18  Q It's higher than the "probable cause" standard that is needed to obtain an

19 indictment, correct?

20  A Yes.

21  Q And it's higher than the "preponderance of the evidence" standard that's

22 often needed to obtain a judgment in a civil case, correct?

23  A It is.

24  Q In your experience as a Federal criminal prosecutor, is it fair to say that it can

25 be very difficult to convince a jury beyond a reasonable doubt to convict even when you

1      have a significant amount of evidence that a defendant has violated a law?

2              A      At times it can be, yes.

3              Q      In fact, in order to obtain a criminal conviction, you need not only to

4      establish the defendant's guilt beyond a reasonable doubt but you actually have to

5      convince 12 jurors that you've met that very high standard of proof, correct?

6              A      You do.    Jurors have to make these decisions unanimously.

7              Q      And when you say they have to make the decision unanimously, that means

8      that if even one single jury has what he or she considers to be a reasonable doubt, that

9      juror will be instructed to find your defendant not guilty, correct?

10             A      If that juror cannot reconcile his or her differences with the majority of the

11     jury, yes.

12             Q      Okay.

13             I want to talk through some of the considerations that a prosecutor might take

14     into account when weighing whether the admissible evidence will probably be sufficient

15     to obtain and sustain a conviction beyond a reasonable doubt.

16             We talked through sufficiency of the evidence earlier.    Is sufficiency of the

17     evidence something that a prosecutor might take into account?

18             A      In deciding?

19             Q      In deciding whether to bring charges?

20             A      Yeah, absolutely.

21             Q      Okay.

22             Does the ability to explain the charges effectively to a jury matter?

23             A      Yeah, even if you have the evidence, you have to be able to convey the

24     significance of that evidence to the jury.    And most good lawyers, good prosecutors, if

25     you've got sufficient evidence, they'll figure out a way to articulate the basis for a

1    conviction.

2        Q    But it can be challenging, because facts can be complicated, correct?

3        A    Can be challenging, particularly in more complicated cases, yes.

4        Q    Are defenses to a charge something that a prosecutor would take into

5    account when deciding whether or not to charge?

6        A    Defenses are something that good prosecutors should be very mindful of

7    when deciding whether to proceed, yes.

8        Q    And taking all of these things into account, a prosecutor can only bring

9    charges if, based on those considerations, the prosecutor is confident that they can

10   obtain and sustain a conviction, correct?

11       A    You're going to recommend a charge when you think you can prevail and

12   persuade a jury, yes.

13       Q    Okay.

14            How do you prosecutors learn how to assess and evaluate the type of concerns we

15   just talked through?

16       A    They read.    They listen to others.    They watch cases.    They develop by

17   their own experiences.    And they -- look, most folks that come to a U.S. Attorney's Office

18   have some level of experience, but the more you work as a prosecutor, the more you

19   appreciate making these judgment calls.

20       Q    And is it fair to say that prosecutors, therefore, have kind of unique

21   experience in making those judgment calls?

22       A    Yes.    Especially, you know, the experienced prosecutors have unique

23   experience in making these decisions, yes.

24       Q    And is it fair to say that investigators who are working on the case probably

25   don't have that same experience making the judgment calls about whether to bring

1    charges?

2          A      I mean, it's fair to say that investigators, by virtue of their responsibilities,

3    aren't called upon to make these decisions.    Some investigators who have experience

4    and have been around a while and are really good understand and appreciate

5    prosecutorial determination, some more than others.

6          Q      In general, is it fair to say that one unique difference between investigators

7    and prosecutors is that investigators generally do their work before trial and before the

8    stage where the evidence is actually contested and prosecutors have to think about

9    presenting the evidence to a jury in a contested setting?

10         A      Yeah, now, that's generally the case, but the fact is, agents continue to work

11   not only before trial -- or, the bulk of their work is done before trial, but they continue to

12   do all kinds of things during the course of a trial.

13         And prosecutors -- the best prosecutors do the bulk of their work before trial.

14   The presentation then takes over.    So it's the actual responsibility, then, to present your

15   case to the jury.    But the presentation doesn't go well if you haven't done your

16   homework well in advance.

17         Q      Understood.    My point is just that prosecutors, as opposed to investigators,

18   have to consider how the facts and the evidence will play out in an adversarial setting.

19   Is that fair to say?

20         A      They have to consider that if they're going to be successful and persuade a

21   jury, yes.

22         Q      Okay.

23         Given the difference in roles between investigators and prosecutors, is it

24   surprising that there are sometimes differences in opinion between investigators and

25   prosecutors about, for example, the strength of the evidence and the likelihood of

1    success at trial?

2           A      Yeah, I can say that it is not unusual for prosecutors and agents to, at times,

3    disagree as to strength of the case, investigative decisions, things of that nature.      It does

4    happen from time to time.

5           Q      And in the course of your career as a prosecutor and as a supervisor of

6    prosecutors, have you experienced these disagreements?

7           A      Sure.     Part of my responsibilities entail running into those and trying to

8    resolve those.

9           Q      And how do you work to resolve those differences?

10          A      You make sure that everyone has an opportunity to be heard.      You hash it

11   out; you talk it through.     And, you know, if the parties are unable to -- that is, the agents

12   and the prosecutors -- to persuade or come to a consensus, you make a decision as to

13   how you're going to proceed.     And hopefully everybody gets on board, and then you

14   proceed.

15          Q      And if everybody doesn't get on board, though, it's prosecutors that have

16   the final say, correct?

17          A      Typically, the prosecutors -- especially when it comes to charging decisions

18   and how the case is going to move forward, prosecutors are ultimately making that

19   decision.

20          Q      And that's because prosecutors are responsible for actually bringing the case

21   to trial, correct?

22          A      The prosecutor is responsible for -- yes, for putting together the evidence

23   and presenting the case at trial, yes.

24          Q      And it's ultimately the prosecutor's decision as to whether the strength of

25   the evidence will be sufficient to convince 12 jurors beyond a reasonable doubt, correct?

1   A It is.

2   Mr. <u>Goldman.</u> Could I just add something on this line of questioning?

3   Is it common for prosecutors to meet with defense counsel to get a presentation

4 from them prior to making a charging decision?

5   Mr. <u>Weiss.</u> In the run-of-the-mill case, it certainly will happen that prosecutors

6 will hear from defense counsel. In tax cases, my understanding is, it's sort of part of the

7 process. Taxpayer conferences are generally built into the tax process, as I understand

8 it. I'm not an expert. That's my understanding.

9   Mr. <u>Goldman.</u> Well, you can confirm that Hunter Biden's lawyers made

10 presentations to your office as part of this investigation, correct?

11   Mr. <u>Weiss.</u> I'm not going to confirm those kinds of discussions, because it

12 wouldn't be appropriate for me to comment on those kinds of discussions. But I've

13 certainly participated in cases generally where defense counsel has made a pitch to the

14 prosecutors.

15   Mr. <u>Goldman.</u> I'm not asking for the discussions. I'm just asking about the fact

16 of the matter, that defense counsel for Hunter Biden made a presentation or multiple

17 presentations to your office. I don't want you to get into the details; just whether it

18 happened or not.

19   Mr. <u>Weiss.</u> I can say that Hunter Biden's counsel made a -- made a pitch.

20   Mr. <u>Goldman.</u> Right. And that pitch was to the prosecutors, correct?

21   Mr. <u>Weiss.</u> That pitch was -- again, I'm not going to get into the particulars. I

22 will acknowledge that it happened.

23   Mr. <u>Goldman.</u> But it wasn't to -- it wasn't with IRS agents.

24   Mr. <u>Weiss.</u> No. No.

25   Mr. <u>Goldman.</u> It would just be to the prosecutors?

1      Mr. <u>Weiss.</u>  Again, I'm not going to get into the particulars.    The pitch was

2  made.

3      Mr. <u>Goldman.</u>  All I'm just trying to figure --

4      Mr. <u>Weiss.</u>  Any prosecutor would want to hear -- I mean, if defense counsel

5  wants to talk to me about his case and tell me why we shouldn't move forward, I'm just

6  hearing additional input with respect --

7      Mr. <u>Goldman.</u>  Very common.    I agree.    I'm just trying to make sure we

8  understand who that pitch is made to.

9      Mr. <u>Weiss.</u>  I don't want to --

10      Mr. <u>Goldman.</u>  It was made to the prosecutors, not to the investigators, because

11  the prosecutors are ultimately responsible for making the charging decision, correct?

12      Mr. <u>Weiss.</u>  I don't want to get into the particulars in this case, but it would -- as a

13  general matter, it would be -- it would typically be the case, as I understand it, that

14  prosecutors and defense counsel would be the ones participating in such a scenario.

15      Mr. <u>Goldman.</u>  Thank you.

16      Mr. <u>Weiss.</u>  Sure.

17      ██████.  Mr. Ivey, do you have --

18      Mr. <u>Ivey.</u>  No.

19      Mr. <u>Goldman.</u>  I have more, if we have time.    I just thought you were -- if you

20  want to continue, go.

21      ██████.  We have about 5 minutes.

22      Mr. <u>Goldman.</u>  Do you have any more?    You can go.

23      ██████.  I'm at a stopping point.

24      Mr. <u>Goldman.</u>  Okay.

25      I just wanted to follow up on a couple of things from the Republican side, their

1    questions.

2         When you say you had ultimate authority if it proved necessary, that meant, am I

3    correct, that you were assured that if there was any point when you needed additional

4    authority to charge what you thought you had sufficient evidence to charge, that you

5    would be able to do that, correct?

6         Mr. <u>Weiss.</u>   I was assured that if I needed to proceed in another jurisdiction and I

7    chose to do so, I had the authority to do those things.

8         Mr. <u>Goldman.</u>   Okay.   And so the fact that you may not have sought particular

9    authority has no bearing on whether you had that authority.

10        Mr. <u>Weiss.</u>   No, I had -- that's correct.   I had the authority; I just hadn't

11   exercised the authority, is what you're speaking to.

12        Mr. <u>Goldman.</u>   Yes.   So the fact of not exercising doesn't mean you do not have

13   it.

14        Mr. <u>Weiss.</u>   That's the way I see it, yes.

15        Mr. <u>Goldman.</u>   Okay.

16        And is it also fair to say that the decision for a different U.S. Attorney's Office to

17   agree to join or partner with an investigation from another U.S. Attorney's Office

18   considers many, many factors, not just the substance of the investigation?

19        Mr. <u>Weiss.</u>   Again, not discussing this case, but generally they could consider any

20   number of factors --

1    [12:18 p.m.]

2         Mr. Goldman.    Right.    And in part because the local U.S. Attorney's Office, if

3    partnering with an outside Attorney's Office would necessarily want to put their own staff

4    and their own resources in that case if it's in their own district?

5         Mr. Weiss.    Sure.    They're considering their resource constraints, their

6    priorities, all kinds of factors in deciding whether they want to throw additional resources

7    at the matter you're presenting.

8         Mr. Goldman.    Right.    And in a case of a 4-year investigation with more than 60

9    witnesses and hundreds of thousands of documents, it would require a lot of effort from

10   a local U.S. Attorney's Office to get up to speed on such an investigation.    Is that fair to

11   say?

12        Mr. Weiss.    And again, that sounds like you're getting into the case at hand, so I

13   can't get into that decision-making process.    But I can say that I would expect, generally

14   speaking, that the more complicated the case, the more resource-intensive the case,

15   perhaps the more difficult the decision is for the district who was receiving this

16   information.

17        Mr. Goldman.    And I may have missed this at the beginning.    Did you ever ask

18   for 515 Special Attorney authority?

19        Mr. Weiss.    I did ask for 515 Special Attorney authority.

20        Mr. Goldman.    When did you do that?

21        Mr. Weiss.    In the spring of 2022.

22        Mr. Goldman.    Were you granted that?

23        Mr. Weiss.    And at the -- I asked for it, and then in -- I think I've described it in or

24   around February, March of 2022, and at the conclusion of the process in D.C., as was

25   discussed with majority counsel, I was informed by the Principal Deputy Attorney General

1    that if I decided to proceed in the District of Columbia, I had the authority to proceed and

2    the authority to move forward with whatever charges I deemed appropriate.

3         Mr. Goldman.    And that the first step would be to see if you could partner with

4    that U.S. Attorney.    Is that right?

5         Mr. Weiss.    The first step was just to contact the U.S. Attorney's Office to see if

6    they wanted to join in the prosecution.

7         Mr. Goldman.    Okay.    And you ultimately requested Special Counsel authority?

8         Mr. Weiss.    I requested Special Counsel authority upfront.

9         Mr. Goldman.    What do you mean "upfront"?

10        Mr. Weiss.    In preliminary -- in my first conversations with the Principal Deputy

11   Attorney General, and in my conversation in February of 2022, I raised the specter of 515

12   authority at that time.

13        Mr. Goldman.    Not Special Attorney.    I'm asking about Special Counsel

14   authority.

15        Mr. Weiss.    Oh, I'm sorry.    I'm sorry.

16        Mr. Goldman.    Yeah.

17        Mr. Weiss.    I misunderstood.    Hopefully the record reflects I misunderstood.    I

18   was speaking to Special Attorney.

19        I never requested Special Counsel authority -- I'm sorry -- until August of 2023.

20        Mr. Goldman.    And why did you request Special Counsel authority in August?

21        Mr. Weiss.    I'm not going to discuss that.    That's a matter -- those are privileged

22   communications between myself and the executives at the Department.

23        Mr. Goldman.    But you were granted Special Counsel authority?

24        Mr. Weiss.    I was granted Special Counsel authority.

25        Mr. Goldman.    And that means that you can charge whatever you believe you

1    have sufficient evidence to charge wherever you need to charge it?

2         Mr. <u>Weiss.</u>   That means, consistent with the AG's order, I can charge -- I can

3    discharge my responsibilities and charge the -- bring forth the charges in whatever

4    jurisdiction is appropriate.

5         Mr. <u>Goldman.</u>   And I believe this is a matter of public record, but isn't it true that

6    Hunter Biden's attorneys waived venue as part of that proposed plea agreement in

7    Delaware?

8         Mr. <u>Weiss.</u>   The plea documents are there.   And as part of that resolution, my

9    recollection is, yes, there was a waiver -- there was a venue waiver as part of those

10   materials.

11        Mr. <u>Goldman.</u>   Thank you.

12        ████.   Did you ever have any doubt that you would be granted 515 authority

13   if you sought it from the Deputy Attorney General's Office?

14        Mr. <u>Weiss.</u>   From the time I received the assurance from PADAG John Carlin I

15   didn't really concern myself with authority moving forward.   I understood that I had the

16   authority to proceed, you know, and to prosecute the charges I thought appropriate.

17        ████.   Okay.

18        Mr. <u>Lieu.</u>   So I'm just a little confused.   I just want to understand.   You can't

19   talk about the particular aspects of the case today, right?

20        Mr. <u>Weiss.</u>   Right.

21        Mr. <u>Lieu.</u>   All right.   So you testified that you have had whatever authority you

22   believe you needed to take the appropriate steps, right?

23        Mr. <u>Weiss.</u>   I have.

24        Mr. <u>Lieu.</u>   And you said that no one at Department of Justice has stopped you

25   from taking steps you deemed appropriate, right?

1        Mr. Weiss.    Yes.

2        Mr. Lieu.    I don't know what we're doing here today.    We should just end this.

3    This is totally stupid.    He can't talk about the facts of the case.    He said he had all the

4    authority he needs.    So I'm asking the Republicans why don't we just shut this down?

5    We're just wasting everybody's time.    I don't understand why we're all here.    What's

6    the point of this?

7        I yield back.

8        ███████.    On that note, we can go off the record.

9    Thank you.

10    [Recess.]

11        Chairman Jordan.    Let's go back on the record.

12    Thanks, Mr. Weiss.

13        In your last hour, Mr. Goldman asked you, Did you ever ask for 515 authority?

14    And you said, Yes, in the spring of 2022.

15        Did you ask for that authority before meeting with Mr. Graves -- or talking with

16    Mr. Graves about partnering with him or after?

17        Mr. Weiss.    Before.

18        Chairman Jordan.    You asked for it before.

19        And you asked -- this was the PADAG, right?

20        Mr. Weiss.    This was the PADAG and Brad Weinsheimer.

21        Chairman Jordan.    So Mr. Carlin and Mr. Weinsheimer?

22        Mr. Weiss.    Yes.

23        Chairman Jordan.    And they told you no at the time, that you should go talk to

24    Mr. Graves in D.C.?

25        Mr. Weiss.    No.    They never said no.    They never said no.    I asked for it.

1    They said, Let's follow the process.    Go talk -- let's talk to Mr. Graves, see if they're going

2    to join.    We're going to take it step by step.    No one ever said no.

3        Chairman Jordan.    Okay.    And in the course of your investigation, from when

4    you started all the way until August 8th when you asked for Special Counsel status and

5    then were granted Special Counsel status on August 11th, did you ever have 515

6    authority throughout that time?

7        Mr. Weiss.    I never -- as we've discussed, I never executed on that assurance that

8    I would have the authority.

9        Chairman Jordan.    So you asked for it before you talked to Mr. Graves.    Mr.

10    Graves -- you asked for it, and PADAG said, No.    Go talk to Mr. Graves first.    You go talk

11    to him.    He says that he doesn't want to partner with you, and you never subsequently

12    asked for it.    And the only time that you've been given any special counsel/515 authority

13    is when you asked for it in August of this year?

14        Mr. Weiss.    No.    The premise of your question I can't endorse.    You said, I

15    asked for it, the PADAG said, No.    As I said a moment ago, no one ever said no.    He

16    didn't say no.

17        Chairman Jordan.    Okay.

18        Mr. Weiss.    They said to follow the process, talk to Graves, give him the

19    opportunity to join.    When I completed that process, I returned to 515, and I was

20    assured you had the authority to proceed in D.C. and to file any charges you deem

21    appropriate.

22        Chairman Jordan.    Again, I just want to be clear, though.    Mr. Goldman asked

23    last hour, Did you ever ask for 515 authority?    You said, Yes, in the spring of 2022.

24        And what I'm asking is did you ever have 515 authority throughout this

25    investigation?

1    Mr. Weiss. I was assured I had the authority necessary to move forward, yes.

2    Chairman Jordan. Let me ask it this way --

3    Mr. Weiss. I didn't request an order that ultimately gave me the authority that

4 would have been required if I had, in fact, filed the charges.

5    Chairman Jordan. Okay. Did you ask for it? You said, Yes, in the spring of

6 2022. What I want to know is, were you ever granted 515 authority?

7    Mr. Weiss. As I said a couple of times, I was assured at the conclusion of the

8 process in D.C. that I had 515 authority to proceed if I determined it was appropriate.

9    Chairman Jordan. Okay. And what you wrote to Senator Graham is -- on

10 July 10th of this year, you said, You would be granted this authority if it proved necessary.

11 Is that right?

12    Mr. Weiss. I'm looking at the letter.

13    Chairman Jordan. This is the July 10th letter to Ranking Member Graham.

14    Mr. Weiss. I'm sure you're reading it accurately.

15 Yes, that's what it says.

16    Chairman Jordan. Now, in this letter you say: I have not requested Special

17 Counsel designation.

18    Was that something different than 28 U.S.C. 515?

19    Mr. Weiss. Yes. That was --

20    Chairman Jordan. Okay.

21    Mr. Weiss. Yes.

22    Chairman Jordan. And you didn't request that again until August 8th and were

23 granted that on August 11th of this year. Is that right?

24    Mr. Weiss. I think your question was you didn't request it again. I only

25 requested it in --

1          Chairman Jordan.    No.    I meant again -- I wasn't referring to that.

2          Okay.    And then the next sentence:    When I had the discussion with

3     Department officials regarding judicial appointment under 28 U.S.C. 515, which we've

4     been talking about, which would allow me to file charges in a district outside my own

5     without the partnership of the U.S. local attorney, I was assured I would be granted

6     authority if it proved necessary.

7          When Mr. Graves turned you down, wasn't it necessary?

8          Mr. Weiss.    If I chose to proceed.    If I chose to move forward in D.C., it would

9     have been necessary, yes.

10          Chairman Jordan.    But you went to Mr. Graves and asked him to partner.    I

11     assume that meant you wanted to proceed in D.C.    He says:    No, we're not going to

12     partner.    And I'm asking, that wasn't proof enough to be necessary to ask for 515?

13          Mr. Weiss.    Again, I don't want to get into deliberative process or case merits.

14     But as I think I mentioned previously, we were thinking about D.C. and L.A., and at this

15     time, I was assured that if I wanted to proceed in D.C., I had the authority, and I was not

16     prepared at that time to make a decision as to where we would proceed.

17          Chairman Jordan.    Okay.

18          Mr. Biggs.    Can I ask a question?

19          You keep saying you were assured that you had the authority.

20          Mr. Weiss.    Uh-huh.

21          Mr. Biggs.    Who assured you?

22          Mr. Weiss.    The Principal Deputy Attorney General told me that I would have the

23     authority to proceed in the District of Columbia and file whatever charges I deemed

24     appropriate.

25          Mr. Biggs.    Was it conditional in any way?

1          Mr. Weiss.    No.

2          Mr. Biggs.    You just flat out had the authority.    He assured you -- I don't know

3    who it was that assured you that you would have that authority.    In fact, did you take

4    that as a granting of authority?

5          Mr. Weiss.    From -- I understood that -- based on that assurance, I understood

6    that I could charge in that jurisdiction and proceed and that, yes, I could determine what

7    charges were appropriate.

8          Mr. Biggs.    Regardless of Mr. Graves?

9          Mr. Weiss.    Yes.

10          Mr. Biggs.    Okay.

11          Mr. Weiss.    Yes.

12          Mr. Biggs.    Thank you.

13          Mr. Weiss.    Sure.    You're welcome.

14                                EXAMINATION

15          BY MR. CASTOR:

16     Q     I want to go back to, in 2020, were you aware that the U.S. Attorney out in

17    the Western District of Pennsylvania, Scott Brady, was asked by the Department to vet all

18    incoming Ukraine-related information?

19     A     I was aware that the U.S. Attorney in the Western District of Pennsylvania

20    had been assigned that vetting responsibility.

21     Q     And how frequently did you interact with Mr. Brady regarding information

22    his office received during his tenure?

23     A     I'm not going to discuss that process at all.    That's still ongoing.    It's still

24    the subject of ongoing investigative matters.

25     Q     Mr. Brady testified to the committee that it was a challenge for his office to

1   obtain information from you and your investigative team, so much so that at one point,

2   he had to submit written interrogatories to your office.

3         Can you help us understand what happened there?

4         A     No.   I'm sorry.   At this time I can't help you understand what happened

5   there.   I'm not going to discuss matters that concern ongoing investigations.   At the

6   appropriate time, I'll prepare a report, and I expect that this will be something that will be

7   addressed in the report.

8         Q     Okay.   So you're not denying that Mr. Brady had to send you

9   interrogatory-style questions to get information out of you?

10        A     I'm not commenting either way on the process at all.   I want to make that

11   clear.   It would be inappropriate for me to do so.

12                         [Weiss Exhibit No. 9

13                         Was marked for identification.]

14          BY MR. CASTOR:

15        Q     Are you familiar -- let's mark this as the next exhibit -- with an FD-1023 dated

16   June 30, 2020, summarizing a confidential human sources meeting with Burisma

17   executives during which they discussed bribes allegedly paid to Joe Biden and Hunter

18   Biden?

19        A     I'm sorry.   What was your question about this document?

20        Q     Are you familiar with this?

21        A     I'm not going to comment on that.   I appreciate your question, but it

22   concerns a matter that is subject to an outstanding investigation.   It's something that I

23   absolutely cannot comment on either way.

24        Q     The FBI has consistently reviewed the confidential human source in question

25   and found them to be highly credible.

1        Is that your understanding?

2      A   As I said a moment ago, this is a matter about which I absolutely cannot

3    comment.   It would be inappropriate for me to do so, although at the appropriate time,

4    I hope to address this matter and all aspects of this process.

5      Q   Brady told us that he had such trouble getting ahold of you and your office,

6    that he had to go through the PADAG, and basically the PADAG had to intervene and

7    instruct your office to take a meeting with him.

8      A   Is that a question?

9      Q   Yes.   Why wouldn't you meet with Mr. Brady?

10      A   I'm not at liberty to discuss that at this time.   I look forward to the

11   opportunity to addressing this in the special counsel's report at the appropriate time.

12      Q   Yeah.   Whether you had a meeting with Mr. Brady or not, I mean, you

13   certainly can tell us at a privilege log level the number of communications you had with

14   Mr. Brady.

15      A   No, I'm not going to get into this topic at all.   It would be inappropriate,

16   absolutely inappropriate to do so while this matter is outstanding.

17      Q   Did your office conduct any further investigation after you became aware of

18   the 1023?   Did you interview the confidential human source in question?

19      A   Counsel, you know I can't discuss outstanding investigative matters.   It's

20   inappropriate for me to do so.

21      Q   Okay.   I want to mark the two Delaware cases as the next exhibits.

22      Last hour I referenced some comments you made in some different tax cases.

23   Just for your benefit, I wanted to mark them just so we could close that loop.

24      A   I recall that.

25      Mr. <u>Castor.</u>   Number 10 and 11.

1                          [Weiss Exhibits Nos. 10 and 11

2                          Were marked for identification.]

3            BY MR. CASTOR:

4      Q      Number 10 is the "Sussex County Photographer Bruce Kevin Fleming

5   Sentenced for Federal Tax Evasion."    The fifth paragraph is your comment that "The

6   financial loss in tax cases is shared by every member of the tax-paying public.    Our

7   Nation's ability to operate and serve its citizenry depends on voluntary compliance with

8   tax obligations.    The defendant not only willfully evaded his personal income tax

9   obligations, but he failed to pay over taxes withheld from his employees' paychecks,

10  demonstrating a complete disregard for their individual tax liabilities."

11           Do you remember making that statement?

12     A      I don't recall making the statements, but I don't doubt that I did.

13     Q      Okay.    And you still stand by that, correct?

14     A      Sure.

15     Q      The same with the next exhibit, the last paragraph is:    "Tax dodging

16  represents an affront to every member of the tax-paying public, and we will continue to

17  prosecute tax cheats aggressively."

18           Do you remember making that?

19     A      I don't recall the specific statement, but I'm satisfied that those are the

20  words that were used, and I stand by that statement.

21     Q      If over -- in 2014 and 2015, it's been well-established by the whistleblowers,

22  Hunter Biden had in excess of over $1 million in revenue coming in from Burisma that has

23  avoided tax entirely.

24           Do you think it's fair that he is able to avoid paying tax on that gigantic sum of

25  money?

1    A    Again, that's something I can't comment on.    That pertains to the ongoing

2    litigation and our outstanding investigation.    I'm just not at liberty to comment at this

3    time, but there will come a time.

4    Q    Even though the statute of limitations has lapsed?

5    A    Yes, yes.

6    Q    When is the appropriate time to address why the statute of limitations was

7    allowed to lapse?

8    A    I'll address it in the report, but even though the statute of limitations has

9    lapsed and even though charges won't be filed, if there were to be an outstanding tax

10    prosecution, there is no reason to believe that evidence pertaining to prior years, or

11    witnesses involved in prior years, wouldn't be part of that litigation.

12    Q    Okay.    But you can still I think -- without compromising a potential

13    prosecution that cannot be had for 2014 and 2015, you ought to be able to tell us about

14    the decision to let the statute lapse.

15    A    I understand and appreciate the question and what you're suggesting.    I'm

16    just not at liberty to do so.    What I can say is, because it's akin to a charging

17    decision -- and making charging decisions in any matter, you're considering the proof.

18    You're considering your witnesses.    You're considering legal challenges.    If it's a

19    multi-charge situation, you're considering the effect of certain charges on other charges,

20    and whether those charges enhance or detract from your prosecution.

21    So, as a general matter, I'm just offering that there are any number of

22    considerations that would go into account --

23    Q    Okay.

24    A    -- in deciding whether to pursue them or not.

25    Q    Did you make a decision to affirmatively let the statute lapse, or did it

1      happen by accident?

2          A       I'm not going to address that at this time, but I will address it in the report.

3          Q       Okay.

4          Mr. Biggs.    Can I weigh in just for a second on that?

5          Because I appreciate what you're saying about it might have bearing on future

6      cases or any potential for future prosecution, but the question here is distinctly different

7      from that.    This is, was this an accidental lapsing?    Was this an intentional lapsing?    It

8      really has no connection or bearing on any potential outcome of prosecution going

9      forward.    So I'm struggling to understand your position on that.

10         Mr. Weiss.    Yeah, I respect the question, Congressman.    I understand it, but it

11     gets into deliberative process in this case, decision making processes, and those are

12     things that I'm not at liberty to discuss at this time.    But as I said, I will address it.    I will

13     address it in the report.

14         Mr. Castor.    I want to mark the next exhibit, exhibit 12.

15                          [Weiss Exhibit No. 12

16                          Was marked for identification.]

17             BY MR. CASTOR:

18         Q       This is the special agent report we've had some discussion about.    It was

19     produced in limited form.    But this is the special agent report prepared by the IRS

20     criminal investigative agent at the end -- he began writing it at the end of 2021 and

21     wrapped it up in the beginning of 2022.

22         A       You're telling me that this is the report or a portion of the report?

23         Q       This is a portion of the report.

24         A       Got it.

25         Q       Fair enough.    It contains the cover page and then the last two pages.    It's

1    an 85-page document.    Is this the first time -- you've seen this report before, correct?    I

2    think you told us that this morning.

3         A    I believe I have, yes.    I believe I --

4         Q    You saw the whole 85 pages?

5         A    I believe I have.

6         Q    Okay.    Was there anything in the 85-page report that you or your Assistant

7    U.S. Attorneys disagreed with?

8         A    I wouldn't comment on that now because it pertains to the case and the

9    investigation, and I don't recall.

10        Q    Okay.    If you would go to the second page, which is page 84 of the special

11   agent report.    It states:    "The recommendation for prosecution is based on the facts

12   above" -- that's the prior 83 pages -- "and recommends that RHB," Hunter Biden, "be

13   prosecuted under the provisions of Title 26, United States Code, Sections 7201 and 7206

14   for the tax years 2014, 2018, and 2019, and under the provisions of Title 26, United States

15   Code, Section 7203 for the tax years 2015, 2016, 2017, 2018, and 2019.

16        "A draft of this special agent report has been given to DOJ tax senior attorney

17   Mark Daly, as well as AUSA Lesley Wolf.    AUSA Wolf has reviewed the appendices and

18   the charges cited in this report and agrees with the prosecution recommendation of the

19   above cited charges against RHB."    That is Hunter Biden.

20        Is that consistent with your understanding of what was in this special agent report

21   when you reviewed it?

22        A    Yeah.    I'm not going to comment on any aspect or substance of the

23   investigative report, but I will acknowledge that you read the paragraph accurately.

24        Q    Okay.    But I guess what my question is, this isn't a doctored document.

25   This is what --

1          A     I have no reason to believe that this is a doctored document.

2          Q     Okay.    And if Lesley Wolf and Mark Daly didn't agree with this stuff,

3   presumably the criminal investigator who prepared the report wouldn't put that on the

4   conclusions and recommendations page, correct?    In fact, it was ultimately signed and

5   executed.

6          A     Again, I can't speak to that.    But, like I said, I agree that what you have

7   represented is stated in the report, and I believe this is --

8          Q     Okay.

9          A     -- an authentic version, subject to the redactions, of what I would have seen.

10         Q     Okay.    But a criminal investigative agent wouldn't make false

11   representations, correct, in the ordinary course of business?

12         A     I'm not going to get into the substance of this particular report.    But, as a

13   general matter, I wouldn't expect any agent to make false representations in a report of

14   any kind.

15         Q     Okay.    Shortly after the special agent report was prepared we have been

16   told through -- in sworn testimony that the DOJ Tax Division drafted a 99-page report

17   regarding the charging decisions in the matter.

18             Are you familiar with that document?

19         A     I'm not going to get into the preparation of that document or any other

20   attorney-driven document in this case.

21         Q     Okay.    But you read the 99-page report that the Tax Division prepared,

22   right?

23         A     I'm not going to get into the particulars of the documents that were

24   prepared, other than to say if something was presented to me in this case, I read it.

25         Q     Okay.    Certainly something as significant as a 99-page memo?

1          A          Well, generally speaking, the fact that something is 99 pages doesn't

2     necessarily mean it's significant, but --

3          Q          Well --

4          A          -- as I said, I reviewed appropriate materials during the course of this case.

5          Q          Okay.     But it --

6          A          I'm not going to get into the substance of those materials.

7          Q          Okay.     But if the DOJ Tax Division did draft a 99-page report related to the

8     Hunter Biden matter, you certainly would have reviewed it in the ordinary course,

9     correct?

10         A          Again, I'm not going to get into the particulars of this case because it

11    necessarily gets into the deliberative process and case materials.     As a supervisor of this

12    case, I would have read the key documents, absolutely.

13         Q          Okay.     Do you know who authored it?

14         A          I'm not going to -- no, I'm not going to get into the particulars of any report

15    in this case or discuss the authors.

16         Q          Okay.     And do you know if it was -- I'm going to ask you, do you know if it

17    was authored in part by your AUSAs in the Tax Division?

18         A          Again, I'm not going to get into the particulars of those matters because it

19    necessarily involves deliberative process and prosecutorial decisionmaking,

20    recommendations, and the like, all those kinds of things.

21         Q          Let's take it up a level.     Ordinarily, would this type of memo be prepared

22    jointly with the U.S. Attorney's Office in the Tax Division, or would it ordinarily be a Tax

23    Division document?

24         A          Based on my experience -- and the fact is, I'm unfamiliar with a case in which

25    I participated where the U.S. Attorney's Office in Delaware has partnered with tax

1    divisions.    So I can't draw on that frame of reference that you allude to.

2        Q    Actually, this type of memo, in your experience, would be a DOJ Tax Division

3    product?

4        A    I'm not saying either way.    I'm not going to get into the particulars here.

5    What I'm suggesting is what happened here, that's the basis of the full sum of my

6    experience --

7        Q    Okay.

8        A    -- in the sort of hypothetical that you're presenting.

9        Q    Okay.    If the case had concluded and you had issued your report, would you

10   be able to tell me the answer to that question --

11       A    Okay.

12       Q    -- or are you withholding it because of the ongoing investigation, the

13   deliberative process or --

14       A    It's part of the deliberative process, and for that reason, I can't comment.

15       Q    But do you know the answer, I guess, of who wrote the memo?

16       A    Again, I'm not going to get into whether I know the answer or not.    This is

17   at all part of the deliberative process.

18       Mr. Biggs.    You're not saying there wasn't a memo like this?

19       Mr. Weiss.    Like what?

20       Mr. Biggs.    He's referenced this specific memo.    I'm asking you, do you agree

21   that that certain memo exists?

22       Mr. Weiss.    I'm not going to acknowledge -- I'm not going to talk about memos

23   that were prepared during the course of this case.    It's part of the deliberative process.

24   I'm not going to talk about --

25       Mr. Biggs.    I'm asking you if the memo was created.

1          Mr. <u>Weiss.</u>    Again, I understand that you're going to draw from my answer, which

2     is why I'm going to be very careful in what I respond to and what I don't.    And I'm

3     unable, because it delves into the deliberative process, to say anything in this regard.

4                    BY MR. CASTOR:

5          Q      Okay.    Did you attend a meeting on June 15th at Main Justice about this

6     case where the players involved included the entire investigative -- representatives from

7     the investigative team, including Gary Shapley; his supervisor, Darrell Waldon; Mark Daly

8     from the Tax Division; Stuart Goldberg from the Tax Division; Jack Morgan from the Tax

9     Division?    Does this jog your memory?    I can give you additional participants if that's

10    helpful.

11         A      I don't want to discuss particular meetings, but I will say that I participated in

12    several meetings, and that some of those meetings involved virtually all of the folks who

13    were involved in this case at a leadership level.

14         Q      Okay.    The June 15th meeting happened here in Washington, D.C.    So can

15    you tell us, did you travel down here for the meeting?

16         A      Again, I'm not going to talk about those kinds of things.    I'm not going to

17    get into the particulars of our investigation, particular meetings, who participated.    I'm

18    here to talk about my authority, decision-making authority.

19         Q      Okay.    Did you meet with Gary Shapley the day before?

20         A      As I mentioned a moment ago, I met with agents and the investigative and

21    leadership team on several occasions during the course of this process, and I did so out

22    of -- in an effort to make sure -- and I mentioned this in reference to a question

23    previously -- an effort to make sure that the agents were heard, and that their views on

24    this investigation, their view of the case and appropriate charges was part of the

25    decision-making process, but I can't get into the particulars.

1       Q    Okay.   We've received testimony, not just from the IRS whistleblowers, but

2  also from other witnesses, that at the June 14th -- or sorry -- the June 15th meeting, DOJ

3  Tax had a presentation.

4      Do you remember that presentation?

5       A    I'm not going to get into the particulars of any presentation or the

6  circumstances surrounding this meeting.   This, again, would be something that I would

7  expect and I'd be more than happy to address in the special counsel's report.

8       Q    The testimony shows that at the June 15th meeting the Tax Division lawyers

9  presented complications and all the difficulties they would have with bringing a case, but

10  yet, FBI personnel piped up and disputed that characterization.

11      Do you remember that?

12       A    I'm not at liberty to discuss any particulars concerning this meeting or other

13  meetings, other than meetings at which my decision-making authority was discussed.

14       Q    When did you decide to contact the Central District of California, the Los

15  Angeles U.S. Attorney's Office about this case?

16       A    I contacted the Central District of California in August of '22.

17       Q    And did that -- was that preceded by a discussion with the DAG's Office?

18       A    I would have had a discussion with the DAG's Office -- I mean, at this point in

19  time, as I think I alluded to previously, I was having monthly conversations, or about each

20  month with the Office of the Deputy Attorney General.

21       Q    Okay.   And those monthly conversations were with Mr. Weinsheimer?

22       A    Primarily, yes.

23       Q    Was Mr. Carlin and then, subsequently, Mr. Miller involved with that?

24       A    No.   As I told you, I never spoke to Miller, and I believe Mr. Carlin had left

25  the Department at -- you know, somewhere during this time, the summer of 2022.

1      Q    And were your Weinsheimer telephone calls monthly, was that a regularly

2  scheduled call or did it just happen to turn out to be monthly based on --

3      A    It happened to be monthly.

4      Q    Okay.

5      A    Based on -- you know, I'm estimating the frequency of the meetings.

6      Q    Okay.    Fair enough.

7      And so before you decided to contact the Los Angeles U.S. Attorney's Office, you

8  had a conversation with Mr. Weinsheimer?

9      A    I don't know -- I don't know if it was before or shortly thereafter.    I don't

10  know what preceded what, but -- so I don't recall the particulars.

11      Q    Did he need to grease the skids for that meeting?

12      A    No, he did not.

13      Q    Did you ask for 515 authority before or after going to Los Angeles?

14      A    I just -- no.    I described my conversations with respect to 515 authority in

15  the context of the D.C. discussions.

16      Q    Okay.

17      A    And so in my mind, from my perspective, I didn't need to raise it, and I didn't

18  raise it any further.

19      Q    Okay.    So as we understand it, the U.S. Attorney in Los Angeles wasn't

20  installed until September of 2022, but you had made contact with that office during the

21  month of August.    Is that correct?

22      A    I had contact with --

23      Q    His predecessor?

24      A    -- his predecessor, the Acting U.S. Attorney at that time.

25      Q    Okay.    And as we understand it, according to Mr. Estrada, some SAUSAs

1    were established.    Is that correct?

2         A    Again -- and you asked that about D.C.    I just don't recall the particulars of

3    whether SAUSAs were established and exactly what that meant, but I don't necessarily

4    dispute it.    I just don't recall the particulars.

5         Q    Okay.    So if Mr. Estrada told us there are officials from your office in

6    Delaware, AUSAs, that have been granted Special Assistant U.S. Attorney authority under

7    the SAUSA regime, you don't know if that's correct or not?

8         A    I just can't -- I can't recall.    I can't recall the particulars of that process.    I

9    know the conversations in which I participated and, you know, what we were doing

10   vis-à-vis the Central District of California.

11        Q    What was the -- do you remember the name of the person you were talking

12   to, the predecessor, the acting, before Mr. Estrada was installed?

13        A    Stephanie Christensen.

14        Q    And did Ms. Christensen -- did she urge you to wait until Estrada was on

15   board?

16        A    No.

17        Q    What was the nature of your conversation with her in August of 2022?

18        A    Similar to my conversation with U.S. Attorney Graves.

19        Q    Okay.

20        A    Basically that this is the case.    These are the circumstances.    I'm reaching

21   out to see if you wanted to join or participate in this case.    I have requested 515

22   authority.    And it went from there with line personnel having communications.

23        Q    Okay.    Did Ms. Christensen ever present you with a decision from their

24   office about whether they wanted to partner, co-counsel, or whatever?

25        A    She did not.

1      Q    Okay.   And so then when was your next interaction with the office?   Was

2    that after Mr. Estrada was installed?

3      A    I believe it was.

4      Q    And what do you remember from that?

5      A    I had a brief conversation with U.S. Attorney Estrada.   It was in October

6    of '22, and Mr. Estrada informed me that his office was -- declined to participate with us

7    or to join us in that case.

8      Q    Okay.   So he shot you down, too, just like Mr. Graves?

9      A    I'm not going to use the words "shot me down" --

10      Q    Okay.

11      A    -- but he declined to participate in the case.

12      Q    Okay.   And so what was your move from there?

13      A    Same as it had been before, to proceed to moving forward.

14      Q    Okay.

15      A    To focus on the decision-making process.

16      Q    Okay.   But you said that you felt confident that had you asked for it, you

17    would have had 515 authority to take a case and bring it in Los Angeles?

18      A    Yes.   It wasn't a question of my authority.   It was just a question of

19    deciding to move forward.

20    Chairman <u>Jordan.</u>   Just tell me the timeline again.   So in August of '22 you

21    talked to Ms. Christensen, I think you said, and said, Do you want to partner with the

22    Central District of California?   And was there any conversations between that August

23    contact and October when Mr. Estrada who became the U.S. Attorney told you no?

24    Mr. <u>Weiss.</u>   Not by me.

25    Chairman <u>Jordan.</u>   But your office had subsequent contacts in that time frame

1    between August and October?

2            Mr. <u>Weiss.</u>    My office and Tax Division were working with folks in L.A.

3            Chairman <u>Jordan.</u>    And the first contact you had with Mr. Estrada is when you got

4    on the phone and he told you no?

5            Mr. <u>Weiss.</u>    That's the first and only contact with respect to this matter that I had

6    with Mr. Estrada.

7            Chairman <u>Jordan.</u>    Okay.

8                    BY MR. CASTOR:

9        Q    Just one call that you remember with him?

10       A    One call about this, yes.

11       Q    Okay.    If he remembers more than one call, is it possible that there was

12   more than one call?

13       A    If he remembers more than one call, it wasn't at this time about this issue.

14   That's my recollection.

15       Q    Okay.    So D.C. didn't want to partner, correct?

16       A    D.C. chose not to participate in this case as a partner, that's correct.

17       Q    Okay.    And Los Angeles, the Central District of California, they didn't want

18   to partner either, correct?

19       A    L.A. chose not to join us in this case, that's correct.

20       Q    Okay.    DOJ Tax, while at first they wanted to -- they were enthusiastic

21   about moving forward, then they moved -- at the June 15th meeting, we learned that DOJ

22   Tax was reluctant to proceed?

23       A    I'm not going to embrace that characterization, nor can I comment on any

24   discussions that were had with the Tax Division in June of 2022, or at any other time.

25       Q    Okay.

1          A       I'm just not going to get into that.

2          Q       We've been told -- Scott Brady testified that every time he tried to talk to

3    your office he was basically turned down and had to go to the PADAG to set up some

4    meetings with you in your office.

5          A       Counsel, in all candor, I don't know that I would accept that representation

6    under any circumstances.    But in any event, I'm not going to get into particulars of

7    communications with Mr. Brady on the matter that you're referring to.

8          Q       At this point did you feel like you were on an island?

9          A       No, no.

10         Q       I mean, D.C. didn't want to prosecute and partner with you; L.A. didn't want

11   to partner with you; DOJ Tax was expressing reservations.    I mean, did you feel like you

12   had -- you know, you were getting isolated?

13         A       No.    I thought that -- as I said repeatedly, I thought I had the authority and

14   then it was a question of making the decisions.

15         Chairman Jordan.    What was it going to take to prove necessary to ask for and

16   get 515 status?    You're 0 for 2.    You had asked before you ever went to the initial

17   contact with the D.C. Attorney, Mr. Graves, and you say in your letter, if it proved

18   necessary, you would request and get that authority.    What was it going to take if you

19   were already 0 for 2?

20         Mr. Weiss.    Chairman, I mean, your question presumes that I'm asking the U.S.

21   Attorneys in L.A. and in D.C. for their approval with respect to 515 status.    That wasn't

22   happening at all.    I wasn't asking them for anything in that regard.

23         Chairman Jordan.    I'm not saying you were.

24         Mr. Weiss.    I had it if I wanted.

25         Chairman Jordan.    You asked them to partner with the case.

1        Mr. <u>Weiss.</u>   I asked them --

2        Chairman <u>Jordan.</u>   Both of them told you no.   You were told by Main Justice,

3   prior to your initial ask of the U.S. Attorney in the District of Columbia, that if you needed

4   515 authority -- you asked for 515 authority.   He said, No.   Go talk to them.   You're 0

5   for 2, and you still don't ask for it.   You still don't get it.

6        Mr. <u>Weiss.</u>   The only -- I still don't get it.   The only question is did I ask for it.

7   So I knew that when or if I asked for it, I was going to get it.   That wasn't at the forefront

8   of my mind.   What I was concentrating on now was the case, the strength of the case

9   and whether we bring the case.   That's all that was -- that was the focus of my attention,

10   not the authority issue.

11        Mr. <u>Castor.</u>   Do we have in the exhibits the August 7, 2020 email?

12        Ms. <u>Nabity.</u>   Yes.

13        Mr. <u>Castor.</u>   I'm going to mark as the next exhibit -- we're up to number 13.

14                        [Weiss Exhibit No. 13

15                       Was marked for identification.]

16        BY MR. CASTOR:

17        Q   On August 2nd, AUSA Lesley Wolf sent FBI Special Agent Joshua Wilson an

18   email in which she wrote:   There should be nothing about Political Figure 1 -- and that

19   refers to Joe Biden -- in the draft search warrant.

20        Are you familiar with that?

21        Are you familiar with that?

22        A   Can I look at what you're referring to?

23        Q   I referenced an August 2nd email.   Now the marked email is August 7th.

24        But there should be nothing about Political Figure 1 in the search warrant.   And

25   the question is do you know who Political Figure 1 is?   And I think by all accounts, it's Joe

1    Biden.

2         A    I don't know if -- because there are redactions on the below email, whether I

3    was copied.    But, in any event, this clearly pertains to aspects of the investigation, and

4    I'm not going to comment on any aspect of the investigation.

5         Q    In your experience, for ordinary cases, is it normal for prosecutors to order

6    investigators to remove references to key figures that could potentially be implicated in a

7    search warrant?

8         A    Again, there are so many variables in that hypothetical, and it's not

9    something I -- it wouldn't be appropriate for me to speculate or offer an opinion on a set

10   of circumstances such as those.

11        Q    Whistleblowers have testified that during a prosecution team meeting on

12   September 3, 2020, that Lesley Wolf stated that there was enough probable cause for

13   search warrants, but optics were a driving factor in the decision of whether to execute

14   that search warrant.

15        Do you remember that?

16        A    No, I don't, and nor would I comment on particulars of the investigation.

17   It's just not appropriate now, and perhaps it will be appropriate at the time I prepare the

18   report.

19        Q    But for an investigation that doesn't involve the son of a President, or the

20   future President at that time, would that -- regular case, not involving the son of a future

21   President or the son of a former Vice President, would that type of driving factor be

22   appropriate optics?

23        A    Again, I'm not going to comment on a question that necessarily is a

24   hypothetical.    Prosecutors will consider any number of factors in deciding whether to

25   proceed with certain investigative techniques.    And I just -- there are so many variables

1    that might go into that decision-making process, it just wouldn't be productive or

2    constructive for me to get into those circumstances.

3         Q    Are you aware of the day of action that was planned on December 8, 2020?

4         A    I am aware as a general matter to that eventuality.    But, again, because it's

5    an investigative technique as part of our overall investigation into this matter, I'm not at

6    liberty to get into the particulars.

7         Q    Do you know how many interviews were planned for that day?

8         A    Just not going to get into the particulars of that matter.

9         Q    And do you know how many interviews were actually conducted?

10         A    I'm not at liberty to get into the particulars of that matter.    I would say that

11    as a general matter in white-collar investigations, when you're dealing with persons who

12    are represented by counsel, you never accept as a fait accompli that folks will be available

13    for you and will be willing participants in interviews.

14         So as a general matter, I don't know that there are expectations in that regard

15    when you're dealing with certain types of cases and investigations.

16         Q    But they had success with Rob Walker, didn't they?

17         A    Again, I can't get into the particulars of this case, because it involves the

18    investigation.

19         Q    And the transcript of the Rob Walker interview, I mean, that was made

20    public as a part of the whistleblower proceedings, correct?

21         A    I can't get into the particulars of this investigation.    It would be

22    inappropriate for me to comment on any aspect of it or any witness who has or has not

23    spoken.

24         Q    Do you know if Mr. Walker was represented by counsel?

25         A    I'm just not at liberty to discuss the particulars of the investigation at this

1    time.

2         Q      Do you know who made the decision to tip off the presidential transition

3    team about the day of action, and that the investigators wanted to try to speak with

4    Hunter Biden?

5         A      That's, again, another -- that's a part of the investigation, and it is something

6    that I would expect to address in the submission of my report, but it wouldn't be

7    appropriate for me to comment on that matter until that time.

8         Q      Okay.    So you acknowledge that that was an issue that occurred?

9         A      Again, I am -- that's something that I will address -- it's something -- if -- I'm

10   not going to comment on the investigation, but investigative techniques and certain other

11   aspects of the investigation would be topics I would expect to address at the time I

12   prepare the report.

13        Q      Are you familiar with investigators' plan to search Hunter Biden's storage

14   unit around this time period?

15        A      Again, I'm not going to get into the particulars of any particular investigative

16   technique or what was or was not done during the course of the investigation.    It will be

17   addressed at a later time.

18        Q      How many taxpayer conferences -- Mr. Goldman raised this with you, that

19   there were a series of taxpayer conferences with lawyers for Hunter Biden.    The

20   question is how many were there?

21        A      I believe we talked about defense counsel, and I mentioned that, as a

22   general rule, there are -- my understanding, not being a tax expert, but part of the

23   process afforded in tax cases is that the putative defendant taxpayer may be afforded a

24   conference with Tax Division counsel or the attorneys assigned to the case.

25        Q      And ordinarily that's one, right?    There's, like, one?

1        A      In all candor, Counsel, I don't know what the normal course is.    I'm not an

2   expert in Tax Division processes in this regard and how many conferences are typically

3   afforded.

4        Q      Do you remember Mr. Clark suggesting that it would be career suicide to

5   bring a case involving Hunter Biden?

6        A      I'm not going to talk about the particulars of any conversations with defense

7   counsel or whatever representations Mr. Clark may have made.

8        Q      But you're aware Mr. Clark took a volume of information and he handed it

9   over to the press, correct?

10       A      I'm aware of Mr. Clark.    I'm just not going to talk about anything he has said

11   or anything he has done.    He can address that if he so desires.

12       Q      Okay.    But there was a big long New York Times article and a Politico story

13   about this, correct?

14       A      I try to stay away from press reports so that I can focus on the case and --

15       Q      Okay.    So you haven't read The New York Times article?

16       A      I don't recall either way.

17       Mr. Castor.    Okay.    Do you want to mark the next exhibit?    We'll mark it then.

18                              [Weiss Exhibit No. 14

19                              Was marked for identification.]

20            BY MR. CASTOR:

21       Q      So The New York Times reported that Mr. Clark wrote to your office and

22   basically raised the prospect that President Biden would be called as a witness, and

23   because of that, that would be a reason that you should not bring the case.

24            Do you remember that allegation?

25       A      I'm not going to comment on that, what Mr. Clark may have said or

1      represented to us.

2           Q      Uh-huh.

3           A      But I'd say, as a general matter, decisions in the case are going to be based

4      on the facts and the law, not any representation --

5           Q      Okay.

6           A      -- by the defense counsel or -- I'm not going to call them threats, but

7      whatever he may have said in that regard.

8           Q      So surely you remember this New York Times article coming out, right?    I

9      mean, this is a pretty significant article against the backdrop of your case.    You can flip

10     through it.    It's pretty --

11          Do you remember reading the article when it came out?

12          A      I don't know that I recall reading the article.    I'm not going to

13     discuss -- whatever Mr. Clark chose to share with the press, that's for him to speak to.

14     I'm not going to comment on it either way.    It would be inappropriate -- to the extent

15     this is discussing plea negotiations, absolutely inappropriate for a prosecutor to talk

16     about that process.

17          Q      Okay.    Stuart Goldberg testified that he went to Delaware for one of these

18     taxpayer conference meetings.

19          Do you remember that?

20          A      Do I remember Stuart Goldberg coming to Delaware?

21          Q      Yeah.

22          A      I'm not going to get into the meetings.

23          Q      I mean, he did.    I don't know what the difference is.

24          A      Well, I understand that he -- I don't know, but I'm not going to discuss

25     meetings with defense counsel.    I just don't think it's appropriate for this process, and it

1    doesn't go to my authority.

2        Q    Okay.   I mean, it's a little confusing for us.   I mean, witnesses come in with

3    the same DOJ lawyers and, you know, some witnesses are talking about one thing, and

4    then now you're saying you're not going to talk about it.

5        Do you -- I guess the question is, do you remember the meeting?

6        A    Look, I can only make decisions on behalf of myself and the integrity of the

7    investigation and the process moving forward.   That's what I'm focused on.   I can't

8    speak to why Mr. Goldberg did or did not address something that I'm handling differently.

9    I understand the frustration, but I'm not in a position to address it.

10        Q    During this meeting, Mr. Clark said that your legacy was on the line, how you

11    handled this case.

12        Do you remember that?

13        A    Again, I'm not going to talk about the meeting or any particulars with respect

14    to the meeting.

15        Q    I'm going to turn your attention to the Attorney General statements about

16    your authority.   In April of 2022, he stated:   The Hunter Biden investigation is being run

17    and supervised by the United States Attorney for the District of Delaware.   He's in

18    charge of that investigation.   There will not be any interference of any political or

19    improper kind.

20        Do you remember hearing the Attorney General's comments in April of 2022?

21        A    I can't -- I can't recall when or if I heard specific comments.   What I can say

22    is I believe -- with respect to what you've just represented to me, I believe I'm in charge of

23    the investigation, and I don't believe I was interfered with in the exercise of my

24    responsibilities in this case.

25        Q    So the Attorney General has had a couple of silent appearances where this

1    topic has come up, and I guess the question is, did you have direct communications with

2    the Attorney General?

3          A      I've never had any direct communications with the Attorney General, save

4    my communication in requesting Special Counsel authority in August of 2023.

5          Q      When you did request Special Counsel authority in August of 2023, how did

6    you request it?    Was it in writing or on the telephone?

7          A      It was in writing, and that's about all I'm going to say about that process.

8          Q      Okay.    Did you reach out directly to the Attorney General, or did you go

9    through Mr. Weinsheimer?

10         A      I'm not going to get into anything further.    I requested it, and it was

11   granted.

12         Q      Okay.    So the Attorney General, Mr. Garland's testimony before the Senate

13   in April of 2022, did Mr. Weinsheimer tip you off that the Attorney General was going to

14   be making those statements, or did he follow up after they were made to alert you to

15   them?

16         A      I don't recall ever being tipped off or alerted to anything the Attorney

17   General was or was not going to say.

18         Q      Okay.

19         A      -- to Congress or anyone else.

20         Q      Okay.

21         A      I don't recall anything that resembles such a process.

22         Q      Okay.    So to the extent you are familiar with them, you just heard about

23   them in the news?

24         A      I'm not sure where I heard about them.    All I can say and all I'd address is

25   what I understand the situation to be with respect to anything that was said that

1    pertained to me, the investigation, my authority, anything in that nature.

2        Q      In March of 2023, the Attorney General stated:    "The U.S. Attorney in

3    Delaware has been advised that he has the full authority to make those kind of referrals,"

4    referring to other U.S. Attorney's Offices, "or bring cases in other jurisdictions if he feels

5    it's necessary, and I've not heard anything from that office to suggest they're not able to

6    do everything that the U.S. Attorney wants to do."

7        Do you remember the Attorney General making that comment?

8        A      I don't know if I have a specific recollection of that comment or the others.

9        Q      Okay.

10       A      What I'd say is I've testified to you folks is that -- or I've described for you

11   folks is that I had the ability to pursue charges in the jurisdiction I determined was

12   appropriate.

13       Q      But as of March of 2023, I mean, you tried to bring a case in D.C.    He

14   decided not to partner.    You tried to bring a case in the Central District of California, in

15   Los Angeles.    He decided not to partner.    So how do you reconcile that?

16       A      How do I reconcile that with what?

17       Q      That, on one hand, the Department is saying, yeah, we're going to give you

18   515 authority.    The Attorney General is saying you have the full authority.    But, on the

19   other hand, when you actually try to implement any of these things, you're told no.

20       A      Again, you're putting one fact together with another that don't go together.

21   I had the authority.    I was satisfied I had the authority.    I wasn't concerned about my

22   authority.    The only issue I was concerned with was the decisionmaking on the case, the

23   strength of the case, and whether to bring the case.    That was the focus of my thought

24   process, not the authority.

25       Q      And in your letter you talk about requesting Special Attorney status?

1          A      In exhibits 1, 2, or 3?

2          Q      Correct.

3          A      Yes.

4          Q      And then ultimately, you requested Special Counsel status.    Why the

5      difference?    Like, why didn't you just request Special Attorney status as you had

6      indicated?

7          A      I'm not going to get into the particulars as to why I requested Special

8      Counsel status --

9          Q      Okay.

10         A      -- as opposed to Special Attorney status.

11         Q      Okay.

12         A      That's just --

13         Chairman Jordan.    The whole premise here is on your authority.    That gets to

14     the heart of the matter.    What is the distinction your authority -- you requested Special

15     Attorney status clear back in March of '22 -- actually February of '22 before you went to

16     Mr. Graves.    That's the heart of what we're trying to get at, and you won't answer the

17     question.

18         Mr. Weiss.    No, I'm not going to get into the particulars of why I requested

19     Special Counsel status.    That's beyond the scope of this, in my mind.

20         Mr. Castor.    Okay.

21         Mr. Weiss.    Those are executive communications and inappropriate for me to

22     disclose.    I had the authority that I thought was appropriate as U.S. Attorney to bring the

23     charges under 515 as I've discussed, and I continue to have the authority to move forward

24     in my current status.

25              BY MR. CASTOR:

1        Q     What were the differences, though, in Special Attorney status and in Special

2    Counsel status?    Like, you were making your decision in August to request Special

3    Counsel status.    Surely, you mulled whether Special Attorney status would do it for you.

4        And so the question is, in August of 2023, when you're thinking this over, you're

5    mulling it, what are the differences in your mind between those two?

6        A     Yeah.    That gets right back to the question that was posed by the chairman

7    and yourself previously, and it necessarily gets into particular executive conversations

8    that I'm not at liberty to discuss, would be inappropriate for me to discuss at this time,

9    certainly would be the subject, and should be the subject, of my Special Counsel report

10   when that's submitted.

11       Q     Okay.    If you're giving a lecture then -- let's say hypothetically you're giving

12   a lecture to a bunch of law students, and you're trying to help law students understand

13   the difference between the two, what would you tell them?

14       A     The difference between --

15       Q     Special Counsel authority and Special Attorney.

16       A     Well, there are differences, and we discussed some of the processes that

17   one must follow.    I mean, as a U.S. Attorney, I've got to go through the 515 process that

18   we've been discussing extensively.    As Special Counsel, that process doesn't exist.   I

19   have the authority, consistent with my mandate as ordered by the Attorney General, to

20   prosecute and to bring the case wherever circumstances dictate.

21       So I don't have to go through that step-by-step process.    But that's one example

22   of the differences between the two.

1     [1:34 p.m.]

2              BY MR. CASTRO:

3         Q    And, if you were told that you would have been able to have 515 authority if

4    you asked for it, like, why wouldn't you just go that route?

5         A    Again, that necessarily gets into the issue that we've been looking at, and it's

6    just not appropriate for me to get into at this time.

7         Mrs. Spartz.    Are there key differences that are significant in the statuses, any

8    other difference except processes for 515?

9         Mr. Weiss.    I mean, generally speaking, the idea is you don't report -- you know,

10   the reporting requirements aren't as demanding as Special Counsel, but I'm trying to

11   think of other differences.    Resource availability might be different under the two

12   processes.    But, again, I would return to the idea that, whether I was Special Counsel or

13   whether I was a U.S. Attorney, you know, I had the authority I needed to proceed as I

14   deemed appropriate.

15              BY MR. CASTRO:

16        Q    Since you've been appointed Special Counsel, did you get more staff?

17        A    I don't want to get into the particulars of the staff, and I continue to work on

18   building the team, but I'm not going to get into the particulars.

19        Q    Do you have separate office space?

20        A    I do have separate office space.

21        Q    Okay.    And you're housed in Delaware?

22        A    I am housed in Delaware.

23        Q    Okay.    So it's totally separate office as Special Counsel from the U.S.

24   Attorney?

25        A    It is.

1    Q    Okay.    And you're performing both functions?    You're performing the

2    functions of the United States Attorney for the District of Delaware, and the Special

3    Counsel?

4    A    I have help as U.S. Attorney, but I'm doing the best I can in each of the roles,

5    yes.

6    Q    Okay.    And I'm sorry if I just asked this, but how large is your team on the

7    Special Counsel's Office?    I think I asked a slightly different question, but I'm not trying

8    to be repetitive here.

9    A    I don't know that you have.    I don't want to get into particulars of numbers,

10    individuals, and the team, so -- and determine that we will have the team necessary to

11    pursue the case as we assess it.

12    Chairman Jordan.    I just want to read from the Attorney General's statement on

13    August 11th of this year announcing U.S. Special Counsel.    Bottom of the first page of

14    what's been marked, it says:    "On Tuesday of this week, Mr. Weiss advised me" -- this is

15    a Friday, August 11th, so Tuesday would have been August 8th.    "On Tuesday of this

16    week, Mr. Weiss advised me that, in his judgment, his investigation reached a stage in

17    which he should continue his work as Special Counsel, and he asked to be so appointed."

18    And you said that was the only contact you've had with the Attorney General, was

19    when you asked him for this?

20    Mr. Weiss.    That's my professional --

21    Chairman Jordan.    And just refresh my memory.    Was that a phone call, email?

22    How was that?    A letter?

23    Mr. Weiss.    I didn't get into the particulars, but that is the only communication

24    that I had with the Attorney General that I recall, yes.

25    Chairman Jordan.    Did you talk with anyone else at Main Justice prior to the

1    communication directly with the Attorney General?

2         Mr. Weiss.   With respect to that request?

3         Chairman Jordan.   Yes.

4         Mr. Weiss.   No.

5         Chairman Jordan.   Okay.

6              BY MR. CASTRO:

7         Q    During your discussions with Mr. Weinsheimer about 515 authority, was

8    there any discussion about the conflict-of-interest rules and whether they would be

9    applicable here?

10        A    For conflict-of-interest rules for me?

11        Q    Correct.

12        A    No.   Not as it pertained to my -- oh, wait.   They would be applicable here

13   with respect to what?   Special Counsel, Special Attorney?   I just want to make sure I

14   understand.

15        Q    The fact that you're handling, you know, the Hunter Biden case, that you're

16   the Delaware U.S. Attorney, you know, Hunter Biden is the son of the President, who is

17   from Delaware, who is certainly a very influential person and comes from a very

18   influential family in Delaware.

19        A    No.   I had been with the case for a couple of years, and, no, we never

20   discussed whether it was appropriate for me to continue to handle the case, because I

21   was the U.S. Attorney in Delaware.

22        Q    Okay.   There has been some reporting that, during President Biden's son

23   Beau Biden's tenure as attorney general in Delaware, you had some interactions with

24   him.

25             What can you tell us about those?

1          A     I don't know what that has to do with my authority, but I --

2          Q     Were you friends with Beau Biden?

3          A     No, I wasn't friends with Beau Biden.    I barely had a relationship with

4    Beau Biden.

5          Q     Okay.

6          A     I was the Acting U.S. Attorney.    He was the attorney general, so our paths

7    crossed.    That was the extent of this relationship.

8          Q     Okay.    Any relationship with any other Biden family members?

9          A     Nope.

10         Ms. Zdeb.    Steve, can we go off the record for one quick second?

11         Mr. Castro.    Sure.

12         [Discussion off the record.]

13         Mr. Castro.    Back on the record.

14             BY MR. CASTRO:

15         Q     Did you have anything to add after conferring with counsel?

16         A     No, no, no.    I -- no.

17         Q     Okay.    When Graves and Estrada told you that they didn't want to partner

18   on the case, did they give you any specific feedback about why?

19         A     I never had a conversation with Graves about not partnering, and I had a

20   conversation with Estrada.    I don't want to get into particulars.    It goes to the merits,

21   and --

22         Mr. Biggs.    It goes to the merits of what?

23         Mr. Weiss.    It goes to merits of the case, views of the case, discussions about the

24   case, and I'm not going to discuss those discussions because it does bear on the merits of

25   the case and the investigation.

1         Mr. <u>Biggs.</u>   The phrase is interesting.   I -- "goes to the merits of the case."   All

2    right.

3                   BY MR. CASTRO:

4         Q    So the Graves people, that was all staff to staff?   You learned that

5    Mr. Graves didn't want to partner via staff?

6         A    That's correct.   I learned via the folks on my side of the aisle, yes.

7         Q    And you never had a subsequent follow-up with him?

8         A    No.   I wasn't -- it wasn't necessary.   It wasn't like I was looking to

9    persuade anyone.   I wasn't concerned about my ability to go forward, so there was no

10   need to say, "Do you want to reconsider," or anything of that nature.   They said it.   I

11   accepted it, and I had conversations with the Office of Deputy Attorney General and

12   understood what my options were.

13        Q    Okay.   Did Graves or Estrada -- did their offices offer you anything?   Did

14   they offer you office space or access to their grand juries?

15        A    As I said earlier, I specifically recall feedback from Mr. Graves' office that

16   would have afforded us those logistical assists, yes.

17        Q    But you didn't take him up on that offer?

18        A    Well, I didn't proceed in the jurisdiction, so I didn't take him up on that offer.

19        Q    Did Mr. Weinsheimer ever tell you that he met with Chris Clark?

20        A    He -- if -- no.   If he met with Chris Clark, I would have been at that meeting.

21        Q    Okay.   So there were no one-on-one meetings or telephone calls between

22   Mr. Clark and Brad Weinsheimer?

23        A    I am unaware of any such meeting, and I don't think any such meeting would

24   have occurred.

25        Q    Was Mr. Weinsheimer -- did he attend all the meetings, the taxpayer

1      conference meetings?

2              A      Well, there are two types of meetings.    I didn't attend taxpayer

3      conferences to the -- you know, I didn't participate in any taxpayer conference.

4              Q      But you attended some meetings with Mr. Clark, correct?

5              A      As I acknowledged earlier, there was a meeting, or

6      there -- meeting -- meetings with defense counsel took place.    Just can't get into the

7      particulars of any meeting.

8              Mr. Castro.    Okay.    Our hour is up, so I'll stop there.

9              [Recess.]

1   [2:19 p.m.]

2   ███████.   All right.   It is 2:20.   We can go back on the record.

3   BY ████████:

4   Q   Special Counsel Weiss, in the last hour of questioning, the majority counsel

5   asked you a number of questions about supposed investigative steps, and you repeatedly

6   declined to comment.

7   In declining to comment, you did not intend to confirm or deny that any

8   investigative steps were or were not taken, correct?

9   A   I do not, that's correct.

10   Q   Okay.   And so, for example, you were asked about a 1023 form that I think

11   was marked as exhibit 9.   In declining to comment, you did not intend to suggest that

12   your office had, had not seen the form, had or had not taken any steps with regard to the

13   form.   You were declining to comment entirely as to the question, correct?

14   A   Yes.   I don't want to communicate anything in that regard so as not to

15   jeopardize anything that we have that is ongoing.

16   Q   Okay.   And one more question:   The comment was made that you agree

17   that the transition team was tipped off before a supposed interview of Hunter Biden.

18   You did not mean to confirm or deny that that actually took place, correct?

19   A   That's correct.   I did not mean to confirm or deny that fact.

20   Q   Okay.   I want to look at exhibit 12, which is the Special Counsel Report.

21   Realizing that there are a number of redactions and that this may be redacted,

22   there is no date on this report, correct?

23   A   This -- oh, yes.   It is 12.   I'm sorry.   There is a sticker that says 2, but I do

24   not see a date on exhibit 12.

25   Q   Okay.   And you realize it says pages 84 and 85, but you have not been

1    presented with the pages preceding pages 84 and 85, correct?

2         A    That's correct.

3         Q    Okay.    So, given that there is no date on this, you don't know, for example,

4    what steps might have been taken, what evidence might have been developed after this

5    report was presented, correct?

6         A    Whether I do or not, I am not at liberty to comment on any steps or

7    investigative avenues that were pursued after the submission of the report.

8         Q    Understood.    And this is not the entire report, correct, as it exists?

9         A    Exhibit 12 does not represent the entire report.

10        Q    Okay.    The statement was made in the prior hour that Matt Graves and/or

11   Martin Estrada, quote, "shot you down" or told you no.    Is that an accurate

12   representation of your interactions with them?

13        A    It is not.    As I explained on several occasions, I did not ask them for their

14   permission to proceed.    That wasn't the question that was posed.

15        I asked whether they were interested in joining in or participating in the case, and

16   they declined to do so, but I still had the ability to move forward if and when I chose to do

17   so.

18        Q    Okay.    And that pertains to both the Central District of California and the

19   District of Columbia, correct?

20        A    That is correct.

21        Q    Okay.    Were you denied 515 authority in spring 2022?

22        A    I was not denied 515 authority at any time, no.

23        Q    Okay.    And, in fact, you said earlier that -- I'm sorry.    Withdraw that.

24        You don't need section 515 authority to take investigative steps in another

25   jurisdiction, correct?

1    A    You do not need 515 authority to pursue investigative steps wherever they

2    may be, yes.

3    Q    Okay.    You've said in your letters and you reiterated again today that you

4    were assured that you would be granted 515 authority if it proved necessary.

5        At what point would you need to formally go through the process to obtain

6    section 515 authority?

7    A    I would execute on that authority at the time we were ready to bring the

8    charges, to file.

9    Q    Okay.    And, accordingly, if you were not ready to bring charges, you would

10   not formally go through the process to obtain 515 authority.    Is that correct?

11   A    That's correct.

12   Q    Okay.    In the prior hour, you were asked about some statement supposedly

13   made by Mr. Clark.    I think there was a reference to career suicide and your legacy being

14   on the line.    I don't want to get into those statements specifically, and I understand you

15   can't comment on them, but at a high level based on your many years of experience as a

16   prosecutor, it's accurate to say that defense attorneys have an obligation to vigorously

17   defend their clients, correct?

18   A    As a general matter, absolutely.

19   Q    And, as part of that defense, defense attorneys might sometimes use what

20   some people could consider to be aggressive language in their conversations with

21   prosecutors.    Is that fair?

22   A    Certainly there are times when defense counsel may choose to use

23   aggressive language.

24   Q    And have you been in situations in which defense counsel has used

25   aggressive language with prosecutors?

1      A      I believe that I have, although I don't find it -- personally, I don't find it very

2   effective for what that's worth, but I suspect that I have witnessed such tactics.

3      Q      Okay.    When you say you don't find it very effective, in your experience, are

4   prosecutors easily intimidated by defense tactics like aggressive language?

5      A      I mean, I can't -- no.    I wouldn't expect that most prosecutors would be

6   intimidated by such tactics.

7      Q      And, when you say you don't find it very effective for defense attorneys to

8   use those kind of aggressive tactics, why do you say that?

9      A      Because we're bound to make our decisions based on the facts and the law,

10   so, if -- I find, as a general matter, defense counsel is most effective when he focuses -- he

11   or she focuses on the facts and law and demonstrates why my case isn't what I think it is.

12      Q      Okay.    Thank you.

13      I want to turn to the release of information in cases.    Are you familiar with the

14   term "law enforcement sensitive information"?

15      A      I am generally, yes.

16      Q      What's your understanding of what that term means?

17      A      It means that it's information that is part of the investigation, and, therefore,

18   our preference would be that such information not be released, at least -- well, I wouldn't

19   even limit it to the pendency of the investigation, yes.

20      Q      Are you familiar with what I mean when I refer to 6(e) material?

21      A      I certainly am.

22      Q      What is 6(e) material?

23      A      It's grand jury material.

24      Q      Are there particular safeguards around 6(e) material, or grand jury material?

25      A      Sure.

1      Q    What are they?

2      A    There are statutes that provide that the knowing release of grand jury

3  material could be a criminal offense under certain circumstances depending upon the

4  surrounding circumstances.

5      Q    Is it fair to say that the Justice Department works to keep both information

6  about ongoing matters and law enforcement sensitive information and 6(e) material from

7  being released?

8      A    Yes.

9      Q    Why is that?

10     A    Because release of such material could jeopardize any ongoing investigation,

11  and perhaps be used by an adversary to undermine the ongoing investigation or the case

12  if it's ultimately prosecuted.

13     Q    Okay.    Could it actually impair prosecutors' ability to move forward with a

14  case?

15     A    It could impair an ability to move forward.    It certainly doesn't do it any

16  good.

17     Q    Okay.    And it could actually prevent prosecutors from obtaining a

18  conviction, right?

19     A    Under certain circumstances.    I mean, it's a hypothetical, but, as I said, it's

20  not a good development for prosecution.

21     Q    Okay.    Is it also a concern that the release of information about ongoing

22  investigations could create a risk of damaging the reputation of individuals who might not

23  ultimately be charged, for example?

24     A    Certainly that's -- you know, that's a fair concern, yes.    That's why we don't

25  talk about ongoing matters.

1      Q      In this case, there have been allegations that, on at least two occasions,

2  information about the ongoing investigation, including potentially 6(e) material, was

3  leaked to the press.

4      Are you familiar with these allegations?

5      A      I'm not familiar with the particulars that you're discussing.

6      Q      Okay.    Would it be concerning if information about this case was leaked to

7  the press?

8      A      Absolutely.    Any case for any prosecutor, the release of information to the

9  press would be of concern, yes.

10      Q      Moving on, we've been keeping a loose tally, and, by our count so far today,

11  the majority has asked you more than 75 times questions about the ongoing

12  investigation, and you've repeatedly declined to answer.

13      It was made clear to the majority in advance of your testimony that you would

14  only be able to discuss the scope of your authority over this case, correct?

15      A      My understanding, as I said in my opening statement, was that I was coming

16  in here to discuss the scope of the authority, but I have no comment with respect to the

17  number of times that the question has been raised.    I've tried to be consistent in my

18  responses to the best of my ability.

19      Q      Okay.    Can you talk a little bit about why you are concerned about

20  discussing the underlying case in this format as opposed to putting the information into a

21  report to be released later?

22      A      I don't want to say or do anything to jeopardize the ongoing case.    We're

23  doing our best to gather the evidence and to make informed decisions.    There are

24  people working very hard on that exercise, and the last thing I want to do is to say

25  anything here -- while I am mindful of oversight responsibilities, I'm doing my best to

1    respond to questions.    I am really sensitive to the idea that I don't do anything to

2    jeopardize what we're working on otherwise with respect to the investigation or any

3    prosecution.

4         Q    And can you explain why discussing that information here might jeopardize a

5    prosecution or might impact the ongoing case?

6         A    Certainly, you know, there are any number of ways in which that could

7    manifest itself, but whether a court takes exception to something I say, whether defense

8    counsel uses something I say to attack the prosecution or the merits of the prosecution,

9    these are all things that I'm trying to be mindful of so as to not undermine what we're

10   working hard on the investigative front.

11        Q    Okay.    And so, to the extent that you have declined to respond to questions

12   about the underlying case, that is a decision that you yourself are making based on

13   protecting that case, correct?

14        A    Yes.

15        Q    It's not a directive from Mr. Weinsheimer, for example?

16        A    No one has directed me.    I'm doing my best.    I'm responsible for the case

17   and for the investigation, as I've tried to communicate, and I'm trying my best on my own,

18   without direction, to preserve the integrity of the case.

19        Q    Compared to other matters that you've worked on during your career at the

20   Department of Justice, has this matter attracted more public attention than others?

21        A    I think that's fair.

22        Q    Has this outsized attention led to increased attention on your office

23   specifically?

24        A    It's led to increased attention for everyone who has touched the case.    I

25   think that's correct.

1        Q    Has the outsized attention given to this case resulted in threats and

2   harassment against members of your office?

3        A    Yes.   Members of my office, agents assigned to the case, both from the IRS

4   and from the FBI, doxing family members of members of my office.   So, yeah, it's part

5   and parcel of this case.

6        Q    Do you have concerns for the safety of individuals working in your office?

7        A    Sure.   I have safety concerns for everybody who has worked on the case,

8   and we want to make sure that folks -- yeah, folks are encouraged to do what they need

9   to do with respect to the pursuit of justice generally and they not be intimidated in any

10   way from performing their responsibilities.

11        Q    Do you have concerns that the threats and harassment employees have

12   received are intended to intimidate them into not doing their jobs?

13        A    I really can't speak to the intention of any actor in this realm.   I just know

14   that these -- that certain actions have been taken by individuals, doxing, and, you know,

15   threats that have been made, and that gives rise to concern.   We've got to be able to do

16   our jobs.

17        And, sure, people shouldn't be intimidated, threatened, or in any way influenced

18   by others who -- again, I don't know what their motives are, but we're just trying to do a

19   public service here, so --

20        Q    Have you yourself been the subject of any threats or harassment?

21        A    I've certainly received messages, calls, emails from folks who have not been

22   completely enamored of my -- with my role in this case.

23        Q    Do you have concerns for your safety or that of your family because of these

24   threats?

25        A    You know, I'm not -- for myself, I'm not particularly concerned.   Certainly I

1 am concerned, as any parent or spouse would be for -- yeah, for family, yep.

2  Q Are you familiar with threats that have been targeting Lesley Wolf?

3  A I am aware that Lesley Wolf has received threats, yes.

4  Q Is it fair to say that she's been the particular target for threats?

5  A I think that Lesley has received more than others for the most part in this

6 case, yes.

7  Q Do you have confidence in Ms. Wolf as a prosecutor?

8  A Yeah. I have confidence in Ms. Wolf as a prosecutor.

9  Q Okay. Are you confident that she did her work on the Hunter Biden matter

10 in a professional and unbiased manner without partisan or political considerations?

11  A I believe she did. As I said, she served the Department for more than

12 16 years, and I believe her to be a prosecutor with integrity.

13  ███████. Okay. All right. Thank you. We can go off the record.

14  [Recess.]

15  Mr. Castro. We can go back on the record. It's 2:36.

16   BY MR. CASTRO:

17  Q Did you have any interactions with FBI official Timothy Tebow?

18  A I don't know a Timothy Tebow, so I'd say no.

19  Q Okay.

20  A Not that I know of.

21  Q Are you aware that FBI agents from the Washington Field Office interviewed

22 a gentleman by the name of Tony Bobulinski?

23  A I am aware of investigative steps in this case generally, but I'm not going to

24 discuss any particular investigative step that was taken.

25  Q Mr. Bobulinski has -- I don't know what the right word is -- maybe

1    complained that he tried to give the FBI information, but they didn't seem willing to take

2    it, and the U.S. Attorney's Office in Delaware didn't follow up with him.

3          What can you say with regard to that?

4          A    Counsel, as you might surmise, I can't say anything in that regard, because it

5    pertains to the investigation.    And, at this time, I'm just not at liberty to comment on

6    any aspect of the investigation, although I suspect I could comment on that and probably

7    would at the conclusion of our investigation and submission of the report.

8          Q    Okay.    Have you had any issues getting the information you needed from

9    Mr. Bobulinski?

10         A    Again, I'm not going to comment on the investigation.

11         Q    Have you interacted with an FBI agent named Eric Miller?

12         A    Can you tell me the agency?

13         Q    With the FBI.    The Washington Field Office of the FBI.

14         A    No.    Not that I recall.

15         Q    Okay.    Are you aware of the role of the Washington Field Office in

16   suppressing information related to the Hunter Biden case?

17         A    I have no particular knowledge about such a matter.    I mean, not really.

18         Q    Okay.    Your primary FBI office is the Baltimore Field Office?

19         A    Our -- the SAC, the special agent in charge, is located in the Baltimore Field

20   Office.    That's correct.

21         Q    Okay.    And who is the special agent in charge that you interact with in

22   Baltimore?

23         A    During -- currently?

24         Q    Currently.

25         A    As of today, it's Tom Sobocinski.

1       Q       Okay.    And what other FBI officials in that office do you interact with?

2       A       His assistant special agent in charge is Ryeshia Holley, and those are the folks

3   I recall off the top of my head.

4       Q       Okay.    As far as the IRS personnel, how frequently does your office utilize

5   the supervisory or the special agents from the IRS in your cases?

6       A       We utilize special agents from the IRS in any tax case, and, at a minimum, a

7   support capacity in many other cases.

8       Q       Okay.    So it's not uncommon for your office to work with the IRS agents?

9       A       No.    Hopefully not.    If we're -- you know, no, because they're a

10   tremendous tool.    So, no, we work with the IRS on a number of cases.

11      Q       Okay.    I'm going to mark the plea agreement.

12      Mr. Castro.    What number are we up to?

13      Ms. Nabity.    Fifteen.

14      Mr. Castro.    Fifteen.

15                              [Weiss Exhibit No. 15

16                              Was marked for identification.]

17              BY MR. CASTRO:

18      Q       This is the copy of the plea agreement dated July 26th of this year.

19              What's the current status of this plea agreement?

20      A       The plea agreement has been withdrawn, and that's all I'd say about it at this

21   moment.    There is ongoing litigation in this matter, as you know, and, therefore, I'm not

22   going to say anything that's going to compromise the prosecution in the district of

23   Delaware.

24      Q       Okay.    But we certainly can talk about the public plea agreement, can't we?

25      A       I'm not going to talk about the public plea agreement because I don't know

1    how or when or if it will be utilized by defense counsel to advance the defense in this

2    case.

3         Q      Okay.   Do you know who drafted the statement of facts and the plea

4    agreement?

5         A      Again, I'm not going to get into this.    This is the subject of ongoing

6    litigation, an indicted case, so there is no way I'm going to comment on this matter.

7         Q      Okay.   Let me just ask you generally, though:    If the defense attorney

8    drafted it, would that give you concern?

9         A      I review with skepticism anything that is prepared by another party, so you

10   have to critically review documents you received drafted from an adversary, certainly.

11        Q      Okay.   So it would be uncommon for a defense attorney to draft a

12   statement of facts and plea agreement?

13        A      Plea agreements and statement of facts accompanying plea agreements, as

14   a general matter, are part of the prosecution's efforts.

15        Q      Could you turn to page 2?    And I'll call your attention to 5(a).

16              Pursuant to the United States Sentencing Guidelines, section 2T1.1, the amount of

17   loss as to count 1 and 2, including relevant conduct as defined in the Sentencing

18   Guidelines, is no less than 1.1 million and no greater than 1.5 million.

19              Is this true and correct?

20        A      You've rounded the numbers, but otherwise you've accurately read the

21   provision in the plea agreement.

22        Q      Okay.   And this was a plea agreement that was submitted to the court and

23   was, you know, attempted to be implemented, correct?

24        A      This was a plea agreement that was submitted to the court.

25        Q      Okay.   So the information contained in here is accurate to the best of your

knowledge?

A Yeah, I'm not going to say anything about the contents of the plea agreement or anything else about the process.

Q And your office signed this, correct, on page 6?

A There is a signature on the signature line on behalf of the United States, yes.

Q So, based on that, we can deduce that everything in here is something that is true and correct to the best of your knowledge?

A Again, I'm not going to comment on anything that implicates the contents of this document.

Q Okay. I'll refer you to page 7 of exhibit 1. It's exhibit 1. It's page 7 of the --

A I got it.

Q -- document, the paragraph that states, during calendar year 2017, Biden earned a substantial income, including just under 1 million from a company he formed with the CEO of a Chinese business conglomerate, 666,666 -- that's an unusual number -- "from his domestic business interests; approximately 664,000 from a Chinese -- another Chinese infrastructure investment company, 500,000 in director's fees from a Ukrainian energy company, 70,000 relating to a Romanian business, and 48,000 from the multinational law firm.

Is this all true and correct to the best of your understanding?

A Again, all I'm going to say is that you've accurately read the paragraph. Otherwise, I'm not going to comment on the document or the exhibit attached thereto.

Q Okay. Do you know who drafted this part, exhibit 1?

A Again, I'm not going to get into the contents or the drafting process with respect to this.

1    Q    Who would ordinarily draft these types of documents?

2    A    I'm not -- won't comment on it as it applies to this case.    Generally, the

3    statement of facts that accompany a plea are the province of the prosecution as a general

4    matter.

5    Q    Okay.

6    A    However, that's not to say there have been -- I am aware of circumstances in

7    which, you know, the other side has had comment or had input into a document.

8    Q    Would it be common for defense counsel to draft something and then send

9    it to the prosecution and have the prosecutors basically use the document --

10    A    Again, that --

11    Q    -- and edit it?

12    A    That sounds like we're suggesting such with respect to this case, and, again,

13    it's -- we're litigating this, so I'm not going to get into anything that could be utilized in a

14    way that's contrary to the government's interests on this topic.

15    Q    Yeah.    I was just asking from a general matter.

16    A    I understand.

17    Q    Do you take documents that defense attorneys send you and then just work

18    from there?

19    A    Again, I'm just --

20    Q    Not in the case.    Just generally.

21    A    I'm giving you what I can, you know, on this kind of -- on this situation.    I

22    mean, this is active litigation.    We're involved in motions practice as we speak.

23    Q    Flipping the page to page 8, the third paragraph, the paragraph that begins

24    with "despite"?

25    A    I see it.

1        Q    Direct your attention to the second sentence.   On or about March 22nd,

2  2018, Biden received a $1 million payment into his Owasco, LLC bank account as a

3  payment for legal fees for Patrick Ho and 939,000 remained available as of tax day.

4        Is that true and correct to the best of your knowledge?

5        A    As I've stated previously, counsel, I'm just not going to comment on any

6  aspect of the contents of this document or the plea agreement in general.

7        Q    But this was a plea agreement accompanied by a statement of facts that

8  your office signed?

9        A    This is a plea agreement that was signed by someone in my -- I believe in my

10  office.

11        Q    Okay.   And this isn't the first time you've seen this, right?

12        A    This --

13        Q    We're talking about the right plea agreement, right?

14        A    This is not the first time I have seen this.

15        Q    Okay.   Did you have any involvement with this particular document --

16        A    Not going to talk about it.

17        Q    -- or was it just the AUSAs in your office?

18        A    Not going to talk about the process, as I've said before.   Just not going to

19  talk about the process that underlies this, that led to the completion of the report, or any

20  of the contents thereof.

21        Q    Okay.   Ordinarily, are you involved in it?

22        A    Again, I'm not -- I'm just not going to get into that.

23        Q    Outside of this case, is, like, the U.S. Attorney ordinarily involved in revising

24  plea agreements that your AUSAs are handling?

25        A    I have -- we're a small office, so it wouldn't be the craziest thing for me to

1    review and have questions or suggestions with respect to a plea agreement.

2        Q    Okay.    On July 26th, the date of this plea agreement, Judge Noreika of U.S.

3    District Court for the District of Delaware declined to accept the Department's plea and

4    pretrial diversion agreements, correct?

5        A    I'm not going to comment on Judge Noreika's decision at all.    I'm just not

6    going to offer any comment in that regard.

7        Q    Okay.    But she declines to -- I mean, I don't mean to be difficult here, but --

8        A    The plea agreement did not go forward.

9        Q    Okay.    Because of the judge?

10       A    I'm not going to comment on why, who said what, the judge's comments.

11   We're in the matter before the judge as we speak, so I'm not going to say anything in that

12   regard.

13       Q    Okay.

14       Mr. Castro.    Can we get a copy of the pretrial diversion agreement?    We'll mark

15   that as the next exhibit.

16       We can go off the record for a second.

17       [Discussion off the record.]

18       Mr. Castro.    All right.    We're up to exhibit 16.    This is the pretrial diversion

19   agreement.

20                              [Weiss Exhibit No. 16

21                              Was marked for identification.]

22               BY MR. CASTRO:

23       Q    Paragraph 15 -- I'm sure you've seen this document before, correct?

24       A    I've seen this document before.

25       Q    This is the pretrial diversion agreement.    On page 9 of the document, it's

1    signed by Mr. Wise of your office under your authority.    It's signed by the defendant,

2    Robert Hunter Biden, and his attorney, Chris Clark.    And there is also a signature block

3    for the United States probation officer.

4            Is the probation officer needed to make this document effective?

5        A    Not going to comment on that.    It's the subject of ongoing litigation.

6        Q    Is there ordinarily a spot for the probation officer to sign?

7        A    Not going to comment on that at all.    It's subject of ongoing litigation.    I'm

8    not going to say or do anything to jeopardize the litigation or the rights of either the

9    government or defense in pursuing that litigation.

10        Q    You've seen pretrial diversion agreements in your district before?

11        A    I have seen pretrial diversion agreements in my district before.

12        Q    Okay.    And is ordinarily the probation office one of the parties that has to

13    sign?

14        A    In our district, the probation office is a party to the agreement.

15        Q    Okay.    And they sign it?

16        A    They are party to the agreement.    I can't recall specific circumstances.    I

17    don't review all the pretrial diversion agreements, but the probation office is absolutely a

18    party to a pretrial diversion agreement.

19        Q    Okay.    Now, is that not the case in other districts to your knowledge?

20        A    I can't speak to other districts.

21        Q    Okay.    Paragraph 15 of this document, which I believe is on page 7, states,

22    "The United States agrees not to criminally prosecute Biden outside the terms of this

23    agreement for any Federal crimes encompassed by the attached statement of facts and

24    the statement of facts attached as exhibit 1 to the memorandum of plea agreement filed

25    the same day.    This agreement does not provide any protection against prosecution for

1    any future conduct by Biden or by any of his affiliated businesses."

2          Did I get that right?    Did I read it accurately?

3          A      You read it well.

4          Q      Okay.    Thank you.

5          Other than the Hunter Biden case, how many times has your office included, you

6    know, in a pretrial diversion agreement, an agreement not to prosecute crimes that are

7    unrelated to the crime being diverted?

8          A      I'm not going to comment on that.    Again, I'm not going to comment on the

9    substance of this document.    Subject of ongoing litigation, and I don't want to in any

10   way influence that litigation.

11         Q      Okay.    Well, what is the status of the litigation?    Maybe you could just

12   help us understand that and that would alleviate the need to ask.

13         A      The government has filed charges in the district of Delaware, and

14   we're -- motions practice is -- will be underway.

15         Q      Okay.    And are these agreements -- the plea agreement, are they subject to

16   litigation specifically?

17         A      They haven't filed their motions, but --

18         Q      Okay.

19         A      -- there are documentation -- there is documentation that suggests that it

20   will certainly be the subject of litigation.

21         Q      Okay.    Did you personally sign off on both of these agreements?

22         A      Again, I'm not going to get into the particulars of my sign-off or any other

23   aspect of the preparation of the documents or the content of the documents.

24         Q      Okay.    Well, then who is Leo Wise and Derek Hines?

25         A      They are -- they were persons who were authorized to sign the document on

1    my behalf.

2         Q    Okay.    Are they AUSAs in the district of Delaware?

3         A    They are -- they are AUSAs who are -- they're AUSAs.    That's all -- they

4    were, I think, SAUSAs on this matter.

5         Q    They were SAUSAs?

6         A    Special Assistant United States Attorneys.

7         Q    Okay.    Are they part of your office now?    Are they still part of the --

8         A    I'm not going to comment on personnel.

9         Q    Okay.    Well, why wasn't -- I mean, Lesley Wolf, as far as -- you know, we're

10   aware and the whistleblower testified Lesley Wolf was the lead prosecutor on this.    Why

11   isn't she signing these documents?

12        A    I'm not going to -- I'm not going to speak to personnel -- anyone's role in our

13   prosecution or who participated and who did not participate and why that may be.

14        Q    Was she benched in the wake of the whistleblower testimony?

15        A    Not going to discuss personnel matters.    It's not -- it's certainly outside the

16   scope of the intended topic that we're here to discuss.

17        Q    Well, your intended topic, but, I mean, you know, we're obviously following

18   up on what we believe is credible testimony provided by whistleblowers via protected

19   disclosures?

20        A    I understand that you have a role to perform and a job to do, as I do.    And,

21   yes, I'm here to discuss my authority and all aspects of that question, but not the case,

22   the personnel on the case, or anything associated with the investigation.

23        Q    Okay.    Is Ms. Wolf still working the case?

24        A    I'm not going to comment on personnel that's part of the case.    Just not

25   going to do it for the reasons we've previously discussed.    Just not helpful in that regard.

1       Q    What's the Delaware way?

2       A    I don't really know what the Delaware way is.   I've heard the phrase.   I'm

3  not from Delaware, but I've heard the phrase, so I don't pretend to be intimately familiar

4  with the connotation.

5       Q    Have you ever used the term "the Delaware way"?

6       A    No.   I don't think -- I don't believe I've ever used the term "the Delaware

7  way."

8       Q    Are you aware of a prosecution of a gentleman by the name of Christopher

9  Tigani?

10      A    I am, yes.

11      Q    And you prosecuted him?

12      A    I was -- I don't recall my status at the time, whether I was acting or -- but I

13  am aware of the prosecution for Mr. Tigani.

14      Q    Okay.   At the time, I believe you were the interim head of the office?

15      A    I may have been.

16      Q    Okay.

17      A    If it was, you know, 2009, 2010, I was acting or interim U.S. Attorney during

18  that timeframe.

19      Q    And you had stated at the time that Tigani had become the embodiment of

20  the Delaware way.

21      A    Okay.

22      Q    Do you know what you meant when you said that?

23      A    You know, I can't -- I can't specifically recall.   I recall Mr. Tigani's case, and I

24  know that it pertained to -- or my recollection is that it pertained to campaign violations.

25      Q    Okay.

1      A      Bundling, I believe.    Bundling campaign contributions.

2      Q      In the presentencing memo for that case, it was written, "The defendant

3  himself, Mr. Tigani, best described the pervasive nature of his conduct to Federal agents.

4  Over a 6-year period, defendant became the embodiment of the Delaware way, a

5  concept described uniformly by defendant and others as a form of soft corruption

6  intersecting business and political interests which has existed in the State for years."

7         Does that refresh your recollection?

8      A      The idea of soft corruption?    I wouldn't -- I don't -- I don't recall.    That was

9  submitted -- I think I was the supervisor at the time.    You can tell me if I'm wrong, if the

10  AUSA -- my name is under the AUSAs.    I certainly wouldn't retreat from the description

11  in that sentencing memorandum --

12      Q      Okay.

13      A      -- with respect to Mr. Tigani's role and what it represented.

14      Q      Okay.    Would you characterize the Delaware legal community as a small,

15  tight-knit legal community?

16      A      I would characterize the Delaware community as a small community, yes, for

17  sure.

18      Q      And, for the most part, all the key players who litigate in Federal court know

19  one another?

20      A      I think that's fair that folks get to know one another pretty quickly, yes.

21      Q      Okay.    Did you ever have any concerns that you were responsible for

22  bringing a case against the President's son and, yet, you're part of this close-knit

23  community?

24      A      No, I didn't.    No.    Yes, I just -- I just acknowledge that the Delaware,

25  particularly in Federal courts -- you know, there is only a certain number of practitioners

1    locally --

2        Q    Right.

3        A    -- and there is extensive base that comes in from outside of Delaware.

4        Q    Right.

5        A    But there is a certain limited number of practitioners that regularly appear in

6    Federal court, but that fact, as far as I'm concerned, and nor did any other fact give pause,

7    as far as I was concerned, with respect to my ability to pursue the facts and the law and

8    go where they led in this investigation or the prosecution.

9        Q    Was there any discussion that you ever were a part of that maybe it would

10    be best to have a Special Counsel over this case that was not connected to this small,

11    tight-knit legal community of Delaware?

12        A    I don't recall any discussion that was had along those lines.    That is,

13    perhaps Special Counsel would be appropriate because this is a small, tight-knit legal

14    community.    No, I don't recall any conversation of that length or of that nature.

15        Q    Or, like, maybe for this case, the best type of Special Counsel would be

16    somebody from outside the Delaware legal community?

17        A    A conversation which -- that I was privy to, or participated in?

18        Q    Right.    I mean, either/or, yes.

19        A    I don't recall that, no.    No.    I don't recall a conversation that suggested

20    that someone from Delaware having responsibility of this case could not fulfill his or her

21    responsibilities.

22        Q    Do you think, from an outsider's perspective, that a reasonable outsider

23    could perceive that potentially there could be a conflict of interest there worthy of

24    addressing?

25        A    You know, I can't speak to that.    You know, it's speculation, but -- so I really

1    can't address it.

2         Q      I mean, one of the principles under the Special Counsel regime is that, if the

3    President needs to be investigated or the President's, you know, close family member of

4    the President, that that be handled -- if a Special Counsel is going to be appointed, that it

5    be detached from the authority of the President, correct?

6         A      Yeah.    I don't know about being detached from the authority of the

7    President.    What I would say is, at least as it pertains to me, that I wouldn't have

8    requested an appointment of Special Counsel if I didn't think I could fulfill the

9    responsibilities that attached thereto, which are significant.    I fully appreciate it, and I

10   wouldn't have asked for it if I didn't think I could do it.

11        Q      Right.    Do you see any conflict of interest that you serve at the pleasure of

12   President Joe Biden, yet, at the same time, you're in the midst of a prosecution of his

13   son?

14        A      I understand what you're suggesting.    The fact is that Special Counsel

15   ultimately reports to the Attorney General, who reports to the President of the United

16   States, regardless of who it is.    That's the way it works.    So you could -- one could

17   frame the same question with respect to anybody that might operate in this role.

18        Q      Are you familiar with Robert Hur?

19        A      I am familiar with Robert Hur, yes.

20        Q      And he's another Special Counsel currently?

21        A      He is another Special Counsel.

22        Q      And, to your understanding, what is he examining?

23        A      He's examining the document case.

24        Q      Okay.

25        A      The classified document situation.

1        Q    Is he somebody with experience in Delaware, or is he from the Delaware

2    legal community?

3        A    Rob Hur was the U.S. Attorney in the District of Maryland when I was U.S.

4    Attorney in -- and I still am -- in Delaware.

5        Q    Okay.   Do you know why Mr. Hur was selected?

6        A    I don't.

7        Q    And he was brought in from outside the Department?   That's correct?

8        A    Rob was -- my understanding is that Rob Hur was not part of the Department

9    of Justice at the time.   That's my understanding.

10        Q    In August of 2023, when you requested Special Counsel authority, did you

11    have a recommendation that maybe the Department ought to consider somebody other

12    than yourself, or were you the only person that you thought could do this job?

13        A    I'm not going to get into the particulars of my request for the reasons I

14    discussed previously.

15        Q    Okay.   Was there any discussion with the Department about whether you

16    were the best person for the job, or whether they ought to go outside the Department

17    like they did with Mr. Hur, like they did in other Special Counsel situations?

18        A    No.   As I mentioned previously, I -- you know, I submitted the request.

19    That was the only request that I am aware of.   I don't know -- I have no idea whether the

20    Department considered other options.

21        Q    And, when you submitted the request, was that through Mr. Weinsheimer?

22        A    No.   No, it wasn't.

23        Q    Did you have communications with Mr. Weinsheimer before you submitted

24    the request?

25        A    I did not have communications with Mr. Weinsheimer about the request

1    before I submitted it.

2        Q    Okay.    You just went right to the Attorney General?

3        A    I submitted the request on my own initiative, and, otherwise, I really can't

4    get into the particulars at all.

5        Q    Right.    Have you had subsequent conversations with Mr. Weinsheimer?    Is

6    he the individual that you reported to, or --

7        A    After I was appointed?

8        Q    Correct.

9        A    Yes.    I continue to discuss the matter with Mr. Weinsheimer.

10        Q    So he's your primary point of contact still?

11        A    He continues to be my primary point of contact, yes.

12        Q    Okay.    And do you still consider yourself as reporting into the DAG as a

13    Special Counsel like a U.S. Attorney would?

14        A    Ultimately, whether I'm Special Counsel or as U.S. Attorney, yes, you

15    have -- it's still the Attorney General that --

16        Q    Right.

17        A    -- runs the Department, whether -- and that applies whether I am Special

18    Counsel or U.S. Attorney, absolutely.

19        Chairman Jordan.    Have you kept up the rhythm?    You said earlier today that

20    you had monthly contacts with the key people at the Justice Department.    Have you

21    kept up that same protocol?    Has it increased or decreased as Special Counsel?

22        Mr. Weiss.    I guess it's been, I guess, 3 months.    I don't know that there is much

23    of a practice or that I could say, you know, circumstances.    You know, I've had several

24    conversations in the last 3 months with Mr. Weinsheimer.    I can say that.

25        Chairman Jordan.    So it's picked up?

1    Mr. <u>Weiss.</u> It's -- I've had probably -- yes, several conversations. Whether that

2 will continue or it was unique to the initial stages of the project, I really can't speak to.

3    Chairman <u>Jordan.</u> Okay.

4      BY MR. CASTRO:

5    Q If you're going to indict somebody, would you need to alert

6 Mr. Weinsheimer in advance? Would you need to alert the DAG or alert the Attorney

7 General?

8    A I don't -- it's expected and my recollection of the regulations that attend to a

9 Special Counsel would require to apprise the AG, I expect, through the Office of the

10 Deputy Attorney General of significant developments in the case.

11    Q So, if you were going to indict somebody, you would presumably go through

12 Mr. Weinsheimer and then --

13    A The regulations provide for keeping the AG and his designee apprised of

14 significant developments. That's my understanding of the regs.

15    Q Right. But, in practice, Mr. Weinsheimer is your primary contact?

16    A Historically, that's been the case, correct.

17    Q Okay. So, if you were going to indict someone, you'd probably alert

18 Mr. Weinsheimer and determine whether any other communications were needed with

19 the DAG individually or the AG?

20    A If I were to take a significant step in the case, I expect, as you've suggested,

21 that, yes, I would have contact with Mr. Weinsheimer.

22    Q Okay. Has Mr. Weinsheimer given you any guidance or limiting instructions

23 about things you can or can't do?

24    A No.

25    Q You mentioned earlier this morning in a previous round that you had -- we

1    asked you about discussions that you had with Mr. Estrada, and I believe you told us that,

2    with respect to bringing a case in the, you know, Los Angeles U.S. Attorney's Office, the

3    Central District of California, you had one conversation with Mr. Estrada?

4         A    Yes.   Yes.   At that time, I had one -- yes.   I had one conversation relevant

5    to our pursuit of the case in 2022, that's correct.

6         Q    Okay.   And then I take it by that that you potentially have had additional

7    communications with Mr. Estrada?

8         A    Yeah, I don't want to get into those communications, but I was trying to

9    address -- I don't know who said what, but the notion that there may have been another

10   conversation.

11        Q    Mr. Estrada testified that there was another conversation in September

12   of 2023.   Do you remember that one?

13        A    Yeah, I don't want to get into the particulars of any further conversations.   I

14   mean, the first one -- and I'm not trying to be cute.   The first one spoke to my authority.

15   The second one, I just -- it would not be appropriate for me to comment on.

16        Q    Okay.   If you were going to bring an indictment in the Central District of

17   California as Special Counsel, what would you need to do with respect to Mr. Estrada?

18   Would you need to let him know you're doing it?   Would you --

19        A    Again, I don't want to get into the particulars here, but, as Special Counsel,

20   just as U.S. Attorney, there should be some communication to another district so that

21   someone -- you can't just appear and be there.   There has to be some --

22        Q    Of course.

23        A    -- coordination.

24        Q    So you would expect to alert Mr. Estrada if you were bringing in --

25        A    I've said as much as I can say without in any way compromising or giving -- or

1    speaking to what now may be transpiring.    I just don't want to get into that at all.

2    Q    Okay.    Do you have any indictments that are on the horizon?

3    A    I'm not going to speak to indictments that may be on the horizon or

4    deliberative process or anything in that regard, as I'm sure you know.

5    Chairman Jordan.    Do you have any idea when you will complete your task as

6    Special Counsel?

7    Mr. Weiss.    I do not as I sit here today, but we will try to move it as quickly as

8    possible without compromising the investigation or the prosecution of any case that

9    might be brought.

10    BY MR. CASTRO:

11    Q    Do you have any goal as to when you'd like to bring it to conclusion?

12    A    Two weeks ago.    No, I say -- again, I say that in jest, but no.    Look, I

13    recognize that it's never good for cases to linger, so I am interested in efficiency to the

14    extent possible.

15    Chairman Jordan.    It's been 5 years.

16    Mr. Weiss.    I understand that, Chairman.    I really do.    I absolutely do.

17    Chairman Jordan.    So that doesn't -- you just used the term "linger."    That

18    doesn't fit the definition of "linger"?

19    Mr. Weiss.    I understand your question and appreciate it.

20    BY MR. CASTRO:

21    Q    Are you familiar with an individual by the name of Alexander Mackler?

22    A    I am familiar with an individual by the name of Alexander Mackler.

23    Q    And how do you know him?

24    A    Mr. Mackler was an AUSA in U.S. Attorney's Office in the District of

25    Delaware.

1          Q     And do you know how long?

2          A     I believe for a couple years, but I can't speak with any specificity as to his

3    tenure, but that's my general recollection.

4          Q     Okay.    Do you remember what timeframe?

5          A     I don't know specifically.    2017, 2018 --

6          Q     Okay.

7          A     -- I think, generally.

1    [3:12 p.m.]

2                    BY MR. CASTOR:

3         Q    Okay.    Did you know that he also had served at one point as Joe Biden's

4    press secretary?

5         A    I didn't know, and -- I didn't know Mr. Mackler's role vis-à-vis now-President

6    Biden.    I knew that Mr. Mackler had worked for now-President Biden.

7         Q    Are you aware that he served as Beau Biden's campaign manager during his

8    reelection campaign?

9         A    I was not aware of that, not to the best of my knowledge.

10        Q    Were you aware that in 2014 through 2016 he served as deputy counsel to

11   then-Vice President Biden?

12        A    I was not aware of that.

13        Q    Were you aware that in November of 2021 Mr. Mackler was named to

14   President Biden's transition team?

15        A    I do think I learned of that.

16        Q    Okay.    And when did you learn of that, or under what circumstances?

17        A    I don't know.    I don't know.    I don't know when or what the circumstances

18   were, but I think I heard that.

19        Q    When Mr. Mackler was with the U.S. Attorney's Office in Delaware, what

20   was his role?

21        A    He was an AUSA.

22        Q    And, as I understand it, he was an AUSA from August of 2016 through May of

23   2019?    Is that --

24        A    Again, you have dates.    I was estimating.    Apparently, I wasn't that far off.

25   But --

1        Q       Okay.

2        A       -- I'm not going to challenge that.

3        Q       Okay.    And during his time as an AUSA, did you have any interactions with

4    him?

5        A       Sure.    We're a small office.    I have interactions --

6        Q       Okay.

7        A       -- with everybody in my office.

8        Q       Okay.

9        A       At least if I'm doing my job.

10        Q       Do you remember under what circumstances Mr. Mackler left the U.S.

11    Attorney's Office?

12        A       I know that he went to be the chief deputy for the Attorney General's Office

13    for the State of Delaware.

14        Q       Okay.    And that was in 2019, when he left?

15        A       Again, I can't recall the particulars, but that sounds within the realm of

16    reason.

17        Q       When you subsequently found out that he was part of the transition team,

18    did that give you any concern that it might create an optics issue?

19        A       No.

20        Q       Did you or anyone in your office have any communications with him when

21    he was working with the transition team?

22        A       I don't know when he worked with the transition team.    I don't know if I

23    would've had any conversations with him.    I certainly wouldn't have had any

24    conversations with him about his work as a member of the transition team.

25        Q       Okay.

1          A       I don't -- I'm very confident I had no conversations with him about it.

2          Q       Would you or any member of your staff have had a conversation with

3    Mr. Mackler about the Hunter Biden case?

4          A       I have not spoken to Mr. Mackler ever about the Hunter Biden case.

5          Q       Okay.

6          A       I have no idea whether anyone else has spoken to Alex Mackler period or

7    about the case.

8          Q       Okay.    So you don't know if any of your AUSAs had any communications

9    with Mr. Mackler?

10         A       I do not know.

11         Q       Okay.

12                 Earlier, I had asked you about the transition team being tipped off as far as the

13   day of action in December of 2020.

14         A       You said the transition team was tipped off?

15         Q       Yeah.

16         A       Yeah, I'm unaware of the transition team -- I'm unaware of that, and I

17   can't -- I'm just not going to -- as I said before, I can't comment on it, because it pertains

18   to the investigation.    But I'm unaware of that.

19         Q       Would that concern you, if somebody in your office tipped off the transition

20   team about something related to the day of action?

21         A       I think as part of minority counsel's questions, I would be concerned with

22   anything that comes out pertaining to an investigation for which I'm responsible and

23   anyone hears of it.    It shouldn't happen --

24         Q       Okay.

25         A       -- and it does the investigation no good.

1      Q    Okay.   So, if some investigative actions were planned for the day of action

2  in December of 2020 and, before that occurred, the transition team was tipped off about

3  it, that would give you concern.

4      A    I'm not going to talk about the particulars in this case.   I will acknowledge

5  that, to the extent, as a general matter, anything of that nature occurred, it's a problem.

6      Q    And if you found out that something like that did occur, what would you do

7  to address it?

8      A    That's a hypothetical.   I'm not going to speculate on that.   I'm just saying,

9  as a general matter, it's problematic.   I'm not going to talk about anything that might

10  touch on this case or this investigation.

11      Q    Do any of the attorneys on your team, whether it's a Special Counsel team or

12  before the Special Counsel team was stood up, have any ties which you would consider

13  close to the Biden family?

14      A    I'm not going to get -- I don't know relationships.   I don't delve into those

15  kinds of things, as a general matter, and it's just not something I'm particularly

16  comfortable speaking about.   But I will say, I'm unaware of any such thing.

17      Q    Do you remember, during the Special Counsel Robert Mueller's probe,

18  advocates or allies of President Trump raised a concern that members of the Special

19  Counsel team had a lot of contributions to Democrats?   Do you remember that?

20      A    I remember allegations about a leaning by --

21      Q    Okay.

22      A    -- members of Mr. Mueller's team.   I do recall that coming up in a repeated

23  fashion.

24      Q    Is that something you've considered as you've built your team, to examine

25  the political contributions of the people on the team so it doesn't give the impression that

1    they're aligned with one party or another?

2         A     I understand the question, and for the reasons we just mentioned, I

3    understand why you ask it.    But the fact is, I looked for people who were the best

4    qualified and were interested in participating in this effort.    That's what I asked about.

5    That's what I focused --

6         Q     Okay.

7         A     -- my recruitment efforts on.

8         Q     Okay.    And, in any way, have you examined whether you've got folks on

9    your staff that are big-time political contributors to Democrats?

10        A     I'm not going to speak to it, because I don't want to discuss personnel,

11   and -- but I understand the question, the sensitivity, but it's not something I'm in a

12   position to address.

13        Chairman Jordan.    You may have answered this earlier.    The Special Counsel

14   staff, was it selected from your team in Delaware's U.S. Attorney's Office and/or from

15   outside?

16        Mr. Weiss.    It wasn't limited.

17        Chairman Jordan.    Okay.    So you went outside the office to get staff for this

18   task.

19        Mr. Weiss.    I don't want to get too far into the process or the particulars, but I

20   was not restricted in any way; I'll say that.    I was able --

21        Chairman Jordan.    Are there folks --

22        Mr. Weiss.    -- to go outside.

23        Chairman Jordan.    -- on the team from -- are there folks on the Special Counsel

24   team who were already working in the Delaware U.S. Attorney's Office?

25        Mr. Weiss.    Yeah, I'm not -- I don't want to get into the particulars of who's on it,

1    for the reasons we've previously discussed.    I just don't want to get into personnel.

2            Chairman Jordan.    Is it fair to say that there could be members from the

3    Delaware U.S. Attorney's Office and people from outside the Delaware's U.S. Attorney's

4    Office?    Is it fair to say that that could be the makeup of the team?

5            Mr. Weiss.    There is nothing in the regulations that would prohibit such a thing.

6            Chairman Jordan.    Okay.

7                    BY MR. CASTOR:

8        Q    One of the big questions I think a lot of our members have is that, as of last

9    July, you know, heading into July 26th, you know, we saw the plea agreement and the

10   pre-trial diversion agreement; you know, we thought this matter was coming to a close,

11   and then it didn't.

12           How do you address the fact that this was on the verge of being completely over

13   and wrapped up on July 26th and then, boom, in August, you have to request Special

14   Counsel status, now you're standing up a whole new office, and we've got an

15   investigation that could go on for some time?

16       A    Yeah.    I understand the question and the members' curiosity.

17       Q    Uh-huh.

18       A    Because I've got ongoing litigation in Delaware, I'm not at liberty to discuss

19   it.    But --

20       Q    Uh-huh.

21       A    -- I can say that at no time was it coming to a close.    I think, as I stated in

22   the one statement I made at the time --

23       Q    Uh-huh.

24       A    -- the investigation was continuing.    So it wasn't ending there in any event.

25           Chairman Jordan.    When the judge would've accepted the agreement, it wasn't

1   over?

2          Mr. Weiss.   Our efforts were not concluded; that's correct.

3                  BY MR. CASTOR:

4      Q   I mean, if that's the case, though, why would Chris Clark sign the agreement?

5   I mean, you know, the agreement seems pretty comprehensive.    I mean, the statement

6   of facts, like, goes way beyond just the matters at hand.

7      A   Counsel, you know, just by virtue of the question, I'm not in a position to

8   address what Mr. Clark may or may not have been thinking.    I don't know, and --

9      Q   Uh-huh.

10     A   -- I'm not going to presume to guess.

11     Q   Are you aware of a referral that was made regarding a potential campaign

12  finance violation by the individual that paid Hunter Biden's taxes?

13     A   I'm not familiar with the matter you're describing.

14     Q   So Mr. Morris, right, paid off Hunter Biden's tax debt, right?

15     A   I'm not going to discuss --

16     Q   Do you know who he is?

17     A   I'm not going to discuss those particulars.

18     Q   Do you know who he is?

19     A   I'm not going to discuss any particulars that pertain to ongoing investigative

20  matters.

21     Q   Right.    But my question is, do you know who Kevin Morris is?

22     A   I understand your question, but it's not something I'm in a position to discuss

23  at this time, because it --

24     Q   Okay.

25     A   -- references or it pertains to matters that are outstanding.

1   Q Okay.

2   A It's something I suspect I will very much address in the report.

3   Q Right.

4   Did you find it surprising or unusual that somebody wanted to come in and just,

5 like, pay off a taxpayer's tax bill?   I mean, isn't that unusual?   Does that happen in

6 ordinary cases?

7   A I don't know, and nor would I comment on that.

8   Q Right.   Okay.   And, if so, you know, if someone hypothetically did do that,

9 is there a campaign finance violation that might be worthy of investigating?

10   A Again, I'm not going to comment on what may or may not be worthy of

11 investigation.

12   Q Okay.

13   I want to turn our attention to the October 7th meeting.

14   The October 7th meeting, of course, was described by Mr. Shapley as his red line,

15 as his red-line moment, that the experience he had in the October 7th meeting was so

16 shocking to him that he felt the only honorable thing he could do next would be to seek

17 avenues to so-called blow the whistle.

18   What do you remember about the October 7th meeting?

19   A I remember that the meeting occurred in Delaware, in a conference room.

20 I recall the participants, some of whom I believe you have spoken to.   And I recall that,

21 in advance of the meeting, The Washington Post and I believe The Wall Street Journal --

22   Q Uh-huh.

23   A -- had published articles that discussed the investigation, the fact that the

24 U.S. Attorney in Delaware was sitting on charges that were available as of that summer,

25 and that the source of that information was someone close to the investigation; I don't

1    recall the particulars.

2          But I remember that happening, I believe, the day before the articles came out, so

3    I know that I addressed that up front with the participants in the meeting.    And I

4    discussed other things, including -- I mean, the purpose of the meeting was to discuss the

5    process and to share with IRS and FBI where we were in that process.

6          And I -- given that the leak had occurred, given that I knew I was going into this

7    meeting discussing what was clearly deliberative process, I was purposefully trying to be

8    cautious and limited in my description of that process, and I believe that I was.

9          But I described the fact that I had been in D.C., that I had -- I believe I referenced

10    the 515 authority that we have discussed today, that I sought it, and that I was now

11    proceeding down the same path in the Central District of California.

12    Q    Do you believe that any of the participants in the meeting were the source of

13    the leak?

14    A    I don't know who is the source of the leak.    And if I knew, I wouldn't discuss

15    it here.

16    Q    Okay.    But the individuals in the meeting -- let's just go over them.    Was

17    Ms. Holley there?

18    A    I don't want to get into the particulars, but I know Ms. Holley has been here

19    and has testified.    So --

20    Q    Right.

21    A    -- yes, Ryeshia Holley was there and Tom Sobocinski --

22    Q    Right.

23    A    -- from the FBI were there.

24    Q    And Gary Shapley was in attendance?

25    A    Gary Shapley was in attendance.

1       Q       And was Mr. Ziegler?

2       A       I don't recall Mr. Ziegler being there, no.

3       Q       Okay.

4               Now, as it comes to the criminal investigators, was there anyone else from IRS

5       present that you know?

6       A       The SAC was there.

7       Q       Okay.    Mr. Waldon?

8       A       Mr. Waldon.

9       Q       Okay.    Anybody else?

10      A       Anybody else from IRS?

11      Q       IRS or FBI.

12      A       No, not that I recall.

13      Q       And then -- so those individuals, if they are leaking to the press, I mean, that

14      is a high crime, right, for a criminal investigator?

15      A       It's a major problem, for anybody to be --

16      Q       Right.

17      A       -- leaking to the press --

18      Q       So --

19      A       -- that's affiliated with the case either directly or indirectly.    Absolutely --

20      Q       Right.

21      A       -- a major problem.

22      Q       So, I mean, if the FBI officials or the IRS officials were the source of this leak,

23      they would be in big trouble, wouldn't they?

24      A       If it can be proved, they would be in big trouble.

25      Q       And as far as we know, the TIGTA has been investigating this, correct?    Do

1        you know about TIGTA?

2              A     I know what TIGTA is --

3              Q     Yeah.

4              A     -- but I'm not going to speak to any investigative efforts by TIGTA or

5        otherwise.

6              Q     And why is that?

7              A     Because it's inappropriate for me to comment on that.

8              Q     Okay.    Has TIGTA interviewed you?

9              A     I'm not going to discuss that.

10             Q     Okay.

11             Are you aware -- Mr. Shapley has been blamed for this leak, and he has

12      strenuously objected, that he was not the source of this leak.    He has taken affirmative

13      measures to release the reporter from any confidentiality -- you know, source reporter

14      confidentiality agreement.    He's told the reporter that, if I'm your source, you are free to

15      disclose that.

16             Are you aware of that?

17             A     I'm not -- I don't know -- I don't recall it, but I'm not going to comment on it

18      either way.    I'm not going to --

19             Q     Okay.

20             A     -- I'm not going to assess --

21             Q     Do you think Mr. Shapley was the source?

22             A     I'm not going to comment on that either.

23             Q     Who else was in attendance for the October 7th meeting?

24             A     Folks from my office.

25             Q     Mr. Weede?

1        A        I'm not going to identify people who haven't appeared, for the reasons we

2    have discussed.

3        Q        Uh-huh.

4        A        I just don't want to disclose names of participants.

5        Q        Okay.    And Ms. Hanson?    That's our understanding of the -- were there

6    any other officials as part of that meeting?

7        A        Folks from my office and the people we've previously discussed.

8        Q        Okay.    Was Ms. Wolf there?

9        A        Ms. Wolf was not in attendance at the meeting.

10       Q        How come?

11       A        Because this was a leadership meeting.

12       Q        Gary Shapley was there.

13       A        He's in IRS leadership, as I understand it.    He was the ASAC, I believe.

14       Q        Okay.

15       A        That's my recollection of his title.

16       Q        So that counts as leadership?

17       A        He was a participant in the meeting.

18       Q        Okay.    Do you know who arranged the meeting?

19       A        My recollection is that Mr. Shapley sent me an email asking for a meeting to

20    get an update.    And I think that communication was followed up on by his SAC.

21       Q        Okay.

22       A        And I agreed to sit down with those guys and the FBI and to say what I could,

23    even though we were still engaged in the deliberative process --

24       Q        Uh-huh.

25       A        -- to say what I could about where things stood.

1      Q      Uh-huh.   And what do you remember about what you said during that

2   meeting?

3      A      I mean, I've described it in general terms, and I can't get into the particulars.

4             But, as to my authority, I recall describing the process in a very general, somewhat

5   cryptic way probably -- that it had taken place in D.C., that I had sought 515 authority, I

6   followed a process, and that now I was in the Central District of California --

7      Q      Uh-huh.

8      A      -- to see whether they would join us or participate in the prosecution moving

9   forward.   That's my best recollection.

10     Q      Okay.

11            We'll mark as exhibit 17 an email that Mr. Shapley sent to Mr. Batdorf, who is Mr.

12   Waldon's boss.

13                              [Weiss Exhibit No. 17

14                              Was marked for identification.]

15            BY MR. CASTOR:

16     Q      So he CC'ed Waldon, who was at the meeting.

17            Item 1 from -- this isn't the first time you've seen this, right?

18     A      I've seen this before.

19     Q      Okay.   Did you see it in conjunction with the whistleblower testimony

20   coming out, or did you see it back when it was written?

21     A      I don't remember seeing this when it was written, no.

22     Q      Okay.   So Mr. Waldon didn't forward this to you?

23     A      I'm not --

24     Q      To the best of your knowledge, obviously.

25     A      I recall seeing this after the whistleblower testified.

1        Q      Okay.

2        So item number 1 on here is "Discussion about the agent leak," as you mentioned,

3    that the "DOJ IG will be notified," that "FBI headquarters is notified and they refer it to

4    their Counter Intelligence squad in a field office for investigation," and IRS CI indicated

5    that "we need to make a referral to TIGTA."

6        So is it fair to say that all the participants in the meeting were fairly enthusiastic

7    about pursuing the leak?

8        A      Oh, I don't know about that.    No, I'm not going to characterize whether

9    they were enthusiastic about pursuing a leak.

10       Q      Uh-huh.

11       A      I wanted to communicate that this was damn serious stuff --

12       Q      Right.

13       A      -- and that I was enthusiastic about putting a stop to it.

14       Q      Okay.    But the DOJ IG was notified.    Did you ask them --

15       A      I'm not going to get into particulars, but my office made the notifications

16    that were appropriate under the circumstances.

17       Q      Okay.    And then you asked IRS to make a referral to TIGTA?

18       A      That's what I read here.

19       Q      Okay.    And do you remember if that happened?

20       A      I don't re- -- I suspect that it did, but --

21       Q      Okay.

22       A      -- I don't have a specific recollection.    But I would have no reason --

23       Q      Okay.

24       A      -- to question whether it did or not.

25       Chairman Jordan.    But you did these; you did A, B, and C?    This came from your

1    office?    You notified Horowitz, and then you worked with the FBI -- "headquarters is

2    notified and they refer it to their Counter Intelligence squad" -- you were the instigator of

3    all that?

4              Mr. Weiss.    I'm not saying that.    All I'm saying is that my office made the

5    appropriate notifications given what I had read, heard, and learned about a leak relevant

6    to our ongoing investigation.

7              Chairman Jordan.    And the "appropriate notifications," one of those would've

8    been to let the inspector general know at DOJ?

9              Mr. Weiss.    The notifications would be to let the responsible authorities, who

10   would be, you know, required to investigate --

11             Chairman Jordan.    Uh-huh.

12             Mr. Weiss.    -- such an allegation.

13             Chairman Jordan.    Okay.

14             Mr. Weiss.    Yes.

15                 BY MR. CASTOR:

16   Q       Number 2 on this email:    "Weiss stated that he is not the deciding person

17   on whether charges are filed."

18             What's your reaction to that?

19   A       It's not what I said, nor is it what I believed, as I've told you guys repeatedly

20   today.

21   Q       What do you think you did say at that meeting that would give Gary Shapley

22   the -- and, subsequently, Shapley, I think, has released his, you know, contemporaneously

23   handwritten notes.    Because, you know, people are calling Gary Shapley a liar, and so

24   he's trying to defend himself.

25   A       I believe people have called me a liar.

1      Q     So I'm asking you what your -- I mean, what's your reaction?    Like, do you

2    think you may have said something that was interpreted -- misinterpreted?

3      A     Counsel, in all candor, I don't know.    That's possible.    It's possible

4    that -- as I said, I was trying to be careful.    I wasn't trying to be -- I was trying to be

5    careful in what I said.    Because I had a leak --

6      Q     Uh-huh.

7      A     -- that had just transpired, and I'm talking about deliberative process, which

8    is something unique to what prosecutors discuss.    We usually don't go through those

9    kinds of things with agents.    But, here, I thought it was appropriate to give them an

10   update.    So I would have generally described that process.

11     Q     Okay.

12     A     I don't know -- it certainly -- perhaps somebody misunderstood what I said in

13   that regard.

14     Q     Okay.

15           And then number 2 -- under 2(b), Mr. Shapley has notes about the process.    The

16   first is, "Needs DOJ Tax approval first - stated that DOJ Tax will give 'discretion' (We

17   explained what that means and why that is problematic)."

18           Does that sync with your memory of what you --

19     A     Not exactly.    I don't doubt that I mentioned DOJ Tax --

20     Q     Uh-huh.

21     A     -- and, you know, a general reference to the role and the process.

22     Q     Right.

23     A     Not that -- I don't recall saying anything about DOJ Tax approval being

24   required first --

25     Q     Okay.

1    A    -- second, third, or anything --

2    Q    Okay.

3    A    -- of that nature.

4    Q    But, as we've discussed, under the Justice Manual, DOJ Tax has to approve

5    felony charges, right?

6    A    DOJ Tax has approval -- is required to approve Title 26 charges.    Yes, we

7    have discussed that.    And I welcomed DOJ Tax's input in this case.    Never felt that I had

8    an issue in that regard.

9    Q    Right.    But whether you had Special Counsel authority or 515 authority, no

10   matter what kind of authority you had, you still had to have DOJ Tax's approval for tax

11   charges.

12   A    You're still consulting with DOJ Tax --

13   Q    Right.

14   A    -- absolutely.

15   Q    Okay.    So, when Mr. Shapley writes, "Needs DOJ Tax approval first," I mean,

16   that is consistent with the facts of life, correct?

17   A    I'm not -- look, I'm not challenging the DOJ Tax.    And I believe I would've

18   said, as I've said here today, I'm not operating in a vacuum.    There are processes here.

19   And others need to be involved.

20   Q    Right.

21   A    And DOJ Tax was performing its due diligence.    And I welcomed that.

22   Q    Okay.

23   I'm at the end of my hour, so I have to unfortunately stop.

24   [Recess.]

25   ██████.    All right.    It is 3:52.    We can go back on the record.

1               BY ▮▮▮▮▮▮▮:

2        Q      Special Counsel Weiss, did you have any conversations with Attorney

3    General Barr about whether you should be appointed Special Counsel?

4        A      I had conversations with Attorney General Barr, and I don't want to get into

5    the content of those conversations, because they're with the AG.

6        Q      Okay.    But you did have conversations to that effect with Attorney General

7    Barr?

8        A      I had conversations with the Attorney General, yes.

9        Q      I want to introduce as exhibit 18 an NPR article entitled "Barr Says No Need

10   for Special Counsel for Hunter Biden Probe, Election Fraud Claims," dated December 21,

11   2020.

12                              [Weiss Exhibit No. 18

13                              Was marked for identification.]

14              BY ▮▮▮▮▮▮▮:

15       Q      Have you seen this before?

16       A      I don't recall.

17       Q      Okay.

18              On the bottom of the second page of this article -- I'm just going to read it out

19   loud -- it says, "Some Republicans are pushing for the Justice Department to name a

20   Special Counsel to handle the probe, which would add an extra layer of protection from

21   potential political influence in a sensitive case involving the president-elect's son.    Asked

22   whether he agreed with the idea, Barr said no."

23              Quote, "'I think it's being handled responsibly and professionally currently within

24   the department, and to this point I have seen no reason to appoint a Special Counsel, and

25   I have no plan to do so before I leave,' he told reporters."

1          Did I read that correctly?

2     A    You did read it correctly.

3     Q    So it is accurate that Attorney General Barr did not see a reason to appoint a

4     Special Counsel in this case, correct?

5     A    According to what you read.   I don't know -- according to what you read,

6     that's correct.   Otherwise, I wouldn't comment on any aspect of that.

7     Q    And Attorney General Barr was an appointee of President Trump, correct?

8     A    I understand that -- that is correct.

9     Q    Okay.

10         Moving on, just a few quick questions about Alexander Mackler.   Did

11    Mr. Mackler play any role in this case?

12    A    He did not.

13    Q    Did he provide any input into this case?

14    A    He did not.

15    Q    To the best of your recollection, did he have any conversations with anybody

16    involved in this case?

17    A    I just don't -- I know nothing about any conversations he may have had with

18    anybody involved with this case.

19    Q    Based on your --

20    A    He had no conversations with me about this case.

21    Q    Okay.   And based on your interactions with Mr. Mackler as a former

22    employee of the Delaware U.S. Attorney's Office, do you have any reason to question

23    Mr. Mackler's integrity?

24    A    I do not.

25    Q    Do you have any reason to question Mr. Mackler's prosecutorial ethics?

1       A      I do not.

2       Q      Are you aware that Mr. Mackler was a -- or, actually, still is a member of the

3    Army JAG National Guard?

4       A      I am.    I believe he served in that capacity -- perhaps started in that capacity

5    as he left the U.S. Attorney's Office, if I recall.

6       Q      And so he actually was on Active Duty and away from the office throughout

7    2019, correct?

8       A      I don't know about throughout 2019, but my recollection is, the last several

9    months of his -- I think he was still on our rolls --

10      Q      Uh-huh.

11      A      -- but the last several months he was serving in the National Guard.    And

12   the Department makes provisions for that, or did in this circumstance.    I don't recall the

13   particulars.

14      Q      Okay.    Thank you.

15      All right.    We can go off the record.    Thank you.

16      [Recess.]

17      Mr. Castor.    We'll go back on the record.    It's 3:58.

18      Mrs. Spartz has some questions.

19      Mrs. Spartz.    Thank you so much.    Thank you for being here.    And I apologize if

20   I haven't been here all the time.    I tried to do my best.

21      But I just have a few clarifications.    I'm not an attorney in this committee, but

22   just trying to understand procedurally.    And then one question related to your

23   biography.

24      It looks like you worked at a financial services firm.    Can you state which one?

25      Mr. Weiss.    It was a firm called The Siegfried Group.

1          Mrs. Spartz.    Okay.    And what did you do, what kind of financial --

2          Mr. Weiss.    I am not a financial expert at all.    I actually helped the folks run the

3    business.    So --

4          Mrs. Spartz.    Okay.    So it wasn't -- okay.

5          Mr. Weiss.    -- it was in a business capacity.    I used to represent those folks as a

6    lawyer, and I got involved in the business.

7          Mrs. Spartz.    Okay.    Okay.

8          Well, talking about statute of limitations, you know, I'm just trying to understand,

9    you know, from -- and I am -- you know, I was a CPA and did public accounting, but I

10   didn't deal with taxes, but I understand the processes in taxes.

11         And it looks like, just to clarify -- so, based on, you know, that you have this memo

12   that I think earlier was exhibit 2 that was provided to you, regarding to IRS conclusions

13   and recommendations, which was stated that, you know, success (ph), you know,

14   prosecute targets for years '14, '15, '16, '17, '18, and '19.

15         So, just procedurally, so the statute of limitations for the '14 and '15 has expired;

16   is that correct?

17         Mr. Weiss.    Yeah.    I'm -- the statute of limitations for '14 and '15 has expired.

18         Mrs. Spartz.    Yes.    What about '16?

19         Mr. Weiss.    I'm not going to comment on anything --

20         Mrs. Spartz.    Well, I'm just talking from theoretical standpoint, like, just in

21   general, how the law works, not specifically for this case from this specific situation, you

22   know, like, if you did based on the law.    You know, I'm not talking about this situation,

23   what is it this time.    Because I'm not an attorney on this case.    But '16, would that be

24   expired by now too?

25         Mr. Weiss.    I'm not going to speak to -- I don't know the particulars about the

1    statute of limitations generally.    It would depend upon, I think, the given charges.

2        However, I am familiar with the statute of limitations as it pertains to potential

3    charges in this case, and that's not something I'm going to speak to.

4        Mrs. <u>Spartz.</u>    But with the general statute of limitations on tax, you know, fraud

5    and anything else, what is generally it is?    I mean, you don't know the law, but I'm just

6    trying to find out, because I don't familiar.    What is the statute of limitations?

7        Mr. <u>Weiss.</u>    I'm not a tax practitioner, but my understanding --

8        Mrs. <u>Spartz.</u>    But you're a prosecutor, right?

9        Mr. <u>Weiss.</u>    I am a prosecutor, yes.

10        Mrs. <u>Spartz.</u>    Yeah.    So you need to know that, right?

11        Mr. <u>Weiss.</u>    No, I don't need to know all the statute of limitations applicable to all

12    Federal offenses.    No, I don't know that that's required for me.    But to the best of my --

13        Mrs. <u>Spartz.</u>    But --

14        Mr. <u>Weiss.</u>    -- to the best of my recollection, I think in tax cases it's a 6-year

15    statute of limitations.    And I'm saying that's the best of my recollection.

16        Mrs. <u>Spartz.</u>    Okay.    So it's about 6 years.    So do you usually look at that and

17    have a sense of urgency when you investigate anything with statute of limitations, or do

18    you actually look at that as a prosecutor?

19        Mr. <u>Weiss.</u>    Prosecutors are aware of the statute of limitations.

20        Mrs. <u>Spartz.</u>    So you have a sense of urgency.

21        Mr. <u>Weiss.</u>    Prosecutors are aware of the statute of limitations as a general

22    matter, yes.

23        Mrs. <u>Spartz.</u>    So when did you start to investigate this?    In which year did you

24    start investigate this?

25        Mr. <u>Weiss.</u>    We -- I think I've discussed that we got a referral in 2019.

1        Mrs. Spartz.    2019.    So it took you several years to figure out until statute of

2    limitations.

3        Do you think you don't have enough resources?    Because I've been in this -- I

4    understand Tax Code.    It doesn't seem -- or you don't have enough resources to figure

5    out?    Why does the investigation take so long?

6        I mean, because it seems to be very simple.    You have a tax return.    People

7    report stuff.    This is not a complicated, convoluted scheme, you know, where people

8    doing some evaluations and try to do offshore things.    It's very simple.

9        You know, you either have things that -- if you don't have enough resources or you

10    don't have people that have enough knowledge?    It seems like that shouldn't be

11    complicated tax case taking 4 to 5 years to figure it out.    What is happening --

12        Mr. Weiss.    Yeah.    I mean --

13        Mrs. Spartz.    -- in the Department?

14        Mr. Weiss.    -- was that a question?

15        Mrs. Spartz.    Yeah, it's a question.    Why take --

16        Mr. Weiss.    I don't understand the question.

17        Mrs. Spartz.    The question is why it takes you 4 to 5 years to figure out -- until

18    you figure out what to do, when the tax statute of limitation expires on this case, to deal

19    with simple tax transaction.    Why is that?    Is it a lack of resources in Department?

20        Mr. Weiss.    Again, I'm not going to discuss the investigation.    Your question, no

21    matter how you phrase it, asks as to the particulars of the investigation, and I'm not going

22    to discuss it.

23        Mrs. Spartz.    Well, I'm not asking you.    I'm just saying, every case I've seen, it

24    takes the Department special prosecutor that I've seen years to figure out something that

25    I probably can do it within half an hour, I'll be honest with you.

1          So you don't have enough professionals?    Or -- this seems to me very strange, as

2     a professional.    I can claim myself being a CPA professional in that business.    I'm not

3     sure I understand what's happening there.    And that is my question.

4          So what do you believe you'll be able to complete in the current investigation?

5     Are you planning to do it urgently, or are you going to spend another 5 years?    What is

6     your -- like, do you have a sense of urgency when you deal with these cases at all?

7          Mr. Weiss.    Yeah, I'm not going to put a timeframe on it.    As I said previously in

8     response to counsel's questions, we plan to move as efficiently as possible.

9          Mrs. Spartz.    Okay.

10          What about when you have a designation -- so I think earlier there was a question

11     of Special Counsel versus anything else, like Special Attorney.    Is your accountability and

12     level of responses to Congress different, or is it exactly the same?    Is there any

13     procedural difference, in general, Special Counsel than anyone -- other, you know,

14     attorney in the Department of Justice?    Is it there is a different level of how you should

15     report to Congress?

16          It should be the same.    So the only differences would be on jurisdiction, on what

17     kind of reporting, but there is no formalities, what you have to be telling us.    Is there a

18     difference between that or not?

19          Mr. Weiss.    If I understand your question, no, I'm not aware of any difference.    I

20     am accountable for my actions and for the cases under my supervision whether I'm a

21     U.S. Attorney or whether I'm Special Counsel.

22          Mrs. Spartz.    So all your responses for us would not be any different, right?    So

23     you pretty much would not be able to say anything to us that you consider in the

24     investigation, doesn't matter how long, no matter in which capacity you work, either as

25     Special Attorney or Special Counsel?    There is no difference, right?    You would be

1  responding to us "no" on pretty much anything we ask you about an investigation.    Is

2  there a level differentiation?

3        Mr. <u>Weiss.</u>    No, there is no differentiation.    As I've said before, I've tried to

4  answer --

5        Mrs. <u>Spartz.</u>    Yeah.

6        Mr. <u>Weiss.</u>    -- the questions as best I could, particularly with respect to my

7  authority.    And it was my understanding that that was the primary purpose of my

8  appearance here today.

9        But I am unable to answer questions about ongoing litigation or the investigation,

10  yes.    I understand your frustration, but I'm unable to address that.

11        Mrs. <u>Spartz.</u>    No, I'm just trying to understand, because this is not just you; it's

12  every Special Counsel.

13        Mr. <u>Weiss.</u>    Yeah.

14        Mrs. <u>Spartz.</u>    I in my short time on this committee that has very slow

15  investigations, statute of limitation expires, and no one recalls anything by the time it's

16  done.

17        And I'm just trying to see procedurally -- you've been in this department for very

18  long.    I mean, if we'd be doing in business like that, as an attorney, you'd be out of

19  practice if you would do that.    You would go bankrupt.    But it seems that we continue

20  this.    And I'm just trying to figure out what is going on with the Department in general,

21  because this is a very -- you know, the story is always the same.

22        What is any consequences to the Department right now for, you understand, you

23  know, if you fail -- you know, you're talking about, you know, your duties and

24  having -- you know, which is important, you know, for the public and proper due

25  processes and rule of law -- if there is any generally consequences?    If you believe that

1    there is something you do it, it is not?    Is there any consequences or -- except, you

2    know, someone lets you go -- if there is any consequences in general.

3          How does the Department work if you do something to violate how the

4    prosecution happens or, like, any ethics or any other concerns?    How does it happen in

5    the Department?    Do you know the rules?

6          Mr. Weiss.    Congresswoman, if I understand your question, it is -- I think it is, if I

7    do something that is inappropriate or unethical --

8          Mrs. Spartz.    Ill intent.

9          Mr. Weiss.    -- are there -- ill intent -- are there consequences?    Absolutely, just

10    as with any other attorney practicing on behalf of or within the Department.

11          Mrs. Spartz.    So what is the consequences?

12          Mr. Weiss.    I'm not --

13          Mrs. Spartz.    No, what is the -- like, what is the process for that, if somebody -- or

14    if somebody under you would do something like that, what is the processes for that?

15          Mr. Weiss.    It depends what's done.    And I'm not going to explore all kinds of

16    scenarios.    But, you know, we are responsible to act professionally and to abide by rules

17    of conduct.

18          Mrs. Spartz.    But are there internal processes or they're external?    Is

19    Department of Justice can only --

20          Mr. Weiss.    It depends what a prosecutor's actions are, with respect to what

21    consequences derive from that conduct.    I can't -- there are any number of things that

22    could happen that could lead to problems for a prosecutor.    We have responsibilities to

23    act in a certain way.

24          Mrs. Spartz.    What is the incentive for you -- or what is internal incentive for you

25    to have a completion of the cases?    Do you have internal incentives at Department once

1   you have productivity?    Do you have internal incentives to actually do things fast, or you

2   don't generally?

3        Mr. Weiss.    You have incentives -- all prosecutors have incentives.    I certainly

4   have an incentive to prosecute this case as best I can.    I know, am very much aware, that

5   people are watching this case.    We're having a discussion about the case today.    I'm

6   mindful of that.

7        So I am trying to perform my responsibilities as best I can and fulfill those

8   responsibilities to follow the facts and the law.    That's the best I can do.

9        Mrs. Spartz.    But if you would have something that -- not collaboration internal

10   to the Department, who would you address it with?    Would you come to Congress?

11   And how would you address it, if you believe there is no collaboration internally and you

12   don't -- what is the process for you to -- would you let us know?    Or who would you

13   know?

14        Mr. Weiss.    I would -- if I wasn't satisfied with something -- this is a hypothetical,

15   so I shouldn't speculate, but I would stay within the Department and try to resolve it

16   there.

17        Mrs. Spartz.    So generally it's internal.    You generally don't come externally to

18   Congress or anything.    This is internal.

19        Mr. Weiss.    I would expect to get it resolved in Congress -- I'm sorry, not in

20   Congress.    I would expect to get it resolved within the Department.    Everyone in the

21   Department knows that, in my current capacity, I'm going to prepare a report at the end

22   of the day, and I'm going to describe what I've experienced along the way.

23        Mrs. Spartz.    Okay.    Just one last question.

24        Mr. Weiss.    Sure.

25        Mrs. Spartz.    So, generally, you know, theoretically, if we look at some of this

1    stuff, you know, when Vice President Biden was in office, which was '14, '15, and '16,

2    theoretically it would be that all of the years could be potentially -- two of them for sure

3    are statute of limitations -- theoretically all of the years would be statute of limitations,

4    unless something else happened would expire statute of limitations, all of the years with

5    what happened with Hunter, with his situation, with Burisma and any other transaction

6    during the time of the Vice President was in office.

7           Is that correct, based on -- assessment?

8           Mr. Weiss.   I don't -- I'm not drawing a connection between charges in this case

9    versus the now-President's status as a Vice President.    Our responsibility is to make

10   decisions based on the evidence before us.    And that's what we've done in this case.

11          Mrs. Spartz.   Okay.   Thank you.

12          Mr. Weiss.   Sure.   Thank you.

13              BY MR. CASTOR:

14   Q    I just have one more question on Mr. Mackler.    Just to clarify, when was

15   the last time you spoke to him?   I know you said you didn't speak about this case, but --

16   A    I don't know.   I don't know.   I can't recall.

17   Q    Was it when he was with your office, or was it after?

18   A    No, no.   I've spoken to him since he's left my office, which I think we

19   established was in 2019, so --

20   Q    Okay.

21   A    I just -- I don't know.

22   Q    Okay.

23   A    Don't recall it.

24   Q    Certainly wasn't about this case?

25   A    No.   I never discussed this case with him that I can recall.    No.

1      Q     I'll go back to exhibit 12 -- I'm sorry.    Mrs. Spartz was discussing exhibit 12.

2    Exhibit 17.

3           You had the right one, I think.

4      A     This one?

5      Q     It says exhibit 10 on the bottom, but that's from a different proceeding.

6      A     Yeah.    Sorry.

7      Q     Where we last left off was on the first page, 2(b)(i), "Needs DOJ Tax approval

8    first."    And then I think that's where we concluded our discussion.

9           So the next item on that page is "No venue."    This is 2(b)(ii).    "No venue in

10   Delaware has been known since at least June 2021."

11          Do you recall if that was discussed, venue in Delaware wasn't an option?

12     A     I don't recall if it was discussed.    But I discussed the fact that I had pursued

13   the process in D.C. and in L.A.

14     Q     Okay.    Obviously, if you could've pursued it in Delaware, that would've

15   been your first choice, certainly, right?

16     A     Again, I discussed that we were, you know, in D.C. and that -- or we had

17   been in D.C. and, at this time, we were in the Central District of California.

18     Q     Okay.

19   (iii):    "Went to D.C. U.S. Attorney in early summer."

20          Of course, we know that that was in March, correct, when you went to --

21     A     That's correct.

22     Q     -- Mr. Graves?

23     A     That's correct.

24     Q     "-- to request to charge there."    The U.S. Attorney "said they could not

25   charge in his district."

1          And then (1) underneath that was, "Weiss requested Special Counsel authority

2     when it was sent to D.C. and Main DOJ denied his request and told him to follow the

3     process."

4          And the way Shapley, you know, records this in his notes, it seems similar to the

5     way you described your interactions with Main Justice, in that you told us that you asked

6     for 515 authority -- that is, Special Counsel authority -- and that Main Justice -- I mean,

7     Shapley writes "denied his request," and you said that your request was never denied,

8     but Main Justice did tell you to follow the process, correct?

9          A     I described that I had a conversation with Main Justice about following the

10    process.    No one ever said -- no one ever denied --

11         Q     Right.

12         A     -- my authority.    And I didn't request Special Counsel authority.    I

13    requested what I characterized as 515 authority --

14         Q     Right.

15         A     -- and what we agreed was Special Attorney authority.

16         And I would also take issue with, I think, what's under, if I can read it correctly,

17    (iii):    "Went to D.C. USAO in early summer to request to charge there -- Biden appointed

18    USA said they could not charge in his district."

19         As I've said on several occasions, I wasn't asking the Biden-appointed U.S.

20    Attorney in D.C. whether I could or could not charge in his district.    I didn't present that

21    question for his consideration.

22         Q     But these notes were prepared from the meeting.    Is it possible

23    Mr. Shapley misunderstood what you were -- you were obviously, during the course of

24    this meeting, you were walking through some of these issues, correct?    And he's making

25    notes about it?

1        A      I can't speak to what Mr. Shapley -- clearly, he was -- "clearly" -- I suspect he

2     was taking notes.    I don't know.    I don't know why the notes came about this way.

3     But if he misheard or misunderstood something, the fact that he reduced it to notes

4     doesn't change the misunderstanding or --

5        Q      Right.

6        A      -- whether he misheard it.    I know what I believe to be the case and what I

7     believe I said, you know, in that regard.

8        Chairman Jordan.    Well, he got it exactly right in 2(b)(iii)(1), the next sentence

9     down, other than the term "counsel" versus "attorney":    "USA Weiss requested Special

10    counsel authority when it was sent to D.C. and Main DOJ denied his request and told him

11    to follow the process."

12        That's exactly what you told us earlier, other than the word "denied."    They

13    didn't grant your request.    So it seems to me he got it exactly right there.

14        Mr. Weiss.    Well, "denied" is a key word in that phrase.    It wasn't -- it wasn't

15    denied.    I --

16        Chairman Jordan.    But it wasn't granted, right?

17        Mr. Weiss.    Yes.    We have been over this.    It wasn't granted.    They said,

18    follow the process.    I followed the process.    And in completing the process --

19        Chairman Jordan.    But, Mr. Weiss, when you ask for something and they don't

20    give it to you, what is that?

21        Mr. Weiss.    I asked for something, and in that conversation they didn't give it to

22    me, but at the --

23        Chairman Jordan.    All right.    It's a simple question.

24        Mr. Weiss.    -- at the conclusion --

25        Chairman Jordan.    When you ask for something and they didn't give it to you,

1    what is that?

2           Mr. Weiss.   I'm not -- you want me to say it's a denial, but it's not.   Not when I

3    know that, weeks later, I was specifically told, "You can proceed."   So it's the same

4    question, it's the same request --

5           Chairman Jordan.   Maybe weeks later, but at that point what is it?

6           Mr. Weiss.   It's, "Proceed, with this process.   We're asking you to go through

7    this process."   From my mind, it's a sequencing event.   It's not a denial in any way,

8    shape, or form.   That's the way I interpreted it.

9           Chairman Jordan.   Okay.

10               BY MR. CASTOR:

11     Q     Flipping over the page to (iv):   "Mid-September they sent the case to

12    central district of California -- coinciding with the confirmation of the new biden

13    appointed USA -- decision is still pending."

14          And that's pretty much an accurate assessment, right?

15     A     Inaccurate?   Or accurate?

16     Q     Accurate.

17     A     No.   I didn't bring this -- as we discussed, I didn't bring this about in

18    mid-September.   I contacted the U.S. Attorney's Office in mid-August.

19     Q     Right.   But --

20     A     It had nothing to do with coinciding with the appointment of a new Biden

21    appointee.

22     Q     But your first communication with the U.S. Attorney out there, with Estrada,

23    was right after he was confirmed, correct?

24     A     No.   My understanding -- and I didn't track the dates -- was that he was

25    confirmed sometime in the month of September, mid-September.   My first

1    communication with him was in mid-October.

2        Q    Okay.

3        "If California doesn't" -- this is (v):    "If California does not support charging USA

4    Weiss has no authority to charge in California."

5        Is that something that was discussed at the October 7th meeting?

6        A    No.   I would not have said that.   It's not what I believed; it's not what I

7    said.

8        Q    "He would have to request permission to bring charges in California from the

9    Deputy Attorney General/Attorney General."

10       Isn't that -- I mean, if Estrada said, no, I don't want to partner, I don't want to

11   co-counsel, whatever the word is, then you go and request 515 authority, correct?

12       A    That's consistent with the process I've described --

13       Q    Right.

14       A    -- in most respects in D.C.    But by this point in time, as we have discussed, I

15   had been through the process, I knew that the ultimate decision was, you can proceed in

16   D.C. and pursue charges.    So I wasn't asking here.

17       Then the question at the conclusion of this process was simply deciding the

18   merits.

19       Q    This meeting happened, like, right around the same time that you were

20   engaging with Mr. Estrada, correct?

21       A    I engaged with Mr. Estrada after this conversation.

22       Q    Okay.   So, as of the October 7th meeting, you didn't have a final

23   determination from his office about whether they wanted to --

24       A    As best I recall, I did not have a final determination.

25       Q    Okay.

1        A    I had not had that conversation with the U.S. Attorney.

2        Q    But if they had said no, as it turns out they did, then your next move is to get

3 Special Counsel authority or 515 authority, whichever, if you're going to prosecute in the

4 Central District of California?

5        A    As I think I mentioned, as it was in my mind, that issue had been resolved.

6 So my next move is to decide, okay, is this case moving forward?   We've gotten

7 feedback from D.C.   Now we've gotten feedback from L.A.   We're deciding the case;

8 we're going to decide --

9        Q    Right.

10       A    -- how to proceed in the case.   It's not asking for permission or resolving

11 any questions about whether I have authority to proceed.

12       Q    Okay.

13       Then, 3:   "They are not going to charge 2014/2015 tax years."

14       By this point in time of October of 2022 -- I mean, I believe the statute lapsed in

15 September.   So, by this meeting, the statute had lapsed for the 2014 and 2015 tax

16 years?

17       A    Yeah, I'm not going to discuss the statute, when it lapsed, or the

18 circumstances surrounding that.   Nor am I going to discuss any conversations I had with

19 them about 2014.

20       Q    Okay.

21       A    I'll discuss authority, but I'm just not going to go beyond that.

22       Q    But, I mean, it's my understanding that, you know, part of your -- I mean, we

23 didn't agree to a scope, because we obviously have questions --

24       A    I understand.

25       Q    -- that you're not willing to answer.

1       A    I understand the committee has questions well beyond that, but -- and I

2  hope at the appropriate time I'll be able to answer them.

3       Q    But I did think -- pardon me for suggesting this, but I did think that the

4  content of the October 7th meeting was all fair game.

5       A    The content of the October 7 meeting as it pertains to authority is certainly

6  fair game.   And I've tried to --

7       Q    But --

8       A    I've tried to discuss other aspects that I think inform the authority issue.

9  But that's the extent of what --

10      Q    Okay.

11      A    -- of the scope of what I'm authorized to discuss.

12      Q    Okay.   So can you confirm that the decision not to charge 2014 and 2015

13  was discussed at that meeting?

14      A    I can't get into -- I can't get into the merits of that discussion.   I can't get

15  into that discussion.

16      Q    Okay.   You don't have any reason to believe that Shapley is lying, correct?

17      A    I don't -- I can't speak to Mr. Shapley.   I'm not saying anything about

18  whether he's lying.   I'm not suggesting that he's lying.   I don't know the basis for his

19  statements or what he's committed to his notes.

20      Q    Okay.

21  Do you remember Mr. Shapley stating that he did not concur with the decision to

22  not charge 2014 and 2015, as he writes in his notes here?

23      A    Again, if I commented on that, it would speak to the decision itself, which I'm

24  not going to discuss.

25  I remember Mr. Shapley's body language at the meeting at various times.   I do

1    remember that.

2        Q    Okay.    But do you remember him asserting, stating for the record that he

3    didn't concur with any particular decision?

4        A    It's not something I'm going to discuss, because it would necessarily go

5    into -- be it a reaction to something I said about the merits of the case or the

6    investigation, and I just can't get into that at this point in time.

7        Q    Okay.

8            And Special Agent Holley, the assistant special agent in charge, she testified, too,

9    that she remembers Burisma being discussed, the fact that if you don't charge 2014 and

10   2015, that all the Burisma income is tax-free.

11           Do you remember that being discussed?

12       A    I'm not going to discuss the case, the investigation, or those kinds of details.

13       Q    Okay.    Did you have any concerns that, if you didn't charge 2014 and 2015,

14   all the Burisma income just goes tax-free?

15       A    Again, I'm not going to discuss the case, the investigation, or those

16   particulars.    I understand the question, and I appreciate why you ask the question.

17       Q    Okay.    So you could understand why members, our members at least, are

18   concerned about that issue, about the 2014 and 2015, specifically the Burisma years, you

19   know, that Hunter Biden is getting off scot-free here.

20       A    Yeah, I understand why you're asking the questions on behalf of the

21   committee.    And it's certainly something that I would intend to address and would plan

22   to address in the Special Counsel report.

23       Q    Okay.

24           Number 5 on this document states that "no major investigative actions remain."

25           Is that something you remember being discussed at the October 7th meeting?

1  A  Again, I'm not going to talk about investigative actions --

2  Q  Okay.

3  A  -- or what had been done and what remained at that time.

4  Q  Right.

5  And when Shapley testified in May of 2023 to the committees -- or he testified

6 before the Ways and Means Committee, he told us that nothing had happened, you

7 know, that there weren't any -- and, by that time, he didn't know he'd been removed

8 from the case.  He stated in May of 2023 that no investigative actions had occurred on

9 the Hunter Biden case.

10  So that is consistent with number 5 here, that "no major investigative actions

11 remain."  Is that something you can concur with?

12  A  No, it's not something I can comment on as of today.  It's something I hope

13 to be able to comment on in the report.

14  Q  Okay.

15  Do you remember that meeting -- and this relates to 6(c).  Do you remember the

16 meeting as being contentious?

17  A  There, you mean his reference to "communication issues" or "update

18 issues," that these issues were surprisingly contentious?

19  Q  Well, the way I interpret number 6 -- and this is informed, obviously, by

20 Mr. Shapley's testimony -- that, at the end of the meeting, IRS -- and "us" meaning the

21 IRS -- and the FBI brought up some general issues, and they included communication

22 issues, update issues, which, as we understand them, are sort of -- you know, you can

23 conflate those.  But (c), his observation that these were "surprisingly contentious."

24  A  Yeah.  I can't -- I don't know that I'm going to characterize whether these

25 issues were surprisingly contentious.  I remember -- I do recall communication issues

1      and updates from this point forward coming up.

2           Q      Okay.

3           A      I remember Mr. Shapley talking about communications from this point

4      forward.

5           Q      Uh-huh.

6           A      And I'm at a meeting where, the day before, The Post and The Wall Street

7      Journal reported leaks that were purported to be coming from someone close to my

8      investigation and, I think, mentioned an agent.    So I was unwilling to make any

9      commitments --

10          Q      Okay.

11          A      -- about further communication.    I wanted to better understand, to the

12     extent possible, what had transpired, rather than making commitments to how

13     frequently --

14          Q      Uh-huh.

15          A      -- I was going to meet with Mr. Shapley or anybody else associated with the

16     team at that particular time.

17          Q      Okay.    So it sounds like it was contentious.

18          A      You know, I'm just saying I was very sensitive to the issue and I was --

19          Q      Right.

20          A      -- concerned about the issue, because I am concerned about the

21     investigation --

22          Q      Right.

23          A      -- and trying to preserve the integrity of the investigation moving forward.

24          Q      Right.

25                 And just so you know, from our perspective -- and I think I mentioned this

1    earlier -- you know, we're sensitive to any allegation that Mr. Shapley was the leaker for

2    the story, because he has denied that he's done it.    And, you know, if you're an IRS

3    agent or FBI agent and you leak to a reporter, I mean, that is a high crime.    I mean, you

4    would lose your job.    I mean, the stakes are super-high.

5        So, to the extent -- you know, I hope we can establish that, you know, there's no

6    evidence, there's zero evidence that Mr. Shapley was involved with any leaks.

7        A    I can't comment on that.    I don't pretend to be familiar with the evidence --

8        Q    Right.    But you don't have any evidence that Mr. Shapley was involved

9    with --

10        A    I'm not going to say anything about that.

11        Chairman Jordan.    When did you learn that Mr. Shapley and Mr. Ziegler were

12    coming to Congress under whistleblower status?    And how did you learn that?

13        Mr. Weiss.    I think -- I don't know whether I heard it in news media or from

14    somebody with the Department.    But I think it was in, I don't know, somewhere around

15    April, that it cropped up in April of 2023 --

16        Chairman Jordan.    Right.

17        Mr. Weiss.    -- something of that nature.

18        Chairman Jordan.    Right.

19        Mr. Weiss.    I didn't know any of the particulars at that time.    I don't think I

20    learned them until I saw the testimony.

21        Chairman Jordan.    Who was the somebody from the Department who told you

22    that, if it wasn't the press?

23        Mr. Weiss.    I don't know.

24        Chairman Jordan.    You said it was one or the other.

25        Mr. Weiss.    If it was somebody from the Department, it would've been

1      Mr. Weinsheimer.

1    [4:27 p.m.]

2        Chairman Jordan.    Do you remember if he called you or emailed you or what?

3        Mr. Weiss.    I don't recall.    I believe I was on -- I was on what was supposed to

4    be a vacation at the time.

5        Chairman Jordan.    When you go to another U.S. Attorney and ask them to

6    partner, what are you asking them to partner on?

7        Mr. Weiss.    I'm asking them to -- to decide whether they're willing to be part of

8    the investigation, whether they're willing to assign someone to be co-counsel in the

9    investigation.

10        Chairman Jordan.    Is it -- are you asking them to partner on investigation only

11    and/or prosecution?

12        Mr. Weiss.    To the extent there were further investigative steps, they wouldn't

13    be precluded, but I was primarily focused on -- I mean, in my mind, prosecution piece of

14    the investigation.

15        Chairman Jordan.    So you were ready to prosecute, you wanted to prosecute in

16    D.C.    When you all go to Mr. Graves and you go to him and ask him to partner, you're

17    actually asking him to partner not so much on the investigation but on the decision that

18    you've already made in your mind to prosecute in that venue?

19        Mr. Weiss.    No.    No decision had been made at that point in time, but we -- this

20    is where we wanted to proceed.    There were still -- still things that had to happen, but I

21    was thinking -- and I knew what resources we had available to us, so the discussion, in my

22    mind, with Mr. Graves is more -- when I'm asking about partnering, at least in my mind,

23    I'm thinking more about his office.

24        Chairman Jordan.    Well, I'll go back to the original question.    What are you

25    asking him to partner on?

1          Mr. Weiss.   I'm asking whether they want to be --

2          Chairman Jordan.    Partner on the prosecution?

3          Mr. Weiss. -- they want to be part of the case, and in my mind, I'm thinking more

4    about from an attorney standpoint, whether -- whether --

5          Chairman Jordan.    Part of the case, to do what, to prosecute?

6          Mr. Weiss.    Prosecutors, they're -- prosecutors perform both, you know,

7    prosecutorial aspects of their job and investigatory aspects of their job, depending upon

8    what they're doing.

9          Chairman Jordan.    Okay.    Because I just want to be clear, because you said you

10   were primarily -- I thought you said earlier, you were primarily asking -- when you went to

11   ask him to partner, you were asking them to partner on prosecuting the case?

12         Mr. Weiss.   I was asking him to join in the prosecution of the case, whether they

13   wanted to be part of it.

14         Chairman Jordan.    Got it.

15         Mr. Castor.   Did you need them?    Did you need their help?

16         Mr. Weiss.    No.    Well, did I need them -- as I said, we were prepared to

17   proceed.    We were prepared to go forward if they chose not to participate.

18         Mr. Castor.    But did you need extra bodies?

19         Mr. Weiss.   I wouldn't -- I'm not going to talk about whether I needed more

20   resources or the particulars of those kinds of things.

21         Chairman Jordan.    But you would only ask them to partner on prosecuting the

22   case if you felt that the case needed to be prosecuted, fair?

23         Mr. Weiss.   I would only ask them to partner in the case if I was contemplating

24   prosecution in that jurisdiction, if that was part of the consideration.    That's the only

25   reason it would be asked.    Not that a decision had been made, just that it was being

1    considered.

2           Chairman <u>Jordan.</u>    Well, that sort of brings us back to where we were, I guess,

3    earlier today.    So you're asking Mr. Graves and the D.C. U.S. Attorney to partner with

4    you on the prosecution of the case.    They declined.

5           Why didn't you then request 515 status so you could prosecute the case in D.C.?

6           Mr. <u>Weiss.</u>    Again, because we -- there was still -- can't get into something that

7    would go into deliberative process, case discussions, and things of that nature.    But

8    the --

9           Chairman <u>Jordan.</u>    But did the discussion with Mr. Graves cause you to change

10   your mind on what you initially asked him to partner with you on?

11          Mr. <u>Weiss.</u>    My discussion with Mr. Graves did not change my mind in any

12   respect, no.

13          Chairman <u>Jordan.</u>    That's amazing.    Okay.

14          Mr. <u>Castor.</u>    Both Mr. Graves and Mr. Estrada testified that your request to

15   partner on the case was a difficult -- was difficult for them because they felt they were

16   stretched too thin.    Did they communicate that to you?

17          Mr. <u>Weiss.</u>    I'm not going to get into the specifics of the discussion.

18          BY MR. CASTOR:

19   Q    Mr. Estrada said that he was dealing with -- and he really went into how

20   they've got just a terrible fentanyl problem, and they've got just -- they're overrun with

21   problems relating to the border.

22          And he talked about how they don't have enough attorneys in his office to handle

23   their own business, and so, he indicated to us the idea that he would be able to lend his

24   limited personnel -- he also said he's got a gigantic office, but, you know, his limited

25   resources to you was a real issue.    Did he let you know about that?

1        A      I'm not going to talk about the particulars of what he discussed in that

2    regard.

3            Chairman Jordan.    But you didn't ask for additional help, said when you went to

4    Mr. Graves you weren't looking for people to help.    You were just looking for him to

5    partner with the prosecution.    You weren't actually asking him to give you attorneys to

6    help with the investigation.

7            Mr. Weiss.    We were -- we were giving him the opportunity to join in the

8    investigation.    If we decided to proceed in D.C., we would've proceeded with or without

9    assistance from Mr. Graves.

10            BY MR. CASTOR:

11        Q      Did it surprise you that two Biden appointees didn't want to participate in a

12    case to prosecute the son of the President?

13        A      I understand the question.    I'm just not going to comment on whether I was

14    or was not surprised.

15            Mr. Castor.    Okay.

16            Go off the record briefly.

17            [Discussion off the record.]

18            BY MR. CASTOR:

19        Q      We'll go back on the record?

20            It's our understanding you filed a statement of interest on behalf of DOJ in a

21    patent infringement suit between Moderna and Arbutus relating to a COVID vaccine.

22    Does this ring any bells for you?

23        A      No.    I can't -- I can't speak to it.    I'm sorry.

24        Q      Okay.    To the extent your office would file a statement of interest in a

25    matter such as this, what would be the process?    Would you have communications with

1   Main Justice, or would you handle that without the --

2           Mr. Ivey.   Could I ask though, the statement of interest that was filed by the

3   U.S. Attorney's Office in Delaware?

4           Mr. Castor.   Yes.

5           Mr. Ivey.   Okay.   And the case then is related to what we're investigating in

6   some way or something totally different?

7           Chairman Jordan.   Totally different.   Let's go off the record.

8           Mr. Castor.   This is -- we'll go off the record for a second.

9           [Discussion off the record.]

10          Mr. Ivey.   Let's go back on the record.

11          Mr. Castor.   Okay.

12              BY MR. CASTOR:

13      Q    So when your office files a statement of interest, is it customary that

14   Main Justice be involved in that process?

15      A    Again, I can't speak to the usual pattern when my office files a statement of

16   interest and the participation of DOJ and the component.   It's so dependent upon the

17   particular circumstances, and because I'm not familiar with the circumstances here, I'm

18   just unable to intelligently comment on the matter.

19      Q    Okay.   Fair enough.

20          Does the name Brian Boynton ring any bells?   He's a Principal Deputy Associate

21   Attorney General in the Civil Division.

22      A    It does not.

23      Q    Okay.   So as you sit here today, you're not -- you don't have any

24   recollection of filing a statement of interest with this Moderna vaccine issue?

25      A    Yeah, and, Counsel, I'm not saying we didn't or we did.   I just don't -- I just

1    don't have a recollection.

2         Q    Okay.    Fair enough.    All right.

3         Mr. <u>Ivey.</u>    Could I -- I just want to --

4         Mr. <u>Castor.</u>    You want me to go off the record, or you want to put this on the

5    record?

6         Mr. <u>Ivey.</u>    No, I want this to be on the record.

7         Mr. <u>Castor.</u>    All right.

8         ███████.    And then I actually have, like, maybe three questions.

9         Mr. <u>Ivey.</u>    Oh, well, go ahead.

10        ███████.    Yeah.

11        Mr. <u>Ivey.</u>    Go ahead.

12        ███████.    Can you hear me if I stay here?

13        Mr. <u>Castor.</u>    Yes.

14        ███████.    Okay.

15        Mr. <u>Castor.</u>    So we're starting a whole new -- we're starting a new round?

16        ███████.    It's almost five o'clock.    I don't think we're --

17        Mr. <u>Ivey.</u>    No.    Another hour, though, right?

18        Mr. <u>Castor.</u>    All right.    We're going to --

19        Mr. <u>Ivey.</u>    Last round, but --

20        ████████.    I'm not going to be constrained.

21        Mr. <u>Ivey.</u>    All right.

22        Mr. <u>Castor.</u>    We're going to go back on the record.

23        ███████.    We'll go back on the record.

24        Mr. <u>Castor.</u>    It's 4:38.

25        ███████?

1          ██████.   Did you want to make a statement first?

2     Mr. Ivey.   No, go ahead.

3          ██████.   Okay.

4               BY ████████:

5          Q     I want to turn back to exhibit 10 -- or I'm sorry, it's exhibit 17 -- it's the back

6     of exhibit 10, yeah -- the reference to communication issues, it's 6A on page 2.

7          Is it fair to say that communication can often be a challenge when you're pursuing

8     a case?

9          A     You know, I'm -- sorry, I'm stumbling right now.

10         Q     Let me rephrase it differently.

11         A     Perhaps it can be a challenge.    It's important -- it's incredibly important that

12    you have open communication.    At least I believe it's important to a successful

13    prosecution, especially in a long-term case.    People have a lot invested in the case,

14    so -- so I think it's an important part of partnering with agencies and with co-counsel.

15         Q     And in this particular case, you had prosecutors and investigators who were

16    situated in different offices -- different physical offices, correct?

17         A     That's correct.

18         Q     And that can potentially make communication challenging as well?

19         A     That can -- that can complicate things, but again, it's still important, yeah.

20         Q     And you said you had a number of meetings -- you said this, I think, much

21    earlier today -- you had a number of meetings with supervisors and with various

22    members of the team, and that was an effort to make sure that they were heard and that

23    they were hearing from you, correct?

24         A     I did -- I did speak to that, yes.

25         Q     Okay.    And that's an attempt to address communication, correct, to

1    improve communication?

2        A     I was certainly interested in, yes, maintaining communications.

3        Q     You said that you recall Mr. Shapley's body language during this meeting.

4    Can you describe what Mr. Shapley's body language was?

5        A     I don't know that I could describe the particulars, but I knew at various

6    points in time, based on the nature of Mr. Shapley's reaction, that I suspected he wasn't

7    happy with something I was saying.    Whatever that might've been -- and I don't recall

8    what it was in reaction to, but I do recall times in which he wasn't pleased with whatever

9    it was that was coming out of my mouth.

10       Mr. Ivey.    Mr. Weiss, I wanted to thank you for coming and testifying today, and I

11   know it's been a long, difficult day.    I appreciated your statement at the beginning

12   where you reference that this was unprecedented and that -- because you're in the

13   middle of a prosecution, and you did reference not only at the beginning, but over

14   multiple occasions, that you're going to produce a report.

15       And I just wanted to flag for the chairman and the committee that this is exactly

16   why I objected to him being brought in previously or that -- the committee doing

17   investigations in the middle of prosecutions like this.

18       So I'm a little concerned that what's going to happen at the hearing is, statements

19   will be made that he wasn't answering questions or he was being evasive or anything like

20   that.    The only reason he's here is because we required him to come in.    And because,

21   as he pointed out, he's in the middle of an investigation, there's a lot of stuff he can't

22   answer.

23       So hopefully when we get to the hearing, nobody will be making allegations like

24   that directly.

25       Chairman Jordan.    Well, he's here voluntarily, and DOJ offered to have him to

1  come in to talk to us about the three different letters that we -- that was the focus of

2  our -- the primary focus of our asking questions.

3      Obviously, we think things flow from that, and that's why Mr. Castor and others

4  asked the questions we did, and Mr. Weiss made the determination not to answer most

5  of those.

6      Mr. Ivey.   Well, I think he was right not to answer them.   I think he's sort of

7  stuck in the --

8      Chairman Jordan.   I'm just saying, DOJ offered to have him come talk to us

9  because of the various letters were sent this summer --

10      Mr. Castor.   Yeah.

11      Chairman Jordan.   -- and the concern about the different positions that the

12  letters seem to indicate that the Department was taking.

13      Mr. Castor.   In July, DOJ offered a number of dates, I think four dates, two in

14  September, two in October.   We were working with the Department, you know, for that.

15  So this was not a voluntary transcribed interview that was conducted under the threat of

16  subpoena or anything.   It was -- it was voluntary.

17      Mr. Ivey.   I appreciate that.   I don't think we should be doing these for the

18  reasons I stated, but fair enough.

19      Chairman Jordan.   You can take that up with the Attorney General.

20      Mr. Ivey.   Will do.

21      ████.   We can go off the record.

22      Ms. Nabity.   We're off the record.

23      [Whereupon, at 4:41 p.m., the interview was concluded.]

1                          Certificate of Deponent/Interviewee

2

3

4          I have read the foregoing _____ pages, which contain the correct transcript of the

5    answers made by me to the questions therein recorded.

6

7

8

9                              _____

10                                      Witness Name

11

12

13                             _____

14                                          Date

15