**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

　　　　　　　　　　　　*Plaintiff*,

　　　v.

MARK DALY, *et al.*,

　　　　　　　　　　　　*Defendants*.

Case No.  1:24-cv-815

## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Plaintiff moves for a preliminary injunction, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure on the preliminary injunction schedule, *see* LCvR 65.1(c), (d), or on an otherwise expedited schedule ordered by the Court, to require Defendants Mark Daly and Jack Morgan to appear before the Committee on the Judiciary of the United States House of Representatives for depositions.  Plaintiff's motion is based on the attached memorandum of law, the Declaration of Todd B. Tatelman, and any oral argument presented at the hearing on Plaintiff's motion.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
  *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
  *Deputy General Counsel*
Bradley Craigmyle (IL Bar No. 6326760)
  *Associate General Counsel*
Andy T. Wang (D.C. Bar No. 1034325)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

March 21, 2024

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

*Plaintiff*,

v.

MARK DALY, *et al.*,

*Defendants*.

Case No.  1:24-cv-815

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION FOR PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

TABLE OF EXHIBITS ................................................................................................iii

TABLE OF AUTHORITIES ....................................................................................... vi

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................... 4

I.      The Committee's investigation into DOJ and the President................................ 4

II.     Daly's and Morgan's importance to the Committee's investigation ................. 11

III.    The Committee attempted to get testimony from Daly and Morgan through the
        accommodation process, but negotiations are at an impasse............................. 13

IV.     The Committee's constitutional authority to conduct investigations, as part of and
        including an impeachment inquiry, and to issue subpoenas to advance its
        investigations ................................................................................................... 16

LEGAL STANDARD................................................................................................... 18

ARGUMENT ............................................................................................................... 18

I.      This Court has authority to resolve this case .................................................... 18

        A.      The Committee has standing under binding D.C. Circuit precedent .................. 18

        B.      The Court has subject matter jurisdiction under 28 U.S.C. § 1331 ...................... 19

        C.      The Committee may bring this action to enforce its Subpoenas ......................... 21

                1.      The Committee has an equitable cause of action...................................... 21

                2.      The Committee has a cause of action under the Declaratory
                        Judgment Act ......................................................................................... 28

        D.      This case is otherwise justiciable.................................................................... 29

II.     The Committee will likely succeed on the merits of its claim that Daly and
        Morgan have violated their legal obligations to appear before the Committee for
        their depositions .............................................................................................. 30

        A.      Daly and Morgan have a legal obligation to appear before the Committee
                in response to lawfully issued Congressional subpoenas .................................. 31

B.     The OLC Opinions do not affect the legality of the Subpoenas ........................... 32

C.     The House has authority under the Constitution to prevent agency counsel from attending depositions ..................................................................................... 34

III.    The Committee's ability to exercise its Article I powers is impeded, and it is entitled to injunctive relief ................................................................................................. 41

A.     Daly's and Morgan's refusal to testify is causing the Committee irreparable harm ....................................................................................................... 41

B.     Allowing the Committee's investigation to proceed with Daly's and Morgan's testimony serves equity and advances the public interest .................... 44

CONCLUSION ............................................................................................................................. 45

**<u>TABLE OF EXHIBITS</u>**

The exhibits listed below are those attached to the Declaration of Todd B. Tatelman.  For the Court's and the parties' convenience, where those exhibits were also attached to the complaint in this case, they are labeled consistently with the exhibits as attached to the complaint.

**Exhibits to Declaration of Todd B. Tatelman (March 21, 2024)**

Exhibit A    Subpoena from the House Committee on the Judiciary to Mark Daly, Senior Litigation Counsel, Tax Division, Department of Justice (DOJ) (Feb. 22, 2024)

Exhibit B    Subpoena from the House Committee on the Judiciary to Jack Morgan, DOJ (Feb. 22, 2024)

Exhibit C    Transcript of the Interview of Gary Shapley, Supervisory Special Agent, Internal Revenue Service (IRS) (May 26, 2023)

Exhibit D    Transcript of the Interview of Joseph Ziegler, Special Agent, IRS (June 1, 2023)

Exhibit E    Transcript of the Hearing, *United States v. Biden*, No. 1:23-cr-61-MN (D. Del. July 26, 2023), ECF No. 16

Exhibit F    Memorandum from Representative James Comer, Chairman, House Committee on Oversight & Accountability, et al., to Members of the House Committee on Oversight & Accountability, et al. (Sept. 27, 2023)

Exhibit G    Staff of the House Committee on the Judiciary, et al., 118th Congress, *Interim Staff Report: The Justice Department's Deviations from Standard Processes in Its Investigation of Hunter Biden* (2023)

Exhibit H    Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (July 21, 2023)

Exhibit I    Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, to Merrick Garland, Attorney General, DOJ (Feb. 28, 2023)

Exhibit J    Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (June 29, 2023)

Exhibit K    Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney General, DOJ (July 31, 2023)

Exhibit N    Supplemental Production of Gary Shapley, Supervisory Special Agent, IRS (Sept. 22, 2022)

| Exhibit Q | Transcript of the Interview of Matthew M. Graves, U.S. Attorney for the District of Columbia, DOJ (Oct. 3, 2023) |
|---|---|
| Exhibit S | Transcript of the Interview of David Weiss, Special Counsel, DOJ (Nov. 7, 2023) |
| Exhibit T | Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (July 13, 2023) |
| Exhibit U | Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (July 24, 2023) |
| Exhibit V | Subpoena from the House Committee on the Judiciary to Mark Daly, Senior Litigation Counsel, Tax Division, DOJ (Sept. 14, 2023) |
| Exhibit W | Subpoena from the House Committee on the Judiciary to Jack Morgan, Trial Attorney, Tax Division, DOJ (Sept. 14, 2023) |
| Exhibit AA | Letter from Robert Driscoll, Counsel for Mark Daly, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (Oct. 24, 2023) |
| Exhibit BB | Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Robert Driscoll, Counsel for Mark Daly (Oct. 25, 2023) |
| Exhibit CC | Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (Oct. 25, 2023) |
| Exhibit EE | November 2023 email chain between the House Committee on the Judiciary staff and Catherine Duval, Counsel for Jack Morgan |
| Exhibit FF | Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Catherine Duval, Counsel for Jack Morgan (Nov. 2, 2023) |
| Exhibit HH | Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, to Mark Daly, Senior Litigation Counsel, Tax Division, DOJ (Feb. 22, 2024) |
| Exhibit II | Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, to Jack Morgan, Trial Attorney, Tax Division, DOJ (Feb. 22, 2024) |
| Exhibit JJ | Letter from Robert Driscoll, Counsel for Mark Daly, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (Feb. 24, 2024) |
| Exhibit KK | Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Robert Driscoll, Counsel for Mark Daly (Feb. 29, 2024) |
| Exhibit LL | Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Catherine Duval, Counsel for Jack Morgan (Feb. 29, 2024) |
| Exhibit RR | House Resolution 12, 100th Congress (1987) |

Exhibit SS     House Resolution 258, 102d Congress (1991)

Exhibit TT    Rules of the Select Committee to Investigate Covert Arms Transactions with Iran of the U.S. House of Representatives, 100th Congress (Committee Print 1987)

Exhibit UU   Rules of the Task Force to Investigate Certain Allegations Concerning the Holding of American Hostages by Iran in 1990 of the U.S. House of Representatives, 102d Congress (Committee Print 1992)

Exhibit YY   Transcript of the Interview of Lesley Wolf, Former Assistant U.S. Attorney, DOJ (Dec. 14, 2023)

Exhibit AAA  Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Jenny Kramer, Counsel for Lesley Wolf (Dec. 12, 2023)

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                              **Page(s)**

*Alexander v. Sandoval*,
    532 U.S. 275 (2001)....................................................................................................................25

*Anderson v. Dunn*,
    19 U.S. 204 (1821)......................................................................................................................24

*Armstrong v. Exceptional Child Ctr., Inc.*,
    575 U.S. 320 (2015)..................................................................................................22, 23, 27

*Bell v. Hood*,
    327 U.S. 678 (1946)....................................................................................................................22

*C&E Servs., Inc. v. D.C. Water & Sewer Auth.*,
    310 F.3d 197 (D.C. Cir. 2002)................................................................................................28

*Carroll v. Safford*,
    44 U.S. (3 How.) 441 (1845)...................................................................................................22

*Clinton v. Jones*,
    520 U.S. 681 (1997)....................................................................................................................43

*Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*,
    140 S. Ct. 1009 (2020)..............................................................................................................25

*\*Comm. on Judiciary v. McGahn*,
    415 F. Supp. 3d 148 (D.D.C. 2019) ......................3, 20, 24, 25, 26, 27, 28, 30, 33, 34, 39, 44

*Comm. on Judiciary v. McGahn*,
    951 F.3d 510 (D.C. Cir. 2020)................................................................................................20

*\*Comm. on Judiciary v. McGahn (McGahn En Banc)*,
    968 F.3d 755 (D.C. Cir. 2020) (en banc)..............................................................18, 19, 20, 22

*Comm. on Judiciary v. McGahn (McGahn Vacated Panel)*,
    973 F.3d 121 (D.C. Cir. 2020)..............................................................................20, 25, 27, 29

*Comm. on Judiciary v. McGahn*,
    Order, No. 19-5331 (D.C. Cir. Oct. 15, 2020) .....................................................................25

*Comm. on Judiciary v. McGahn*,
    Order, No. 19-5331 (D.C. Cir. July 13, 2021) .....................................................................25

*Comm. on Judiciary v. Miers (Miers I),*
    558 F. Supp. 2d 53 (D.D.C. 2008) ........................20, 22, 23, 26, 28, 29, 30, 31, 32, 33, 34, 44

*Comm. on Judiciary v. Miers (Miers II),*
    575 F. Supp. 2d 201 (D.D.C. 2008) ...........................................................................33, 44

*Comm. on Oversight & Gov't Reform v. Holder,*
    979 F. Supp. 2d 1 (D.D.C. 2013) .............................................19, 20, 24, 28, 29, 30

*Dunlap v. Presidential Advisory Comm'n on Election Integrity,*
    286 F. Supp. 3d 96 (D.D.C. 2017) .........................................................................42

*Eastland v. U.S. Servicemen's Fund,*
    421 U.S. 491 (1975)...................................................................................7, 31, 43

*Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity,*
    266 F. Supp. 3d 297 (D.D.C. 2017) .......................................................................43

*Exxon Corp. v. FTC,*
    589 F.2d 582 (D.C. Cir. 1978)...............................................................................44

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.,*
    561 U.S. 477 (2010).........................................................................................23, 28

*Gordon v. Holder,*
    721 F.3d 638 (D.C. Cir. 2013)...........................................................................42, 44

*Hernandez v. Mesa,*
    140 S. Ct. 735 (2020)...........................................................................................25

*In re Application of Comm. on Judiciary,*
    414 F. Supp. 3d 129 (D.D.C. 2019) ....................................................................7, 8

*In re Rep. & Recommendation of June 5, 1972,*
    370 F. Supp. 1219 (D.D.C. 1974) ..................................................................1, 16, 44

*In re Sealed Case,*
    121 F.3d 729 (D.C. Cir. 1997)...............................................................................41

*Jacobs v. United States,*
    290 U.S. 13 (1933).............................................................................................23

*Jesner v. Arab Bank, PLC,*
    584 U.S. 241 (2018).............................................................................................25

*Maryland v. King*,
    567 U.S. 1301 (2012)..................................................................................42

*McCulloch v. Maryland*,
    17 U.S. (4 Wheat.) 316 (1819).....................................................................37

*McGrain v. Daugherty*,
    273 U.S. 135 (1927) ........................................................................17, 21, 31

*Me. Cmty. Health Options v. United States*,
    140 S. Ct. 1308 (2020)................................................................................21

*Medellin v. Texas*,
    552 U.S. 491 (2008)....................................................................................32

*Mims v. Arrow Fin. Servs., LLC*,
    565 U.S. 368 (2012)....................................................................................21

*Morton v. Mancari*,
    417 U.S. 535 (1974)....................................................................................21

*Nixon v. Adm'r of Gen. Servs.*,
    433 U.S. 425 (1977)....................................................................................30

*Nken v. Holder*,
    556 U.S. 418 (2009)....................................................................................18

*NLRB v. Noel Canning*,
    573 U.S. 513 (2014)..............................................................................34, 35

*PHH Corp. v. CFPB*,
    839 F.3d 1 (D.C. Cir. 2016) ........................................................................37

*Pursuing Am.'s Greatness v. FEC*,
    831 F.3d 500 (D.C. Cir. 2016).....................................................................18

*Quinn v. United States*,
    349 U.S. 155 (1955)....................................................................................21

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*,
    498 F.2d 725 (D.C. Cir. 1974) (en banc)....................................................30

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016)....................................................................................28

*Trump v. Mazars USA, LLP*,
    591 U.S. 848 (2020)................................................................................28, 31

*United States v. AT&T (AT&T I)*,
    551 F.2d 384 (D.C. Cir. 1976).............................................................20, 30

*United States v. AT&T (AT&T II)*,
    567 F.2d 121 (D.C. Cir. 1977).............................................................28, 30

*United States v. Ballin*,
    144 U.S. 1 (1892)............................................................................................35

*United States v. Bryan*,
    339 U.S. 323 (1950).......................................................................................32

*United States v. Stanley*,
    483 U.S. 669 (1987).......................................................................................26

*Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*,
    535 U.S. 635 (2002).......................................................................................20

*Watkins v. United States*,
    354 U.S. 178 (1957)..........................................................................31, 32, 44

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)............................................................................................18

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952).......................................................................................32

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017).......................................................................................25

**Constitution**

U.S. Const. art. I, § 1, cl. 1..................................................................................17

U.S. Const. art. I, § 2, cl. 5..................................................................................16

U.S. Const. art. I, § 5, cl. 2.............................................................................3, 34

**Statutes and Regulations**

2 U.S.C. § 288d........................................................................................................27

18 U.S.C. § 3237(a) .................................................................................................9

26 U.S.C. § 7201 ................................................................................................9

26 U.S.C. § 7202 ................................................................................................9

26 U.S.C. § 7206 ................................................................................................9

28 U.S.C. § 547 ..................................................................................................9

28 U.S.C. § 1331 ........................................................................................19, 28

28 U.S.C. § 1365 ........................................................................................20, 27

28 U.S.C. § 2201(a) ..........................................................................................28

28 C.F.R. § 0.70 ................................................................................................11

**Legislative Authorities**

4 J. Richardson, *A Compilation of the Messages and Papers of the Presidents*,
    H. Misc. Doc. 53-210 (1897), https://perma.cc/82XR-DWJ2 ................................................16

169 Cong. Rec. H6922-23 (daily ed. Dec. 13, 2023)
    https://perma.cc/ATQ9-27VV ..............................................................................1, 7

*Constitution, Jefferson's Manual,*
    *and Rules of the House of Representatives of the United States*,
    H. Doc. 117-161 (2023), https://perma.cc/3HCB-WYMP ......................................16

H. Comm. on the Judiciary, *Abuse of Power, Waste of Resources,*
    *and Fear: What Internal Documents and Testimony From Career*
    *Employees Show About the FTC Under Chain Lina Khan*
    (last visited Mar. 20, 2024), https://perma.cc/77JH-Q3M3 ....................................36

H. Rep. No. 116-125 (2019), https://perma.cc/2NQH-KUXP ....................................36

H. Res. 5, 118th Cong. § 3(k)(3) (2023), https://perma.cc/28AM-XD4R ....................................36

H. Res. 6, 110th Cong. § 502 (2007), https://perma.cc/6PJ6-8TD3 ..............................36

H. Res. 917, 118th Cong. § 2 (2023), https://perma.cc/57G5-C54Y ......................................17, 31

H. Res. 918, 118th Cong. (2023), https://perma.cc/69QX-U332 ..........................................1, 7, 17

*Hearing with IRS Whistleblowers About the Biden Criminal Investigation:*
    *Before the H. Comm. on Oversight and Accountability*,
    118th Cong. (July 19, 2023), https://perma.cc/NXG7-3BGU ....................................5

Oversight Comm. Democrats, *Committee Depositions in the
    House of Representatives: Longstanding Republican and
    Democratic Practice of Excluding Agency Counsel*,
    (last visited Mar. 20, 2024), https://perma.cc/3ZS3-4EEX .......................................................37

Rules of the Committee on the Judiciary of the U.S. House of Representatives,
    118th Cong. (2023) (Judiciary Committee Rules), https://perma.cc/6UUS-LYE

    Judiciary Committee Rule II(c) ...........................................................................16

    Judiciary Committee Rule IV(a) ..........................................................................31

Rule X.4(c)(3)(A), Rules of the House of Representatives,
    110th Cong. (2007), https://perma.cc/V4GZ-FDV ..............................................36

Rules of the House of Representatives,
    118th Cong. (2023), https://perma.cc/3UX4-2YG5

    House Rule X.1 ...................................................................................................17

    House Rule X.1(*l*)(1) .......................................................................................4, 17

    House Rule X.1(*l*)(7) .......................................................................................4, 17

    House Rule XI.1(b)(1) ........................................................................................31

    House Rule XI.2(m) ...........................................................................................17

    House Rule XI.2(m)(1)(B) ..................................................................................31

    House Rule XI.2(m)(3)(A)(i) ..............................................................................31

    House Rule XI.2(b), (c)(1) ..................................................................................16

## Other Sources

2 *The Records of the Federal Convention of 1787* (Max Farrand ed., 1911) ...............................42

*A Sitting President's Amenability to Indictment and Criminal Prosecution*,
    24 Op. O.L.C. 222, 2000 WL 33711291 (Oct. 16, 2000) ........................................42

*Attempted Exclusion of Agency Couns. from Cong. Depositions of Agency Emps.*,
    43 Op. O.L.C. ___, 2019 WL 2563045 (May 23, 2019)........................................14, 37, 38, 40

Criminal Tax Manual, Tax Division, DOJ (2022), https://perma.cc/DC8Y-M7XP........................9

*Exclusion of Agency Couns. from Cong. Depositions in the Impeachment Context*,
  43 Op. O.L.C. __, 2019 WL 6047055 (Nov. 1, 2019) ............................................................15

Jonathan David Shaub, *The Executive's Privilege*, 70 Duke L.J. 1 (2020) ............................39, 40

*Justice Department tells Mueller to limit scope of congressional testimony*,
  CBS News (July 22, 2019, 7:24 PM), https://perma.cc/W4XS-PDZB ..................................38

Louis D. Brandeis, *Other People's Money*, Brandeis School of Law
  (last visited Mar. 20, 2024), https://perma.cc/97JW-L4VZ ........................................................2

Press Release, *Appointment of a Special Counsel*,
  DOJ (Aug. 11, 2023), https://perma.cc/24SD-KYJC ...............................................................9

Transcript of Testimony of Merrick Garland, Att'y Gen.,
  DOJ (Sept. 20, 2023), https://perma.cc/M7CW-VEGQ .........................................................10

## <u>INTRODUCTION</u>

This case concerns what this Court has said is "a matter of the most critical moment to the Nation, an impeachment investigation involving the President of the United States." *In re Rep. & Recommendation of June 5, 1972*, 370 F. Supp. 1219, 1230 (D.D.C. 1974). And this Court has noted with respect to such an impeachment investigation that "[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information." *Id.* Here, the Committee on the Judiciary of the U.S. House of Representatives (Judiciary Committee or Committee) seeks to fulfill its "compelling need" for such information by filing this suit to enforce subpoenas for testimony necessary to its consideration of whether to draft articles of impeachment against President Joseph R. Biden, Jr.

The full House of Representatives (House) has formalized this impeachment inquiry. *See* H. Res. 918, 118th Cong. (2023), https://perma.cc/69QX-U332; 169 Cong. Rec. H6922-23 (daily ed. Dec. 13, 2023), https://perma.cc/ATQ9-27VV. One question being investigated—that the full House agreed the Committee should continue looking into—is whether the President abused his power by obstructing or influencing, or attempting to obstruct or influence, investigations into his son, Robert Hunter Biden.

For years, the Internal Revenue Service (IRS) and the U.S. Department of Justice (DOJ) have been investigating Hunter Biden for tax crimes. In the spring of 2023, two IRS whistleblowers who were intimately involved in that investigation came forward and exposed several ways that DOJ had deviated from its standard practices to benefit Hunter Biden. In May 2023, President Biden stated publicly "my son has done nothing wrong," a potential attempt to use the authority of his office to influence the direction of his son's investigation. Then, just two months later, in July 2023, a plea deal between DOJ and Hunter Biden unraveled during a

hearing when, among other things, the DOJ prosecutor was unable to provide any precedent for the unusual provisions in the plea agreement that benefited Hunter Biden.

While the prosecution is ongoing, there is ample reason to conclude that DOJ has afforded Hunter Biden special treatment. The critical question is: why? Given the control that a president exercises over DOJ, the Committee is not only investigating DOJ's commitment to impartial justice but also whether President Biden has abused his power as President to impede, obstruct, or otherwise influence investigations into his son. The Committee's investigation is thus conducted pursuant to the House's solemn power of impeachment as well as its more general oversight authority to assist in developing any needed legislative reforms.

Because, as Justice Brandeis has said, "[s]unlight is … the best of disinfectants," the Committee cannot investigate in the dark. Louis D. Brandeis, *Other People's Money*, ch. V, Brandeis School of Law (last visited Mar. 20, 2024), https://perma.cc/97JW-L4VZ. To determine whether the President has committed an impeachable offense and to craft effective legislative reforms, all facts must be brought to light. And to uncover these facts, the Committee must hear from Defendants Mark Daly and Jack Morgan, two current or former DOJ Tax Division attorneys who have firsthand knowledge of irregularities in DOJ's investigation that appear to have benefited Hunter Biden.

Notwithstanding the Committee's best efforts, its attempts to secure Daly's and Morgan's testimony have been thwarted. At first, DOJ refused to make Daly and Morgan available for voluntary interviews with the Committee, forcing the Committee to subpoena (Subpoena or Subpoenas[1]) them for depositions, twice. But they defied the Subpoenas because they elected to comply with DOJ's baseless and unlawful direction not to appear. They have deferred to DOJ's

---

[1] Subpoena or Subpoenas refers to the specific subpoena(s) issued to either Defendant.

2

claim that the Subpoenas are invalid because, under House Rules, agency counsel (a lawyer who represents the Executive Branch's interests, not Daly's or Morgan's) cannot attend.  Among other things, DOJ argues that the inability of agency counsel to attend supposedly interferes with the President's ability to control the disclosure of potentially privileged information.

But the duty to comply with the Subpoenas (by appearing for depositions) is separate from any duty to disclose purportedly privileged material.  Regardless of what information Daly and Morgan will disclose, or who may accompany them, they still must appear.  *See, e.g.*, *Comm. on Judiciary v. McGahn*, 415 F. Supp. 3d 148, 168 (D.D.C. 2019) ("[T]he question of whether … the recipient of a subpoena has to disclose … the particular information that the subpoena requests is entirely distinct from the question of whether the recipient of a subpoena has the legally enforceable duty to perform in response to a subpoena at all.").

Beyond that fatal flaw in DOJ's position, the agency counsel regulation is a rule that governs House proceedings and thus plainly falls within the Constitution's clear command that each chamber of Congress "may determine the Rules of its Proceedings."  U.S. Const. art. I, § 5, cl. 2.  The House has decided to exercise its constitutional rulemaking authority in this manner because it protects the integrity of its investigations: a witness may be less willing to share information that reflects poorly on his employing agency if that agency's lawyer is sitting right next to him.  Moreover, the agency counsel rule is not new: the House has adopted variations of this rule since the 1980s, and more than 175 Executive Branch witnesses have appeared and testified without the presence of agency counsel.

The Committee's need for Daly's and Morgan's testimony is urgent.  Every day that they defy the Committee's Subpoenas delays and hinders its investigation at a time when the Committee is seeking to conclude its fact gathering.  Daly and Morgan are obstructing the

House's exercise of its exclusive power to consider articles of impeachment, impeding its efforts to consider legislation and conduct oversight, and irreparably injuring Congress's stature as a coordinate branch of government engaged in one of its most critical functions.  The Committee therefore asks this Court to quickly grant its motion, conclude that Daly and Morgan have no basis in law to defy the Committee's Subpoenas, and enjoin them to appear and testify.

## BACKGROUND

### I.    The Committee's investigation into DOJ and the President

The IRS began investigating Hunter Biden in November 2018 for potential tax crimes arising out of his business dealings and spending habits.  *See generally* Decl. of Todd B. Tatelman (Decl.), Ex. G.  This was followed by a Federal Bureau of Investigation (FBI) inquiry in 2019, which was subsequently merged with the IRS investigation, and came to include DOJ. *Id.* at 5.  This joint investigation continued into the Biden Administration and was still active when the 118th Congress commenced.

Early in 2023, the Committee was concerned that DOJ's investigation of Hunter Biden was not being led by a special counsel.  Without the appointment of a special counsel, DOJ's investigation ran the risk of an actual conflict of interest given that important decisions regarding the prosecution of President Biden's son would be made by officials who answer to and serve at the pleasure of the President.  Decl., Ex. I at 1.  The Committee thus began its own investigation under its oversight jurisdiction.  *See* Rule X.1(*l*)(1), (7), Rules of the House of Representatives, 118th Cong. (2023) (House Rules), https://perma.cc/3UX4-2YG5.

Soon, however, the Committee's concerns about DOJ's handling of the Hunter Biden investigation became more acute.  In spring 2023, two IRS whistleblowers voluntarily appeared for interviews before the House Committee on Ways and Means, Decl., Exs. C and D, and then

testified publicly at a hearing before the House Committee on Oversight and Accountability.[2] Both whistleblowers were intimately involved in the Hunter Biden investigation. One was the agent who opened the investigation and served as the lead IRS agent. Decl., Ex. G at 6. The other was the lead agent's supervisor on the investigation. *Id.* Both testified about their grave concerns regarding DOJ's conduct of the investigation, including DOJ's apparent preferential treatment of Hunter Biden. *Id.* Specifically, both whistleblowers identified numerous DOJ deviations from normal investigative protocols, such as allowing the statute of limitations to lapse on certain felony tax charges despite defense counsel's willingness to enter into an agreement to toll the statute of limitations for those charges, prohibiting investigators from referring to or asking about President Biden during witness interviews, withholding evidence from investigators, and excluding investigators from meetings with the defense team. *See generally id.* This testimony raised substantial concerns that political interference may have hindered DOJ's investigation of Hunter Biden.

These concerns were magnified when DOJ and Hunter Biden reached a highly unusual plea deal. He would have pled guilty to only two misdemeanor counts of failing to pay taxes, and a separate felony firearm possession charge would have been dismissed after a two-year diversionary term. Decl., Ex. E at 4, 6. By accepting the diversion agreement, however, Hunter Biden would also have received immunity for crimes completely unrelated to the gun charge. *Id.* at 46. At the plea hearing, when the judge asked the prosecutor whether he "ha[d] any precedent

---

[2] *Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight and Accountability*, 118th Cong. (July 19, 2023), https://perma.cc/NXG7-3BGU.

for agreeing not to prosecute crimes that have nothing to do with the case or the charges being diverted," the prosecutor said that he was "not aware of any." *Id.*

Moreover, if the government ever believed that Hunter Biden violated the terms of the diversion agreement, DOJ could not bring charges unless the judge also agreed. *Id.* at 92-93. The judge questioned whether such a provision, which "puts [the Judicial Branch] in the middle of a decision as to whether to bring a charge," was even constitutional. *Id.* at 95. The judge bluntly "asked if there is any precedent for this, [and she] was told no. [She] … asked if there is any authority for this, [she] was told no." *Id.* at 103. According to the Committee, these two provisions together

> shifted a broad immunity provision, which benefits Mr. Biden, from the plea agreement to the pretrial diversion agreement apparently to prevent the District Court from being able to scrutinize and reject that immunity provision. And then, [DOJ] has benefitted Mr. Biden by giving up its unilateral ability to bring charges against him if it concludes that he has breached the pretrial diversion agreement.

Decl., Ex. K at 3. While the plea and diversion agreements ultimately fell apart after questioning from the judge, DOJ's consent to these "atypical" agreements "raise[d] serious concerns … that [DOJ] ha[d] provided preferential treatment toward Mr. Biden in the course of its investigation and proposed resolution of his alleged criminal conduct." *Id.* at 1, 4.

Given all these developments, the Committee began to focus on whether DOJ's handling of the Hunter Biden investigation called for legislative reforms such as "reforming the 'special attorney' statute, codifying the special counsel regulations, reforming the Tax Division of [DOJ] and its interactions with the IRS, and expanding the ability of the IRS, including whistleblowers, to share certain tax information with Congress." Decl., Ex. J at 1-2.

Additionally, by fall 2023, the Committee's investigation became part of a broader impeachment inquiry into President Biden. After Speaker McCarthy directed the Committee (and others) "to open a formal impeachment inquiry into" the President, the relevant committees

6

released an Impeachment Memorandum on September 27, 2023, that, among other things, outlined the scope of the impeachment inquiry.  Decl., Ex. F at 2.

The Impeachment Memorandum explained that the inquiry was examining, as relevant here, whether "Joe Biden abuse[d] his power as President to impede, obstruct, or otherwise hinder investigations (including Congressional investigations) or the prosecution of Hunter Biden."  *Id.* at 29.  The Impeachment Memorandum further discussed the troubled DOJ investigation of Hunter Biden and set forth how President Biden has made repeated public statements about his son's innocence, while serving as President, such as the incident in May 2023 when he told a reporter that "my son has done nothing wrong."  *Id.* at 26-27.  Of course, these statements "could represent attempts to use the authority of his office to influence [DOJ's] actions and decision-making in the criminal investigation of his son."  *Id.* at 29.

The full House ultimately formalized the impeachment inquiry by adopting House Resolution 918.  *See* 169 Cong. Rec. H6922-23 (daily ed. Dec. 13, 2023).  It directs the Committee to continue its "ongoing" inquiry into whether sufficient grounds, including those "set forth in the" September 27, 2023 Impeachment Memorandum, exist to impeach President Biden.  *See* H. Res. 918, 118th Cong. (2023).  Thus, at this point, the Committee's investigation is not only considering the need for legislative reforms; it serves the dual purpose of determining whether President Biden has committed an impeachable offense.  Decl., Ex. F at 21-27, 29.

Of course, Congress must understand the full extent of any wrongdoing in connection with DOJ's handling of the Hunter Biden investigation.  "A legislative body cannot legislate wisely or effectively in the absence of information."  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 504 (1975) (alteration and citation omitted).  And "[i]mpeachment based on anything less than all relevant evidence would compromise the public's faith in the process."  *In re*

*Application of Comm. on Judiciary*, 414 F. Supp. 3d 129, 176 (D.D.C. 2019).  Although DOJ has

attempted to shield much of its investigation from the Committee's oversight, the Committee has

worked diligently to understand DOJ's handling of the Hunter Biden case.  The Committee has

released a nearly eighty-page interim staff report that documents the status of its investigation.

Thus far, the Committee's investigation has revealed serious deviations from standard DOJ

protocol.  *See generally* Decl., Ex. G.  It has also uncovered information that raises questions

about potential political interference.

For example, DOJ prevented investigators from pursuing promising leads and

interviewing crucial witnesses.  Among other things, DOJ did not allow investigators to

interview Hunter Biden's adult children because, according to DOJ, "they would be in 'hot

water' if they interviewed 'the President's grandchildren,'" even though investigators determined

that Hunter Biden had impermissibly taken tax deductions for payments he made to his adult

children.  *Id.* at 29.  DOJ even withheld crucial information from investigators and sought to

cabin the investigation.  For example, the FBI withheld the contents of Hunter Biden's laptop

and hard drive from IRS agents working on the same investigation, even though they notified the

IRS that those devices contained evidence of tax crimes.  *Id.* at 5.  Both whistleblowers also

testified that DOJ allowed the statute of limitations to lapse for the 2014 and 2015 tax years

notwithstanding the defense team being willing to execute a tolling agreement.  *Id.* at 31-35.

The President's political appointees also appear to have frustrated DOJ's ability to bring

charges against his son, including charges related to the 2014 and 2015 tax years.  Such charges

must be filed in the district where the defendant resides or where the tax return is prepared or

filed.[3]  This meant that charges against Hunter Biden related to the 2014 and 2015 tax years would have needed to be filed in the District of Columbia, where Hunter Biden lived until 2017, and for later years, in the Central District of California, where Hunter Biden moved in 2017.  *See* Decl., Ex. C at 100.

The lead prosecutor assigned to the case is David Weiss, the U.S. Attorney for the District of Delaware.  Before his appointment as Special Counsel on August 11, 2023, Weiss could not have filed charges outside of Delaware.  *See* 28 U.S.C. § 547 (noting that each "United States attorney, *within his district*, shall … prosecute for all offenses against the United States" (emphasis added)).  Therefore, he needed to partner with Matthew Graves, the U.S. Attorney for the District of Columbia, and/or Martin Estrada, the U.S. Attorney for the Central District of California, to bring charges against Hunter Biden in those districts.[4]  In February or March 2022, and August 2022, Weiss approached Graves's and Estrada's offices, respectively, to ask them to partner with him to bring charges against Hunter Biden in their respective districts.  Decl., Ex. G at 44-49.  But Graves and Estrada declined to partner with Weiss, *id.*, notwithstanding Attorney General Merrick Garland's public claim that Weiss "would have the necessary authority [to

---

[3] Under the federal criminal venue statute, "any offense … begun in one district and completed in another, or committed in more than one district, may be inquired of and prosecuted in any district in which such offense was begun, continued, or completed."  18 U.S.C. § 3237(a). That means for the tax offenses relevant to Hunter Biden, that is, 26 U.S.C. § 7201 (tax evasion), § 7202 (failure to file or pay a return), and § 7206 (filing a false return), venue is proper in any district where the return was, or should have been, prepared or filed.  *See generally* Criminal Tax Manual, Tax Division, DOJ, § 6 (2022), https://perma.cc/DC8Y-M7XP.

[4] Weiss now has the authority to file charges outside the District of Delaware after he was appointed to serve as a special counsel on August 11, 2023.  *See* Press Release, *Appointment of a Special Counsel*, DOJ (Aug. 11, 2023), https://perma.cc/24SD-KYJC.

bring charges in any district] and that no U.S. attorney could block him."[5]  Both of these U.S. Attorneys were appointed by President Biden, raising questions about whether political interference played a role in their decisions not to partner with Weiss and his team.

The U.S. Attorney for the District of Columbia's decision not to partner with Weiss to bring charges related to tax years 2014 and 2015 is especially concerning.  According to one of the IRS whistleblowers, prosecutors initially supported charging Hunter Biden for tax offenses related to those years, and DOJ's Tax Division authored an extensive prosecution memo recommending as such.  Decl., Ex. C at 23-25.  According to an IRS whistleblower, Tax Division representatives, including Daly, presented the memorandum to the U.S. Attorney's Office for the District of Columbia in March 2022.  *Id.* at 24, 65.  According to one of the IRS whistleblowers, Daly reported that the first assistant in that office, a non-presidentially-appointed (presumably career) prosecutor, was optimistic about bringing charges and stated she would assign a prosecutor to assist.  *Id.*  But just a couple of days later, Daly told the other IRS whistleblower that Graves had personally reviewed the report and indicated that he did not support the charges or the investigation as a whole and would not allow charges to proceed in his district.  *Id.*  When the Committee asked Graves about this incident, he told a different story.  Graves testified that he relied on his team's recommendation and never reviewed the relevant materials himself.  Decl., Ex. G at 47.  Following Graves's decision, the statute of limitations related to tax years 2014 and 2015 ended up lapsing despite defense counsel's willingness to enter into a tolling agreement.  *Id.* at 33.

---

[5] Transcript of Testimony of Merrick Garland, Att'y Gen., DOJ (Sept. 20, 2023), https://perma.cc/M7CW-VEGQ.

Although the Committee has now uncovered how DOJ seemingly operated by different rules during the Hunter Biden investigation, it must still determine what motivated DOJ's irregular conduct.  To do this, the Committee requires testimony from witnesses with firsthand knowledge of DOJ's investigation.  That is where Daly and Morgan come in.

## II.      Daly's and Morgan's importance to the Committee's investigation

The Tax Division of DOJ handles all criminal proceedings "arising under the internal revenue laws."  28 C.F.R. § 0.70.  As a result, the Tax Division was, and is, closely involved with the Hunter Biden investigation.  Daly, a Tax Division Senior Litigation Counsel, and Morgan, then a Tax Division Trial Attorney, were assigned to work on the investigation.  Decl., Ex. C at 36; Ex. D at 134.  Based on the information the Committee has developed to date, they have "knowledge of the day-to-day operation of the Hunter Biden investigation [that] is critical to" its investigation.  Decl., Ex. G at 75.

For example, both were present at an October 2021 "tax summit" where all the prosecutors, including Daly and Morgan, agreed to move forward with generating a prosecution memorandum that would recommend charges against Hunter Biden for tax years 2014 to 2019, with felony charges for 2014 and 2018.  Decl., Ex. D at 32-33.  In line with this agreement, the IRS finalized a Special Agent Report on January 27, 2022, recommending charges for 2014 to 2019.  Decl., Ex. C at 42-43.  Prosecutors, including Daly, agreed with the report's recommendation.  *Id.* at 43.  However, in an apparently abrupt about-face, Daly and Morgan then gave a presentation on June 15, 2022, arguing that Hunter Biden should *not* be charged for the 2014 and 2015 tax years, the same tax years for which DOJ ultimately allowed the statute of limitations to lapse without bringing charges.  Decl., Ex. G at 33.  Daly and Morgan are thus critical witnesses for answering questions related to this topic.

Additionally, Daly has unique insight into Weiss's unsuccessful efforts to partner with the U.S. Attorneys for the District of Columbia and Central District of California to bring charges against Hunter Biden.  As discussed above, according to an IRS whistleblower, Daly was part of the team of prosecutors that participated in a March 2022 meeting with the U.S. Attorney's Office for the District of Columbia.  And according to one of the IRS whistleblowers, Daly gave a presentation to the U.S. Attorney's Office for the Central District of California about bringing charges against Hunter Biden for the 2016 through 2019 tax years.  Decl., Ex. N.

The Committee has attempted to get information from other sources but has been unable to obtain information that Daly and Morgan possess.  For example, the Committee interviewed Weiss, but he declined to answer questions relating to "any aspect" of "the merits [of] the investigation," including why DOJ permitted the statute of limitations to lapse for charges related to tax years 2014 and 2015.  Decl., Ex. S at 20-21.  The Committee also interviewed Lesley Wolf, a former senior member of the prosecution team, but she too refused to answer most of the Committee's questions and refused to answer questions about DOJ permitting the statute of limitations to lapse for charges related to tax years 2014 and 2015.  Decl., Ex. YY at 99.

The Committee has also interviewed other witnesses such as Stuart Goldberg, the Acting Deputy Assistant Attorney General of DOJ's Tax Division, and senior FBI supervisors.  But they lacked the granular familiarity with many issues related to the investigation that Daly and Morgan possess.  Finally, although the Committee has interviewed Graves and Estrada, they either refused to answer the Committee's questions or gave testimony that heightened the Committee's need to hear from Daly and Morgan.  For example, Graves declined to elaborate on his decision to not partner with Weiss to bring charges against Hunter Biden for tax years 2014

and 2015, citing the fact that the investigation was ongoing, Decl., Ex. Q at 24, and gave

testimony about his role in the case that was inconsistent with whistleblower testimony.

      In sum, Daly and Morgan have personal knowledge of information that is critical to the

Committee's investigation, information the Committee has diligently tried, without success, to

obtain from other sources.

### III.    The Committee attempted to get testimony from Daly and Morgan through the accommodation process, but negotiations are at an impasse

      On June 29, 2023, the Committee sent a letter to DOJ seeking voluntary transcribed

interviews with several DOJ employees involved in the Hunter Biden investigation, including

Daly and Morgan.  Decl., Ex. J.  There, the Committee explained that it "must obtain the first-

hand testimony from these individuals to fully assess the serious allegations raised by these brave

IRS whistleblowers."  *Id.* at 1.  After several correspondences, DOJ agreed only to make Weiss

and certain other witnesses available for interviews.  *See* Decl. Exs. T, H, and U.  DOJ never

made Daly and Morgan available to testify before the Committee.

      Because DOJ did not agree to make Daly and Morgan available for voluntary transcribed

interviews, the Committee subpoenaed each of them on September 14, 2023, for depositions on

September 27 and 28, 2023, respectively.  Decl., Exs. V and W.  The dates for Daly's and

Morgan's depositions were then moved to October 26 and November 6, respectively, to

accommodate their schedules.  On October 24, 2023, two days before Daly was scheduled to

testify, Daly's personal attorney wrote to the Committee stating that Committee staff "were

exceedingly gracious and professional regarding the [S]ubpoena," and that Daly would abide by

the Subpoena, with the caveat that he would "follow whatever instructions are clearly given by

[DOJ]."  Decl., Ex. AA at 1, 2.  In essence, Daly made clear that but for DOJ directing him to

ignore the Committee's Subpoena, he would abide by it.

The next day, October 25, 2023, DOJ directed Daly not to obey the Subpoena.  Decl., Ex. BB.  The only reason proffered by DOJ to Daly was that because agency counsel could not accompany Daly to the deposition, the Subpoena lacked legal effect.  *Id.* at 2.  DOJ's letter cited a single source for this proposition: a 2019 opinion issued by DOJ's Office of Legal Counsel (OLC) claiming that "Committee subpoenas purporting to require the witnesses to appear without agency counsel [are] legally invalid and not subject to civil or criminal enforcement." *Attempted Exclusion of Agency Couns. from Cong. Depositions of Agency Emps.*, 43 Op. O.L.C. __, 2019 WL 2563045, at *2 (May 23, 2019) (May 2019 OLC Opinion).  The same day, DOJ also wrote a letter to the Committee.  Decl., Ex. CC.  It too declared that the Subpoenas lacked legal effect due to the agency counsel issue and cited the same OLC opinion.  *Id.* at 8.  Daly abided by DOJ's letter and did not appear for his deposition the next day.  As for Morgan, his personal counsel also stated that Morgan had no "per se" objection to appearing for the deposition, but that he too would follow DOJ's guidance.  Decl., Ex. EE at 1.  On November 2, 2023, DOJ directed Morgan to not appear for his deposition for the same reasons it offered to Daly.  Decl., Ex. FF.  Morgan did not show up to his November 6, 2023 deposition.

As a last-ditch attempt at placating DOJ to avoid the need for the Committee to initiate litigation, on February 22, 2024, the Committee again issued new Subpoenas that required Daly and Morgan to appear for depositions on March 1, 2024.  Decl., Exs. A and B.  While, as explained further below, the House's decision not to allow agency counsel to attend depositions is a legitimate exercise of its constitutional authority to adopt its own rules and procedures, the Committee nonetheless offered the "extraordinary accommodation … to allow agency counsel to remain physically present just outside the Committee room in which the deposition will occur."

Decl., Exs. HH at 5 and II at 5.  This was so that Daly, Morgan, or their counsel could request a recess to consult with agency counsel "at any time."  Decl., Exs. HH at 5 and II at 5.

The cover letters for the new Subpoenas noted that their testimony is "necessary" to the Committee's investigation into "whether sufficient grounds exist to draft articles of impeachment against President Joseph R. Biden," pursuant to House Resolution 918, which directed the Committee to continue the House's impeachment inquiry.  Decl., Exs. HH at 1 and II at 1.  The letters explained how "[a]s part of its impeachment inquiry, the Committee is investigating, among other things, whether President Biden 'abuse[d] his power as President to impede, obstruct, or otherwise hinder investigations or the prosecution of Hunter Biden.'"  Decl., Exs. HH at 1 and II at 1.  It then explained how as part of its investigation, "[s]ome of the information the Committee has uncovered suggest that political interference may have impeded the Hunter Biden investigation and prosecution."  Decl., Exs. HH at 2 and II at 2.  Because they each were "a member of the team that was assigned to work on the Hunter Biden matter," the Committee believes that Daly and Morgan "have firsthand knowledge of the investigation's day-to-day operations," which is "critical to the impeachment inquiry."  Decl., Exs. HH at 2 and II at 2.

On February 24, 2024, Daly's personal attorney wrote to the Committee, again stating that Daly would appear absent any contrary instruction from DOJ.  Decl., Ex. JJ.  That instruction came on February 29, when DOJ directed both Daly and Morgan not to appear for the same reason it provided in its earlier direction letters, *see generally* Decl., Exs. KK and LL, citing the same OLC opinion as well as a second OLC opinion, also from 2019, *see Exclusion of Agency Couns. from Cong. Depositions in the Impeachment Context*, 43 Op. O.L.C. __, 2019 WL 6047055 (Nov. 1, 2019) (November 2019 OLC Opinion).  As a result, neither Daly nor Morgan appeared for their depositions on March 1, 2024.

**IV.    The Committee's constitutional authority to conduct investigations, as part of and including an impeachment inquiry, and to issue subpoenas to advance its investigations**

The Committee's authority to conduct this investigation—and to issue subpoenas to execute it—comes from Article I of the Constitution.  The Committee's ability to investigate DOJ's handling of the Hunter Biden matter rests on two independent constitutional bases.

The impeachment power is textually committed by the Constitution to the House and the House alone.  U.S. Const. art. I, § 2, cl. 5.  This power is far-reaching, as with "an impeachment investigation involving the President of the United States[,] [i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair inquiry based on all the pertinent information." *Rep. & Recommendation*, 370 F. Supp. at 1230.  Even prior presidents have admitted that an impeachment inquiry "penetrate[s] into the most secret recesses of the Executive Department" and includes the authority to "command the attendance of any and every agent of the Government, and compel them to produce all papers, public or private, official or unofficial, and to testify on oath to all facts within their knowledge."  4 J. Richardson, *A Compilation of the Messages and Papers of the Presidents*, H. Misc. Doc. 53-210, at 434 (1897) (statement of President James K. Polk), https://perma.cc/82XR-DWJ2.  The Committee's jurisdiction includes impeachment. *Constitution, Jefferson's Manual, and Rules of the House of Representatives of the United States*, H. Doc. 117-161, § 605, at 329 (2023), https://perma.cc/3HCB-WYMP.  Impeachment resolutions are normally referred by the Speaker of the House to the Committee and are eligible for consideration pursuant to applicable House and Committee Rules. *See* House Rule XI.2(b), (c)(1); *see also* Rule II(c), Rules of the Committee on the Judiciary of the U.S. House of Representatives, 118th Cong. (2023) (Judiciary Committee Rules), https://perma.cc/6UUS-LYEH.

In September 2023, the Committee launched its impeachment inquiry.  That inquiry is assessing, among other things, whether President Biden directly or indirectly obstructed DOJ's investigation of his son, Hunter Biden.  The full House formalized that inquiry in December 2023, *see generally* H. Res. 918, 118th Cong. (2023), and it confirmed that the Committee has the authority to issue subpoenas as part of its investigation, *see id.* § 6 (adopting House Resolution 917); H. Res. 917, 118th Cong. § 2 (2023), https://perma.cc/57G5-C54Y.

Separate from the House's impeachment power, Article I of the Constitution vests Congress with "[a]ll legislative Powers."  U.S. Const. art. I, § 1, cl. 1.  Those powers include the authority to investigate matters relating to subjects within its broad legislative purview; conduct oversight of Executive Branch agencies; examine whether Executive Branch agencies are faithfully, effectively, and efficiently executing the laws; and determine whether changes to federal law are necessary and proper.  DOJ is one of the Executive Branch agencies over which the Committee has oversight authority.  *See* House Rule X.1(*l*)(1), (7).[6]  For nearly a century, the Supreme Court has recognized that the Constitution vests the House with the "power of inquiry—with process to enforce it"—commensurate with the House's Article I legislative authority to investigate any subject on which "legislation could be had."  *McGrain v. Daugherty*, 273 U.S. 135, 174, 177 (1927).  This power has been delegated to the Committee.  *See, e.g.*, House Rule XI.2(m) (delegating subpoena power).

In sum, the Judiciary Committee has plenary authority—under its solemn power of impeachment and from its constitutional authority to conduct legislative oversight—to investigate DOJ's handling of the investigation of Hunter Biden, including whether President

---

[6] The House Rules establish various standing committees, including the Judiciary Committee, and delegate to each committee "jurisdiction and related functions."  *See generally* House Rule X.1.

Biden abused his power to interfere with that investigation, and to compel Defendants Daly and Morgan to appear and provide testimony.

## **LEGAL STANDARD**

To obtain a preliminary injunction, the Committee must show that (1) it is likely to succeed on the merits of its claim, (2) it is likely to suffer irreparable harm without preliminary relief, (3) the balance of equities tips in the Committee's favor, and (4) a preliminary injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The last two factors merge when the federal government is a party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016).

## **ARGUMENT**

Daly and Morgan have violated their legal duty to comply with the Committee's lawfully issued Subpoenas, and their defiance is obstructing the Committee's investigation. DOJ's position that the Subpoenas are unenforceable—to which Daly and Morgan deferred—has no merit. The Constitution empowers the House to adopt its own rules. It has had a version of the agency counsel rule for decades, and many Executive Branch employees have testified in Congressional depositions without agency counsel. And as three Judges of this Court have found, this is the type of case the Court has the power to resolve, and the Committee's requested relief—which will protect its legal right to Daly's and Morgan's testimony—is within the Court's authority to grant. This Court should enjoin Daly and Morgan to appear for their depositions.

I.   **This Court has authority to resolve this case**

A.   **The Committee has standing under binding D.C. Circuit precedent**

"For more than forty years this circuit has held that a House of Congress has standing to pursue a subpoena enforcement lawsuit in federal court." *Comm. on Judiciary v. McGahn*, 968

F.3d 755, 771 (D.C. Cir. 2020) (en banc) (*McGahn En Banc*).  The D.C. Circuit's en banc

decision controls here.  There, the Committee sued to enforce a subpoena compelling Donald F.

McGahn, II, the former White House Counsel, to appear for testimony.  *Id.* at 761-62.  The full

D.C. Circuit held that the Committee had "Article III standing to protect against the denial of that

to which it alleges it is entitled, namely McGahn's testimony in response to its duly issued

subpoena."  *Id.* at 763.  The court explained that "[b]ecause the Committee's injury has been

caused by McGahn's defiance of its subpoena and can be cured here only by judicial

enforcement of the subpoena, the injury is traceable to McGahn's conduct and judicially

redressable."  *Id.*

This case is indistinguishable from *McGahn En Banc* and the forty years of legal

precedent it reviewed.  The failure of Daly and Morgan to comply with their Subpoenas has

injured the Committee; that injury is directly traceable to them; and this Court can remedy it.

*See also Comm. on Oversight & Gov't Reform v. Holder*, 979 F. Supp. 2d 1, 20 (D.D.C. 2013)

("[I]t [is] well established that a legislative body suffers a redressable injury when that body

cannot receive information necessary to carry out its constitutional responsibilities."  (alterations

in original) (citation omitted)).  Binding Circuit precedent thus conclusively holds that the

Committee here may sue to vindicate its institutional interests.

### B.   The Court has subject matter jurisdiction under 28 U.S.C. § 1331

The Committee brought this suit to enforce Subpoenas that it issued as part of its Article

I authority.  The case thus arises under the Constitution, and the Court has subject matter

jurisdiction under 28 U.S.C. § 1331.

"The district courts shall have original jurisdiction of all civil actions arising under the

Constitution."  28 U.S.C. § 1331.  Here, the Committee seeks to enforce subpoenas for

testimony relevant to its ongoing impeachment inquiry and legislative oversight responsibilities. Because the Committee's "subpoena power derives implicitly from Article I of the Constitution, the case ar[ises] under the Constitution for purposes of section 1331." *Holder*, 979 F. Supp. 2d at 17; *accord Comm. on Judiciary v. Miers*, 558 F. Supp. 2d 53, 64-65 (D.D.C. 2008) (*Miers I*); *see also United States v. AT&T*, 551 F.2d 384, 388-89 (D.C. Cir. 1976) (*AT&T I*).

Congress did not impliedly withdraw federal courts' jurisdiction to hear House subpoena-enforcement cases under § 1331 when it enacted a statute that explicitly provides jurisdiction over Senate subpoena-enforcement cases without mentioning the House at all. *See generally* 28 U.S.C. § 1365. Two Judges of this Court have considered whether the Senate statute prevents courts from exercising jurisdiction over a House subpoena-enforcement case, and both concluded that it does not. *See McGahn*, 415 F. Supp. 3d at 175-76;[7] *Holder*, 979 F. Supp. 2d at 17-20.[8]

This is unsurprising because "[t]he mere fact that some acts are made reviewable should not suffice to support an implication of exclusion as to others." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 643 (2002) (citation omitted). Here, the Committee's enforcement suit presents a federal question, and nothing in § 1365, which "merely makes some other [subpoena enforcement] actions … reviewable in federal court," "displays any intent to withdraw federal jurisdiction under § 1331." *Id.* at 643-44. Indeed, "jurisdiction conferred by

---

[7] The *McGahn* decision was reversed on Article III standing grounds by a D.C. Circuit panel. *Comm. on Judiciary v. McGahn*, 951 F.3d 510, 513 (D.C. Cir. 2020). The en banc Court reversed the panel, holding that the Committee did have standing, and remanded the case back to the panel, *McGahn En Banc*, 968 F.3d at 778, which then held that the Committee lacked a cause of action, *Comm. on Judiciary v. McGahn*, 973 F.3d 121, 123 (D.C. Cir. 2020) (*McGahn Vacated Panel*). The en banc Court again vacated the panel decision, but the parties settled, and the appeal was dismissed before the Court could rehear the case en banc.

[8] The defendants in *Miers I* conceded that the Court had jurisdiction under § 1331. *Miers I*, 558 F. Supp. 2d at 64.

20

28 U.S.C. § 1331 should hold firm against 'mere implication flowing from subsequent legislation.'" *Mims v. Arrow Fin. Servs., LLC*, 565 U.S. 368, 383 (2012) (citation omitted); *see also id.* at 379.  And "[i]n the absence of some affirmative showing of an intention to repeal, the only permissible justification for a repeal by implication is when the earlier and later statutes are irreconcilable." *Morton v. Mancari*, 417 U.S. 535, 550 (1974); *see also Me. Cmty. Health Options v. United States*, 140 S. Ct. 1308, 1323 (2020).  Here, §§ 1365 and 1331 do not conflict; therefore § 1365 in no way affects this Court's jurisdiction under § 1331.

### C.    The Committee may bring this action to enforce its Subpoenas

The Committee has a constitutional right—under Article I—to Daly's and Morgan's testimony.  This Court may remedy that constitutional violation by requiring Daly and Morgan to appear.  The Court does not need statutory authorization to do so because we are dealing with a constitutional right, not a statutory one.  And regardless, the Declaratory Judgment Act provides any necessary authorization.

### 1.    The Committee has an equitable cause of action

Just as Article I gives the Committee the power to investigate—and to compel testimony via subpoena as part of that investigative authority—it confers on the Committee the corollary power to sue to enforce a subpoena.  *See Quinn v. United States*, 349 U.S. 155, 160-61 (1955) (noting that Congress has "the authority to compel testimony, either through its own processes or through judicial trial" (footnote omitted)); *McGrain*, 273 U.S. at 174 ("We are of [the] opinion that the power of inquiry—with process to enforce it—is an essential and appropriate auxiliary to the legislative function.").  Indeed, two Judges of this Court have expressly found that a House committee has a cause of action under the Constitution to enforce a subpoena.

**a.** The Committee filed this suit to vindicate a constitutional right, and courts regularly protect constitutional rights by preventing Executive Branch officials from violating them. This case is no different. The Committee has a legal right—one that flows directly from its authority under Article I—to Daly's and Morgan's testimony. *See, e.g.*, *Miers I*, 558 F. Supp. 2d at 91 ("[B]y utilizing its power to issue subpoenas and proceed with an investigation via compulsory process, Congress creates a *legal right* to the responsive information that those subpoenas will yield."). By refusing to comply with their Subpoenas, Daly and Morgan are depriving the Committee of information to which it is entitled and thus are interfering with the Committee's Article I impeachment power and legislative oversight authority. *Cf. McGahn En Banc*, 968 F.3d at 765 ("The House … has a long-recognized right, based in the Constitution, to have McGahn appear to testify and produce documents. … By refusing to testify in response to the Committee's concededly valid subpoena, McGahn has denied the Committee something to which it alleges it is entitled by law.").

This Court has the equitable authority to prevent Daly and Morgan from violating the Committee's constitutional rights by enjoining them to appear before the Committee. *See, e.g.*, *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015) ("[I]n a proper case, relief may be given in a court of equity ... to prevent an injurious act by a public officer." (second alteration in original) (quoting *Carroll v. Safford*, 44 U.S. (3 How.) 441, 463 (1845))); *Bell v. Hood*, 327 U.S. 678, 684 (1946) ("[I]t is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution …."). Indeed, the Supreme Court has noted that "[t]he ability to sue to enjoin unconstitutional actions by state and federal officers is the creation of courts of equity, and reflects a long history

22

of judicial review of illegal executive action, tracing back to England." *Armstrong*, 575 U.S. at 327.

Finally, the Supreme Court has allowed plaintiffs to bring suits to vindicate constitutional rights directly under the Constitution, just as the Committee has done here. *See, e.g.*, *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010) (rejecting the government's argument that faulted the plaintiffs for not pointing to any Supreme Court case that recognized "an implied private right of action directly under the Constitution to challenge governmental action under the Appointments Clause or separation-of-powers principles"); *Jacobs v. United States*, 290 U.S. 13, 16 (1933) (permitting plaintiff to bring suit directly under the Fifth Amendment based on allegations that the United States had taken his property for public use without just compensation).  Thus, the Committee may bring this suit to enforce the Subpoenas.

**b.**  Two Judges of the Court have expressly recognized the House can sue under Article I to enforce a subpoena.  In *Miers I*, this Court "conclude[d] that the Committee has an implied cause of action derived from Article I to seek a declaratory judgment concerning the exercise of its subpoena power."  558 F. Supp. 2d at 94.  This conclusion flowed from Supreme Court precedent "constru[ing] Article I … to find an implied right of investigation, and … an implied right to compel compliance with that investigative power, accruing to Congress."  *Id.* at 90.  The Court recognized that the Committee has other ways to try to compel compliance with subpoenas and concluded that those alternative remedies did not preclude the Committee from bringing a civil suit under Article I.  *See id.* at 91-92 (discussing the inherent contempt authority).  Finally, the Court explained why recognizing the Committee's implied cause of action does not raise the same concerns that recognizing an implied cause of action for damages might.  *See id.* at 94 (explaining that the Court's decision allows only the House and its committees to sue, and thus

would not "lead[] to a deluge of additional litigation," to enforce subpoenas and would not

negatively impact government employees or operations the way suits for damages might).[9]

More recently, this Court in *McGahn* reached the same conclusion. 415 F. Supp. 3d at

193 ("[A]s Judge Bates recognized in *Miers [I]*, Article I of the Constitution is all the cause that

a committee of Congress needs to seek a judicial declaration from the court regarding the

validity and enforceability of a subpoena that it has allegedly issued in furtherance of its

constitutional power of inquiry."). Its decision found that this result flowed directly from

Supreme Court precedent. *See id.* at 193-94. The Court also rejected the claim that recognizing

a House committee's ability to file a civil lawsuit to enforce a subpoena contradicts Supreme

Court precedent related to implied causes of action. *Id.* at 194. Rather, the Court emphasized

that the power to enforce subpoenas is just as much a part of the Article I power as the authority

to conduct investigations. *See id.*

This makes sense. As Supreme Court precedent recognizes, when the Constitution grants

a power, it also grants auxiliary powers that are necessary to exercising it. *Id.* ("There is not in

the whole of [the Constitution], a grant of powers which does not draw after it others, not

expressed, but vital to their exercise ...." (alteration in original) (quoting *Anderson v. Dunn*, 19

U.S. 204, 225-26 (1821))). And the ability to enforce subpoenas is necessary to the House's

ability to execute investigations by compelling witness testimony. Because the House

Committee in the *McGahn* litigation had the constitutional right to enforce its subpoena, and

because "the judiciary is clearly discernible as the primary means through which constitutional

---

[9] The Court in *Holder* "d[id] not take issue" with the *Miers I* Court's conclusion that the House has an implied cause of action under Article I, but the Court in *Holder* found it unnecessary to reach that issue after it found that the Declaratory Judgment Act provides a cause of action. *See* 979 F. Supp. 2d at 23 n.11.

rights may be enforced," the Court concluded that the Committee there had a cause of action to bring its suit.  *See id.* (citation omitted).

While a divided D.C. Circuit panel later held during the *McGahn* litigation that the House does not have a cause of action to enforce subpoenas, *see McGahn Vacated Panel*, 973 F.3d at 123, that decision was incorrect for several reasons, which is presumably why the full D.C. Circuit ultimately vacated it and agreed to rehear the case en banc.  *See* Order, *Comm. on Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. Oct. 15, 2020) (granting petition for rehearing en banc and vacating the panel decision).[10]

*First*, the panel's majority opinion improperly conflated recognition of a House committee's implied right to sue under the Constitution for injunctive relief to enforce a subpoena, with recognition of an implied right to sue under a statute or to sue for damages. Indeed, the majority's analysis started from the premise that courts should "hesitate before finding implied causes of action."  *See* 973 F.3d at 123.  But the cases it relied on to support that proposition dealt with recognizing implied causes of action either pursuant to a Congressional statute, *see id.* (citing *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1015 (2020); *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 262-63 (2018); and *Alexander v. Sandoval*, 532 U.S. 275, 286-87 (2001)), or for damages against federal officials, *see id.* (citing *Hernandez v. Mesa*, 140 S. Ct. 735, 741-43 (2020); and *Ziglar v. Abbasi*, 582 U.S. 120, 135 (2017)).  While courts should hesitate before recognizing a cause of action in these scenarios— which are fundamentally different from a House committee's ability to sue for injunctive relief to enforce a subpoena—there is no reason for the Court to hesitate here.

---

[10] Before the D.C. Circuit could rehear the case en banc, the parties settled, and McGahn's appeal was dismissed as moot.  *See* Order, *Comm. on Judiciary v. McGahn*, No. 19-5331 (D.C. Cir. July 13, 2021).

That is because a House committee's right to sue to enforce a subpoena involves a constitutional right, and recognizing that right does not create the same separation-of-powers issues that recognizing an implied right to sue under a Congressional statute might. "It is the judiciary, rather than Congress, that is traditionally regarded as the arbiter of constitutional rights and it is self-evident why courts do not look to congressional intent when construing the Constitution." *Miers I*, 558 F. Supp. 2d at 88. But Congressionally conferred statutory rights are meaningfully different. Courts should hesitate before recognizing an implied right to sue under a statute because it is Congress, not the Judiciary, that determines whether to allow a private person to sue to enforce a right that Congress itself has provided. *See id.* ("Numerous Supreme Court decisions … establish that plaintiffs seeking to imply a cause of action from a federal statute bear the heavy burden of proving that Congress clearly meant for the statute to provide a private *right* to a class of individuals and that Congress also intended the statute to create a private federal *remedy*.").

Relatedly, recognizing a right to sue federal officials for damages raises concerns that recognizing a House committee's right to sue to enforce a subpoena does not, just as this Court explained in *Miers I*. *See* 558 F. Supp. 2d at 94; *see also McGahn*, 415 F. Supp. 3d at 208 ("Nor can DOJ reasonably rely on the well-established body of case law that applies to the very different circumstance of immunity from civil damages."). Indeed, given the Judiciary's long history of preventing federal officials from violating constitutional rights, the Supreme Court has explained that cases seeking redress "designed to halt or prevent [a] constitutional violation rather than the award of money damages … 'd[o] not ask the Court to imply a new kind of cause of action.'" *United States v. Stanley*, 483 U.S. 669, 683 (1987) (citation omitted).

*Second*, the majority opinion wrongly assumed that Congress must authorize the House's right to enforce a subpoena, even though that right comes directly from Article I.  Working from this flawed premise, the majority opinion concluded that Congress had declined to do so by authorizing the Senate, but not the House, to bring subpoena-enforcement actions.  *See McGahn Vacated Panel*, 973 F.3d at 123 (citing 2 U.S.C. § 288d and 28 U.S.C. § 1365(b)).  But this analysis misunderstands the nature of the right: the House's ability to sue to enforce a subpoena comes directly from Article I, and it does not require any Congressional authorization.  The Senate-specific statutes are thus beside the point.  And if the House did need Congressional authorization, as we explain below, the Declaratory Judgment Act provides it.  *See, e.g.*, *McGahn*, 415 F. Supp. 3d at 195.

*Third*, when considering whether courts have traditionally provided the equitable relief that the House committee sought, the majority opinion considered only whether there were historical examples that involved the same facts.  *See McGahn Vacated Panel*, 973 F.3d at 372 ("The Committee cannot point to a single example in which a chamber of Congress brought suit for injunctive relief against the Executive Branch prior to the 1970s.").  But when considering whether a litigant is asking for relief that courts of equity have traditionally provided, it makes more sense to focus on the type of relief, not the specific facts at issue.  The House Committee in *McGahn* was simply asking the court to remedy the Executive Branch's unconstitutional action.  Courts have long provided that relief as part of their equitable authority.  *See, e.g.*, *Armstrong*, 575 U.S. at 325.

**c.**  Finally, there are no special cause-of-action rules for cases that pit two government branches against each other.  In *Free Enterprise Fund*, the Supreme Court found no barrier to an "implied private right of action directly under the Constitution to challenge governmental action

under … separation-of-powers principles."  561 U.S. at 491 n.2 (citation omitted).  And in other cases involving Congressional subpoenas, both the D.C. Circuit and the Supreme Court have permitted the Executive Branch as well as the President in his personal capacity to seek equitable relief to vindicate their constitutional prerogatives.  *See United States v. AT&T*, 567 F.2d 121, 130-31 (D.C. Cir. 1977) (*AT&T II*); *Trump v. Mazars USA, LLP*, 591 U.S. 848 (2020).  It cannot be the case that the Executive Branch may pursue equitable relief when its constitutional interests are impacted, but the House cannot.

### 2.      The Committee has a cause of action under the Declaratory Judgment Act

Three Judges of this Court have concluded that a House committee may sue under the Declaratory Judgment Act to enforce a subpoena.  *See Miers I*, 558 F. Supp. 2d at 88; *Holder*, 979 F. Supp. 2d at 23-24; *McGahn*, 415 F. Supp. 3d at 195.  This Court should do the same.

The analysis is straightforward.  The Act empowers courts to declare parties' "rights" and "legal relations" where there is (1) an actual case or controversy and (2) federal jurisdiction.  28 U.S.C. § 2201(a).  Both these requirements are met here.  *First*, because, as explained above, the Committee has standing, it necessarily follows that there is an actual case or controversy.  *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) ("Standing to sue is a doctrine rooted in the traditional understanding of a case or controversy.").  *Second*, also as explained above, the Court has jurisdiction under 28 U.S.C. § 1331.  There are no other requirements under the Declaratory Judgment Act, and it thus authorizes the Committee to seek a judicial declaration of its right to compliance with its issued Subpoenas.

To be sure, the Act "presupposes the existence of a judicially remediable right."  *C&E Servs., Inc. v. D.C. Water & Sewer Auth.*, 310 F.3d 197, 201 (D.C. Cir. 2002).  But that judicially remediable right exists: "[t]he Constitution itself is the source of the right of compulsory process

28

that the Committee seeks to vindicate here." *McGahn Vacated Panel*, 973 F.3d at 127-29

(Rogers, J., dissenting); *see also Miers I*, 558 F. Supp. 2d at 88 ("It is the Constitution, and not

any independent cause of action, that supplies the basis for Congress's right to invoke the DJA

here."); *Holder*, 979 F. Supp. 2d at 23 (explaining that the House committee "has alleged an

actual injury to rights derived from the Constitution").  Relying on its mistaken conclusion that

the Constitution does not give the House a right to sue to enforce a subpoena, the majority panel

opinion in *McGahn Vacated Panel* wrongfully concluded that the House Committee could not

sue under the Act.  *See* 973 F.3d at 124-25.  This Court should instead follow the logic of *Miers*

and *Holder* and conclude that the Committee may bring its suit under the Act.

### D.        This case is otherwise justiciable

There is no other reason that prevents the Court from hearing this case.  As outlined

above, the Committee has tried for months to secure Daly's and Morgan's testimony.  It first

offered voluntary interviews, then it subpoenaed Daly and Morgan, and finally, it offered the

"extraordinary accommodation [of] allow[ing] agency counsel to remain physically present just

outside the Committee room in which the deposition will occur" so that they or their counsel can

request a recess to consult with agency counsel "at any time."  Decl., Exs. HH at 5 and II at 5.

DOJ has rejected all these efforts, and the parties are at an impasse.  With further negotiations

now futile, and the damage to the Committee growing every day, this Court's speedy

intervention is warranted.  *See Holder*, 979 F. Supp. 2d at 25 ("It is sufficient that [the Court]

finds the conclusion that there is an impasse to be inescapable, and that under those

circumstances, it does not appear that there would be any point to sending this matter back.").

Moreover, the "mere fact that there is a conflict between the legislative and executive

branches over a Congressional subpoena does not preclude judicial resolution of the conflict."

*AT&T I*, 551 F.2d at 390.  Courts have found justiciable numerous separation-of-powers disputes

between the Executive and Congress.  *See, e.g.*, *McGahn*, 415 F. Supp. 3d at 177; *Holder*, 979 F.

Supp. 2d at 4; *Miers I*, 558 F. Supp. 2d at 84-85; *AT&T II*, 567 F.2d at 125-130; *Senate Select*

*Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 728 (D.C. Cir. 1974) (en

banc); *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425 (1977).  And when it comes to cases about

subpoena enforcement, courts have been clear that they

> can identify no reason why that right cannot be vindicated by recourse to the federal
> courts ….  After all, courts routinely enforce subpoenas in favor of parties with
> rights to information.  The mere fact that this case involves a dispute between the
> political branches—or that such disputes are normally settled through negotiation
> and accommodation—is not sufficient to render the Committee's right non-
> judicially remedial.  That argument is foreclosed by precedent ….

*Miers I*, 558 F. Supp. 2d at 84-85.

Given that the parties are at an impasse, and that judicial review is particularly

appropriate where, as here, "the narrow legal question posed by the complaint is precisely the

sort of crisp legal issue that courts are well-equipped to address and routinely called upon to

resolve," *Holder*, 979 F. Supp. 2d at 4, this Court should hear the case.

## II.     The Committee will likely succeed on the merits of its claim that Daly and Morgan have violated their legal obligations to appear before the Committee for their depositions

A Congressional subpoena for testimony triggers a legal obligation to comply.  Yet Daly

and Morgan deferred to OLC's view that the Subpoenas are categorically unenforceable because

the agency counsel rule purportedly interferes with the President's ability to control the

substance of their testimony.  OLC's argument is fundamentally flawed because concerns about

disclosing purportedly privileged information in no way affect the legality of the Subpoenas

themselves.  Daly and Morgan must appear and raise any privilege claims as the Committee asks

questions.  Putting aside the flaw in OLC's logic, the agency counsel rule is a lawful exercise of the House's expansive rulemaking authority.

### A.   Daly and Morgan have a legal obligation to appear before the Committee in response to lawfully issued Congressional subpoenas

The Supreme Court has long held that "where [Congress does not] possess the requisite information … recourse must be had to others who do possess it."  *McGrain*, 273 U.S. at 175.  Therefore, "some means of compulsion are essential to obtain what is needed," *id.*, with that being a Congressional subpoena, *Eastland*, 421 U.S. at 504 ("Issuance of subpoenas … has long been held to be a legitimate use by Congress of its power to investigate.").  In turn, the House has delegated its subpoena power to committees.  The House Rules empower all standing committees, including the Judiciary Committee, to "conduct at any time such investigations and studies as it considers necessary or appropriate in the exercise of its responsibilities" over matters within its jurisdiction.  House Rule XI.1(b)(1).  To aid these inquiries, the Judiciary Committee, like all standing committees, is authorized to issue subpoenas.  House Rule XI.2(m)(1)(B), (3)(A)(i); *see also* Judiciary Committee Rules IV(a).  And the full House has confirmed that the Committee has the "authority to issue subpoenas" for purposes of the impeachment inquiry.  H. Res. 917, 118th Cong. § 2 (2023).  Consequently, the Committee, pursuant to its delegated powers, issued legally valid Subpoenas for Daly's and Morgan's appearance, and neither Daly, Morgan, nor DOJ has identified any procedural defect with the Subpoenas themselves.

Having received lawfully issued Subpoenas, Daly's and Morgan's legal obligation is clear: they must appear before the Committee.  "When Congress seeks information …, it 'unquestionably' remains 'the duty of *all* citizens to cooperate.'"  *Mazars*, 591 U.S. at 871 (quoting *Watkins v. United States*, 354 U.S. 178, 187 (1957)).  "The Supreme Court has made it abundantly clear that compliance with a congressional subpoena is a legal requirement."  *Miers I*,

558 F. Supp. 2d at 99.  Indeed, for Daly and Morgan, "[i]t is their unremitting obligation to respond to subpoenas, to respect the dignity of the Congress and its committees and to testify fully with respect to matters within the province of proper investigations."  *Id.* at 84 (quoting *Watkins*, 354 U.S. at 187-88) *see also United States v. Bryan*, 339 U.S. 323, 331 (1950) ("We have often iterated the importance of this public duty [to comply with Congressional subpoenas], which every person within the jurisdiction of the Government is bound to perform ….").  Daly and Morgan have violated their legal duty by failing to appear.

Their refusal to comply with the Subpoenas cannot be excused with a claim of "following orders."  For one, the Executive Branch's direction to disobey a legal command from a coordinate branch of government does not create a conflicting legal obligation.  "The President's authority to act … 'must stem either from an act of Congress or from the Constitution itself.'"  *Medellin v. Texas*, 552 U.S. 491, 524 (2008) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)).  Here, DOJ's letters directing Daly and Morgan not to appear stem from neither, as instructing employees to ignore a Congressional subpoena is certainly not based on any act of Congress and, for the reasons explained below, is not within the realm of Executive powers.  *See Youngstown Sheet & Tube Co.*, 343 U.S. at 588-89 (holding unlawful the President's order to the Secretary of Commerce to seize steel mills as it exceeded the scope of the President's power).  Daly's and Morgan's actions have deprived the Committee of its constitutional right to information and are unlawful.

**B.      The OLC Opinions do not affect the legality of the Subpoenas**

The May 2019 OLC Opinion asserted that subpoenas issued pursuant to the House's legislative oversight powers to one current and one former Executive Branch official were unenforceable because House Rules do not permit agency counsel to attend depositions.  The November 2019 OLC Opinion expanded that logic to cover impeachment investigations.  In both

opinions, OLC claimed that the House's exclusion of agency counsel interferes with the President's ability to control the disclosure of privileged information and to supervise Executive Branch communications with Congress.  But setting aside the merits of OLC's claims (which we address below), OLC's argument applies only to the substance of what Executive Branch employees disclose to Congress; it does not address the legality of the Subpoenas themselves. Whether a witness must disclose specific information "is entirely distinct from the question of whether the recipient of a subpoena has the legally enforceable duty to perform in response to a subpoena at all."  *McGahn*, 415 F. Supp. 3d at 168.

As explained by then-Judge Ketanji Brown Jackson in *McGahn*, "if a subpoena is valid and the recipient is not otherwise privileged to ignore it, then some response is due by ordinary operation of the law."  *Id.*  The response due to the Committee's Subpoenas is that Daly and Morgan appear at the requested time and location for Committee questioning.  Given that Daly and Morgan enjoy no personal privilege to ignore their Subpoenas, *see, e.g.*, *Comm. on Judiciary v. Miers*, 575 F. Supp. 2d 201, 205 (D.D.C. 2008) (*Miers II*) ("[T]he Executive has not identified any case law that indicates that *any* individual is immune from compliance with congressional subpoenas …."), they were required to appear before the Committee at the prescribed time and place to answer questions.

The *Miers* litigation reinforces that purported privilege claims do not affect a witness's obligation to appear for a deposition when subpoenaed.  There, the House Committee subpoenaed the White House Counsel, Harriet Miers, for testimony, and she ignored it because of another OLC opinion that reasoned she was absolutely immune due to executive privilege. *Miers I*, 558 F. Supp. 2d. at 62.  But the Court held that Miers was "not excused from compliance with the Committee's subpoena by virtue of a claim of executive privilege that may

33

ultimately be made.  Instead, she must appear before the Committee to provide testimony, and invoke executive privilege where appropriate."  *Id.* at 106.  *Miers*'s analysis of the privilege issue is consistent with other "common law privileges;" when invoked, "the privileged information is omitted from the testimony."  *McGahn*, 415 F. Supp. 3d at 168-69.  Thus, any privilege claims are dealt with on a question-by-question basis, not by categorically refusing to appear.  *Id.* at 200 ("[I]f a duly authorized committee of Congress issues a valid legislative subpoena to a current or former senior-level presidential aide, the law requires the aide to appear as directed, and assert executive privilege as appropriate.").

As *Miers I* simply put it, "[t]he Committee's primary argument on this point is incredibly straight-forward.  Ms. Miers was the recipient of a duly issued congressional subpoena.  Hence, she was legally obligated to appear to testify before the Committee on this matter, at which time she could assert legitimate privilege claims to specific questions or subjects."  558 F. Supp. 2d at 99.  The same is true here.  The OLC Opinions do not engage with the analytical distinction between the duty to disclose certain information and the separate duty to comply with a legally issued subpoena by appearing, and it cites no authority to support its leap that purported privilege claims affect the legality of a subpoena.  In short, nothing in the OLC Opinions changes the fact that Daly and Morgan are legally obligated to appear for their depositions.

### C.     The House has authority under the Constitution to prevent agency counsel from attending depositions

Each chamber "may determine the Rules of its Proceedings."  U.S. Const. art. 1, § 5, cl. 2.  This rulemaking power is a "broad delegation of authority to [each chamber] to determine how and when to conduct its business."  *NLRB v. Noel Canning*, 573 U.S. 513, 550 (2014).  In fact, "'all matters of method are open to the determination' of [each chamber], as long as there is 'a reasonable relation between the mode or method of proceeding established by the rule and the

result which is sought to be attained' and the rule does not 'ignore constitutional restraints or violate fundamental rights.'" *Id.* (quoting *United States v. Ballin*, 144 U.S. 1, 5 (1892)). "The power to make rules is not one which once exercised is exhausted. It is a continuous power, always subject to be exercised by the house, and, within the limitations suggested, absolute and beyond the challenge of any other body or tribunal." *Ballin*, 144 U.S. at 5. The agency counsel rule is a valid exercise of the House's rulemaking authority.

**1.** The House has chosen to exercise its "absolute" rulemaking power by excluding agency counsel from depositions to ensure that witnesses are not intimidated or chilled into less-than-absolute candor by the presence of lawyers who represent the interests of their employer. This is especially important when a witness's interests depart from that of the employing agency, such as when the witness has information that reflects poorly on the employing agency.

These concerns are not abstract here. An impeachment inquiry necessarily means ascertaining facts that could inculpate the President, so his interests and those of Executive Branch lawyers will necessarily diverge from those having that information. Likewise, an oversight investigation into irregularities at DOJ could produce information that is damaging to DOJ leadership, so DOJ's interests and those of agency counsel will inevitably diverge from those having such information. Indeed, both Daly and Morgan have said that they personally have no objections to being deposed. Yet DOJ has instructed them not to testify, even though it has permitted other officials involved in the Hunter Biden investigation to speak with the Committee. This at least raises the possibility that the presence of DOJ counsel next to Daly and Morgan is meant to chill whatever they have to say to the Committee. By enforcing the agency counsel rule here, the Committee is protecting the integrity of its investigation.

**2.**   The agency counsel rule has a long pedigree in the House.  The practice began in the 1980s and 1990s when the House began regularly delegating the authority to conduct depositions to entities such as a select committee and task force.  *See, e.g.*, Decl., Exs. RR and SS.  In providing this authority, the House permitted the select committee and the task force to adopt rules regulating depositions, including regulations regarding who could attend.  *See, e.g.*, Decl., Exs. RR, § 2, and SS, § 2.  In turn, the select committee and task force adopted rules that allowed personal counsel to accompany witnesses to advise them of their rights but did not allow agency counsel to attend.  *See, e.g.*, Decl., Exs. TT, Rule 7.3, and UU, Rule 7.3.

In 2007, the House elected to delegate deposition authority to certain standing committees.  H. Res. 6, 110th Cong. § 502 (2007), https://perma.cc/6PJ6-8TD3; Rule X.4(c)(3)(A), Rules of the House of Representatives, 110th Cong. (2007), https://perma.cc/V4GZ-FDVH.  Under the current House Rules, all standing committees but two have the authority to conduct depositions.  The relevant deposition regulations have always prevented agency counsel from attending, and in the 118th Congress, the full House adopted language as part of its rules package that expressly prevents agency counsel from attending depositions.  H. Res. 5, 118th Cong. § 3(k)(3) (2023), https://perma.cc/28AM-XD4R.

**3.**   The agency counsel rule has not been a mere formality: more than 175 Executive Branch witnesses have been deposed—under both Democratic and Republican control of the House—without agency counsel present.[11]  Given that the Supreme Court has long held that "the

---

[11] *See, e.g.*, H. Rep. No. 116-125, at 33-34 (2019) (report from the Oversight Committee, which was under Democratic control), https://perma.cc/2NQH-KUXP; H. Comm. on the Judiciary, *Abuse of Power, Waste of Resources, and Fear: What Internal Documents and Testimony From Career Employees Show About the FTC Under Chain Lina Khan* 5 (last visited Mar. 20, 2024) ("Repeatedly during the Committee's transcribed interviews of FTC staff, the FTC officials present at the interview—who were there to represent the interests of the FTC and

respective powers of those who are equally the representatives of the people[] are to be adjusted

… by the practice of the government [and] ought to receive a considerable impression from that

practice," *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 401 (1819); *PHH Corp. v. CFPB*,

839 F.3d 1, 21-25 (D.C. Cir. 2016) (summarizing Supreme Court cases using historical practice

as a method of constitutional interpretation in separation-of-powers cases), historical practice

supports the conclusion that the agency counsel rule is a valid exercise of the House's

constitutional rulemaking authority.

**4.**  Unlike the agency counsel rule that has been in place for many years, the OLC

Opinions on which Daly and Morgan presumably relied in deferring to DOJ's direction not to

appear were just published in 2019.  The opinions argue that preventing agency counsel from

attending depositions of Executive Branch employees who will testify about their official duties

"would impair the President's constitutional authority" in two ways: it would allegedly impair

his ability (1) "to control the disclosure of privileged information and" (2) "to supervise the

Executive Branch's communications with Congress."  *See, e.g.*, May 2019 OLC Opinion, 2019

WL 2563045 (introductory paragraph).  OLC claims that Congressional committees cannot

"constitutionally bar agency counsel from accompanying agency employees called to testify on

matters within the scope of their official duties" and advises that "subpoenas purporting to

require the witnesses to appear without agency counsel [are] legally invalid and not subject to

---

Chair Khan, not the witnesses—attempted to impede the Committee's fact-finding.  For
example, the Committee's questioning of FTC witnesses was repeatedly interrupted by FTC
counsel, and witnesses were directed not to answer the Committee's questions on a number of
topics …."), https://perma.cc/77JH-Q3M3; Oversight Comm. Democrats, *Committee
Depositions in the House of Representatives: Longstanding Republican and Democratic Practice
of Excluding Agency Counsel* 4-5 (last visited Mar. 20, 2024), https://perma.cc/3ZS3-4EEX.

civil or criminal enforcement." *Id.* at \*2.  The OLC Opinions lack legal support and, if accepted, would disrupt the balance of power between the Legislative and Executive Branches.

   **a.**  As an initial matter, OLC assumes that the only way the President can control the disclosure of privileged information and supervise communications is by having an Executive Branch lawyer in the room during a deposition.  This assumption has no basis in law or fact.

Legally, the OLC Opinions cite no authority for their assumption that alternative means, such as a letter directing an Executive Branch employee not to disclose certain information, would be insufficient to protect purportedly privileged information and to supervise these communications.  In the past, DOJ has done just that.[12]  It has even used this method in this investigation.  For example, DOJ authorized Wolf, one of the lead prosecutors on the Hunter Biden investigation, to testify only about certain topics when she appeared before the Committee for a transcribed interview without agency counsel present.  Decl., Ex. AAA.  Although Wolf was no longer a DOJ employee when she was interviewed, she was still, according to the analysis of the May 2019 OLC Opinion, "disclosing the Executive Branch's information."  *See* 2019 WL 2563045, at \*7.  The Executive Branch could also prepare the witness before the deposition.  In this case, for example, the Committee had made clear to Daly, Morgan, and DOJ many topics about which the Defendants will be questioned.  As a result, agency counsel can discuss these topics with the witnesses prior to their depositions and inform them of DOJ's view as to which questions they may not answer.

Moreover, if Daly or Morgan (or their personal counsel) is unsure after that preparation if they should answer any given question, because of the accommodation the Committee offered,

---

[12] *Cf. Justice Department tells Mueller to limit scope of congressional testimony*, CBS News (July 22, 2019, 7:24 PM), https://perma.cc/W4XS-PDZB.

they could request (and would be granted) a recess to confer with agency counsel who would be just outside the room.  OLC has pointed to no authority that suggests these alternatives would be inadequate.  Factually, it is simply not true that an Executive Branch lawyer must be in the room to prevent the disclosure of certain information.  *See, e.g.*, Jonathan David Shaub, *The Executive's Privilege*, 70 Duke L.J. 1, 68 (2020) ("Of course, the lack of agency counsel would not definitively result in the disclosure of any potentially privileged information.").  This is surely why more than 175 Executive Branch witnesses have appeared before House committees without agency counsel present.

**b.**  Likewise, OLC cites no legal authority to support its claim that the President must have absolute and unfettered authority (exercised through a physically present agency lawyer) to control what information Executive Branch employees disclose.  This Court's decision in *McGahn* implicitly rejected this absolutist view of the President's authority.  *See* 415 F. Supp. 3d at 213 ("[T]he primary takeaway from the past 250 years of recorded American history is that Presidents are not kings. … This means that they do not have subjects, bound by loyalty or blood, whose destiny they are entitled to control.").  Rather, while acknowledging that Executive Branch employees may at times have an obligation not to disclose certain information, *McGahn* concluded that it "is a duty that the [employee] herself possesses."  *Id.* (emphasis added).

Viewed this way, it is Daly's and Morgan's duty not to disclose any privileged information at issue, not necessarily the President's power to oversee and direct employees' communications.  And Daly and Morgan could discharge that duty by objecting to questions, with the assistance of personal counsel, that they think implicates privileged information.  They could also, because of the extraordinary accommodation the Committee offered, request a recess at any time to consult with agency counsel, who may sit outside the deposition room.  OLC

argues—again without citing to any legal authority—that this would not remedy the purported constitutional concerns that it identified because the accommodation, among other things, "would leave such judgments entirely up to the employee and his private counsel." *See* May 2019 OLC Opinion, 2019 WL 2563045, at *13. This again relies on an unsupported, absolutist view of the President's authority, one that is in tension with this Court's decision in *McGahn*.

**c.** OLC attempts to elevate the Executive's interests over the Legislative Branch's and, if adopted, would aggrandize the Executive at Congress's expense. OLC argues that a subpoena that potentially infringes on the President's authority to control the disclosure of information, in any way, is categorically unenforceable. *See* May 2019 OLC Opinion*, 2019 WL 2563045, at *2; see also* Shaub, *supra*, at 68 ("The [May 2019 OLC O]pinion rests on the premise that any burden on the president's authority to control the dissemination of information is unconstitutional—and may be countermanded by a presidential directive, without any need to analyze or balance congressional interest."). Yet, as explained above, OLC's position here would meaningfully interfere with Congress's Article I authority to obtain information by requiring the presence of agency counsel in all depositions of Executive Branch employees. While OLC insists, without any precedent whatsoever, that its absolutist position on the presence of agency counsel is a rigid constitutional requirement, the Committee's position, including the accommodations it has offered, recognizes each branch's legitimate interests.

Furthermore, the President's authority to refuse to disclose privileged material is necessarily limited by the privilege itself. *See* Shaub, *supra*, at 68 ("[T]his prophylactic doctrine [that OLC adopts] … is *absolute*, despite the fact that the underlying authority the privilege is purportedly necessary to protect—the president's authority to control the dissemination of information—is qualified."). Consider the deliberative process privilege, which is qualified in

two ways: it is limited to material that satisfies a certain legal standard, and it does not apply when there is evidence of governmental wrongdoing.  *In re Sealed Case*, 121 F.3d 729, 737-38 (D.C. Cir. 1997).  By arguing that subpoenas that compel testimony without the presence of agency counsel are categorically unenforceable, and by advising that witnesses like Daly and Morgan need not appear, OLC's advice prevents the Committee from gathering *any* information, not just the information that could be privileged.  The Court should reject this attempt to arrogate the Executive Branch at Congress's expense.

**III.    The Committee's ability to exercise its Article I powers is impeded, and it is entitled to injunctive relief**

The very nature of the Committee's investigation speaks to its urgency: the Committee is considering whether there are sufficient grounds to impeach a sitting President.  Daly and Morgan have important information critical to the Committee's investigation.  Their refusal to comply with the Committee's Subpoenas impedes the Committee's work.  For the reasons stated below, the Committee will suffer irreparable injury without injunctive relief, and the balance of the equities and the public interest are in its favor.  Under these circumstances, this Court should issue an injunction requiring Daly and Morgan to appear before the Committee.

**A.    Daly's and Morgan's refusal to testify is causing the Committee irreparable harm**

Daly's and Morgan's knowledge of the Hunter Biden investigation is not only comprehensive, it is also unique.  As explained above, the Committee must speak to both of them because it has been unable to acquire from other sources the information that they possess, and thus without their testimony, the Committee would be deprived of the information to which it is constitutionally entitled.  That alone is an irreparable harm because "where an obligation to disclose exists, plaintiffs may suffer irreparable harm if they are denied access to information

that is highly relevant to an ongoing public debate." *Dunlap v. Presidential Advisory Comm'n on Election Integrity*, 286 F. Supp. 3d 96, 110 (D.D.C. 2017).

Courts have also recognized that analogous invasions of constitutional prerogatives cause irreparable harm. For example, "suits for declaratory and injunctive relief against the threatened invasion of a constitutional right do not ordinarily require proof of any injury other than the threatened constitutional deprivation itself." *Gordon v. Holder*, 721 F.3d 638, 653 (D.C. Cir. 2013) (alteration and citation omitted). And "any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (alteration and citation omitted). Here, Daly's and Morgan's deference to DOJ's direction to disregard a lawful Congressional subpoena is hindering the Committee's performance of its constitutionally mandated duties. That constitutional injury is no less irreparable than those suffered by a private litigant enforcing a personal right or a state prevented from implementing a statute.

But the Committee's injury is temporal, too. And the harm caused by the deprivation of information, compounded by the ticking clock, is particularly acute. On the one hand, the very nature of impeachment is that it serves as a mechanism to remove the President before his term is over. As James Madison explained, "[t]he limitation of the period of [the President's] service[] was not a sufficient security" against incapacity or corruption, which could be "fatal to the Republic." *See* 2 *The Records of the Federal Convention of 1787*, at 65-66 (Max Farrand ed., 1911). Thus, "the Framers themselves" recognized "the public interest in *immediately* removing a sitting President whose continuation in office poses a threat to the Nation's welfare." *A Sitting President's Amenability to Indictment and Criminal Prosecution*, 24 Op. O.L.C. 222, 2000 WL 33711291, at * 27 (Oct. 16, 2000) (emphasis added). On the other hand, the

Committee is engaged in thoughtful and time-intensive consideration of the facts needed to determine whether to exercise its solemn power of impeachment, notwithstanding the fact that "the House … is not a continuing body."  *Eastland*, 421 U.S. at 512.

Thus, here, each day that Daly and Morgan do not testify they obstruct the Committee from deciding whether to recommend that the President be impeached, heighten the risk that crucial information relevant to this investigation may be lost or forgotten, and move the President one day closer to being able to run out the clock at the end of the 118th Congress. Every passing day "increase[s] the danger of prejudice resulting from the loss of evidence, including the inability of witnesses to recall specific facts."  *Clinton v. Jones*, 520 U.S. 681, 707-08 (1997).  "Indeed, the D.C. Circuit has held that 'stale information is of little value' … and that the harm in delaying disclosure is not necessarily redressed even if the information is provided at some later date …."  *Elec. Privacy Info. Ctr. v. Presidential Advisory Comm'n on Election Integrity*, 266 F. Supp. 3d 297, 319 (D.D.C. 2017) (citations omitted).

By failing to testify, Daly and Morgan are also interfering with the Committee's Article I authority to conduct oversight of DOJ and determine whether legislative reforms are necessary. After all, the Committee "cannot legislate wisely or effectively in the absence of information respecting the conditions which the legislation is intended to affect or change."  *See Eastland*, 421 U.S. at 504.  The Committee must understand why DOJ has deviated from its standard investigative protocols during the Hunter Biden investigation to determine if legislative reforms are necessary to prevent such conduct in the future.  And Daly's and Morgan's testimony is key to gaining that understanding.

Here, Daly's and Morgan's refusal to testify is undermining the Committee's ability to complete its investigation with the urgency the Constitution requires, and that must certainly

suffice for irreparable harm to the Committee. *See Miers II*, 575 F. Supp. 2d at 207 ("The Committee has demonstrated that it will suffer substantial harm … [because] [the Executive can] 'run out the clock on this Congress.'  'That outcome … would be extremely damaging to the Committee, as it seeks closure to this important [i]nvestigation prior to the end of the current Congress and Administration.'"  (citations omitted)).

### B.  Allowing the Committee's investigation to proceed with Daly's and Morgan's testimony serves equity and advances the public interest

The balance of equities and the public interest are in the Committee's favor.  The Committee has subpoenaed testimony key to its investigation, and there is a "clear public interest in maximizing the effectiveness of the investigatory powers of Congress." *Exxon Corp. v. FTC*, 589 F.2d 582, 594 (D.C. Cir. 1978).  That is particularly so when impeachment is at stake—"[i]t would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair [impeachment] inquiry based on all the pertinent information." *Rep. & Recommendation*, 370 F. Supp. at 1230.

Daly and Morgan, on the other hand, have no valid interest in defying the Committee's Subpoenas, as it is their "unremitting obligation" to respond to them. *See Watkins*, 354 U.S. at 187.  In fact, as discussed above, both Daly and Morgan have explicitly stated that they have no interest in defying the Committee at all, but that they are deferring to DOJ's instruction.  Yet DOJ has no more valid interest in unlawfully preventing Daly's and Morgan's testimony than it would have in "enforcement of an unconstitutional law [which] is always contrary to the public interest." *Gordon*, 721 F.3d at 653.  While DOJ claims an interest in the control of potentially privileged information, that is ultimately a separate issue from whether Daly and Morgan have a legal obligation to comply with duly issued Congressional subpoenas. *See McGahn*, 415 F. Supp. 3d at 168; *Miers I*, 558 F. Supp. 2d at 106.

At bottom, Daly's and Morgan's testimony is immensely important as the Committee investigates whether the President engaged in misconduct, considers whether to recommend articles of impeachment against him, and discharges its legislative oversight responsibility.

## CONCLUSION

For all of these reasons, this Court should enter a preliminary injunction ordering Daly and Morgan to comply with the Judiciary Committee's Subpoenas by appearing for depositions.

Respectfully submitted,

*/s/ Matthew B. Berry*
Matthew B. Berry (D.C. Bar No. 1002470)
  *General Counsel*
Todd B. Tatelman (VA Bar No. 66008)
  *Deputy General Counsel*
Bradley Craigmyle (IL Bar No. 6326760)
  *Associate General Counsel*
Andy T. Wang (D.C. Bar No. 1034325)
  *Assistant General Counsel*

OFFICE OF GENERAL COUNSEL
U.S. HOUSE OF REPRESENTATIVES
5140 O'Neill House Office Building
Washington, D.C. 20515
(202) 225-9700
Matthew.Berry@mail.house.gov

*Counsel for Plaintiff Committee on the Judiciary of the U.S. House of Representatives*

March 21, 2024