## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

               *Plaintiff*,

    v.

MARK DALY, *et al.*,

               *Defendants*.

Case No.  1:24-cv-815

**DECLARATION OF TODD B. TATELMAN IN SUPPORT OF PLAINTIFF COMMITTEE ON THE JUDICIARY'S MOTION FOR PRELIMINARY INJUNCTION**

I, Todd B. Tatelman, declare as follows:

1.      I am the Deputy General Counsel in the Office of General Counsel of the U.S. House of Representatives.  I have served in this capacity since 2018 and have served in the Office of General Counsel since 2011.  I represent the Committee on the Judiciary of the U.S. House of Representatives (House Committee on the Judiciary) in this matter.

2.      Attached as Exhibit A[1] is a true and accurate copy of the Subpoena from the House Committee on the Judiciary to Mark Daly, Senior Litigation Counsel, Tax Division, Department of Justice (DOJ) (Feb. 22, 2024).

3.      Attached as Exhibit B is a true and accurate copy of the Subpoena from the House Committee on the Judiciary to Jack Morgan, DOJ (Feb. 22, 2024).

---

[1] For the Court's and the parties' convenience, where the exhibits attached here were also attached to the complaint in this matter, they are labeled consistently with the exhibits to the complaint.

4.      Attached as Exhibit C is a true and accurate copy of the Transcript of the
Interview of Gary Shapley, Supervisory Special Agent, Internal Revenue Service (IRS) (May 26,
2023).

5.      Attached as Exhibit D is a true and accurate copy of the Transcript of the
Interview of Joseph Ziegler, Special Agent, IRS (June 1, 2023).

6.      Attached as Exhibit E is a true and accurate copy of the Transcript of the Hearing,
*United States v. Biden*, No. 1:23-cr-61-MN (D. Del. July 26, 2023), ECF No. 16.

7.      Attached as Exhibit F is a true and accurate copy of the Memorandum from
Representative James Comer, Chairman, House Committee on Oversight & Accountability, et
al., to Members of the House Committee on Oversight & Accountability, et al. (Sept. 27, 2023).

8.      Attached as Exhibit G is a true and accurate copy of the Staff of the House
Committee on the Judiciary, et al., 118th Congress, *Interim Staff Report: The Justice
Department's Deviations from Standard Processes in Its Investigation of Hunter Biden* (2023).

9.      Attached as Exhibit H is a true and accurate copy of the Letter from
Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick
Garland, Attorney General, DOJ (July 21, 2023).

10.     Attached as Exhibit I is a true and accurate copy of the Letter from Representative
Jim Jordan, Chairman, House Committee on the Judiciary, to Merrick Garland, Attorney
General, DOJ (Feb. 28, 2023).

11.     Attached as Exhibit J is a true and accurate copy of the Letter from Representative
Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick Garland, Attorney
General, DOJ (June 29, 2023).

12.     Attached as Exhibit K is a true and accurate copy of the Letter from
Representative Jim Jordan, Chairman, House Committee on the Judiciary, et al., to Merrick
Garland, Attorney General, DOJ (July 31, 2023).

13.     Attached as Exhibit N is a true and accurate copy of the Supplemental Production
of Gary Shapley, Supervisory Special Agent, IRS (Sept. 22, 2022).

14.     Attached as Exhibit Q is a true and accurate copy of the Transcript of the
Interview of Matthew M. Graves, U.S. Attorney for the District of Columbia, DOJ (Oct. 3,
2023).

15.     Attached as Exhibit S is a true and accurate copy of the Transcript of the
Interview of David Weiss, Special Counsel, DOJ (Nov. 7, 2023).

16.     Attached as Exhibit T is a true and accurate copy of the Letter from Carlos
Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House
Committee on the Judiciary (July 13, 2023).

17.     Attached as Exhibit U is a true and accurate copy of the Letter from Carlos
Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House
Committee on the Judiciary (July 24, 2023).

18.     Attached as Exhibit V is a true and accurate copy of the Subpoena from the House
Committee on the Judiciary to Mark Daly, Senior Litigation Counsel, Tax Division, DOJ (Sept.
14, 2023).

19.     Attached as Exhibit W is a true and accurate copy of the Subpoena from the
House Committee on the Judiciary to Jack Morgan, Trial Attorney, Tax Division, DOJ (Sept. 14,
2023).

20.     Attached as Exhibit AA is a true and accurate copy of the Letter from Robert Driscoll, Counsel for Mark Daly, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (Oct. 24, 2023).

21.     Attached as Exhibit BB is a true and accurate copy of the Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Robert Driscoll, Counsel for Mark Daly (Oct. 25, 2023).

22.     Attached as Exhibit CC is a true and accurate copy of the Letter from Carlos Uriarte, Assistant Attorney General, DOJ, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (Oct. 25, 2023).

23.     Attached as Exhibit EE is a true and accurate copy of a November 2023 email chain between the House Committee on the Judiciary staff and Catherine Duval, Counsel for Jack Morgan.

24.     Attached as Exhibit FF is a true and accurate copy of the Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Catherine Duval, Counsel for Jack Morgan (Nov. 2, 2023).

25.     Attached as Exhibit HH is a true and accurate copy of the Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, to Mark Daly, Senior Litigation Counsel, Tax Division, DOJ (Feb. 22, 2024).

26.     Attached as Exhibit II is a true and accurate copy of the Letter from Representative Jim Jordan, Chairman, House Committee on the Judiciary, to Jack Morgan, Trial Attorney, Tax Division, DOJ (Feb. 22, 2024).

27.     Attached as Exhibit JJ is a true and accurate copy of the Letter from Robert Driscoll, Counsel for Mark Daly, to Representative Jim Jordan, Chairman, House Committee on the Judiciary (Feb. 24, 2024).

28.     Attached as Exhibit KK is a true and accurate copy of the Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Robert Driscoll, Counsel for Mark Daly (Feb. 29, 2024).

29.     Attached as Exhibit LL is a true and accurate copy of the Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Catherine Duval, Counsel for Jack Morgan (Feb. 29, 2024).

30.     Attached as Exhibit RR is a true and accurate copy of House Resolution 12, 100th Congress (1987).

31.     Attached as Exhibit SS is a true and accurate copy of House Resolution 258, 102d Congress (1991).

32.     Attached as Exhibit TT is a true and accurate copy of the Rules of the Select Committee to Investigate Covert Arms Transactions with Iran of the U.S. House of Representatives, 100th Congress (Committee Print 1987).

33.     Attached as Exhibit UU is a true and accurate copy of the Rules of the Task Force to Investigate Certain Allegations Concerning the Holding of American Hostages by Iran in 1990 of the U.S. House of Representatives, 102d Congress (Committee Print 1992).

34.     Attached as Exhibit YY is a true and accurate copy of the Transcript of the Interview of Lesley Wolf, Former Assistant U.S. Attorney, DOJ (Dec. 14, 2023).

35.     Attached as Exhibit AAA is a true and accurate copy of the Letter from Bradley Weinsheimer, Associate Deputy Attorney General, DOJ, to Jenny Kramer, Counsel for Lesley Wolf (Dec. 12, 2023).

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.  Executed on March 21, 2024, in Washington, DC.

*Todd B. Tatelman*
TODD B. TATELMAN

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, 2138 Rayburn House Office Building Washington, D.C. 20515, *Plaintiff*, v. MARK DALY, in his official capacity, U.S. Department of Justice, and JACK MORGAN, in his official capacity, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W. Washington, D.C. 20530, *Defendants*. | Case No. 1:24-cv-815 |

# Exhibit A

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Mark F. Daly, Senior Litigation Counsel, Tax Division, U.S. Department of Justice

You are hereby commanded to be and appear before the

Committee on the Judiciary

of the House of Representatives of the United States at the place, date, and time specified below.

☐ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of production: _____
>
> Date: _____          Time: _____

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: 2237 Rayburn House Office Building
>
> Date: March 1, 2024          Time: 2:00 p.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

> Place of testimony: _____
>
> Date: _____          Time: _____

*To* The U.S. Marshals Service, or any authorized Member or congressional staff

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this *22nd* day of *Febuary* , 20 *24*

*Chairman or Authorized Member*

Attest: *Kevin F. McCulen*

*Clerk*

# PROOF OF SERVICE

Subpoena for

Mark F. Daly, Senior Litigation Counsel, Tax Division, U.S. Department of Justice

Address  U.S. Department of Justice, 950 Pennsylvania Avenue, N.W. Washington, DC 20530

before the  Committee on the Judiciary

*U.S. House of Representatives*
*118th Congress*

Served by (print name) _____

Title _____

Manner of service _____

_____

Date _____

Signature of Server _____

Address _____

_____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, 2138 Rayburn House Office Building Washington, D.C. 20515, *Plaintiff*, v. MARK DALY, in his official capacity, U.S. Department of Justice, and JACK MORGAN, in his official capacity, U.S. Department of Justice, 950 Pennsylvania Avenue, N.W. Washington, D.C. 20530, *Defendants*. | Case No. 1:24-cv-815 |

# Exhibit B

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Jack Morgan, U.S. Department of Justice _____ ☐

You are hereby commanded to be and appear before the

Committee on the Judiciary _____ ▾

of the House of Representatives of the United States at the place, date, and time specified below.

☐ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: _____

Date: _____     Time: _____

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: 2237 Rayburn House Office Building _____

Date: March 1, 2024 _____     Time: 10:00 a.m. _____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____     Time: _____

*To* The U.S. Marshals Service, or any authorized Member or congressional staff _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 22nd day of February _____, 20 24

*Chairman or Authorized Member*

Attest: *Kevin F. McCumber* _____

*Clerk*

## PROOF OF SERVICE

Subpoena for

Jack Morgan, U.S. Department of Justice

Address  U.S. Department of Justice, 950 Pennsylvania Avenue, N.W. Washington, DC 20530

before the  Committee on the Judiciary

*U.S. House of Representatives*
*118th Congress*

Served by (print name)

Title

Manner of service

Date

Signature of Server

Address

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, <br><br> 2138 Rayburn House Office Building <br> Washington, D.C. 20515, <br><br>               *Plaintiff*, <br><br>       v. <br><br> MARK DALY, in his official capacity, <br> U.S. Department of Justice, and <br><br> JACK MORGAN, in his official capacity, <br> U.S. Department of Justice, <br><br> 950 Pennsylvania Avenue, N.W. <br> Washington, D.C. 20530, <br><br>               *Defendants*. | Case No. 1:24-cv-815 |

# Exhibit C

COMMITTEE ON WAYS AND MEANS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:    GARY A. SHAPLEY, JR.

Friday, May 26, 2023

Washington, D.C.

The interview in the above matter was held in 5480 O'Neill House Office Building, commencing at 9:33 a.m.

Appearances:


For the COMMITTEE ON WAYS AND MEANS:


██████████, MAJORITY COUNSEL

██████████, MAJORITY COUNSEL

██████████, MAJORITY COUNSEL

███████████, MAJORITY STAFF

██████████, MAJORITY STAFF

██████████, MAJORITY COUNSEL

████████████, MINORITY COUNSEL

██████████, MINORITY   COUNSEL

██████████████, MINORITY COUNSEL


For GARY A. SHAPLEY, JR.:


MARK D. LYTLE,

PARTNER,

NIXON PEABODY LLP


TRISTAN LEAVITT,

PRESIDENT,

EMPOWER OVERSIGHT

MAJORITY COUNSEL 1.    Good morning.    This is a transcribed interview of Internal Revenue Service Criminal Supervisory Special Agent Gary Shapley.

Chairman Jason Smith has requested this interview following a letter sent to the committee through counsel on April 19th, 2023, indicating Mr. Shapley's desire to make protected whistleblower disclosures to Congress.

This interview is being conducted as part of the committee's oversight of the Internal Revenue Code and the Internal Revenue Service.

Would the witness please state your name for the record?

Mr. Shapley.    Gary Shapley.

MAJORITY COUNSEL 1.    Could counsel for the witness please state your names for the record?

Mr. Lytle.    Mark Lytle.

Mr. Leavitt.    Tristan Leavitt.

MAJORITY COUNSEL 1.    On behalf of the committee, I want to thank you for appearing here today to answer our questions and for coming forward to make these disclosures to Congress.

My name is ███████████.    I'm an attorney on Chairman Smith's Ways and Means Committee staff.

I'll now have everyone else from the committee who is here at the table introduce themselves as well.

MAJORITY COUNSEL 2.    ███████████ with the majority staff.

MAJORITY COUNSEL 3.    ███████████, majority staff.

MAJORITY STAFF.    ███████████, majority staff.

MAJORITY COUNSEL 4.    ███████████, majority staff.

MAJORITY STAFF.    ███████████, majority staff.

MINORITY COUNSEL 1. ██████████, minority staff.

MINORITY COUNSEL 2. ███████████, minority staff.

MINORITY COUNSEL 3. █████████, minority.

MAJORITY COUNSEL 1.    Thank you.

I'd like to now go over the ground rules and guidelines we'll follow during today's interview.

Because you have come forward as a whistleblower and seek to make disclosures to Congress, we will first give you an opportunity to make an opening statement.

Following your statement, the questioning will proceed in rounds.    The majority will ask questions first for one hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose.    We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break apart from that, please just let us know.

As you can see, there is an official court reporter taking down everything we say to make a written record, so we ask that you give verbal responses to all questions.

Do you understand?

Mr. Shapley.    Yes, I do.

MAJORITY COUNSEL 1.    So the court reporter can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on staff whose turn it is.

Please try and speak clearly so the court reporter can understand and so everyone at the end of the table can hear you.    It is important that we don't talk over one another or interrupt each other if we can help it, and that goes for everyone present at today's interview.

We want you to answer our questions in the most complete, truthful manner as possible, so we will take our time.   If you have any questions or if you do not understand one of our questions, please let us know.

Our questions will cover a wide range of topics, so if you need clarification on any point, just say so.   If you honestly don't know the answer to a question or do not remember, it is best not to guess.   Please give us your best recollection.

It is okay to tell us if you learned the information from someone else.   Just indicate how you came to know the information.   If there are things you don't know or can't remember, just say so and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

If you need to confer with counsel, we can go off the record and stop the clock until you are prepared to respond.

You should also understand that, by law, you're required to answer questions from Congress truthfully.

Do you understand?

Mr. <u>Shapley.</u>   Yes, I do.

<u>MAJORITY COUNSEL 1.</u>   This also applies to questions posed by congressional staff in an interview.

Do you understand?

Mr. <u>Shapley.</u>   Yes, I do.

<u>MAJORITY COUNSEL 1.</u>   Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or making a false statement under 18 U.S.C. 1001.

Do you understand?

Mr. <u>Shapley.</u>   Yes, I do.

MAJORITY COUNSEL 1.    Is there any reason you are unable to provide truthful answer to today's questions?

Mr. Shapley.    There is not.

MAJORITY COUNSEL 1.    Finally, I'd like to note the information discussed here today is confidential.    As an IRS agent, I know you understand the significance of our tax privacy laws.    Chairman Smith takes our tax privacy laws extremely seriously, and we have worked diligently to make sure that you can provide your disclosures to Congress in a legal manner and with the assistance of counsel.

As I'm sure you know, 26 U.S.C. Section 6103 makes tax returns and return information confidential, subject to specific authorizations or exceptions in the statute.

The statute anticipates and provides for whistleblowers like yourself to come forward and share information with Congress under Section 6103(f)(5).

Specifically, that statute permits a person with access to returns or return information to disclose it to a committee referred to in subsection (f)(1) or any individual authorized to receive or inspect information under paragraph (4)(A) if the whistleblower believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

In your position at the IRS, do you or did you have access to return or return information covered by Section 6103 of the Internal Revenue Code?

Mr. Shapley.    Yes.

MAJORITY COUNSEL 1.    Have you had access to return information that you believe may relate to possible misconduct, maladministration, or taxpayer abuse?

Mr. Shapley.    Yes.

MAJORITY COUNSEL 1.    Do you wish to disclose such information to the committee today?

Mr. <u>Shapley.</u>    Yes, I do.

<u>MAJORITY COUNSEL 1.</u>    In addition to Section 6103(f)(5), the chairman of the committee on Ways and Means has authority under Section 6103(f)(4)(A) to designate agents to receive and inspect returns and return information.

To facilitate the disclosures you wish to make here today, Chairman Smith has designated the individuals in this room for the purposes of receiving the information you wish to share.    The chairman considers this entire interview and the resulting transcript as protected confidential information under Section 6103.

That means that this interview can only proceed so long as everyone in the room is properly designated to receive the information.    The chairman has designated the court reporter and the related individuals that provide transcription services to the House of Representatives.

I'd like to remind the witness and everyone in the room that 26 U.S.C. Section 7213 makes it unlawful to make any disclosure of returns or return information not authorized by Section 6103.    Unauthorized disclosure of such information can be a felony punishable by fine or imprisonment.

Given the statutory protection for this type of information, we ask that you not speak about what we discuss in this interview to individuals not designated to receive such information.

For the same reason, the marked exhibits that we use today will remain with the court reporter so that they can go in the official transcript, and any copies of those exhibits will be returned to us when we wrap up.

We also understand that you have alleged that you have been retaliated against for seeking to blow the whistle inside your agency and to Congress.    We will discuss that issue in more detail, but I will note that Chairman Smith values whistleblowers and knows

that whistleblowers take significant risks when disclosing wrongdoing.   That is why there are legal protections in place for whistleblowers making disclosures to Congress, such as the protections in 5 U.S.C. Section 2302(b)(8)(C), which your counsel identified in your initial letter to the committee.

At a hearing before the Ways and Means Committee on April 27th, 2023, Chairman Smith asked IRS Commissioner Werfel to commit that there will be no retaliation against whistleblowers.   The IRS Commissioner replied, quote, "I can say without hesitation, any hesitation, there will be no retaliation for anyone making an allegation," end quote.

Since that time, you have shared additional information with the committee regarding allegations of retaliation.   This is very troubling, particularly given Commissioner Werfel's testimony before the committee.   We will discuss your allegations in greater detail today.

That is the end of my preamble.   Is there anything my colleagues from the minority would like to add?

MINORITY COUNSEL 1.   Thanks, █████.

Thank you very much for appearing before us today.   I personally am very happy that you were able to share with us some information in advance, because I think that helped us get prepared for this meeting today.   I look forward to hearing what you have to say.   Thank you for coming in.

MAJORITY COUNSEL 1.   And with that, we invite you to begin with an opening statement, after which we will begin questioning.

Mr. Shapley.   So thank you for having me here today.

My name is Gary Shapley.   I am a supervisory special agent with the Internal Revenue Service Criminal Investigation.   I have been an IRS agent since July 2009, and

have served as a supervisory special agent or acting assistant special agent in charge since April 2018.

I grew up in a little town in upstate New York and never thought that I would be in this position I am today.    I was taught to be proud of this country that had afforded me so many opportunities and to always do the right thing -- the right thing, a simple philosophy that has me sitting here today.    There is no reward for me for becoming a whistleblower.    The only win for me is to not be fired or arrested or retaliated against.

Before October of 2022, I had received the highest awards available to me in my agency and multiple awards from DOJ.    In October 2022, I was a senior leader, assistant special agent in charge of the Chicago Field Office, and received the highest performance rating available that year as an outstanding.

I was planning to transition to a new position in headquarters for an international collaboration of foreign tax organizations that I was picked to help set up and operated since 2018.    I have led, planned, and executed undercover operations and/or search warrants in over a dozen countries.    I have investigated and managed some of the largest cases in U.S. history and of the history of the agency, recovering over $3.5 billion for the United States Government.

Since October 2022, IRS CI has taken every opportunity to retaliate against me and my team.

I was passed over for a promotion for which I was clearly most qualified.

The special agent in charge and assistant special agent in charge of the Washington, D.C. Field Office have sent threats to the field office, suppressing additional potential whistleblowers from coming forward.

Even after IRS CI senior leadership had been made aware on a recurring basis that the Delaware U.S. Attorney's Office and the Department of Justice was acting improperly,

they acquiesced to a DOJ request to remove the entire team from the Hunter Biden investigation, a team that had been investigating it for over 5 years.   Passing the buck and deferring to others was a common theme with IRS CI leadership during this investigation.

After you hear my testimony, I believe you will understand why my conscience would not be silenced.   My oath of office would have been unfulfilled if I did nothing.   I went from a senior leader to a pariah, and the only thing that happened in between was that I blew the whistle.

I am blowing the whistle because the Delaware U.S. Attorney's Office, Department of Justice Tax, and Department of Justice provided preferential treatment and unchecked conflicts of interest in an important and high-profile investigation of the President's son, Hunter Biden.

The mission of IRS CI is to investigate potential criminal violations of Internal Revenue Code and related financial crimes in a manner that fosters confidence in the Code and compliance with the law.

That mission can only be met by treating every taxpayer we encounter the same. The normal process must be followed.   If search warrants or witness interviews or document requests that include the actual subjects' names are not allowed, for example, that is simply a deviation from the normal process that provided preferential treatment, in this case to Hunter Biden.

The case agent on this case is one of the best agents in the entire agency. Without his knowledge and persistence, DOJ would have prevented the investigative team from collecting enough evidence to make an informed assessment, which ultimately included even DOJ agreeing on the recommended criminal charges.

I am alleging, with evidence, that DOJ provided preferential treatment,

slow-walked the investigation, did nothing to avoid obvious conflicts of interest in this investigation.

I have absolutely no political activities in my past.   I vote in the general election and recently voted in the midterms because of an interest in the process for my children, who I took to witness one of the pillars of this Nation, the right to vote.

I have never given a dollar to any campaign, never attended a campaign event at any level of government, never had a campaign sign on my car, lawn, et cetera.   I do not own and have never owned a tee shirt or hat with any election topic.   I vote for the candidate, not the party.   I have voted for Presidents with both an R and/or a D in front of their names.

I speak on this topic so I can try to head off time that might be spent on it.   In the end, a fact is a fact, regardless of the political affiliation of the person who brought it to you.

I am hoping the whistleblower process will allow me to give this protected disclosure and leave it to you to make your determinations based on what my testimony and the documents say about the investigation.

I respect this institution and have faith that the issues I raise will be considered appropriately.   I beg of you to protect me from the coming retaliatory storm.   You are my only hope, and your actions send a message to all those out there that see wrongdoing but are terrified to bring it to light.

In this country, we believe in the rule of law, and that applies to everyone.   There is not a two-track justice system depending on who you are and who you're connected to.

But the criminal tax investigation of Hunter Biden, led by the United States Attorney's Office for the District of Delaware, has been handled differently than any investigation I've ever been a part of for the past 14 years of my IRS service.

Some of the decisions seem to be influenced by politics.    But whatever the motivations, at every stage decisions were made that had the effect of benefiting the subject of the investigation.    These decisions included slow-walking investigative steps, not allowing enforcement actions to be executed, limiting investigators' line of questioning for witnesses, misleading investigators on charging authority, delaying any and all actions months before elections to ensure the investigation did not go overt well before policy memorandum mandated the pause.    These are just only a few examples.

The investigation into Hunter Biden, code name Sportsman, was first opened in November 2018 as an offshoot of an investigation the IRS was conducting into a foreign-based amateur online pornography platform.    Special Agent ███████ developed the investigative lead and was assigned to be the original case agent.

In October 2019, the FBI became aware that a repair shop had a laptop allegedly belonging to Hunter Biden and that the laptop might contain evidence of a crime.    The FBI verified its authenticity in November of 2019 by matching the device number against Hunter Biden's Apple iCloud ID.

When the FBI took possession of the device in December 2019, they notified the IRS that it likely contained evidence of tax crimes.    Thus, Special Agent ██████ drafted an affidavit for a Title 26 search warrant, which a magistrate judge approved that month.

In January 2020, I became the supervisor of the Sportsman case.    The group, known as the International Tax and Financial Crimes group, or the ITFC, is comprised of 12 elite agents who were selected based on their experience and performance in the area of complex high-dollar international tax investigations.

The IRS direct investigative team, including the co-case agent, case agent, and me, were working closely with the FBI and the Delaware U.S. Attorney's Office and Department of Justice Tax in biweekly prosecution team meetings, or pros meetings.

Yet, it soon became clear to me this case was being handled differently than any I'd seen before.

As early as March 6th, 2020, I sent a sensitive case report up through my chain of command at IRS reporting that by mid-March the IRS would be ready to seek approval for physical search warrants in California, Arkansas, New York, and Washington, D.C.

Special Agent ███ drafted an April 1st, 2020, affidavit establishing probable cause for these physical search warrants.   We also planned to conduct approximately 15 contemporaneous interviews at that time.

Yet, after former Vice President Joseph Biden became the presumptive Democratic nominee for President in early April 2020, career DOJ officials dragged their feet on the IRS taking these investigative steps.

By June 2020, those same career officials were already delaying overt investigative actions.   This was well before the typical 60- to 90-day period when DOJ would historically stand down before an election.   It was apparent that DOJ was purposely slow-walking investigative actions in this matter.

On a June 16th, 2020, call Special Agent ███ and I had with our chain of command up to the Director of Field Operations, I pointed out that if normal procedures had been followed we already would have executed search warrants, conducted interviews, and served document requests.   Nevertheless, my IRS chain of command decided we would defer to DOJ.

Thus, I became the highest-ranking IRS CI leader to participate in our prosecution team calls, be up to date on specific case strategies, to discuss the investigation with DOJ and the Delaware U.S. Attorney's Office, and to address concerns as they arose.

From around October 2020 through October 2022, I was the IRS CI manager who interacted directly with the United States Attorney, David Weiss, and individuals at DOJ

Tax Division the most.

Even after investigative steps were denied, enforcement operations were rejected by DOJ, leading to the election in November 2020, we continued to obtain further leads in the Sportsman's case and prepared for when we could go overt.

For example, in August 2020, we got the results back from an iCloud search warrant.    Unlike the laptop, these came to the investigative team from a third-party record keeper and included a set of messages.    The messages included material we clearly needed to follow up on.

Nevertheless, prosecutors denied investigators' requests to develop a strategy to look into the messages and denied investigators' suggestion to obtain location information to see where the texts were sent from.

For example, we obtained a July 30th, 2017, WhatsApp message from Hunter Biden to Henry Zhao, where Hunter Biden wrote:    "I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled.    Tell the director that I would like to resolve this now before it gets out of hand, and now means tonight.    And, Z, if I get a call or text from anyone involved in this other than you, Zhang, or the chairman, I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction.    I am sitting here waiting for the call with my father."

Communications like these made it clear we needed to search the guest house at the Bidens' Delaware residence where Hunter Biden stayed for a time.

In a September 3rd, 2023 [2020], pros meeting, the Assistant United States Attorney, Lesley Wolf, told us there was more than enough probable cause for the physical search warrant there, but the question was whether the juice was worth the squeeze.    She continued that optics were a driving factor in the decision on whether to

execute a search warrant.   She said a lot of evidence in our investigation would be found in the guest house of former Vice President Biden, but said there is no way we will get that approved.

The prosecutors even wanted to remove Hunter Biden's name from electronic search warrants, 2703(d) orders, and document requests.   Special Agent ███ said on the call he felt uncomfortable with removing the subject's name from those documents just based on what might or might not be approved, as that seemed unethical.   But his concerns were ignored.

And Department of Justice Tax Line Attorney Jack Morgan said, doing it without Hunter Biden's name would probably still get us, in quote, "most" of the data we sought. I have never been part of an investigation where only getting most of the data was considered sufficient.

On September 3rd, 2020, the slow-walking of process continued when AUSA Wolf stated that a search warrant for the emails for Blue Star Strategies was being sat on by OEO.   That's the Department of Justice Office -- actually, I'm sorry.   I don't know what it means, the acronym.

She indicated it would likely not get approved.    This was a significant blow to the Foreign Agents Registration Act piece of the investigation.

On September 4th, 2020, Deputy Attorney General Donoghue issued a cease and desist of all overt investigative activities due to the coming election.   AUSA Wolf made several odd statements, to include that DOJ was under fire and it was self-inflicted.   She stated that DOJ needed to repair their reputation.

At the next pros meeting, on September 21st, 2020, the FBI tried to dictate that we only do five of the planned interviews so FBI management could reevaluate if they wanted to continue assisting.   Special Agent ███ told them it seems inappropriate for

them to dictate in an IRS investigation who should be interviewed.

Later that day, I learned the FBI case agent in Delaware had only recently moved back to his hometown of Wilmington with his wife and family and was concerned about the consequences for him and his family if they conducted these sensitive interviews and executed a search warrant of the President Biden guest house.

On October 19th, 2020, I emailed Assistant United States Attorney Wolf:    "We need to talk about the computer.    It appears the FBI is making certain representations about the device, and the only reason we know what is on the device is because of the IRS CI affiant search warrant that allowed access to the documents.    If Durham also executed a search warrant on a device, we need to know so that my leadership is informed.    My management has to be looped into whatever the FBI is doing with the laptop.    It is IRS CI's responsibility to know what is happening.    Let me know when I can be briefed on this issue."

My email led to a special meeting on October 22nd, 2020, with the prosecution team and the FBI's computer analysis team to discuss Hunter Biden's laptop.    We once again objected that we still had not been given access to the laptop.

Special Agent ███████ asked about the full filter reviewed copy of the contents of the devices.    He stated he had not been provided with the data.    AUSA Lesley Wolf stated that she would not have seen it because, for a variety of reasons, prosecutors decided to keep it from the investigators.    This decision is unprecedented in my experience.

Investigators assigned to this investigation were obstructed from seeing all the available evidence.    It is unknown if all the evidence in the laptop was reviewed by agents or by prosecutors.

Based on guidance provided by the prosecutors on a recurring basis to not look

into anything related to President Biden, there is no way of knowing if evidence of other criminal activity existed concerning Hunter Biden or President Biden.

AUSA Wolf acknowledged that there was no reason to believe that any data was manipulated on devices by any third party.    She further supported this belief by mentioning that they corroborated the data with other sources of information received.

Also on an October 22nd, 2020, pros team call, AUSA Wolf stated that United States Attorney David Weiss had reviewed the affidavit for search warrant of Hunter Biden's residence and agreed that probable cause had been achieved.

Even though the legal requirements were met and the investigative team knew evidence would be in these locations, AUSA Wolf stated that they would not allow a physical search warrant on Hunter Biden.

The case agent and I raised the issue to IRS CI leadership on a continued basis, to include in a June 16th, 2020, meeting with the Director of Field Operations, where I stated:    "DOJ Tax has made a concerted effort to drag their feet concerning conducting search warrants and interviewing key witnesses in an effort to push those actions to a timeframe where they can invoke the Department of Justice rule of thumb concerning affecting elections."    No follow-up questions were asked and no action was taken by IRS CI senior leadership.

Because the 2020 election was contested, our original plan to go overt on or around November 17th was delayed.    DOJ pushed back against the day of action date because they did not want to approach Hunter Biden while he was in Delaware, potentially collocated with President Biden.

United States Attorney Weiss stated on November 10th, 2020, that he had to delay the day of action because it was a contested election.    He also stated that because there was no leak in the investigation to date, therefore not public at the time, that the

primary focus was to protect the integrity of the investigation, which meant to keep it concealed from the public.

We began preparing for what we called our day of action on December 8th, 2020. That included document requests and approximately 12 interviews around the country. The search warrant had been rejected by DOJ, and we included a possibility of a potential consent search of Hunter Biden's residence, which was a Hail Mary.

On December 3rd, 2020, we had around a 12-hour long meeting at the United States Attorney's Office in Delaware with the prosecution team.    United States Attorney Weiss came in at the beginning of the meeting and jubilantly congratulated the investigative team for keeping the investigation a "secret," quote.

Weiss was in and out for the rest of the meeting, but it went downhill from there. We shared with prosecutors our outline to interview Hunter Biden's associate, Rob Walker.    Among other things, we wanted to question Walker about an email that said: "Ten held by H for the big guy."    We had obvious questions like who was H, who the big guy was, and why this percentage was to be held separately with the association hidden.

But AUSA Wolf interjected and said she did not want to ask about the big guy and stated she did not want to ask questions about "dad."    When multiple people in the room spoke up and objected that we had to ask, she responded, there's no specific criminality to that line of questioning.

This upset the FBI too.    And as I'll explain in a moment, the IRS and FBI agents conducting this interview tried to skirt AUSA Wolf's direction.

Hunter Biden was assigned Secret Service protection on or around our December 3rd meeting.    So we developed a plan for the FBI Los Angeles special agent in charge to reach out at 8 a.m. on December 8th to the Secret Service Los Angeles special agent in charge and tell them that we would be coming to the residence to seek an interview with

Hunter Biden and that it was part of an official investigation.

However, the night before, December 7th, 2020, I was informed that FBI headquarters had notified Secret Service headquarters and the transition team about the planned actions the following day.   This essentially tipped off a group of people very close to President Biden and Hunter Biden and gave this group an opportunity to obstruct the approach on the witnesses.

The next morning, when I saw my FBI counterpart, Supervisory Special Agent Joe Gordon, he was clearly dejected about how our plan had been interfered with.   FBI SSA Gordon memorialized the new plan in an email the morning of December 8th, 2020, that stated the subject and the Secret Service protectees would be given the phone numbers of the FBI SSA Joe Gordon and I and the subject would call us if he wanted to speak with us.

SSA Gordon and I waited in the car outside of Hunter Biden's California residence waiting for a phone call.   It was no surprise that the phone call SSA Gordon received was from his ASAC Alfred Watson, who informed us that Hunter Biden would contact us through his attorneys.

We received a telephone call later that morning from Hunter Biden's attorneys, who said he would accept service for any document requests, but we couldn't talk to his client.   The public news of our investigation hit the press the next day.

I can't know for certain whether FBI's advance notice played a role or not, but the 12 interviews we hoped to conduct on our day of action, we only got one substantive interview.   It was with Rob Walker in Arkansas, and it was exactly the sort of interview we expected to have if the FBI hadn't tipped off Secret Service and the transition team.

In the interview, the FBI agent tried to get Rob Walker to talk about the "ten held by H" email while not directly contradicting AUSA Wolf's direction not to ask about the,

quote, "big guy."    The FBI agent said, this is a quote:    "The famous email that Tony was pointing out like the equity split, can you tell me your opinion of that, when it's going through like, you know, ten B dot-dot-dot held by H?"

Walker answered:    "I think that maybe James was wishful thinking or maybe he was just projecting that, you know, if this was a good relationship and this was something that was going to happen, the VP was never going to run, just protecting that, you know, maybe at some point he would be a piece of it, but he was more just, you know -- it looks terrible, but it's not.    I certainly never was thinking at any time the VP was a part of anything we were doing."

And yet it was clearly valuable for the investigators to ask about Hunter Biden's dad, as Walker went on to describe an instance in which the former Vice President showed up at a CEFC meeting.

Walker said:    "We were at the Four Seasons and we were having lunch and he stopped in, just said hello to everybody.    I don't even think he drank water.    I think Hunter Biden said, 'I may be trying to start a company or try to do something with these guys and could you?'    And I think he was like, if I'm around and he'd show up."

The FBI agent asked:    "So you definitely got the feeling that that was orchestrated by Hunter Biden to have like an appearance by his dad at that meeting just to kind of bolster your chances at making a deal work out?"

Walker answered:    "Sure."

The FBI agent continued:    "Any times when he was in office, or did you hear Hunter Biden say that he was setting up a meeting with his dad with them while dad was still in office?"

Walker answered:    "Yes."

And, inexplicably, the FBI agent changed the subject.

On December 10th, 2020, the prosecutorial team met again to discuss the next steps.   One piece of information that came out of the day of action was that Hunter Biden vacated the Washington, D.C., office of Owasco.   His documents all went into a storage unit in northern Virginia.   The IRS prepared an affidavit in support of a search warrant for the unit, but AUSA Wolf once again objected.

My special agent in charge and I scheduled a call with United States Attorney Weiss on December 14th just to talk about that specific issue.   United States Attorney Weiss agreed that if the storage unit wasn't accessed for 30 days we could execute a search warrant on it.

No sooner had we gotten off the call then we heard AUSA Wolf had simply reached out to Hunter Biden's defense counsel and told him about the storage unit, once again ruining our chance to get to evidence before being destroyed, manipulated, or concealed.

My special agent in charge at the time emailed that she would be informing the director of field operations and the deputy chief of IRS CI of her, quote, "frustration with the United States Attorney's Office not allowing us to go forward with a search warrant."

To this day, I have no way of knowing if the documents from that unit were among those ultimately provided to our team.

This was the second search warrant where prosecutors agreed that probable cause was achieved, but would not allow the investigators to execute a search warrant, a clear indication of preferential treatment of Hunter Biden.

In a briefing that I requested to make to Director of Field Operations Batdorf and SAC Waldon on March 2nd, 2021, investigators mentioned the possibility of blowing the whistle on how DOJ was handling this case.   My special agent in charge disengaged and was minimally involved moving forward.

This same sort of unprecedented behavior continued through 2021. For example, as I wrote to my chain of command on a May 3rd, 2021, memo: "This investigation has been hampered and slowed by claims of potential election meddling. Through interviews and review of evidence obtained, it appears there may be campaign finance criminal violations. AUSA Wolf stated on the last prosecution team meeting that she did not want any of the agents to look into the allegation. She cited a need to focus on the 2014 tax year, that we could not yet prove an allegation beyond a reasonable doubt, and that she does not want to include their Public Integrity Unit because they would take authority away from her. We do not agree with her obstruction on this matter," end quote.

After we shared on August 18th, 2021, and multiple times thereafter about interviews we had planned, on September 9th, 2021, AUSA Wolf emailed us: "I do not think you are going to be able to do these interviews as planned." She told us they would require approval from the Tax Division.

These delays extended through September and into October. Then the United States Attorney's Office raised other objections. Part of what we examined were charges made with Hunter Biden's card that might conceivably have been done by his children. However, on October 21st, 2021, AUSA Wolf told us it will get us into hot water if we interview the President's grandchildren.

As a result of this behavior, I went to my Director of Field Operations in November 2021 to express how poorly DOJ was handling this case. Despite these obstacles, around this time Special Agent ███████ began drafting the Special Agent Report, or SAR, which is a document in which IRS recommends what charges should be brought.

A[nother] troubling issue occurred with IRS criminal tax attorneys, commonly known as CT counsel, related to their review of the SAR [that recommended] charging

Hunter Biden that laid out the evidence for each element of each violation.

The CT Counsel Line Attorney Christine Steinbrunner worked with the case agent to get questions answered and to understand the case and the evidence.    She indicated to the case agent that she was going to concur with all the recommended charges in the SAR.

On February 9th, 2022, a CT counsel attorney at the national office reached out to the co-case agent and told her that Ms. Steinbrunner had sent it forward with concur for all charges and that the five members of the review team at the national office concurred with the line attorney.

It then went to CT senior leadership Rick Lunger and Elizabeth Hadden, and direction was given to the line attorney, Ms. Steinbrunner, to change it to a nonconcur for all charges.

I informed SAC Waldon, and he telephoned Ms.    Steinbrunner's supervisor, Veena Luthra.    Ms. Luthra stated it had always been a nonconcur.    I then communicated with SAC Waldon that CT was misrepresenting the facts.

On February 11th, 2022, CT counsel issued the memorandum nonconcurring with all counts.    In a documented exchange with Ms. Steinbrunner, the case agent told her: "Did you know that they were saying that it's always been a nonconcur?"

Ms. Steinbrunner responded:    "What?   No, I sent them a yellow light."

I have no idea why Ms. Luthra would provide false information about this topic.

Since CT counsel's opinion is only advisory, on February 25th, 2022, the IRS sent the SAR to the Delaware U.S. Attorney's Office -- I'm sorry, that's incorrect.    They sent it to the Department of Justice Tax Division.

AUSA Wolf supported charging Hunter Biden for tax evasion and false return in 2014, 2018, and 2019, and failure to file or pay for 2015, 2016, and 2017.    It is my

understanding that the Tax Division then authored a 90-plus-page memo that recommended prosecution.

The proper venue for a tax case is where the subject resides or where the return is prepared or filed.   That meant the proper venue for the years we were looking into would either be Washington, D.C., or California, not Delaware.

In March 2022, DOJ's Tax Division presented its prosecution memo to the United States Attorney's Office for the District of Columbia, which had venue over the 2014 and 2015 tax years.   The case agent and I requested to be part of the presentation to the D.C. U.S. Attorney's Office, but were denied.

Department of Justice Tax Division Mark Daly telephoned the case agent and stated that the First Assistant at the D.C. U.S. Attorney's Office was optimistic and had stated she would assign an AUSA to assist.

Just a couple days later, Mark Daly called the case agent back and told him that the President Biden appointee to the United States Attorney for the District of Columbia, Matthew Graves, personally reviewed the report and did not support it.   We in the IRS didn't realize at the time that meant there was no ability to charge there.

Attorney General Merrick Garland appeared before the Senate Appropriations Committee on April 26th, 2022.   Senator Bill Hagerty asked him how the American people could be confident that the administration was conducting a serious investigation into the President's own son.

Garland testified:   "Because we put the investigation in the hands of a Trump appointee from the previous administration, who is the United States Attorney for the District of Delaware, and because you have me as the Attorney General, who is committed to the independence of the Justice Department from any influence from the White House in criminal matters."

Garland said:    "The Hunter Biden investigation is being run by and supervised by the United States Attorney for the District of Delaware.    He is in charge of that investigation.    There will not be interference of any political or improper kind."

We knew that President Biden-appointed U.S. Attorney Matthew Graves did not support the investigation, but DOJ and United States Attorney Weiss allowed us to believe that he had some special authority to charge.

From March 2022 through October 7th, 2022, I was under the impression that, based on AG Garland's testimony before Congress and statements by U.S. Attorney Weiss and prosecutors, that they were still deciding whether to charge 2014 and 2015 tax violations.

However, I would later be told by United States Attorney Weiss that the D.C. U.S. Attorney would not allow U.S. Attorney Weiss to charge those years in his district.    This resulted in United States Attorney Weiss requesting special counsel authority from Main DOJ to charge in the District of Columbia.    I don't know if he asked before or after the Attorney General's April 26th, 2022, statement, but Weiss said his request for that authority was denied and that he was told to follow DOJ's process.

That process meant no charges would ever be brought in the District of Columbia, where the statute of limitations on the 2014 and '15 charges would eventually expire. The years in question included foreign income from Burisma and a scheme to evade his income taxes through a partnership with a convicted felon.    There were also potential FARA issues relating to 2014 and 2015.    The purposeful exclusion of the 2014 and 2015 years sanitized the most substantive criminal conduct and concealed material facts.

Hunter Biden still has not reported approximately $400,000 in income from Burisma and has not paid the tax due and owing of around $125,000 even after being told multiple times by his partner, Eric Schwerin, that he had to amend his 2014 return to

report that income.

To make matters worse, defense counsel was willing to sign statute of limitations extensions for 2014 and 2015 and had done so several times.    Because United States Attorney Weiss had no ability to charge 2014 and 2015, DOJ allowed the statute of limitations to expire.    There is no mechanism available to collect the tax owed by Hunter Biden for 2014 other than in a voluntary fashion.

In the first week of May 2022, I received a call from FBI Supervisory Special Agent Joe Gordon.    Gordon was preparing a briefing for FBI leadership.    He told me that his field office thought they should push for this case to be given to a special counsel and said, quote:    "My leadership is wondering why your leadership isn't asking for a special counsel in this investigation."

I relayed that information to my Director of Field Operations, who simply responded:    "I wouldn't even know how to go about that."

But since we didn't know D.C., District of Columbia, had refused to bring charges and that United States Attorney Weiss had no authority to overrule them, we believed at that time that the case could still be prosecuted.

It is common practice for DOJ to ask for the case agents' communications in discovery, as they might have to testify in court.    However, it's much more unusual to ask for management communications, because it is simply not discoverable.

In March of 2022, DOJ requested of the IRS and FBI all management-level emails and documents on this case.    I didn't produce my emails, but I provided them with my sensitive case reports and memorandums that included contemporaneous documentation of DOJ's continued unethical conduct.

Much of that information was being provided up my chain of command for over 2 years on how I thought their handling of the case was unethical.    I didn't hear anything

back about this at the time, leading me to believe no one read the discovery I provided.

In our July 29th, 2022, prosecution team call, AUSA Wolf told us that United States Attorney Weiss indicated that the end of September would be his goal to charge the 2014 and 2015 years, because they did not want to get any closer to a midterm election.   She also said:   "The X factor on timing will include any delay defense counsel has requested."

Two weeks later, I learned how defense counsel felt about the case when prosecutors told us on a pros team call that Chris Clark, Hunter Biden's counsel from Latham and Watkins, told them that if they charge Hunter Biden, they would be committing "career suicide," end quote.

Around this time, there began to be discussions of the fact that the remaining tax years, 2016, '17, '18 and '19, needed to be brought in the Central District of California. There was no explanation as to why, after being declined in D.C. for 2014 and 2015, that it took until mid-September 2022 to present the case to the Central District of California United States Attorney's Office.

Prosecutors stated that they presented the case to the Central District of California in mid-September.   That happened to correspond with the confirmation of the President Biden appointee to the United States Attorney, Martin Estrada.   The case agent and I asked to participate in that presentation, but it was denied.

On a September 22nd, 2022, pros team call, AUSA Wolf announced we wouldn't be taking any actions until after the midterm elections, asking:   Why would we shoot ourselves in the foot by charging before the election?   This was decided even though DOJ's Public Integrity Section had provided instruction that there did not need to be a cease and desist on investigative actions due to the upcoming midterms.   It still appeared that decisions were being made to conceal from the public the results of the investigation.

The next meeting was in person on October 7th, 2022, and it took place in the Delaware U.S. Attorney's Office.    This meeting included only senior-level managers from IRS CI, FBI, and the Delaware U.S. Attorney's Office.    This ended up being my red-line meeting in our investigation for me.

United States Attorney Weiss was present for the meeting.    He surprised us by telling us on the charges, quote:    "I'm not the deciding official on whether charges are filed," unquote.

He then shocked us with the earth-shattering news that the Biden-appointed D.C. U.S. Attorney Matthew Graves would not allow him to charge in his district.

To add to the surprise, U.S. Attorney Weiss stated that he subsequently asked for special counsel authority from Main DOJ at that time and was denied that authority. Instead, he was told to follow the process, which was known to send U.S.    Attorney Weiss through another President Biden-appointed U.S. Attorney.

This was troubling, because he stated that, if California does not support charging, he has no authority to charge in California.    Because it had been denied, he informed us the government would not be bringing charges against Hunter Biden for the 2014-2015 tax years, for which the statute of limitations were set to expire in one month.

All of our years of effort getting to the bottom of the massive amounts of foreign money Hunter Biden received from Burisma and others during that period would be for nothing.

Weiss also told us that if the new United States Attorney for the Central District of California declined to support charging for the 2016 through 2019 years, he would have to request special counsel authority again from the Deputy Attorney General and/or the Attorney General.

I couldn't understand why the IRS wasn't told in the summer of 2022 that D.C. had

already declined charges.    Everyone in that meeting seemed shellshocked, and I felt misled by the Delaware United States Attorney's Office.

At this point, I expressed to United States Attorney Weiss several concerns with how this case had been handled from the beginning.    The meeting was very contentious and ended quite awkwardly.    It would be the last in-person meeting I had with United States Attorney Weiss.

We had one more call 10 days later on October 17th, 2022.    United States Attorney Weiss wasn't on this call.    In response to questions about more subpoena requests, we were told there was no grand jury any longer to issue subpoena requests out of.

When we asked when the Central District of California might make its decision on the case, DOJ Tax Mark Daly responded, quote:    "I'm not the boss of them."

After this call, DOJ either stopped scheduling prosecution team meetings or else just stopped inviting the IRS to them.

Disclosing our concerns to United States Attorney Weiss produced other problems too.    In May, I had produced all my sensitive case reports for enforcement to date. And now suddenly 5 months later, on October 24th, 2022, DOJ started asking for all those reports since May.

They also renewed the request for all my emails on the case, saying they needed to ensure they were aware of any exculpatory or impeachment effort in the case.    But their extraordinary request looked to us just like a fishing expedition to know what we'd been saying about their unethical handling of the case.

On November 7th, 2022, the FBI special agent on the case, Mike Dzielak, called me to tell me the United States Attorney's Office had requested both management- and senior management-level documents from the FBI related to the investigation.    He said

that had never happened before and that he was shocked at the request.   The FBI refused to provide any further discovery to the Delaware U.S. Attorney's Office.

I also shared with my leadership how inappropriate the whole situation was.   On December 12th, 2022, I emailed – "the United States Attorney's Office was so eager to get my emails, which they already had 95 percent of, then surprise they might have a problem with a few of them that memorialized their conduct.   If the content of what I documented in report or email is the cause of their consternation, I would direct them to consider their actions instead of who documented them.

I documented issues that I would normally have addressed as they occurred, because the United States Attorney's Office and Department of Justice Tax continued visceral reactions to any dissenting opinions or ideas.   Every single day was a battle to do our jobs.

I continually reported these issues up to IRS CI leadership beginning in the summer of 2020.   Now, because they realize I documented their conduct, they separate me out, cease all communication, and are now attempting to salvage their own conduct by attacking mine.   This is an attempt by the U.S. Attorney's Office to tarnish my good standing and position with IRS CI, and I expect IRS CI leadership to understand that.

As recent as the October 7th meeting, the Delaware U.S. Attorney's Office had nothing but good things to say about me and the team.   Then they finally read discovery items which were provided 6 months previous that are actually not discoverable, and they are beginning to defend their own unethical actions.

I have called into question the conduct of the United States Attorneys and DOJ Tax on this investigation on a recurring basis and am prepared to present these issues.

For over a year, I've had trouble sleeping and wake all hours of night thinking about this.   After some time, I realized it was because I subconsciously knew they were

not doing the right thing, but I could not fathom concluding that the United States

Attorney's Office or DOJ Tax were in the wrong.

After I wrapped my mind around the fact that they were not infallible, I started to

sleep better.    My choice was to turn a blind eye to their malfeasance and not sleep or to

put myself in the crosshairs by doing the right thing.    My conscience chose the latter.

I hope IRS CI applauds the incredibly difficult position I have been put into instead

of entertaining United States Attorney's Office attacks.    If they bring up something

legitimate, I am sure we can address it, because it was not intentional.    Everything I do is

with the goal of furthering IRS CI's mission, protecting the fairness of our tax system, and

representing IRS CI with honor."

In January of this year, I learned United States Attorney Estrada had declined to

bring the charges in the Central District of California.    For all intents and purposes, the

case was dead, with the exception of one gun charge that could be brought in Delaware.

And yet, when Senator Chuck Grassley asked Attorney General Garland about the

case on March 1st, 2023, Garland testified, quote:    "The United States Attorney had

been advised that he has full authority to make those referrals you're talking about or to

bring cases in other districts if he needs to do that.    He has been advised that he should

get anything he needs.    I have not heard anything from that office that suggests they are

not able to do anything that the U.S. Attorney wants them to do."

I don't have any firsthand information into why Garland said that, but to all of us

who have been in the October 7th meeting with Weiss, this was clearly false testimony.

On March 16th, 2023, DOJ Tax Mark Daly was overheard on his telephone by one

of my agents.    Mark Daly was talking to DOJ Tax Attorney Jack Morgan.    Mr. Daly stated

that they would give United States Attorney Weiss the approvals required if he wanted

them, but that he had no idea where he planned to charge Hunter Biden.

This indicates that after the Central District of California declined to allow charges to be brought there, the only route to United States Attorney Weiss was to request special counsel authority.   It appears that this case was not moving forward until Senator Grassley asked pointed questions that held AG Garland accountable.

After my attorney sent the first letter to Congress on April 19th, I started to hear rumblings that DOJ was picking the case back up again.   I don't believe that would have happened were it not for me blowing the whistle.

However, on Monday, May 15th, my special agent in charge called me and told me that DOJ had requested an entirely new team from the IRS and that none of the 12 agents in my group would be able to work the case.   This seems like clear retaliation for me making my disclosures.

What's worse, after Special Agent ███████ emailed the Commissioner to point out the human cost of the IRS simply implementing DOJ's retaliatory direction, my assistant special agent in charge threatened him with leaking (6)(E) material.

And my special agent in charge sent me and other supervisors an email at the same time that said we had to stay within our chain of command.   I interpreted this as a clear warning to me and anyone else who might be thinking of blowing the whistle.

I did not choose to sit here before you today.   I was compelled by my conscience when decision after decision has been made to deviate from our normal investigative processes.   I believe Congress needs to know this information.   I trust you'll do the right thing, because we have nothing if I can't trust this body.

<u>MAJORITY COUNSEL 1.</u>   Thank you very much for your thorough opening statement.

The time is 10:24.   We'll start the clock with majority questions.

To start, I'd like to mark this document as exhibit 1.

[Shapley Exhibit No. 1

Was marked for identification.]



Nixon Peabody LLP
799 9th Street NW
Suite 500
Washington, DC 20001-5327
Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

**Mark D. Lytle**
Partner

T / ▮▮▮▮▮
F / ▮▮▮▮▮

April 19, 2023

*Via Electronic Transmission*

The Honorable Ron Wyden
Chairman, Committee on Finance
Co-Chair, Whistleblower Protection Caucus
United States Senate

The Honorable Jason Smith
Chairman, Committee on Ways & Means
United States House of Representatives

The Honorable Mike Crapo
Ranking Member, Committee on Finance
United States Senate

The Honorable Richard Neal
Ranking Member, Committee on Ways & Means
United States House of Representatives

The Honorable Richard Durbin
Chairman, Committee on the Judiciary
United States Senate

The Honorable Jim Jordan
Chairman, Committee on the Judiciary
United States House of Representatives

The Honorable Lindsey Graham
Ranking Member, Committee on the Judiciary
United States Senate

The Honorable Jerrold Nadler
Ranking Member, Committee on the Judiciary
United States House of Representatives

The Honorable Charles Grassley
Co-Chair, Whistleblower Protection Caucus
Member, Committee on Finance
United States Senate

Dear Chairs and Ranking Members:

I represent a career IRS Criminal Supervisory Special Agent who has been overseeing the ongoing and sensitive investigation of a high-profile, controversial subject since early 2020 and would like to make protected whistleblower disclosures to Congress. Despite serious risks of retaliation, my client is offering to provide you with information necessary to exercise your constitutional oversight function and wishes to make the disclosures in a non-partisan manner to the leadership of the relevant committees on both sides of the political aisle.

My client has already made legally protected disclosures internally at the IRS, through counsel to the U.S. Treasury Inspector General for Tax Administration, and to the Department of Justice, Office of Inspector General. The protected disclosures: (1) contradict sworn testimony to Congress by a senior political appointee, (2) involve failure to mitigate clear conflicts of interest in the ultimate disposition of the case, and (3) detail examples of preferential treatment

April 19, 2023
Page 2

Attorneys at Law
nixonpeabody.com
@NixonPeabodyLLP

and politics improperly infecting decisions and protocols that would normally be followed by career law enforcement professionals in similar circumstances if the subject were not politically connected.

Some of the protected disclosures contain information that is restricted by statute from unauthorized disclosure to protect taxpayer and tax return information.

My client would like to share the same legally protected disclosures with Congress—pursuant to 26 U.S.C. § 6103(f)(5) and the protections afforded by 5 U.S.C. 2302(b)(8)(C)—that he has already shared with other oversight authorities. Out of an abundance of caution regarding taxpayer privacy laws, my client has refrained from sharing certain information even with me in the course of seeking legal advice. Thus, it is challenging for me to make fully informed judgments about how best to proceed.

My goal is to ensure that my client can properly share his lawfully protected disclosures with congressional committees. Thus, I respectfully request that your committees work with me to facilitate sharing this information with congress legally and with the fully informed advice of counsel. With the appropriate legal protections and in the appropriate setting, I would be happy to meet with you and provide a more detailed proffer of the testimony my client could provide to Congress.

Sincerely,

Mark D. Lytle
Partner

cc:     The Honorable Michael Horowitz
        Inspector General, U.S. Department of Justice

        The Honorable Russell George
        Inspector General for Tax Administration, U.S. Department of the Treasury

EXAMINATION

BY <u>MAJORITY COUNSEL 1:</u>

Q     Do you recognize this document?

A     Yes, I do.

Q     What is it?

A     This is the April 19th, 2023, letter sent to the chairs and ranking members identified here by my attorneys Mark Lytle and -- oh, it's just from Mark Lytle.

Q     And this is the initial reason why we're here today?

A     This initiated what's happening, yes.

Q     Okay.   I'd like to talk a little bit about your background. You mentioned, I believe, that you started at the IRS in 2009.   Is that correct?

A     Yes, that's correct.

Q     And what is your educational background?

A     I have an accounting and business degree from the University of Maryland, and I have a master's in business administration from the University of Baltimore.

Q     And before you joined the IRS, what did you do for employment?

A     I was in the Office of Inspector General with the National Security Agency.

Q     And when did you begin in that position?

A     2007.

Q     Did you hold any other positions prior to that?

A     Internships and stuff like that.

Q     What was your motivation for joining the IRS?

A     I always planned on going into law enforcement and I really had a desire to serve.   And that was why I went with the accounting degree and business degree and I

got my MBA, was for the purpose of getting that special agent job with the Federal Government.

Q       And you talked through sort of your history at the IRS during your opening statement.   Can you briefly summarize your roles and responsibilities in your current position?

A       Yes.   So I oversee 12 agents.   They are handpicked.   They sit all across the country.   We work all high-dollar, complex, international cases.   We work foreign financial institutions.   We do undercover operations and search warrants and all that stuff in other countries and in this country.

And I'm responsible for reviewing all enforcement actions and recommendation reports and case initiations and so on and so forth.   That's like my main job as the supervisory special agent of ITFC.

I'm also a representative in the Joint Chiefs of Global Tax Enforcement, working I guess directly under the Chief of IRS CI.   And it works with four other partner countries in trying to collaborate and attack tax noncompliance on a global scale and share information where we can legally.

Q       And who do you directly report to?

A       My current report is Assistant Special Agent in Charge Lola Watson.

BY MAJORITY COUNSEL 2:

Q       Where does she sit?

A       Washington, D.C.

Q       She sits in Washington.   And your office is in Baltimore?

A       Yeah.   I either sit in D.C. or Baltimore.   I kind of split time.

Q       Okay.

BY MAJORITY COUNSEL 1:

Q      In the typical situation in the criminal tax investigation, what is your understanding of the leadership and management structure at the Tax Division at the Department of Justice?

A      Well, with most of our cases, because they're complex and high-dollar and they usually align with the very top priorities in the agency, we usually have Department of Justice Tax attorneys that assist on the cases with us.

That's not typical for small cases, normal cases.    But in our cases and in this particular case, from the very beginning there were two Department of Justice Tax Division attorneys working side by side with us the entire time.    So they worked as prosecutors alongside the AUSAs in Delaware.

And then ultimately what happens is the prosecution recommendation report that is produced by Criminal Investigation gets sent to DOJ Tax.    And they absorb that report, and they usually put out a memo either approving, providing discretion, or declining. And in the normal course, it's usually a pretty quick turnaround, 30 days, 45 days.

Q      You mentioned two prosecutors in this case at DOJ Tax.    Who are those two individuals?

A      At the beginning, it was Jason Poole and Mark Daly.    And Mark Daly was definitely the lead.    Jason Poole took a different position at some point and Jack Morgan took his spot.

Q      And did those individuals sit in Washington, D.C.?

A      I know Mark Daly does.    I'm pretty sure -- yeah, Jack Morgan does as well, yes, yes.

Q      In the course of this investigation, did you interact with anyone else at the DOJ Tax Division?

A      I interacted with Jason Poole a lot, but in his new role, because he became

the chief of the Northern Division of the Department of Justice's Tax Division, and I had to call him on several occasions concerning issues we were having.

MAJORITY COUNSEL 2.    On this case?

Mr. Shapley.    Yes.

MAJORITY COUNSEL 1.    Okay.    And in a typical case, what is IRS CI's relationship with any given U.S. Attorney's Office?

Mr. Shapley.    I'm sorry, can I add to my last question there?

MAJORITY COUNSEL 1.    Please.

Mr. Shapley.    So I also interacted with Stuart Goldberg, who I think is a Deputy Assistant Attorney General, I think is his title, on a few occasions.

MAJORITY COUNSEL 2.    And he's the head of the Tax Division?

Mr. Shapley.    I believe he's the head of the Civil Tax Division and the head of the Criminal is different, but there is not currently a person who's been confirmed there, I believe.

Usually Stuart Goldberg would not be the person overseeing the criminal tax stuff. It usually would go to the personal -- the Criminal Division.

MAJORITY COUNSEL 2.    Is it fair to say he was the senior-most official in the Tax Division?

Mr. Shapley.    Yes.    That's fair, yes.

BY MAJORITY COUNSEL 1:

Q    On this investigation?

A    That's correct.

Q    Okay.    What in a typical case would be IRS CI's relationship with the U.S. Attorney's Office?

A    On a case, we would talk strategy.    We would go and get the evidence,

bring the evidence to them.    We would be requesting to do, get certain document requests from them.

There are things like search warrants and undercover operations that all go through the United States Attorney's Office prosecutors.    And generally, the way it works is the agents go out and they get the information, and they have to be proactive in doing so.    And they bring that information to the prosecutor, and we kind of go forward from there.

Q    In your opening statement, you described prosecution team meetings.    In this case, individuals from which organizations participated in those meetings?

[10:32 a.m.]

Mr. <u>Shapley.</u>   Sure, yeah.    The prosecution team is the United States Attorney's Office for Delaware, Department of Justice Tax Division.

At some point in time, a Department of Justice National Security Division attorney came on.

<u>MAJORITY COUNSEL 2.</u>   Who was that?

Mr. <u>Shapley.</u>   McKenzie.    Brian McKenzie.

And then it was FBI.    And that was usually from the SSA to the case agents, and there was around four or five of them.

BY <u>MAJORITY COUNSEL 1:</u>

Q     Sorry.    What's SSA?

A     I'm sorry.    Supervisory special agent, SSA.

And then it was IRS.    And it was me, ███████, and the co-case agent, Christine Puglisi.    And there was also an IRS CI agent out of the Philadelphia Field Office that was working some ancillary issues, Anthony LoPiccolo, who would also participate in those.

And United States Attorney Weiss would be on those, but it wasn't scheduled. He'd be on some -- pop in, pop out, that type of thing.

Q     And is the structure of that prosecution team typical for a case of this size and profile?

A     It was -- we met more often, I think, because there were so many moving parts.    I wouldn't say that it's typical to have a prosecution team meeting every 2 weeks in other cases.    But it was just a way to get everybody at one spot at one time to have the conversations.

Q     And how did this specific investigation begin?

A        So Special Agent ███████ was working on another case, and during that case he found some reports that had some individuals' names in it.    And it was basically a case development tool he was using, and he looked at those and was seeing if he can initiate criminal investigations on that list of people, and Hunter Biden was one of the people on that list.

Q        And from that stage, how does an investigation open?    What's the process around that?

A        So the agent can write a PI evaluation report, and they send it to my level, the SSA, supervisory special agent.    And if it's a Title 26 case, it can just be approved and put on our system.

Now, under a PI, it's kind of unique at IRS CI.    There are only a few techniques you can use, and it does [not] include third-party contacts and stuff like that.

So there's a whole other effort to make a subject criminal investigation, and that's a more involved form, called the 9131, and it has a bunch of attachments.    And really it's an analysis of all the steps taken in the primary investigative phase.

And that 9131, in this case, if it's -- it goes forward to Department of Justice Tax Division for approval and -- yeah, yeah.    I'm sorry.

Generally.    If it's generally like a 9131, if it's going to be a grand jury investigation, request a grand jury investigation, generally a 9131 goes to Department of Justice Tax Division, who approves it, and you're allowed to participate in that grand jury.

Q        When a matter develops in this way, is there interaction on the civil side related to civil audits?    Are audits opened in connection with this process?

A        Audits aren't opened in partner with a criminal investigation.    Part of the primary investigative phase, as one of the things you would do, you would request all the information from IDRS, our internal system.    That would include checks for audits and

things like that in the past, but there would be no request to initiate any civil activity.

It's actually the exact opposite.    A form is issued that says -- the title of the form is Suspend Civil Activity, and the subject's identifiers are included.

Q    So in your opening statement you discussed tax years 2014 through 2019 for this particular taxpayer.    Do you know whether there are any issues related to 2020 or 2021?

A    No.    We never included that as part of the investigation. We did get the returns, but we didn't.

> [Shapley Exhibit No. 2
>
> Was marked for identification.]



ROBERT DOE ("RHB")

████████████
███ ▌ ████████
    ████████████

Years: 2014, 2015, 2016, 2017, 2018, 2019

Violation(s):Title 26, United States Code, Section 7201
Title 26, United States Code, Section 7206(1)
Title 26, United States Code, Section 7203

Special Agent: ██████████████
Revenue Agent: ██████████████

2. 

## CONCLUSIONS AND RECOMMENDATIONS

The recommendation for prosecution is based on the facts above and ▮▮▮▮▮ recommends that RHB be prosecuted under the provisions of Title 26 USC Sections 7201 and 7206 (1) for the tax years 2014, 2018 and 2019 and under the provisions of Title 26 USC Section 7203 for the tax years 2015, 2016, 2017, 2018 and 2019.

A draft of this SAR has been given to DOJ-Tax Senior Attorney Mark Daly, as well as Assistant United States Attorney Lesley Wolf. AUSA Wolf has reviewed the appendices and the charges cited in this report and agrees with the prosecution recommendation of the above cited charges against RHB.



Special Agent
Cellular ▮▮▮▮▮

**Approved:**

Gary Shapley

84

Supervisory Special Agent, Criminal Investigation

Cellular ████████████

BY <u>MAJORITY COUNSEL 1:</u>

Q      Okay.    I'd like to talk now a little bit about the specific tax years at issue.

The document being handed to you is marked as exhibit 2.

Are you familiar with this document?

A      Yes, I am.

Q      What is it?

A      This is the special agent report.

Q      And who is the subject of this report?

A      Yeah.    To clarify the last response, it's an excerpt from the special agent

report.

Q      And who is the subject of this report?

A      So it says Robert Doe.    That was the name that was put into our internal

system to attempt to keep anyone from revealing the name, and "RHB" stands for Robert

Hunter Biden.

Q      And turning to the second page of the document, this excerpt includes the

"Conclusions and Recommendations" section.    Can you describe the conclusions and

recommendations made in this report?

A      Yes, I can.    The report includes itemized elements of each violation for each

year up above it that I couldn't provide because of grand jury (6)(e) material.

This recommended felony tax evasion charges, that's 7201, is tax evasion, and

7206(1) is a false tax return, also a felony, for the tax years 2014, 2018, and 2019.    And

for Title 26 7203, which is a failure to file or pay, that is a misdemeanor charge for '15,

'16, '17, '18, and '19.

Also under that is a paragraph that is common when we work directly with

Department of Justice Tax Division and AUSA so closely.    We usually would give a statement saying what they wanted as well at that time.

This report was reviewed extensively with Mark Daly, and also a lot with AUSA Lesley Wolf, and each of them agreed with the recommendations as posed in this report.

Q    Okay.    And when was this document finalized and signed?

A    It was, I believe, January 27th of 2022.

BY MAJORITY COUNSEL 2:

Q    And can you just walk us through the process for this document?    This is an IRS document?

A    It is, yeah.

Q    And it is sent to who?

A    Yeah.    This document is a very robust document that includes everything that we do.    Internally it would go to CT counsel for their review.    They provide a memo, concur or nonconcur.    It's just advisory.    We don't have to follow what they say.

Q    Did they concur?

A    They nonconcurred.

Q    They did not concur?

A    Yeah.    There was a portion in my opening statement that described that event where the line attorney concurred with all charges and then it went to the national office to review on sensitive case.

The panel at the national office agreed with the line attorney that it was concur. And when it went up to their top two people at the CT counsel, they sent it back to the line attorney and told her to change it to nonconcur.

Q    Okay.

A    So I'm not even sure.    That could happen on occasion.    What was

incredibly outside the norm here was that they usually tell us, and we ask them to tell us if anything is going to be a nonconcur.    And all along they were saying it's a concur, it's a concur -- with all charges.    It was green for 2018, yellow for other years, which is all in the concur range.

And when we got the nonconcur, I went to my special agent in charge who called the line attorney's supervisor and she said, it's always been nonconcur.

And then it was really incredible that that statement was made, and maybe only IRS CI geeks care about that.    But then we communicate in an instant message that's captured with the line attorney saying, "They are telling us that this has always been a nonconcur," and she's like, "What, no, no.    It was a concur when I sent it up."

So for some reason, that got miscommunicated.

Q     Was any feedback provided as to why?

A     There's a robust document that was created by CT counsel -- I spent time rebutting it, but there was nothing that we hadn't considered in the investigative team with the prosecution team for the 3-plus years we'd been investigating.

Yeah, and this advisory.    Yeah, it is, I would say, 90-plus percent of everything that I do in my international tax group is nonconcur by CT counsel, and we ignore what they say.

So then this report goes, after that, to the Department of Justice Tax Division. It's transmitted to them.    And that's when they take it and they review it.    And usually it's approve, discretion, or declined in a normal course.    But we sent it to them on February 25th of 2022, and I have yet to see an approval, discretion, or declination.

Q     And what's the U.S. Attorney's Office in Delaware's role with this particular document?

A     So it's just to help advise them.    After DOJ Tax, if they approve a charge,

then that's DOJ Tax saying that you have to charge it.    And if the United States

Attorney's Office, they can say, "We don't want to charge it here," but DOJ Tax then has

to go and charge it.    They have the authority to do so.

Q    So did the U.S. Attorney's Office in Delaware concur with this?

A    They would never have [to as part of the process, but] they did when it was

written, right?    They were on board with all the charges when it was written.    But there

would never be an official time where we requested their concur or nonconcur.

Q    So did they review it before you submitted it to DOJ?

A    Oh, yes, yes.

Q    Okay.

A    Yes.

Q    And they had an opportunity to make suggestions or --

A    Yes.

Q    -- tell you to tweak things?

A    Yes.

Q    And they didn't.

A    Well, we did, but --

Q    The final document though --

A    Yeah.

Q    -- they concurred.

A    The final document was a compilation of everyone's understanding of what

the evidence said and what should be charged.

Just a little bit more about this document.    I mean, this document is around – it's

incredibly robust.    So I think it was around 85 pages, just the report, and it goes through

the theory of investigation.    And then it goes, like I said, into each year and each

element.

And it's each piece of evidence in each element, and it's cited to evidence.    So this report, in reality, crashes my computer every time it comes up because it includes all the evidence attached to it.    It's like 8-, 9-, 10,000 pages of evidence and documents. It's an incredibly robust document.

[Shapley Exhibit No. 3

Was marked for identification.]



nue Service Office of Appeals may request non-binding mediation on any issue unresolved at the conclusion of—

(A) appeals procedures; or

(B) unsuccessful attempts to enter into a closing agreement under section 7121 or a compromise under section 7122.

**(2) Arbitration**

The Secretary shall establish a pilot program under which a taxpayer and the Internal Revenue Service Office of Appeals may jointly request binding arbitration on any issue unresolved at the conclusion of—

(A) appeals procedures; or

(B) unsuccessful attempts to enter into a closing agreement under section 7121 or a compromise under section 7122.

(Added Pub. L. 105–206, title III, §3465(a)(1), July 22, 1998, 112 Stat. 768.)

<center>PRIOR PROVISIONS</center>

A prior section 7123 was renumbered section 7124 of this title.

## § 7124. Cross references

For criminal penalties for concealment of property, false statement, or falsifying and destroying records, in connection with any closing agreement, compromise, or offer of compromise, see section 7206.

(Aug. 16, 1954, ch. 736, 68A Stat. 850, §7123; Pub. L. 97–258, §3(f)(12), Sept. 13, 1982, 96 Stat. 1065; renumbered §7124, Pub. L. 105–206, title III, §3465(a)(1), July 22, 1998, 112 Stat. 767.)

<center>AMENDMENTS</center>

1998—Pub. L. 105–206 renumbered section 7123 of this title as this section.

1982—Subsec. (a). Pub. L. 97–258, §3(f)(12)(A), struck out heading "Criminal penalties".

Subsec. (b). Pub. L. 97–258, §3(f)(12)(B), struck out subsec. (b) which set forth cross reference to R.S. 3469 (31 U.S.C. 194) relating to compromises after judgment.

## CHAPTER 75—CRIMES, OTHER OFFENSES, AND FORFEITURES

| Subchapter | | Sec.[1] |
|---|---|---|
| A. | Crimes | 7201 |
| B. | Other offenses | 7261 |
| C. | Forfeitures | 7301 |
| D. | Miscellaneous penalty and forfeiture provisions | 7341 |

### Subchapter A—Crimes

| Part | |
|---|---|
| I. | General provisions. |
| II. | Penalties applicable to certain taxes. |

### PART I—GENERAL PROVISIONS

| Sec. | |
|---|---|
| 7201. | Attempt to evade or defeat tax. |
| 7202. | Willful failure to collect or pay over tax. |
| 7203. | Willful failure to file return, supply information, or pay tax. |
| 7204. | Fraudulent statement or failure to make statement to employees. |
| 7205. | Fraudulent withholding exemption certificate or failure to supply information. |
| 7206. | Fraud and false statements. |

| Sec. | |
|---|---|
| 7207. | Fraudulent returns, statements, or other documents. |
| 7208. | Offenses relating to stamps. |
| 7209. | Unauthorized use or sale of stamps. |
| 7210. | Failure to obey summons. |
| 7211. | False statements to purchasers or lessees relating to tax. |
| 7212. | Attempts to interfere with administration of internal revenue laws. |
| 7213. | Unauthorized disclosure of information. |
| 7213A. | Unauthorized inspection of returns or return information. |
| 7214. | Offenses by officers and employees of the United States. |
| 7215. | Offenses with respect to collected taxes. |
| 7216. | Disclosure or use of information by preparers of returns. |
| 7217. | Prohibition on executive branch influence over taxpayer audits and other investigations. |

<center>AMENDMENTS</center>

1998—Pub. L. 105–206, title I, §1105(b), July 22, 1998, 112 Stat. 711, added item 7217.

1997—Pub. L. 105–35, §2(b)(2), Aug. 5, 1997, 111 Stat. 1105, added item 7213A.

1982—Pub. L. 97–248, title III, §357(b)(2), Sept. 3, 1982, 96 Stat. 646, struck out item 7217 "Civil damages for unauthorized disclosure of returns and return information".

1976—Pub. L. 94–455, title XII, §1202(e)(2), Oct. 4, 1976, 90 Stat. 1687, added item 7217.

1971—Pub. L. 92–178, title III, §316(b), Dec. 10, 1971, 85 Stat. 529, added item 7216.

1958—Pub. L. 85–321, §3(b), Feb. 11, 1958, 72 Stat. 6, added item 7215.

## § 7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 97–248, title III, §329(a), Sept. 3, 1982, 96 Stat. 618.)

<center>AMENDMENTS</center>

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$10,000".

<center>EFFECTIVE DATE OF 1982 AMENDMENT</center>

Section 329(e) of Pub. L. 97–248 provided that: "The amendments made by this section [amending this section and sections 7203, 7206, and 7207 of this title] shall apply to offenses committed after the date of the enactment of this Act [Sept. 3, 1982]."

## § 7202. Willful failure to collect or pay over tax

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851.)

**EXHIBIT**

3

§ 7124. Cross references

For criminal penalties for concealment of property, false statement, or falsifying and destroying records, in connection with any closing agreement, compromise, or offer of compromise, see section 7206.

(Aug. 16, 1954, ch. 736, 68A Stat. 850, § 7123; Pub. L. 97–258, § 3(f)(12), Sept. 13, 1982, 96 Stat. 1065; renumbered § 7124, Pub. L. 105–206, title III, § 3465(a)(1), July 22, 1998, 112 Stat. 767.)

AMENDMENTS

1998—Pub. L. 105–206 renumbered section 7123 of this title as this section.
1982—Subsec. (a). Pub. L. 97–258, § 3(f)(12)(A), struck out heading "Criminal penalties".
Subsec. (b). Pub. L. 97–258, § 3(f)(12)(B), struck out subsec. (b) which set forth cross reference to R.S. 3469 (31 U.S.C. 194) relating to compromises after judgment.

## CHAPTER 75—CRIMES, OTHER OFFENSES, AND FORFEITURES

| Subchapter | | Sec.[1] |
|---|---|---|
| A. | Crimes | 7201 |
| B. | Other offenses | 7261 |
| C. | Forfeitures | 7301 |
| D. | Miscellaneous penalty and forfeiture provisions | 7341 |

### Subchapter A—Crimes

| Part | |
|---|---|
| I. | General provisions. |
| II. | Penalties applicable to certain taxes. |

#### PART I—GENERAL PROVISIONS

| Sec. | |
|---|---|
| 7201. | Attempt to evade or defeat tax. |
| 7202. | Willful failure to collect or pay over tax. |
| 7203. | Willful failure to file return, supply information, or pay tax. |
| 7204. | Fraudulent statement or failure to make statement to employees. |
| 7205. | Fraudulent withholding exemption certificate or failure to supply information. |
| 7206. | Fraud and false statements. |
| 7207. | Fraudulent returns, statements, or other documents. |
| 7208. | Offenses relating to stamps. |
| 7209. | Unauthorized use or sale of stamps. |
| 7210. | Failure to obey summons. |
| 7211. | False statements to purchasers or lessees relating to tax. |
| 7212. | Attempts to interfere with administration of internal revenue laws. |
| 7213. | Unauthorized disclosure of information. |
| 7213A. | Unauthorized inspection of returns or return information. |
| 7214. | Offenses by officers and employees of the United States. |
| 7215. | Offenses with respect to collected taxes. |
| 7216. | Disclosure or use of information by preparers of returns. |
| 7217. | Prohibition on executive branch influence over taxpayer audits and other investigations. |

AMENDMENTS

1998—Pub. L. 105–206, title I, § 1105(b), July 22, 1998, 112 Stat. 711, added item 7217.
1997—Pub. L. 105–35, § 2(b)(2), Aug. 5, 1997, 111 Stat. 1105, added item 7213A.
1982—Pub. L. 97–248, title III, § 357(b)(2), Sept. 3, 1982, 96 Stat. 646, struck out item 7217 "Civil damages for un-

[1] Section numbers editorially supplied.

authorized disclosure of returns and return information".
1976—Pub. L. 94–455, title XII, § 1202(e)(2), Oct. 4, 1976, 90 Stat. 1687, added item 7217.
1971—Pub. L. 92–178, title III, § 316(b), Dec. 10, 1971, 85 Stat. 529, added item 7216.
1958—Pub. L. 85–321, § 3(b), Feb. 11, 1958, 72 Stat. 6, added item 7215.

## § 7201. Attempt to evade or defeat tax

Any person who willfully attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 97–248, title III, § 329(a), Sept. 3, 1982, 96 Stat. 618.)

AMENDMENTS

1982—Pub. L. 97–248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$10,000".

EFFECTIVE DATE OF 1982 AMENDMENT

Pub. L. 97–248, title III, § 329(e), Sept. 3, 1982, 96 Stat. 619, provided that: "The amendments made by this section [amending this section and sections 7203, 7206, and 7207 of this title] shall apply to offenses committed after the date of the enactment of this Act [Sept. 3, 1982]."

## § 7202. Willful failure to collect or pay over tax

Any person required under this title to collect, account for, and pay over any tax imposed by this title who willfully fails to collect or truthfully account for and pay over such tax shall, in addition to other penalties provided by law, be guilty of a felony and, upon conviction thereof, shall be fined not more than $10,000, or imprisoned not more than 5 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 851.)

## § 7203. Willful failure to file return, supply information, or pay tax

Any person required under this title to pay any estimated tax or tax, or required by this title or by regulations made under authority thereof to make a return, keep any records, or supply any information, who willfully fails to pay such estimated tax or tax, make such return, keep such records, or supply such information, at the time or times required by law or regulations, shall, in addition to other penalties provided by law, be guilty of a misdemeanor and, upon conviction thereof, shall be fined not more than $25,000 ($100,000 in the case of a corporation), or imprisoned not more than 1 year, or both, together with the costs of prosecution. In the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure. In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting

"felony" for "misdemeanor" and "5 years" for "1 year".

(Aug. 16, 1954, ch. 736, 68A Stat. 851; Pub. L. 90-364, title I, §103(e)(5), June 28, 1968, 82 Stat. 264; Pub. L. 97-248, title III, §§327, 329(b), Sept. 3, 1982, 96 Stat. 617, 618; Pub. L. 98-369, div. A, title IV, §412(b)(9), July 18, 1984, 98 Stat. 792; Pub. L. 100-690, title VII, §7601(a)(2)(B), Nov. 18, 1988, 102 Stat. 4504; Pub. L. 101-647, title XXXIII, §3303(a), Nov. 29, 1990, 104 Stat. 4918.)

### AMENDMENTS

1990—Pub. L. 101-647 substituted "substituting 'felony' for 'misdemeanor' and'' for "substituting''.

1988—Pub. L. 100-690 inserted at end "In the case of a willful violation of any provision of section 6050I, the first sentence of this section shall be applied by substituting '5 years' for '1 year'.''

1984—Pub. L. 98-369 struck out "(other than a return required under the authority of section 6015)'' after "to make a return''.

1982—Pub. L. 97-248, §329(b), substituted "$25,000 ($100,000 in the case of a corporation)'' for "$10,000''.

Pub. L. 97-248, §327, inserted last sentence providing that, in the case of any person with respect to whom there is a failure to pay any estimated tax, this section shall not apply to such person with respect to such failure if there is no addition to tax under section 6654 or 6655 with respect to such failure.

1968—Pub. L. 90-364 struck out reference to section 6016.

### EFFECTIVE DATE OF 1990 AMENDMENT

Pub. L. 101-647, title XXXIII, §3303(c), Nov. 29, 1990, 104 Stat. 4918, provided that: "The amendment made by subsection (a) [amending this section] shall apply to actions and failures to act, occurring after the date of the enactment of this Act [Nov. 29, 1990].''.

### EFFECTIVE DATE OF 1988 AMENDMENT

Amendment by Pub. L. 100-690 applicable to actions after Nov. 18, 1988, see section 7601(a)(3) of Pub. L. 100-690, set out as a note under section 6050I of this title.

### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98-369 applicable with respect to taxable years beginning after Dec. 31, 1984, see section 414(a)(1) of Pub. L. 98-369, set out as a note under section 6654 of this title.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by section 329(b) of Pub. L. 97-248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97-248, set out as a note under section 7201 of this title.

### EFFECTIVE DATE OF 1968 AMENDMENT

Amendment by Pub. L. 90-364 applicable with respect to taxable years beginning after Dec. 31, 1967, except as provided by section 104 of Pub. L. 90-364, see section 103(f) of Pub. L. 90-364, set out as a note under section 243 of this title.

## § 7204. Fraudulent statement or failure to make statement to employees

In lieu of any other penalty provided by law (except the penalty provided by section 6674) any person required under the provisions of section 6051 to furnish a statement who willfully furnishes a false or fraudulent statement or who willfully fails to furnish a statement in the manner, at the time, and showing the information required under section 6051, or regulations prescribed thereunder, shall, for each such of-

fense, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 852.)

## § 7205. Fraudulent withholding exemption certificate or failure to supply information

### (a) Withholding on wages

Any individual required to supply information to his employer under section 3402 who willfully supplies false or fraudulent information, or who willfully fails to supply information thereunder which would require an increase in the tax to be withheld under section 3402, shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

### (b) Backup withholding on interest and dividends

If any individual willfully makes a false certification under paragraph (1) or (2)(C) of section 3406(d), then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 852; Pub. L. 89-368, title I, §101(e)(5), Mar. 15, 1966, 80 Stat. 62; Pub. L. 97-34, title VII, §721(b), Aug. 13, 1981, 95 Stat. 341; Pub. L. 97-248, title III, §§306(b), 308(a), Sept. 3, 1982, 96 Stat. 586, 591; Pub. L. 98-67, title I, §§102(a), 107(b), Aug. 5, 1983, 97 Stat. 369, 382; Pub. L. 98-369, div. A, title I, §159(a), July 18, 1984, 98 Stat. 696; Pub. L. 101-239, title VII, §7711(b)(2), Dec. 19, 1989, 103 Stat. 2393.)

### AMENDMENTS

1989—Subsec. (b). Pub. L. 101-239 amended subsec. (b) generally. Prior to amendment, subsec. (b) read as follows: "If any individual willfully makes—

"(1) any false certification or affirmation on any statement required by a payor in order to meet the due diligence requirements of section 6676(b), or

"(2) a false certification under paragraph (1) or (2)(C) of section 3406(d),

then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both.''

1984—Pub. L. 98-369 in subsecs. (a) and (b) substituted "in addition to'' for "in lieu of'' and struck out reference to penalty under section 6682 after "penalty provided by law''.

1983—Pub. L. 98-67 designated existing provisions as subsec. (a), added subsec. (b), and repealed amendments made by Pub. L. 97-248. See 1982 Amendment note below.

1982—Pub. L. 97-248 provided that, applicable to payments of interest, dividends, and patronage dividends paid or credited after June 30, 1983, this section is amended by designating the existing provisions as subsec. (a) with a heading of "Withholding on wages", and by adding a new subsec. (b), of Pub. L. 98-67, title I, Aug. 5, 1983, 97 Stat. 369, repealed subtitle A (§§301-308) of title III of Pub. L. 97-248 as of the close of June 30, 1983, and provided that the Internal Revenue Code of 1954 [now 1986] [this title] shall be applied and administered (subject to certain exceptions) as if such subtitle A (and the amendments made by such subtitle A) had not been enacted. Subsec. (b), referred to above, read as follows:

"(b) Withholding of interest and dividends

"Any person who—

then such individual shall, in addition to any other penalty provided by law, upon conviction thereof, be fined not more than $1,000, or imprisoned not more than 1 year, or both."

1984—Pub. L. 98-369 in subsecs. (a) and (b) substituted "in addition to" for "in lieu of" and struck out reference to penalty under section 6682 after "penalty provided by law".

1983—Pub. L. 98-67 designated existing provisions as subsec. (a), added subsec. (b), and repealed amendments made by Pub. L. 97-248. See 1982 Amendment note below.

1982—Pub. L. 97-248 provided that, applicable to payments of interest, dividends, and patronage dividends paid or credited after June 30, 1983, this section is amended by designating the existing provisions as subsec. (a) with a heading of "Withholding on wages", and by adding a new subsec. (b). Section 102(a), (b) of Pub. L. 98-67, title I, Aug. 5, 1983, 97 Stat. 369, repealed subtitle A (§§ 301–308) of title III of Pub. L. 97-248 as of the close of June 30, 1983, and provided that the Internal Revenue Code of 1954 [now 1986] [this title] shall be applied and administered (subject to certain exceptions) as if such subtitle A (and the amendments made by such subtitle A) had not been enacted. Subsec. (b), referred to above, read as follows:

"(b) Withholding of interest and dividends

"Any person who—

"(1) willfully files an exemption certificate with any payor under section 3452(f)(1)(A), which is known by him to be fraudulent or to be false as to any material matter, or

"(2) is required to furnish notice under section 3452(f)(1)(B), and willfully fails to furnish such notice in the manner and at the time required pursuant to section 3452(f)(1)(B) or the regulations prescribed thereunder,

shall, in lieu of any penalty otherwise provided, upon conviction thereof, be fined not more than $500, or imprisoned not more than 1 year, or both."

1981—Pub. L. 97-34 substituted "$1,000" for "$500".

1966—Pub. L. 89-368 substituted "section 3402" and "any other penalty provided by law (except the penalty provided by section 6682)" for "section 3402(f)" and "any penalty otherwise provided" respectively.

### Statutory Notes and Related Subsidiaries

#### Effective Date of 1989 Amendment

Amendment by Pub. L. 101-239 applicable to returns and statements the due date for which (determined without regard to extensions) is after Dec. 31, 1989, see section 7711(c) of Pub. L. 101-239, set out as a note under section 6721 of this title.

#### Effective Date of 1984 Amendment

Pub. L. 98-369, div. A, title I, §159(b), July 18, 1984, 98 Stat. 696, provided that: "The amendments made by this section [amending this section] shall apply to actions and failures to act occurring after the date of the enactment of this Act [July 18, 1984]."

#### Effective Date of 1983 Amendment

Amendment by section 107(b) of Pub. L. 98-67 effective Aug. 5, 1983, see section 110(c) of Pub. L. 98-67, set out as a note under section 31 of this title.

#### Effective Date of 1981 Amendment

Amendment by Pub. L. 97-34 applicable to acts and failures to act after Dec. 31, 1981, see section 721(d) of Pub. L. 97-34, set out as a note under section 6682 of this title.

### § 7206. Fraud and false statements

Any person who—

#### (1) Declaration under penalties of perjury

Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; or

#### (2) Aid or assistance

Willfully aids or assists in, or procures, counsels, or advises the preparation or presentation under, or in connection with any matter arising under, the internal revenue laws, of a return, affidavit, claim, or other document, which is fraudulent or is false as to any material matter, whether or not such falsity or fraud is with the knowledge or consent of the person authorized or required to present such return, affidavit, claim, or document; or

#### (3) Fraudulent bonds, permits, and entries

Simulates or falsely or fraudulently executes or signs any bond, permit, entry, or other document required by the provisions of the internal revenue laws, or by any regulation made in pursuance thereof, or procures the same to be falsely or fraudulently executed, or advises, aids in, or connives at such execution thereof; or

#### (4) Removal or concealment with intent to defraud

Removes, deposits, or conceals, or is concerned in removing, depositing, or concealing, any goods or commodities for or in respect whereof any tax is or shall be imposed, or any property upon which levy is authorized by section 6331, with intent to evade or defeat the assessment or collection of any tax imposed by this title; or

#### (5) Compromises and closing agreements

In connection with any compromise under section 7122, or offer of such compromise, or in connection with any closing agreement under section 7121, or offer to enter into any such agreement, willfully—

##### (A) Concealment of property

Conceals from any officer or employee of the United States any property belonging to the estate of a taxpayer or other person liable in respect of the tax, or

##### (B) Withholding, falsifying, and destroying records

Receives, withholds, destroys, mutilates, or falsifies any book, document, or record, or makes any false statement, relating to the estate or financial condition of the taxpayer or other person liable in respect of the tax;

shall be guilty of a felony and, upon conviction thereof, shall be fined not more than $100,000 ($500,000 in the case of a corporation), or imprisoned not more than 3 years, or both, together with the costs of prosecution.

(Aug. 16, 1954, ch. 736, 68A Stat. 852; Pub. L. 97-248, title III, §329(c), Sept. 3, 1982, 96 Stat. 618.)

### Editorial Notes

#### Amendments

1982—Pub. L. 97-248 substituted "$100,000 ($500,000 in the case of a corporation)" for "$5,000".

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

## § 7207. Fraudulent returns, statements, or other documents

Any person who willfully delivers or discloses to the Secretary any list, return, account, statement, or other document, known by him to be fraudulent or to be false as to any material matter, shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both. Any person required pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527 to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $10,000 ($50,000 in the case of a corporation), or imprisoned not more than 1 year, or both.

(Aug. 16, 1954, ch. 736, 68A Stat. 853; Pub. L. 87–792, § 7(m)(3), Oct. 10, 1962, 76 Stat. 831; Pub. L. 91–172, title I, § 101(e)(5), Dec. 30, 1969, 83 Stat. 524; Pub. L. 94–455, title XIX, § 1906(b)(13)(A), Oct. 4, 1976, 90 Stat. 1834; Pub. L. 96–603, § 1(d)(5), Dec. 28, 1980, 94 Stat. 3505; Pub. L. 97–248, title III, § 329(d), Sept. 3, 1982, 96 Stat. 619; Pub. L. 98–369, div. A, title IV, § 491(d)(51), July 18, 1984, 98 Stat. 852; Pub. L. 100–203, title X, § 10704(c), Dec. 22, 1987, 101 Stat. 1330–463; Pub. L. 105–277, div. J, title I, § 1004(b)(2)(E), Oct. 21, 1998, 112 Stat. 2681–890; Pub. L. 107–276, § 6(d), Nov. 2, 2002, 116 Stat. 1933.)

### Editorial Notes

#### AMENDMENTS

2002—Pub. L. 107–276 substituted "pursuant to section 6047(b), section 6104(d), or subsection (i) or (j) of section 527" for "pursuant to subsection (b) of section 6047 or pursuant to subsection (d) of section 6104".

1998—Pub. L. 105–277 struck out "or (e)" after "subsection (d)".

1987—Pub. L. 100–203 inserted reference to subsec. (e) of section 6104.

1984—Pub. L. 98–369 struck out "or (c)" after "subsection (b)".

1982—Pub. L. 97–248 substituted "$10,000 ($50,000 in the case of a corporation)" for "$1,000" wherever appearing.

1980—Pub. L. 96–603 substituted "subsection (b) or (c) of section 6047 or pursuant to subsection (d) of section 6104" for "sections 6047(b) or (c), 6056, or 6104(d)".

1976—Pub. L. 94–455 struck out "or his delegate" after "Secretary".

1969—Pub. L. 91–172 substituted "sections 6047(b) or (c), 6056, or 6104(d)" for "section 6047(b) or (c)".

1962—Pub. L. 87–792 inserted sentence providing that any person required pursuant to section 6047(b) or (c) to furnish any information to the Secretary or any other person who willfully furnishes to the Secretary or such other person any information known by him to be fraudulent or to be false as to any material matter shall be fined not more than $1,000, or imprisoned not more than 1 year, or both.

## Statutory Notes and Related Subsidiaries

### EFFECTIVE DATE OF 2002 AMENDMENT

Pub. L. 107–276, § 6(h)(3), Nov. 2, 2002, 116 Stat. 1934, provided that: "The amendment made by subsection (d)

[amending this section] shall apply to reports and notices required to be filed on or after the date of the enactment of this Act [Nov. 2, 2002]."

### EFFECTIVE DATE OF 1998 AMENDMENT

Amendment by Pub. L. 105–277 applicable to requests made after the later of Dec. 31, 1998, or the 60th day after the Secretary of the Treasury first issues the regulations referred to in section 6104(d)(4) of this title, see section 1004(b)(3) of Pub. L. 105–277, set out as a note under section 6104 of this title.

### EFFECTIVE DATE OF 1987 AMENDMENT

Amendment by Pub. L. 100–203 applicable to returns for years beginning after Dec. 31, 1986, and on and after Dec. 22, 1987, in case of applications submitted after July 15, 1987, or on or before July 15, 1987, if the organization has a copy of the application on July 15, 1987, see section 10704(d) of Pub. L. 100–203, set out as a note under section 6652 of this title.

### EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–369 applicable to obligations issued after Dec. 31, 1983, see section 491(f)(1) of Pub. L. 98–369, set out as a note under section 62 of this title.

### EFFECTIVE DATE OF 1982 AMENDMENT

Amendment by Pub. L. 97–248 applicable to offenses committed after Sept. 3, 1982, see section 329(e) of Pub. L. 97–248, set out as a note under section 7201 of this title.

### EFFECTIVE DATE OF 1980 AMENDMENT

Amendment by Pub. L. 96–603 applicable to taxable years beginning after Dec. 31, 1980, see section 1(f) of Pub. L. 96–603, set out as a note under section 6033 of this title.

### EFFECTIVE DATE OF 1969 AMENDMENT

Amendment by Pub. L. 91–172 effective Jan. 1, 1970, see section 101(k)(1) of Pub. L. 91–172, set out as an Effective Date note under section 4940 of this title.

### EFFECTIVE DATE OF 1962 AMENDMENT

Amendment by Pub. L. 87–792 applicable to taxable years beginning after Dec. 31, 1962, see section 8 of Pub. L. 87–792, set out as a note under section 22 of this title.

#### ANNUAL REPORTS

Pub. L. 110–428, § 2(e), Oct. 15, 2008, 122 Stat. 4840, provided that: "The Secretary of the Treasury shall annually submit to Congress and make publicly available a report on the filing of false and fraudulent returns by individuals incarcerated in Federal and State prisons. Such report shall include statistics on the number of false and fraudulent returns associated with each Federal and State prison."

## § 7208. Offenses relating to stamps

Any person who—

### (1) Counterfeiting

With intent to defraud, alters, forges, makes, or counterfeits any stamp, coupon, ticket, book, or other device prescribed under authority of this title for the collection or payment of any tax imposed by this title, or sells, lends, or has in his possession any such altered, forged, or counterfeited stamp, coupon, ticket, book, or other device, or makes, uses, sells, or has in his possession any material in imitation of the material used in the manufacture of such stamp, coupon, ticket, book, or other device; or

### (2) Mutilation or removal

Fraudulently cuts, tears, or removes from any vellum, parchment, paper, instrument,

BY <u>MAJORITY COUNSEL 1:</u>

Q    Okay.    The document just handed to you is being marked exhibit 3.    I'll give you a moment to look it over.

A    Oh, okay, yes.    Okay.

Q    So this document contains the relevant statutory citations included in the special agent report document you just looked at, and I'd like to walk through each of the relevant statutes briefly.

A    Okay.

Q    26 U.S.C. 7201 covers attempt to evade or defeat tax.    Is that correct?

A    That is.

Q    What are the elements of a 7201 offense?

A    So the elements are affirmative acts of evasion.    They are that there's a tax due and owing and -- I'm not used to reading it in this setting, so I'm sorry.    So it's willful attempts in any manner to evade or defeat any tax imposed by this title or the payment thereof.    There has to be tax due and owing.    And the willfulness is a voluntary, intentional violation of a known legal duty.    And those are the elements.

Q    And what is the statute of limitations for this offense?

A    It's 6 -- this says 5 years.    Did that just change?    It was 6 years -- 6 years from the date.    Yeah.    This says 5 years.

<u>MINORITY COUNSEL 2.</u>    No, that's the prison sentence.

Mr. <u>Shapley.</u>    Oh, thank you very much.

Yeah, the statute of limitations is 6 years from when the return is filed or of an affirmative act of evasion that could occur after the filing of the tax returns.

BY <u>MAJORITY COUNSEL 1:</u>

Q      Okay.    And based on the conclusion in your report, the elements for that offense were met in tax years 2014, 2018, and 2019.    Is that correct?

A      That's correct.

Q      Okay.    26 U.S.C. 7203 covers willful failure to file, to supply information, or pay tax.    Is that correct?

A      It is.

Q      And what are the elements of a 7203 offense?

A      So that's that you had a requirement to file and that you had the knowledge that you did have to file, is how I know it.    I mean, would you --

Q      That's okay, you don't need to read the whole thing.

BY MAJORITY COUNSEL 2:

Q      Yeah, we're just giving you the statute.    And this isn't a pop quiz.

A      Yeah, sorry, yeah.

Q      We're just trying to understand what the elements of these crimes are --

A      Yeah.

Q      -- what the statute of limitations is and so forth.    And since this is not a pop quiz, we just thought we would provide this as a resource.

A      Yeah.    I never see it in this format.

BY MAJORITY COUNSEL 1:

Q      Understood.

And what's the statute of limitations for this?

A      It's 6 years.

Q      And based on this report, elements for that offense were met in 2015, 2016, 2017, 2018, and 2019.    Is that correct?

A      That's correct, yes.

Q      And same exercise, 26 U.S.C. 7206 (1) covers fraud or false statement.    Is that correct?

A      It is.

Q      And what are the elements of a 7206 (1) offense as you understand it?

A      So that there's a material misrepresentation of an item on that tax return, that they subscribe to that under penalties of perjury, and the willfulness and knowledge.

Q      Okay.    And what is the statute of limitations for that offense?

A      It's 6 years.

Q      And the elements for that offense were met in tax years 2014, 2018, and 2019.    Is that correct?

A      That's correct, yes.

Q      Is the tax liability at issue here related to just the individual taxpayer or to related companies controlled or that the taxpayer's --

A      These charges include related companies as well.

Q      Okay.    Can you tell us which companies were involved?

A      Yeah.    He was responsible for filing personal income tax returns as well as returns for Owasco P.C.

Q      And is there anything you can tell us about Owasco P.C., as far as what is the company, what does it do?

A      Oh.    So Owasco P.C., through the evidence that we obtained, was basically created with his partner Eric Schwerin.    And the crux of this, as I understand it, is that Hunter Biden had a history of noncompliance with his taxes, and he would often get large sums of money and wouldn't withhold.

So Owasco P.C. -- was initially for the -- the whole purpose was, Eric Schwerin came in to help him with his tax situation so it didn't continue to be a problem in the

future.

So all of his consulting fees and all that type of stuff would go into Owasco. There would be withholdings from it.    So then he didn't get -- when he filed his tax returns, they had withholdings to offset the taxes that he owed for that year.

Q      Okay.    Were there any other companies that you looked at in connection with this investigation?

A      Yes.

Q      A lot?

A      Yes, a lot.

Q      Okay.    The U.S. House Committee on Oversight and Accountability has publicly identified a series of companies, mostly LLCs, that are connected to this taxpayer. I'd like to walk through a list of those companies and just ask whether any of these companies were part of your investigative work.

Lion Hall Group, LLC?

A      Yes.

Q      Owasco P.C.?

A      Yes.

Q      Robinson Walker, LLC?

A      Yes.

Q      Skaneateles, LLC?

A      Yes.

Q      Seneca Global Advisers, LLC?

A      Yes.

Q      Rosemont Seneca Partners, LLC?

A      Yes.

Q       Rosemont Seneca Principal Investments, LLC?

A       Yes.

Q       Rosemont Realty, LLC?

A       Yes.

Q       Rosemont Seneca Technology Partners, LLC?

A       Not a hundred percent sure on that one.

Q       Rosemont Seneca Thornton, LLC?

A       Yes.

Q       Rosemont Seneca Advisors, LLC?

A       Yes.

Q       Rosemont Seneca Bohai, LLC?

A       Yes.

Q       JBB SR, Inc?

A       I'm not sure of that one.

Q       RSTP II Alpha Partners, LLC?

A       Yes.

Q       RSTP II Bravo Partners, LLC?

A       Yes.

Q       Owasco, LLC?

A       Yes.

Q       Hudson West III, LLC?

A       Yes.

Yes.    Sorry.

Q       Hudson West V, LLC?

A       I'm not sure about V.

Q      CEFC Infrastructure Investment U.S., LLC?

A      Yes.

Q      And in your line of work, are you familiar with what a form 1023 is?

MAJORITY COUNSEL 2.      FBI form 1023?

Mr. Shapley.     I don't know that form.

         BY MAJORITY COUNSEL 1:

Q      In the course of your investigation, did any FBI agent ever make you aware of a form 1023 related to Hunter Biden or any of his family members?

A      We never discussed the form.

Q      Okay.    I think in your opening statement you discussed the jurisdiction in which the crimes we were just discussing took place, and you stated the District of Columbia.    Is that correct?

A      For 2014 and 2015, yes.

Q      Okay.    And Central District of California?    Is that correct?

A      That is correct.

Q      Any other jurisdictions?

A      The -- no, no.    I mean, there was a possibility of some, but it was always that those were the strongest, those were the ones that should be.

Q      And those are the jurisdictions related to the recommendations in the special agent report excerpt that we looked at earlier?

A      Yes, that's correct.

Q      And are you able to share details or estimates of the scope of the liability the taxpayer had to the U.S. Government or the loss to the U.S. Government in each of these tax years?

A      I probably couldn't itemize it off the top of my head, but altogether it was

around $2.2 million.

Q       Spanning 2014 through 2019 tax years?

A       Yes.    And that only includes tax liabilities that were determined on a filed tax return, because there's still unreported income in 2014 that there's no way to collect because the statute of limitations is gone.

Q       Okay.    So let's talk about that.

So you stated earlier that at the October 7th, 2022, meeting there was only 1 month remaining to collect taxes owed for tax years -- for tax year 2014.    Is that correct?

A       To charge.

Q       To charge?

A       Yes.

Q       For tax year 2014?

A       I believe it was '14 and '15.

Q       '14 and '15.    Okay.

Do you know or can you clarify whether there was a deadline for collecting those taxes?

A       I don't know if I understand your question.    Sorry.

Q       Is the deadline for collecting taxes the same as the statute of limitations period for the crime?

A       The deadline to collect, I guess, is what I'm confused about.    Like when the tax return is filed, even if it's only an extension and they're going to extend it, they have to pay the tax due and owing by the due date of the return.

And then if someone was charged and there was, say, a $2.2 million tax due and owing, it would be the courts that define when the payments are made as part of the sentencing.

Q      Okay.    Understood.

MAJORITY COUNSEL 2.    Was the statute about to run, though?    You talked about the October 7th, 2022, meeting.

Mr. Shapley.    Yeah.    The statute was about to blow in March of 2022.    And Department of Justice Tax Division and the U.S. Attorney's Office in Delaware were saying, "Get us the report, get us the report, get us the report."    They were pushing really hard to get the report to them because they wanted to go to defense counsel and say that it's been recommended, because they were hoping to initiate conversations.

Their plan was, was to go to D.C. and to charge pretty soon thereafter, which is why they requested discovery from all the agents at that time.    But what happened was the defense counsel said, "Whoa, whoa, whoa, whoa, don't charge, we'll sign statute of limitations waivers."

Mr. Lytle.    Extensions.

Mr. Shapley.    Extensions.    I'm sorry.    Statute of limitation extensions.    So I believe at least two of those were signed by defense counsel, and the prosecutors told us that they were willing to sign that, more of them, but they just didn't request it after the November limitation expired.

BY MAJORITY COUNSEL 2:

Q      Do you know when the extensions were signed and for what tax years?

A      Well, these were specific to 2014 and '15 because the statute of limitations were expiring.

Q      Okay.

A      And they -- didn't -- they just wanted to say, "Well, don't indict, my guy, like, we'll talk to you about it, we'll sign the extensions, and then you can --"

Q      And how long were the extensions good for?

A      I believe it was 6 months, each extension, but I'm not a hundred percent on
that.   They could -- maybe they could being be defined as well.   I'm not -- because I
know they signed at least two, and the last one was expiring in November of 2022.

Mr. Leavitt.   So they were shorter than 6 months.

Mr. Shapley.   Yeah, so they might be shorter than 6 months.

MAJORITY COUNSEL 2.   And ultimately the statute ran?

Mr. Shapley.   It was a conscious decision by DOJ to let that run.   They could've
had them extend '14 and '15, but they said no.

MAJORITY COUNSEL 1.   And when you say DOJ, who, in your opinion, ultimately
made that decision?

Mr. Shapley.   So, it had to be United States Attorney Weiss.   I don't know
personally, but that's how it would usually work.

BY MAJORITY COUNSEL 2:

Q      It's not DOJ Tax?

A      In this case no.   The U.S. Attorney's Office would likely take the lead.   But
then again, that's just based on my experience and how it would usually work, how I've
seen it work.

Q      And can you give us any more information about the statute running in that
particular instance?

A      I mean --

Q      Did you get any feedback from the U.S. Attorney's Office as to the
blow-by-blow between their office and the taxpayer's lawyers?

A      They weren't very transparent with the interactions with defense counsel.
I just know that in March when D.C. said no we still had that belief that he had some
authority, because we were doing a lot of work to try to, like, overcome whatever issues

D.C. said that they had with the report.

And we thought that he still had the authority to charge.   And then October 7th meeting comes and he said we couldn't charge it there, and he requested special counsel authority.   It was denied.   So there was really no ability to charge it there.   He had no mechanism to charge it if what he said actually happened.   So they let the statute expire.

MAJORITY COUNSEL 1.   Okay.   I'm going to talk about specific issues in specific tax years to the extent you're able.   I know you said that special agent report was a very robust document.   And if you don't know or you don't recall the answers, that's totally fine.

For tax year 2014, what evidence led to the recommendation for charges for attempt to evade and false statement?

Mr. Lytle.   Can we just have a sort of an understanding that he can't speak about grand jury materials and protected (6)(E) just so it's clear that way?

MAJORITY COUNSEL 1.   Absolutely.   And if that's an issue, we'll certainly defer to you on that, what can and can't be talked about.

Mr. Lytle.   Great.

Mr. Shapley.   So, is the question for specific evidence or more of a theme of evidence?

MAJORITY COUNSEL 1.   Let's start with a theme.

Mr. Shapley.   So concerning the Burisma income, Hunter Biden basically used a nominee organization, Rosemont Seneca Bohai -- which a convicted felon was the partner of.

MAJORITY COUNSEL 2.   That's Mr. Archer?

Mr. Shapley.   Yes.   Yes, Devon Archer.

And so the way the money worked is there's a document which is the contract between Burisma and Hunter Biden.   Those are the two parties.   It was for $1 million per year.   Of course this was 2014, and it was negotiated in April, so the payments in that year were reduced by the months.   So it was $666,000, $83,000 a month he was receiving.

What Hunter Biden did with that is he told Burisma to send that income to Rosemont Seneca Bohai.   And then when the money came back to him, he booked it as a loan.

So there's all this machinations of nonsense happening over here in this nominee structure that, "Oh, this is complex, this is complex," and, well, it's not complex, because this is -- it was a taxable event as soon as the income came from Burisma to Hunter Biden. And whatever he did with it after it was really just a scheme to evade taxes for that year.

And to add to it, is that Rosemont Seneca Bohai and Archer, when the money came back to Hunter Biden, they booked that as an expense on their books.   So even the two parties didn't treat it the same way.

And then Eric Schwerin realized this and looked into it, and he even told Hunter Biden on multiple occasions, multiple communications, you need to amend your 2014 return to include the Burisma income.   And he never did, and the statute's gone now.

[Shapley Exhibit No. 4

Was marked for identification.]

From: **Eric Schwerin**
Subject: Income
Date: January 16, 2017 at 3:11 PM
To: Hunter Biden




In 2013, your taxes reported $833,614 in income.

In 2014, your taxes reported $847,328 in income. (To be amended at $1,247,328)

In 2015, your taxes reported $2,478,208 in income.

2013 and 2014 were normal years where your income was based pretty much solely on income from Rosemont Seneca and Boies. In 2014 you joined the Burisma board and we still need to amend your 2014 returns to reflect the unreported Burisma income. That is approximately $400,000 extra so your income in 2014 was closer to $1,247,328.

The reason for the increased income in 2015 was that your income broke down as follows:

$166,666 from Burnham (for RSA)
$216,000 from Boies
$365,403 from Owasco (for RSA)
$300,000 one time payment from Eudora (for the 1/3 of CitizensRx)

The above represents all the cash you received directly.

In addition, you reported $1,000,000 of income that all went to RSB and you report $188,616 in income that also went to RSB. You didn't receive this in cash and it is in reality "phantom income".

So, of the approximately $2.5m in income you never really received almost $1.2m of it. (My numbers are approximate but you get the idea.)

Of the $1,300,000 in cash you received you had to pay $751,294 in taxes. Since you couldn't have lived on approximately $550,000 a year you "borrowed" some money from RSB in advance of payments.

FYI, in 2014 and 2015 you also had expenses beyond the norm because you renovated the house. Across 2014 and 2015 the renovation payments totaled approx. $200,000.

The numbers for 2016 haven't been finalized yet but you made at least the following:

$1,295,000 from Owasco, P.C. (representing Burisma and any Romania payments)
$216,000 from Boies Schiller

Unlike the prior years you actually received the above cash but the total income for 2016 won't be close to 2015.

Hope this makes sense.


Eric D. Schwerin



EXHIBIT

4



🖨 Consider the environment before printing this email.

BY <u>MAJORITY COUNSEL 1</u>:

Q     What's been handed to you has been marked as exhibit 4.    I'll give you a moment to review it.

A     Yep.

Q     Have you seen this document before?

A     I haven't seen it in this form, but I've seen excerpts of this document.

Q     Is this one of the communications you were referencing just a moment ago?

A     I believe so, yes.

Q     And it looks like it's about the fourth paragraph down, it reads:    "In 2014 you joined the Burisma board and we still need to amend your 2014 returns to reflect the unreported Burisma income."

Do you see that?

A     Yes.

Q     And is that consistent with your understanding of the issues in the 2014 return?

A     Yeah, this is.    This is accurate, yes.

Q     Is there anything else on this document that stands out to you as significant?

A     Well, what's important to note here as well is that Owasco was set up for this exact reason, was to take in these type of consulting fees and to withhold taxes from it.    And Hunter Biden communicated with several folks that he wanted to keep this outside of the D.C. people, and we believe that to be Eric Schwerin and Owasco, and the purpose was to evade income taxes on that, in my understanding of the evidence.    So, that's kind of like laid over this as well.

And then when Eric Schwerin realizes there's money coming in, Hunter Biden is

telling him, "No, this is a loan, it's a loan, it's a loan, it's a loan," and then eventually Eric Schwerin is talking with Momtazi, who is the accountant for Devon Archer and Rosemont Seneca Bohai, and they start talking.    And that's when Eric Schwerin realizes that this is actual income, and he's like, "We're going to have to book this as income." And there's multiple communications in the evidence that talk about that.

MAJORITY COUNSEL 2.   So this was an affirmative scheme by the taxpayer to avoid paying taxes?

Mr. Shapley.    This is, like, textbook, I learned at basic training nominee stuff. And in all of the defenses, it was a loan, got to have a promissory note, you got to have defined interest, and you got to have repayments, and none of those were included.

And we raised that to DOJ Tax, and in one particular instance to Jack Morgan, specifically saying this is not a loan.    We don't have these three things.    In any case, these are the things we determine if it's a loan or not, and he said that this is not a typical case.

MAJORITY COUNSEL 2.    And do you think "This is not a typical case" referred to the fact that this was the Vice President's son?

Mr. Shapley.    Yeah, yeah.    I think that there was -- every single time the process could be bogged down by deferring to some other approval level, they took full advantage of that.

[Shapley Exhibit No. 5

Was marked for identification.]

**Mesires, George R.**
Re: Tax Analysis - Attorney Communication
April 12, 2016 at 11:19 PM
Levinson, Kenneth S. █████
Eric Schwerin ████████████████ █████ Hunter Biden ████████ ████, MacPhail, Michael R.
████████, Klinefeldt, Nicholas A. █████

I am out at those times so please proceed without me. Even if Mike or nick can't join then, I think Ken/Eric, and ideally Hunter, should connect. George.

## George R. Mesires
*Partner*

██████████████████

**Direct:** ████████████
**Mobile:** ████████████

[FaegreBD.com](FaegreBD.com)   [Download vCard](Download vCard)

## FAEGRE BAKER DANIELS LLP

████████████████

Sent from my iPhone

On Apr 12, 2016, at 10:16 PM, Levinson, Kenneth S. <████████████████> wrote:

> Eric, All
>
> From my perspective, the 10 and 11:30 EDT time slots work for me tomorrow (Wednesday). I'm good with either of those, so when a critical mass is reached, please let us know and we'll have the call with whomever is available.
>
> Thanks, and best regards.
>
> Ken
>
> On Apr 12, 2016, at 9:44 PM, Eric Schwerin <████████████████> wrote:
>
> Not sure of Hunter's availability tomorrow for this call other than a call at 10, 11:30 and 2:30 EDT tomorrow I am free. Each of those calls should take no more than 30 minutes.
>
> Are there any times in there that work for everyone else?
>
> I can answer pretty much all of the questions in the email.
>
> Eric D. Schwerin
> ████████████████
>
> Sent from my iPhone
>
> On Apr 12, 2016, at 7:09 PM, Mesires, George R. <████████████████> wrote:
>
>> Eric and Hunter:
>>
>> Please see Ken's comments/questions attached. Please let us know when you are available for a call tomorrow to discuss this.
>>
>> Thanks,
>>
>> George

**EXHIBIT**

tabbies®

5

**From:** Eric Schwerin [mailto: ███████████████]
**Sent:** Monday, April 11, 2016 3:50 PM
**To:** Hunter Biden
**Cc:** Mesires, George R.
**Subject:** Tax Analysis - Attorney Communication

Hunter-

See below for analysis of Burisma payments through RSB for 2015.

For the first 10 months of 2015, total pre-tax Burisma payments through RSB = $606,666

RSB Agreed to Hold Back $245,498 of the above amount to cover taxes (approx. 38%) which left you with $361,168 in "post-tax" dollars to draw down.

For the first 10 months of 2015, you drew down approximately $413,000 from RSB. Therefore you drew down $51,835 more than you should have.

If RSB counts the first 10 months of Burisma payments as income to you, they should send you the $245,498 - $51,835 or $193,663 which could be put towards your tax liabilities for 2015.

So, on $606,666 in income you'll have $193,663 to go towards taxes.

Note that for November and December of 2015, the full $83,333 for each month was sent to Owasco, PC via RSB and you withheld the appropriate taxes yourself. It is only the first 10 months of 2015 that need to be taken care of.

The only other point to keep in mind is that while Burisma paid you $83,333 a month for the first 10 months of 2015, for the first 8 months, a portion of that ($27,778 a month) went to Alex as his Board Finders Fee. RSB has taken that amount as an expense and we need to figure out a way to capture that expense so that you are only paying taxes on $55,555 a month in income through the end of August 2015 instead of the full $83,333. I am going to assume the accountants can take care of that.

Let me know if you have questions.

Best,

Eric

Eric D. Schwerin
Rosemont Seneca Advisors, LLC



🖶 Consider the environment before printing this email.

<mime-attachment>

<u>MAJORITY COUNSEL 2.</u>   We've just given you exhibit 5.   I think it's more email communication with Schwerin and Hunter Biden's lawyer, George Mesires, partner at the Drinker Biddle firm or whatever the firm's called now, Faegre.

Have you seen this document before?

Mr. <u>Lytle.</u>   Can we talk to our client just briefly.

<u>MAJORITY COUNSEL 2.</u>   Of course.   We can go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>   We're back on the record.

BY <u>MAJORITY COUNSEL 2:</u>

Q    The question is whether you've seen this document before.

A    No.    Anything from George Mesires was considered privileged --

Q    Okay.

A    -- attorney-client privilege and was not provided to us.

Q    Okay.    And so that was kept from you by the FBI?

A    No.    It would be a filter team.

Q    Okay.

A    When we get any information, and even from the laptop and hard drive, it went through filter reviews, and we only saw what came back as nonprivileged.

Q    But who ran the filter team?

A    It was different each time.    We had agents assigned, groups of noninvolved agents assigned that were --

Q    With IRS or FBI?

A    It was a little bit of both.    I think that we took turns.    I remember at least two different filter teams made up of noninvolved IRS agents.

Q    Okay.

A    And these eventually go to the prosecutors, like after the filter review.

Q    Okay.

Mr. <u>Lytle.</u>    I'm sorry.    Is there DOJ attorneys assigned to the filter team as well?

Mr. <u>Shapley.</u>    Yes, yes.

BY <u>MAJORITY COUNSEL 2:</u>

Q    Okay.    On page 2 -- it's an email chain, so it actually starts from the last page and works forward.    The communication here is Eric Schwerin to Hunter Biden, correct?

A     Appears so, yes.

Q     And Eric Schwerin is not Hunter Biden's lawyer, correct?

A     That's correct.

Q     Okay.    So you think they marked this attorney-client privilege just because they cc'd Mesires?

A     Absolutely.

Q     Okay.

A     That was one of the things, just a search term was the known legal counsel and just immediately went to --

Q     So if he cc's Mesires on every communication, it's all privileged?

A     That was the direction to the filter teams, and then it would go to the DOJ attorney that oversaw that, and they would make the ultimate decision.

Q     Okay.

A     But they basically claimed privilege on a huge amount of information to include the return preparers, Morgan Wingate, later on, and they said it was because they had a verbal Kovel agreement with them.

Q     Okay.

A     A Kovel agreement, do you want me to explain?    So I think it's from case law and it's basically that a defense team can bring in an accountant or CPA or return preparer into the defense team to assist them, so they become covered by the attorney-client privilege.

In this case, when we were attempting to interview the CPAs on it, Hunter Biden's legal team said there's a verbal Kovel team so you can't talk to them.

And we tried to get DOJ and U.S. Attorney's Office to pierce that, because everyone, even they said it was nonsense.    But they just wouldn't.    It took, like, 12

months to finally get to the CPAs to actually get information from them.

Q      Okay.    Looking at the content on page 2, if you and your team had access to this information, would that have been helpful, direct communication from Schwerin to Hunter Biden?    And you previously told us that one of Schwerin's main functions was to help ensure that Hunter Biden was paying his taxes correctly, right?

A      Yeah.    I'm not reading it -- I haven't read it all, but any discussions in this area, we need to know, we need to know that if it's truly a loan, then we can't include it. We need all the pieces of information that discuss income, which is why it's so important to ask about 10 percent for anybody else.

MAJORITY COUNSEL 2.    Let's go off the record for a second.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

BY MAJORITY COUNSEL 2:

Q      Now, was your team, were they permitted to use open-source methods for looking at the materials for this case?    Like, if materials were published on the internet related to Hunter Biden or related to Hunter Biden's business concerns, were you allowed to consult that?

A      No.    We were directed that if there's anything from the laptop from other sources to not look at it because then it's potential for it to be tainted.

Q      Okay.    So if it's posted on the internet, if it's written about in the newspaper, you were not allowed to consult that open source method?

A      Yeah.    We were directed not to.

Q      Is that customary?

A      I would say yes.    Yes.

Q      Okay.    Going back to the special agent report, after you submitted the

report recommending charges, could you just walk us through the timeline of what then happened?

A       From?

Q       You told us about what happened inside of IRS.

A       So February 25th, 2022, forward?

Q       Correct.

A       So we sent it to DOJ Tax Division, and that spurred their discussions with defense counsel.    We did not participate in that.

And I would say that I think it's not typical for the investigative team and the agents to never be in on proffers or reverse proffers with defense counsel.    We never once were allowed to do so.

And even though some communications occur with defense counsel without agents, I've never seen it where we've never been involved.

Then it went to D.C. U.S. Attorney's Office.    Department of Justice Tax Division authored a 99-page memorandum that was requested by Stuart Goldberg.    And my understanding is that it was for the purpose to support recommending that they move and be opened in D.C.    It was like a document to support opening up and charging in D.C. for 2014 and '15.

Q       Okay.    So you send what's exhibit 2, or the IRS sends it to DOJ Tax, and the result was DOJ Tax Division produced a 99-page memo to support what your memo had recommended?

A       I never saw it, but my understanding was, is that we were moving -- we were going to go to D.C., and we were going to charge, and here's the discovery.    That was the trajectory there.    So I've never seen the document, but it's been described to me as supporting those years and charging those years.

Q    Do you feel like the document was kept from you and your team?

A    Yeah.    I don't know there's any reason not to share it with us.    I don't know why.    And it's also outside the norm.    When a SAR goes to DOJ Tax, it usually gets -- if there's DOJ Tax attorneys working on that case, they -- those attorneys aren't the ones that get the report.    It's like a third-party supposedly objective person who looks at the report and writes up whether it's approved, discretion, whatever.

This whole 99-page report was a whole separate event, and John Kane at Department of Justice Tax Division was assigned to be the objective reviewer, and I still have never seen a report from him approving, discretion, or declining.

Q    Okay.    So, after receiving the 99-page memo from DOJ Tax, the U.S. attorney in Delaware initiates prosecution in the District of Columbia, correct -- or he seeks permission from --

A    Yeah, they send --

Q    -- U.S. Attorney Graves?

A    -- at least Mark Daly and I believe AUSA Wolf as well, to meet with the first assistant in D.C., and the first meeting was Mark Daly called my case agent and said, "Hey, looks good, they're going to assign AUSA."

Q    That was Special Agent ███████?

A    That's correct.    And then it was 2 or 3 days later, Mark Daly calls ███████ and says, "No, they don't support it.    So we're basically dead in the water."

Q    And that was the end of it?

A    Yeah.    At that point it became like a void.    For 2 months we were working to combat the potential defenses.    And I think it was all a ruse because we didn't know at the time that he requested special counsel authority and was denied.    So he had no ability to charge there whatsoever, but I feel like he just sent us on a fool's errand to try

to rebut it.

Q     And when was the decision made by the U.S. attorney in the District of Columbia not to go forward?

A     It was in the March time frame.    Like I said, we requested to be a part of that, but they didn't allow us to.

Q     And when did you learn of that decision?

A     I feel like it was same day.    It was a date in March, and, unfortunately, I don't know the date.

Q     Okay.

[Discussion off the record.]

Mr. Shapley.    Yeah.    So at the time we thought that he just didn't support it. And that David Weiss would still have the ability to charge at some point.    But later on, on October 7th, David Weiss tells us straight out that he didn't allow it to be charged in his district.    And then he says he also requested special counsel authority, which why would he request special counsel authority if he had the authority to charge.

So, yeah, it's a little bit nuanced, but what I knew then was that he just didn't support it.

BY MAJORITY COUNSEL 2:

Q     I want to call your attention to some testimony, and I believe you mentioned it in your opener.    But if the decision to not bring charges in D.C. was made in March of '22 --

A     Yes.

Q     -- okay, a month later, roughly, in April of 2022, at the Senate Appropriations Committee Subcommittee on Commerce, Justice, Science, held a hearing, a review of the DOJ's funding request.    And during the hearing under questioning from Senator

Hagerty -- and, again, I think you mentioned this -- regarding the Hunter Biden

investigation, the Attorney General testified -- this is a month later -- that U.S.

Attorney Weiss is supervising the investigation, is in charge of that investigation.    He

also testified there will not be any interference of any political or improper kind.

Did you remember hearing that at the time?

A    I did not hear that at the time.

Q    And did anyone on your team ever bring that to your attention

subsequently?

A    I learned of it on and around October 7th meeting --

Q    Okay.

A    -- because that's when it became substantive to me, like, because we still

were misled to believe that U.S. Attorney Weiss had the ability to charge in D.C. and that

we were still talking about the '14, '15 year.

And then when he tells us in the October 7th meeting that he's not the deciding

official and he doesn't have the authority to decide and that he requested special counsel

authority and was denied, that's when the statements of Attorney General Garland

became apparent that they were not accurate.

Q    Right.    And subsequently -- and you mentioned this in your

testimony -- Senator Grassley, on March 1st of 2023, so a whole year had gone by, asked

the Attorney General about this, and the Attorney General responded -- you mentioned

this -- "I promised to leave the matter of Hunter Biden in the hands of the U.S. attorney

for the District of Delaware…I have pledged not to interfere with that investigation, and I

have carried through on my pledge."

Is that a true statement?

A    It's not accurate.    No, it's not accurate.

Q     And by March of 2023, you had certainly known that the U.S. attorney in Delaware did not have special counsel authorities.    Is that correct?

A     By what he told us, yes.

Q     And when the Attorney General made that statement, that had been almost a year after the decision was made not to move forward in the district in D.C., correct?

A     Yes.

Q     Senator Grassley followed up:    "Without special counsel authority he could need permission of another U.S. attorney in certain circumstances to bring charges outside of the District of Delaware.    I'd like clarification from you," Senator Grassley said to the Attorney General, "with respect to these concerns."

And the Attorney General responded:    "The U.S. attorney in Delaware has been advised that he has full authority to make those kind[s] of referrals that you are talking about or bring cases in other jurisdictions."

Okay.    I'll just say it again.    The Attorney General said that he, meaning U.S. Attorney Weiss, "has full authority to make those kind[s] of referrals that you are talking about or bring cases in other jurisdictions if he feels it's necessary.    And I will assure that if he does, he will be able to do that."

Are you aware that the Attorney General responded in that way?

A     Yes, I am.

Q     Is that true?

A     No, that's not.    Based on what actually happened, as well as the statements provided by U.S. Attorney Weiss, those statements are false.

Q     And those statements were made in March of 2023, 1 year after the case was attempted to be brought in D.C. by the United States Attorney's Office for Delaware, correct?

A      That's right.

Q      And it also occurred many months after you learned in October of 2022 of this happening.    Is that correct?

A      Of this happening?    I'm sorry.

Q      Of the U.S. attorney in Delaware being denied the ability --

A      Oh.    Yes.

Q      -- to bring the case in D.C.?

A      Yes, that's correct, yes.

Q      Senator Grassley followed up:    "Does the Delaware U.S. attorney lack independent charging authority over certain criminal allegations against the President's son outside of the District of Delaware?"

And the Attorney General responded:    "He would have to bring…if it's in another district, he'd have to bring the case in another district.    But as I said, I have promised to ensure that he is able to carry out his investigation and that he be able to run it.    And if he needs to bring it in another jurisdiction -- again, if he needs to bring it in another jurisdiction -- he will have full authority to do that."

Did that happen?

A      No.

Q      Senator Grassley then said:    "Has the Delaware U.S. attorney sought permission of another United States Attorney's Office, such as the District of Columbia, or" -- presumably Senator Grassley meant the Central District of "California to bring charges?    If so, was it denied?"

And what's the actual answer to that question?

A      That he did bring it to both of them, and they both denied it.

Q      And, just remind me again, what was the timing of the Central District of

California denying?

    A    We were informed that they denied it in and around January of 2023.

    Q    Okay.   So 3 months before this testimony.

    A    Yes.

    Q    Approximately.

And the Attorney General followed up, and he said:   "I don't know the answer to that, and I don't want to get into the internal elements of the decision making by the U.S. attorney.   But he has been advised that he is not to be denied anything he needs.   And if that were to happen, it should ascend through the Department's ranks.   But I have not heard anything from that office to suggest that they're not able to do everything the U.S. attorney wants to do."

Do you think it's conceivable that the DAG's office or the head of DOJ Tax kept that information from the Attorney General?

    A    I feel like it's my opinion that you wouldn't make statements like that if you thought that was the case.

<u>MAJORITY COUNSEL 2.</u>   I think our hour's up.   Going to have to stop there as our hour's up.

Mr. <u>Shapley.</u>   Sure.

[Recess.]

[11:40 a.m.]

BY <u>MINORITY COUNSEL 2:</u>

Q    Thank you again for coming in and providing your testimony before the committee.   I don't think we will take the full hour allotted.    Hopefully we will be able to move things along a little bit.

I actually wanted to start by just going back, way back in your initial testimony.    It is something our counterparts alluded to in the beginning of their questioning.    Your initial testimony that over the course of your career you worked on teams or worked on cases that collected in the neighborhood of something along the lines of $3.2 billion of previously uncollected tax revenue.    Obviously, $2 million or thereabouts, that amount at issue is relatively small, relative to the $3.2 billion over the course of your career you've collected.    I am just sort of trying to get a sense of the scope and scale of this investigation relative to what would be a normal size of a criminal investigation of the type that you work on.

You have a team of 12.    How many investigations does your team generally work on at one time?

A    I have 75 investigations that I am [in charge of] right now of 12 agents.

Q    And how many man-hours would you say that your team spent on this investigation?

A    I would just have to multiply it, right?    We have at least one agent working full-time on it for 4 years -- at least 4 years.    So it's 2,000 hours a year.

Q    And is it typical to assign an agent full-time for 4 years on an amount in issue of $2 million or thereabouts?

A    It would be normal with an IRS CI, right?    Like, the amount of time it takes,

we don't drive that bus.    So we have to work with our partners.    So they have an effect on the timing as well, but the case agent also had other cases as well.

Q    When you say work with your partners, do you mean work with defense counsel and work with -- who do you mean --

A    Like, FBI, DOJ.

Q    And presumably, though, in terms of how agents and your team and you allocate your time in terms of looking at these cases, does that all receive review in terms of allocation of resources?

A    Yeah, yeah.    In this particular case, we also work large cases, the initial case is a $6 billion case.    And then we also have spinoffs from these larger cases that we work, and that is the way that we do to on some other large cases we are working now. So this is an example of one of those spinoff cases that had an international nexus, so we kept it within the group.

Q    Right.    But presumably, there was a $6 billion case, and then evidence came to light and that evidence was referred to a spinoff case.    Presumably if the evidence, was an amount at issue of $1,000, the IRS wouldn't put a full-time employee on that audit for 4 years?

A    My agents would not spend time on $1,000.    And we are not auditors, we are criminal investigators.

Q    Criminal investigators.

A    Yeah, yeah, yeah, yeah.    Okay.

Q    So there is some sort of threshold and some sort of judgment applied to how many man-hours are applied on any given case, correct?

A    I don't know if there is any application of how many man-hours around each case.    I have never seen that.

Q      But somebody at some point does make a decision as to how many resources, how much in terms of CI's resources they are going to devote to any given case at any given time, right?    And presumably, that, at least in part, is dependent upon the amount at issue?

A      It is definitely not about the amount, right?    If it is a case that is approved, then if it takes 3 years or 4 years or however long it takes, they are going to let that play out.    At some point, if the charges look not viable, then we discontinue the case.    But that never occurred in this case.

Q      Right.    So the size of the tax liability is irrelevant to the resources that CI puts into the investigation?

A      Like a $2.2 million case for 95 percent of the IRS CI special agents would be a huge case for them.

Q      That is relevant information.

So this is generally considered within IRS CI to be a big case.

A      Yes.

Q      And a case of this size would typically have 12 or, for instance, 12 simultaneous interviews in terms of its investigatory step or something along those lines?

A      I mean --

Q      It wouldn't be unusual?

A      It's case-by-case.    Yeah, it is case by case, right?    We don't always do days of actions.    We do lots of days of actions, but it is based on the case because you want to do them simultaneously so that the witness pool isn't tainted by each other.    So that is why the simultaneous interviews occurred in this particular case.

Q      So, the resources that were being devoted to this case, at the end of the day, you did receive some sort of supervisory approval and up the chain, folks understood

what kind of resources were being devoted to the investigation here?

A       I guess I was confused about the resources, like, yeah, there are hours that are applied to the case.

Q       Think about hours being applied to the case as resources, so man-hours.

A       Okay.   So could you say the question again then?

Q       It was relatively understood by folks senior in CI, probably at DOJ Tax, how many man-hours were being devoted to the investigation of Hunter Biden's taxes?

A       Yeah, yeah.

Mr. Leavitt.    Did you want to talk about the supervisory approval process?

MINORITY COUNSEL 2.    If there is a supervisory approval process for the allocation of resources like that, then sure.    I am under the impression that there is not.

Mr. Leavitt.    I don't mean for the resources.    I just mean just for the case, the case being briefed up in terms of awareness of supervisors?

Mr. Shapley.    People are aware of the hours spent on the case, yes.    But it is not -- it is definitely -- DOJ would never, DOJ U.S. Attorney's Office they would never, they don't care how many hours are applied to a case, right?    And we even assigned a co-case agent to assist, try[ing] to keep the sphere small.    They would never know it.    It would really be hours applied to a case would be on our 17A CIMIS report, 17-As, and it is really like me as a supervisor or me as the ASAC, and I don't think that they go even higher than that.    I don't think that anyone -- like a special agent in charge probably wouldn't even like look at the allocation of resources on a case.    They just want to know if it is viable or if it is not viable.

Mr. Leavitt.    But you were briefing your supervisors about the case, in which case --

Mr. Shapley.    Oh, yeah, yeah.    But if we are talking about resources, that is my

answer.   If we are talking about case specifics, then that is a different story.

BY MINORITY COUNSEL 2:

Q      That is totally fine.

I would like to ask you a little bit about the special agent report that was discussed earlier.   Your special agent report was approximately 85 pages long and it recommended charging recommendations.   Could you once again, and I know you did it before, but it would be helpful for us again -- what specifically was the process by which it went to an entity that gave it a nonconcurrence?

A      Sure, yes.   When a special agent report is still in draft, it comes past my desk and we send it to our criminal tax attorneys, called CT counsel, and they do a review of it.   They create a -- it is called a CEM, I believe it is Criminal Enforcement Memorandum.   So yes, that is the process.

Then we get that and then, the management and the agent.   And then we sometimes take time to answer any concerns or to provide additional evidence that maybe they didn't see to make those recommendations.   But then, when it is a nonconcur from CT counsel, in order for it to go forward to the department of [Justice] Tax division, it has to be approved by the director of field operations which is -- so an IRS investigation is the chief, deputy chief, and then there is three director of field operations.   So, like, the third level.   So when there is a nonconcur from CT counsel, the director of field operations has to approve that to be transmitted to the Department of Justice tax division.

Q      Just -- sorry.   The director of op has to approve it to override the nonconcur to transmit?   When you say approve, what do you mean?

A      I don't think override is the correct term because CT counsel is advisory.

Q      Okay.

A      But I think it is an extra step in the process to ensure that more people have reviewed it and agree with the evidence since the elements were met.

Q      Could you say a little more about who comprises the makeup of the CT counsel?

A      Just by title or names or --

Q      If you have their names or what their experience is?

A      So the head, I am not sure if it is a director or chief of criminal tax is Rick Lunger.    And the number two there is Elizabeth Hadden, I believe.    And then there is area counsel and that is like a middle layer of management.    And for me on this case it was Veena Luthra.    Then my line attorney, it was Christine Steinbrunner and she went by Christy and -- I'm sorry, did I answer your whole question?

Q      What are their backgrounds?    Why are they designated to be in this role, which appears to be something of an advisory review role?

A      The --

Q      Their professional backgrounds, what lead them to be put on this CT -- on this counsel?

A      I mean --

Q      Are they appointed?

A      Oh, no, no, no, they are internal, just internal career hires.

Mr. Lytle.    Also, could you just pause your question and give him time to answer because sometimes you guys are talking over each other.    But he needs time to just digest what you are asking him.    Are you asking -- does he know the process of how people's qualifications are determined to serve on CT counsel?

MINORITY COUNSEL 2.    That is certainly a question I could be asking, yes.    If that is the question he wants to answer --

Mr. Lytle.   No, no.   I just wanted to clarify.

MINORITY COUNSEL 2.   He can answer it either or both ways, which is to say either do we know the specific individuals and what their qualification are, or if he does not -- what would make an individual qualified to serve on this counsel?

Mr. Leavitt.   Elizabeth would know more about it, wouldn't --

Mr. Shapley.   I mean, the only background I know is Elizabeth Hadden was at the Department of Justice tax division up until a year or 2 years ago maybe.   Like, 2 years ago.   And then she came over to be the number two in CT counsel.   In terms of background, that is all I know about them.

BY MINORITY COUNSEL 2:

Q   But in general, is it safe to say that they are experienced criminal tax attorneys, or criminal tax agents or having a fair amount of experience in criminal tax investigations?

A   They review our reports, our enforcement actions for legal sufficiency based on the Internal Revenue manual, yeah.

Yeah, well, yes, CT counsel is not a respected organization within IRS CI.   Their opinion, as I alluded to before, I bet you around 90 percent of everything that we do in the international realm are not concurred with them, and we just simply ignore them.   I have heard AUSA's and prosecutors in the past when the agent will be, like, Well, you know, CT counsel nonconcurred, I have heard them say, I don't care anything of what they are saying.   And then in this particular case -- it was either the August 16, 2022 meeting, or the October 7, 2022 meeting and -- Shawn Weede, who was the number two, I believe, at the U.S. Attorney's Office at Delaware actually had CT counsel's nonconcur memorandum, which, that is the first time I have ever seen a U.S. Attorney's office ever even interested in that document.   And they ostensibly laughed at the legal reasonings

in that document.

Q      Can you describe the legal reasonings?

A      I couldn't with specificity.    I really want to.    So --

Mr. <u>Lytle.</u>    If you recall.

Mr. <u>Shapley.</u>    I don't recall.    But internationally, there are things that they just in every single CEM they write, right?    Like, availability of foreign witnesses, one. Admissibility of foreign evidence, two, right?    There are these things, like, if a guy's 70-years-old, then they make some statement about how he could die before trial.    So, I don't remember the specific items in their memorandum, but those are the types of things that I see like consistent in their reviews of the international work.

Mr. <u>Leavitt.</u>    So you are saying it covers not just legal sufficiency but as a practical matter in success of trial for the ability to get to prosecution.

Mr. <u>Shapley.</u>    Yeah, it could.

BY <u>MINORITY COUNSEL 2:</u>

Q      Do charging decisions also depend on the practicality of success at trial as a general matter?

A      From?

Q      From the DOJ?

A      Yeah.

Q      If legal sufficiency is not solely the basis by which CT counsel makes its recommendations, then is that also true of the Department of Justice?

A      Reasonable likelihood of prosecution is the statement, as I understand it, but I am also not an attorney.

Q      Fair enough.

I want to go back to something you testified to -- you mentioned green light,

yellow light, red light on various [occasions] -- and I kind of wanted to flesh that out a little bit more.    I think you testified that the line attorney had suggested that for every tax year other than 2018, she had a yellow light, and then for 2018, it was a green light. Can you describe to me what you view as a distinction between a yellow light and a green light?

A    Sure, yeah.    And this was described to me by CT counsel Christy Steinbrunner where a yellow and green [is a] concur and red is that she did not concur. Some of the reasons to be in yellow are that, like, I said before would be admissibility of foreign evidence, and availability of foreign witnesses and things of that nature.    But to be yellow, the elements of the crimes and the minimum legal requirements have to be met.

Q    But again, just for clarity, yellow indicates that notwithstanding [that] the legality of a crime has been met, there may be other considerations regarding the likelihood of success at trial?

A    I don't know if it pertains to the likelihood of success, but it is definitely like maybe there's complexities, like, international type issues in there.

Q    Do you have any indication of what, for instance, you described 2014 and you described a payment disguised as a loan, what would cause an evaluation of that year [to] impact your chances of being yellow as opposed to green?

A    I don't recall what she said specifically.    I could opine if you wanted me to.

Q    If you had to guess, what would it be?    If you had to venture your best professional judgment as to why it might be yellow?

A    Sure.    So, as I described the income flows, that is how I would see it presented to a jury, right?    Because you have got to consider the jury might be a 20-year-old auto mechanic, right?    As soon as a contract between the two parties

identified occurs and payments from that contract begin, that is the taxable path.    For
instance you can't send your paycheck to someone else, and then them send you money
and tell you to say it is a loan and then you not pay taxes on it.

So if you go into the other side, this construct, this scheme to evade, of course it is
incredibly complex and confusing because it is made up.    So, that is an example of how
that might work for 2014 as CT counsel's opinion.

Q      Then sort of continuing along with the special agent report, we discussed
before I guess the nonconcur was over[ridden] -- but it was passed on to DOJ as a result
of concurrence by who exactly?

A      Director of field operations.

Q      Director of field operations.    And then that went to DOJ tax.    And then
DOJ tax authored a 99-page memo?

A      I don't want to commit to a timing of that memo, but it is around that time.
And that was separate and distinct from the path of the SAR.    That SAR would never be
reviewed [for approval] by the DOJ tax attorneys who are working the case.    It always
would go to a separate person.    And in this particular instance, it was DOJ tax John Kane
is his name.    So the 99 page [memo], I am sure it was being authored or maybe it was
authored or it was said to author around that time.    But it was in process because we
knew since at least June of 2021, there was no venue in Delaware.    So we knew that it
had to go to D.C., it had to go to California.    So, I think this document, which was outside
the norm, but maybe -- I am not saying that it is wrong, right, it is just outside the
norm -- maybe it was for the purpose of helping them present it to the D.C. U.S.
Attorney's Office, and eventually to CDCA, the Central District of California.

Q      Okay.    So this was a memo that was I would say not written necessarily in
the normal course of an investigation, and it would not normally be something that was

produced in response to an SAR?

A      Yes.

Q      Have you ever seen a DOJ tax memo?

A      The 99-page memo?

Q      The 99-page memo.

A      I have not.    I have seen excerpts in a presentation.

Q      And did those excerpts give you a sense of whether or not DOJ tax was

recommending charges?

A      I don't think I could conclude from those excerpts that that happened.    But

I have worked with Mark Daly for 10 years and I talked to him almost daily, it was called

the "daily Daly," that was extra.    But you see all the action up until March, right?    And

you see the SAR being sent over on February 25, you see the discovery request.    They

anticipated it was going to go to D.C. and it was going to be opened in D.C. and it was

going to be charged in D.C.    So if they produced a 99-page memorandum that said

something other than that, would be surprised but I have not read that document.

Q      But you don't have any reason to believe that, or knowledge one way or the

other of whether or not the DOJ tax memo contained information about litigation risk for

instance?

A      I did not see that.    I wouldn't know that.

MINORITY COUNSEL 2.      ██████, that is all I have.

        BY MINORITY COUNSEL 1:

Q      Thank you for being here today.    I appreciate it.    I am going to go back

over some of the things you said that I probably just missed in my notes. I just want to

make sure that I have a clear record.

        I think one of my colleagues had asked you when did this case begin.    And you

noted that it started on another case, and then it had basically spun off of that and he

was on a list of individuals.    Do you have a date as to when the case started, like a year?

        A    So 2018, internally, the IRS CI, yes.    And it went through like that PI, that

primary investigation phase.    And then it went through the 9131 process to go to the

U.S. Attorney's Office, the DOJ tax approval to go to the U.S. Attorney's Office.

        Q    This was another question that I had.    I think it is exhibit 2, and it is just the

list of the tax years and the conclusion.    On the front of it, it has a special agent and that

person is redacted and the revenue agent is also redacted.    Are you able to provide the

names or are you one of these individuals?    I just can't tell who wrote it.

        A    Sure.    So special agent -- this report was written by ██████████.    He is

the case agent on this.

        Q    Okay.

        A    The revenue agent -- he had zero input into the authoring of this document.

What a revenue agent's traditional responsibilities are as a special agent we might get all

these income streams and get a compilation of what we believe to be income.    And we

give it to these revenue agents -- and they are super educated in Tax Code and

everything.    And they put it into a RAR, Revenue Agent Report, and it basically spits out

for each year what the additional tax due and owing, taking into account additional

income, maybe additional expenses that would lower that tax income, the tax due and

owing.    But that is the role in it.    So -- I don't know why he's on the front of --

        Q    Is that --

        A    I don't know why he's on the front of the report, but I think it is kind of to

throw him a bone because --

        Q    Okay, okay.    Do you know if that person, the revenue agent, do they review

the final document, the draft before it comes across your desk?

A      No.

Q      Or it is just really you are using their numbers and that is why they --

A      It's only numbers -- appendix A to every SAR is an additional tax [due] and owing for criminal purposes, that would be the revenue agent's -- that would be the only thing that they would create exhibits that populate that document, that document says all these years, this is how much they owe for criminal purposes.    That would be the extent of their interaction with this document.

Q      Okay.    So I am going to come back to exhibit 1 in a minute, but I wanted to look at exhibit 4 and 5.    So I want to start with exhibit 4.    Did you provide this email to the committee?

A      No.

Q      Okay.    Do you know where this email came from?

A      As part of the investigation I wouldn't be able to answer that question, unless you are asking me like literally where it came from on the document.

Q      Well, I am asking two things.    I was going to get to the person.    We have never seen these two documents on my side, and so I just don't know where they came from.    And the documents that I have been provided are the ones that you gave to the committee.    So I am just wondering if this is some second set of documents that we didn't receive, or where these documents actually came from?

A      No, I'm --

Mr. Lytle.    So two questions there.

MINORITY COUNSEL 1.    Yes.

Mr. Lytle.    Does he know how they were obtained?

MINORITY COUNSEL 1.    Yes.

Mr. Lytle.    Is a question.    Do you know that?

Mr. Shapley.    No, I don't.

Mr. Lytle.    Okay.    Second question, did you deliver Exhibit 4 to the committee?

Mr. Shapley.    No, I did not.

MINORITY COUNSEL 1.    Okay.

Mr. Leavitt.    Or 5.

        BY MINORITY COUNSEL 1:

Q    Did you deliver exhibit 5 to the committee?

A    I did not.

Q    Because I did actually read the documents that you provided, so I was surprised by these two documents.    Where they came from, I don't know, maybe the internet.    I don't know.

Can we talk about the individuals that are listed in exhibit 4?

A    Sure.

Q    Do you know who Eric Schwerin is?

A    Yes, I know who Eric Schwerin is, yes.

Q    And is he an attorney, a person, an accountant?    Do you know anything about his background or what is his relationship here?    I guess I am trying to understand why we have an email from Eric here.

A    Okay.    So I don't know if he's an attorney or CPA, but he is a very close friend of the family of the Bidens and a close friend of Hunter Biden.    And he is known to just be a very diligent guy.    And he was brought in and helped create OWASCO P.C. Based on the documents that I have read and understand to -- for the sole purpose of getting Hunter Biden into tax compliance.    Because in the early 2000s, he often had these large taxes due and owing, and then he couldn't pay them.    And he used to have problems and that stuff.    So he was brought in to help bring Hunter Biden into tax

compliance.

Q    Okay.    And this was back in 2017.    Okay.

And then on exhibit 5, it's the same question, George Mesires, and I think you

might have mentioned him earlier, do you know his relationship?

A    Yeah.    I know him to be a personal, quote, unquote attorney to Hunter

Biden.    And if I wasn't taken off the case, I would have been tainted by this document.

Q    And do you know who Eric is?    Eric is the same guy from exhibit 4, I guess.

A    Yeah, Eric Schwerin.

Q    And do you know if there is -- and maybe I missed it, do you see any

response on here from Hunter Biden to these emails?

A    I don't.    This is the first time I have seen this so I don't see an email from

Hunter Biden, or at least what this document shows.

Q    And then it appears in the top in the header, right after the date there a

number of names.    But it also appears that there is a number of names that have been

redacted.    The first one is Eric Schwerin, and then Hunter Biden, Michael McPhail and

then Nicholas Klinefeldt.    But it seems some names that are missing.    Would you

happen to know who those names might be?

A    I think they are there, but they are just grayed out.

Q    Oh.

A    I think it is email addresses.

Q    Oh, okay.

A    Yeah.    That is why I looked to see if it was a bleed-through, or yeah, they

are just very faint.    So it looks like the email address is to those individuals.

Q    Okay.    Thank you.

Now I would like to go to exhibit 1.    This is a letter that was sent, and these are

some basic questions.    I want to make sure that I have my notes clear so that I

remember what I am doing when I go back to look at this.    Okay.

Mr. Leavitt.    What was your question before whether there was an email from

Hunter Biden or whether he was the recipient?

MINORITY COUNSEL 1.    Oh, no.    My question was I thought that there were

names that had been redacted out.    But it turns out that they were actually the email

addresses of those individuals?

Mr. Leavitt.    But prior to that you were asking about whether Hunter Biden was

on this.

MINORITY COUNSEL 1.    No, whether there was a response from him.

Mr. Shapley.    That's how I understood it.

MINORITY COUNSEL 1.    And he said there was no response.

BY MINORITY COUNSEL 1:

Q     On the first letter which is dated April 19th, and is exhibit 1, it is mentioned

in here that my client has already made legally protected disclosures internally at the IRS.

I wanted to ask a little bit about those disclosures, when they were made and to whom

they were made, and whether you made them by letter or email -- I know you can make

them by phone call as well -- and if you received any acknowledgment.

So, we can break those down, but that is essentially it.    I want to know a little

bit more about the line with the disclosures within the IRS.

A     I don't think I will be able to be all inclusive, but I will give you examples.

Q     That is fine.

A     I think that the first disclosure that I made that something was far outside

the norm was a June 16th of 2020 memorandum.    That memorialized a meeting with

the director of field operations and down, so it would be the SAC, the ASAC, me, case

agent.    I can't remember exact dates for some of these.

Q     That is okay.

A     It was something that the SCRs, these sensitive case reports, that went up to supposedly to the chief, they are authored for the chief.    And there is only a finite number of sensitive case reports produced in CI, because they are there for the purpose of informing the chief on these more sensitive cases.    And so, those were monthly on this case.    There were multiple of those where I raised various concerns to the chief.

Q     Do you know who the chief was at the time or maybe the chief changed over time, but --

A     So Don Fort was the chief through December 31st of 2020 and since then, the chief is Jim Lee.

There were briefings, there were meetings, at least, like once a year those occurred, sometimes twice a year.    And then as we got to 2022, we had those conversations more frequently, and they were surrounding bigger meetings, like a June 15th, 2022 meeting at Main DOJ, an October 7th, 2022 meeting.

Q     That is good, yeah.    Thank you.

At any time, did you make any disclosures outside of CI?    Did you make any disclosures out of the chain to, I don't know, the deputy commissioner of services and enforcement, or anyone outside of CI?

Mr. Lytle.    This is outside of CI, right?

MINORITY COUNSEL 1.    Yeah.

Mr. Lytle.    But within the IRS?

MINORITY COUNSEL 1.    Within the IRS.

Mr. Shapley.    So the chief would be, you know, that is the highest, right, like that we would usually go to unless of course I thought the chief was not doing something that

they should be doing.    I raise these issues to the U.S. Attorney's Office in Delaware, and

often to DOJ tax attorneys, but outside, I --

               BY <u>MINORITY COUNSEL 1</u>:

Q    But no one at Treasury?

A    Oh, no.

Q    No one at IRS above -- other than CI, no deputy commissioners, no

commissioner?

A    That is correct.    And, there was a common theme that ████████ and the

co-case agent Christine Puglisi would -- after all these pros team calls we would have a

follow-up call.    And sometimes FBI agents would be on there as well.    And it was

basically talking about the strategy and it often became like, Wow, they are not letting us

do this.    Can you believe they said that?    Like that type of thing.

And we -- in order to protect the record of the investigation basically it was me

that could only document that, right?    Because we wanted to make sure that the agents

weren't documenting things that would eventually be turned over in discovery and could

somehow affect the viability of the case.

So that is something that I documented moving forward.    And each time we

were, like, Wow, they didn't let us do the search warrant.    Like she said -- to overcome

probable cause with a search warrant is, like, that is it, right?    That is really, like, okay,

well, you are going to go do it, because we want evidence that is unfiltered, right?    But

the whole point is we were like, well, there is no way they are not going to charge us.

The evidence is there.    They say the evidence is there.    And we just really couldn't

believe that they would be doing something wrong.    It was a very heavy burden to

overcome from my experience and training to be, like, wow, there is something going on

here.

So it got to the point where we are like, well, they are just going to charge and all the things that they didn't do were just going to go away, right, and it is not going to matter.    But it just didn't happen.    And then the October 7th meeting, you know, changed everything for me and I could no longer stay silent.    And the case agent is also willing to come forward as well.

Q    Do you know if the chief reports to anyone on, like your SCRs?    Does that go anywhere up the chain at IRS, or does it just go to chief, so Mr. Fort at the time, and that is kind of the end of it.    Did he ever give you an acknowledgement that he read the SCR?

A    No, no.    Well, the first question is I don't know if goes above the chief. The second question is, you know, there is -- they never told me they read the document. It is for the chiefs, but I don't know if they read it.

Q    So no one gives you any feedback like, we need more information on this particular bullet point or something like that?

A    You know, that was a common theme along the investigation as well is that we would be raising these issues, right and my senior leadership was never, like, okay explain that to me.    Oh, okay, we disagree with you.    So we are not going to do anything.    In fact, there is multiple correspondence that basically show that they are, like, wow, yeah.    And then we understand and we support you and whatever.    And then even the prosecution recommendation, right?    So finally, when we heard that '14 -- they were kind of leaning toward -- we thought they were still deciding on '14 and '15 in August, and that they were leaning toward a no to charge those.    My DFO responds that he is going to go and talk to the deputy chief and tell him to call over to Stuart Goldberg and tell him that IRS CI supports 2014 and 2015.    It was kind of, like, I hate to be too colloquial but it was like literally burying their heads in the sand.    But

when it popped up, they even agreed, they even were able to say that they agreed with some of these charges that eventually were not charged.

Q     Okay.

Mr. <u>Leavitt.</u>    Could I just clear something up?

MINORITY COUNSEL 1.    Yes.

Mr. <u>Leavitt.</u>    When you asked about Treasury, are you just talking about Main Treasury or the inspector general there as well?

MINORITY COUNSEL 1.    I was really talking about Main Treasury.

Mr. <u>Leavitt.</u>    Okay.    Thank you.

MINORITY COUNSEL 1.    But if you'd like to answer about the inspector general that is fine, too, but I was asking about Main Treasury.

Mr. <u>Lytle.</u>    Just to clarify, his attorneys have made some disclosures to all of these entities so --

MINORITY COUNSEL 1.    That is fine.    But I am not asking about those.    I was asking more at the time --

Mr. <u>Lytle.</u>    Got it.

MINORITY COUNSEL 1.    -- whether there were any other channels or avenues for reporting up through the IRS beyond the chief, or someone else that he might have emailed.    I don't know [maybe] the chief counsel, or if there is someone else that is in that chain of command that we did not ask about.    My question was really just what he answered, which is did he or anyone else in that chain do anything within main Treasury.

Mr. <u>Shapley.</u>    I was a little confused by it, but -- okay, good.

MINORITY COUNSEL 1.    Okay, that is correct.

You guys have any other questions?    We're done.

Thank you very much.

MAJORITY COUNSEL 1.    Off the record.

[Discussion off the record.]

BY MAJORITY COUNSEL 3:

Q    We were surprised to learn that prosecutors walked away from a tax assessment of hundreds of thousands of dollars.    In a typical IRS audit there will be an examination of taxpayers records, either in person or via mail.    If the IRS determines that additional tax is owed, IRS exam will make a formal adjustment to tax liability. Interest and penalties may apply being an underpayment of tax.    And if there is no agreement between the taxpayer and the revenue agents on the amount of tax owed, there is an assessment, and the taxpayer has 30 days to consider their next course of action.    Again, this is in a civil case.    The taxpayer may choose to appeal the assessment administratively within the IRS, or to the Federal courts.    But the taxpayer owes that tax plus any interest and penalties.    If left unpaid, that can lead to criminal prosecution.    It is our sense that it would be rare for the IRS to simply walk away from a six-figure tax assessment on the civil side.    But based on your testimony, this case started within IRS CI.    Can you confirm?

A    Yeah, that is correct.

Q    So your team went through the course of this investigation.    You mentioned that there was $400,000 in underreported income for 2014 or 2015 or both. Can you confirm?

A    2014 was the $400,000.

Q    Thank you.    And that amount was reflected on an SAR?

A    Yes.

Q    Thank you.    Then as we discussed in 2022 the U.S. Attorney allowed the statute of limitations to expire with respect to that amount.    Can you confirm?

A      With respect to that tax year, which included --

Q      The 2014 tax year.

A      Yes.    That is correct.

Q      Is it typical for IRS CI to make an assessment of additional taxes owed, and then see the IRS and prosecutors simply allow the statute of limitations to run out?

A      So assessment is a civil term and assessment means that like that dollar amount goes on that taxpayer's account and then they owe that, right?    So assessment is kind of used a little bit outside of what I am used to.    So --

Q      I understand.    On an SAR, there will be a number, an assessed amount, or a deficiency in tax.    Is that correct?

A      Tax due and owing for criminal purposes, yes.

Q      Criminal purposes.    And is it typical for IRS and prosecutors to simply allow the statute of limitations to run out from the amounts shown on an SAR?    Is that a typical practice with cases that you have dealt with?

A      Letting a statute of limitations expire in an active criminal investigation is not normal.

Q      Thank you.

I would also add it seems that if Hunter Biden had been audited like any normal American, he definitely would not have received a free pass on a six-figure tax bill for 2014.    That would have been an assessment, that would have gone potentially through the courts.    It is not something that IRS on the civil side would have just walked away from.

A      I mean, based on my understanding of civil, yeah.    That is correct.

Q      Thank you.

Mr. Leavitt.    2015 is also when the statute of limitations --

Mr. <u>Shapley.</u>   Yeah, 2015 the statute of limitations also expired.   I mean, I just -- that particular year and that particular charge, I could see some issues with that that would preclude it being charged.

BY <u>MAJORITY COUNSEL 1</u>:

Q      When you say that particular year?

A      2015.

Q      2015.

A      Yeah, so, 2014 is -- the elements are met, absolutely should have been charged, any other case I ever worked with similar fact patterns, similar acts of evasion and similar tax due and owing.   2015 was a lower -- was a much lower amount.   And, you know, I don't -- I am not -- I wouldn't argue that 2015 should have been -- that if they didn't charge it that was a huge problem.

BY <u>MAJORITY COUNSEL 2</u>:

Q      And why was that?   What was the number in 2015?

A      It was lower it was like $23,000, $25,000.   It was really low.   And there were like, diamonds given, and it was like gifts and stuff -- so it was a little bit less straightforward.   2014 was just solid straightforward.

Q      And what was the number in 2014, if you know?

A      The tax -- again --

Q      So of unassessed -- per the report was, what was that?   I want to say it was $220,000 but I don't remember off the top of my head, 2014.   I do know that there is still that $125,000 of unreported that cannot be collected through civil or criminal means.

BY <u>MAJORITY COUNSEL 1</u>:

Q      And just to clarify that point, because of the way this played out on the criminal side, civil actions were suspended during the course of your investigation.   Is

that correct?

A       Yes, that is correct.

Q       And now that the statute was allowed to run for 2014, there is no mechanism by which the IRS can force the taxpayer to pay the amounts you believe are due?

A       That is correct.

Q       Okay, we just talked about tax year 2015.    We have talked a lot about tax year 2014.    I would like to just run through the other relevant years here.    For tax year 2016, what was the amount at issue, if you recall?

A       You know, I don't want to say individual tax years and the tax charges, just because I am just not -- I had that chart in my head and I am not confident enough to say -- I mean, it is 2.2 over those years so --

Q       Understood, understood.

BY MAJORITY COUNSEL 2:

Q       Just going back to 2014 and 2015, do you know if he was paying taxes on his Burisma?    He was paid $1 million or so basically for nothing.    Do you know if he was paying taxes on that, the $80,000 a month coming in through the Rosemont Seneca Bohai, I believe?

A       So for 2014, the $400,000 of unreported income today is the Burisma income.

Q       Correct.

A       It was not reported, and no taxes were paid on that.

Q       Okay.    And you believe it's $400,000, not $1 million?

A       Well, the number was $666,000, because it was in April, right?

Q       Okay.

A    So it was $1 million per year.

Q    Okay.

A    So the beginning was $666,000.    And then we gave -- in criminal investigation we are very conservative with those numbers.    So in theory, it really should be -- that number should be $666,000 of tax due and owing.    And then the tax loss associated with that.    But we gave him the benefit of the doubt on anything -- on the amount between 666 and 400.

Q    And then in 2015 is he paying his tax on the Burisma money?

A    Not at the time, but he -- it does wind up because Eric Schwerin --

MAJORITY COUNSEL 1.    Let's go off record for one second.

I'm sorry, go ahead.    Back on the record.

Mr. Shapley.    Because Eric Schwerin is now involved in that whole process so he made sure that things are --

BY MAJORITY COUNSEL 2:

Q    And is there anything about 2016 that you remember, or stands out -- because you mentioned in 2014 it was Burisma, and 2015 you said it was complicated, there were some diamonds and some other hard-to-value assets that were provided to him as income.    Do you remember anything about 2016?

A    2016 was a failure to file [and] pay year so it wasn't -- it wasn't a position of unreported income and acts of evasion, it was just that he didn't file and/or pay what he was supposed to.

Mr. Lytle.    Can I just confer briefly to refresh his recollection?

MAJORITY COUNSEL 2.    Sure.    Of course.

MAJORITY COUNSEL 2.    We can go off the record while they are conferring.

[Discussion off the record.]

BY MAJORITY COUNSEL 2:

Q       So I was asking if anything about 2016 stuck out to you.    And you said it was a failure to file, failure to pay case.    And I think that is when we went off the record.

A       Yeah, yeah.    I mean, in terms of the actual conduct, I don't think I can get into it right now -- I don't want to mix up tax years.    And ultimately, the case agent on those things getting into each -- I mean, it will be very dissected and very --

Q       Okay.    How about 2017, anything that stands out to you?

A       It was a bigger dollar amount, right?    It was around $500,000 taxed and owing.

Mr. Lytle.    Are you asking the conduct that resulted in that income?

MAJORITY COUNSEL 2.    I am asking him about both.    I am asking if he's aware of roughly the dollar figure and what the dollar figure is for.    Like he mentioned in 2015, it related to some diamonds.    2014 it related to Burisma.    So I am just asking if he has any recollection about -- each year, now we are at 2017.

Mr. Shapley.    Yeah, no.    That was a failure to file pay year as well.    And the tax loss was around $500,000.

BY MAJORITY COUNSEL 2:

Q       And 2018?

A       Yeah, 2018 was -- yeah, there is a lot of -- 2018 was like said to be -- that was at green light year from even CT, like, from a low level.    There was -- even DOJ tax and U.S. Attorney's Office in Delaware was, like, this is a slam dunk case.    So what occurred in 2018 was -- it wasn't a tax return that was prepared until 2020 mind you so it was, like, late and stuff.    But he was expensing personal expenses, his business expenses.    So, I mean, everything, there was a payment that -- there was a $25,000 to one of his girlfriends and it said, "golf membership."    And then we went out and followed that

money it was for a sex club membership in LA.

And there were off-the-book employees.    So Lunden Roberts was -- she is the mother of one of his children in Arkansas.    And she was an off-the-book employee that he was giving her healthcare benefits, she wasn't working, you know.    All that was expensed.    There were multiple examples of prostitutes that were ordered basically, and we have all the communications between that where he would pay for these prostitutes, would book them a flight where even the flight ticket showed their name.    And then he expensed those.

Mr. Lytle.    First class?

Mr. Shapley.    I don't recall if it was first -- I think it was first class on some of them, but some of them was, like, Frontier, I don't think they were a first class.

So the worst part about 2018 is that Hunter Biden's accountants are sitting there with him at a table, and they have all the numbers in front of them, right?    The bank accounts in front of them and they are saying that, you know, you need to circle what are business expenses so that we know what to deduct.    So it becomes apparent to the accountants during this interaction that he's putting things on here that aren't expenses, that aren't true business expenses.    So the accountants create a representation letter that basically they said they have never done before.    And they had him sign this document, and it was basically because they didn't believe what he was saying, but they didn't -- if they were going to prepare his return, they had to listen to what he was saying. I mean, I guess they could have just chosen not to prepare his tax return would have been their only out.    But that was the type of conduct in 2018.

[12:49 p.m.]

BY <u>MAJORITY COUNSEL 2:</u>

Q       What do you think happened between 2014 and 2018?    You told us that he had utilized this Eric Schwerin fellow to try to get his taxes in order so he pays his taxes, but we get to 2018, and he's trying to expense prostitutes and whatnot.

A       Yeah, and --

Q       And for purposes of his tax returns, he's expensing them to what business?

A       To Owasco P.C., I believe.

Q       Okay.

A       Yeah, I believe it was Owasco.    So I don't have the date in front of me, but Eric Schwerin and Hunter Biden have a falling-out.

Q       Okay.

A       Yeah.    And so Eric Schwerin leaves and stops working with and for Hunter Biden.    And I think that's where -- it was in that timeframe where Schwerin was no longer participating.

Q       Okay.    Was the Owasco concern conducting any legitimate business that would need to expense anything?

A       I mean, they're a company that brought in his consulting fees.    So, if they were truly consulting fees and he was traveling to get his consulting fees, or some legitimate expenses can happen, like the office, and things like that.

Q       Do you know if they had an office?

A       Yeah.    Oh, yeah, at one point it did because --

Q       So Owasco had a separate office from Rosemont Seneca?

A       I don't know if it was separate because -- I don't know the answer to that.

Q     And then now we're at 2019.     Is there anything that stands out about that tax year, either an amount or procedurally?

A     No.     It's a -- no, not a whole lot for me.

Q     And as I understand it, at some point, the 2014, '15 and '16, was that --

Mr. Leavitt.     Sorry, if I could confer for a second.

MAJORITY COUNSEL 2.     Of course.     Off the record.

[Discussion held off the record.]

MAJORITY COUNSEL 2.     Back on the record.

Mr. Shapley.     So, you know, these tax debts were outstanding, and there was only 1 year there was a payment plan where he paid $10,000.

BY MAJORITY COUNSEL 2:

Q     Do you remember what year that was?

A     I think it was 2016, I believe.     But he paid it a few times, and then he stopped paying it.     And, then ultimately, in late 2019-2020, a Kevin Patrick Morris comes into the picture.     And he was described as meeting Hunter Biden at a campaign finance event.     And he paid off several different tranches of tax due and owing, to include Federal and D.C. tax due and owing.

And when they prepared some of these returns, they wrote that Kevin Patrick Morris gave him a loan for these.     So that's also not taxable.     So that was one of the points of -- that was a compilation of all the tax due and owing, so --

Q     Some of these years, they tried to file in D.C., and then in the Central District of California?     Do you know where the breakdown was?

Where the U.S. Attorney's Office for Delaware tried to bring a case in D.C., and then they also tried to bring it in the Central District of California, do you know the breakdown in years?

A      Yeah.    So, the venue for 2014 and 2015 was D.C., and the venue for 2016 through 2019 was Central District of California.

Q      So D.C. was only 2014 and 2015?

A      That is correct.

Q      And when was the statute supposed to run for 2014 to 2015 after the extensions?    And we probably covered that before.    I apologize for asking again.

A      After all the extensions, it was November of 2022.

Q      So when they learned in March of 2022 that the D.C. U.S. Attorney is not bringing that case, they had April, May through November of that year to do something about that tax liability, correct?

A      Yes.

Q      And they did not do anything?

A      They did not, no.

Q      They could have tolled the statute of limitations?    They could have shifted it over to the Civil Division to pursue it civilly, correct?

A      Yes to the first question.    To the civil statute, I don't know if it would have still been open.

Q      Okay.

A      So I don't know that.    But, I mean, one thing that they did do is he did request special counsel authority in that time, right?    He was denied so -- and that's a big point that I want to make.

So it's not just -- I've worked cases for a long time and very big cases.    And yes, there -- investigators sometimes have disagreements with prosecutors.

But if you look at this, you can see -- they brought the case to D.C.    Like, they're not bringing the case to D.C. because they don't support it and they don't think it should

be charged.    And then I don't know -- it just wouldn't make any sense to me that David

Weiss requested special counsel authority if he didn't also think that those years should

be charged.

So that's just kind of, some of the things that were happening in that time period.

Q    And you said that the Central District of California, that case was brought out

there in January of 2023, you said?

A    No, September of 2022.

Q    September of 2022 is when they brought the case in California?

A    They brought the case to California.

Q    To California.

A    It was the same week that Martin Estrada was confirmed.

Q    Okay.

A    So, after 6 months, we're kind of in limbo, and we don't know why it took 6

months to then take the next step.    And, maybe it's coincidence, but it went there at the

same time that --

Q    Okay.

Mr. Lytle.    Can we go off the record for a moment?

MAJORITY COUNSEL 2.    Off the record.

[Discussion held off the record.]

MAJORITY COUNSEL 2.    Back on the record.

BY MAJORITY COUNSEL 2:

Q    I know you're not sure of when the U.S. Attorney for Delaware asked for

special counsel status, but do you have a timeframe?    Sometime between March of

2022 and January of 2023?    Is that fair?

A    My understanding was that it was right in March after he was told by

Matthew Graves that they didn't support it.

Q      And do you know if he asked for special counsel status at any time before he

brought the case to the Central District of California?

A      For California?

Q      Yes.

A      I don't know that.    But in the October 7th meeting, he did say that if

California tells him no, he has no authority to charge in California, and that he would have

to request special counsel authority in order to charge it.

Q      And you don't know if he did ask for special counsel authority a second

time?

A      I do not know.

Mr. Lytle COUNSEL 1.    Can we go off the record a moment?

MAJORITY COUNSEL 2.    Sure.

[Discussion held off the record.]

[Recess.]

[1:32 p.m.]

<u>MAJORITY COUNSEL 2.</u>   Back on the record.   It's 1:32.

[Shapley Exhibit No. 6

Was marked for identification.]

**EXHIBIT**

6

Laptop and Hard Drive Timeline
10/22/2020 – 1000am

1. 3 laptops to the shop
2. Financial records show Sportsman was around Wilmington DE shop at a cigar shop on the same day
3. Other intelligence shows Sportsman was in the area
4. computer shop calls Sportsman to tell him to bring in an external hard drive to put recovered data on to. Sportsman returned to the shop with the external hard drive
   a. Phone records show shop called Sportsman and sportsman called the shop around this time
5. During data recovery effort (could not fix the computer so was just recovering any data he could recover)
6. At this point there was the laptop, external hard drive, and a hard drive at the computer shop (3 devices)-computer shop always kept a copy of the customers data for a period of time before purging the data off his system
7. October 16, 2019 – Richard Steven McKissack reported to the FBI office in Albequerque "his son is in possession of a sportsman computer that had not been retrieved and was not paid for…said it contains evidence of white collar crime…he did not view this data personally"
8. FBI Albuquerque generated a lead that went to Baltimore FBI.
9. FBI Baltimore received the lead on 10/17/2019.
10. Discussions began on what to do with the computer.
11. Reached out to Richard on 11/3/2019 and got John Paul's contact information
12. 11/6/2019 – Josh Wilson called John Paul
    a. Provided device number and FBI determined that device was registered to Sportsman via apple ID account/iCloud account
    b. Verification of device -
13. 11/7/2019 – FBI interviewed John Paul at his residence near Trolly Square right around the corner form the shop on Delaware Ave.
14. FBI produced a 302 and Dillon looked at the 302 to determine if there was any privileged information – produced because John Paul was providing statements about what he saw on the laptop
    a. Determined no taint items in 302 – but not being shared with prosecution team
15. 11/21/2019 – telephonic interview to clarify the steps taken to notify sportsman of completion of service request, request of payment and pick up of the item.
16. 12/9/2019
    a. Took property of laptop, external hard drive and copy of receipt signed by sportmans
    b. ▇▇▇▇ provided copy of ▇▇▇▇ and fbi receipt of property
17. SA ▇▇▇▇ began drafting search warrant affidavit for the computer on 12/3/2019

18. 12/13/2019 – obtained T26 SW signed by SA ▓▓▓▓ for laptop and external hard drive – presented a filter protocol to the magistrate with the SW

19. 12/12/2019 – OEO approval came concerning the search warrant for the laptop and hard drive

20. FBI determined in order to do a full forensic review a replacement laptop had to be purchased so the hard drive could be installed, booted and imaged.

21. Eric Overly, CART agent, imaged the external hard drive in Delaware.

22. 12/19/2019 – Image of hard drive is provided to RCFL. Went to Philadelphia so it stayed in Delaware district.

23. 1/6/2020 – forensic computer people at FBI started analysis

24. After forensics there were some initial emails about what computer analyst was seeing – many pictures with many body parts, file names, and things similar to this

25. SA ▓▓▓▓ never saw a forensic report of actual hard drive or laptop – they had to actually go to the device – no cellabright report of hard drive showing the analysis in pdf format.

26. 1/15/2020 – Josh sent an email that some information was put on a shared drive with various file extensions

27. LTFC – various emails around 1/23/2020 talking about data imaging, etc.

28. 1/27/2020 - DE1 and DE2 -exported file extensions - were first pieces of evidence that were provided by computer forensics that included some files sorted by extension – was provided on a USB drive

29. SA ▓▓▓▓ asked if all information on the hard drive had been reviewed…the answer is that they did not look at all of that…SA ▓▓▓▓ questions if Dillon reviewed all iMessage's that were relevant and not privileged. They would find the answer.

30. 2/27/2020 – DE3 with all messages from the hard drive were provided by computer forensics – via USB Drive

31. 2/10/2020 – Filter review completed – relevancy review began for the hard drive

32. 227 Productions
    a. DE3 – USB containing exported messages (ipad and macbook messages) No iphone messages

33. 3/31/2020 – email about quality and completeness of imaged/recovered information from the hard drive. (SA ▓▓▓▓ said he had no seen it. USAO said that he would not have seen it because for a variety of reasons they thought they needed to keep it from the agents – they were going to give a redacted version at some point in time to the agents – Stephania takes what comes form Dillon …)

Laptop – iphone messages were on the hard drive but encrypted they didn't get those messages until they looked at laptop and found a business card with the password on it so they were able to get into the iphone messages

34. ▮▮▮ and ▮▮▮▮▮▮▮▮▮ – is related to the ipad backup

35. 3/6/2020 – FBI received the image of the laptop

36. 3/10/2020 – went to RCFL in philly to facilitate the forensic exam

37. 4/7/2020 – First evidence produced DE4 from laptop – less than what was provide in DE1,2,3

    a. Because de-duped

    b. Josh Wilson accepted this personally

38. 4/10/2020 – thumb drive to LTFC

39. 4/17/2020 – Uploaded documents to USAFx but got an error – talked about all the various types of files that were provided; voicemials, messages, videos, etc.

40. 4/20/2020 – Dillon sent to AUSA's only

    a. Zip files with Pdf and html version of cell phone reports via usafx\

    b. Redacted cellabright file but 5gb so can upload separately if you want—contain wise it is identical to other productions

    c. SA ▮▮▮ does not believe he ever received that cellabright file – Lesley said, "OK."

41. 5/11/2020 - The cellabright file was sent on thumb drive and uploaded at some point—timing is not exact

42. SA ▮▮▮▮ – For items not seen by agents shouldn't they see everything because if they have to testify to it they need to see it

    a. Lesley response is that this is a historical review and we can discuss that later

43. Someone asked if we could tell if files had been added by the computer shop

    a. The computer guy said they could do a csv list that shows when everything was created

    b. He said that the laptop was "returned to original"

    c. Lesley said (while laughing) that because a lot of people are going to be asking for the laptop

    d. Josh Wilson stated that (while laughing) so whoever they are they are going to have to buy a laptop to put the hard drive in so they can read it.

    e. Lesley stated that this team trying to determine if anything was added to the computer by a third party which are allegations being made by people who are not the defendant in this case is not a priority. We have no reason to believe there is anything fabricated nefariously on the computer and or hard drive. There are emails and other items that corroborate the items on the laptop and hard drive.

Ended around 1258

BY <u>MAJORITY COUNSEL 2:</u>

Q      We just marked exhibit 6, and this is a document titled "Laptop and Hard

Drive Timeline" dated October 22, 2020, 10 a.m.

Can you tell us about this document, who prepared it, and why?

A      Yes, I prepared this document.    It was to memorialize a meeting that we

had with the prosecution team, plus the FBI CART team, which were the computer

analysis team.

One of the things that prompted this was an email that I had sent a couple days

earlier that basically asked AUSA Wolf to have a discussion about the laptop, because IRS

CI was the affiant that actually allowed to get the contents of that laptop and devices.

When I say laptops, there's a couple devices.

So then this occurred, and it was almost 4 hours, I think.    It was a long -- no.

Yeah.   Three hours.    It was long and it was very detailed, and I just documented it here.

Q      Do you know what warrant the FBI used to obtain these devices?

A      It wasn't a warrant for the FBI to physically take custody of it.    They

determined, because it was abandoned property, that it could be turned over via a

document request.

[Witness confers with counsel.]

[Discussion held off the record.]

<u>MAJORITY COUNSEL 2.</u>    Back on the record.

BY <u>MAJORITY COUNSEL 2:</u>

Q      Who obtained the devices?

A      FBI did.

Q      Okay.    And could you tell us, you know, anything else about this document

that is worth knowing about?

    A    So would you like me to go through the document for high points or --

    Q    Just the significant parts.

    A    Yes.   So there are a couple significant parts of this.   One was that, at this time, the laptop was a very big story, so we were just making sure that everything was being handled appropriately.

So we wanted to go through the timeline of what happened with the laptop and devices.   I thought one of the most important first parts was that on November 6 of 2019, the FBI case agent, Josh Wilson, called up the computer shop owner, John Paul, and basically got the device numbers from him.

And then we bounced those device numbers off third-party records, and it showed that it was, in fact, Hunter Biden's device.   So it was a very first important step.

And then it's a lot of minutia with what they did with the information -- or with the analysis of the computers.   But what was important here was that █████████, the IRS case agent, pointed out a couple different times how he had not seen -- he was not given a cellabright report, which is just what they call the output of the FBI CART team analysis, and was questioning whether or not the investigators were provided everything.

And when it came down to item number 33 on page 2, Special Agent █████ is saying like, well, I haven't seen this information.   And AUSA Lesley Wolf says, well, you haven't seen it because, for a variety of reasons, they kept it from the agents.   And she said that at some point they were going to give a redacted version, but we don't even think we got a full -- even a redacted version.   We only got piecemeal items.

So it was an example of pertinent, relevant evidence that a prosecutor kept from an agent, and I --

    Q    You're supposed to be on the same team, correct?

A     Yes.    And it had already gone through a filter review, right?    So there was no attorney-client privilege.    So that couldn't be an excuse.

A prosecutor, in my experience, would never want that, right?    Because they want the agents to go through the evidence and the agents to spend that time.    So, you know, we don't really know what the full contents of that laptop ever had on it.

Q     And was it the U.S. Attorney's Office that was withholding the documents from the investigative agents?

A     AUSA Wolf was the one who communicated it.    I don't know if they confer with DOJ Tax or not, but AUSA Wolf's the one that made the statement.

Q     And flipping over to the last page, number 42, Special Agent ████, you have listed here:    "For items not seen by agents, shouldn't they see everything because if they have to testify, they need to see it."

And what was the response from the U.S. Attorney's Office, Assistant U.S. Attorney Wolf?

A     It was a nonsensical response.    It was just something about historical review.    But, you know, this 42 is an example of like -- this should have been such a mundane task, right?    Like, after the analysis was complete, here you go, agents.    You know, there was no attorney-client privileged information.    Agents, do your analysis.

This is such a -- this is an example of Special Agent ████ saying like, Look, like shouldn't -- we got to see this.    I don't know how, as an IRS agent, if someone is getting 10 percent of the income, when I do a tax comp for criminal purposes for Hunter Biden, I can't include the 10 percent if he's not getting that.    So we need to know where all the 10 percent is going, right?

Q     So if the 10 percent was going to the proverbial big guy?

A     Yeah.    So, I mean, this is just a very small example.    This is every -- like this

happened all the time.    Number 42 happened all the time where even on the smallest

items, for example, like the subpoenas that I alluded to in my opening statement it was a

time period in late summer 2021 where we had prioritized these interviews.

And we were to the point where we needed to go out to all these prostitutes,

because these were expensed.    So we had, it was probably four or five different weeks

where,  ▮▮▮▮▮▮▮  would give the -- or I can't say that -- attachment for the document

request and have it, you know, ready to go the next week.

So I had to call Jason Poole multiple times, because they wouldn't give those

document requests without Stuart Goldberg personally approving them.    And, you

know, there were a couple different times he was on vacation 1 week.    So he just didn't

approve them.    So we had to move these trips.

But that's the side story.    But 42 is kind of like a microcosm of like many other

events that occurred similar to that.

Q      Okay.    And turning to 43, item C, Ms. Wolf said, while laughing, "that

because a lot of people are going to be asking for the laptop."

What did you take that to mean?    Was that just a nervous laughter that she was

suppressing something that needed to be addressed?

A      I think -- it was in the media a lot, a lot of talk about the laptop.    So I guess I

didn't take from it that it was nefarious.    It was really just that they were like joking

about how everyone wanted the laptop.

Q      Okay.

A      And then it was right after that that FBI --

Q      Including the IRS criminal investigators, correct?

A      Yes.    We would have also liked to have seen that, unfiltered and

unmanipulated by the prosecutors.

Q      Item E, Ms. Wolf stated:    "This team trying to determine if anything was added to the computer by a third party which are allegations being made by people who are not the defendant in this case, is not a priority.    We have no reason to believe there is anything fabricated nefariously on the computer and/or the hard drive."

So this is Ms. Wolf, the Assistant United States Attorney, stating, according to your contemporaneous notes, that we, meaning DOJ, and the prosecution team have no reason to believe there is anything fabricated nefariously on the computer and/or hard drive.    Is that correct?

A      That is correct.

Q      There are emails and other items that corroborate the items on the laptop and the hard drive.    Is that further evidence from Ms. Wolf that the items on the laptop are authentic?

A      That is correct.

Q      And are you aware of any point in time ever that Hunter Biden or his lawyers have asserted that anything on the laptop is not accurate or not legitimate or not authentic?

A      Like news reports?    Like, you know --

Q      Has it just come to your attention?    Has anyone made an allegation that knows anything about the laptop that it's not authentic, that they would have a reason to know?

A      Anyone in --

Q      Hunter Biden, his lawyers, anyone from the Biden camp?

A      Oh, I don't know.    I don't recall who was making what statements.    I mean, I --

Mr. Lytle.    You're not aware of them?

Mr. Shapley.    Yeah, I'm not aware of it.

BY MAJORITY COUNSEL 2:

Q      If you're not aware -- I'm not either -- of anyone, Hunter Biden or his lawyers saying that anything on the laptop is fraudulent, doctored.

A      Yeah.    I don't know of that, no.

Q      Okay.    And that never came up in the prosecution team discussions?

A      No, no.

Q      And if there was a question that there was doctored material or inauthentic material on the laptop, that would be something that the prosecution team would discuss, correct?

A      They were -- we were discussing it.

Q      Okay.

A      I think that there's even another bullet point here where they're talking about looking back to see if documents have been -- or if files have been manipulated. Yeah.    So A is:    The computer guy said that they could do a CSV list that shows when everything was created, and that the laptop was returned to original when they -- yes.

So, I mean, the whole discussion was about can we rely on this information on the laptop, is it Hunter Biden's?    And their opinion was, it was, and it was not manipulated in any way.

Q      It was reliable evidence?

A      That is correct.

Q      Okay.

I want to mark another document that you produced.    It will be number 7.

[Shapley Exhibit No. 7

Was marked for identification.]

*Ex. 1*



**EXHIBIT**

tabbies®

7



## DEPARTMENT OF THE TREASURY
### Internal Revenue Service
### Criminal Investigation

## Memorandum of Conversation

| | |
|---|---|
| **Investigation #:** | ▮▮▮▮▮▮▮ |
| **Investigation Name:** | Doe, Robert |
| **Date:** | September 3, 2020 |
| **Time:** | Approx 1300-1415 |
| **Participant(s):** | See Below, |

**Location:**

1. The following individuals participated on this call or were invited to this call:
   a. ▮▮▮▮▮▮▮ – IRS-CI Special Agent
   b. Anthony Lopicolo – IRS-CI Special Agent
   c. Christine Puglisi – IRS-CI Special Agent
   d. Gary Shapley – IRS-CI Supervisory Special Agent (Author)
   e. Lesley Wolf – AUSA Delaware
   f. Carley Hudson – USAO Delaware
   g. Stefania Roca – USAO Delaware
   h. Jack Morgan – DOJ Tax
   i. Mark Daly – DOJ Tax
   j. FBI Agents with the following email addresses: ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ,
   ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮

2. AUSA Wolf stated that probable cause was not a question in determining if a physical search warrant was legally viable. She stated that there is more than enough probable cause. She stated that the decision was whether the "juice was worth the squeeze…" concerning whether the prosecution team thought that OEO and/or public integrity would approve these types of action.

3. AUSA Wolf stated that it is likely that a lot of the evidence sought in the T26 investigation would be found in the guest house of Joe Biden's residence and she stated, "…there is no way we will get that approved…" SA ▮▮▮▮ interjected that there were several emails talking about the records stored at the guest house and that those communications stated that key evidence the prosecution team would seek would be sent to the subjects' California residence.

4. There was a discussion with prosecutors about removing the subjects name from several electronic search warrants, 2703-D orders and ▮▮▮▮ attachments. The theme was that with the subjects name in the document it would not be approved by "…people way above them…" SA ▮▮▮▮ stated that he did not agree with removing the subjects name and instead said that we should not be changing the document to fit in

with what may or may not be approved.  SA▮▮▮▮said he was not comfortable with that as it would appear that the change was made for unethical purposes.  AUSA Wolf basically disregarded SA▮▮▮▮concerns and DOJ Tax Jack Morgan interjected stating that the removal of it the subjects name would still ensure we received "most" of the data the team sought.  AUSA Wolf moved to the next topic.

5. AUSA Wolf discussed the Blue Star Google email search warrant they authored and sent forward for approvals.  She said that public integrity had approved it but that OEO was sitting on it.  It appeared that behind the scenes she received communications that indicated that warrant would not be approved.

   \*\*\*\*\*Follow on call requested by AUSA Wolf on 9/4/2020 at 0945.\*\*\*\*\*

6. United States Attorney Weiss talked to Deputy Attorney General Donahue.  They determined that the prosecution team can no longer issue any external requests (outside of government) whether search warrants, ▮▮▮▮2703-D orders, preservation letters etc.  Everything needs to be vetted with USA Weiss and DAG Donahue.  This is because it is 60 days out of the election even though it is not technically inside any parameters.  AUSA Wolf said that DOJ has zero tolerance for risk that any of these requests somehow tip off someone who would leak this to the media.

7. SA▮▮▮▮asked if the team would still be planning to go overt in November.  AUSA Wolf said that the possibility of ballots still being counted and concerning the hand over of power that she cannot determine if that would happen.

8. AUSA Wolf said that DOJ is under fire and that it was self-inflicted.  She said that DOJ needs to repair their reputation.  AUSA Wolf said we should assume we would continue after the election.

9. AUSA Wolf said that the DAG's office is the one who made the decision.

I prepared this memorandum on September 3, 2020 and  September 4, 2020, immediately after the conversation with see list above.

Gary Shapley
Supervisory Special Agent

☑ Double click here to sign
Witness

U.S. Treasury Criminal Investigation

BY <u>MAJORITY COUNSEL 2</u>:

Q     It's a memorandum of conversation regarding the Robert Doe investigation. This is a two-page document, two pages of content -- the document is three pages, the third page doesn't have anything on it -- prepared by yourself dated September 3, 2020.

A     Yes.

Q     And you wrote this document?

A     I did.

Q     Can you describe the significance of this document?

A     Yes.    So this was a pros team meeting September 3rd, 2020.    And we were having a discussion about being able to do the physical search warrants on Hunter Biden's residence and/or the guest house of President Biden's residence in Delaware.

And we had already established -- well, herein too this is when AUSA Wolf is stating that the probable cause had been achieved and that there was more than enough evidence and that there was likely evidence to be seized relevant to the investigation that could be found at these locations.

So she stated, "The decision was whether the juice was worth the squeeze."    And also a statement made here was that she said that, well, we had to consider the optics of doing a search warrant on, you know, Hunter Biden's residence and/or the guest house of President Biden.

She further states about the guest house of Joe Biden that there was no way we'd get that approved.    And here's another example of Case Agent ████████ interjecting, talking about that there were other documents that said that there was information that would be in the guest house and in the subject's California residence in Venice Beach at the time.

And further, there was another discussion about moving forward on these external document requests.   So we did multiple electronic search warrants, D orders, you know, document requests.

And prosecutors were pushing to remove the subject's name from those.   And the reasoning behind that was that they were worried that it would -- someone would -- out there that received these documents, these document requests, would leak the information, and that if it just had the entity that it would be less -- it would be more difficult to link it to Hunter Biden.   So, I mean, of course, the issue is that she said that it would not be approved way above them, right, which -- and I could talk about that in a moment.

And then we're having a long conversation about it and every one of the investigators are like, look, like this is not normal.   There is no way we'd ever send out -- how do you do a thorough investigation of a subject without the subject's name on it?   It's just -- it was absolutely absurd.

And then even Jack Morgan from DOJ Tax said, well, we'll receive most of the information.   And in my experience with working with prosecutors who might be going toward a trial, most is never going to -- never going to be good enough for them.

Q      Was there any overt discussion at these meetings that we're dealing with the son of a Presidential candidate?   Was that ever discussed explicitly?

A      I mean, they were careful.   They tried to be careful.   You know, that's why, you know, there's not a lot of emails, there's not a lot of documents they produced, right?   There were discussions that were obvious that they were talking about the issues with investigating a Presidential nominee at that time.

Q      When AUSA stated that the juice was -- whether the juice was worth the squeeze, what do you think she was referring to?   Whether the effort expended to get a

physical search warrant would be worth it?    It takes a lot of hard work and effort on the side of the investigative team to obtain a T-3 warrant, correct?

A    Well, it wasn't a T-3.

Q    Not a T-3.

A    A physical search warrant.

Q    A physical search warrant.

A    I think that she wasn't worried about that part.    She was worried about blow-back from doing a search warrant that was related to Hunter Biden.    I think all of these things that they didn't allow us to do, even back in June of 2020, was because their primary goal was to keep this investigation secret, right?

And even on December 3rd of 2020, when we're in Delaware U.S. Attorney's Office prepping for the day of action on December 8, Weiss came in and was like -- congratulations for keeping it secret.    And I was like, well, I thought that we were conducting an investigation here.    I didn't think that what we were doing was trying to keep a secret.

But there were multiple things like this that occurred -- and this wasn't specific to the upcoming election, right?    Like, we hadn't got the cease -- this was on September 3rd, 2020 -- we hadn't got a cease and desist from DOJ Public Integrity to stop.

So this was generally just that they wanted to remove the subject's name because they were so worried that some company got a document request and that they would give it to the media and that it would somehow out the investigation.

BY MAJORITY COUNSEL 1:

Q    When you said that AUSA Wolf was worried about blow-back, from who do you think she was worried about blow-back?

A    I think it was worried about, that there's going to be, suggestions of election

meddling, or that you're targeting targeting -- Hunter Biden.

I think -- all of her -- all of the reluctance to do all this I believe was related to that. Like, when she says, there's no way we'll get that approved, so at the time, right, like this is September 3rd of 2020.    So Bill Barr is the Attorney General, right?    So I would assume this would -- I don't know, but would this go to his level?    I don't know who's not approving it, right?

But I think that this was an excuse to not even send it up.    So I would -- I don't know 100 percent, but I'm almost positive that they just said, Well, we're not going to get that approved so we're not even going to send it up.    And that was always kind of an excuse, to use the process to slow it down and to kind of hide behind.

BY <u>MAJORITY COUNSEL 2</u>:

Q    And your belief, based on your experience, was they were afraid that maybe it would be approved?

A    Yes, yes.

Q    And so they wanted to stop it right there in Delaware, in the U.S. Attorney's Office in Delaware?

A    That is correct.    And even the storage unit search warrant.    I mean, that was after the election.    And there was no -- it was a storage unit in northern Virginia. No one would have known that was connected to Hunter Biden.

But we had information that there was -- the clean-out of the Owasco office was located in this storage unit in northern Virginia.    And after the day of action, we got a little bit more information about it, so we wanted to do it.

And the night of the day of action, ███████ sends a search warrant affidavit to Lesley Wolf saying, let's do it, right?    Now, there's not even an election issue, right? And it's in a storage unit.    It's not on someone's residence.

And still, AUSA Wolf and the prosecutors wouldn't allow us to do it, so much so that I set up a call with Weiss and my Special Agent in Charge at the time, and we said, Look, we got to do this.    We can't just rely on a document request for them to give us whatever.    We need unfettered access to this evidence.    We don't know what they're going to give us eventually.

And he agreed that -- look, if it's not -- Weiss agreed on that call that if it is not accessed, that storage unit, within 30 days that he would allow us to do a search warrant on that.

I'm feeling great, right?    So hang up the phone, an hour later I find out that AUSA Wolf and the other prosecutors told defense counsel about the storage unit.    So it was off the table.    And that was even after the election.

So there's many things.    Any other case I ever worked, if they were like there's a storage unit with documents from the business and personal documents in relation to the years under investigation -- the risk was zero, because it's on a storage unit, it's not on a residence -- there's no prosecutor I've ever worked with that wouldn't say, go get those documents.

Q    Do you think these decisions were made by Ms. Wolf, the AUSA, or do you think these decisions were made by the U.S. Attorney?

A    I don't know the answer to that.    Based on what I was led to believe that Weiss was in charge, right?    And that the prosecutors often use that as an excuse. Well, that's a great idea, we're going to go talk to Weiss about it.

Q    From some of your testimony, though, in the last few minutes, it seems that the AUSA Wolf may have been curtailing parts of the investigation, but the U.S. Attorney had expressed, at least overtly, that he was interested in moving forward, at least with the search warrant for the storage unit.

A      Yes.    That particular item, yeah.    I mean, Weiss -- I mean, I think Weiss

didn't have an opportunity to talk to Wolf, right?    And maybe they didn't communicate

that Weiss had agreed to that.

But the whole point is, is that December 8th, there's emails where Weiss and -- or,

I'm sorry, Wolf is asking for a search warrant affidavit.    Like, let's go do a search warrant,

right?

And then ██ gets the search warrant affidavit forward.    And then all of a sudden

they're like, we don't want to do that.    And they knew we were talking to Weiss about

the physical search warrant.    So I don't know why they would call the defense counsel at

the same time without speaking to Weiss about what came out of that meeting about the

physical storage unit.

BY <u>MAJORITY COUNSEL 1:</u>

Q      From an investigation process perspective, is it typical for prosecutors to

notify defense counsel before executing a search warrant?

A      No.    No, that wouldn't happen.

BY <u>MAJORITY COUNSEL 2:</u>

Q      Is that inappropriate?

A      Absolutely.    I mean, officer safety.    I mean, it's just incredible.    You know,

there's destruction of evidence.    I mean, you go into a door and they know you're

coming.    It's terrifying.

Q      So it's not just for the integrity of the investigation, there are safety issues?

A      Absolutely, yes.

Q      Let's talk about the day of action, which occurred a couple months later.

This memorandum of conversation we were discussing was September 3, 2020.    And the

day of action was going to be -- it turned out it wasn't very action-packed.    Is that

correct?

A      Yeah.    There was only one successful interview that day, but there were

lots of document requests.

Q      What other agencies were you coordinating with for the day of action?

A      FBI.

Q      Is that the only one?

A      Yes.

Q      And what was the original plan for the day of action?    I know you

mentioned 12 interviews, some in Arkansas, some in California.    But maybe you can just

walk us through, again, at a high level, what was planned for the day of action.

A      So the plan on how to execute that day?

Q      Yes.

A      All right.    So the plan that we discussed and agreed upon on that December

3rd meeting, and it might have morphed in a couple days after just to finalize some

things, was that for Hunter Biden, who now had a Secret Service detail, that we were

going to have the FBI Special Agent in Charge call the Secret Service Special Agent in

Charge the night before to just say, hey, I'm calling you at 8 a.m.    It's important.

And then 8 a.m. call.    FBI SSA Joe Gordon and I were the ones tasked with

interviewing Hunter Biden.

Q      So you're in California?

A      In California, yes.    So the night before -- so that was the plan.    I went to

FBI L.A. Field Office with the FBI SSA.    We talked to their management.    That's the plan.

We're going home, right?

Now it's December 7th, the night before the day of action.    And I'm prepping for

interviews, because I'm interviewing Hunter Biden and Kevin Patrick Morris, right?    So

I'm prepping.    I'm prepping.

I get a phone call from my Assistant Special Agent in Charge, George Murphy, who tells me that FBI headquarters notified Secret Service headquarters and the transition team that the day of action was occurring the next day.    And that the new plan became --

Q    Can I just stop you there?    Why did they tell the political officials?

A    I have no -- I have no idea, no idea.

Q    That certainly sounds strange to you, correct?

A    All of it is strange.

Q    It's one thing to tell the subject, but to tell the political officials introduces a whole range of topics of concern.    Isn't that correct?

A    Yeah.    All of it -- yes.    Yes to your answer, but all of it was incredible. There's also another officer safety issue, because these people close to him are going to know that we have agents out there out and about trying to do interviews and try to get information.

And then just, tampering with witnesses, right?    Now you're telling the witnesses that agents might be knocking on your door tomorrow, don't say anything.    And ultimately, we got one guy that talked.

Q    Right.    So of the 12 witnesses, do you remember who was on that list other than Hunter Biden and --

A    I generally know it was Joan Mayer, Eric Schwerin, Rob Walker.    It was Kathleen Buhle, Kevin Morris.

Q    These people are located in the United States?

A    Yes.

Q    Eric Schwerin, where is he located?

A     D.C., I think.

Q     And Rob Walker is in Arkansas?

A     That is correct, yes.    There were a few more, but I don't recall.

Q     And for the day of action, were you given any instructions -- and I think you mentioned this in your opening statement -- about what the agents could and could not ask?

A     Yes, we did.

Q     And could you tell us a little bit more about that, again?

A     Yes.    So on December 3rd, 2020, in the Delaware U.S. Attorney's Office, we were going over -- it was a very, very long day, because we had -- there were a group of like 12 or 15 people in the room.    Weiss was coming in and out.    And we were prepping for each individual witness.

So the agents that were going to conduct those interviews were Zooming into this meeting.    So we're going over each outline.    There were multiple times where Lesley Wolf said that she didn't want to ask questions about dad.    And dad was kind of how we referred to him.    We referred to Hunter Biden's father, you know, as dad.

Q     That's Joe Biden?

A     Yes.    James Biden as uncle.

Q     You were not allowed to refer to James Biden either?

A     We called him uncle.    I think it was so that we could speak more openly without, yelling, President Biden or James Biden.    I don't think that was nefarious, but -- she said, I don't want questions about dad.

So now we're in the Rob Walker, and the interview outline is eight, nine, 10 pages, and we're on page 4.    So we're not on priority items, but we're kind of gaining that rapport, getting him used to the interview, just like we do a lot of things.    Now we're

going to ask him substantive things that we really want to know.

So in there, it said:   "10 held by H for the big guy."   And it just said how -- what we were going to ask on that topic.   And Lesley Wolf stops and says, we're not asking -- I don't want to ask about the big guy.   And everyone -- basically, everyone in the room except for the prosecutors had a big problem with that.   There was a large debate about it.   And, she said, I don't want to talk about big guy.   I don't want to -- I don't want to ask about dad.   So you see in the --

Q   Do you know why?

A   I think that she was trying to limit where the investigation could go.

Q   And do you know what her motivation was?

A   I don't know what her motivation is, no.

Q   And did anyone on the team give her any feedback about what are you doing, this is crazy?

A   Everyone there -- the prosecutors are generally pretty silent.   So Lesley Wolf was the main voice, and the other ones were very subordinate and kind of only talked when they were asked to talk.

So FBI raised concerns.   ██████ raised concerns.   I raised concerns about it. She's like I don't want to talk about the big guy.   Don't ask about the big guy.   So you see in the Rob Walker interview --

MAJORITY COUNSEL 2.   And we can mark that.   It's No. 8.

[Shapley Exhibit No. 8

Was marked for identification.]

EXHIBIT

8

W23-1   Page 1 of 214

272D-BA-3065729
JJW:glwm
H Drive

Date of Conversation:  December 8, 2020

(Transcribed from WAV file copy)

Participants:   1. SA Joshua J. Wilson,
                   Federal Bureau of Investigation (FBI)       =      Wilson
                2. SA Adam Soline,
                   Internal Revenue Service (IRS),
                   Criminal Investigations                     =      Soline
                3. John Robinson Walker, aka: Rob              =      Walker

Betsy (Walker?), wife of John Robinson Walker, aka: Rob = Betsy
A male voice in background (Unknown Male?) = Male
Unknown Female = Female (Wait Staff)
Unknown Male = Male (Wait Staff)

Type of Conversation:  Taped Interview

A transcription of the above-described conversation is as follows:

Preamble by
Wilson:        Okay, this is Special Agent Joshua Wilson with the FBI accompanied by...

Soline:        Special Agent Adam Soline, IRS, CI.

Wilson:        Okay, today's date is December 8th of 2020.  The local time in Little Rock, Arkansas is
               10:03 a.m.  Ah, the following will be an attempted interview with John Robinson Walker
               at his residence, ▮▮▮▮▮▮▮▮▮▮▮▮ also in Little Rock.

               (Background Noise.  Exit vehicle and slams car door.  Walking noise).

               (Pause).

(Counter #: 04:08:43/00:00:58):

Wilson:        I wonder if this..., anybody saw us coming through?

Soline:        Hmph, hmph, hmph.

               (Background Noise).

Soline:        I'm gonna (Unintelligible).

               (Background Noise).

Wilson:         Um.., as far as the.., the failed joint venture that was gonna be Sinohawk which involved Tony and James and you...

Walker:         Hmph hmph.

Wilson:         ...and.., and Hunter...,

Walker:         Hmph hmph.

Wilson:         ...um.., you know, it was kind of the, um, the famous email that Tony was pointing out like the.., the equity split.

Soline:         (Whispers).  Uh huh.

Wilson:         Um...

Walker:         Sure.

Wilson:         Who... Like can you tell me your opinion of that?  Like ah...  Ah, did you... I mean are you familiar with what I'm talking about.., that email.., when it's going through like, you know, ten b.., held by "H," you know, like...

Walker:         Yeah.

Wilson:         ...so you...

Walker:         Yeah, I saw that on Twitter or somethin'...

Wilson:         Okay.  (Laughs).  Right.

Walker:         ...or maybe.., maybe when Tucker Carlson...

Wilson:         Yeah.

Walker:         ...talks about it on his show.

Wilson:         So what.., w...  Like can you tell me about that?

Walker:         It was an email.  I think that maybe James was ah.., wishful thinking that ah.., or maybe he was ah, projecting that, you know, if this was a good relationship and if this was something that was gonna happen, that ah.., ah.., and if the.., the V. P. was never gonna run...,

Soline:         Hmph hmph.

Walker:         ...just projecting that, you know, maybe at some point, he would be a piece of it but he was more just, you know, ah, you know, it.., it.., it looks terrible but it's not.

W23-1 - Page 80 of 214

| | |
|---|---|
| Wilson: | Right.  It was more of a "unicorns and rainbows" type email? |
| Walker: | Yeah..., and.., and.., and fuck Tony for..., for trying to..., I mean for taking little pieces of.., |
| Soline: | Uh huh. |
| Walker: | ...of emails or.., or, you know, and not showing it the.., the structure of a.., of an LLC or taking pieces of conversation that he recorded of me that ah.., to try to do that.  I don't know what's in it for Tony but.., but that email looks... |
| Soline: | Hmph hmph. |
| Walker: | ...bad and it's ah.., probably hard to explain for ah.., James.  Do I remember it?  No.  Does it look real?  Yeah.  And ah.., ah.., you know, I certainly never was thinking at any time that ah.., the V. P. was a part of anything we were doin'. |
| Wilson: | Okay.  Have you met the V. P.? |
| Walker: | Yes. |
| Wilson: | How many times roughly? |
| Walker: | Oh, I...my wife used to...(Unintelligible)... |
| Wilson: | Yeah, that's right. |
| Walker: | ...so..., |
| Wilson: | That's right. |
| Walker: | ...so... |
| Wilson: | Yeah. |
| Walker: | ...I mean I would get called and I'd.., I'd play golf with him probably eight to twelve times and... |
| Wilson: | Okay. |
| Walker: | ...ah.., um... |
| Wilson: | In Delaware or... |
| Walker: | Ah, I played with him at um.., ah.., Bully Rock in Havre de Grace with ah.., Beau and Hunter one time. |
| Wilson: | Okay. |

Walker:        That's probably the first time and then um..,

Soline:        Hmph hmph.

Walker:        ...played with 'em in D. C. probably ten times or so...

Wilson:        Okay.

Walker:        ...and it was really um.., more of ah.., hey, my dad's gonna go play golf..., you're...,
               you've gotta come with me.., and I'm  like at work.

Wilson:        Yeah.

Walker:        Too bad.

Wilson:        (Laughs).  Gotcha.

Walker:        Yeah.

Wilson:        Okay.

Walker:        So...·

Wilson:        Um...

Walker:        And, you know, I guess and in that.., ah.., you know, if.., if Mazie was havin' a birthday
               party, I may be there...

Soline:        Hmph hmph.

Walker:        ...and he would stop by the Vietnam restaurant somewhere, somethin', or...

Soline:        (Sighs).

Walker:        ...if ah.., um.., you know, they're.., they're.., you know, Christmas things but even...  I
               mean I'm sure he knows who I am.  He knows I'm...

Wilson:        Okay.

Walker:        But he doesn't know me

Wilson:        Okay.  Did um.., did the V. P. ever show up at any CEFC meeting or anything like that..,
               even once he was out of office?

Walker:        Yes.

Wilson:        Okay.

| | |
|---|---|
| Walker: | It was out-of-office.  Ah, we were in ah.., D. C. at the Four Seasons... |
| Soline: | Hmph hmph. |
| Walker: | ...and ah.., we were having lunch and he.., he stopped in... |
| Soline: | Hmph hmph. |
| Walker: | ...then he'd ah, leave. |
| Wilson: | Okay. |
| Walker: | That was it. |
| Wilson: | Just said hello to everybody and then... |
| Walker: | Yes. |
| Wilson: | ...took off? |
| Walker: | He literally sat down.  I don't even think he drank water.  I think Hunter said um.., I may be tryin' to start a company, ah, or tried to do something with these guys and could you.., and  think he was like "if I'm around"....and he'd show up. |
| Wilson: | Okay.  So I mean you definitely got the feeling that, that was orchestrated by Hunter to.., to have like a.., an appearance by his Dad at that meeting just to kind of.., |
| Walker: | Hmph hmph. |
| Wilson: | ...bolster your chances at... |
| Walker: | Hmph hmph. |
| Wilson: | ...makin' a deal work out. |
| Walker: | Sure. |
| Wilson: | Okay.  Um.., any other...  So that was the..., ah.., Four Seasons in D. C. after he was out of office? |
| Walker: | Yeah. |
| Wilson: | Um, where...  Any times when he was in office or did you hear Hunter say that he was settin' up a meeting with his dad with them while dad was still in office? |
| Walker: | Yeah. |

Wilson:     Okay. All right. Um.., when you started to learn about like you were going your separate ways as far as um.., splittin' off.., you and James were not gonna.., but you know that Hunter was continuing on and was...,

Walker:     Hmph hmph.

Wilson:     ...you know, involved with Hudson West...,

Walker:     Hmph hmph.

Wilson:     They...  I mean first of all, did you even know that or did you read that Senate report.., the Hudson West stuff?

Walker:     Um, I had ah.., I think .., specific things no.  Did I think that ah..., they...

Wilson:     He was still working with them?

Walker:     Did I think he was still working with them and then ah.., did I think that he had ah......received the money, sure, I was questioning that.

Wilson:     Uh huh.

Walker:     Um.., ah.., did I...  I never questioned him about it.  I was ah.., happy to be out.  If ah..., ah.., I read in the Senate Report where he received five or ten million dollars...

Wilson:     Okay.

Walker:     ...and ah.., ah..., I had ah.., always suspected it and I think ah.., Tony had suspected it also but ah.., I.., just at that point, I wasn't, you know, I didn't know anything for a fact.  I wasn't gonna divulge anything to Tony who would probably try to do something about it.

Wilson:     Right.

Walker:     Yeah.

Wilson:     And you probably heard it from Eric too 'cause Eric was still working with...

Soline:     Hmph hmph.

Wilson:     ...Hunter during that time.

Walker:     I'll say Eric didn't say anything directly but he alluded to it...,

Wilson:     Okay.

Walker:     ...to me at one point.

BY <u>MAJORITY COUNSEL 2:</u>

Q      This is a document of a December 8, 2020, interview by Special Agent Wilson of the FBI and Rob Walker.

And just as I understand this document, this is a transcript of a recording?

A      Yeah.    This is an excerpt of a transcript of a recording.    That is correct.

Q      And so was Special Agent Wilson wearing a -- or recording it on his phone, or how did it get recorded, to your knowledge?

A      Yes.    Mr. Walker was consensually monitored.

Q      Okay.    So he agreed to have the interview recorded?

A      No.    The agents were the consenting people to monitor.

Q      Okay.    So it's like a one-party State or --

A      Yeah, yeah.    Well, law enforcement, we have the consensual monitoring rules.

Q      Okay.

A      And we got approvals to do consensual monitoring for these things.    So the agents are the consensual.

Q      All right.    Now, are they wearing a wire or are they just using an iPhone, or how does that happen?

A      It's different.    We have different tech.    Key fobs, coffee mugs, iPhones. There's lots of different things.    I haven't seen a physical like what you think of as like taped to your chest.

Q      Well, I used the term "wire," but what I mean is a specific device for purposes of recording, not just an iPhone.

A      That is correct.    And this was to be able to be inserted into evidence at trial

transcript of that recording, excerpt of a transcript.

Q       Maybe you could draw our attention to the significant parts of this document.

A       Sure.   So, right up to the time when Special Agent Josh Wilson or Special Agent Adam Soline, who is an IRS agent, one of my agents, was going up to this door, they were deliberating.   They were basically debating about Lesley Wolf's directives.

And they were like, how can we not ask?   Like, that was wrong.   We got to ask. We got to ask.   And so they basically decided that they would ask the question without saying the words "big guy," and that then they would somehow be doing what they were asked to do.

So, as you can see in here, page 79, it's about right in the middle of the page where it says "Wilson" and it begins "who."   So this -- Wilson's question and -- do you want me to read it or --

Q       I can read it.

A       Okay.

Q       It says:   "Who...Like can you tell me your opinion of that?   Like" -- I won't read the ahs and the – "I mean are you familiar with what I'm talking about…, that email.., when it's going through like, you know, ten b.., held by "H"?   And Walker responds in the affirmative.

A       Yeah.

Q       And then Walker further says:   "Yeah, I saw that on Twitter."

A       Yes.

Q       And so what else is significant about this back-and-forth between Special Agent Wilson --

A       Sure.   So this just shows the lengths at which we had to do to -- and how it

affected actually our jobs and conducting these interviews.    But then you go --

Q    Because Walker was a business partner of Hunter Biden, correct?

A    That is correct, yeah.

Q    And so he was especially positioned to know what 10 for the big guy meant, right?

A    Yes, yes.

Q    And so by not asking directly about that, you're giving away a legitimate investigative lead, correct?

A    Definitely could be, yes.    So, as I kind of stated about -- I'll say it a little more directly.    They were debating about this, right?    But they were struggling to come to grips.

Even, you know, what is it, 5 days later when they're headed to do that interview and they know that it's wrong but they were agents and they did the best that they could.

So if you move down into this -- this couple pages, you can see that they're saying VP, VP, page 80.

Q    Okay.

A    They're calling him VP, and that was because they weren't supposed to call him dad.

Q    Okay.

A    Not call him dad.    So that's the --

Q    So VP wasn't on the list.    It was don't mention the big guy, don't mention dad?

A    Yeah.

Q    But VP wasn't on the list of barred terms?

A    It was a little bit of a protest, I guess, to say that we're asking it, but, we'll ask

it in a way that maybe she's not mad.

Q      Do you think she would have been mad, though, because clearly she was trying to steer the investigation away from Joe Biden, correct?

A      I mean -- yeah, of course.    She would have been -- she was the type of person that did not like dissenting opinions, and what she said went.

Q      Do you think at this point in this -- maybe you don't know, but I'm going to ask it anyway -- whether she was angling for some sort of position in the administration in the Justice Department?

A      I have no idea.

Q      Was there ever any chatter among your colleagues about that, if that was her motivation?

A      No, I've never heard that.

Q      Did you or any of her colleagues have any speculation about her motives, or was it just that she was trying to keep this case from moving forward?

A      Her motives are just difficult to assess, right?    We're just thinking about the investigation and how we have prosecutors on the case that are obstructing our efforts to get all the evidence.    That's really, eventually, the reason why we went a couple years of this type of conduct was because we just -- we have to do it.    We have to suck it up. We got to work this case.

I got a prosecutor that's not great to work with.    That happens sometimes.    We just got to move forward, right?    So that's what we did for a year, 2 years, 3 years.    So she was not pleasant to work with.    She was -- I don't want to belabor that point, but it was her way, right?

And if there was big guy in the transcript, she was either going to directly berate you, or she was probably going to give you the silent treatment, which was one of her

tactics, for a couple weeks and talk behind your back.

MAJORITY COUNSEL 2.   Okay.   Our hour is up, so pivot to our colleagues.

Mr. Shapley.   We can come back to that, right?   There's more on that.

MAJORITY COUNSEL 2.   Correct.

MAJORITY COUNSEL 1.   Go off the record.

[Recess.]

MAJORITY COUNSEL 2.   We are back on the record.   It's 2:20.

BY MINORITY COUNSEL 2:

Q       Thanks again.   I think on our side, we have sort of a smattering of clarifying questions and the like.

First, I'd like to go back to a discussion we were having before regarding the relationship between civil tax investigations and civil tax liability and criminal tax liability.

And I think I'd like to start with questions about something that you alluded to that I have not heard before. I just wanted to get clarity on it.

You said in the discussions of the various tax years, when we got to, I believe it was 2016, or maybe my notes are a little bit fuzzy, there was a point where you said that Hunter Biden was paying off tax debts in installments.

Could you describe a little more about what that was, what those payments were for exactly?

A       Yes.   So he was assessed a civil tax assessment at some point, and he entered into a payment agreement with IRS civil side to pay $10,000 a month, I believe.

Q       Do you know for what year that liability was assessed?

A       I don't.

Q       But not for any of the years in question?

A       No.   They would have been prior.

Q     Prior, okay.    And then who is responsible or what is the process at IRS CI for, let's say, hypothetically, there's a case that comes before CI, and they review it and they decide that it doesn't necessarily meet the standard for criminal prosecution, but there's, nonetheless, tax liability.

Is there a process for referral to the civil?

A     Yes.    It's called just that, civil referral.

Q     Civil referral.    And did that occur in this case at all after -- after prosecution was declined, or the statute ran, the criminal statute ran?

A     No, it didn't, because the civil statutes had run.    The statute of limitations had run.    I'm sorry.

Q     The civil statute of limitations on fraud are infinite under IRS 6501(c).    And, similarly, the statute for failure to file also does not run if you don't file a return.

Was that thought of and acknowledged by Criminal Investigation when deciding whether to refer the case?

A     Are you asking about the civil fraud penalty?

Q     No, not the civil -- if there's fraud under 6501(c) -- if the IRS can demonstrate fraud, then the statute of 6 years does not apply, correct?

A     The civil fraud penalty which you are referring to -- it can only be assessed with a criminal conviction.    That's the standard for civil to be able to make that fraud assessment.    And there are some jurisdictions where it has to even be 7201, an evasion case, in order for the civil fraud penalty to be able to be assessed.

Q     6501 is the civil fraud penalty or -- maybe I'm mixed up, because I was under the impression that that was the limitation on assessment.    So put it aside.    I don't have my Code with me.

But I was pretty sure that the limitation on assessment -- in the case of fraud,

simply did not run.    But --

A    I think you are partly correct, but the way that the precedence for proving

fraud, for the civil fraud penalty, is a criminal conviction or guilty plea.

Q    That could -- we'll have to look.

A    That's my understanding, and that's the way that I've seen it done in the

past.

Q    Okay.    Fair enough.

Skipping around, can we go back to AUSA Wolf for a moment?    If I recall, AUSA

Wolf was among the individuals who, at the end of the day, were in favor of charging

Hunter Biden in their recommendations to, for instance, the D.C. office of the DOJ?

A    They were supportive of the charges in the SAR --

Q    Yes.

A    -- and moving forward to the D.C. U.S. Attorney's Office, and presumably to

the California U.S. Attorney's Office, yes.

Q    Right.    So, when all was said and done, AUSA Wolf and Mr. Weiss as

well -- they didn't appear to be impartial -- to be biased in their conclusion as to whether

or not to charge Hunter Biden?

A    I don't think that's an accurate statement.    There were -- during the

investigation, we have no way to know if we have all the evidence.    We were obstructed

from approaching certain witnesses.    We were obstructed from asking certain questions.

We limited the names that were on document requests.

So we have no idea what's out there that could have linked us to one bank

account that opened up a whole other slew of evidence for us.    Just the search warrants

not being allowed after they've agreed that probable cause has been achieved.

I look at it as is that there was all these obstructions, and at the end of the day,

the evidence was still strong enough to support them charging.    That's how I look at it.

Was that your question?    I'm sorry.

Q       It is my question.    But there's still a point where nonetheless they have discretion to agree or disagree with your recommendations, and they chose to agree with them.

A       Officially, and -- there's two different things you're talking about, right? There's the SAR that we give to them and they review.    And we've been working with them every single day.    They know every single piece of evidence.    They know more evidence than we do, because they withheld some from us.

So when that SAR went forward, we talked with them constantly about these are the charges that we're looking to recommend.    Is everyone on the same page, right? So we don't want to recommend something and then have some huge argument over it, right?    So everyone was on board then with the SAR.

Afterwards, with what happened at D.C., or happened at California, or if any charges have been approved officially yet or -- I don't know the answer to that.

Q       But nonetheless, they still supported your conclusion in the SAR at the end of the day?

A       That's accurate, yes.

Q       And that was despite what you perceived as obstructing various steps of evidentiary gathering along the way?

Mr. Leavitt.    Can we go off the record for a second?

MINORITY COUNSEL 2.    Of course.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

MINORITY COUNSEL 2.    Back on the record.

BY <u>MINORITY COUNSEL 2:</u>

Q       I was just clarifying that they agreed with your conclusions in the SAR, and I said that was despite what were your perceptions of those obstructing the obtaining of evidentiary material along the way and reaching those conclusions.

A       That is correct.    But I just want to go back to the fact that it could have been much more.    It could have been much bigger.    There could have been income streams, more income streams, to other people associated with it, to include the President.

So, that's my answer.

Q       And is it your opinion, not necessarily your professional opinion, but your opinion as a citizen that the FBI in 2016 and after the 2016 election took something of a reputational hit?

A       I don't really have a lot of opinion about that.    I don't --

Q       You're familiar with the Jim Comey memo and the like, presumably?

A       Yeah.    I'm not a big guy that reads a lot of news and stuff.    Obviously, you hear things.    And my NBC News app, I see once in a while stuff on that.    But, working with the FBI, it didn't seem like there was -- I don't -- is some factions of the media saying that there's a problem, but I didn't sense it.    I still -- I didn't sense it doing the work.

[2:28 p.m.]

BY <u>MINORITY COUNSEL 2:</u>

Q    That's fair, you're in the trenches and you're working closely with the things, but, obviously, the FBI was very much in the public eye as a result of the 2016 election and the Comey memo and the potential for interference there.

And, do you think, in general, in organizations that have sort of tiers of authority and tiers of responsibility, where, you have workers at a lower level and reporting up the chain to higher up, that those up the higher chain might have a different prudential outlook on the reputational concerns of an organization?

Mr. <u>Shapley.</u>    Yeah.

<u>MINORITY COUNSEL 2.</u>    Okay.    That's all I have.

<u>MINORITY COUNSEL 1.</u>    Thanks.

BY <u>MINORITY COUNSEL 1:</u>

Q    Okay.    I have a couple questions, and a lot of these are like my former questions.    I just want to go back and make sure that I have the record right and correct.

So earlier you had mentioned that, in 2015, there were some issues that were different.    You mentioned the diamonds, you mentioned the low amount for 2015, that maybe the case was less straightforward, I guess in the case of the loan.

Was there anything else in 2015 that made it, you think, different than 2014, other than the amount?    Were there any other issues that you can think of that maybe we haven't listed or talked about yet?

A    The conduct in 2015 and 2014 was entirely different.    So, there was a scheme to evade in 2014 by using Rosemont Seneca Bohai to divert income from Burisma under Devon Archer's entity.    In 2015, that was kind of sifted out through Eric Schwerin.

He became aware of that in 2015.    You got to think, 2015, the tax return's due in 2016, and if an extension is filed April 15th of 2016, then the return is not due until October 15, 2016.

So Eric Schwerin had become aware of the income, and that's kind of how that whole thing changed --

Q    And so maybe that's why the amount was lower in 2015, maybe he actually helped.    Okay.

A    Can I --

Q    Yeah, sure.

A    So, initially when the SAR was written, the amount of taxes owing was around $160,000 for that year.

Q    For 2015?

A    For 2015.

Q    Okay.

A    But, we were battling to get information from accountants and so on and so forth, right?    And we're trying to be as conservative as possible to give every benefit to the subject in terms of the actual tax due and owing.    So ultimately, 2015 just became something where it was -- to be conservative, it was not an issue.    I had no issue with that.

Mr. Leavitt.    And you're saying that was after the SAR had already gone forth.    Is that right?

Mr. Shapley.    Yeah.    So more information was received after that SAR went forward.

[Shapley Exhibit No. 6

Was marked for identification.]

BY <u>MINORITY COUNSEL 1</u>:

Q     Great, thanks.

Okay.    Now I want to talk about exhibit 6, which is your memo about the laptop and the hard drive.    Was this memo provided to anyone?

A     This memo was discussed in length with the case agent and co-case agent, but to protect the record, these I couldn't send to them.

Q     Okay.

A     So after each time we had calls like this, I would have conversations with them.    There was even a document that I produced where they were like, well, there was this problem, this problem, this problem.    So I was like, I'll record it, because we don't want this to potentially be discoverable and have any issues in the future.

So this is an example of that, where if there are at least two people that will say that we talked about this right after, and most of the conversation is to discuss what happened during that, to make sure that it was accurate.

Q     But you don't provide a copy to your supervisor or Mr. Fort or anyone else in your chain of command?

A     No.

Q     It just stays with you?

A     That's correct.

Q     Okay.    That's my question.

A     Yeah.

Q     And then in this exhibit 6, there's two items that are redacted -- it says December 9, 2019, and there's two redactions.    Why are those redactions there?

A     It was just a potential 6E type situation.

[Shapley Exhibit No. 7

Was marked for identification.]

Q    Okay.

Thank you.

Now I'm going to look at exhibit 7.    And the question is the same as the one before it.    Was this memorandum provided to anyone or copied to anybody?

A    It was not.    Just to reiterate again, that this was discussed right after -- I can't even think of a time when we didn't have a discussion immediately after these meetings with just me, case agent, co-case agent, and sometimes with FBI agents on the phone to discuss this.

Mr. Leavitt.    Let me just clarify, to discuss your documentation of the meeting, which did include other parties?

Mr. Shapley.    That's correct.

MINORITY COUNSEL 1.    I thought that's what he was saying, but thank you.

BY MINORITY COUNSEL 1:

Q    Okay.    When we were talking about this exhibit 7, you mentioned that, at the time, Bill Barr was the AG.    Why did you not take your concerns up the chain in 2020 at that time?

A    Well, as I said before, there is a healthy tension between investigators and prosecutors, right?    And there are sometimes when I don't agree with a prosecutor, but every time I don't agree with a prosecutor, I'm not going to run to Bill Barr or to senior leadership to -- to blow the whistle or make a protected disclosure.    The whole focus was to do what we had to do, even if it meant dealing with obstructions from prosecutors to get this case across the finish line, if it was worthy of it.

And, that's what we did.    Every single time something happened wrong in this investigation, I couldn't bring it to Bill Barr or anyone else, so --

Q     And did you think about, in 2020 at all, coming to the committee at that point in time?   Because I know that you mentioned that there were irregularities that you saw in the summer of 2020.   Did you think about coming to the committee or coming forward at that time or making a report to TIGTA in 2020?

A     Like I said, we are trained and we work with these prosecutors hours and hours, trips, and spend all this time.   We are just trained to trust them, and it was an incredibly high burden.   If I wasn't in the October 7th meeting, my red line might not have been crossed.

But the things in that meeting -- it solidified a lot of things that had happened previously and explained a lot of things that happened previously.   And it just got to the point where, okay, now all of these things that happened that might be investigator versus prosecutor-type thing, I just, I thought it got to the point where -- this is not a small thing.   I'm not coming to the House Ways and Means Committee when a prosecutor says we can't do one search warrant.   That's just not -- I'm not going to do -- I'm never going to do that, right?   This is a series of events over 3 years where every single thing was to obstruct the investigation.   Every single thing limited evidence that we were able to obtain.   And, so -- if I was in the wrong for not coming to House Ways and Means Committee, I don't know.

Q     I wasn't saying -- I wasn't implying that.

A     Okay.

Q     I was just asking, was that something that you considered in 2020, because it seems like a lot of things happened in 2020, especially at the end, and so hence my question.

A     Well, I had the exact opposite feeling right then, right, because we were going over -- we thought that the evidence we had so far -- we were going to get a bunch

of new evidence.    We thought the evidence we had so far would maybe lead to an early resolution of the case.

So there was a lot of excitement because we, for a year or so -- or a year for me, because I came on in January 2020, but longer than that from others, we couldn't do a drive-by of his residence without Stuart Goldberg approving it.

So, no -- we just wanted to move the investigation forward, and now we were finally doing that.    And so we were hoping that we'd get what we need and keep moving forward.

Q    And then, you just mentioned when you were talking, that you don't normally make it a routine to come to House Ways and Means Committee.    How many times, just generally so we get a sense, do you disagree maybe with something that a prosecutor says in a case?    Is it regularly?    Is it most cases?    Some cases? Sometimes?    This is the first time?    Can you give us some sense as to that interaction and how often they don't agree in your cases?

A    How many times have I disagreed with a prosecutor on a case?

Q    Yeah.    Just generally.

A    I mean --

Q    Is it every case there's always something or what's a general sense?

A    It's always a professional relationship where everyone is moving forward toward the common goal.    The mission of the agency, and their agency, right?    So if every -- I challenge prosecutors all the time.    They challenge me.    It's fantastic.    And then we go and everything's great, and we come in the next day and talk about our families.    It happens but, in this particular instance, it wasn't jovial.    It was just, this is the way it is.    And then even when we try to get support to go -- for example, to get my SAC involved, to bring her to Weiss, to try to get this search warrant and this physical

stores [storage] location, we still got the end around, so -- I don't know.    Did I answer

your question?    I'm sorry.

Q    No, that answers my question.    That's what I wanted to know.    I just

wanted to get some context.    Like, if you were to tell me that most of the time we all

agree a hundred percent and this is the first time that we didn't agree, that would

obviously be different than, well, there's normally give and take in a case, and so this is

what we're seeing here.

Okay.    Moving to exhibit 8.

A    Well, I don't think that's what we're seeing here.    I don't think that -- that's

not what I saw here.    Maybe you're just speaking generally.

Q    I am.

A    Okay.

Q    Yeah, I am.

Mr. Lytle.    Well, what did you want to say?

Mr. Shapley.    No.    I think I've said it, that this is not the norm.    This is -- I've

worked with some great guys, some great prosecutors that went on to be U.S. attorneys

and went on to be the deputy attorney general and, I think I have experience enough to

where it means something.

And I can't even count a time -- I don't even think I can come up with a time where

a prosecutor made a decision that I didn't agree with, that they didn't take the time to

explain to me and I didn't walk away being like, I disagree, but that makes sense.    And

that just did not -- countless things did not -- that did not happen here.

BY MINORITY COUNSEL 1:

Q    So do you think it was this prosecutor, is that what you're saying essentially,

that's who your dealings were with?

A      I don't know what the ultimate motive was, right?    I only know what I know.    I know what the evidence said, I know what precedent is, I know what my experience is.    I know all of the things that happened in the investigation.

It just appears to me that based on taking all those factors into account, that there was some type of nefarious motive here, and I don't know what it is.    I don't know.

Q      At the beginning when you were giving your opening statement, you had mentioned that the committee was your last hope, last sort of chance.    And so, obviously, we're not a law enforcement body.    What are you hoping to get from the committee?    What is your outcome that you're looking for?    Is it a process change at IRS?    Is there something that you're hoping to get with your last hope, which was the way you described it?

A      So I'm just here to give the documents and give my testimony, and I can steer you to others that have documents and who can give testimony.    And the whole thing was that I have faith in the committee and this country, in general, to do the right thing.    And, ultimately, if you guys at the end of the day don't agree, that's not for me to say.    But, in terms of corrective actions or recommendations -- that's for you all to decide.

Q      Okay.    I was just making sure that there wasn't something that you wanted in this particular case.    That's what I was asking.

[Shapley Exhibit No. 8

Was marked for identification.]

BY MINORITY COUNSEL 1:

Q      Okay.    Looking at exhibit 8, which is the interview.

A      Yeah.

Q      As I'm reading this interview, it was held in a restaurant or some place,

because I notice here that it says "unknown female," and then it says "female, wait staff."

Where did the interview take place?

A      It was at his residence.

And I also noticed what you said, but at one point they were outside, and I couldn't tell by the transcript if they were mowing the lawn or if there was lawn maintenance -- I don't know what it was.

Q      Okay.

A      But they were in his residence.    They went to his residence.

Q      Okay.

A      And his wife was there as well.

Q      I did see the wife, and so that's why I wasn't sure.    It seemed like maybe they were in a restaurant or something.    That's why I asked the question.

A      No, no.    I don't think so, no.

Q      Okay.    And you said that the consent was given by the IRS agents for the recording of the interview.

Did he know that he was being recorded?    Do you tell the interviewee that they're being recorded?

A      We do not have to tell the interviewee that they're being recorded, and I don't know the answer as to whether we did tell him, because people can ask, right, if they're being recorded, and I don't have the answer to that side.    But we don't need to inform them that they're being recorded.

Q      Okay.    And then I was looking at the top of the transcript.    And I know that you gave us some excerpts, and we're on a couple pages, and then the total looks like 214 pages.    What else was discussed?    Was there anything else discussed in the other pages that we don't have that go to the tax, I guess, liabilities from 2014 to 2018?

I'm trying to get context on the other things that were discussed during this 214 pages that we only have a couple of these pages.

A     Sure, yeah.    So, I can't make a representation to all 214 pages, but the reason why I thought this was pertinent was because this was basically showing the outcome of the obstruction from the direction to not ask witnesses certain things.    And that's what brought this in.    So, that's why this section's included -- and I can't really remember -- if you're asking if there's dollars and cents in there for tax liabilities, I would say I don't think that there is.    But is there a different thing that you wanted me --

Q     No.    I was just wondering, in these types of interviews, and this one in particular, do you talk to him about some of the questions that you had?    I know, like 2015, you mentioned diamonds or other items.    When you're doing an interview with this person, Mr. Walker, would you talk to him about all the tax years and any issues that you might have in any of the years, or is it just limited to a single scope?    I'm trying to understand how the interview would work with him.

A     It's by witness.    So say Eric Schwerin would have been, and Joan Mayer, those are like every single year:    income, work, what's going on, expenses, in-depth type of things.    The accountant, CPA, return preparer, same thing.

This is a witness that was a business partner that was involved in a deal with CEFC, so most of the questions were kind of geared toward that and SinoHawk and some of these other things.    So this one in particular likely wouldn't even have broached the topic of how would Rob Walker know what Hunter Biden's tax situation is.    He wasn't involved in the preparation of stuff --

Q     Okay.

A     -- of it, so --

Q     Okay, that's fair.

And then the entire transcript, the whole 214 pages -- who does that go to? Would it go to AUSA Wolf?    You mentioned that she didn't want you to use the words "big guy" and other things.    So would she have seen that "VP" was used, and would she have commented on this transcript -- what happens to the transcript once you receive it?

A     So the evidence in a case should be available to everybody in the case -- prosecutors and investigators -- unless there's some type of confidential, classified type thing that could be partitioned into some SCIF or so and so forth, but everyone should have this.    And I would have to say that she read it.    I don't know directly that she read it, but it was 214 pages, so, maybe she had someone else read it.    I don't know, but --

Q     But it's available --

A     Absolutely.

Q     -- to the entire team?

A     Absolutely.

Q     Okay.    Okay.    And then I just noticed -- this is just a basic question.    I noticed through here there's a lot of these words like the "hmph," like h-m-p-h.    You see, that's kind of all throughout this interview.    What was that?    Was it like, hmph, like I'm agreeing with you, or, like, hmph, like, maybe that's a fact, or, hmph, that's not a fact, it's a question?    I don't know how to read the "hmph."    Do you recall anything from that interview that would help us with this phrase?

A     So, I wasn't in the interview, but I did chastise my agent from stop saying hmph hmph in the middle of it.    I did argue -- so I think you're absolutely right, and I think that if you listen to segments of the actual recording, you would almost have to -- when you read it in context, it makes sense, he's like, uh-huh, hmph, hmph, like, and then you can tell by the line of questioning that he responded in the affirmative.    But I

think it might require you to listen to that little section in the recording.

 Q Yeah. Okay.

  BY <u>MINORITY COUNSEL 1:</u> I think that's all that I have. Do you have anything else?

 That's all that we have for now. Thank you.

 <u>MAJORITY COUNSEL 1.</u> You're welcome.

 [Discussion off the record.]

 <u>MAJORITY COUNSEL 2.</u> Back on the record. It's 2:50.

 Do you want to go first, ███, or do you want me to?

 <u>MAJORITY COUNSEL 1.</u> I have just a couple quick follow-ups.

 <u>MAJORITY COUNSEL 2.</u> Okay.

  BY <u>MAJORITY COUNSEL 1:</u>

 Q I'd like to bring your attention back to exhibit 2, what we've been referring to as the SAR, which is the special agent report. Is that correct?

 A This is the excerpt from that, yes.

 Q And you were discussing earlier the idea about whether U.S. Attorney Weiss and AUSA Wolf appeared impartial because they approved your recommendation in the SAR.

 Only AUSA Wolf is mentioned in this document. Is that correct?

 A That is correct, yes.

 Q Okay. And the reference in this document that AUSA Wolf agrees with the prosecution recommendation, did you take that to include the endorsement of the U.S. Attorney Weiss or just AUSA Wolf?

 A Well, I did take it to include him, but there are also other events that led me to believe that he also concurred with it. There were -- I can think of one specific time,

on that 6-15-2022 meeting at Main DOJ, Stuart Goldberg, Weiss, and everyone underneath is there, every level of everyone underneath is there.

And this was when DOJ Tax was kind of giving a presentation about potential problems with '14, '15.    Now they've already tried to bring it to D.C.    They already requested special counsel and got denied.    So now they're kind of trying to make this evidential issue for those years.

So on the side of that, in a break, Weiss comes up and he's talking to me on the side, and ███████ comes up, the case agent.    And Weiss was like, you guys always convince me, I agree with this, and then DOJ Tax tells me something else.

So I know that Weiss agreed with these charges, and -- I don't know.    At the end of the day, they should've been charged.    I offered to give prosecution recommendation reports from previous cases to show precedent, to show specific examples of this loan issue and how this would follow a precedent in other cases being charged, and it just kind of fell on deaf ears.

Q    Based on your knowledge, do you have an opinion of whether U.S. Attorney Weiss did everything -- took all appropriate steps to pursue charges that you just testified that you believe he concurred with?

A    Like with D.C., with Main Justice, with all that stuff?

Q    Yes.

A    As he described it, his process was go to D.C. and try to charge there, but he needed permission from the U.S. attorney there.    When that got denied, he requested special counsel authority.    Then in the October 7th meeting, he's basically explaining what happens in California, right, if he -- if he recom -- he's going to recommend to California -- well, it had already gone to California, right, but there was no answer yet.

He's like, well, if they say no, then I'm going to have to request special counsel

authority from the DAG or the AG.    All I know is what he told me he did, and that's all I can say, I think, to that.

Q    Just a clarifying point on the earlier discussion about sort of your decision to make protected disclosures, right?    You testified that the October 7th, 2022, meeting was the breaking point.    Is that correct?

A    Yes, it was.

Q    Okay.    And would it be correct to say that you sought to state your opinion and impact decision making short of protected disclosures before the October 7th meeting?

A    Well, I think I reached a level of protected disclosure internally to IRS senior leadership before that.

Q    And at what point was that first protected disclosure?

A    I believe it was June of 2020.    You got to understand, at the time, I wasn't making a protected disclosure.    I was just working a case raising issues, right?    It's not until we're down the road a hundred miles that that was a protect[ed disclosure] -- you know?

Q    Yeah.    Understood.

A    But it seems like the October 7th meeting, after that, after I raised issues directly to them, I explained to them the risk of not charging '14, '15.    I explained to them how we had no mechanism to ever recoup that money, and I went like kind of like point by point how the elements were met.

And, it was that meeting where I think DOJ started to look into the discovery that I had provided back to March, because I was like, this is not right, there's a big, huge problem here.    And it switched from me raising just concerns, hoping that they'd be remedied, to now I'm like, no, this is a problem.    And I think because of that, they went

and looked at all my documents that I contemporaneously documented over the years.
And then I think they started attacking me.    And I think I read a part in my opening
statement, the email that I sent to my director of field operations exactly on that topic.

Q    And who was the director of field operations that you sent that email to?

A    Mike Batdorf.

[Shapley Exhibit No. 9

Was marked for identification.]

| | |
|---|---|
| **From:** | Batdorf Michael T |
| **To:** | Shapley Gary A Jr; Waldon Darrell J |
| **Subject:** | RE: Shapley - Manager - Discovery Update |
| **Date:** | Tuesday, December 13, 2022 7:47:36 AM |
| **Attachments:** | image004.png |
| | image001.png |

Gary. Good Morning.

I have not reviewed the emails that were provided to the U.S. Attorney's Office nor had conversation with the prosecuting team regarding them. I plan to do both in the coming weeks. I understand through your emails that you believe the prosecuting team may have not conducted themselves in an ethical or proper manner to include prosecutorial misconduct. I am not the reviewing official, deciding official or expert on such matters. However, there are routes that you could take if you truly believe there are violations of ethical conduct or prosecutorial misconduct. Either way you choose, Darrell, Kareem, and I (along with the Chief and Deputy Chief) will continue to work through any potential issues on this investigation.

Enjoy your use of lose annual leave and the holidays with your family and friends.



**From:** Shapley Gary A Jr <                        >
**Sent:** Monday, December 12, 2022 1:32 PM
**To:** Waldon Darrell J <                        >
**Cc:** Batdorf Michael T <                        >
**Subject:** RE: Shapley - Manager - Discovery Update

Darrell/Mike,

I am on use or lose beginning Wednesday, 12/14, returning 1/3/2023. I am off line most of tomorrow traveling to Alexandria, VA to do my annual medical exam.

If you have questions about any emails I would ask you share it in advance so I can look at them and be prepared to put them into context. The USAO was so eager to get my emails (which they already had 95% of)...then surprise...they "might" have a problem with a few of them that memorialized their conduct. If the content of what I documented, in report or email, is the cause of their consternation I would direct them to consider their actions instead of who documented them.



EXHIBIT

tabbies®

9

**I have done nothing wrong.** Instead of constant battles with the USAO/DOJ Tax, I chose to be politically savvy. I documented issues, that I would have normally addressed as they occurred, because of the USAO and DOJ Tax's continued visceral reactions to any dissenting opinions or ideas. Every single day was a battle to do our job. I continually reported these issues up to IRS-CI leadership beginning in the summer of 2020. Now, because they realized I documented their conduct they separate me out, cease all communication and are now attempting to salvage their own conduct by attacking mine. This is an attempt by the USAO to tarnish my good standing and position within IRS-CI...and I expect IRS-CI leadership to understand that. As recent as the October 7 meeting, the Delaware USAO had nothing but good things to say about me/us. Then they finally read "discovery" items (provided 6 months previous - that are not discoverable) and they are beginning to defend their own unethical actions.

Consider the below:

1. I am not a witness – therefore Jencks/Impeachment is not an issue.
2. I am not the receiver of original evidence nor engaged in any negative exculpatory language against the subject (Brady material is evidence the prosecution is required to disclose that involves any evidence favorable to the accused – evidence that goes towards negating a defendant's guilt, that would reduce a defendants potential sentence, or evidence going to the credibility of a witness) -- therefore no Brady/Exculpatory information exists. My documentation only shows the USAO/DOJ Tax's preferential treatment of this subject.
3. I have called into question the conduct of the USAO and DOJ Tax on this investigation on a recurring basis and am prepared to present these issues.

For over a year I have had trouble sleeping; awake all hours of the night thinking about this. After some time, I realized it was because I subconsciously knew they were not doing the right thing. But I could not fathom concluding that the USAO/DOJ Tax were in the wrong. After I wrapped my mind around the fact that they are not infallible, I started to sleep better. My choice was to turn a blind eye to their malfeasance, and not sleep, or to put myself in the crosshairs by doing the right thing. My conscience chose the latter.

I hope IRS-CI applauds the incredibly difficult position I have been put into instead of entertaining the USAO's attacks. If they bring up something legitimate; I am sure we can address it because it was not intentional. Everything I do is with the goal of furthering IRS-CI's mission, protecting the fairness of our tax system and representing IRS-CI with honor.

I look forward to presenting these issues to you. I do have some obligations during my UorL, but will forfeit some leave if it is to protect my reputation and the agency's interests.

Thanks.

BY <u>MAJORITY COUNSEL 1</u>:

Q    Okay.   I've just marked as exhibit 9 the email you just referred to.    Just to confirm, can you describe this document?

A    Sure, yeah.    This is the email that I sent to Mike Batdorf, the director of field operations, and cc'd -- oh, I'm sorry -- I sent to Darrell Waldon, the SAC, and cc'd Mike Batdorf, the DFO.    And this was the culmination of an October 24th communication from Delaware U.S. Attorney's Office and -- well, it was really Lesley Wolf and Mark Daly who called the case agent, ███████, on the telephone and said, hey, we need -- we need Shapley's emails and his -- these sensitive case reports that he's authored back to May.

And they didn't ask for discovery for anybody else.    They didn't ask for, from the -- mind you, the agents had provided discovery March-April timeframe, so there was 6 months or so of additional discovery, and they're not asking for that, right?    They're only asking for mine.

So ███████ sends me an email with Wolf and Daly on it that says, hey, you know, they asked for this, you got to talk to Shapley.    I respond, hey, yeah, I'm available 9:15, let's chat.    And she sends that, she forwards my email to Shawn Weede, number [two] -- a senior level at Delaware U.S. Attorney's Office.

And then he contacts me about this discovery, and he's kind of putting a lot of pressure on me.    So even Weiss called up, the deputy chief, to complain about timing of the emails that got turned over from me at that request.    But, basically, I think that they understood that it was a serious issue, what they had told me on October 7th, and that I had a huge problem with it, so I think that they started looking into what I had done for 2 or 3 years.    And then they specifically targeted me, because there was an SCR in my

original discovery that went to the chief that said that these people are doing the wrong thing, and this is specific, not general, specific things that they're doing that are wrong.

So they wanted to get the universe of everything that I produced -- and then they eventually started attacking me on it.    And so October 17th was the last time we had an actual call together.    And then they canc- -- then there was -- and the next call was scheduled, and then there's an awkward cancellation right before.    And then they didn't -- they wouldn't talk to us anymore, and it was because they knew that I had documented their malfeasance contemporaneously over the years.

Q     Do you know whether those prosecution team's meetings continued after October 17th?

A     If they did, we were not invited.    IRS was not invited.    This is an email that kind of toward the end where I had turned over the documents.    The documents were easy, but I'm not going to get into why the emails, we had to create PST files, and, [I] don't want to get into it.    But it was like a 25-, 30-day process.

Q     Complicated?

A     I had to get computer people on my computer to remote in to get it.    I was actually in San Diego assisting with execution of search warrants on other cases, and I have computer people chiming in to try to get my emails, because Weiss is calling my deputy chief, who knows what they're saying.    So --

Q     And at what time was that all taking place?

A     It was right around Thanksgiving time.

Q     2022?

A     Yes, thank you, 2022.    And when the request came in -- it was like the next week I was in Australia for search warrants, and then I was traveling somewhere else for a week, Los Angeles, and then it was Thanksgiving.    And then I was in San Diego for search

warrants.    I had zero time to do this.    So that's why I was like, I can't get this done right now.    And so, they were bothered by that, so they called my deputy chief and God knows what they said.    I don't know.

Q    Okay.

A    But this email was basically, I sent to these guys to say, this is just completely unacceptable.    And I laid out to them Jencks and Brady, and why a manager's information would never be discoverable.

Now, if I had had a successful interview of Hunter Biden, that changes things, right?    I might be a witness, I could be impeached, et cetera, et cetera.    But other than that, because that didn't occur, they never ask for -- they never ask for discovery from my level or above.    Never.

Q    Okay.    And I was a little inartful before about protected disclosures.    I was trying to get at the point that the October 7th, 2022, meeting, is it accurate that that would've been -- after that that is when you started to, or sometime after that, started to consider the possibility of making a protected disclosure to Congress?

A    Yes.

Q    Okay.

A    That's when I became -- looked into the process and read 6103, you guys and Senate Finance, right, that's when that occurred, and that's when I sought counsel.

Q    Okay.

A    Did you want to finish document 8?

MAJORITY COUNSEL 2.    Sorry, sir.

Mr. Shapley.    Just a reminder, document 8, there are still things that we --

MAJORITY COUNSEL 2.    We are going to come back to that, right.

We're marking exhibit 10.

[Shapley Exhibit No. 10

Was marked for identification.]

| From: | Waldon Darrell J |
| To: | Shapley Gary A Jr; Batdorf Michael T |
| Subject: | RE: Sportsman Meeting Update |
| Date: | Tuesday, October 11, 2022 7:27:14 AM |
| Attachments: | image001.png |

Good morning, all –

Thanks, Gary. You covered it all. I am taking care of referral to TIGTA.

Mike – let me know if you have any questions.
Darrell

*Darrell J. Waldon*
*Special Agent in Charge*
*Washington, D.C. Field Office*
*(C)* ▮▮▮▮▮▮▮

> **From:** Shapley Gary A Jr < ▮▮▮▮▮▮▮ >
> **Sent:** Friday, October 07, 2022 6:09 PM
> **To:** Batdorf Michael T < ▮▮▮▮▮▮▮ >
> **Cc:** Waldon Darrell J < ▮▮▮▮▮▮▮ >
> **Subject:** Sportsman Meeting Update

Mike,

Darrell asked me to shoot an update from todays meeting.  Darrell – feel free to comment if
I miss something.

1.  Discussion about the agent leak – requested the sphere stay as small as possible
    a.  DOJ IG will be notified
    b.  FBI – HQ is notified and they refer it to their Counter Intelligence squad in a
        field office for investigation
    c.  IRS-CI – **We need to make a referral to TIGTA** – What do you need from me
        on this action item?
2.  **Weiss stated that he is not the deciding person on whether charges are filed**
    a.  I believe this to be a huge problem – inconsistent with DOJ public position
        and Merrick Garland testimony
    b.  Process for decision:
        i.  Needs DOJ Tax approval first – stated that DOJ Tax will give
            "discretion" (We explained what that means and why that is
            problematic)
        ii.  No venue in Delaware has been known since at least June 2021
        iii.  Went to D.C. USAO in early summer to request to charge there –
            Biden appointed USA said they could not charge in his district
            1.  USA Weiss requested Special counsel authority when it was
                sent to D.C and Main DOJ denied his request and told him to
                follow the process

EXHIBIT
10

      iv.  Mid-September they sent the case to the central district of California – coinciding with the confirmation of the new biden appointed USA – decision is still pending

      v.  If CA does not support charging USA Weiss has no authority to charge in CA –

          1.  He would have to request permission to bring charges in CA from the Deputy Attorney General/Attorney General (unclear on which he said)

      vi.  With DOJ Tax only giving "discretion" they are not bound to bring the charges in CA and **this case could end up without any charges**

3.  They are not going to charge 2014/2015 tax years

    a.  I stated, for the record, that I did not concur with that decision and put on the record that IRS will have a lot of risk associated with this decision because there is still a large amount of unreported income in that year from Burisma that we have no mechanism to recover

    b.  Their reason not to charge it does not overcome the scheme and affirmative acts – in my opinion

4.  FBI SAC asked the room if anyone thought the case had been politicized – we can discuss this is you prefer

5.  No major investigative actions remain

6.  Both us and the FBI brought up some general issues to include:

    a.  Communication issues

    b.  Update issues

    **c.  These issues were surprisingly contentious**

Always available to discuss.  Have a great weekend!

Text  Description automatically generated



**WARNING:**

**LAW ENFORCEMENT SENSITIVE (LES) - FOR OFFICIAL USE ONLY (FOUO)**

The information contained in this email is considered confidential and sensitive in nature as well as sensitive but unclassified and/or legally privileged information. It is not to be released to the media, the general public, or to non-law enforcement personnel who do not have a "need-to-know".  This information is not to be posted on the Internet, or disseminated through unsecured channels, and is intended for law enforcement personnel only. It is solely for the use of the intended recipient(s). Unauthorized interception, review, use or disclosure is prohibited and may violate applicable laws including the Electronic Communications Privacy Act. If you are not the intended recipient, please contact the sender and destroy all copies of the communication.

BY <u>MAJORITY COUNSEL 2:</u>

Q      This is an email chain that starts on October 7th, 2022.    Presumably this is after the meeting, correct?

A      That's correct.

Q      And you send this to Mr. Batdorf and Mr. Waldon.    And what is the upshot of this document?    Are you just giving a readout of the October 7th meeting?

A      Yeah.    I realized the gravity of what I just witnessed, so I didn't want it to be a memo to file that didn't go anywhere else.    So I did this to ensure that my information was corroborated right then, right there.

Q      Right.

A      So that people couldn't --

Q      Right.    So this is essentially your contemporaneous notes from that business meeting, correct?

A      Yeah.

Q      And at the top, Mr. Waldon indicates that this is an accurate reflection of what happened in the meeting?

A      That's correct.

Q      And he was in the meeting?

A      He was.

Q      Did you have any discussions with him outside of this doc -- did you tell him you were preparing the document?

A      Yes, I did.    I told him that I would be the one that would summarize it for Mike, the DFO, Batdorf, and I said that I'd cc you so that you can confirm.

Q      Okay.    So your email says: "Mike, Darrell asked me to shoot an update from

today's meeting."

Did Mr. Waldon ask you to prepare this?

A     I put it in front of him and he said sure, that sounds great.

Q     Okay.

A     So --

Q     And you're just trying to explain why you're sending the email, correct?

A     I'm trying to play nice because I was -- I'm trying to play nice.

Q     In No. 1 on this email you prepared, says:    "Discussion about the agent leak -- requested the sphere stay as small as possible…DOJ IG will be notified.    FBI -- HQ is notified."

What was the specific leak?

A     So there was a leak, I'm not sure what outlet, on October 6th of 2022 -- it appeared to come from the agent's level, who was critical of the prosecutors for not charging the case.

Q     Okay.    Talking about the Hunter Biden case?

A     Yes, not charging the Hunter Biden case.

So, obviously that was part of the discussion at the beginning.    And there have been multiple leaks in this case going back, and this one was handled a lot differently because I guess it was purportedly from the agent's level.

So this drastic -- you know, they used that as an excuse to kind of -- to do what they were doing to us after this meeting on the 7th, they kind of used that leak as an excuse to exclude us.

Q     And then the second item in the memo -- or the document you prepared, this summary of the meeting, AUSA "Weiss stated that he is not the deciding person on whether charges are filed…I believe this to be a huge problem -- inconsistent with DOJ

public position and Merrick Garland testimony."

It's pretty remarkable that the U.S. attorney on October 7th said he is not the deciding official.    Did he say it in those words?

A      Yeah.    He said, I am not the deciding person on whether charges are filed.

Q      So there's no ambiguity, he was crystal clear in what he was saying?

A      It was how I understood it, and it was also how the special agent in charge understood it.

Q      Okay.    Is there anything else in this document that is worth bringing to our attention?

A      Yeah.    So if you go down to 2 b ii, that's kind of the acknowledgement that it's been kept in Delaware since June, even though the venue is known or was in Delaware since 2021, which not -- it is what it is.    But that describes the reason why we run into these conflicts now in the political interference here.

So he says that when he went to D.C. U.S. Attorney's Office in early summer to request charge there, Biden-appointed U.S. attorney said they could not charge in his district.    So it said they could not charge.    So up to that point, I thought that he had just said we don't support this.

Q      Right.

A      And we thought that Weiss was still deciding.    And when he said this that said he could not charge, okay.    So that's a big difference -- that's a material difference in what was occurring.

And then he further says that he requested special counsel authority when it was sent to D.C. and the Main DOJ denied his request, told him to follow the process.

Now, following the process, as they would've only have known, was to go through another -- a non-Weiss-appointed U.S. attorney -- or not Weiss.    They were going to go

through somebody else.    And when AG Garland's first defense of why everything's okay here, he immediately goes to because is Weiss a Trump appointee.    So the materiality of this being a decision outside of Weiss is pretty significant, in my opinion.

So then it goes on to page 2.    So at the bottom of page 1, that's when Weiss requested special counsel authority.    That's the first time we'd heard that, and that he was denied.

And then he said that they went to Central District of California mid-September, and it was the same week that the Biden-appointed U.S. attorney was confirmed.    And then he says, if California does not support charging, Weiss has no authority to charge in California, which is obviously contrary to what Merrick Garland said.    Then he said that he would have to request permission to bring charges in California from the DAG or AG.

Q      Right.    And earlier this morning when we were talking about Senator Grassley and the Attorney General, and maybe my notes are wrong, but I thought we had discussed that the effort to bring the case to the Central District of California was in January of 2023, and this here seems that it was -- or a little bit earlier?

A      No, it was September.

Q      It was September.

A      September 2023?

Q      Okay.    I probably have it wrong.

A      Yeah.

Mr. Shapley.    September 2022.

Oh, in January 2023, we learned from SAC Waldon that California had declined to --

MAJORITY COUNSEL 2.    Okay.

Mr. Shapley.    -- declined the case.

BY <u>MAJORITY COUNSEL 2</u>:

Q   Oh, okay.   I understand.   So in September of 2022, the materials are presented to the Central District of California?

A   That's correct.

Q   And it wasn't until January of 2023 that a resolution on that was determined?

A   It's when we learned of it.   I don't know if it had already been decided.

Q   Okay.   And along similar lines, is it fair to say that in March of 2022, the case was brought to the U.S. attorney for D.C.?

A   That's correct.

Q   And then in the early summer of 2022 is when you learned that the U.S. attorney in D.C. had declined to move that forward?

A   No.   It was right in March, because that was when Mark Daly was calling my case agent.

Q   Okay.

A   The one call was, hey, things kind of look good here.   Call a couple days later was, they said no.

Q   Okay.   So that was in March?

A   That was in March.

Q   And that was right away.   There was no delay or there was no --

A   There was very little delay.   We weren't involved in the presentation in D.C., so I don't know the exact date that it went over.   But it was right there at the end of March that it was declined.

Q   So in your notes on page 1, 2 b iii, went to D.C. U.S. attorney in early summer, is that Weiss sort of getting the dates --

A     Yeah, I think he was just --

Q     -- incorrect?

A     -- kind of being --

Q     Okay.

A     Yeah.

Q     But it should read March of 2022, correct?

A     He would've been more accurate to say spring than early summer.

Q     Okay.    And then flipping back to the second page, No. 3, this is what you stated for the record, that if they're not going to charge 2014 and 2015, they're just letting this Burisma income go untaxed, correct?

A     Yeah.

Q     And this is just a gift to the taxpayer, right?

A     It significantly reduced the egregiousness of his conduct if that wasn't included.

Q     Right.    And I think we had established that he was getting paid about a million bucks per year in 2014, and it started in April, so it was two-thirds of the million.

A     Yeah.

Q     So that was just going completely tax-free to the taxpayer Hunter Biden, correct?

A     That's correct.

Q     Did you get any feedback when you stated that for the record?

A     There was just some general discussion.

Q     Okay.

A     It wasn't anything reportable, I guess.

Q     So nobody said, Gary, whoa, whoa, whoa, there's a mix-up here, the reason

we can't do this is because of X reason?

A     No.    No.    There's an August email that maybe I alluded to before from DFO Batdorf that says that we support 2014 and '15, and we're going to have the deputy chief call over to Stuart Goldberg at DOJ Tax to tell him we support it.    And then SAC Waldon is in this meeting, right, FBI SAC Sobocinski and FBI ASAC Holley are there as well. It was just that was their decision.

Q     Okay.

A     But the funny thing is that now that he said he requested special counsel authority in D.C. and was denied back then, him saying that he decided not to charge '14 and '15 at that point in time was moot, because he had no ability to charge it.    So maybe that's a nuance that only I think is important.

Q     Right.

A     But, he's saying that he made the decision not to charge it, but he didn't make the decision not to charge it.    The D.C. U.S. Attorney's Office made the decision not to charge it.    And then when he was denied special counsel authority, he had no ability to charge it.

Q     Okay.

A     And that's my understanding.

MAJORITY COUNSEL 2.    Off the record a second.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

          BY MAJORITY COUNSEL 2:

Q     We'll go back to exhibit 8.    There's a discussion at the bottom of page 81, where the Special Agent Wilson asked whether the VP, meaning now President Biden, ever showed up at any CEFC meeting.

Is it fair to say that the question is whether the President, the now President, ever showed up at his son's meetings to support his son, to give it some legitimacy?    Is that a fair reading of the question?

A    Yes.

Q    And the answer was "yes" from Rob Walker, correct?

A    Yes.    And this question was specific to out of office, and his request was yes.

Q    Right.    And did they also ask whether the President, when he was the VP, appeared at any meetings on behalf of his son, when he was in office?

A    Yes.    So the bottom of 82, FBI Agent Wilson, "Any times when he was in office or did you hear Hunter say that he was settin' up a meeting with his dad with them while dad was still in office," and Walker's response was "Yeah."

Q    And then flipping to the next page, Special Agent Wilson said:    "Okay. All right. Um.., when you started to learn about like you were going your separate ways as far as um..,splittin' off.., you and James were not gonna.., but you know that Hunter was continuing on and was…,"

Is James a reference to James Biden?

A    Yes.

Q    And do you know what's going on in that exchange right there about James going his separate ways with Rob Walker?

A    I don't know anything too specific about that.

Q    Okay.    And there's also a reference to Tony in this document.

A    Yes.

Q    A little bit further down on page 83.    And Tony I think appears on page 80 as well.    I was just wondering, for the record, who Tony is, if you know.

A      That's Tony Bobulinski.

Q      Okay.     Tony Bobulinski.

A      So if I could add -- it was page 81 or 82, right in the middle.     And Walker basically describes that the VP "literally sat down.     I don't even think he drank water.    I think" -- and then he's basically saying Hunter told him about the company he's trying to start --

Q      Right.

A      -- with these guys.     And basically saying, well, if you're going to be around, Dad, can you like, stop by?     And, he'd show up, it said.     So then Wilson asks him, "so…you definitely got the feeling that, that was orchestrated by Hunter…to have…an appearance by his Dad at that meeting, just to kind of…bolster your chances at…makin' a deal work out."     And Walker said "sure."

Q      Walker agrees, but of course he agrees.     Why else would Hunter bring his dad into these meetings, correct?     He's trying to trade on the family name, and if he brings his dad to the meetings, it gives him a lot more credibility, correct?

A      It would make sense, yes.

Q      Is there anything else on this exhibit that we have not discussed that we ought to?

A      Yeah.     That was 82.     Yeah.     So he asked a question about when he was out of office, did he ever meet with him, but then he also said, well, when he was in office, did he --

Q      Right.

A      -- he responded that, yes.

Q      Right.    Okay.

A      Yeah.

Q    Next exhibit we're going to mark is the WhatsApp document.    This is number 11.

[Shapley Exhibit No. 11

Was marked for identification.]

| | |
|---|---|
| 7/30/2017 | WA message with SM and Zhao, SM says, "Z- Please have the director call me- not James or Tony or Jim- have him call me tonight. I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled. I am very concerned that the Chairman has either changed his mind and broken our deal without telling me or that he is unaware of the promises and assurances that have been made have not been kept. Tell the director that I would like to resolve this now before it gets out of hand. And now means tonight. And Z if I get a call or text from anyone involved in this other than you, Zhang or the Chairman I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction. All too often people mistake kindness for weakness --- and all too often I am standing over top of them saying I warned you. From this moment until whenever he reaches me. It I 9:45 AM here and i assume 9:45 PM there so his night is running out." Zhao responds, "Copy. I will call you on Whatsapp."  SM says, "Ok my friend - I am sitting here waiting for the call with my father. I sure hope whatever it is you are doing is very very very important." Zhao says, "Hi Hunter, is it good time to call now? Hi Hunter, director did not answer my call. But he got the message you just mentioned." |
| 7/31/2017 | WA message with SM and Dong, SM says, "Kevin I was told by the Director through Zhao that we were to speak tonight. If there is some extraordinary reason you can not do so please let me know. I assume that you know that this is highly confidential and time sensitive." |
| 7/31/2017 | WA message with SM and Vuk Jeremic, SM  says, "Call u in a minute I'm on w/ director" |
| 7/31/2017 | WA message with SM and Zhao, Zhao sends Kevin Dong's foreign phone number. |
| 7/31/2017 | WA message with SM and Zhao, SM says, "Z -- i reached out to K and he declined my call and has not returned my text. I assume he knows that our plan to speak is highly confidential. I just hope he isn't talking to Tony or J -- if he is we have a real problem. If I can reshape this partnership to what the chairman intended then James and Rob will be well taken care of but I will not have Tony dictating to me nor the director what we can and cannot do." Zhao responds, "I don't think he is talking to Tony or the other guys. mostly with the director. I just sent an email to you and cc to Kevin. He has your phone number now. Hi Hunter, did you see the email from Kevin? The director would like to suggest you and Kevin have a meeting. CEFC is willing to cooperate with the family. He thinks now the priority is to solve the problem mentioned last night." |
| 7/31/2017 | WA message with SM and Zhao, Zhao sends SM an image of a message which reads. "Raymond (believed to be Zhao), many thanks for the introduction. Hunter I am based in New York and my US phone is [redacted] Let's talk tomorrow? Kevin" |
| 8/1/2017 | WA message with SM and Fran Persons, SM says, "Ok- want to talk Hong Kong and whether Bo intends to do 100 or understandable -- done his part" |
| 8/2/2017 | WA message with SM and Zhao, Zhao says, "Hi Hunter, director asked me to extend to you that Kevin has reported to him about your discussion. He supports your proposition and will act correspondingly."  SM responds, "That is a great relief and very welcome news my friend - let My friend know that I'm looking forward to his arrival here with great anticipation- we will do extraordinary things together and I am happy to have him as a brother in this endeavor- and my family sends their best wishes and looks forward to playing some golf when the director has time." |
| 8/3/2017 | WA message with SM and Dong, Dong says, "I received the following and thought we were finished    Hi Hunter, sorry to ping you at late hours. I am texting to convey some info from director Zang:  1) His best regards to you, Jim and VP;  2) He fully supports cooperating with you and the proposition provided by you. Chairman also agrees upon you idea;  3) Kevin is designated by director Zang to discuss with you on technical matters. The fund will be wired to the jointly administrated account in a timely manner.  Thanks!"  Dong asks, "From Zhao" and SM responds "Yes". |
| 8/3/2017 | WA Message with SM and Dong, SM says, "K- Very simple:  1. 10 M per annum budget to use to further the interst of the JV. This move to 5M is completely new to me and is not acceptable obviously.  2. All expenditures/ expenses salaries will be agreed to by board. My (Biden's) expenses and determination of how BIDEN (tean 5M) capital will be determined by Owasco  in consultation with Hudson. The Hudson capital will be utilized for expenses beyond those Biden/Owasco has committed to Monochromes business. (K we won't break 5 and the additional 5 can roll to next year if the Chairman and CEFC review is favorable. It all has to agreed to by Board - but if the Chairman doesn't value this relationship is being worth at leas 5M  then I'm just baffled.  3. You saw minor clarification of exclusivity.  4. We are all saying the same thing I hope . Please let's put this to bed tonight sign officially tomorrow (or anytime as late tonight as you want) and get to work. I am tired of this Kevin. I can make 55M in salary at any law firm in America. If you think this is about money it's not. The Biden's are the best I know at doing exactly what the Chairman wants from this partnershipn . Please let's not quibble over peanuts."  and Dong responds, "Do you want me to talk to Zang or you want to have a call together?" |



EXHIBIT

11

BY <u>MAJORITY COUNSEL 2</u>:

Q      Could you tell us about this document, what is it, and how was it obtained --

A      Sure.    So there was an electronic search warrant for iCloud backup, and these messages were in that backup and provided --

Q      Okay.

A      -- from a third party, from iCloud.

Q      Okay.    Who was it provided to?

A      The -- the investigative team from --

Q      Okay.

A      It would go through all the same processes of -- since it's electronic, it would go to one of the computer analysis folks, and then they would put it in a readable format, and then it would go through filter review.

Q      Okay.    And these aren't WhatsApp messages, these are summaries of WhatsApp messages, correct?

A      Yeah, that's correct.    Because it was something about the readability of the actual piece, right?    It was easier to summarize in a spreadsheet.

Q      Okay.    And who did the summary?    Who prepared this document?

A      It was either the computer analysis guy or ███████, one or the other.

Q      And you referenced some of this document in your opening statement. And if you can draw our attention to the parts that you referenced in your opener.

A      Oh.    Do -- would you like me to --

Q      Well, you can just flag it --

A      Yeah.    So --

Q      -- by date -- or some of the dates are multiple dates, so --

A      The first one, July -- the top one, July 30 of 2017, and this is Hunter Biden emailing Zhao, who is one of the executives at CEFC.    He's basically saying have the director call him, and he's demanding that he doesn't call James Biden or Tony or Jim Bulger (ph).    Have him call me.    And it says, I'm sitting here with my father, and he would like to understand why the commitment made has not been fulfilled.

Mr. Leavitt.    Sorry.    You said "he."    "We" would like to understand.

Mr. Shapley.    Oh, sorry.

And we would like to understand why the commitment made was not fulfilled.

So I mean, I'm just looking down.

So it says, "And Z, if I get a call or text from anyone involved in this other than you, Zhang or the Chairman I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction."

So then there's, a little bit going on.    And then Hunter Biden responds, "Okay, my friend -- I am sitting here waiting for the call with my father.    I sure hope whatever it is you are doing is very very very important."

BY MAJORITY COUNSEL 2:

Q      That seems pretty threatening, doesn't it?

A      Yeah, yeah.    And there are other excerpts, some that are pretty pertinent where --

Q      And just for the record, SM stands for Sportsman?

A      That's correct.

Q      Which is Hunter Biden?

A      That's correct.

Q      Is it unusual to use a code name like that or code initials?    If you were just

investigating somebody who didn't have national prominence, would you make up a name like Sportsman?

A    We do use code names now and again.    FBI is really heavy in them.

Q    Okay.

A    So this code name did come from FBI --

Q    Okay.

A    -- on this particular one.    We probably would've went with Robert Doe.

Q    Okay.

A    But it does happen occasionally.

Q    Okay.

A    So some of the other pertinent things in here are just talking about, CEFC is willing to cooperate with the family.

Q    And what date was that?

A    That is 7-31-20- -- well, it's one, two, three, four, the fifth message --

Q    Okay.

A    -- second line from the bottom, go all the way over.

Q    Got it.

"The director would like to suggest you and Kevin have a meeting.    CEFC is willing to cooperate with the family."

And the family is the Biden family, correct?

A    Yeah.    And he even alludes to that later on, all the way in the very bottom of No. 4, of the last part of that message where --

Q    Who is Kevin Dong?

A    So he's like the CEFC spokesperson kind of in -- he's Gon Win Dong (ph), and he goes by Kevin.

Q      Okay.

A      So he's just connected with CEFC.     He's kind of the runner.

So that No. 4, fourth line up from the very bottom, "put this to bed tonight…I can make $5 [million] in salary at any law firm in America.     If you think this is about money it's not.     The Bidens are the best I know at doing exactly what the Chairman wants from this partnership…let's not quibble over peanuts."

But, you know, he alludes to "the Bidens are the best I know at" again here.

Q      And who is saying "the Bidens are the best I know"?

A      Hunter Biden is saying that.

Q      Okay.     So Hunter Biden is referring to sort of his family here, "the Bidens are the best I know"?

A      Yep.

Q      So he's self-identifying that his family is good at doing this?

A      At doing what the chairman wants from this partnership.     Chairman Ye is who he's speaking about.

Q      Okay.

A      And --

[Discussion off the record.]

Mr. Shapley.     Yeah.     I just flagged the third message to Vuk Jeremic.

MAJORITY COUNSEL 2.     Okay.

Mr. Shapley.     And that's from Hunter Biden to Vuk Jeremic.     And it says, "Call u in a minute I'm on w/ director."

So Vuk Jeremic is that former Serbian politician and former -- I don't know what his title was but of the U.N. Assembly.     And so because of something like that in this, let alone the rest of it, we wanted to look into this.

And the reason why this was included in here was because that when agents saw this in late August, September of 2020, we went to the prosecutors.    We said, we got to ask questions about this, we got to figure this out, we got to -- like, what's going on with this?    And the response was, No.    No, we're not going to do it.

You want to know why?    And it makes a little bit of sense, right?    Well, we don't know if he was lying that his father was sitting next to him, right?

So then we said, well, let's get the location data for the messages, and if they're co-located, then we're on better ground here, right?

MAJORITY COUNSEL 2.    Right.

Mr. Shapley.    And they, no, we're not going to do that.    And we even brought that up in a pros-team meeting because ███████ created an agenda for every single meeting, and the agenda item number, like, 2 or 3, or whatever it was, location data, and that was specific to this, and they didn't allow us to do it.

[3:29 p.m.]

                    BY <u>MAJORITY COUNSEL 2:</u>

        Q       And the reason you wanted to look into this is because there could have

been a lot of money coming in from CEFC that was untaxed, correct?

        A       Yeah.    We're talking about a lot of things there.    There's FARA in play.

And the FBI is considering a lot of national security type issues here.    And we were

precluded from doing anything.

        Q       Is there anything else from this exhibit 11 that we haven't covered that we

should?

        Mr. <u>Lytle.</u>    Can we confer for a second?

        <u>MAJORITY COUNSEL 2.</u>    Excuse me?

        Mr. <u>Lytle.</u>    Can we confer for a second?

        <u>MAJORITY COUNSEL 2.</u>    Of course.

        <u>MAJORITY COUNSEL 1.</u>    Off the record.

        <u>MAJORITY COUNSEL 2.</u>    Go off the record, please.

        [Discussion off the record.]

Mr. <u>Shapley.</u>    I had alluded to FARA and some other things there.    But, some of these people in here, Chairman Ye, Gon Win Dong (ph), Zhao, are believed to be connected to the Chinese Communist Party.

BY <u>MAJORITY COUNSEL 2</u>:

Q      Okay.    So there could be national security implications with communications with those officials, correct?

A      That is correct.

Q      And was that sentiment also shared by the FBI?

A      Yes.

Q      And despite those concerns that the FBI had and that the rest of the team had, that was not looked into.    Is that correct?

A      The prosecutors said don't do it.    And then we asked for location, they said, no, we're not going to do that.    And if FBI did something at some level, I'm not privy to it.

Q      So you don't know if FBI CT went off and --

A      You would almost hope that they did, but I don't know if they did.

Q      Okay.    We're going to turn our attention to some of the retaliation you have faced.

BY <u>MAJORITY COUNSEL 1</u>:

Q      We talked about the email you sent up to Mr. Waldon, talking to Michael Batdorf.    And you read a portion of that in your opening statement as well.

Subsequent to that and in other material that you have shared with the committee, you referenced a failure to select situation.    Can you explain what happened with that situation?

A      Sure, yeah.    So I was selected in 2018 to help stand up the Joint Chiefs of

Global Tax Enforcement called the J5.   It's an assembly of Australia, U.K., Canada, Netherlands, and United States.   And because of my reputation working on international cases and working with other countries, and my experience, Chief Don Fort at the time selected me.   It wasn't something where it was even a job announcement.   It was all of a sudden you are a member of the J5, and I had to ask what the J5 was.

So I helped stand up the group.   My agents worked a vast majority of the operational cases that are considered J5 cases.   And ultimately there was a J5 lead.   It was an IR-1 position, like a deputy director level position at headquarters.   She was retiring.   And, everyone thought that that was the job that I was going to get, right, and I wanted that job.   And I was already an IR-1 because I was the assistant special agent in charge at the Chicago field office during that time.   And I received and outstanding rating during that rating period and everything.   So I applied for that job.

There were two people that were original members of the J5.   I was one of them. And ultimately, I didn't get that job.   The interview was one day after this email, and --

Q    That interview was on December 14th?

A    That's correct.   And this email was December 13th.   Well -- I'm sorry. The bottom one is December 12, 2022, top one is December 13, 2022.

So, being that J5 lead, they work directly with the chief, because they're basically a spokesman for the chief in J5 matters.   So -- ultimately I interviewed.   And then on January 3rd, 2023, in senior staff meeting they announced the other person, Oleg, had gotten the position.

I'm friends with a lot of people on senior staff, and they called me and said, what's going on here.   And it wasn't till the next day that Scott Goodlin, the director of IO, called me and told me that I wasn't selected for the job.   And I'm the one that had to brief Scott Goodlin when he got that job about what the J5 was.

So -- the person selected -- he hadn't been an ASAC.   I'd been an ASAC for 16 months at two different SES field offices, New York and Chicago.   I wasn't --

Q     So you believe you were qualified for the position?

A     Yes, I do.

Q     And you believe you had qualifications superior to the individual selected?

A     Yes.

Q     And why do you believe you were not selected?

A     Because I'm raising these issues.   And I think that -- Weiss calling my deputy chief, and right before this, right around this time, and who knows what he said, but I think it tainted me.   I think that they retaliated against me because of that.   There's really no other explanation for it.   Even what was explained to me by Scott Goodlin as to why Oleg got it, it almost -- it made no -- I don't even know if Scott Goodlin understands it made no sense, but it made no sense, right?   So yeah.

Q     Did you hear from colleagues after that decision was made about the fact that you hadn't gotten the position?

A     Yeah.   Several of our foreign partners, one of them is like the deputy chief of the Australian taxation office, basically was dejected and was like how -- I don't even know -- it was twofold; one, because I told them I was going to resign from my J5 duties, which I did do.   And they were like, well, number one, what are they going to do without you?   But I was in charge of a vast majority of operational stuff.   And I had the institutional knowledge since it stood up, many of the things I helped stand up.   So -- I'm sorry.

So after I resigned to the director of global ops Kareem Carter, who is actually now the SAC of Washington, D.C. field office.   It was Lola Watson ASAC, Kareem Carter SAC. He was the director of global ops.   And I sent him an email, and said, I'm resigning my J5

duties.    And they had no idea what to do.    And then I'm talking to some of the analysts

there.    Are there any discussions?    They are like, no, we don't know what's going

on -- obviously they had one chief brief -- monthly I briefed the chief and the top

executives on the J5 stuff.

So I wasn't on the first call after I resigned.    And they were like, there were no

questions answered because I wasn't there.    And -- sorry, I just lost my train of thought.

Q      It's okay.    Is it fair to say that there are others inside the agency that would

share your opinion that you were more qualified than the person selected?

A      Oh, absolutely, yes.    There were even times when the person who got

selected, he couldn't do what he needed to do, so he had to call me in to do it.    One was

a trip to Australia in February timeframe to go and represent in the intelligence group

there and the J5.    And he just simply would have added no value, so I had to go.    And

then there was a briefing to, it's called a JSEIT, it's joint strategic -- JSEIT, it's J-S-E-I-T, it's a

joint strategic emerging issues task -- I don't know what T is for.    I apologize.

So I presented on three of the J5 cases within my group at this JSEIT meeting,

which is basically a bunch of executives from all over the different business operating

divisions within IRS.    And I presented three cases that we are working on J5.    And when

they asked for someone to speak to that group, it came through Kareem Carter to Scott

Goodlin, director of IO, to Oleg.    And Oleg responds with, well, the only person that can

give this presentation is Shapley.

So then I give the briefing, and now I'm the lead of one of the working groups out

of there.    And I was just asked to be the lead of a second working group, which I asked

them, please, I don't have the time.

Q      Understood.    Okay.    Moving forward to May 15th, 2023, the committee

received the letter from your counsel noting that you and your entire investigative team

were removed from an ongoing investigation of a high-profile controversial subject, who

we've been discussing is Hunter Biden.     Is that correct?

     A    That is correct.

     Q    How long had you been working on this investigation when you were

removed?

     A    Since January 2020.

     Q    Who informed you that you and your team were being removed from the

investigation?

     A    SAC Kareem Carter.

     Q    How were you informed?

     A    The ASAC Lola Watson put a meeting on my calendar, and it was a telephone

call, conference call.     And the subject was Sportsman update.     ███████ wasn't

invited, but I had him on the line anyway, and he witnessed the telephone call.     We

produced a memo which both of us signed, because was taken off the investigation as

well, so he can see and sign all documents.

     Q    Okay.     And remind me -- I know you covered this earlier, but just for the

record, when you say the whole team was removed, how many people was that?

     A    Sure.     Yeah.     So it was me, Case Agent ███████, Co-Case Agent Christine

Puglisi, and the rest of my team, which is 12 in total, were not allowed to take the

investigation.     So they basically ensured that it was not under my supervision anymore.

     Q    Were you given a reason on that phone call as to why the team was

removed?

     A    I specifically asked and he said, no, didn't give a reason.     To which I said,

how could you possibly make a decision like that in a case like this without being given a

reason?     So then I said, well, if you were given a reason and you can't tell me, okay, just

don't tell me, but don't tell me they didn't give you a reason -- so I challenged him on it.

Q     And was the case closed at this point?

A     It was not closed, no.

Q     Were other IRS employees assigned to the case?    Was your team replaced?

A     After, yes.

Q     So to the best of your knowledge, the investigation remains open and the team has been replaced by other IRS personnel?

A     Yes.

MAJORITY COUNSEL 2.    And did we indicate who made that decision?    Was it at DOJ or --

Mr. Shapley.    I don't know if it was asked, but yes, Kareem Carter told me that DOJ had requested that change.

MAJORITY COUNSEL 2.    And do we know who at DOJ?    Was it the Tax Division? Was it the U.S. Attorney's Office in Delaware?

Mr. Shapley.    He said DOJ, is my recollection.

MAJORITY COUNSEL 2.    Okay.

BY MAJORITY COUNSEL 1:

Q     In your career at the IRS, have you ever been removed from an active investigation like this?

A     No, no.    And we even saw testimony from Don Fort, the former chief of IRS CI.    And I don't remember the context or who was asking the question, but he was asked about this issue and said, in your 30 years, had you ever seen a team removed like that? And his response was, no, I've never seen that.

Q     And this was recent testimony before Congress?

A     It was May 16th.

Q       What is your understanding about who has decision making authority about what IRS personnel work on any given investigation?

A       IRS personnel should be managed by IRS, not by DOJ.

Q       In this context of IRS working on cases with a different department, different agency, Department of Justice, are you aware of any formal documentation about how that relationship is managed, a memorandum of understanding, any kind of agreement about who has decision making authority on an issue like this?

A       I don't think I know of a memorandum, no.    No.

Q       And why do you believe you and your team were removed from the case?

A       I think the DOJ, because we were raising protected disclosures, that they wanted to get rid of us.    And it was twofold because we were making disclosures, but also because they knew that our disclosures were valid.

Q       Moving forward, only a week, May 22nd, the committee received another communication from your counsel.    It included an attachment that was a letter to the IRS commissioner, Daniel Werfel, regarding additional retaliation.

Can you talk about what happened in that instance?

A       Yeah.    So after being removed from -- my red line was October 7, 2022.

████████ case agent's red line was being removed from the case without cause.    And he decided to make that disclosure to the IRS commissioner because he thought that the people who were retaliating were at the highest levels of IRS CI, so he went to the next two levels, which is the deputy commissioner and commissioner of IRS.

Q       And how did IRS respond to that communication?

A       So ASAC Lola Watson sent him an email basically threatening him that he could have violated 6(e) with the communication with someone who's not on the 6(e) list. I only could assume that that's the commissioner, because our 6(e) lists are incredibly

robust.    I mean, the commissioner is on it now.    So, I would imagine Lola Watson is not on the 6(e) list and she's an ASAC, right?    Because ASACs come in, ASACs come out, and it's really the position.

So they threatened a 6(e) violation, which there was no 6(e) in there.    And also told him that there is no -- no information should be shared at any time outside of his chain.    It was like 2 minutes later, Kareem Carter, the SAC, sends an email to all the managers in the D.C. field office saying that you are to follow the chain of command, in no instances are you to provide information outside of that chain of command without their permission.

Q    Why is that problematic?

A    It was a direct threat.    Other people, like the co-case agent that is going to make her decision on what she wants to do, that is a shot across her bow, and anyone else that ever wants to comes forward, and it's just plain and simple.

Q    And did that communication about discussions not leaving the chain of command, did that include any language acknowledging exceptions for whistleblowers?

A    It did not.    There was a follow-up email from Deputy Commissioner O'Donnell yesterday where he sent out to everyone in the IRS basically -- it seemed as though they realized that they had done something wrong and they were trying to cleanse their error.    And they sent an email that had language about how to blow the whistle of 6103 and 6(e).    I believe that -- 6103 issues or 6(e) issues.    And my understanding is that's also deficient, because it did not have language in there that you can go to Congress and that there are ways that you can go to --

Q    So it did not include any reference or any language about individuals being able to contact Congress or communicate with Congress about allegations of wrongdoing?

A     That's correct.    Even in their attempt to cleanse, they still fell short.    It was

an email from deputy commissioner of services enforcement is what is says, but that's

Douglas O'Donnell.    And it was yesterday, May 25th, at 4:53 p.m.    And yes, there's no

language of being able to make those disclosures to Congress.

Q     Okay.    Other than the items that we've just been discussing, have there

been any other issues of potential retaliation that you would like us to know about?

A     I think that there is.    Can I have a second?

MAJORITY COUNSEL 1.     Go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.     Back on the record.

Mr. Shapley.    So this is emerging now.    We have a really large case, and it's

actually ▮▮▮▮▮▮▮'s case, just the best agent.    And this huge case, nationwide, with

around 30 to 40 spinoff investigations.    And we required the director of field operations

to buy on to the strategy.    And it was in January where I presented the strategy to them,

and all three DFOs agreed to the strategy.    And then it was in February, I don't have the

dates in front of me, DFO Mike Batdorf sends an email to all people across the country

who were working this case saying that we're going to pause on it.    So that was in

February.

And now we're still trying to work it.    We're still trying it push it forward.    We

have all these meetings, and they keep giving us -- they keep telling us ways that they

would approve it moving forward, but we can't move forward that way because there's

already grand jury material in it and because I'm not speaking about the Hunter Biden

case, I can say that.

BY MAJORITY COUNSEL 1:

Q     This case is different --

A      Different --

Q      Totally unrelated case?

A      Totally unrelated case.

Q      I'm sorry.    You're describing a totally unrelated case.    Is that right?

A      That is correct.    Yeah.

So even today I don't know -- what's the date?    The 26th of May, we're still on a

pause.    And I think that it's directly related to coming forward and making these

disclosures, because Mike Batdorf was the one that I initially called and said, with advice

of counsel, to say, hey, I've retained counsel and I'm going down the road to blow the

whistle, and then all this stuff starts happening.

Q      So you believe he may be retaliating by slowing down or impacting your

duties and responsibilities on totally unrelated matters?

A      Absolutely.    And all three DFOs agreed to this strategy and then he paused

it.    And the effect is now they can say, oh, well, you screwed this up or you didn't do

something right or something happened, and it can ultimately affect me.

Q      And for the record, what does DFO stand for?

A      Director of field operations.

Q      Okay.

MAJORITY COUNSEL 1.    Our hour is up.

[Recess.]

            BY MINORITY COUNSEL 2:

Q      Just really these are clarifying questions.    The letter you wrote to the

committee regarding your being removed from the Hunter Biden audit was on May 15th.

On what date did the Sportsman update meeting occur?

A      Sure.    So, my lawyer sent that letter.    And also, it wasn't an audit.    It's a

criminal investigation, just to clarify.    But that meeting was 1:30 on May 15th.

Q    Okay.

A    And the letter went the same day.    Yes.

Q    Okay.    And could you clarify or explain what the IRS' response was with the ▆▆▆▆ disclosure up the chain?    Who exactly is Lola Watson and what is her role, and how does she fit into that disclosure?

A    Sure.    Yeah.    So ▆▆▆▆, one of my agents; me, SSA supervisor; ASAC, assistant special agent in charge Lola Watson; then SAC Kareem Carter.

Q    Okay.

A    So he sent the email to ASAC and above.    So ASAC, SAC, DFO, deputy chief, chief, deputy commissioner, commissioner.    And she, the ASAC Lola Watson was the one who responded directly to him about following the chain of command which just a small nuance is that she didn't send it to me, which would have been the chain of command, so --

Q    I see.    So she was someone who was on the original email, along with the commissioner, the deputy commissioner, all the way down.    In her response, did she also cc the commissioner, cc the deputy commissioner, or was that just sent directly to him?

A    The only address we could see was his, so we don't know if there was bcc.

Q    And presumably, since the meeting was on May 15th, that email to the commissioner was also May 15th or May 16th or sometime close thereafter?

A    I think it was the 12th, May 12th.    I think -- was it a Friday?

Q    Well, if the meeting didn't occur until the 15th, I'm trying to figure out --

A    Oh, no, no.    Oh, no.    Okay.    I'm sorry.    I wasn't following your question.

Q    So when was ▆▆▆▆'s email to the commissioner, et cetera?

A   Okay.   Okay.   I'm sorry.   I totally missed your question.

Q   Yeah.

A   So it was -- is the 15th a Monday or a Tuesday?   It was Monday or Tuesday was when that happened.   And then he sent the email either Thursday or Friday of the same week.

MINORITY COUNSEL 1.   15th is Monday.

Mr. <u>Shapley.</u>   Monday, yes.   So that's when I got the call that the team was removed, and he sent that email Thursday or Friday.

Mr. <u>Leavitt.</u>   Just to clarify, you received our letter, right, that had it as an attachment?

MINORITY COUNSEL 1.   Yes, we have the May 15 letter.

MINORITY COUNSEL 2.   Do we have the email with the ███ attachment?   I can't remember.

Mr. <u>Leavitt.</u>   May 22nd, I think, is the date we sent our letter.

MINORITY COUNSEL 1.   Yeah, we have that.

MINORITY COUNSEL 2.   We have it in our files.

And then I guess my only other question is, as far as personnel decisions go in terms of who assigns who to a case or who would remove someone from a case, is there any reason in the normal course of business that the commissioner of the IRS would be asked or have to approve any kind of movements at that level?

Mr. <u>Shapley.</u>   I don't know of that occurring before, so I don't know who would approve it.

MINORITY COUNSEL 2.   Okay.   I'm good.

MINORITY COUNSEL 1.   Thanks.   And I'm going to make mine brief, so I think we're almost done here.   That gives everybody hope.

BY <u>MINORITY COUNSEL 1:</u>

Q    I want to go back to exhibit 11.    That's [where] the WhatsApp messages were summarized.    I had a couple of clarifying questions on that.

Who is WA?    There's a WA --

A    That means WhatsApp.

Q    Oh, WhatsApp.    Okay.    That's not a person.

A    No.

Q    I was wondering how you guys knew it was WhatsApp.

Okay.    And then you mentioned when you were providing some explanation about these WhatsApp messages that Chairman Ye was talking about a partnership. What is that partnership?    And that was in connection with the July 31, 2017, message or so.    I know you were talking about that.

A    Sure.    Yeah, yeah.    I'm just --

Mr. <u>Lytle.</u>    Which message is it?    Can you direct him to it?

<u>MINORITY COUNSEL 1.</u>    I have written down here in my notes that it's the fifth message, July 31, 2017.    It talks about, "Will work with family."    That one.

<u>MINORITY COUNSEL 2.</u>    "If I can reshape this partnership to what the chairman intended."

Mr. <u>Shapley.</u>    Oh, oh.    Okay.    Yes.    Oh, I'm sorry.

BY <u>MINORITY COUNSEL 1:</u>

Q    What is the partnership?    Do you know what it does or what it's supposed to do?

A    In all of my review of the evidence in this case, I'm not exactly sure what Hunter Biden is doing for this money.    So the partnership, I'm not really sure what services he's providing as part of that partnership.

Was that your question?

Q       Yeah.    I was trying to see, if this is some sort of a real estate partnership or a -- I have no idea.    We don't know.

A       This particular CEFC deal is not a real estate deal.    No, it's not.    There are some dollar amounts in the last message, but I didn't really go into that too much.

Q       Okay.

MINORITY COUNSEL 1.    Okay.    We don't have anything else.

MAJORITY COUNSEL 1.    Okay.    Well, we want to thank you for --

Mr. Lytle.    Can we just have a follow-up?

MAJORITY COUNSEL 1.    Oh, sure.

Mr. Lytle.    I just have a couple of follow-up questions, if that's okay.

MAJORITY COUNSEL 2.    This is on the record?

Mr. Lytle.    Yes.

MAJORITY COUNSEL 2.    Okay.

        BY MR. LYTLE:

Q       So, October 7, 2022, the meeting with Weiss where Weiss proclaimed he didn't have the authority to make charges.    You know that meeting, right?

A       Yep.

Q       Could you just name the people that were in attendance at that meeting, to the best of your recollection?

A       Sure.    Yeah.    So from the FBI it was SAC Tom Sobocinski, ASAC Ryeshia Holley.    IRS SAC Darryl Waldon.    I was ASAC at the time, and I was there.    And it was U.S. Attorney David Weiss and then Shawn Weede.    And Shannon Hanson.

So I don't know what Shawn Weede and Shannon Hanson's titles are, but they were like David Weiss' one and two type person.    Probably crim chief, first assistant, that

area.

Q      And so if someone wanted to just check with those folks, they could tell what they heard Weiss say at the same meeting that you were at.

A      Yep.

Q      Fair to say?

A      Yep.

Mr. <u>Lytle.</u>   Okay.   I don't have anything else.

<u>MAJORITY COUNSEL 2.</u>   I'm sure they're going to be eager to come in and speak with us.

<u>MAJORITY COUNSEL 1.</u>   Is there anything else that you would like to mention before we conclude today that we haven't already covered?

Mr. <u>Shapley.</u>   No.   Just thanks for listening.   My life's on the line here, so do what you can.

<u>MAJORITY COUNSEL 1.</u>   Thank you very much for your time and for a long day on a Friday before a holiday weekend.   We greatly appreciate it.   Have a good afternoon.

Mr. <u>Shapley.</u>   Thank you.

Mr. <u>Lytle.</u>   Off the record.

[Whereupon, at 4:11 p.m., the interview was adjourned.]

Certificate of Deponent/Interviewee


I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.


_____

Witness Name


_____

Date

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit D

COMMITTEE ON WAYS AND MEANS,

U.S. HOUSE OF REPRESENTATIVES,

WASHINGTON, D.C.

INTERVIEW OF:   ███████████

Thursday, June 1, 2023

Washington, D.C.

The interview in the above matter was held in room 5480, O'Neill House Office Building, commencing at 9:41 a.m.

Present:   Representative Jason Smith.

Appearances:

For the COMMITTEE ON WAYS AND MEANS:

███████████, MAJORITY COUNSEL

███████████, MAJORITY COUNSEL

███████████, MAJORITY COUNSEL

████████████, MAJORITY STAFF

████████████, MAJORITY STAFF

████████████, MAJORITY COUNSEL

██████████████, MINORITY COUNSEL

████████████, MINORITY COUNSEL

███████████████, MINORITY COUNSEL

For ███████████:

DEAN ZERBE

PARTNER

ZERBE, MILLER, FINGERET, FRANK AND JADAV, LLP

███████████████████

██████████████

<u>MAJORITY COUNSEL 1.</u>    Let's go on the record.

Good morning.

This is a transcribed interview of an Internal Revenue Service criminal investigator.

Chairman Jason Smith has requested this interview following a letter sent to the committee through counsel on May 24th, 2023, indicating your desire to make protected whistleblower disclosures to Congress.

This interview is being conducted as part of the committee's oversight of the Internal Revenue Code and the Internal Revenue Service.

Could the witness please state your name for the record?

Mr. ███.    It's ███████.

<u>MAJORITY COUNSEL 1.</u>    And counsel for the witness, please state your names for the record.

Mr. <u>Zerbe.</u>    Dean Zerbe.

<u>MAJORITY COUNSEL 1.</u>    On behalf of the committee, I want to thank you for appearing here today to answer our questions and for coming forward to make these disclosures to Congress.

My name is ███████.    I'm an attorney on Chairman Smith's Ways and Means Committee staff.

I'll now have everyone else here from the committee introduce themselves, starting with the chairman.

Chairman <u>Smith.</u>    Jason Smith, chairman of the Ways and Means Committee.

<u>MAJORITY COUNSEL 2.</u>    ███████, also with the Ways and Means Committee staff.

<u>MAJORITY COUNSEL 3.</u>    ███████, Ways and Means majority staff.

Ms. ███.    ███████, Ways and Means majority staff.

Ms. ████. ████████, Ways and Means majority staff.

<u>MINORITY COUNSEL 1.</u> ████████, Ways and Means minority staff.

Ms. ████. ████████, Ways and Means minority staff.

<u>MAJORITY COUNSEL 1.</u>   I'd like to now go over the ground rules and guidelines that we will follow during today's interview.

Because you have come forward as a whistleblower and seek to make disclosures to Congress, we will first give you an opportunity make an opening statement.

Following your statement, the questions will proceed in rounds.   The majority will ask questions first for 1 hour, and then the minority will have an opportunity to ask questions for an equal period of time if they choose.   We will alternate back and forth until there are no more questions and the interview is over.

Typically, we take a short break at the end of each hour, but if you would like to take a break, apart from that, please just let us know.

As you can see, there's an official court reporter taking down everything we say to make a written record.   So we ask that you give verbal responses to all questions.

Do you understand?

Mr. ████.   Yes, I do.

<u>MAJORITY COUNSEL 1.</u>   So the court reporter can take down a clear record, we will do our best to limit the number of people directing questions at you during any given hour to just those people on the staff whose turn it is.

Please try and speak clearly so the court reporter can understand and so everyone down at the end of the table can hear you.   It is important that we do not talk over one another or interrupt each other if we can help it, and that goes for everyone present at today's interview.

We want you to answer our questions in the most complete and truthful manner

possible, so we will take our time.    If you have any questions or if you do not understand one of our questions, please let us know.    Our questions will cover a wide range of topics, so if you need clarification at any point, just let us know.

If you honestly don't know the answer to a question or do not remember it, it's best not to guess.    Please give us your best recollection.    It is okay to tell us if you learned information from someone else.    Just indicate how you came to know the information.

If there are things you do not know or cannot remember, just say so, and please inform us who, to the best of your knowledge, might be able to provide a more complete answer to the question.

If you need to confer with your counsel, we can go off the record and stop the clock until you are prepared to respond.

You should also understand that by law you're required to answer questions from Congress truthfully.

Do you understand?

Mr. ███. Yes, I do.

MAJORITY COUNSEL 1.    That also applies to questions posed by congressional staff in an interview.

Do you understand?

Mr. ███. Yes, I do.

MAJORITY COUNSEL 1.    Witnesses that knowingly provide false testimony could be subject to criminal prosecution for perjury or for making false statements under 18 U.S.C.    Section 1001.

Do you understand that?

Mr. ███. Yes, I do.

MAJORITY COUNSEL 1.    Is there any reason you are unable to provide truthful answers to today's questions?

Mr. ▮▮▮▮.    No, there is not.

MAJORITY COUNSEL 1.    I would like to note that the information discussed here today is confidential.    As an IRS investigator, I know you understand the significance of our tax privacy laws.    Chairman Smith takes those tax privacy laws extremely seriously, and we have worked diligently to make sure that you can provide your disclosures to Congress in a legal manner and with the assistance of counsel.

I'm sure you know 26 U.S.C. Section 6103 makes tax returns and returns information confidential, subject to specific authorizations or exceptions in the statute.

The statute anticipates and provides for whistleblowers like yourself to come forward and share information with Congress under Section 6103(f)(5).

Specifically, the statute permits a person with access to returns or return information to disclose it to a committee referred to in subsection (f)(1) or any individual authorized to receive or inspect information under paragraph (4)(A) if the whistleblower believes such return or return information may relate to possible misconduct, maladministration, or taxpayer abuse.

In your position at the IRS, do you or did you have access to return or return information covered by Section 6103 of the Internal Revenue Code?

Mr. ▮▮▮▮.    I did.

MAJORITY COUNSEL 1.    Have you had access to return information that you believe may relate to possible misconduct, maladministration, or taxpayer abuse?

Mr. ▮▮▮▮.    I have.

MAJORITY COUNSEL 1.    And do you wish to disclose that information to the committee today?

Mr. ███. I do.

MAJORITY COUNSEL 1.   In addition to Section 6103(f)(5), the chairman of the

Committee on Ways and Means has the authority under Section 6103(f)(4)(A) to

designate agents to receive and inspect returns or return information.

To facilitate the disclosures you wish to make here today, Chairman Smith has

designated the individuals in this room for the purposes of receiving the information you

wish to share.

The chairman considers this entire interview and the resulting transcript as

protected confidential information under Section 6103.   That means that this interview

can only proceed so long as everyone in the room is properly designated to receive the

information.

The chairman has designated the court reporters and the related individuals that

provide transcription services to the House of Representatives.

I would like to remind the witness and everyone in the room that 26 U.S.C. Section

7213 makes it unlawful to make any disclosure of returns or return information not

authorized by Section 6103.   Unauthorized disclosures of such information can be a

felony punishable by fine or imprisonment.

Given the statutory protections for this type of information, we ask that you do

not speak about what we discuss in this interview to individuals not designated to receive

such information.

For the same reason, any marked exhibits that we use here today will remain with

the court reporters so that they can go in the official transcript and any copies of those

exhibits will be returned to us when we wrap up.

Your letter to the committee references the fact that you have been removed

from a high-profile case and that you are concerned about possible retaliation.

Chairman Smith values whistleblowers and knows that whistleblowers take significant risks when disclosing wrongdoing.    That is why there are legal protections in place for whistleblowers making disclosures to Congress.

At a hearing before the Ways and Means Committee on April 27th, 2023, Chairman Smith asked IRS Commissioner Werfel to commit that there will be no retaliation against whistleblowers.    The IRS Commissioner replied, quote:    "I can say without any hesitation there will be no retaliation for anyone making an allegation," end quote.

We understand your removal from the case team came subsequent to that testimony from the Commissioner.    This is very troubling, and we will certainly discuss that in more detail today.

That's the end of my remarks.    Is there anything that my colleagues from the minority would like to add?

MINORITY COUNSEL 1.    No.    We'd just like to thank you for coming to talk to us today, and we look forward to hearing your testimony.

MAJORITY COUNSEL 1.    And with that, I'll give you the opportunity to make an opening statement.

Mr. Zerbe.    I don't have as nearly extensive [remarks], but just a couple of points, particularly with the chairman here.

We just want note that if the committee -- we made this point but just to have it -- that if the committee were to elect or choose to release the transcripts, we would ask for strong consideration for his anonymity in terms of that.    You can identify him in terms of his role and position and release the transcript.    But in terms of his identity, his specific name, we would ask that consideration, strong consideration, be given for keeping that anonymous.

And the second is, just a blanket point, is he'll be covering an enormous amount of topics ranging over a number of years today and to the best of his ability, but, obviously, to understand he is doing his best in terms of recall and remembering what is going on and making his best efforts in that.    But, obviously, folks are not infallible on that.    But we'll strive to be as accurate and complete as possible.

So, ███, go ahead.

Mr. ██████.    So as was stated, I am a special agent with the Internal Revenue Service Criminal Investigation.

I wanted to start out by saying I'm coming here to you today after someone from your committee reached out to my counsel to come in and testify.    I paid for my own flight to be here in front of you, as I do not live in the D.C. area.    I have not accepted any payments from anyone in coming here, and I have legal representation through my attorney, Dean Zerbe.

I felt that it was my duty as a government employee to abide by your request, and I think that it's important that all you should know from my recollection of what happened during the Hunter Biden investigation so that we can learn from it, fix some things so justice is served, and create policy so that it doesn't happen again to us in the future.

One thing that I know, people would say about me, is that I'm passionate about my job and my career at the IRS.    I always strive to be the most efficient and best agent I can possibly be, always fighting for justice, and I always try make sure that we are doing the right thing for the right reason.

But in doing the right thing, I've found that people will fight me tooth and nail and do everything in their own power to protect their own self-interests.

So if I get emotional during some of this, I apologize, but this has been 5 years of

my life.    So what's happened has been [difficult] -- yeah.    So I apologize for that.

I'm an American, and my allegiances are to my country and my government.    I'm also a gay man.    I have a husband, two dogs, a home, and a life full of family and friends. But above all else, I'm a human being.    My sexuality doesn't define me as a person.    It's just who I love.

I'd like to say one more thing regarding this topic of sexuality, especially since it's the start of Pride Month.    But people have said that I'm gay and people have said, because I'm gay and that I am working as the case agent on this investigation, that I must be a far-left liberal, perfectly placed to fit some agenda.    This was stuff that was on social media regarding me.

I can tell you that I am none of those things.    I'm a career government employee, and I have always strived to not let politics enter my frame of mind when working cases.

I've tried to stay so nonpolitical that in the last Presidential election I voted but had decided to not vote for the Presidential candidate because I didn't want to be asked that question in a court proceeding in the future and I didn't want to show any potential bias.

My political beliefs are simple.    I'm as middle of the road as they come but would consider myself to be a Democrat.    When I was younger, I grew up in a conservative household.    I also held conservative beliefs.    But over time those beliefs have changed.

At the end of the day, I will always vote for love, kindness, justice, and fairness, because that's what I believe God would want for all of us.

I heard something recently that I think is overly relevant:    The eyes are useless when the mind is blind.    Basically showing us that you can have the best investigators in the world, but if you don't have prosecutors, people willing to pursue justice, and are constantly putting up roadblocks, you'll never achieve a resolution.

I've been an agent with the IRS since 2010.    In 2007, I received my undergraduate degree in accounting from ▮▮▮▮▮▮▮ and my MBA from ▮▮▮▮▮▮, so my master's in business administration.    Prior to starting my career at the IRS, I worked as an external auditor for ▮▮▮▮▮▮.

Throughout my career with the IRS, I have held multiple collateral positions, as well as worked a variety of criminal tax and money-laundering investigations.    Over the years, I have received "outstanding" on my performance evaluations in receiving multiple performance awards and have also received a quality step increase, which is one of highest-valued performance awards.

I was [a] healthcare fraud coordinator, worked criminal tax and money-laundering investigations of physicians, pharmacists, and medical billing companies.    I have authored and have been the affiant of multiple physical and electronic search warrants. I have authored and been the affiant on multiple seizure warrants, having seized millions of dollars' worth of criminal proceeds laundered through the purchase of homes, vehicles, jewelry, and the use of bank accounts.

I was a public information officer previously in which I worked as a liaison with the IRS and the U.S. Attorney's Office, our law enforcement partners, and the media partners in helping get publicity for our tax cases.

This collateral duty allowed me to get a whole different perspective of the why we do our job.    If you have a successful criminal tax case and no one hears about it, was it really successful?

The mission of the IRS is clear.    We are to investigate potential criminal violations of the Internal Revenue Code and related financial crimes in a manner that fosters confidence in the tax system and compliance with the law.

My agency has continually worked to show the American public this mission, it's

against the law to commit these tax offenses, and what would happen if they chose to do so.

[In] November of 2018, I transitioned out of being the public information officer and I transitioned to the International Tax and Financial Crimes group out of Washington, D.C., where we specialized in international tax crime tax cases.    We're a specialty group. We sit all over the U.S., and we primarily work international tax cases.

This was around the same time that I had initiated the criminal tax investigation into Robert Hunter Biden.    I will come back to that topic here in a few minutes.

But I wanted to give you guys an example of what I was working prior to this, something very similar that happened in that case, and kind of my perspective on that and the differences between that case and the Hunter Biden case.

While I was working as the public information officer, I took over as the case agent of an extremely complex captive insurance tax investigation.

This investigation was the first of its kind.    It had a lot of issues, to include age of the case, and I was coming in as the second assigned agent, as the previous agent was promoted.    So there's an example of why an agent might drop off [of a case].    They got promoted.

So I came in as the second agent, and I worked the case for approximately 3 years with attorneys from the Tax Division and the U.S. Attorney's Office.

One of the Tax Division attorneys assigned to that case is the same attorney that was assigned in the beginning of the Hunter Biden investigation.    His name is Jason Poole.    He was eventually promoted at DOJ Tax and oversaw the Hunter Biden investigation as [the] chief of [the] Northern [Area].    So chief of DOJ Tax Northern.

I know that Mr. Poole would say how good of an agent I was, how good my work was, and I think he would speak highly of me.

Now, why does this captive investigation matter?

Prior to joining the case, DOJ Tax had approved tax charges for the case and the case was in the process of progressing towards indictment.   Our assigned Assistant United States Attorney was promoted to judge, and DOJ Tax had made the decision to reinvestigate the case.

After working thousands of hours on that captive case, poring over evidence, interviewing witnesses all over the U.S., the decision was made by DOJ Tax to change the approval to a declination and not charge the case.

I was devastated when I found that out, but at the end of the day I understood.

We did everything we could to try to work through the issues and get the captive case ready for indictment.   I fought hard, having meetings with the leaders of my agency and DOJ Tax to try and get it charged.   But at the end of the day it was a difference in opinion, and DOJ Tax didn't want to set precedence.

I'm bringing this up to show you an example of difference in opinion between the investigators and prosecutors when it came to charging.   The captive case and the steps taken were significantly different than what happened with the Hunter Biden investigation, and hopefully I can show you that with my testimony here today.

So I have ultimately made the decision to come forward and agree to your request because I believe I made multiple attempts at blowing the whistle internally at the IRS. One of those was an email that I sent internally to the Commissioner of the IRS and was essentially intimidated and retaliated against after I sent that.

And I will bring that if you guys want.   I can bring that up later on.

Mr. Zerbe.   We can provide that email, right.

Chairman Smith.   Is it the current IRS Commissioner or the acting?

Mr. Zerbe.   Mr. Chairman, yes, it's the current.   This is the one that was in the

newspapers that was attached to the longer letter by Mr. Shapley.    You've essentially got most of the context of that letter.    But, yes, Mr. Chairman, it's within the last 2, 3 weeks.    So yes.

Mr. ████.    So I'm sitting here in front of you right now terrified.    In coming forward, I'm risking my career, my reputation,

and the casework that I'm working outside this investigation.    I believe that the Delaware U.S. Attorney's Office and DOJ Tax have a clear target on me and my supervisor's back, and I believe that they are waiting for an opportunity pounce on us.

My own agency retaliated against me, as I just stated, even after years of essentially being left on an island from them when it came to this investigation.

I did not ask to be in this position, nor do I want to be.    My supervisor, who I wholeheartedly respect, decided to blow the whistle on how this investigation was handled because his red line was crossed.

The timing of when he did that was something that we did not agree on but he felt he had to, and I wasn't going to stop him from doing what he thought was right.

I'd like to note that I wasn't present at the leadership meeting on October 7th, 2022, that Mr. Shapley and leaders from the IRS were a part of with U.S. Attorney David Weiss, the meeting where he made the statements about not being in charge.

I also wanted to continue to protect the record and my ability to testify as the case agent in the future, which is also a part of the reason I didn't come forward to you.

At the end of the day, I worked on a complex criminal tax investigation over the last 5 years, and the investigative process is 99.9 percent done, and we were in the process of bringing the case to indictment.    And I have emails and stuff that I can reference that show that.

Since October of 2022, the Delaware U.S. Attorney's Office and DOJ Tax have

pretty much stopped communicating with me and my team, and we have ultimately been removed and replaced from the investigative team.   I want to make that clear.   We were removed, and they replaced us with a new agent and a new supervisor.

I'm pleased to respond to the committee's request to assist them in oversight work and to provide information through statutorily authorized provisions of 6103(f)(5). I have reason to believe that there was gross mismanagement present throughout this investigation, that there was gross waste of funds relating to the tax dollars spent on investigating this case, and that there was an abuse of authority by DOJ Tax and the Delaware U.S. Attorney's Office.

I will present some evidence now and later, if needed. I will present evidence now and at a later date, if needed.   And I will leave it to you to make your own determinations, based on my testimony and the documents, what they say about the handling of this investigation.   Obviously, we have not provided any documents to you guys so far.

In providing this testimony, I will protect sensitive and secret material, first off. And I will also strive to protect current and ongoing investigations that are spin-offs from the Hunter Biden investigation.

I would also like to mention something else that's very important.   Sometimes I think the excellent work that the investigators did regarding this investigation is being overlooked.

I have worked with some of the best investigators on this team, some of the best investigators, by far the best forensic accountant with the FBI [I have] ever worked with. Amazing, intelligent people from the IRS, an amazing co-case agent who was there for me every step of the way, who took my calls when I felt like I couldn't go on with the investigation anymore because of what was being done and the roadblocks that were

being put in front of me.

My supervisor, Gary Shapley, best supervisor I've ever worked with in my life.    He was someone I could come to whenever I needed to vent, was someone who always fought with his heart and soul to do what was right, even if we didn't agree on the path, and would try to make sure that we always were heard.    He is someone I look up to as a leader in our organization.

Now, as for the prosecutors on the case, which included AUSAs from Delaware and line attorneys from DOJ Tax.    I considered a lot of these people my friends and we spent a lot of time together over the last 5 years.

Their conduct since October of 2022 has honestly been appalling, and I do not think that they are considering the human impact of the decisions they're making.

I have respected their work but think they got lost in the type of investigation they were overseeing.    Looking back on everything, they had the best investigators in the Nation and the prosecutors were the JV squad and weren't up to the task of handling such a big case.    They would often slow-walk investigative steps, often not follow the appropriate investigative procedure, and would say that we couldn't do or had to wait on certain steps because there were too many approvals in front of us.

I recently heard from another case agent on the investigation that the Delaware U.S. Attorney's Office loves to slow-walk cases and overthink everything.    They felt that this was exaggerated tenfold because of this case.

That agent also said that they had to work with this U.S. Attorney's Office.    So they had to keep the status quo and not raise any questions or issues that could potentially hurt that relationship.

I was different.    I was coming in from the outside.    I was able to bring up real issues, challenge their arguments, and it was apparent that they didn't like it.    It was

often met with rolling eyes, dismissing my ideas, and telling me that they would, quote, "think about it."

I started this investigation in November of 2018 after -- so this is going to go through kind of a timeline chronology of the case, just so you guys are aware.

I started this investigation in November of 2018 after reviewing bank reports related to another case I was working on a social media company.    Those bank reports identified Hunter Biden as paying prostitutes related to a potential prostitution ring.

Also included in those bank reports was evidence that Hunter Biden was living lavishly through his corporate bank account.    This is a typical thing that we look for in tax cases -- criminal tax cases, I should say.

In addition, there was media reporting related to Hunter Biden's wife, ex-wife, divorce proceedings basically talking about his tax issues.    And I wanted to quote some of the things that were said in her divorce filing which was public record.

"Throughout the parties' separation, Mr. Biden" -- referring to Hunter Biden -- "has created financial concerns for the family by spending extravagantly on his own interests, including drugs, alcohol, prostitutes, strip clubs, gifts for women with whom he had sexual relationships with, while leaving the family with no funds to pay legitimate bills.

"The parties' outstanding debts are shocking and overwhelming.    The parties have maxed-out credit card debt, double mortgages on both real properties they own, and a tax debt of at least $300,000."

This is all the information that I had in my hand in November when I wanted to open this investigation.

So I began talking with colleagues in my group, and they were asking me why would I want to open up a case like this.    Big cases, big problems was the thing I was

constantly hearing.

I responded to say it shouldn't matter the name of the person on whether we work a tax case or not.    It should be the merit of the evidence, the allegation, and the clear understanding of why we are opening that investigation.    So doing the right thing for the right reason.

After discussing the case with my previous supervisor at the time, Matt Kutz, he made a decision to look into the case further before sending it -- sending the case up for referral.

So I wanted to note something here.    When we get a bank report, a lot of times we are able to take the information in that and bring it over to the U.S. Attorney's Office to say, "Hey, look at this bank report.    We need -- are you guys interested in potentially opening up an investigation?"

So that's typical.    And because we're in D.C., he lived in D.C., we would have taken it to the D.C. U.S. Attorney's Office.

My manager at the time told me, "No, you cannot do that.    That's a tax disclosure issue."    I didn't agree with him because there's been multiple instances where we do that.    That's a normal part of our job.    But he was my manager, and I wasn't going to fight him on it, and he told me that I had to open this up the normal tax administrative way that we would do [for] these cases.

At this point in 2018, I believe that I was the only agent in the U.S. looking into Hunter Biden.    So I immediately drafted a criminal tax initiation package and sent it to my manager for his review.

I wanted to provide an example of something that my SSA [at that time] told me which caused me pause and concern.    This is from what I recall.    But he said a political family like this, you have to have more than just an allegation and evidence related to

that allegation.    In order for this case to move forward, you basically have to show a significant amount of evidence and similar wrongdoing that would basically illustrate a prosecution report.

So he's basically telling me that I have to show more than just non-[filed] tax returns and the information from the ex-wife in the divorce proceedings.

I did not agree with him at this time -- and I told him that we have to treat each taxpayer the same, it shouldn't matter on their name.    But he was my manager and I had to do what he said.

So after three of these initiation packages, he finally allowed me to push this forward to DOJ Tax for their review.

So the way that our grand jury cases -- or the way -- I'm sorry.    The way that our cases work is when the case is referred from IRS to DOJ Tax, the case has to go through our ASAC and SAC, and then it goes to DOJ Tax where they review and approve it and send it to the appropriate venue or jurisdiction.

So in [or] around March or April of 2019, the case went up to DOJ Tax.    And at that time we were told that William Barr made the decision to join two investigations together.    So at that point in time I had found out that Delaware had opened up an investigation related to the bank reports and that that occurred in January of 2019, so 2 months after I started mine.

So when I found out about their case and was told that we had to merge the two, I did a venue analysis.    I showed them that, "Hey, the venue's in D.C.    It's not in Delaware.    We need to work this in D.C."    But, ultimately, I was overruled, and it was determined to send the case, join the two case together, and work everything under Delaware.

So it was at that time that we had learned that the FBI in Delaware were referring

to the Hunter Biden -- were referring to Hunter Biden and the case by the name
"Sportsman."

So what were the potential issues I saw with working the case in Delaware?    We
were working with a small U.S. Attorney's Office who might not have ever worked a case
of this caliber.    Delaware was in the State in which the subject's father lived, and the
family was extremely well-known throughout the State, including people on the team.
And when I say team, the investigators and prosecutors on the team.

This was later evident by President Joe Biden -- well, he was formerly Vice
President at that time -- having to come into the FBI office on an unrelated matter and it
being joked with the team.

There's another issue where a magistrate judge in Delaware made an
inappropriate comment at the signing of the first electronic search warrant that caused
her to remove herself -- that caused her to recuse herself from the investigation.    This
set us back an additional 4 months as we had to draft new warrants and redo
investigative steps.

I want to correct the record on that and say that that's themself, so just so that
we're clear on that.

This is a few of the many issues that we encountered with working the case out of
Delaware.    But at the end of the day, I constantly remember telling myself and my
co-case agent and my supervisor that these are issues, we have to deal with it -- that we
have to deal with -- and there's nothing we can change.

Around the same time in 2019, I had emails being sent to me and the Hunter --
and the prosecutors on the case, the Hunter Biden prosecutors, from my IRS supervisor.
So this was Matt Kutz still.

From what I was told by various people in my agency, my IRS supervisor, Matt

Kutz, created memos which he put in the investigative files regarding the investigation potentially violating the subject's Sixth Amendment rights.    He also referred to Donald Trump's tweets at the time.

I recall that at one point I had to go around my supervisor and ask his boss, ASAC George Murphy, to tell him to stop sending me and the Hunter Biden prosecution team these emails and that I was searching media articles on a weekly basis and was aware of everything being written in the media regarding the case.

So one of the first disagreements I recall between the IRS investigators and the prosecutors was the idea of going overt.    When we work criminal tax investigations, there's an IRS policy in place that we need to interview the subject within 30 days of elevating the investigation.

I would like to note that there are reasons why we might wait to interview the subject of an investigation, to include potential undercover work, active crimes continuing to occur, and other covert investigative steps.    But with tax cases, the evidence is typically historical, which allows us to go overt sooner, which is why this is stated in the IRM.

I thought this to be even more true about wanting to go overt, because at the time of starting the investigation Hunter Biden had unfiled returns for 2016 and '17 and had unpaid taxes for '15.    And I wanted to put Hunter Biden on notice in the event that he filed tax returns and potentially paid his taxes.

In a normal investigation, we would typically advise the subject of the criminal investigation, try to get a statement from them, try to get an understanding of why there were unfiled returns.    And it sort of puts us on notice -- or puts them on notice that the IRS is looking into them currently and then it kind of preserves the record in an essence.

I was overruled during multiple meetings almost to the point that I couldn't bring

it up anymore to the attorneys, and they would get visually upset with me.    And I was continually being told that we had to stay covert to preserve potential evidence from the FBI side of the investigation.    I even offered just IRS agents going forward in interviewing the subject, just, "Hey, we have a criminal tax investigation.    We want to talk to you." But it was ultimately overruled.

So I can recall being assured by the AUSAs and DOJ Tax attorneys that we would still be fine with potential Spies evasion charges because other activities would be similar to us interviewing the subject, which included the Senate investigation at the time, as well as the Arkansas case related to Lunden Roberts.

So Spies evasion.    Spies evasion is essentially when you have unfiled returns.    So normally unfiled returns is a misdemeanor.    Spies evasion is a felony.    So it's essentially stating that they willfully evaded the requirement to file and/or pay their taxes, and there were overt acts present, that essentially that's the reason why they unfiled or didn't file the tax returns.

Mr. Zerbe.    Spies is spelled S-p-i-e-s.

Mr. ███████.    Thank you.

So we did not end up going overt and conducting interviews until after the 2020 election on December 8th, 2020, after I continually pushed the issue at various meetings.

So I wanted to continue on with this, my memory of events from May 2019 to December 8th, the date we went overt with the case.

So throughout that time period we were obtaining multiple electronic search warrants, so email accounts.    There were QuickBooks accounts.    There was a Dropbox. There was an Apple iCloud.    There was the laptop.

And with Hunter Biden being an attorney, all of this information had to go through a lengthy review.    So it had to go through a filter team, a filter AUSA.    So they're

filtering out any attorney-client privilege documents.    And then ultimately we on the team, on the investigative team, would get the documents to review for relevancy or nonrelevancy.

Throughout this entire time, we're getting these email search warrants.    We're reviewing the records.    We're working as a team.    We're actually bringing in people to do the filter review.

Throughout all this time we're having biweekly meetings.    At these biweekly meetings, I am continually bringing up that we need to go overt.

There came a point in time to where there were some bank reports out there that were going to get released, and they were going to include potentially the names of the investigators from the IRS and the FBI who received those bank reports.

So with that being released in the public, we're like it's going to out our investigation, so we need to come out and go overt with the tax case.

And I remember there were always times to where we were always on an impending election cycle.    It was always the election being brought up.

In early 2020, it was the midterms.    I think that Iowa was the very first one where we weren't sure what we were allowed to do or we weren't -- it was always wait and see. And then ultimately --

Mr. Zerbe.    Correct.    So when you say the midterms, you mean the caucuses and the primaries for the Presidential run?

Mr. ████.    Yeah.    No, I'm sorry.    I mean the -- exactly.    I'm sorry.    The primaries.

So we on our side were preparing for the day of action.    We were trying to establish who were the witnesses we wanted to talk to, who were -- we wanted to do search warrants.    We wanted to do search warrants of physical residences.

In a failure to file case, that's typically what you want to do, is search warrants. So get inside the house and get evidence related to the unfiled returns, see if they were trying to get their returns filed and just never ended up doing it.

We were always talking about those search warrants, talking about going overt. And it was always we need [to] go through the evidence.    We need to go through all [of] the search warrant records.    We need to make sure that we've kind of gone through everything before we go overt.

And we didn't agree with it.    We pushed this up our management chain that we didn't agree with it.

Our leadership, so leadership within my office, my S-A-C, my SAC, she agreed that we needed to go overt, but at the end of the day they outweighed us on this.

One other thing I would like to note is September 4th, 2020, we had a conference call and [DOJ Tax and Delaware USAO] told us essentially that we were on pause from any overt activities or any activities that could be overt whatsoever.    So we couldn't -- we weren't allowed to issue subpoenas.

So I have an example of this -- so October 20th, 2020, right before the election, we're getting ready to go overt the week or two after the election.    The election's in early November.    We're getting ready to go overt after the election.

And we needed to do a walk-by to make sure where Hunter Biden lives.    That's typical of our -- we would go in general clothes, walk by the residence, see what's going on, see if there's Secret Service.

And in an email to Mark Daly, one of the DOJ Tax attorneys, he says:    "Tax does not approve.    This will be on hold until further notice."

I have never in my career have had Tax Division, let alone approve us doing a walk-by or anything like this.

So my response to him was:   "I'm sure I'll get asked."   So this is October 20th, 2020.   "But can you ask for the reasons why, since I think this would still be a covert action, especially since the U.S. Attorney approved this?"

He says:   "Call when free."

And, ultimately, we never were able to do the walk by the residence until after the election.   And that's ultimately when we went overt and were able to do the activities that day on December 8th.

Another devastating blow came to the investigation when we lost one of the AUSAs to the private sector in early 2020.

Former AUSA Jamie McCall, who was a judge advocate for the Marine Corps, working primarily as a prosecutor, achieving the rank of captain in the Marine Corps, was a hardworking, no-nonsense kind of AUSA.

I always thought in talking with him that he wanted to do the right thing for the right reason.   He would constantly push the envelope, and it was apparent that he was following the evidence and not working to create roadblocks.   I firmly believe that his departure had a significant impact on the future of the investigation and the investigative steps.

So I plan on providing you some more assistance -- or some more instances in which the assigned prosecutors did not follow the ordinary process, where they slow-walked and put in unnecessary approvals.

This is obviously not all of them, but is a small set of examples.   I can recall [a] meeting prior to the 2020 election in September of 2020 when we were discussing [with the prosecutors] potential additional electronic search warrants and covert subpoenas related to the case.

One of the prosecutors suggested removing the subject's name from the request.

I said on that call that I didn't feel comfortable with removing the subject's name from any documents just based on what might or might not be approved, and I told them that I thought that that was unethical.

DOJ Tax Attorney Jack Morgan said that doing it without Hunter Biden's name would essentially get us most of what we were seeking.   I have never been a part of an investigation where we talked [with the prosecutors] about even removing the subject's name from a subpoena, especially a covert subpoena.

Okay.   So after the day of action on December 8th, 2020, the prosecutorial team met --

Mr. <u>Zerbe.</u>   Explain "day of action."

Mr. ███.   Okay.   Day of action was when we went and attempted to do interviews.

All along we were preparing for doing interviews.   I had a list of probably 30 people and I tiered them.   So it was Tier 1, Tier 2.   And I had a proposal early on that said I want to go and talk to all these people.

It got whittled down to, I think, 10 people on the day of action, some of those people who we were only allowed to serve subpoenas and weren't allowed to talk to.

So that day of action happens.   We go and talk to everyone.

So that night, December 8th, 2020, the prosecutorial team met on a phone call. During that phone call we talked about a storage unit that Hunter Biden vacated when he vacated his Washington, D.C., office and stored a lot of the items in there.   That was uncovered through that day of action.

On the night, at the direction of Lesley Wolf, I prepared an affidavit in support of the search warrant for the storage unit.   And I thought, in looking back at this, that these were pretty telling.

Mr. <u>Zerbe.</u>   You need to be clear.   Lesley Wolf, who was Lesley Wolf?

Mr. ███.   Lesley Wolf was the assistant United States attorney in Delaware.

I say to her on December 8th, 2020:   "Sending the draft affidavit.   I guess I'm happy we drafted this before.   I kept the computer language in the warrant in case there are electronic devices."

So I'm going to move on to the next paragraph.

"We will work to get this approved ASAP on our end.   So please communicate your thoughts.   I would like to possibly execute this sometime next week.   I think that is reasonable, given the upcoming holiday."

Her response to me, December 9th, was:   "We are getting to work on this, but I want to manage expectations with you regarding timing.   It has to go through us, DOJ Tax, possibly OEO, and definitely [Eastern District of Virginia] (EDVA), who has never seen the case before, layer in the filter requirements in the Fourth Circuit, and it's just not clear it's going to happen next week, even with everyone making it a priority."

So that tells me two things right there.   That David Weiss wasn't really in charge. And it also tells me that I have never had a case [investigation] to where, if we needed to get records and preserve them, that we didn't do everything in our power to get a search warrant approved and get moving on that expeditiously.

So I guess with the storage unit -- we asked them to keep an eye on it and tell us if anyone went to it.   But it was highly unusual that I'm being told that we couldn't even do it the following week.

So let me go back to this.

So after I sent -- after we sent each other these emails, it was ultimately decided by AUSA Lesley Wolf to not do the storage unit search warrant.

On a phone call with AUSA Lesley Wolf -- and this is just from my recollection, I

didn't document this in notes -- I told her that I completely disagreed with her and that we weren't following the appropriate investigative steps to get the stuff in the storage locker and that I thought that she might be acting inappropriately.

At the time AUSA Wolf asked me if we had problems working together now and if I had issues with her moving forward.   I responded at the time that I didn't and that we could move forward.

After thinking about it further, I approached them with an idea, AUSA Wolf, and I said:   What if we didn't tell Hunter Biden's counsel about the storage unit?   He's been given a request for records.   What if at the time that he's given for those requests for records he doesn't access the unit?   And if he doesn't access the unit, we know he's not complying with that request.   So if at the end of that time he doesn't access it, let's do a search warrant on it then.   She told me she would think about it.

So I pushed this up to my leadership.   I pushed it through my SSA.   They all agreed with it.   They thought it was a great idea.   So they called David Weiss, the U.S. attorney in Delaware.

David said to them that -- they called it "█████ Plan."   "Yes, that sounds like a great idea.   Let's plan on doing that."   That's what he told them from what I was told after that call, on the call with -- on that call.

So I find out a couple days later that, on a phone call from them, that AUSA Wolf and DOJ Tax Mark Daly called Hunter Biden's counsel and told them about the storage location and said that the request for records includes the stuff [in] there.

So they literally went around my back, my idea, around what we [had] already talked about, and did something completely different.   And I guess it was at this point -- there were a lot of things that happened before this.   But it was at this point for me that I started to believe that the attorneys with the Delaware U.S. Attorney's Office

and DOJ Tax were not acting appropriately, they were not following the appropriate investigative steps, and that we were not a part of the trajectory and/or the planning of the investigation as we normally are.

I can recall another situation in which investigative activities were being held up by unnecessary approvals and constant slow-walking.   In essence, they were not letting me do my investigative job.

So this is an email regarding requesting documents.   So I say:   "Attached are these document requests for interviews I'm planning to do that are out of town."

So I'm planning to do these interviews, and I send those document requests to them.

Lesley Wolf says to me on September 9th, 2021:   "I do not think that you are going to be able to do these interviews as planned.   The document requests require approval from Tax Division.   At present, Jack and Mark are racing to get the EWC motion on Stuart's desk" -- so Stuart was the [Acting] Deputy [Assistant] Attorney General, Stuart Goldberg at Tax Division -- "Stuart's desk for approval before he leaves town for a week.

"Along with the approval for the" -- and I'm going to leave the name out of that -- "both of these items are higher priority and we can't pull time and attention away to move these subpoenas through.

"Appreciate that are you always trying to stay active and do some travel before your end, but we will be able to get these interviews and document requests done when we have a little more breathing room."

My response to her, September 10th, 2021, was:   "Okay.   I had planned stuff like this for weeks in advance to prevent this from happening.   I had brought up these interviews on multiple occasions, dating back to August 18.   And now we are being prevented from doing it 4 days before.

"This is making it difficult for me to do my job.    I don't understand why DOJ Tax senior management is needing to approve every simple document request and/or witness interview, and maybe this is a conversation that needs to be had at a higher level.

"I can push these interviews off.    Just know that I'm trying to do as much as I can to plan and get the tasks handed down to me accomplished in a timely manner in an effort to ultimately finish the pros report.

"I discussed with Mark" -- Mark Daly, DOJ Tax attorney -- "that interviews we had planned for the end of the month should be a priority as they relate to a former employee, previous business partners, and some 2018 expenditures.    I will have those subpoenas for those interviews in California to the pros team by next week so we don't have this issue again."

And so, again -- end of the month I request [to the prosecutors that] subpoenas go out -- or I request document requests to go out -- to go out and travel.    And Mark Daly, DOJ Tax attorney, says in an email to me on September 20th -- and these were document requests relating to prostitutes that Hunter was paying.

He says in this:    "Subject:    Emails sent to management with list of ten document requests to be served."

And he says:    "Ask whether they object."

And I said:    "You are the man.    I will fill you in tomorrow on my issues.    I'm almost at the end of my rope, and I am sick of fighting to do what's right.    Can you send me the final version so I can send them?"

So this is me further stating -- what I see as further stating to them that I'm sick of fighting for always doing what's right.    There were so many situations, and these are just a few, to where I'm fighting to get document requests to go do interviews.    I'm fighting to -- and it's just all:    Let me think about it.    There's too many approvals to go get that

done.

And then not only was I having issues with the prosecutors on the case, but then I had issues internally within the IRS.    And I had to go around my senior leadership to my director of field operations.    So that's the fourth person above me.

He told me that I can come to him any time with issues on this case -- it's the director of field operations, his name is Mike Batdorf -- that I can come to him at any time and with any issues that I'm having.

And was raising issues all along with so many various people in my management about the slow-walking, the issues that we were having with doing interviews, with doing document requests.

I said to him, Mike Batdorf, on September 20th:    "Again I hate to bother you with this.    I'm almost at the end of my rope, and I think I'm at the point again where I need your help.    I have a ton of interviews and travel planned and scheduled for the next 3 months.    Keeping on a timeline is extremely important, and I don't want this to continue to be a problem.    I don't mind the questions from management, but it feels like they are not listening to me."

That is a number one -- like the fact that management was not listening to me is an overarching theme regarding this investigation.    It felt like they left me on an island.

Mr. Zerbe.    Could you give the date of that email?

Mr. ▮▮▮.    Yeah, September 20th, 2021.

Mr. Zerbe.    Let me just pause there for a second because I want to be mindful of the chairman.

I would say, ▮▮, that he's probably going -- you've probably got about another 15 minutes to go.

Mr. ▮▮▮.    Yeah.

Mr. <u>Zerbe.</u>   He's probably got 15 minutes to go in his opening statement, if that's all right, but we can also pause because I think you're going to get into the prosecutorial memo referral, which is kind of important, but kind of a natural break point.

So we're happy to keep going.    We're happy to pause.    And if the chairman's got any questions, because I know you're a busy fellow, we can do that, too.    So you tell me how you want to --

<u>MAJORITY COUNSEL 1.</u>    I think if you have 15 minutes, let's go ahead and finish that up.

Mr. <u>Zerbe.</u>    Okay.

<u>MAJORITY COUNSEL 1.</u>    And then we can take a short break.

Mr. <u>Zerbe.</u>    Okay.    Perfect.

Go ahead.    I'm sorry.

Mr. ████.    Okay.    I wanted to mention one more thing.    I can recall wanting to interview and getting records from Hunter Biden's children and members of the Biden family.    There were expenses paid for the children, as well as potential credit card expenditures and Venmo payments, that were deducted on the tax return.

On October 21st, 2021, AUSA Lesley Wolf told us it will get us into hot water if we interview the President's grandchildren.    That was completely abnormal, out of the question.    And it's a part of our normal process that we go and interview people, especially people who are receiving money or receiving payments related to a case like this.

So that's just another example of issues like that.

So in October of 2021, we had what was called a tax summit to where we all met together.    When I say "we all," so the prosecutors, so Jack Morgan and Mark Daly from DOJ Tax, Lesley Wolf and Carly Hudson from the U.S. Attorney's Office in Delaware.

So at that time we decided what charges we were going to push forward in the prosecution report.    So we all made the decision on that we were going to move forward with 2014, 2015, 2016, 2017, 2018, and 2019.    And it would be felony counts related to 2014 and felony counts related to 2018.    That was the decision made at that time.

So I drafted the prosecution report.    I spent all Thanksgiving, around that time, drafting this massive report.    Our reports are a lot of evidence.    There's a lot of stuff that goes into it.

So in November [I] drafted the report.    It went up to our internal counsel.    So they're called Criminal Tax counsel.    Went up to our internal counsel.

They review it for legal issues, and they actually give a recommendation to our leadership on whether to move the case forward or not.    They basically give an approval or a declination.

All along they were telling me that that -- CT counsel attorney was telling me -- her name was Christy Steinbrunner -- we're good to go on these, I'm going to give you [a] green [light].    So green being that you're good to go on those years, and yellow, yellow being caution.    She was telling me that they were going to concur to it.    I was hearing that all along.

And they took almost -- more than 60 days on their review, which is more than they're allowed.    Took more than 60 days.    And in February of 2022 -- and I'm not going to get into the details of this -- they end up sending a nonconcur, so a declination for all of the tax years at hand.

And I asked -- I messaged the CT attorney, Christy Steinbrunner, and I go:    You told me that we were concur, that we were good to go.

And she said:    I always told you it was green -- or I always told you it was green

and yellow.

I have to look at what the statement says.    But basically she told me what I stated in there, that it was a concur.

So that was one of the first times where I was like, well, gosh, now we have these issues with our U.S. Attorney's Office and DOJ Tax, and now I'm also having issues with CT counsel.

So our leadership ended up pushing that forward and ended up approving it and sending it to DOJ Tax in February or March of 2022.

So let me go to my notes here.

So February 25th, 2022, the IRS sent the prosecution report forward to DOJ Tax and the U.S. Attorney's Office.    So in my report proper venue for the case was in D.C. and California.    We had no venue in Delaware whatsoever for the tax charges.

I recall hearing --

Mr. <u>Zerbe.</u>    And why is that?

Mr. ████.    So for failure to file charges, if there are failure to file charges, it's where the subject lives.

If it's a false return or if it's an evasion charge -- so if it's false return, it's where the return is prepared or sent from.    If it's an evasion charge, it can be where the overt acts occurred.    So for 2014 and 2015, venue was D.C.    For 2016, '17, '18, and '19, the venue was in California.

On or about March 14th, 2022, they're now able to have what's called a taxpayer conference with defense counsel.    That gives an opportunity for defense counsel to come in and present:    Here are our defenses.    Here's why we don't think that you have a case.

All the cases I've ever been a part of, they're afforded one.    In this case I know

that they've had three.    With the most recent one, they've had four.    So that's high -- I have never heard of that in my career.

So they have the taxpayer conference.    On or about April 26th, 2022, they have a second taxpayer conference.    At that conference -- at that taxpayer conference they present defenses for 2014 and 2015.    We end up reinvestigating the case relating to 2014 and 2015.

I guess -- most importantly, I need to step back a second.

March of 2022, we are told -- I get a phone call that they are bringing the case forward to start -- I need to ask you a question about how I --

MAJORITY COUNSEL 2.    We can go off the record, please.

[Discussion off the record.]

[10:41 a.m.]

Mr. ███. Okay. So in March of 2022, we know that they are going to D.C. to open a case, okay?

So I'm told -- and this is from my recollection of conversations, and I do not have notes on this. As I am the case agent, we wouldn't typically take notes on this.

I am told that it was sent to the line attorneys in the D.C. U.S. Attorney's Office. They got my prosecution report, all the information that we had, and said, hey, we want to open up this case here. The line attorneys there said, here's the process. We'll get you guys going.

Two days later, I find out another meeting was -- so meanwhile, presenting the case to D.C. was something we asked for but was denied. We were not allowed to go there to present the case to D.C. We were all to rely on the attorneys to go and do that.

So in March -- or a couple days later after that meeting, I get a phone call. And this is -- from my recollection, from Mark Daly, the DOJ Tax attorney. And I think he was a little bit too forward with his information he gave me. But he basically said that now that the U.S. Attorney looked at the case, they don't want to move forward with it.

And essentially what he told me is that not only are they not going to join the case and give us assistance -- so give us another AUSA, give us someone to help there -- they also told our prosecutors that they don't think we have -- that we can -- or they don't think that we have the charges -- or not the ability, but the evidence for the charges to charge in D.C.

So not only was it a, no, we're not going to help you, but it was a, you shouldn't bring the charges here, essentially.

Mr. Zerbe. Can we go off the record?

MAJORITY COUNSEL 1.   Off the record, please.

[Discussion off the record.]

MAJORITY COUNSEL 1.   On the record.

Go ahead.

Mr. ███.   So the first impression from the D.C. U.S. Attorney's Office was, yeah, this all looks great.   Here's the process.   It didn't sound like they were going to move to say no to it.   It sounded like, hey, the lower-level attorneys were like, whatever we need to do to get this going.   And then it changed.

So, I mean, that was frustrating for me.   But at the end of the day -- they're following this normal process that they call[ed] it.

So that all happened.   So we're no longer talking about D.C. anymore.   Now we have -- the defense is presented 2014, 2015, and I was having a lot of issues with the DOJ Tax attorneys and the AUSA regarding 2014 to 2015, because now they're doubting it. So what we ended up doing is reinvestigating all of it.

We ended up looking at the evidence, and we found emails that actually showed that Hunter Biden [had] planned [for] what happened that caused him to essentially evade his taxes for 2014.   We presented this.   We dug into it.   We figured this all out. And hopefully after this, I can go through some of that for you guys.

But we dug through this all.   And then we were like, we finally figured it out. This is why this happened.   And it felt like the line attorneys weren't listening to us. They weren't following the evidence.   They were saying, well, they provided this defense, so that's the way it has to be, versus us looking at it like, well, no, let's figure out the way that the evidence shows us.

So there was a heated argument between myself and Jack Morgan, the DOJ Tax attorney, where I said, I don't think you are looking at the evidence appropriately.   You

are saying something completely different than what the evidence is showing.

And he asks another time, do we have a problem here, ██?    Are you questioning my ethics?    Are you questioning my integrity?    Another argument like that.

So we ultimately ended up asking for a meeting with David Weiss, the U.S. Attorney in Delaware.    We were afforded that.    And at that same time -- so this is in mid-June -- we met with David Weiss and all the leadership.    Including FBI, ASAC, SAC, all the people from FBI, and Stuart Goldberg, the [Acting Assistant Attorney General] of Tax Division.    We all met in D.C.    We were able to present on the findings regarding 2014, 2015, the case, and moving forward related to it.

We were constantly pushing David.    We were pushing our leadership with -- I'm using the wrong word.    We were reciting what the evidence showed.    And I'll show you what the evidence was.

Ultimately, what happened is we have a meeting.    A phone call.    It's in early August.    And we get a phone call, all the teams on it together.    So AUSA Lesley Wolf, Carly Hudson, Jack Morgan, and Mark Daly, DOJ Tax.

And they say at that meeting that we are going to approve the recommendation of charges for the -- and this is from my recollection.    They are going to approve the recommendation of charges for the 2017, 2018, and 2019 tax years and that the venue for those -- the appropriate venue for those is California.    They were not approving 2014, 2015.    And I don't remember if it included 2016.    I can't remember that off the top of my head.

But I want to say that -- in an email from Mark Daly on August 18th, 2022, after this phone call, he basically said, we have three upcoming interviews, these three interviews for weeks in September.    He says, in here, the week of September 19th, we may be conducting the case in two separate districts:    Delaware, Los Angeles.    And they

say for Los Angeles, they're going to intro the case and possible readback.    So that shows me that they're presenting the case out to California, they've approved the charges, and they're moving forward on it.

I want to say one more thing.    We also learned that they gave what's called discretion.    This is what I was told.    This is from my memory.    But that they didn't get full on approval.    They gave discretion to charge the case.    From my understanding with Tax Division, if they were to approve the charges, according to policy, California would have to charge the case.

So we have one last meeting with David Weiss, U.S. Attorney in Delaware, in early September -- it was either end of August, early September 2022 -- to talk about the 2014, 2015 tax year.    And at that meeting, David says to us -- and this is from my recollection -- that he agrees with us regarding the 2014, 2015 tax year.    They're great. Yes, we investigated it.    We figured it out.    But he has been getting concerns from DOJ Tax regarding the tax years because they viewed that, at a trial -- that it could affect the later years.    That the information regarding the subject's brother's death, the substance abuse -- that all those things could play a huge role and cause the jury to say essentially -- to have sympathy for him and to not convict on the charges.

At that time, David is telling us, well, I'm still weighing it.    I love the 2014, 2015. Essentially, I want to charge it.    And at that meeting, he tells us -- we ask him, when are we going to charge?    And he says, well, hopefully end of September.    It was kind of up in the air.

Then October 6th happens to where there's an article in -- I apologize.    So this gets into what happened and why we were ultimately removed.    So October 6th -- I believe is the date -- The Washington Post has an article.    In that article, it talks about this difference between the investigators and the prosecutors.

And there are statements that are made in there from Hunter Biden's counsel that basically is saying that we're not getting a -- we're getting a biased view and that -- threatening us with criminal wrongdoing if this is being leaked to the media.

So October 6th, that article comes out.    October 7th was the meeting with the leadership and David Weiss.    And that's where those statements were made regarding David saying, I'm not the deciding official on whether charges are filed.    He has no authority to charge in California, essentially, is what is told to me about that meeting.

After that article on October 6th, we have one more interview left.    We're still talking with the AUSAs.    They're still meeting with us.

October 12th, 2022, was the last investigative interview that we did.    I had a phone call -- I think it was around the week of October 22nd.    I have it in my notes over here.

But I had a phone call with AUSA Lesley Wolf, and she asked me for the significant case reporting that my manager sent up to [IRS] leadership.    She asked this as a part of discovery.    She didn't ask for --    Five months prior to this, we turned over some discovery.    It's highly unusual -- or I've never had it happen to where they've asked me for my manager's either emails or discovery.

And it was at that point that I believe things changed with them, and they saw some information in -- or I don't know what it was, but -- they request[ed] discovery to include emails from the team, but it also included emails and documents from supervisors.

And just so you know, that would be super unusual because -- imagine if the chief of our agency had to provide discovery in all the cases that we work.    It just would be impossible.

Anyways.    So, requests discovery.    And then -- I'm sorry.    We essentially get

removed from the investigation.    So at that point, we are essentially removed.

So I sent an email on December 7th that says, "So I was informed by my SAC that the meeting scheduled for tomorrow needed to be canceled and that he will field updates from now on.    Please confirm that this is correct and send out a meeting cancellation to the team."    This is December 7th, 2022, to Mark Daly, DOJ Tax.

Mark responds December 8th.    David -- meaning David Weiss, U.S. Attorney -- and Darrell -- Darrell Waldon, the SAC of IRS -- had been in conversation, and that's what they have decided.    I will let the team know.

So we found out through talking with our SAC that the attorneys had found -- we were always asking for updates on charging.    When are we going to charge?    When are we going to charge?    We were told that the prosecutors had found some emails that concerned them if they could actually charge the case.    That's what they said to us.

So at that point, I'm just -- I'm shocked.    And I'm like, you guys told me prior to this that these years are slam dunks.    We were in a whole posture to charge.    And then all of a sudden, they are saying this.

Continue to move forward to end of April.    The media article comes out regarding the whistleblower, and I don't think it was maybe 2 weeks later.

Mr. <u>Zerbe.</u>    Can we go off the record?

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    We'll go on the record.

Mr. ████.    I wish to close with one final thought.    I think about all of this, the difficult and grinding path that I and my colleagues have had to take in this matter, and how best it could be avoided.

I humbly view my role here today and response to the committee's request was to provide the facts as I best understood them, and to let Congress, the administration, and

the public consider those facts and determine the best path forward.

However, for myself, as I reflect, it is not difficult not to believe that appointing a special counsel in this matter is the best way to go forward to give everyone confidence in the fairness of our tax system.

While the impression was that the U.S. Attorney in Delaware has essentially the powers of special counsel in this case, free rein to do as needed, as is clearly shown, this was not the case.   The U.S. Attorney in Delaware in our investigation was constantly hamstrung, limited, and marginalized by DOJ officials as well as other U.S. Attorneys.   I view that a special counsel for this case would have cut through the toughest problems that continues to make problems for this case.

I would ask Congress and the administration, after reviewing the facts, to consider a special counsel for this case as well as consider the appropriateness of this special counsel taking under their authority all the related cases and spin-off investigations that have come forward from this investigation, related cases that I believe are subject to the same problems and difficulties we had.

Lastly, I would encourage Congress and the administration to consider establishing an official channel for Federal investigators to pull the emergency cord and raise the issue of the appointment of a special counsel for consideration by your senior officials.

I do not want my colleagues at the IRS, FBI, and other Federal law enforcement agencies to go through my frustrating and disheartening journey.   I believe having such a path will strengthen the public's confidence in their institutions and the fair and equal treatment of the Americans under law.

MAJORITY COUNSEL 1.   Let's go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.   We'll go back on the record.

And I'll turn it over to Chairman Smith to ask a few questions.

Chairman <u>Smith.</u>    Thank you.

Thank you for your opening statement and getting us started, and thank you for your bravery as to what you stated to do the right things for the right reasons.    We appreciate that.

A couple things that I want to talk about.    Earlier, you said you sent an email just a few weeks ago to the Commissioner of the IRS.    What was the email address that you sent the email to?

Mr. ███.    So I believe it was just Douglas -- I believe it was just his email that was in our directory --

Chairman <u>Smith.</u>    I just wanted to clarify if it was the same email that I have for him.   That's why I want to know if you could tell me what his email address that you sent --

Mr. <u>Zerbe.</u>    Sure.    We'll get it --

Mr. ███.    I don't have it with me, but I would need to go in my computer, and I can actually see the email.

Chairman <u>Smith.</u>    Exactly.    If you could get that to us, that would be helpful.

Also, could you tell if that email had been opened?

Mr. ███.    I didn't put [a] read receipt on it.

Chairman <u>Smith.</u>    Okay.    Did you get a response from that email?

Mr. ███.    No, I did not.

Chairman <u>Smith.</u>    Okay.    In that email, did it ask for him to look at it with concerns of the case?    What was the basis of the email?

Mr. ███.    Do you care if I read it?

Chairman <u>Smith.</u>    Sure.

Mr. █████.  I actually -- if you don't mind, like, it was something --

Mr. Zerbe.   Just to be clear, we're happy to share the email with you as well.   It was kind of either bring material or don't bring material.   So we had not wanted to --

Chairman Smith.   Read the email for the record.

Mr. Zerbe.   Yeah.

Mr. █████.   Okay.   So it went to Douglas O'Donnell, [Deputy] Commissioner, Daniel Werfel, Commissioner, Jim Lee, chief of IRS CI, Guy Ficco, which is deputy chief, Michael Batdorf, who was the director of field operations, Kareem Carter, who was my special agent in charge, and Lola Watson, who was my assistant special agent in charge.

It says, "My respective IRS leadership, first off, I apologize for breaking the managerial chain of command, but the reason I am doing this is because I don't think my concerns and/or words are being relayed to your respective offices.   I am requesting that you consider some of the issues at hand.   I'm sure you are aware I was removed this week from a highly sensitive case out of the Delaware U.S. Attorney's Office after nearly 5 years of work.   I was not afforded the opportunity of a phone call directly from my special agent in charge or assistant special agent in charge, even though this had been my investigation since the start."

And outside, I still have not received a phone call from my assistant special agent in charge or anyone in my IRS CI leadership other than my supervisor.

"I can't continue to explain how disappointed I am by the actions taken on behalf of our agency.   I want to echo that I love my job, I love my agency, and I am extremely appreciative of the job and position that I've had over the last 13 years.   There is a human impact to the decisions being made that no one in the government seems to care about or understand.   I had opened this investigation in 2018, have spent thousands of hours on the case, worked to complete 95 percent of the investigation, have sacrificed

sleep, vacations, gray hairs, et cetera.    My husband and I, in identifying me as the case

agent, were both publicly outed and ridiculed on social media due to our sexual

orientation.    And to ultimately be removed for always trying to do the right thing is

unacceptable, in my opinion.

"Again, my leadership above my direct manager, who was also removed, didn't

give me the common courtesy of a phone call, did not afford me the opportunity of

understanding why this decision was made, and did not afford me an opportunity to

explain my case.    If this is how our leadership expects our leaders to lead, without

considering the human impact -- or without considering the human component, that is

just unacceptable, and you should be ashamed of yourselves.    I am continually asking

myself, is this the kind of culture we want within the IRS and that I want to be a part of?

For the last couple years, my SSA" -- supervisor -- "and I have tried to gain the attention of

our senior leadership about certain issues prevalent regarding this investigation.    I have

asked for countless meetings with our chief and deputy chief, often to be left on an island

and not heard from.    The lack of IRS CI senior leadership involvement in this

investigation is deeply troubling and unacceptable.    Rather than recognizing the need to

ensure close engagement and full support of the investigatory team in this extraordinarily

sensitive case, the response too often had been that we were isolated, even when I said

on multiple occasions that I wasn't being heard and that I thought I wasn't able to

perform my job adequately because of the actions of the U.S. Attorney's Office and

Department of Justice.

"My concerns were ignored by senior leadership.    The ultimate decision to

remove the investigatory team from Delaware, without actually talking with the

investigatory team, in my opinion, was a decision made not to side with the investigators,

but to side with the United States Attorney's Office and the Department of Justice, who

we have been saying for some time has been acting inappropriately.    I appreciate your time and courtesy in reviewing this email.    Again, I can only reiterate my love for my work at CI and great appreciation for my colleagues and a strong desire for CI to learn from and be strengthened by my difficult experience.    I never thought in my career I'd have to write an email like this, but here I am.    Thank you, again, for your consideration with me."

   And that email did receive a response.

   Mr. <u>Zerbe.</u>   We'll go off the record.

   [Discussion off the record.]

   Chairman <u>Smith.</u>   Back on the record.

   Mr. ████.   On May 19th, 2023, Lola Watson wrote to me.    On the subject line, it says, "Reminder:    Chain of command."

   "Good afternoon, Special Agent ████.   We acknowledge your email received yesterday morning.    You have been told several times that you need to follow your chain of command.    IRS Criminal Investigation maintains a chain of command for numerous reasons to include trying to stop unauthorized disclosures.    Your email yesterday may have included potential grand jury material -- grand jury, a.k.a. 6(e) material -- in the subject line in contents of the email, and you included recipients that are not on that 6(e) list.    In the future, please follow previous stated directives and this written directive that no information should be sent to the director of field operations, deputy chief, chief, or any other executive without being sent through my office or the SAC's office first."

   Chairman <u>Smith.</u>   The letter your counsel sent to the committee references your removal from the case.    I think you know that on May 15th, 2023, a letter was sent to me and Ranking Member Neal by another whistleblower's counsel, noting that the entire investigative team had been removed from the case.

Can you confirm that you were removed from the case?

Mr. █████. I can confirm that I have been removed from the case, yes.

Chairman <u>Smith.</u> How long had you been working on this investigation by the time you were removed?

Mr. █████. Since November of 2018. So approximately 5 years.

Chairman <u>Smith.</u> Who informed you that you were being removed from the investigation?

Mr. █████. I learned through my supervisor, Gary Shapley.

Chairman <u>Smith.</u> How were you informed that you were being removed from this investigation?

Mr. █████. He told me -- Gary Shapley told me that he was removed and I was removed.

Chairman <u>Smith.</u> So it was by phone call?

Mr. █████. Yes.

Chairman <u>Smith.</u> Have you ever been removed from an investigation prior to the one at issue here?

Mr. █████. Can we go off the record for a second?

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u> We can go back on the record.

Mr. █████. So I want to be clear with this. Can I explain what happened?

The assistant special agent in charge, Lola Watson, sent Gary an email -- not me, Gary Shapley -- my supervisor an email saying that they want to have a call regarding Sportsman. So a Sportsman update call. Gary, not feeling comfortable with our leadership, asked me to be on that call as a witness. I was not invited on that call, but I participated via phone on that phone call.

And it was during that call that -- I overheard it, and they said that essentially the ITFC -- so our group was removed from the investigation, and they were going to replace us with some other agents within the D.C. Field Office that they didn't know the names of yet.   There was no mention of, we need you to tell ███.   No mention of me whatsoever. It was just that we were removed from the case.

Chairman <u>Smith.</u>   Do you know who it was that said that on the call?

Mr. ███.   That was Special Agent in Charge Kareem Carter.

Chairman <u>Smith.</u>   Okay.

Mr. ███.   And I can tell you that Supervisor Gary Shapley really challenged him with, you're not doing the right -- you're not making the right decision here.   Really challenged him with, are you sure you want to make this decision?   So --

Chairman <u>Smith.</u>   And the individual that made that statement on the call, who was he employed by?

Mr. ███.   The Internal Revenue Service.

Chairman <u>Smith.</u>   The IRS?

Mr. ███.   Yes.

Chairman <u>Smith.</u>   Not the Department of Justice?

Mr. ███.   Correct.

Chairman <u>Smith.</u>   Who are his supervisors?

Mr. ███.   His supervisor would be Mike Batdorf, director of field operations, for the IRS Criminal Investigation.   And then above him would be Guy Ficco, deputy chief of IRS Criminal Investigation.   And then above him would be our chief, Jim Lee, IRS Criminal Investigation.

Chairman <u>Smith.</u>   And then who is above Jim Lee?

Mr. ███.   The Deputy Commissioner, Daniel Werfel, and then Commissioner

Douglas O'Donnell.

Mr. <u>Zerbe.</u>    To clarify that, that's the Deputy -- the Commissioner is Werfel.

Mr. ████.    Yes.    You're right.    I'm sorry.

The Commissioner is Daniel Werfel.    Deputy Commissioner is Douglas O'Donnell.

Chairman <u>Smith.</u>    Have you ever been removed from an investigation prior to the one at issue here?

Mr. ████.    No, I have not.

Chairman <u>Smith.</u>    The May 15th letter notes that you and your team were informed that the change was at the request of the Department of Justice.    Is that your understanding?

Mr. ████.    Yes.

Chairman <u>Smith.</u>    But it was the IRS employee that, on the phone call, said you were removed?

Mr. ████.    Correct.

<u>MAJORITY COUNSEL 1.</u>    Why do you believe it was the Department of Justice?

Mr. ████.    I have a document I could go to, but I believe it's because he said it was at the Department of Justice's request.    That's just from my recollection of what I heard.

Chairman <u>Smith.</u>    If you have a document, that would be helpful.

Who was responsible for communicating your job duties and responsibilities?

Mr. ████.    It would be my supervisor.    My direct supervisor.    So Gary Shapley.

Chairman <u>Smith.</u>    Who has the ability to reduce or change your job duties and responsibilities?

Mr. ████.    Anyone from my supervisor all the way up to -- it could be anyone in

that chain of command.

Chairman Smith.    Could Commissioner Werfel have any responsibilities and direction of any of his employees at the IRS?

Mr. ███.    That, I don't --

Mr. Zerbe.    Let me rephrase the question.

I think, Chairman, you're asking, would the Commissioner have the authority to assign or reassign your duties if he chose to do so?

Mr. ███.    That was the purpose of my email, was to make him aware of what happened.    And I thought that he was -- I'll give you an example.

With a chief executive officer at a company, you would think that they're in charge of everything that happens within their company.    So that was where my thoughts were, is that if I'm having difficulty with my chain of command -- my leadership that I've gone to for so long on this case -- I had to go above them.    That was my thought.

Chairman Smith.    You've been an IRS employee how long?

Mr. ███.    13 years.

Chairman Smith.    13 years.

And do you view the Commissioner of the IRS as the top of the chain of command?

Mr. ███.    So I think that Janet Yellen out of the Treasury, since we're under the Department of Treasury, would be above that, but --

Mr. Zerbe.    Right.    Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. ███.    Yeah.    I would think that the Commissioner is in charge of the IRS.

Chairman Smith.    And of all of the 80,000-plus employees of the IRS?

Mr. ▮▮▮▮▮.   Yes.

Chairman Smith.   Who do you believe is responsible for your removal from the case team?

Mr. ▮▮▮▮▮.   This is my opinion based on my observations and everything that I've seen so far.   It would be -- Department of Justice Tax would have been involved, so Mark Daly and Jack Morgan.   I think that Stuart Goldberg also would have had some say in this, who is the deputy attorney general for Tax Division.   And then David Weiss and the people that were part of the U.S. Attorney's Office, so Lesley Wolf and Carly Hudson. I would say that those people had some say.

Chairman Smith.   Is there anyone else at the IRS that we should talk to to fully understand how this decision was made?

Mr. ▮▮▮▮▮.   It would be the special agent in charge, Kareem Carter.   And I think it's important that, on that phone call, we asked for a reason why and weren't given that.

Chairman Smith.   Have you been given a reason yet to this day?

Mr. ▮▮▮▮▮.   No, we have not.   And I can tell you in my normal course of investigations I work, why an agent would be removed is for conduct.   So if they did something wrong.   But I've never seen it to where they would remove from a supervisor down -- anything like that ever.

Chairman Smith.   How many people were removed from this team?

Mr. ▮▮▮▮▮.   So from the way that it was phrased on the phone call, it was my supervisor and our International Tax and Financial Crimes group.   So there's 12 people total in our group.

Chairman Smith.   So 12 people were removed counting the supervisor?

Mr. ▮▮▮▮▮.   It would be 13 counting the supervisor.   But that's just me going off of my recollection.   It's around that figure.

Chairman <u>Smith.</u>   Okay.   One other thing that I want to just touch on that's a little bit different than this, in your opening statement, you were talking about an individual that made the statement to you saying that the President's grandchildren, you should not interview?   What was that?

Mr. ███.   Yeah.   So -- yeah.   So AUSA Lesley Wolf -- and this was in quotes, so this must have been something that my -- so I also want to be clear on something else. Normally in an investigation, if we're having a meeting or whatnot, we would take notes, investigative notes, but there really isn't much that goes into those notes in a meeting. And I didn't think I would need to document things that were being said during those meetings.

But at this time, after discussions we were having internally, my supervisor felt it necessary when some of the inappropriate comments that were being made -- to start documenting them.

So, yeah, it says in quotes, "will get us into a lot of hot water if we interview the President's grandchildren."   And I don't remember what ultimately happened with the grandchildren.   I know I have never interviewed them, and we have not interviewed them.

Chairman <u>Smith.</u>   And who was it that said that?

Mr. ███.   AUSA Lesley Wolf.

Chairman <u>Smith.</u>   Was it common when talking about this case to talk about how the President felt?

Mr. ███.   No, not how the President felt.   No, I don't think so.

Chairman <u>Smith.</u>   Or to even refer to it as the President's son or the President's grandchildren?

Mr. ███.   Yeah, I think there were times where we did refer to them as the

President's grandchildren, yes.    Like, for example, for James Biden, we would call him the uncle.    So that's how we referred to him, as the uncle.

Mr. <u>Zerbe.</u>    Let me go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. ████.    There were a lot of times to where they would discuss the election or discuss politics, and I had to say, on multiple occasions, that I felt that it was inappropriate that they were saying it.    And there were things that would come up. For example -- even though there were smaller transaction amounts -- there were Venmo transactions that were paid to family and friends.    And some of these Venmo transactions were deducted.

So I continually asked, Can I go and interview them?    And can we understand what these payments were for?    If they made other payments?    And those were always met with no.    And I think one of them was Valerie Owens that we talked about that I wasn't allowed to go and do that interview.    I believe that Valerie is a relative of Joe Biden.    It might be his sister.    I don't -- all I know is she's a relative of his.

Yeah.    So standard practice is -- for any transaction, you want to go out -- and a lot of our job is hitting the pavement, going out and talking to people.    There was a lot of different investigative steps that we took, that even going and talking to the prostitutes, we found multiple people that he called his employees that were also prostitutes, and that he would have them clean his hotel room or -- there were a lot of these interviews that we ended up going and doing and talking to people that were so worth it, even though someone might -- we were always being told by the prosecutors, you guys are wasting your time going and doing that.    It's not worth it.    And literally, I would surprise them every time and find everyone.

Chairman <u>Smith.</u>    Thank you.

Mr. <u>Zerbe.</u>    Thank you.

Mr. ███.    Thank you.

       BY <u>MAJORITY COUNSEL 1</u>:

Q    So to follow up on some of the chairman's questions, you mentioned Kareem

Carter as the person who made the statement on the phone call about the removal of the

team.    Is that right?

A    Yes.

Q    And you mentioned the chain of command up from there.

Do you know whether anyone else in that chain of command was aware of this

decision?

A    I do not know that.    I think they are after my email.

Q    Understood.

But you don't know prior to that?

A    Yeah.    And to be completely candid with you, I was talking with my -- I

essentially wanted to have a meeting or a sit-down and explain to -- now above all my

leadership -- because at the end of the day, I don't think we would be sitting here right

now if us as agents -- myself and the co-case agent and Gary -- were afforded the

opportunity to sit down with our chief or deputy chief to explain to them, hey, guys,

here's the problems we're encountering.    Here's the meeting that [we] just had.    What

do we do to fix this?    Because we're the IRS.    They're Department of Justice.

Obviously, we refer the case to them to prosecute, but if we feel that something is

going wrong with it, they should be there to help us through those problems, not putting

their head down and not listening to us.

Q    So you mentioned Michael Batdorf and that he had told you previously that

you could go directly to him.    Is that right?

A    Yes.

Q    Did you do that at the stage where you learned that you were removed?

A    I did not.

Q    Okay.    Did you feel like you could talk to him about this issue?

A    No, because I've been having other issues with him on another case I'm working that is -- I felt like that chain of -- that that relationship was broken.

Q    When did that relationship start to break down?

A    Probably since mid-October, maybe, would be my guess.    I mean, it's -- yeah.    It's definitely --

Q    Mid-October 2022?

A    Yes.

Q    And you mentioned issues you were having with him on another case.    It's totally fine if you don't want to get into the specifics of that particular case, but can you generally describe the issues that you're referring to?

A    Yeah.    I need to stay very, very high level on this.

I had received approval with a strategy related to this case.    And they backtracked that approval a couple weeks later and said to me that we need to put this on pause and that we'll get back to you on what strategy we're going to do moving forward.    And we're still on a pause right now.

MAJORITY COUNSEL 1.    Can we go off the record real quick?

[Discussion off the record.]

MAJORITY COUNSEL 1.    We're back on the record.

BY MAJORITY COUNSEL 1:

Q    We were talking about the approval on the strategy for this other case.

And just to clarify, this is a totally unrelated matter?

A       Unrelated matter, yes.

Q       Okay.    And can you describe more about what happened to that strategy?

A       It felt like it was -- all along, we had been -- for the past probably year, we had been communicating a strategy on this case that is tackling a big problem and trying to tackle it efficiently, okay?    And it's a compliance issue in this area.

So we were briefing our [IRS] leaders and constantly having meetings about what we're planning on doing, and they were on all [of] these phone calls, and we were sending emails of our strategy.    And very recently, one of those strategies was moving forward on this compliance issue, and we were a go on it.

And a few weeks later, I receive[d] a phone call that basically says, you're being paused, and we're having to relook at what you were doing, and we will make a determination moving forward.

So now, to all my peers and the different people, I was the one pushing the strategy, and it got halted in place, and now I have to go back to [these] people and explain to them why -- it was just a mess.    It was an absolute mess.

Q       When did you get that phone call saying that you were being paused?

A       It was in February of 2023.    It was either a phone call or an email.

Q       And have you been able to proceed since then, or do you remain paused?

A       On that specific aspect of that investigation, as of right now, yes, we're still on a pause.

Q       So other than the removal from the case team, are there any other issues that have come to your attention that give you concern about possible retaliation?

A       Yeah.    So when I say there's a lot of this -- I sent an email on April 13, 2023, to Lola Watson, my assistant special agent in charge.    And I said, "So I want to put" -- [at

this point] we're still on the Hunter Biden investigation.

And I say, "So I want to put some stuff in front of you regarding updates I am hearing on the Sportsman, et al investigation, that I am not hearing through you or Kareem" -- Kareem Carter being the SAC -- "which is concerning to me.   I don't think that you or Kareem have any reason to keep things from me, but I wanted to make you both aware of some of these updates."

And some of these updates were Hunter Biden's counsel meeting with DOJ Tax -- or meeting with Main DOJ at the end of the month, which I viewed as a significant update that I hadn't heard through them.   Because remember that previous email, all communication was now [to go] through David Weiss and the SAC.

It also says here, "I have heard that David Weiss is currently asking for a pros memo" -- prosecution memo -- "from DOJ Tax approving the tax charges.   I would consider this a significant update since indicating that David is seeking the charging authority."

And then there's other related investigative questions that I had, but I thought that this was another email in the chain that was, like, no one's -- we were essentially removed since --

Q       So this is prior to what we could call formal removal in May 2023.   Is that right?

A       Yes.

Q       So at this time, you were still officially on the case.   Is that right?

A       Yes.

Q       Okay.   Is it your testimony that, although you hadn't been formally removed, you felt that you had been cut out of the case prior to that?

A       Yes.   Absolutely.

Q      Okay.   And when did you first feel that you were cut out of the case?

A      It most likely would have been at the end of October.   When they requested my discovery so that -- the significant case reporting and the emails from my supervisor.   That was when I felt that the -- or I didn't feel.   I thought that the posture changed with our relationship.

[Discussion off the record.]

Mr. ███.   We're back on the record?

MAJORITY COUNSEL 1.   Yeah.

Mr. ███.   So October 6th was the Post article.   And I remember hearing from them that that touched super close to the investigation and that they felt that [it] was information that's coming [from] inside the investigation.

All along, all up until this point, we would constantly be on the forefront of, Hey, any media updates?   What's going on?   On our weekly calls, we would always discuss media.

Prior to this, there were other leaks.   After our day of action in December of 2020, we got word that a couple of the news sources were going to release an article on the investigation.   This was a couple days prior to us going public -- going overt.

So that leak happened, and nothing changed after that one.   And everything indicated, even in communication in meetings from what I recall -- we thought that the leak was potentially from someone in [the] Department of Justice.   So we would constantly be talking about, yeah, it's not an IRS person.   It's not anyone on the team. It's always -- it appeared like it was someone from Department of Justice.   So that's what kind of shocked me with this moving forward.

I was interviewed by an investigator -- I think they were with TIGTA.   I told them, I didn't leak anything.   I thought that the leak might have come from either defense

counsel, or from DOJ like the other ones came.    But what I can tell you, and I've told this to the prosecution team, I've done everything that I can to keep my record clean and to keep my ability to testify as the case agent as clean as I possibly can.

And it honestly -- it hurt.    It hurt that these are people I talked with on a daily basis.    And even after the investigators came and I told them that I didn't leak the information, it was a complete shutoff of talking.

So it was end of January, early February, I am told about a meeting that is held with FBI only.    There's no IRS people there.    And it's regarding some of the spin-off investigations.    And one of the former forensic accountants who was on the case was a part of that meeting.    So they were moving on with some of our other spin-offs.

We had other tax spin-off investigations that were completely stopped.    We haven't done anything on those since.    But yet they were moving on those other ones. But we were not there.

BY <u>MAJORITY COUNSEL 1</u>:

Q    And is that atypical?

A    Yes.    Normally, we would have been invited, especially because those other spin-off cases -- one of them has a tax component to it.

Q    And the timing of that was late January, early February 2023?    Is that right?

A    Yes.

Q    Okay.

A    I did hear from FBI that they were being treated the exact same way -- that they had to communicate through their SAC to the U.S. Attorney in Delaware.

Q    Can you tell us who you heard that from?

A    So I could -- so her name -- I'm not meaning to be -- so it's Michelle Hoffman. I know she's a career employee there.    I would ask that if her name could be redacted,

that we redact it.

Q    Understood.

A    But I don't want -- because she's not someone that would want to be brought into something like this.    She has a career.

Q    Understood.

Taking a step back on the issue of spin-offs, how would it typically work if you were working a large case and you learn of other information that leads you to think you need to investigate a spin-off in another issue?    What kind of process would normally play out?

A    So the process is a little bit different because we're with this international tax group.    We can work cases anywhere.    So the venue for the stuff we work really doesn't matter.

But typically within our agency, if we have a spin-off and there's -- there were other spin-offs in this case that we spun off the information to another IRS office.    So we actually met with them.    We sat down.    Here's the evidence.    And then they took the case on after that.

But the ones that I held closely in this case were ones that were in the area of where we were working this case, and they were -- it was information -- they were current investigations I was conducting.

Q    So the nature of these specific spin-offs would typically involve your international tax group --

A    Yes.

Q    -- on a going-forward basis?

A    Yep.

Q    Okay.    So after October 2022, any other concerns or instances that might

be considered retaliation that you have?

    A    None that I can think of.

[Discussion off the record.]

    Mr. ██████.    Could I say something else real quick?

    <u>MAJORITY COUNSEL 2.</u>    Of course.

    Mr. ██████.    So what's kind of the most shocking to me is that we were on the trajectory of charging the case.    And we literally finished our investigative steps.    The pros memo from Department of Justice Tax was written.    I had worked with the -- they call it a third-party person who reviewed the case.    I had discussions with him.    And in all reality, we were looking towards indicting.

    And to hear from the DOJ Tax people -- they weren't sure whether David was going to able to sign the indictment alone or whether it would have to be David and the U.S. Attorney in that area.

    And now, I've come to learn through everything that David couldn't sign an indictment that's out of district.    He had to have that U.S. Attorney there.    That's what my understanding is, at least.    And I've come later to hear -- through multiple people, that California also said no.

    So now you have -- and that's another frustrating part was we asked to present this after we found this new information related to 2014 and 2015 to D.C.    We wanted to present the case, the facts.    And we were not afforded that.    We wanted to do the same thing to California.    And we were not afforded that.    It was always, we'll handle it.

    And this is very atypical.    Up until October, we were very involved with -- here's the evidence.    Here -- helping them out through their writing of their pros memo.

    BY <u>MAJORITY COUNSEL 2</u>:

    Q    Can we just break down each of the years involved and help us understand

how much money is at stake?

A      Yes.

Q      Starting with 2014?

A      Okay.    So 2014 -- it would have been false return and evasion of assessment that we were looking into.    So 7206(1) -- Title 26, [U.S.C. Section] 7206(1), and Title 26, [U.S.C. Section] 7201.    I'm going to go through the charges, and then I can go through them by year, if that's okay.

Q      Okay.

A      And then 2015, we proposed charges for Title 26 United States Code [Section] 7203, failure to timely pay tax.

Tax year 2016 was, again, [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2017 was [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax.

2018 was [Title 26, U.S.C. Section] 7201, evasion of assessment and payment; [Title 26, U.S.C. Section] 7203, failure to timely file and pay tax; and [Title 26, U.S.C. Section] 7206(1), false return.

So just to be clear, failure to timely file and pay tax -- that's a misdemeanor.    And false return -- false return and evasion are felonies.    So false return is basically that an item you report on your return is false.    So it's a little bit different than the elements for evasion, but it is essentially the same thing.

And then 2019 was failure to timely file and pay.

So Hunter Biden had had a lot of tax issues, even predating all of this stuff.    Back in 2002, he filed his Form 1040 late-filing and owing over $100,000 in taxes; 2003, owed more than $100,000 dollars in taxes; 2004, late-filed and owed more than $20,000 in taxes; and then 2005, late filed his personal return and owed over $100,000 in taxes.

[11:47 a.m.]

Mr. ████.   So he had a history of tax issues.

So those tax issues is why he asked for Eric Schwerin to be his finance accounting person.   So that happens in 2006, 2007, because of the issues that Hunter was having with his taxes.

So Eric Schwerin actually creates an entity called Owasco P.C., which was a C Corp. And so the problem that Hunter was having was he was receiving a lot of [Form] 1099 income.   So that [Form] 1099 income wasn't having any taxes withheld.   So that's why he was owing a ton of money when it came to filing his returns.

So he created this C Corporation.   The C Corporation would take in this 1099 income, and it would pay him a salary in W-2 wages.   So Eric Schwerin sets that up.

BY <u>MAJORITY COUNSEL 2</u>:

Q      Do you know what he was doing to earn the money?

A      At that time I believe it was legal work.   I don't remember off the top of my head.   But I know that he worked for a law firm for a period of time.   Oldaker Biden -- my memory is not the best on that.   I do know it was for legal services.

Moving forward -- and the reason why this was so important is -- for 2014, so he enters into this Burisma contract.   And the Burisma contract is with him and Devon Archer.   So they were earning a million dollars a year, both of them, for being put on this board.   And essentially Archer was put on the board one month before Hunter was.   So as a part of getting on that board, Hunter sends an email to Devon Archer, stating here's my plan for how we're going to pay -- or here's our plan for what we're going to do with this million dollars.

At that time Devon Archer and Hunter Biden were also looking into this Bohai

Harvest investment.    There was about a million dollars that they had to put forward.

Hunter didn't have the money to put that forward.    So Devon was, like, why don't I take

part of the Burisma money.    We can pay another part of it to you and then half of it will

go into the investment in this Chinese company.

So [Hunter Biden] sets this out in this email and what ends up happening is -- so

imagine this.    If you are an owner of a company and your friend tells you that, I want to

pay my wages to your company and you're going to loan the money back to me, that's

essentially what happened here.    He took loans from that corporation -- which were

distributions.    And he didn't pay taxes on those loans.

So what we had found is that -- can I pause for a second?

MAJORITY COUNSEL 2.    Off the record.

[Discussion off the record.]

Mr. ▮▮▮▮▮.    Back on the record?

        BY MAJORITY COUNSEL 2:

Q    Yes.

A    All right.    So essentially for 2014, we had found that Hunter didn't report

any of the money he earned from Burisma.

So the reason why this is important is because Hunter set it up this way, to

not -- to essentially earn the money through his friend's corporation and then have his

friend pay him back half of the money as loans, quote, unquote, loans.    So --

Q    How much in tax liability are we talking about here?

A    Okay.    So -- no, these are the -- oh, you printed it up.

Mr. Zerbe.    Yeah, I --

Mr. ▮▮▮▮▮.    Okay.    So -- the most conservative approach would have been

$124,845 in tax loss.    So this would have --

Mr. <u>Zerbe.</u>   For what year?

Mr. ███.   For 2014.

So this would include payments that he would have received directly from Rosemont Seneca Bohai, so $315,000, payments that were made by the Rosemont Seneca Bohai entity by Archer for Sportsman or for Hunter's benefit, so $4,500 that was paid to a medical bill, and then another medical bill of $6,000.   So that's the most conservative approach.

In addition to this, we had a Porsche that was purchased through Rosemont Seneca Bohai that was for Hunter's benefit.   That was from Novartus holdings which is Kegnes Rakishev.   Kegnes Rakishev is a Kazakhstan official or a Kazakhstan person.

And from what we were told, this was paid for Hunter to build a Tesla dealership in Kazakhstan.   I took it to be that it was for future business that the two of them might have together.   But the --

BY <u>MAJORITY COUNSEL 2</u>:

Q      So none of this was taxed.

A      None of it was taxed.

Q      And to date none of it has been paid or prosecuted.

A      So none of this has been paid or prosecuted.

And I would also like to note that the statute has run out on these tax years or on the 2014 tax year.

Q      Okay.

A      They were extending that statute up until December of --

Q      It's a 6-year statute?

A      Yes.   They were extending that statute -- he was signing statute extensions. And from the best of my knowledge, he never continued to sign those.   And I do not, as I

know it today, that the 2014 tax year, the statute's gone.    I have brought up that --

Mr. <u>Zerbe.</u>    Right.    Go ahead.

Mr. ███.    I have brought up that if we went based on an evasion theory, that he evaded these taxes -- so one more step to this is Hunter to his counsel told them about this scheme.

So basically said -- Devon Archer was handling the taxes and I was taking some of the money as loans.

So there's documentation of this and the date, everything.    So we viewed that as he's lying to his attorney.    He's telling his attorney exactly what happened, and he's trying to cover it up.    But ultimately it gets found out, and then Eric Schwerin ends up investigating it and figures out that, hey, you didn't report this money.    You need to file an amended return.

It's actually included on the marital separation agreement this tax due and owing related to this unfiled or related to this amended tax return.

So they actually were preparing and trying to file the [amended] returns.    We have found out that Hunter might have received advice that if you don't have the money to pay your taxes, then you don't have to -- then I wouldn't file your tax return or that amended tax return.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.    Under what conceivable theory did DOJ not find that to be worthwhile to prosecute?

A    They believed -- they believed the fact that the -- they believed their defense that the money was a loan and that -- so through our investigation we did find out that --

Q    What did they contend it was a loan for?

A    Well, that was our argument, that you can't loan yourself your own money.

It just doesn't make any sense.    So --

Q    I mean, this just seems to be a series of sham transactions, correct?

A    So, yes, I would agree that the transactions would -- you would want to sham the transactions, yes.

I do know that, there were some issues prevalent that were brought up related to Devon Archer and his credibility.    So, also having a potential witness there, was also a problem.

But I offered, well, why don't you have the agent testify to this email?    The email's pretty clear in what he's setting out here.    Why doesn't an agent testify to this?

Q    At least with respect to the Burisma income --

A    Okay.

Q    -- he's getting a million dollars a year.    It started at least part of the way through 2014.    Okay.    So maybe it's 600 and --

A    So it's $666,667.

Q    Okay.    So he received 600 -- you know, north of $660,000 for serving on the Burisma board by all accounts for doing nothing.    And that money completely escaped taxation, correct?

A    A portion of it was taxed.    The reason why a portion of it was taxed -- and I don't want to get into the details.    But the money held in the account that was going towards investments, so the half that was going for that Bohai Harvest investment, that half, because there was no offsetting expense, would have been taxed.

Q    Okay.

A    Does that make sense?

Q    Okay.    Yes.

A    Because there was no offsetting expense, he wasn't deducting the payments

he's making, so Archer wasn't deducting the payments he's making on the return, that money would have been taxed.    So that money Archer would have paid some taxes over for about half of it.

Q      Okay.

A      That's why in our theory our most conservative approach would have been half the money.

Q      Okay.    Okay.    What can you tell us about 2015?

A      Okay.    So for --

Q      He's getting a million dollars from Burisma in 2015, correct?

Mr. Zerbe.    Excuse me.    I want to make sure.

MAJORITY COUNSEL 2.    We're off the record here.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Okay.    We're back on the record.

Mr. ███.    So 2014 and 2015 are interrelated because this is -- during 2014 and 2015, Hunter is having his [Burisma] payments paid to Rosemont Seneca Bohai.    So essentially what happens in 2015, the amount of taxes he owes at the end of the year, which I'm going to explain in a second, is because of what happened in 2014, because of this setup.

But what he brought up that I wanted to reiterate is the 2014-2015 tax year can still be in play.

And so what ended up happening is we were assigning statute extensions.    We were having these meetings on the 2014-2015 tax year.    And I believe that from what happened is, because D.C. said no, they have since let that statute run.    So they no longer asked for statute extensions.

I never got ahold of those statute extensions.    I don't know what they look like.

But what I could say is, if we had a neutral person come in here, in explaining my theory that in an evasion case, it's your last affirmative act.    If there are affirmative acts which [I believe] there are within the last 6 years, then we could potentially work that tax year.

      Mr. <u>Zerbe.</u>    And you use affirmative acts.

      Mr. ███.    I believe that there could be but I'd have to look at -- I would argue that there could be.    And then that being the meeting that he had with his attorneys where he basically tells them what happened and I view that as a lie, because what he did was actually different than what happened.

           BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.

A    So 2015?

Q    2015.

A    All right.    So in early 2016, Hunter and Devon Archer receive a document request related to Devon Archer's Tribal bonds scheme.    So that document requests from Hunter.

So Eric Schwerin says:    What's this Rosemont Seneca Bohai entity?    You always told me that you had it taken care of.

So Eric Schwerin starts investigating it.    Starts investigating it in March and April. Eric realizes that the [Burisma] money from 2014 wasn't reported.    So they need to report that, the money that Rosemont Seneca Bohai is earning, [on Hunter's] 2015 [tax extension].

So on the extension they include income from Burisma.    They pay a large amount of money with the extension.    And when the return is filed, Hunter owes, with this 2015 filing, so October 15, 2016, he owes $176,550 with no payment.    So at the time of filing, it's that amount.

In May of 2017, Hunter starts a self-imposed $10,000-dollar-a-month payment plan, making seven payments of $10,000 over the period May of 2017 through March of 2018, and then stops.

So our theory was with our case was that the amount that he owed after that payment plan stopped would be the most conservative amount.    So it would be $100,675.

But you could argue that the actual amount that he reported when he filed his return and did not pay $176,000, that that would be the tax amount [charged].

        BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.

A    And that amount has been paid.    That amount has since been paid.

Q    The $176,000?

A    The amount that was owed for the 2015 tax year, yes.

Q    Okay.    And what was that amount?

A    It was over $100,000.    So it was including penalties and interest.

Q    So 2015's off the table now?

A    2015, yes, 2015 would be off the table because it followed the 2014 tax year. So that was D.C.

Q    Okay.    When you sought to get this prosecuted in D.C., what year was that for?

A    2015.

Can you ask the question again.    I'm sorry.

Q    Well, if you say 2015 has been paid --

A    Oh, so --

Q    I'm just trying to reconcile.    You said 2015 has been paid.

A     Yeah, so --

Q     But 2015 was also sent to the U.S. Attorney's Office in D.C. for prosecution.

A     With a willful failure to timely file and pay [charge] --

Q     Uh-huh.

A     -- the statute is that the taxes are owed.

And even if you pay them after --

Q     Uh-huh.

A     -- the crime still --

Q     Okay.

A     -- occurred.

Q     Okay.    Fair enough.

A     Yes.    2014 and 2015 in D.C.

Q     Okay.    And then what can you tell us about 2016?

A     Okay.    For 2016, there's quite a few things.    So --

Q     Is this D.C. or California, 2016?

A     2016, he didn't file his personal return.    But he did file his C Corp return.

Q     Okay.

A     So he filed one of them but didn't file the other.

And on the personal return, he didn't report payments he received, personal payments he received from Rob Walker.

Q     Uh-huh.

A     So it was $162,179, which would have given additional tax due and owing of $69,000.

Q     Okay.

A     But those payments, there was a reliance issue with that.    He had told this

or Eric Schwerin had told his accountants about those payments -- or the receipt of that money, in the beginning of the year, the [accountants] dropped it off later.    So we knew that there was going to be an issue with that.

So the only thing on the table for that year was the failure to timely file and pay the taxes for his personal return --

Q    Okay.

A    -- which would have been $45,661 that he filed with -- when his [Form] 1040 was [filed] --

Q    Okay.    And how about 2017?

A    Could I say some other stuff regarding 2016 --

Q    Okay.

A    -- real quick?    During the fall of 2017, Eric Schwerin and his accountant, Bill Morgan -- and I have to say that Bill Morgan has since passed away.    He died in 2019. But that was his accountant.

Both made a significant effort in getting Hunter -- in getting the prepared returns to Hunter.    They sent multiple emails to Hunter and even a package with the returns, ready to go in his office.    All he had to do was sign it and mail it in.

In an email from Hunter to Eric Schwerin on November 17, 2017, he says:    "Also, I just saw last week the unmarked envelope in the office requiring signature for my taxes."

This email further confirms that Hunter received the 2016 tax returns but failed to file them timely with the IRS.

And the venue for that would have been California.

Q    Is that because he moved to California?

A    With the failure to file, it would have been where you lived.    I'd have to

look back in my notes.     But this one also could be D.C. or California.

Q     Okay.     When did he move to California?     Do you know?

A     I know he officially moved April 1st, on or about April 1st, 2018.

Q     2017?

A     Yes.

Failure to timely file and to pay taxes owed when -- so this is for both his corporate and personal returns.

Q     Uh-huh.

A     The taxes owed when he filed his Form 1120 was $13,630.     I don't believe that those taxes have since been paid but -- to the best of my knowledge I don't believe that the corporate taxes, that small amount has been paid.

Q     Okay.

A     And then for his personal return, failure to timely file and pay his taxes owed when his Form 1040 was filed, $581,713.

Q     So half a million dollars.

A     Yep.     And that has been paid and that is through, which it's in the media, is through Kevin Morris paid that.

Q     When was that paid?

A     That was paid in and around October of 2020 or October 2021 -- I apologize -- 2021.

Q     Okay.     How about 2018?

A     All right.     So 2018 was the false return year, but then you also have failure to timely file and pay because these are the returns that were filed late.

So what ended up happening is Hunter goes out to California in 2018.     In his book he's talking about substance abuse and drug use and all these different --

prostitution --prostitution use and all this different type of stuff.

So in 2019, he marries his wife, Melissa Biden, Cohen-Biden.    And he is newly sober.    At that same time, I believe there's also a Senate investigation, and he also is having the Arkansas child support payment case.    And then at that same time he also had the ex-wife that he was in breach of the marital separation agreement.    So he has all these things coming to a head.

And it's not until November of 2020 -- let me go back to the first page.    It's not until November of 2019 -- I apologize -- 2019 that he hires Edward White & Company as his new accountants.    So he hires Edward White.    They're out in California.    And the reason why is the judge in the Arkansas court case asked for tax returns.

Q    Okay.

A    We believe that that was part of the reason why.

So February of 2020, he files his 2017 and 2018 Forms 1040 and 1120.    2016's [Form 1040 was] not filed at that point.    July of 2020 --

MAJORITY COUNSEL 2.    I should note we're at our hour mark.    We want to be respectful of our time.    So we may have to push pause.

MINORITY COUNSEL 1.    Okay.    That's great.

EXAMINATION

BY MINORITY COUNSEL 1:

Q    Thank you very much for appearing before us today.

I have some questions that I wanted to go over from some of the things that you had already mentioned, and I want to make sure that I actually had them correct in my notes.    Some things should be relatively straightforward.

You talked about being on the case, and you were assigned to the case November of 2018.    This was in your opening statement.    You were talking about the fact that you

had gotten some comments from some of the AUSAs about the case itself.

You had said, quote, "After three of these filings, they said that we could go forward."

What were the three filings that you were referring to?    This was in the context of, I guess, moving the case forward.

Mr. <u>Zerbe.</u>    Can we go off the record here?

<u>MAJORITY COUNSEL 1.</u>    Off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. █████.    My initiation packet, so sending the case forward to get -- we call it subject case.    It's an SCI.    It's elevating the case to actually working the investigation.

My first one showed the unfiled returns and the taxes owed for 2015 and that was it on my first package.    So that was the wrongdoing that we were alleging.

And my supervisor goes:    You don't have enough.    You need to find more.

So I kept digging for more and more.

And even after that point, he goes:    You haven't found enough.

So I ended up searching bank reports that [I] ran on the periphery of what we were looking at.

So I ran bank reports for Burisma, and in those bank reports I had found additional payments that Hunter had received.    And then at that point I had found that Hunter did not report the income for 2014 related to Burisma.

So now I had a false return year.    So that alone -- it was basically so much evidence that I put in there -- allowed us to elevate the case.

BY <u>MINORITY COUNSEL 1</u>:

Q    You filed three of those initial reports?    Is that what the three filings were,

or was it three times going back to him?

A    Three times going back to him.    That would be the correct way to state it.

Q    Shortly after that, you talked about in March and April of 2018 that Attorney General Barr had made a decision to join the cases.    And then you said that Delaware had opened the case.    You said January of -- is that 2019 or 2018 or 2020?    I didn't get the year.

A    It was January of 2019 --

Q    Okay.

A    -- that Delaware, U.S. Attorney's Office, and FBI had opened up the investigation.    They wouldn't have been able to see in our IRS system that we had a case open.

Q    Okay.

Mr. Zerbe.    Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 3.    Back on the record.

Mr. ███.    Okay.    So that would have been that we joined -- you're talking about one that we joined together?

BY MINORITY COUNSEL 1:

Q    [Nonverbal response.]

A    May of 2019.

Q    Okay.    You're talking about 2019.    You were mentioning the fact that there was a George Murphy that was writing memos or emails and documenting some of his conclusions that were on the other side regarding this case.

Could you tell us more about him?    What's his title and who is he and how does he relate to you in terms of your chain of command?

A      So it was actually Matthew Kutz.    He was my supervisor at the time and from the articles that he was sending me, I would say he had more of a liberal view than I had and it was pretty obvious from the things he would send me and discuss.    And that's just me making an observation.

So I later found out about these memos that were put in the file regarding the issues that he saw with the investigation, the fact that we even had it opened.    So I only learned about those after.

And then it came to a point to where he's sending us so many media articles about different issues that I had to tell him stop, please.    And I had to go around him.    And that's when I went to my ASAC at the time, George Murphy, who was above him.

MAJORITY COUNSEL 2.    Off the record.

MAJORITY COUNSEL 1.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    On the record.

Mr. ███.    So these articles were a lot about -- were a lot of articles regarding Trump and getting a fair investigation and things related to that, Trump's tweets and stuff like that.    So, that's what drew me to my conclusion.

BY MINORITY COUNSEL 1:

Q      What was the purpose behind him sending you the Trump tweets?    What was he trying to get at, or was he trying to give you more information for your case? Why would he send those, or do you know?

A      Yeah, I think he was bringing up concerns with potentially us prosecuting the case down the road, potential issues we're going to incur.    I don't remember the exact email that he sent that caused me to be -- that he had to stop sending me some of the news articles, because it wasn't even the fact that he was sending me these news articles.

It was the opinion he was providing in those emails that I did not agree or that I did

not -- not agree with but did not think was appropriate.    That's --

Q    Okay.    You mentioned -- this is a little ways later -- I believe on September

the 9th of 2021 that you had an email.    You were reading through it, and you had

mentioned that Stuart Goldberg was leaving town.

You said there was a name that you wanted to leave out when you were reading

the email.    What was that name?

A    So it was the name of Hunter's personal counsel, George Mesires.

Q    Okay.    Moving forward -- and we are into October 12th of 2022.    You had

mentioned, I think, at some point that you had maybe a list of 30 individuals you wanted

to interview.    Then they had maybe dwindled that down to, say, 10.    On October 12th

of 2022, you said the last interview took place.

How many interviews did you do in total?

A    Of witnesses?    Well over 60.

Mr. <u>Zerbe.</u>    No, no, no.

Of the 30 that you had put in the list, take her through what happened to that list

of the 30.

Mr. ███.    Oh, okay.    So of the 30, of the 30 that were in the list, I believe we

talked to or had the opportunity to talk to all of them or a majority of them.

And there were even additional ones that came after that.    So I think total in the

case we talked to maybe 60 witnesses, if not more.

BY <u>MINORITY COUNSEL 1</u>:

Q    Is that typical for the amount of taxes that were owed in this case that you

would talk to 60 witnesses?

A    Yeah, so I would say when it's a joint investigation with FBI and

IRS -- especially for a false return to where they're deducting things that appear personal, that would be typical that you would go out and talk to people around him at the time, that these returns are around, or that the tax returns are around.

I guess this kind of has a nuance, though.   So a lot of the issues that we were encountering were regarding substance abuse.   So his frame of mind, was he -- like he was obviously involved in these large dollar deals.   But -- how did he act?   Was he in a clear frame of mind?   Was he a functioning addict?   All those different things were important and why we went and talked to a lot of the witnesses we talked to.

Q   Okay.   A little bit later on you had mentioned that he was sending Venmos to family and friends.   In particular, one person was Valerie Owens, his sister.

What was the amount of these Venmo transactions?   I know you wanted to reach out and talk to the individuals.   What was the size of the Venmo transactions?

A   I'd have to look back at them, but they were between zero and $2,000.

And I know that some of the family members were on trips and went to visit with Hunter during this time period.   So that's why some of those things, if they were out there, visiting him and he's claiming that these are business deductions, they would give insight as to where, what business was he doing, stuff like that.

Q   Is this typical that you would want to talk to people's grandchildren and relatives when they have amounts that are between zero and $2,000?   Is that typical?

A   So I can say for the kids -- there was Columbia school tuition, $30,000.   That was deducted -- I believe that was for ███████ or █████.   There was prep, study prep, checks that were deducted for one of the kids or one of -- and when I say the kids, one of Hunter's kids.

So it wasn't just those smaller dollar amounts.   There were others that were included in there.

BY <u>MINORITY COUNSEL 2</u>:

Q      Following up on that, the deductibility of tuition expenses and fees is sort of a matter of law.    Right?

A      Yeah.

Q      -- its treatment is pretty clear in the Tax Code one way or the other.

What kind of information would you generally hope to gain from talking to the grandchildren about payments that were sent?

A      So there were other payments or other credit card payments, so for clothing, for jewelry, for certain things.    There's a ton of different expenses that were also included in there, in addition to something like Columbia or prep or the tuition.

So as a part of our cases -- you have to have a third party that comes in.    And we can't just rely on that statement that, oh, it's not deductible.    We have to actually call someone in, as a witness, to --

Mr. <u>Zerbe.</u>    Confirm.

Mr. ███.    -- confirm what that's for.    There's a legal term for it, but I can't think of it off the top of my head, for why we have to do that.

BY <u>MINORITY COUNSEL 1</u>:

Q      Typically, and we're asking here, if the IRS goes to investigate an individual for taxes that weren't filed or weren't paid, such as the situation that we're in now, the IRS goes out and talks to all of their relatives and grandchildren and other people, 60-plus witnesses, that's typical for a case?

A      What I would say to that is every case is different.    You have to follow where the evidence leads you.    If evidence is leading you to family members or people receiving payments on behalf of that person, then those would be leads that you would go and follow.

So in addition to some of this stuff that we've been talking about, he also had members of his family, including Lunden Roberts, on his payroll.   We know that during the time period she was paid, she did not work for him.   So he was deducting things for salary for employees that were his family members.   A lot of those witnesses are people we would go and talk to.

Q     Before you get to this point, is there any set of questions that you send out to the person that they can answer and respond back to you?   Or is it at the point that it reaches your group it's like, 60 interviews?   You're out, talking to every person that they know.

Is there an opportunity for the person to agree or not agree to anything that you're saying is personal and maybe not a proper business deduction?

A     So when it comes to witnesses, those interviews are voluntary.   They don't have to talk to us if they don't want to.   So a part of what we do in our job is we go out there and we interview witnesses.   So there are situations where we can let them know that we're coming but the majority of the time we go and it's a surprise visit.   So they don't know that we're coming.   They're not prepared for what they're going to say. That's typical of our cases.

Q     Is this in a situation where the person contests what they owe, or do you just do this off the bat if it gets referred to your unit?

Mr. Zerbe.   I didn't hear that que -- can you --

Mr. ▇▇▇▇.   Yeah.

Mr. Zerbe.   Can you say it one more time, ▇▇▇▇?   I'm sorry.

        BY MINORITY COUNSEL 1:

Q     I'm trying to understand if, in this situation, was there some opportunity where any taxpayer -- doesn't even have to be this particular one -- does the taxpayer

have an opportunity to see the facts and decide whether they're going to contest what you're saying?    Could he have just paid this at the very beginning is my question?

A       So -- I guess the problem with that would be the reason why -- let's take a step back, big picture.

So there's IRS civil.    So they're coming in, and they would do audits.    They would do all different sorts of type of work related to civil issues.    So that essentially means that you made a mistake on your return.    You didn't report something.

Where we come in, IRS criminal investigation, is that there was a willful omission or there was a willful criminal act that you took part in, in order to either evade your taxes, to file a false return, to not file timely your tax return, to not pay your taxes.

There's a big difference and there's a big distinction between what's civil and what's criminal.

And so with us on the criminal side, as far as your question goes, does he get an opportunity to come in and explain, so once our case is referred we offer the person an opportunity to talk to us.    We go and do an interview.    If he has an explanation, a lot of people will offer their defenses at that time.

In this case, December 8th, 2020, we went and tried to interview Hunter.    And he declined to be interviewed.    So that's his choice.    That's his right.    But we did afford him an opportunity to explain what happened.

And then as far as when the case is referred, when a case is referred for prosecution to Department of Justice tax, the target or the subject of that case is entitled to what's called a taxpayer conference.    And that's where they meet with their defense counsel, and their defense counsel says here are my defenses.    Here's why I don't think you should charge me.

Q       And did he do that?

A       His account[ant] -- I was not allowed at those meetings which, to be honest with you, that -- sometimes they don't have us at these -- at those meetings.     But with a case like this, of this caliber -- we asked to be at those meetings.     They said that we couldn't be there.     I know of other agents that are at those taxpayer conference meetings.

Q       Okay.     I want to get some sense generally of your caseload and what you work.     How many cases do you currently have?     How many cases did you have back in 2018 when this case was assigned to you?

A       I was new to the group.     So this was one of two cases that I was working at the time.     And then moving forward to right now, I have one large case.     But it includes probably 80 tangential cases -- or 80 sort of spinoff cases that I'm trying to manage and work, as well.

That's abnormal.     Normally for an IRS special agent, normally it's one or two cases that they're working a year because of how much work goes into them.

Q       You mentioned that one of your other cases is paused.     How many cases do you have that are paused?     I don't know how you count the one large one with the 80 tangentials.     But how many of those are paused?

A       Probably 20-ish.     Let me rephrase that.     I would say 10 to 15.

Mr. Zerbe.     Why are they paused?     You might expand on that.

BY MINORITY COUNSEL 1:

Q       I was going ask that question.     So, yeah, go ahead.

A       They are second-guessing the strategy that we're putting forward on those.

Q       Do you have any idea of a timeline when they would get back to you on when they would lift the pause?

A       I didn't -- I was told it was going to be quick.     And it -- I know that my

supervisor is meeting with some of the leadership today to talk about it.

Q      In your cases that you've had, first starting back since November of 2018, coming forward, have you had disagreements in other cases that you've been working?

A      Yeah, yes.

Q      How did that play out?    How do your disagreements play out generally?

A      I can give you an example of in another situation I was working, we also had a person who had failed to file returns and they earned a significant amount of money and they went out into -- I need to be -- so they had that situation at hand.

I went to the prosecutors on the case.    And I said, hey, this person has these unfiled returns.   I'm thinking that specifically with what has happened -- and specifically with what has happened in news reporting related to them, I think we need to go talk to them.

And they were, like, well, no, you probably shouldn't do that.

They at the beginning onset they did not agree with me.    So me and my supervisor, we sat down with them.    And we said here's the reasons why we should go forward and interview [them].    Put [them] on notice regarding a potential tax investigation and see if [they] want to come in and talk to us.

And they were a "no" in the beginning and they changed to being a "yes" and we actually went out and did that and that is turning out to be something successful right now.

Q      Is that the same supervisor that you had on this case or --

A      Yes.

Q      -- is it a different supervisor?

A      Same supervisor, Gary Shapley.

But I want to draw your -- so remember that captive insurance case that I talked

about?   That was a huge disagreement.   I was honestly devastated by that.   And I met with top, top officials on presenting the evidence and presenting the case.   And at the end of the day it was still a "no."

And that was a huge -- I felt that the evidence was strong enough but their opinion was different than mine.   So that was something that -- that's the best example that I can give of that.

Q   You said that there are 12 people, roughly, in your group?   Is that correct? How many are in your group?

A   Twelve.

Q   Twelve.   Those twelve individuals, did they all -- oh, go ahead.

A   Approximately 12.   Let me --

Q   Okay.   Approximately 12.   Did all 12 of those individuals work on this case?

A   So in some form or fashion, they would have either helped with interviews, been a secondary on interviews.   There are a couple of newer agents who haven't had time to help in our group.

But, I think the notion that our group was removed was they weren't going to assign it to another person within my group, if that makes sense.   They wanted to go outside of that.

Q   How many groups like yours are at IRS?

A   There's only one International Tax and Financial Crimes group.   There are similar groups but they work different things.   So there's a Cybercrimes group.   They specifically work cybercrime cases.   There's an Excise Tax group.   They work alcohol, tobacco.   I forget what specific name they have.   But they only work those types of cases.

So we have specialty groups that are established around.    We're unique to the international tax realm.

Q    Do you have any questions?

BY <u>MINORITY COUNSEL 2</u>:

Q    I do have a few questions.    I apologize that I was late.    I had a preexisting commitment this morning.

I want to also clarify some things in your statement.

Could we talk a bit about C.T.?

A    Sure.

Q    Who is Christy Steinbrunner exactly?    What was Christy Steinbrunner's position?    Do I have that name right?    Christy Steinbrunner?

A    Yeah, Christy Steinbrunner.

Mr. <u>Zerbe.</u>    Can you spell it?

Mr. ████.    She had that correct spelling over there.    So I think --

Mr. <u>Zerbe.</u>    Okay.    Good.

Mr. ████.    She is essentially a line attorney with the national office, and she deals directly with our international tax group.

BY <u>MINORITY COUNSEL 2</u>:

Q    But was she a part of C.T.?

A    Can you say that again?

Q    I think in your testimony we said that the report went up to C.T. --

A    Yep.

Q    -- and that Christy Steinbrunner had been saying all along that this was good to go.    This was the green light.    Or a yellow light.    I'm trying to figure out what the relationship between her and C.T. was.

[Discussion off the record.]

Mr. ████.    So within IRS we have what's called Criminal Tax counsel.    They're our advisory internal counsel for the IRS.    So, when we send a case initiation package forward to DOJ tax, it has to go through their review, as well.    And they provide [an] advisory [opinion].

BY MINORITY COUNSEL 2:

Q    And so Christy Steinbrunner was not part of that advisory group per se.

A    She is -- she's the line attorney who does the initial review --

Q    Okay.

A    -- of the prosecution report.

Q    I see.    Then it goes to some sort of review panel?    I'm still trying to figure out --

Mr. Zerbe.    We'll just take you through it again.    Okay.    So --

Mr. ████.    So from my understanding -- and this is what I've learned after is she reviews the prosecution report.    She reviewed our package.    So let me step back even further.

So this entire case, since Christy was the one who reviewed my initiation package, she's someone I've been communicating to with issues, evidentiary issues, what's been going on in the case.    So I've been keeping her apprised with everything that's been going on.

So when the case comes to her, she's not just taking this cold.    When the case gets up to C.T. counsel, she reviews it and writes what's called a CEM, a Criminal Evaluation Memo.    That CEM, she was telling me the entire time, was a concur and it was what she was calling a green and a yellow light, green for the later tax years, yellow for the earlier tax years.

And what I had learned is that needs to go up to a panel at [CT-Counsel], their national office, because of this case, for them to review.

And what I've heard on the back end -- this is technically hearsay -- is that they all agreed with her recommendation.   But then it went to people above her and they told her that -- your writing appears like you want to give a nonconcur.   So this needs to be a nonconcur to all charges.

BY <u>MINORITY COUNSEL 2</u>:

Q     And there's no document that was produced out of C.T. memorializing that nonconcur judgment?

A     So they provided a -- what, the Criminal Evaluation Memorandum?   So there is a document that is, yeah, that memo.

Q     That's a document that Christy Steinbrunner wrote.   And the idea is that -- and I'm just sort of trying to -- she was told that -- because I assume initially when she wrote it, she concluded, this was a green or a yellow.

Was she instructed to change her evaluation or was there a subsequent other written document that evaluated the work that she's submitted and gave other reasons why there was a nonconcurrence?

A     So, I mean, I don't know that.   Obviously, there has to be records of what went up and then what came back down.   So there is definitely -- if it's there, it's there.

But, I have an exchange with her through Messenger where I said to her:   Did you know that they were always saying it's going to be a nonconcur?

Ms. Steinbrunner responded:   "What?   No. I sent them a yellow light."

After discussing this, I couldn't believe, because we were doing everything in our power to show -- because normally what happens is, if they give us a nonconcur, we try to go back to them with additional evidence or additional investigative work so that they

can give us a concur.

The fact that it came back just a flat nonconcur to all years, it was one of many blows that we encountered.

Q    Right.

A    I had even suggested sending the report up without the subject's name, putting in just the Doe so that people couldn't see.    But they said it would be too hard to take out the details related to the subject, that people would know who it was.

Q    Can you describe for me to the best of your ability why Christy Steinbrunner -- you just said that she represented to you that her recommendation was a yellow.    What is the difference between a yellow and a green?    Why would a recommendation be yellow as opposed to green?

A    So from what my understanding that she said is, yellow is we're concurring but we're giving cautionary statements of these are the legal impediments that we see. So these are the legal issues that we see.    Even though we're agreeing to move it forward, we think that these issues might come up.    But a red is basically, we don't think you should move forward on this.

Q    Were there specifics that she mentioned as far as what legal issues might, what the hazards of litigation were in particular?

Mr. ███.    Can we go off the record?

MAJORITY COUNSEL 2.    Off the record.

[12:46 p.m.]

MAJORITY COUNSEL 1.    We can go back on the record.

Mr. ███.    Part of the impediments were how a jury was going to look at this.

BY MINORITY COUNSEL 2:

Q    And that being because a jury might find the facts sympathetic?

A    Yes.

Q    You alluded to that possibility as well -- when the case went higher up -- or at least -- I'm not sure if you heard this information directly or if this was information that you testified that you heard indirectly regarding a decision that one part of the DOJ had reportedly made that suggested that facts that might have come out in 2014 or 2015 could create something of a sympathetic taint for later tax years.

Is that something that typically, in your role primarily as an investigator, you would discuss in a normal course of business with those who made the prosecuting decision?

A    Yeah, because those are things that we want to counteract throughout our investigation, or those are things that we need to address as a part of our investigation.

Q    And --

Mr. Zerbe.    I'm sorry.    Go ahead.

MINORITY COUNSEL 2.    Oh, no, no, I think that you're sort of anticipating my next question.

BY MINORITY COUNSEL 2:

Q    Would you be able to describe what those factors might have been that would give concern to those making a prosecuting decision?

A    Yeah.    So, you're referring to the meeting that we had with David Weiss,

the U.S. attorney, in September of 2022.

In that meeting he had alluded that DOJ Tax was of the mindset that the jury's sympathy -- related to the death of his brother and the drug use -- would affect the later tax years, and that David, at that time, was weighing whether to go forward based on that or not because he was getting swayed one way or the other.    And David said he felt strongly with the evidence and what we were presenting.

And another part I want to add in is, when we say that the scheme is developed in 2014 -- so 2014, Hunter is entering this million-dollar board agreement with Burisma. So, he is very well aware.    He's not apparent to be on drugs at that point.    It's not until Beau dies in May of 2015 that he kind of falls off the wagon and all these different issues start arising.

So I guess that's also important, is that during his sober -- or not his sober time, but during a clear-of-mind time, he's engaging in this agreement.    And then that caused the false return to be prepared.

But, looking back at everything, I don't know if those meetings held with us were just to make us happy, because David didn't -- we were already told no by D.C., and they told us not to bring forward a case.    I don't even know if at that time whoever at DOJ leadership told them, because I've learned later that he was told that he can't get special counsel authority to charge the case in D.C. and that he needed to follow the normal process.

Q      Okay.    Thank you.    That's a helpful clarification.

Just a few other specific follow-ups.

Going back now to the CT report and your work.    I don't know if it was a report per se.    But you learned of some judgment on this panel.    You went on to say that the leadership nonetheless, notwithstanding this recommendation, ended up pushing this

case through to the DOJ Tax.

What do you mean by "our leadership" in that decision?

A       So I don't know -- I know it has to go up to the special agent in charge, but I don't know if it went above him.    I thought it would have to go above him.    But it was either the director of field operations or the special agent in charge approves the referral that ultimately sends the case to Department of Justice Tax Division.

And so what happens at that point is DOJ Tax then reviews it.    In this case, they established a third-party reviewer, John Kane, to come in and look at the merits of the evidence.    And then, he's supposed to take an objective view of the case, which he was doing.    And that then goes to Stuart [Goldberg, Acting Deputy Assistant Attorney General] to ultimately be approved or declined.

Q       In your discussion of the various frustrations that you experienced along the way in terms of conducting your investigation, you discussed internal IRS issues and that often you went to the director of field operations, for instance, and that there was a lot of slow-walking involved in the IRS.

Do you think that the fact that they approved or pushed forward, in IRS leadership and the director of field operations, a case which had otherwise received a negative or a nonrecommended charge from this review panel is indicative of the fact that they weren't trying to slow-walk anything?    How do you reconcile, I guess is my --

A       No, I understand what you're saying.

So CT counsel is advisory.    They took the maximum amount of time to review this case that they could possibly take.    That's first off.

As far as my leadership goes, we're trying to point out that the slow-walking and the approvals for everything, a lot of that happened at the U.S. Attorney's Office in Delaware and DOJ Tax level.    So it wasn't more -- and we were just trying to make our

leadership aware of all those issues that we were encountering.

Q    So the slow-walking was not from the internal IRS per se, or maybe it was at the behest of DOJ --

A    Yeah.

Q    -- you suspect?

A    Yes.    And I would like to say that -- it appeared that our agency had their head down and didn't want to know any of the details or problems that we were having. We would communicate a lot of issues up, and they would say that they're communicating those higher than them, but we would never know if that were to happen.    We only ever met one time with the chief on this investigation, and it was towards the middle of our investigation.

I wanted to -- maybe this fits, maybe this doesn't, but -- communication issues.

So there's an FBI supervisor -- this is August 25th, 2022.    So Garrett Curley is his name.    He was an acting supervisor over the group that was working this case.

He says:    "I know we have our monthly meetings" -- and this is going to Lesley Wolf, AUSA for Delaware -- "but dissemination of information in between those meetings is being missed.    At least for me, I'm finding out about meetings, updates, and interviews well after the fact, which is causing me to send the wrong information to my headquarters.    I figured with everyone's schedules, an easiest way to correct this is through an email chain or going back to weekly meetings."

Lesley's response on August 25th, 2022, was:    "Garrett (ph), please stand down on this until we've had a chance to connect the next week."

So he was basically shut down after he was like:    You guys aren't communicating to me.

Q    Did you know if they ended up connecting?

A      I believe that they did end up connecting, yes.

Q      In my experience, sometimes having long email chains on things like that, sometimes things are missed.    Maybe what she was suggesting was a phone call would be easier to talk about.

A      Well, we were such a big team, there was a lot of this happening to where -- like us not being included in the taxpayer conference meetings.    There was a lot of information turned over at those meetings that we didn't hear about or we heard about late.   So there was definitely a breakdown in communication of what we heard.

And one thing that I want to be clear on, that there was information -- and I don't know the detail of that information that was withheld from us -- but there was information withheld from the investigators.

And some of that was withheld for privilege.    But there was other things -- we went out and talked to one of the potential prostitutes.    And there were videos that I've seen out there on Twitter, on the internet, and information related to that person that I had never seen before.

And I brought this up as an issue.    I'm like:    I'm seeing things here.    Why am I not seeing that from you guys?    And when I say "you guys," the prosecutors.    And there was a notion that some information was being held back from us, and I don't know what that information was.

Q      Because we discussed this earlier, that there were leaks, there were multiple leaks throughout the course of the investigation.

Would you say that the number of leaks to the media was typical in this case compared to a normal case in CI?

A      I would say, in my personal opinion, I would say it was low.    With a case of this high-profile nature, I would have thought it was low.

Q      But in terms of a comparably high-profile case anyway.    There were leaks, and there were some -- but you think --

A      So I'd go back --

Q      What's an example of another high-profile case that we're comparing that to?

A      So some of the information that was released -- or some of the information that was leaked related to the Trump classified documents.    So that case.    So there were actual pictures that were leaked from inside the search warrant.    And this is what my memory of seeing things in the media.    So that's something that I remember.    But, I mean -- yeah.

Q      I guess my follow-up is, do you think in a case where there have been leaks and there's perhaps concern about leaks through the media, it's appropriate for, in some cases on some levels, for information to be held in a tight group to sort of -- prevent further leaks?

A      I do understand what you're saying.    But if the investigators don't get the material to investigate the case -- typically -- we investigate the evidence, and we send that to the prosecutors to review, or here's the pertinent stuff.    It's not the other way around, typically.

So I am following what you're saying, but we had, in my opinion, we had no concerns of leaks on our internal team.    Prior to us going overt, prior to that December 8th day of action, up until a couple days before, there were no leaks at all.    So that just shows you how tight-knit our group was.

Q      I have one more question, and then I can turn to ███ again.

I want to skip way forward again to the removal of your team from the investigation.    I guess I have a few questions.

As far as you know, is there still an active investigation in the matter?

A      Yes.

Q      Obviously, the IRS is a very large organization, 80,000-some employees.

I think you recited it for the chairman, but just to confirm -- in terms of layers of review between you and Commissioner Werfel, are we talking six, seven, roughly?

A      One, two, three, four, five, six.    So he'd be number seven.

Q      Number seven.

In the normal course, would you expect that the Commissioner of the IRS would have direct knowledge of any kind of personnel shifting or maneuvers seven levels down?

A      I would think in a case of this nature, if I were a leader of -- if I were in charge of an agency, I would want to know about stuff that's going on with inside the IRS, and here's the reason why.    It is things like this can affect the reputation of the agency. You know what I mean?    It's a big risk with something like this out there.    And, that's my opinion.

Q      But you have no reason to believe that Commissioner Werfel knew of this short of his being informed by perhaps his deputy or someone below under the normal course of events, someone in the command would have to explicitly inform Commissioner Werfel.    For instance, Commissioner Werfel would not in the normal course directly make these personnel changes.

A      So I would say that he knew that there were, prior to my email, he knew that there were whistleblowers related to this case because they specifically asked him about whistleblowers within the IRS.

Mr. Zerbe.    I want to make sure -- you made one point.    I think you need to clarify it for him.    He asked if the case is going forward.

I think for everybody here, explain though that it's not just kind of Garanimals

where they can swap you in and out.    Talk about, you not being on the case, you have to put somebody in new, but kind of how that impacts.    I just want you to understand that.

Mr. ████.    So what's frustrating -- and I think it's obvious is he removed two of the people who have been challenging and been kind of like this is the -- we're trying to do the right thing, we're trying to do the right thing.    And it was kind of like we got loud enough, and they found an avenue to remove us.

I have been told by so many people on this case that we're where we are today because of my work.    It's 5 years of an investigation.    You can't just pick up that and move it onto someone else.

And if they removed all the prosecutors, DOJ Tax, and had a brand-new team, I would understand that completely if that's the decision that they made.    But they just removed us.    Not our management -- I mean, that right there should tell you a lot.

Did I answer that?

Mr. Zerbe.    Yeah.    Let me go off the record.

[Discussion off the record.]

Mr. ████.    On the record.

I just want to say that I made every effort to -- when we work these cases, you have to be careful of what you might say that could be used against you if you were to go to trial or if you were to go in front of a grand jury.    Usually, the IRS special agent is the final witness, the summary witness.    So things that you put out there in emails, they can attack you at a later date.

So I did everything that I could to possibly make the record as clean as it possibly could, investigated the case, but in doing that, here's all the things that happened because of that.

MINORITY COUNSEL 2.    ?

BY <u>MINORITY COUNSEL 1</u>:

Q    Okay.    I only have one other question that I wanted to go back to.

In your cases that you have, the what I would say spin-offs and everything that you've worked since November of 2018, are there any other cases that involve sensitive individuals that you would consider to be sensitive cases?

A    Not of a political nature.

Q    Okay.    Is this the only case that involves, say, children or family members of a politician?

A    Yes.

Q    Okay.    Are there any cases that involve politicians themselves?

A    That I've been removed from or --

Q    Just that you've worked since November of 2018.

A    That are spin-offs of this case?

Q    Just in general.    I'm trying to --

Mr. <u>Zerbe.</u>    I don't think she's trying-- let me think about it.

Let me go off the record?

[Discussion off the record.]

Mr. ███.    On the record.

This is the only one that is of a nature that's politically sensitive.    So the answer to your -- yes, this is the only one.

<u>MINORITY COUNSEL 1.</u>    Those are all my questions for now.    Thank you.

Mr. <u>Zerbe.</u>    Can I suggest, if we could take a break.

<u>MAJORITY COUNSEL 1.</u>    We'll go off the record.

[Recess.]

<u>MAJORITY COUNSEL 1.</u>    We'll go back on the record.

We've got a series of questions we're going to jump back into.   I know you had a lot of prepared materials, and I just want you to know that when we get to the end, we'll make sure to give you an opportunity if there's anything we haven't covered.   So I don't want you to think it's your last chance to cover stuff.

BY MAJORITY COUNSEL 1:

Q      Okay.   When we last left off our questioning, we had, I think, just gotten through tax year 2018.

A      Yep.

Q      Could we go back to what we were talking about?   And can you tell us what we need to know about tax year 2019?

A      And do you guys care if I -- so I want to put this in an even bigger picture. And I'm sorry I didn't start out with this, but now that I've got some food in my belly.

Global income streams for everyone altogether, so it's for the period 2014 through 2019, our investigative years, so the total global transfers that Hunter and his associates would have received from Ukraine, Romania, and China was $17.3 million, approximately.   Okay?   So a staggering amount.

So Burisma paid to everyone involved $6.5 million.   Burisma to Blue Star, $540,000.   Burisma to Boies Schiller -- that was the law firm that Hunter was of counsel for -- $288,000.   So that's $7.3 million to those people.

Approximate total transfers from the Romania company -- I say the Romania company, I just want to keep it at that -- to everyone was $3.1 million.   The total transfers from HW III to everyone was $3.7 million.   Total transfers from State Energy HK to Rob Walker was $3 million -- or to Robinson Walker, LLC, correct that.

Total transfers from CEFC Infrastructure to Owasco P.C. was $100,000.   So that's $6.8 million.   So that gives you $17.3 million.

Of this amount, for the period 2014 through 2020, I have extended it one more year, but it pretty much ends at the end of 2019, that's when income stops coming in, it's $8.3 million.    This is what Hunter would have received of that.

So total Burisma net of Devon Archer payments was $2.6 million.    Total transfers from the Romania company via Rob Walker was $1 million.    Total transfers from HW III net any payments to James Biden was $2.3 million.    The total transfers from CEFC was $100,000.    Total transfers from State Energy HK from Rob Walker was $664,000.

You also have cash that was deposited.    That was $50,000.    You have a chip diamond and a larger diamond.    The larger diamond from various reports that I've read, it's about $80,000.    We still don't know where that diamond is at to this day.

You have the Porsche, which was $142,000.    You have half of an investment in a company called American Well that was $25,000.    You have medical payments made by Archer, that's $10,000.    So these are all approximates.    Let me just reiterate that.    And then you have the one-third capital contribution made into Bohai Harvest that was $325,000.

You also have other [Form] W-2 payroll that he received of $859,000.    So that gives you a total of $8.3 million.

This does not also include any benefit or payments received by Kevin Morris. Okay.

MAJORITY COUNSEL 2.    When Kevin Morris paid the 2017 tax bill --

Mr. ███.    He paid the 2017 tax bill, yes.

MAJORITY COUNSEL 2.    That's a taxable event, correct?

Mr. ███.    So can I -- since it's 6103, can I --

Mr. Zerbe.    You can explain it.

Mr. ███.    Okay.    So on Hunter's 2020 tax return --

MAJORITY COUNSEL 2.   Let me ask you this.   Did he plus it up?

Mr. ███.   Did he?

MAJORITY COUNSEL 2.   Plus it up?

Mr. Zerbe.   Let him --

MAJORITY COUNSEL 2.   Okay.

Mr. ███.   What do you mean by "plus it up"?

[Discussion off the record.]

Mr. ███.   Okay.   Yeah.   No, I apologize.

BY MAJORITY COUNSEL 2:

Q   No worries.

A   So on his 2020 tax return, personal tax return, Hunter stated:   "See statement in 2020.   The taxpayer received financial support from a personal friend totaling approximately $1.4 million.   The parties agreed in 2020 to treat the support as a loan and later documented their agreement in a promissory note in the amount of $1.4 million, 5 percent interest.

"The promissory note requires periodic payments between 2025 and 2027.   The promissory note was executed by both parties on October 13th, 2021.

"The taxpayer is treating this amount as a loan for tax purposes.   The balance of the financial support is treated as a gift.   No amount of the support is treated as a reported taxable event on this tax return."

So that's what was filed with the return.

Q   And has that transaction been investigated or --

A   I'm no longer a part of an investigation related to that.

Q   Okay.   That wasn't the question.

The question was, do you know if that has been investigated by the IRS?

A      So I'm going to --

Q      It's a voluntary interview.    If you're not comfortable saying, you don't have to answer the question, any of our questions.

A      It goes back to one of my -- if there is potentially a current investigation that's out there to --

Mr. <u>Zerbe.</u>    Let's go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>    Go back on the record?

Mr. <u>Zerbe.</u>    Yes.

<u>MAJORITY COUNSEL 2.</u>    Is there anything else about the tax years of 2014 through 2019 that we haven't discussed that ought to be made clear?

Mr. ████.    Yeah.    There's 2018 that we left off on.    I went through the global payments.

So 2018 was the false tax return year.

If we don't include relevant conduct -- so relevant conduct is conduct that we didn't subpoena or that we didn't get records for that could, at sentencing, be included.

So if you don't include relevant conduct and it's just expense items that we investigated, Hunter underreported his tax return by $500,000 or -- give me one second. That's including relevant conduct.

Okay.    So he underreported his total income by $267,000, if you are using the most conservative approach, and that is a tax loss of $106,000.    So that includes deductions for personal wages and salaries paid, personal travel expenses paid, personal children expenses that he paid, and personal other expenses that he paid.

So let's talk about his 2018 tax year.

2018 was so significant because, at the same time he is writing his book, he is

having the returns prepared.    And the statements in his book completely contradicted what was being deducted on his tax return.    He essentially said in his book that he was in a drug-addled haze and was essentially learning how to cook crack, was some of the quotes in the book.

So some of the items that he deducted were personal no-show employees.    He deducted payments that were made to who he called his West Coast assistant, but she was essentially a prostitute.

He made payments -- there's an $18,000 wire that is made to one of these individuals, and on the wires they say $8,000 in wage and $10,000 in golf -- $10k golf club member deposit.    And we know that that $10,000 went to pay for a sex club.    He went to a sex club, and we've talked to the person that owned that sex club, and they confirmed that he was there.    And the guy has to pay $10,000, and the girl -- whoever is referring him there doesn't have to pay anything.    So that was deducted on the tax return.

The Columbia tuition was deducted on the tax return.    There were all of these sorts of things.    And the thing that showed his involvement in it is he would actually go through the bank statements and would highlight items that were -- either he was excluding from being deducted or that he was highlighting from his personal accounts to deduct on his tax return.    So it was kind of twofold.

And in addition -- because what we viewed that the accountants didn't feel comfortable with the information being provided by Hunter, they actually made him sign what's called a representation letter.    And essentially with this representation letter, he's representing that all the income is being reported and all the deductions are being -- they're for business nature, and they're being reported properly.

BY <u>MAJORITY COUNSEL 1</u>:

Q    Why do accountants have clients sign those kind of letters?

A    I've never seen that in my career.

Q    Do you have an understanding of why they did that in this case?

A    So the timing of it occurred after he started submitting a lot of these expenditures.    So his expenditures that year were very, very high.

He also tried to -- the money that he earned from Hudson West III, he tried to say that that was a loan.    Same thing we have all going along back to Burisma -- I'm loaning from my own capital in the company -- even though he didn't put any capital in the Hudson West III.    It was zero.    So he was trying to say that it was a loan.    But the accountants were so good that they really dug into it, and they were like:    No, no, no, you can't deduct this -- or you can't take this as a loan on your tax return.

He tried to -- or he deducted expenses for hotel rooms for one of his drug dealers or what we believed to be one of his drug dealers.

He deducted a hotel room for his dad, Joe Biden.    There is an invoice in the dad's name -- I'm sorry.    Not the dad, but Joe Biden's name.    The President, President Joe Biden's.

MAJORITY COUNSEL 2.    For how many nights?

Mr. ███.    What was that?

MAJORITY COUNSEL 2.    For how many nights?

Mr. ███.    It was for two nights.

And let me correct the record.    President Joe Biden's name.    And, yeah, that was included.

There was a significant amount of expenses deducted related to his girlfriend at the time, Airbnbs related to her, hotel rooms.    So he deducted a lot for the Chateau Marmont, and he actually was blacklisted and thrown out of the Chateau Marmont.    We

actually have videos -- or we have photos of the rooms and the destruction that was done to the rooms.

      BY <u>MAJORITY COUNSEL 1</u>:

Q    When he deducted two nights for Joe Biden -- he deducted those as business expenses?   Is that right?

A    Yes.

Q    Was --

A    From what I believe.   I apologize.   I didn't mean to interrupt you.   From what I believe, yes.

Q    Okay.   And were you aware of any business that he was involved in with Joe Biden?

A    So this is a complicated issue, and we really -- there was the 10 percent for the big guy in the Sinohawk deal.   We know that the Sinohawk deal never went through. And that relates to CEFC and China.   So essentially, Hunter cut everyone out of that.

And we do know that there were WhatsApp -- I believe it was WhatsApp messages found that there is clear indication -- and Hunter is saying this in those WhatsApp messages, that:   I'm sitting here with my dad ready to make a deal, we're waiting for the phone call.   And that was one of the -- I mean, we couldn't believe that we saw that. That was more indication that the dad might have been involved.

I know that we wanted to get location data because I went to the prosecutors with this, and they, again, came back at me with:   Well, how do we know that?   He could just be lying and claiming that the dad -- that his dad's there, but his dad is not there.

And I said:   Well, this is what we would normally do.   And I have it on a meeting agenda where we talk about location data.   And I don't know if the FBI ever did anything

with it, but I would think it would be a road we would want to go down or that we could

go down, and the reason being that, if President Joe Biden was getting any source of

income, whether it's through someone else's entity or for his benefit at some point, that

could be income.    So that's why it would matter to us.

Q    Anything else on tax year 2018?

A    There was the fact that he deducted some hotel and travel expenses.    So

they argued that, well, he tried to make his best effort.    And they -- and when I say

"they," that's Hunter and his counsel.    I would argue that this shows that they are

making an effort to not make it look as suspicious.    Deducting everything would be

overly suspicious in an audit, and therefore he tried making as many deductions as he

could to minimize his tax.    That's what my beliefs would be.

There is something else.    So I told you guys about the additional income.    But

you also had the unfiled returns.    So on his personal return for 2018, he owed taxes of

$620,901.    And then for 2019, for the personal return -- so that would have also been a

failure to file year -- that was $197,372.

And there were definitely some issues with the 2019 return.    He withdrew

money from a 529 plan.    It was in the ballpark -- I think I actually -- hold on one second.

Let me go into my notes and see if I -- I have the email here.

Q    Can I ask you something a little more general?

So given all these specific aspects that you're referring to of activities with regard

to tax returns that would you agree, at least, rise to the level of suspicious?

A    Yeah.

Q    What's your general view of why someone would engage in these kinds of

deductions, reporting of expenses, et cetera?

A    So from what I believe based on the evidence is his alimony and his child

support payments are based on how much income he earns.     So if he reduces his income, he doesn't have to pay as much.

Q     And what are you basing that opinion on?

A     I would be basing that on discussions I had with prosecutors on the case and my review -- so my recollection of this isn't as clear, but I do recall that coming up in reviewing the marital separation agreement.

And the reason why I say it's complicated is because it changes as you go throughout the years.     So I don't remember the specifics, but I know that that was a part of it.

Q     Okay.     Understood.

You mentioned CEFC.     Did you look at an entity called CEFC Infrastructure Investment, LLC?

A     I believe so, yes.

Q     Do you know what kind of business CEFC was involved in or pursuing?

MAJORITY COUNSEL 1.     Can I go off the record?

Mr. ███.     Yeah.     Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.     Back on the record?

Mr. ███.     I don't feel comfortable disclosing anything further on that issue.

BY <u>MAJORITY COUNSEL 1</u>:

Q     Understood.    Okay.

The U.S. House Committee on Oversight and Accountability has publicly identified a series of companies, mostly LLCs, that are connected to this taxpayer.    We'd like to walk through the list of companies and ask simply whether or not you've come across them in the course of your investigation.    A yes-or-no answer is fine.

Lion Hall Group, LLC?

A     Yes.

Q     Owasco P.C.?

A     Yes.

Q     Robinson Walker, LLC?

A     Yes.

Q     Skaneateles LLC?

A     Skaneateles, yes.

Q     Seneca Global Advisors, LLC?

A     Yes.

Q     Rosemont Seneca Partners, LLC?

A     Yes.

Q     Rosemont Seneca Principal Investments, LLC?

A     Yes.    Yeah, I know.    It's abbreviated RSPI.

Q     Rosemont Realty, LLC?

A     Yes.

Q     Rosemont Seneca Technology Partners, LLC?

A     Yes.

Q     Rosemont Seneca Thornton, LLC?

A     Yes.

Q     Rosemont Seneca Advisors, LLC?

A     Yes.

Q     Rosemont Seneca Bohai, LLC?

A     Yes.

Q     JBB SR, Inc.?

A     Yes.

Q     RSTP II Alpha Partners, LLC?

A     Yes.

Q     RSTP II Bravo Partners, LLC?

A     Yes.

Q     Owasco, LLC?

A     Yes.

Q     Hudson West III, LLC?

A     Yep.

Q     Hudson West V, LLC?

A     Yes.

Q     And CEFC Infrastructure Investment U.S., LLC?

A     Yes.

Q     Okay.    Did there come a time when you learned about testimony from Attorney General Garland before Congress?

A     Yes.    So that was actually something I was going to get into in my closing.

So Attorney General Merrick Garland appeared before the Senate Appropriations Committee in April -- April 22nd, 2022.    At this hearing, when he was questioned about the Hunter Biden investigation, he said:    "Because we put the investigation in the hands

of a Trump appointee from the previous administration who is the U.S. attorney for the District of Delaware, and because you have me as the Attorney General who is committed to the independence of the Justice Department from any influence from the White House in criminal matters, the Hunter Biden investigation is being run by and supervised by the United States attorney for the District of Delaware, he is in charge of that investigation, there will no interference of political or improper kind."

Q    And in your experience with the case, did you find that to be accurate?

A    Can I say at the time and where I sit now?

Q    Sure.

A    So at the time -- I don't remember when this topic of what Merrick Garland said came up -- when exactly this came up, but I can tell you that I always viewed it as David was our advocate sometimes.    David was -- if we wanted to go with a big issue, we went to him.

Q    You're referring to David Weiss?

A    David Weiss.    I apologize.    The U.S. attorney.

So if we wanted -- and I viewed him as he's a Republican from the prior administration.    We have to have faith that he's going to do the right thing and that he's going to push this forward and that he is the person we need to get in front of to tell -- because there were times where we didn't believe that what we were stating regarding the evidence was getting to him.    Because our understanding of the evidence was different than what some of the line attorneys' understanding of the evidence, and we wanted to present on that.    It was the 2014, 2015 issue.

And I'm thankful that we ultimately were able to.    But now looking back at it, I think that -- it depends on when he asked for a special counsel, but those meetings that he had with us were for naught because we didn't end up charging 2014, 2015.

Q      So looking back on it now -- what is your opinion of whether his testimony was accurate?

A      I guess I would say that's not up to me to make that determination, but -- in what I know --

Mr. <u>Zerbe.</u>   Do you want to take a break?    A pause?

Mr. ███.   Yeah.    Off the record, please.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. ███.    So in response to your question, I can't speak to what Merrick Garland thought at the time or what he might have been made aware of at that time.    I was only aware of certain people within the chain that were aware of this investigation.

But looking back at it, the U.S. attorney, David Weiss, he had to follow the normal process.    He had to go to Washington, D.C., the U.S. Attorney's Office, them saying no. So he really wasn't in charge.    He had to follow the process.

And at the end of the day, he went to political appointees, and he's technically not a political appointee, so it's all back to square one again.

BY <u>MAJORITY COUNSEL 1</u>:

Q      We were talking about a hearing in 2022, which we have as April 26th.    I think you said 22nd, but I think it was April 26th.

A      Okay.

Q      The next year, moving forward to 2023, March 1st, 2023, Attorney General Garland was again testifying before Congress and was asked whether, without special counsel authority, a U.S. attorney could bring charges in other jurisdictions outside of Delaware.

Attorney General Garland said that he had been advised that he has full authority

to make those kind of referrals that you're talking about or bring cases in other jurisdictions if he feels it's necessary, and I will assure that if he does, he will be able to do that.

Based on what you testified to earlier, in your opinion, did U.S. Attorney Weiss have that authority to bring charges in other jurisdictions?

A     In what he said, I look kind of at the words from Merrick Garland, and he said he has the full authority to make the referrals.    Did I hear that correct?

Q     Correct.

A     And, yes, he's in charge of making those referrals, but whether --

Mr. Zerbe.    Read the whole quote again.

BY MAJORITY COUNSEL 2:

Q     Let's just back up here.

The Attorney General said the U.S. attorney in Delaware has been advised that he has full authority to make those kinds of referrals that you were talking about.

A     Yes.

Q     Or bring cases in other jurisdictions if he feels it's necessary.    And I will assure that if he does, he will be able to do that.

And the record reflects -- and correct us if we are wrong -- that the U.S. attorney in Delaware tried to bring a criminal case in D.C., and the U.S. attorney in D.C. said no.

A     That's correct.

Q     The U.S. attorney for Delaware, Mr. Weiss, tried to bring a case in California -- was it the Central District of California?

A     Yes.    It was wherever Los Angeles -- yes.

Q     And he was told no.

A     Yes.

Q      Okay.    So going back to what the Attorney General said, how do you

reconcile those two?    Maybe the Attorney General didn't know.    Maybe they were

actively keeping information from the Attorney General.    But it's either that or he's

lying.

A      Yeah.

Q      Are we missing something?

A      No, I agree with you completely.    And when he said that and I looked back

on things, it was completely different from what I recall happening.

My understanding of a person -- so this is from my understanding from what I

have heard from other cases that have happened.    If you are a special counsel, you have

full authority to bring it wherever.

So I do not know if this is true.    And I'm sure you guys will figure this out.    But

DOJ Tax doesn't say:    "Okay, you're approved to charge the tax charges."    I believe that

special counsel has authority to bring whatever charges wherever they want.    And in my

observations over the past 5 years, that is completely different than what happened.

Q      And the Q&A continues, and it just puts a finer point on it.    And this is with

Senator Grassley at the March 1st, 2023, hearing.

Grassley asks as a follow-up:    "Does the Delaware U.S. attorney lack independent

charging authority over certain criminal allegations against the President's son outside

the District of Delaware?"

And the Attorney General responded:    "He would have to bring…if it's in another

district, he'd have to bring the case in another district.    But as I said, I have promised to

ensure that he is able to carry out his investigation and that he be able to run it.    And if

he needs to bring it in another jurisdiction, he will have full authority to do that."

And as we have seen, he tried to bring the case to the U.S. Attorney's Office in

D.C., to the U.S. Attorney's Office in the Central District of California, and he was denied, and he did not have full authority to bring the case, and he did not have special counsel authority.    Isn't that correct?

A      Yes.

Q      And like you testified earlier, we're not talking about $2,000.    Okay?    This isn't a $2,000 type of prosecution.    This is -- and I believe your number was $8.3 million for Hunter Biden.    And on top of that, it was $17.3 million for the group of folks and companies and concerns involved here.    Isn't that correct?

A      Yes.

MAJORITY COUNSEL 1.    On the issue of special counsel authority, do you know whether U.S. Attorney Weiss requested special counsel authority?

Mr. ██████.    I only know this secondhand from what my supervisor told me after that October 7th meeting, that --

MAJORITY COUNSEL 1.    And this is what you know -- [who did you hear this] from secondhand?

Mr. ██████.    I know this from Gary -- my supervisor, Gary Shapley -- telling me about what happened during that meeting.    That --

Mr. Zerbe.    Let's go off.

[Discussion off the record.]

Mr. ██████.    So I heard it was a contentious meeting.    My SAC and my supervisor were there.    There were members from FBI there.    And they had asked him about this, about bringing the case in D.C., and he explained that he was essentially told no.    And then he went back and asked for special counsel authority, and they told him no.    I don't think they said who he went back to, but they told him no.

BY MAJORITY COUNSEL 1:

Q      So you don't know who he requested special counsel authority from?

A      Yes, I do not know that.    But I know that they ultimately said:    No, follow the normal process.

Q      Do you know when he requested special counsel status?

A      That, I do not know.

Q      Do you know if he did it more than one time?

A      That, I do not know.

Can I add one more thing to the special counsel?    So there are multiple discussions within my agency up to our leadership.    So when I say our leadership, [up] to the DFO.    So the director of field operations saying:    This is a case where we need a special counsel brought in; because of all the problems we're having, we need a special counsel.    And he literally looked at us and was like:    I don't know what that means.    I don't know how to even do that.

And then also to that point, I recall discussions with our FBI counterparts on the case, the same issue.    And I thought that they were trying to raise the special counsel issue up through their leadership.

On that note, I just want to let you guys know that the way that FBI and their leadership -- their leadership was very, very much involved in this investigation.    I heard of multiple times that they were reporting up to their leadership, meeting with their leadership.    They had to advise them on this.

And when I say I felt like we were out on an island, we were left out on an island as it comes to this case.    And there was a clear difference between what the FBI was doing and what we were doing when it came to reporting this case and issues up to leadership.

Q      When you say FBI leadership was involved, do you know how high up at the

FBI?

     A     That, I do not know.

     <u>MAJORITY COUNSEL 2.</u>    You testified this morning in your opening statement that there was a very long list of incidents where the prosecutors in Delaware would not let the investigative team pursue certain matters, whether it was to go overt at a certain point of time, whether it was to conduct interviews, or whether it was with the storage unit.

     And my question is, how do you reconcile that long list of efforts to shut down avenues of investigation?    How do you reconcile that with, ultimately, the U.S. Attorney's Office in Delaware did try to bring charges in both D.C. and California?

     Mr. ████.   I don't mean to toot [my horn] -- they had me.    They had me that pushed -- traveling on weekends.   I know that people on the case would say that we would not have a tax case right now if it wasn't for me.    If it wasn't for my investigative abilities and the evidence that we found through our investigation, if it wasn't for that, then we wouldn't be sitting here today talking about potential charges.

     <u>MAJORITY COUNSEL 2.</u>   So is it fair to say that, despite their efforts to shut down avenues of investigation, they couldn't fail to bring the case because of the evidence you and the rest of the team brought to light?

     Mr. ████.   To be honest with you, I think they were -- this is just me talking from my opinion and my perspective -- I think they were always afraid of:   well, that's going to be too many approvals, let's not do that.   They were afraid of all these different things.

     That might touch the campaign, so we can't talk about that right now.   That might touch this area, so we can't talk about that right now.   And it was always, well, we'll sit here and we'll think about it.   We might be able to do it because I'm going to

keep pressuring them to do it.

So I had a long list that I tracked all of our interviews.    And I was like, this is when we're doing this.    I was very organized, and I was very much, like this is what we're doing to get this case done.    And I scheduled everything out.    And I didn't want it to be on me that I was the reason why we didn't pursue the charges in the case.

BY <u>MAJORITY COUNSEL 1</u>:

Q    Do you take that thorough approach to all your cases?

A    Absolutely.

Q    And did you have any reason to pursue this case with any more vigor than any other case?

A    Yeah, I often ask myself:    Am I too much in the weeds, and am I too far into the case that I really don't understand what's going on?

So what I did to combat that was we presented on the issues to neutral third parties.    So our DFO, he sat in for:    Here is the evidence that we had.    Am I looking at this the wrong way?    Am I perceiving this?    And all the people within that chain of command agreed with what we -- that's why it ultimately was pushed forward.

Q    So it wasn't just you pursuing this case on your own?

A    No.

Q    Okay.    I want to go back to what you testified earlier about the day of action.

On that day -- which I understand to be the time when the investigation would go overt.    Is that correct?

A    Yes.

Q    How many interviews were you planning to conduct on that day?

A    So our planning for -- I want to say the approximate number would be 10.

Q    And how many interviews did you actually conduct on that day?

A    So we met with pretty much everyone.    Only one person ended up talking that day.

Q    And who was that?

A    Rob Walker.

Q    And was there anyone you were unable to talk to?

A    Yeah.    There were a lot of people that we were unable to get in touch with.

Q    And why were you unable to get in touch with them?

A    So one of those was the subject, Hunter Biden.    So he had a Secret Service protection detail.    So getting access to him was pretty hard.

Q    Are there ways you can get access to someone that has Secret Service protection?

A    So I didn't go and do that interview.    It was -- if we would have gone a week earlier or when we were supposed to go in the beginning of November.    We were supposed to go, I believe, November 10th, 11th, or 12th.

And it got pushed for -- I don't remember the ultimate reason, but there were a lot of different things being thrown in.    That the election wasn't finalized yet.    That we were still technically on a pause.

So I think there were a lot of different balls in the air, and we just didn't go forward at that time.

So the decision was made out of my hands to not -- and if we would have went, then he wouldn't have had a protection detail.    So we would have been able to do the interview.

Q    Did someone attempt to interview him on the day of action?

A    Yes.

Q     And who was that?

A     Gary Shapley, my supervisor, and Joe Gordon, the supervisor at the FBI.

Q     And they were unable to interview the subject?

A     Correct.

          BY MAJORITY COUNSEL 2:

Q     Do they believe they were hampered by having somebody tipped off --

A     Yeah.   I was --

Q     -- that the interviewees were coming?

A     Yeah.   I was informed of that by my supervisor after.   And I know that
that's an issue that he's brought up to me regarding letting Hunter's team -- or letting the
transition team know, I think, is the way that my boss put it to me.

Q     Letting the transition team know, the political team?

A     I don't know which.   All he ever told me was it was the transition team.
What that entailed, I don't know.

[2:30 p.m.]

BY <u>MAJORITY COUNSEL 2</u>:

Q      Okay.    This isn't the first time that we've heard about the subject, or the target, being tipped off.    You mentioned this morning in context of the storage unit that you did say it was Mark Daly and Lesley Wolf --

A      Yes.

Q      -- contacted Hunter Biden's lawyers and tipped them off about the storage unit --

A      Yes.

Q      -- when you had developed a plan where you were going to not alert anyone on the Hunter Biden side of the storage unit, wait and see if they went to get responsive materials, which you knew was in the storage unit, correct?

A      Yes.

Q      And so by contacting Hunter Biden's lawyers, they totally blew the plan.

A      Yes.

Q      Is that not favoritism?

A      I would hope they weren't doing that for favoritism, but yes, it does look like favoritism.

Q      Was there any other, during the course of the investigation -- I know it's 5 years.    So, there's a lot of time period here.    Were there other instances where the Hunter Biden camp was tipped off by U.S. Attorney officials, or DOJ Tax officials?

A      This might not go into that area.    But, this is something that I wanted to bring that up I thought was -- so in the Washington -- was it Washington -- hold on.    I think it was Washington Post.

In The Washington Post article that came out on October 6th that I referred to, Chris Clark, which is Hunter Biden's lawyer, said in a statement to the newspaper that he's had no contact whatsoever with any Federal investigative agent.    Therefore, a rendition of this case from such an agent is inherently biased, one-sided, and inaccurate.    It is regrettable that law enforcement agents appear to be violating the law to prejudice a case against a person who is a target simply because of his family name.

And, when he said that, it made me think back on we weren't allowed by the prosecutors at any of the taxpayer conferences.    So we couldn't even meet Chris Clark to hear whatever the defense might be.

So I don't know if that was a strategy so that he could make that claim.    I don't know.    But, looking back at specifically what he said, that caused me pause.

Q    Do you think Chris Clark or the lawyers for Hunter Biden actively procured your absence from those meetings?

A    I think they could have, yes.    They could have asked for the agents to not be there.

Q    At these taxpayer conferences, do defense counsel have an opportunity to set the terms ordinarily for those meetings?

A    So I'm usually not in charge of them, but I've never heard of them before.

Q    But you've never been excluded before either, is that correct, to your knowledge?

Mr. <u>Zerbe.</u>    Let's go off the record.

<u>MAJORITY COUNSEL 3.</u>    Off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>    We'll go back on the record.

Mr. ██████.    So I know of agents that are part of those taxpayer conferences, one

specifically with Mark Daly.    There are other cases where he doesn't have communications with defense counsel without an agent there.    I do know that.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Okay.    So you found it unusual that you were excluded?

A    Yes, especially with a case like this.

Q    Okay.

A    Can I make one more comment?

Q    Of course.

A    It was relayed to us that his counsel said something like if you charge this case, good luck with finding a job outside of here or good luck with -- it's career suicide I think is what he said.

Q    And who was that related to?

A    I believe that was --

Q    Was that at the taxpayer conference?

A    I don't know when that occurred.    So I don't know which situation that would have occurred.

Q    How was it related to you?

A    It was just relayed to me through either one of the attorneys or through David Weiss.    I don't remember who said it to us.

Q    So you just don't recall who relayed that to you?

A    Correct.

Q    Okay.

Mr. ███.    Can we go off the record for a second?

[Discussion off the record.]

Mr. ███.    Back on?

MAJORITY COUNSEL 2.    On the record.

Mr. ███.    Thanks.    Yeah, so not being there, apparently there was information brought up during those meetings that we didn't hear until weeks after, if we heard everything.    So there could have been things said there that were never relayed to us.

And it's super important for us because if there's defenses being put out there, we're going to want to know everything, because we're the investigators.    We go back and -- when I say the first taxpayer conference, they presented defenses on 2014-2015. We took their defense and worked through them and tried to refute them with the evidence.    And not being there gave a whole -- it wasn't efficient.    It wasn't -- I don't know.

BY MAJORITY COUNSEL 1:

Q    So you testified earlier that there was a time when you got the sense that investigators had not been provided all the information.    You had seen public reporting. Videos, you mentioned.    Were you aware of Hunter Biden's laptop?

A    Yes.

Q    Did the IRS have access to the material on that laptop?

A    So it was obtained by the FBI, and it was an IRS search warrant.    So it was a Title 26 IRS search warrant of that laptop.

Q    Can you explain that for a second?    So it was a Title 26 search warrant meaning --

A    It was only tax charges and the initial warrant that allowed to us essentially get access to the laptop.    So we had to get a search warrant of it and it wasn't --

Q    And the FBI executed that search warrant?

A    So it would have been done by the FBI forensic, like their forensics team.

Q      And was the information on that laptop shared with IRS investigators investigating the alleged tax crimes?

A      So it's quite complicated, and my memory is not the best when it comes to the laptop, because there were   storage backups to it.    There was also the laptop.

We had different members of our team that would -- we had one agent who looked through the laptop.    We had one agent who looked through backups of it.    So there were a variety of people kind of tackling it all at once.    That's kind of how we tried to do everything.

So from what I do know -- and this has been -- I believe I've gone back through statements that were documented -- that there were some things that were held back from us for one reason or another.    But I don't still know what that is.

Q      Were you aware of any other limitations placed on investigators in this case that we haven't discussed?

Mr. ████.    Can we go off the record?

[Discussion off the record.]

MAJORITY COUNSEL 2.    Okay.    Back on the record.

Mr. ████.    Yeah, things related to the campaign were kind of, at least during the investigative stages, were off limits.

BY MAJORITY COUNSEL 1:

Q      Do you mean the Presidential campaign?

A      Yes, the Presidential campaign.

Q      In 2020.

A      No.    This would have -- yes, but we would not have found out about it until after -- everything was done.    So this would have been when we went overt.

Does that make sense?

Mr. <u>Zerbe.</u>   Go off the record.

<u>MAJORITY COUNSEL 3.</u>   Off.

[Discussion off the record.]

<u>MAJORITY COUNSEL 2.</u>   Back on the record.

Mr. <u>Zerbe.</u>   Go ahead.

Mr. ███.   It would occur after our day of action, after we went overt.   And I recall there being a crisis management meeting.   And because of attorney-client privilege issues, and potentially issues related to the campaign, I felt that some things were off limits discussing.

BY <u>MAJORITY COUNSEL 1</u>:

Q    Why did you feel that way?

A    Because during interviews there was an atmosphere that made it very difficult to ask questions because -- and I know I wasn't the only one that felt this way -- that you get eyes rolling or --

Q    From whom?

A    From Lesley Wolf or from Mark Daly or whoever was -- it was a very intimidating atmosphere sometimes to ask questions.

And the same thing goes from our -- we had biweekly meetings that I would run. And I didn't have a problem with bringing up challenging issues.   But every single time I brought up challenging issues, they would get shot down.

And I recall having phone calls immediately after with my supervisor and my co-case agent and wanting to pull my hair out because I'm just trying get this case done.

Q    And those ideas would be shot down by Lesley Wolf?

A    Would be shot down by the prosecutors on the call.   So it would be Lesley Wolf or Jack Morgan or Mark Daly.

Q      Anyone else?

A      It wasn't all the time, but it did happen.

Q      Other than the three people you mentioned, anyone else that would fall into the role of shooting down ideas?

A      And I want to go back for a second.    It was I'm going sit here and think about it, and then you'd have to bring it up again.    We're thinking about it.    When I say "shooting down," I want to be very loose about that question.

Q      Let me clarify my question.    So you mentioned the creation of an atmosphere that -- would it be accurate to say -- would make you second-guess raising issues?

A      Yeah, absolutely.

Q      Okay.    And other than Lesley Wolf, Jack Morgan, and Mark Daly, was there anyone else that you think created that atmosphere?

A      No.

          BY MAJORITY COUNSEL 2:

Q      Do you have any information about whether Lesley Wolf was doing this because she wanted a job in the administration?    Did she try and get a job with Main Justice?

A      I have not heard that.    This is my personal opinion that Lesley's always been -- she's a really good arguer.    I actually talked with another case agent about that she's really good at arguing and really good at talking her way out of do[ing] whatever.

          And it was a lot of things.    I'll be completely honest with you.    If we would have brought this case in SDNY, who I know was super aggressive because you see it all the time, I don't think we'd be sitting here right now.    If we were to bring this in -- maybe even D.C. U.S. Attorney's Office from the get-go, I don't think we'd be here right now.

BY <u>MAJORITY COUNSEL 1</u>:

Q    I want to go back to something you mentioned earlier regarding a walk-by of Hunter Biden's residence.    I believe you testified that Mark Daly told you that someone had denied your ability to do that walk-by.

A    Yeah.

Q    Who was it that denied that walk-by?

A    It doesn't say.    So it would have been any manager above him.    So it would have been anyone in his management chain --

Q    At DOJ.

A    -- at DOJ Tax.    And I could tell you that's never happened to where you had someone weighing in on whether you could do a covert action, walking by someone's house.

BY <u>MAJORITY COUNSEL 2</u>:

Q    Why did you have to get approval for that?

A    Because we were in a posture at that point that we couldn't do anything that appeared -- any investigative activities pretty much whatsoever.

Q    But you weren't wearing an IRS windbreaker, and you weren't driving a car marked with IRS letters on it.    So how would anyone possibly know?    It's a free country. You're allowed to drive by any house you want.

A    Yeah, I didn't want it -- because I think at that time we were trying to do surveillance of pretty much everyone we were going to potentially interview.    So he was just another one of the people that we wanted to do that for.    I guess I don't know --

Q    But did you have to travel to do the walk-by?

A    No, we would have sent an agent from that area --

Q    Okay.

A       -- out to help.

Q       And was it ordinary that you would have to ask permission from the prosecutors to do something like that in any other case?

A       Not at all ordinary.

Q       So this was special to the Hunter Biden case.

A       Yes.    So it says:    Tax does not approve.

So whatever that means, tax does not approve.

BY UNDERLINE MAJORITY COUNSEL 1:

Q       What is that email in reference to?

A       This is in reference -- this is October 20th, 2020, walk-by of possible residence.

And Mark Daly says:    Tax does not approve.    This will be on hold until further notice.

BY MAJORITY COUNSEL 2:

Q       And the plan was you were just going have an IRS agent out in California walk by the house?

A       Yes.

Q       Drive by the house.

A       Yes.

Q       Check it out.

A       Uh-huh.

Q       Not stop, not interview anyone, not interview neighbors.

A       Nope.

Q       Not knock on the door.    Just drive by the house.

A       Yes.

Q     That was denied.

A     Yes.

BY <u>MAJORITY COUNSEL 1</u>:

Q     We talked earlier about the potential of interviewing I believe it was President Biden's grandchildren.     Is that right?

A     Yes.

Q     So that would be Hunter Biden's children?

A     Yes.

Q     And the interest in conducting their interviews is because Hunter Biden made payments to those individuals?     Is that right?

A     Or made payments for the benefit of them.

Q     And the interest in interviewing them about those payments was not because he made those payments but was because he deducted those on his taxes.     Is that correct?

A     Correct.

Q     And what type of evidence would you need to properly evaluate whether a deduction was properly taken in an instance like this?

A     So you'd want a statement from -- so there's two points to this.     You'd first get the records from, let's say it's Columbia school.     You get records from Columbia school, and they would show you why the person paid that $30,000.     So that's step one.

Step two would also be, if it's paying for someone else, finding out why that person paid that.     Was there any business purpose or reason for paying that?     If it was -- she did work for me and in return for doing some work for me, I paid for this, so that could potentially be a deduction, so reasons like that.

And I want to be clear on this.     I believe what happened down the road is that

there was a potential of it being stipulated, that the kids' expenses were for personal purposes, so it being stipulated from his counsel.    But I don't know if we ever officially got that or -- someone -- an attorney can say that and you can still go back on that down the road.    You know what I mean?

Q    In the absence of a stipulation like that, would it be normal to interview a third party who received a payment that was then deducted on taxes and there was a reason to question the deduction?

A    Yes.    And to be honest with you, sometimes it doesn't matter the dollar amount.    Sometimes -- I've had cases of mine to where there was a small deduction. But then they told us about this information that was completely unrelated to this.

Oh, he told me to open up this bank account for him.

And it can lead on to something that's completely different.

Q    In a typical case, would you consider the interviews of individuals like this to be a completely reasonable step in an investigation like the one you were conducting?

A    Yes.

Q    One other clarifying question on something you mentioned earlier.    You mentioned that when you opened the case at IRS, in the course of moving it forward, you learned that the U.S. Attorney's Office had opened their own case.    Is that right?

A    Yes.

Q    And those two cases were merged.    Is that right?

A    Yes.

Q    And my understanding of your testimony earlier is that the merger of those two cases created a process that would be different from if the case had just proceeded at the IRS.    Is that right?

A    Can you rephrase that question?

Q      What would happen in a typical case if the two cases had not been merged?

A      Oh, we would have opened the case -- the case would have been sent to the intake, so the tax intake, specifically the tax intake at the D.C. U.S. Attorney's Office. They would have evaluated our -- it's called a [Form] 9131, but -- basically our work product.    And they would have done the paperwork to get an investigation going.

So Delaware could have done their own, and we would have done our own thing in D.C.

Q      Under the auspices of the U.S. Attorney in the District of Columbia?

A      Yes.    Because sometimes there are cases to where you have split venue, and sometimes you do want to merge both of them.    But I do know of -- yeah, so, it just honestly depends.    There are situations where both are true.

MAJORITY COUNSEL 2.    Our hour's up.

Mr. Zerbe.    Can we take a quick break and just breathe in and out?

MAJORITY COUNSEL 3.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 2.    We'll go back on the record.

BY MINORITY COUNSEL 1:

Q      Okay.    I wanted to go back to something that you mentioned earlier.    You said that in March/April -- and I think you meant 2018, but I'm not sure -- that Bill Barr made the decision to join these cases together.

A      So that would have been 2019.

Q      2019.

And then you said that the case in Delaware was opened January of 2019?    Is that correct?

A      Yep.

Q      Okay.     And then this case was opened May of 2019?

A      So the cases were joined May of 2019.

Q      How was it communicated to you that Bill Barr joined these cases together?

A      I believe it was my manager that told me.     My manager would have been Matt Kutz.

Q      How would he have known?     Would that have come from Justice somewhere or where does that come from --

A      From his leadership, most likely, when we were told -- we were essentially told that we had go up to Delaware to meet them.     And the decision was made at his direction, from what I recall.

Q      "His" being Bill Barr?

A      Yes.

Q      Okay.     Was there any other discussion of Bill Barr taking interest in this case that you heard of beyond it being joined?

A      Not at all.

Q      Was there any reporting up the chain that you know of to Bill Barr?

A      No, not that I know of.

Q      Okay.     Who were the Justice attorneys on the case at the time that Bill Barr decided to join these cases together?

A      So you had Assistant U.S. Attorney Lesley Wolf, Assistant United States Attorney at the time, Jamie McCall.     And then from DOJ Tax it would have been Kimberly Shartar.     And I believe it was either -- I think that was Jason Poole, [DOJ Tax,] but I don't know if he was promoted at that point.     It could have been also Mark Daly[, DOJ Tax]. So it was two or three attorneys from DOJ Tax.

Q      These attorneys that were on the case, did they change when the new

administration started in 2021?

A    Could you elaborate more on that?

Q    So Lesley Wolf --

A    Okay.

Q    -- she was there in 2018, 2019 when these cases were joined.    Is she still on the case?

A    Yes.

Q    And was she --

A    From what I know, yes.

Q    Okay.    Was she on the case at the beginning of 2021?

A    Yes.

Q    January 1 of 2021?

A    Yes.

Q    The same thing with Jamie McCall.    Was he on the case at the very beginning when Bill Barr joined these cases together?

A    Yes, he was.

Q    Was he on the case January 1 of 2021?

A    No.

Q    He was gone?

A    Yes.

Q    Okay.

A    And they were --

Q    Was someone else put on the case?

A    Yes.    Carly Hudson.

Q    When did Carley join the case?

A      At some point in 2020.

Q      Do you know how attorneys are added to cases?    Do you know if that would have been a Bill Barr decision?

A      I don't know, but I don't think so.

Q      What about Kimberly Shartar?

A      Shartar.

Q      Shartar.    Was she --

A      Shartar.

Q      Was she on the case at the beginning?

A      I believe so, yes.

Q      Was she still on in 2021?

A      No.    She left for a position to become an Assistant United States Attorney in another district.

Q      Was someone else appointed, or put on the case?

A      At some point, Jack Morgan was put on [from] DOJ Tax.

Q      Do you know when he was added?

A      That I do not know.

Q      Would it have been before 2021?

A      Yes.

Q      Jason Poole and Mark Daly -- one of them was on at the beginning?

A      Yes.

Q      One of them was still on in 2021?

A      Yeah, Mark Daly was still on in 2021.

Q      Is he still on the case now?

A      I believe so, yes.

Q      Okay.    Now you mentioned the storage unit and the decision regarding the search.    That was in 2020, correct?

A      Yes.

Q      At the time that the search decision was being made in 2020, were these individuals, the ones that we discussed that were there in 2020, were they the ones that would have made the decision about the storage unit?

A      One of those people, yes.    It would have been up to Lesley Wolf and Mark Daly and potentially Jack Morgan.

Q      But that was a decision still made under the prior administration, and it was made sometime in 2020 after Bill Barr had joined the cases, correct?

A      Yeah, I don't know if by that point -- I don't know when Bill Barr left Main DOJ.

MAJORITY COUNSEL 2.    December 23rd --

Mr. ███.    Okay.

MAJORITY COUNSEL 2.    -- 2020.

BY MINORITY COUNSEL 1:

Q      In your experience, would you think that individuals that had been working a case would change their position because a new administration comes in in 2021?

A      I have never seen that, and I would have reason to hope to believe that that wouldn't happen.    And I have no indication that it was because of a change of administration.

Q      It seems as if they were acting -- in my mind their actions seem consistent over the two administrations, that they had a position that they took and they continued with that position going forward when they made their decision to -- when you probably left the case or even today, since we don't know what's going on today in the case.

A       Yeah, I would to like say something to that, that it wasn't always all bad as it might -- I know I'm bringing up some of the things that have happened that I thought were out of the ordinary and what, looking back, might have been improper.    There was some good that we did, too.

So I don't want it to appear like it was just -- but it was definitely an atmosphere and it was -- as you can see in my emails and, looking back, it was very hard for me to do my job.    I was not handheld but --

Mr. <u>Zerbe.</u>    Handcuffed.

Mr. ████.    -- handcuffed.

<u>MINORITY COUNSEL 2.</u>    How unusual, or in your experience, how frequently have you seen cases merged from the DOJ and IRS?

Mr. <u>Zerbe.</u>    Let's go off the record.

<u>MAJORITY COUNSEL 3.</u>    Off the record.

[Discussion off the record.]

BY <u>MINORITY COUNSEL 2</u>:

Q       That's what I'm asking.    How common is that circumstance?

Sorry.    Back on the record.

A       I have never had that happen in my career.

Q       Would you say it was something of an unusual occurrence for the Attorney General himself to order that?

A       Looking back at it, I think he was trying to utilize the resources that he had. And I recall doing venue analyses for them to determine where proper venue was, to see if -- but everything that I did said that we were -- there's no residence of Hunter other than his dad's residence, his dad, President Biden, in Delaware.

So his return preparers are in, I think it's Maryland, his -- at the time were in

Maryland.    So everything was pointing to outside of Delaware.

Q      Well, when you say utilize his resources, is it usual for the Attorney General to take a specific interest in a case that maybe conservatively would be of, you know, $1 million in value to the U.S. Government, which, although obviously is a lot of money to the folks sitting here, is pretty small, small dollars relative to the entirety of the fiscal --

A      Can ask you your question again?    I apologize.

Q      Does the Attorney General usually weigh in on cases where you're talking about $1 million?

A      I've never had that happen before.

Q      To your knowledge, did Attorney General Barr weigh in, or seek updates on the investigation after those cases were joined?

A      Not to my knowledge.

       BY MINORITY COUNSEL 1:

Q      You mentioned that the FBI leadership was involved in the case.

A      Uh-huh.

Q      And there was some reporting up the chain that you were aware of regarding the FBI leadership's being kept in the loop, I guess, for lack of a better word.

A      Yes.

Q      When did that start, that you became aware of it?    And when did it start, the reporting up the chain at the FBI?

A      I would honestly say it started in the beginning.    I was constantly hearing about them having to report up their chain regarding what was going on.    And towards the end of the case, what was kind of -- it wasn't amusing to me but, the fact they were updating their leadership on a tax investigation.    So their high-up leadership, I should say, was more caring about what we were doing in our investigation.

Q       When you say that the FBI leadership was kept in the loop from the beginning, do you mean November of 2018-ish, in 2018 when you first got involved?

A       So my knowledge of it would have started occurring in the summer of 2019.

Q       Did that continue through 2020?

A       I believe so.

Q       Are you aware of the FBI leadership at any point talking to Attorney General Barr and his leadership regarding this case?    Are you aware of any meetings like that?

A       Not that I'm aware of.

Q       I want to ask a little bit more about the grandchildren.    You said that it's not abnormal to talk to relatives and family.    How old were the grandchildren that you were seeking to interview?

A       We never got -- I honestly don't even know.    I know one of them had to have been in college, so college age, yeah.    To be honest with you -- because we were never allowed to go do it -- normally I would have pulled public reporting, or I would have pulled information that would tell me this.

But because we weren't going to go do it, I didn't need to pull any of that.    So I didn't know their age.

Q       But college age?

A       The one, yes, I believe is college or has graduated from college.

Q       When asked whether this was a reasonable step, you said that you thought that it was a reasonable step to interview someone because another person took a deduction regarding them on the tax return?    That's typical at the IRS?

A       It's not -- in my opinion, that's more of a blanket statement.

How we do our jobs is if -- when we're doing an investigation and we're looking into someone's tax returns, we find the areas that there might be fraudulent deductions.

If this is a deductions case, we look at the deductions.

So if we have a payment that's made to ABC company, and on the memo line it says for whatever their daughter's name is, then we would want to go and talk to that person.   Why was this payment made on your behalf?

And then that's kind of the reason or the line of why we do those interviews.

Q      Okay.   You mentioned that, for instance, your first step might have been to go to Columbia school and ask about the $30,000 and get their records.

Why would that have not been enough to establish what the $30,000 was for if it was for tuition?   Why the extra step of trying to talk to the grandchild?

A      So like I said, typically if -- there could be a situation where I did work for someone, and then instead of giving me actual monetary compensation, they pay for my school.   So that could be a deduction for you, a legitimate deduction.   So as a part of our investigation, we have to figure that out.

BY MINORITY COUNSEL 2:

Q      Did you, as a part of your investigation, talk to all of the hotels where payments were flagged?

A      Almost 100 percent of them.   There was a significant amount of them, yes, specifically for 2018.

Q      What were you seeking in talking to the hotels?

A      We were seeking records regarding hotel stays and the reason for the expenses.   I have the answer for you.   It's a Boulware [Greenberg] issue.   So that's what the legal term is for it: Boulware [Greenberg].   That's why you want to go to a third party to find out.   So we can't just rely on that, this looks personal.   We have to actually go and figure that out.

Q      Is that the name of a case?

A    I believe so, yes.

BY MINORITY COUNSEL 1:

Q    In talking to the hotels, did you establish who stayed in the hotels each of the nights that were deducted?

A    Yes, we got information from the hotels about whose name was on the room.    If there were any issues with the rooms, yeah, there was a lot of information that we got from the hotels.

Q    You mentioned one of the nights was in the name of President Biden?

A    Yes.

Q    Okay.    Do you know if his Secret Service was there with him that night?    Is that on your hotel records?

A    That I do not know.

Q    Were you able to establish that he was actually in the hotel?

A    No, I was not.

Mr. Zerbe.    Can we go off the record?

MAJORITY COUNSEL 3.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 3.    On the record.

Mr. ████.    Back on the record.    I apologize.

I have a receipt of something that was purchased from the person, whoever stayed there, a receipt for food for room service.

BY MINORITY COUNSEL 1:

Q    Oh, you have the receipt that someone was in the hotel room?

A    Yes.

Q    Okay.    But not necessarily who it was in that hotel room?

A    Correct.

Q    Okay.    When you interviewed the hotel, did you interview the employees, as well?

A    So let me be clear on this.    We didn't interview the hotel in this situation. We would have asked for records from the hotel.

BY MINORITY COUNSEL 2:

Q    Would you submit that asking for records from a business is less intrusive than surprising an individual for an interview with the Justice Department or the IRS Criminal Investigation Unit?

A    When we do interviews, or when we do records requests, we don't -- at least in my profession, we don't consider what's least intrusive.    We consider that for search warrants.    But when it comes to going to someone's door and knocking on it to see if they want to submit to a voluntary interview, I would not consider that intrusive.

Q    Is it not that you wouldn't consider it intrusive per se?    It's just whether it's intrusive or not is something that you would not factor into in your investigative process?

A    So if it's a situation of either interviewing someone or issuing them a records request, both of them require me going to them to give it to them or to actually go there and talk to them.    So both -- in the situation with a hotel, you can mail those certified mail.

Q    Right.

A    But in terms of individuals, we can't -- there are situations where we could mail them, but typically we go to the door and we knock.

MINORITY COUNSEL 2.    Can I --

MINORITY COUNSEL 1.    Go ahead.

BY MINORITY COUNSEL 2:

Q      What is the purpose of a drive-by?

A      To establish if someone's living there, if they're present at home, their modus of -- when they are home and when they're not home.    It's to give people or to give the investigators an idea of just their normal course of what they're doing.

And it's also to establish in this case, if there was Secret Service out front, if there was a protection detail.    All those various things come into play.

Q      In order to establish, for instance, whether the person is home, whether it's lived in, what their pattern of usage of the home was, it's not merely sort of walking by casually on the street.    It's repeatedly doing so, correct?

A      It doesn't necessarily have to be repeatedly doing so.

Q      But it often can be?

A      It can be, yes.    In our job, we are trained and taught to do surveillance without being caught.    So that's part of our training, surveillance or a drive-by or a walk-by.

Q      Do we know if Mr. Biden's house was, for instance, at the end of a cul-de-sac?    On a street?    Had a sidewalk where people typically walk?

A      I think this one was in Venice Beach.    It so was just on a -- I think I have actually been there.    There was a sidewalk.    It's a normal neighborhood.

BY MINORITY COUNSEL 1:

Q      On surveillance, you had mentioned that you had roughly 60 people that you wanted to interview.    Did you put surveillance on all 60 of those individuals?

A      No.

Q      On how many of them?

A      Let me be clear on that, that it was originally, we had a larger group of people that we first wanted to interview.    That got smaller, smaller, and smaller until we

got to 10.   I believe that all 10 of those people, we did some sort of surveillance to get eyes on them before doing our day of action.

Mr. Zerbe.   Just off the record.

MAJORITY COUNSEL 3.   Off.

[Discussion off the record.]

MAJORITY COUNSEL 3.   Back on.

BY MINORITY COUNSEL 1:

Q    I think that I was talking more broadly than just the day of action.

A    Okay.

Q    Of all the people that you interviewed, which I assume it's roughly 60 or more, how many had surveillance of any sort?   A drive-by?   A walk-by?   A sit in front of their house?   How many people?

A    It would have been just in that first very instance, the people that we did that December 8th activity related to.

Q    So the 10.   And would the --

A    It would approximately be the 10.

Q    Approximately 10.

Would you have done your surveillance over a number of days?   Weeks?   Is it one day?   One hour?   How long?   How much surveillance?

A    I honestly don't know.   Some of the time we can -- they have a specialty unit within the FBI that can go and do surveillance if we need it of that particular person.

Q    Related to the day of action, which was going to be in 2020 under the prior administration, you had surveillance out on roughly 10 individuals, the ones that you were planning to do the interviews of on that day.

A    And I think it was only to establish that they lived there, to verify that the

person lived there.

Q    Who are the 10?    Do you know who they were?

A    I honestly do not.

Q    Does it include his family members?    Any family members?

A    It does, but it -- so one of the family members that we weren't able to -- they didn't allow us to interview but we were able to serve a records request was James Biden and Sara Biden -- I don't think that we did surveillance of them at all -- his ex-wife, Kathleen Buhle.    And this is all from my memory.    So it was on that day or around that day.    There was also, I believe, Hallie Biden?

Q    Who is Hallie Biden?

A    That is his deceased brother's wife -- widow.    I'm sorry.

BY MINORITY COUNSEL 2:

Q    For clarity, this was in October of 2020?    I'm sorry.    The date of action, what date are we looking at again?

A    December 8th.

Q    December 8th, 2020.

Do you think that, given the fact that many of these were relatives of the President-elect, there would be media presence possibly surrounding some of these individuals?

A    Not that I was aware of.

Q    But if there were to be media presence in some form or another, would that be of concern to either the Department of Justice or the Criminal Investigation Unit?

A    I don't know -- what I can say from my normal process and procedure, if I saw the media out front of someone's house, maybe I might wait until the next day, or wait until that media -- it just depends on the situation.    If it's an interview that I need,

the whole purpose of that was that we were trying to somewhat take people off guard, surprise, and get information from them.

But this was their personal residences.    I wouldn't expect the media to be outside their personal residences.

Q    Can I go back to something that you said -- my colleagues were asking questions previously.    We were referring to Lesley Wolf.    Our counterparts asked whether she was potentially looking for a job in the administration and you suggested -- not that you were aware of and the like.

But then you said something to the effect of, if we had brought this case in SDNY or D.C., we wouldn't be here right now.    That surprised me a bit.    And, leaving SDNY aside, I'm curious why you have that opinion about D.C., when we've learned that D.C. declined to take this case up?

A    So it was a President Biden-appointed attorney who I believe said no to working this case in Washington, D.C.

When a lot of times when another U.S. Attorney's Office gets a case at the absolute end of that case, they don't like it very much because they didn't do the investigation.    So what I was trying to say by that was the D.C. U.S. Attorney's Office and New York, they've worked cases of this caliber.    So they know how to aggressively work these cases.

And this is just from my observations and opinion.    Let me clarify that.    But that's personally what I believe.

Q    In your experience, the Attorney General's Office in Delaware has historically not pursued either tax crimes or other financial crimes with any vigor?

A    No, I don't want to say that at all.    I would want to say that it's a smaller U.S. Attorney's Office.    So a lot of times when you have a smaller U.S. Attorney's Office,

they're a lot less -- I don't want to use the wrong word here.

It's just it's -- the problem that the agent that I spoke with that's from that U.S. Attorney's Office that said that they love to slow-walk things.    It's very common in that office.

Yeah, I said earlier that they were the JV squad, in my opinion, and weren't up to the task of tackling this.

Q    Was this your first time working with that office?

A    Yes.

Q    So safe to say, you were frustrated with working with that office.    But at the same time, as a general matter, as a condition of your job, when you have to work with different U.S. Attorney Offices around the country, oftentimes you get sort of different flavors in an office.

A    Yes.

Q    Is that safe to say?

A    Yes.

Q    At least to an extent, sort of understanding the flavor of how that office worked is part and parcel of your job.

A    Yes.

        BY MINORITY COUNSEL 1:

Q    Can I go back to the $10,000 payments that were made per month?    You mentioned that he was making payments voluntarily.    Is that correct?    Or did he have --

A    Yes.

Q    -- some sort of installment agreement with the IRS?

A    He had a quasi-payment plan that he set up through his accountant, paying $10,000 a month.    But, yes, he had something set up.    It wasn't actually officially set up

with the IRS though.

Mr. <u>Zerbe.</u>   Let's go off the record.

<u>MAJORITY COUNSEL 2.</u>   Off.

[Discussion off the record.]

<u>MAJORITY COUNSEL 3.</u>   On.

<u>MINORITY COUNSEL 1.</u>   Back on.

Mr. ████.   Okay.   So it wasn't an official monthly installment agreement, no. It was self-imposed through his accountant.

And I would also like to say that his passport was revoked.   He wasn't able to get another passport because of the delinquent taxes.

They sent multiple notices.   There's an actual email where he asked how long he can go without paying his taxes.   And, meanwhile, let me reiterate that in the time after this, when he stopped the payment plan -- he stops making the payment plan.   He earns, I think it's over -- I don't want to mistake this number.   He earns $2.4 million from Hudson West III but can't make the $10,000 payment he was making on his taxes.

BY <u>MINORITY COUNSEL 1</u>:

Q   What was the date of when he stopped making the payments?

A   March 5th, 2018.

Mr. <u>Zerbe.</u>   Is the last payment?

Mr. ████.   Is the last payment, yes.

BY <u>MINORITY COUNSEL 1</u>:

Q   Do you know how much he had paid by that point on the $10,000 payments, how many months he had paid?

A   Seven of them, $70,000.

Q   Okay.   I want to go back to the loan.   You said that the way that they set it

up was that there was something attached to his return and it said that part of this was a loan and there was an interest rate of 5 percent.

A    Uh-huh.

Q    Okay.    Did you look into any paperwork regarding that loan?

A    We did attempt to obtain that note, yes.    We did attempt to obtain it, yes.

Q    Did you obtain it, or you just attempted?

A    I don't recall, and I go back to my previous statement that I don't feel comfortable going any further than.

Q    Okay.    Okay.

<u>MINORITY COUNSEL 2.</u>    For clarity's sake, though, because I just want to make sure something is clear on the record -- do you agree that, assuming that there is a true loan, which is to say, a promissory note with interest, and the interest is [paid]-- it's not a sham.    There's nothing untoward about that loan -- an individual making a loan for the ability of another person to satisfy his tax liability.    There's no tax fraud element to such a thing.

[3:33 p.m.]

Mr. ███. It honestly depends if you're able to sham the transaction.

BY <u>MINORITY COUNSEL 2</u>:

Q    Assume it's a true loan.    It's a true honest loan.    This is not a trick question.    I'm not -- I'm just trying to --

A    So, yes, if something is a loan, we would give them the benefit of the doubt. And our most conservative approach is that it's not income, correct.

Q    Similarly, in the case of someone who provides someone with funds out of detached and disinterested generosity in order to satisfy their tax liability, that would be considered a gift and thus not subject to Federal income tax, at least by the recipient?

A    There would be gift tax reporting requirements, and those would have to be upheld, but --

Q    By the donor?

A    Correct.

Q    I want to make sure that, at least on the face of the transaction as described to us, there are certainly two avenues under which such an arrangement would not raise any flags from the perspective of the Internal Revenue Service?

A    Correct.

BY <u>MINORITY COUNSEL 1</u>:

Q    All right.    I want to go back to a little bit of the discussion on the Washington Post article and the comment by Chris Clark, and then there was a question to you.

The statement was that you had heard something somewhere that someone had maybe said that, if they were to charge this, it would be career suicide.    That was

hearsay, third party, that --

A    Yes.

Q    -- you just heard from a third party?

A    Yes.

Q    You have no name as to who said that?

A    I believe it came from Chris Clark, but I only know that from --

Q    But you don't know anyone inside that said this would be career suicide to charge this?

A    Inside the --

Q    The IRS.

A    Oh, yeah.   No, I -- no.   No, no, no.   No.

Q    Okay.   What about from Justice?   Did you hear anybody say that?

A    No.

Could I add one more thing?   I know this is on your time but.

There are potential other spin-offs and things that were in the process of being worked that I somewhat fear are going to get lost in the shuffle of everything that went on in that because, essentially, all I'm having to do is turn my information over to the next case agent.   So that is of a definite concern to me, and it's why I think I've been so vocal on the special counsel perspective and having that neutral person come in there and essentially review the evidence and make his decision.

        BY MINORITY COUNSEL 2:

Q    Can I ask one more question?   I did have one more note that I wanted to raise.

What is the difference between making a referral or bringing a case in the case of Mr. Weiss?   I'm sort of curious.   At least from your perspective, what is the difference

between those two things, at least as spoken by Attorney General Garland?

A      I would -- this is my assumption based on that.    It's referring the matters from your jurisdiction to another jurisdiction.    So referring the work to the other jurisdiction to where you want to charge the case.    So that's bringing the case.

Q      Those seem to be synonyms, as you're describing them.

Mr. Zerbe.    I just want him to see the writing.    I think there's a referral to the case or to bring cases.

Mr. █████.    Yeah, that leads me to believe that statement right there that he has full authority to do whatever he wants with his cases.

BY MINORITY COUNSEL 2:

Q      Admittedly, it's an ambiguous term or phrase because he does say make a referral or bring a case.    I'm trying to understand what the difference between those two are because you pointed out that he did make a referral and he had authority to make a referral, but what would bringing a case be?    What would he do differently if he were to bring a case as opposed to make a referral?

A      So you have this right here where it says, "I have not heard anything from that office that suggests they are not able to do anything that the U.S. Attorney wants them to do."

And the U.S. Attorney wanted them to bring charges in the District of Columbia. And that completely contradicts that statement.

Mr. Zerbe.    Let me go off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

Mr. █████.    So each of these two statements showed to me that there wasn't going to be anything political involvement in this.    That you had this neutral person from

the prior administration that's coming in, and that he's going to be able to do whatever he wants.    And that's what they have confidence in.

The problem I saw was that you have President-appointed U.S. Attorneys who are a part of the process now, so now it has become political again.    So you have a political appointee from a different party that was literally just nominated.    I think it was U.S. Attorney Estrada.    And this is the first thing he gets on his desk.    So the President just appoints me, and this is the first thing that I've got to deal with.

And the part that was -- I know I use this word a lot -- frustrating was that this was for the years that they told us were slam dunks.    Slam-dunk cases.    I was told that by the AUSAs and the DOJ Tax attorneys.

BY MINORITY COUNSEL 1:

Q    Could it be that, when there's a referral, the receiving AUSA -- it's at their discretion then to decide to bring the case versus just bringing the case directly?

A    Yeah.    Yes.

Q    Could it be that the AUSAs that received it have other considerations based on their jurisdiction and cases that they've seen that have been successful in their own jurisdiction?

A    Yes, that is true.    AUSAs can provide guidance based on what they know from their area.

Q    The AUSA -- Weiss -- he was Trump-appointed, correct?

A    Yes.

Q    The two -- well, at least for D.C., the AUSA was Biden-appointed, correct?

A    Yeah.    If you want, the name of him -- just so we're clear for the record.    I have it.    Matthew Graves.

Q    Matthew Graves.

But it isn't that one is more correct than the other, it's just that you have two AUSAs, and they have different opinions of the case?

A      So I go back to Merrick Garland's statement that he says.     "He is in charge of that investigation.     There will not be interference of any political or improper kind."

Q      I guess what I'm asking is, if the situation had been turned around and he had taken the case, then we wouldn't be here.

So, as long as it's a yes, then there's no political interference, but if there's a no, then there is political interference?     That can't be the way that we decide whether or not an AUSA brings a case.

A      So I guess I want to be clear here.     I was not afforded an opportunity to present to D.C. on the merits of the case, what we had found through our investigation for 2014, 2015.     I was not afforded the opportunity to present to the Los Angeles U.S. Attorney or the U.S. Attorney's Office with the evidence that we had found in this case. That was not given me the opportunity.

So that right there alone, I think, is improper on its face.     The people that know the case the best, the case agents that work the case, should be the ones that present on the material.

The thing that draws me pause is the conversations I had with Mark Daly in March 2022 to where -- they get the case.     They get the referral.     They're like, here's what we're going to do to help you guys.     And then a few days later, they meet with the U.S. Attorney, and the U.S. Attorney says, someone in that -- this is all what I heard from it. They said, not only are we not going to help you with that case, but we also don't think you should bring charges here.     So that led me to believe that there might be something else going on there.

Q      In the other cases that you have, have there not been any disagreements in

any of those cases in your career?     When cases go up to the AUSAs, they just take them

all?   They take every case that IRS sends?

A     They do not, no.

BY MINORITY COUNSEL 2:

Q     In general, in your experience -- well, I'll just say this.

In my working experience, I often would love to be the person who -- when I feel

like I'm closest to the facts -- is the one presenting the information to the principal,

making the [decision] -- but quite frankly, I don't always get that opportunity.     I think it's

an experience that many of us in our legal careers have experienced.

Is this the only time that you haven't been able to present your case to the

decision-maker and someone above -- the level above you was in charge of doing that

instead?   Or even two levels above you?

A     Well, yes, there are situations like that.     But from what I know, no one from

the IRS, my agency, got to present to the D.C. U.S. Attorney's Office or California.

MINORITY COUNSEL 1.     We're good.

[Discussion off the record.]

MAJORITY COUNSEL 2.     Back on the record.

BY MAJORITY COUNSEL 2:

Q     During our discussion of the 2018 tax year, you mentioned that Hunter Biden

was making business expenses for prostitutes?

A     Yes, in some circumstances.

Q     Could you give us a little bit more information on that?     What was the

nature of the -- was he paying for -- were they on the payroll?     Was he paying for travel?

A     In some situations, they were on payroll, and that was to get them health

insurance in certain situations.     There was --

Q    So he's paying for health insurance for his prostitutes?

A    Not necessarily for -- so let me go back and -- so one of his girlfriends was on the payroll and --

Mr. ████.    Off the record, please, for a second.

[Discussion off the record.]

MAJORITY COUNSEL 2.    Back on the record.

Mr. ████.    So Lunden Roberts, she was on his payroll.    She was not working. She was actually living in Arkansas pregnant with his child, and she was on his payroll.

There were expenditures for one of -- he called it his West Coast assistant, but we knew her to also be in the prostitution world or believed to be in the prostitution world. And he deducted expenses related to her.    She relates to the sex club issue.

And then there were -- and I know that my counsel brought this up earlier. There were some flying people across State lines, paying for their travel, paying for their hotels.    They were what we call Mann Act violations.

Q    Where he was paying for the travel of an individual to fly out to California or wherever?

A    Or Boston or wherever he was at.    D.C.    I think one of them -- he flew someone for the night.    So, yeah, there were situations like that as well.

Q    And were those Mann Act violations referred to the Justice Department?

A    I know that they were compiling them together.    I don't know what they ended up doing with them.    I know there was an effort at some point to compile them, but I don't know what ultimately happened with them.

Q    And did you interview any of the prostitutes that traveled across State lines --

A    I don't --

Q      -- for that purpose?

A      I don't remember.    There were -- so let me use the correct term here.    If there were prostitutes -- some ended up being his girlfriends.    So, they all kind of morphed and changed.    So I want to be accurate in how I represent them.    But there were a lot of females that I believe he was having sexual relationships with that I ended up interviewing.

Q      And he was paying money for the purpose of a sexual relationship, correct? To the best of your knowledge?

A      To the best of my knowledge, yes.

Q      Okay.    The discussion last round about the Attorney General Barr's involvement, are you aware of the Justice Department policies and procedures that relate to sensitive investigative matters and political matters?

A      I am not.

Q      And do you know if the Attorney General, under the DOJ rules and procedures, has to make some of these decisions?

A      I did not.

Q      Would it surprise you if, in fact, the Attorney General does have to sign off on certain things when it relates to the son of a Presidential candidate or an incoming President-elect?

A      It wouldn't surprise me at all.

Q      Okay.    When Joe Biden stayed at a hotel and Hunter Biden expensed that as a business expense, did you come across any other evidence that Joe Biden was involved with business dealings of Hunter Biden other than the 10 percent for the big guy that you mentioned earlier?

A      Yeah, I'd also mention the WhatsApp.    The indication in there that

regarding -- right before they entered into the CEFC deal --

Q    Okay.

A    -- that the data was there.    And then as far as the trip out to California and the hotel stay, we don't know whether that was for a business purpose -- we just know it was supposedly deducted.

Q    And that was in 2018?

A    Yes.

Q    Okay.    So Joe Biden wasn't the Vice President at that time?

A    No.

Q    Correct?    And he wasn't President?

A    No.

Q    So he didn't, to the best of your knowledge, have Secret Service detailed during 2018, correct?

A    Not that I'm aware of.

Q    It's my understanding -- I think we can stipulate that former VPs get Secret Service for, I think, 90 days or 6 months after their term of office, but then the Secret Service is no longer applicable.

You have no reason to believe that he had Secret Service during the 2018 timeframe, do you?

A    No.

Q    Okay.    Just a question about working with the U.S. Attorney's Office in Delaware.

It seems like the elephant in the room is that -- correct me if I'm wrong, but -- Joe Biden and anyone in the Biden family is royalty in Delaware.    Is that not the case?

A    It was definitely something that was overly apparent in the State, yes.

Q      So whether the President is a Republican or a Democrat, if you are in the district of Delaware, and you are in the U.S. Attorney's Office, and you are trying to bring a case against a family member of Joe Biden, that inherently has its challenges, doesn't it?

A      Yes.

Q      Because Joe Biden is, in effect, royalty in Delaware, correct?

A      I don't know if I would use the term "royalty," but I think he is someone that's a big deal within that State.

Q      Right.    And so all the nonpolitically-appointed officials in the office certainly could be affected by the fact that we're dealing with Joe Biden, correct?    In that office?

A      I went into it with the belief that I would hope that that wouldn't happen. But it being in the Delaware area, it very well could have happened that way.

Q      Okay.    And Lesley Wolf wasn't a political appointee, correct?

A      She was -- not to the best of my knowledge.

Q      Okay.    And Mark Daly wasn't a political appointee, was he?

A      Not to the best of my knowledge.

Q      And Jack Morgan wasn't a political appointee, correct?

A      Not to the best of my knowledge.

BY MAJORITY COUNSEL 1:

Q      And when the U.S. Attorney in D.C. declined, that U.S. Attorney was a political appointee, right?

A      Yes.

Q      And that person was appointed by President Joe Biden.    Is that correct?

A      From the best of my knowledge, yes.

Q      And in the Central District of California, they declined charges in that U.S. Attorney's Office.    Is that correct?

A    From what I have been told through third party, yes.

Q    And that person, that U.S. Attorney, was a political appointee appointed by President Joe Biden.    Is that correct?

A    Yes.

Q    And Attorney General Garland was appointed by President Joe Biden.    Is that correct?

A    Yes.    I would also like to add, I don't know if -- since this recent testimony or things that have happened recently -- if some of this has changed, so --

Q    Understood.

A    And they very well could change their stance, and so I want to make that clear.

Q    Sure.    Is there anything else that we haven't covered today that you would like to share with us?

A    Yeah.    So when we were going through all these issues, we actually sat down after a meeting -- when I say "we," it's me, Gary Shapley, and my co-case agent, Christine Puglisi.

And we wanted to -- at that time -- so this might have been 1 or 2 years ago.    I don't recall the time.    I'm sure if we go back, we can figure it out.    It probably was about a year ago.

But we wanted to get down on paper so that we knew at the time all the problems that we were dealing with.    And we have a list of -- what is it -- seven different areas, and they include lack of transparency, outside the normal course of an investigation, recurring unjustified delays, enforcement actions, misrepresentation of investigator's requested actions, investigator discussions related to the conduct of prosecutors.    And defense counsel bullying and threats.

This is actually in here.   Prosecutors told investigators on a call on August 12th, 2022, that Defense Attorney Chris Clark threatened them, stating that their careers would be ruined if they brought various charges against Hunter.

They also said -- which I think that this is important, too -- in several other conversations, prosecutors told investigators that defense counsel requested meetings with high-ranking DOJ officials before any charging decisions were made.

Q    And at the time that Chris Clark made those statements, he was representing Hunter Biden.   Is that right?

A    Yes.

Q    And Hunter Biden's father was the President of the United States.   Is that right?

A    Yes.

Q    And the people that he made that statement to were employees of the Justice Department.   Is that correct?

A    Yes.   And a lot of these things, I think we've already gone over in detail. I'm going to look through here and see if there's anything that stands out that is important to you guys.

MAJORITY COUNSEL 2.   Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.   We'll go back on the record.

Mr. ████.   So June 15th, 2022, the meeting with Stuart Goldberg, [Acting Deputy Assistant Attorney General].   The meeting with DOJ Tax at Main DOJ where the purpose of the meeting was misrepresented to the agents.   We had no idea that they were going to bring up a huge presentation to everyone there regarding the reasons why we shouldn't charge this case.

So they presented on their stuff.    I ended up presenting on my side our understanding of the evidence and the investigation.    And it caught us off guard because they misrepresented that meeting to us.

BY <u>MAJORITY COUNSEL 1</u>:

Q      Who was present at that meeting?

A      So you had the SAC and ASAC at the time of FBI.    You had my leadership, which included my supervisor.    Gary Shapley.    That included my SAC at the time.    So that would have been Darrell Waldon.    And I believe my DFO was also present there.    I could be wrong on that.    His name was Mike Batdorf.    Stuart Goldberg was there.    He was the DAG.    David Weiss was there.    Lesley Wolf, Jack Morgan, Mark Daly, and then the agents from the FBI who were part of the case team.

Q      And who gave the presentation?

A      Jack Morgan and Mark Daly.

Q      So not David Weiss?

A      Not David Weiss.

This was lack of transparency section.    "Assistant U.S. Attorneys irrationally dismissed most suggestions from the investigators, creating an environment where investigators were apprehensive to bring up differing opinions."

There's one in here that -- can I do something off the record?

<u>MAJORITY COUNSEL 1.</u>    Go off the record.

[Discussion off the record.]

<u>MAJORITY COUNSEL 1.</u>    Back on the record.

Mr. ████.    "Prosecutors at one point instructed investigators not to complete any other work that was not specifically tied to the tax year 2014."

And the whole reason behind that was because we were running out of our

statute.    We had an issue with our statute that year.    So they made us focus everything in our work on 2014.

"Prosecutors instructed investigators not to ask questions in a certain area because they did not want to get DOJ PIN" -- Public Integrity -- "involved because that would result in another layer of approvals."

Yeah.    There was -- "A recurring discussion occurred between the FBI and IRS CI" -- so agents with both -- "about the unprofessional conduct engaged by the prosecutors."

And this is under investigator discussions related to conduct of prosecutors.

"FBI telephoned IRS CI in May or June of 2022 suggesting that we request a special counsel be assigned."

Q    Do you know who at the FBI made that call?

A    I do not know.    But I believe that was the supervisor at the time, Joe Gordon.

"At several times during this investigation, we were made aware that FBI leadership was confused and concerned about the path the case was taking.    Evidence of this concern was that the Baltimore FBI SAC at the time attended a meeting at Main DOJ at the Tax Division knowing that only tax charges were on the table being discussed. The FBI SAC asked several questions about the tax case and presented rebuttals to DOJ Tax attorneys, who were presenting on defenses raised by defense counsel.    The FBI SAC made comments during breaks while talking with Gary Shapley that the issues raised by DOJ Tax that might result in not charging are nonsense."

There was one more thing that I was going to bring up, but I --

Q    You've shared a lot with us.

Who was the FBI SAC -- that made the comment you just referred to regarding

"nonsense"?

A     So I would have to get that.    I know I have it.    So we owe you the IRS

Commissioner's email, and I can get you that.

Q     Okay.    Is there --

Mr. <u>Zerbe.</u>    What does he want?

Mr. ███.    The IRS Commissioner's email.

Mr. <u>Zerbe.</u>    I got that.

Mr. ███.    And then the SAC that attended the -- we called it the Tax Summit.

Mr. <u>Zerbe.</u>    Okay.

<u>MAJORITY COUNSEL 1.</u>    I'm going to go ahead and stop there and turn it over to

my colleague.

BY <u>MINORITY COUNSEL 1</u>:

Q     We want to follow up.

You mentioned a June 15, 2022, meeting where you say they misrepresented the

purpose of the meeting, and they presented the reasons why you should not charge.

What were some of the reasons that they gave at the meeting?

A     More so a lot of the evidence related to the defenses that were presented.

So I'll give you an example.

I had an argument with one of the DOJ Tax attorneys regarding the loan.    The

Burisma money loan.    And he was telling me -- so the money kind of switches in 2017.

Hunter starts paying Archer half of his money from Burisma starting in 2017.    And they

actually enter into an agreement stating that they're going to do that from that point on.

Because at that point, Archer is no longer on the board because he had his pending legal

issue going on.

So they kept saying that that money being sent to Archer in the later years was a

repayment of loan.    And I literally held up the document.    I'm like, there's this document that literally lays this out that this is for services rendered related to the Burisma board.    And there's no indication at all, whatsoever, that this money is a loan.

And that was the part where it just got so frustrating with -- I'm showing you evidence, and you're just not listening to me.

BY MINORITY COUNSEL 2:

Q    But they had a whole presentation prepared on their decision not to charge?

A    It wasn't on their decision not to charge.    It was all the reasons why we shouldn't charge for 2014, 2015.

Q    How long would you say that presentation was?    Was it a PowerPoint?

A    I don't remember, to be honest with you.

Q    But presumably, there were a litany of reasons?

A    Yeah.    So when they found out the defense -- that the money was a loan and that part of the taxes were paid, they threw their hands up and they were like, oh, this -- it was essentially like this is the end of the world.

And what me and the investigator did is we figured it out.    We found out stuff after that that we didn't know before.    And we spent so much time working through the issue and showing how it wasn't a loan at all.    There's no indication of it whatsoever. Again, I go back to -- you can't loan yourself your own income.

Q    Can I ask a bit about -- you mentioned just in response to ████'s question -- or it was related around this information.

You said the prosecutors asked you to limit some of your [questions] -- I'm not sure exactly what you suggested they were limiting    -- because they didn't want to get DOJ Public Integrity involved.    Can you talk a little bit more about what DOJ Public Integrity is?

A    It's just another level of approval that, for certain issues, will come and opine and approve whether -- I believe that Public Integrity is involved if you're issuing a subpoena to an attorney.    If they're involved in that.    So there are certain things where they give their approvals for whether you can do something or not.

Q    Does Public Integrity -- I'm sort of trying to get a sense of what would you say the general purpose of that unit or that approval process is?    What is the point of it?

A    I believe when cases are of a political nature and when there's complex issues, or when you need someone outside of your team to opine on something, they're the people you go to.

Q    So --

A    That's my understanding.    So this is -- I'm not a part of DOJ.    So I only know this from what I've heard.

Q    Doesn't the fact that prosecutors were sort of trying to avoid that extra layer of review indicate -- not that they were trying to stonewall the process, but actually rather trying to expedite the process?

A    I guess I'm confused by the question.

Q    Well, presumably, another layer of review would only add time to various steps along the investigative process, right?

A    I just -- I wanted to follow the evidence.    I wanted to do the right thing. And I go back to -- if David is truly in charge and he's supposed special counsel, why are we going to these approvals?    Why can't David, who is in charge of the investigation, just allow us to do it?

Q    I guess I don't know the answer to that question.

But are these -- I don't know to what extent -- maybe you can tell me.    Does David have the authority to bypass all DOJ approval processes at his discretion?

A      I don't think so.    But, in my opinion, that would be something that you guys would have to figure out.    What authority did he -- and, everything is pointing to me that he didn't have that authority.

Q      As a matter of course, can an AUSA, bypass those kinds of procedures? Who would need to grant permission to bypass the standard DOJ procedures such as getting approval from the Public Integrity?

A      Yeah -- I would look at current special counsel cases.    What approvals are they having to get?    What are they having to do?    So that's what I would do if I were trying to figure out an answer to that.

I had no issue -- to be honest with you, I had no issue with getting the approvals. But when you're putting the approvals as a roadblock that we don't want to do it because, well, that's going to take too much time to get those approvals and when we're trying to put everything out there to follow the right path, that is frustrating.

Q      I guess what I'm wondering is, is there a balance?    In any organization, you know, there are processes and approvals.

It incumbent upon the prosecutors to sort of weigh the probative value of the evidence that they might potentially gather with the speed and other issues potentially related to Public Integrity and the like that could be intended in gathering that evidence?

A      I understand what you're saying, but, yeah, I don't know how to appropriately answer that.

Mr. Zerbe.    I just want to make sure you answer --

Mr. ████.    Off the record.

[Discussion off the record.]

MAJORITY COUNSEL 1.    Back on the record.

MINORITY COUNSEL 2.    I don't have anything else.

MINORITY COUNSEL 1.   That's it.   We have nothing else.

BY MAJORITY COUNSEL 1:

Q      I just have a couple follow-ups or maybe just one.

If someone meets all the elements for a crime of willful evasion and are found to, in conjunction with that, owe a liability, and they pay off that liability years later when they've been caught, has a crime still been committed?

A      Yes.

Q      Is there anything else we haven't covered today that you would like to share with us?

A      Not that I can think of.

MAJORITY COUNSEL 1.   With that, I have no further questions.   I'd like to thank you for making this disclosure and for coming in and for your service.   Thank you very much.

[Discussion off the record.]

MAJORITY COUNSEL 1.   Back on the record.

Mr. ████.   Any of the agents' names that I've said, if those could be redacted. Because, I'm coming forward as a witness.   I'm asking for those protections as well, but I don't want to ruin people's careers because they're a part of this investigation, so --

MAJORITY COUNSEL 1.   We understand your request, and we'll take that under advisement.

Mr. ████.   Okay.

MAJORITY COUNSEL 1.   Thank you.

Off the record.

[Whereupon, at 4:21 p.m., the interview was concluded.]

Certificate of Deponent/Interviewee


I have read the foregoing _____ pages, which contain the correct transcript of the answers made by me to the questions therein recorded.



_____

Witness Name



_____

Date

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

         *Plaintiff*,

    v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

         *Defendants*.

Case No. 1:24-cv-815

# Exhibit E

1

```
 1                IN THE UNITED STATES DISTRICT COURT

 2                 FOR THE DISTRICT OF DELAWARE

 3

 4    UNITED STATES OF AMERICA,  )
                                 )
 5                               ) CRIMINAL ACTION
      v.                         ) NO. 23-mj-274(MN)
 6                               )
      ROBERT HUNTER BIDEN,       ) CRIMINAL ACTION
 7                               ) NO. 23-61(MN)
                  Defendant.     )
 8

 9                   Wednesday, July 26, 2023
                     10:00 a.m.
10                   Initial Appearance
                     Plea Hearing
11
                     844 King Street
12                   Wilmington, Delaware

13
      BEFORE:  THE HONORABLE MARYELLEN NOREIKA
14             United States District Court Judge

15

16    APPEARANCES:

17

18             UNITED STATES ATTORNEY'S OFFICE
               DISTRICT OF DELAWARE
19             BY:  BENJAMIN L. WALLACE, ESQ.
               BY:  DEREK E. HINES, ESQ.
20             BY:  LEO J. WISE, ESQ.

21
                        Counsel for the United States
22

23

24

25
```

2

```
 1    APPEARANCES CONTINUED:

 2

 3    CLARK SMITH VILLAZOR LLP
      BY:  CHRISTOPHER J. CLARK, ESQ.
 4
      -and-
 5
      BERGER HARRIS, LLP
 6    BY:  RICHARD I.G. JONES, JR., ESQ.

 7
                     Counsel for the Defendant
 8

 9

10             _ _ _ _ _ _ _ _ _ _ _

11

12         THE COURT:  All right.  Good morning, everyone.
13    Please be seated.  All right.  Hold on.  Let me just start
14    by reminding everyone that there is no recording of these
15    proceedings that is permitted.  For those of you in the
16    back, you are certainly permitted to watch, but we will not
17    have any disruptions.  Any disruption or attempt to disrupt
18    will result in the Court's security personnel or the U.S.
19    Marshals escorting you out.
20         All right.  With that.
21         MR. WISE:  Good morning, Your Honor.  Leo Wise,
22    Derek Hines, and Benjamin Wallace on behalf of the United
23    States.  Now is the time the Court has set for an initial
24    appearance on the criminal information filed in the United
25    States versus Robert Hunter Biden, 23-cr-61-MN charging the
```

3

```
 1    Defendant with a firearm offense, and for the entry of a
 2    guilty plea to the criminal information filed in the
 3    separate matter, United States versus Robert Hunter Biden,
 4    23-mj-274-MN, charging the Defendant with two counts of
 5    failure to pay taxes.  The parties are ready to proceed.  I
 6    ask permission to pass up an executed version of the plea
 7    agreement in the tax case at this time.
 8         THE COURT:  You may.  Thank you.
 9         MR. WISE:  And my understanding, Your Honor, is
10    that we're going -- Your Honor first will conduct the
11    initial appearance on the firearm charge and then turn to
12    the plea hearing on the tax charge.
13         THE COURT:  No.  Hold on.  Let me just take a
14    look.  All right.
15         Good morning, Mr. Clark, Mr. Biden.
16         MR. CLARK:  Good morning, Your Honor.
17         THE COURT:  Just so that we don't have you
18    feeling that you need to pop up and down, I am fine if you
19    want to when I'm asking questions stay seated so you don't
20    have to just keep popping up.
21         MR. CLARK:  We won't do it any other time.
22         THE COURT:  All right.  Thank you.  Okay.  So we
23    do have two cases here, one is a criminal action based on a
24    felony information related to a gun charge, and the other is
25    Criminal Action 23-274 based on the misdemeanor involving
```

4

```
 1    the tax charges.  This is the Defendant's first appearance.
 2    I had planned to conduct the initial appearance on the two
 3    cases at the same time.  Is there any objection to that?
 4         MR. WISE:  None, Your Honor.  Thank you.
 5         MR. CLARK:  None, Your Honor.
 6         THE COURT:  I thought it might be more efficient
 7    and save some time.
 8         THE COURT:  Mr. Biden, in Criminal Action 23-61,
 9    the United States Attorney for the District of Delaware has
10    filed a felony information which charges you with possession
11    of a firearm by a person who is an unlawful user of or
12    addicted to a controlled substance in violation of 18 United
13    States Code Sections 922(g)(3) and 924(a)(2).
14         And in Criminal Action 23-274, the United States
15    Attorney for the District of Delaware has filed a
16    misdemeanor information which charges you with two counts of
17    willful failure to pay tax in violation of 26 United States
18    Code Section 7203.  Do you understand that those are the
19    charges that are pending here?
20         THE DEFENDANT:  Yes, Your Honor.
21         THE COURT:  Do you understand that the maximum
22    penalties for the gun charge are ten years of imprisonment,
23    a fine of $250,000, three years of supervised release, and a
24    special assessment of $100?
25         THE DEFENDANT:  Yes, Your Honor.
```

5

1       THE COURT:  And do you understand that the
2   maximum penalties for each of Counts I and II of the tax
3   case are twelve months of imprisonment, a $100,000 fine or
4   twice the gross gain or loss from the offense, whichever is
5   greater, one year of supervised release, restitution and a
6   $25 special assessment as well as costs of prosecution?
7       THE DEFENDANT:  Yes, Your Honor.
8       THE COURT:  All right.  Now, Mr. Biden, you have
9   the right to be represented by an attorney in these matters,
10  that means if you can afford to, you can hire an attorney of
11  your own choice.  If you can't afford to, you may ask the
12  court to appointment an attorney to represent you.  Do you
13  understand that?
14      THE DEFENDANT:  Yes, Your Honor.
15      THE COURT:  All right.  You are presently
16  represented by Mr. Clark.  Do you wish to continue that
17  representation?
18      THE DEFENDANT:  Yes, Your Honor.
19      THE COURT:  All right.  Now, Mr. Biden, you have
20  the right to a preliminary hearing in these cases.  At that
21  hearing, the government would have to produce sufficient
22  evidence to show that it has probable cause to believe that
23  you committed the crimes with which you are being charged.
24  At that hearing you would have the right to introduce
25  evidence and to cross-examine any adverse witnesses who

6

1   would be testifying against you.  Do you understand that?
2       THE DEFENDANT:  Yes, Your Honor.
3       THE COURT:  All right.  Now, I understand that
4   you intend to plead guilty to the tax charges.  Do I have
5   that right?
6       THE DEFENDANT:  Yes, Your Honor.
7       THE COURT:  All right.  Do you understand that
8   if you plead guilty to those charges, you will be waiving
9   your right to a preliminary hearing?
10      THE DEFENDANT:  Yes, Your Honor.
11      THE COURT:  I also understand that the plan for
12  the gun charge is a Diversion Agreement.  Counsel, do we
13  need to do anything regarding a preliminary hearing at this
14  point in light of the planned Diversion Agreement?
15      MR. WISE:  No, Your Honor.
16      MR. CLARK:  We're in agreement with that, Your
17  Honor.
18      THE COURT:  All right.  Mr. Biden, you are not
19  required to make any statements to the authorities.  If you
20  had already made statements to the authorities, you may stop
21  and not make any more.  If you start to make a statement and
22  you change your mind, you may stop at any time.  And any
23  statement that you do make may be used against you.  Do you
24  understand all of that?
25      THE DEFENDANT:  Yes, Your Honor.

7

1       THE COURT:  All right.  Now, pursuant to the Due
2   Process Act, I confirm that the government has a continuing
3   obligation pursuant to Brady v. Maryland and its progeny to
4   produce all exculpatory evidence and I order that it do so
5   at the appropriate time.  The consequences for violating a
6   Brady obligation and/or my order could include, but are not
7   limited to, contempt proceedings, sanctions, referral to
8   disciplinary counsel, adverse jury instructions, exclusion
9   of evidence and dismissal of the charges.  Does the
10  government understand that?
11      MR. WISE:  Yes, Your Honor.
12      THE COURT:  Has all Brady material been
13  produced?
14      MR. WISE:  Yes, Your Honor.
15      THE COURT:  Mr. Clark, any concerns about that?
16      MR. CLARK:  None whatsoever, Your Honor.
17      THE COURT:  Thank you.
18      Pretrial release, what is the government's
19  position?
20      MR. WISE:  The conditions that have been
21  recommended we agree with.
22      THE COURT:  Any concerns about that, Mr. Clark?
23      MR. CLARK:  No, Your Honor, we're in accordance.
24      THE COURT:  You can't help yourself, you're just
25  going to keep jumping up.

8

1       MR. CLARK:  I was taught at a hard school.
2       THE COURT:  I know.  I couldn't even think if I
3   wasn't standing.
4       I understand that pretrial release -- I agree
5   that pretrial release is appropriate subject to the
6   following conditions which I will read into the record.  The
7   Defendant must not violate federal, state, or local law
8   while on release.
9       The Defendant must cooperate in the collection
10  of a DNA sample if it is authorized by 34 United States Code
11  Section 40702.
12      The Defendant must advise the court or the
13  pretrial services officer or some supervising officer in
14  writing before making any change in residence or telephone
15  number.
16      The Defendant must appear in court as required
17  and if convicted must surrender as directed to serve a
18  sentence that the Court may impose.
19      I also impose the following additional
20  conditions.
21      Sir, you must submit to supervision by and
22  report to supervision to the probation office in the
23  district in which you are residing.  You must continue or
24  actively seek employment.  You must communicate in writing
25  all international travel plans and provide supporting

9

1  documentation if requested to both the District of Delaware
2  and the district in which you are residing.  You must not
3  possess a firearm, destructive device or other weapon.  You
4  must not use alcohol.  You must not use or unlawfully
5  possess a narcotic drug or other controlled substance
6  defined in 21 United States Code, Section 802, unless
7  prescribed by a licensed medical practitioner.  I will
8  clarify, however, that marijuana is not legal under federal
9  law and you are prohibited from using marijuana regardless
10 of whether it is legal or not in the state in which you are
11 or it is prescribed by a medical practitioner.
12            You must submit to testing for a prohibited
13 substance if required by the pretrial services officer or
14 supervising officer.  Testing may be done with random
15 frequency and may include urine testing, the wearing of a
16 sweat patch, remote alcohol testing system and/or any form
17 of prohibited substance screening or testing.  You must not
18 obstruct, attempt to obstruct or tamper with the efficiency
19 or accuracy of prohibited substance screening or testing.
20            Just give me a minute here.
21            And you must participate in a program of
22 inpatient or outpatient substance abuse, therapy, or
23 counseling if directed by the pretrial services officer or
24 the supervising officer.  Do you understand those
25 conditions, sir?

10

1            THE DEFENDANT:  Yes, Your Honor.
2            THE COURT:  All right.  Any objection or
3  comments on the conditions imposed?
4            MR. CLARK:  None from the defense, Your Honor.
5            MR. WISE:  Nor from the United States, Your
6  Honor.
7            THE COURT:  All right.  Mr. Biden, violating any
8  of the conditions of release may result in the immediate
9  issuance of a warrant for your arrest, revocation of your
10 release, an order for detention, forfeiture of any bond or
11 prosecution for contempt of court, and it could result in
12 imprisonment, a fine, or both.  Do you understand that?
13            THE DEFENDANT:  Yes, Your Honor.
14            THE COURT:  Anything I left out or anything I
15 need to address with respect to the initial appearances?
16            MR. WISE:  Not from the United States, Your
17 Honor.
18            MR. CLARK:  No, Your Honor.
19            THE COURT:  Now, we have two cases and two
20 agreements and I understand that the Diversion Agreement is
21 not something that is typically before the Court, but you
22 all did send it to me so I do want to talk about that a
23 little bit.  There are some provisions in those agreements
24 that are not standard and are different from what I normally
25 see, so I think we need to walk through these documents and

11

1            get some understanding of what is being proposed so that I
2  can give due consideration to the determination that you all
3  are asking me to make.  So I want to start with Criminal
4  Action 23-274 involving the tax charges.
5            All right.  Now, Mr. Biden, you told me that you
6  intend to enter a plea of guilty in those cases, correct?
7            THE DEFENDANT:  Yes, Your Honor.
8            THE COURT:  So it is my responsibility to make
9  sure that that plea is a voluntary and knowing plea.  And in
10 order to do that, I first need to ask you a series of
11 questions.  Before I ask you those questions, I am going to
12 have you placed under oath to answer those questions
13 truthfully.  And it's important that you do answer those
14 questions truthfully because if you don't, any false answers
15 may be used against you in a separate prosecution for
16 perjury.  Do you understand that?
17            THE DEFENDANT:  Yes, Your Honor.
18            THE COURT:  All right.  Mr. Buckson, will you
19 please swear in the Defendant.
20            COURT CLERK:  Will you please rise and raise
21 your right hand.  Please state and spell your full name for
22 the record.
23            THE DEFENDANT:  Robert Hunter Biden.
24 R-O-B-E-R-T, H-U-N-T-E-R, B-I-D-E-N.
25            ROBERT HUNTER BIDEN, was duly sworn under oath.

12

1            THE COURT:  Thank you, sir.  You may be seated.
2  All right.  Now, sir, if at any time you want to confer with
3  your counsel when I'm asking you questions, you may, just
4  let me know.  All right?
5            THE DEFENDANT:  Thank you, Your Honor.
6            THE COURT:  How old are you?
7            THE DEFENDANT:  Fifty-three years old, Your
8  Honor.
9            THE COURT:  How far did you go in school?
10            THE DEFENDANT:  Law school, Your Honor.
11            THE COURT:  When did you graduate from law
12 school?
13            THE DEFENDANT:  1996.
14            THE COURT:  You're member of the bar?
15            THE DEFENDANT:  Yes, Your Honor.
16            THE COURT:  Any particular?
17            THE DEFENDANT:  District of Columbia and
18 Connecticut, Your Honor.
19            THE COURT:  Thank you.  And you speak and
20 understand English?
21            THE DEFENDANT:  Yes, Your Honor.
22            THE COURT:  Are you currently or have you
23 recently been under the care of a physician or psychiatrist?
24            THE DEFENDANT:  No, Your Honor.
25            THE COURT:  Have you ever been hospitalized or

13

1  treated for any mental illness or addiction to narcotic
2  drugs of any kind?
3          THE DEFENDANT:  I have attended treatment
4  facilities for addiction, Your Honor.
5          THE COURT:  Okay.  So that was included in my
6  question which is treatment for addiction to drugs.
7          THE DEFENDANT:  Yes, Your Honor.
8          THE COURT:  So I need you to tell me about that.
9  How many times have you, to the best of your recollection,
10  been treated whether inpatient or outpatient?
11          THE DEFENDANT:  Beginning in 2003 with the
12  inpatient, Your Honor, I have been to I believe close to six
13  inpatient over the course of twenty years.
14          THE COURT:  All right.
15          THE DEFENDANT:  And I have also been in
16  outpatient programs also during that time.
17          MR. CLARK:  Just to be clear, it's numerous,
18  Your Honor.
19          THE COURT:  I'm not going to walk through every
20  single one, but I just want to make sure I have some
21  understanding.
22          All right.  Now, sir, each time that you were
23  treated in an inpatient facility, what was it for?
24          THE DEFENDANT:  For addiction to alcohol
25  primarily originally, Your Honor.

14

1          THE COURT:  Okay.  And have you ever been in an
2  inpatient treatment program where you were treated for
3  something else other than alcoholism?
4          THE DEFENDANT:  Drugs, also, Your Honor.
5          THE COURT:  Okay.  And I'm just not sure how
6  these programs work.  I'm sorry.  Is it for any particular
7  drug that you're treated or is it just sort of --
8          THE DEFENDANT:  No.
9          THE COURT:  Everything.
10          THE DEFENDANT:  Everything, Your Honor.
11          THE COURT:  Okay.  And when was the most recent
12  time that you were in treatment?  Well, are you currently in
13  treatment for your alcohol or drug issues?
14          THE DEFENDANT:  No, I'm not, Your Honor.
15          THE COURT:  When was the last time that you were
16  in treatment?
17          THE DEFENDANT:  I believe the fall of 2018.
18          MR. CLARK:  I think that's right, Your Honor.
19          THE COURT:  Okay.
20          THE DEFENDANT:  Your Honor, sorry.
21          THE COURT:  That's okay.  So the fall of 2018,
22  and was that inpatient or outpatient?
23          THE DEFENDANT:  Inpatient, and then also
24  outpatient.
25          THE COURT:  Okay.  And when you -- did you

15

1  complete that program or did you leave that program prior to
2  completion?
3          THE DEFENDANT:  I completed that program, the
4  inpatient portion of it, Your Honor.
5          THE COURT:  Okay.  And after you completed that
6  program, did you then continue to use drugs for some period
7  of time?
8          THE DEFENDANT:  I did, Your Honor.
9          THE COURT:  All right.  So when was the last
10  time -- so the fall of 2018 was the last time that you
11  received any treatment, right?
12          THE DEFENDANT:  Yes, Your Honor.
13          THE COURT:  Okay.  When was the last time that
14  you used, ingested, or were under the influence of any drug,
15  legal or illegal medication or alcoholic beverage of any
16  kind?
17          THE DEFENDANT:  June of 2019, Your Honor.
18          THE COURT:  All right.  And so just to be clear,
19  you are not presently under the influence of any drug, legal
20  or illegal, medication or alcoholic beverage of any kind, is
21  that correct?
22          THE DEFENDANT:  No, Your Honor.
23          THE COURT:  Well, let's just be clear because,
24  you know, people might look at this transcript.  I said is
25  that correct and you said no.

16

1          THE DEFENDANT:  I'm sorry, yes, Your Honor,
2  excuse me.
3          THE COURT:  And sir, do you understand what's
4  going on and why we're here today?
5          THE DEFENDANT:  Yes, I do understand.
6          THE COURT:  Counsel, do you have any doubt as to
7  your client's competence?
8          MR. CLARK:  None whatsoever.
9          THE COURT:  Any concerns from the government?
10          MR. WISE:  No, Your Honor.
11          THE COURT:  Based on the information that I
12  received, Mr. Biden, I find that you are competent and
13  capable of proceeding here today.
14          So now I want to talk about the misdemeanor
15  information which contains the tax charges that you are
16  pleading guilty to.  Have you received a copy of the
17  information pending against you?
18          THE DEFENDANT:  Yes, Your Honor.
19          THE COURT:  Have you fully discussed those
20  charges and the case in general with Mr. Clark?
21          THE DEFENDANT:  Yes, Your Honor.
22          THE COURT:  Are you fully satisfied with the
23  counsel, representation, and advice you received from him in
24  this case?
25          THE DEFENDANT:  Yes, Your Honor.

17

1  THE COURT:  You have the right to have the
2  information read out loud at this hearing, but you can also
3  waive that reading.  Would you like me to ask the government
4  to read it or do you waive that?
5  THE DEFENDANT:  I waive that, Your Honor.
6  THE COURT:  Okay.  Next, the Memorandum of Plea
7  Agreement which was handed up to me.  First, let me ask
8  counsel, what provision of the rules is this plea agreement
9  being presented under?
10  MR. WISE:  It's presented under Rule
11  11(c)(1)(B), Your Honor, of the Federal Rules of Criminal
12  Procedure.
13  THE COURT:  All right.  And so just so we're
14  clear, and Mr. Clark, you agree with that?
15  MR. CLARK:  I do, Your Honor.
16  THE COURT:  All right.  Just so we're clear,
17  this is not a plea under Rule 11(c)(1)(C), what is often
18  called a C plea which binds me to impose a specific sentence
19  if I accept the plea, is that correct?
20  MR. WISE:  It is, Your Honor.
21  MR. CLARK:  We agree, Your Honor.
22  THE COURT:  So in your view, what is my role
23  here under Rule 11(c)(1)(B)?
24  MR. WISE:  Your Honor has two roles as Your
25  Honor has already begun to determine that the plea is

18

1  knowing and voluntary under Rule 11(B), and to apprise the
2  Defendant that you are not bound by the recommendation of
3  the United States in this case pursuant to Rule 11(c)(3)(B).
4  THE COURT:  That's it?
5  MR. WISE:  That's it.
6  THE COURT:  All right.  Now, is it my role to
7  accept or reject this plea?
8  MR. WISE:  It is not, Your Honor.
9  THE COURT:  Now, let me just ask you this.
10  Would my role be different if this were a plea under Rule
11  11(c)(1)(A)?
12  MR. WISE:  Yes, Your Honor, it would.
13  THE COURT:  How would you say it's different?
14  MR. WISE:  Both Rule 11(c)(1)(A) pleas and
15  11(c)(1)(C) pleas require the Court to either accept, reject
16  or defer on the plea agreement itself, not on the plea which
17  is governed by like I said a separate provision of the rule
18  which is 11(B), but in terms of the Court's role vis-a-vis
19  the agreement is to accept, reject or defer.
20  THE COURT:  All right.  And I do want to talk
21  about that a little bit further, but when we talk about the
22  plea, but you can sit down for now.
23  Now, wait, let me ask you this.  If it's a
24  11(c)(1)(A) plea, what is your understanding of the factors
25  that I need to look at?

19

1  MR. WISE:  So the rule itself is silent on the
2  factors, but the case law suggest that the factors -- that
3  the rejecting or accepting the plea would relate to the
4  Court's traditional role at sentencing, so if, for instance,
5  the Court thought that the charge bargain which is what
6  11(c)(1)(A) does, if the Court thought the charge bargain
7  did not adequately reflect the seriousness of the offense
8  which would affect the Court's ability to sentence, then
9  there is case law that says under those circumstances the
10  Court could reject the charge bargain that was contained in
11  the (c)(1)(A) plea.
12  THE COURT:  When you say the charge bargain, you
13  mean the bargain by which the Defendant pleads guilty and
14  the government agrees not to bring other charges or to drop
15  charges that have already been brought?
16  MR. WISE:  Exactly, Your Honor.
17  THE COURT:  All right.  And in looking at an
18  11(c)(1)(A) plea, would I need to consider or are those
19  factors that you just sort of talked about, is that usually
20  referred to as in the interest of justice?
21  MR. WISE:  They are, Your Honor.
22  THE COURT:  All right.  You can be seated.
23  So yesterday I received from third parties a
24  letter with almost 900 pages of attachments in one case, and
25  a memorandum of law with hundreds of more pages of exhibits

20

1  in the other.  I have not had time to review those
2  submissions.  I understand that there is some objection to
3  them and I will give the Defendant and the government if it
4  wishes an opportunity to respond to those if they choose.
5  But even though I have not been able to review the
6  third-party submissions, I do understand that they request
7  that I reject the plea agreement based on information that
8  the filers submit cast doubt on the investigation performed
9  or the charges brought or both.
10  So let me ask you this.  If I were to think that
11  the facts presented in those submissions or even the facts
12  that have been presented to me in this case and the attached
13  agreements suggest that the investigation was lacking or
14  that more serious charges should have been brought, is it
15  within my power to ask or direct the United States Attorney
16  or the Attorney General of the United States to redo the
17  investigation or bring different or more serious charges?
18  MR. WISE:  I don't believe so, Your Honor, no.
19  MR. CLARK:  We agree, Your Honor, it would raise
20  obviously massive separation of powers questions if that was
21  to be taken.
22  THE COURT:  Okay.  And isn't that decision about
23  what charges to bring for the prosecutor as part of the
24  Executive Branch?
25  MR. WISE:  It is, Your Honor.

**21**

1    MR. CLARK:  We concur, Your Honor.

2    THE COURT:  All right.  So if there were a

3  failure in the investigation or the charges brought were

4  inappropriate, how would that get addressed in our form of

5  government?

6    MR. WISE:  Through the political process, Your

7  Honor.

8    MR. CLARK:  In particular, Your Honor, the

9  Executive Branch is charged fully with investigating, making

10  prosecutorial discretion decisions, and indeed that's where

11  the term prosecutorial discretion comes from, it is vested

12  in the Executive Branch.

13    THE COURT:  All right.  Okay.  Let's walk

14  through some of the provisions of the plea, Memorandum of

15  Plea Agreement.  Do you have it in front of you, sir?

16    THE DEFENDANT:  Yes, Your Honor.

17    THE COURT:  It's six pages long and has an

18  attached Exhibit 1 which is four pages long as well as a

19  sealed attachment referenced as Attachment A.  Attachment A

20  is a document that is not public, but it is a standard

21  document that is filed in all cases in this district and is

22  not filed only in connection with this case.  The Memorandum

23  of Plea Agreement has three signatures on the final page.

24  Is one of those signatures yours?

25    THE DEFENDANT:  Yes, Your Honor.

**22**

1    THE COURT:  Okay.  And when did you sign it?

2    THE DEFENDANT:  This morning, Your Honor.

3    THE COURT:  And before you signed it, did you

4  have an opportunity to read it and discuss it with your

5  attorney?

6    THE DEFENDANT:  I did, Your Honor.

7    THE COURT:  Are you satisfied with the advice

8  and counsel you received regarding the plea agreement.

9    THE DEFENDANT:  I am, Your Honor.

10    THE COURT:  All right.  Let's have a side-bar up

11  here.

12    (Sealed Attachment A side-bar discussion under

13  separate cover.)

14    (End of sealed Attachment A discussion.)

15    THE COURT:  All right.  Let's go back on the

16  unsealed portion of the record.

17    So I'm now going to ask the prosecutor to read

18  the essential terms of the plea agreement.  Sir, I'll ask

19  you to listen carefully to what he says because when he's

20  finished, I'm going to ask you if the agreement as recited

21  by him reflects the deal that you believe you reached with

22  the government.

23    Mr. Wise.

24    MR. WISE:  Thank you, Your Honor.

25    Paragraph 1 provides that the Defendant waives

**23**

1  any challenge to the information based on venue and agrees

2  to plead guilty in the United States District Court for the

3  District of Delaware to Counts I and II of the information

4  which charge him with willful failure to pay tax in

5  violation of Title 26 United States Code Section 7203.

6    Paragraph 2 describes how the Defendant

7  understands that the maximum penalties for each of Counts I

8  and II are as Your Honor previously indicated, twelve months

9  of imprisonment, a $100,000 fine or twice the gross gain or

10  loss from the offense, whichever is greater, one year of

11  supervised release, restitution and a $25 special assessment

12  per count and the cost of prosecution which the parties

13  stipulate is zero.

14    Paragraph 3 describes the essential elements

15  that the government would have to prove if the case went to

16  trial and those are one, that the Defendant had a duty to

17  pay tax.  Two, that the tax was not paid at the time

18  required by law.  And three, that the failure to pay was

19  willful.  The Defendant knowingly and voluntarily and

20  intelligently admits his guilt to each of these elements and

21  further admits to the information contained in the statement

22  of facts which is attached to the information as Exhibit 1.

23    Paragraph 4 provides that the Defendant is

24  pleading guilty to Counts I and II because he is in fact

25  guilty.

**24**

1    Paragraph 5 contains certain stipulations under

2  the sentencing guidelines.  Paragraph 5A provides that the

3  amount of loss as to Counts I and II, so a combined loss is

4  no less than $1,199,524 and no greater than $1,593,329.

5    Subparagraph B provides that the conduct set

6  forth in the statement of facts which is Attachment A to the

7  Diversion Agreement filed, which will be filed today does

8  not constitute relevant conduct pursuant to United States

9  Sentencing Guideline 1(b)(1.3).  Paragraph C provides that

10  provided that the United States does not subsequently learn

11  of conduct by the Defendant inconsistent with the acceptance

12  of responsibility, that it will not oppose a two level

13  decrease pursuant to U.S. Sentencing Guideline 3(e)(1.1)(a)

14  for acceptance.  And further, that should it be determined

15  that the Defendant's offense level is 16 or greater prior to

16  the application of the two level reduction for acceptance

17  that the United States will move to reduce the sentence, the

18  guideline by one additional level pursuant to U.S.

19  Sentencing Guideline 3(e)(1.1)(b) for a total reconduction

20  of three levels.

21    It is understood and agreed by the parties that

22  these stipulations are not binding upon either the probation

23  office or the Court.

24    Second, that the Court may make factual and

25  legal determinations that differ from these stipulations

25

1    that may result in an increase or decrease in the sentencing
2    guideline range and the sentence that may be imposed.
3            Paragraph 6 provides that for reasons to be
4    articulated at or near the time of sentencing, the United
5    States will recommend a sentence of probation.
6            Paragraph 7 provides that the United States
7    retains the right to defend the rulings of the District
8    Court in any subsequent proceeding.
9            Paragraph 8 outlines at length the sentencing
10   procedure which I believe the Court will review with the
11   Defendant in more detail.
12           Paragraph 9 contains a broad appellant waiver
13   which I also understand the Court will review with the
14   Defendant in greater detail.
15           Paragraph 10 provides that the Defendant agrees
16   to pay a $50 special assessment at the day of sentencing.
17           Paragraph 11 provides that the memorandum
18   expressly incorporates Attachment A which is attached and
19   filed under seal and that the government as Your Honor has
20   said routinely files such an attachment even though it may
21   or may not continue additional terms.  To the extent it
22   does, however, the parties acknowledge and agree to be bound
23   by it.
24           Paragraph 12 addresses restitution under the
25   Mandatory Victim Restitution Act.  And the Defendant agrees

26

1    to the entry of the restitution order for the full amount of
2    the victims loses attributable to his activities as ordered
3    by the Court which is expected to be zero because the self
4    assessed tax due at the time of filing and associated
5    interest and penalties have been paid to the Internal
6    Revenue Service by a third party on behalf of the Defendant.
7    However, the Defendant understands that an unanticipated
8    amount of a restitution order will not serve as grounds to
9    withdraw his guilty plea.  The parties further understand
10   that should the Internal Revenue Service determine there are
11   additional taxes due and owing for the tax years 2014
12   through 2019, they are not subject to the terms of this
13   agreement and for the purposes of this memorandum the sole
14   victim of Counts I and II is the United States Treasury.
15           And finally paragraph 13 provides that it is
16   further agreed by the parties that the memorandum and
17   Exhibit A together with the sealed attachment supersedes all
18   prior promises, representations and statements of the
19   parties, that the memorandum may be modified only in writing
20   signed by all the parties and that any and all promises,
21   representations, and statements made prior to or after this
22   memorandum are null and void and have no affect whatsoever
23   unless they comport with the subsequent written
24   modifications and provisions of this paragraph.
25           THE COURT:  Thank you.  I did have a couple of

27

1    initial questions.
2            Paragraph 5A says that the amount of losses no
3    less than 1,100 -- well, actually before we ask that,
4    because I'm going to ask how it relates to the facts, why
5    don't you go through Exhibit 1 you referenced, why don't you
6    put Exhibit 1 on the record.
7            MR. WISE:  Yes, Your Honor.
8            At all times relevant to the instant
9    Information, the Defendant, Robert Hunter Biden, hereafter
10   Biden, was an attorney and businessman with lucrative
11   domestic and international business interests.  From 2017 to
12   2019, he served on the board of a Ukrainian energy company
13   and a Chinese private equity fund.  He further negotiated
14   and executed contracts for business and legal services that
15   paid millions of dollars of compensation to him and/or his
16   domestic corporations, Owasco, PC and Owasco, LLC.  Through
17   at least early 2017, he also was employed by a prestigious
18   multi-national law firm in an "of counsel" capacity.  For
19   this work, he earned substantial income, totaling more than
20   $2.3 million in 2017 and $2.1 million in 2018.
21           Biden also has a well-documented and
22   long-standing struggle with substance abuse.  Following the
23   death of his brother in 2015, Biden relapsed and over time
24   progressed from alcohol to abusing illegal drugs, including
25   crack cocaine in 2016.  This contributed to the collapse of

28

1    his marriage, with his divorce finalized in March 2017, as
2    well as the collapse of his most significant professional
3    relationship in Fall 2017.  Nonetheless, in 2017, despite
4    his addiction, Biden successfully entered into business
5    ventures and landed legal clients, earning millions of
6    dollars.  By his own telling in a memoir published in 2021,
7    Biden's substance abuse worsened in 2018, a year that
8    included a move to Los Angeles and what he has described as
9    a "spring and summer of nonstop debauchery."  Even during
10   this period, however, Biden continued to earn money and
11   exercise control over his personal and corporate finances.
12           Federal income tax returns and payments are due
13   on or about April 15th of each year for the prior calendar
14   year.  Biden, like many other taxpayers, routinely requested
15   an automatic extension to file his returns, pushing the due
16   date for a tax return to on or about October 15th.  An
17   extension of time to file a return, however, does not extend
18   the deadline for payment of taxes, which remain due on the
19   April filing date.
20           During calendar year 2017, Biden earned
21   substantial income, including: just under $1 million from a
22   company he formed with the CEO of a Chinese business
23   conglomerate; $666,666 from his domestic business interests;
24   approximately $664,000 from a Chinese infrastructure
25   investment company; $500,000 in director's fees from a

29

1  Ukrainian energy company: $70,000 relating to a Romanian
2  business; and $48,000 from the multi-national law firm.
3      Throughout tax year 2017, Biden worked with a DC
4  and Maryland based accountant to prepare his individual and
5  corporate tax returns.  In 2018, this accountant (who died
6  in 2019) prepared Biden's 2017 corporate and individual
7  income tax returns and throughout the fall repeatedly
8  attempted to provide them to Biden for review and signature.
9  These efforts included directly contacting Biden, reaching
10  out to his administrative assistant, and sending copies to
11  his former business partner.  The former business partner
12  reviewed the returns and sent several emails to Biden in
13  which he commented on their substance and reminded Biden of
14  his filing obligations.  The former business partner left
15  the final returns for Biden at Biden's office.  Despite
16  these actions, Biden neither signed nor submitted the
17  individual or corporate income tax returns to the Internal
18  Revenue Service.
19      Not only did the accountant timely prepare
20  Biden's individual and corporate tax returns, the accountant
21  repeatedly encouraged Biden to timely pay the taxes
22  associated with the 2017 tax returns.  Beginning in
23  April 2018 and continuing into October 2018, the accountant
24  advised Biden to make his tax payments, noting approximately
25  $600,000 owed by Biden personally and an additional $204,000

30

1  owed by Owasco, PC.  Biden told the accountant he could pay
2  $25,000 in April 2018 towards his taxes, but no such payment
3  was made to the Internal Revenue Service.  His large tax
4  liability stemmed in part from the fact that over the course
5  of 2017, Biden began withdrawing substantial funds outside
6  of Owasco, PC's established payroll system, which had been
7  created, in part, to ensure that Biden had sufficient
8  withholdings to timely pay any outstanding tax liability.
9  The end of year liability should not have come as a
10  surprise.  At the time of those withdrawals, Biden's
11  business partner advised him that these transfers, made
12  without withholding, would result in a significant tax
13  liability at year end.
14      Despite his large outstanding tax liability and
15  profligate spending, on or about April 17, 2018, the due
16  date for 2017 tax payments, Biden did, in fact, have the
17  funds available to pay his outstanding 2017 tax liability
18  for both his personal and corporate returns.  On or about
19  March 22, 2018, Biden received a $1 million payment into his
20  Owasco, LLC bank account as payment for legal fees for
21  Patrick Ho, and $939,000 remained available as of tax day.
22  Over the next six months Biden would spend almost the
23  entirety of this balance on personal expenses, including
24  large cash withdrawals, transfers to his personal account,
25  travel, and entertainment.

31

1      Biden continued to earn handsomely and spend
2  wildly in 2018.  He received a little over $2.6 million in
3  business and consulting fees from the company he formed with
4  the CEO of a Chinese business conglomerate and the Ukrainian
5  energy company.  However, without the structure of a stable
6  business partner and still in the throes of addiction, Biden
7  essentially ignored his tax obligations, withholding only
8  approximately $38,465, less than six percent of the taxes
9  owed.  Tax returns and filings for tax year 2018 were due on
10  April 15th, 2019.  On that date, Biden traded emails with
11  his DC accountant and his attorney about seeking an
12  extension.  The accountant advised Biden of his obligation
13  to make a tax payment on that date, irrespective of the
14  extension to file a return.  Ultimately, the extension was
15  filed, making the return due on October 15, 2019.  Biden,
16  however, paid nothing.  As with tax year 2017, at the time
17  his 2018 tax payment was due, Biden continued to have
18  substantial income and the ability to pay his tax liability,
19  having received payments totaling approximately $758,000
20  during March and April 2019.  By late May, Biden had spent
21  almost the entire sum on personal expenses, including large
22  cash withdrawals, payments to or on behalf of his children,
23  credit card balances, and car payments for his Porsche.
24      After numerous programs and trips to rehab,
25  Biden got sober in May 2019, the same month he married his

32

1  current wife.  He has remained sober since.  Biden remained
2  in California and spent much of 2019 painting and developing
3  plans for his memoir, which he began working on through the
4  fall and into the winter.  During summer 2019, he was sued
5  in two different domestic-relations lawsuits, both seeking
6  payment of support obligations.  He still did not, however,
7  make preparations to file or actually file either his 2018
8  individual or corporate income tax returns on or about
9  October 15, 2019, the extension due date.
10      In or around November 2019, Biden engaged a
11  California accountant to prepare his individual and
12  corporate income tax returns for 2017 and 2018.  The
13  California accountant began gathering materials and started
14  preparing Biden's 2017 and 2018 returns in early 2020.  By
15  that time, the domestic relations lawsuits had progressed,
16  and having failed to do so previously, Biden was under court
17  order to provide his tax returns or face potential sanctions
18  including imprisonment.  On or about January 27, 2020, Biden
19  signed a representation letter for the California
20  accountants, averring that he was providing the accountants
21  with truthful and accurate information and acknowledging his
22  responsibility for the accuracy of those tax returns.  Over
23  the days that followed, Biden participated in a series of
24  meetings with the California accountants and identified
25  business and personal expenses in connection with his tax

33

1   returns.  During this process, Biden miscategorized certain
2   personal expenses as legitimate business expenses, resulting
3   in a reduction in his tax liability.  At the same time, the
4   California accountants overreported Biden's income, which
5   partially offset this reduction.
6           Or on about February 18th, 2020, Biden filed his
7   individual and corporate income tax returns with the
8   Internal Revenue Service for tax years 2017 and 2018.  On
9   his 2017 Form 1040, Biden reported $2,376,436 in total
10  income and a self-assessed tax due of $710,598, of which
11  $125,909 was timely paid, leaving a balance due and owing of
12  $581,713.  On his 2017 Form 1120 for Owasco, PC, Biden
13  reported gross receipts of $2,698,041 and a self-assessed
14  tax due and owing of $13,630.  On his 2018 Form 1040, Biden
15  reported $2,187,286 in total income and a self-assessed tax
16  of $659,366, of which $38,465 was timely paid, leaving a
17  balance due and owing of $620,901.  No additional payments
18  were included at the time of filing.  On his 2018 Form 1120
19  for Owasco, PC, Biden reported gross receipts of $2,659,014
20  and a self-assessed tax due and owing of $4,247.
21          Approximately a year-and-a-half later, on or
22  about October 18th, 2021, a third party paid the Internal
23  Revenue Service $955,800 to cover Biden's self-assessed
24  individual tax liability with interest and penalties for tax
25  year 2017 and $956,632 to cover Biden's self-assessed

34

1   individual tax liability with interest and penalties for tax
2   year 2018.
3           In addition, in or around February of 2020,
4   Biden's California accountants discovered that Biden's 2016
5   Form 1040 had not been filed.  The return was originally
6   prepared in or around October 2017 and showed $15,520 in
7   taxes due and owing.  Though it was delivered to Biden at
8   Biden's office, this return was not filed with the Internal
9   Revenue Service.  After learning in 2020 that the Form 1040
10  for 2016 remained unfiled, Biden filed a Form 1040 on
11  June 12, 2020.  For tax year 2016, Biden reported $1,580,283
12  in total income and self-assessed tax due of $492,895, of
13  which $447,234 was timely paid, leaving a balance due and
14  owing of $45,661.  Biden did not include a payment with this
15  return.  On or about October 18, 2021, this liability, plus
16  accrued interest and penalties, was also fully paid by a
17  third party.
18          Finally, after seeking an extension, Biden
19  timely filed his 2019 Form 1040 on or about October 15th,
20  2020.  He did not, however, pay his estimated tax due when
21  filing for an extension as required by law.  For tax year
22  2019, Biden reported $1,045,850 in total income and a
23  self-assessed tax due and owing of $197,372.  On October 18,
24  2021, this liability, plus accrued interest and penalties,
25  was also fully paid by the same third party.

35

1           THE COURT:  All right.  Thank you.  Now I did
2   have a few questions.
3           Paragraph 5A says that the amount of loss as to
4   Counts I and II including the relevant conduct as defined in
5   sentencing guideline is no less than $1,199,524, and no
6   greater than $1,593,329.  Is that the combined loss or the
7   loss for each count?
8           MR. WISE:  Combined loss, Your Honor.
9           THE COURT:  All right.  In Exhibit 1, there are
10  references to taxes paid by a third party on Mr. Biden's
11  behalf of $955,800, and $956,632, as well as $492,000 in
12  2016 and $197,000 for 2019.  Just looking at 2017 and 2018
13  which are the subject of this case, those numbers add up to
14  more than $1.9 million.  Can you help me square that with
15  the relevant conduct.
16          MR. WISE:  So the amount that was paid by the
17  third party includes significant penalties and interests
18  which we have not included in the loss described in that's in
19  paragraph 5A.  The paragraph 5A is the taxes and there is a
20  dispute as to what the taxes were based on the business
21  deductions and that's something that the parties will
22  address in their sentencing memorandum, but this number is
23  loss without inclusion of the penalties and interest.
24          THE COURT:  Is that standard?
25          MR. WISE:  Yes, Your Honor.

36

1           THE COURT:  Did you want to say something?
2           MR. CLARK:  I was going to say it's a relevant
3   guideline, Your Honor, for a failure to pay case omits
4   penalties and interests from the calculation of the tax
5   table loss.  And there is a dispute about where in the range
6   it goes, but the explanation, penalties and interest are not
7   properly included under this guideline for this offense.
8           THE COURT:  And if it were tax evasion, would
9   those be included?
10          MR. CLARK:  It's my understanding that they
11  would be, Your Honor.
12          MR. WISE:  Yes, Your Honor.
13          THE COURT:  Okay.  Paragraph 5b refers to the
14  Diversion Agreement.  That's the Diversion Agreement
15  contemplated in the Criminal Action 23-61, the felony gun
16  charge?
17          MR. WISE:  Yes, Your Honor.
18          THE COURT:  All right.  Paragraph 12 refers to
19  restitution, and says the self-assessed tax due at the time
20  of filing and the associated interest and patents have been
21  paid to the Internal Revenue Service by a third party on
22  behalf of the Defendant.  What does self-assessed mean?
23          MR. WISE:  It means the amount when the returns
24  were prepared that, the return prepared determine what was
25  owed based on the income that was reported and deductions

37

1  and credit.
2       MR. CLARK:  I think, Your Honor, based on that
3  and all this process, these numbers are based on payout
4  numbers that were obtained from the IRS.  Self assessment is
5  a process by which a return filer writes a return, says this
6  is how much tax I owe.  There was a lot of process here
7  between the IRS and these returns and at the end of the day
8  a payout number was obtained by the IRS and that number was
9  paid.
10      THE COURT:  So this isn't -- that's what I'm
11 trying to figure out, is there someone still looking into
12 that to see if the self-assessed number is accurate, or do
13 you know that it's zero?
14      MR. WISE:  So the self-assessed number again is
15 the amount on the return plus the interest and penalties
16 that were derived through the payoff.  As the statement of
17 facts addresses, there is a dispute as to what was
18 self-assessed or what the self-assessed number would be for
19 tax year 2018 and that will be addressed in the sentencing
20 memoranda.
21      MR. CLARK:  To be clear, the dispute is we think
22 it's lower.  As the statement of facts recites, there was
23 actually an overstatement of Mr. Biden's income that year.
24 I mean, my understanding is all of the monies that the IRS
25 takes a position Mr. Biden owes as a result of every tax

38

1  year being discussed have been paid based on their
2  calculation, if that answers Your Honor's question.
3       MR. WISE:  So our position, Your Honor, is there
4  are additional -- there are deductions that were taken that
5  were improper and so that's why for the loss purposes,
6  putting aside what the payoff number was in our sentencing
7  memorandum, we will address those.  The IRS in arriving at
8  the payoff number didn't --
9       THE COURT:  Well, I'm just asking because you
10 said it's expected to be zero, why is it expected to be zero
11 if you're telling me that the numbers might be wrong?
12      MR. WISE:  Because that is the payoff amount
13 that the IRS gave to the Defendant which is sort of a
14 process that produces that that is separate from the
15 criminal investigation and essentially divorced from it.
16 That's why the agreement doesn't bind the IRS if they then
17 make a decision essentially for additional restitution that
18 could occur.
19      THE COURT:  Why do you say it's expected to be
20 zero?
21      MR. WISE:  Because as of the payoff number that
22 was given, there is no at this moment restitution owed to
23 the IRS.
24      THE COURT:  All right.  So those are my initial
25 questions.  I may have some more as we go through this, but

39

1  that's what I had at this moment.
2       Mr. Biden, does the written agreement as
3  summarized by Mr. Wise accurately reflect the agreement you
4  have reached with the government?
5       THE DEFENDANT:  Yes, Your Honor.
6       THE COURT:  Has anyone threatened you or forced
7  you into entering this written agreement?
8       THE DEFENDANT:  No, Your Honor.
9       THE COURT:  Has anyone made you any promises
10 that are not contained in the written agreement?
11      MR. CLARK:  Your Honor, with the exception of
12 the Diversion Agreement --
13      THE COURT:  We're not making an exception.  I
14 want to know, has anyone made you any promises that are not
15 contained in the written Memorandum of Plea Agreement?
16      MR. CLARK:  Yes, there are promises from the
17 government in the Diversion Agreement, Your Honor.
18      THE COURT:  And sir, are you relying on the
19 promises made in the Diversion Agreement in connection with
20 your agreement to plead guilty?
21      THE DEFENDANT:  Yes, Your Honor.
22      THE COURT:  And if the Diversion Agreement were
23 not valid or unenforceable for any reason, would you enter
24 into the Memorandum of Plea Agreement?
25      THE DEFENDANT:  No, Your Honor.

40

1       THE COURT:  All right.  So we're going to
2  discuss that agreement in a bit, but for now let me say --
3  by the way, I didn't get a copy of paragraph 15 of the
4  agreement, but the parties provided me with a copy of that
5  agreement prior to this hearing, so that's what I'm going to
6  quote from at the moment.
7       Paragraph 15 of the Diversion Agreement states
8  the United States agrees not to criminally prosecute Biden
9  outside of the terms of this agreement for any federal
10 crimes encompassed by the attached statement of facts,
11 Attachment A to the Diversion Agreement, and the statement
12 of facts attached as Exhibit 1 to the Memorandum of Plea
13 Agreement filed this same day.  This agreement does not
14 provide any protection against prosecution for any future
15 conduct by Biden or by any of his affiliated businesses.
16      And just so we're clear, I think you already
17 answered this, sir, but are you relying on that promise in
18 connection with your agreement to accept the Memorandum of
19 Plea Agreement and plead guilty?
20      THE DEFENDANT:  Yes, Your Honor.
21      THE COURT:  If that provision were not valid or
22 not enforceable, would you accept the Memorandum of Plea
23 Agreement?
24      THE DEFENDANT:  No, Your Honor.
25      THE COURT:  If you had no immunity from the

41

1    government, perhaps even a different prosecutor and the
2    government could bring a felony tax evasion charge or drug
3    charges against you, would you still enter the plea
4    agreement and plead guilty to these tax charges?
5         THE DEFENDANT:  No, Your Honor.
6         THE COURT:  All right.  So I need some help here
7    because you all told me this was a plea under Rule
8    11(c)(1)(B) and not (c)(1)(A), but yet I have this provision
9    that I would think is normally in a plea agreement.  So tell
10   me, how do these agreements relate?  Are they part of a
11   package deal?
12        MR. WISE:  So, Your Honor, the United State's
13   position is that the agreements stand alone by their own
14   terms and both agreements include their last paragraph that
15   says that with this one caveat --
16        THE COURT:  This is a big caveat, though, if
17   you're telling me Rule 11(c)(1)(B) doesn't give me any
18   authority to look at this, (c)(1)(A) refers to, you know,
19   having an agreement not to prosecute.  That's why I'm
20   looking at this.  I'm not saying that you're wrong, but I
21   need to understand this.
22        MR. WISE:  Sure.  So Your Honor, again, our view
23   is the plea agreement stands alone.  There is no charge
24   bargaining in the plea agreement, period.  And that's what
25   they have agreed to.  The Diversion Agreement --

42

1         THE COURT:  But he would not agree, just so I
2    understand, sir, you would not agree to that plea agreement
3    if you didn't get some immunity from other charges, is that
4    right?
5         MR. CLARK:  Speaking for my client, that's
6    correct, Your Honor.
7         THE COURT:  I didn't mean that to be a
8    rhetorical question.  So you're trying to tell me that
9    that's separate, but I think -- and I understand why he's
10   saying no, I wouldn't -- that isn't separate to me, I need
11   them both.
12        MR. WISE:  That's the intention with the
13   agreement he signed.
14        THE COURT:  So the intention of the agreement he
15   signed was that it would be completely separate and if that
16   Diversion Agreement were not valid or unenforceable and he
17   were on the hook for other charges that he would still be
18   pleading guilty?
19        MR. WISE:  That's right, because that's what the
20   final paragraph of the plea agreement says he's agreeing to,
21   that the plea agreement stands on its own without any
22   additional promises outside the four corners of that
23   agreement.
24        THE COURT:  Do you guys need to talk about this
25   for a few minutes?

43

1         MR. CLARK:  Yes.
2         THE COURT:  How about I give you guys an
3    opportunity so we can make sure we're on the same page
4    because part of my charge here is to make sure that the
5    Defendant knows what he's pleading to.
6         MR. CLARK:  We appreciate it, Your Honor.
7         COURT CLERK:  All rise.
8         (A brief recess was taken.)
9         THE COURT:  All right.  Please be seated.  Where
10   are we?
11        MR. CLARK:  Your Honor, I want to apologize for
12   maybe my unartful phrasing for some of the issues that came
13   up a minute ago.  Perhaps I can explain the Defendant's
14   position and that may clarify things.  There are two
15   agreements in this case.  They are both very important to
16   the Defendant.  One is a plea agreement that the Court has
17   before it and my client is ready to enter a plea to that
18   plea agreement without contingency, without reservation, and
19   without connection.  There is another agreement which is a
20   Diversion Agreement which --
21        THE COURT:  Right.  So let me just ask you, if
22   that Diversion Agreement were not valid or were
23   unenforceable for some reason, would he enter this plea?
24        MR. CLARK:  He is ready to live by the terms of
25   that agreement --

44

1         THE COURT:  If that Diversion Agreement did not
2    exist, he would be willing to live by the terms of the plea
3    and plead guilty?  I have concerns about that Diversion
4    Agreement so I'm asking you, if it were not valid, if it
5    were unenforceable, would he plead to the memorandum of
6    plea?
7         MR. CLARK:  Based on our understanding of the
8    Diversion Agreement, which is a bilateral agreement between
9    the Defendant and the government which the government has
10   reaffirmed to me it will stand by, then yeah, he would enter
11   the plea.
12        THE COURT:  So you're not answering my question.
13   You're saying well, we think it's valid and enforceable.
14   I'm asking you, if it were not, go with me here, if that
15   agreement were not valid and enforceable, if that agreement
16   did not exist and he could not rely on it, would he enter
17   the memoranda of plea?
18        MR. CLARK:  You're asking for a hypothetical
19   from me, Your Honor.
20        THE COURT:  Yes, I'm asking that because --
21        MR. CLARK:  Yes, my client would resolve this
22   case on these terms in the hypothetical situation that exist
23   without that Diversion Agreement.  I want to be clear that
24   it is the parties' position that there is a Diversion
25   Agreement between the parties which is binding.  But take

45

1 that out of today's proceeding and my client is ready to
2 enter a plea under the plea agreement.
3         THE COURT:  All right.  Let me ask you those
4 questions again, Mr. Biden.  If the Diversion Agreement were
5 not valid and enforceable for any reason, would you enter
6 the Memorandum of Plea Agreement?
7         THE DEFENDANT:  Yes, Your Honor.
8         THE COURT:  And are you relying on the promise
9 in the Diversion Agreement not to prosecute you in
10 connection with your agreement to accept the Memorandum of
11 Plea Agreement and plead guilty?
12         THE DEFENDANT:  No, Your Honor.
13         THE COURT:  And so if you had no immunity from
14 the government through that Diversion Agreement and the
15 government could bring felony tax evasion charges or drug
16 charges against you, would you still enter the plea
17 agreement and plead guilty to these tax charges?
18         THE DEFENDANT:  Yes, Your Honor.
19         THE COURT:  All right.  Now, I want to talk a
20 little bit about this agreement not to prosecute.  The
21 agreement not to prosecute includes -- is in the gun case,
22 but it also includes crimes related to the tax case.  So we
23 looked through a bunch of diversion agreements that we have
24 access to and we couldn't find anything that had anything
25 similar to that.

46

1         So let me first ask, do you have any precedent
2 for agreeing not to prosecute crimes that have nothing to do
3 with the case or the charges being diverted?
4         MR. WISE:  I'm not aware of any, Your Honor.
5         THE COURT:  Do you have any authority that says
6 that that's appropriate and that the probation officer
7 should agree to that as terms, or the chief of probation
8 should agree to that as terms of a Diversion Agreement?
9         MR. WISE:  Your Honor, I believe that this is a
10 bilateral agreement between the parties that the parties
11 view in their best interest.  I don't believe that the role
12 of probation would include weighing whether the benefit of
13 the bargain is valid or not from the perspective of the
14 United States or the Defendant.
15         THE COURT:  So have you ever seen -- I think I
16 just asked you this, but have you ever seen a Diversion
17 Agreement where the agreement not to prosecute is so broad
18 that it encompasses crimes in a different case?
19         MR. WISE:  No.  And I would say, Your Honor, I
20 don't think it is broad in the sense that --
21         THE COURT:  We're going to talk about that.  You
22 can sit down.
23         All right.  Now, is an agreement not to bring
24 charges or an agreement to drop charges typically something
25 that is included in a Memorandum of Plea Agreement?

47

1         MR. WISE:  It can be.
2         THE COURT:  And if it were included in the
3 Memorandum of Plea Agreement, would that make this plea
4 agreement one pursuant to Rule 11(c)(1)(A)?
5         MR. WALLACE:  It would.
6         THE COURT:  In your view, that would change the
7 analysis of what I needed to do in evaluating whether to
8 accept this plea or not, right?
9         MR. WISE:  It would.
10         THE COURT:  And so let's just understand this.
11 If it were that, then my role would be to accept or reject
12 the plea, right?
13         MR. WISE:  It would.
14         THE COURT:  What happens if I accept the plea,
15 we go forward to sentencing?
16         MR. WISE:  Yes.
17         THE COURT:  And what happens if I reject the
18 plea?
19         MR. WISE:  Then we -- this is one of the issues
20 with charge bargaining.
21         THE COURT:  Because there is a waiver of venue.
22         MR. WISE:  Well, there is a waiver of venue, but
23 also, and this has been addressed by some courts outside of
24 this circuit, because of the separation of powers, if the
25 Court were to reject a (c)(1)(A) on its view that the

48

1 charges should be different --
2         THE COURT:  Well, what if I were to reject the
3 (c)(1)(A) plea on the grounds that it includes an agreement
4 not to prosecute, that as we're going to talk about in a few
5 minutes, I don't really understand the scope of.
6         MR. WISE:  So --
7         THE COURT:  I mean, forget all the
8 investigation, what charges were brought, I think that the
9 parties have made clear that we live in a system of
10 separation of powers, those powers are given to the
11 Executive Branch.  Right?
12         MR. WISE:  Right.
13         THE COURT:  So I don't mean to violate the
14 separation of powers or do anything unconstitutional.  I'm
15 trying to figure out what my role is and what the
16 appropriate rule is that applies to this.
17         MR. WISE:  Right.
18         THE COURT:  Okay.  And so I am trying to
19 understand if I were to reject the plea, I'm not saying I am
20 going to, I have not -- for anyone in the back, I have not
21 made that determination, but if I were to reject the plea,
22 just tell me what happens.
23         MR. WISE:  So then we have two charges against
24 the Defendant and they're misdemeanors, so we don't need
25 to be indicted and we go forward and there is a trial on

49

1  those charges, and there is a possibility that there could
2  be additional charges brought.
3          THE COURT:  Related to the tax issues?
4          MR. WISE:  Yes.
5          THE COURT:  Do you agree with that, Mr. Clark,
6  what would happen?  Again, I want to make sure I'm not
7  saying that's my decision.
8          MR. CLARK:  I understand, Your Honor.  I don't
9  necessarily disagree.  I'm not aware of any additional
10  charges that could validly be brought with regard to the tax
11  charges.  Again, without getting into the whole
12  investigation, but I do think there is some context that's
13  important here.  The U.S. Attorney's Office and me spent
14  five years in meeting after meeting, hours, ten hour long
15  meetings going through my client's taxes on a line-by-line
16  basis, and this is the disposition the parties came to after
17  a five-year investigation that was pursued with unbelievable
18  diligence and doggedness.  And so first of all, I don't
19  think there are any other charges to be brought.  I think,
20  you know, we thought that just like in any compromise
21  situation, we had valid arguments with regard to these
22  charges, but my client undertook to plead guilty to them
23  because it was the right disposition for all the parties
24  after extensive negotiation, and so yeah, I think we would
25  have two filed informations and the Court and the parties

50

1  would figure out how to proceed on those informations and
2  that would be the rest of the process.
3          THE COURT:  All right.  So you said there might
4  be additional charges.  Are you at liberty to tell us what
5  you're thinking those might be or is that just a
6  hypothetical that there might be?
7          MR. WISE:  It was a hypothetical response to
8  your question.
9          THE COURT:  Is there an ongoing investigation
10  here?
11          MR. WISE:  There is.
12          THE COURT:  May I ask then why if there is we're
13  doing this piecemeal?
14          MR. WISE:  Your Honor may ask, but I'm not in a
15  position where I can say.
16          THE COURT:  Okay.  So you can sit down.
17          I think what I'm concerned about here is that
18  you seem to be asking for the inclusion of the Court in this
19  agreement, yet you're telling me that I don't have any role
20  in it, and you're leaving provisions of the plea agreement
21  out and putting them into an agreement that you are not
22  asking me to sign off on.  So I need you to help me
23  understand why this isn't in the written plea agreement.
24          MR. CLARK:  If I may, Your Honor.  I mean, the
25  original conception here was something like a deferred

51

1  prosecution, non-prosecution agreement, which generally the
2  Court doesn't necessarily weigh in on.  I don't think it was
3  the -- we are not asking the Court to rule in any way on the
4  Diversion Agreement.  The diversion as far as I understand
5  it has been approved by probation, there is a -- you've
6  arraigned the Defendant on the instrument and I believe that
7  process will go forward.
8          THE COURT:  We have to talk about the Diversion
9  Agreement because you have included me into the Diversion
10  Agreement, so we are going to talk about that.  But I am
11  just still, you know, normally -- so we have two agreements,
12  we have a plea agreement where you're saying Judge, we're
13  all here in front of you for him to plead.  You're saying I
14  don't even get to accept it, I guess I'm supposed to rubber
15  stamp it under Rule (c)(1)(B).  But then it would be a plea
16  under Rule (c)(1)(A) if the provision that you have put in
17  the Diversion Agreement which you do not have anyplace for
18  me to sign and it is not in my purview under the statute to
19  sign, you put that provision over there.  So I am concerned
20  that you're taking provisions out of the agreement, of a
21  plea agreement that would normally be in there.  So can you
22  -- I don't really understand why that is.
23          MR. WISE:  So the bargain that was reached by
24  the parties was the Plea Agreement that is in front of Your
25  Honor, which is a (c)(1)(B) as I mentioned, where there is

52

1  only a recommended sentence, that is -- that is the Plea
2  Agreement --
3          THE COURT:  Well, it's not, because you do
4  reference -- you reference the Diversion Agreement in the
5  Plea Agreement.
6          MR. WISE:  Not in the Plea Agreement.
7          THE COURT:  You do.  I asked you if paragraph 5B
8  referred to the Diversion Agreement and you said yes.
9          MR. WISE:  Only insofar as it's not relevant
10  conduct.
11          THE COURT:  You reference it in the Plea
12  Agreement, right?
13          MR. WISE:  But it doesn't incorporate it.
14          THE COURT:  And in the Diversion Agreement, you
15  reference the Memorandum of Plea Agreement, right?
16          MR. WISE:  Only part of it.
17          THE COURT:  And you say that the -- in the
18  Diversion Agreement when you say there is not going to be
19  any prosecution, you say that's not just prosecution on the
20  gun charge which is the subject of the Diversion Agreement,
21  you say also no prosecution with respect to anything in the
22  statement of facts attached to the memorandum of plea,
23  right.
24          MR. WISE:  Yes.
25          THE COURT:  All right.  Okay.  So I don't really

53

1  understand, though, why that's not part of the Plea
2  Agreement.
3        MR. WISE:  Because by the terms of the Plea
4  Agreement, the only function, the Diversion Agreement --
5  well, it has no function but the parties negotiated that
6  their view, and it's their view, probation can take a
7  different view, Your Honor can take a different view, their
8  view is the firearms offense should not be considered
9  relevant conduct for calculating the guidelines related to
10 the tax offense, that is all that 5(b) says.  It does not
11 incorporate the paragraph 15 or any part of the Diversion
12 Agreement, it simply says our view is the Diversion
13 Agreement, the firearm offense should not be considered
14 relevant conduct in calculating the guidelines.
15       I think practically how this would work, Your
16 Honor, is if Your Honor takes the plea and signs the
17 Diversion Agreement which is what puts it into force as of
18 today, and at some point in the future we were to bring
19 charges that the Defendant thought were encompassed by the
20 factual statement in the Diversion Agreement or the factual
21 statement in the Plea Agreement, they could move to dismiss
22 those charges on the grounds that we had contractually
23 agreed not to bring charges encompassed within the factual
24 statement of the Diversion Agreement or the factual
25 statement of the tax charges.

54

1        MR. CLARK:  That's my understanding, Your Honor,
2  we would be enforcing a contract with the Department of
3  Justice.
4        THE COURT:  I don't understand how you have an
5  agreement not to pursue other charges in the case, the
6  misdemeanor case, and you say that is not part of his Plea
7  Agreement.
8        MR. WISE:  Because the Plea Agreement does not
9  include that.
10       THE COURT:  All right.  So let's talk a little
11 bit more about this.  To the extent that the agreement --
12 you can sit down.
13       To the extent that the agreement not to
14 prosecute is promised, do the parties have some
15 understanding what the scope of that agreement is?
16       MR. WISE:  Yes, Your Honor.
17       THE COURT:  No, tell me, like specifically what
18 does it include.  You said that there is an investigation, I
19 don't know what that is, but you must know that if there are
20 particular charges that could be brought based on the facts
21 that are there.
22       MR. WISE:  So I can tell you what I think we
23 can't charge.  I can't tell you what the ongoing
24 investigation is.  So, for instance, I think based on the
25 terms of the agreement, we cannot bring tax evasion charges

55

1  for the years described in the factual statement to the Plea
2  Agreement.  And I think we cannot bring for the firearms
3  charges based on the firearm identified in the factual
4  statement to the Diversion Agreement.
5        THE COURT:  All right.  So there are references
6  to foreign companies, for example, in the facts section.
7  Could the government bring a charge under the Foreign Agents
8  Registration Act?
9        MR. WISE:  Yes.
10       THE COURT:  I'm trying to figure out if there is
11 a meeting of the minds here and I'm not sure that this
12 provision isn't part of the Plea Agreement and so that's why
13 I'm asking.
14       MR. CLARK:  Your Honor, the Plea Agreement --
15       THE COURT:  I need you to answer my question if
16 you can.  Is there a meeting of the minds on that one?
17       MR. CLARK:  As stated by the government just
18 now, I don't agree with what the government said.
19       THE COURT:  So I mean, these are contracts.  To
20 be enforceable, there has to be a meeting of the minds.  So
21 what do we do now?
22       MR. WISE:  Then there is no deal.
23       THE COURT:  All right.  I guess then the
24 question is where does that leave us?  So what do we need to
25 do?  Do you guys need some time to talk?  Do you need me to

56

1  set a date -- do we need to talk about a preliminary hearing
2  since we didn't really need to do one with the agreement?
3        MR. CLARK:  We'll waive the preliminary hearing.
4  As far as I'm concerned, the Plea Agreement is null and
5  void.  You know, we'll have -- we are going to have to
6  discuss things with the government.
7        THE COURT:  All right.  So I think we're on the
8  clock now.  So what should we do?  Do you want me to set a
9  date for pretrial motions?  Do you want to exclude a little
10 bit of time so that you have some time to talk?  What do you
11 want to do?
12       MR. CLARK:  I think we would need thirty days
13 after the trial clock to figure out what's going on.
14       THE COURT:  All right.  I agree.  I know that
15 this has come as a little bit of a curve ball, but I think
16 that having you guys talk some more makes sense, and we will
17 exclude the time up through -- so the thirty days takes us
18 to the Friday before Labor Day.  Do you want that or do you
19 want the following week?
20       MR. CLARK:  I think that's fine, Your Honor.
21       THE COURT:  So we'll exclude up through
22 September 1st, you guys can get me a status report then.  I
23 think it does make sense in the interest of justice to do
24 so.  We'll get a status report and then we'll figure out
25 where we are.

57

1    MR. CLARK:  Your Honor, can we ask you to take
2  ten minutes and see whether we can somehow make any headway
3  on this?
4    THE COURT:  Okay.
5    MR. CLARK:  Thank you, Your Honor.
6    COURT CLERK:  All rise.
7    (A brief recess was taken.)
8    THE COURT:  All right.  Please be seated.  Where
9  are we?
10    MR. CLARK:  Your Honor, we have had some
11  discussion between the parties to try to clarify the
12  understanding and I just want to kind of summarize where we
13  are and if the government's counsel wants to correct me.
14  The parties have taken the position that the Diversion
15  Agreement is a separate agreement from the Plea Agreement.
16  The Diversion Agreement is a bilateral contract between the
17  parties.  Your Honor has asked the parties what their
18  understanding of the paragraph 15 of the Diversion Agreement
19  is.  I think there was some space between us and at this
20  point, we are prepared to agree with the government that the
21  scope of paragraph 15 relates to the specific areas of
22  federal crimes that is discussed in the statement of facts
23  which in general and broadly relate to gun possession, tax
24  issues, and drug use.
25    THE COURT:  So are you going to rewrite that?

58

1    MR. CLARK:  The government says that's what it
2  means and Your Honor asked for what the parties agree.
3    THE COURT:  I'm just looking at the language of
4  that.  So you're comfortable with that's what it means even
5  though the language of that seems substantially broader?
6    MR. CLARK:  Your Honor, I just put on the record
7  what I have --
8    THE COURT:  You didn't just answer yes so that
9  also -- so yes, you are comfortable that provision
10  means that it only relate and for what period of time?
11    MR. WISE:  It would be the period of time in the
12  statement of fact, both statement of facts.
13    THE COURT:  Help me out with that.
14    MR. WISE:  '14 to '19 for the tax offenses and
15  the drug -- and the admission of drug use in that period and
16  then the firearms is obviously specifically identified in
17  the time period in which that was possessed.
18    THE COURT:  All right.  So the defense agrees
19  that the agreement not to prosecute only includes the time
20  period from 2014 to 2019, it only includes tax charges in
21  that time period, drug charges in that time period, and the
22  particular -- the firearms charges that relate to this
23  particular firearm?
24    MR. CLARK:  Yes, Your Honor.
25    THE COURT:  All right.  So you can be seated.

59

1  Let me just take a look here.  I mean, part of the issue
2  that I'm having is understanding, you know, regardless of
3  whether this is a plea under subsection B or subsection A,
4  it has to be a knowing plea and I'm already faced with the
5  Defendant under oath saying both that he would not enter the
6  Memorandum of Plea Agreement if the Diversion Agreement were
7  not valid, and that he would.  And so I'm a little bit
8  confused about that.  So I think we can work through that.
9  But let's take a look at some of the rest of this.
10    All right.  Sir, other than what we have just
11  discussed, are there any other promises that have been made
12  to you to entice you to enter the Memorandum of Plea
13  Agreement?
14    THE DEFENDANT:  No, Your Honor.
15    THE COURT:  Do you understand that this is the
16  time to tell me of any promises not in the record or of any
17  threats that have been made because after today you won't be
18  able to withdraw your plea based on information that you
19  could have shared with me here?
20    THE DEFENDANT:  Yes, Your Honor.
21    THE COURT:  Do you understand that the plea --
22  terms of the Plea Agreement are merely recommendations to
23  me, that I can reject those recommendations without
24  permitting you to withdraw your plea and impose a sentence
25  that is harsher or longer or more severe than the one that

60

1  you may anticipate?
2    THE DEFENDANT:  Yes, Your Honor.
3    THE COURT:  Are you pleading guilty of your own
4  free will because you are, in fact, guilty?
5    THE DEFENDANT:  Yes, Your Honor.
6    THE COURT:  All right.  Now I want to walk
7  through some of the specific provisions of the agreement.
8  First, venue.  Do you have the agreement in front of you?
9    THE DEFENDANT:  Yes, Your Honor.
10    THE COURT:  All right.  So paragraph 1 states
11  that you waive any challenge to the information based on
12  venue.  Do you understand that absent that waiver, you could
13  challenge this Court being the appropriate Court to hear
14  these charges?
15    THE DEFENDANT:  Yes, Your Honor.
16    THE COURT:  By entering this plea you are giving
17  up that challenge?
18    THE DEFENDANT:  Yes, Your Honor.
19    THE COURT:  Did you discuss that provision with
20  your counsel?
21    THE DEFENDANT:  Yes, Your Honor.
22    THE COURT:  Again, are you satisfied with the
23  advice that you received?
24    THE DEFENDANT:  Yes, Your Honor.
25    THE COURT:  Now, next, in paragraph 2, Mr. Wise

61

1  went over the maximum penalties for Counts I and II when he
2  summarized the essential terms and I mentioned those to you
3  earlier when we were doing the initial plea.  Do you
4  understand what the maximum penalties are for each of the
5  counts that's pending against you?
6       THE DEFENDANT:  Yes, Your Honor.
7       THE COURT:  Do you need me to go through them
8  one more time or are you okay?
9       THE DEFENDANT:  No, Your Honor, thank you.
10      THE COURT:  Paragraph 3.  Paragraph 3 list the
11  essential elements of Counts I and II that the government
12  would have to prove.  Specifically for each count the
13  government would have to prove beyond a reasonable doubt
14  that the Defendant, you, had a duty to pay a tax.  Two, the
15  tax was not paid at the time required by law.  And three,
16  that your failure to pay was willful.  Do you understand
17  that if I accept your guilty plea, the government will not
18  have to prove anything?
19      THE DEFENDANT:  Yes, Your Honor.
20      THE COURT:  Paragraph 3 also references the
21  statement of facts attached to the Plea Agreement as
22  Exhibit 1.  Mr. Wise read those into the record and that is
23  something that is not common in my experience.  I just want
24  to ask you about some of those.  I'm not going to go through
25  all of those facts but I want to ask them because it is part

62

1  of the Plea Agreement that is being presented to me and
2  particularly given our earlier discussion about the fact
3  that those facts are incorporated into the agreement not to
4  prosecute.
5       All right.  So, do you have those in front of
6  you?
7       THE DEFENDANT:  Yes, Your Honor.
8       THE COURT:  All right.  So in the very first
9  paragraph of Exhibit 1, it says towards the end, it says
10  through at least early 2017 -- I think before that, in the
11  first paragraph, in the second sentence it says from 2017 to
12  2019, you served on the board of Ukrainian energy company
13  and a Chinese private equity fund.  Can you tell me what
14  those companies were?
15      THE DEFENDANT:  The Ukrainian energy company was
16  Burisma, and the Chinese private equity fund was Bohai,
17  Harvest and Rosemont.
18      THE COURT:  And some of this I'm asking just so
19  I understand because there are other references to Ukrainian
20  companies and Chinese companies and I can't tell if they're
21  the same company or not, so that's part of why I'm asking
22  you.  Later in that paragraph, it says through at least 2017
23  you were employed by a prestigious multi-national law firm
24  in an of counsel position.  It says through at least 2017.
25  What were the years, do you remember like how long you

63

1  worked there?
2       THE DEFENDANT:  Your Honor, I think I was at
3  Boise Schiller 2010, maybe, was when I started, but I am not
4  positive of that.  That's what I believe.
5       THE COURT:  Okay.  And were you in an of counsel
6  position that whole time?
7       THE DEFENDANT:  Yes, Your Honor.
8       THE COURT:  All right.  Now, it says then that
9  you -- for the work you did, you earned 2.3 million in 2017
10  and 2.1 million in 2018.  Now, you left Boise Schiller in
11  2017, right?
12      THE DEFENDANT:  Yes, Your Honor.
13      THE COURT:  So, can you tell me how -- I'm
14  trying to understand the 2018 $2.1 million.
15      MR. CLARK:  My understanding, Your Honor, is
16  that sentence picks up the work described in the last couple
17  of sentences, not just the work for Boise Schiller.
18      THE COURT:  Well, Mr. Biden actually knows.
19      THE DEFENDANT:  Yeah, exactly, Your Honor, I
20  believe what the government intended for that sentence was
21  that it was the total income, not just as it relates to my
22  capacity for Boise Schiller.
23      THE COURT:  So for all your work --
24      THE DEFENDANT:  For this work, it's all of the
25  things that are listed above there.

64

1       THE COURT:  All right.  Thank you.  Okay.  In
2  the next paragraph, it says you have a well-documented and
3  long-standing struggle with abuse and you did tell me
4  already, I'm not going to ask you again about your efforts
5  to treat that.  But when we talk about well-documented, is
6  there a particular thing that we're looking at for where
7  it's documented or is that just based on your discussions?
8       THE DEFENDANT:  Well, I believe the government
9  is referring to a book that I wrote about my struggles with
10  addiction in that period of time in my life.  And quite
11  possibly other news outlets and interviews and things that
12  have been done.
13      THE COURT:  Okay.  In that paragraph, it refers
14  sort of towards the middle, it refers to your struggles with
15  addiction led to the collapse of your most significant
16  professional relationship.  Is that referring to the law
17  firm or something else?
18      THE DEFENDANT:  My business relationship, my
19  business relationships, all of my business relationships,
20  ultimately including the law firm.  And I had a business that
21  was Rosemont Seneca advisors, and I had a long-standing
22  business partner from the inception of that company that I
23  started.  And others that all collapsed during that period
24  of time.
25      THE COURT:  So one of the businesses was

65

1 Rosemont Seneca.  Were there others that collapsed?  The one
2 reference here to Owasco.
3          THE DEFENDANT:  Virtually everything collapsed.
4 Owasco is the holding company for all of the other companies
5 below there.
6          THE COURT:  Okay.  And who was your business
7 partner?
8          THE DEFENDANT:  A gentleman named Eric Schwerin.
9          THE COURT:  All right.  The fourth paragraph
10 says during the calendar year 2017, you earned substantial
11 income including just under a million dollars from a company
12 you formed with a CEO of a Chinese business conglomerate.
13 Is that the same or a different Chinese company from the one
14 you referenced earlier?
15          THE DEFENDANT:  I started a company called
16 Hudson West, Your Honor, and my partner was associated with
17 a Chinese energy company called CEFC.
18          THE COURT:  Who was your partner?
19          THE DEFENDANT:  I don't know how to spell his
20 name, Yi Jianming is the chairman of that company.
21          THE COURT:  Is that company still in existence?
22          THE DEFENDANT:  No.
23          THE COURT:  Okay.  Then it says you made
24 $666,666 from your domestic business interest.  Is that the
25 Rosemont Seneca one?

66

1          THE DEFENDANT:  Yes, Your Honor, I believe
2 that's what it refers to.
3          THE COURT:  $664,000 from a Chinese
4 infrastructure investment company.  Is that one of the
5 companies we've already talked about?
6          THE DEFENDANT:  I believe so, yes, Your Honor.
7          THE COURT:  Which one is that?
8          THE WITNESS:  I believe CEFC.
9          THE COURT:  Okay.  $500,000 in director's fees
10 from the Ukrainian energy company.  That's the one that you
11 already told me about?
12          THE DEFENDANT:  Same, Burisma.
13          THE COURT:  Burisma.
14          Okay.  48,000 from the law firm.
15          THE DEFENDANT:  Yes.
16          THE COURT:  That's the Boise Schiller?
17          THE DEFENDANT:  Yes, it is.
18          THE COURT:  All right.  Okay.  The bottom of
19 that first page, the final paragraph says that the
20 accountant sent copies of the tax documents, copies of the
21 tax documents to your former business partner.  Is that
22 Mr. Schwerin?
23          THE DEFENDANT:  I believe that's who it's
24 referring to, yes, Your Honor.
25          THE COURT:  All right.  On the next page, at the

67

1 end of the second paragraph, starting four lines from the
2 bottom in the middle of the line, the paragraph talks about
3 your tax liability.  And it says the end of year liability
4 should not have come as a surprise.  Do you see that?
5          THE DEFENDANT:  I'm sorry, I'm just trying --
6          THE COURT:  That's okay.  Take your time.
7          THE DEFENDANT:  Yes, I see that here.
8          THE COURT:  It says it should not have come as a
9 surprise.  It wasn't a surprise, is that right?
10          THE DEFENDANT:  Yes, Your Honor.
11          THE COURT:  And you knew --
12          THE DEFENDANT:  Well, I don't -- I didn't write
13 this, Your Honor, so the characterization --
14          MR. CLARK:  Can we elaborate the time there,
15 Your Honor?
16          THE COURT:  Yes.
17          MR. CLARK:  So essentially there was a tax
18 treatment that was undertaken in that year, and it changed
19 the tax treatment at the very end of the year for a
20 particular asset.  And so I think the point is, and I didn't
21 write this either, there was substantial influx of income
22 during that year.  There was an issue with this last minute
23 tax treatment change, and so there were expressions at times
24 of surprise at that.  I think the government's point is you
25 knew you made a lot of money, it shouldn't have come as a

68

1 surprise.
2          THE COURT:  My only concern is when I read this
3 as a lawyer, it shouldn't have come as a surprise, that
4 doesn't preclude Mr. Biden from saying yes, it did.
5          MR. CLARK:  Your Honor's characterization is
6 exactly right.
7          THE COURT:  You're saying it actually was a
8 surprise?
9          MR. CLARK:  In that year.
10          THE COURT:  You guys are okay with that?
11          MR. WISE:  Yes, Your Honor.
12          THE COURT:  All right.  But you did know that
13 you owed tax money, right?
14          THE DEFENDANT:  Yes, Your Honor.
15          THE COURT:  And your business partner,
16 Mr. Schwerin, told you that no withholdings had been made?
17          THE DEFENDANT:  Yes, Your Honor, I believe that
18 to be the case.
19          THE COURT:  All right.  In the third paragraph,
20 which is actually the second full paragraph, it says on or
21 about March 22nd, 2018, you received a million dollar
22 payment into your Owasco bank account as payment for legal
23 fees for Patrick Ho.
24          THE DEFENDANT:  Yes, Your Honor.
25          THE COURT:  Who is that payment received from,

69

1   was that the law firm?
2   THE DEFENDANT:  Received from Patrick Ho, Your
3   Honor.
4   THE COURT:  Mr. Ho himself?
5   THE DEFENDANT:  Yes.
6   THE COURT:  Were you doing legal work for him
7   separate and apart from the law firm?
8   THE DEFENDANT:  Yes, Your Honor.  Well --
9   MR. CLARK:  That wasn't through Boise Schiller,
10  Your Honor, Mr. Biden was engaged as an attorney.
11  THE COURT:  Right.  So that's why I asked.  You
12  were doing work for him --
13  THE DEFENDANT:  My own law firm, not as counsel.
14  THE COURT:  So you had your own law firm as
15  well?
16  THE DEFENDANT:  I think Owasco PT acted as a --
17  acted as a law firm entity, yeah.
18  THE COURT:  Okay.
19  THE DEFENDANT:  I believe that's the case, but I
20  don't know that for a fact.
21  THE COURT:  Okay.  The final paragraph on the
22  second page of the exhibit says that you received a little
23  bit more than $2.6 million in business and consulting fees
24  from the company you formed with the CEO of the Chinese
25  business conglomerate and the Ukrainian energy company, and

70

1   -- I guess originally I was asking if that was in addition
2   to the money you had received from the -- if that was in
3   addition to the money you had received from the law firm,
4   but I think we clarified earlier that --
5   THE DEFENDANT:  Yes, Your Honor.
6   THE COURT:  So I guess what I'm confused about
7   is -- so is that $2.6 million, that was in 2018?
8   MR. CLARK:  That's our understanding, Your
9   Honor.
10  THE COURT:  But it says in the first paragraph
11  of the exhibit for the work that you did for the Ukrainian
12  company and the Chinese company and your domestic
13  businesses, it was $2.1 million.
14  MR. CLARK:  Your Honor, I think actually for
15  this one, and again, we didn't write this, but we don't
16  dispute its accuracy, I think this may summarize a chain of
17  payments that was made over a couple of years.
18  MR. WISE:  Your Honor, as I read that, the
19  reference in the first paragraph is to -- is income and it's
20  more than -- the language is more than 2.1 million in 2018,
21  and by contrast the paragraph Your Honor just pointed out,
22  it's talking about fees he generated at about 2.6 million, I
23  think there were expenses that were business expenses that
24  would be taken from those fees that would get you to a lower
25  income number that's north of 2.1 million.

71

1   THE COURT:  Okay.  In the first full paragraph
2   on the third one, it says after numerous programs and trips
3   to rehab, you got sober in May of 2019.  Do you see that?
4   THE DEFENDANT:  Yes, Your Honor.
5   THE COURT:  When I asked you earlier when you
6   last used or were under the influence of a controlled
7   substance or a medication, you said June of 2019.  What was
8   it that you did in June of 2019?
9   THE DEFENDANT:  I was married on May of --
10  May 17th of 2019, and that is my sobriety date.
11  THE COURT:  When I asked you earlier --
12  THE DEFENDANT:  I was being conservative, Your
13  Honor.  I think in between that date to be technically and
14  completely honest from the day that I got married until
15  June 1st, I did have a drink or two.
16  THE COURT:  Okay.
17  THE DEFENDANT:  So I count my sobriety date at
18  least in the program that you attend as June 1st, so that's
19  why I did that.
20  THE COURT:  You said the program you attend.  I
21  thought you -- are you attending a --
22  THE DEFENDANT:  No, a separate program that
23  required anonymity, Your Honor.
24  THE COURT:  Okay.  But I am just trying to make
25  sure that we don't --

72

1   THE DEFENDANT:  No, no, I'm not saying that
2   there are any programs that I'm involved in right now, I'm
3   saying meetings that I go to, the sobriety date is often
4   quoted.
5   MR. CLARK:  He draws a distinction between
6   treatment and a program.
7   THE COURT:  Okay.
8   THE DEFENDANT:  And it's not --
9   THE COURT:  And I appreciate that, whether we
10  call it a treatment or something, you are doing something to
11  support your sobriety, is that correct?
12  THE DEFENDANT:  Yes, Your Honor.
13  THE COURT:  Okay.  All right.  Then that
14  paragraph says that you did not make preparations to file or
15  actually file your 2018 individual or corporate income tax
16  when it was due in 2019.  Is that right?
17  THE DEFENDANT:  Yes, Your Honor.
18  THE COURT:  Okay.  And it was due according to
19  this in October of 2019.  Right?
20  THE DEFENDANT:  Yes, Your Honor.
21  THE COURT:  And you were sober at that time?
22  THE DEFENDANT:  I was, Your Honor.
23  THE COURT:  But you didn't file your taxes.
24  THE DEFENDANT:  Yes, Your Honor, in putting my
25  life back together, it was a flood, an enormous amount of

73

1 problems and by the time I was able to find someone to be
2 able to help me, I was already past the deadline in which I
3 should not have gone past.
4     THE COURT:  At the end of the next paragraph, it
5 says that in 2020, during the process of putting together
6 your 2017 and 2018 tax returns, you mischaracterized certain
7 personal expenses as legitimate business expenses.  What's
8 that referencing?
9     MR. CLARK:  Your Honor, it may be better if I
10 explain it because Mr. Biden is actually not that close to
11 the facts.  In essence, in a very compressed time frame,
12 Mr. Biden was asked to identify for all of these tax years
13 that were being done from his credit cards and other bank
14 accounts what's a business expense and what is a personal
15 expense.  And he was asked to go through charts and mark
16 them.  And there are situations in which he made an error
17 with regard to marking business expenses or personal
18 expenses.  In several instances, most of them relate to one
19 account, which was a business line of credit account, which
20 he and his accountants treated as business expenses but that
21 he never reviewed the actual records for because the
22 accountants couldn't get the records.  So we concede that he
23 made mistakes, erroneous mistakes in categorizing some of
24 these business and personal expenses.  And that's what it
25 refers to.

74

1     THE COURT:  Do you know the approximate amount
2 of money of these mistakes?
3     MR. CLARK:  That's what the discussion of the
4 dispute was.  We see it in not minimizing, around $30,000
5 over the entirety of all the filings.  I think the
6 government thinks it's higher.  But that's part of what
7 we're going to shake out at sentencing.  It is not massive
8 amounts of money from the perspective of these tax returns.
9 And as this points out I think in the next sentence, during
10 the same year that these errors were made, Mr. Biden's
11 accountants erroneously overreported his income by several
12 hundred thousand dollars.  And so there is -- there are
13 errors going both ways in that year, some of them are these
14 mistakes, and that mistake by his accountants.
15     THE COURT:  And just so I understand, are these
16 things that he made these mistakes and gave them to his
17 accountant and then they were corrected or he made these
18 mistakes, gave them to his accountant and then those
19 mistakes ended up in the filing that were ultimately made to
20 the Internal Revenue Service?
21     MR. CLARK:  It was the latter, the accountants
22 didn't catch the mistakes.
23     THE COURT:  And again, sir, this was done after
24 you were already sober?
25     THE DEFENDANT:  Yes, Your Honor.

75

1     THE COURT:  All right.  In the next paragraph,
2 there are more references to self-assessed tax.  Is that the
3 same as we discussed previously, the amount of tax that he
4 determined he owed?
5     MR. WISE:  Yes, Your Honor.
6     THE COURT:  And at the top of the last page, and
7 also in I guess the last paragraph, or maybe even all those
8 paragraphs, there is a reference to a third party who paid
9 your tax liability.  Is it the same person who paid all of
10 the outstanding liability?
11     THE DEFENDANT:  Yes, Your Honor.  I took a loan
12 from that individual.
13     THE COURT:  You took a loan?
14     THE DEFENDANT:  Yes.
15     THE COURT:  Do you make payments on that loan?
16     THE DEFENDANT:  Not currently, Your Honor, but
17 it's a normal typical loan with terms and a time frame.
18     THE COURT:  Okay.  All right.  Let's talk now
19 about the paragraph 9, the appellant waiver provision.
20 Mr. Biden, your agreement contains an appellant waiver
21 provision in paragraph 9.  This waiver limits your ability
22 to appeal your sentence.  Have you discussed this waiver
23 with your attorney?
24     THE DEFENDANT:  Yes.  Yes, I have Your Honor.
25     THE COURT:  Are you satisfied with the advice

76

1 and counsel you have received with respect to the waiver?
2     THE DEFENDANT:  Yes, I am, Your Honor.
3     THE COURT:  Now, I can read the waiver to you if
4 you would like me to or you can tell me that you're
5 confident that you understand it.  Do you want me to review
6 it with you?
7     THE DEFENDANT:  I'm confident that I understand
8 it, Your Honor.
9     THE COURT:  Do you understand that it is a broad
10 waiver provision and it leaves you with narrow appellant
11 rights should you disagree with your conviction or your
12 sentence?
13     THE DEFENDANT:  Yes, Your Honor.
14     THE COURT:  And that it leaves you little
15 ability to challenge your conviction or sentence?
16     THE DEFENDANT:  Yes, Your Honor.
17     THE COURT:  Do you understand that it is
18 unlikely that the conditions that would allow you to appeal
19 will occur and you will likely have no relief should you
20 receive a sentence that is different than the one that you
21 anticipate?
22     THE DEFENDANT:  Yes, Your Honor.
23     THE COURT:  All right.  I find that the
24 Defendant has knowingly and voluntarily waived his appellant
25 rights.

77

1    Now, as Mr. Wise said earlier, I want to talk to
2 you a little about the sentencing process in federal court.
3 It's not required in a misdemeanor case, but I am going to
4 ask the United States Probation Office to prepare a
5 presentence investigation report to the Court before
6 sentencing. You and the government will have a chance to
7 review and challenge the facts in that report. Do you
8 understand that?
9    THE DEFENDANT: Yes, Your Honor.
10    THE COURT: It's been my responsibility under
11 the statute, 18 United States Code Section 3553(a) to impose
12 a sentence that is sufficient but not greater than necessary
13 to provide punishment and afford deterrents. Under the
14 current law I have to follow a three-step process. First, I
15 have to consider the sentencing guidelines that's been
16 calculated by the probation office and any objections to
17 those guidelines. Then, I have to rule on any motions for a
18 departure from those guidelines and explain how those
19 motions if granted would impact the guidelines. And
20 finally, I have to consider all of the factors in the
21 statute including personal factors that would help me to
22 determine what an appropriate sentence is. And that
23 sentence may, again, vary either upwards or downwards from
24 the guidelines.
25    The government has agreed not to oppose a

78

1 sentence of probation, but it's important that you
2 understand that without reviewing the presentence report, I
3 can't predict for you today whether I will agree that that's
4 an appropriate sentence or not. Do you understand that?
5    THE DEFENDANT: Yes, Your Honor.
6    THE COURT: Do you also understand that parole
7 has been abolished and that to the extent that you were
8 given any period of imprisonment, you would not be released
9 on parole from that imprisonment?
10    THE DEFENDANT: I understand that, Your Honor.
11    THE COURT: Do you understand that if you're
12 sentenced to a term of incarceration followed by a period of
13 supervised release or a period -- if you were given a period
14 of probation, if you are found in violation of the
15 conditions of your supervised release or your probation that
16 that may be revoked and you would have to serve additional
17 time in prison if you were imprisoned or if you were on
18 probation that you might have to serve time in prison?
19    THE DEFENDANT: Yes, Your Honor.
20    THE COURT: Do you understand that your sentence
21 may include payment of a fine or payment of restitution, and
22 it will include a mandatory special assessment for each
23 offense to which you plead guilty?
24    THE DEFENDANT: Yes, Your Honor.
25    THE COURT: Have you discussed with your counsel

79

1 what the sentencing guideline calculation might be for the
2 offenses to which you are pleading guilty?
3    THE DEFENDANT: Yes, Your Honor.
4    THE COURT: And do you understand that if I
5 impose a sentence that is harsher or longer or more severe
6 than the one that you may anticipate, you will still be
7 bound by your plea and will not have the right to withdraw
8 it on that basis?
9    THE DEFENDANT: Yes, Your Honor.
10    THE COURT: All right. Now I want to talk about
11 some of the rights that you waive if you plead guilty. Do
12 you understand that you have the right to plead not guilty
13 to this offense, to persist in your plea of not guilty and
14 to have a trial by jury on the offense during which you
15 would also have the right to the assistance of counsel and
16 the right to see and hear all of the witnesses and have them
17 cross-examined on your behalf?
18    THE DEFENDANT: Yes, Your Honor.
19    THE COURT: The standard of proving guilt is
20 beyond a reasonable doubt and it is the highest standard of
21 proof in our justice system. If the government failed to
22 establish your guilt beyond a reasonable doubt, you would be
23 acquited of the charges against you. Do you understand
24 that?
25    THE DEFENDANT: Yes, Your Honor.

80

1    THE COURT: Do you understand that at trial you
2 would have the right on your own part to decline to testify
3 or to put on any evidence at all and that if you decided not
4 to testify or to put on any evidence, that could not be used
5 against you?
6    THE DEFENDANT: Yes, Your Honor.
7    THE COURT: Do you understand that if the case
8 were to go to trial, it would be the government's burden to
9 prove to the jury, again, beyond a reasonable doubt, each of
10 the essential elements of the offenses charge and the jury
11 would have unanimously agree as to your guilt?
12    THE DEFENDANT: Yes, Your Honor.
13    THE COURT: Do you further understand that by
14 entering a plea of guilty, there will be no trial and you
15 will have waived and given up your right to trial by jury as
16 well as the rights associated with that trial?
17    THE DEFENDANT: Yes, Your Honor.
18    THE COURT: I'm going to ask the prosecutor to
19 summarize for us what the government would be prepared to
20 prove if the case were to go to trial.
21    MR. WISE: Your Honor, I have read in its
22 entirety the factual statement that we would be prepared to
23 prove.
24    THE COURT: All right. Do you want to tell me
25 how that meets the essential elements?

81

1   MR. WISE:  Yes, Your Honor.

2   THE COURT:  I mean, I can figure it out, but I

3   think it's probably worthwhile you telling me.

4   MR. WISE:  The first element, the Defendant had

5   a duty to pay a tax.  The Defendant earned substantial

6   income as the factual statement points out.  And we can go

7   with -- as Your Honor has pointed out, there are several

8   places in the factual statement where it identified where he

9   obviously earned, looking at the first paragraph,

10  2.3 million in 2017 and 2.1 million in 2018, he therefore

11  had a duty to pay a tax on that income.  That is the highest

12  level of summary.

13  The tax was not paid at the time required by

14  law.  Again, even when he received an extension, the tax was

15  due in April of 2018 for calendar year 2017 and in April of

16  2019 for calendar year 2018.  And finally, the failure to

17  pay was willful.  And the Plea Agreement statement of facts

18  describes that despite his addiction issues, he was able to

19  generate significant amounts of income and made financial

20  decisions about how to spend that money, and that those

21  decisions did not include meeting his obligations to pay his

22  taxes.

23  THE COURT:  All right.  Mr. Biden, is there

24  anything you wish to challenge or amend in the government's

25  recitation of proof?

82

1   THE DEFENDANT:  No, Your Honor.

2   THE COURT:  Do you disagree with any of the

3   government's factual recitations?

4   THE DEFENDANT:  No, Your Honor.

5   THE COURT:  Mr. Clark, do you have any

6   objections or concerns with the government's recitation of

7   proof?

8   MR. CLARK:  I do not, Your Honor.

9   THE COURT:  All right.  Now at this point I

10  would normally ask Mr. Biden how he pleads, but as we've

11  already discussed, the Diversion Agreement is out there in a

12  felony case, it is cross-referenced in the Memorandum of

13  Plea Agreement.  The Plea Agreement is cross-referenced in

14  the Diversion Agreement, so before I ask him how he pleads,

15  I need to understand -- well, ask him how he pleads or

16  decide if I can accept the Plea Agreement, I need to

17  understand the Diversion Agreement.

18  So the felony gun charge here is a bit unusual,

19  and we don't usually make diversion agreements public.  I

20  don't usually see a diversion agreement as the parties up

21  here have hinted, but in fact you all did send it to me and

22  it is referenced in the agreement that is before me in the

23  tax case.

24  So it's a little bit unique in that I have a

25  copy of the Diversion Agreement and that the Diversion

83

1   Agreement contains what I view to be some nonstandard terms

2   like the broad immunity and a term that invokes the Court or

3   involves the Court as part of that agreement.

4   So given all that, Mr. Wise, why don't you go

5   ahead and summarize the terms of the Diversion Agreement

6   given that the parties have agreed to make it public.

7   MR. WISE:  Yes, Your Honor.  The first under

8   Roman numeral one, the parties to the Diversion Agreement

9   are the United States of America by and through the United

10  States Attorney's Office for the District of Delaware and

11  Robert Hunter Biden.

12  Roman two describes the terms and conditions of

13  the agreement.  Paragraph 1 provides that it's for a

14  two-year period, twenty-four months beginning on the date of

15  approval of this agreement, and that would be when the chief

16  probation officer, Ms. Brey signs it, unless there is a

17  breach as set forth in paragraphs 13 and 14.

18  Paragraph 2 provides that this 24-month period

19  will be known as the diversion period.

20  Paragraph 3 provides that Biden shall waive

21  indictment in relation to the information filed in the gun

22  case, which again is 23cr61 which charges him with one count

23  of knowingly possessing a firearm while an unlawful user or

24  person addicted to a controlled substance in violation of

25  Title 18 United States Code Section 922(g)(3) and 924(a)(2).

84

1   And the relevant year for the conduct is 2018.

2   Paragraph 4 provides that if Biden complies with

3   his obligations under the agreement, then the United States

4   within thirty days after the expiration of the diversion

5   period will file a motion with the Court seeking the

6   dismissal of the information.

7   Paragraph 5, Biden agrees that the United States

8   has probable cause to bring the charge in the Information

9   and that the charge is not frivolous or made in bad faith.

10  He also agrees at a future time the United States should

11  move to dismiss the information pursuant to this agreement,

12  he will not be a prevailing party with regard to the

13  Information and he waives any possible claims to attorney

14  fees or litigation expenses arising out of the investigation

15  or prosecution of this case.

16  Paragraph 6 provides that in light of the fact

17  that Biden has accepted responsibility for the actions

18  referred to in the statement of facts as Attachment A to

19  this agreement and taken into consideration Biden's candid

20  acknowledgment of his historical drug use as well as his

21  current sobriety and in consideration for the other terms in

22  the agreement, the United States shall divert this matter in

23  the manner set forth in this agreement pursuant to the terms

24  and conditions also set forth in the agreement.

25  Paragraph 7 provides that Biden agrees to waive

85

1  all defenses based on statute of limitations with respect to
2  charges in the information and any other federal firearm
3  charges that could be brought with respect to the conduct
4  set forth in the statement of fact which again is Attachment
5  A.  And he agrees that the applicable statute of limitation
6  period for any charges arising under the firearms purchase
7  shall be tolled during the diversion period.  He agrees not
8  to assert any speedy trial rights under the Sixth Amendment
9  or Federal Rule of Criminal Procedure 48(b) B or any local
10 rule here in the District of Delaware.
11         Paragraph 8 provides that it is the intent of
12 this agreement for Biden to agree to be subject to the
13 jurisdiction of and venue in the United States District
14 Court for the District of Delaware with respect to the
15 charge set forth in the information and for any federal
16 charges arising out of the firearms purchase set forth in
17 the statement of facts.
18         Paragraph 9 and its subparagraph are the
19 commitments and undertakings of Biden and that includes not
20 purchasing, possessing, attempting to purchase firearms as
21 that term is defined in the relevant statute during the
22 diversion period, consent to a permanent entry in the
23 National Instant Criminal Background Check System such that
24 he will be denied via NICS if he attempts to legally
25 purchase another firearm.

86

1          And then paragraph C, I'm not going to read the
2  entire paragraph, but it's a provision that the gun in
3  question is forfeited to the United States.
4          Starting at paragraph 10 --
5          THE COURT:  Could I ask to you pause for one
6  second.  I forgot my glasses and I'm going to ask someone in
7  the back to get my glasses, but I didn't want her to open
8  the door and freak people out.
9          All right.  Apologies, go ahead.
10         MR. WISE:  Starting at paragraph 10, or in
11 paragraph 10 and subparagraph are additional conditions
12 applicable to the diversion period and these include that
13 Biden is subject to supervision as directed by U.S.
14 Probation and Pretrial Services; that he continue to
15 actively seek employment; that he refrain from unlawfully
16 possessing controlled substance; that he refrain from using
17 alcohol; that he submit to substance abuse testing and
18 participate in substance abuse treatment as directed by the
19 U.S. Probation and Pretrial Services Office in this
20 district; that he submits to fingerprinting by the FBI and
21 it describes what will be done with that fingerprint and how
22 it will be preserved for a time; that he communicate in
23 writing all international travel plans and provide
24 documentation, if requested, to U.S. Probation and Pretrial
25 and that he not commit a violation of any federal, state or

87

1  local law.
2          Paragraph 11, in paragraph 11 Biden acknowledges
3  and agrees to the statement of facts that are Attachment A
4  to this agreement and he agrees that they're truthful and
5  accurate.
6          Paragraph 12, Biden agrees that neither he nor
7  anyone else at his direction will make any statement in
8  litigation or otherwise repudiating or contradicting the
9  statement of fact.  If the United States believes such a
10 contrary statement has been made, and such statement
11 constitutes a knowing material breach, then the United
12 States may seek a determination regarding such alleged
13 breach pursuant to the procedures set forth in paragraph 14.
14         Starting in paragraph 13, it lays out the
15 procedure if there is a breach.  First, paragraph 13.  Biden
16 agrees that a knowing failure to abide by or fully perform
17 any of the terms, promises, or agreements set forth in this
18 Agreement shall constitute a breach of this Agreement.
19         Paragraph 14 provides that if the United States
20 believes that a knowing material breach of this Agreement
21 has occurred, it may seek a determination by the United
22 States District Judge for the District of Delaware with
23 responsibility for supervision of this agreement.  Upon
24 notice to Biden the United States may seek a determination
25 on a preponderance of the evidence presented to such

88

1  District Judge.  Biden shall have the right to present
2  evidence to rebut any such claim.  If after that process the
3  judge overseeing such process makes a final determination
4  that Biden has committed a knowing material breach of this
5  agreement, then the United States may elect from two
6  remedies that are specified in the agreement depending on
7  the nature and seriousness testify breach.
8          Remedy 1, which is a sub A of paragraph 14 is
9  the United States may give Biden a specific time period in
10 which to remedy the breach.  If the United States determines
11 that Biden has failed to remedy the breach during the
12 specified time period, then the United States may elect
13 Remedy 2.  Remedy 2 is the United States may prosecute Biden
14 for any federal criminal violation in which the United
15 States has knowledge including crimes relating to the
16 conduct set forth in the statement of facts, which is
17 Attachment A, and that includes obstruction of justice and
18 any such prosecution is not time barred by any statute of
19 limitation on the date of signing of this agreement,
20 notwithstanding the statute of limitation between the
21 signing and the commencement of such prosecution.
22         And finally, the United States does not require
23 to offer Remedy 1 before proceeding to Remedy 2 if in its
24 sole determination the nature and the serious of the breach
25 warrants termination of the agreement.

89

1    Paragraph 15 is the agreement not to prosecute.
2  The language, the United States agrees not to criminally
3  prosecute Biden outside the terms of this agreement for any
4  federal crimes encompassed by the attached statement of
5  facts, Attachment A, and the statement of facts attached as
6  Exhibit 1 to the Memorandum of Plea Agreement filed this
7  same day.  This Agreement does not provide any protection
8  against prosecution for any further conduct by Biden or by
9  any of his affiliated businesses.  Obviously this paragraph
10  has been orally modified by counsel for Mr. Biden and we
11  would -- I'm not going to attempt to paraphrase it.  I don't
12  want to make the record muddy.  The statement by counsel is
13  obviously as Your Honor acknowledged a modification of this
14  provision, and that we believe is binding.
15    Paragraph 16, starting paragraph 16, there are
16  general terms and conditions, the parties consented to the
17  public disclosure of this agreement, and shall be publicly
18  filed.  The parties stipulate and agree that the conduct set
19  forth in the statement of facts does not constitute relevant
20  conduct for the offenses, to the tax offenses, which Your
21  Honor has identified as a similar provision in the Plea
22  Agreement, that the firearms offense is not relevant conduct
23  for the tax charge.
24    Paragraph 18 this agreement may be executed in
25  counterparts, each of which constitutes an original and all

90

1  of which constitutes one and the same agreement.
2    And paragraph 19 is an incorporation agreement
3  like in the Plea Agreement, this agreement sets forth all of
4  the terms of the agreement between the United States and
5  Biden.  It constitutes a complete and final agreement
6  between the United States and Biden in this matter.  There
7  are no other agreements written or otherwise modifying the
8  terms, conditions or obligations of this agreement.  No
9  future modifications or additions of this agreement in whole
10  or in part shall be valid unless they are set forth in
11  writing or signed by the United States, and Biden and
12  Biden's counsel.
13    THE COURT:  All right.  Thank you.
14    Mr. Clark, any corrections you want to make?
15    MR. CLARK:  No, Your Honor.
16    THE COURT:  The information charges Mr. Biden
17  with violation of 18 United States Code 922(g)(3).  Does
18  anyone have any concerns about the constitutionality of that
19  charge in light of the recent Third Circuit *Range* case?
20    MR. WISE:  No, Your Honor.
21    MR. CLARK:  Your Honor, I note our -- that's one
22  of the reasons the parties I think are in the disposition we
23  are in.  We don't waive in a later prosecution any
24  challenges on that.
25    THE COURT:  I completely understand that.  That

91

1  was kind of why I was asking the government the question.
2    So if 922(g)(3), which makes it unlawful for a
3  drug user addict to possess a gun were found by some court
4  to be unconstitutional, what happens to the Diversion
5  Agreement?
6    MR. WISE:  Your Honor, the Diversion Agreement
7  is a contract between the parties so it's in effect until
8  it's either breached or a determination, period.
9    MR. CLARK:  I can tell you our intention would
10  be to abide by the agreement and only raise such
11  constitutional determining at such time that somebody tried
12  to bring any charges on this, otherwise it's an agreement
13  between the parties.  We are going to honor the agreement.
14    THE COURT:  I have had one or two cases
15  involving a person struggling with addiction who bought a
16  gun, we usually see a felony charge for false statement.
17  The Defendant has admitted that his statement was false, but
18  he wasn't charged.  Again, I'm not trying to get into the
19  purview of the prosecutor, and I understand the separation
20  of powers, it's in your discretion, but I just want to ask,
21  does the government have any concern about not bringing the
22  false statement charge in light of our discussion of
23  922(g)(3) and the constitutionality of that charge.
24    MR. WISE:  No, Your Honor.
25    THE COURT:  Paragraph 7 says that the statute of

92

1  limitations is waived.  Can you just tell me when would the
2  statute of limitation be waived on a charge for false
3  statement if the Diversion Agreement were not in place?
4    MR. CLARK:  When would it run, Your Honor?
5    THE COURT:  I understand it's tolled by the
6  agreement.  I have concerns about the agreement, that's why
7  I'm asking these questions, so if the agreement weren't
8  there.
9    MR. CLARK:  It would be October 2023.
10    MR. WISE:  October 12th, 2023.
11    THE COURT:  All right.  Thank you.
12    All right.  Now I have reviewed the case law and
13  I have reviewed the statute and I had understood that the
14  decision to offer the defendant, any defendant a pretrial
15  diversion rest squarely with the prosecutor and consistent
16  with that, you all have told me repeatedly that's a separate
17  agreement, there is no place for me to sign off on it, and
18  as I think I mentioned earlier, usually I don't see those
19  agreements.  But you all did send it to me and as we've
20  discussed, some of it seems like it could be relevant to the
21  plea.
22    One provision in particular stands out to me,
23  and that is paragraph 14.  That paragraph says if the United
24  States believes that a knowing material breach of this
25  agreement has occurred, it may seek a determination by the

93

1  United States District Judge for the District of Delaware
2  with responsibility for the supervision of this agreement.
3  It then goes on to say that if I do find a breach, then the
4  government can either give the Defendant time to remedy the
5  breach or prosecute him for the crime that is the subject of
6  the information or any other that falls within the language
7  of the agreement.  Do I have that understanding correct?
8        MR. CLARK:  That's my understanding of the
9  provision, Your Honor.
10        THE COURT:  So can you tell me what's
11  contemplated by that, how it would work?
12        MR. WISE:  So, Your Honor, obviously the
13  Diversion Agreement covers offenses related to firearms, so
14  if there was a breach, then he could be charged with -- the
15  offenses related to that firearm as well as perjury,
16  obstruction of justice, and any prosecution not barred by
17  the statute of limitations related to that.
18        MR. CLARK:  I think Your Honor may be asking the
19  functionality of your involvement.  And the concept was
20  along the lines of a VOSR where a situation is brought to
21  the Court and the Court would make a factual determination
22  in the first instance that there was a violation of
23  supervised -- I mean, diversion is not supervised release,
24  but in some senses it can be, and so the idea was that the
25  Court would determine whether or not there was a violation

95

1  that finding?
2        MR. WISE:  No.
3        THE COURT:  And you don't have any precedent for
4  that, right?
5        MR. WISE:  No, Your Honor.
6        THE COURT:  Do you have any authority that any
7  Court has ever accepted that or said that they would do
8  that?
9        MR. WISE:  No, Your Honor, this was crafted to
10  suit the facts and circumstances.
11        THE COURT:  I'm concerned that that provision
12  makes me a gatekeeper to criminal charges and puts me in the
13  middle of a decision as to whether to bring a charge.  And
14  we already talked about separation of powers and that choice
15  as to whether to bring charges is not -- that's the
16  executive branch, not the judicial branch, so is this even
17  constitutional?
18        MR. CLARK:  I believe it is, Your Honor, because
19  what the structure makes clear is that Your Honor is just
20  finding facts.
21        THE COURT:  But no charges -- usually in these
22  agreements, right, Mr. Clark, the prosecutor says we think
23  he breached, and I don't mean to point it out, I'm not
24  saying you're going to breach.
25        MR. CLARK:  I understand.

94

1  and then the government would move on to a remedy.
2        THE COURT:  First it got my attention because
3  you keep telling me that I have no role, I shouldn't be
4  reading this thing, I shouldn't be concerned about what's in
5  these provisions, but you have agreed that I will do that,
6  but you didn't ask me for sign off, so do you have any
7  precedent for that?
8        MR. WISE:  Your Honor, no.  No, I don't have a
9  precedent.
10        THE COURT:  As I read it, tell me if I'm reading
11  this correctly, that under the agreement as you all have
12  drafted it the only way that charges could ever be brought
13  is if I have the hearing that you all agreed that I have to
14  have, right?
15        MR. WISE:  Yes.
16        THE COURT:  So if I don't have a hearing or make
17  a finding, no criminal charges can be pursued for the gun
18  charge or any other federal charge within the scope of the
19  agreement not to be prosecuted, right?
20        MR. WISE:  I believe that's right, Your Honor.
21        THE COURT:  So is there some requirement that
22  you have that I have to make that finding that you all
23  agreed that I would without asking?
24        MR. WISE:  Is there some --
25        THE COURT:  Requirement that says I have to make

96

1        THE COURT:  We're doing a hypothetical.
2        MR. CLARK:  I understand the question.
3        THE COURT:  The prosecutor says there is a
4  breach, Judge, we got to move forward on the information.
5  You then come forward and you're like, Judge, he didn't
6  breach, review this, okay, so that's the standard.  The
7  government has -- the executive branch has already made a
8  determination we are going to proceed with the charges.
9  Now, the government cannot make the decision to proceed with
10  charges absent involving the Court.
11        MR. CLARK:  Respectfully, Your Honor, I don't
12  think that's the way it's structured and I do think the way
13  it's structured may get some way past your concern.  What it
14  is is that it's not that the government has decided to bring
15  charges, it's that the government believes there is a
16  breach.  In paragraph 14, the government brings the breach
17  to Your Honor and says we need a determination of whether
18  there is a breach.  So it's not a question that we've
19  decided what to opt into, we've decided what to do, we want
20  your -- it's Your Honor, we believe there is a factual
21  dispute between the parties, not a breach, we would like you
22  to make a factual determination.
23        THE COURT:  Why can't you do that in the normal
24  way?  As I read this, the government has no discretion to
25  bring charges if it believes that a breach has occurred

97

1 unless I opine.

2      MR. CLARK:  Can we approach and discuss one
3 issue with Your Honor?

4      THE COURT:  You mean because it's confidential?

5      MR. CLARK:  Yeah.

6      THE COURT:  Okay.  You're going to have to make
7 -- you're going to have to make a showing as to why.  As I
8 understand, once we're in court in the Third Circuit, it's
9 essentially strict scrutiny, so can you explain to me why
10 this is something that cannot go on the record?

11      MR. CLARK:  It relates to the plea discussions
12 between the parties generally which aren't discussed
13 publicly.

14      THE COURT:  I will allow you to have -- we will
15 have a discussion on the sealed portion, but you're going to
16 have to convince me that it needs to be maintained as
17 sealed.  All right?  Because I can't -- it's hard for me to
18 say that in the abstract if you're saying that's a plea
19 discussion.

20      MR. CLARK:  Your Honor, let me try to handle it
21 separately.  There was a desire because of there being as
22 Your Honor has seen a tremendous amount of political drag
23 with this Defendant that the normal mechanism that might
24 take place would have the protection of the Court not in the
25 discretion to bring a charge, but in finding a breach, and

98

1 so that that wouldn't be something that would become more
2 politicized, but rather would be something that the parties
3 could rely on, someone we consider a neutral arbiter to
4 determine the breach, not the charge.

5      THE COURT:  I understand.  Look, I knew why you
6 brought it, okay, I could see why you would want that
7 provision in here, but I don't -- you are putting me -- the
8 government, the executive branch has the discretion to bring
9 charges.  Here, the government does not have discretion to
10 continue to pursue this charge or any other charge unless
11 you include the Court.  And that seems like it's getting
12 outside of my lane in terms of what I am allowed to do.  And
13 thus, I have concerns about the constitutionality of this
14 provision.  That gives me concerns about the
15 constitutionality of this agreement because there doesn't
16 seem to be a separate severability, and that gives me
17 concerns about whether the Defendant has the protection from
18 prosecution that he thinks he's getting if this agreement
19 turns out to be not worth the paper it's written on.

20      MR. CLARK:  Your Honor, all --

21      THE COURT:  My concern is, and part of what I
22 have to do is knowing and voluntary, and I can't let him --
23 I'm not convinced this is a plea under subsection B, but
24 even if it is, and all I have to say is, is it knowing and
25 voluntary.  I can't let him plead to something if he thinks

99

1 he has protection and he doesn't.

2      MR. CLARK:  Absolutely, Your Honor.  I think the
3 analogy to a VOSR is not a bad analogy.  The government
4 comes to the Court and it says Your Honor, we believe there
5 has been a violation of supervised release.  Unless you,
6 Judge, make a factual finding that that happened, we can't
7 do what we would normally do with regards to this Defendant.
8 Right?  And again, it's the fact and then the discretion.
9 Right?  And so here it's very analogous to that process
10 which is not a violation of separation of powers.  I
11 understand what your Your Honor is saying.

12      THE COURT:  I think I might need a little bit
13 more on this because it is confusing to me.  But let me --
14 or concerning I should say more than confusing.

15      Let me ask you this, if that provision violates the
16 constitution, what happens to the Diversion Agreement?

17      MR. CLARK:  If that provision violates the
18 constitution, the diversion -- first of all, I'm not aware
19 of a manner in which we can challenge the Diversion
20 Agreement, but if it did, I think we would say that, if it's
21 unconstitutional, right --

22      THE COURT:  The way I'm seeing it is the
23 government decides -- not to be politicized, the government
24 decides we're going to bring a charge and you say no, that's
25 prohibited by the Diversion Agreement, and the government

100

1 says that Diversion Agreement is unconstitutional.  You
2 don't have the protection of it.  So I'm not going to not
3 voice my concerns when I think that there are -- you know,
4 you telling me we're not going to challenge it, that really
5 doesn't --

6      MR. CLARK:  No, I'm not saying that, Your Honor.
7 Under those circumstances we would have a contractual
8 dispute about this contract between the government and us
9 and that would get litigated like any other contractual
10 dispute would get litigated.  That's what this is.

11      THE COURT:  But what if it is unconstitutional,
12 what happens to the Diversion Agreement?

13      MR. CLARK:  I think it's valid but for this
14 provision.

15      THE COURT:  Is there a severability provision?

16      MR. CLARK:  There isn't, but there is nothing
17 that says it is a unitary contract either, it's kind of half
18 and half.  There is no merger clause or severability clause,
19 so in my -- it's a toss up on that, right, Your Honor.

20      THE COURT:  So if I say that I am not going to
21 do what is requested, what you all have agreed that I am
22 going to do, what happens to the Diversion Agreement?

23      MR. CLARK:  If you're saying it right now in a
24 binding manner --

25      THE COURT:  I'm just asking you, I'm not making

1  a finding, I'm asking you because I'm trying to exercise due
2  deliberation and consideration and make sure that we don't
3  make a misstep.
4         So Mr. Wise, if I say I'm not doing it, your
5  contract has an impossibility in there because nothing can
6  happen, I understand Mr. Clark might say that's fine, Your
7  Honor, but the government, what happens if I say I'm not
8  going to do that, you can agree I'm going to do it, but I'm
9  not?
10        MR. WISE:  So in negotiating these terms we
11  obviously agreed to -- as Your Honor has pointed out, the
12  executive branch has the authority to bring charges, we have
13  agreed to a limitation, if you will, that is predicated on
14  the Court taking certain action.  If the Court declines to
15  take the action contemplated by the agreement, we would have
16  to examine whether there were other ways to seek the
17  enforcement of the agreement.
18        MR. CLARK:  And there is a way to modify the
19  agreement obviously between the parties, Your Honor, so by
20  written modification we could modify that provision if Your
21  Honor said I won't participate.
22        THE COURT:  All right.  So what are you talking
23  about?
24        MR. CLARK:  I'm saying that if Your Honor said
25  I've determined that this isn't proper, I'm not going to

1  participate, we would work on provision, paragraph 19 which
2  says that, you know, we can modify or add to the agreement
3  with the written consent of the parties and we would come up
4  with an alternative dispute resolution system.
5         I personally, Your Honor, I mean, again, I don't
6  mean to hang everything on a VOSR analogy, I have done many
7  of them in my life, I don't think it is unconstitutional, I
8  think it's very fair question from the Court, I don't think
9  it is, but I think if the Court were to determine it was not
10  appropriate, we would modify the contract and you would
11  determine on another dispute resolution.
12        MR. WISE:  The analogy that I would offer, Your
13  Honor, VOSR's statutory framework is many U.S. Attorney's
14  offices' practice around the country have proffer agreements
15  or Queen for a day agreements where a defendant -- a
16  defendant, a witness, a target will sit down, make certain
17  statements pursuant to an agreement and some of those
18  agreements have provisions that in the event that the
19  government believes there is a breach that they lied, they
20  will go to a judicial officer for a determination and if
21  that is the case and the agreement is deemed void, then
22  charges, for instance, 1001 charges making a false statement
23  to a law enforcement officer could be brought.  So I think
24  that's a similar -- and those agreements unlike VOSR are not
25  governed by an elaborate statutory scheme, they're contracts

1  between United States and individuals, but it contemplates a
2  role for a judicial officer that affects the ability of
3  the government to bring charges.
4         THE COURT:  I take your points on the analogy to
5  the VOSR, but I know, I asked if there is any precedent for
6  this, I was told no.  I was asked if there is any authority
7  for this, I was told no.  And I get the analogy, but I don't
8  think that I can on the fly make the analogy that you're
9  asking me to make or even, you know, you're telling me that
10  this is -- so that this is appropriate.  So I am not sure --
11  I'm not sure what to do with that.  It may be that you're
12  correct, that that's an appropriate analogy, but it may be
13  that you are not.
14        MR. CLARK:  May I propose something, Your Honor?
15  You don't have to -- there is no action again, not to -- I
16  know you don't necessarily want to hear that all the time,
17  that you have to take with a regular Diversion Agreement.
18  Can I propose that Your Honor can take time with regard to
19  this provision, inform the parties, and if you find that the
20  provision is improper, and we can even brief it to you, I'll
21  commit with the government that we'll work under
22  paragraph 19 to implement another procedure.  But again, I
23  don't think that needs to hold up today's disposition.
24        THE COURT:  The problem that I have, I'm not
25  sure that it doesn't.  Again, you all are telling me just

1  rubber stamp the agreement, Your Honor, because all we're
2  doing is recommending a plea.  But it seems like the
3  argument you're making is form over substance.  What's funny
4  to me is you put me right smack in the middle of the
5  Diversion Agreement that I should have no role in, you plop
6  meet right in there and then on the thing that I would
7  normally have the ability to sign off on or look at in the
8  context of a Plea Agreement, you just take it out and you
9  say Your Honor, don't pay any attention to that provision
10  not to prosecute because we put it in an agreement that's
11  beyond your ability.
12        So this is what I am going to do.  These
13  agreements are not straightforward and they contain some
14  atypical provisions.  I am not criticizing you for coming up
15  with those, I think that you have worked hard to come up
16  with creative ways to deal with this.  But I am not in a
17  position where I can decide to accept or reject the Plea
18  Agreement, so I need to defer it.
19        First, I don't know which rule this falls under.
20  I am not convinced that it is actually a plea under
21  subsection B, which you all suggest is me rubber stamping
22  the plea if it's a knowing plea.  But even if it were, I
23  have testimony under oath both that the Defendant is
24  concerned about ensuring that he has immunity from
25  additional charges, and also that well, he doesn't need that

105

1  in terms of the Plea Agreement.  So I need to think about
2  that.
3          Additionally, I need some understanding as to
4  why this is a plea under B and that my concern about the
5  form over substance of the agreement not to prosecute is not
6  valid, or why I should do this.  So I would like some
7  briefing, additional briefing on why subsection B is the
8  appropriate section, and if I were to determine that this
9  actually is a plea under subsection A, it would be helpful
10  to me to have your views on what it is that makes this plea
11  acceptable, because I'm not saying that it is not, but
12  nobody seems to really have given me that what I would need
13  if I were to determine that as I read this as a whole, I
14  think that that really is what is in front of me.  So I need
15  that.
16          And then I would like as you offered, Mr. Clark,
17  you guys can go back and work on whether or not you can take
18  out that provision and come up with something else that's
19  acceptable, and while you do that, you might, though I'm not
20  trying to tell you how to negotiate the Diversion Agreement,
21  you might fix that one paragraph that you have orally
22  modified today.
23          I would like to understand why that provision,
24  if you want it to go forward is appropriate, and why I am
25  not doing something that gets me outside of my lane in terms

106

1  of my branch of government if I were to do what is being
2  requested.
3          Does that make sense?
4          MR. CLARK:  That makes sense, Your Honor.  I
5  think that the parties have been very eager to resolve this
6  matter, and it has been pending for an extended period of
7  time.
8          THE COURT:  It hasn't been pending for that long
9  a period of time, I know that when you guys first called,
10  you said you would send me the agreements on a Tuesday or a
11  Thursday and you wanted to have the hearing within a few
12  days.  I couldn't accommodate that schedule, but the fact
13  is, this is a -- this is our normal course of timing of
14  things and so I understand, and I certainly understand why
15  you want to get this resolved, but I am not in a position
16  where I can do that now.  So if you guys want to tell me
17  when you're thinking you can get me the papers that I'm
18  asking for.
19          MR. WISE:  Your Honor, we would -- what I would
20  anticipate is we'll need to order the transcript from
21  today's proceeding to address some of the issues you have
22  raised to make sure we're precisely addressing what you're
23  asking us to, so I think building in a little bit of time to
24  get the transcript and then a reasonable amount of time
25  after that to submit, I would say at least fourteen days.

107

1          MR. CLARK:  Fine with us, Your Honor.
2          MR. WISE:  I would also say, Your Honor, we're
3  not asking the Court to rubber stamp anything.
4          THE COURT:  It certainly sounds like it.  Tell
5  me again what you think my role is for a plea under
6  11(b)(1)(B).
7          MR. WISE:  It's not what I think the Court's
8  role --
9          THE COURT:  I agree, I read the rule, the rule
10  says I couldn't accept or reject, you're saying it's not a
11  rubber stamp, so what is it I do?
12          MR. WISE:  You don't take action on the Plea
13  Agreement.  What Rule 11(c) says is for Rule (c)(1)(B) the
14  Court must advised the Defendant that the Defendant has no
15  right to withdraw the plea if the Court does not follow the
16  recommendation or request.  So the rule does not contemplate
17  the Court taking any position on the agreement if it's a
18  (c)(1)(B), rather the rule requires the Court to give that
19  advisement, and that is the extent of the Court's role.  And
20  this has been briefed not in this circuit, but in other
21  circuits and we can certainly include that, that's not my
22  view --
23          THE COURT:  I certainly understand what -- if
24  it's a plea under subsection (c)(1)(B), I am not going to
25  just agree with you as to the limits of my role.  My problem

108

1  is I am not -- I am not sure, and I need to understand the
2  propriety, it may very well be that it is appropriate, but
3  as I said, it did catch my attention, you throw me in there,
4  Judge, you're the gatekeeper and then you take me out of the
5  other aspects of the -- you throw me into the Diversion
6  Agreement and then you take me out of the Memorandum of Plea
7  Agreement.
8          So I cannot accept the Plea Agreement today.  I
9  mean, based on what you just said, Mr. Wise, Mr. Clark, if
10  you want, I can accept a guilty plea while I defer my
11  decision on the Plea Agreement, which the Supreme Court said
12  is appropriate in the *Hyde* case, 520 U.S. 670 (1997), if
13  your client wants to plead guilty pending my determination
14  on the Plea Agreement.
15          MR. CLARK:  We're pleading guilty pursuant to
16  the Plea Agreement, Your Honor, so that would not be
17  something that we would do.
18          THE COURT:  Does that mean that I need to take a
19  plea of not guilty?
20          MR. CLARK:  I believe you do, Your Honor.
21          THE COURT:  All right.  So Mr. Biden, I know you
22  want to get this over with, and I'm sorry, but I do want to
23  make sure that I am careful in my view of this.  So I do
24  need some more information.  And part of that is making sure
25  that your plea gets you what you think it gets and part of

109

1    it is making sure that I do justice as I'm required to do in
2    this court.  So I need some additional information.  I'm not
3    saying I'm not going to reject the plea, I'm not saying I'm
4    going to accept the Plea Agreement.  I need more
5    information.
6              So at this point I'm just going to ask you,
7    without the Plea Agreement, without me saying that I would
8    agree to the Plea Agreement, how do you plead to the charges
9    that we have been discussing?
10             THE DEFENDANT:  Not guilty, Your Honor.
11             THE COURT:  Thank you.
12             So I will look forward to the parties'
13   submissions.  And after we have a chance to review those, we
14   will either issue an order as to what we're planning to do
15   with the plea or we'll have a status conference or we'll get
16   back here.
17             Do we need to do anything else?  I know that we
18   talked about we were on the clock now.  Can we exclude the
19   time, that gives me some time to look at these for
20   thirty days or not?
21             MR. CLARK:  I would imagine the Court can
22   exclude the time for briefing, yeah.
23             MR. WISE:  We agree, Your Honor.
24             THE COURT:  So we will do that.  And after we
25   see it, we will take a look and get back to you.

110

1              Mr. Biden, I need you to just stick around for a
2    minute after we adjourn.  I need you -- my deputy is going
3    to ask you to sign the release order that we talked about,
4    and then I need you to go downstairs to the marshals for
5    processing and to catch up with probation.
6              All right?
7              THE DEFENDANT:  Yes, Your Honor.
8              THE COURT:  Anything else that we need to talk
9    about while we are here today?
10             MR. WISE:  Not on behalf of the United States.
11             MR. CLARK:  No, Your Honor.
12             THE COURT:  Thank you.
13             (Court adjourned at 1:14 p.m.)
14
15             I hereby certify the foregoing is a true and
     accurate transcript from my stenographic notes in the proceeding.
16

17                      /s/ Dale C. Hawkins
                      Official Court Reporter
18                      U.S. District Court
19
20
21
22
23
24
25

## $

**$1,045,850** [1] - 34:22
**$1,199,524** [2] - 24:4, 35:5
**$1,580,283** [1] - 34:11
**$1,593,329** [2] - 24:4, 35:6
**$100** [1] - 4:24
**$100,000** [2] - 5:3, 23:9
**$125,909** [1] - 33:11
**$13,630** [1] - 33:14
**$15,520** [1] - 34:6
**$197,000** [1] - 35:12
**$197,372** [1] - 34:23
**$2,187,286** [1] - 33:15
**$2,376,436** [1] - 33:9
**$2,659,014** [1] - 33:19
**$2,698,041** [1] - 33:13
**$204,000** [1] - 29:25
**$25** [2] - 5:6, 23:11
**$25,000** [1] - 30:2
**$250,000** [1] - 4:23
**$30,000** [1] - 74:4
**$38,465** [2] - 31:8, 33:16
**$4,247** [1] - 33:20
**$447,234** [1] - 34:13
**$45,661** [1] - 34:14
**$48,000** [1] - 29:2
**$492,000** [1] - 35:11
**$492,895** [1] - 34:12
**$50** [1] - 25:16
**$500,000** [2] - 28:25, 66:9
**$581,713** [1] - 33:12
**$600,000** [1] - 29:25
**$620,901** [1] - 33:17
**$659,366** [1] - 33:16
**$664,000** [2] - 28:24, 66:3
**$666,666** [2] - 28:23, 65:24
**$70,000** [1] - 29:1
**$710,598** [1] - 33:10
**$758,000** [1] - 31:19
**$939,000** [1] - 30:21
**$955,800** [2] - 33:23, 35:11
**$956,632** [2] - 33:25, 35:11

## '

**'14** [1] - 58:14
**'19** [1] - 58:14

## /

**/s** [1] - 110:17

## 1

**1** [16] - 21:18, 22:25, 23:22, 27:5, 27:6, 28:21, 30:19, 35:9, 40:12, 60:10, 61:22, 62:9, 83:13, 88:8, 88:23, 89:6
**1(b)(1.3)** [1] - 24:9
**1,100** [1] - 27:3
**1.9** [1] - 35:14
**10** [4] - 25:15, 86:4, 86:10, 86:11
**1001** [1] - 102:22
**1040** [6] - 33:9, 33:14, 34:5, 34:9, 34:10, 34:19
**10:00** [1] - 1:9
**11** [3] - 25:17, 87:2
**11(B** [2] - 18:1, 18:18
**11(b)(1)(B)** [1] - 107:6
**11(c** [1] - 107:13
**11(c)(1)(A** [6] - 18:11, 18:14, 18:24, 19:6, 19:18, 47:4
**11(c)(1)(B** [4] - 17:11, 17:23, 41:8, 41:17
**11(c)(1)(C** [2] - 17:17, 18:15
**11(c)(3)(B)** [1] - 18:3
**1120** [2] - 33:12, 33:18
**12** [4] - 25:24, 34:11, 36:18, 87:6
**12th** [1] - 92:10
**13** [4] - 26:15, 83:17, 87:14, 87:15
**14** [6] - 83:17, 87:13, 87:19, 88:8, 92:23, 96:16
**15** [8] - 31:15, 32:9, 40:3, 40:7, 53:11, 57:18, 57:21, 89:1
**15th** [4] - 28:13, 28:16, 31:10, 34:19
**16** [3] - 24:15, 89:15
**17** [1] - 30:15
**17th** [1] - 71:10
**18** [7] - 4:12, 34:15, 34:23, 77:11, 83:25, 89:24, 90:17
**18th** [2] - 33:6, 33:22
**19** [3] - 90:2, 102:1, 103:22
**1996** [1] - 12:13
**1997** [1] - 108:12
**1:14** [1] - 110:13

## 2

**2** [6] - 23:6, 60:25, 83:18, 88:13, 88:23
**2.1** [7] - 27:20, 63:10, 63:14, 70:13, 70:20, 71:3, 81:10
**2.3** [3] - 27:20, 63:9, 81:10
**2.6** [4] - 31:2, 69:23, 70:7, 70:22
**2003** [1] - 13:11
**2010** [1] - 63:3
**2014** [2] - 26:11, 58:20
**2015** [1] - 27:23
**2016** [5] - 27:25, 34:4, 34:10, 34:11, 35:12
**2017** [32] - 27:11, 27:17, 27:20, 28:1, 28:3, 28:20, 29:3, 29:6, 29:22, 30:5, 30:16, 30:17, 31:16, 32:12, 32:14, 33:8, 33:9, 33:12, 33:25, 34:6, 35:12, 62:10, 62:11, 62:22, 62:24, 63:9, 63:11, 65:10, 73:6, 81:10, 81:15
**2018** [34] - 14:17, 14:21, 15:10, 27:20, 28:7, 29:5, 29:23, 30:2, 30:15, 30:19, 31:2, 31:9, 31:17, 32:7, 32:12, 32:14, 33:8, 33:14, 33:18, 34:2, 35:12, 37:19, 63:10, 63:14, 68:21, 70:7, 70:20, 72:15, 73:6, 81:10, 81:15, 81:16, 84:1
**2019** [24] - 15:17, 26:12, 27:12, 29:6, 31:10, 31:15, 31:20, 31:25, 32:2, 32:4, 32:9, 32:10, 34:19, 34:22, 35:12, 58:20, 62:12, 71:3, 71:7, 71:8, 71:10, 72:16, 72:19, 81:16
**2020** [8] - 32:14, 32:18, 33:6, 34:3, 34:9, 34:11, 34:20, 73:5
**2021** [4] - 28:6, 33:22, 34:15, 34:24
**2023** [3] - 1:8, 92:9, 92:10

## 1st, 2nd etc

**1st** [3] - 56:22, 71:15, 71:18

## 2

**21** [1] - 9:6
**22** [1] - 30:19
**22nd** [1] - 68:21
**23-274** [3] - 3:25, 4:14, 11:4
**23-61** [2] - 4:8, 36:15
**23-61(MN** [1] - 1:6
**23-cr-61-MN** [1] - 2:25
**23-mj-274(MN** [1] - 1:5
**23-mj-274-MN** [1] - 3:4
**23cr61** [1] - 83:22
**24-month** [1] - 83:18
**26** [3] - 1:8, 4:17, 23:5
**27** [1] - 32:18

## 3

**3** [5] - 23:14, 61:10, 61:20, 83:20
**3(e)(1.1)(a** [1] - 24:13
**3(e)(1.1)(b** [1] - 24:19
**34** [1] - 8:10
**3553(a** [1] - 77:11

## 4

**4** [2] - 23:23, 84:2
**40702** [1] - 8:11
**48(b** [1] - 85:9
**48,000** [1] - 66:14

## 5

**5** [2] - 24:1, 84:7
**5(b** [1] - 53:10
**520** [1] - 108:12
**5A** [5] - 24:2, 27:2, 35:3, 35:19
**5b** [1] - 36:13
**5B** [1] - 52:7

## 6

**6** [2] - 25:3, 84:16
**670** [1] - 108:12

## 7

**7** [3] - 25:6, 84:25, 91:25
**7203** [2] - 4:18, 23:5

## 8

**8** [2] - 25:9, 85:11
**802** [1] - 9:6
**844** [1] - 1:11

## 9

**9** [4] - 25:12, 75:19, 75:21, 85:18
**900** [1] - 19:24
**922(g)(3** [4] - 4:13, 83:25, 91:2, 91:23
**922(g)(3)** [1] - 90:17
**924(a)(2)** [2] - 4:13, 83:25

## A

**a.m** [1] - 1:9
**abide** [2] - 87:16, 91:10
**ability** [7] - 19:8, 31:18, 75:21, 76:15, 103:2, 104:7, 104:11
**able** [5] - 20:5, 59:18, 73:1, 73:2, 81:18
**abolished** [1] - 78:7
**absent** [2] - 60:12, 96:10
**absolutely** [1] - 99:2
**abstract** [1] - 97:18
**abuse** [6] - 9:22, 27:22, 28:7, 64:3, 86:17, 86:18
**abusing** [1] - 27:24
**accept** [17] - 17:19, 18:7, 18:15, 18:19, 40:18, 40:22, 45:10, 47:8, 47:11, 47:14, 51:14, 61:17, 82:16, 104:17, 107:10, 108:8, 108:10, 109:4
**acceptable** [2] - 105:11, 105:19
**acceptance** [3] - 24:11, 24:14, 24:16
**accepted** [2] - 84:17, 95:7
**accepting** [1] - 19:3
**access** [1] - 45:24
**accommodate** [1] - 106:12
**accordance** [1] - 7:23
**according** [1] - 72:18
**account** [5] - 30:20, 30:24, 68:22, 73:19
**accountant** [13] - 29:4, 29:5, 29:19, 29:20, 29:23, 30:1, 31:11, 31:12, 32:11, 32:13, 66:20, 74:17, 74:18
**accountants** [10] - 32:20, 32:24, 33:4, 34:4, 73:20, 73:22,

74:11, 74:14, 74:21
**accounts** [1] - 73:14
**accrued** [2] - 34:16, 34:24
**accuracy** [3] - 9:19, 32:22, 70:16
**accurate** [4] - 32:21, 37:12, 87:5, 110:15
**accurately** [1] - 39:3
**acknowledge** [1] - 25:22
**acknowledged** [1] - 89:13
**acknowledges** [1] - 87:2
**acknowledging** [1] - 32:21
**acknowledgment** [1] - 84:20
**acquitted** [1] - 79:23
**Act** [3] - 7:2, 25:25, 55:8
**acted** [2] - 69:16, 69:17
**action** [5] - 3:23, 101:14, 101:15, 103:15, 107:12
**ACTION** [2] - 1:4, 1:6
**Action** [5] - 3:25, 4:8, 4:14, 11:4, 36:15
**actions** [2] - 29:16, 84:17
**actively** [2] - 8:24, 86:15
**activities** [1] - 26:2
**actual** [1] - 73:21
**add** [2] - 35:13, 102:2
**addict** [1] - 91:3
**addicted** [2] - 4:12, 83:24
**addiction** [10] - 13:1, 13:4, 13:6, 13:24, 28:4, 31:6, 64:10, 64:15, 81:18, 91:15
**addition** [3] - 34:3, 70:1, 70:3
**additional** [17] - 8:19, 24:18, 25:21, 26:11, 29:25, 33:17, 38:4, 38:17, 42:22, 49:2, 49:9, 50:4, 78:16, 86:11, 104:25, 105:7, 109:2
**additionally** [1] - 105:3
**additions** [1] - 90:9
**address** [4] - 10:15, 35:22, 38:7, 106:21
**addressed** [3] - 21:4, 37:19, 47:23

**addresses** [2] - 25:24, 37:17
**addressing** [1] - 106:22
**adequately** [1] - 19:7
**adjourn** [1] - 110:2
**adjourned** [1] - 110:13
**administrative** [1] - 29:10
**admission** [1] - 58:15
**admits** [2] - 23:20, 23:21
**admitted** [1] - 91:17
**adverse** [2] - 5:25, 7:8
**advice** [4] - 16:23, 22:7, 60:23, 75:25
**advise** [1] - 8:12
**advised** [4] - 29:24, 30:11, 31:12, 107:14
**advisement** [1] - 107:19
**advisors** [1] - 64:21
**affect** [2] - 19:8, 26:22
**affects** [1] - 103:2
**affiliated** [2] - 40:15, 89:9
**afford** [3] - 5:10, 5:11, 77:13
**Agents** [1] - 55:7
**ago** [1] - 43:13
**agree** [24] - 7:21, 8:4, 17:14, 17:21, 20:19, 25:22, 42:1, 42:2, 46:7, 46:8, 49:5, 55:18, 56:14, 57:20, 58:2, 78:3, 80:11, 85:12, 89:18, 101:8, 107:9, 107:25, 109:8, 109:23
**agreed** [12] - 24:21, 26:16, 41:25, 53:23, 77:25, 83:6, 94:5, 94:13, 94:23, 100:21, 101:11, 101:13
**agreeing** [2] - 42:20, 46:2
**agreement** [124] - 3:7, 6:16, 17:8, 18:16, 18:19, 20:7, 22:8, 22:18, 22:20, 26:13, 38:16, 39:2, 39:3, 39:7, 39:10, 39:20, 40:2, 40:4, 40:5, 40:9, 40:13, 40:18, 41:4, 41:9, 41:19, 41:23, 41:24, 42:2, 42:13, 42:14, 42:20, 42:21, 42:23, 43:16, 43:18, 43:19, 43:25,

44:8, 44:15, 45:2, 45:10, 45:17, 45:20, 45:21, 46:10, 46:17, 46:23, 46:24, 47:4, 48:3, 50:19, 50:20, 50:21, 50:23, 51:1, 51:12, 51:20, 51:21, 54:5, 54:11, 54:13, 54:15, 54:25, 56:2, 57:15, 58:19, 60:7, 60:8, 62:3, 75:20, 82:20, 82:22, 83:3, 83:13, 83:15, 84:3, 84:11, 84:19, 84:22, 84:23, 84:24, 85:12, 87:4, 87:23, 88:5, 88:6, 88:19, 88:25, 89:1, 89:3, 89:17, 89:24, 90:1, 90:2, 90:3, 90:4, 90:5, 90:8, 90:9, 91:10, 91:12, 91:13, 92:6, 92:7, 92:17, 92:25, 93:2, 93:7, 94:11, 94:19, 98:15, 98:18, 101:15, 101:17, 101:19, 102:2, 102:17, 102:21, 104:1, 104:10, 105:5, 107:17
**Agreement** [123] - 6:12, 6:14, 10:20, 17:7, 21:15, 21:23, 24:7, 36:14, 39:12, 39:15, 39:17, 39:19, 39:22, 39:24, 40:7, 40:11, 40:13, 40:19, 40:23, 41:25, 42:16, 43:20, 43:22, 44:1, 44:4, 44:8, 44:23, 44:25, 45:4, 45:6, 45:9, 45:11, 45:14, 46:8, 46:17, 46:25, 47:3, 51:4, 51:9, 51:10, 51:17, 51:24, 52:2, 52:4, 52:5, 52:6, 52:8, 52:12, 52:20, 53:2, 53:4, 53:12, 53:13, 53:17, 53:20, 53:21, 53:24, 54:7, 54:8, 55:2, 55:4, 55:12, 55:14, 56:4, 57:15, 57:16, 57:18, 59:6, 59:13, 59:22, 61:21, 62:1, 81:17, 82:11, 82:13, 82:14, 82:16, 82:17, 82:25, 83:1, 83:5, 83:8, 87:18, 87:20, 89:6, 89:7, 89:22,

90:3, 91:5, 91:6, 92:3, 93:13, 99:16, 99:20, 99:25, 100:1, 100:12, 100:22, 103:17, 104:5, 104:8, 104:18, 105:1, 105:20, 107:13, 108:6, 108:7, 108:8, 108:11, 108:14, 108:16, 109:4, 109:7, 109:8
**agreements** [20] - 10:20, 10:23, 20:13, 41:10, 41:13, 41:14, 43:15, 45:23, 51:11, 82:19, 87:17, 90:7, 92:19, 95:22, 102:14, 102:15, 102:18, 102:24, 104:13, 106:10
**agrees** [16] - 19:14, 23:1, 25:15, 25:25, 40:8, 58:18, 84:7, 84:10, 84:25, 85:5, 85:7, 87:3, 87:4, 87:6, 87:16, 89:2
**ahead** [2] - 83:5, 86:9
**alcohol** [6] - 9:4, 9:16, 13:24, 14:13, 27:24, 86:17
**alcoholic** [2] - 15:15, 15:20
**alcoholism** [1] - 14:3
**alleged** [1] - 87:12
**allow** [2] - 76:18, 97:14
**allowed** [1] - 98:12
**almost** [3] - 19:24, 30:22, 31:21
**alone** [2] - 41:13, 41:23
**alternative** [1] - 102:4
**amend** [1] - 81:24
**Amendment** [1] - 85:8
**AMERICA** [1] - 1:3
**America** [1] - 83:9
**amount** [14] - 24:3, 26:1, 26:8, 27:2, 35:3, 35:16, 36:23, 37:15, 38:12, 72:25, 74:1, 75:3, 97:22, 106:24
**amounts** [2] - 74:8, 81:19
**analogous** [1] - 99:9
**analogy** [8] - 99:3, 102:6, 102:12, 103:4, 103:7, 103:8, 103:12

**analysis** [1] - 47:7
**Angeles** [1] - 28:8
**anonymity** [1] - 71:23
**answer** [4] - 11:12, 11:13, 55:15, 58:8
**answered** [1] - 40:17
**answering** [1] - 44:12
**answers** [2] - 11:14, 38:2
**anticipate** [4] - 60:1, 76:21, 79:6, 106:20
**anyplace** [1] - 51:17
**apart** [1] - 69:7
**apologies** [1] - 86:9
**apologize** [1] - 43:11
**appeal** [2] - 75:22, 76:18
**appear** [1] - 8:16
**appearance** [4] - 2:24, 3:11, 4:1, 4:2
**Appearance** [1] - 1:9
**appearances** [1] - 10:15
**APPEARANCES** [2] - 1:16, 2:1
**appellant** [5] - 25:12, 75:19, 75:20, 76:10, 76:24
**applicable** [2] - 85:5, 86:12
**application** [1] - 24:16
**applies** [1] - 48:16
**appointment** [1] - 5:12
**appreciate** [2] - 43:6, 72:9
**apprise** [1] - 18:1
**approach** [1] - 97:2
**appropriate** [14] - 7:5, 8:5, 46:6, 48:16, 60:13, 77:22, 78:4, 102:10, 103:10, 103:12, 105:8, 105:24, 108:2, 108:12
**approval** [1] - 83:15
**approved** [1] - 51:5
**approximate** [1] - 74:1
**April** [9] - 28:13, 28:19, 29:23, 30:2, 30:15, 31:10, 31:20, 81:15
**arbiter** [1] - 98:3
**areas** [1] - 57:21
**argument** [1] - 104:3
**arguments** [1] - 49:21
**arising** [3] - 84:14, 85:6, 85:16
**arraigned** [1] - 51:6
**arrest** [1] - 10:9

**arriving** [1] - 38:7
**articulated** [1] - 25:4
**aside** [1] - 38:6
**aspects** [1] - 108:5
**assert** [1] - 85:8
**assessed** [16] - 26:4, 33:10, 33:13, 33:15, 33:20, 33:23, 33:25, 34:12, 34:23, 36:19, 36:22, 37:12, 37:14, 37:18, 75:2
**assessment** [6] - 4:24, 5:6, 23:11, 25:16, 37:4, 78:22
**asset** [1] - 67:20
**assistance** [1] - 79:15
**assistant** [1] - 29:10
**associated** [5] - 26:4, 29:22, 36:20, 65:16, 80:16
**attached** [10] - 20:12, 21:18, 23:22, 25:18, 40:10, 40:12, 52:22, 61:21, 89:4, 89:5
**attachment** [4] - 21:19, 25:20, 26:17
**Attachment** [11] - 21:19, 22:12, 22:14, 24:6, 25:18, 40:11, 84:18, 85:4, 87:3, 88:17, 89:5
**attachments** [1] - 19:24
**attempt** [3] - 2:17, 9:18, 89:11
**attempted** [1] - 29:8
**attempting** [1] - 85:20
**attempts** [1] - 85:24
**attend** [2] - 71:18, 71:20
**attended** [1] - 13:3
**attending** [1] - 71:21
**attention** [3] - 94:2, 104:9, 108:3
**attorney** [9] - 5:9, 5:10, 5:12, 22:5, 27:10, 31:11, 69:10, 75:23, 84:13
**Attorney** [4] - 4:9, 4:15, 20:15, 20:16
**Attorney's** [3] - 49:13, 83:10, 102:13
**ATTORNEY'S** [1] - 1:18
**attributable** [1] - 26:2
**atypical** [1] - 104:14
**authorities** [2] - 6:19, 6:20
**authority** [5] - 41:18, 46:5, 95:6, 101:12,

103:6
**authorized** [1] - 8:10
**automatic** [1] - 28:15
**available** [2] - 30:17, 30:21
**averring** [1] - 32:20
**aware** [3] - 46:4, 49:9, 99:18

## B

**B-I-D-E-N** [1] - 11:24
**Background** [1] - 85:23
**bad** [2] - 84:9, 99:3
**balance** [4] - 30:23, 33:11, 33:17, 34:13
**balances** [1] - 31:23
**ball** [1] - 56:15
**bank** [3] - 30:20, 68:22, 73:13
**bar** [3] - 12:14, 22:10, 22:12
**bargain** [7] - 19:5, 19:6, 19:10, 19:12, 19:13, 46:13, 51:23
**bargaining** [4] - 41:24, 47:20
**barred** [2] - 88:18, 93:16
**based** [20] - 3:23, 3:25, 16:11, 20:7, 23:1, 29:4, 35:20, 36:25, 37:2, 37:3, 38:1, 44:7, 54:20, 54:24, 55:3, 59:18, 60:11, 64:7, 85:1, 108:9
**basis** [2] - 49:16, 79:8
**become** [1] - 98:1
**BEFORE** [1] - 1:13
**began** [3] - 30:5, 32:3, 32:13
**beginning** [3] - 13:11, 29:22, 83:14
**begun** [1] - 17:25
**behalf** [7] - 2:22, 26:6, 31:22, 35:11, 36:22, 79:17, 110:10
**believes** [6] - 87:9, 87:20, 92:24, 96:15, 96:25, 102:19
**below** [1] - 65:5
**benefit** [1] - 46:12
**Benjamin** [1] - 2:22
**BENJAMIN** [1] - 1:19
**BERGER** [1] - 2:5
**best** [2] - 13:9, 46:11
**better** [1] - 73:9
**between** [19] - 37:7,

44:8, 44:25, 46:10, 57:11, 57:16, 57:19, 71:13, 72:5, 88:20, 90:4, 90:6, 91:7, 91:13, 96:21, 97:12, 100:8, 101:19, 103:1
**beverage** [2] - 15:15, 15:20
**beyond** [5] - 61:13, 79:20, 79:22, 80:9, 104:11
**Biden** [100] - 2:25, 3:3, 3:15, 4:8, 5:8, 5:19, 6:18, 10:7, 11:5, 11:23, 16:12, 27:9, 27:10, 27:21, 27:23, 28:4, 28:10, 28:14, 28:20, 29:3, 29:8, 29:9, 29:12, 29:13, 29:15, 29:16, 29:21, 29:24, 29:25, 30:1, 30:5, 30:7, 30:16, 30:19, 30:22, 31:1, 31:6, 31:10, 31:12, 31:15, 31:17, 31:20, 31:25, 32:1, 32:10, 32:16, 32:18, 32:23, 33:1, 33:6, 33:9, 33:12, 33:14, 33:19, 34:7, 34:10, 34:11, 34:14, 34:18, 34:22, 37:25, 39:2, 40:8, 40:15, 45:4, 63:18, 68:4, 69:10, 73:10, 73:12, 75:20, 81:23, 82:10, 83:11, 83:20, 84:2, 84:7, 84:17, 84:25, 85:12, 85:19, 86:13, 87:2, 87:6, 87:15, 87:24, 88:1, 88:4, 88:9, 88:11, 88:13, 89:3, 89:8, 89:10, 90:5, 90:6, 90:11, 90:16, 108:21, 110:1
**BIDEN** [2] - 1:6, 11:25
**Biden's** [17] - 28:7, 29:6, 29:15, 29:20, 30:10, 32:14, 33:4, 33:23, 33:25, 34:4, 34:8, 35:10, 37:23, 74:10, 84:19, 90:12
**big** [1] - 41:16
**bilateral** [3] - 44:8, 46:10, 57:16
**bind** [1] - 38:16
**binding** [4] - 24:22, 44:25, 89:14, 100:24
**binds** [1] - 17:18
**bit** [13] - 10:23, 18:21,

40:2, 45:20, 54:11, 56:10, 56:15, 59:7, 69:23, 82:18, 82:24, 99:12, 106:23
**board** [2] - 27:12, 62:12
**Bohai** [1] - 62:16
**Boise** [6] - 63:3, 63:10, 63:17, 63:22, 66:16, 69:9
**bond** [1] - 10:10
**book** [1] - 64:9
**bottom** [2] - 66:18, 67:2
**bought** [1] - 91:15
**bound** [3] - 18:2, 25:22, 79:7
**Brady** [3] - 7:3, 7:6, 7:12
**branch** [6] - 95:16, 96:7, 98:8, 101:12, 106:1
**Branch** [4] - 20:24, 21:9, 21:12, 48:11
**breach** [26] - 83:17, 87:11, 87:13, 87:15, 87:18, 87:20, 88:4, 88:7, 88:10, 88:11, 88:24, 92:24, 93:3, 93:5, 93:14, 95:24, 96:4, 96:6, 96:16, 96:18, 96:21, 96:25, 97:25, 98:4, 102:19
**breached** [2] - 91:8, 95:23
**Brey** [1] - 83:16
**brief** [3] - 43:8, 57:7, 103:20
**briefed** [1] - 107:20
**briefing** [3] - 105:7, 109:22
**bring** [22] - 19:14, 20:17, 20:23, 41:2, 45:15, 46:23, 53:18, 53:23, 54:25, 55:2, 55:7, 84:8, 91:12, 95:13, 95:15, 96:14, 96:25, 97:25, 98:8, 99:24, 101:12, 103:3
**bringing** [1] - 91:21
**brings** [1] - 96:16
**broad** [5] - 25:12, 46:17, 46:20, 76:9, 83:2
**broader** [1] - 58:5
**broadly** [1] - 57:23
**brother** [1] - 27:23
**brought** [14] - 19:15, 20:9, 20:14, 21:3, 48:8, 49:2, 49:10,

49:19, 54:20, 85:3, 93:20, 94:12, 98:6, 102:23
**Buckson** [1] - 11:18
**building** [1] - 106:23
**bunch** [1] - 45:23
**burden** [1] - 80:8
**Burisma** [5] - 62:16, 66:12, 66:13
**business** [35] - 27:11, 27:14, 28:4, 28:22, 28:23, 29:2, 29:11, 29:14, 30:11, 31:3, 31:4, 31:6, 32:25, 33:2, 35:20, 64:18, 64:19, 64:20, 64:22, 65:6, 65:12, 65:24, 66:21, 68:15, 69:23, 69:25, 70:23, 73:7, 73:14, 73:17, 73:19, 73:20, 73:24
**businesses** [4] - 40:15, 64:25, 70:13, 89:9
**businessman** [1] - 27:10
**BY** [4] - 1:19, 1:20, 2:3, 2:6

## C

**c)(1)(A** [6] - 19:11, 41:8, 41:18, 47:25, 48:3, 51:16
**c)(1)(B** [4] - 51:25, 107:13, 107:18, 107:24
**c)(1)(B)** [1] - 51:15
**calculated** [1] - 77:16
**calculating** [2] - 53:9, 53:14
**calculation** [3] - 36:4, 38:2, 79:1
**calendar** [5] - 28:13, 28:20, 65:10, 81:15, 81:16
**California** [7] - 32:2, 32:11, 32:13, 32:19, 32:24, 33:4, 34:4
**candid** [1] - 84:19
**cannot** [5] - 54:25, 55:2, 96:9, 97:10, 108:8
**capable** [1] - 16:13
**capacity** [2] - 27:18, 63:22
**car** [1] - 31:23
**card** [1] - 31:23
**cards** [1] - 73:13
**care** [1] - 12:23

careful [1] - 108:23
carefully [1] - 22:19
case [34] - 3:7, 5:3,
16:20, 16:24, 18:3,
19:2, 19:9, 19:24,
20:12, 21:22, 23:15,
35:13, 36:3, 43:15,
44:22, 45:21, 45:22,
46:3, 46:18, 54:5,
54:6, 68:18, 69:19,
77:3, 80:7, 80:20,
82:12, 82:23, 83:22,
84:15, 90:19, 92:12,
102:21, 108:12
cases [7] - 3:23, 4:3,
5:20, 10:19, 11:6,
21:21, 91:14
cash [2] - 30:24, 31:22
cast [1] - 20:8
catch [3] - 74:22,
108:3, 110:5
categorizing [1] -
73:23
caveat [2] - 41:15,
41:16
CEFC [2] - 65:17, 66:8
CEO [4] - 28:22, 31:4,
65:12, 69:24
certain [5] - 24:1,
33:1, 73:6, 101:14,
102:16
certainly [5] - 2:16,
106:14, 107:4,
107:21, 107:23
certify [1] - 110:15
chain [1] - 70:16
chairman [1] - 65:20
challenge [9] - 23:1,
60:11, 60:13, 60:17,
76:15, 77:7, 81:24,
99:19, 100:4
challenges [1] - 90:24
chance [2] - 77:6,
109:13
change [4] - 6:22,
8:14, 47:6, 67:23
changed [1] - 67:18
characterization [2] -
67:13, 68:5
charge [37] - 3:11,
3:12, 3:24, 4:22,
6:12, 19:5, 19:6,
19:10, 19:12, 23:4,
36:16, 41:2, 41:23,
43:4, 47:20, 52:20,
54:23, 55:7, 80:10,
82:18, 84:8, 84:9,
85:15, 89:23, 90:19,
91:16, 91:22, 91:23,
92:2, 94:18, 95:13,

97:25, 98:4, 98:10,
99:24
charged [4] - 5:23,
21:9, 91:18, 93:14
charges [73] - 4:1,
4:10, 4:16, 4:19, 6:4,
6:8, 7:9, 11:4, 16:15,
16:20, 19:14, 19:15,
20:9, 20:14, 20:17,
20:23, 21:3, 41:3,
41:4, 42:3, 42:17,
45:15, 45:16, 45:17,
46:3, 46:24, 48:1,
48:8, 48:23, 49:1,
49:2, 49:10, 49:11,
49:19, 49:22, 50:4,
53:19, 53:22, 53:23,
53:25, 54:5, 54:20,
54:25, 55:3, 58:20,
58:21, 58:22, 60:14,
79:23, 83:22, 85:2,
85:3, 85:6, 85:16,
90:16, 91:12, 94:12,
94:17, 95:12, 95:15,
95:21, 96:8, 96:10,
96:15, 96:25, 98:9,
101:12, 102:22,
103:3, 104:25, 109:8
charging [2] - 2:25,
3:4
charts [1] - 73:15
Check [1] - 85:23
chief [2] - 46:7, 83:15
children [1] - 31:22
Chinese [13] - 27:13,
28:22, 28:24, 31:4,
62:13, 62:16, 62:20,
65:12, 65:13, 65:17,
66:3, 69:24, 70:12
choice [2] - 5:11,
95:14
choose [1] - 20:4
CHRISTOPHER [1] -
2:3
Circuit [2] - 90:19,
97:8
circuit [2] - 47:24,
107:20
circuits [1] - 107:21
circumstances [3] -
19:9, 95:10, 100:7
claim [1] - 88:2
claims [1] - 84:13
clarified [1] - 70:4
clarify [2] - 9:8, 43:14,
57:11
Clark [13] - 3:15, 5:16,
7:15, 7:22, 16:20,
17:14, 49:5, 82:5,
90:14, 95:22, 101:6,

105:16, 108:9
CLARK [91] - 2:3, 2:3,
3:16, 3:21, 4:5, 6:16,
7:16, 7:23, 8:1, 10:4,
10:18, 13:17, 14:18,
16:8, 17:15, 17:21,
20:19, 21:1, 21:8,
36:2, 36:10, 37:2,
37:21, 39:11, 39:16,
42:5, 43:1, 43:6,
43:11, 43:24, 44:7,
44:18, 44:21, 49:8,
50:24, 54:1, 55:14,
55:17, 56:3, 56:12,
56:20, 57:1, 57:5,
57:10, 58:1, 58:6,
58:24, 63:15, 67:14,
67:17, 68:5, 68:9,
69:9, 70:8, 70:14,
72:5, 73:9, 74:3,
74:21, 82:8, 90:15,
90:21, 91:9, 92:4,
92:9, 93:8, 93:18,
95:18, 95:25, 96:2,
96:11, 97:2, 97:5,
97:11, 97:20, 98:20,
99:2, 99:17, 100:6,
100:13, 100:16,
100:23, 101:18,
101:24, 103:14,
106:4, 107:1,
108:15, 108:20,
109:21, 110:11
clause [2] - 100:18
clear [10] - 13:17,
15:18, 15:23, 17:14,
17:16, 37:21, 40:16,
44:23, 48:9, 95:19
CLERK [1] - 11:20,
43:7, 57:6
client [6] - 42:5, 43:17,
44:21, 45:1, 49:22,
108:13
client's [2] - 16:7,
49:15
clients [1] - 28:5
clock [3] - 56:8, 56:13,
109:18
close [2] - 13:12,
73:10
cocaine [1] - 27:25
Code [8] - 4:13, 4:18,
8:10, 9:6, 23:5,
77:11, 83:25, 90:17
collapse [3] - 27:25,
28:2, 64:15
collapsed [3] - 64:23,
65:1, 65:3
collection [1] - 8:9
Columbia [1] - 12:17

combined [3] - 24:3,
35:6, 35:8
comfortable [2] -
58:4, 58:9
coming [1] - 104:14
commencement [1] -
88:21
commented [1] -
29:13
comments [1] - 10:3
commit [2] - 86:25,
103:21
commitments [1] -
85:19
committed [2] - 5:23,
88:4
common [1] - 61:23
communicate [2] -
8:24, 86:22
companies [6] - 55:6,
62:14, 62:20, 65:4,
66:5
company [23] - 27:12,
28:22, 28:25, 29:1,
31:3, 31:5, 62:12,
62:15, 62:21, 64:22,
65:4, 65:11, 65:13,
65:15, 65:17, 65:20,
65:21, 66:4, 66:10,
69:24, 69:25, 70:12
compensation [1] -
27:15
competence [1] - 16:7
competent [1] - 16:12
complete [2] - 15:1,
90:5
completed [2] - 15:3,
15:5
completely [3] -
42:15, 71:14, 90:25
completion [1] - 15:2
complies [1] - 84:2
comport [1] - 26:23
compressed [1] -
73:11
compromise [1] -
49:20
concede [1] - 73:22
concept [1] - 93:19
conception [1] - 50:25
concern [5] - 68:2,
91:21, 96:13, 98:21,
105:4
concerned [6] - 50:17,
51:19, 56:4, 94:4,
95:11, 104:24
concerning [1] - 99:14
concerns [11] - 7:15,
7:22, 16:9, 44:3,
82:6, 90:18, 92:6,

98:13, 98:14, 98:17,
100:3
concur [1] - 21:1
conditions [13] - 7:20,
8:6, 8:20, 9:25, 10:3,
10:8, 76:18, 78:15,
83:12, 84:24, 86:11,
89:16, 90:8
conduct [18] - 3:10,
4:2, 24:5, 24:8,
24:11, 35:4, 35:15,
40:15, 52:10, 53:9,
53:14, 84:1, 85:3,
88:16, 89:8, 89:18,
89:20, 89:22
confer [1] - 12:2
conference [1] -
109:15
confident [2] - 76:5,
76:7
confidential [1] - 97:4
confirm [1] - 7:2
confused [2] - 59:8,
70:6
confusing [2] - 99:13,
99:14
conglomerate [4] -
28:23, 31:4, 65:12,
69:25
Connecticut [1] -
12:18
connection [6] -
21:22, 32:25, 39:19,
40:18, 43:19, 45:10
consent [2] - 85:22,
102:3
consented [1] - 89:16
consequences [1] -
7:5
conservative [1] -
71:12
consider [4] - 19:18,
77:15, 77:20, 98:3
consideration [4] -
11:2, 84:19, 84:21,
101:2
considered [2] - 53:8,
53:13
consistent [1] - 92:15
constitute [3] - 24:8,
87:18, 89:19
constitutes [4] -
87:11, 89:25, 90:1,
90:5
constitution [2] -
99:16, 99:18
constitutional [2] -
91:11, 95:17
constitutionality [4] -
90:18, 91:23, 98:13,

98:15
**consulting** [2] - 31:3, 69:23
**contacting** [1] - 29:9
**contain** [1] - 104:13
**contained** [4] - 19:10, 23:21, 39:10, 39:15
**contains** [5] - 16:15, 24:1, 25:12, 75:20, 83:1
**contemplate** [1] - 107:16
**contemplated** [3] - 36:15, 93:11, 101:15
**contemplates** [1] - 103:1
**contempt** [2] - 7:7, 10:11
**context** [2] - 49:12, 104:8
**contingency** [1] - 43:18
**continue** [6] - 5:16, 8:23, 15:6, 25:21, 86:14, 98:10
**CONTINUED** [1] - 2:1
**continued** [3] - 28:10, 31:1, 31:17
**continuing** [1] - 7:2, 29:23
**contract** [7] - 54:2, 57:16, 91:7, 100:8, 100:17, 101:5, 102:10
**contracts** [3] - 27:14, 55:19, 102:25
**contractual** [2] - 100:7, 100:9
**contractually** [1] - 53:22
**contradicting** [1] - 87:8
**contrary** [1] - 87:10
**contrast** [1] - 70:21
**contributed** [1] - 27:25
**control** [1] - 28:11
**controlled** [5] - 4:12, 9:5, 71:6, 83:24, 86:16
**convicted** [1] - 8:17
**conviction** [2] - 76:11, 76:15
**convince** [1] - 97:16
**convinced** [2] - 98:23, 104:20
**cooperate** [1] - 8:9
**copies** [3] - 29:10, 66:20
**copy** [4] - 16:16, 40:3,

40:4, 82:25
**corners** [1] - 42:22
**corporate** [10] - 28:11, 29:5, 29:6, 29:17, 29:20, 30:18, 32:8, 32:12, 33:7, 72:15
**corporations** [1] - 27:16
**correct** [9] - 11:6, 15:21, 15:25, 17:19, 42:6, 57:13, 72:11, 93:7, 103:12
**corrected** [1] - 74:17
**corrections** [1] - 90:14
**correctly** [1] - 94:11
**cost** [1] - 23:12
**costs** [1] - 5:6
**Counsel** [2] - 1:21, 2:7
**counsel** [19] - 6:12, 7:8, 12:3, 16:6, 16:23, 17:8, 22:8, 27:18, 57:13, 60:20, 62:24, 63:5, 69:13, 76:1, 78:25, 79:15, 89:10, 89:12, 90:12
**counseling** [1] - 9:23
**count** [5] - 23:12, 35:7, 61:12, 71:17, 83:22
**counterparts** [1] - 89:25
**country** [1] - 102:14
**Counts** [9] - 5:2, 23:3, 23:7, 23:24, 24:3, 26:14, 35:4, 61:1, 61:11
**counts** [3] - 3:4, 4:16, 61:5
**couple** [3] - 26:25, 63:16, 70:17
**course** [3] - 13:13, 30:4, 106:13
**COURT** [311] - 1:1, 2:12, 3:8, 3:13, 3:17, 3:22, 4:6, 4:8, 4:21, 5:1, 5:8, 5:15, 5:19, 6:3, 6:7, 6:11, 6:18, 7:1, 7:12, 7:15, 7:17, 7:22, 7:24, 8:2, 10:2, 10:7, 10:14, 10:19, 11:8, 11:18, 11:20, 12:1, 12:6, 12:9, 12:11, 12:14, 12:16, 12:19, 12:22, 12:25, 13:5, 13:8, 13:14, 13:19, 14:1, 14:5, 14:9, 14:11, 14:15, 14:19, 14:21, 14:25, 15:5, 15:9, 15:13, 15:18, 15:23, 16:3,

16:6, 16:9, 16:11, 16:19, 16:22, 17:1, 17:6, 17:13, 17:16, 17:22, 18:4, 18:6, 18:9, 18:13, 18:20, 19:12, 19:17, 19:22, 20:22, 21:2, 21:13, 21:17, 22:1, 22:3, 22:7, 22:10, 22:15, 26:25, 35:1, 35:9, 35:24, 36:1, 36:8, 36:13, 36:18, 37:10, 38:9, 38:19, 38:24, 39:6, 39:9, 39:13, 39:18, 39:22, 40:1, 40:21, 40:25, 41:6, 41:16, 42:1, 42:7, 42:14, 42:24, 43:2, 43:7, 43:9, 43:21, 44:1, 44:12, 44:20, 45:3, 45:8, 45:13, 45:19, 46:5, 46:15, 46:21, 47:2, 47:6, 47:10, 47:14, 47:17, 47:21, 48:2, 48:7, 48:13, 48:18, 49:3, 49:5, 50:3, 50:9, 50:12, 50:16, 51:8, 52:3, 52:7, 52:11, 52:14, 52:17, 52:25, 54:4, 54:10, 54:17, 55:5, 55:10, 55:15, 55:19, 55:23, 56:7, 56:14, 56:21, 57:4, 57:6, 57:8, 57:25, 58:3, 58:8, 58:13, 58:18, 58:25, 59:15, 59:21, 60:3, 60:6, 60:10, 60:16, 60:19, 60:22, 60:25, 61:7, 61:10, 61:20, 62:8, 62:18, 63:5, 63:8, 63:13, 63:18, 63:23, 64:1, 64:13, 64:25, 65:6, 65:9, 65:18, 65:21, 65:23, 66:3, 66:7, 66:9, 66:13, 66:16, 66:18, 66:25, 67:6, 67:8, 67:11, 67:16, 68:2, 68:7, 68:10, 68:12, 68:15, 68:19, 68:25, 69:4, 69:6, 69:11, 69:14, 69:18, 69:21, 70:6, 70:10, 71:1, 71:5, 71:11, 71:16, 71:20, 71:24, 72:7, 72:9, 72:13, 72:18, 72:21, 72:23, 73:4, 74:1, 74:15, 74:23, 75:1, 75:6, 75:13, 75:15,

75:18, 75:25, 76:3, 76:9, 76:14, 76:17, 76:23, 77:10, 78:6, 78:11, 78:20, 78:25, 79:4, 79:10, 79:19, 80:1, 80:7, 80:13, 80:18, 80:24, 81:2, 81:23, 82:2, 82:5, 82:9, 86:5, 90:13, 90:16, 90:25, 91:14, 91:25, 92:5, 92:11, 93:10, 94:2, 94:10, 94:16, 94:21, 94:25, 95:3, 95:6, 95:11, 95:21, 96:1, 96:3, 96:23, 97:4, 97:6, 97:14, 98:5, 98:21, 99:12, 99:22, 100:11, 100:15, 100:20, 100:25, 101:22, 103:4, 103:24, 106:8, 107:4, 107:9, 107:23, 108:18, 108:21, 109:11, 109:24, 110:8, 110:12
**court** [9] - 5:12, 8:12, 8:16, 10:11, 32:16, 77:2, 91:3, 97:8, 109:2
**Court** [50] - 1:14, 2:23, 8:18, 10:21, 18:15, 19:5, 19:6, 19:10, 23:2, 24:23, 24:24, 25:8, 25:10, 25:13, 26:3, 43:16, 47:25, 49:25, 50:18, 51:2, 51:3, 60:13, 77:5, 83:2, 83:3, 84:5, 85:14, 93:21, 93:25, 95:7, 96:10, 97:24, 98:11, 99:4, 101:14, 102:8, 102:9, 107:3, 107:14, 107:15, 107:17, 107:18, 108:11, 109:21, 110:13, 110:17, 110:18
**Court's** [6] - 2:18, 18:18, 19:4, 19:8, 107:7, 107:19
**courts** [1] - 47:23
**cover** [3] - 22:13, 33:23, 33:25
**covers** [1] - 93:13
**crack** [1] - 27:25
**crafted** [1] - 95:9
**created** [1] - 30:7
**creative** [1] - 104:16

**credit** [4] - 31:23, 37:1, 73:13, 73:19
**crime** [1] - 93:5
**crimes** [8] - 5:23, 40:10, 45:22, 46:2, 46:18, 57:22, 88:15, 89:4
**Criminal** [8] - 3:25, 4:8, 4:14, 11:3, 17:11, 36:15, 85:9, 85:23
**CRIMINAL** [2] - 1:4, 1:6
**criminal** [7] - 2:24, 3:2, 3:23, 38:15, 88:14, 94:17, 95:12
**criminally** [2] - 40:8, 89:2
**criticizing** [1] - 104:14
**cross** [4] - 5:25, 79:17, 82:12, 82:13
**cross-examine** [1] - 5:25
**cross-examined** [1] - 79:17
**cross-referenced** [2] - 82:12, 82:13
**current** [3] - 32:1, 77:14, 84:21
**curve** [1] - 56:15

**D**

**Dale** [1] - 110:17
**date** [14] - 28:16, 28:19, 30:16, 31:10, 31:13, 32:9, 56:1, 56:9, 71:10, 71:13, 71:17, 72:3, 83:14, 88:19
**days** [7] - 32:23, 56:12, 56:17, 84:4, 106:12, 106:25, 109:20
**DC** [2] - 29:3, 31:11
**deadline** [2] - 28:18, 73:2
**deal** [4] - 22:21, 41:11, 55:22, 104:16
**death** [1] - 27:23
**debauchery** [1] - 28:9
**decide** [2] - 82:16, 104:17
**decided** [4] - 80:3, 96:14, 96:19
**decides** [1] - 99:23, 99:24
**decision** [7] - 20:22, 38:17, 49:7, 92:14, 95:13, 96:9, 108:11

**decisions** [3] - 21:10, 81:20, 81:21
**decline** [1] - 80:2
**declines** [1] - 101:14
**decrease** [2] - 24:13, 25:1
**deductions** [3] - 35:21, 36:25, 38:4
**deemed** [1] - 102:21
**defend** [1] - 25:7
**DEFENDANT** [144] - 4:20, 4:25, 5:7, 5:14, 5:18, 6:2, 6:6, 6:10, 6:25, 10:1, 10:13, 11:7, 11:17, 11:23, 12:5, 12:7, 12:10, 12:13, 12:15, 12:17, 12:21, 12:24, 13:3, 13:7, 13:11, 13:15, 13:24, 14:4, 14:8, 14:10, 14:14, 14:17, 14:20, 14:23, 15:3, 15:8, 15:12, 15:17, 15:22, 16:1, 16:5, 16:18, 16:21, 16:25, 17:5, 21:16, 21:25, 22:2, 22:6, 22:9, 39:5, 39:8, 39:21, 39:25, 40:20, 40:24, 41:5, 45:7, 45:12, 45:18, 59:14, 59:20, 60:2, 60:5, 60:9, 60:15, 60:18, 60:21, 60:24, 61:6, 61:9, 61:19, 62:7, 62:15, 63:2, 63:7, 63:12, 63:19, 63:24, 64:8, 64:18, 65:3, 65:8, 65:15, 65:19, 65:22, 66:1, 66:6, 66:12, 66:15, 66:17, 66:23, 67:5, 67:7, 67:10, 67:12, 68:14, 68:17, 68:24, 69:2, 69:5, 69:8, 69:13, 69:16, 69:19, 70:5, 71:4, 71:9, 71:12, 71:17, 71:22, 72:1, 72:8, 72:12, 72:17, 72:20, 72:22, 72:24, 74:25, 75:11, 75:14, 75:16, 75:24, 76:2, 76:7, 76:13, 76:16, 76:22, 77:9, 78:5, 78:10, 78:19, 78:24, 79:3, 79:9, 79:18, 79:25, 80:6, 80:12, 80:17, 82:1, 82:4, 109:10, 110:7
**Defendant** [47] - 1:7,

2:7, 3:1, 3:4, 8:7, 8:9, 8:12, 8:16, 11:19, 18:2, 19:13, 20:3, 22:25, 23:6, 23:16, 23:19, 23:23, 24:11, 25:11, 25:14, 25:15, 25:25, 26:6, 26:7, 27:9, 36:22, 38:13, 43:5, 43:16, 44:9, 46:14, 48:24, 51:6, 53:19, 59:5, 61:14, 76:24, 81:4, 81:5, 91:17, 93:4, 97:23, 98:17, 99:7, 104:23, 107:14
**defendant** [4] - 92:14, 102:15, 102:16
**Defendant's** [3] - 4:1, 24:15, 43:13
**defense** [2] - 10:4, 58:18
**defenses** [1] - 85:1
**defer** [4] - 18:16, 18:19, 104:18, 108:10
**deferred** [1] - 50:25
**defined** [3] - 9:6, 35:4, 85:21
**DELAWARE** [2] - 1:2, 1:18
**Delaware** [10] - 1:12, 4:9, 4:15, 9:1, 23:3, 83:10, 85:10, 85:14, 87:22, 93:1
**deliberation** [1] - 101:2
**delivered** [1] - 34:7
**denied** [1] - 85:24
**Department** [1] - 54:2
**departure** [1] - 77:18
**deputy** [1] - 110:2
**Derek** [1] - 2:22
**DEREK** [1] - 1:19
**derived** [1] - 37:16
**described** [3] - 28:8, 55:1, 63:16
**describes** [5] - 23:6, 23:14, 81:18, 83:12, 86:21
**desire** [1] - 97:21
**despite** [4] - 28:3, 29:15, 30:14, 81:18
**destructive** [1] - 9:3
**detail** [2] - 25:11, 25:14
**detention** [1] - 10:10
**determination** [15] - 11:2, 48:21, 87:12, 87:21, 87:24, 88:3, 88:24, 91:8, 92:25,

93:21, 96:8, 96:17, 96:22, 102:20, 108:13
**determinations** [1] - 24:25
**determine** [10] - 17:25, 26:10, 36:24, 77:22, 93:25, 98:4, 102:9, 102:11, 105:8, 105:13
**determined** [3] - 24:14, 75:4, 101:25
**determines** [1] - 88:10
**determining** [1] - 91:11
**deterrents** [1] - 77:13
**developing** [1] - 32:2
**device** [1] - 9:3
**died** [1] - 29:5
**differ** [1] - 24:25
**different** [12] - 10:24, 18:10, 18:13, 20:17, 32:5, 41:1, 46:18, 48:1, 53:7, 65:13, 76:20
**diligence** [1] - 49:18
**direct** [1] - 20:15
**directed** [4] - 8:17, 9:23, 86:13, 86:18
**direction** [1] - 87:7
**directly** [1] - 29:9
**director's** [2] - 28:25, 66:9
**disagree** [3] - 49:9, 76:11, 82:2
**disciplinary** [1] - 7:8
**disclosure** [1] - 89:17
**discovered** [1] - 34:4
**discretion** [8] - 21:10, 21:11, 91:20, 96:24, 97:25, 98:8, 98:9, 99:8
**discuss** [5] - 22:4, 40:2, 56:6, 60:19, 97:2
**discussed** [10] - 16:19, 38:1, 57:22, 59:11, 75:3, 75:22, 78:25, 82:11, 92:20, 97:12
**discussing** [1] - 109:9
**discussion** [8] - 22:12, 22:14, 57:11, 62:2, 74:3, 91:22, 97:15, 97:19
**discussions** [2] - 64:7, 97:11
**dismiss** [1] - 53:21, 84:11
**dismissal** [2] - 7:9,

84:6
**disposition** [4] - 49:16, 49:23, 90:22, 103:23
**dispute** [11] - 35:20, 36:5, 37:17, 37:21, 70:16, 74:4, 96:21, 100:8, 100:10, 102:4, 102:11
**disrupt** [1] - 2:17
**disruption** [1] - 2:17
**disruptions** [1] - 2:17
**distinction** [1] - 72:5
**DISTRICT** [3] - 1:1, 1:2, 1:18
**district** [5] - 8:23, 9:2, 12:17, 21:21, 86:20
**District** [17] - 1:14, 4:9, 4:15, 9:1, 23:2, 23:3, 25:7, 83:10, 85:10, 85:13, 85:14, 87:22, 88:1, 93:1, 110:18
**diversion** [12] - 45:23, 51:4, 82:19, 82:20, 83:19, 84:4, 85:7, 85:22, 86:12, 92:15, 93:23, 99:18
**Diversion** [67] - 6:12, 6:14, 10:20, 24:7, 36:14, 39:12, 39:17, 39:19, 39:22, 40:7, 40:11, 41:25, 42:16, 43:20, 43:22, 44:1, 44:3, 44:8, 44:23, 44:24, 45:4, 45:9, 45:14, 46:8, 46:16, 51:4, 51:8, 51:9, 51:17, 52:4, 52:8, 52:14, 52:18, 52:20, 53:4, 53:11, 53:12, 53:17, 53:20, 53:24, 55:4, 57:14, 57:16, 57:18, 59:6, 82:11, 82:14, 82:17, 82:25, 83:5, 83:8, 91:4, 91:6, 92:3, 93:13, 99:16, 99:19, 99:25, 100:1, 100:12, 100:22, 103:17, 104:5, 105:20, 108:5
**divert** [1] - 84:22
**diverted** [1] - 46:3
**divorce** [1] - 28:1
**divorced** [1] - 38:15
**DNA** [1] - 8:10
**document** [2] - 21:20, 21:21
**documentation** [2] - 9:1, 86:24

**documented** [4] - 27:21, 64:2, 64:5, 64:7
**documents** [3] - 10:25, 66:20, 66:21
**doggedness** [1] - 49:18
**dollar** [1] - 68:21
**dollars** [4] - 27:15, 28:6, 65:11, 74:12
**domestic** [7] - 27:11, 27:16, 28:23, 32:5, 32:15, 65:24, 70:12
**domestic-relations** [1] - 32:5
**done** [6] - 9:14, 64:12, 73:13, 74:23, 86:21, 102:16
**door** [1] - 86:8
**doubt** [6] - 16:6, 20:8, 61:13, 79:20, 79:22, 80:9
**down** [6] - 3:18, 18:22, 46:22, 50:16, 54:12, 102:16
**downstairs** [1] - 110:4
**downwards** [1] - 77:23
**drafted** [1] - 94:12
**drag** [1] - 97:22
**draws** [1] - 72:5
**drink** [1] - 71:15
**drop** [2] - 19:14, 46:24
**drug** [13] - 9:5, 14:7, 14:13, 15:14, 15:19, 41:2, 45:15, 57:24, 58:15, 58:21, 84:20, 91:3
**drugs** [5] - 13:2, 13:6, 14:4, 15:6, 27:24
**Due** [1] - 7:1
**due** [26] - 11:2, 26:4, 26:11, 28:12, 28:15, 28:18, 30:15, 31:9, 31:15, 31:17, 32:9, 33:10, 33:11, 33:14, 33:17, 33:20, 34:7, 34:12, 34:13, 34:20, 34:23, 36:19, 72:16, 72:18, 81:15, 101:1
**duly** [1] - 11:25
**during** [15] - 13:16, 28:9, 28:20, 31:20, 32:4, 33:1, 64:23, 65:10, 67:22, 73:5, 74:9, 79:14, 85:7, 85:21, 88:11
**duty** [4] - 23:16, 61:14, 81:5, 81:11

# E

**eager** [1] - 106:5
**early** [3] - 27:17, 32:14, 62:10
**earn** [2] - 28:10, 31:1
**earned** [6] - 27:19, 28:20, 63:9, 65:10, 81:5, 81:9
**earning** [1] - 28:5
**effect** [1] - 91:7
**efficiency** [1] - 9:18
**efficient** [1] - 4:6
**efforts** [2] - 29:9, 64:4
**either** [9] - 18:15, 24:22, 32:7, 67:21, 77:23, 91:8, 93:4, 100:17, 109:14
**elaborate** [2] - 67:14, 102:25
**elect** [2] - 88:5, 88:12
**element** [1] - 81:4
**elements** [5] - 23:14, 23:20, 61:11, 80:10, 80:25
**emails** [2] - 29:12, 31:10
**employed** [2] - 27:17, 62:23
**employment** [2] - 8:24, 86:15
**encompassed** [4] - 40:10, 53:19, 53:23, 89:4
**encompasses** [1] - 46:18
**encouraged** [1] - 29:21
**end** [9] - 22:14, 30:9, 30:13, 37:7, 62:9, 67:1, 67:3, 67:19, 73:4
**ended** [1] - 74:19
**energy** [8] - 27:12, 29:1, 31:5, 62:12, 62:15, 65:17, 66:10, 69:25
**enforceable** [5] - 40:22, 44:13, 44:15, 45:5, 55:20
**enforcement** [2] - 101:17, 102:23
**enforcing** [1] - 54:2
**engaged** [2] - 32:10, 69:10
**English** [1] - 12:20
**enormous** [1] - 72:25
**ensure** [1] - 30:7
**ensuring** [1] - 104:24
**enter** [12] - 11:6,

39:23, 41:3, 43:17, 43:23, 44:10, 44:16, 45:2, 45:5, 45:16, 59:5, 59:12
**entered** [1] - 28:4
**entering** [3] - 39:7, 60:16, 80:14
**entertainment** [1] - 30:25
**entice** [1] - 59:12
**entire** [2] - 31:21, 86:2
**entirety** [3] - 30:23, 74:5, 80:22
**entity** [1] - 69:17
**entry** [3] - 3:1, 26:1, 85:22
**equity** [3] - 27:13, 62:13, 62:16
**Eric** [1] - 65:8
**erroneous** [1] - 73:23
**erroneously** [1] - 74:11
**error** [1] - 73:16
**errors** [2] - 74:10, 74:13
**escorting** [1] - 2:19
**ESQ** [5] - 1:19, 1:19, 1:20, 2:3, 2:6
**essence** [1] - 73:11
**essential** [6] - 22:18, 23:14, 61:2, 61:11, 80:10, 80:25
**essentially** [5] - 31:7, 38:15, 38:17, 67:17, 97:9
**establish** [1] - 79:22
**established** [1] - 30:6
**estimated** [1] - 34:20
**evaluating** [1] - 47:7
**evasion** [2] - 36:8, 41:2, 45:15, 54:25
**event** [1] - 102:18
**evidence** [5] - 5:22, 5:25, 7:4, 7:9, 80:3, 80:4, 87:25, 88:2
**exactly** [3] - 19:16, 63:19, 68:6
**examine** [1] - 5:25, 101:16
**examined** [1] - 79:17
**example** [1] - 55:6
**exception** [2] - 39:11, 39:13
**exclude** [5] - 56:9, 56:17, 56:21, 109:18, 109:22
**exclusion** [1] - 7:8
**exculpatory** [1] - 7:4
**excuse** [1] - 16:2
**executed** [3] - 3:6,

27:14, 89:24
**executive** [4] - 95:16, 96:7, 98:8, 101:12
**Executive** [4] - 20:24, 21:9, 21:12, 48:11
**exercise** [2] - 28:11, 101:1
**Exhibit** [10] - 21:18, 23:22, 26:17, 27:5, 27:6, 35:9, 40:12, 61:22, 62:9, 89:6
**exhibit** [2] - 69:22, 70:11
**exhibits** [1] - 19:25
**exist** [3] - 44:2, 44:16, 44:22
**existence** [1] - 65:21
**expected** [4] - 26:3, 38:10, 38:19
**expense** [2] - 73:14, 73:15
**expenses** [14] - 30:23, 31:21, 32:25, 33:2, 70:23, 73:7, 73:17, 73:18, 73:20, 73:24, 84:14
**experience** [1] - 61:23
**expiration** [1] - 84:4
**explain** [4] - 43:13, 73:10, 77:18, 97:9
**explanation** [1] - 36:6
**expressions** [1] - 67:23
**expressly** [1] - 25:18
**extend** [1] - 28:17
**extended** [1] - 106:6
**extension** [9] - 28:15, 28:17, 31:12, 31:14, 32:9, 34:18, 34:21, 81:14
**extensive** [1] - 49:24
**extent** [5] - 25:21, 54:11, 54:13, 78:7, 107:19

# F

**face** [1] - 32:17
**faced** [1] - 59:4
**facilities** [1] - 13:4
**facility** [1] - 13:23
**fact** [13] - 23:24, 30:4, 30:16, 58:12, 60:4, 62:2, 69:20, 82:21, 84:16, 85:4, 87:9, 99:8, 106:12
**factors** [6] - 18:24, 19:2, 19:19, 77:20, 77:21
**facts** [29] - 20:11,

23:22, 24:6, 27:4, 37:17, 37:22, 40:10, 40:12, 52:22, 54:20, 55:6, 57:22, 58:12, 61:21, 61:25, 62:3, 73:11, 77:7, 81:17, 84:18, 85:17, 87:3, 88:16, 89:5, 89:19, 95:10, 95:20
**factual** [15] - 24:24, 53:20, 53:23, 53:24, 55:1, 55:3, 80:22, 81:6, 81:8, 82:3, 93:21, 96:20, 96:22, 99:6
**failed** [3] - 32:16, 79:21, 88:11
**failure** [9] - 3:5, 4:17, 21:3, 23:4, 23:18, 36:3, 61:16, 81:16, 87:16
**fair** [1] - 102:8
**faith** [1] - 84:9
**fall** [5] - 14:17, 14:21, 15:10, 29:7, 32:4
**Fall** [1] - 28:3
**falls** [2] - 93:6, 104:19
**false** [6] - 11:14, 91:16, 91:17, 91:22, 92:2, 102:22
**far** [3] - 12:9, 51:4, 56:4
**FBI** [1] - 86:20
**February** [2] - 33:6, 34:3
**federal** [12] - 8:7, 9:8, 28:12, 40:9, 57:22, 77:2, 85:2, 85:15, 86:25, 88:14, 89:4, 94:18
**Federal** [2] - 17:11, 85:9
**fees** [9] - 28:25, 30:20, 31:3, 66:9, 68:23, 69:23, 70:22, 70:24, 84:14
**felony** [8] - 3:24, 4:10, 36:15, 41:2, 45:15, 82:12, 82:18, 91:16
**few** [4] - 35:2, 42:25, 48:4, 106:11
**fifty** [1] - 12:7
**fifty-three** [1] - 12:7
**figure** [7] - 37:11, 48:15, 50:1, 55:10, 56:13, 56:24, 81:2
**file** [9] - 28:15, 28:17, 31:14, 32:7, 72:14, 72:15, 72:23, 84:5
**filed** [20] - 2:24, 3:2,

4:10, 4:15, 21:21, 21:22, 24:7, 25:19, 31:15, 33:6, 34:5, 34:8, 34:10, 34:19, 40:13, 49:25, 83:21, 89:6, 89:18
**filer** [1] - 37:5
**filers** [1] - 20:8
**files** [1] - 25:20
**filing** [7] - 26:4, 28:19, 29:14, 33:18, 34:21, 36:20, 74:19
**filings** [2] - 31:9, 74:5
**final** [7] - 21:23, 29:15, 42:20, 66:19, 69:21, 88:3, 90:5
**finalized** [1] - 28:1
**finally** [5] - 26:15, 34:18, 77:20, 81:16, 88:22
**finances** [1] - 28:11
**financial** [1] - 81:19
**fine** [9] - 3:18, 4:23, 5:3, 10:12, 23:9, 56:20, 78:21, 101:6, 107:1
**fingerprint** [1] - 86:21
**fingerprinting** [1] - 86:20
**finished** [1] - 22:20
**firearm** [11] - 3:1, 3:11, 4:11, 9:3, 53:13, 55:3, 58:23, 83:23, 85:2, 85:25, 93:15
**firearms** [9] - 53:8, 55:2, 58:16, 58:22, 85:6, 85:16, 85:20, 89:22, 93:13
**firm** [12] - 27:18, 29:2, 62:23, 64:17, 64:20, 66:14, 69:1, 69:7, 69:13, 69:14, 69:17, 70:3
**first** [23] - 3:10, 4:1, 11:10, 17:7, 46:1, 49:18, 60:8, 62:8, 62:11, 66:19, 70:10, 70:19, 71:1, 77:14, 81:4, 81:9, 83:7, 87:15, 93:22, 94:2, 99:18, 104:19, 106:9
**five** [2] - 49:14, 49:17
**five-year** [1] - 49:17
**fix** [1] - 105:21
**flood** [1] - 72:25
**fly** [1] - 103:8
**follow** [2] - 77:14, 107:15
**followed** [2] - 32:23,

78:12
**following** [4] - 8:6, 8:19, 27:22, 56:19
**FOR** [1] - 1:2
**force** [1] - 53:17
**forced** [1] - 39:6
**foregoing** [1] - 110:15
**foreign** [1] - 55:6
**Foreign** [1] - 55:7
**forfeited** [1] - 86:3
**forfeiture** [1] - 10:10
**forget** [1] - 48:7
**forgot** [1] - 86:6
**form** [4] - 9:16, 21:4, 104:3, 105:5
**Form** [8] - 33:9, 33:12, 33:14, 33:18, 34:5, 34:9, 34:10, 34:19
**formed** [1] - 28:22, 31:3, 65:12, 69:24
**former** [4] - 29:11, 29:14, 66:21
**forth** [13] - 24:6, 83:17, 84:23, 84:24, 85:4, 85:15, 85:16, 87:13, 87:17, 88:16, 89:19, 90:3, 90:10
**forward** [7] - 47:15, 48:25, 51:7, 96:4, 96:5, 105:24, 109:12
**four** [4] - 21:18, 42:22, 67:1, 83:14
**fourteen** [1] - 106:25
**fourth** [1] - 65:9
**frame** [2] - 73:11, 75:17
**framework** [1] - 102:13
**freak** [1] - 86:8
**free** [1] - 60:4
**frequency** [1] - 9:15
**Friday** [1] - 56:18
**frivolous** [1] - 84:9
**front** [6] - 21:15, 51:13, 51:24, 60:8, 62:5, 105:14
**full** [4] - 11:21, 26:1, 68:20, 71:1
**fully** [6] - 16:19, 16:22, 21:9, 34:16, 34:25, 87:16
**function** [2] - 53:4, 53:5
**functionality** [1] - 93:19
**fund** [3] - 27:13, 62:13, 62:16
**funds** [2] - 30:5, 30:17
**funny** [1] - 104:3
**future** [4] - 40:14,

53:18, 84:10, 90:9

## G

**gain** [2] - 5:4, 23:9
**gatekeeper** [2] - 95:12, 108:4
**gathering** [1] - 32:13
**General** [1] - 20:16
**general** [3] - 16:20, 57:23, 89:16
**generally** [2] - 51:1, 97:12
**generate** [1] - 81:19
**generated** [1] - 70:22
**gentleman** [1] - 65:8
**given** [9] - 38:22, 48:10, 62:2, 78:8, 78:13, 80:15, 83:4, 83:6, 105:12
**glasses** [2] - 86:6, 86:7
**governed** [2] - 18:17, 102:25
**government** [57] - 5:21, 7:2, 7:10, 16:9, 17:3, 19:14, 20:3, 21:5, 22:22, 23:15, 25:19, 39:4, 39:17, 41:1, 41:2, 44:9, 45:14, 45:15, 55:7, 55:17, 55:18, 56:6, 57:20, 58:1, 61:11, 61:13, 61:17, 63:20, 64:8, 74:6, 77:6, 77:25, 79:21, 80:19, 91:1, 91:21, 93:4, 94:1, 96:7, 96:9, 96:14, 96:15, 96:16, 96:24, 98:8, 98:9, 99:3, 99:23, 99:25, 100:8, 101:7, 102:19, 103:3, 103:21, 106:1
**government's** [7] - 7:18, 57:13, 67:24, 80:8, 81:24, 82:3, 82:6
**graduate** [1] - 12:11
**granted** [1] - 77:19
**greater** [7] - 5:5, 23:10, 24:4, 24:15, 25:14, 35:6, 77:12
**gross** [4] - 5:4, 23:9, 33:13, 33:19
**grounds** [3] - 26:8, 48:3, 53:22
**guess** [5] - 51:14, 55:23, 70:1, 70:6, 75:7

**Guideline** [3] - 24:9, 24:13, 24:19
**guideline** [6] - 24:18, 25:2, 35:5, 36:3, 36:7, 79:1
**guidelines** [8] - 24:2, 53:9, 53:14, 77:15, 77:17, 77:18, 77:19, 77:24
**guilt** [4] - 23:20, 79:19, 79:22, 80:11
**guilty** [32] - 3:2, 6:4, 6:8, 11:6, 16:16, 19:13, 23:2, 23:24, 23:25, 26:9, 39:20, 40:19, 41:4, 42:18, 44:3, 45:11, 45:17, 49:22, 60:3, 60:4, 61:17, 78:23, 79:2, 79:11, 79:12, 79:13, 80:14, 108:10, 108:13, 108:15, 108:19, 109:10
**gun** [13] - 3:24, 4:22, 6:12, 36:15, 45:21, 52:20, 57:23, 82:18, 83:21, 86:2, 91:3, 91:16, 94:17
**guys** [9] - 42:24, 43:2, 55:25, 56:16, 56:22, 68:10, 105:17, 106:9, 106:16

## H

**half** [3] - 33:21, 100:17, 100:18
**hand** [1] - 11:21
**handed** [1] - 17:7
**handle** [1] - 97:20
**handsomely** [1] - 31:1
**hang** [1] - 102:6
**hard** [3] - 8:1, 97:17, 104:15
**HARRIS** [1] - 2:5
**harsher** [2] - 59:25, 79:5
**Harvest** [1] - 62:17
**Hawkins** [1] - 110:17
**headway** [1] - 57:2
**hear** [3] - 60:13, 79:16, 103:16
**hearing** [13] - 3:12, 5:20, 5:21, 5:24, 6:9, 6:13, 17:2, 40:5, 56:1, 56:3, 94:13, 94:16, 106:11
**Hearing** [1] - 1:10
**help** [7] - 7:24, 35:14, 41:6, 50:22, 58:13,

73:2, 77:21
**helpful** [1] - 105:9
**hereafter** [1] - 27:9
**hereby** [1] - 110:15
**higher** [1] - 74:6
**highest** [2] - 79:20, 81:11
**himself** [1] - 69:4
**Hines** [1] - 2:22
**HINES** [1] - 1:19
**hinted** [1] - 82:21
**hire** [1] - 5:10
**historical** [1] - 84:20
**ho** [1] - 69:4
**Ho** [3] - 30:21, 68:23, 69:2
**hold** [3] - 2:13, 3:13, 103:23
**holding** [1] - 65:4
**honest** [1] - 71:14
**honor** [1] - 91:13
**Honor** [254] - 2:21, 3:9, 3:10, 3:16, 4:4, 4:5, 4:20, 4:25, 5:7, 5:14, 5:18, 6:2, 6:6, 6:10, 6:15, 6:17, 6:25, 7:11, 7:14, 7:16, 7:23, 10:1, 10:4, 10:6, 10:13, 10:17, 10:18, 11:7, 11:17, 12:5, 12:8, 12:10, 12:15, 12:18, 12:21, 12:24, 13:4, 13:7, 13:12, 13:18, 13:25, 14:4, 14:10, 14:14, 14:18, 14:20, 15:4, 15:8, 15:12, 15:17, 15:22, 16:1, 16:10, 16:18, 16:21, 16:25, 17:5, 17:11, 17:15, 17:20, 17:21, 17:24, 17:25, 18:8, 18:12, 19:16, 19:21, 20:18, 20:19, 20:25, 21:1, 21:7, 21:8, 21:16, 21:25, 22:2, 22:6, 22:9, 22:24, 23:8, 25:19, 27:7, 35:8, 35:25, 36:3, 36:11, 36:12, 36:17, 37:2, 38:3, 39:5, 39:8, 39:11, 39:17, 39:21, 39:25, 40:20, 40:24, 41:5, 41:12, 41:22, 42:6, 43:6, 43:11, 44:19, 45:7, 45:12, 45:18, 46:4, 46:9, 46:19, 49:8, 50:14, 50:24, 51:25, 53:7, 53:16, 54:1,

54:16, 55:14, 56:20, 57:1, 57:5, 57:10, 57:17, 58:2, 58:6, 58:24, 59:14, 59:20, 60:2, 60:5, 60:9, 60:15, 60:18, 60:21, 60:24, 61:6, 61:9, 61:19, 62:7, 63:2, 63:7, 63:12, 63:15, 63:19, 65:16, 66:1, 66:6, 66:24, 67:10, 67:13, 67:15, 68:11, 68:14, 68:17, 68:24, 69:3, 69:8, 69:10, 70:5, 70:9, 70:14, 70:18, 70:21, 71:4, 71:13, 71:23, 72:12, 72:17, 72:20, 72:22, 72:24, 73:9, 74:25, 75:5, 75:11, 75:16, 75:24, 76:2, 76:8, 76:13, 76:16, 76:22, 77:9, 78:5, 78:10, 78:19, 78:24, 79:3, 79:9, 79:18, 79:25, 80:6, 80:12, 80:17, 80:21, 81:1, 81:7, 82:1, 82:4, 82:8, 83:7, 89:13, 89:21, 90:15, 90:20, 90:21, 91:6, 91:24, 92:4, 93:9, 93:12, 93:18, 94:8, 94:20, 95:5, 95:9, 95:18, 95:19, 96:11, 96:17, 96:20, 97:3, 97:20, 97:22, 98:20, 99:2, 99:4, 99:11, 100:6, 100:19, 101:7, 101:11, 101:19, 101:21, 101:24, 102:5, 102:13, 103:14, 103:18, 104:1, 104:9, 106:4, 106:19, 107:1, 107:2, 108:16, 108:20, 109:10, 109:23, 110:7, 110:11
**Honor's** [2] - 38:2, 68:5
**HONORABLE** [1] - 1:13
**hook** [1] - 42:17
**hospitalized** [1] - 12:25
**hour** [1] - 49:14
**hours** [1] - 49:14
**Hudson** [1] - 65:16
**hundred** [1] - 74:12

**hundreds** [1] - 19:25
**HUNTER** [3] - 1:6, 11:24, 11:25
**Hunter** [5] - 2:25, 3:3, 11:23, 27:9, 83:11
**Hyde** [1] - 108:12
**hypothetical** [5] - 44:18, 44:22, 50:6, 50:7, 96:1

**I**

**I.G** [1] - 2:6
**idea** [1] - 93:24
**identified** [5] - 32:24, 55:3, 58:16, 81:8, 89:21
**identify** [1] - 73:12
**ignored** [1] - 31:7
**ll** [9] - 5:2, 23:3, 23:8, 23:24, 24:3, 26:14, 35:4, 61:1, 61:11
**illegal** [3] - 15:15, 15:20, 27:24
**illness** [1] - 13:1
**imagine** [1] - 109:21
**immediate** [1] - 10:8
**immunity** [5] - 40:25, 42:3, 45:13, 83:2, 104:24
**impact** [1] - 77:19
**implement** [1] - 103:22
**important** [4] - 11:13, 43:15, 49:13, 78:1
**impose** [6] - 8:18, 8:19, 17:18, 59:24, 77:11, 79:5
**imposed** [2] - 10:3, 25:2
**impossibility** [1] - 101:5
**imprisoned** [1] - 78:17
**imprisonment** [7] - 4:22, 5:3, 10:12, 23:9, 32:18, 78:8, 78:9
**improper** [2] - 38:5, 103:20
**IN** [1] - 1:1
**inappropriate** [1] - 21:4
**incarceration** [1] - 78:12
**inception** [1] - 64:22
**include** [13] - 7:6, 9:15, 34:14, 41:14, 46:12, 54:9, 54:18, 78:21, 78:22, 81:21, 86:12, 98:11, 107:21

**included** [10] - 13:5, 28:8, 29:9, 33:18, 35:18, 36:7, 36:9, 46:25, 47:2, 51:9
**includes** [5] - 35:17, 45:21, 45:22, 48:3, 58:19, 58:20, 85:19, 88:17
**including** [10] - 27:24, 28:21, 30:23, 31:21, 32:18, 35:4, 64:20, 65:11, 77:21, 88:15
**inclusion** [2] - 35:23, 50:18
**income** [26] - 27:19, 28:12, 28:21, 29:7, 29:17, 31:18, 32:8, 32:12, 33:4, 33:7, 33:10, 33:15, 34:12, 34:22, 36:25, 37:23, 63:21, 65:11, 67:21, 70:19, 70:25, 72:15, 74:11, 81:6, 81:11, 81:19
**inconsistent** [1] - 24:11
**incorporate** [2] - 52:13, 53:11
**incorporated** [1] - 62:3
**incorporates** [1] - 25:18
**incorporation** [1] - 90:2
**increase** [1] - 25:1
**indeed** [1] - 21:10
**indicated** [1] - 23:8
**indicted** [1] - 48:25
**indictment** [1] - 83:21
**individual** [11] - 29:4, 29:6, 29:17, 29:20, 32:8, 32:11, 33:7, 33:24, 34:1, 72:15, 75:12
**individuals** [1] - 103:1
**influence** [3] - 15:14, 15:19, 71:6
**influx** [1] - 67:21
**inform** [1] - 103:19
**information** [27] - 2:24, 3:2, 3:24, 4:10, 4:16, 16:11, 16:15, 16:17, 17:2, 20:7, 23:1, 23:3, 23:21, 32:21, 59:18, 60:11, 83:21, 84:6, 84:11, 85:2, 85:15, 90:16, 93:6, 96:4, 108:24, 109:2, 109:5
**Information** [3] - 27:9,

84:8, 84:13
**informations** [2] - 49:25, 50:1
**infrastructure** [2] - 28:24, 66:4
**ingested** [1] - 15:14
**Initial** [1] - 1:9
**initial** [7] - 2:23, 3:11, 4:2, 10:15, 27:1, 38:24, 61:3
**inpatient** [9] - 9:22, 13:10, 13:12, 13:13, 13:23, 14:2, 14:22, 14:23, 15:4
**insofar** [1] - 52:9
**instance** [4] - 19:4, 54:24, 93:22, 102:22
**instances** [1] - 73:18
**Instant** [1] - 85:23
**instant** [1] - 27:8
**instructions** [1] - 7:8
**instrument** [1] - 51:6
**intelligently** [1] - 23:20
**intend** [2] - 6:4, 11:6
**intended** [1] - 63:20
**intent** [1] - 85:11
**intention** [3] - 42:12, 42:14, 91:9
**interest** [13] - 19:20, 26:5, 33:24, 34:1, 34:16, 34:24, 35:23, 36:6, 36:20, 37:15, 46:11, 56:23, 65:24
**interests** [4] - 27:11, 28:23, 35:17, 36:4
**Internal** [9] - 26:5, 26:10, 29:17, 30:3, 33:8, 33:22, 34:8, 36:21, 74:20
**international** [3] - 8:25, 27:11, 86:23
**interviews** [1] - 64:11
**introduce** [1] - 5:24
**investigating** [1] - 21:9
**investigation** [13] - 20:8, 20:13, 20:17, 21:3, 38:15, 48:8, 49:12, 49:17, 50:9, 54:18, 54:24, 77:5, 84:14
**investment** [2] - 28:25, 66:4
**invokes** [1] - 83:2
**involved** [1] - 72:2
**involvement** [1] - 93:19
**involves** [1] - 83:3
**involving** [4] - 3:25,

11:4, 91:15, 96:10
**irrespective** [1] - 31:13
**IRS** [8] - 37:4, 37:7, 37:8, 37:24, 38:7, 38:13, 38:16, 38:23
**issuance** [1] - 10:9
**issue** [4] - 59:1, 67:22, 97:3, 109:14
**issues** [7] - 14:13, 43:12, 47:19, 49:3, 57:24, 81:18, 106:21
**itself** [2] - 18:16, 19:1

**J**

**January** [1] - 32:18
**Jianming** [1] - 65:20
**JONES** [1] - 2:6
**JR** [1] - 2:6
**judge** [1] - 88:3
**Judge** [9] - 1:14, 51:12, 87:22, 88:1, 93:1, 96:4, 96:5, 99:6, 108:4
**judicial** [3] - 95:16, 102:20, 103:2
**July** [1] - 1:8
**jumping** [1] - 7:25
**June** [6] - 15:17, 34:11, 71:7, 71:8, 71:15, 71:18
**jurisdiction** [1] - 85:13
**jury** [5] - 7:8, 79:14, 80:9, 80:10, 80:15
**justice** [9] - 19:20, 56:23, 79:21, 88:17, 93:16, 109:1
**Justice** [1] - 54:3

**K**

**keep** [3] - 3:20, 7:25, 94:3
**kind** [6] - 13:2, 15:16, 15:20, 57:12, 91:1, 100:17
**King** [1] - 1:11
**knowing** [11] - 11:9, 18:1, 59:4, 87:11, 87:16, 87:20, 88:4, 92:24, 98:22, 98:24, 104:22
**knowingly** [3] - 23:19, 76:24, 83:23
**knowledge** [1] - 88:15
**known** [1] - 83:19
**knows** [2] - 43:5, 63:18

**L**

**Labor** [1] - 56:18
**lacking** [1] - 20:13
**landed** [1] - 28:5
**lane** [2] - 98:12, 105:25
**language** [5] - 58:3, 58:5, 70:20, 89:2, 93:6
**large** [4] - 30:3, 30:14, 30:24, 31:21
**last** [10] - 14:15, 15:9, 15:10, 15:13, 41:14, 63:16, 67:22, 71:6, 75:6, 75:7
**late** [1] - 31:20
**latter** [1] - 74:21
**law** [27] - 8:7, 9:9, 12:10, 12:11, 19:2, 19:9, 19:25, 23:18, 27:18, 29:2, 34:21, 61:15, 62:23, 66:14, 64:20, 66:14, 69:1, 69:7, 69:13, 69:14, 69:17, 70:3, 77:14, 81:14, 87:1, 92:12, 102:23
**lawsuits** [2] - 32:5, 32:15
**lawyer** [1] - 68:3
**lays** [1] - 87:14
**learn** [1] - 24:10
**learning** [1] - 34:9
**least** [6] - 27:17, 62:10, 62:22, 62:24, 71:18, 106:25
**leave** [2] - 15:1, 55:24
**leaves** [2] - 76:10, 76:14
**leaving** [4] - 33:11, 33:16, 34:13, 50:20
**led** [1] - 64:15
**left** [3] - 10:14, 29:14, 63:10
**legal** [10] - 9:8, 9:10, 15:15, 15:19, 24:25, 27:14, 28:5, 30:20, 68:22, 69:6
**legally** [1] - 85:24
**legitimate** [2] - 33:2, 73:7
**length** [1] - 25:9
**LEO** [1] - 1:20
**Leo** [1] - 2:21
**less** [4] - 24:4, 27:3, 31:8, 35:5
**letter** [2] - 19:24, 32:19
**level** [5] - 24:12,

24:15, 24:16, 24:18, 81:12
**levels** [1] - 24:20
**liability** [16] - 30:4, 30:8, 30:9, 30:13, 30:14, 30:17, 31:18, 33:3, 33:24, 34:1, 34:15, 34:24, 67:3, 75:9, 75:10
**liberty** [1] - 50:4
**licensed** [1] - 9:7
**lied** [1] - 102:19
**life** [3] - 64:10, 72:25, 102:7
**light** [4] - 6:14, 84:16, 90:19, 91:22
**likely** [1] - 76:19
**limitation** [5] - 85:5, 88:19, 88:20, 92:2, 101:13
**limitations** [3] - 85:1, 92:1, 93:17
**limited** [1] - 7:7
**limits** [2] - 75:21, 107:25
**line** [4] - 49:15, 67:2, 73:19
**line-by-line** [1] - 49:15
**lines** [2] - 67:1, 93:20
**list** [1] - 61:10
**listed** [1] - 63:25
**listen** [1] - 22:19
**litigated** [2] - 100:9, 100:10
**litigation** [2] - 84:14, 87:8
**live** [3] - 43:24, 44:2, 48:9
**LLC** [2] - 27:16, 30:20
**LLP** [2] - 2:3, 2:5
**loan** [4] - 75:11, 75:13, 75:15, 75:17
**local** [3] - 8:7, 85:9, 87:1
**long-standing** [3] - 27:22, 64:3, 64:21
**look** [11] - 3:14, 15:24, 18:25, 41:18, 59:1, 59:9, 98:5, 104:7, 109:12, 109:19, 109:25
**looked** [1] - 45:23
**looking** [7] - 19:17, 35:12, 37:11, 41:20, 58:3, 64:6, 81:9
**Los** [1] - 28:8
**loses** [1] - 26:2
**loss** [12] - 5:4, 23:10, 24:3, 35:3, 35:6, 35:7, 35:8, 35:18,

35:23, 36:5, 38:5
**losses** [1] - 27:2
**loud** [1] - 17:2
**lower** [2] - 37:22, 70:24
**lucrative** [1] - 27:10

## M

**maintained** [1] - 97:16
**mandatory** [1] - 78:22
**Mandatory** [1] - 25:25
**manner** [4] - 84:23, 99:19, 100:24
**March** [4] - 28:1, 30:19, 31:20, 68:21
**marijuana** [2] - 9:8, 9:9
**mark** [1] - 73:15
**marking** [1] - 73:17
**marriage** [1] - 28:1
**married** [3] - 31:25, 71:9, 71:14
**Marshals** [1] - 2:19
**marshals** [1] - 110:4
**MARYELLEN** [1] - 1:13
**Maryland** [2] - 7:3, 29:4
**massive** [2] - 20:20, 74:7
**material** [5] - 7:12, 87:11, 87:20, 88:4, 92:24
**materials** [1] - 32:13
**matter** [4] - 3:3, 84:22, 90:6, 106:6
**matters** [1] - 5:9
**maximum** [5] - 4:21, 5:2, 23:7, 61:1, 61:4
**mean** [17] - 19:13, 36:22, 37:24, 42:7, 48:7, 48:13, 50:24, 55:19, 59:1, 81:2, 93:23, 95:23, 97:4, 102:5, 102:6, 108:9, 108:18
**means** [5] - 5:10, 36:23, 58:2, 58:4, 58:10
**mechanism** [1] - 97:23
**medical** [2] - 9:7, 9:11
**medication** [3] - 15:15, 15:20, 71:7
**meet** [1] - 104:6
**meeting** [6] - 49:14, 55:11, 55:16, 55:20, 81:21
**meetings** [3] - 32:24,

49:15, 72:3
**meets** [1] - 80:25
**member** [1] - 12:14
**memoir** [2] - 28:6, 32:3
**memoranda** [2] - 37:20, 44:17
**memorandum** [11] - 19:25, 23:22, 25:17, 26:13, 26:16, 26:19, 26:22, 35:22, 38:7, 44:5, 52:22
**Memorandum** [18] - 17:6, 21:14, 21:22, 39:15, 39:24, 40:12, 40:18, 40:22, 45:6, 45:10, 46:25, 47:3, 52:15, 59:6, 59:12, 82:12, 89:6, 108:6
**mental** [1] - 13:1
**mentioned** [3] - 51:25, 61:2, 92:18
**merely** [1] - 59:22
**merger** [1] - 100:18
**middle** [4] - 64:14, 67:2, 95:13, 104:4
**might** [3] - 4:6, 15:24, 38:11, 50:3, 50:5, 50:6, 78:18, 79:1, 97:23, 99:12, 101:6, 105:19, 105:21
**million** [19] - 27:20, 28:21, 30:19, 31:2, 35:14, 63:9, 63:10, 63:14, 65:11, 68:21, 69:23, 70:7, 70:13, 70:20, 70:22, 70:25, 81:10
**millions** [2] - 27:15, 28:5
**mind** [1] - 6:22
**minds** [3] - 55:11, 55:16, 55:20
**minimizing** [1] - 74:4
**minute** [4] - 9:20, 43:13, 67:22, 110:2
**minutes** [3] - 42:25, 48:5, 57:2
**miscategorized** [1] - 33:1
**mischaracterized** [1] - 73:6
**misdemeanor** [5] - 3:25, 4:16, 16:14, 54:6, 77:3
**misdemeanors** [1] - 48:24
**misstep** [1] - 101:3
**mistake** [1] - 74:14
**mistakes** [8] - 73:23,

74:2, 74:14, 74:16, 74:18, 74:19, 74:22
**modification** [2] - 89:13, 101:20
**modifications** [2] - 26:24, 90:9
**modified** [3] - 26:19, 89:10, 105:22
**modify** [4] - 101:18, 101:20, 102:2, 102:10
**modifying** [1] - 90:7
**moment** [3] - 38:22, 39:1, 40:6
**money** [8] - 28:10, 67:25, 68:13, 70:2, 70:3, 74:2, 74:8, 81:20
**monies** [1] - 37:24
**month** [1] - 31:25
**months** [4] - 5:3, 23:8, 30:22, 83:14
**morning** [5] - 2:12, 2:21, 3:15, 3:16, 22:2
**most** [4] - 14:11, 28:2, 64:15, 73:18
**motion** [1] - 84:5
**motions** [3] - 56:9, 77:17, 77:19
**move** [6] - 24:17, 28:8, 53:21, 84:11, 94:1, 96:4
**MR** [188] - 2:21, 3:9, 3:16, 3:21, 4:4, 4:5, 6:15, 6:16, 7:11, 7:14, 7:16, 7:20, 7:23, 8:1, 10:4, 10:5, 10:16, 10:18, 13:17, 14:18, 16:8, 16:10, 17:10, 17:15, 17:20, 17:21, 17:24, 18:5, 18:8, 18:12, 18:14, 19:1, 19:16, 19:21, 20:18, 20:19, 20:25, 21:1, 21:6, 21:8, 22:24, 27:7, 35:8, 35:16, 35:25, 36:2, 36:10, 36:12, 36:17, 36:23, 37:2, 37:14, 37:21, 38:3, 38:12, 38:21, 39:11, 39:16, 41:12, 41:22, 42:5, 42:12, 42:19, 43:1, 43:6, 43:11, 43:24, 44:7, 44:18, 44:21, 46:4, 46:9, 46:19, 47:1, 47:5, 47:9, 47:13, 47:16, 47:19, 47:22, 48:6, 48:12,

48:17, 48:23, 49:4, 49:8, 50:7, 50:11, 50:14, 50:24, 51:23, 52:6, 52:9, 52:13, 52:16, 52:24, 53:3, 54:1, 54:8, 54:16, 54:22, 55:9, 55:14, 55:17, 55:22, 56:3, 56:12, 56:20, 57:1, 57:5, 57:10, 58:1, 58:6, 58:11, 58:14, 58:24, 63:15, 67:14, 67:17, 68:5, 68:9, 68:11, 69:9, 70:8, 70:14, 70:18, 72:5, 73:9, 74:3, 74:21, 75:5, 80:21, 81:1, 81:4, 82:8, 83:7, 86:10, 90:15, 90:20, 90:21, 91:6, 91:9, 91:24, 92:4, 92:9, 92:10, 93:8, 93:12, 93:18, 94:8, 94:15, 94:20, 94:24, 95:2, 95:5, 95:9, 95:18, 95:25, 96:2, 96:11, 97:2, 97:5, 97:11, 97:20, 98:20, 99:2, 99:17, 100:6, 100:13, 100:16, 100:23, 101:10, 101:18, 101:24, 102:12, 103:14, 106:4, 106:19, 107:1, 107:2, 107:7, 107:12, 108:15, 108:20, 109:21, 109:23, 110:10, 110:11
**muddy** [1] - 89:12
**multi** [3] - 27:18, 29:2, 62:23
**multi-national** [3] - 27:18, 29:2, 62:23
**must** [16] - 8:7, 8:9, 8:12, 8:16, 8:17, 8:21, 8:23, 8:24, 9:2, 9:4, 9:12, 9:17, 9:21, 54:19, 107:14

## N

**name** [2] - 11:21, 65:20
**named** [1] - 65:8
**narcotic** [2] - 9:5, 13:1
**narrow** [1] - 76:10
**National** [1] - 85:23
**national** [3] - 27:18, 29:2, 62:23

**nature** [2] - 88:7, 88:24
**near** [1] - 25:4
**necessarily** [3] - 49:9, 51:2, 103:16
**necessary** [1] - 77:12
**need** [43] - 3:18, 6:13, 10:15, 10:25, 11:10, 13:8, 18:25, 19:18, 41:6, 41:21, 42:10, 42:24, 48:24, 50:22, 55:15, 55:24, 55:25, 56:1, 56:2, 56:12, 61:7, 82:15, 82:16, 96:17, 99:12, 104:18, 104:25, 105:1, 105:3, 105:12, 105:14, 106:20, 108:1, 108:18, 108:24, 109:2, 109:4, 109:17, 110:1, 110:2, 110:4, 110:8
**needed** [1] - 47:7
**needs** [2] - 97:16, 103:23
**negotiate** [1] - 105:20
**negotiated** [2] - 27:13, 53:5
**negotiating** [1] - 101:10
**negotiation** [1] - 49:24
**neutral** [1] - 98:3
**never** [1] - 73:21
**news** [1] - 64:11
**next** [8] - 17:6, 30:22, 60:25, 64:2, 66:25, 73:4, 74:9, 75:1
**NICS** [1] - 85:24
**NO** [2] - 1:5, 1:6
**nobody** [1] - 105:12
**non** [1] - 51:1
**non-prosecution** [1] - 51:1
**none** [5] - 4:4, 4:5, 7:16, 10:4, 16:8
**nonetheless** [1] - 28:3
**nonstandard** [1] - 83:1
**nonstop** [1] - 28:9
**NOREIKA** [1] - 1:13
**normal** [4] - 75:17, 96:23, 97:23, 106:13
**normally** [7] - 10:24, 41:9, 51:11, 51:21, 82:10, 99:7, 104:7
**north** [1] - 70:25
**note** [1] - 90:21
**notes** [1] - 110:15
**nothing** [4] - 31:16,

46:2, 100:16, 101:5
**notice** [1] - 87:24
**noting** [1] - 29:24
**notwithstanding** [1] - 88:20
**November** [1] - 32:10
**null** [2] - 26:22, 56:4
**number** [11] - 8:15, 35:22, 37:8, 37:12, 37:14, 37:18, 38:6, 38:8, 38:21, 70:25
**numbers** [4] - 35:13, 37:3, 37:4, 38:11
**numeral** [1] - 83:8
**numerous** [3] - 13:17, 31:24, 71:2

## O

**oath** [4] - 11:12, 11:25, 59:5, 104:23
**objection** [3] - 4:3, 10:2, 20:2
**objections** [2] - 77:16, 82:6
**obligation** [3] - 7:3, 7:6, 31:12
**obligations** [6] - 29:14, 31:7, 32:6, 81:21, 84:3, 90:8
**obstruct** [2] - 9:18
**obstruction** [2] - 88:17, 93:16
**obtained** [2] - 37:4, 37:8
**obviously** [8] - 20:20, 58:16, 81:9, 89:9, 89:13, 93:12, 101:11, 101:19
**occur** [2] - 38:18, 76:19
**occurred** [3] - 87:21, 92:25, 96:25
**October** [12] - 28:16, 29:23, 31:15, 32:9, 33:22, 34:6, 34:15, 34:19, 34:23, 72:19, 92:9, 92:10
**OF** [3] - 1:2, 1:3, 1:18
**offense** [13] - 3:1, 5:4, 19:7, 23:10, 24:15, 36:7, 53:8, 53:10, 53:13, 78:23, 79:13, 79:14, 89:22
**offenses** [7] - 58:14, 79:2, 80:10, 89:20, 93:13, 93:15
**offer** [3] - 88:23, 92:14, 102:12
**offered** [1] - 105:16

**office** [5] - 8:22, 24:23, 29:15, 34:8, 77:16
**Office** [4] - 49:13, 77:4, 83:10, 86:19
**OFFICE** [1] - 1:18
**officer** [11] - 8:13, 9:13, 9:14, 9:23, 9:24, 46:6, 83:16, 102:20, 102:23, 103:2
**offices'** [1] - 102:14
**Official** [1] - 110:17
**offset** [1] - 33:5
**often** [2] - 17:17, 72:3
**old** [2] - 12:6, 12:7
**omits** [1] - 36:3
**once** [1] - 97:8
**one** [37] - 3:23, 5:5, 13:20, 19:24, 21:24, 23:10, 23:16, 24:18, 41:15, 43:16, 47:4, 47:19, 55:16, 56:2, 59:25, 61:8, 64:25, 65:1, 65:13, 65:25, 66:4, 66:7, 66:10, 70:15, 71:2, 73:18, 76:20, 79:6, 83:8, 83:22, 86:5, 90:1, 90:21, 91:14, 92:22, 97:2, 105:21
**ongoing** [2] - 50:9, 54:23
**open** [1] - 86:7
**opine** [1] - 97:1
**opportunity** [3] - 20:4, 22:4, 43:3
**oppose** [2] - 24:12, 77:25
**opt** [1] - 96:19
**orally** [2] - 89:10, 105:21
**order** [10] - 7:4, 7:6, 10:10, 11:10, 26:1, 26:8, 32:17, 106:20, 109:14, 110:3
**ordered** [1] - 26:2
**original** [2] - 50:25, 89:25
**originally** [3] - 13:25, 34:5, 70:1
**otherwise** [3] - 87:8, 90:7, 91:12
**outlets** [1] - 64:11
**outlines** [1] - 25:9
**outpatient** [5] - 9:22, 13:10, 13:16, 14:22, 14:24
**outside** [7] - 30:5, 40:9, 42:22, 47:23,

89:3, 98:12, 105:25
**outstanding** [4] - 30:8, 30:14, 30:17, 75:10
**overreported** [2] - 33:4, 74:11
**overseeing** [1] - 88:3
**overstatement** [1] - 37:23
**Owasco** [11] - 27:16, 30:1, 30:6, 30:20, 33:12, 33:19, 65:2, 65:4, 68:22, 69:16
**owe** [1] - 37:6
**owed** [7] - 29:25, 30:1, 31:9, 36:25, 38:22, 68:13, 75:4
**owes** [1] - 37:25
**owing** [8] - 26:11, 33:11, 33:14, 33:17, 33:20, 34:7, 34:14, 34:23
**own** [8] - 5:11, 28:6, 41:13, 42:21, 60:3, 69:13, 69:14, 80:2

## P

**p.m** [1] - 110:13
**package** [1] - 41:11
**page** [6] - 21:23, 43:3, 66:19, 66:25, 69:22, 75:6
**pages** [4] - 19:24, 19:25, 21:17, 21:18
**paid** [21] - 27:17, 26:5, 27:15, 31:16, 33:11, 33:16, 33:22, 34:13, 34:16, 34:25, 35:10, 35:16, 36:21, 37:9, 38:1, 61:15, 75:8, 75:9, 81:13
**painting** [1] - 32:2
**paper** [1] - 98:19
**papers** [1] - 106:17
**paragraph** [93] - 22:25, 23:6, 23:14, 23:23, 24:1, 24:2, 24:9, 25:3, 25:6, 25:9, 25:12, 25:15, 25:17, 25:24, 26:15, 26:24, 27:2, 35:3, 35:19, 36:13, 36:18, 40:3, 40:7, 41:14, 42:20, 52:7, 53:11, 57:18, 57:21, 60:10, 60:25, 61:10, 61:20, 62:9, 62:11, 62:22, 64:2, 64:13, 65:9, 66:19, 67:1, 67:2,

68:19, 68:20, 69:21, 70:10, 70:19, 70:21, 71:1, 72:14, 73:4, 75:1, 75:7, 75:19, 75:21, 81:9, 83:13, 83:18, 83:20, 84:2, 84:7, 84:16, 84:25, 85:11, 85:18, 86:1, 86:2, 86:4, 86:10, 86:11, 87:2, 87:6, 87:13, 87:14, 87:15, 87:19, 88:8, 89:1, 89:9, 89:15, 89:24, 90:2, 91:25, 92:23, 96:16, 102:1, 103:22, 105:21
**paragraphs** [2] - 75:8, 83:17
**paraphrase** [1] - 89:11
**parole** [2] - 78:6, 78:9
**part** [20] - 20:23, 30:4, 30:7, 41:10, 43:4, 52:16, 53:1, 53:11, 54:6, 55:12, 59:1, 61:25, 62:21, 74:6, 80:2, 83:3, 90:10, 98:21, 108:24, 108:25
**partially** [1] - 33:5
**participate** [4] - 9:21, 86:18, 101:21, 102:1
**participated** [1] - 32:23
**particular** [9] - 12:16, 14:6, 21:8, 54:20, 58:22, 58:23, 64:6, 67:20, 92:22
**particularly** [1] - 62:2
**parties** [41] - 3:5, 19:23, 23:12, 24:21, 25:22, 26:9, 26:16, 26:19, 26:20, 35:21, 40:4, 44:25, 46:10, 48:9, 49:16, 49:23, 49:25, 51:24, 53:5, 54:14, 57:11, 57:14, 57:17, 58:2, 82:20, 83:6, 83:8, 89:16, 89:18, 90:22, 91:7, 91:13, 96:21, 97:12, 98:2, 101:19, 102:3, 103:19, 106:15
**parties'** [2] - 44:24, 109:12
**partner** [11] - 29:11, 29:14, 30:11, 31:6, 64:22, 65:7, 65:16, 65:18, 66:21, 68:15
**party** [10] - 20:6, 26:6, 33:22, 34:17, 34:25,

35:10, 35:17, 36:21, 75:8, 84:12
**pass** [1] - 3:6
**past** [3] - 73:2, 73:3, 96:13
**patch** [1] - 9:16
**patents** [1] - 36:20
**Patrick** [3] - 30:21, 68:23, 69:2
**pause** [1] - 86:5
**pay** [20] - 3:5, 4:17, 23:4, 23:17, 23:18, 25:16, 29:21, 30:1, 30:8, 30:17, 31:18, 34:20, 36:3, 61:14, 61:16, 81:5, 81:11, 81:17, 81:21, 104:9
**payment** [3] - 28:18, 30:2, 30:19, 30:20, 31:13, 31:17, 32:6, 34:14, 68:22, 68:25, 78:21
**payments** [9] - 28:12, 29:24, 30:16, 31:19, 31:22, 31:23, 33:17, 70:17, 75:15
**payoff** [5] - 37:16, 38:6, 38:8, 38:12, 38:21
**payout** [2] - 37:3, 37:8
**payroll** [1] - 30:6
**PC** [4] - 27:16, 30:1, 33:12, 33:19
**PC's** [1] - 30:6
**penalties** [15] - 4:22, 5:2, 23:7, 26:5, 33:24, 34:1, 34:16, 34:24, 35:17, 35:23, 36:4, 36:6, 37:15, 61:1, 61:4
**pending** [6] - 4:19, 16:17, 61:5, 106:6, 106:8, 108:13
**people** [2] - 15:24, 86:8
**per** [1] - 23:12
**percent** [1] - 31:8
**perform** [1] - 87:16
**performed** [1] - 20:8
**perhaps** [2] - 41:1, 43:13
**period** [29] - 15:6, 28:10, 41:24, 58:10, 58:11, 58:15, 58:17, 58:20, 58:21, 64:10, 64:23, 78:8, 78:12, 78:13, 83:14, 83:18, 83:19, 84:5, 85:6, 85:7, 85:22, 86:12, 88:9, 88:12, 91:8,

106:6, 106:9
**perjury** [2] - 11:16, 93:15
**permanent** [1] - 85:22
**permission** [1] - 3:6
**permitted** [2] - 2:15, 2:16
**permitting** [1] - 59:24
**persist** [1] - 79:13
**person** [4] - 4:11, 75:9, 83:24, 91:15
**personal** [12] - 28:11, 30:18, 30:23, 30:24, 31:21, 32:25, 33:2, 73:7, 73:14, 73:17, 73:24, 77:21
**personally** [2] - 29:25, 102:5
**personnel** [1] - 2:18
**perspective** [2] - 46:13, 74:8
**phrasing** [1] - 43:12
**physician** [1] - 12:23
**picks** [1] - 63:16
**piecemeal** [1] - 50:13
**place** [3] - 92:3, 92:17, 97:24
**placed** [1] - 11:12
**places** [1] - 81:8
**plan** [1] - 6:11
**planned** [2] - 4:2, 6:14
**planning** [1] - 109:14
**plans** [3] - 8:25, 32:3, 86:23
**plea** [89] - 3:2, 3:6, 3:12, 11:6, 11:9, 17:8, 17:17, 17:18, 17:19, 17:25, 18:7, 18:10, 18:16, 18:22, 18:24, 19:3, 19:11, 19:18, 20:7, 21:14, 22:8, 22:18, 26:9, 41:3, 41:7, 41:9, 41:23, 41:24, 42:2, 42:20, 42:21, 43:16, 43:17, 43:18, 43:23, 44:2, 44:6, 44:11, 44:17, 45:2, 45:16, 47:3, 47:8, 47:12, 47:14, 47:18, 48:3, 48:19, 48:21, 50:20, 50:23, 51:12, 51:15, 51:21, 52:22, 53:16, 59:3, 59:4, 59:18, 59:21, 59:24, 60:16, 61:3, 61:17, 79:7, 79:13, 80:14, 92:21, 97:11, 97:18, 98:23, 104:2, 104:20, 104:22, 105:4,

105:9, 105:10, 107:5, 107:15, 107:24, 108:10, 108:19, 108:25, 109:3, 109:15
**Plea** [53] - 1:10, 17:6, 21:15, 21:23, 39:15, 39:24, 40:12, 40:19, 40:22, 45:6, 45:11, 46:25, 47:3, 51:24, 52:1, 52:5, 52:6, 52:11, 52:15, 53:1, 53:3, 53:21, 54:6, 54:8, 55:1, 55:12, 55:14, 56:4, 57:15, 59:6, 59:12, 59:22, 61:21, 62:1, 81:17, 82:13, 82:16, 89:6, 89:21, 90:3, 104:8, 104:17, 105:1, 107:12, 108:6, 108:8, 108:11, 108:14, 108:16, 109:4, 109:7, 109:8
**plead** [18] - 6:4, 6:8, 23:2, 39:20, 40:19, 41:4, 44:3, 44:5, 45:11, 45:17, 49:22, 51:13, 78:23, 79:11, 79:12, 98:25, 108:13, 109:8
**pleading** [7] - 16:16, 23:24, 42:18, 43:5, 60:3, 79:2, 108:15
**pleads** [4] - 19:13, 82:10, 82:14, 82:15
**pleas** [2] - 18:14, 18:15
**plop** [1] - 104:5
**plus** [3] - 34:15, 34:24, 37:15
**point** [8] - 6:14, 53:18, 57:20, 67:20, 67:24, 82:9, 95:23, 109:6
**pointed** [3] - 70:21, 81:7, 101:11
**points** [3] - 74:9, 81:6, 103:4
**political** [2] - 21:6, 97:22
**politicized** [2] - 98:2, 99:23
**pop** [1] - 3:18
**popping** [1] - 3:20
**Porsche** [1] - 31:23
**portion** [3] - 15:4, 22:16, 97:15
**position** [13] - 7:19, 37:25, 38:3, 41:13, 43:14, 44:24, 50:15,

57:14, 62:24, 63:6, 104:17, 106:15, 107:17
**positive** [1] - 63:4
**possess** [3] - 9:3, 9:5, 91:3
**possessed** [1] - 58:17
**possessing** [3] - 83:23, 85:20, 86:16
**possession** [2] - 4:10, 57:23
**possibility** [1] - 49:1
**possible** [1] - 84:13
**possibly** [1] - 64:11
**potential** [1] - 32:17
**power** [1] - 20:15
**powers** [8] - 20:20, 47:24, 48:10, 48:14, 91:20, 95:14, 99:10
**practically** [1] - 53:15
**practice** [1] - 102:14
**practitioner** [2] - 9:7, 9:11
**precedent** [5] - 46:1, 94:7, 94:9, 95:3, 103:5
**precisely** [1] - 106:22
**preclude** [1] - 68:4
**predicated** [1] - 101:13
**predict** [1] - 78:3
**preliminary** [5] - 5:20, 6:9, 6:13, 56:1, 56:3
**preparations** [2] - 32:7, 72:14
**prepare** [4] - 29:4, 29:19, 32:11, 77:4
**prepared** [7] - 29:6, 34:6, 36:24, 57:20, 80:19, 80:22
**preparing** [1] - 32:14
**preponderance** [1] - 87:25
**prescribed** [2] - 9:7, 9:11
**present** [1] - 88:1
**presented** [6] - 17:9, 17:10, 20:11, 20:12, 62:1, 87:25
**presentence** [2] - 77:5, 78:2
**presently** [2] - 5:15, 15:19
**preserved** [1] - 86:22
**prestigious** [2] - 27:17, 62:23
**Pretrial** [3] - 86:14, 86:19, 86:24
**pretrial** [8] - 7:18, 8:4, 8:5, 8:13, 9:13, 9:23,

56:9, 92:14
**prevailing** [1] - 84:12
**previously** [3] - 23:8, 32:16, 75:3
**primarily** [1] - 13:25
**prison** [2] - 78:17, 78:18
**private** [3] - 27:13, 62:13, 62:16
**probable** [2] - 5:22, 84:8
**Probation** [4] - 77:4, 86:14, 86:19, 86:24
**probation** [15] - 8:22, 24:22, 25:5, 46:6, 46:7, 46:12, 51:5, 53:6, 77:16, 78:1, 78:14, 78:15, 78:18, 83:16, 110:5
**problem** [2] - 103:24, 107:25
**problems** [1] - 73:1
**Procedure** [2] - 17:12, 85:9
**procedure** [3] - 25:10, 87:15, 103:22
**procedures** [1] - 87:13
**proceed** [4] - 3:5, 50:1, 96:8, 96:9
**proceeding** [6] - 16:13, 25:8, 45:1, 88:23, 106:21, 110:15
**proceedings** [2] - 2:15, 7:7
**Process** [1] - 7:2
**process** [21] - 21:6, 33:1, 37:3, 37:5, 37:6, 38:14, 50:2, 51:7, 73:5, 77:2, 77:14, 88:2, 88:3, 99:9
**processing** [1] - 110:5
**produce** [2] - 5:21, 7:4
**produced** [1] - 7:13
**produces** [1] - 38:14
**professional** [2] - 28:2, 64:16
**proffer** [1] - 102:14
**profligate** [1] - 30:15
**progeny** [1] - 7:3
**program** [10] - 9:21, 14:2, 15:1, 15:3, 15:6, 71:18, 71:20, 71:22, 72:6
**programs** [5] - 13:16, 14:6, 31:24, 71:2, 72:2
**progressed** [2] - 27:24, 32:15

**prohibited** [5] - 9:9, 9:12, 9:17, 9:19, 99:25
**promise** [2] - 40:17, 45:8
**promised** [1] - 54:14
**promises** [10] - 26:18, 26:20, 39:9, 39:14, 39:16, 39:19, 42:22, 59:11, 59:16, 87:17
**proof** [3] - 79:21, 81:25, 82:7
**proper** [1] - 101:25
**properly** [1] - 36:7
**propose** [2] - 103:14, 103:18
**proposed** [1] - 11:1
**propriety** [1] - 108:2
**prosecute** [17] - 40:8, 41:19, 45:9, 45:20, 45:21, 46:2, 46:17, 48:4, 54:14, 58:19, 62:4, 88:13, 89:1, 89:3, 93:5, 104:10, 105:5
**prosecuted** [1] - 94:19
**prosecution** [17] - 5:6, 10:11, 11:15, 23:12, 40:14, 51:1, 52:19, 52:21, 84:15, 88:18, 88:21, 89:8, 90:23, 93:16, 98:18
**prosecutor** [8] - 20:23, 22:17, 41:1, 80:18, 91:19, 92:15, 95:22, 96:3
**prosecutorial** [2] - 21:10, 21:11
**protection** [6] - 40:14, 89:7, 97:24, 98:17, 99:1, 100:2
**prove** [7] - 23:15, 61:12, 61:13, 61:18, 80:9, 80:20, 80:23
**provide** [7] - 8:25, 29:8, 32:17, 40:14, 77:13, 86:23, 89:7
**provided** [2] - 24:10, 40:4
**provides** [18] - 22:25, 23:23, 24:2, 24:5, 24:9, 25:3, 25:6, 25:15, 25:17, 26:15, 83:13, 83:18, 83:20, 84:2, 84:16, 84:25, 85:11, 87:19
**providing** [1] - 32:20
**proving** [1] - 79:19
**provision** [31] - 17:8, 18:17, 40:21, 41:8,

51:16, 51:19, 55:12, 58:9, 60:19, 75:19, 75:21, 76:10, 86:2, 89:14, 89:21, 92:22, 93:9, 95:11, 98:7, 98:14, 99:15, 99:17, 100:14, 100:15, 101:20, 102:1, 103:19, 103:20, 104:9, 105:18, 105:23
**provisions** [9] - 10:23, 21:14, 26:24, 50:20, 51:20, 60:7, 94:5, 102:18, 104:14
**psychiatrist** [1] - 12:23
**PT** [1] - 69:16
**public** [4] - 21:20, 82:19, 83:6, 89:17
**publicly** [2] - 89:17, 97:13
**published** [1] - 28:6
**punishment** [1] - 77:13
**purchase** [4] - 85:6, 85:16, 85:20, 85:25
**purchasing** [1] - 85:20
**purposes** [2] - 26:13, 38:5
**pursuant** [12] - 7:1, 7:3, 18:3, 24:8, 24:13, 24:18, 47:4, 84:11, 84:23, 87:13, 102:17, 108:15
**pursue** [2] - 54:5, 98:10
**pursued** [2] - 49:17, 94:17
**purview** [2] - 51:18, 91:19
**pushing** [1] - 28:15
**put** [8] - 27:6, 51:16, 51:19, 58:6, 80:3, 80:4, 104:4, 104:10
**puts** [2] - 53:17, 95:12
**putting** [3] - 38:6, 50:21, 72:24, 73:5, 98:7

---

## Q

**Queen** [1] - 102:15
**questions** [12] - 3:19, 11:11, 11:12, 11:14, 12:3, 20:20, 27:1, 35:2, 38:25, 45:4, 92:7
**quite** [1] - 64:10
**quote** [1] - 40:6

**quoted** [1] - 72:4

---

## R

**raise** [3] - 11:20, 20:19, 91:10
**raised** [1] - 106:22
**random** [1] - 9:14
**Range** [1] - 90:19
**range** [2] - 25:2, 36:5
**rather** [2] - 98:2, 107:18
**reached** [3] - 22:21, 39:4, 51:23
**reaching** [1] - 29:9
**read** [15] - 8:6, 17:2, 17:4, 22:4, 22:17, 61:22, 68:2, 70:18, 76:3, 80:21, 86:1, 94:10, 96:24, 105:13, 107:9
**reading** [3] - 17:3, 94:4, 94:10
**ready** [4] - 3:5, 43:17, 43:24, 45:1
**reaffirmed** [1] - 44:10
**really** [7] - 48:5, 51:22, 52:25, 56:2, 100:4, 105:12, 105:14
**reason** [3] - 39:23, 43:23, 45:5
**reasonable** [5] - 61:13, 79:20, 79:22, 80:9, 106:24
**reasons** [2] - 25:3, 90:22
**rebut** [1] - 88:2
**receipts** [2] - 33:13, 33:19
**receive** [1] - 76:20
**received** [18] - 15:11, 16:12, 16:16, 16:23, 19:23, 22:8, 30:19, 31:2, 31:19, 60:23, 68:21, 68:25, 69:2, 69:22, 70:2, 70:3, 76:1, 81:14
**recent** [2] - 14:11, 90:19
**recently** [1] - 12:23
**recess** [2] - 43:8, 57:7
**recitation** [2] - 81:25, 82:6
**recitations** [1] - 82:3
**recited** [1] - 37:22
**recites** [1] - 37:22
**recollection** [1] - 13:9
**recommend** [1] - 25:5
**recommendation** [2] - 18:2, 107:16

**recommendations** [2] - 59:22, 59:23
**recommended** [2] - 7:21, 52:1
**recommending** [1] - 104:2
**reconduction** [1] - 24:19
**record** [9] - 8:6, 11:22, 22:16, 27:6, 58:6, 59:16, 61:22, 89:12, 97:10
**recording** [1] - 2:14
**records** [2] - 73:21, 73:22
**redo** [1] - 20:16
**reduce** [1] - 24:17
**reduction** [3] - 24:16, 33:3, 33:5
**reference** [7] - 52:4, 52:11, 52:15, 65:2, 70:19, 75:8
**referenced** [6] - 21:19, 27:5, 65:14, 82:12, 82:13, 82:22
**references** [5] - 35:10, 55:5, 61:20, 62:19, 75:2
**referencing** [1] - 73:8
**referral** [1] - 7:7
**referred** [3] - 19:20, 52:8, 84:18
**referring** [3] - 64:9, 64:16, 66:24
**refers** [7] - 36:13, 36:18, 41:18, 64:13, 64:14, 66:2, 73:25
**reflect** [2] - 19:7, 39:3
**reflects** [1] - 22:21
**refrain** [2] - 86:15, 86:16
**regard** [5] - 49:10, 49:21, 73:17, 84:12, 103:18
**regarding** [3] - 6:13, 22:8, 87:12
**regardless** [2] - 9:9, 59:2
**regards** [1] - 99:7
**Registration** [1] - 55:8
**regular** [1] - 103:17
**rehab** [2] - 31:24, 71:3
**reject** [15] - 18:7, 18:15, 18:19, 19:10, 20:7, 47:11, 47:17, 47:25, 48:2, 48:19, 48:21, 59:23, 104:17, 107:10, 109:3
**rejecting** [1] - 19:3

**relapsed** [1] - 27:23
**relate** [6] - 19:3, 41:10, 57:23, 58:10, 58:22, 73:18
**related** [7] - 3:24, 45:22, 49:3, 53:9, 93:13, 93:15, 93:17
**relates** [4] - 27:4, 57:21, 63:21, 97:11
**relating** [2] - 29:1, 88:15
**relation** [1] - 83:21
**relations** [2] - 32:5, 32:15
**relationship** [3] - 28:3, 64:16, 64:18
**relationships** [2] - 64:18
**release** [14] - 4:23, 5:5, 7:18, 8:4, 8:5, 8:8, 10:8, 10:10, 23:11, 78:13, 78:15, 93:23, 99:5, 110:3
**released** [1] - 78:8
**relevant** [13] - 24:8, 27:8, 35:4, 35:15, 36:2, 52:9, 53:9, 53:14, 84:1, 85:21, 89:19, 89:22, 92:20
**relief** [1] - 76:19
**rely** [2] - 44:16, 98:3
**relying** [3] - 39:18, 40:17, 45:8
**remain** [1] - 28:18
**remained** [4] - 30:21, 32:1, 34:10
**remedies** [1] - 88:6
**remedy** [5] - 88:8, 88:10, 88:11, 93:4, 94:1
**Remedy** [4] - 88:13, 88:23
**remember** [1] - 62:25
**reminded** [1] - 29:13
**reminding** [1] - 2:14
**remote** [1] - 9:16
**repeatedly** [3] - 29:7, 29:21, 92:16
**report** [6] - 8:22, 56:22, 56:24, 77:5, 77:7, 78:2
**reported** [7] - 33:9, 33:13, 33:15, 33:19, 34:11, 34:22, 36:25
**Reporter** [1] - 110:17
**represent** [1] - 5:12
**representation** [3] - 5:17, 16:23, 32:19
**representations** [2] - 26:18, 26:21

**represented** [2] - 5:9, 5:16
**repudiating** [1] - 87:8
**request** [2] - 20:6, 107:16
**requested** [5] - 9:1, 28:14, 86:24, 100:21, 106:2
**require** [2] - 18:15, 88:22
**required** [10] - 6:19, 8:16, 9:13, 23:18, 34:21, 61:15, 71:23, 77:3, 81:13, 109:1
**requirement** [2] - 94:21, 94:25
**requires** [1] - 107:18
**reservation** [1] - 43:18
**residence** [1] - 8:14
**residing** [2] - 8:23, 9:2
**resolution** [2] - 102:4, 102:11
**resolve** [2] - 44:21, 106:5
**resolved** [1] - 106:15
**respect** [6] - 10:15, 52:21, 76:1, 85:1, 85:3, 85:14
**respectfully** [1] - 96:11
**respond** [1] - 20:4
**response** [1] - 50:7
**responsibility** [7] - 11:8, 24:12, 32:22, 77:10, 84:17, 87:23, 93:2
**rest** [3] - 50:2, 59:9, 92:15
**restitution** [9] - 5:5, 23:11, 25:24, 26:1, 26:8, 36:19, 38:17, 38:22, 78:21
**Restitution** [1] - 25:25
**result** [6] - 2:18, 10:8, 10:11, 25:1, 30:12, 37:25
**resulting** [1] - 33:2
**retains** [1] - 25:7
**return** [11] - 28:16, 28:17, 31:14, 31:15, 34:5, 34:8, 34:15, 36:24, 37:5, 37:15
**returns** [22] - 28:12, 28:15, 29:5, 29:7, 29:12, 29:15, 29:17, 29:20, 29:22, 30:18, 31:9, 32:8, 32:12, 32:14, 32:17, 32:22, 33:1, 33:7, 36:23, 37:7, 73:6, 74:8

**Revenue** [9] - 26:6, 26:10, 29:18, 30:3, 33:8, 33:23, 34:9, 36:21, 74:20
**review** [9] - 20:1, 20:5, 25:10, 25:13, 29:8, 76:5, 77:7, 96:6, 109:13
**reviewed** [4] - 29:12, 73:21, 92:12, 92:13
**reviewing** [1] - 78:2
**revocation** [1] - 10:9
**revoked** [1] - 78:16
**rewrite** [1] - 57:25
**rhetorical** [1] - 42:8
**RICHARD** [1] - 2:6
**rights** [5] - 76:11, 76:25, 79:11, 80:16, 85:8
**rise** [3] - 11:20, 43:7, 57:6
**Robert** [5] - 2:25, 3:3, 11:23, 27:9, 83:11
**ROBERT** [3] - 1:6, 11:24, 11:25
**role** [16] - 17:22, 18:6, 18:10, 18:18, 19:4, 46:11, 47:11, 48:15, 50:19, 94:3, 103:2, 104:5, 107:5, 107:8, 107:19, 107:25
**roles** [1] - 17:24
**Roman** [2] - 83:8, 83:12
**Romanian** [1] - 29:1
**Rosemont** [4] - 62:17, 64:21, 65:1, 65:25
**routinely** [2] - 25:20, 28:14
**rubber** [5] - 51:14, 104:1, 104:21, 107:3, 107:11
**rule** [11] - 18:17, 19:1, 48:16, 51:3, 77:17, 85:10, 104:19, 107:9, 107:16, 107:18
**Rule** [15] - 17:10, 17:17, 17:23, 18:1, 18:3, 18:10, 18:14, 41:7, 41:17, 47:4, 51:15, 51:16, 85:9, 107:13
**rules** [1] - 17:8
**Rules** [1] - 17:11
**rulings** [1] - 25:7
**run** [1] - 92:4

**S**

**sample** [1] - 8:10
**sanctions** [2] - 7:7, 32:17
**satisfied** [4] - 16:22, 22:7, 60:22, 75:25
**save** [1] - 4:7
**schedule** [1] - 106:12
**scheme** [1] - 102:25
**Schiller** [6] - 63:3, 63:10, 63:17, 63:22, 66:16, 69:9
**school** [4] - 8:1, 12:9, 12:10, 12:12
**Schwerin** [3] - 65:8, 66:22, 68:16
**scope** [4] - 48:5, 54:15, 57:21, 94:18
**screening** [2] - 9:17, 9:19
**scrutiny** [1] - 97:9
**seal** [1] - 25:19
**sealed** [5] - 21:19, 22:14, 26:17, 97:15, 97:17
**Sealed** [1] - 22:12
**seated** [7] - 2:13, 3:19, 12:1, 19:22, 43:9, 57:8, 58:25
**second** [6] - 24:24, 62:11, 67:1, 68:20, 69:22, 86:6
**Section** [6] - 4:18, 8:11, 9:6, 23:5, 77:11, 83:25
**section** [2] - 55:6, 105:8
**Sections** [1] - 4:13
**security** [1] - 2:18
**see** [13] - 10:25, 37:12, 57:2, 67:4, 67:7, 71:3, 74:4, 79:16, 82:20, 91:16, 92:18, 98:6, 109:25
**seeing** [1] - 99:22
**seek** [7] - 8:24, 86:15, 87:12, 87:21, 87:24, 92:25, 101:16
**seeking** [4] - 31:11, 32:5, 34:18, 84:5
**seem** [2] - 50:18, 98:16
**self** [17] - 26:3, 33:10, 33:13, 33:15, 33:20, 33:23, 33:25, 34:12, 34:23, 36:19, 36:22, 37:4, 37:12, 37:14, 37:18, 75:2
**self-assessed** [15] -

33:10, 33:13, 33:15, 33:20, 33:23, 33:25, 34:12, 34:23, 36:19, 36:22, 37:12, 37:14, 37:18, 75:2
**send** [4] - 10:22, 82:21, 92:19, 106:10
**sending** [1] - 29:10
**Seneca** [3] - 64:21, 65:1, 65:25
**sense** [5] - 46:20, 56:16, 56:23, 106:3, 106:4
**senses** [1] - 93:24
**sent** [2] - 29:12, 66:20
**sentence** [23] - 8:18, 17:18, 19:8, 24:17, 25:2, 25:5, 52:1, 59:24, 62:11, 63:16, 63:20, 74:9, 75:22, 76:12, 76:15, 76:20, 77:12, 77:22, 77:23, 78:1, 78:4, 78:20, 79:5
**sentenced** [1] - 78:12
**sentences** [1] - 63:17
**Sentencing** [3] - 24:9, 24:13, 24:19
**sentencing** [16] - 19:4, 24:2, 25:1, 25:4, 25:9, 25:16, 35:5, 35:22, 37:19, 38:6, 47:15, 74:7, 77:2, 77:6, 77:15, 79:1
**separate** [3] - 3:3, 11:15, 18:17, 22:13, 38:14, 42:9, 42:10, 42:15, 57:15, 69:7, 71:22, 92:16, 98:16
**separately** [1] - 97:21
**separation** [7] - 20:20, 47:24, 48:10, 48:14, 91:19, 95:14, 99:10
**September** [1] - 56:22
**series** [2] - 11:10, 32:23
**serious** [3] - 20:14, 20:17, 88:24
**seriousness** [2] - 19:7, 88:7
**serve** [4] - 8:17, 26:8, 78:16, 78:18
**served** [2] - 27:12, 62:12
**Service** [9] - 26:6, 26:10, 29:18, 30:3, 33:8, 33:23, 34:9, 36:21, 74:20
**services** [4] - 8:13, 9:13, 9:23, 27:14

**Services** [2] - 86:14, 86:19
**set** [15] - 2:23, 24:5, 56:1, 56:8, 83:17, 84:23, 84:24, 85:4, 85:15, 85:16, 87:13, 87:17, 88:16, 89:18, 90:10
**sets** [1] - 90:3
**severability** [3] - 98:16, 100:15, 100:18
**several** [4] - 29:12, 73:18, 74:11, 81:7
**severe** [2] - 59:25, 79:5
**shake** [1] - 74:7
**shall** [7] - 83:20, 84:22, 85:7, 87:18, 88:1, 89:17, 90:10
**shared** [1] - 59:19
**show** [1] - 5:22
**showed** [1] - 34:6
**showing** [1] - 97:7
**side** [2] - 22:10, 22:12
**side-bar** [2] - 22:10, 22:12
**sign** [8] - 22:1, 50:22, 51:18, 51:19, 92:17, 94:6, 104:7, 110:3
**signature** [1] - 29:8
**signatures** [2] - 21:23, 21:24
**signed** [7] - 22:3, 26:20, 29:16, 32:19, 42:13, 42:15, 90:11
**significant** [5] - 28:2, 30:12, 35:17, 64:15, 81:19
**signing** [2] - 88:19, 88:21
**signs** [2] - 53:16, 83:16
**silent** [1] - 19:1
**similar** [3] - 45:25, 89:21, 102:24
**simply** [1] - 53:12
**single** [1] - 13:20
**sit** [5] - 18:22, 46:22, 50:16, 54:12, 102:16
**situation** [3] - 44:22, 49:21, 93:20
**situations** [1] - 73:16
**six** [4] - 13:12, 21:17, 30:22, 31:8
**Sixth** [1] - 85:8
**smack** [1] - 104:4
**SMITH** [1] - 2:3
**sober** [3] - 31:25, 32:1, 71:3, 72:21,

74:24
**sobriety** [5] - 71:10, 71:17, 72:3, 72:11, 84:21
**sole** [2] - 26:13, 88:24
**someone** [4] - 37:11, 73:1, 86:6, 98:3
**sorry** [5] - 14:6, 14:20, 16:1, 67:5, 108:22
**sort** [4] - 14:7, 19:19, 38:13, 64:14
**sounds** [1] - 107:4
**space** [1] - 57:19
**speaking** [1] - 42:5
**special** [5] - 4:24, 5:6, 23:11, 25:16, 78:22
**specific** [4] - 17:18, 57:21, 60:7, 88:9
**specifically** [3] - 54:17, 58:16, 61:12
**specified** [2] - 88:6, 88:12
**speedy** [1] - 85:8
**spell** [2] - 11:21, 65:19
**spend** [3] - 30:22, 31:1, 81:20
**spending** [1] - 30:15
**spent** [3] - 31:20, 32:2, 49:13
**spring** [1] - 28:9
**square** [1] - 35:14
**squarely** [1] - 92:15
**stable** [1] - 31:5
**stamp** [4] - 51:15, 104:1, 107:3, 107:11
**stamping** [1] - 104:21
**stand** [2] - 41:13, 44:10
**standard** [6] - 10:24, 21:20, 35:24, 79:19, 79:20, 96:6
**standing** [4] - 8:3, 27:22, 64:3, 64:21
**stands** [3] - 41:23, 42:21, 92:22
**start** [3] - 2:13, 6:21, 11:3
**started** [4] - 32:13, 63:3, 64:23, 65:15
**starting** [5] - 67:1, 86:4, 86:10, 87:14, 89:15
**state** [4] - 8:7, 9:10, 11:21, 86:25
**State's** [1] - 41:12
**statement** [41] - 6:21, 6:23, 23:21, 24:6, 37:16, 37:22, 40:10, 40:11, 52:22, 53:20, 53:21, 53:24, 53:25,

55:1, 55:4, 57:22, 58:12, 61:21, 80:22, 81:6, 81:8, 81:17, 84:18, 85:4, 85:17, 87:3, 87:7, 87:9, 87:10, 88:16, 89:4, 89:5, 89:12, 89:19, 91:16, 91:17, 91:22, 92:3, 102:22
**statements** [5] - 6:19, 6:20, 26:18, 26:21, 102:17
**states** [2] - 40:7, 60:10
**STATES** [3] - 1:1, 1:3, 1:18
**States** [58] - 1:14, 1:21, 2:23, 2:25, 3:3, 4:9, 4:13, 4:14, 4:17, 8:10, 9:6, 10:5, 10:16, 18:3, 20:15, 20:16, 23:2, 23:5, 24:8, 24:10, 24:17, 25:5, 25:6, 26:14, 40:8, 46:14, 77:4, 77:11, 83:9, 83:10, 83:25, 84:3, 84:7, 84:10, 84:22, 85:13, 86:3, 87:9, 87:12, 87:19, 87:22, 87:24, 88:5, 88:9, 88:10, 88:12, 88:13, 88:15, 88:22, 89:2, 90:4, 90:6, 90:11, 90:17, 92:24, 93:1, 103:1, 110:10
**status** [3] - 56:22, 56:24, 109:15
**statute** [12] - 51:18, 77:11, 77:21, 85:1, 85:5, 85:21, 88:18, 88:20, 91:25, 92:2, 92:13, 93:17
**statutory** [2] - 102:13, 102:25
**stay** [1] - 3:19
**stemmed** [1] - 30:4
**stenographic** [1] - 110:15
**step** [1] - 77:14
**stick** [1] - 110:1
**still** [9] - 31:6, 32:6, 37:11, 41:3, 42:17, 45:16, 51:11, 65:21, 79:6
**stipulate** [2] - 23:13, 89:18
**stipulation** [1] - 35:18
**stipulations** [3] - 24:1, 24:22, 24:25
**stop** [2] - 6:20, 6:22

**straightforward** [1] - 104:13
**Street** [1] - 1:11
**strict** [1] - 97:9
**structure** [2] - 31:5, 95:19
**structured** [2] - 96:12, 96:13
**struggle** [2] - 27:22, 64:3
**struggles** [2] - 64:9, 64:14
**struggling** [1] - 91:15
**sub** [1] - 88:8
**subject** [7] - 8:5, 26:12, 35:13, 52:20, 85:12, 86:13, 93:5
**submissions** [4] - 20:2, 20:6, 20:11, 109:13
**submit** [5] - 8:21, 9:12, 20:8, 86:17, 106:25
**submits** [1] - 86:20
**submitted** [1] - 29:16
**subparagraph** [3] - 24:5, 85:18, 86:11
**subsection** [7] - 59:3, 98:23, 104:21, 105:7, 105:9, 107:24
**subsequent** [2] - 25:8, 26:23
**subsequently** [1] - 24:10
**substance** [16] - 4:12, 9:5, 9:13, 9:17, 9:19, 9:22, 27:22, 28:7, 29:13, 71:7, 83:24, 86:16, 86:17, 86:18, 104:3, 105:5
**substantial** [7] - 27:19, 28:21, 30:5, 31:18, 65:10, 67:21, 81:5
**substantially** [1] - 58:5
**successfully** [1] - 28:4
**sued** [1] - 32:4
**sufficient** [3] - 5:21, 30:7, 77:12
**suggest** [3] - 19:2, 20:13, 104:21
**suit** [1] - 95:10
**sum** [1] - 31:21
**summarize** [4] - 57:12, 70:16, 80:19, 83:5
**summarized** [2] - 39:3, 61:2
**summary** [1] - 81:12

**summer** [2] - 28:9, 32:4
**supersedes** [1] - 26:17
**supervised** [8] - 4:23, 5:5, 23:11, 78:13, 78:15, 93:23, 99:5
**supervising** [3] - 8:13, 9:14, 9:24
**supervision** [5] - 8:21, 8:22, 86:13, 87:23, 93:2
**support** [2] - 32:6, 72:11
**supporting** [1] - 8:25
**supposed** [1] - 51:14
**Supreme** [1] - 108:11
**surprise** [5] - 30:10, 67:4, 67:9, 67:24, 68:1, 68:3, 68:8
**surrender** [1] - 8:17
**swear** [1] - 11:19
**sweat** [1] - 9:16
**sworn** [1] - 11:25
**System** [1] - 85:23
**system** [5] - 9:16, 30:6, 48:9, 79:21, 102:4

# T

**table** [1] - 36:5
**talks** [1] - 67:2
**tamper** [1] - 9:18
**target** [1] - 102:16
**taught** [1] - 8:1
**tax** [99] - 3:7, 3:12, 4:1, 4:17, 5:2, 6:4, 11:4, 16:15, 23:4, 23:17, 26:4, 26:11, 28:12, 28:16, 29:3, 29:5, 29:7, 29:17, 29:20, 29:22, 29:24, 30:3, 30:8, 30:12, 30:14, 30:16, 30:17, 30:21, 31:7, 31:9, 31:13, 31:16, 31:17, 31:18, 32:8, 32:12, 32:17, 32:22, 32:25, 33:3, 33:7, 33:8, 33:10, 33:14, 33:15, 33:20, 33:24, 34:1, 34:11, 34:12, 34:20, 34:21, 34:23, 36:4, 36:8, 36:19, 37:6, 37:19, 37:25, 41:2, 41:4, 45:15, 45:17, 45:22, 49:3, 49:10, 53:10, 53:25, 54:25, 57:23, 58:14, 58:20,

61:14, 61:15, 66:20, 66:21, 67:3, 67:17, 67:19, 67:23, 68:13, 72:15, 73:6, 73:12, 74:8, 75:2, 75:3, 75:9, 81:5, 81:11, 81:13, 81:14, 82:23, 89:20, 89:23
**taxes** [13] - 3:5, 26:11, 28:18, 29:21, 30:2, 31:8, 34:7, 35:10, 35:19, 35:20, 49:15, 72:23, 81:22
**taxpayers** [1] - 28:14
**technically** [1] - 71:13
**telephone** [1] - 8:14
**ten** [3] - 4:22, 49:14, 57:2
**term** [4] - 21:11, 78:12, 83:2, 85:21
**termination** [1] - 88:25
**terms** [30] - 18:18, 22:18, 25:21, 26:12, 40:9, 41:14, 43:24, 44:2, 44:22, 46:7, 46:8, 53:3, 54:25, 59:22, 61:2, 75:17, 83:1, 83:5, 83:12, 84:21, 84:23, 87:17, 89:3, 89:16, 90:4, 90:8, 98:12, 101:10, 105:1, 105:25
**testify** [3] - 80:2, 80:4, 88:7
**testifying** [1] - 6:1
**testimony** [1] - 104:23
**testing** [7] - 9:12, 9:14, 9:15, 9:16, 9:17, 9:19, 86:17
**THE** [455] - 1:1, 1:2, 1:13, 2:12, 3:8, 3:13, 3:17, 3:22, 4:6, 4:8, 4:20, 4:21, 4:25, 5:1, 5:7, 5:8, 5:14, 5:15, 5:18, 5:19, 6:2, 6:3, 6:6, 6:7, 6:10, 6:11, 6:18, 6:25, 7:1, 7:12, 7:15, 7:17, 7:22, 7:24, 8:2, 10:1, 10:2, 10:7, 10:13, 10:14, 10:19, 11:7, 11:8, 11:17, 11:18, 11:23, 12:1, 12:5, 12:6, 12:7, 12:9, 12:10, 12:11, 12:13, 12:14, 12:15, 12:16, 12:17, 12:19, 12:21, 12:22, 12:24, 12:25, 13:3, 13:5, 13:7, 13:8,

13:11, 13:14, 13:15,
13:19, 13:24, 14:1,
14:4, 14:5, 14:8,
14:9, 14:10, 14:11,
14:14, 14:15, 14:17,
14:19, 14:20, 14:21,
14:23, 14:25, 15:3,
15:5, 15:8, 15:9,
15:12, 15:13, 15:17,
15:18, 15:22, 15:23,
16:1, 16:3, 16:5,
16:6, 16:9, 16:11,
16:18, 16:19, 16:21,
16:22, 16:25, 17:1,
17:5, 17:6, 17:13,
17:16, 17:22, 18:4,
18:6, 18:9, 18:13,
18:20, 19:12, 19:17,
19:22, 20:22, 21:2,
21:13, 21:16, 21:17,
21:25, 22:1, 22:2,
22:3, 22:6, 22:7,
22:9, 22:10, 22:15,
26:25, 35:1, 35:9,
35:24, 36:1, 36:8,
36:13, 36:18, 37:10,
38:9, 38:19, 38:24,
39:5, 39:6, 39:8,
39:9, 39:13, 39:18,
39:21, 39:22, 39:25,
40:1, 40:20, 40:21,
40:24, 40:25, 41:5,
41:6, 41:16, 42:1,
42:7, 42:14, 42:24,
43:2, 43:9, 43:21,
44:1, 44:12, 44:20,
45:3, 45:7, 45:8,
45:12, 45:13, 45:18,
45:19, 46:5, 46:15,
46:21, 47:2, 47:6,
47:10, 47:14, 47:17,
47:21, 48:2, 48:7,
48:13, 48:18, 49:3,
49:5, 50:3, 50:9,
50:12, 50:16, 51:8,
52:3, 52:7, 52:11,
52:14, 52:17, 52:25,
54:4, 54:10, 54:17,
55:5, 55:10, 55:15,
55:19, 55:23, 56:7,
56:14, 56:21, 57:4,
57:8, 57:25, 58:3,
58:8, 58:13, 58:18,
58:25, 59:14, 59:15,
59:20, 59:21, 60:2,
60:3, 60:5, 60:6,
60:9, 60:10, 60:15,
60:16, 60:18, 60:19,
60:21, 60:22, 60:24,
60:25, 61:6, 61:7,
61:9, 61:10, 61:19,

61:20, 62:7, 62:8,
62:15, 62:18, 63:2,
63:5, 63:7, 63:8,
63:12, 63:13, 63:18,
63:19, 63:23, 63:24,
64:1, 64:8, 64:13,
64:18, 64:25, 65:3,
65:6, 65:8, 65:9,
65:15, 65:18, 65:19,
65:21, 65:22, 65:23,
66:1, 66:3, 66:6,
66:7, 66:8, 66:9,
66:12, 66:13, 66:15,
66:16, 66:17, 66:18,
66:23, 66:25, 67:5,
67:6, 67:7, 67:8,
67:10, 67:11, 67:12,
67:16, 68:2, 68:7,
68:10, 68:12, 68:14,
68:15, 68:17, 68:19,
68:24, 68:25, 69:2,
69:4, 69:5, 69:6,
69:8, 69:11, 69:13,
69:14, 69:16, 69:18,
69:19, 69:21, 70:5,
70:6, 70:10, 71:1,
71:4, 71:5, 71:9,
71:11, 71:12, 71:16,
71:17, 71:20, 71:22,
71:24, 72:1, 72:7,
72:8, 72:9, 72:12,
72:13, 72:17, 72:18,
72:20, 72:21, 72:22,
72:23, 72:24, 73:4,
74:1, 74:15, 74:23,
74:25, 75:1, 75:6,
75:11, 75:13, 75:14,
75:15, 75:16, 75:18,
75:24, 75:25, 76:2,
76:3, 76:7, 76:9,
76:13, 76:14, 76:16,
76:17, 76:22, 76:23,
77:9, 77:10, 78:5,
78:6, 78:10, 78:11,
78:19, 78:20, 78:24,
78:25, 79:3, 79:4,
79:9, 79:10, 79:18,
79:19, 79:25, 80:1,
80:6, 80:7, 80:12,
80:13, 80:17, 80:18,
80:24, 81:2, 81:23,
82:1, 82:2, 82:4,
82:5, 82:9, 86:5,
90:13, 90:16, 90:25,
91:14, 91:25, 92:5,
92:11, 93:10, 94:2,
94:10, 94:16, 94:21,
94:25, 95:3, 95:6,
95:11, 95:21, 96:1,
96:3, 96:23, 97:4,
97:6, 97:14, 98:5,

98:21, 99:12, 99:22,
100:11, 100:15,
100:20, 100:25,
101:22, 103:4,
103:24, 106:8,
107:4, 107:9,
107:23, 108:18,
108:21, 109:10,
109:11, 109:24,
110:7, 110:8, 110:12
**therapy** [1] - 9:22
**therefore** [1] - 81:10
**thinking** [2] - 50:5,
106:17
**thinks** [3] - 74:6,
98:18, 98:25
**third** [12] - 19:23, 20:6,
26:6, 33:22, 34:17,
34:25, 35:10, 35:17,
36:21, 68:19, 71:2,
75:8
**Third** [2] - 90:19, 97:8
**third-party** [1] - 20:6
**thirty** [4] - 56:12,
56:17, 84:4, 109:20
**thousand** [1] - 74:12
**threatened** [1] - 39:6
**threats** [1] - 59:17
**three** [7] - 4:23, 12:7,
21:23, 23:18, 24:20,
61:15, 77:14
**three-step** [1] - 77:14
**throes** [1] - 31:6
**throughout** [2] - 29:3,
29:7
**throw** [2] - 108:3,
108:5
**Thursday** [1] - 106:11
**timely** [7] - 29:19,
29:21, 30:8, 33:11,
33:16, 34:13, 34:19
**timing** [1] - 106:13
**Title** [2] - 23:5, 83:25
**today** [9] - 16:4, 16:13,
24:7, 53:18, 59:17,
78:3, 105:22, 108:8,
110:9
**today's** [3] - 45:1,
103:23, 106:21
**together** [3] - 26:17,
72:25, 73:5
**tolled** [2] - 85:7, 92:5
**took** [2] - 75:11, 75:13
**top** [1] - 75:6
**toss** [1] - 100:19
**total** [6] - 24:19, 33:9,
33:15, 34:12, 34:22,
63:21
**totaling** [2] - 27:19,
31:19

**towards** [3] - 30:2,
62:9, 64:14
**traded** [1] - 31:10
**traditional** [1] - 19:4
**transcript** [4] - 15:24,
106:20, 106:24,
110:15
**transfers** [2] - 30:11,
30:24
**travel** [3] - 8:25, 30:25,
86:23
**Treasury** [1] - 26:14
**treat** [1] - 64:5
**treated** [6] - 13:1,
13:10, 13:23, 14:2,
14:7, 73:20
**treatment** [13] - 13:3,
13:6, 14:2, 14:12,
14:13, 14:16, 15:11,
67:18, 67:19, 67:23,
72:6, 72:10, 86:18
**tremendous** [1] -
97:22
**trial** [11] - 23:16,
48:25, 56:13, 79:14,
80:1, 80:8, 80:14,
80:15, 80:16, 80:20,
85:8
**tried** [1] - 91:11
**trips** [2] - 31:24, 71:2
**true** [1] - 110:15
**truthful** [2] - 32:21,
87:4
**truthfully** [2] - 11:13,
11:14
**try** [2] - 57:11, 97:20
**trying** [11] - 37:11,
42:8, 48:15, 48:18,
55:10, 63:14, 67:5,
71:24, 91:18, 101:1,
105:20
**Tuesday** [1] - 106:10
**turn** [1] - 3:11
**turns** [1] - 98:19
**twelve** [2] - 5:3, 23:8
**twenty** [2] - 13:13,
83:14
**twenty-four** [1] - 83:14
**twice** [2] - 5:4, 23:9
**two** [21] - 3:4, 3:23,
4:2, 4:16, 10:19,
17:24, 23:17, 24:12,
24:16, 32:5, 43:14,
48:23, 49:25, 51:11,
61:14, 71:15, 83:12,
83:14, 88:5, 91:14
**two-year** [1] - 83:14
**typical** [1] - 75:17
**typically** [2] - 10:21,
46:24

## U

**U.S** [10] - 2:18, 24:13,
24:18, 49:13, 86:13,
86:19, 86:24,
102:13, 108:12,
110:18
**Ukrainian** [9] - 27:12,
29:1, 31:4, 62:12,
62:15, 62:19, 66:10,
69:25, 70:11
**ultimately** [3] - 31:14,
64:20, 74:19
**unanimously** [1] -
80:11
**unanticipated** [1] -
26:7
**unartful** [1] - 43:12
**unbelievable** [1] -
49:17
**unconstitutional** [6] -
48:14, 91:4, 99:21,
100:1, 100:11, 102:7
**under** [47] - 9:8, 11:12,
11:25, 12:23, 15:14,
15:19, 17:9, 17:10,
17:17, 17:23, 18:1,
18:10, 19:9, 22:12,
24:1, 25:19, 25:24,
28:21, 32:16, 36:7,
41:7, 45:2, 51:15,
51:16, 51:18, 55:7,
59:3, 59:5, 65:11,
71:6, 77:10, 77:13,
83:7, 84:3, 85:6,
85:8, 94:11, 98:23,
100:7, 103:21,
104:19, 104:20,
104:23, 105:4,
105:9, 107:5, 107:24
**understood** [2] -
24:21, 92:13
**undertaken** [1] - 67:18
**undertakings** [1] -
85:19
**undertook** [1] - 49:22
**unenforceable** [4] -
39:23, 42:16, 43:23,
44:5
**unfiled** [1] - 34:10
**unique** [1] - 82:24
**unitary** [1] - 100:17
**UNITED** [3] - 1:1, 1:3,
1:18
**United** [59] - 1:14,
1:21, 2:22, 2:24, 3:3,
4:9, 4:12, 4:14, 4:17,
8:10, 9:6, 10:5,
10:16, 18:3, 20:15,
20:16, 23:2, 23:5,

24:8, 24:10, 24:17,
25:4, 25:6, 26:14,
40:8, 41:12, 46:14,
77:4, 77:11, 83:9,
83:25, 84:3, 84:7,
84:10, 84:22, 85:13,
86:3, 87:9, 87:11,
87:19, 87:21, 87:24,
88:5, 88:9, 88:10,
88:12, 88:13, 88:14,
88:22, 89:2, 90:4,
90:6, 90:11, 90:17,
92:23, 93:1, 103:1,
110:10
**unlawful** [1] - 4:11,
83:23, 91:2
**unlawfully** [2] - 9:4,
86:15
**unless** [7] - 9:6, 26:23,
83:16, 90:10, 97:1,
98:10, 99:5
**unlike** [1] - 102:24
**unlikely** [1] - 76:18
**unsealed** [1] - 22:16
**unusual** [1] - 82:18
**up** [22] - 3:6, 3:18,
3:20, 7:25, 17:7,
22:10, 35:13, 43:13,
56:17, 56:21, 60:17,
63:16, 74:19, 80:15,
82:20, 100:19,
102:3, 103:23,
104:14, 104:15,
105:18, 110:5
**upwards** [1] - 77:23
**urine** [1] - 9:15
**user** [3] - 4:11, 83:23,
91:3

### V

**valid** [14] - 39:23,
40:21, 42:16, 43:22,
44:4, 44:13, 44:15,
45:5, 46:13, 49:21,
59:7, 90:10, 100:13,
105:6
**validly** [1] - 49:10
**vary** [1] - 77:23
**ventures** [1] - 28:5
**venue** [6] - 23:1,
47:21, 47:22, 60:8,
60:12, 85:13
**version** [1] - 3:6
**versus** [2] - 2:25, 3:3
**vested** [1] - 21:11
**via** [1] - 85:24
**victim** [1] - 26:14
**Victim** [1] - 25:25
**victims** [1] - 26:2

**view** [14] - 17:22,
41:22, 46:11, 47:6,
47:25, 53:6, 53:7,
53:8, 53:12, 83:1,
107:22, 108:23
**views** [1] - 105:10
**VILLAZOR** [1] - 2:3
**violate** [2] - 8:7, 48:13
**violates** [2] - 99:15,
99:17
**violating** [2] - 7:5,
10:7
**violation** [12] - 4:12,
4:17, 23:5, 78:14,
83:24, 86:25, 88:14,
90:17, 93:22, 93:25,
99:5, 99:10
**virtually** [1] - 65:3
**vis** [2] - 18:18
**vis-a-vis** [1] - 18:18
**voice** [1] - 100:3
**void** [3] - 26:22, 56:5,
102:21
**voluntarily** [2] - 23:19,
76:24
**voluntary** [4] - 11:9,
18:1, 98:22, 98:25
**VOSR** [5] - 93:20,
99:3, 102:6, 102:24,
103:5
**VOSR's** [1] - 102:13

### W

**wait** [1] - 18:23
**waive** [9] - 17:3, 17:4,
17:5, 56:3, 60:11,
79:11, 83:20, 84:25,
90:23
**waived** [4] - 76:24,
80:15, 92:1, 92:2
**waiver** [11] - 25:12,
47:21, 47:22, 60:12,
75:19, 75:20, 75:21,
75:22, 76:1, 76:3,
76:10
**waives** [2] - 22:25,
84:13
**waiving** [1] - 6:8
**walk** [4] - 10:25,
13:19, 21:13, 60:6
**Wallace** [1] - 2:22
**WALLACE** [2] - 1:19,
47:5
**wants** [2] - 57:13,
108:13
**warrant** [1] - 10:9
**warrants** [1] - 88:25
**watch** [1] - 2:16
**ways** [3] - 74:13,

101:16, 104:16
**weapon** [1] - 9:3
**wearing** [1] - 9:15
**Wednesday** [1] - 1:8
**week** [1] - 56:19
**weigh** [1] - 51:2
**weighing** [1] - 46:12
**well-documented** [3] -
27:21, 64:2, 64:5
**West** [1] - 65:16
**whatsoever** [3] - 7:16,
16:8, 26:22
**whichever** [2] - 5:4,
23:10
**whole** [4] - 49:11,
63:6, 90:9, 105:13
**wife** [1] - 32:1
**wildly** [1] - 31:2
**willful** [5] - 4:17, 23:4,
23:19, 61:16, 81:17
**willing** [1] - 44:2
**Wilmington** [1] - 1:12
**winter** [1] - 32:4
**wise** [6] - 22:23,
61:22, 77:1, 83:4,
101:4, 108:9
**WISE** [99] - 1:20, 2:21,
3:9, 4:4, 6:15, 7:11,
7:14, 7:20, 10:5,
10:16, 16:10, 17:10,
17:20, 17:24, 18:5,
18:8, 18:12, 18:14,
19:1, 19:16, 19:21,
20:18, 20:25, 21:6,
22:24, 27:7, 35:8,
35:16, 35:25, 36:12,
36:17, 36:23, 37:14,
38:3, 38:12, 38:21,
41:12, 41:22, 42:12,
42:19, 46:4, 46:9,
46:19, 47:1, 47:9,
47:13, 47:16, 47:19,
47:22, 48:6, 48:12,
48:17, 48:23, 49:4,
50:7, 50:11, 50:14,
51:23, 52:6, 52:9,
52:13, 52:16, 52:24,
53:3, 54:8, 54:16,
54:22, 55:9, 55:22,
58:11, 58:14, 68:11,
70:18, 75:5, 80:21,
81:1, 81:4, 83:7,
86:10, 90:20, 91:6,
91:24, 92:10, 93:12,
94:8, 94:15, 94:20,
94:24, 95:2, 95:5,
95:9, 101:10,
102:12, 106:19,
107:2, 107:7,
107:12, 109:23,

110:10
**Wise** [3] - 2:21, 39:3,
60:25
**wish** [2] - 5:16, 81:24
**wishes** [1] - 20:4
**withdraw** [5] - 26:9,
59:18, 59:24, 79:7,
107:15
**withdrawals** [3] -
30:10, 30:24, 31:22
**withdrawing** [1] - 30:5
**withholding** [2] -
30:12, 31:7
**withholdings** [2] -
30:8, 68:16
**WITNESS** [1] - 66:8
**witness** [1] - 102:16
**witnesses** [2] - 5:25,
79:16
**worsened** [1] - 28:7
**worth** [1] - 98:19
**worthwhile** [1] - 81:3
**write** [3] - 67:12,
67:21, 70:15
**writes** [1] - 37:5
**writing** [5] - 8:14,
8:24, 26:19, 86:23,
90:11
**written** [10] - 26:23,
39:2, 39:7, 39:10,
39:15, 50:23, 90:7,
98:19, 101:20, 102:3
**wrote** [1] - 64:9

### Y

**year** [32] - 5:5, 23:10,
28:7, 28:13, 28:14,
28:20, 29:3, 30:9,
30:13, 31:9, 31:16,
33:21, 33:25, 34:2,
34:11, 34:21, 37:19,
37:23, 38:1, 49:17,
65:10, 67:3, 67:18,
67:19, 67:22, 68:9,
74:10, 74:13, 81:15,
81:16, 83:14, 84:1
**year-and-a-half** [1] -
33:21
**years** [11] - 4:22, 4:23,
12:7, 13:13, 26:11,
33:8, 49:14, 55:1,
62:25, 70:17, 73:12
**yesterday** [1] - 19:23
**Yi** [1] - 65:20
**yourself** [1] - 7:24

### Z

**zero** [6] - 23:13, 26:3,

37:13, 38:10, 38:20

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

*Defendants*.

Case No. 1:24-cv-815

# Exhibit F

**MEMORANDUM**

| | |
|---|---|
| **TO:** | Members of the Committee on Oversight and Accountability, Committee on Judiciary, and Committee on Ways and Means |
| **FROM:** | Chairman James Comer, Chairman Jim Jordan, and Chairman Jason Smith |
| **DATE:** | September 27, 2023 |
| **RE:** | Impeachment Inquiry |

## I.    <u>Introduction</u>

For the past several months, the House Committees on Oversight and Accountability (Oversight Committee), Ways and Means (Ways and Means Committee), and the Judiciary (Judiciary Committee) (collectively, Committees) have been investigating (1) foreign money received by the Biden family, (2) President Joe Biden's involvement in his family's foreign business entanglements, and (3) steps taken by the Biden Administration to slow, hamper, or otherwise impede the criminal investigation of the President's son, Robert Hunter Biden, which involves funds received by the Biden family from foreign sources. As a result of these investigations, the Committees have uncovered significant new information that raises serious concerns as to whether the President has abused his federal office to enrich his family and conceal his and/or his family's misconduct. This information includes:

***The Biden family and their business associates received over $24 million from foreign sources over the course of approximately five years.***

- From 2014 to 2019, Biden family members and their affiliate companies received over $15 million from foreign companies and foreign nationals in Ukraine, Russia, Kazakhstan, Romania, and China. Biden business associates received an additional $9 million.

- This money was transmitted to Biden family members from foreign sources through an exceedingly complex chain of transactions that made it difficult to track the flow of these funds.

***President Biden was personally involved in his family's foreign business dealings, and those business arrangements intersected with his official duties.***

- The President had knowledge of many of his family's business dealings, and indeed participated in them by having phone calls and attending private dinners—including while he was Vice President—with his family's business associates and foreign business associates who would pay his family millions of dollars for no identifiable product or service.

1

- These foreign business associates of the President's family had interests in countries where then-Vice President Biden—and as President—played, and continues to play, an active role in formulating and implementing the foreign policy of the United States.

***The President has not been truthful about his family's foreign business entanglements.***

- Weeks before the 2020 Presidential election, then-candidate Joe Biden said on national television that his family did not receive any money from China.  That was a lie.  Joe Biden not only knew about his family's work with Chinese nationals, business associates have confirmed that Joe Biden met with his family's Chinese associates—including while he was Vice President.

- President Biden's assertions that he never discussed business with his family are false.

The Committees have also uncovered substantial information, including through whistleblowers, indicating that the Biden Administration has obstructed the criminal investigation into Hunter Biden.  This information includes evidence that Department of Justice personnel blocked avenues of inquiry that could have led to evidence incriminating President Biden and impeded efforts to prosecute Hunter Biden for tax crimes relating to foreign business arrangements that could have implicated President Biden.

As a result of the information assembled by the Committees, on September 12, 2023, Speaker Kevin McCarthy directed the Committees to open a formal impeachment inquiry into President Joe Biden.  While work on legislative reforms to address the deficiencies in current law revealed by the Committees' investigations will continue, the Committees will now additionally focus on determining whether to recommend articles of impeachment against President Biden as detailed below.

This Memorandum further explains the purpose of the inquiry, summarizes the evidence justifying the inquiry, and outlines the scope of this impeachment investigation.

## II.     Purpose of Impeachment Inquiry

We begin with a brief overview of the impeachment power before turning to the purpose of this specific impeachment inquiry.

The Constitution vests the House of Representatives with the "sole Power of Impeachment"[1] and provides that the "President, Vice President and all civil Officers of the United States, shall be removed from Office on Impeachment for, and Conviction of, Treason, Bribery, or other high Crimes and Misdemeanors."[2]  While removal is automatic once an officer is impeached and convicted, Congress may, in its discretion, go further and disqualify the officer from ever "hold[ing] … any Office of honor, Trust or Profit under the United States."[3]

---

[1] U.S. Const. art. I, § 2, cl. 5.
[2] *Id.* art. II, § 4.
[3] *See id.* art. I, § 3, cl. 7.

As Alexander Hamilton explained in *Federalist No. 65*, impeachment involves "those offenses which proceed from the misconduct of public men, or, in other words, from the abuse or violation of some public trust."[4]  In our nation's history, such offenses have included bribery, abuse of power, obstruction of justice, obstruction of Congress, perjury, and using one's office for personal gain.[5]  Hamilton described impeachment as a "bridle in the hands of the legislative body upon the executive servants of the government."[6]  As an exclusive Congressional authority, impeachment serves as a critical check on the other branches of the federal government.[7]  It also protects our constitutional republic from officers who engage in malfeasance.[8]  After all, once an officer is impeached and convicted, he is automatically removed from office and can be disqualified from ever holding office again.

Given that impeachment is designed, among other things, to protect the American people from corrupt public officials, it makes sense that the Constitution does not limit impeachable offenses to those an officer committed while serving in his current office.  In fact, the Constitution says nothing at all about the timing of impeachable acts.  An officer may be impeached for conduct in a former office as well as his current office.  Indeed, the House has adopted articles of impeachment based on conduct occurring prior to an officer assuming his current position.[9]  As a result, President Biden may be impeached for any impeachable offenses he committed as Vice President in addition to any such offenses he has committed as President.

The purpose of this inquiry—and at this stage, it is just that, an inquiry—is to determine whether sufficient grounds exist for the Committees to draft articles of impeachment against President Biden for consideration by the full House.  This impeachment inquiry will enable the Committees to gather information necessary to assess whether President Biden has engaged in impeachable conduct.[10]  The decision to begin this inquiry does not mean that the Committees

---

[4] *See, e.g.*, The Federalist No. 65 (Hamilton).

[5] *See, e.g.*, H. Rep. No. 100-810, at 1 (1988) (first article explaining a conspiracy where a district court judge took money from criminal defendants and, in return, imposed sentences that did not require incarceration); H.R. Res. 755, 116th Cong. (2019) (abuse of power and obstruction of Congress); H. Rep. No. 105-830, at 32-105 (1998) (describing articles based on perjury, obstruction of justice, and abuse of power); H. Doc. No. 62-1140, at 1701 (1912) ("He [the impeached officer] has prostituted his high office for personal profit.  He has attempted by various transactions to commercialize his potentiality as a judge.").

[6] The Federalist No. 65 (Hamilton).

[7] *See, e.g.*, The Federalist No. 66 (Hamilton) ("[T]he powers relating to impeachments are … an essential check in the hands of [Congress] upon the encroachments of the executive."); *see also* U.S. Const. art. II, § 2, cl. 1 ("The President … shall have Power to grant Reprieves and Pardons for Offenses against the United States, *except in Cases of Impeachment*."  (emphasis added)).

[8] *See, e.g.*, 1 Joseph Story, *Commentaries on the Constitution of the United States* § 803, at 568 (4th ed. 1873) ("[Impeachment] is not so much designed to punish an offender as to secure the state against gross official misdemeanors.  It touches neither his person nor his property, but simply divests him of his political capacity.").

[9] In 1912, the House impeached Judge Robert Archbald, who was a federal district court judge and then a federal circuit court judge.  When the House adopted thirteen articles of impeachment against him, Archbald was a federal circuit court judge, but six articles were based solely on his conduct as a district court judge, and another was based on his conduct both as a district court judge and as a circuit court judge.  More recently, in 2010, the House impeached Judge G. Thomas Porteous, Jr., who was a state court judge before being appointed to the federal bench.  One of the articles of impeachment that the House adopted against him was based solely on events that occurred while Porteous was still a state court judge, and a separate article was based on his conduct both while a state court judge and while a federal judge.

[10] *See, e.g.*, *In re Request for Access to Grand Jury Materials Grand Jury No. 81-1, Miami*, 833 F.2d 1438, 1445 (11th Cir. 1987) ("[The House] holds investigative powers that are ancillary to its impeachment power.").

have reached a conclusion on this question.  As the U.S. Court of Appeals for the District of Columbia Circuit has stated, "To level the grave accusation that a President has committed 'Treason, Bribery, or other high Crimes and Misdemeanors,' U.S. Const. art. II, § 4, the House must be appropriately informed."[11]  And an impeachment inquiry is the traditional means by which the House assembles and evaluates that information.[12]  There is no artificial deadline for concluding this inquiry.  The Committees will follow the facts and will take the necessary time to determine whether articles of impeachment should be drafted and referred to the full House for consideration.

While the full House must vote to adopt any articles of impeachment, the full House need not vote to launch this impeachment inquiry.  The Constitution, which, again, gives the House the sole power of impeachment, includes no requirement that the full House vote to start an impeachment inquiry.  Neither do the Rules of the House of Representatives.  In fact, the House has launched several impeachment inquiries without a full House vote,[13] and four years ago a federal district court expressly rejected the argument that a House resolution is required to begin an impeachment inquiry.[14]

### III.    Basis of Impeachment Inquiry and Information Obtained to Date

The Committees have accumulated significant evidence suggesting that President Biden knew of, participated in, and profited from his family's international business activities.  The evidence further suggests the President may have used certain members of his family—particularly his son, Hunter Biden—to accumulate millions of dollars from foreign individuals and entities for the benefit of his family and himself.  In particular, the Committees have assembled information indicating that President Biden may have: (1) performed official acts or changed United States policy as a direct result of the foreign money received by his family; (2) provided access to his federal office in exchange for his family's receipt of foreign money; and/or (3) knowingly participated in a scheme where foreign business interests were led to believe that they would gain access to him (in his official capacity) if they were to pay substantial amounts of money to his family.  If any of these things did occur, that would

---

[11] *Comm. on Judiciary of U.S. House of Representatives v. McGahn*, 968 F.3d 755, 765 (D.C. Cir. 2020) (en banc).

[12] *See, e.g.*, H. Rep. No. 116-346, at 28 (2019) ("Here, consistent with historical practice, the House divided its impeachment inquiry into two phases, first collecting evidence and then bringing that evidence before the Judiciary Committee for its consideration of articles of impeachment."), https://www.congress.gov/116/crpt/hrpt346/CRPT-116hrpt346.pdf; H. Rep. No. 111-427, at 7 (2010) ("[T]he impeachment inquiry was referred by the Committee on the Judiciary to a Task Force on Judicial Impeachment …, comprised of 12 Committee Members, to conduct the investigation."), https://www.congress.gov/111/crpt/hrpt427/CRPT-111hrpt427.pdf; H.R. Rep. No. 101-8, at 292 (1989) (explaining that the relevant committee reviewed materials that had been compiled in other proceedings and "began its own investigation" "in connection with the impeachment inquiry").

[13] For example, in the 1980s, the full House did not vote to authorize the impeachment inquiries involving Judge Harry Claiborne, Judge Alcee Hastings, or Judge Walter Nixon.  And in 2019, the Speaker of the House announced the beginning of a formal impeachment inquiry into President Trump more than a month before the full House voted to authorize it.

[14] *See In re Application of Comm. on Judiciary*, 414 F. Supp. 3d 129, 168 (D.D.C. 2019) ("Even in cases of presidential impeachment, a House resolution has never, in fact, been required to begin an impeachment inquiry."), *aff'd*, 951 F.3d 589 (D.C. Cir. 2020), *vacated and remanded sub nom. on other grounds DOJ v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021).

constitute a grave abuse of the high office to which the American people have entrusted President Biden.

The evidence also suggests President Biden has attempted to conceal his association with and participation in various foreign business deals his family members arranged to capitalize on his positions of public trust. And during the few instances in which the President has been given an opportunity to explain his role in his family's foreign business deals, the President has either lied or made assertions that are highly implausible in light of the record before the Committees.

The evidence about the Biden family's business practices the Committees have accumulated, and Joe Biden's participation in those activities, is significant and includes bank records, discussions with former business associates, interviews with investigators from the Hunter Biden criminal investigation, and government records from the Department of the Treasury (Treasury Department), National Archives and Records Administration (National Archives), the Federal Bureau of Investigation (FBI), and Internal Revenue Service (IRS). The Committees have also reviewed records abandoned by the President's son, including messages among Biden family members. These messages appear to confirm President Biden has fostered a system in which he uses his family members as agents that offer access to his positions of public trust, influence on American policy, and protection from investigations or prosecution. Moreover, this system appears to not only financially benefit the President's family but also himself. As recently as 2019, Hunter Biden texted a member of his own family "I Hope you all can do what I did and pay for everything for this entire family Fro [sic] 30 years . . . [U]nlike Pop I won't make you give me half your salary."[15]

Devon Archer, a longtime Biden business associate, during an interview with the Oversight Committee, described the Biden "brand" as well as how Hunter Biden placed Joe Biden on phone calls, including on speaker phone, approximately "20 times" with business associates.[16] Rob Walker, another longtime Biden associate, described Joe Biden taking meetings with certain business partners. Archer also explained how then-Vice President Biden sat at dinners with oligarchs who paid his son millions of dollars and met for coffee in Beijing with his son's Chinese business partner. Tony Bobulinski, another Biden associate, has confirmed that Joe Biden was the "big guy" referenced in an email explaining how he and others would divide equity in a joint venture with a corrupt Chinese company. This reference to the "big guy" has been corroborated by reference to Joe Biden as the "big guy" in an FBI document generated prior to the publicization of the email Bobulinski referenced. That same FBI document details a bribery scheme in which the President allegedly participated with his son.

As part of its legislative and oversight work, the Oversight Committee has sought to prevent potential future corruption by a President's or Vice President's family through consideration of legislation aimed at imposing disclosure requirements regarding the financial interests of the family members of Presidents and Vice Presidents. The Oversight Committee has explained its legislative purposes in a series of investigative letters, hearings, and memoranda that also detail through bank records the transfers of funds to the Biden family and its business associates from Ukrainian, Russian, Kazakhstani, Romanian, and Chinese sources.

---

[15] Text message from Hunter Biden to Naomi Biden, Jan. 3, 2019 (7:39 P.M.).
[16] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 29 and 51.

The information and evidence the Committees have gathered establishes a good faith basis to conclude that the President has been dishonest with the American people.  There is significant evidence that the President had involvement in his family's foreign business entanglements and his Administration has taken steps to impede the criminal investigation into his family relating to those entanglements.  For these reasons a formal impeachment inquiry into his role in these matters is appropriate and necessary.  Below is a summary of the evidence accumulated by the Committees to date.

    A.  <u>Summary of the Oversight Committee's Financial Investigation</u>

The Oversight Committee has reviewed Suspicious Activity Reports (SARs) from the Treasury Department related to certain companies and business associates affiliated with the Bidens.[17]  These SARs included detailed banking information that was flagged by financial institutions involving Biden family members and their business associates.

Based in part on information from these SARs, the Oversight Committee has issued subpoenas to six different banks for records related to companies and individuals who conducted business with certain Biden family members and their related companies.  A pattern of incredible financial complexity emerged from Biden associates' bank records and other evidence that spanned from approximately 2014 to 2019.  The Biden family used the corporate bank accounts of third-party associates to receive wires from foreign companies and foreign nationals.  The Biden business associates would then disperse money to various Biden family members in incremental payments over time.  While much of this money went to Hunter Biden's professional corporation, Owasco P.C., and his other bank accounts, other Biden family members and their companies also received significant payments.[18]

During the five-year period from 2014 to 2019, Biden family members and their associates received over $24 million from foreign companies and foreign nationals, with more than $15 million received by the Biden family and $9 million by business associates.[19]  The Committees have not identified legitimate services that would warrant the lucrative payments from these foreign sources.

---

[17] Letter from Hon. James Comer, Chairman, H. Comm. on Oversight & Accountability, to Hon. Janet Yellen, Secretary, U.S. Dep't of Treasury (Jan. 11, 2023).

[18] The Oversight Committee has identified specific companies that require further investigation based on the financial documents that revealed a pattern of influence peddling and serious ethics issues.  Some of these entities are discussed in detail below and include Owasco P.C; Owasco, LLC; Rosemont Seneca Partners, LLC; Rosemont Seneca Advisors, LLC; Skaneateles, LLC; Hudson West III, LLC; Hudson West V, LLC; Robinson Walker, LLC; Rosemont Seneca Bohai, LLC; Rosemont Seneca Thornton, LLC; Lion Hall Group, LLC; and JBBSR, INC.

[19] Memorandum (Mar. 16, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: New Evidence Resulting from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes; Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes; Memorandum (Aug. 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes.

B.  <u>Biden Influence Peddling with Ukrainian, Russian, and Kazakhstani Companies and Nationals</u>

*(i)      Influence Peddling in Ukraine and Payments from Burisma*

With regard to Ukraine, the Oversight Committee has developed a significant body of evidence consisting of financial records and testimony to suggest then-Vice President Biden's family used his position as Vice President to accumulate millions of dollars from Burisma, a company then implicated in a years-long corruption investigation conducted by Ukrainian authorities.  The evidence also indicates that then-Vice President Biden took official action that had the effect of benefiting Burisma.  The evidence the Oversight Committee has developed through testimony and bank records is bolstered by an FBI FD-1023 form that alleges the President directly participated in a bribery scheme.

*(ii)     Financial Records and Testimony Regarding Burisma Payments*

Hunter Biden joined Burisma as counsel in early 2014 and assumed a position on the board of directors by April/May 2014.[20]  Devon Archer testified that Hunter Biden became a member of the board of directors after a meeting in Lake Como, Italy, with Vadym Pozharsky, Burisma's corporate secretary, and Mykola "Nikolay" Zlochevsky, Burisma's president.[21]  Pozharsky often communicated with Biden/Archer on behalf of Zlochevsky.[22]

For their positions on the board of Burisma, Hunter Biden and Devon Archer were each paid $1 million per year, equating to each receiving approximately $83,333 per month.[23]  For 2014 and 2015, Hunter Biden and Devon Archer received approximately $3.32 million.  Based on IRS whistleblower testimony provided to the Ways and Means Committee, Hunter Biden and Devon Archer earned $6.5 million from Burisma.[24]  This finding is consistent with the Oversight Committee's financial investigation thus far.  Money wired by Burisma to the Rosemont Seneca Bohai account was often later transferred to Hunter Biden directly and his professional corporation, Owasco, P.C., in small increments.[25]  Hunter Biden did not have any relevant qualifications for serving on the board of a Ukrainian energy company (other than his connection to his father).

In February 2015, Viktor Shokin became the prosecutor general of Ukraine, inheriting an ongoing investigation of Burisma's President.[26]  Devon Archer testified about how Burisma faced "government pressure from [the] Ukrainian Government investigations into Mykola, et cetera."[27]  On December 4, 2015, the Burisma board of directors met in Dubai.[28]  After that

---

[20] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 19.

[21] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 17.

[22] *See, e.g.*, Email from Vadym Pozharsky to Hunter Biden dated May 7, 2014 ("Dear Hunter…[G]ood luck to you in China, will convey your message to Nikolay.").

[23] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 18.

[24] *See* Transcript of Special Agent, Internal Revenue Service, H. Comm. on Ways and Means, at 99.

[25] Memorandum (August 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 16.

[26] Oleg Sukhov, *Political survivor Shokin takes over general prosecutor office;* Kyiv Post (Feb. 10, 2015).

[27] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 34.

[28] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 31.

meeting, Hunter Biden was asked to alleviate "pressure" Burisma was facing from the Ukrainian government's investigation into Zlochevsky, and Hunter Biden "called D.C."[29]  Five days later—on December 9, 2015—Vice President Biden delivered a speech to the Verkhovna Rada (the Ukrainian parliament), in which he claimed the "Office of the General Prosecutor desperately needs reform."[30]  Indeed, on the flight to Ukraine, Vice President Biden reportedly "called an audible" and "changed the plan" regarding the Obama-Biden Administration's policy concerning the renewal of a $1 billion loan guarantee for Ukraine, making it contingent upon the firing of Shokin, which could help alleviate some of the pressure that Burisma was getting from Ukraine's government.[31]

In March 2016, the Rada voted to remove Shokin despite "veteran observers of Ukrainian politics [saying] that the prosecutor . . . had played an important role in balancing competing political interests, helping maintain stability during a treacherous era in the divided country's history."[32]  In a 2018 public appearance before the Council on Foreign Relations, Joe Biden described these events—albeit with inaccuracy regarding certain details:

> I'm desperately concerned about the backsliding on the part of Kiev in terms of corruption.  They made—I mean, I'll give you one concrete example.  I was—not I, but it just happened to be that was the assignment I got.  I got all the good ones.  And so I got Ukraine.  And I remember going over, convincing our team, our leaders to—convincing that we should be providing for loan guarantees.  And I went over, I guess, the 12th, 13th time to Kiev.  And I was supposed to announce that there was another billion-dollar loan guarantee.  And I had gotten a commitment from Poroshenko and from Yatsenyuk that they would take action against the state prosecutor.  And they didn't.

> So they said they had—they were walking out to a press conference.  I said, nah, I'm not going to—or, we're not going to give you the billion dollars.  They said, you have no authority.  You're not the president.  The president said—I said, call him.  I said, I'm telling you, you're not getting the billion dollars.  I said, you're not getting the billion. I'm going to be leaving here in, I think it was about six hours.  I looked at them and said: I'm leaving in six hours.  **If the prosecutor is not fired, you're not getting the money. Well, son of a bitch. He got fired. And they put in place someone who was solid at the time.**[33]

The "solid" new prosecutor general of Ukraine who replaced Viktor Shokin was Yuriy Lutsenko, who was not a lawyer and whose "one shining qualification appeared to be his loyalty

---

[29] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 34, 36.
[30] Remarks by Vice President Joe Biden to The Ukrainian Rada, Dec. 9, 2015, The White House, *available at* https://obamawhitehouse.archives.gov/the-press-office/2015/12/09/remarks-vice-president-joe-biden-ukrainian-rada.
[31] Glenn Kessler, *Inside VP Biden's linking of a loan to a Ukraine prosecutor's ouster*, Wash. Post (Sep. 15, 2023).
[32] Andrew E. Kramer, *Ukraine Ousts Viktor Shokin, Top Prosecutor, and Political Stability Hangs in the Balance*, N.Y. Times (March 29, 2016).
[33] *Foreign Affairs Issue Launch with Former Vice President Joe Biden*, Council on Foreign Relations (Jan. 23, 2018) (emphasis added).

to [President Petro Poroshenko]."[34]  Within a year of the elevation of Lutsenko, Ukrainian prosecutors closed the investigation of Zlochevsky.[35]

In addition to this sudden change in the Obama-Biden Administration's strategy regarding Ukraine, Vice President Biden provided further value to his family's business associates by protecting them from anti-corruption efforts.  Devon Archer testified that "people would be intimidated to mess with [Burisma]….legally" because of the Biden "brand."[36]  During the transcribed interview with Devon Archer, he described the Biden "brand" and its value to a company such as Burisma:

> Q:        You keep saying "the brand," but by "brand" you mean the Biden family, correct?
>
> A:        Correct.
>
> Q:        And that brand is what, in your opinion, was the majority of what the value that was delivered from Hunter Biden to Burisma?
>
> A:        I didn't say majority, but I wouldn't speculate on percentages. But I do think that was an element of it.
>
> Mr. Biggs:  When you say "Biden family" – sorry to cut in here.  I just want to get a clarification.
>
>              You aren't talking about Dr. Jill or anybody else.  You're talking about Joe Biden. Is that fair to say?
>
> A:        Yeah, that's fair to say.  Listen, I think it's – I don't think about it as, you know, Joe directly, but it's fair.  That's fair to say.  Obviously, that brought the most value to the brand.[37]

On April 16, 2015, Hunter Biden, Devon Archer, and Vice President Joe Biden attended a private dinner at Café Milano in Washington, D.C. with Vadym Pozharsky (a Burisma executive) and others.[38]

Additional information about the Ukrainian payments can be found in the Third Bank Records Memorandum released by the Oversight Committee.

---

[34] Oleg Sukhov, *Powerful suspects escape justice on Lutsenko's watch*, Kyiv Post (April 13, 2018).
[35] Oleg Sukhov, *Powerful suspects escape justice on Lutsenko's watch*, Kyiv Post (April 13, 2018).
[36] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 105.
[37] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 29-30.
[38] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 66.

(iii)    *FBI FD-1023 Form*

A June 30, 2020 FBI FD-1023 form subpoenaed by the Oversight Committee alleges that President Biden directly participated in a bribery scheme involving Burisma.  The confidential human source (CHS) who provided its contents has been developed and trusted by the FBI since the Obama-Biden Administration and was paid significant money for the information he or she provided.

The FD-1023 form provides a detailed description of two in-person meetings and telephone calls between the CHS and Burisma executives and/or then-president of Burisma, Mykola Zlochevsky over the course of several years.  The first meeting described in the FD-1023 form allegedly occurred in late 2015 or 2016.  During that meeting with Burisma employee Vadym Pozharsky and others, Pozharsky stated that members of the Burisma board of directors included former Polish President Aleksander Kwasniewski and Hunter Biden.  Pozharsky allegedly said Hunter Biden was hired to "protect us, through his dad, from all kinds of problems[.]"[39]  He also allegedly indicated that Hunter Biden "was not smart" and Burisma therefore wanted to get additional counsel to advise on whether Burisma should purchase a United States oil and gas business.[40]

In 2016, the FD-1023 form details that the CHS traveled to Vienna, Austria, and met with Zlochevsky.[41]  During that meeting, the CHS advised against an initial public offering for Burisma in the United States due to an ongoing Ukrainian corruption investigation focused on Burisma, led by then-Prosecutor General Viktor Shokin.  Zlochevsky replied something to the effect of, "Don't worry Hunter will take care of all of those issues through his dad."[42]  During this conversation, Zlochevsky allegedly told the CHS he had paid $5 million to two Bidens and that both Hunter Biden and Joe Biden had told Zlochevsky to hire Hunter Biden to the board of directors.[43]  The CHS understood the conversation to mean Zlochevsky "already had paid the Bidens, presumably to 'deal with Shokin.'"[44]

In 2016 or 2017, the CHS again spoke by phone with Zlochevsky.  Zlochevsky stated he was not happy about the outcome of the 2016 U.S. presidential election because of his association with the Bidens.  Zlochevsky stated "he didn't want to pay the Bidens and he was 'pushed to pay' them."[45]  Zlochevsky stated he had "many text messages and 'recordings' that show he was coerced to make such payments[.]"[46]

In 2019, the CHS again spoke with Zlochevsky over the phone.[47]  The CHS stated Zlochevsky could face difficulty explaining suspicious wire transfers "that may evidence any (illicit) payments to the Bidens."[48]  Zlochevsky stated that he did not directly transfer funds to

---

[39] FBI Form FD-1023 (dated June 30, 2020), at 1.
[40] *Id.*
[41] FBI Form FD-1023 (dated June 30, 2020), at 1-2.
[42] FBI Form FD-1023 (dated June 30, 2020), at 2.
[43] *Id.*
[44] *Id.*
[45] *Id.*
[46] *Id.*
[47] FBI Form FD-1023 (dated June 30, 2020), at 3.
[48] *Id.* (Parenthetical in original).

the "Big Guy," which the CHS understood to mean Joe Biden, but used a series of transactions that would take investigators years to trace.[49]

### (iv)   Payment from Russia

On December 6, 2013, a bank account for a company called Rosemont Seneca Thornton was opened and listed Devon Archer and Rosemont Seneca Partners as beneficiaries of the account.[50]  Hunter Biden, through his stake in Rosemont Seneca Partners, was a beneficiary of funds deposited in the Rosemont Seneca Thornton bank account.  On February 13, 2014, Rosemont Seneca Bohai, LLC (Rosemont Seneca Bohai) was opened in Delaware.[51]  Devon Archer confirmed to the Committee that he and Hunter Biden were 50-50 owners of Rosemont Seneca Bohai.[52]

The next day, on February 14, 2014, the Russian oligarch Yelena Baturina—the wealthiest woman in Russia at the time,[53] and then married to the former Mayor of Moscow— wired the Rosemont Seneca Thornton bank account $3.5 million.[54]  On March 11, 2014, Rosemont Seneca Thornton transferred $2,752,711 to a Rosemont Seneca Bohai account.[55]  In early February 2014—around the time of Baturina's transfer of $3.5 million into the Rosemont Seneca Thornton bank account—Devon Archer, Hunter Biden, and Vice President Biden had dinner with Yelena Baturina and others at Café Milano in Washington, D.C.[56]  There is no evidence that Hunter Biden performed any legitimate service in exchange for the money that Baturina sent to companies affiliated with him.

Following Russia's invasion of Ukraine in 2022, the Biden Administration placed several Russian oligarchs on the public sanctions list.  Notably, Yelena Baturina was not on the list.[57]

Additional information about the Russian payment can be found in the Third Bank Records Memorandum released by the Oversight Committee.

---

[49] Id.

[50] Memorandum (August 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 6.

[51] OpenCorporates.com, Rosemont Seneca Bohai, LLC, https://opencorporates.com/companies/us_de/5481769 (last accessed Aug. 8, 2023).

[52] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 64.

[53] Владелица Wildberries стала богатейшей россиянкой по версии Forbes, Forbes ru (Feb. 20, 2020), https://www.forbes.ru/milliardery/393387-vladelica-wildberries-stala-bogateyshey-rossiyankoy-po-versii-forbes.

[54] Memorandum (August 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 8.

[55] Memorandum (August 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 8.

[56] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 46.

[57] John Hyatt, The Russian Oligarch Billionaires Who Haven't Been Sanctioned, Forbes (April 7, 2022).

(v)     *$142,300 Sportscar from Kazakhstan*

On February 5, 2014, an email indicates Hunter Biden met Kazakhstani oligarch Kenes Rakishev at the Hay Adams Hotel in Washington, D.C.[58]  Rakishev was a Kazakhstani oligarch and director of Kazakhstan's state-owned oil company KazMunayGas.[59]  Rakishev maintained ties to Karim Massimov,[60] who became the prime minister on April 2, 2014.[61]  In email correspondence with Biden business associate Devon Archer surrounding the meeting, Rakishev requested that Secretary of State John Kerry visit Kazakhstan.[62]  Devon Archer replied, "If we have some business started as planned I will ensure its [sic] planned soonest."[63]  The Oversight Committee continues to investigate the details of Secretary Kerry's eventual visit to Kazakhstan in November 2015.[64]

On April 22, 2014, Rakishev used his Singaporean entity, Novatus Holdings, to wire the Rosemont Seneca Bohai bank account $142,300.[65]  The next day, the exact same amount was wired out to a car dealership in New Jersey for an expensive sportscar for Hunter Biden.  After receiving the payment for the sportscar, in May and June of 2014, Hunter Biden and Devon Archer represented Burisma on a trip to Kazakhstan to evaluate a deal between Burisma and KazMunayGas.[66]

In early 2014, Devon Archer, Hunter Biden, and Vice President Biden had dinner with Kenes Rakishev and Karim Massimov and others at Café Milano in Washington, D.C.[67]  Massimov would also attend the April 16, 2015, dinner with Hunter Biden, Devon Archer, Vice President Biden, and others.[68]

Additional information about the Kazakhstani payment can be found in the Third Bank Records Memorandum released by the Oversight Committee.

## C.  Biden Influence Peddling in Romania

On May 21, 2014, then Vice President Biden visited Romania and delivered a speech addressed to the Romanian Prime Minister, judges, prosecutors, and leaders of the parliament.[69]  During his speech, Vice President Biden stated the following:

---

[58] Email from Kenes Rakishev to Hunter Biden and Devon Archer dated February 5, 2014.

[59] *Ракишев Кенес Хамитович*, https://kapital.kz/dossier/rakishev-kenes.

[60] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 63.

[61] Raushan Nurshayeva, *Masimov returns as Kazakh PM to face economic crisis*, Reuters (Apr. 2, 2014), https://www.reuters.com/article/us-kazakhstan-government/masimov-returns-as-kazakh-pm-to-face-economic-crisis-idUSBREA311AI20140402.

[62] Email from Kenes Rakishev to Hunter Biden and Devon Archer dated February 5, 2014.

[63] Email from Devon Archer to Kenes Rakishev, copying Hunter Biden dated February 5, 2014.

[64] *See, e.g.*, Matt Spetalnick, *Kerry courts Kazakh leader as U.S. eyes stronger Central Asia ties*, Reuters (Nov. 2, 2015).

[65] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 61-62.

[66] Email from Devon Archer to Hunter Biden and Vadym Pozharsky dated May 7, 2014.

[67] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 46.

[68] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 45.

[69] Remarks by vice President Joe Biden to Romanian Civil Society Groups and Students (Cotroceni Palace, Bucharest, Romania), The White House – Office of the Vice President (May 21, 2014), *available at*

Corruption is a cancer, a cancer that eats away at a citizen's faith in democracy, diminishes the instinct for innovation and creativity; already-tight national budgets, crowding out important national investments. It wastes the talent of entire generations. It scares away investments and jobs. And most importantly it denies the people their dignity. It saps the collective strength and resolve of a nation. Corruption is just another form of tyranny.

*And corruption can represent a clear and present danger not only to a nation's economy, but to its very national security*.[70]

In 2014 and 2015, one of the most high-profile corruption prosecutions in Romania revolved around Gabriel Popoviciu.[71] On September 28, 2015, Vice President Biden welcomed Romanian President Klaus Iohannis to the White House.[72] During the meeting, Vice President Biden discussed anti-corruption issues and promoting the rule of law to strengthen Romania's national security.[73] Within approximately five weeks of this meeting, Bladon Enterprises Limited (Bladon Enterprises) began making deposits into the bank account of Robinson Walker, LLC.[74] Robinson Walker, LLC was formed by longtime Biden business associate John "Rob" Walker. Bladon Enterprises is reported to be Gabriel Popoviciu's company used to conduct business in Romania.[75]

From November 2015 to May 2017, Bladon Enterprises paid Robinson Walker, LLC over $3 million.[76] Biden family accounts then received approximately $1.038 million from the Robinson Walker, LLC account after the Bladon Enterprises deposits.[77] The recipients of the money from the Bladon Enterprises deposits included EEIG (James Gilliar), Hunter Biden, Hallie Biden, Owasco, P.C., and an unknown Biden bank account.[78] These payments appear to be separate from any legal fees Hunter Biden received through the law firm, Boies Schiller, as

---

https://obamawhitehouse.archives.gov/the-press-office/2014/05/21/remarks-vice-president-joe-Biden-romanian-civil-society-groups-and-stude.

[70] *Id.* (emphasis added).

[71] Laura Strickler & Rich Schapiro, *Hunter Biden's legal work in Romania raises new questions about his overseas dealings*, NBC News (Oct. 24, 2019).

[72] The White House, Office of the Vice President, Readout of the Vice President's Meeting with Romanian President Klaus Iohannis (Sept. 28, 2015).

[73] The White House, Office of the Vice President, Readout of the Vice President's Meeting with Romanian President Klaus Iohannis (Sept. 28, 2015).

[74] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 12.

[75] *Romanian investor develops large residential complex in office area* (Oct. 6, 2016), *available at* https://www.romania-insider.com/romanian-investor-develops-large-residential-complex-office-area.

[76] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 12.

[77] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 12.

[78] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 12.

the payments were directly from Rob Walker's company. The Oversight Committee has not identified legitimate services that would warrant these lucrative payments to Biden family members.

Additional information about Romanian payments can be found in the Second Bank Records Memorandum released by the Oversight Committee.

D.   Joe Biden and His Family Have Had Financial Dealings with Concerning Chinese Nationals, and Joe Biden Has Made False Statements About Those Entanglements

On October 22, 2020, President Biden (then a candidate) answered a question about whether there was anything inappropriate or unethical about his son's business dealings in Ukraine or China. President Biden denied that his son or anybody else from his family had received money from China and stated:

> My son has not made money in terms of this thing about, what are you talking about, China. I have not had—the only guy who made money from China is this guy [Donald Trump]. He's the only one. _Nobody else has made money from China_.[79]

Evidence shows this was not true. In fact, the evidence demonstrates Joe Biden knew his statement was false. Evidence indicates President Biden has participated in his family's dealings with Chinese entities. All of this raises questions about why President Biden concealed his family's involvement with certain Chinese nationals and companies and whether any of his official acts have been influenced by these prior business interactions and/or concern that evidence regarding his family's business dealings with China could be released.

_(i)      CEFC China Energy and Related Chinese Companies_

CEFC China Energy (CEFC) was a Chinese energy conglomerate that quickly rose from obscurity to becoming one of China's largest ostensibly private companies. CEFC was closely affiliated with China's Belt and Road Initiative, and its chairman, Ye Jianming, told Chinese media that CEFC "aims to serve the state's strategy."[80] By 2017, Chairman Ye had "transformed [CEFC] from a little-known fuel trader to a fast-expanding oil and finance giant with assets in Europe, the Middle East, Central Asia and Africa."[81] Chairman Ye and CEFC reportedly had connections to the Chinese military.[82] Though it was in theory a private company, CEFC "has layers of Communist Party committees, which are usually staples of state-owned enterprises."[83]

The Bidens' introduction to CEFC began while Joe Biden was Vice President, in late 2015, when Vuk Jeremic—a Serbian politician and recipient of millions of dollars from CEFC

---

[79] Justin McCormack, _Biden at Last Presidential Debate: 'My son Has not Made Money' from China,'_ Nat'l Review (Dec. 10, 2020) (emphasis added).
[80] Ji Tianqin & Han Wei, _In Depth: Investigation Casts Shadow on Rosneft's China Investor CEFC_, Caixin Global (March 1, 2018).
[81] Ji Tianqin & Han Wei, _In Depth: Investigation Casts Shadow on Rosneft's China Investor CEFC_, Caixin Global (March 1, 2018).
[82] _See, e.g.,_ "The Belt, The Road And The Money," Transcript, NPR (Apr. 20, 2018).
[83] Ji Tianqin & Han Wei, _In Depth: Investigation Casts Shadow on Rosneft's China Investor CEFC_, Caixin Global (March 1, 2018).

related entities[84]—invited Hunter Biden to attend a "private dinner" with Chairman Ye.[85] Principals of CEFC who engaged in business with the Bidens were the subjects of corruption arrests and prosecutions. According to the U.S. Department of Justice (DOJ or Department), Chairman Ye used CEFC to bribe and corruptly influence foreign officials. One of Chairman Ye's agents in the United States and abroad—Patrick Ho—was convicted of international bribery and money laundering offenses because of his work for CEFC in Africa.[86] DOJ referenced part of Chairman Ye's role in that bribery scheme in a press release:

> HO also advised his boss, Ye Jianming, the then-chairman of CEFC China, to provide $500,000 in cash to [President of Uganda Yoweri] Museveni, ostensibly as a campaign donation, even though Museveni, had already been reelected. HO intended these payments to influence [Uganda Minister of Foreign Affairs Sam] Kutesa and Museveni to use their official power to steer business advantages to CEFC China.[87]

On March 1, 2017, State Energy HK Limited, a company affiliated with Chairman Ye, sent a wire to Robinson Walker, LLC for $3 million.[88] John "Rob" Walker was a longtime Biden business associate who formed Robinson Walker, LLC in Delaware.[89] The day after receiving the $3 million wire from China, Robinson Walker, LLC sent a wire to EEIG, a company associated with James Gilliar, in Abu Dhabi for $1.065 million.[90] Over the next approximately three months, Robinson Walker, LLC sent 16 incremental payments totaling $1,065,692 to various Biden family members and their corporate accounts: Hunter Biden, Hunter Biden's professional corporation, Owasco, P.C., one of James Biden's companies (JBBSR Inc.), Hallie Biden, and an unknown Biden account.[91] The Committee can identify no legitimate services rendered by these individuals or legitimate reason for payments being made in this manner.

After the Oversight Committee revealed the payments from China, President Biden continued making false statements. On March 18, 2023, in response to a reporter's question

---

[84] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 19 and 29.

[85] Email from Vuk Jeremic to Eric Schwerin, Dec. 1, 2015 (11:14 A.M.).

[86] U.S. Dep't of Justice, *Patrick Ho, Former Head of Organization Backed by Chinese Energy Conglomerate, Sentenced to 3 Years in Prison for International Bribery and Money Laundering Offenses*, U.S. Attorney's Offices (Southern District of New York), Mar. 25, 2019.

[87] *Id.*

[88] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 31.

[89] *See* Memorandum (Mar. 16, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: New Evidence Resulting from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes.

[90] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 31.

[91] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 31.

regarding the over $1 million paid to the Biden family from this Chinese company, President Biden claimed, "That's not true."[92]

However, President Biden not only knew of his family's business practices in China; evidence indicates he participated in them.  On December 8, 2020, the FBI and IRS conducted a recorded interview of Rob Walker.  A transcript of that interview confirmed that Joe Biden met with individuals from CEFC:

| | |
|---|---|
| FBI Agent: | Okay. Did um .., did the V.P. ever show up at any CEFC meeting or anything like that.., even once he was out of office? |
| Walker: | Yes. |
| FBI Agent: | Okay. |
| Walker: | It was out-of-office.  Ah, we were in ah.., D.C. at the Four Seasons… |
| IRS Agent: | Hmph hmph. |
| Walker: | …and ah.., we were having lunch and he.., he stopped in… |
| IRS Agent: | Hmph hmph. |
| Walker: | …then he'd ah, leave. |
| FBI Agent: | Okay. |
| Walker: | That was it. |
| FBI Agent: | Just said hello to everybody and then… |
| Walker: | Yes. |
| FBI Agent: | …took off? |
| Walker: | He literally sat down. I don't even think he drank water. I think Hunter said um.., I may be tryin' to start a company, ah, or tried to do something with these guys and could you.., and think he was like "if I'm around" …. and he'd show up. |
| FBI Agent: | Okay. So I mean you definitely got the feeling that, that was orchestrated by Hunter to.., to have like a.., an appearance by his Dad at that meeting just to kind of.., |

---

[92] Chris Pandolfo, Biden denies $1M in payments to family from Hunter associate, despite bank records: 'Not true', Fox News (Mar. 18, 2023).

| Walker: | Hmph hmph. |
| FBI Agent: | …bolster your chances at… |
| Walker: | Hmph hmph. |
| FBI Agent: | …makin' a deal work out. |
| Walker: | Sure. |
| FBI Agent: | Okay. Um.., any other… So that was the…, ah.., Four Seasons in D.C. after he was out of office? |
| Walker: | Yeah. |
| FBI Agent: | Um, where… Any times when he was in office or did you hear Hunter say that he was settin' up a meeting with his dad with them while dad was still in office? |
| Walker: | Yeah.[93] |

The President's statement that the Oversight Committee's bank records were "not true" is false and even more egregious, given evidence that he stood to profit directly from the arrangement. Originally—in early 2017—the deal with CEFC included other associates of Hunter Biden and James Biden, namely: Rob Walker, Tony Bobulinski, and James Gilliar. Bobulinski has spoken publicly about meeting with Joe Biden in 2017 about the CEFC deal.[94] On May 13, 2017, Gilliar wrote in an email to Bobulinski (copying Rob Walker and Hunter Biden): "At the moment there s [sic] a provisional agreement that the equity will be distributed as follows[:] 20 H[;] 20 RW[;] 20JG[;] 20 TB[;] 10 Jim[;] 10 held by H for the big guy?"[95] A week after Gilliar's email, Gilliar wrote Bobulinski, "Don't mention Joe being involved, it's only when u are face to face, I know u know that but they are paranoid[.]"[96]

The original equity structure for the joint venture with CEFC was changed to remove Gilliar, Walker, and Bobulinski, with only Hunter Biden and James Biden remaining of the original group.[97] Joe Biden's participation in the venture appears to have continued. In one WhatsApp message dated July 30, 2017, Hunter Biden wrote to a CEFC business associate, "I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled."[98] He continued:

---

[93] Transcript of recorded interview with Rob Walker, Dec. 8, 2020, at 81-82.

[94] *See, e.g.*, Brian Flood, *Tony Bobulinski tells Tucker Carlson Joe Biden was 'chairman' of Hunter Biden's overseas business dealings*, Fox News (Oct. 4, 2022). https://www.foxnews.com/media/tony-bobulinski-tucker-carlson-joe-biden-chairman-hunter-biden-overseas-business-dealings.

[95] Email from James Gilliar to Tony Bobulinski, May 13, 2017 (6:48 A.M.), copying Rob Walker and Hunter Biden.

[96] Message from James Gilliar to Tony Bobulinski, May 20, 2017.

[97] Transcript of recorded interview with Rob Walker, Dec. 8, 2020, at 83.

[98] WhatsApp message, dated July 30, 2017, between Hunter Biden and Associate, provided in testimony provided by Mr. Gary Shapley to the H. Comm. on Ways & Means (May 26, 2023).

Tell the director that I would like to resolve this now before it gets out of hand. And now means tonight…. [I]f I get a call or text from anyone involved in this other than you, Zhang, or the Chairman I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction.[99]

After the CEFC associate responded, Hunter Biden said again: "I am sitting here waiting for the call with my father. I sure hope whatever it is you are doing is very very very important."[100]  The next day, the CEFC associate sent a message stating, "CEFC is willing to cooperate with the family."[101]  Then, on August 3, 2017, Hunter Biden wrote "The Biden's [sic] are the best I know at doing exactly what the Chairman wants from this partnershipn [sic]."[102]

Bank records obtained by the Oversight Committee establish that on August 4, 2017—the day after Hunter Biden's WhatsApp message above—CEFC Infrastructure Investment (US) (CEFC Infrastructure) wired $100,000 to Hunter Biden's professional corporation, Owasco, P.C. The Committee was able to trace this money to a Chinese company and Chinese national, Gongwen "Kevin" Dong.[103]

On August 2, 2017, CEFC (through Hudson West V) and Hunter Biden (through Owasco, P.C.) established another company, Hudson West III, LLC.[104]  Dong and Biden were each 50 percent owners of Hudson West III.[105]  Bank records show between August 2017 and October 2018, Hudson West III sent over $4 million to Hunter Biden-related companies and over $75,000 to a James Biden company, Lion Hall Group, LLC.[106]

The next month, on September 21, 2017, Hunter Biden wrote an email to the general manager of the House of Sweden, a building in Washington, D.C., in which he requested "keys [be] made available for new office mates: Joe Biden Jill Biden Jim Biden Gongwen Dong (Chairman Ye CEFC emissary)[.]"[107]  Hunter Biden also requested "the office sign ton [sic]

---

[99] *Id.*

[100] *Id.*

[101] WhatsApp message, dated July 31, 2017, between Hunter Biden and Associate, provided in testimony provided by Mr. Gary Shapley to the H. Comm. on Ways & Means (May 26, 2023).

[102] WhatsApp message, dated August 3, 2017, between Hunter Biden and Associate, provided in testimony provided by Mr. Gary Shapley to the H. Comm. on Ways & Means (May 26, 2023).

[103] Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes, at 23.

[104] Amended and Restated Limited Liability Company Agreement of Hudson West III, LLC between Hudson West V, LLC and Owasco, P.C. (Aug. 2, 2017).  Executed by Dong Gongwen, President, and R. Hunter Biden, Co-Chairman (*See* Schedule I, showing Hudson West V, LLC as 50 percent equity holder and Owasco, P.C. as 50 percent equity holder), *available at* https://www.grassley.senate.gov/imo/media/doc/2.%20Hudson%20West%20III%20LLC%20Agreement.pdf.

[105] *Id.*

[106] Letter from Hon. Charles E. Grassley, Ranking Member, S. Comm. on the Judiciary, and Hon. Ron Johnson, Ranking Member, Perm. Subcomm. On Investigations to Hon. David Weiss, U.S. Att'y (D. Del.), U.S. Dep't of Justice (Oct. 26, 2022), *available at* https://www.grassley.senate.gov/imo/media/doc/grassley_johnson_to_us_attorney_weiss_-_hunter_biden_investigation.pdf.

[107] E-mail from Hunter Biden to House of Sweden management (Sep. 21, 2017) (parenthetical in original).

reflect the following[:] The Biden Foundation Hudson West (CEFC US)[.]"[108]  Hunter Biden then provided the personal phone number of Joe Biden, to whom Hunter Biden refers as his "partner" along with Dong and Jim Biden.[109]  The management was told to call Joe Biden if they chose.[110]  In 2018, Chairman Ye was detained by Chinese authorities, and it was initially reported by Chinese media that his "detention in China was ordered directly by the Chinese president, Xi Jinping."[111]

All of the evidence reviewed above indicates that CEFC officials may have targeted certain Biden family members for their connections to Joe Biden.  The Biden family profited from these lucrative financial arrangements, and this raises questions about whether this money, and/or concerns that Chinese sources may release additional evidence about these business relationships with the Biden family, have had any impact on official acts performed by President Biden or United States foreign policy.

Additional information about CEFC payments can be found in the First Bank Records Memorandum and the Second Bank Records Memorandum released by the Oversight Committee.

(ii)    *BHR Partners and Jonathan Li*

As outlined below, President Biden became familiar with another of Hunter Biden's business associates in China, Jonathan Li, while he was Vice President.  Jonathan Li was affiliated with a Chinese government-linked private-equity fund, Bohai Capital.[112]  On December 16, 2013, Bohai Harvest RST (Shanghai) Equity Investment Fund Management Co., Ltd. (BHR Partners) was formed, a venture between Rosemont Seneca Thornton, a Biden-affiliated business, and Chinese entities.[113]

On July 31, 2023, the Oversight Committee conducted a transcribed interview of Devon Archer, who discussed Vice President Biden's interactions with Jonathan Li.[114]  In December 2013, then-Vice President Biden and Hunter Biden traveled on Air Force Two to China.[115] Devon Archer stated Vice President Biden had coffee with Jonathan Li in Beijing:

---

[108] *Id.* (parenthetical in original).

[109] *Id.*

[110] *Id.*

[111] Eric Ng & Xie Yu, *China detains CEFC's founder Ye Jianming, wiping out US $153 million in value of stocks*, S. China Morning Post, Mar. 1, 2018, available at
https://web.archive.org/web/20180301105430/https://www.scmp.com/business/companies/article/2135238/china-detain-cefc-founder-ye-jianming-stocks (accessed Apr. 27, 2023).

[112]  Adam Entous, *Will Hunter Biden Jeopardize His Father's Campaign? Joe Biden's son is under scrutiny for his business dealings and tumultuous personal life, The New Yorker* (July 1, 2019); Report (September 23, 2020), S. Comm. on Homeland Security and Governmental Affairs and U.S. Senate Committee on Finance From Maj. Comm. staff to Comm. Members. Re: Hunter Biden, Burisma, and Corruption: The Impact on U.S. Government Policy and Related Concerns, at 3.

[113] National Enterprise Credit Information Publicity System Records for Bohai Huamei (Shanghai) Equity Investment Fund Management Co., Ltd.

[114] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023).

[115] The Vice President's 2013 Asia Trip – Japan, China and the Republic of Korea, The White House, *available at* https://obamawhitehouse.archives.gov/issues/foreign-policy/asia-trip-2013.

Q:     Jonathan Li –

A:     Yes.

Q:     – that call, was that an inbound call, an outbound call? To the extent you remember.

A:     Yeah, to the extent I remember, that – I don't know, but I know there was a "hello."  There was, like – you know, they ended up having coffee, I think, so he might've known him.

Q:     Jonathan –

A:     Jonathan Li and President Biden had coffee.  So it might've been, like, after they had coffee, and he was saying hello, so there was, like, some familiarity.

Q:     Where was that, that they had coffee?

A:     They had coffee in Beijing.[116]

Devon Archer also stated that Vice President Biden wrote a college admission letter for Jonathan Li's daughter.[117]  The Oversight Committee has also identified an email indicating Joe Biden, after his vice presidency, wrote a recommendation letter for Jonathan Li's son to attend Brown University.[118]  Vice President Biden knew Jonathan Li, met with him, had at least one phone call with him, and wrote college recommendation letters for his children.

Additional information about BHR Partners and Jonathan Li will be released in a future Oversight Committee Bank Records Memorandum.

---

[116] *Id.* at 124.
[117] *Id.* at 125-126.
[118] Email from Jonathan Li to Eric Schwerin copying Hunter Biden, James Bulger, and Devon Archer dated Feb. 20, 2017.

E. Obstruction of Investigation of President Biden's Son, Including Biden Family
   Business Dealings, by His Own Administration

   *(i)   Testimony of IRS Whistleblowers*

Two whistleblowers from the IRS came forward to the Ways and Means Committee to provide protected disclosures about a sensitive, high-profile matter.  That high-profile matter is an investigation into whether Hunter Biden committed tax-related crimes and other federal offenses.  The investigation, which looked into Hunter Biden's financial dealings, implicated transactions that involved foreign entities like Burisma, among others, and Hunter Biden.  In addition to providing information relevant to the Oversight Committee's investigation, the IRS whistleblowers raised grave concerns that certain people within DOJ, and potentially within the IRS, have sought to hinder, obstruct, and sabotage the investigation by David Weiss, U.S. Attorney for the District of Delaware, of the President's son, Hunter Biden, an investigation that could implicate Joe Biden in his son's foreign business dealings.  The whistleblowers also alleged that DOJ and IRS officials have retaliated against the whistleblowers for raising these concerns to Congress.  The actions by DOJ and the IRS raise concerns about whether the Biden Administration has obstructed justice and Joe Biden's knowledge of, influence over, and/or involvement with such obstruction.

Supervisory Special Agent Gary Shapley provided this information in a transcribed interview (Shapley Interview) to the Ways and Means Committee on May 26, 2023.[119]  On June 1, 2023, an additional IRS whistleblower—the primary IRS criminal investigator on the Hunter Biden investigation, Mr. Joseph Ziegler—provided additional disclosures to the Ways and Means Committee in a separate transcribed interview (Ziegler Interview).[120]  The whistleblowers made allegations of a wide range of problems with DOJ's handling of this case.  Just one of those issues includes allegations that whenever investigators sought to take an investigative step that might relate to, involve, or implicate Joe Biden, they were curtailed or prevented from taking that step.  The whistleblowers provided numerous examples of the roadblocks they faced throughout the investigation.  For instance, Mr. Shapley testified that in a May 3, 2021, memo he wrote: "Through interviews and review of evidence obtained, it appears there may be campaign finance criminal violations. AUSA Wolf stated on the last prosecution team meeting that she did not want any of the agents to look into the allegation."[121]

Further, IRS investigators wanted to interview Hunter Biden's adult children about payments that Hunter Biden purportedly made to them or for their benefit (e.g., clothes, tuition, etc.), which he had deducted from his taxes.[122]  However, on October 21, 2021, AUSA Wolf told investigators that they would be in "hot water" if they interviewed Hunter Biden's adult children.[123]  One of the whistleblowers, Special Agent Joseph Ziegler, described this restriction as "completely abnormal" because it is "part of [the] normal process" to interview people who are receiving money from the case subject.[124]  Despite investigators discovering evidence that

---

[119] *See* Transcribed interview of Gary Shapley, Internal Revenue Service (May 26, 2023).

[120] *See* Transcribed interview of Joseph Ziegler, Internal Revenue Service (June 1, 2023).

[121] *Id.* at 22.

[122] Ziegler Interview at 32, 129; *See* Reese Gorman, *Hunter Biden investigation: Agents warned against interviewing his adult children*, WASH. EXAM. (July 19, 2023).

[123] *Id.* at 32.

[124] *Id.* at 32.

Hunter Biden may have deducted from his taxes payments to family members for personal expenses, IRS investigators were also prohibited from interviewing other Biden family members, including Valerie Biden Owens (President Biden's sister), James Biden (President Biden's brother), Sara Biden (President Biden's sister-in-law), Hallie Biden (Beau Biden's widow), and Kathleen Buhle (Hunter Biden's ex-wife).[125]

These whistleblowers provided extensive testimony, and Mr. Shapley provided several documents, that corroborate his account of events.  This testimony necessitated further congressional investigation into the handling of the tax investigation of Hunter Biden by both the IRS and DOJ.  The Committee on Ways and Means has conducted interviews of two additional IRS employees regarding the whistleblower allegations, and the three Committees have partnered to send numerous investigative letters requesting documents from, and interviews of, numerous Biden Administration officials.

Subsequent to the release of the two transcripts from the IRS whistleblowers, the Oversight Committee held a hearing on July 19, 2023.[126]  In addition to raising serious concerns about the Biden Administration's handling of the investigation of President Biden's son, the whistleblowers' testimony corroborated the Oversight Committee's findings, including the Biden family and their associates' use of over twenty companies; their receipt of millions of dollars from countries including Ukraine, Romania, and China; and Joe Biden's participation in a meeting with CEFC.[127]

> (ii)     *The Biden Justice Department allowed the statute of limitations to expire on certain alleged criminal conduct that could implicate President Biden.*

The Judiciary Committee has also gathered evidence that the Biden Administration has improperly influenced the course of the IRS and DOJ investigation into Hunter Biden by allowing the statute of limitations to lapse on certain charges.

According to IRS whistleblower Supervisory Special Agent Gary Shapley, the Department allowed the statute of limitations to lapse on the 2014 and 2015 tax crimes committed by Hunter Biden.  Shapley testified that, up until October 7, 2022, he believed that prosecutors "were deciding whether to charge 2014 and 2015 tax violations" based on statements made by Attorney General Merrick Garland and Weiss.[128]  During this time period, prosecutors and Hunter Biden's counsel entered into agreements to toll the statute of limitations for crimes pertaining to the 2014 and 2015 tax years.[129]

On October 7, 2022, Weiss, in a meeting with senior managers, indicated that he was ultimately "not the deciding official on whether charges are filed."[130]  Shapley later learned that the U.S. Attorney for the District of Columbia, Matthew Graves, an appointee of President

---

[125] *Id.* at 53, 144.
[126] *Hearing with IRS Whistleblowers About the Biden Criminal Investigation*, H. Comm. on Oversight and Accountability (July 19, 2023).
[127] *Hearing Wrap Up: IRS Whistleblowers Expose How Bidens Were Treated Differently*, H. Comm. on Oversight and Accountability (July 19, 2023).
[128] Shapley Interview at 25.
[129] *Id.* at 54.
[130] *Id.* at 28.

Biden, "would not allow [Weiss] to charge in his district."[131]  As a result, Weiss went to Main Justice to request special counsel authority in the District of Columbia, which Main Justice denied.[132]  Weiss was instead told to "follow DOJ's process."[133]

In November 2022, despite defense counsel's willingness to again toll the statute of limitations again, the Department allowed the statute of limitations to lapse on the 2014 and 2015 charges.[134]  As a result, no charges were ever brought.[135]  The expiration of the tax charges for 2014 and 2015 is significant because during those years, Hunter Biden took on a lucrative role serving on the board of Burisma.[136]  Also during that period, his father, then-Vice President Joe Biden, sought to have the Ukrainian prosecutor investigating Burisma fired.[137]  That prosecutor, Viktor Shokin, "was fired after then-Vice President Joe Biden threatened to pull $1 billion in US aid."[138]  Ultimately, the "exclusion of the 2014 and 2015 years sanitized the most substantive criminal conduct and concealed material facts" relating to Hunter Biden's foreign income, "a scheme to evade income taxes through a partnership with a convicted felon[,]" and "potential FARA issues"—all of which implicates his father, Joe Biden.[139]  Simply put, the Biden Administration's DOJ appears to have intentionally slow-walked the investigation that potentially implicated President Biden by allowing the statute of limitations to expire.[140]

> (iii)   *The Biden Justice Department afforded Hunter Biden special treatment and a lenient plea deal for which the Department could offer no comparable precedent.*

When the Department was compelled to take some prosecutorial action against Hunter Biden, it tried to push through an apparently unprecedented plea deal, which imploded in open court.  In May 2023, around the time that the IRS whistleblowers initially testified to Congress about irregularities in the Department's investigation and shortly after a meeting between Hunter Biden's former lawyer Chris Clark, Weiss, and Associate Deputy Attorney General Bradley Weinsheimer,[141] the Department began formally negotiating with Hunter Biden's lawyers about potential plea and pretrial diversion agreements.[142]  The negotiations culminated in a plea agreement publicly announced on June 20, 2023.[143]

---

[131] *Id.*

[132] *Id.* at 25.

[133] Shapley Interview at 25.

[134] *Id.* at 100.

[135] *Id.*

[136] Steven Nelson, *Ukrainian prosecutor whose ouster Biden pushed was 'threat,' says Devon Archer*, N.Y. POST (Aug. 4, 2023).

[137] *Id.*

[138] *Id.*

[139] Shapley Interview at 25.

[140] *Id.* at 26.

[141] *See* Betsy Woodruff Swan, *In talks with prosecutors, Hunter Biden's lawyers vowed to put the president on the stand*, POLITICO (Aug. 19, 2023) (reporting that Clark, Weiss, and Weinsheimer met on April 26, 2023 to discuss the charges, but noting that it is "not clear what happened in the meeting, which came at a sensitive moment for the probe").

[142] Defendant's Response to the U.S. Motion to Vacate the Court's Briefing Order, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. Aug. 13, 2023). *See also* Jessica Lynch, *Hunter Biden began negotiating plea deal with DOJ right after IRS whistleblower first came forward, court docs show*, DAILY CALLER (Aug. 14, 2023).

[143] Swan, *supra* note 141.

However, according to public reporting, Clark began pressuring the Department to settle Hunter Biden's case as early as spring of 2022.[144]  Specifically, Clark threatened investigators that they faced career "suicide" if they pursued the investigation,[145] asked for meetings "with people at the highest levels of the [] Department,"[146] and threatened to call President Biden to testify as a fact witness for the defense.[147]  Clark even went so far as to tell prosecutors that they would be creating a "Constitutional crisis" by pitting the President against the Department he runs.[148]

The deal reached by Weiss's team and Hunter Biden's lawyers would have had Hunter Biden plead guilty to two misdemeanor tax charges, plus a diversion agreement to dismiss a separate felony gun charge if Hunter Biden complied for two years with the conditions set forth in the agreement.[149]  The one-of-its-kind agreement shifted a broad immunity provision from the plea agreement to the pretrial diversion agreement, benefiting Hunter Biden with the aim of preventing the District Court from being able to scrutinize and reject that immunity provision.[150] It also gave the District Court the sole power to determine whether Hunter Biden breached the pretrial diversion agreement—a prerequisite for the Department to file the diverted charges against him in the future and a provision benefitting Hunter Biden.[151]

On July 26, 2023, Hunter Biden appeared before Judge Maryellen Noreika of the U.S. District Court for the District of Delaware for a hearing on the plea deal.[152]  The plea deal fell apart when prosecutors and defense attorneys could not provide answers to routine questions about the agreement posed by Judge Noreika.[153]  Judge Noreika described the Department's deal as "not standard" and "different from what I normally see."[154]  Judge Noreika raised concerns about two provisions of the deal: (1) a provision of the pretrial diversion agreement for the gun charge that would prohibit the Department from bringing charges within the scope of the agreement unless and until Judge Noreika first determined that the diversion agreement had been breached,[155] and (2) a grant of immunity within the pretrial diversion agreement that would immunize Hunter Biden for not only the gun-related conduct, but also his unrelated tax crimes.[156]

---

[144] *Id.*

[145] *See* Shapley Interview at 27 (stating that Clark told prosecutors that they would be committing "career suicide" if they filed criminal charges against Hunter Biden); Ziegler Interview at 122.

[146] Swan, *supra* note 141.

[147] *Id.*

[148] *Id.*

[149] Josh Gerstein et al., *Hunter Biden reaches plea deal with feds to resolve tax issues, gun charge*, POLITICO (June 20, 2023).

[150] *See* Letter from Chairmen Jim Jordan, Jason Smith, and James Comer, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (July 31, 2023). *See also* Transcript of Record at 46-47, 107, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July 26, 2023).

[151] Transcript of Record at 95, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July, 26, 2023).

[152] *See* Michael S. Schmidt et al., *Inside the Collapse of Hunter Biden's Plea Deal*, N.Y. TIMES (Aug. 19, 2023) ; Swan, *supra* note 141.

[153] Schmidt, *supra* note 152; Swan, *supra* note 141.

[154] Transcript of Record at 10, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July, 26, 2023.

[155] *Id.* at 92-93.

[156] *Id.* at 46-47.

When Judge Noreika asked if there was precedent for either of these provisions, prosecutors were unable to provide any.[157]

At the conclusion of the hearing, Judge Noreika expressed discomfort with the structure of the plea and pretrial diversion agreements and the constitutionality of the provision that would prevent prosecutors from filing future charges against Hunter Biden without judicial approval.[158] Ultimately, Judge Noreika concluded that she could not accept the plea agreement and postponed the proceedings.[159]  Negotiations to modify the plea agreement were abandoned before the announcement of Weiss's special counsel appointment.[160]

> ### (iv)    The Biden Justice Department made inconsistent and false statements to Congress about the independence of its investigations into Hunter Biden.

The Department has made inconsistent statements to the Judiciary Committee about the independence of its investigation into Hunter Biden, raising serious concerns that political appointees of Joe Biden have obstructed the investigation.

On March 1, 2023, Attorney General Garland told the Senate Judiciary Committee that U.S. Attorney David Weiss "has full authority . . . to bring cases in other jurisdictions if he feels it's necessary."[161]  Then, on June 7, 2023, Weiss wrote to the Judiciary Committee, stating: "I have been granted ultimate authority over this matter, including responsibility for deciding where, when, and whether to file charges . . . ."[162]  On June 30, however, Weiss claimed in a second letter to the Judiciary Committee that "my charging authority is geographically limited to my home district."  He expanded:

> If venue for a case lies elsewhere, common Departmental practice is to contact the United States Attorney's Office for the district in question and determine whether it wants to partner on the case. If not, I may request Special Attorney status from the Attorney General pursuant to 28 U.S.C. § 515. Here, I have been assured that, if necessary after the above process, I would be granted § 515 Authority in the District of Columbia, the Central District of California, or any other district where charges could be brought in this matter.[163]

In transcribed interviews of two senior leaders of the FBI Baltimore Field Office, however, the Judiciary Committee learned that Weiss had to follow a "cumbersome" and

---

[157] *Id.* at 46, 103.

[158] *Id.* 95-98.

[159] *Id.*; *see also*, Transcript of Record at 54-55, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July 26, 2023).

[160] U.S. Motion to Voluntarily Dismiss Criminal Tax Information Without Prejudice so that Tax Charges Can Be Brought in a District Where Venue Lies, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. Aug. 11, 2023).

[161] *Oversight of the Department of Justice: Hearing Before the S. Comm. on the Judiciary*, 118th Cong. (2023) (statement of Merrick Garland, Att'y Gen., U.S. Dep't of Justice).

[162] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 7, 2023).

[163] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023).

"bureaucratic" process to bring charges against Hunter Biden outside of Delaware.[164]  The testimony from these two FBI witnesses buttresses the existing evidence that Weiss did not have full and sole authority over the Justice Department's Hunter Biden investigation.  In addition, Shapley testified that two U.S. Attorneys denied partnering with Weiss to bring charges against Hunter Biden. According to Shapley, in March 2022, the Justice Department's Tax Division presented the case against Hunter Biden to the U.S. Attorney's Office in the District of Columbia.[165]  Although the office's First Assistant was "optimistic" about the case and willing to "assign an AUSA to assist[,]" U.S. Attorney Matthew Graves, appointed by President Biden, "personally reviewed the report and did not support it."[166]  Shapley testified that he learned about Graves's decision to not partner with Weiss in the October 7, 2022 meeting during which Weiss indicated that Graves "would not allow him to charge in his district."[167] At that same meeting, Weiss also stated that "he has no authority to charge in California" and if he wanted to bring charges in California, "he would have to request special counsel authority in order to charge it."[168]  In January 2023, Shapley learned that U.S. Attorney Martin Estrada, also appointed by President Biden, refused to partner with Weiss and "had declined to bring charges in the Central District of California."[169]

> (v)     *President Biden has made repeated statements about Hunter Biden's innocence and his own purported lack of involvement in his son's business dealings, prejudicing the Department's investigation.*

President Biden, by himself and through his staff, has prejudiced the Department's investigation by making repeated public statements about Hunter Biden's innocence.  These statements could represent attempts to use the authority of his office to influence the Department's actions and decision-making in the criminal investigation of his son, an investigation which could implicate the President himself.

Since becoming president, President Biden has continued to use his office to promote his and Hunter Biden's innocence.  On October 11, 2022, a reporter asked President Biden about potential charges against Hunter.[170]  While acknowledging that Hunter Biden lied on his application to purchase a gun, President Biden stated, "I'm confident that he is—what he says and does are consistent with what happens."[171]  President Biden then reiterated that he has "great confidence in [his] son."[172]  In May 2023, President Biden again defended his son, stating, "[M]y

---

[164] Transcribed Interview of Thomas Sobocinski at 44, 68, 103 (Sept. 7, 2023).
[165] Shapley Interview at 24.
[166] *Id.*
[167] *Id.* at 28.
[168] *Id.* at 102.
[169] *Id.* at 31.   In testimony to the Judiciary Committee on September 20, 2023, Attorney General Garland stated that Weiss had full authority over the investigation because Garland "promised" Weiss that he would have full authority.  In particular, Garland testified that Weiss "had the authority because I promised that he would have the authority."  This statement—that Weiss had full authority because he *would* have full authority if he sought it— appears to be self-contradictory and inconsistent with Garland's prior statement in March 2023 that Weiss *had* full authority at the time of the statement.

[170] Kevin Liptak & Evan Perez, *Biden addresses possible criminal charges against Hunter Biden and says he's 'proud' of son's fight against drug addiction*, CNN (Oct. 12, 2022).
[171] *Id.*
[172] *Id.*

son has done nothing wrong."[173]  He added, "I trust him. I have faith in him."[174]

In August 2023, a reporter brought up testimony that President Biden was "on speakerphone" with Hunter Biden's former business associates "talking business," potentially implicating President Biden in these crimes.[175]  President Biden shot back, "I never talked business with anybody. I knew you'd have a lousy question."[176]  When the reporter asked President Biden to explain why the question was lousy, he responded, "Because it's not true."[177]

Senior employees of the Executive Office of the President have also publicly commented on Hunter Biden's innocence and President Biden's purported lack of involvement in his son's foreign business dealings.  For example, former White House Chief of Staff Ron Klain stated, "Of course the president is confident that his son didn't break the law" and that President Biden "is confident that his family did the right thing."[178]  Klain added, "[t]hese are actions by Hunter and his brother.  They're private matters.  They don't involve the president.  And they certainly are something that no one at the White House is involved in."[179]  On April 5, 2022, then-White House Press Secretary Jen Psaki agreed with a reporter's question that the President has "never spoke[n] to his son about his overseas business dealings."[180]  On July 24, 2023, in an exchange with a reporter, White House Press Secretary Karine Jean-Pierre stated that President Biden "was never in business with his son."[181]  Two days later, Jean-Pierre again reiterated at a press briefing, that "nothing has changed," again denying that President Biden had any involvement with his son's foreign business dealings.[182]  Yet these statements seem flatly inconsistent with evidence that the Committee has gathered thus far.

## IV.   Scope of Impeachment Inquiry

The Committees' inquiry into possible impeachable offenses committed by President Biden requires pursuing investigative leads generated by the Committees in the course of their oversight work to date.  In addition to the thousands of documents the Committees have already reviewed and many interviews that the Committees have already conducted, the Committees will obtain additional evidence.  Because the impeachment inquiry will go where that evidence leads, the investigation could head in directions that the Committees do not currently foresee.  However, given the evidence gathered to date, the impeachment inquiry will initially focus  on the following questions.

*First, did Joe Biden, as Vice President and/or President, take any official action or effect any change in government policy because of money or other things of value provided to*

---

[173] Katherine Doyle, *Biden defends son Hunter ahead of possible federal tax, gun charges*, NBC News (May 5, 2023).

[174] *Id.*

[175] Alexander Hall, *Biden scorched for response to question about talking to Hunter's business associates: 'Pathological liar'*, FOX NEWS (Aug. 10, 2023)

[176] *Id.*

[177] *Id.*

[178] *Id.*

[179] *Id.*

[180] *Press Briefing by Press Secretary Jen Psaki, April 5, 2022*, THE WHITE HOUSE (April 5, 2022).

[181] *Press Briefing by Press Secretary Karine Jean-Pierre*, THE WHITE HOUSE (July 24, 2023).

[182] *Press Briefing by Press Secretary Karine Jean-Pierre and National Security Council Coordinator for Strategic Communications John Kirby*, THE WHITE HOUSE (July 26, 2023).

*his family or him from foreign interests?*  The Committees have uncovered that payments: (1) went to members of Joe Biden's family, and (2) occurred or began during Joe Biden's Vice Presidency; and (3) originated from certain countries in which then-Vice President Biden played an official role on behalf of the Obama-Biden Administration.  Moreover, this money reached the Biden family through a layered and obfuscated payment structure, which usually involved intermediaries and incremental distributions of funds.[183]  In certain countries, during or shortly after then-Vice President Biden delivered speeches and messages on behalf of the Obama-Biden Administration about fighting corruption (*e.g.*, Romania, Ukraine), his son engaged in business deals with individuals (*e.g.*, Gabriel Popoviciu, Mykola Zlochevsky) who were under investigation for corruption by those countries.[184]  The Committees will investigate whether the foreign money paid to the Biden family had any impact on Joe Biden's conduct as President or Vice President, including the bribery allegations set forth in the FBI FD-1023 form.  The Committees will also investigate whether any of this foreign money reached Joe Biden directly or was used to directly benefit him, such as by paying his bills.

**Second, did Joe Biden, as Vice President and/or President, abuse his office of public trust by providing foreign interests with access to him and his office in exchange for payments to his family or him?** During his Vice Presidency, Joe Biden spoke, met, and socialized with his son's foreign business associates.  On at least two occasions—2014 and 2015—Joe Biden attended small, private dinners in Washington, D.C. with foreign individuals who had paid or would pay his son millions of dollars.[185]  In 2014, one of the individuals who attended the dinner was Yelena Baturina—a Russian oligarch and the wealthiest woman in Russia—who around the timeframe of the dinner wired $3.5 million to Rosemont Seneca Thornton.[186]  In 2015, one of the individuals who attended the dinner with the Vice President—Vadym Pozharsky—was an executive of Burisma, the Ukrainian company that paid Hunter Biden $1 million per year and whose president—Mykola Zlochevsky—was under investigation for corruption.  In the spring of 2015, Hunter Biden and his business associates attended a breakfast at the Naval Observatory, where the discussion focused on who would be the next Secretary General of the United Nations; one of the participants was a lobbyist for a Kazakhstani individual who was seeking the position.[187]  The Committees will investigate whether these foreign interests were given access to Joe Biden as a result of payments made to his family or him.

**Third, did Joe Biden, as Vice President and/or President, abuse his office of public trust by knowingly participating in a scheme to enrich himself or his family by giving foreign interests the impression that they would receive access to him and his office in exchange for payments to his family or him?** As reviewed above, Joe Biden called into business meetings

---

[183] *See*, Memorandum (May 10, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Second Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes; *see also*, Memorandum (August 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes.

[184] *Id.*

[185] *See*, Memorandum (August 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes.

[186] Memorandum (August 9, 2023), H. Comm. on Oversight & Accountability. From Maj. Comm. staff to Comm. Members. Re: Third Bank Records Memorandum from the Oversight Committee's Investigation into the Biden Family's Influence Peddling and Business Schemes.

[187] Transcribed interview of Devon Archer, H. Comm. on Oversight & Accountability (July 31, 2023), at 78-79.

held by his son and spoke to the attendees on speakerphone.  He also attended dinners with Hunter Biden and his son's foreign business associates.  The evidence suggests that Joe Biden knew or must have known that these interactions would give his son's foreign business associates the appearance that they would have access to him and his office if they were to make substantial payments to his son.  And if this is true, then Joe Biden was using his office to enrich his family, even if he ended up not providing his son's foreign business associates with such access.  The Committees will therefore investigate whether Joe Biden engaged in a scheme with his son to secure foreign money by giving foreign business interests the impression that they would be provided with access to Biden and his office if they made payments to his son.

*Fourth, did Joe Biden abuse his power as President to impede, obstruct, or otherwise hinder investigations (including Congressional investigations)[188] or the prosecution of Hunter Biden?*  To answer this question, the Committees will need to obtain information regarding the federal criminal investigation of Hunter Biden, such as the failure by the Department of Justice to bring felony tax charges against Hunter Biden for tax years 2014 and 2015, despite IRS investigators' disclosures to Congress that the U.S. Attorney's Office in Delaware had ample evidence to support those charges.  The Committees will also need to procure information regarding possible retaliation against those investigators.  The inquiry will also review the understanding that was eventually struck by Hunter Biden's legal team and federal prosecutors (including the plea agreement and pretrial diversion agreement)[189] after the IRS whistleblowers' disclosures to Congress and before that understanding being questioned by a federal judge.[190]  And it will review whether any political appointees of Joe Biden obstructed the criminal investigation of Hunter Biden and whether Joe Biden or anyone at the White House had any involvement in that obstruction directly or indirectly, such as through the issuance of public statements.

\*                          \*                          \*

Necessarily, the impeachment inquiry will span the time of Joe Biden's Vice Presidency to the present, including his time out of office.  The impeachment inquiry will focus on whether the President has engaged in corruption, bribery, and influence peddling during his time as Vice President and President.  The impeachment inquiry will simultaneously investigate whether actions have been taken by the Biden Administration to obstruct or hinder accountability for the same potential corruption, bribery, and influence peddling.  Due to the existing evidence of self-dealing and personal and familial enrichment by Joe Biden through the abuse of his official roles, the impeachment inquiry will require access to records of not only President Biden but the

---

[188] For example, the Oversight Committee has requested information regarding the classified materials discovered in the President's home—where his son has resided during the time period relevant to this investigation—and personal office, but the White House has provided no information to the Committee regarding the contents of or its full approach towards those documents.  The refusal to cooperate is despite growing evidence accumulated by the Oversight Committee that the White House has not been forthcoming regarding the classified materials discovered in 2022 and that such actions represent potentially a serious violation of federal law for which a former president has faced federal indictment. *See* Letter from Hon. James Comer, Chairman, H. Comm. on Oversight & Accountability to Stuart Delery, White House Counsel (Jan. 10, 2023); *see also* Letter from Hon. James Comer, Chairman, H. Comm. on Oversight & Accountability to Ron Klain, White House Chief of Staff (Jan. 15, 2023).

[189] Betsy Woodruff Swan, *Read the proposed Hunter Biden plea agreement*, POLITICO (July 26, 2023), https://www.politico.com/news/2023/07/26/proposed-hunter-biden-plea-agreement-00108426.

[190] Betsy Woodruff Swan, *Read the proposed Hunter Biden plea agreement*, POLITICO (July 26, 2023), https://www.politico.com/news/2023/07/26/proposed-hunter-biden-plea-agreement-00108426.

people and entities in his proximity throughout the relevant time period, including those of his family members and Obama-Biden and Biden-Harris Administration officials.

      Because of the nature of the Biden family's business practices, the Committees anticipate the impeachment inquiry will require access to a variety of sources of information.  In addition to bank records and other financial documents the Committees will obtain through subpoena, if necessary, the Committees anticipate the impeachment inquiry will require the production of documents by the United States Departments of State, Justice, Treasury, and Homeland Security, the National Archives, and other government agencies, as well as certain documents from state governments and international sources.  The Committee will also conduct depositions or transcribed interviews of people with firsthand knowledge of the Biden family's business practices and finances, in addition to former and current Administration officials.  When possible, the Committees will request that this information be provided voluntarily, but the Committees anticipate—based on statements made to the Committees during their regular oversight work—that certain individuals will require subpoenas to appear or cooperate with the Committees' impeachment inquiry in a timely manner.  The Committees will use all of the tools at their disposal to conduct a thorough and needed investigation and fulfill the constitutional responsibility of determining whether articles of impeachment against President Biden should be drafted and referred to the full House.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| 2138 Rayburn House Office Building Washington, D.C. 20515, | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-815 |
| MARK DALY, in his official capacity, U.S. Department of Justice, and | |
| JACK MORGAN, in his official capacity, U.S. Department of Justice, | |
| 950 Pennsylvania Avenue, N.W. Washington, D.C. 20530, | |
| *Defendants*. | |

# Exhibit G



**THE JUSTICE DEPARTMENT'S DEVIATIONS FROM STANDARD PROCESSES IN ITS INVESTIGATION OF HUNTER BIDEN**

Interim Staff Report of the

Committee on the Judiciary,
Committee on Ways and Means, and
Committee on Oversight and Accountability

U.S. House of Representatives

December 5, 2023

<div align="center">EXECUTIVE SUMMARY</div>

---

*"Corruption is a cancer, a cancer that eats away at a citizen's faith in democracy . . . . It saps the collective strength and resolve of a nation. Corruption is just another form of tyranny."*
—Vice President Joe Biden, May 21, 2014

In the spring of 2023, two brave IRS whistleblowers stepped forward to notify Congress of how the Justice Department had impeded, delayed, and obstructed the criminal investigation of the President's son, Hunter Biden. The whistleblowers, who came forward only after IRS leadership failed to address their concerns, noted several deviations by Justice Department officials "from the normal process that provided preferential treatment, in this case to Hunter Biden."[1] The whistleblowers exposed how the Justice Department allowed the statute of limitations on certain charges against Hunter Biden to lapse, prohibited line investigators from referring to or asking about President Biden during witness interviews, withheld evidence from line investigators, excluded the investigative team from meetings with defense counsel, and tipped off defense counsel about pending search warrants.[2]

On September 12, 2023, on the basis of testimony from these whistleblower and other evidence gathered to that point, the Speaker of the House directed the Committees to conduct an inquiry to determine whether sufficient grounds existed for the impeachment of President Biden.[3] On September 27, 2023, pursuant to the Speaker's directive, the Committees released a memorandum laying out what the Committees were investigating, including: (1) foreign money received by the Biden family; (2) President Joe Biden's involvement in his family's foreign business entanglements; and (3) steps taken by the Biden Administration to slow, hamper, or otherwise impede the criminal investigation of the President's son, Hunter Biden, which involves funds received by the Biden family from foreign sources.[4]

The third prong of the impeachment inquiry encompasses oversight, initiated by the Committees following the whistleblowers' revelations, into the Biden Justice Department's purported commitment to impartial justice. As part of this aspect of the inquiry, as it relates to the criminal investigation of Hunter Biden and the potential obstruction of that investigation, the Committees have so far obtained hundreds of pages of documents from the whistleblowers and conducted transcribed interviews with ten officials from the Justice Department, FBI, and IRS. Those officials are:

- Special Counsel and U.S. Attorney for the District of Delaware David Weiss,

- U.S. Attorney for the District of Columbia Matthew Graves,

---

[1] Transcribed Interview of Gary Shapley, Supervisory Special Agent, Internal Revenue Serv., at 10 (May 26, 2023) [hereinafter Shapley Interview].
[2] *Id.*; Transcribed Interview of Joseph Ziegler, Special Agent, Internal Revenue Serv. (June 1, 2023) [hereinafter Ziegler Interview].
[3] Press Release, Rep. Kevin McCarthy, Speaker of the H. of Reps., Speaker McCarthy Opens an Impeachment Inquiry (Sept. 12, 2023).
[4] Memorandum from Chairmen Jim Jordan, James Comer, and Jason Smith, to Members of the H. Comm. on the Judiciary, H. Comm. on Oversight & Accountability, and H. Comm. on Ways & Means (Sept. 27, 2023).

- U.S. Attorney for the Central District of California E. Martin Estrada,

- Former U.S Attorney for the Western District of Pennsylvania Scott Brady,

- Acting Deputy Assistant Attorney General for Criminal Matters at the Justice Department's Tax Division Stuart Goldberg,

- FBI Special Agent in Charge Thomas Sobocinski,

- FBI Assistant Special Agent in Charge Ryeshia Holley,

- Former FBI Supervisory Special Agent Joe Gordon,

- IRS Director of Field Operations Michael Batdorf, and

- IRS Special Agent in Charge Darrell Waldon

The testimony and documents received by the Committees to date corroborates many of the allegations made by the IRS whistleblowers. For example:

- ***Testimony demonstrated that the Justice Department and FBI bureaucrats afforded special treatment to Joe Biden's adult son Hunter.*** Several witnesses acknowledged the delicate approach used during the Hunter Biden case, describing the investigation as "sensitive" or "significant." Evidence shows Department officials slow-walked the investigation, informed defense counsel of future investigative actions, prevented line investigators from taking otherwise ordinary investigative steps, and even allowed the statute of limitations to expire on the most serious potential charges. These unusual—and oftentimes in the view of witnesses, unprecedented—tactics conflicted with standard operating procedures and ultimately had the effect of benefiting Hunter Biden.

- ***Biden Justice Department officials explained to the Committees how U.S. Attorney Weiss did not have "ultimate authority" over the Hunter Biden case, contrary to his assertions to Congress.*** Instead, Biden Administration political appointees exercised significant oversight and control over the investigation. Witnesses described how Weiss had to seek (1) agreement from other U.S. Attorneys to bring cases in a district geographically distinct from his own and (2) approval from the Biden Justice Department's Tax Division to bring specific charges or take investigative actions against Hunter Biden.

- ***After the whistleblowers came forward, the Biden Justice Department attempted to cover-up Hunter Biden's wrongdoing, as well as its own.*** There is no question that without the brave IRS whistleblowers, it is likely that the Biden Justice Department would have never acted on Hunter Biden's misconduct. When forced to act, the Biden Justice Department worked closely with Hunter Biden's counsel to craft an

unprecedented plea deal that was so biased in the direction of Hunter Biden it fell apart in open court. When a federal judge rejected the Department's attempt to push through a sweetheart plea deal and quietly end the five-year investigation of Hunter Biden, Attorney General Garland appointed Weiss as special counsel and refused to answer questions about the case on the basis of the existence of an "ongoing investigation." Using the "ongoing investigation" as a veil to shield its misconduct, the Biden Justice Department unilaterally limited the scope of witness testimony and document productions to Congress, severely curtailing the Committees' ability to gather information.

Even still, despite these troubling findings, there is more information that the Justice Department is keeping from the Committees. The Justice Department has still not fully complied with requests for relevant documents, and it has impeded the Committees' investigation by baselessly preventing two Tax Division officials—Senior Litigation Counsel Mark Daly and Trial Attorney Jack Morgan—from testifying, despite subpoenas compelling their testimony. These documents and this testimony are necessary for the Committees to complete our inquiry.

The Department's blatant disregard for the Committees' constitutionally prescribed oversight responsibilities is yet another stain that the Biden Administration has placed on the Justice Department's once-venerated reputation. Although the Committees' investigation is far from complete, this interim report details the findings to date and summarizes some of the evidence uncovered in the impeachment inquiry. The Committees will continue to gather evidence to determine whether sufficient grounds exist to draft articles of impeachment against President Biden for consideration by the full House of Representatives.

---

### TABLE OF CONTENTS

---

Executive Summary ................................................................................................... 1

Table of Contents ....................................................................................................... 4

Background .................................................................................................................. 5

I. Testimony shows that the Justice Department afforded preferential treatment to President Biden's son. ........................................................................................................... 8

   A.  Witnesses described how the Department deviated from standard operating procedure to afford Hunter Biden special treatment. .......................................................... 8

   B.  FBI bureaucrats impeded the investigation into Hunter Biden by slow-walking investigative action and withholding relevant information. .................................... 16

   C.  Senior officials in the Delaware U.S. Attorney's Office attempted to avoid learning information that could implicate President Biden in criminal activity. ..................... 21

   D.  The Delaware U.S. Attorney's Office continually sought to keep the Biden name out of the investigation. .................................................................................................. 26

   E.  Prosecutors in Weiss's office allowed the statute of limitations for some of Hunter Biden's most serious crimes to lapse. .................................................................... 31

II. Contrary to his assertions to Congress, U.S. Attorney Weiss did not have "ultimate authority" over the Hunter Biden case. .................................................................................... 36

   A.  Weiss did not have the sole authority to bring a case against Hunter Biden in a judicial district outside of Delaware. ................................................................................... 36

   B.  Testimony confirms that two Biden-appointed U.S. Attorneys declined to partner with Weiss to bring cases in their districts against Hunter Biden. ................................ 44

   C.  The Department's Tax Division had to approve any tax charges U.S. Attorney Weiss wanted to pursue. ................................................................................................... 50

III. The Biden Administration has sought to influence the Hunter Biden investigation in a manner favorable to President Biden. ................................................................................... 56

   A.  Throughout Weiss's investigation, President Biden has made statements that prejudice the Justice Department's investigation and the appearance of impartial justice. ........... 56

   B.  Without the brave IRS whistleblowers, it is likely that the Justice Department would have never acted on Hunter Biden's misconduct. ............................................................ 58

   C.  Hunter Biden's attorneys are pushing the Biden Justice Department to investigate witnesses in retaliation for making protected disclosures regarding Hunter Biden's alleged criminal conduct. ................................................................................................... 61

   D.  After a multi-year investigation, Weiss offered Hunter Biden a sweetheart plea deal that fell apart under simple questioning from the judge. ............................................... 63

   E.  Line investigators believe the Hunter Biden investigation is proceeding too slowly, potentially allowing the statute of limitations to lapse on additional charges. .......... 68

   F.  The Biden Justice Department's unilateral scoping limitations and inadequate document productions have severely curtailed the Committees' ability to gather information. ........ 71

Conclusion .................................................................................................................. 77

---

<div align="center">B<span style="font-variant:small-caps">ACKGROUND</span></div>

---

In November 2018, the Internal Revenue Service (IRS) opened an investigation into Hunter Biden for potential tax crimes after discovering bank reports showing that "Hunter Biden was living lavishly through his corporate bank account," along with public reporting about Hunter Biden's substantial tax debt.[5] The IRS's investigation was soon followed by an investigation opened out of the Federal Bureau of Investigation (FBI) Wilmington Resident Agency, a sub-office of the FBI's Baltimore Field Office, in February 2019.[6] Two months later, in April 2019, FBI investigators learned of the IRS's investigation of Hunter Biden, and the Justice Department merged the two investigations later that month.[7] In October 2019, the FBI learned of a laptop and external hard drive previously owned by Hunter Biden that contained evidence of Hunter Biden's criminal conduct,[8] including drug use, solicitation of prostitutes, and influence-peddling.[9] In November 2019, the FBI verified the authenticity of the laptop and hard drive and on December 9, 2019, the FBI seized the devices.[10] After taking possession of the devices, the FBI notified the IRS that the devices contained evidence of Hunter Biden's tax crimes,[11] though prosecutors withheld the contents of the devices from IRS case agents working on the Hunter Biden investigation.[12]

In April 2023, the Committees became aware of serious whistleblower allegations from two IRS agents who worked on the Justice Department's criminal investigation of Hunter Biden.[13] In particular, a lawyer for one of the whistleblowers informed the Committees that his client wanted to make protected disclosures to Congress that:

> (1) contradict sworn testimony to Congress by a senior political appointee, (2) involve failure to mitigate clear conflicts of interest in the ultimate disposition of the case, and (3) detail examples of preferential treatment and politics improperly infecting decisions and protocols that would normally be followed by career law enforcement professionals in similar circumstances if the subject were not politically connected.[14]

---

[5] Ziegler Interview at 17. *See also* Shapley Interview at 12.

[6] Transcribed Interview of Joe Gordon, Ret. Supervisory Special Agent, Fed. Bureau of Investigation, at 63 (July 17, 2023) [hereinafter Gordon Interview].

[7] *Id.* at 29, 64. *See also* Letter from Dean Zerbe to H. Comm. on Ways & Means (June 19, 2023) (explaining that although Ziegler initially testified that Attorney General Bill Barr directed that the two investigations be merged, he later realized that he was mistaken and that he was unaware as to who at the Justice Department directed that the investigations be merged).

[8] Shapley Interview at 12; Shapley Interview, Ex. 6.

[9] Victor Nava & Miranda Devine, *Delaware 'laptop from hell' repairman John Paul Mac Isaac deposed by Hunter Biden lawyers for 7 hours*, N.Y. P<span style="font-variant:small-caps">OST</span> (June 2, 2023).

[10] Shapley Interview at 12; Shapley Interview, Ex. 6.

[11] Shapley Interview at 12; Shapley Interview, Ex. 6.

[12] Shapley Interview at 16; Shapley Interview, Ex. 6.

[13] *See* Letter from Mark D. Lytle to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al. (Apr. 19, 2023); Letter from Tristan Leavitt & Mark D. Lytle to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al. (May 15, 2023).

[14] Letter from Mark D. Lytle to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, et al. (Apr. 19, 2023).

On May 26, 2023, IRS Supervisory Special Agent Gary Shapley bravely stepped forward, at great personal and professional risk, and testified before the Committee on Ways and Means about the preferential treatment that the Justice Department afforded to Hunter Biden throughout the course of its almost-five-year investigation.[15] Six days later, on June 1, 2023, the IRS case agent who initially opened the investigation, Special Agent Joseph Ziegler, also testified before the Ways and Means Committee, similarly doing so at great personal and professional risk.[16] On July 19, 2023, both Supervisory Special Agent Shapley and Special Agent Ziegler publicly testified at a hearing of the Committee on Oversight and Accountability about the preferential treatment they witnessed firsthand in the investigation concerning Hunter Biden.[17]

Both whistleblowers are seasoned IRS agents with years of experience dealing with high-profile and complex tax cases. Both have received numerous awards and commendations for the high quality of their work.[18] Supervisory Special Agent Shapley, a 14-year veteran of the IRS, leads an elite team of a dozen agents who specialize in international tax and financial crimes.[19] Special Agent Ziegler, a self-described Democrat,[20] is a 13-year veteran of the IRS who currently serves as an agent on Shapley's team.[21] Until May 15, 2023, when the Justice Department ordered their removal from the case, Shapley served as the IRS supervisor over the Hunter Biden investigation,[22] with Ziegler serving as the lead IRS case agent.[23]

The whistleblowers' testimony to Congress noted several deviations by Department officials "from the normal process that provided preferential treatment, in this case to Hunter Biden,"[24] including: allowing the statute of limitations to lapse; requesting IRS and FBI management-level investigative communications; prohibiting investigators from asking about the "big guy" or "dad," both of which refer to Joe Biden,[25] during witness interviews; excluding the investigative team from meetings with defense counsel; and notifying defense counsel of pending search warrants.[26] Additionally, both whistleblowers testified about the investigators' failed attempt to interview Hunter Biden due to FBI headquarters giving the Biden transition team and Secret Service a heads-up of a surprise encounter.[27] By September 2022, Biden Justice Department prosecutors continued hindering the investigators' efforts by prohibiting any overt investigative actions until after the midterm elections, even though the Department's Public

---

[15] Shapley Interview.

[16] Ziegler Interview.

[17] *Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight and Accountability*, 118th Cong. (July 19, 2023).

[18] Shapley Interview at 8-9; Ziegler Interview at 11-12.

[19] Shapley Interview at 8-9, 12.

[20] Ziegler Interview at 10.

[21] Shapley Interview at 12.

[22] *Id.*

[23] Ziegler Interview at 10.

[24] Shapley Interview at 10.

[25] *See id.* at 119 ("There were multiple times where Lesley Wolf said that she didn't want to ask questions about dad. And dad was kind of how we referred to him. We referred to Hunter Biden's father, you know, as dad."); Michael Goodwin, *Hunter biz partner confirms email, details Joe Biden's push to make millions from China: Goodwin*, N.Y. POST (Oct. 22, 2020) (quoting Hunter Biden's former business partner Tony Bobulinski as stating, "The reference to 'the Big Guy' in the much publicized May 13, 2017 email is in fact a reference to Joe Biden.").

[26] *See generally* Shapley Interview; Ziegler Interview.

[27] Shapley Interview at 19; Ziegler Interview at 119.

Integrity Section gave the prosecution team guidance to the contrary.[28] These major deviations from departmental process came to a boiling point on October 7, 2022, when Shapley attended a meeting at the Delaware U.S. Attorney's Office (USAO) during which Weiss stated that he was not the deciding official on whether charges were filed against Hunter Biden.[29] Weiss's confession at that meeting revealed that the Biden Administration was in fact controlling the investigation of the President's son, despite Attorney General Garland's sworn congressional testimony to the contrary.[30] Shapley described this meeting as a "red-line" for him, testifying that he then expressed several concerns directly to Weiss about how the Hunter Biden investigation had been handled.[31]

Shapley's and Ziegler's testimony provided *prima facie* evidence of several serious deficiencies in the Justice Department's investigation and its commitment to impartial justice, as well as calling into question the truthfulness of statements made to Congress by senior Justice Department officials. Following their testimony, and to inform the Committees' oversight of the Justice Department, the Committees requested transcribed interviews with eleven Department employees. To date, the Committees have conducted six of the requested interviews. Throughout the process, from unilaterally limiting the scope of interviews to directing two witnesses not to even appear for compelled depositions, the Justice Department has hindered the Committees' ability to obtain information necessary to fully examine the allegations. Even still, despite these attempts at handicapping the Committees' investigation, the information uncovered during these transcribed interviews confirms the whistleblowers' testimony.

President Joe Biden promised to keep politics out of the Department. Just weeks before his inauguration, then-President-elect Biden said, "[i]t's not my Justice Department. It's the people's Justice Department," and that those leading the Department will have the "independent capacity to decide who gets prosecuted and who doesn't."[32] Likewise, during Judge Merrick Garland's confirmation hearing in 2021 to become Attorney General, he vowed not to weaponize the Justice Department to target the Biden Administration's political opponents. In fact, Attorney General Garland promised, "[t]he Department . . . will be under my protection for the purpose of preventing any kind of partisan or other improper motive in making any kind of investigation or prosecution. That's my vow. That's the only reason I'm willing to do this job."[33] However, as the Committees' investigative work has uncovered, under the leadership of President Biden and Attorney General Garland, the Justice Department has gone to great lengths to circumvent the justice system for President Biden's son, Hunter Biden, who allegedly sold access to the highest levels of our nation's government and avoided paying millions of dollars in taxes.[34]

---

[28] Shapley Interview at 27.
[29] *Id.* at 28.
[30] *See Hearing on the Fiscal Year 2023 Justice Department Budget Request, Before the Subcomm. on Com., Just., Sci., & Related Agencies of the S. Comm. on Appropriations*, 117th Cong. (2022) (statement of Merrick Garland, Att'y Gen., U.S. Dep't of Just.) ("[T]he Hunter Biden investigation . . . is being run by and supervised by the United States Attorney for the District of Delaware. . . . [H]e is in charge of that investigation. There will not be interference of any political or improper kind.").
[31] Shapley Interview at 28-29.
[32] Morgan Chalfant, *Biden, Harris pledge to keep politics out of DOJ*, THE HILL (Dec. 3, 2020).
[33] Jeremy Herb, *Garland vows at confirmation hearing to keep politics out of DOJ while drawing praise*, CNN (Feb. 22, 2021).
[34] Editorial, *Hunter Was Selling the Biden 'Brand'*, WALL ST. J. (July 31, 2023); Josh Christenson and Steven Nelson, *Hunter Biden ducked $1.2M tax bill over 2017, 2018: IRS whistleblower*, N.Y. POST (June 28, 2023).

### I. TESTIMONY SHOWS THAT THE JUSTICE DEPARTMENT AFFORDED PREFERENTIAL TREATMENT TO PRESIDENT BIDEN'S SON.

The fundamental mission of the Justice Department is to uphold the rule of law.[35] To do so, the Department has adopted values of integrity and impartiality, promising all Americans that it will enforce federal law "without prejudice or improper influence."[36] The Department's mission and its values are reflected in the Justice Manual, described as "a set of rules, regulations, [and] procedures that basically provides guidance to Department of Justice personnel."[37] The Justice Manual includes a section specific to the fair and impartial enforcement of federal laws, explaining that uniform enforcement of criminal tax laws is necessary "[t]o achieve maximum deterrence" of tax crimes.[38]

However, during their respective transcribed interviews with the Committee on Ways and Means, the IRS whistleblowers described dozens of deviations from standard investigative practice by Department officials that afforded Hunter Biden preferential treatment throughout this investigation. In particular, the whistleblowers described how the Department allowed the statute of limitations to lapse, prohibited line investigators from asking about Joe Biden in witness interviews, and notified defense counsel of pending search warrants.[39] The whistleblowers' account of the preferential treatment provided to Hunter Biden has been corroborated by testimony from additional witnesses and by documents provided to the Committees. These deviations from standard investigative practice unfortunately reinforce the perception that the Biden Justice Department is operating a two-tiered system of justice.[40]

### A. Witnesses described how the Department deviated from standard operating procedure to afford Hunter Biden special treatment.

Witnesses and documents confirm that the Biden Justice Department has not handled Hunter Biden's case like any other case. According to Shapley, the criminal tax investigation of the President's son "has been handled differently than any investigation [he's] been a part of" throughout his 14-year career at the IRS.[41] Other witnesses with knowledge of the case have since corroborated Shapley's testimony that the Justice Department treated Hunter Biden's case differently than other criminal investigations.

During his transcribed interview, Stuart Goldberg, the Acting Deputy Assistant Attorney General for Criminal Matters within the Department's Tax Division, confirmed whistleblower

---

[35] *About DOJ*, U.S. DEP'T OF JUST., https://www.justice.gov/about (last visited Nov. 26, 2023).
[36] *Id.*
[37] Transcribed Interview of David Weiss, Special Counsel & U.S. Att'y, Dist. of Del., at 63 (Nov. 7, 2023) [hereinafter Weiss Interview].
[38] U.S. Dep't of Just., Just. Manual § 6-4.010 (2023).
[39] *See generally* Shapley Interview; Ziegler Interview.
[40] *Cf. Oversight of the Federal Bureau of Investigation: Hearing Before the H. Comm. on the Judiciary*, 118th Cong., at 2-3 (2023) (statement of Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary) (listing additional examples of the "double standard that exists now in our justice system").
[41] Shapley Interview at 11.

testimony that the Hunter Biden case received special treatment, as it required "closer supervision," compared to more "run-of-the-mill cases."[42] Goldberg testified:

> Q.    Was the fact that Hunter Biden was involved here, did that require DOJ Tax's sign-off because it's a sensitive matter?
>
> A.    Well, without getting into the case, again trying to answer a question at a slightly higher level, there are cases that are sensitive, people—some would say sensitive, sometimes say significant cases. And those cases typically have closer supervision than other, more run-of-the-mill cases.
>
> Q.    And if there's a target of an investigation that has some political significance attached to him or her . . . does that trigger any heightened review process within DOJ Tax?
>
> A.    So if something can be termed as sensitive pursuant to the case it might be because it's a public official or it's a person that has a noteworthy profile or it's going to generate a lot of media attention, or might be congressional interest. It could be a corporation or an individual. That might mean that the case would come to my level for ultimate sign-off on the case as opposed to be[ing] handled at the chief's level.
>
> Q.    . . . And is it fair to say that the Hunter Biden case fell into that category?
>
> A.    Yes.[43]

In addition, Goldberg recounted an incident in which U.S. Attorney David Weiss summoned him to attend a meeting in Delaware with prosecutors and Hunter Biden's defense counsel—something that Goldberg said he had never done before with respect to any U.S. Attorney's Office.[44] Goldberg testified:

> Q.    Did you participate in any meetings in person with the Delaware U.S. Attorney's Office?
>
> A.    Yes.
>
> Q.    How many?
>
> A.    One.

---

[42] Transcribed Interview of Stuart Goldberg, Acting Deputy Assistant Att'y Gen. for Crim. Matters, U.S. Dep't of Just., Tax Div., at 17 (Oct. 25, 2023) [hereinafter Goldberg Interview].
[43] *Id.*
[44] *Id.* at 25-27.

Q.      And when was that?

A.      January 2023.

Q.      And who was in attendance?

A.      The U.S. Attorney.

Q.      Mr. Weiss?

A.      Yes. Several assistants from his office.

Q.      Was Lesley Wolf there?

A.      Yes. The lawyers from the Tax Division were there.

Q.      Mr. Morgan and Mr. Daly?

A.      Yes. And defense counsel representing Mr. Biden.

                              *       *       *

Q.      Okay. And was it customary for you to attend that type of meeting or did you only attend here because of the significance of the target and the investigation?

A.      I attended because Mr. Weiss asked me to come up for the meeting.

Q.      Okay. How frequently do you travel to U.S. Attorney's Offices for meetings of that sort? Was that unusual for you to—

A.      For me to go to a U.S. Attorney's Office on a case?

Q.      Yeah.

A.      It's not something that I would commonly do.

Q.      Okay. How many times have you done it . . . [i]n your current role?

A.      I think it's the only time I've done it.[45]

---

[45] *Id.*

Ziegler also explained how the Bidens were afforded special treatment due to being a politically powerful family in Delaware. Ziegler recalled one instance early in the investigation that "caused [him] pause and concern."[46] In late 2018, Ziegler sent documentation that would refer the case to the Department's Tax Division for further investigation up to his manager at the time, Supervisory Special Agent Matt Kutz,[47] for Kutz's review. Upon reviewing the package of documents, Kutz told Ziegler that "a political family like this, you have to have more than just an allegation and evidence related to that allegation. In order for this case to move forward, you basically have to show a significant amount of evidence and similar wrongdoing that would basically illustrate a prosecution report."[48] Ziegler replied that "we have to treat each taxpayer the same, it shouldn't matter on their name."[49] However, Kutz refused to listen to Ziegler's concerns, causing Ziegler to lament that Kutz "was [his] manager and [he] had to do what [Kutz] said."[50] Ultimately, Ziegler had to draft three versions of the referral package before Kutz approved it for review by the Tax Division.[51]

Department and IRS officials expressed obvious concerns over investigating a Biden in Delaware, ultimately leading to the Department's sensitive approach in handling this case. Ziegler described the challenges associated with investigating the Bidens in Delaware, explaining that "Delaware was in the State in which the subject's father lived, and the family was extremely well-known throughout the State, including . . . [to] the investigators and prosecutors on the team."[52] He testified:

> Q.     Okay. Just a question about working with the U.S. Attorney's Office in Delaware. It seems like the elephant in the room is that – correct me if I'm wrong, but – Joe Biden and anyone in the Biden family is royalty in Delaware. Is that not the case?
>
> A.     It was definitely something that was overly apparent in the State, yes.
>
> Q.     So whether the President is a Republican or a Democrat, if you are in the district of Delaware, and you are in the U.S. Attorney's Office, and you are trying to bring a case against a family member of Joe Biden, that inherently has its challenges, doesn't it?
>
> A.     Yes. . . . I think he is someone that's a big deal within that State.

---

[46] Ziegler Interview at 18.
[47] Shapley was assigned as supervisor of the Hunter Biden investigation in January 2020. Shapley Interview at 12.
[48] Ziegler Interview at 18-19.
[49] *Id.* at 19.
[50] *Id.*
[51] *Id.*
[52] *Id.* at 20.

Q.      Right. And so all the nonpolitically-appointed officials in the office certainly could be affected by the fact that we're dealing with Joe Biden, correct? In that office?

A.      I went into it with the belief that I would hope that that wouldn't happen. But it being in the Delaware area, it very well could have happened that way.[53]

Shapley similarly testified that an unidentified FBI case agent in Wilmington "was concerned about the consequences for him and his family" if he had to investigate the Bidens in Delaware.[54] However, when he sat for his transcribed interview, Delaware U.S. Attorney Weiss would not acknowledge any fear or worry about investigating the President's son in the Biden family's home state of Delaware. Weiss suggested that although there are only "a certain number of practitioners" in the small Delaware legal community, he was not concerned with bringing a case there against the President's son.[55] Weiss testified:

Q.      Would you characterize the Delaware legal community as a small, tight-knit legal community?

A.      I would characterize the Delaware community as a small community, yes, for sure.

Q.      And, for the most part, all the key players who litigate in Federal court know one another?

A.      I think that's fair that folks get to know one another pretty quickly, yes.

Q.      . . . Did you ever have any concerns that you were responsible for bringing a case against the President's son and, yet, you're part of this close-knit community?

A.      No, I didn't. No. Yes, I just – I just acknowledge that the Delaware, particularly in Federal court – you know, there is only a certain number of practitioners locally –[56]

Testimony obtained by the Committees shows that Hunter Biden received numerous other special privileges throughout the course of the investigation due to his last name. For example, retired FBI Supervisory Special Agent Joe Gordon of the FBI Wilmington Resident Agency testified that FBI headquarters tipped off then-President-elect Biden's transition team of the IRS and FBI investigators' plan to interview Hunter Biden the following day. He explained:

---

[53] *Id.* at 157-58.
[54] Shapley Interview at 16.
[55] Weiss Interview at 143-45.
[56] *Id.* at 143-44.

Q.    Did you also receive information that the transition team was notified as well?

A.    I don't recall that exactly. . . . I know I was upset when I learned about it.

Q.    Why were you upset?

A.    I felt it was people that did not need to know about our intent. I believe that the Secret Service had to be notified for our safety, for lack of confusion, for deconfliction, which we would do in so many other cases, but I didn't understand why the initial notification.[57]

Gordon provided further details on the irregularity of events that occurred the morning investigators were to interview Hunter Biden. Specifically, Gordon elaborated on how one of his superiors ordered them to stand down and not pursue their planned suspect interview of the President's son.[58] He stated:

Q.    What happened the next day? Did you learn any information given now that Secret Service headquarters knows? . . .

A.    So, obviously, we were on the West Coast. There were additional interviews across the country, to include the East Coast, which was 3 hours ahead. So we were up early. I was partnered with supervisor number two of the IRS. And as we got together or while we got together on that morning, I was notified by my assistant special agent in charge that we would not even be allowed to approach [Hunter Biden's] house; that the plan, as told to us, was that my information would be given to the Secret Service, to whom I don't know exactly . . . with the notification that we would like to talk to Hunter Biden; and that I was not to go near the house and to stand by.

Q.    In your career of 20 years, have you ever been told . . . that you had to wait outside of a target's home until they contacted you?

A.    Not that I recall. I mean, there have been times where we waited for maybe something else operationally to happen, but, no, not from the point of view of the target, the subject of the investigation.

---

[57] Gordon Interview at 33.

[58] *Id.* at 33-35.

<center>*     *     *</center>

> Q.      And were you able to interview Hunter Biden . . . as part of your investigation?
>
> A.      I was not.[59]

During his interview, Gordon explained how the treatment of Hunter Biden's interview was vastly different from interviews of other investigative targets. He stated that it is "important" for FBI agents conducting a criminal investigation to be discreet about their intent "to go out and talk with the target of a[n] investigation," to give themselves "the best opportunity to have a conversation with somebody and not have them influenced in some way" and to prevent targets and witnesses from destroying evidence.[60] Such a common-sense tactic did not occur in Hunter Biden's case because FBI headquarters tipped off the Biden presidential transition team about investigators' plan to interview Hunter Biden.

The whistleblowers also detailed a situation—described by Shapley as "one of the major deviations [from standard operating procedure] in this case"[61]—in which one of the prosecutors in Weiss's office, Assistant U.S. Attorney Lesley Wolf,[62] prohibited line investigators from looking into incriminating messages involving now-President Biden. In July 2017, Hunter Biden was negotiating a business deal with executives from CEFC China Energy, a now-defunct Chinese conglomerate with close ties to the Chinese Communist Party,[63] which has had multiple executives imprisoned for corruption.[64] On July 30, 2017, Hunter Biden invoked his father in a threatening message to CEFC executive Zhao Runlong (a.k.a. Raymond Zhao).[65] Hunter Biden wrote:

> Z[hao]- Please have the [CEFC] director call me- not James [Biden] or Tony [Bobulinski] or Jim [Bulger]- have him call me tonight. **I am sitting here with my father and we would like to understand why the commitment made has not been fulfilled**. I am very concerned that the [CEFC] Chairman has either changed his mind

---

[59] *Id.*

[60] *Id.* at 25.

[61] *Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight & Accountability*, 118th Cong., at 19 (2023) (statement of Gary Shapley, Supervisory Special Agent, Internal Revenue Serv.).

[62] *Id.* at 71 (statement of Joseph Ziegler, Special Agent, Internal Revenue Serv.) (identifying Lesley Wolf as the prosecutor who prevented investigators from obtaining the relevant location data).

[63] *See* MAJORITY STAFF OF S. COMM. ON FIN. & S. COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFS., 116TH CONG., HUNTER BIDEN, BURISMA, AND CORRUPTION: THE IMPACT ON U.S. GOVERNMENT POLICY AND RELATED CONCERNS, at 71-75 (2020) (detailing CEFC's connections to the Chinese Communist Party).

[64] *See* Press Release, U.S. Att'y's Off. S. Dist. of N.Y., Patrick Ho, Former Head Of Organization Backed By Chinese Energy Conglomerate, Convicted Of International Bribery, Money Laundering Offenses (Dec. 5, 2018); Shu Zhang & Chen Aizhu, *China's CEFC founder Ye named in corruption case - state media*, REUTERS (Oct. 12, 2018).

[65] Jerry Dunleavy, *Hunter Biden invoking 'my father' resulted in millions flowing from CCP-linked company*, WASH. EXAM'R (June 28, 2023); Josh Christenson, *Why Hunter Biden angrily threatened his Chinese business associate*, N.Y. POST (June 26, 2023).

<center>14</center>

and broken our deal without telling me or that he is unaware of the promises and assurances that have been made have not been kept. Tell the director that I would like to resolve this now before it gets out of hand. And now means tonight. And Z[hao] if I get a call or text from anyone involved in this other than you, [CEFC Executive Director] Zhang [Jianjun] or the [CEFC] Chairman **I will make certain that between the man sitting next to me and every person he knows and my ability to forever hold a grudge that you will regret not following my direction**. All too often people mistake kindness for weakness --- and all too often I am standing over top of them saying I warned you. From this moment until whenever he reaches me. It [is] 9:45 AM here and [I] assume 9:45 PM there so his night is running out.[66]

When Zhao responded that he received the message, Hunter Biden reiterated that he was "sitting here waiting for the call with [his] father."[67]

When IRS investigators discovered Hunter Biden's message, they asked Wolf if they could obtain location data to determine from where the messages were sent to determine whether Hunter Biden was actually sitting next to his father and establish probable cause for interviewing now-President Biden.[68] Shapley explained that the message not only constituted evidence of potential tax crimes, but also raised national security and Foreign Agents Registration Act (FARA) concerns as well.[69] Despite the fact that collecting location data is what investigators "would normally do" in this scenario,[70] Wolf denied the request.[71] Investigators discovered other incriminating messages Hunter Biden had sent and received,[72] some of which suggested that now-President Biden was involved in his son's foreign business ventures.[73] According to Shapley, these messages "included material [that investigators] clearly needed to follow up on," and "made it clear [investigators] needed to search the guest house at the Bidens' Delaware residence where Hunter Biden stayed for a time."[74] However, once again, "prosecutors denied

---

[66] Shapley Interview, Ex. 11 (emphasis added).

[67] *Id.*

[68] Shapley Interview at 163. *See also Timeline of Hunter Biden Investigation*, EMPOWER OVERSIGHT (last updated Sept. 29, 2023).

[69] Shapley Interview at 164.

[70] Ziegler Interview at 105. *See also Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight & Accountability*, 118th Cong., at 50-51 (2023) (statement of Gary Shapley, Supervisory Special Agent, Internal Revenue Serv.) ("I recall [prosecutors] saying to me that, how do we know that [Joe Biden] is there . . . and then I said well, we would get the location data. So as a part of my normal investigation, that is what I would do."); *Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight & Accountability*, 118th Cong., at 65 (2023) (statement of Joseph Ziegler, Special Agent, Internal Revenue Serv.) ("So typically, in that situation, you'd want to get location data, contemporaneous data that would show where that person is at, so that's what we would typically look to.").

[71] Shapley Interview at 14, 163, 165; Ziegler Interview at  105-06.

[72] *See generally* Ziegler Supplemental Production 2, Ex. 300.

[73] *E.g.*, Shapley Interview, Ex. 11 (listing a WhatsApp message Hunter Biden sent to another CEFC executive stating, "I can make $5M in salary at any law firm in America. If you think this is about money it's not. The Biden's [sic] are the best I know at doing exactly what the Chairman wants from this partnership[]. Please let's not quibble over peanuts.").

[74] Shapley Interview at 14.

investigators' requests to develop a strategy to look into the messages and denied investigators' suggestion to obtain location information to see where the texts were sent from."[75]

Overall, the testimony from Justice Department, FBI, and IRS officials substantiates the IRS whistleblowers' prior testimony that the Justice Department's "sensitive" treatment of Hunter Biden's case deviated from the normal investigative practices and fell well short of the Department's mission of impartial justice.

## B. FBI bureaucrats impeded the investigation into Hunter Biden by slow-walking investigative action and withholding relevant information.

Witness testimony also highlights how officials in the FBI headquarters worked to slow-walk and stall the Justice Department's efforts to review the credibility of information related to Ukraine. In late 2019 or early 2020, the Justice Department set up a system to coordinate multiple Department matters related to Ukraine.[76] As part of this effort, on January 3, 2020, then-Attorney General Bill Barr and then-Deputy Attorney General Jeffrey Rosen gave then-U.S. Attorney for the Western District of Pennsylvania Scott Brady a limited assignment to vet information related to Ukraine coming into the Justice Department, and then to pass credible information along to U.S. Attorneys' Offices with relevant ongoing grand jury investigations by providing substantive briefings on their findings and recommending next steps.[77] In his transcribed interview, Brady confirmed to the Committee that "any member of the public" could provide information as part of this intake process, and that his office treated the information the same as all other information provided to the Department.[78] Brady described his assignment as "an intake and vetting process, kind of akin to a due diligence,"[79] involving assessing the credibility of information using publicly available resources and pre-existing FBI records.[80] Brady explained that his office did not have access to grand jury tools such as subpoenaing documents or witnesses.[81]

In his transcribed interview, Brady detailed for the Judiciary Committee the "challenging working relationship" he had with the FBI in carrying out his assignment, as well as the FBI's "reluctance . . . to really do any tasking related to [the] assignment from DAG Rosen and looking into allegations of Ukrainian corruption broadly and then specifically anything that intersected with Hunter Biden and his role in Burisma."[82] In particular, challenges arose from FBI

---

[75] Id.

[76] Letter from Stephen E. Boyd, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jerrold Nadler, Chairman, H. Comm. on the Judiciary (Feb. 18, 2020).

[77] Brady Interview at 10-13. See also Brady Interview at 35 ("My goal was for us to do our task, our job that we were given by AG Barr, DAG Rosen."); Brady Interview at 43 ("Q. Okay. So the task that you were given came ultimately from Attorney General Barr. Is that right? A. I believe so, yes.").

[78] Brady Interview at 14, 63. See also Letter from Stephen E. Boyd, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jerrold Nadler, Chairman, H. Comm. on the Judiciary (Feb. 18, 2020) ("Nor do these procedures grant any individual unique access to the Department. Indeed, any member of the public who has relevant information may contact the Department and make use of its intake process for Ukraine-related matters. . . . All information provided through this process will be treated just like any other information provided to the Department.").

[79] Brady Interview at 11.

[80] Id. at 11-12.

[81] Id. at 12, 15.

[82] Id. at 37.

headquarters slow-walking the vetting process, which the FBI purportedly did due to the "sensitive nature" of the assignment.[83] Brady explained that the FBI required Baltimore Field Office special agents to obtain an unnecessary and unprecedented number of approvals from FBI headquarters to take even the most basic investigative actions.[84] For instance, while FBI agents working on the type of assessment Brady was conducting are typically required to obtain approval every 30 days to continue working on the assessment, such approval is generally given at the Supervisory Special Agent level.[85] However, in Brady's case, FBI agents were required to obtain approval from 17 separate officials, most of whom were at FBI headquarters, every 30 days to continue working on the assessment—something Brady had never seen in his career.[86] He testified:

> Q.   Did you get a sense of why the FBI was reluctant to take any action? . . .

> A.   I don't know why they were reluctant. I know that, because of what they deemed to be the sensitive nature, and this was sensitive, as it related to Mr. [Hunter] Biden, that there were a lot of steps of approval and a lot of eyes that had to look at things and sign off on any action that the special agents that were doing the day-to-day work and interacting with our team would take.

> It was my understanding that FBI Headquarters had to sign off on every assignment, no matter how small or routine, before they could take action, which then just lengthened the amount of time . . . between us asking them to do something and them actually performing it.

> Q.   And, in your dealings with the FBI, was this level of signoff regular, that the special agent would have to get signoff to take any little investigative action?

> A.   Not in my experience. In my experience, on most investigations, even sensitive investigations, and/or public corruption investigations, it was usually contained within the field office. . . .

> Even something as simple as extending the assessment that we talked about, that requires a renewal every 30 days under the FBI [Domestic Investigations and Operations Guide]. Normally that, either opening or renewal, can be . . . at the

---

[83] *Id.*
[84] *Id.*
[85] *Id.* at 38. *See generally* Fed. Bureau of Investigation, Domestic Investigations and Operations Guide § 5.6 (2021).
[86] Brady Interview at 38.

[Supervisory Special Agent] level. In this case, it required 17 different people, including mostly at the headquarters level to sign off on it before the assessment could be extended.

And so, at different times, we were told by the special agents that they had to go pens down sometimes for 2 or 3 weeks at a time before they could re-engage and take additional steps because they were still waiting on, again, someone within the 17 chain signoff to approve.

Q.     And had you ever seen a 17-person signoff required by the FBI?

A.     Never in my career.[87]

Brady also recounted how officials at FBI headquarters told line agents to withhold information from Brady's office. Brady explained:

Q.     Were there any other . . . challenges that you experienced with the FBI?

A.     Yes. There was one occasion where we were informed by members of the Pittsburgh FBI team that was conducting this investigation, this vetting process with our U.S. Attorney team in Pittsburgh, that they were told by someone at FBI Headquarters that they were not to affirmatively share information with us but that they were only to share information with us if we asked them a direct question relating to that information, which is not typically how the investigative process goes.

At one point, when we were setting up the entire vetting process, and there was a discussion with the FBI about whether—how, in their administrative process, it should be characterized, and I said: Well let's all sit together around a table and talk this out; could you please share with me your DIOG, which is the FBI's bible for their processes and procedures.

We were told that someone at FBI Headquarters, unknown to me, said: Don't share that with the U.S. Attorney's office, to which I said: I'm a presidentially appointed United States Attorney. We're on the same team, part of the Department of

---

[87] *Id.* at 37-38.

Justice. What do you mean you can't share your DIOG with
me. They said: That's what we were told, so we can't, sir.[88]

Brady testified that the prohibition on sharing information between FBI Pittsburgh and his office
was out of the ordinary and resulted in unnecessary delays in the investigation. He explained:

> Q.     What was the normal kind of reporting process between your
>        office and FBI Pittsburgh?
>
> A.     I mean, on a normal case, it's an iterative process, a
>        collaborative process between agent, investigator, and
>        [Assistant U.S. Attorney] and prosecutor. There's mutuality
>        of information sharing. There's a certain transparency
>        because . . . the goal is to conduct an investigation and make
>        a determination at some point with the agency's
>        recommendation about prosecute, not prosecute. But, even
>        short of that . . . take investigative steps that you discuss and
>        agree on, and you know, to move an investigation forward or
>        to open other avenues, identify potential witnesses, subjects,
>        targets. This was not that dynamic.
>
> Q.     And, with the FBI not following the typical investigative
>        process at the direction of FBI headquarters, what did that
>        mean for your assignment in vetting Ukraine-related
>        information?
>
> A.     It just meant, as I testified earlier, there were stops and starts.
>        It was sometimes difficult to get full information back from
>        the FBI. Again, as I mentioned, sometimes they had to go
>        pens down while they were awaiting approval from
>        headquarters. There were delays when we were trying to
>        re-interview the [confidential human source] in June
>        of 2020. It was challenging.[89]

This prohibition on information sharing with the U.S. Attorney's Office for the Western
District of Pennsylvania had real consequences. Brady informed the Committee that there were
"many things" relevant to his investigation that the FBI did not share with his office.[90] As an
example, Brady said that he "was not aware . . . that the FBI was in possession of the Hunter
Biden laptop" until it was publicly reported in October 2020.[91] Brady expressed that he was
"surprised" to learn this information from a media report because the laptop contained
"information relating to Hunter Biden's activities on the board of Burisma in Ukraine, that might
have been helpful in our assessment of the information that we were receiving about him" and

---

[88] *Id.* at 85.
[89] *Id.* at 85-86.
[90] *Id.* at 105.
[91] *Id.*

that Brady "would have expected that be shared" with his office.[92] Brady also noted that his whole team working on the Ukraine-related information assignment was surprised that the FBI did not inform them of the laptop.[93]

      The FBI also tried to prevent Brady from learning more about allegations that the Biden family had received bribes in connection with then-Vice President Biden's official actions. Notably, the bribery allegations were not even discovered until Brady's office located an FBI document memorializing a report from a confidential human source (CHS), known as an FD-1023, referencing Hunter Biden's lucrative position on Burisma's board that the FBI "had not . . . looked into or developed any further."[94] Former Attorney General Bill Barr stated during a media interview that the information Brady's office developed "had been overlooked by the FBI."[95] Brady attempted to get the FBI to re-interview the CHS who had produced the original report to further develop information relevant to his assignment.[96] Brady told the Committee that the FBI also initially resisted his efforts to re-interview the CHS after the discovery of the FD-1023, though it eventually relented and allowed the interview to proceed.[97]

      The subsequent interview of the CHS—whom the FBI considered "highly credible" and had previously used in multiple investigative matters[98]—resulted in the creation of another FD-1023 on June 30, 2020, this time containing information implicating then-Vice President Biden in a multimillion-dollar bribery scheme. As memorialized in this FD-1023, during a meeting in late 2015 or early 2016, an executive from the Ukrainian natural gas company Burisma told the CHS that Burisma had hired Hunter Biden to "protect us, through his dad, from all kinds of problems."[99] In another meeting in 2016, Burisma founder and owner Mykola Zlochevsky, whom State Department officials considered to be a corrupt, "odious oligarch,"[100] told the CHS that "it cost 5 (million) to pay one Biden, and 5 (million) to [pay] another Biden."[101] The CHS said it was unclear whether Zlochevsky had already made these payments to the Bidens.[102] When the CHS recommended firing Hunter Biden, Zlochevsky mentioned that he needed to keep Hunter Biden on the board of directors "so everything will be okay."[103] The CHS then asked Zlochevsky whether Hunter Biden or Joe Biden told him he should retain Hunter Biden, to which

---

[92] *Id. See also id.* at 157 ("Q. . . . Were you surprised that you didn't know about the existence of this laptop? A. Yes.").

[93] *Id.* at 159.

[94] *Id.* at 90.

[95] *Fox News Sunday* (Fox News television broadcast June 11, 2023).

[96] Brady Interview at 91

[97] *See id.* (describing the FBI's "reluctance" and "resistance" to re-interviewing the CHS).

[98] *Id.* at 19-20. Brady further confirmed that the information contained the 1023 at issue did not come from Rudy Giuliani or any known sources of Russian disinformation. *See id.* at 96 ("[T]hat was already communicated to [Weiss's] office, that the 1023 was from a credible CHS that had a history with the FBI, and that it was not derived from any of the information from Mr. Giuliani."); *id.* at 103 ("[Attorney] General Barr's statements are all accurate, including his statement that the information contained in the 1023 was not derived from any Giuliani-related information and are not from . . . known sources of Russian disinformation.").

[99] FBI Form FD-1023 re Confidential Human Source's Meetings with Burisma Executives, at 1 (June 30, 2020).

[100] MAJORITY STAFF OF S. COMM. ON FIN. & S. COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFS., 116TH CONG., HUNTER BIDEN, BURISMA, AND CORRUPTION: THE IMPACT ON U.S. GOVERNMENT POLICY AND RELATED CONCERNS, at 23-25 (2020).

[101] FBI Form FD-1023 re Confidential Human Source's Meetings with Burisma Executives, at 2 (June 30, 2020).

[102] *Id.*

[103] *Id.*

Zlochevsky replied that "[t]hey both did."[104] When the CHS brought up the issue of the Ukrainian Prosecutor General's investigation of Burisma, Zlochevsky said that the investigation "will go away anyway," and that it was "too late to change his decision" regarding how to deal with the investigation, which the CHS understood "to mean that Zlochevsky had already . . . paid the Bidens, presumably to deal with [the Prosecutor General]."[105] Zlochevsky later informed the CHS that "he didn't want to pay the Bidens and he was pushed to pay them."[106] During a subsequent phone call in 2019, Zlochevsky told the CHS that he did not send any funds directly to the "Big Guy"—"which CHS understood was a reference to Joe Biden"—and that it would take investigators ten years to find the records of illicit payments to now-President Biden due to the vast number of companies and bank accounts Zlochevsky controls.[107]

The FBI's reluctance to cooperate with Brady's assignment added further delays to the process of vetting Ukraine-related information coming into the Justice Department.[108] Ultimately, Brady had no choice but to seek help from the Deputy Attorney General's office "at least five or six times on a myriad of different issues" to get the FBI to follow the typical investigative process and stop hindering the assignment.[109] According to Brady, FBI orders related to "information sharing, not sharing, approvals, [and] delays" were issued from "somewhere in FBI Headquarters below the Deputy Director."[110] Brady explained that while the "choke point" in the information sharing was somewhere within FBI headquarters, he had no visibility into where exactly it originated.[111]

Simply put, the FBI and officials in headquarters slow-walked taking necessary investigative actions and sharing relevant information that could have helped prosecutors gather evidence in the case against Hunter Biden. This lack of transparency and reluctance to take action due to sensitivities around the case ultimately benefited Hunter Biden.

## C.  Senior officials in the Delaware U.S. Attorney's Office attempted to avoid learning information that could implicate President Biden in criminal activity.

The Committees have obtained information showing that the U.S. Attorney's Office for the District of Delaware under the leadership of David Weiss also deviated from standard operating procedure to the benefit of Hunter Biden. Although Weiss was initially appointed by President Trump, he was recommended for the position by Delaware's two Democratic senators, Tom Carper and Chris Coons.[112] In 2021, the Biden Administration asked Weiss to stay on as

---

[104] *Id.*
[105] *Id.* (internal quotation marks omitted).
[106] *Id.* (internal quotation marks omitted).
[107] *Id.* at 3.
[108] Brady Interview at 38, 41, 86, 187.
[109] *Id.* at 39.
[110] *Id.* at 87.
[111] *Id.* at 40.
[112] Josephine Peterson, *David Weiss sworn in as Delaware U.S. Attorney*, NEWS J. (Feb. 23, 2018). President Trump also appointed Judge Maryellen Noreika, who would later oversee the hearing on the sweetheart plea deal Weiss offered to Hunter Biden, despite the fact that she was a registered Democrat, because she had been recommended by Senators Carper and Coons. *See Maryellen Noreika – Nominee for the U.S. District Court for the District of Delaware*, VETTING ROOM (Feb. 5. 2018); Press Release, Sen. Chris Coons, Carper, Coons' Judicial Candidates

U.S. Attorney.[113] Weiss had previously been appointed as interim U.S. Attorney in Delaware during the Obama Administration,[114] and had "often" worked with Hunter Biden's brother, Beau Biden, during Beau Biden's tenure as Attorney General of Delaware.[115] While Weiss was registered as a Republican, Assistant U.S. Attorney Lesley Wolf, who played a central role in the Hunter Biden investigation, had donated to Democrat campaigns.[116] In a state dominated politically by the Biden family, these facts are not insignificant.

According to former U.S. Attorney Scott Brady, it was "regularly a challenge to interact with" the U.S. Attorney's Office for the District of Delaware.[117] Brady testified that communication "became problematic at different points" between his office and Weiss's office.[118] There were times when Brady and Weiss would have to get involved directly to attempt to resolve communication issues between their offices.[119] Brady testified:

> Q.    Did you have any issues developing a channel of communication initially with the Delaware U.S. Attorney's Office?
>
> A.    Yes.
>
> Q.    And could you talk to us about that?
>
> A.    Speaking generally, from a process perspective, I think there was both a skepticism of the information that we were developing, that we had received, and skepticism and then weariness of that information. I think they were very concerned about any information sharing with our office.
>
>      It became problematic at different points, which required Mr. Weiss and me to get involved and level set, as it were, but it was regularly a challenge to interact with the investigative team from Delaware.[120]

---

Nominated for U.S. District Court Bench: White House nominates Maryellen Noreika and Colm Connolly for bench positions (Dec. 21, 2017).

[113] *See* Weiss Interview at 11.

[114] *Meet the U.S. Attorney: David C. Weiss*, U.S. DEP'T OF JUST. (Feb. 5, 2020); Andrew C. McCarthy, Opinion, *Garland does the Bidens no favor by dodging a special counsel appointment*, THE HILL (Apr. 28, 2022).

[115] Michael Kranish, *Before investigating Hunter Biden, prosecutor worked with brother Beau*, WASH. POST (Aug. 20, 2023).

[116] Michael Ginsberg, *Meet The US Attorney Who Allegedly Covered For Hunter Biden*, DAILY CALLER (June 28, 2023).

[117] Brady Interview at 29.

[118] *Id.*

[119] *Id.*

[120] *Id.* at 29-30.

Brady testified that in his experience, U.S. Attorney's Offices are generally "fairly clear and transparent" with each other, "even on sensitive matters." [121] He called the communication issues with Weiss's office "unusual." [122]

Brady explained that his team merely wanted "to understand what [Weiss's team] had looked at, what they had not looked at to make sure we weren't . . . duplicating efforts, stepping on toes, doing anything that would in any way complicate their lives and their investigation." [123] Despite their best efforts to communicate with Weiss's team, Brady stated that the relationship between their offices became "problematic." [124] When asked why he thought the relationship deteriorated, Brady explained:

> I don't want to speculate as to why, but I know that there was no information sharing back to us . . . . And, at one point, the communication between our offices was so constricted that we had to provide written questions to the investigative team in Delaware, almost in the form of interrogatories, and receive written answers back. [125]

Brady further elaborated on the stilted relationship between the two offices, stating:

> Q.   Now, also, based on what you said, throughout the process, you said that the Delaware U.S. Attorney's Office wasn't willing to cooperate, so much so that you had to send interrogatories?
>
> A.   Yes, we had conversations, asked for communication and a flow of information, mostly one way from us to them, but also, as I testified, we wanted to make sure we weren't duplicating what they were doing. They would not engage. And so finally, after me calling Mr. Weiss and saying can you please talk to your team, this is important, this is why we want to interact with them, the response that we got back is you can submit your questions to our team in written form, which we did.
>
> Q.   And that was unusual?
>
> A.   I had never seen it before. [126]

---

[121] *Id.* at 31.
[122] *Id.*
[123] *Id.* at 37.
[124] *Id.* at 29.
[125] *Id.* at 30.
[126] *Id.* at 156-57.

The "unusual" communication issues that Brady had with Weiss's office were only magnified when Brady's team sought to pass the information from the June 30, 2020 FD-1023, containing allegations that then-Vice President Joe Biden and Hunter Biden each received a $5 million bribe from a Ukrainian oligarch, off to Weiss's team—who had an existing grand jury investigation into Hunter Biden.[127] Brady recalled that he asked multiple times to brief the Delaware U.S. Attorney's Office on details of the FD-1023.[128] Brady testified that he ultimately had to seek assistance from the Deputy Attorney General's office to resolve the reluctance from Weiss's office to take the briefing.[129] The intervention from the Deputy Attorney General's office resulted in Main Justice ordering Weiss's office to cooperate with Brady's office and receive the briefing.[130]

During his interview with the Judiciary Committee, Brady walked through paragraphs of Shapley's supplemental disclosure statement that detailed what occurred behind the scenes prior to the briefing that Brady's team provided to Weiss's team about the FD-1023. Brady testified:

> Q.    So, looking at paragraph four on page 2 [of Shapley's September 20, 2023 statement] as it continues onto page 2, the second full sentence, it says: The prosecution team discussed the Hunter Biden related work of the Pittsburgh USAO on several occasions, as it was a line item on the recurring prosecution team's call agenda for a long period of time. Assistant U.S. Attorney Lesley Wolf told us the Pittsburgh USAO and U.S. Attorney Scott Brady requested to brief the Delaware USAO's Hunter Biden's investigative team on multiple occasions, but they were turned down by AUSA Wolf and the Delaware USAO. Is it accurate that you had requested multiple times, you or your office, to brief the Delaware U.S. Attorney's Office?

> A.    Yes.

                        *       *       *

> Q.    And were you ever told that the Delaware U.S. Attorney's Office did not want a briefing from your office?

> A.    I believe I was. I don't remember. But I know that we had trouble scheduling it.

> Q.    Okay. And then, further down, it states AUSA Wolf's comments made clear she did not want to cooperate with the

---

[127] Id. at 20-21, 95-97.
[128] Id. at 95.
[129] Id. at 97.
[130] Shapley Supplemental Production 3, Attachment 6 ("Pittsburgh read out on their investigation was ordered to be received by this prosecution team by the P[A]DAG.").

Pittsburgh USAO, and that she had already concluded no information from that office could be credible stating her belief that it all came from Rudy Giuliani.

Were you ever made aware of Ms. Wolf's processing and decisions regarding this briefing, and why she didn't want the briefing?

A.   I was not. We did, however, make it clear that some of the information including this 1023 did not come from Mr. Giuliani.[131]

\*          \*          \*

Q.   [Shapley's statement] states, on the October 22, 2020, prosecution team call, AUSA Wolf informed us that because the Delaware U.S. Attorney's Office had been ordered by the principal deputy attorney general at Justice Department headquarters to receive the briefing from the Pittsburgh USAO, it would be happening the next day, October 23, 2020.

Does that match your recollection of how things went down, the PADAG communication?

A.   I didn't have specific knowledge that that was what happened between the PADAG and the Delaware U.S. Attorney's Office until I saw Mr. Shapley's testimony.

Q.   Did you bring this concern that the USAO in Delaware was not wanting a briefing from you? Did you bring that concern to the PADAG?

A.   I'm sure I did.[132]

Brady testified that ultimately his office passed the FD-1023 along to Weiss's office for "further analysis or investigation" and "made specific[] recommendations."[133] But, as he stated, "that was the end of our tasking."[134]

The opposition expressed by the Delaware USAO to receiving credible information from Brady's office was just the starting point of their reluctance to engage on matters involving Hunter Biden. As their work continued on the investigation, Weiss's team would further deviate

---

[131] Brady Interview at 94-96.
[132] *Id.* at 97.
[133] *Id.* at 99.
[134] *Id.*

from standard investigative practices to shield Hunter Biden and the Biden family from close scrutiny.

### D. The Delaware U.S. Attorney's Office continually sought to keep the Biden name out of the investigation.

Throughout the investigation, Weiss's team in the Delaware USAO hindered and handicapped the criminal investigation into Hunter Biden. One of the ways that Weiss's team did this was by keeping the Biden name out of the investigation. Shapley testified that prosecutors wanted to go as far as removing Hunter Biden's name from "electronic search warrants, 2703(d) orders, and document requests" based on what they thought would get approved.[135] Ziegler corroborated this statement, recalling an instance in which he told prosecutors on a team call that he was uncomfortable removing Hunter Biden's name from any documents "just based on what might or might not get approved," and that he thought doing so was "unethical."[136]

Documents produced to the Ways and Means Committee further evidence the desire of Weiss's team to shield the Bidens from scrutiny. On August 7, 2020, Lesley Wolf, Weiss's top prosecutor on the case, told the investigative team, "As a priority, someone needs to redraft attachment B . . . . There should be nothing about Political Figure 1 in here."[137]



# EXHIBIT 202

| | |
|---|---|
| **From:** | Wolf, Lesley (USADE) ██████████████ |
| **Sent:** | Friday, August 07, 2020 7:41 PM |
| **To:** | Wilson, Joshua J. (BA) (FBI); Hudson, Carly (USADE) |
| **Cc:** | Roepcke, Susan C. (BA) (FBI); Hoffman, Michelle A. (BA) (FBI); Ziegler Joseph A; Gordon, Joseph P. (BA) (FBI) |
| **Subject:** | RE: BS SW Draft |

As a priority, someone needs to redraft attachment B.  I am not sure what this is cut and pasted from but other than the attribution, location and identity stuff at the end, none if it is appropriate and within the scope of this warrant.  Please focus on FARA evidence only.  There should be nothing about Political Figure 1 in here.

Thanks.

The attachment referenced by Wolf included terms for a search warrant for records related to Hunter Biden. The warrant defined "POLITICAL FIGURE 1" as "FORMER VICE PRESIDENT JOSEPH ROBINETTE BIDEN JR."[138]

---

[135] Shapley Interview at 15.
[136] Ziegler Interview at 25-26.
[137] Ziegler Supplemental Production 2, Ex. 202.
[138] Ziegler Supplemental Production 2, Ex. 203.

18.     POLITICAL FIGURE 1 - FORMER VICE PRESIDENT JOSEPH

ROBINETTE BIDEN JR. - VP BIDEN is currently the Democratic Party Presidential candidate

for the United States and served as the 47th officeholder for the position of the Office of the Vice

President of the United States (VPOTUS) in the Barack Obama Administration from January 20,

2009 to January 20, 2017. He is the father of SUBJECT 1.

Other information suggests that Justice Department prosecutors prevented investigators from taking ordinary investigative steps. During a prosecution team call on September 3, 2020, Wolf stated that there was "no way" the team could get the approval to obtain a search warrant for the Delaware guest house of then-presidential candidate Joe Biden, where Hunter Biden frequently stayed, despite acknowledging that "there was more than enough probable cause for the physical search warrant there" and "a lot of evidence in [the] investigation would be found" there.[139] Shapley understood Wolf's claim that the search request would not be approved to be an "excuse" Wolf "hid[] behind" to not even attempt to get it approved.[140] Wolf continued that the question of whether to search then-candidate Joe Biden's guest house "was whether the juice was worth the squeeze" and that "optics were a driving factor in the decision on whether to execute a search warrant."[141] On October 22, 2020, Wolf informed the prosecution team that U.S. Attorney Weiss agreed that there was probable cause to search the residence, but that they would not be pursuing a search warrant nonetheless.[142] Shapley and Ziegler both testified that they have never heard a prosecutor say that optics were a driving factor in deciding whether to execute a search warrant.[143]

In December 2020, Wolf even went so far as to alert Hunter Biden's defense attorneys about an impending search warrant for a storage unit owned by Hunter Biden.[144] On December

---

[139] Shapley Interview at 14-15.
[140] *Id.* at 114.
[141] *Id.* at 14-15.
[142] Shapley Supplemental Production 3, Attachment 6.
[143] *Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight and Accountability*, 118th Cong. (July 19, 2023) (statements of Gary Shapley and Joseph Ziegler).
[144] Shapley Interview at 21, 114-15; Ziegler Interview at 26-27, 120.

8, 2020, Ziegler drafted an affidavit in support of the search warrant for the storage unit.[145] Three days later, on December 11, Ziegler and Wolf had a phone call during which they disagreed about the plan to search the storage unit, with Wolf claiming that "she was worried about what this [search] might do to the relationship with the opposing counsel moving forward," and that she would prefer to use a different method[146] to obtain the documents in the storage unit.[147] Ziegler pointed out that Wolf's suggestion "affords [Hunter Biden] the opportunity to 'decide' what to turn[]over," and that "in any other case, this wouldn't be the normal course of action that they might take and that [prosecutors] are deviating now."[148] Shortly thereafter, Wolf decided not to pursue the search warrant for the storage unit.[149] On December 14, Shapley and IRS Special Agent in Charge Kelly Jackson called Weiss to discuss searching the storage unit and Weiss agreed that they could proceed with obtaining a search warrant if no one accessed the unit for 30 days.[150] Within an hour of the call with Weiss, however, Shapley learned that Wolf and Tax Division Senior Litigation Counsel Mark Daly had informed Hunter Biden's defense counsel about investigators' plan to search the storage unit, thereby "ruining [investigators'] chance to get to evidence before being destroyed, manipulated, or concealed."[151] Investigators were ultimately unable to search the storage unit.[152]

Ziegler described Wolf's actions in obstructing the search of the storage unit as "a defining moment for [him] in the investigation" where he realized that "the Delaware U.S. Attorney's Office was providing preferential treatment to [Hunter Biden] and his counsel," and was "not following the normal investigative process."[153] Shapley similarly noted that Wolf's actions deviated from the norm, testifying that "there's no prosecutor [he's] ever worked with that wouldn't say, go get those documents."[154] Shapley and Ziegler were not the only ones upset with these actions, as IRS Special Agent in Charge Kelly Jackson also expressed "frustration" with the Delaware USAO for "not allowing [the IRS] to go forth with the [search warrant]."[155]

Other information available to the Committees shows that Justice Department prosecutors prohibited the investigative team from asking about or referencing President Biden during witness interviews,[156] even though President Biden was often mentioned in Hunter Biden's communications about his business ventures.[157] In addition, prosecutors also delayed

---

[145] Ziegler Interview at 26.
[146] Ziegler redacted the method Wolf suggested for obtaining the documents in the storage unit.
[147] Ziegler Supplemental Production 2, Ex. 205.
[148] *Id.*
[149] Ziegler Interview at 27.
[150] Shapley Interview at 21.
[151] *Id.*
[152] Ziegler Supplemental Affidavit 2, at 2.
[153] *Id.*
[154] Shapley Interview at 115.
[155] Shapley Supplemental Production 3, Attachment 11.
[156] Shapley Interview at 18. *See also id.* at 119 ("There were multiple times where Lesley Wolf said that she didn't want to ask questions about dad. And dad was kind of how we referred to him. We referred to Hunter Biden's father, you know, as dad.").
[157] *See, e.g.*, Michael Goodwin, *Hunter biz partner confirms email, details Joe Biden's push to make millions from China: Goodwin*, N.Y. POST (Oct. 22, 2020) (quoting Hunter Biden's former business partner Tony Bobulinski as stating, "The reference to 'the Big Guy' in the much publicized May 13, 2017 email is in fact a reference to Joe Biden. . . . Hunter Biden called his dad 'the Big Guy' or 'my Chairman,' and frequently referenced asking him for his sign-off or advice on various potential deals that we were discussing.").

investigators from conducting planned witness interviews. In an email sent on September 9, 2021, Wolf wrote to Ziegler, "I do not think that you are going to be able to do these interviews [with alleged escorts] as planned."[158] Ziegler explained that he "didn't understand why DOJ-Tax management was needing to approve this," and that it "was not normal process and [he] ha[s] never had a case where DOJ-Tax management weighed in on low level, general interviews and records requests."[159] Ziegler's frustrations with the Department's constant roadblocks led him to lament that he was "sick of fighting to do what's right."[160]

The next month, in October 2021, Wolf went further and prohibited investigators from interviewing Hunter Biden's adult children.[161] After investigators determined that Hunter Biden deducted from his taxes nondeductible payments he made to his children for personal expenses,[162] Wolf told investigators they would be in "hot water" if they interviewed "the President's grandchildren."[163] Ziegler described Wolf's response as "completely abnormal," explaining that it is "a completely reasonable step" and "part of [the] normal process" for investigators to interview "people who are receiving money or receiving payments related to a case like this."[164] Wolf similarly prevented investigators from interviewing other members of the Biden family who received payments from Hunter Biden that he had deducted from his taxes.[165]

Not only were Justice Department prosecutors quick to limit or outright prohibit the use of the Biden name, they also impeded investigations into all of Hunter Biden's alleged criminal conduct. According to testimony from Shapley, and further corroborated by documents produced to the Ways and Means Committee, Wolf stated on a May 2021 prosecution team conference call that she did not want any of the agents to look into potential campaign finance violations.[166] Instead, Wolf tried to explain away the need to look into the violations, citing "a need to focus on the 2014 tax year, that we cannot yet prove an allegation beyond a reasonable doubt and that she does not want to include [DOJ's] Public Integrity unit because they would take authority away from her."[167]

---

[158] Ziegler Supplemental Production 2, Ex. 208. *See also* Ziegler Supplemental Affidavit 2, at 3.

[159] Ziegler Supplemental Affidavit 2, at 3.

[160] Ziegler Supplemental Production 2, Ex. 209. *See also* Ziegler Supplemental Affidavit 2, at 3.

[161] Shapley Interview at 22; Ziegler Interview at 32, 129.

[162] Ziegler Interview at 32. Shapley added that "[p]art of what [investigators] examined were charges made with Hunter Biden's card that might conceivably have been done by his children." Shapley Interview at 22.

[163] Shapley Interview at 22; Ziegler Interview at 32, 52.

[164] Ziegler Interview at 32, 130. *See also Hearing with IRS Whistleblowers About the Biden Criminal Investigation: Before the H. Comm. on Oversight and Accountability*, 118th Cong. (July 19, 2023) (written testimony of Joseph Ziegler, Special Agent, Internal Revenue Serv.) (stating that Wolf's response "was abnormal and a deviation from normal procedure").

[165] Ziegler Interview at 53.

[166] Shapley Supplemental Production 3, Attachment 14.

[167] Shapley Interview at 22.

> **Results & Challenges:** *(empirical results - for example, SCIs initiated, indictments, seizures, and significant challenges/obstacles)*
> At this point in time, evidence obtained to date supports a prosecution recommendation for DOE that he willfully evaded the assessment and payment of Federal income taxes due and owing. This investigation has been hampered and slowed by claims of potential election meddling. Even after the election, the day of action was delayed more than two weeks. The FBI is a participating agency and they have provided conflicting opinions on investigative decisions. FBI is actively investigating potential ▇▇▇▇ violations. Through interviews and review of evidence obtained via ▇▇▇▇ and search warrant, it appears there may be campaign finance criminal violations. AUSA Wolf stated on the last prosecution team meeting that she did not want any of the agents to look into the allegation. She cited a need to focus on the 2014 tax year, that we cannot yet prove the allegation beyond a reasonable doubt and that she does not want to include their Public Integrity unit because they would take authority away from her. We do not agree with her obstruction on this matter. The assigned AUSA does not like dissenting opinions. The USAO and FBI received congressional inquiries concerning this investigation and it's believed they have ignored their requests. We continue to offer resources to complete outstanding investigative tasks but the AUSA prefers to continue to delay tasks to a later date.

However, as Shapley told Congress, the line investigators "d[id] not agree with [Wolf's] obstruction on this matter."[168] IRS Director of Field Operations Michael Batdorf corroborated Shapley's testimony, noting that his investigators expressed concerns about Wolf stonewalling their efforts to interview witnesses, which required approval from Weiss's team.[169]

Testimony from FBI officials further underscored the allegation that prosecutors on Weiss's team were stonewalling the investigation and "slow-walking" the case.[170] Sobocinski described his frustration with the pace of the investigation multiple times, testifying that his goal was to get the case to a "resolution."[171] He also stated he "would have liked [the investigation] to move faster."[172] Holley likewise expressed "overall frustration" about the slow pace of the investigative process.[173] Additionally, Gordon noted that prior to their attempt to interview Hunter Biden, investigators were told they "would not even be allowed to approach [Hunter Biden's] house" and that instead, Gordon's name and contact information would be given to the Secret Service along with a note that investigators would like to interview Hunter Biden.[174] Gordon averred that this was the first time in his twenty-year career at the FBI that he had been told to wait outside a target's home until the target contacts him.[175]

Documents and testimony obtained by the Committees to date corroborate the whistleblowers' account of the constant roadblocks they encountered to properly investigate the case on Hunter Biden. Overall, the evidence indicates that Weiss's prosecutors at the Delaware

---

[168] Shapley Supplemental Production 3, Attachment 14.

[169] Transcribed Interview of Michael Batdorf, Dir. of Field Ops., Internal Revenue Serv., at 60-61 (Sept. 12, 2023) [hereinafter Batdorf Interview].

[170] *See* Shapley Interview at 13 ("It was apparent that DOJ was purposely slow-walking investigative actions in this matter."); Ziegler Interview at 92 ("As far as my leadership goes, we're trying to point out that the slow-walking and the approvals for everything, a lot of that happened at the U.S. Attorney's Office in Delaware and DOJ Tax level.").

[171] *E.g.*, Transcribed Interview of Thomas Sobocinski, Special Agent in Charge, Balt. Field Off., Fed. Bureau of Investigation, at 34 (Sept. 7, 2023) [hereinafter Sobocinski Interview].

[172] *Id.* at 99.

[173] Transcribed Interview of Ryeshia Holley, Assistant Special Agent in Charge, Balt. Field Off., Fed. Bureau of Investigation, at 104 (Sept. 11, 2023) [hereinafter Holley Interview].

[174] Gordon Interview at 34.

[175] *Id.* at 34.

U.S. Attorney's Office provided special treatment to the Biden family that it would not have provided any other American in any other investigation.

### E. Prosecutors in Weiss's office allowed the statute of limitations for some of Hunter Biden's most serious crimes to lapse.

As Shapley and Ziegler described in their testimony to Congress, the possible felony charges against Hunter Biden for the 2014 and 2015 tax years involved "the most substantive criminal conduct."[176] Those tax years involved income from Hunter Biden's position on the board of directors of Burisma Holdings, and most importantly, connected Joe Biden's actions as Vice President to his son's alleged criminal conduct.

Hunter Biden served on the board of directors of Burisma from April 2014 until April 2019.[177] During Hunter Biden's tenure, Burisma paid him up to $1 million annually, though it cut his salary two months after his father left office.[178] While Hunter Biden served on the board, Burisma and its founder and owner, Mykola Zlochevsky, were under investigation by the Ukrainian government.[179] According to one Burisma executive, Burisma hired Hunter Biden specifically to "protect us, through his dad, from all kinds of problems."[180] Burisma executives explicitly asked Hunter Biden to help alleviate the "government pressure from Ukrainian Government investigations into Mykola, et cetera."[181] In response, Hunter Biden "called D.C."[182] The Ukrainian government soon fired the investigating Prosecutor General, Viktor Shokin, "after then-Vice President Joe Biden threatened to pull $1 billion in U.S. aid" earmarked for Ukraine if Shokin remained in office.[183] Notably, then-Vice President Biden unilaterally decided to change U.S. policy regarding the loan during a plane ride to Ukraine.[184]

According to evidence discovered by IRS investigators, one way in which Hunter Biden evaded paying taxes on his income from Burisma was by having it sent to the bank account of a company he co-owned with his business partner and then distributing the money to himself while falsely telling the IRS that the distribution was a nontaxable loan.[185] Shapley explained that this was a "textbook" affirmative scheme by Hunter Biden to avoid paying taxes.[186] In basic terms, as Ziegler put it, "you can't loan yourself your own money. It just doesn't make any sense."[187]

---

[176] Shapley Interview at 25.
[177] Kenneth P. Vogel & Iuliia Mendel, *Biden faces conflict of interest questions that are being promoted by Trump and Allies,* N.Y. TIMES (May 1, 2019).
[178] Miranda Devine, *Hunter Biden's Ukraine salary was cut two months after Joe Biden left office*, N.Y. POST (May 26, 2021).
[179] STAFF REPORT, S. COMM. ON HOMELAND SEC. & GOVERNMENTAL AFFS. & S. COMM. ON FIN., HUNTER BIDEN, BURISMA, AND CORRUPTION: THE IMPACT ON U.S. GOVERNMENT POLICY AND RELATED CONCERNS, at 8 (2020).
[180] FBI Form FD-1023 re Confidential Human Source's Meetings with Burisma Executives, at 1 (June 30, 2020).
[181] Transcribed Interview of Devon Archer, at 34 (July 31, 2023).
[182] *Id.* at 36.
[183] Steven Nelson, *Ukrainian prosecutor whose ouster Biden pushed was 'threatened,' says Devon Archer*, N.Y. POST (Aug. 4, 2023).
[184] Glenn Kessler, *Inside VP Biden's linking of a loan to a Ukraine prosecutor's ouster*, WASH. POST (Sept. 15, 2023).
[185] Shapley Interview at 57-59; Ziegler Interview at 64-66
[186] Shapley Interview at 58-59.
[187] Ziegler Interview at 66-67.

Notably, with respect to this particular scheme, IRS investigators could find no evidence typically needed to verify that a given payment is, in fact, a loan.[188] However, when Shapley informed Tax Division trial attorney Jack Morgan that there was no such evidence, Morgan replied that "this is not a typical case" due to the fact that it involved President Biden's son.[189] Email correspondence between Hunter Biden and his business associate Eric Schwerin sheds additional light on this scheme.[190]



In late 2021, Special Agent Ziegler compiled a Special Agent Report (SAR) that recommended prosecuting Hunter Biden for tax crimes related to the 2014 and 2015 tax years.[191] Ziegler confirmed in his SAR that "AUSA Wolf has reviewed the appendices and the charges cited in this report and agrees with the prosecution recommendation of the above cited charges against [Robert Hunter Biden]."[192]

---

[188] Shapley Interview at 59.
[189] Id.
[190] See Shapley Interview, Ex. 4.
[191] See Shapley Interview, Ex. 2.
[192] Id.

---

### CONCLUSIONS AND RECOMMENDATIONS

The recommendation for prosecution is based on the facts above and ████████ recommends that RHB be prosecuted under the provisions of Title 26 USC Sections 7201 and 7206 (1) for the tax years 2014, 2018 and 2019 and under the provisions of Title 26 USC Section 7203 for the tax years 2015, 2016, 2017, 2018 and 2019.

A draft of this SAR has been given to DOJ-Tax Senior Attorney Mark Daly, as well as Assistant United States Attorney Lesley Wolf. AUSA Wolf has reviewed the appendices and the charges cited in this report and agrees with the prosecution recommendation of the above cited charges against RHB.

---

Then prosecutors and the Biden Justice Department's Tax Division changed their recommendation. On June 15, 2022, investigators and prosecutors attended a meeting at Main Justice in Washington, D.C. where two Tax Division attorneys, Mark Daly and Jack Morgan, gave a presentation on the reasons not to charge Hunter Biden for tax crimes committed during the 2014 and 2015 tax years.[193] During his transcribed interview, Goldberg confirmed the whistleblowers' account that Tax Division attorneys indeed gave a presentation, but Department counsel who accompanied Goldberg would not allow him to discuss the substance of the presentation.[194]

During his transcribed interview, Shapley testified that the Biden Justice Department allowed the statute of limitations to lapse on the 2014 and 2015 tax crimes.[195] Specifically, Shapley stated that up until a meeting he attended with Weiss on October 7, 2022, he believed, based on statements made by Attorney General Garland and Weiss, that prosecutors "were deciding whether to charge 2014 and 2015 tax violations."[196] During this period, Shapley explained, prosecutors and Hunter Biden's legal team entered into agreements to toll the statute of limitations for crimes pertaining to the 2014 and 2015 tax years.[197] However, despite the defense counsel's willingness to toll the statute of limitations on the charges again, the Biden Justice Department ultimately allowed the statute of limitations to lapse on those years in November 2022.[198] Shapley cited this decision as yet another example of the Biden Justice Department disregarding established norms to benefit Hunter Biden, explaining that "[l]etting a statute of limitations expire in an active criminal investigation is not normal."[199]

In his transcribed interview, U.S. Attorney Weiss confirmed that the Biden Justice Department allowed the statute of limitations for the 2014 and 2015 tax year charges to expire.

---

[193] Ziegler Interview at 160, 164.
[194] Goldberg Interview at 30-31.
[195] Shapley Interview at 25-26, 54-55, 100.
[196] *Id.* at 25.
[197] *Id.* at 54.
[198] *Id.* at 25-26, 54-55, 100.
[199] *Id.* at 92.

However, Weiss refused to explain why the charges were allowed to lapse.[200] Specifically, Weiss testified:

> Q.   [I]n 2014 and 2015, it's been well-established by the whistleblowers, Hunter Biden had in excess of over $1 million in revenue coming in from Burisma that has avoided tax entirely. Do you think it's fair that he is able to avoid paying tax on that gigantic sum of money?
>
> A.   Again, that's something I can't comment on. That pertains to the ongoing litigation and our outstanding investigation. I'm just not at liberty to comment at this time, but there will come a time.
>
> Q.   Even though the statute of limitations has lapsed?
>
> A.   Yes, yes.
>
> Q.   When is the appropriate time to address why the statute of limitations was allowed to lapse?
>
> A.   I'll address it in the report, but even though the statute of limitations has lapsed and even though charges won't be filed, if there were to be an outstanding tax prosecution, there is no reason to believe that evidence pertaining to prior years, or witnesses involved in prior years, wouldn't be part of that litigation.[201]

Under the guise of the "ongoing litigation and [the] outstanding investigation"—even though criminal liability cannot result from any investigation given the lapse in the statute of limitations—the Justice Department refused to explain why it failed to bring charges for the 2014 and 2015 tax years.[202] This prosecutorial decision is highly significant because those years included Hunter Biden's Burisma income and connected his father's official actions to his alleged criminal conduct. Ultimately, as Shapley explained, "[t]he purposeful exclusion of the 2014 and 2015 years sanitized the most substantive criminal conduct and concealed material facts" in this matter, including "a scheme to evade income taxes through a partnership with a convicted felon," and "potential [Foreign Agents Registration Act] issues."[203]

Overall, the testimony and documents the Committees have received to date show that the Justice Department—under the leadership of Attorney General Garland and President Biden—afforded kid-glove treatment to Hunter Biden. From slow-walking the investigation, to informing defense counsel of future investigative actions, to exhibiting a reluctance to take

---

[200] Weiss Interview at 93-94.
[201] *Id.* at 92-94.
[202] *Id.* at 93.
[203] Shapley Interview at 25.

investigative actions, to finally allowing the statute of limitations to expire on the most serious crimes, the Biden Justice Department used an overly delicate approach when pursuing the President's son's criminal conduct. The delicate approach used by the Department in its Hunter Biden investigation deviated from its standards and it mission to ensure impartial justice without fear or favor.

## II. CONTRARY TO HIS ASSERTIONS TO CONGRESS, U.S. ATTORNEY WEISS DID NOT HAVE "ULTIMATE AUTHORITY" OVER THE HUNTER BIDEN CASE.

During their respective testimonies to the Ways and Means Committee, IRS Supervisory Special Agent Shapley and Special Agent Ziegler each described a meeting on October 7, 2022, at Main Justice during which U.S. Attorney Weiss stated he was "not the deciding official" on whether charges would be filed against Hunter Biden.[204] Both whistleblowers were surprised upon learning this information, and Shapley even described this moment as his "red line," after which he could no longer tolerate the Biden Justice Department's tampering with the investigation.[205] Shapley contemporaneously memorialized Weiss's statement at the October 7 meeting in handwritten notes taken during the meeting,[206] as well as an email he sent shortly after the meeting concluded to IRS Director of Field Operations Michael Batdorf and Special Agent in Charge Darrell Waldon.[207]

Despite subsequent protestations from the Biden Justice Department and U.S. Attorney Weiss to the contrary, including sworn testimony from Attorney General Garland that Weiss "has full authority to . . . bring cases in other jurisdictions if he feels it's necessary"[208] and public statements that Weiss "was given complete authority to make all decisions on his own,"[209] the Committees have received documentary and testimonial evidence from multiple sources, including career Justice Department and FBI officials and three Biden-appointed U.S. Attorneys, confirming that Weiss did not maintain "ultimate authority" over the Hunter Biden matter. Instead, witnesses described the numerous approvals that Weiss needed to obtain, including from the Biden Justice Department's Tax Division and other U.S. Attorneys' Offices, and the complex process he had to navigate before he could file charges against Hunter Biden outside of his own district in Delaware.

### A. Weiss did not have the sole authority to bring a case against Hunter Biden in a judicial district outside of Delaware.

U.S. Attorney Weiss's representations about his authority have shifted over time. Initially, in response to a letter addressed to Attorney General Garland, Weiss asserted to the Judiciary

---

[204] *Id.* at 28; Ziegler Interview at 40.

[205] Shapley Interview at 28, 134, 171.

[206] *See* Letter from Tristan Leavitt & Mark D. Lytle, to H. Comm. on the Judiciary (Sept. 13, 2023) (attaching a copy of Shapley's notes from the October 7 meeting); Letter from Tristan Leavitt & Mark D. Lytle, to H. Comm. on Ways & Means and S. Comm. on Fin. (Sept. 13, 2023) (same).

[207] Email from Gary Shapley, Supervisory Special Agent, Internal Revenue Serv., to Michael Batdorf & Darrell Waldon, Internal Revenue Serv. (Oct. 7, 2022, 6:09 PM.).

[208] *Hearing on Oversight of the Department of Justice, Before the S. Comm. on the Judiciary*, 118th Cong. (2023) (statement of Merrick Garland, Att'y Gen., U.S. Dep't of Just.). *See also Hearing on the Fiscal Year 2023 Justice Department Budget Request, Before the Subcomm. on Com., Just., Sci., & Related Agencies of the S. Comm. on Appropriations*, 117th Cong. (2022) (statement of Merrick Garland, Att'y Gen., U.S. Dep't of Just.) ("[T]he Hunter Biden investigation . . . is being run and supervised by the United States Attorney for the District of Delaware. . . . [H]e is in charge of that investigation. There will not be interference of any political or improper kind.").

[209] *AG Garland Maintains David Weiss Had Full Authority Over Hunter Biden Case*, C-SPAN (June 23, 2023).

Committee: "*I have been granted ultimate authority* over this matter, including responsibility for deciding where, when, and whether to file charges . . . ."[210]



**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

Hercules Plaza
1313 North Market Street          (302) 573-6277
P.O. Box 2046                     FAX (302) 573-6220
Wilmington, Delaware 19899-2046

June 7, 2023

The Honorable Jim Jordan
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, D.C. 20515

Dear Chairman Jordan:

 Your May 25th letter to Attorney General Garland was forwarded to me, with a request that I respond on behalf of the Department.

 While your letter does not specify by name the ongoing investigation that is the subject of the Committee's oversight, its content suggests your inquiry is related to an investigation in my District. If my assumption is correct, I want to make clear that, as the Attorney General has stated, I have been granted ultimate authority over this matter, including responsibility for deciding where, when, and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution, consistent with federal law, the Principles of Federal Prosecution, and Departmental regulations.

 Your letter references recently-announced staffing determinations in the matter and the Committee's concern that those decisions intersect with whistleblower protections. I agree wholeheartedly that whistleblowers play an integral role in promoting both civil servant accountability and good government practices. Federal law protects whistleblowers from retaliation, as well it should.

 The information sought by the Committee concerns an open matter about which the Department is not at liberty to respond. As then-Deputy Attorney General Rod Rosenstein wrote in 2018 in response to a request for information from the Honorable Charles Grassley, Chairman of the Senate Committee on the Judiciary:

> Congressional inquiries during the pendency of a matter pose an inherent threat to the integrity of the Department's law enforcement and litigation functions. Such inquiries inescapably create the risk that the public and the courts will perceive undue political and Congressional influence over law enforcement and litigation decisions. Such inquiries also often seek

Subsequently, in a June 30 letter to the Judiciary Committee, Weiss claimed that his "charging authority is geographically limited to [his] home district" and that "[i]f venue for a case lies

---

[210] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 7, 2023) (emphasis added).

elsewhere, common Departmental practice is to contact the United States Attorney's Office for the district in question and determine whether it wants to partner on the case."[211] If a fellow U.S. Attorney declined to "partner," Weiss explained, he would have had to request "Special Attorney" status, which he claimed to "have been assured that, if necessary" he would receive.[212]

---

The Honorable Jim Jordan                                          Page 2
June 30, 2023

   As the U.S. Attorney for the District of Delaware, my charging authority is geographically limited to my home district. If venue for a case lies elsewhere, common Departmental practice is to contact the United States Attorney's Office for the district in question and determine whether it wants to partner on the case. If not, I may request Special Attorney status from the Attorney General pursuant to 28 U.S.C. § 515. Here, I have been assured that, if necessary after the above process, I would be granted § 515 Authority in the District of Columbia, the Central District of California, or any other district where charges could be brought in this matter.

   At the appropriate time, I welcome the opportunity to discuss these topics with the Committee in more detail, and answer questions related to the whistleblowers' allegations consistent with the law and Department policy. It is my understanding that the Office of Legislative Affairs will work with the Committee to discuss appropriate timeline and scope.

                                          Sincerely,

                                          David C. Weiss
                                          United States Attorney


cc: The Honorable Jerrold L. Nadler, Ranking Member

---

Finally, in a July 10 letter to Senator Lindsey Graham, Weiss acknowledged that he had "discussions" with unnamed "Departmental officials" about seeking Special Attorney status and that he "was assured" the authority would be granted.[213] Weiss did not detail the substance of those discussions, the timing of them, or the officials with whom he spoke.

---

[211] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023).
[212] Id.
[213] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Sen. Lindsey Graham, Ranking Member, S. Comm. on the Judiciary (July 10, 2023).



**U.S. Department of Justice**

*United States Attorney's Office*
*District of Delaware*

---

*Hercules Plaza*
*1313 North Market Street*          *(302) 573-6277*
*P.O. Box 2046*                     *FAX (302) 573-6220*
*Wilmington, Delaware 19899-2046*

July 10, 2023

The Honorable Lindsey O. Graham
Ranking Member
Senate Committee on the Judiciary
United States Senate
Washington, D.C. 20510

Dear Senator Graham:

This is in response to your June 28, 2023, letter.[1]

As I recently explained to the Honorable Jim Jordan,[2] since the whistleblowers' allegations relate to a criminal investigation that is currently being prosecuted in the United States District Court for the District of Delaware, I have a duty to protect confidential law enforcement information and deliberative communications related to the case. As I likewise indicated, I welcome the opportunity to respond to these claims in more detail at the appropriate future time, as authorized by the law and Department policy.

To clarify an apparent misperception and to avoid future confusion, I wish to make one point clear: in this case, I have not requested Special Counsel designation pursuant to 28 CFR § 600 *et seq*. Rather, I had discussions with Departmental officials regarding potential appointment under 28 U.S.C. § 515, which would have allowed me to file charges in a district outside my own without the partnership of the local U.S. Attorney. I was assured that I would be granted this authority if it proved necessary. And this assurance came months before the October 7, 2022, meeting referenced throughout the whistleblowers' allegations. In this case, I've followed the process outlined in my June 30 letter and have never been denied the authority to bring charges in any jurisdiction.

---

In other words, in his first letter, Weiss represented to the Judiciary Committee that he *had been* granted ultimate authority with respect to the filing of charges. But in his second letter, Weiss told the Committee that he had been assured by unnamed officials that he *would be* granted that authority in the future, if necessary, after going through a specified process, and he notably provided no explanation of who would make the determination of necessity.[214] These are

---

[214] *Compare* Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 7, 2023), *with* Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023).

inconsistent representations, and it is not possible for both of them to be true. Weiss's shifting statements about his authority to bring charges against Hunter Biden, especially his authority to bring charges outside of Delaware, suggest an attempt to cover up the fact that improper political considerations factored into the Department's investigative and prosecutorial function.

Testimony provided to the Committee has revealed that U.S. Attorney Weiss's claims about having the "ultimate" authority to bring charges outside of Delaware are clearly false. As with all U.S. Attorneys, Weiss's jurisdiction is limited to his home district.[215] While there are several means by which a U.S. Attorney may bring charges in a different district, each method requires approval from another deciding official in the Justice Department. According to testimony received by the Committees, there appear to be five distinct ways in which a U.S. Attorney can bring charges outside of his district: (1) get the local U.S. Attorney to agree to partner on the prosecution,[216] (2) get the local U.S. Attorney to agree to prosecute the case on his or her own,[217] (3) get the local U.S. Attorney to appoint one or more Assistant U.S. Attorneys from the referring office as Special Assistant U.S. Attorneys (SAUSAs) in that district,[218] (4) be appointed as "special attorney" (also known as obtaining "515 authority" due to the fact that such authority is conferred under 28 U.S.C. § 515) by the Attorney General or his delegate,[219] or (5) be appointed as special counsel by the Attorney General.[220] There is, however, no scenario in which a U.S. Attorney may unilaterally decide to bring charges in another judicial district under his or her sole authority.

Furthermore, Weiss only fulfilled one of the requirements for bringing charges outside of his district—being appointed as special counsel—on August 11, 2023,[221] nearly five years after his office first became involved in the case.[222] This entirely contradicts Weiss's and Attorney General Garland's earlier claims that Weiss, throughout the entirety of the investigation, had "ultimate" authority to bring charges in any judicial district he wanted.

In broad strokes, the process that Main Justice required Weiss to go through involved first seeking approval from the local U.S. Attorney, whether that involved partnering on the prosecution, taking over the prosecution, or appointing SAUSAs, and then, if the local U.S. Attorney refused, seeking appointment from senior Justice Department officials as special

---

[215] *See* 28 U.S.C. § 547.

[216] Weiss Interview at 16.

[217] Transcribed Interview of Matthew Graves, U.S. Att'y, D.C., at 102. (Oct. 3, 2023) [hereinafter Graves Interview].

[218] *Id.* at 101; Transcribed Interview of E. Martin Estrada, U.S. Att'y, C. Dist. of Cal., at 17, 42-43 (Oct. 24, 2023) [hereinafter Estrada Interview].

[219] Goldberg Interview at 71 ("If a U.S. Attorney wanted to bring a case in another district, and the U.S. Attorney there . . . didn't want to be partnered with it . . . then the U.S. Attorney would need to secure a 515 letter in order to bring that case in that district.").

[220] Weiss Interview at 16-17.

[221] Off. of the Att'y Gen., Order No. 5730-2023, Appointment of David C. Weiss as Special Counsel (2023).

[222] Weiss's office opened its investigation of Hunter Biden around February 2019. *See* Gordon Interview at 28, 63 (stating that Weiss's office and the FBI's Wilmington Resident Agency opened their investigation of Hunter Biden in February 2019); Email from Joseph Ziegler, Special Agent, Internal Revenue Serv., to Jessica Moran, Trial Att'y, U.S. Dep't of Just., Tax Div. (Apr. 15, 2019, 4:13 PM) ("Approx. February 2019 – My SSA advised me about the Delaware USAO [is] looking into [Hunter Biden] subsequent to the SAR.").

attorney or special counsel.[223] Additionally, each of the witnesses the Committee interviewed seemed uncertain of how exactly this process was supposed to work and how Weiss was expected to navigate it. For instance, FBI Special Agent in Charge of the Baltimore Field Office Thomas Sobocinski described the "process [Weiss] had to work through" to bring charges outside of Delaware as "cumbersome" and "bureaucratic."[224] When asked for additional details, Sobocinski explained that he did not "know the intricacies" of the process.[225]

Even the U.S. Attorneys who the Judiciary Committee interviewed were confounded by the process, so much so that they contradicted one another as to what exactly Weiss needed to do to bring charges outside of Delaware. Weiss, for his part, testified that he needed to ask other U.S. Attorneys to partner on prosecuting the case,[226] which he described as "common Departmental practice."[227] Conversely, the U.S. Attorney for the District of Columbia, Matthew Graves, testified that "U.S. Attorney's Offices don't partner with other U.S. Attorney's Offices,"[228] and described such partnerships as a "rare hybrid model" that he had "never" used before in his Justice Department career.[229] Graves described a complicated two-track-plus-a-hybrid-model system that he believed Weiss needed to pursue before requesting special counsel or special attorney status. He testified:

> Q.    [W]hat are the two tracks, in your mind?
>
> A.    The two tracks, in my mind, are the AUSAs from the other jurisdiction just come in and handle everything themselves . . . or the other jurisdiction just transfers the case to us and then we prosecute it. . . . I can't think of a situation where it's the hybrid model that you just . . . described, where it's two offices joining—
>
> Q.    So what was Weiss looking for here? . . . Was he track one, track two, or hybrid?

---

[223] Weiss Interview at 15-16 ("[Main Justice] wanted me to proceed in the way it would typically be done, and that would involve ultimately reaching out to the U.S. Attorney in the District of Columbia. I raised the idea of 515 authority at that time because I had been handling the investigation for some period of time. And, as I said, they suggested let's go through the typical process and reach out to D.C. and see if D.C. would be interested in joining or otherwise participating in the investigation."); Goldberg Interview at 71 ("If a U.S. Attorney wanted to bring a case in another district, and the U.S. Attorney there . . . didn't want to be partnered with it . . . then the U.S. Attorney would need to secure a 515 letter in order to bring that case in that district."); Holley Interview at 10-11 ("I am aware that if [Weiss] is not able to partner with a particular district, that there are other processes he can go through . . . to move forward . . . in the investigation.").

[224] Sobocinski Interview at 44-45, 103.

[225] *Id.* at 103.

[226] Weiss Interview at 15-16.

[227] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023).

[228] Graves Interview at 33. *See also id.* at 34 ("It's exceedingly rare for an ongoing investigation for someone to join as a partner afterwards.").

[229] *Id.* at 106.

A.      So, again, this wasn't explicitly said, but he was talking about—my recollection of the conversation was, he was immediately talking about what he needed to do and the support that he needed to complete that. So my frame of—

Q.      Was it track one or track two?

A.      —my frame of reference, how I'm hearing it, is, he is most focused on getting his charges brought by his people in the District. I am the one that introduces the [hybrid model] idea of, "Hey, can we maybe join up with this?" And he says, "We can discuss that."

Q.      Well, why would you do that? If that's not one of the two tracks, why would you do that? And you just told us earlier that U.S. Attorney's Offices, when they're on the receiving end, someone's coming in, they don't like that. The investigation's been going for 3 years; you've got, as I said before, two cooks in the kitchen then. Why would you offer that?

A.      So the giving end, in my experience, rarely—the end that already has the case very rarely wants to do that, for all of the reasons you just articulated. . . . The end that's on the receiving end of it is looking at things differently. And I laid out some of the considerations before. Like, you know, particularly in complex matters where there's gonna be a lot of litigation, you can have authority generated in the course of those cases that you're stuck with. And if you have a bunch of people who aren't from the jurisdiction litigating those issues—and this has happened to us with Main Justice components before—that can have massive programmatic consequences for you.

Q.      And 3 weeks later, you decided you didn't want to go that route.

A.      Yes, that is correct.[230]

Witnesses were also seemingly confused about the various means by which the Justice Department could appoint a special counsel. Several witnesses incorrectly stated that only special attorneys are appointed under 28 U.S.C. § 515, whereas special counsels must be

---

[230] *Id.* at 102-04.

appointed under the special counsel regulations.[231] For instance, Goldberg, a senior and longtime Justice Department employee, erroneously believed § 515 only conferred special attorney status:

> Q.    Do you know if Mr. Weiss has 515 authority now?
>
> A.    I don't know the answer to that.
>
> Q.    And 515 authority is 28 United States Code 515?
>
> A.    515. Yes.
>
> Q.    And that's the special counsel—
>
> A.    Not special counsel.
>
> Q.    Special attorney?
>
> A.    It's special attorney. Yeah.[232]

However, like the previous five special counsels,[233] Weiss was appointed as such under 28 U.S.C. § 515, and several other general statutes.[234] Weiss could not have been appointed as special counsel pursuant to the regulations, because they require that "[t]he Special Counsel shall be selected from outside the United States Government" and Weiss, of course, is a current Justice Department employee.[235] Further, although none of the statutory provisions under which Weiss was appointed use the term "special counsel," and § 515 instead refers to a "special attorney,"

---

[231] *See* JARED P. COLE, CONG. RSCH. SERV., R44857, SPECIAL COUNSEL INVESTIGATIONS: HISTORY, AUTHORITY, APPOINTMENT AND REMOVAL, at 9 (2019) ("[A]n individual referred to as a 'special counsel' thus may be appointed under either the general statutory authority or under the specific special counsel regulations[.]").

[232] Goldberg Interview at 71-72. *See also* Estrada Interview at 39 ("So I don't know that [28 U.S.C. § 515] is a special counsel statute.").

[233] *See* OFF. OF THE ATT'Y GEN., ORDER NO. 5588-2023, APPOINTMENT OF ROBERT K. HUR AS SPECIAL COUNSEL (2023) (appointing Special Counsel Robert Hur under 28 U.S.C. §§ 509, 510, 515, and 533); OFF. OF THE ATT'Y GEN., ORDER NO. 5559-2022, APPOINTMENT OF JOHN L. SMITH AS SPECIAL COUNSEL (2022) (appointing Special Counsel Jack Smith under 28 U.S.C. §§ 509, 510, 515, and 533); OFF. OF THE ATT'Y GEN., ORDER NO. 4878-2020, APPOINTMENT OF SPECIAL COUNSEL TO INVESTIGATE MATTERS RELATED TO INTELLIGENCE ACTIVITIES AND INVESTIGATIONS ARISING OUT OF THE 2016 PRESIDENTIAL CAMPAIGNS (2020) (appointing Special Counsel John Durham under 28 U.S.C. §§ 509, 510, and 515); OFF. OF THE DEPUTY ATT'Y GEN., ORDER NO. 3915-2017, APPOINTMENT OF SPECIAL COUNSEL TO INVESTIGATE RUSSIAN INTERFERENCE WITH THE 2016 PRESIDENTIAL ELECTION AND RELATED MATTERS (2017) (appointing Special Counsel Robert Mueller under 28 U.S.C. §§ 509, 510, and 515); Letter from James B. Comey, Acting Att'y Gen., U.S. Dep't of Just., to Patrick J. Fitzgerald, U.S. Att'y, N.D. Ill. (Dec. 30, 2003) (appointing Special Counsel Patrick Fitzgerald under 28 U.S.C. §§ 508, 509, 510, and 515).

[234] OFF. OF THE ATT'Y GEN., ORDER NO. 5730-2023, APPOINTMENT OF DAVID C. WEISS AS SPECIAL COUNSEL (2023) (appointing Special Counsel David Weiss under 28 U.S.C. §§ 509, 510, 515, and 533).

[235] 28 C.F.R. § 600.3(a).

courts have frequently recognized that special counsels may be appointed under these provisions.[236] The Justice Department appears to recognize this fact as well.[237]

In sum, the evidence available to the Committees shows that Weiss was not able to bring charges outside of Delaware on his own accord until he was appointed special counsel on August 11, 2023, nearly five years after his office first began investigating Hunter Biden. Instead, Weiss was forced to pursue a cumbersome and complex bureaucratic process to seek approvals from other U.S. Attorneys and officials within Main Justice. The evidence that Weiss did not have sole authority to bring charges outside of Delaware contradicts Weiss's assertion to the Judiciary Committee that he had "ultimate" authority to bring charges wherever he chose.

**B. Testimony confirms that two Biden-appointed U.S. Attorneys declined to partner with Weiss to bring cases in their districts against Hunter Biden.**

Initially, in February 2022, Weiss sought to obtain special attorney status from the Department for the purpose of filing charges against Hunter Biden in D.C. and California. However, by Weiss's own admission, the Biden Justice Department did not approve his request and instead instructed him to go through the process of asking the U.S. Attorneys in D.C. and the Central District of California to partner with him on the prosecution. Weiss testified:

> A. I initiated email contact with Mr. Carlin, and I subsequently had a conversation with [then-Principal Associate Deputy Attorney General] John Carlin, and I believe [Associate Deputy Attorney General] Bradley Weinsheimer was on the call.

> Q. Okay. And what did they tell you about bringing the case in D.C. or different jurisdictions from yours?

> A. We discussed the fact that I would—they wanted me to proceed in the way it would typically be done, and that would involve ultimately reaching out to the U.S. Attorney in the District of Columbia. I raised the idea of 515 authority at that time because I had been handling the investigation for some period of time. And, as I said, they suggested let's go through the typical process and reach out to D.C. and see if D.C. would be interested in joining or otherwise participating in the investigation.[238]

---

[236] *See In re Grand Jury Investigation*, 916 F.3d 1047, 1049-50 (D.C. Cir. 2019); *United States v. Stone*, 394 F. Supp. 3d 1, 17 (D.D.C. 2019); *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 623 (D.D.C. 2018); *United States v. Manafort*, 321 F. Supp. 3d 640, 657 (E.D. Va. 2018).
[237] *See* Government's Response in Opposition to Motion to Dismiss at 5, *United States v. Manafort*, No. 1:17-cr-00201-ABJ (D.D.C. Apr. 2, 2018) ("These statutes—Section 515 in particular—authorize the Attorney General to appoint a Special Counsel and to define the Special Counsel's duties. In doing so, the Attorney General is not required to invoke the Special Counsel regulations (28 C.F.R. Part 600).").
[238] Weiss Interview at 15-16.

<center>*          *          *</center>

Q.     But [515 authority] wasn't granted, right?

A.     Yes. We have been over this. It wasn't granted. They said, follow the process. I followed the process. And in completing the process—

Q.     But, Mr. Weiss, when you ask for something and they don't give it to you, what is that?

A.     I asked for something, and in that conversation they didn't give it to me[.][239]

### i.     Biden-appointee and donor U.S. Attorney Matthew Graves declined to partner with Weiss to bring the 2014 and 2015 tax crimes in D.C.

In late February or early March 2022, approximately one month after the Biden Justice Department did not approve his request for special attorney authority, Weiss called U.S. Attorney for the District of Columbia Matthew Graves—a Biden appointee and donor who has worked for three Democratic presidential campaigns, including the Biden campaign[240]—to discuss charging the case in D.C.[241] In their transcribed interviews, Weiss and Graves provided the Judiciary Committee with different accounts of that conversation. According to Graves, Weiss said he was looking for administrative support and Graves brought up the idea of partnering on the prosecution.[242] Graves testified:

Q.     Can you walk us through your recollection of how the Hunter Biden case was brought to your office?

A.     Yes.  To the best of my recollection, in late February or early March of 2022, then U.S. Attorney Weiss, now Special Counsel Weiss, called me directly.

Q.     Okay.  And what did he say?

---

[239] *Id.* at 182.

[240] Graves Interview at 28-29 (noting that Graves conducted work on behalf of the Biden campaign, the Kerry campaign, and the Clinton-Gore campaign).

[241] *Id.* at 16-17, 27 (stating that the call occurred in late February or early March); Weiss Interview at 19, 21, 55 (stating that the call occurred in early March).

[242] *See id.* at 23 ("I was the first person to raise whether they wanted a local counsel on the case."); *id.* at 27 ("We decided that we were not going to join the investigation. And, again, the context here is, I was the one who brought it up, not them."); *id.* at 74 ("Q. Mr. Graves, Mr. Weiss never actually asked you directly to be local counsel in the Hunter Biden case. Is that fair to say? A. That's my recollection, that I was the first one to raise it. And that kind of informed my thinking that that was an ask from me as opposed to an ask from him."). Graves explained that "joining the case" and "being local counsel" are "one and the same." *Id.* at 33.

<center>45</center>

> A. To my recollection, he said that he had a case where there was a component of that case that he had deemed he wanted to bring in the District of Columbia.
>
> Q. . . . And what did you say?
>
> A. So, at a high level, without getting into the case specifics, my recollection was generally . . . asking him whether he was just looking for the kind of normal administrative support that any U.S. Attorney would need if they were going to come and bring a case in another jurisdiction or have their people bring a case in another jurisdiction, or whether he was asking for us to join the investigation.
>
> Q. And what was his answer?
>
> A. To the best of my recollection, his answer was that, at a minimum, it was providing the support but we could discuss further joining or not.[243]

Conversely, Weiss told the Committee that he asked Graves to partner on the case,[244] as he was instructed to do by Main Justice when they did not approve his first request for special attorney status.[245] Weiss testified that he "reached out [to Graves] . . . and basically inquired as to whether his office would be willing to join us or participate in this case."[246] When asked to elaborate on what exactly he was asking Graves to partner on, Weiss explained that he "was asking [Graves] to join in the prosecution of the case," and whether Graves was "willing to assign someone to be co-counsel in the investigation."[247] Weiss also expressed that he had no recollection of asking Graves for administrative support.[248]

Graves testified that after his call with Weiss, Graves stressed to his criminal division chief and principal AUSA that he needed to make a decision on partnering with Weiss's office

---

[243] *Id.* at 16-17.

[244] *See* Weiss Interview at 124 ("I asked whether [Graves and Estrada] were interested in joining in or participating in the case, and they declined to do so[.]"); *id.* at 192 ("[W]hen I'm asking [Graves] about partnering . . ."); *id.* at 195 ("[W]e were giving [Graves] the opportunity to join in the investigation.").

[245] *Id.* at 16 ("And, as I said, they suggested let's go through the typical process and reach out to D.C. and see if D.C. would be interested in joining or otherwise participating in the investigation."); *id.* at 83 ("The first step was just to contact the U.S. Attorney's Office to see if they wanted to join in the prosecution."); *id.* at 86 ("They said to follow the process, talk to Graves, give him the opportunity to join."). *See also* Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023) ("If venue for a case lies elsewhere, common Departmental practice is to contact the United States Attorney's Office for the district in question and *determine whether it wants to partner on the case*." (emphasis added)).

[246] Weiss Interview at 57.

[247] *Id.* at 192-93.

[248] *Id.* at 55 ("Q. Okay. And when you approached Mr. Graves, did you ask him to provide administrative support as you were exploring the possibility of bringing charges in the District of Columbia? A. I don't know whether I did or not, to tell you the truth. It was one conversation, 5 or 10 minutes, and I don't recall the particulars with respect to the need for administrative support.").

quickly,[249] presumably because the statute of limitations on the 2014 and 2015 charges was about to lapse.[250] Graves's team then spent approximately three weeks analyzing the case, including unspecified case material they received from Weiss's office,[251] to recommend to Graves whether their office should partner on the prosecution.[252] Graves said that he did not review any of the case material himself.[253] On March 19, 2022, Graves met with five or six members of his office, during which Graves decided not to partner with Weiss's office on prosecuting the case against Hunter Biden.[254] Graves then "instructed [his] career prosecutors to convey the decision [not to partner] and the basis for the decision to [Weiss's] career prosecutors."[255]

In late March or early April, Weiss learned from his staff that Graves had decided not to partner on prosecuting the case.[256] Instead, Graves offered to provide Weiss's office with administrative support such as securing time before a grand jury.[257] Due to Graves's refusal to partner on the case, Weiss was unable to bring charges against Hunter Biden in D.C. unless the Biden Justice Department was willing to reconsider Weiss's request for special attorney status.[258]

### ii. *Biden-appointed U.S. Attorney Martin Estrada declined to partner with Weiss to bring charges in Los Angeles, citing serious crime epidemic and resource constraints.*

In August 2022, according to Weiss's testimony, he asked Acting U.S. Attorney for the Central District of California Stephanie Christensen to partner with his office on prosecuting charges against Hunter Biden in the Central District of California.[259] In late September or early October 2022, shortly after being sworn in to office, the new Biden-appointed U.S. Attorney E. Martin Estrada learned of Weiss's request to partner on the case from career attorneys in his office.[260] Estrada also learned that career attorneys in his office had already informed Weiss's office that "they were recommending against partnering or co-counseling [o]n the charges being contemplated" and that Weiss wanted to discuss the matter with Estrada.[261] At the October 7,

---

[249] Graves Interview at 20, 27, 45.

[250] *See* Shapley Interview at 54 ("The statute [of limitations] was about to blow in March 2022."). Prosecutors and defense counsel later agreed to toll the statute of limitations before it expired in March 2022. Prosecutors ultimately allowed the statute of limitations to expire in November 2022, despite defense counsel offering to sign another tolling agreement. *Id.* at 26, 54.

[251] Graves Interview at 20-21, 80. *See also* Weiss Interview at 22 ("We provided [Graves's office] with information so that they could make an informed judgment on deciding whether to participate in the investigation. But I'm not going to get into particulars of documentation.").

[252] Graves Interview at 18-19.

[253] *Id.* at 21, 80-81.

[254] *Id.* at 23-24.

[255] *Id.* at 28.

[256] Weiss Interview at 19, 21.

[257] Graves Interview at 17, 31.

[258] Weiss Interview at 19-20 ("Q. Okay. And what did [Graves's decision not to partner] mean for the case proceeding? A. That meant that I would follow up with respect to the 515 authority –").

[259] *Id.* at 102.

[260] Estrada Interview at 14-15.

[261] *Id.* at 15. *See also id.* at 87 ("So my understanding was that, at some point shortly after I started, I was told that there was a request from the District of Delaware to co-counsel, partner on the case; that my career attorneys had recommended against doing so; that had been communicated to the District of Delaware; and the District of Delaware then, through Mr. Weiss, wanted to talk to me about it.").

2022 meeting, per Shapley's contemporaneous notes of the meeting, Weiss stated that if Estrada rejected his request to partner then he "will request approval to proceed in [California]."[262]

During his transcribed interview with the Committee, Estrada provided additional details about his evaluation of Weiss's request to partner. In early October 2022, Estrada reviewed three "memoranda analyzing facts and law," which involved "the question of whether to co[-]counsel" that had been drafted by his staff, Weiss's staff, and DOJ Tax.[263] Estrada refused to disclose any additional details about the memoranda he reviewed,[264] other than to add that, in addition to the three memos, "there were many legal memoranda that were written and presented to [Estrada] in making this decision of whether or not to agree with the career attorneys."[265] Shortly after reviewing the memoranda, Estrada met with his criminal division chief, major frauds section chief, and first AUSA to discuss the facts and law of the case and Weiss's request to partner on prosecuting.[266] During that meeting, Estrada decided not to partner with Weiss's office.[267] On October 19, 2022, Estrada informed Weiss of his decision not to partner on prosecuting the case, and that he would instead provide Weiss's office with administrative support if they needed it.[268] This was the third occasion on which Weiss was unable to bring charges in a district other than Delaware.

Estrada explained that his decision not to partner with Weiss was due to the crime epidemic plaguing his district and his office's already-limited resources. According to Estrada, his office "was down 40 AUSAs at the time [of Weiss's request to partner], so [they] were very resource-strapped."[269] Estrada described the serious crime epidemic plaguing his district, stating:

> We have a Fentanyl epidemic which is one of the worst in the country[]. We've done more death-resulting cases than any other district in the country. We're on pace to do more this year than we ever had before. We've got a violent crime epidemic with firearms. We've done more Hobbs Act cases than we ever have in the past 2 years. We have a National Security Section, a division, unlike most other offices, because we're the gateway to Asia.[270]

*       *       *

> We also look to the practical impact of limited resources. As I mentioned, we have . . . about 20 million people in the district, yet, at the time I came in, about 140 AUSAs. That's just over one AUSA per 100,000 people in the district. At the same time, we're dealing

---

[262] Tristan Leavitt & Mark D. Lytle, to H. Comm. on Ways & Means and S. Comm. on Fin. (Sept. 13, 2023) (attaching a copy of Shapley's notes from the October 7 meeting).
[263] Estrada Interview at 20, 29, 71.
[264] *Id.* at 20, 29.
[265] *Id.* at 29.
[266] *Id.* at 19-21.
[267] *Id.* at 21.
[268] *Id.* at 22; Weiss Interview at 103.
[269] Estrada Interview at 32.
[270] *Id.* at 28.

> with—as I said, we're the gang capital. We, unfortunately, export
> MS-13, Crips gangs, Hispanic gangs, Mexican mafia to the rest of
> the country. Our cartels infect the rest of the country. The fraud we
> have here infects the rest of the country. So there were a lot of issues
> I needed to deal with right there and then which called for
> resources.[271]

Weiss seemingly had another method to bring charges in California that he failed to use. According to Estrada, before his confirmation, one of the Acting U.S. Attorneys in the district had appointed Assistant U.S. Attorneys from Weiss's office to serve as SAUSAs in the Central District of California, meaning they were authorized to bring charges and litigate in that district.[272] Estrada was unaware of how many SAUSAs were appointed, other than that it was more than one, and he was unaware when exactly they were appointed, explaining that he did not ask for the information "because it didn't seem relevant" to him.[273] Weiss was unable to provide any information on this topic because he could not "recall the particulars of whether SAUSAs were established and exactly what that meant[.]"[274] It is not clear why Weiss needed to partner with Estrada when he already had Assistant U.S. Attorneys from his office who were able, as SAUSAs, to bring charges and prosecute the case in Estrada's district.

Weiss and Estrada remained in contact with each other about the case even after Weiss was appointed as special counsel. Estrada informed the Committee that he had a call with Weiss about the case on September 19, 2023, though he refused to discuss the call other than to say it "did not involve the question of whether to co[-]counsel on contemplated charges against Hunter Biden[.]"[275] Weiss similarly acknowledged the call's existence without providing further detail.[276]

After both U.S. Attorney Graves in D.C. and U.S. Attorney Estrada in California declined to partner on prosecuting the case against Hunter Biden,[277] it appears that Weiss did not make any further attempt to prosecute in those districts until he received special counsel status. Weiss did not attempt to bring charges in those districts despite assurances he said he received from Main Justice that he would receive special attorney status if necessary.

---

[271] *Id.* at 34.

[272] *Id.* at 17-18, 23.

[273] *Id.* at 18.

[274] Weiss Interview at 102.

[275] Estrada Interview at 26.

[276] Weiss Interview at 149 ("Q. Mr. Estrada testified that there was another conversation in September of 2023. Do you remember that one? A. Yeah, I don't want to get into the particulars of any further conversations. I mean, the first one . . . spoke to my authority. The second one, I just – it would not be appropriate for me to comment on.").

[277] *See* Goldberg Interview at 76 ("Q. . . . [Weiss] had taken the case to two separate United States Attorneys. He took it to the U.S. Attorney for the district of D.C., and he took it to the U.S. Attorney for the Central District of California, and both U.S. Attorneys declined to partner, correct? A. That's my understanding, that they did not want to partner on the case.").

### C. The Department's Tax Division had to approve any tax charges U.S. Attorney Weiss wanted to pursue.

In addition to being geographically limited in where he could bring charges against Hunter Biden, Weiss also needed approval from the Biden Justice Department's Tax Division to bring tax-related charges against Hunter Biden. As IRS whistleblower Shapley wrote in his contemporaneous notes from the October 2022 prosecution team meeting, Weiss stated he "[n]eeds DOJ Tax approval first – stated that DOJ Tax will give 'discretion' (We explained what that means and why that was problematic)."[278] The Justice Manual, which sets forth the standards by which the Justice Department conducts its prosecutions, supports this understanding. It states that "[t]he *final* authority for the prosecution or declination of all criminal matters arising under the internal revenue laws rests with the Assistant Attorney General, Tax Division."[279] It is difficult to reconcile this provision with Weiss's claim that he had "ultimate" authority over the Department's Hunter Biden case, including what charges to bring. Indeed, none of the witnesses the Committee interviewed were able to reconcile this discrepancy.[280]

The Justice Manual further specifies that "only after the Tax Division has authorized the prosecution of individuals and entities for criminal tax violations may a United States Attorney's Office seek an indictment or file any tax charges."[281] Similarly, with regard to opening a tax investigation, the Justice Manual provides that "[o]nly after the Tax Division has authorized a grand jury investigation may a United States Attorney's Office issue subpoenas and undertake other investigative actions."[282] Thus, even if Weiss had been afforded special attorney authority, he still needed approval from the Tax Division before bringing tax charges.[283] According to U.S. Attorney Graves, the Tax Division is afforded this responsibility because "the Tax Code is one of the most complicated criminal regimes that we have. . . . And you want a centralized group that is very much steeped in these issues and able to make sure that tax prosecutions across the country are being implemented uniformly."[284]

Witnesses repeatedly confirmed to the Judiciary Committee that the Tax Division first had to approve opening a grand jury investigation of Hunter Biden's alleged tax crimes, and then also had to approve all tax charges that U.S. Attorney Weiss wanted to pursue. Stuart Goldberg, Acting Deputy Assistant Attorney General for Criminal Matters in the Tax Division, who has worked at the Justice Department since 1988, testified that the Tax Division must approve

---

[278] Email from Gary Shapley, Supervisory Special Agent, Internal Revenue Serv., to Michael Batdorf & Darrell Waldon, Internal Revenue Serv. (Oct. 7, 2022, 6:09 PM).

[279] U.S. Dep't of Just., Just. Manual § 6-4.218 (2023).

[280] *See, e.g.*, Estrada Interview at 39 ("Q. Okay. But, if the Justice Manual says that the Assistant Attorney General for the Tax Division has the final authority, how do you reconcile that with Mr. Weiss' statement that he had ultimate authority? A. I'm not going to attempt to reconcile anything.").

[281] U.S. Dep't of Just., Just. Manual § 6-1.110 (2023) (emphasis in original). *See also id.* § 6-4.200 ("The Tax Division must approve any and all criminal charges that a United States Attorney's Office intends to bring against a defendant for conduct arising under the internal revenue laws, regardless of which criminal statute(s) the United States Attorney's Office proposes to use in charging the defendant.").

[282] *Id.* § 6-1.110 (emphasis in original). *See also* § 6-4.120 ("[T]he Tax Division must first approve and authorize the United States Attorney's Office's use of a grand jury to investigate criminal tax violations.").

[283] Goldberg Interview at 74; Graves Interview at 94.

[284] Graves Interview at 49.

criminal tax charges, with very limited exceptions (which are not relevant to the Hunter Biden case[285]) before a U.S. Attorney may file such charges.[286] The role of U.S. Attorneys, including Weiss, in regard to charging decisions is limited to merely recommending charges.[287] Goldberg stated:

> Q.    Can you explain the role of the Tax Division in approving criminal investigations?
>
> A.    So there are various approval functions that the Tax Division has that might come up in the course of a particular case. Some of those deal with whether or not a grand jury investigation can be opened, whether or not a prosecution can be brought generally. There are investigative steps that are reserved for the Tax Division, and somebody in my position would have to sign off on things like attorney subpoenas, for instance. That's overall what it looks like.
>
> Q.    According to the Department of Justice, the Justice Manual, only after the Tax Division has authorized a grand jury investigation may a United States Attorney's Office issue subpoenas and undertake other investigative actions. Is that consistent with your understanding?
>
> A.    In terms of directly working a tax case. Sometimes there are overlapping Title 18 charges where they might be able to collect information that's useful. But, yes, before they issue a tax-related subpoena [they] should have a grand jury authorization.
>
> Q.    And isn't it also true that under the Justice Manual DOJ Tax's approval is required before the U.S. Attorney's Office may bring charges for felony cases?
>
> A.    Yes, that is true, though there are a very small number of cases, I think, that under the regulations—I think there are a small number of cases, excise tax cases and things like that, where I think it's possible for a U.S. Attorney's Office to get

---

[285] The criminal tax matters for which Tax Division approval is not required before a U.S. Attorney may file charges include excise taxes, multiple filings of false and fictitious returns claiming refunds, trust fund matters, "ten percenter" matters, and IRS form 8300 returns. *See* U.S. Dep't of Just., Just. Manual § 6-4.243 (2023).

[286] *See* Goldberg Interview at 74 ("Q. Okay. So if felony tax charges are going to be brought, the Tax Division has to sign off? Has to okay it? A. In a typical case, yes, we would have to okay that.").

[287] *See id.* at 75 ("My understanding is that if you're a U.S. Attorney who is leading a prosecution, that you can make recommendations on your case, but . . . if you want to bring a tax case, you need to get Tax Division authority."); *id.* at 82 ("[Weiss] was in a position where he was going to make a recommendation . . . regarding the prosecution[.]"); *id.* at 84 ("[Weiss] was going to be making a recommendation on the case.").

a direct referral and actually bring the case. But those are small and unusual.[288]

Weiss similarly agreed that Tax Division sign-off was required for charges and investigative steps. He testified:

> Q.    Okay. So, under the [Justice] manual, the final authority for the prosecution or declination of all criminal matters arising under the Internal Revenue laws rest[s] with the Tax Division, correct?
>
> A.    I am aware that Tax Division approves the charging of [T]itle 26 offenses. . . .
>
> Q.    Okay. But, if you're working a tax case, there's specific investigative steps that need the okay or approval of the Tax Division before you can initiate, correct?
>
> A.    That's my understanding.[289]

U.S. Attorney Matthew Graves also understood that the Tax Division played a central approval function in tax cases. He stated:

> Q.    [I]t is fair to say, in Federal criminal tax cases, approval from DOJ Tax is required before a U.S. Attorney's office may issue subpoenas or undertake other investigative actions?
>
> A.    There are various steps along the investigative process that have to be approved by the Tax Division in connection with the prosecution or investigation of tax charges.
>
> Q.    Okay. And so, if a U.S. Attorney, whether it's yourself or Mr. Weiss, wanted to bring tax charges against an individual, it would require the approval of the Tax Division, correct?
>
> A.    That is correct.[290]

U.S. Attorney Estrada was also aware of the required Tax Division authorization before bringing tax-related charges. He testified that "for certain tax charges, you need authorization from the

---

[288] *Id.* at 8-9.

[289] Weiss Interview at 29-30. *See also id.* at 168 ("Q. But, as we've discussed, under the Justice Manual, DOJ Tax has to approve felony charges, right? A. DOJ Tax . . . is required to approve Title 26 charges.").

[290] Graves Interview at 11-12. *See also id.* at 94 ("Q. Because before getting special counsel authority, for Mr. Weiss to bring some of these charges, he would've needed, as we discussed this morning, the approval of the Tax Division. A. So, again, I don't know the specifics of this case. The way the Justice Manual is set up, certainly Tax Division approval would be required.").

Tax Division to bring those charges and then also to dismiss those charges . . . if you choose to dismiss them."[291]

IRS Director of Field Operations Michael Batdorf provided the same information when interviewed by the Committee on Ways and Means. He explained:

> Q.  Okay. So at the time of the June 15th meeting, so the meeting we've just been discussing, was it your view that David Weiss had the authority to bring this case, any charges he wanted, in any jurisdiction he wanted?
>
> A.  It was my view that—well, DOJ Tax had not authorized any charges at that time. So DOJ Tax would have to authorize charges prior to David Weiss recommending an indictment or prosecution.[292]
>
> *       *       *
>
> Q.  Okay. And so if they—and if they decline, if they did not authorize, then there is no way to go forward in the case, you need—because you need DOJ Tax approval?
>
> A.  You need DOJ Tax approval.
>
> Q.  So Mr. Weiss couldn't bring charges without first getting DOJ Tax approval?
>
> A.  No. Not—to the best of my knowledge, no.[293]

The Tax Division may also decline tax charges that a U.S. Attorney wants to bring in a jurisdiction.[294] Weiss explained that if the Tax Division refused to authorize charges, he "could have appealed to the Deputy Attorney General or the Attorney General."[295] However, Weiss did not have the authority to unilaterally overrule the Tax Division's charging decisions with respect to tax-related charges.

Witnesses were unable to reconcile the Justice Manual requirements that the Tax Division approve tax charges before a U.S. Attorney may file them with Weiss's claim that he had "ultimate authority . . . for deciding where, when and whether to file charges" in this case.[296] For instance, Goldberg attempted to reconcile the matter by saying Weiss didn't really mean "ultimate" (i.e., final or utmost) authority when he used the term "ultimate authority," but instead

---

[291] Estrada Interview at 38.
[292] Batdorf Interview at 22-23.
[293] *Id.* at 39.
[294] Goldberg Interview at 13.
[295] Weiss Interview at 30-31.
[296] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023).

meant that he only had authority "subject to limitations that are placed on departmental prosecutors."[297] However, Goldberg's attempt at reconciling this discrepancy acknowledged that Weiss was not the final decisionmaker on this case and that he indeed required approval from Justice Department officials, per the Justice Manual provisions and associated federal regulations,[298] which contradicts Attorney General Garland's broad statements about the scope of Weiss's "complete" authority to "make all decisions on his own."[299]

U.S. Attorney Weiss similarly attempted to reconcile the Justice Manual provisions with his statements about his authority. He stated:

> Q. But, as we've discussed, under the Justice Manual, DOJ Tax has to approve felony charges, right?
>
> A. DOJ Tax has approval—is required to approve Title 26 charges. Yes, we have discussed that. And I welcomed DOJ Tax's input in this case. Never felt that I had an issue in that regard.
>
> Q. Right. But whether you had Special Counsel authority or 515 authority, no matter what kind of authority you had, you still had to have DOJ Tax's approval for tax charges.
>
> A. You're still consulting with DOJ Tax . . . absolutely.
>
> Q. Okay. So, when Mr. Shapley writes, "Needs DOJ Tax approval first," I mean, that is consistent with the facts of life, correct?
>
> A. I'm not—look, I'm not challenging the DOJ Tax. And I believe I would've said, as I've said here today, I'm not operating in a vacuum. There are processes here. And others need to be involved.[300]

The fact that DOJ policy required Weiss to obtain approval from the Tax Division before opening a grand jury investigation, and then get further approval before filing charges, undermines Weiss's plain-language assertion that he had ultimate authority over this case. Ultimately, contrary to Attorney General Garland's assurances, Biden Administration political appointees exercised significant oversight and control over the Hunter Biden investigation.

---

[297] Goldberg Interview at 83.
[298] *See* 28 C.F.R. § 0.70 ("The following functions are assigned to and shall be conducted, handled, or supervised by, the Assistant Attorney General, Tax Division: . . . [c]riminal proceedings arising under the internal revenue laws[.]"). *See also* Goldberg Interview at 61 ("There's a regulation, 28 CFR 0.70, which specifically says that Tax Division has authority over matters arising under the Internal Revenue laws.").
[299] *See, e.g., AG Garland Maintains David Weiss Had Full Authority Over Hunter Biden Case*, C-SPAN (June 23, 2023) ("I don't know how it would be possible for anybody to block [Weiss] from bringing a prosecution, given that he has this authority. . . . [H]e was given complete authority to make all decisions on his own.").
[300] Weiss Interview at 168.

During his transcribed interview, Weiss defended his assertions about having "ultimate" authority over the Hunter Biden investigation as U.S. Attorney because, in his words, he was "the decisionmaker in this case,"[301] and he "didn't need anybody's permission" to make decisions."[302] Weiss conceded that he does not "make these decisions in a vacuum" as he is "bound by Federal law, the principles of Federal prosecution, and DOJ guidelines," and that "[a]s a result, there are processes that [he] must adhere to in making investigative and charging decisions."[303] Weiss contended, however, that "[t]hese processes did not interfere with [his] decisionmaking authority" as he was not "blocked or otherwise prevented from pursuing charges or taking the steps necessary in the investigation by other U.S. Attorneys, the Tax Division, or anyone else in the Department of Justice."[304]

Weiss's attempts to explain away his statements strain credulity and ignore the fact that on three separate occasions he was indeed blocked from bringing charges against Hunter Biden.[305] First, in February 2022, Main Justice rebuffed his request for special attorney status. Second, in March 2022, U.S. Attorney Graves refused to partner on the case.[306] And third, in October 2022, U.S. Attorney Estrada likewise refused to partner on the case.[307] The only reason Weiss was ultimately able to file tax charges against Hunter Biden in June 2023 is because Hunter Biden waived venue to help usher through an unprecedented sweetheart plea deal.[308] Weiss's argument is further belied by the fact that on August 11, 2023, Attorney General Garland appointed Weiss special counsel, thereby empowering him to bring charges outside of his home district of Delaware.[309] However, if Weiss already had "ultimate" authority to bring charges outside of his home district, the need for special counsel authority would have been redundant, and there would have been no reason for Weiss to request such authority.

---

[301] *Id.* at 9.

[302] *Id.* at 30.

[303] *Id.* at 9.

[304] *Id.*

[305] *See id.* at 182 ("I asked for [special attorney status], and in that conversation [Main Justice] didn't give it to me[.]").

[306] *See supra* Part II.B.i.

[307] *See supra* Part II.B.ii.

[308] Memorandum of Plea Agreement at 1, *United States v. Biden*, No. 1:23-mj-00274-UNA (D. Del. Aug. 2, 2023); Diversion Agreement at 3, *United States v. Biden*, No. 1:23-cr-00061-MN (D. Del. Aug. 2, 2023).

[309] OFF. OF THE ATT'Y GEN., ORDER NO. 5730-2023, APPOINTMENT OF DAVID C. WEISS AS SPECIAL COUNSEL (2023).

### III. THE BIDEN ADMINISTRATION HAS SOUGHT TO INFLUENCE THE HUNTER BIDEN INVESTIGATION IN A MANNER FAVORABLE TO PRESIDENT BIDEN.

The Committees have gathered evidence that the Biden Administration has improperly influenced the course of the independent IRS and Justice Department investigation into Hunter Biden. According to the available evidence, the Biden Justice Department shut down certain lines of inquiry and allowed the statute of limitations to lapse on certain charges. After whistleblowers came forward to detail the Department's obstruction, and the Department was compelled to take some prosecutorial action, the Department tried to push through a sweetheart plea deal, which imploded in open court. The Biden Justice Department has made inconsistent statements to the Judiciary Committee about the independence of its investigation, and President Biden has prejudiced the investigation by making statements proclaiming his son's innocence. In short, evidence obtained to date details how the Biden Administration has deviated from its typical process to provide the President's son special treatment and influence the investigation in a way that is favorable to the President's family.

### A. Throughout Weiss's investigation, President Biden has made statements that prejudice the Justice Department's investigation and the appearance of impartial justice.

President Biden and his White House staff have prejudiced the Department's investigation by making repeated public statements about Hunter Biden's innocence.[310] President Biden is the head of the Executive Branch, and Justice Department officials are appointed by and serve at the pleasure of the President. As such, the President's statements, as well as those from senior White House officials, risk influencing the Department's actions and its decision-making in the ongoing criminal investigation of the President's son, an investigation which has implicated the President himself.

Since becoming President, President Biden has used the bully pulpit of his office to speak about the Justice Department's investigation into his son in a manner that leaves no ambiguity that he believes the investigation to be baseless. For example, on October 11, 2022, a reporter asked President Biden about potential charges against Hunter.[311] While acknowledging that Hunter Biden lied on his application to purchase a gun, President Biden stated, "I'm confident that he is—what he says and does are consistent with what happens."[312] President Biden then reiterated that he has "great confidence in [his] son."[313] In May 2023, President Biden again defended his son, stating, "[M]y son has done nothing wrong."[314] He added, "I trust him. I have faith in him."[315]

---

[310] *See, e.g.*, Jerry Dunleavy, *Hunter Biden investigation: How president's denial of son's wrongdoing colors DOJ inquiry*, WASH. EXAM'R (May 11, 2023).

[311] Kevin Liptak & Evan Perez, *Biden addresses possible criminal charges against Hunter Biden and says he's 'proud' of son's fight against drug addiction*, CNN (Oct. 12, 2022).

[312] *Id.*

[313] *Id.*

[314] Katherine Doyle, *Biden defends son Hunter ahead of possible federal tax, gun charges*, NBC NEWS (May 5, 2023).

[315] *Id.*

In August 2023, a reporter brought up testimony that President Biden was "on speakerphone" with Hunter Biden's former business associates "talking business," potentially implicating President Biden in these crimes.[316] President Biden shot back caustically: "I never talked business with anybody. I knew you'd have a lousy question."[317] When the reporter followed up to President Biden to explain why the question was lousy, the President shot back, "Because it's not true."[318]

Senior White House employees have also sought to prejudice the Justice Department's investigation by publicly commenting on Hunter Biden's innocence and President Biden's purported lack of involvement in his son's foreign business dealings. For example, then-White House Chief of Staff Ron Klain stated, "Of course the president is confident that his son didn't break the law" and that President Biden "is confident that his family did the right thing."[319] Klain added, "[t]hese are actions by Hunter and [the President's] brother. They're private matters. They don't involve the president. And they certainly are something that no one at the White House is involved in."[320] On April 5, 2022, then-White House Press Secretary Jen Psaki agreed with a reporter's question that the President has "never spoke[n] to his son about his overseas business dealings."[321] On July 24, 2023, in an exchange with a reporter, White House Press Secretary Karine Jean-Pierre stated that President Biden "was never in business with his son."[322] Two days later, Jean-Pierre reiterated at a press briefing that "nothing has changed," again denying that President Biden had any involvement with his son's foreign business dealings.[323]

Despite their claims, these statements from both President Biden and his senior White House staff appear to be inconsistent with evidence that the Committees have gathered—including bank records, discussions with former business associates, interviews with investigators from the Hunter Biden criminal investigation, and government records from multiple agencies—that the President was involved in his family's foreign business entanglements. The statements by the President and senior White House officials send a strong signal to Justice Department prosecutors, who ultimately are accountable to them President, that any investigation into Hunter Biden has no merit. At the very least, the President's statements create the dangerous appearance that his Justice Department has failed to live up to its mission of fair and impartial administration of justice.

---

[316] Alexander Hall, *Biden scorched for response to question about talking to Hunter's business associates: 'Pathological liar'*, FOX NEWS (Aug. 10, 2023).

[317] *Id.*

[318] *Id.*

[319] David Cohen, *Biden 'confident' his son didn't break the law, White House chief of staff says*, POLITICO (Apr. 3, 2022).

[320] *Id.*

[321] *Press Briefing by Press Secretary Jen Psaki, April 5, 2022*, THE WHITE HOUSE (Apr. 5, 2022).

[322] *Press Briefing by Press Secretary Karine Jean-Pierre*, THE WHITE HOUSE (July 24, 2023).

[323] *Press Briefing by Press Secretary Karine Jean-Pierre and National Security Council Coordinator for Strategic Communications John Kirby*, THE WHITE HOUSE (July 26, 2023).

**B. Without the brave IRS whistleblowers, it is likely that the Justice Department would have never acted on Hunter Biden's misconduct.**

The evidence that the Committees have uncovered to date suggests that the Justice Department had no intention of aggressively investigating or acting upon allegations of potential criminal conduct by Hunter Biden until transparency forced accountability. If not for the brave whistleblowers shedding light on the Justice Department's intentional slow-walking of the investigation and deviations from standard investigative practices, it seems likely that the Justice Department would have never acted on the investigation.

In his contemporaneous handwritten notes taken at the October 7, 2022 meeting, Shapley wrote that "[i]nvestigative work essentially complete per U.S. [Attorney]."[324] Additionally, in an email to his superiors sent shortly after the meeting, Shapley explained that "[n]o major investigative actions remain" with respect to the Hunter Biden investigation.[325]

---

[324] Letter from Tristan Leavitt & Mark D. Lytle, to H. Comm. on Ways and Means & S. Comm. on Fin. (Sept. 13, 2023) (attaching Shapley's notes from the October 7 meeting).
[325] Email from Gary Shapley, Supervisory Special Agent, Internal Revenue Serv., to Michael Batdorf & Darrell Waldon, Internal Revenue Serv. (Oct. 7, 2022, 6:09 PM).

2. **Weiss stated that he is not the deciding person on whether charges are filed**
   a. I believe this to be a huge problem – inconsistent with DOJ public position and Merrick Garland testimony
   b. Process for decision:
      i. Needs DOJ Tax approval first – stated that DOJ Tax will give "discretion" (We explained what that means and why that is problematic)
      ii. No venue in Delaware has been known since at least June 2021
      iii. Went to D.C. USAO in early summer to request to charge there – Biden appointed USA said they could not charge in his district
          1. USA Weiss requested Special counsel authority when it was sent to D.C and Main DOJ denied his request and told him to follow the process
      iv. Mid-September they sent the case to the central district of California – coinciding with the confirmation of the new biden appointed USA – decision is still pending
      v. If CA does not support charging USA Weiss has no authority to charge in CA –
          1. He would have to request permission to bring charges in CA from the Deputy Attorney General/Attorney General (unclear on which he said)
      vi. With DOJ Tax only giving "discretion" they are not bound to bring the charges in CA and **this case could end up without any charges**
3. They are not going to charge 2014/2015 tax years
   a. I stated, for the record, that I did not concur with that decision and put on the record that IRS will have a lot of risk associated with this decision because there is still a large amount of unreported income in that year from Burisma that we have no mechanism to recover
   b. Their reason not to charge it does not overcome the scheme and affirmative acts – in my opinion
4. FBI SAC asked the room if anyone thought the case had been politicized – we can discuss this is you prefer
5. No major investigative actions remain
6. Both us and the FBI brought up some general issues to include:
   a. Communication issues
   b. Update issues
   c. **These issues were surprisingly contentious**

Always available to discuss.  Have a great weekend!

Ziegler similarly explained during his transcribed interview on June 1, 2023 that "the investigative process is 99.9 percent done[.]"[326] In other words, at the time of the "red-line" meeting that ultimately led the IRS whistleblowers to shine the light on misconduct in the investigation, the only remaining decision points were whether to pursue charges against Hunter Biden.

Testimony from the FBI officials appears to further substantiate Shapley's assertion. Throughout their testimony, neither Sobocinski nor Holley could describe any real or significant progress made in Weiss's investigation after the October 7 meeting through the August 8, 2023

---

[326] Ziegler Interview at 14.

special counsel announcement.[327] Other than reiterating that the investigation is "ongoing," the witnesses provided bland and ambiguous responses to the Judiciary Committee's questions about the status of the case at the time of the October 7 meeting and what investigative steps remain.

For example, Sobocinski would not provide a clear answer about where in the process the investigation stood, instead stating vaguely that the FBI is doing everything to "bring it forward to the Justice Department."[328] Holley likewise could not articulate any progress made in the investigation after the October 7 meeting until August 2023. Although Holley generally disagreed that all investigative steps had been exhausted as of October 7, she declined to provide examples to the Committee of investigative steps undertaken after October 7.[329] Holley's and Sobocinski's refusal to provide any update on the purported "ongoing investigation" since the October 7, 2022 meeting bolsters whistleblower testimony that 99.9 percent of the investigation had been completed as of October 2022.

The timing of the Justice Department's actions likewise suggest that it would not have taken further action on the Hunter Biden case but for the whistleblower disclosures. Sometime after April 19, 2023, when Shapley's attorney first notified Congress of his client's allegations, Shapley "started to hear rumblings that DOJ was picking the case back up again."[330] This testimony is corroborated by the Department's actions. In May 2023, around the time that the IRS whistleblowers initially testified to Congress and shortly after a meeting between Hunter Biden's then-lawyer Chris Clark,[331] Weiss, and Associate Deputy Attorney General Bradley Weinsheimer,[332] the Biden Justice Department began formally negotiating with Hunter Biden's lawyers about potential plea and pretrial diversion agreements.[333]

---

[327] *See* Sobocinski Interview at 162-63; Holley Interview at 102-03.

[328] Sobocinski Interview at 162.

[329] Holley Interview at 102-03.

[330] Shapley Interview at 32.

[331] On August 15, 2023, Clark filed a motion, which Judge Noreika granted two days later, to withdraw from representing Hunter Biden in this matter due to Clark's belief that he could be called as a witness in future litigation concerning "the negotiation and drafting of the plea agreement and diversion agreement. . . ." Motion for Leave to Withdraw as Counsel for Defendant Robert Hunter Biden, *United States v, Biden*, No. 1:23-mj-00274-MN, No. 1:23-cr-00061-MN (D. Del. Aug. 15, 2023) (citing Delaware Rule of Professional Conduct 3.7(a) which provides that "a lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless… disqualification of the lawyer would work substantial hardship on the client.").

[332] *See* Betsy Woodruff Swan, *In talks with prosecutors, Hunter Biden's lawyers vowed to put the president on the stand*, POLITICO (Aug. 19, 2023) (reporting that Clark, Weiss, and Weinsheimer met on April 26, 2023 to discuss the charges, but noting that it is "not clear what happened in the meeting, which came at a sensitive moment for the probe").

[333] Defendant's Response to the United States' Motion to Vacate the Court's Briefing Order at 1, *United States v. Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. Aug. 13, 2023); *see also* Email from Lesley Wolf, Assistant U.S. Att'y, Dist. of Del., to Chris Clark (May 18, 2023, 10:02 PM) (on file with Committee); James Lynch, *Hunter Biden began negotiating plea deal with DOJ right after IRS whistleblower first came forward, court docs show*, DAILY CALLER (Aug. 14, 2023).

**C. Hunter Biden's attorneys are pushing the Biden Justice Department to investigate witnesses in retaliation for making protected disclosures regarding Hunter Biden's alleged criminal conduct.**

Hunter Biden's legal team has engaged in a brazen effort to intimidate and harass the brave IRS whistleblowers who exposed irregularities in the Department's investigation of Hunter Biden,[334] and a former business associate of Hunter Biden who provided information to the FBI regarding the Bidens' shady business practices. These tactics have even included urging the Department to prosecute the whistleblowers for their protected disclosures to Congress.[335] Federal law protects whistleblowers from retaliation,[336] and efforts to intimidate these whistleblowers raise serious concerns about potential felonious obstruction of the Committees' investigation.[337] The willingness of the Hunter Biden legal team to push the Biden Justice Department into investigating whistleblowers shows the extent to which Hunter Biden believes it can influence the investigation in a manner favorable to him.

On June 30, 2023, Abbe Lowell, an attorney representing Hunter Biden, wrote to the Ways and Means Committee, asserting without evidence that Shapley and Ziegler had violated federal law in making their protected whistleblower disclosures to the Committee.[338] Lowell slandered the brave IRS whistleblowers as "disgruntled agents" with an "axe to grind," and suggested—again without evidence—that these men were responsible for leaks to media outlets.[339] Lowell implied that at least one of the whistleblowers, Shapley, faced "some investigation into his *own conduct*."[340] On June 3, 2023, on his own accord, Shapley provided the Committee on Ways and Means an affidavit that read, in part, as follows:

> I was not the source for the October 6, 2022 Washington Post article, nor have I ever had any contact with [the article's authors] Barrett or Stein. Because I am so confident of this fact, I hereby authorize the Washington Post and/or journalists Devlin Barrett, Perry Stein, or any other Washington Post reporter to release any communications directly or indirectly to or from me. In this regard, I am willing to waive any purported journalistic privilege and/or confidentiality that would have arisen had I been a source for the Washington Post.[341]

Shapley went on to note that he had "never leaked confidential taxpayer information."[342]

---

[334] *See* Kimberley A. Strassel, *Hunter Biden's Smear Strategy*, Wall St. J. (July 6, 2023); Letter from Abbe Lowell, to Rep. Jason Smith, Chairman, H. Comm. on Ways and Means (June 30, 2023).

[335] *See* Michael S. Schmidt et al., *Inside the Collapse of Hunter Biden's Plea Deal*, N.Y. Times (Aug. 19, 2023).

[336] *See, e.g.*, 5 U.S.C. §§ 2302(b)(8)(C), 7211.

[337] *See* 18 U.S.C. §§ 1505, 1512(b).

[338] Letter from Abbe Lowell, to Rep. Jason Smith, Chairman, H. Comm. on Ways & Means (June 30, 2023).

[339] *Id.*

[340] *Id. (*emphasis in original).

[341] Shapley Supplemental Affidavit at 4.

[342] *Id.*

Hunter Biden's lawyers have also directly urged the Justice Department—the law-enforcement component responsible to Hunter Biden's father—to act against the whistleblowers. According to the *New York Times*, Hunter Biden's "lawyers have contended to the Justice Department that by disclosing details about the investigation to Congress, they broke the law and should be prosecuted."[343] On October 31, 2022, Chris Clark sent a letter to U.S. Attorney Weiss falsely accusing Shapley and Ziegler of illegally leaking information about the investigation to the press and demanding they be investigated.[344] Clark also wrote to Justice Department Inspector General Michael Horowitz (twice),[345] Associate Deputy Attorney General Bradley Weinsheimer,[346] and Tax Division Senior Litigation Counsel Mark Daly and Delaware Assistant U.S. Attorneys Lesley Wolf and Carly Hudson[347] demanding that the whistleblowers be investigated. Abbe Lowell sent a similar letter to Weiss on August 14, 2023, falsely claiming that Shapley and Ziegler acted illegally when disclosing information about the Department's wrongdoing to Congress and demanding that they be investigated.[348] However, Shapley's and Ziegler's disclosures to Congress are protected under federal law,[349] and any suggestion that they acted illegally in making these disclosures is nothing short of frivolous and a clear attempt to intimidate the whistleblowers.

Lowell's attempted intimidation tactics did not end with the whistleblowers. On October 7, 2023, Lowell sent a letter to U.S. Attorney Graves demanding an investigation into Tony Bobulinski concerning statements that Bobulinski made about Hunter Biden.[350] Notably, Bobulinski is Hunter Biden's former business partner who had previously identified President Biden as the "big guy" who would take a stake in a joint company with a Chinese energy company closely linked to the Chinese Communist Party.[351] Media outlets confirmed that Hunter and James Biden, President Biden's brother, owned entities that were paid $4.8 million by CEFC China Energy in a 14-month period.[352] As Hunter Biden's former business partner, Bobulinski has firsthand insight into the financial arrangement, including direct meetings with Hunter Biden and President Biden.[353] Lowell's demands for an investigation into Bobulinski appear to be another shallow effort to discredit and intimidate a potential witness against Hunter Biden.

---

[343] Schmidt et al., *supra* note 335.

[344] Letter from Chris Clark to David Weiss, U.S. Att'y, Dist. of Del., at 2, 15-17 (Oct. 31, 2022) (on file with Committee).

[345] Letter from Chris Clark to Michael Horowitz, Inspector Gen., U.S. Dep't of Just. (Feb. 8, 2023) (on file with Committee); Letter from Chris Clark to Michael Horowitz, Inspector Gen., U.S. Dep't of Just. (June 29, 2023) (on file with Committee).

[346] Letter from Chris Clark to Bradley Weinsheimer, Associate Deputy Att'y Gen, U.S. Dep't of Just. (Apr. 21, 2023) (on file with Committee).

[347] Letter from Chris Clark to Mark Daly, Lesley Wolf, and Carly Hudson (Apr. 21, 2023) (on file with Committee).

[348] Letter from Abbe Lowell to David Weiss, U.S. Att'y, Dist. of Del. (Aug. 14, 2023) (on file with Committee).

[349] *See* 26 U.S.C. § 6103(f)(5).

[350] Letter from Abbe Lowell, to Matthew M. Graves, U.S. Att'y, U.S. Dep't of Just. (Oct. 7, 2023).

[351] Michael Goodwin, *Hunter biz partner confirms email, details Joe Biden's push to make millions from China: Goodwin*, N.Y. POST (Oct. 22, 2020) (quoting Bobulinski as stating that "[t]he reference to 'the Big Guy' in the much publicized May 13, 2017 email is in fact a reference to Joe Biden.").

[352] Matt Viser et al., *Inside Hunter Biden's multimillion-dollar deals with a Chinese energy company*, WASH. POST (Mar. 30, 2020).

[353] *See* Ebony Bowden & Steven Nelson, *Hunter's ex-partner Tony Bobulinski: Joe Biden's a liar and here's the proof*, N.Y. POST (Oct. 22, 2020).

Hunter Biden's lawyers have engaged in a relentless and shameful campaign to have whistleblowers arrested for making protected disclosures to Congress. They are asking the senior Justice Department officials—officials who serve at the pleasure of the President—to prosecute witnesses for lawful disclosures that are potentially harmful to the President's son.

### D. After a multi-year investigation, Weiss offered Hunter Biden a sweetheart plea deal that fell apart under simple questioning from the judge.

After a five-year investigation, slowed-walked by Biden-appointees and beset by deviations from standard investigative practices, Weiss offered Hunter Biden a sweetheart plea deal for only two misdemeanor tax crimes and a pretrial diversion agreement for a felony firearm offense,[354] despite prosecutors and investigators recommending charging Hunter Biden with six felonies and five misdemeanors.[355] Further, it was revealed during the hearing on the plea deal that prosecutors and defense counsel did not share the same understanding of the scope of Hunter Biden's immunity from additional charges.[356] While prosecutors understood the immunity provision of the pretrial diversion agreement to only protect Hunter Biden from additional charges related to his tax returns from 2014 to 2019 and his illegal gun purchase in 2014, defense counsel interpreted the immunity provision to also shield Hunter Biden from potential charges related to his foreign business ventures, such as violating the Foreign Agents Registration Act.[357] As the Committees have previously noted, "it is difficult to understand how the parties would not have a meeting of the minds regarding a clause of the agreement as fundamental as the scope of the immunity provision, and it raises questions about what discussions have taken place between the Department and Mr. Biden's counsel regarding the status of those investigations."[358] The judge overseeing the case also inquired as to why prosecutors structured the immunity provision in such a way as to give her no authority to reject it.[359]

The timing of the public announcement of the plea deal also raises the perception it was designed to avoid public criticism of the investigation. The Biden Justice Department announced the plea deal with Hunter Biden mere days before the Ways and Means Committee disclosed the whistleblower testimony detailing how the Department "provided preferential treatment, slow-walked the investigation, [and] did nothing to avoid obvious conflicts of interest in this investigation."[360]

According to public reporting, Hunter Biden's attorney, Chris Clark, began pressuring the Department to settle Hunter Biden's case as early as spring of 2022.[361] From the mid-2022 to early 2023, Clark threatened prosecutors that they faced "career suicide" if they pursued the

---

[354] Carrie Johnson, *Hunter Biden agrees to plead guilty in tax case and avoid prosecution on gun charge*, NPR (June 20, 2023).
[355] *See* Shapley Interview, Ex. 2.
[356] Glenn Thrush et al., *Judge Puts Hunter Biden's Plea Deal on Hold, Questioning Its Details*, N.Y. TIMES (July 26, 2023).
[357] *Id.*
[358] Letter from Chairmen Jim Jordan, Jason Smith, and Jim Comer to Merrick Garland, Att'y Gen., U.S. Dep't of Just. (July 31, 2023).
[359] Glenn Thrush et al., *Judge Puts Hunter Biden's Plea Deal on Hold, Questioning Its Details*, N.Y. TIMES (July 26, 2023).
[360] Shapley Interview at 10-11.
[361] Swan, *supra* note 332.

investigation,[362] demanded meetings "with people at the highest levels of the Justice Department,"[363] and warned that he would call President Biden to testify as a fact witness for the defense in a potential prosecution.[364] He claimed that a prosecution of Hunter Biden would "immediately tarnish the credibility of the Department" as "another example of naked politics influenced by a vendetta of the former President against the current President."[365] Clark even went so far as to tell prosecutors that they would be creating a "Constitutional crisis" by pitting the President against his own Justice Department.[366] These threats seemingly worked on Weiss, who allowed the investigation to linger and did not pick the case back up until shortly after the whistleblower disclosures to Congress in May 2023.[367]

After negotiations with Hunter Biden's counsel, the Biden Justice Department tried to push through an unprecedented plea deal, which imploded in open court. The negotiations culminated in a plea agreement publicly announced on June 20, 2023.[368] The deal would have had Hunter Biden plead guilty to two misdemeanor tax charges, plus a diversion agreement to dismiss a separate felony gun charge if Hunter Biden completed a two-year period of probation.[369] The one-of-its-kind agreement shifted a broad immunity provision from the plea agreement to the pretrial diversion agreement, benefiting Hunter Biden with the aim of preventing the District Court from being able to scrutinize and reject that immunity provision.[370] It also gave the District Court the sole power to determine whether Hunter Biden breached the pretrial diversion agreement—a prerequisite for the Department to file the diverted charges

---

[362] Shapley Interview at 27; Ziegler Interview at 122.

[363] Swan, *supra* note 332. *See also* Letter from Chris Clark to Lesley Wolf, Assistant U.S. Att'y, Dist. of Del. (Oct. 10, 2022) (on file with Committee) (requesting meetings with the Attorney General, Deputy Attorney General, Assistant Attorney General for the Criminal Division, and U.S. Attorney for the District of Delaware); Letter from Chris Clark to Mark Daly, Senior Litig. Counsel, U.S. Dep't of Just., Tax Div. (Oct. 10, 2022) (on file with Committee) (requesting meetings with the Attorney General, the Deputy Attorney General, and the Acting Assistant Attorney General for the Tax Division); Letter from Chris Clark to Mark Daly, Senior Litig. Counsel, U.S. Dep't of Just., Tax Div. (Jan. 31, 2023) (on file with Committee) (requesting meetings with the Attorney General, Deputy Attorney General, and Assistant Attorney General for the Criminal Division); Letter from Chris Clark to David Weiss, U.S. Att'y, Dist. of Del. (Jan. 31, 2023) (on file with Committee) (requesting meetings with the Attorney General, Deputy Attorney General, and Assistant Attorney General for the Criminal Division); Letter from Chris Clark to David Weiss, U.S. Att'y, Dist. of Del. (Feb. 3, 2023) (on file with Committee) (requesting meetings with the Office of Legal Counsel and the Office of the Solicitor General); Letter from Chris Clark to Michael Horowitz, Inspector Gen., U.S. Dep't of Just. (Feb. 8, 2023) (on file with Committee) (requesting a meeting with the Office of the Inspector General).

[364] Letter from Chris Clark to David Weiss, U.S. Att'y, Dist. of Del., at 16 (Oct. 31, 2022) (on file with Committee).

[365] *Id.* at 19.

[366] *Id.* at 16; Swan, *supra* note 332.

[367] Defendant's Response to the United States' Motion to Vacate the Court's Briefing Order at 1, *United States v. Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. Aug. 13, 2023); *see also* Email from Lesley Wolf, Assistant U.S. Att'y, Dist. of Del., to Chris Clark (May 18, 2023, 10:02 PM) (on file with Committee); James Lynch, *Hunter Biden began negotiating plea deal with DOJ right after IRS whistleblower first came forward, court docs show*, DAILY CALLER (Aug. 14, 2023).

[368] Swan, *supra* note 332.

[369] Josh Gerstein et al., *Hunter Biden reaches plea deal with feds to resolve tax issues, gun charge*, POLITICO (June 20, 2023).

[370] *See* Letter from Chairmen Jim Jordan, Jason Smith, and James Comer, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (July 31, 2023). *See also* Transcript of Record at 46-47, 107, *United States v. Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July 26, 2023).

against him in the future and a provision benefiting Hunter Biden.[371]

On July 26, 2023, Hunter Biden appeared before Judge Maryellen Noreika of the U.S. District Court for the District of Delaware for a hearing on the plea deal.[372] The plea deal fell apart when prosecutors and defense attorneys could not provide answers to routine questions about the agreement posed by Judge Noreika.[373] Judge Noreika described the Department's deal as "not standard" and "different from what I normally see."[374] The deal had an unusual structure, involving both a typical plea agreement, which is presented to the court, and a diversion agreement, which Judge Noreika noted is not.[375] Diversion agreements are not approved by a judge, but a probation officer.[376]

Judge Noreika raised concerns about some "nonstandard terms" contained in the diversion agreement: (1) the "broad immunity" provision within the pretrial diversion agreement that would immunize Hunter Biden for not only the gun-related conduct, but also his unrelated tax crimes,[377] and (2) the provision that "invokes the Court or involves the Court as part of that agreement" by prohibiting the government from bringing charges within the scope of the agreement unless and until Judge Noreika first determined that the diversion agreement had been breached.[378] Judge Noreika expressed her concerns stating:

> I think what I'm concerned about here is that you seem to be asking for the inclusion of the Court in this agreement, yet you're telling me that I don't have any role in it, and you're leaving provisions of the plea agreement out and putting them into an agreement that you are not asking me to sign off on. So I need you to help me understand why this isn't in the written plea agreement.[379]

Neither prosecutors from the Biden Justice Department nor Hunter Biden's counsel could provide a satisfactory explanation to Judge Noreika's concerns.

First, the government's promise of immunity, which would usually be in the plea agreement, was for unexplained reasons included in the diversion agreement—meaning Judge Noreika would have no authority over it.[380] That immunity provision would immunize Hunter Biden for not only the felony gun charge subject to the diversion agreement, but also his unrelated and uncharged tax crimes.[381] Judge Noreika noted that she "looked through a bunch of diversion agreements that [she] ha[s] access to . . . [but] couldn't find anything that had anything

---

[371] Transcript of Record at 95, *United States v. Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July 26, 2023).

[372] *See* Swan, *supra* note 332; Schmidt et al., *supra* note 335.

[373] *See* Swan, *supra* note 332; Schmidt et al., *supra* note 335.

[374] Transcript of Record at 10, *United States v. Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July, 26, 2023).

[375] *Id.*

[376] *See id.* at 51.

[377] *Id.* at 46-47, 83.

[378] *Id.* at 92-93.

[379] *Id.* at 50.

[380] *Id.* at 41.

[381] *Id.* at 46-47.

similar to that."[382] She then asked the government, "Do you have any precedent for agreeing not to prosecute crimes that have nothing to do with the case or the charges being diverted?"[383] Special Assistant U.S. Attorney Leo Wise could not provide any precedent for such a provision.[384]

Second, Judge Noreika expressed separation of powers concerns pertaining to the provision of the pretrial diversion agreement for the gun charge that would prohibit the Department from bringing charges within the scope of the agreement unless and until Judge Noreika first determined that the diversion agreement had been breached.[385] Judge Noreika stated:

> Now I have reviewed the case law and I have reviewed the statute and I had understood that the decision to offer the defendant, any defendant a pretrial diversion rest squarely with the prosecutor and consistent with that, you all have told me repeatedly that's a separate agreement, there is no place for me to sign off on it, and as I think I mentioned earlier, usually I don't see those agreements. But you all did send it to me and as we've discussed, some of it seems like it could be relevant to the plea.

> One provision in particular stands out to me, and that is paragraph 14. That paragraph says if the United States believes that a knowing material breach of this agreement has occurred, it may seek a determination by the United States District Judge for the District of Delaware with responsibility for the supervision of this agreement. It then goes on to say that if I do find a breach, then the government can either give the Defendant time to remedy the breach or prosecute him for the crime that is the subject of the information or any other that falls within the language of the agreement. . . . Do you have any authority that any Court has ever accepted that or said that they would do that?[386]

When neither Wise nor Clark could provide any examples of such an agreement, Judge Noreika stated her concern that the "provision makes me a gatekeeper to criminal charges and puts me in the middle of a decision as to whether to bring a charge. And we already talked about separation of powers and that choice as to whether to bring charges is . . . the executive branch, not the judicial branch, so is this even constitutional?"[387] At that point, Clark finally admitted that the unprecedented gatekeeping provision was included for political reasons:

> There was a desire because of there being as Your Honor has seen a

---

[382] *Id.* at 45.
[383] *Id.* at 46.
[384] *Id.*
[385] *Id.* at 92-93.
[386] *Id.* at 92-95.
[387] *Id.* at 95.

> tremendous amount of political drag with this Defendant that the
> normal mechanism that might take place would have the protection
> of the Court not in the discretion to bring a charge, but in finding a
> breach, and so that that wouldn't be something that would become
> more  politicized, but rather would be something that the parties
> could rely on, someone we consider a neutral arbiter to determine
> the breach, not the charge.[388]

In other words, Hunter Biden's lawyers sought to appeal to his unique circumstances as the son of the President to assert that he should receive atypical and seemingly unprecedented treatment in this plea deal. Therefore, they came up with an apparently unprecedented and potentially unconstitutional provision that would prevent prosecutors from filing future charges against Hunter Biden without judicial approval.[389] Judge Noreika responded:

> I understand. Look, I knew why you brought it, okay, I could see
> why you would want that provision in here, but . . . the government,
> the executive branch has the discretion to bring charges. Here, the
> government does not have discretion to continue to pursue this
> charge or any other charge unless you include the Court. And that
> seems like it's getting outside of my lane in terms of what I am
> allowed to do. And thus, I have concerns about the constitutionality
> of this provision. That gives me concerns about the constitutionality
> of this agreement because there doesn't seem to be a separate
> severability, and that gives me concerns about whether the
> Defendant has the protection from prosecution that he thinks he's
> getting if this agreement turns out to be not worth the paper it's
> written on.[390]

Ultimately, Judge Noreika concluded that she could not accept the plea agreement and postponed the proceedings.[391] Subsequent negotiations between Hunter Biden's attorneys and the Justice Department to modify the plea agreement were abandoned before the announcement of Weiss's special counsel appointment.[392]

When asked about the failed plea deal, Weiss refused to comment on Judge Noreika's rejection of his office's plea deal for Hunter Biden. Weiss testified:

> Q.    Okay. On July 26th, the date of this plea agreement, Judge
>       Noreika of U.S. District Court for the District of Delaware
>       declined to accept the Department's plea and pretrial
>       diversion agreements, correct?

---

[388] *Id.* at 97-98.
[389] *Id.* at 95-98.
[390] *Id.* at 98.
[391] *Id.* at 98-99, 104-09.
[392] U.S. Motion to Voluntarily Dismiss Criminal Tax Information Without Prejudice so that Tax Charges Can Be Brought in a District Where Venue Lies, *United States v. Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. Aug. 11, 2023).

| A. | I'm not going to comment on Judge Noreika's decision at all. I'm just not going to offer any comment in that regard. |

| Q. | Okay. But she declines to—I mean, I don't mean to be difficult here, but— |

| A. | The plea agreement did not go forward. |

| Q. | Okay. Because of the judge? |

| A. | I'm not going to comment on why, who said what, the judge's comments. We're in the matter before the judge as we speak, so I'm not going to say anything in that regard.[393] |

After five years of investigating, the only thing Weiss had to show for the investigation was an unprecedented sweetheart plea deal, which overtly appealed to the defendant's special status as the President's son to justify special treatment from the court. This sweetheart plea deal fell apart under scrutiny from a federal judge, leading to the Attorney General's appointment of Weiss as special counsel. Accordingly, Weiss's attempted plea deal is an important part of understanding the extent to which Weiss deviated from standard investigative practices in this case in a manner favorable to Hunter Biden, and his refusal to answer the Committee's questions speak loudly about his inability to defend his actions.

### E. Line investigators believe the Hunter Biden investigation is proceeding too slowly, potentially allowing the statute of limitations to lapse on additional charges.

Following the failed plea deal, Weiss requested special counsel status from Attorney General Garland.[394] On August 11, 2023, Attorney General Garland appointed Weiss as special counsel to continue the investigation of Hunter Biden.[395] During his announcement, Attorney General Garland stated that he was "confident that Weiss will carry out his responsibility in an even-handed and urgent matter, and in accordance with the highest traditions of this Department."[396] However, testimony to date, including testimony from Weiss himself, shows that this investigation has been anything but urgent.

Both IRS whistleblowers detailed the efforts that the Justice Department took to slow the case against Hunter Biden down. Shapley stated that, "[i]t was apparent that DOJ was purposely slow-walking investigative actions in this matter."[397] Similarly, Ziegler testified that he tried "to point out that the slow-walking and approvals for everything, a lot of that happened at the U.S.

---

[393] Weiss Interview at 138.
[394] Press Release, U.S. Dep't of Just., Appointment of a Special Counsel (Aug. 11, 2023).
[395] OFF. OF THE ATT'Y GEN., ORDER NO. 5730-2023, APPOINTMENT OF DAVID C. WEISS AS SPECIAL COUNSEL (2023).
[396] Press Release, U.S. Dep't of Just., Appointment of a Special Counsel (Aug. 11, 2023).
[397] Shapley Interview at 13.

Attorney's Office in Delaware and DOJ Tax level."[398] Multiple witnesses corroborated the whistleblowers' frustration.

Testimony from Sobocinski and Holley, both from the FBI's Baltimore Field Office, underscored the whistleblowers' concern that the Department was not moving at its typical pace in its investigation of Hunter Biden and instead was "slow-walking" the case.[399] Sobocinski described his frustration with the pace of the investigation multiple times, testifying that his goal was to get the case to a "resolution."[400] He also stated he "would have liked [the investigation] to move faster."[401] Sobocinski stated:

> Q.    Was this case moving slow?  You said like at least—
>
> A.    Yup.
>
> Q.    —three dozen times you wanted to get this thing to resolution. And so that sort of suggests that it wasn't getting to resolution and you thought it should be moving a little faster pace.
>
> A.    I would have liked for it to move faster.[402]

Holley likewise expressed "overall frustrat[ion]" about the slow pace of the investigative process.[403] Sobocinski and Holley's frustration not only affirms the whistleblowers' testimony regarding the pace of the investigation, but it also creates a perception that the Justice Department sought to purposefully slow down any potential prosecution of the President's son.

Weiss even acknowledged that the case "lingered."[404] Without ever defending the pace of this investigation, he testified:

> Q.    Do you have any goal as to when you'd like to bring it to conclusion?
>
> A.    Two weeks ago.  No, I say—again, I say that in jest, but no. Look, I recognize that it's never good for cases to linger, so I am interested in efficiency to the extent possible.
>
> Q.    It's been 5 years.

---

[398] Ziegler Interview at 92.
[399] *See* Shapley Interview at 13 ("It was apparent that DOJ was purposely slow-walking investigative actions in this matter."); Ziegler Interview at 92 ("As far as my leadership goes, we're trying to point out that the slow-walking and the approvals for everything, a lot of that happened at the U.S. Attorney's Office in Delaware and DOJ Tax level.").
[400] Sobocinski Interview at 34.
[401] *Id.* at 99.
[402] *Id.*
[403] Holley Interview at 104.
[404] Weiss Interview at 151.

> A.  I understand that . . . I absolutely do.
>
> Q.  So that doesn't—you just used the term "linger."  That doesn't fit the definition of "linger"?
>
> A.  I understand your question and appreciate it.[405]

However, despite appreciating that the investigation had "linger[ed]" for five years, Weiss refused to provide the Committee with any sort of timeline for when the investigation will be completed.[406] When asked if he would need another five years, Weiss stated, "I'm not going to put a timeframe on it" but "we plan to move as efficiently as possible."[407]

However, Weiss testified that the investigation is being run out of the office space afforded to the special counsel team, which is separate from the USAO for the District of Delaware.[408] Weiss additionally testified that, as of the date of his transcribed interview, he was still "building the [special counsel] team," although he would not say how many individuals are currently working on the investigation.[409] He testified:

> Q.  Since you've been appointed Special Counsel, did you get more staff?
>
> A.  I don't want to get into the particulars of the staff, and I continue to work on building the team, but I'm not going to get into the particulars.
>
> Q.  Do you have separate office space?
>
> A.  I do have separate office space.
>
> Q.  Okay.  And you're housed in Delaware?
>
> A.  I am housed in Delaware.
>
> Q.  Okay.  So it's totally separate office as Special Counsel from the U.S. Attorney?
>
> A.  It is.[410]

And when asked for a timeline of the investigation and its completion, Weiss testified:

---

[405] *Id.* at 150.
[406] *Id.* at 175.
[407] *Id.*
[408] Sobocinski Interview at 117-18.
[409] Weiss Interview at 117.
[410] *Id.*

Q.    So wh[en] do you believe you'll be able to complete . . . the current investigation? Are you planning to do it urgently, or are you going to spend another 5 years? . . .

A.    Yeah, I'm not going to put a timeframe on it. As I said previously in response to counsel's questions, we plan to move as efficiently as possible.[411]

Despite Weiss's alleged urgency—and Attorney General Garland's statement that Weiss will work in an "urgent manner"[412]—his actions say something completely different. Rather than moving forward in an urgent manner, the current pace of the investigation seems to run the risk of allowing the statute of limitations to lapse on additional charges potentially facing Hunter Biden.

**F. The Biden Justice Department's unilateral scoping limitations and inadequate document productions have severely curtailed the Committees' ability to gather information.**

Since the whistleblowers came forward in the spring of 2023, the Biden Justice Department refused to cooperate fully and completely with the Committees' investigation. In response to the Committees' letters seeking pertinent documents, communications, and other information, the Justice Department, time and time again, failed to substantially comply, citing the Department's "ongoing investigation."[413] The Justice Department also unilaterally and improperly limited the scope of authorized testimony for witnesses appearing before the Committees.

On February 28, 2023, the Judiciary Committee first requested documents pertaining to the Department's handling of the Hunter Biden investigation due to the potential conflict of interest inherent in an investigation into the President's son.[414] The Judiciary Committee sought documents to determine why Attorney General Garland had declined to appoint a special counsel in the Hunter Biden matter, despite appointing special counsels in other investigations. The Department did not respond until August 25, 2023—after Garland had belatedly appointed Weiss as special counsel—and only has produced 27 pages of documents that contained excessive redactions and were not responsive to the Committee's requests.[415]

On May 25, 2023, the Judiciary Committee again wrote to Attorney General Garland requesting documents and information related to the Department's removal of IRS Supervisory Special Agent Shapley and his entire investigative team from the Hunter Biden investigation

---

[411] *Id.* at 175.

[412] Press Release, U.S. Dep't of Just., Appointment of a Special Counsel (Aug. 11, 2023).

[413] *See, e.g.*, Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Sept. 22, 2023).

[414] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (Feb. 28, 2023).

[415] Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Aug. 25, 2023).

shortly after Shapley made protected disclosures to Congress.[416] While Attorney Garland did not respond, Weiss wrote to the Committee instead on June 7, 2023, stating "the Department is not at liberty to respond."[417] On June 22, 2023, the Judiciary Committee reiterated the request for material regarding the apparent whistleblower retaliation.[418] On June 30, 2023, Weiss responded, stating again that he "is not at liberty to provide the materials you seek."[419]

On July 31, 2023, the Committees wrote once more, requesting documents pertaining to the unusual plea and pretrial diversion agreements with Hunter Biden.[420] The Department responded on August 14, 2023, stating that it is working to identify what information may be available for the Committees and that it "commit[s] to supplementing" its response.[421] Despite the Department's stated commitment to supplement its response, to date, the Committees have yet to receive any documents responsive to the July 31 requests.

On August 28, 2023, the Committees wrote to Attorney General Garland regarding the widespread concerns with his appointment of Weiss as special counsel.[422] On September 11, 2023, the Department reproduced to the Committees a copy of the Attorney General's order outlining the appointment of Weiss—which had previously been provided to the Committees—and refused to produce any of the other requested documents or communications.[423]

On September 12, 2023, the Committees wrote to Attorney General Garland regarding the brazen attempts by Hunter Biden's legal team to intimidate and harass the whistleblowers who detailed—and now have further substantiated[424]—numerous irregularities in the Department's investigation of Hunter Biden.[425] To date, the Department has not responded to the Committees' September 12 letter about Hunter Biden's attempts to intimidate the IRS whistleblowers.

---

[416] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (May 25, 2023).

[417] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 7, 2023).

[418] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to David C. Weiss, U.S. Att'y, Dist. of Del. (June 22, 2023).

[419] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023).

[420] Letter from Chairmen Jim Jordan, Jason Smith, and James Comer, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (July 31, 2023).

[421] Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Aug. 14, 2023).

[422] Letter from Chairmen Jim Jordan, Jason Smith, and James Comer, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (Aug. 28, 2023).

[423] Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Sept. 11, 2023).

[424] *See* Press Release, H. Comm. on Ways and Means, Bombshell: Ways and Means Releases New Documents Revealing Hunter Biden Selling Access to White House, Investigators Blocked from Pursuing Evidence Related to President Biden (Sept. 27, 2023); *see also* Josh Christenson, *Hunter Biden prosecutor ignored evidence for months: whistleblower documents*, N.Y. Post (Sept. 27, 2023).

[425] Letter from Chairmen Jim Jordan, Jason Smith, and James Comer, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (Sept. 12, 2023).

Although the Committees have made many requests for documents concerning the Department's handling of the Hunter Biden investigation since the beginning of the 118th Congress,[426] the Committees agreed to proceed with witness interviews without the relevant documents as a significant accommodation to the Department. But shortly before each interview, the Department sent each witness a letter that unilaterally limited the scope of what each witness was authorized to discuss with the Judiciary Committee—limiting approved testimony to only two topics: (1) statements made by Weiss regarding his authority at an October 7, 2022 meeting, and (2) statements made by Weiss to Congress regarding his authority in investigating Hunter Biden.[427] Notably, the Committee had never agreed to these extreme scope limitations, and had never even been consulted about whether the limitations would be acceptable.

Throughout the Committee's questioning of witnesses, the Department counsel who accompanied the witness would often not allow witnesses to answer specific and relevant questions necessary for the Committee's investigation. For example, during the transcribed interview of Stuart Goldberg, the following exchange occurred:

> Q.     And are you able to tell us anything about what happened with the Hunter Biden case in terms of the process?
>
> DOJ.   He is not.
>
> Q.     Do you know whether a prosecution report was drafted by DOJ Tax after receiving the special agent report?
>
> DOJ.   To the extent there is a general process that applies in all cases, he can speak to that.
>
> Q.     Well, no, I'm asking about the Hunter Biden case. Do you know whether a prosecution report was prepared by DOJ Tax?
>
> DOJ.   And I'm saying he can't speak about the ongoing investigation. And so if there –
>
> Q.     He's not asking what was in the report, he's asking was it prepared.
>
> DOJ.   Right. Yes, I understood the question. But the scope of his authorization does not allow him to speak about the ongoing

---

[426] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (Feb. 28, 2023).
[427] *See* Letter from Bradley Weinsheimer, Assistant Deputy Att'y Gen., U.S. Dep't of Just., to Thomas J. Sobocinski, Special Agent in Charge, Balt. Field Off., Fed. Bureau of Investigation (Sept. 6, 2023); Letter from Bradley Weinsheimer, Assistant Deputy Att'y Gen., U.S. Dep't of Just., to Ryeisha Holley, Assistant Special Agent in Charge, Balt. Field Off., Fed. Bureau of Investigation (Sept. 8, 2023).

investigation, whether it involves the contents or the fact of something that is prepared as part of the process.[428]

Later during the interview, Goldberg was asked if he "remember[ed] the purpose of the [June 15] meeting" about the 2014 and 2015 tax year charges.[429] The Justice Department counsel interjected, "And once we start getting into purpose, what happened at the meeting, those go beyond the scope of his authorization."[430]

During the transcribed interview of U.S. Attorney Graves, the Justice Department's counsel again limited the testimony of Graves. In one exchange:

> Q.     So you're not going to answer?
>
> A.     I agree it's outside the scope.  I could say it's a matter of public record that the office has cross staffed with other special counsels.
>
> Q.     Okay.  Have you ever recommended to another special counsel that they shouldn't move forward with a case?
>
> A.     I could say, in general, I don't recall weighing in or opining on a matter that is not in my office what that component head should or should not do, special counsel or regardless.  That's for them to decide.
>
> Q.     Okay.  Do you recall any discussions about a campaign finance charge related to the Hunter Biden tax matter?
>
> DOJ.   Just even answering yes or no to that question, as I think you know, gets into questions associated with the ongoing investigation and prosecution, and it's outside the scope of what he's authorized to discuss.[431]

The questions posed to the witnesses are critical to the Committees' investigation—and the Department knows this. The Department's decision to unilaterally limit witness testimony unnecessarily hinders the Committees' oversight and prevents the Committees from gathering all necessary evidence.

The Department also directed two Tax Division employees, Senior Litigation Counsel Mark Daly and Trial Attorney Jack Morgan, to disregard lawfully issued deposition subpoenas

---

[428] Goldberg Interview at 24-25.
[429] *Id.* at 30.
[430] *Id.*
[431] Graves Interview at 145.

from the Judiciary Committee.[432] As a result, both employees failed to appear for their respective depositions, despite representations from their personal counsel that they were willing to appear but for the Department's directive.[433] The Department's directives resulted in the Judiciary Committee being unable to procure the testimony of two witnesses whose knowledge of the day-to-day operation of the Hunter Biden investigation is critical to this oversight. The Department's directives are even more concerning in light of its earlier requests that the Judiciary Committee delay the dates of Daly's and Morgan's depositions to accommodate Daly's and Morgan's schedules. The Committee agreed to postpone the depositions for nearly a month as an accommodation to the Department. As it now appears that the Department always intended to direct Daly and Morgan not to appear, the Department's request to postpone the deposition seems to be a bad-faith attempt to delay the Committee's oversight.[434]

The Department's response to the Committees' requests has been wholly inadequate, and there is no valid basis for the Department to obstruct the Committees' inquiry. The Department's suggestion that it can dictate the "timing and scope"[435] of the Committees' oversight because of the ongoing nature of the Department's investigation lacks any valid legal basis and severely curtails the Committees' ability to gather information from Department witnesses. The Department's claim "rests on no constitutional privilege or case law authority" but rather on self-serving opinions unilaterally issued by the Department.[436] In fact, there is ample legal and historical precedent contradicting the Department's assertion—that is, precedent of congressional committees conducting oversight of matters that are the subjects of ongoing investigations.[437] The historical record is replete with examples of the Department providing information related to

---

[432] *See* Deposition of Mark Daly, Senior Litig. Counsel, U.S. Dep't of Just., Tax Div. (Oct. 26, 2023) [hereinafter Daly Deposition]; Deposition of Jack Morgan, Trial Att'y, U.S. Dep't of Just., Tax Div. (Nov. 6, 2023) [hereinafter Morgan Deposition].

[433] *See* Daly Deposition at 3 ("Mr. Daly's personal counsel indicated to us that Mr. Daly was willing to appear and answer our questions. But obviously, he has received an order from the Justice Department not to appear."); Morgan Deposition at 4-5 ("Mr. Morgan[] has no per se objection to testifying, but, given the competing constitutional claims and interests expressed by his employer, the Department of Justice, he will be following his employer's directive.").

[434] *See* Daly Deposition at 3; Morgan Deposition at 5.

[435] *See* Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 13, 2023).

[436] *Obstruction of Justice: Does the Justice Department Have to Respond to Lawfully Issued and Valid Congressional Subpoenas, Hearing Before the H. Comm. on Oversight and Gov't Reform*, 112th Cong. (2011) (statement of Morton Rosenberg, Fellow, Const. Project). *See also* William McGurn, Opinion, *The 'Ongoing Investigation' Dodge on Hunter Biden*, WALL ST. J. (July 10, 2023) (quoting former Assistant U.S. Attorney Andrew McCarthy as stating, "The executive branch response of 'ongoing investigation' is really a political objection, rather than a legal one. There is no 'ongoing investigation' privilege.").

[437] *See* WHEN CONGRESS COMES CALLING, at 75-82 (listing numerous examples of Congress obtaining testimony related to an ongoing criminal investigation); Christopher R. Smith, *I Fought the Law and the Law Lost: The Case for Congressional Oversight Over Systemic DOJ Discovery Abuse in Criminal Cases*, 9 CARDOZO PUB. L. POL'Y & ETHICS J. 85, 107 (2010) ("To preclude Congress from investigating prosecutorial misconduct because of open investigations would completely undermine Congress's constitutional duty to investigate government misconduct, an important legislative branch check on the executive branch."); Tristan Leavitt & Jason Foster, *No, Appointing A 'Special Counsel' Is Not A License For DOJ To Obstruct Congress*, THE FEDERALIST (Aug. 21, 2023) (listing "just a handful of the dozens [of instances] from the past century" in which Congress "obtained testimony and documents from prosecutors involved in active probes, including deliberative prosecutorial memoranda").

ongoing criminal investigations to congressional committees,[438] including the exact type of evidence the Committees are looking for in this investigation.[439] Courts have also recognized that partisan influence of the prosecutorial process is an appropriate target for congressional oversight.[440] The Department's claim that material sought by the Committees is protected by the deliberative process privilege similarly lacks merit given that, according to the D.C. Circuit, this privilege "disappears altogether when there is any reason to believe government misconduct occurred."[441] Simply put, the Department's frivolous assertions are nothing more than a transparent effort to evade congressional scrutiny.

.

---

[438] *See Obstruction of Justice: Does the Justice Department Have to Respond to Lawfully Issued and Valid Congressional Subpoenas, Hearing Before the H. Comm. on Oversight and Gov't Reform*, 112th Cong. (2011) (statement of Louis Fisher, Scholar in Residence, Const. Project) ("Congress has often obtained records related to ongoing criminal investigations."); WHEN CONGRESS COMES CALLING, at 83 ("[T]he oft-repeated claim that the [D]epartment [of Justice] never has allowed congressional access to open or closed litigation files or other 'sensitive' internal deliberative process matters is simply not accurate.").

[439] WHEN CONGRESS COMES CALLING, at 76-77 (stating that over the past century congressional committees have "sought and obtained a wide variety of evidence, including: . . .the testimony of line attorneys and other subordinate agency employees regarding the conduct of open and closed cases; and detailed testimony about specific instances of the Department's failure to prosecute cases that allegedly merited prosecution.").

[440] *See Comm. on the Judiciary v. Miers*, 558 F. Supp. 2d 53, 78 (D.D.C. 2008) ("[G]iven [Congress's] unique ability to address improper partisan influence in the prosecutorial process . . . [n]o other institution will fill the vacuum if Congress is unable to investigate and respond to this evil." (internal quotation marks omitted)).

[441] *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997).

## CONCLUSION

The Committees' investigative work to date has revealed that the Justice Department afforded Hunter Biden—the President's son—preferential treatment throughout its investigation of his numerous alleged crimes, and then sought to cover up its actions after two courageous IRS agents stepped forward to blow the whistle on the Department's deviations from its investigative standards. The Department's concerning actions and kid-glove treatment of Hunter Biden serves as yet another example of the two-tiered justice system at the Biden Justice Department.

To date, the testimony and documents received by the Committees corroborate the whistleblowers' testimony that the Justice Department slow-walked its investigation of Hunter Biden and deviated from standard procedures in a way that favored Hunter Biden. The Committees have evidence that the U.S. Attorney's Office in Delaware worked to remove Hunter Biden's name from search warrants and subpoenas; prohibited investigators from asking about President Biden during witness interviews; tipped off defense counsel about investigative steps; and even allowed the statute of limitations on serious potential crimes to lapse. Additionally, contrary to his assertions to Congress, U.S. Attorney Weiss did not have "ultimate authority" over the Hunter Biden case. Instead, Biden Administration political appointees exercised significant oversight and control over the investigation. As one example, the Biden Justice Department worked closely with Hunter Biden's counsel to craft an unprecedented plea deal, that was so biased in the direction of Hunter Biden, it fell apart in open court.

The Committees are committed to ensuring that all Americans receive fair and uniform treatment under the law. The Committees' work is not complete, and the Committees' oversight will continue despite the Biden Administration's attempts to severely limit, obstruct, and curtail the Committees' inquiry. The Committees will continue to pursue relevant documents and seek key testimony from individuals that were intimately involved in the Department's mishandling of the Hunter Biden investigation.[442] The Committees' continued oversight will inform the ongoing impeachment inquiry,[443] as well as inform potential legislation, which could include strengthening laws protecting whistleblowers from retaliation, reforming the "special attorney" statute,[444] codifying the special counsel regulations,[445] and reforming the Department's Tax Division. The Committees will supplement this interim staff report as necessary.

---

[442] *See* Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (June 29, 2023); Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (July 21, 2023).

[443] Memorandum from Chairmen Jim Jordan, James Comer, and Jason Smith, to Members of the H. Comm. on the Judiciary, H. Comm. on Oversight & Accountability, and H. Comm. on Ways & Means (Sept. 27, 2023).

[444] *See* 28 U.S.C. § 515.

[445] *See* 28 C.F.R. § 600 *et seq.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

     *Plaintiff*,

   v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

     *Defendants*.

Case No. 1:24-cv-815

# Exhibit H

# Congress of the United States
## Washington, DC 20515

July 21, 2023

The Honorable Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, DC 20530

Dear Attorney General Garland:

In the wake of testimony from brave Internal Revenue Service whistleblowers about special treatment for the son of President Biden during the course of a criminal investigation, our Committees are conducting oversight of the Executive Branch's commitment to impartial justice, as well as investigating the veracity of statements made in response to congressional inquiries. As part of this oversight, on June 29, 2023, we requested you make eleven Department of Justice officials available for transcribed interviews before the Judiciary Committee.[1] The Department's July 13 response letter raised several bases for why the Department could not comply immediately with our request.[2] We write to address these bases and to reiterate our request for the Department's voluntary cooperation.

The Department's July 13 response letter questioned the Committees' legislative purpose in conducting our oversight of the Justice Department's preferential treatment afforded to Hunter Biden.[3] There is no serious dispute that the Committees have a legislative purpose to examine how the Department has handled these matters. The Supreme Court has recognized that Congress has a "broad and indispensable" power to conduct oversight,[4] and that a legislative purpose is valid if it "concern[s] a subject on which legislation could be had."[5] In this matter, Congress may consider a number of legislative proposals including, but not limited to, reforming the "special attorney" statute,[6] codifying the special counsel regulations,[7] reforming the Tax Division of the

---

[1] Letter from Chairmen Jim Jordan, Jason Smith, and James Comer, to Merrick B. Garland, Att'y Gen., U.S. Dep't of Just. (June 29, 2023).
[2] Letter from Carlos Felipe Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 13, 2023) [hereinafter July 13 Letter].
[3] *Id.*
[4] *Trump v. Mazars*, 140 S. Ct. 2019, 2031 (2020) (internal quotation marks omitted).
[5] *Id.* (internal quotation marks omitted).
[6] 28 U.S.C. § 515.
[7] 28 C.F.R. § 600 *et seq.*

The Honorable Merrick B. Garland
July 21, 2023
Page 2

Department of Justice and its interactions with the IRS, and expanding the ability of the IRS, including whistleblowers, to share certain tax information with Congress.[8]

The Supreme Court has also recognized that a legislative purpose exists where Congress seeks information from the Executive Branch about "corruption, maladministration or inefficiency in agencies of the Government."[9] Here, whistleblowers have brought forward numerous concerns, backed by contemporaneous documentary evidence, of corruption (e.g., preferential treatment for the President's son), maladministration (e.g., retaliation against whistleblowers), and inefficiency (e.g., an investigation so bogged down by delays and micromanagement that the statute of limitations lapsed before prosecutors could file certain charges). These are among the matters about which the Committees require testimony to inform potential legislative reforms.

The Department's July 13 letter also asserted that it may not engage with Congress about pending investigations.[10] In support of this proposition, the Department cited a nonbinding, twenty-three year old letter to a House subcommittee chairman.[11] The Department's suggestion that it can dictate the "timing and scope" of the Committee's oversight because of ongoing nature of the Department's investigation lacks any valid legal basis and the Committees do not accept it as a legitimate reason to delay its oversight efforts.[12] Even assuming the Department is correct, as it has acknowledged, the U.S. District Court for the District of Delaware will consider Hunter Biden's plea agreement on July 26.[13] At that time, it is the Committees' understanding that the Department's prosecution will have concluded, the matter will be closed, and there will no longer be any reason for the Department to not comply in full with our requests.[14]

The Department's July 13 response endorsed the statements previously made to the Judiciary Committee by U.S. Attorney for the District of Delaware, David Weiss, regarding his authority to investigate and prosecute Hunter Biden. Weiss's representations about his authority, however, have shifted over time. Initially, in response to a letter addressed to you, Weiss asserted: "I *have been granted ultimate authority* over this matter, including responsibility for deciding where, when, and whether to file charges . . . ."[15] Subsequently, in his June 30 letter to the Judiciary Committee, Weiss claimed that his "charging authority is geographically limited to [his] home district" and that "[i]f venue for a case lies elsewhere, common Departmental practice

---

[8] *See, e.g.*, 26 U.S.C. § 6103(f).

[9] *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957).

[10] July 13 Letter, *supra* note 2.

[11] *Id.* (citing Letter from Robert Raben, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. John Linder, Chairman, Subcomm. on Rules & Orgs. of the H. Comm. on Rules (Jan. 27, 200)).

[12] *Id. Cf.* William McGurn, Opinion, *The 'Ongoing Investigation' Dodge on Hunter Biden*, WALL ST. J. (July 10, 2023) (quoting former Assistant U.S. Attorney Andrew McCarthy as stating, "The executive branch response of 'ongoing investigation' is really a political objection, rather than a legal one. There is no 'ongoing investigation' privilege.").

[13] July 13 Letter, *supra* note 2.

[14] *See* Ed. Bd., *Hunter Biden's Prosecutor Keeps Dodging Congress*, WALL ST. J. (July 10, 2023) ("In his letter Mr. Weiss again refused to discuss anything further about his 'ongoing investigation.' But if he's settled the case, why is it 'ongoing'?").

[15] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 7, 2023) (emphasis added).

The Honorable Merrick B. Garland
July 21, 2023
Page 3

is to contact the United States Attorney's Office for the district in question and determine whether it wants to partner on the case."[16] If a fellow U.S. Attorney declined to "partner," Weiss explained, he would have had to request "Special Attorney" status, which he claimed to "have been assured that, if necessary" he would receive.[17] Finally, in a July 10 letter to Senator Lindsey Graham, Weiss acknowledged that he had "discussions" with unnamed "Departmental officials" about seeking Special Attorney status and "was assured" the authority would be granted.[18]

In other words, in his first letter, Weiss represented to the Judiciary Committee that he *had been* granted ultimate authority with respect to the filing of charges. But in his second letter, Weiss told the Committee that he had been assured by unnamed officials that he *would be* granted that authority in the future if necessary after going through a specified process, and he notably provided no explanation of who would make the determination of necessity. These are inconsistent representations, and it is not possible for both of them to be true.

Weiss's shifting statements about his authority to bring charges against Hunter Biden, especially his authority to bring charges outside of Delaware, suggest that improper political considerations factored into the Department's investigative and prosecutorial function. In addition, at least some of Weiss's statements to the Judiciary Committee contradict his own statement to line-level investigators in October 2022, in which he indicated that he was not the "deciding official" on bringing charges against Hunter Biden.[19] This statement was memorialized contemporaneously in an email sent by IRS whistleblower Gary Shapley; and none of the other participants in the meeting at which Weiss made this assertion have contradicted Shapley's account.

On a recent teleconference with Judiciary Committee staff, the Department confirmed that Weiss would appear before the Committee. While we look forward to Weiss appearing at a hearing at the appropriate time, we must first conduct our investigative work, including conducting the transcribed interview of witnesses identified in our June 29 letter. As we explained in that letter, the Department has made available non-Senate-confirmed and line-level employees for testimony to Congress in the past, and we expect no deviation from this precedent in this matter. Accordingly, we write to reiterate our outstanding requests for transcribed interviews with the Department and FBI officials listed in our June 29 letter.

Please contact the Judiciary Committee as soon as possible, but no later than 5:00 p.m. on July 24, 2023, to schedule these transcribed interviews. Absent cooperation with this request, the Judiciary Committee will issue subpoenas to obtain the required testimony.

---

[16] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (June 30, 2023).
[17] *Id.*
[18] Letter from David C. Weiss, U.S. Att'y, Dist. of Del., to Sen. Lindsey O. Graham, Ranking Member, S. Comm. on the Judiciary (July 10, 2023).
[19] Transcribed Interview of Gary A. Shapley, Jr., Supervisory Special Agent, Internal Revenue Serv., at 28 (May 26, 2023); Transcribed Interview of [Redacted], Special Agent, Internal Revenue Serv., at 40 (June 1, 2023).

The Honorable Merrick B. Garland
July 21, 2023
Page 4

Thank you for your attention to this matter.

Sincerely,

Jim Jordan
Chairman
Committee on the Judiciary

Jason Smith
Chairman
Committee on Ways and Means

James Comer
Chairman
Committee on Oversight and Accountability

cc:   The Honorable Jerrold L. Nadler, Ranking Member
Committee on the Judiciary

The Honorable Richard E. Neal, Ranking Member
Committee on Ways and Means

The Honorable Jamie Raskin, Ranking Member
Committee on Oversight and Accountability

The Honorable Daniel Werfel, Commissioner of the Internal Revenue Service

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                *Defendants*.

Case No. 1:24-cv-815

# **Exhibit I**

JIM JORDAN, Ohio
CHAIRMAN

JERROLD NADLER, New York
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States
## House of Representatives
COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515-6216

(202) 225-6906
judiciary.house.gov

February 28, 2023

The Honorable Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Garland:

The Committee on the Judiciary is conducting oversight over the operations and activities of the Department of Justice. The Department's investigation of Hunter Biden, son of President Biden, raises the appearance of a conflict of interest that would necessitate special counsel protections and authorities.[1] However, to date, you have declined to appoint a special counsel in this matter, despite appointing special counsels in other investigations.[2] Your refusal to appoint a special counsel here is conspicuous in this context.[3] Accordingly, to further our oversight, we ask that you please provide the following documents:

1. All documents and communications sent or received by David Weiss or any employee of the U.S. Attorney's Office for the District of Delaware referring or relating to special counsel status for the investigation concerning Hunter Biden; and

2. All documents and communications between or among employees of the U.S. Attorney's Office for the District of Delaware and employees of any other U.S. Attorney's Office with venue to bring charges against Hunter Biden or his associates in that jurisdiction.

---

[1] *See generally* Letter from 33 U.S. Senators, to Hon. Merrick B. Garland, Att'y Gen., Dep't of Justice (Sept. 16, 2022); General Powers of Special Counsel, 28 C.F.R. § 600.1 (2010).
[2] Carrie Johnson, *A special counsel will probe government documents at Biden's home and private office,* NPR (Jan. 12, 2023).
[3] *See* Letter from Sens. Charles E. Grassley & Ron Johnson, U.S. Senate, to Hon. David Weiss, U.S. Att'y, Dist. Del. (May 9, 2022).

The Honorable Merrick B. Garland
February 28, 2023
Page 2

Please provide this information as soon as possible but no later than 5:00 p.m. on March 14, 2023. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman

cc:    The Honorable Jerrold L. Nadler, Ranking Member

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

        *Plaintiff*,

    v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

        *Defendants*.

Case No. 1:24-cv-815

# Exhibit J

# Congress of the United States
## Washington, DC 20515

June 29, 2023

The Honorable Merrick B. Garland
Attorney General
Department of Justice
Washington, DC 20530

Dear Attorney General Garland:

Our Committees are continuing to conduct oversight of the programs and operations of the Department of Justice and Internal Revenue Service within their respective jurisdictions. Recent startling testimony from Internal Revenue Service whistleblowers raises serious questions about the Department's commitment to evenhanded justice and the veracity of assertions made to the Committee on the Judiciary. In order to fully assess these allegations, testimony is required from several Department and Federal Bureau of Investigation employees. We expect your full cooperation as we arrange these transcribed interviews.

From recent testimony before the Ways and Means Committee, we have identified several Department employees who we believe to possess information concerning allegations of politicization and misconduct with respect to the Department's investigation of Hunter Biden. Specifically, the Committees seek to examine whistleblower claims that the Department's investigation of Hunter Biden was purposely slow-walked and subjected to improper and politically motivated interference.[1] The Committees must obtain the first-hand testimony from these individuals to fully assess the serious allegations raised by these brave IRS whistleblowers. Accordingly, we ask that you initially make the following Department employees available for transcribed interviews before the Judiciary Committee promptly:

1. Lesley Wolf
2. Jack Morgan
3. Mark Daly
4. Matthew Graves
5. E. Martin Estrada
6. David Weiss
7. Stuart Goldberg
8. Shawn Weede
9. Shannon Hanson
10. Tom Sobocinski (FBI)
11. Ryeshia Holley (FBI)

We anticipate that we may require testimony from additional Department or FBI employees as our oversight continues, and we expect your cooperation in facilitating these future interviews as well. To the extent that the Department attempts to interfere with our oversight by asserting that line-level employees are off-limits to congressional oversight, please be advised that we will not

---

[1] *See* Transcribed interview of Gary Shapley, Internal Revenue Service (May 26, 2023); Transcribed interview of Case Agent, Internal Revenue Service (June 1, 2023).

The Honorable Merrick B. Garland
June 29, 2023
Page 2

accept that excuse. Congressional committees have regularly received testimony from non-Senate-confirmed and line-level Justice Department employees in the past.[2] We expect this past precedent to apply to our oversight in this matter as well.

The Supreme Court has recognized that Congress has a "broad and indispensable" power to conduct oversight, which "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys in our social, economic or political system for the purpose of enabling Congress to remedy them."[3] Pursuant to Rule X of the Rules of the House of Representatives, the Committee on the Judiciary has jurisdiction over criminal justice matters in the United States.[4] The Committee on Ways and Means is authorized to conduct oversight of the Internal Revenue Service and the administration of the Internal Revenue Code. The Committee on Oversight and Accountability may examine "any matter" at any time. The Committees' need to obtain first-hand testimony from Department employees is vital for carrying out our oversight and for informing potential legislative reforms to the operations and activities of the Department.

To avoid any unnecessary delay, we ask that you please direct your staff to work with the Judiciary Committee staff to begin scheduling these transcribed interviews as soon as possible, but no later than 5:00 p.m. on July 13, 2023. Please be aware that the Committees will resort to compulsory process to obtain the required testimony. Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman
Committee on the Judiciary

Jason Smith
Chairman
Committee on Ways and Means

James Comer
Chairman
Committee on Oversight and Accountability

---

[2] See, e.g., Transcribed interview of Gary Grindler, U.S. Dep't of Justice (Dec. 14, 2011); Transcribed interview of Jack Smith, U.S. Dep't of Justice (May 29, 2014); Transcribed interview of Richard Pilger, U.S. Dep't of Justice (May 6, 2014); Transcribed interview Maame Frimpong, U.S. Dep't of Justice (July 19, 2016); Transcribed interview of Michael B. Steinbach, U.S. Dep't of Justice (June 16, 2020); Transcribed interview of Bruce Ohr, U.S. Dep't of Justice (June 30, 2020); Transcribed interview of Stuart Evans, U.S. Dep't of Justice (July 31, 2020); Transcribed interview of Deputy Chief, Counterintelligence and Export Control Section, U.S. Dep't of Justice (Sept. 18, 2020).
[3] See, e.g., Trump v. Mazars LLP, No. 19-715 at 11 (U.S. slip op. July 9, 2020) (internal quotation marks and citations omitted).
[4] Rules of the U.S. House of Representatives, R. X (2023).

The Honorable Merrick B. Garland
June 29, 2023
Page 3


cc:    The Honorable Jerrold L. Nadler, Ranking Member
       Committee on the Judiciary

       The Honorable Richard E. Neal, Ranking Member
       Committee on Ways and Means

       The Honorable Jamie Raskin, Ranking Member
       Committee on Oversight and Accountability

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                *Plaintiff*,

       v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                *Defendants*.

Case No. 1:24-cv-815

# Exhibit K

**Congress of the United States**

**Washington, DC 20515**

July 31, 2023

The Honorable Merrick B. Garland
Attorney General
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530

Dear Attorney General Garland:

The Committees on Judiciary, Ways and Means, and Oversight and Accountability are continuing their oversight of the Executive Branch's commitment to impartial justice, as well as investigating the veracity of statements made in response to congressional inquiries related to the Department of Justice's investigation of Hunter Biden. Given recent unusual events relating to the Department's plea and pretrial diversion agreements with Mr. Biden, we write to better understand the Department's decision to sign off on such apparently atypical agreements.

According to court documents and recent news reports, Judge Maryellen Noreika of the United States District Court for the District of Delaware declined to accept on Wednesday the Department's plea and pretrial diversion agreements with Mr. Biden.[1] The plea agreement relates to tax charges that have been brought against Mr. Biden while the pretrial diversion agreement pertains to a firearms charge. Judge Noreika described the Department's deal as "not standard" and "different from what I normally see."[2]

**Paragraph 14 of the Pretrial Diversion Agreement**

Judge Noreika raised substantial concerns with paragraph 14 of the pretrial diversion agreement. Normally, if the Department determines that a defendant has breached a pretrial diversion agreement, it can unilaterally decide to bring charges against that defendant; it does not require the District Court's permission to do so. But as described by Judge Noreika, paragraph 14 of Mr. Biden's pretrial diversion agreement:

> says if the United States believes that a knowing material breach of this agreement has occurred, it may seek a determination by the United States District Judge for the District of Delaware with responsibility for the supervision of this agreement. It then goes on to say that if I do find a breach, then the government can either give

---

[1] Transcript of Record at 108, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July, 26, 2023). *See also.,* Glenn Thrush and Michael S. Schmidt, *Judge delays Hunter Biden plea deal*, N.Y. TIMES (July 26, 2023); Perry Stein, Karl Baker, Devlin Barrett, and Matt Viser, *Judge puts Hunter Biden guilty plea on hold for now*, WASH. POST (July 26, 2023) Phil McCausland and Tom Winter, *Hunter Biden pleads not guilty after plea deal is derailed*, NBC NEWS (July 26, 2023).

[2] Transcript of Record at 10, *U.S. v. Robert Hunter Biden*, No. 23-mj-274-MN, No. 23-cr-61-MN (D. Del. July, 26, 2023).

The Honorable Merrick B. Garland
July 31, 2023
Page 2

the Defendant time to remedy the breach or prosecute him for the crime that is the subject of the information or any other that falls within the language of the agreement.[3]

Thus, paragraph 14 of the pretrial diversion agreement means that unless Judge Noreika makes a finding that the pretrial diversion agreement has been breached, "no criminal charges can be pursued [against Mr. Biden] for the gun charge or any other federal charge within the scope of the agreement not to be prosecuted."[4]

At the hearing, Judge Noreika asked the Special Assistant United States Attorney (SAUSA) whether he "ha[d] any authority that any Court has ever accepted that or said that they would do that?"[5] The SAUSA responded, "No."[6] Moreover, Judge Noreika expressed concerns about the constitutionality of the provision because "it makes me a gatekeeper to criminal charges and puts me in the middle of a decision as to whether to bring a charge."[7] She noted, "[T]he government does not have discretion to continue to pursue this charge or any other charge unless you include the Court. And that seems like it's getting outside of my lane in terms of what I am allowed to do."[8]

Judge Noreika reiterated: "I asked if there is any precedent for this, I was told no. I was asked if there is any authority for this, I was told no."[9]

**Paragraph 15 of the Pretrial Diversion Agreement**

Paragraph 15 of the pretrial diversion agreement states: "The United States agrees not to criminally prosecute Biden, outside of the terms of this Agreement, for any federal crimes encompassed by the attached Statement of Facts (Attachment A) and the Statement of Facts attached as Exhibit 1 to the Memorandum of Plea Agreement filed this same day." This grant of immunity in the pretrial diversion agreement therefore not only covers the gun-related conduct addressed by the pretrial diversion agreement but also the *entirely unrelated conduct covered by the plea agreement*.

During the hearing, Judge Noreika questioned the Department about this apparently unusual provision, asking whether the SAUSA "had any precedent for agreeing not to prosecute crimes that have nothing to do with the case or the charges being diverted."[10] The SAUSA responded: "I'm not aware of any, Your Honor."[11] Judge Noreika followed up by asking the

---

[3] Transcript of Record at 92-93.
[4] *Id.* at 94.
[5] *Id.* 95
[6] *Id.* 95.
[7] *Id.* 95.
[8] *Id.* 98
[9] *Id.* 103.
[10] *Id.* at 46
[11] *Id.*

The Honorable Merrick B. Garland
July 31, 2023
Page 3

prosecutor: "[H]ave you ever seen a Diversion Agreement where the agreement not to prosecute is so broad that it encompasses crimes in a different case?"[12] The SAUSA's answer was "No."[13]

### Impact of Unusual Provisions

Taken individually, each of the provisions discussed above raises serious concerns about how the Department has handled this matter. But when considered together, the provisions appear to be even more troubling. Judge Noreika explained the problem: "What's funny to me is you put me right smack in the middle of the Diversion Agreement that I should have no role in, you plop [me] right in there and then on the thing that I would normally have the ability to sign off on or look at in the context of a Plea Agreement, you just take it out and you say Your Honor, don't pay any attention to that provision not to prosecute because we put it in an agreement that's beyond your ability."[14]

In short, the Department shifted a broad immunity provision, which benefits Mr. Biden, from the plea agreement to the pretrial diversion agreement apparently to prevent the District Court from being able to scrutinize and reject that immunity provision. And then, the Department has benefitted Mr. Biden by giving up its unilateral ability to bring charges against him if it concludes that he has breached the pretrial diversion agreement. Instead, it has placed upon itself the burden of getting the District Court's permission to bring charges even though the District Court normally has no role in policing a pretrial diversion agreement in that manner. So, the District Court is apparently removed from the equation when it helps Mr. Biden and inserted into the equation when it helps Mr. Biden.

### Status of Ongoing Investigation

The Committees are also concerned that, contrary to its representations to the Judiciary Committee,[15] the Department may be claiming that other investigations into Mr. Biden are ongoing to shield the Department from Congressional oversight about this matter.[16] In that regard, it was notable that Mr. Biden's counsel stated at the hearing that it was his understanding that the immunity provision in the pretrial diversion agreement would preclude the Department from bringing charges against Mr. Biden under the Foreign Agents Registration Act.[17] While the Department did not agree with that position, it is difficult to understand how the parties would not have a meeting of the minds regarding a clause of the agreement as fundamental as the scope of the immunity provision, and it raises questions about what discussions have taken place between the Department and Mr. Biden's counsel regarding the status of those investigations.

---

[12] *Id.* at 47.

[13] *Id.*

[14] *Id.* at 104.

[15] Letter from Carlos Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (July 24, 2023).

[16] Fox News Staff, *Jonathan Turley skewers DOJ after Hunter Biden plea deal falls apart: 'A problem of their own making'*, Fox News (July 26, 2023) (quoting Professor Jonathan Turley as stating, "This is really a case of the Department of Justice being hoisted on its own petard, because the Justice Department needs to say that there's an ongoing investigation to stop giving information, holding back witnesses to Congress.").

[17] Transcript of Record at 55.

The Honorable Merrick B. Garland
July 31, 2023
Page 4

### Questions/Requests for Documents and Information

The Department's unusual plea and pretrial diversion agreements with Mr. Biden raise serious concerns—especially when combined with recent whistleblower allegations—that the Department has provided preferential treatment toward Mr. Biden in the course of its investigation and proposed resolution of his alleged criminal conduct.[18] The Committees therefore request that the Department provide written answers to the following questions:

1. Other than Mr. Biden's case, how many times in the last ten years has the U.S. Attorney's Office for the District of Delaware included in a pretrial diversion agreement a provision similar to paragraph 14 of the agreement with Mr. Biden? What percentage of the total pretrial diversion agreements entered into by the U.S. Attorney's Office for the District of Delaware does that number represent?

2. Other than Mr. Biden's case, how many times in the last ten years has any unit of the Department included in a pretrial diversion agreement a provision similar to paragraph 14 of the agreement with Mr. Biden? What percentage of total pretrial diversion agreements entered into by the Department does that number represent?

3. Other than Mr. Biden's case, how many times in the last ten years has the U.S. Attorney's Office for the District of Delaware included in a pretrial diversion agreement an agreement not to prosecute crimes that are unrelated to the charges being diverted? What percentage of the total pretrial diversion agreements entered into by the U.S. Attorney's Office for the District of Delaware does that number represent?

4. Other than Mr. Biden's case, how many times in the last ten years has any unit of the Department included in a pretrial diversion agreement an agreement not to prosecute crimes that are unrelated to the charges being diverted? What percentage of the total pretrial diversion agreements entered into by the Department does that number represent?

5. Did the U.S. Attorney's Office for the District of Delaware or Mr. Biden's counsel suggest placing paragraph 14 into the pretrial diversion agreement and requiring the District Court to give the Department permission to bring charges against Mr. Biden in the event the Department determines that he has breached the agreement?

6. Did the U.S. Attorney's Office for the District of Delaware or Mr. Biden's counsel suggest placing in the pretrial diversion agreement immunity for conduct described in the plea agreement?

Additionally, to advance our oversight and inform potential legislative reforms, please provide the Committees with the following documents and information:

---

[18] Transcribed Interview of Gary A. Shapley, Jr., Supervisory Special Agent, Internal Revenue Serv., at 10 (May 26, 2023); Transcribed Interview of Joseph Ziegler, Special Agent, Internal Revenue Serv., at 120, 128 (June 1, 2023).

The Honorable Merrick B. Garland
July 31, 2023
Page 5

1.  A list of similar pretrial diversion agreements entered into by the Department in the last ten years concerning the same charge of felony possession of a firearm by a person who is an unlawful user of or addicted to a controlled substance;

2.  All documents and communications referring or relating to each similar pretrial diversion agreement entered into by the Department in the last ten years concerning the same charge of felony possession of a firearm by a person who is an unlawful user of or addicted to a controlled substance;

3.  A list of pretrial diversion agreements entered into by the Department in the last ten years that include a provision similar to paragraph 14 of the agreement with Hunter Biden;

4.  A list of pretrial diversion agreements entered into by the Department in the last ten years in which the Department agrees not to prosecute crimes that are unrelated to the charges being diverted;

5.  A generalized description of the nature of the Department's ongoing investigation(s) concerning Hunter Biden; and

6.  An explanation of why the Department originally agreed to a plea agreement if other investigation(s) concerning Hunter Biden are ongoing.

Please provide this information as soon as possible but no later than 5:00 p.m. on August 14, 2023. Additionally, please reach out to the Committees' staff to schedule a briefing regarding the nature of the Department's ongoing investigation(s) concerning Hunter Biden. Pursuant to Rule X of the Rules of the House of Representatives, the Committee on the Judiciary has jurisdiction over criminal justice matters in the United States.[19] The Committee on Ways and Means is authorized to conduct oversight of the Internal Revenue Service and the administration of the Internal Revenue Code. The Committee on Oversight and Accountability may examine "any matter" at any time.

Thank you for your prompt attention to this matter.

Sincerely,

Jim Jordan
Chairman
Committee on the Judiciary

Jason Smith
Chairman
Committee on Ways and Means

James Comer
Chairman
Committee on Oversight and Accountability

---

[19] Rules of the U.S. House of Representatives, R. X, 118th Cong. (2023).

The Honorable Merrick B. Garland
July 31, 2023
Page 6


cc:     The Honorable Jerrold L. Nadler, Ranking Member
        Committee on the Judiciary

        The Honorable Richard E. Neal, Ranking Member
        Committee on Ways and Means

        The Honorable Jamie Raskin, Ranking Member
        Committee on Oversight and Accountability

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                              *Plaintiff*,

        v.                                          Case No. 1:24-cv-815

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                              *Defendants*.

# Exhibit N

Attachment 22

9/22/2022
1430
Lesley Wolf and Mark Daly joined late.

Presidentially confirmed usa was confirmed last week.  It will take her time to review the memo and learn to become a USAO.

The chief of economic/financial crimes at USAO looked at the 95 page prosecution recommendation like a hawk.  They brought up several questions that need to be reviewed.

Mark Daly led the effort to answer CA's USAO questions because they were technical tax questions.

Gun charge will likely not be indicted in October.

No deadline given to John Kane concerning DOJ Tax review of charges.  Neither Jason Poole nor Stewart Goldberg have given a deadline.

USAO and DOJ Tax made the decision not to charge until after the election. They said why should they shoot themselves in the foot by charging before.

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                           *Plaintiff*,

           v.                                    Case No. 1:24-cv-815

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                           *Defendants*.

# Exhibit Q

1

2

3

4

5    COMMITTEE ON THE JUDICIARY,

6    U.S. HOUSE OF REPRESENTATIVES,

7    WASHINGTON, D.C.

8

9

10

11

12    INTERVIEW OF:    MATTHEW M. GRAVES

13

14

15

16

17                Tuesday, October 3, 2023

18

19                Washington, D.C.

20

21

22        The interview in the above matter was held in room 2237, Rayburn House Office

23    Building, commencing at 10:00 a.m.

24        Present:    Representatives Jordan, Gaetz, Biggs, and Swalwell.

1    <u>Appearances:</u>

2

3

4    For the COMMITTEE ON THE JUDICIARY:

5

6    CLARK ABOURISK, COUNSEL

7    STEVE CASTOR, GENERAL COUNSEL

8    DILLON CHEPP, COUNSEL

9    SEAN CLERGET, COUNSEL

10   BETSY FERGUSON, DEPUTY GENERAL COUNSEL

11   BRITTANY HAVENS, PROFESSINAL STAFF MEMBER

12   RACHEL JAG, COUNSEL

13   CAROLINE NABITY, CHIEF COUNSEL FOR OVERSIGHT

14   ███████████, MINORITY CHIEF OVERSIGHT COUNSEL

15   █████████████, MINORITY STAFF ASSISTANT

16   ███████████, MINORITY OVERSIGHT COUNSEL

17   ███████████████, MINORITY PROFESSIONAL STAFF MEMBER

18

19

20   For the U.S. DEPARTMENT OF JUSTICE:

21

22   GRETA GAO, SPECIAL COUNSEL, OFFICE OF LEGISLATIVE AFFAIRS

23   SARA ZDEB, DEPUTY ASSISTANT ATTORNEY GENERAL, OFFICE OF LEGISLATIVE AFFAIRS

1

2          Mr. <u>Castor.</u>    Good morning.

3          Mr. <u>Graves.</u>    Good morning.

4          Mr. <u>Castor.</u>    This is a transcribed interview of United States Attorney for the

5   District of Columbia Matthew Graves.

6          Chairman Jordan has requested this interview as part of the committee's oversight

7   of the Justice Department's handling of the Hunter Biden investigation.

8          Would you just please state your name for the record?

9          Mr. <u>Graves.</u>    Matthew Graves.

10         Mr. <u>Castor.</u>    And you're joined here with agency counsel.    I'll have them

11  introduce themselves.

12         Ms. <u>Zdeb.</u>    Sarah Zdeb, Department of Justice.

13         Ms. <u>Gao.</u>    Greta Gao, Department of Justice.

14         Mr. <u>Castor.</u>    And you understand agency counsel has a fiduciary duty to the

15  Department and not you personally?

16         Mr. <u>Graves.</u>    Yes.

17         Mr. <u>Castor.</u>    And you've decided to proceed with agency counsel as opposed to

18  personal counsel, correct?

19         Mr. <u>Graves.</u>    That is correct.

20         Mr. <u>Castor.</u>    Okay.

21         On behalf of the committee, I want to thank you for appearing here today

22  voluntarily to answer our questions.

23         My name is Steve Castor.    I'm with Mr. Jordan's Judiciary Committee staff.    I'll

24  have the staffers here in the room introduce themselves.

25         Ms. <u>Nabity.</u>    Caroline Nabity, with Chairman Jordan's staff.

1          Mr. <u>Clerget.</u>    Sean Clerget, Chairman Jordan's staff.

2          ██████  ██████, Ranking Member Nadler's staff.

3          ██████   ██████, Ranking Member Nadler's staff.

4          ██████  ██████, Ranking Member Nadler's staff.

5          Ms. <u>Havens.</u>    Brittany Havens, Chairman Jordan's staff.

6          Mr. <u>Abourisk.</u>    Clark Abourisk, Chairman Jordan's staff.

7          Ms. <u>Ferguson.</u>    Betsy Ferguson, Chairman Jordan.

8          Ms. <u>Jag.</u>    Rachel Jag, Chairman Jordan's staff.

9          Mr. <u>Chepp.</u>    Dillon Chepp, Chairman Jordan's staff.

10          ██████   ██████, Ranking Member Nadler's staff.

11          Mr. <u>Castor.</u>    The staff participation here is limited to the committee staff, so we

12  won't have additional staffers -- if other folks come in the room, we might stop and have

13  them announce themselves for the record.

14          I'll go over the ground rules and guidelines that we'll follow during today's

15  interview.

16          Our questioning will proceed in rounds.    The majority will ask questions first for 1

17  hour, and then the minority will have an opportunity to also ask questions for an hour.

18  We will alternate back and forth until the interview is complete.

19          Ordinarily, we take a break at the end of each hour, but if you'd like to take a

20  break apart from that, just let us know.

21          As you can see, there's an official House reporter taking down everything we say.

22  So we will, from time to time, need to make sure you give a verbal response, if you nod

23  your head and that type of thing.

24          Do you understand that?

25          Mr. <u>Graves.</u>    Yes.

1          Mr. <u>Castor.</u>    We want you to answer our questions in the most complete and

2    truthful manner possible, so we'll take our time.    If you don't understand our question,

3    just ask, and we can go back.

4          The Rules of Evidence don't apply, and so if a question calls for hearsay, you can

5    just tell us that you didn't learn something firsthand, but maybe you could just tell us how

6    you did learn it.    Is that okay?

7          Mr. <u>Graves.</u>    Yes.

8          Mr. <u>Castor.</u>    You understand you're required to answer questions before

9    Congress truthfully?

10          Mr. <u>Graves.</u>    Yes.

11          Mr. <u>Castor.</u>    And 18 United States Code, 1001, covers false statements before

12    Congress and proceedings like this.    You understand that, correct?

13          Mr. <u>Graves.</u>    Yes.

14          Mr. <u>Castor.</u>    We try to keep the information that we talk about confidential.    A

15    lot of times that doesn't happen.    Sometimes the transcripts come in and they get sent

16    to The Washington Post.    So we don't like the fact that that happens, but we do try to

17    keep things confidential.    So, to the extent we mark exhibits, we'll collect them.

18          That's the end of my welcoming remarks.

19          ▮▮▮▮▮, do you have anything?

20          ▮▮▮▮▮.    We just thank the witness for joining us today.

21          Mr. <u>Graves.</u>    Thank you.

22          Mr. <u>Castor.</u>    Ms. Zdeb, do you have any welcoming remarks?

23          Ms. <u>Zdeb.</u>    I do.    Thank you --

24          Mr. <u>Castor.</u>    Okay, good.

25          Ms. <u>Zdeb.</u>    -- Steve.

1          As you're aware, the committee's inquiry implicates an ongoing criminal

2     investigation and prosecution.    At this juncture, Mr. Graves is going to be able to

3     address questions that can be answered without compromising the ongoing matter.

4          Specifically, the Department has authorized him to discuss U.S. Attorney and

5     now-Special Counsel Weiss's authority.    And that would include the committee's interest

6     in whether Mr. Graves and his office prevented or denied Mr. Weiss the ability to bring

7     charges related to his investigation in the District of Columbia.

8          There may be some additional information Mr. Graves can share, depending on

9     the question, but, again, consistent with the Department's need to protect the ongoing

10    investigation.

11         I think you know, but to the extent you have questions that are outside the scope

12    of what Mr. Graves has been authorized to discuss at this point, we reiterate our

13    willingness to take those questions back and consider further accommodations at the

14    appropriate time.

15         All that said, our goal today is very much to facilitate Mr. Graves sharing as much

16    information as he can consistent with the scope of his authorization.

17         Mr. Castor.    Great.

18         We'll start the clock.    It's 10:05.

19                                   EXAMINATION

20         BY MR. CASTOR:

21    Q    When were you nominated to be the U.S. attorney for D.C.?

22    A    I was nominated in July of 2021.

23    Q    And you were confirmed by the United States Senate when?

24    A    October of 2021, I believe.

25    Q    Okay.    And then you were sworn in as the U.S. attorney?

1  A  In November of 2021.

2  Q  Okay.

3  Prior to joining the U.S. Attorney's Office in November of 2021, what was your

4 experience with the Justice Department?

5  A  I had been a career prosecutor at the Justice Department, serving both as a

6 line assistant and as a career supervisor.

7  Q  Okay. And for how many years?

8  A  Collectively, a little bit under 10.

9  Q  Okay. And in what sections or what divisions of the Department did you

10 work?

11  A  So I worked in the U.S. Attorney's Office for the District of Columbia in a

12 number of different capacities.

13  Q  Okay. But never Main Justice?

14  A  That is correct; I never worked at Main Justice. Some of my investigations

15 involved me working with Main Justice, though.

16  Q  Okay.

17  And your office right now, how many attorneys work in your organization?

18  A  Counting temporary attorneys and attorneys on detail to us, ballpark,

19 roughly 450.

20  Q  Okay.

21  And can you articulate for us your interactions with Main Justice? Do you

22 consider the DAG your supervisor or your direct -- the person you report to?

23  A  And just to be clear, we're talking in my current capacity?

24  Q  Yes.

25  A  I think the way that it's articulated is, my direct supervisor is the Attorney

1      General --

2           Q      Uh-huh.

3           A      -- but there's a dotted line reporting to the Deputy Attorney General --

4           Q      Okay.

5           A      -- in her capacity as chief operating officer of the Department.

6           Q      Okay.    And in your day-to-day report, like, who do you ordinarily

7    communicate with at Main Justice?    Is it Ms. Monaco or Mr. Miller?

8           A      So I think the question assumes a level of coordination or communication

9    that doesn't necessarily exist.

10          Q      Uh-huh.

11          A      As U.S. attorneys, in general, we don't have day-to-day communication with

12   either the Office of the Deputy Attorney General or the Office of the Attorney General.

13          Q      Okay.    How often do you speak with Ms. Monaco?

14          A      Ms. Monaco herself?

15          Q      Uh-huh.

16          A      Probably once a month, once every other month.

17          Q      Okay.    And Mr. Miller, Marshall Miller, the PADAG?

18          A      Probably the same.

19          Q      Okay.

20          A      And it's changed over time in the role.    I would say less now.

21          Q      Okay.    And is there anyone in the DAG's Office that you talk to more than

22   that, on a frequent basis?

23          A      Yes.    I talk to and members of my team talk to people on their staff more

24   than we talk to the principals.

25          Q      Okay.    And for you personally, who's the person in the DAG's Office that

1     you have the most frequent communications with?

2         A    So it varies depending on the issue that's covered.

3         Q    Okay.

4         A    They're kind of divided into subject-matter expertise.

5         Q    Okay.

6         A    So at different times it's been different people, depending on the issue being

7     discussed.

8         Q    Okay.    With regard to the Hunter Biden matter, who in the DAG's Office did

9     you have communications with?

10       A    To the best of my recollection, I don't think I had communications with

11    anybody in the DAG's Office.

12       Q    Okay.    So you didn't speak with Lisa Monaco about the Hunter Biden case?

13       A    Certainly not --

14       Q    Okay.

15       A    -- her.

16       Q    And Marshall Miller?

17       A    No.

18       Q    How about Mr. Weinsheimer, Brad Weinsheimer?

19       A    I mean, other than --

20       Q    About the Hunter Biden case.

21       A    No.

22       Q    Zero communications with Brad Weinsheimer?

23       A    None.

24       Q    Okay.    Any other official in the DAG's Office that you had communications

25    with about the Hunter Biden case?

1        A        So I can't recall.    At that point in time, we were having more conversations

2        than we typically were with members of the Office of the Deputy Attorney General, given

3        what was occurring in our office at that point in time.

4        Q        Okay.

5        A        It is possible that the subject came up, but I have no recollection of it in one

6        of those communications.

7        Q        So you have no specific recollection of any communications with anybody in

8        the DAG's Office about the Hunter Biden case.

9        A        That is correct.

10        Q        How about anybody in the Attorney General's Office?

11        A        No.

12        Q        About the Hunter Biden case.

13        A        Absolutely not.

14        Q        Okay.    So you didn't speak to the Attorney General?

15        A        That is correct.

16        Q        Okay.

17        The chairman has joined us.

18        Mr. Graves.    Chairman.

19        Chairman Jordan.    Mr. Graves, thank you.    Thanks for being here.

20        Mr. Graves.    Thank you for having me.

21                BY MR. CASTOR:

22        Q        Along the same lines, how often do you interact with the Tax Division in your

23        current role?

24        A        Attorneys from the Tax Division?

25        Q        Uh-huh.

1       A       To the best of my recollection, I don't think I've interacted with them at all in

2   my current role.

3       Q       Okay.    But to bring a tax case, the lawyers in your department have

4   interactions with the Tax Division, correct?

5       A       That is correct.

6       Q       And how would you describe that?

7       A       I'm sorry.    Can you reframe the question?

8       Q       How would you describe the communications on an ordinary basis that your

9   U.S. attorneys, your AUSAs, would communicate with the Tax Division lawyers?

10      A       Yeah, so it depends on a variety of factors.    And I did this when I was a

11  career prosecutor.

12      Q       Uh-huh.

13      A       There are cases where you're jointly prosecuting matters with them.    The

14  contact looks different in that context than cases where you're prosecuting the case on

15  your own but, per the Justice Manual, there are certain authorizations you need to obtain

16  from the Tax Division in connection with those prosecutions.

17      Q       Okay.    And so it is fair to say, in Federal criminal tax cases, approval from

18  DOJ Tax is required before a U.S. attorney's office may issue subpoenas or undertake

19  other investigative actions?

20      A       There are various steps along the investigative process that have to be

21  approved by the Tax Division in connection with the prosecution or investigation of tax

22  charges.

23      Q       Okay.    And so, if a U.S. attorney, whether it's yourself or Mr. Weiss, wanted

24  to bring tax charges against an individual, it would require the approval of the Tax

25  Division, correct?

1       A     That is correct.

2       Q     Under the Justice Manual.

3       A     That is correct.

4       Q     Okay.

5             If there is a disagreement, ordinarily, between a U.S. attorney's office and DOJ

6       Tax, in your experience, how is that sorted out?    If, for example, the AUSA or the

7       U.S. attorney wants to bring tax charges and the Tax Division is balking, how does that

8       ordinarily get sorted out?

9       A     So, first and foremost, in my experience -- and I'm drawing on my experience

10      as a career prosecutor, not my current role -- that is handled at the line level.    And if

11      things need to be elevated, they're elevated in normal order up the career supervisory

12      chain.

13      Q     Uh-huh.

14      A     In my experience, generally, the Department arrives at consensus on --

15      Q     Okay.

16      A     -- how we should proceed.

17      Q     Are there ever instances that you're aware of where the DOJ tax lawyers

18      wanted to bring a tax case but the local U.S. attorney or the AUSA assigned to it did not?

19      A     To the best of my recollection, when I was on the line and when I was

20      supervising line attorneys, I can't recall that situation occurring.

21            But an important caveat to that is, I can't remember many cases where we

22      actually partnered with the Tax Division, as opposed to interacting with the Tax Division --

23      Q     Okay.

24      A     -- to get their approval.

25      Q     Okay.    And how is that different?    If there's a tax prosecution in D.C. that

1      your AUSAs are working, how does the partnership work with the Tax Division?

2          A      So, in general, when we're partnering with any Main Justice component, Tax

3      Division or otherwise, they're fully fledged on the case; both supervisory chains have to

4      approve all actions --

5          Q      Okay.

6          A      -- that are taken in connection with the prosecution.

7          Q      Okay.    Are there ever instances where you'll bring a tax case without the

8      assistance of the Tax Division lawyers?

9          A      Yes.    So that's what I was saying before.    All of the cases that I can recall

10     that I worked on or supervised where there were tax charges, we were doing those cases

11     on our own without the Tax Division.

12         Q      Okay.    And why was that, or why would that occur, where you wouldn't

13     lean on Tax Division resources to prosecute a case?

14         A      It's actually fairly normal --

15         Q      Okay.

16         A      -- in my experience.    There is, unfortunately, lots of tax evasion out there,

17     and the Tax Division, it isn't structured to have prosecutors --

18         Q      Okay.

19         A      -- in all of them.    The idea is that the U.S. attorney's offices in general will

20     handle a lot of those cases.

21         Q      Okay.    So the Tax Division reviews the charges, okays them, and then your

22     office would move forward?

23         A      Correct.

24         Q      Okay.

25                Has there ever been an instance where a U.S. attorney from a different district

1   came to you with a case that needed to be prosecuted in D.C.?

2        A    So I think, outside of this situation, the technical answer to your question is

3   no, because it's assuming that those communications are occurring at the U.S. attorney

4   level.

5        There have been instances where other offices have reached out to career people

6   in my office and said, for a variety of reasons, there's this investigation that we have here,

7   where it's actually -- the venue is appropriate in your jurisdiction.

8        Q    Okay.   And so how does that ordinarily work?   The line AUSAs talk to each

9   other and reach a conclusion?

10       A    That's correct, the line AUSAs or -- usually, the interaction is at the line level.

11  It's a career supervisor reaching out to another career supervisor, because people in

12  general know each other.

13       This most commonly happens, in my experience, for our office with the Eastern

14  District of Virginia and Maryland --

15       Q    Uh-huh.

16       A    -- because you can be in an investigation in one jurisdiction and realize,

17  because of our proximity, that, actually, the better venue is another jurisdiction.

18       Q    Okay.   And so, ordinarily, those types of decisions don't make their way up

19  to the U.S. attorney for approval?

20       A    What I would say is, they certainly don't require U.S. attorney approval

21  necessarily.   I am briefed when those happen as part of my normal briefing on what is

22  happening in our Criminal Division.

23       Q    And when these types of situations occur, how does the prosecution move

24  forward?   Let's say it's an AUSA in Maryland that realizes venue's appropriate in D.C.,

25  wants to bring a tax case, confers with your line AUSAs, decide that they will take the

1    case.    How does that work?

2          A     It varies, and it's very case-specific.    It can be what you just described, that

3    we actually take the case and then we try it with our prosecutors.    It can be that

4    assistant United States attorneys from other jurisdictions get designated as special

5    assistant United States --

6          Q     Okay.

7          A     -- attorneys in our jurisdiction --

8          Q     Okay.

9          A     -- and then prosecute the case that way.

10         Q     Okay.    And how often would you say it happens?    What's the more

11   ordinary situation?    Is it your prosecutors taking the case, or is it you, your office,

12   designating the lawyers from Maryland or Virginia as special AUSAs?

13         A     It's -- I'm sorry, I just want to clarify.    Are you saying, what's more

14   common --

15         Q     Yeah.

16         A     -- for prosecutors from another jurisdiction to come here and try the cases

17   or for us to take the case in its entirety?    Is that the question?

18         Q     Yes.

19         A     Okay.    I think, in general, in my experience, it's prosecutors from other

20   jurisdictions coming or --

21         Q     Okay.

22         A     -- us going out and trying.    But it depends.

23         Q     Uh-huh.

24         A     A big factor is going to be, like, how far along are you in the investigation.

25         Q     Right.    Okay.

1       Is there a difference in the DOJ Tax world between approval of charges and

2   discretion?    Are you aware of that distinction?

3       A    No.

4       Q    Okay.    So, as far as you're concerned, DOJ Tax, they either approve or

5   decline to recommend charges?

6       A    In my experience, that's been the case --

7       Q    Okay.

8       A    -- yes.    You either get approval or you don't get approval.

9       Q    Okay.    So there's no middle ground, something called "discretion"?

10      A    In my experience.    I can't claim that I've seen every iteration possible of a

11  tax case.

12      Q    Okay.    Fair enough.

13      Now, as far as the Hunter Biden case is concerned, what is your awareness of DOJ

14  Tax's position on that?

15      A    I have no knowledge from within the Department.

16      Q    Okay.

17      A    I mean, there are things that I've seen in public reporting, but I have no

18  job-related knowledge of what the Tax Division's position is.

19      Q    So you're unaware of whether the Tax Division recommended charges or not

20  in the Hunter Biden case?

21      A    That is correct.

22      Q    Okay.

23      Can you walk us through your recollection of how the Hunter Biden case was

24  brought to your office?

25      A    Yes.    To the best of my recollection, in late February or early March of

1    2022, then-U.S. Attorney Weiss, now-Special Counsel Weiss, called me directly.

2    Q    Okay.    And what did he say?

3    A    To my recollection, he said that he had a case where there was a component

4    of that case that he had deemed he wanted to bring in the District of Columbia.

5    Q    Okay.    And what did you say?

6    A    So, at a high level, without getting into the case specifics, my recollection

7    was generally saying -- asking him whether he was just looking for the kind of normal

8    administrative support that any U.S. attorney would need if they were going to come and

9    bring a case in another jurisdiction or have their people bring a case in another

10   jurisdiction, or whether he was asking for us to join the investigation.

11   Q    And what was his answer?

12   A    To the best of my recollection, his answer was that, at a minimum, it was

13   providing the support but we could discuss further joining or not.

14   Q    And what happened next after that telephone call?    Did you resolve

15   anything on the call?

16   A    Nothing other than a high-level commitment that we would provide

17   whatever logistical support that he needed, and I would work with my career people to

18   put them in touch with his career people.

19   Q    Okay.    And that was the end of the call?

20   A    Yes.

21   Q    And do you remember how long that lasted?

22   A    Best recollection, roughly 10 minutes.

23   Q    And then what did you do next?

24   A    I went to the then-head of our Criminal Division.

25   Q    And who's that?

1      A    Well -- so, in general, I would prefer, in the context of this interview, given

2  what you referenced before about, despite all of our best efforts, some of these

3  transcripts becoming public, giving positions as opposed to names.    We can work with

4  OPA if this really does become --

5      Q    I mean, we'd ask you for the name of the head of the Criminal Division; we

6  might ask, you know, your first assistant.    I think we're looking for those two names, but

7  about other than that, I think we can --

8      A    So can we -- my request to you would be that we kind of work this through

9  OLC as opposed to putting it in an official transcript.    I'm already dealing with enough

10  threats and harassment of my assistant United States attorneys --

11      Q    Okay.

12      A    -- who are career prosecutors.

13      Q    So you're unwilling to tell us who the head of the Criminal Division is?

14      A    So --

15      Q    I mean, we can probably look that up on the internet, can't we?

16      A    So I'm not sure that you could look it up at that point in time.    But what I

17  am saying is, I would like to work this out so that it's not in the official transcript.

18      Q    Okay.

19      So you had a telephone call with the head of the Criminal Division?

20      A    No.    I went to the head of the Criminal Division's office.

21      Q    Okay.    And what did you say, to the best of your recollection?

22      A    To the best of my recollection, I relayed what had just been conveyed to me.

23  I asked the head of the Criminal Division to have some of our career prosecutors work

24  with their counterparts in Delaware to get a briefing on the case --

25      Q    Uh-huh.

1      A      -- to make a recommendation about how we should proceed, in terms of

2  whether we would continue to seek to potentially join the investigation.

3      Q      And did you have any communications with your first assistant on this

4  matter?

5      A      My first assistant was present for a number of these conversations -- well,

6  sorry.    Strike that.

7      I just want to be crystal-clear.    Technically, we don't have a first assistant.

8  There's no one who had that title in our office.

9      Q      Okay.    So what title does the person who serves effectively -- effectively as

10  the first assistant?

11     A      It's the principal assistant.

12     Q      Okay.    So it's just a different name, principal assistant as opposed to a first

13  assistant?

14     A      It's a different name and -- it's a different name.

15     Q      Okay.

16     So tell us about the communications you had with your principal assistant.

17     A      So my principal assistant, to the best of my recollection, was present for this

18  meeting and a couple other limited meetings that occurred, but my principal assistant

19  didn't take any active role in moving anything forward in our office or having

20  communications with anyone outside of our office.

21     Q      Okay.

22     Now, you indicated that you went down the hall to speak with the head of the

23  Criminal Division, correct?

24     A      That is correct.

25     Q      Now, was it just a -- was it an official meeting, in your view, or was it just a

1  conversation?

2  A  I'm not sure of the distinction you're trying --

3  Q  Well, was something on a calendar that you scheduled?

4  A  No, there was no calendar invite.

5  Q  Okay.   So you just walked down the hallway and the head of the Criminal

6  Division was able to talk to you about this?

7  A  That is correct.

8  Q  And do you remember any other communications or meetings like this that

9  you had on the case?

10  A  So I -- there was one other meeting that I recall.

11  Q  Okay.   With the head of the Criminal Division?

12  A  Just in general, there's one other meeting that I recall.

13  Q  Okay.

14  And so what was the next step after you had this discussion with the Criminal

15  Division head?

16  A  So the next step was for the Criminal Division head to reach out to the

17  appropriate section within our office that does tax investigations to have the matter

18  staffed for an assessment and to get back to me quickly with their recommendation.

19  Q  Okay.   And what did they do, as far as you know, next?   Did they go to

20  Delaware?   Did they communicate with the AUSAs in Delaware on the phone?   How

21  did they conduct their assessment?

22  A  My understanding at a high level is, there was some interaction with the

23  AUSAs in Delaware.   They got some case-related or investigation-related material.   I

24  don't know specifically who the individuals were that they interacted with or what

25  materials they reviewed or gathered.

1      Q      Okay.   Now, did you review any materials?

2      A      To the best of my recollection, no, I didn't review any underlying case

3  materials.

4      Q      Okay.

5            So you had the conversation with Mr. Weiss; then you had that conversation with

6  the head of the Criminal Division.    The head of the Criminal Division, as far as you know,

7  instructed the AUSAs in your office to communicate with the AUSAs in Delaware.    Some

8  materials were exchanged, but you don't know what materials they were?

9      A      That is correct.

10      Q      Okay.    And then what happened?

11      A      Well, during the course of all of this, we're taking steps to facilitate whatever

12  then-U.S. Attorney Weiss would need in terms of bringing a case in the District --

13      Q      Okay.

14      A      -- separate and apart from whether we would join the investigation.

15      Q      Okay.    And tell us what that is.

16      A      So some of it is protected, but what I can say at a high level, in general:

17  Whenever you're trying to return an indictment, if it's a felony charge, we can't just bring

18  those charges on our own.    We have to present evidence to a grand jury, and a grand

19  jury has to --

20      Q      Of course.

21      A      -- vote those charges.    So that's a key step that's done in any case where

22  someone wants to bring charges, and kind of facilitating that process.

23      Q      Okay.    And did you facilitate that process?

24      A      So I can't speak specifically about the case, but what I'm telling you generally

25  is that that's what we would do when we receive requests to help with returning an

1    indictment in our jurisdiction.

2          Q      Okay.    And what else?

3          A      At a high level, without getting into case specifics, I think that generally

4    describes what was occurring at that point in time.

5          Q      Okay.

6          What feedback did you receive from your people after the interactions that they

7    had with the U.S. Attorney's Office in Delaware?

8          A      To my recollection, they had a meeting with the relevant career supervisors

9    and the career prosecutor who was assigned to the matter, where they provided their

10   assessment.

11         Q      And what was their assessment?

12         A      So I can't get into what their assessment was, because it concerns an

13   ongoing investigation.

14         Q      Okay.

15         So is that the universe of meetings you had in this case?    You had the -- or,

16   meetings or calls?    You had the call with Mr. Weiss.    You had the drop-by meeting with

17   the head of your Criminal Division.    And then now you said you had a meeting with your

18   AUSAs.

19         A      Those are the most prominent.

20         Q      Uh-huh.

21         A      It's possible -- because, I mean, my Criminal Division chief and I, at that point

22   in time, were in daily contact --

23         Q      Uh-huh.

24         A      -- I mean, multiple times per day.

25         Q      Right.

1      A      So it's possible, in any one of our other various times that we were together,

2      the issue came up.

3            But those are kind of the three most prominent events that I recall.

4      Q      And -- go ahead.

5            Chairman Jordan.    Earlier, Mr. Graves, you said you had one other meeting, 2

6      minutes ago, and you described it as a general meeting.    Is that related to all this?    Or

7      tell me about that meeting.

8            Mr. Graves.    That is the meeting that I was describing where I met with the

9      career prosecutor, yep, yes.

10           Chairman Jordan.    Fine.

11                 BY MR. CASTOR:

12     Q      And when was that?

13     A      I think it was March 19, 2022.

14     Q      And was a decision made at that meeting?

15     A      Yes.

16     Q      Okay.    And the decision was made not to move forward with the case,

17     correct?

18     A      So I wouldn't describe it that way.

19     Q      The decision was made not to partner with the U.S. Attorney's Office from

20     Delaware, correct?

21     A      So I think what has obviously been publicly reported and is known -- and I'm

22     trying to be careful, given that there's an ongoing investigation -- is that we ultimately did

23     not join.

24           And recall, when this came up, to my recollection, I was the first person to raise

25     whether they wanted a local counsel on the case.    And I think the best way of

1    characterizing the decision was, we instructed -- I instructed to say that we weren't going

2    to pursue being a local counsel on the case.

3        Q    So the meeting that you had on March 19th, the decision was made not to

4    join.

5        A    So, not to continue to pursue to see if they'd be willing to allow us to serve

6    as local counsel, but to provide all assistance that was necessary for them to do whatever

7    they wanted to do in our jurisdiction.

8        Q    So the decision was made to invite them into your jurisdiction and let them

9    prosecute the case?

10        A    That decision had been made when then-U.S. Attorney Weiss called me.

11        Q    Okay.

12        A    Then I made the decision, we were going to do whatever he needed --

13        Q    Okay.

14        A    -- done logistically in our jurisdiction.

15        Q    Okay.    So you were going to welcome the prosecutors from Delaware into

16    D.C. and let them prosecute the case?

17        A    Yes.    The only issue was whether we were going to seek to join their

18    investigation or not.

19        Q    Okay.    And you decided not to join their investigation.

20        A    That is correct.

21        Q    And can you tell us why?

22        A    So I unfortunately cannot get into the why without getting into the case

23    specifics of an ongoing investigation.

24        Q    Okay.

25    And how was the decision not to partner or not to join -- everyone's got a

1    different way of saying it -- how was that communicated to the Delaware U.S. Attorney's

2    Office?

3         A    Instructed it to occur at the line level.

4         Q    At the line level?

5         A    Yes.

6         Q    Did you have any telephone calls or anything of that nature with Mr. Weiss?

7         A    To the best of my recollection, no.    I only recall that first conversation.    It's

8    possible that we had one.    I'm talking about, like, a year and a half ago.    But that's all I

9    recall.

10        Q    Okay.

11             And in the March 19th meeting, were all the officials in the meeting your staff?

12        A    That's correct.

13        Q    Okay.    And who was in that meeting?

14        A    The --

15        Q    How many people?

16        A    Roughly, to the best of my recollection, five or six.

17        Q    And who were those five or six people?

18        A    The principal assistant; Criminal Division chief; the head of our fraud, public

19   corruption, and civil rights practice; the head of our Fraud and Public Corruption Unit; and

20   a line assistant, I believe.

21        Q    And can you tell us anything more about the March 19th meeting, about

22   what was communicated to you and what decision -- what types of things led to the

23   ultimate decision?

24        A    So I understand the question, and in the constraints we're operating under, I

25   can't answer it directly.

1        What I can say generally, in terms of how I run these meetings, is, if it's a decision

2    that rises to my level, I make everyone present give their view of how we should proceed.

3        Q    And was the view unanimous?

4        A    So I can't get into this case specifically.    I will say, in general, in my

5    experience, most of the things that come to me, the overwhelming majority are

6    unanimous.

7        Q    Uh-huh.

8        A    There are some times where there's disagreement among various

9    supervisors, and that's where I have to decide with one camp or another.

10       Q    Okay.    But this is a very unusual case, correct?    I mean, this doesn't fall

11   into the ordinary type of matter, right?

12       A    In what sense?

13       Q    Well, it's the son of the President of the United States.

14       A    So I understand where you're coming from, and I get your point.    Being in

15   D.C., we have a good number of cases that involve very prominent individuals.

16       Q    Okay, but nothing like the son of the President of the United States.

17       A    I would actually -- I mean, I can't get into all of it, but I'd actually disagree.    I

18   think there are things of that level that --

19       Q    So this was common?

20       A    I didn't say "common."

21       Q    Uh-huh.

22       A    I didn't say "common" at all.

23       Q    Right.

24       A    But it's not unusual or a one-of-a-kind to have a family member of someone

25   who is prominent, or someone who is prominent themselves, under investigation in our

1    office.

2            Chairman <u>Jordan.</u>    When did U.S. Attorney Weiss call you?    In March of 2022?

3            Mr. <u>Graves.</u>    So, to the best of my recollection, it was late February or early

4    March.

5            Chairman <u>Jordan.</u>    So, in 3 weeks' time -- so you've got the U.S. attorney calling

6    you about an important case, as Steve just talked about, a somewhat unusual case.    He

7    calls you and asks that you partner with them and assist them, right?    I think you made

8    those two distinctions.

9            And -- go ahead.    Correct me if I'm wrong.

10           Mr. <u>Graves.</u>    So I just want to clarify.    He asked for assistance.    I asked if he

11    needed us to partner or if he wanted us to partner.    And he said he was open to a

12    conversation about that --

13           Chairman <u>Jordan.</u>    Okay.

14           Mr. <u>Graves.</u>    -- but needed the assistance.

15           Chairman <u>Jordan.</u>    Okay.

16           But in 3 weeks' time, you decide not to partner.    On March 19th you have the

17    meeting, and the determination is made you were not going to partner with the

18    U.S. attorney.

19           Mr. <u>Graves.</u>    We decided that we were not going to join the investigation.    And,

20    again, the context here is, I was the one who brought it up, not them.    And I understood,

21    for a variety of reasons, it was important for us to move quickly.

22           Chairman <u>Jordan.</u>    And then you didn't call David Weiss; you just let your

23    assistant attorneys let Delaware know.

24           So the only conversation you had with David Weiss was, he calls you up about a

25    pretty important case and asks for your assistance.    You raise the issue of whether you

1    can partner or not.    Three weeks later, you decide you're not going to.    And then you

2    don't communicate back to him.

3        Mr. Graves.    So --

4        Chairman Jordan.    You, personally, don't.

5        Mr. Graves.    So me, personally?    No.    I instructed my career prosecutors to

6    convey the decision and the basis for the decision to his career prosecutors.

7        Chairman Jordan.    Okay.

8            BY MR. CASTOR:

9    Q        Now, you're a big-time Democrat, correct?

10    A        I wouldn't describe it that way, but okay.

11    Q        You were nominated by the President of the United States to be the U.S.

12    Attorney for D.C., correct?

13    A        That is correct.

14    Q        You worked on the Biden campaign, right?

15    A        That is -- I understand where your question is coming from.    I actually

16    wouldn't characterize it that way.

17    Q        You had a role with the Biden campaign?

18    A        So do you want me to actually clarify what that was?

19    Q        Sure.

20    A        So I knew someone who had some affiliation to the campaign; said that I was

21    interested in criminal justice issues.    I got put on this committee, and my

22    responsibilities, being on this committee, consisted of receiving emails from the

23    committee that anybody -- basically, almost anybody who contributed.    I had no direct

24    interaction --

25    Q        Okay.

1   A -- or indirect interaction with anybody on the campaign.

2   Q Contributed money?

3   A I did contribute money.

4   Q Okay.

5   Mr. Swalwell. Sorry, what was it?

6   Mr. Graves. I did contribute money.

7     BY MR. CASTOR:

8   Q And you also had a role with the Kerry campaign, as I understand it?

9   A So the firm that I was working with at the time provided some support to the

10 Kerry campaign in connection with its vetting process for Vice Presidential candidates.

11   Q Anything else with the Kerry campaign?

12   A No, that was it. And I had no direct interaction or indirect interaction with

13 anyone from the Kerry campaign. It was strictly working for people within the firm.

14   Q Okay.

15   I mean, this isn't surprising. I mean, you know, you're the U.S. attorney pick for

16 President Biden.

17   A Yes.

18   Q Obviously you're aligned with his political party and so forth. So, you know,

19 you shouldn't be, you know, alarmed that we're asking these questions or that the

20 answers are, yes, I'm somebody that's been affiliated with the Biden campaign, the Kerry

21 campaign, and also the Clinton-Gore campaign. Is that correct?

22   A Yes. The Clinton-Gore campaign, my sophomore -- junior year of college, I

23 took off my fall semester to work advance for that campaign.

24   Q Okay. And did you ever work on any Republican campaigns?

25   A I did not work on any Republican campaigns. I worked for a Republican

1    State senator.

2         Q    Okay.    Any other bipartisan elected work, work for elected officials?

3         A    Other than -- I mean, I had very limited work for elected officials.    And,

4    again, the only time that I worked directly for an elected official, not in the campaign

5    context, was when I worked for a Republican State senator.

6         Q    Okay.

7              Now, let me take a step back.    In the Hunter Biden case, do you think a

8    special-counsel situation would've made sense from the outset?

9         A    So, you know, I've been authorized to discuss U.S. Attorney Weiss's authority

10   and the circumstances around his interaction with our office about bringing charges.

11   That kind of goes outside of it.    And, candidly, I don't know that I have enough

12   information about the investigation to make that kind of assessment.

13        Q    Uh-huh.    But you understand the perception problem.    You're an

14   appointee of President Biden, and, here, you've been asked to weigh in on a prosecution

15   involving his son.    I mean, certainly, there's an obvious perceived -- at least the

16   perceived conflict of interest, correct?

17        A    I don't -- I don't see it that way.

18        Q    Okay.    And why is that?

19        A    So we have investigations all the time --

20        Q    Uh-huh.

21        A    -- the Department does, of individuals who are members of the

22   administration.

23        Q    Uh-huh.

24        A    A family member of the administration?    I don't see it as necessarily a

25   conflict of interest or perception of a conflict of interest.

1      Q      Uh-huh.    So you don't believe you should've recused yourself?

2      A      No.

3      Q      And in your communications with Mr. Weiss, did he alert you that he

4   believed he had ultimate authority to bring this case?

5      A      The subject of his authority never came up, to the best of my recollection,

6   because it was just assumed that, from the moment I got on the call, he was gonna be

7   able to do whatever he needed to do in our jurisdiction to bring the case, if that was his

8   prerogative.

9      Q      And do you know if, ultimately, the line -- when your line AUSAs were talking

10   to his line AUSAs, do you know if they made any requests of -- like, what did they need

11   from your office other than help with the grand jury --

12      A      So --

13      Q      -- to bring the case?

14      A      Yeah.    So, again, it's hard to get into this without getting into the specifics

15   of the case.    But I would say, in any case, the primary thing you need, once you're at the

16   stage where a charging decision has ostensibly been made, is the logistical support and

17   the grand jury -- getting before a grand jury, securing time in a grand jury --

18      Q      Right.

19      A      -- presenting evidence to a grand jury, and ultimately asking a grand

20   jury -- presenting charges to the grand jury, and ultimately asking a grand jury to return

21   an indictment.

22      Q      And so your testimony is, your office was willing to facilitate that fully.

23      A      Those were my instructions from the first.

24      Q      And do you know if your staff communicated that to the Delaware U.S.

25   Attorney's Office?

1      A      My understanding is, that was communicated instantly.

2      Q      Uh-huh.

3      And after the March 19th meeting where the decision was made not to join, not

4   to partner, did you give any instructions to your staff to go back and tell the Delaware

5   U.S. Attorney's Office that, while you weren't joining and you weren't partnering, you

6   wanted to make all the resources available?

7      A      So we had already made that clear at the outset, so I didn't feel like I needed

8   to give the instruction.    And based on what was happening, I knew that there was no

9   reason that I needed to give that instruction again.

10      Chairman Jordan.   So, then, tell me what the distinction is.    In this March 19th

11   meeting, when you decide that you're not going to do some things but you are going to

12   do others, what is the actual distinction?    What did you decide not to do?

13      Mr. Graves.    So let me take a step back and just talk about this in general.

14      So, as we were talking about before, there are some times, where we have

15   neighboring jurisdictions, where they realize that, for whatever reason, something they

16   were investigating is better venued in D.C.    We work with them all the time -- not "all

17   the time."    It comes up not infrequently, and we have mechanisms for working with

18   them to be able to, like, get their charges brought in the District.    And we work through

19   that.   We often don't join those cases, but we support them.

20      We also have Main Justice components that will come into our jurisdiction and

21   want to bring cases, where, for a variety of reasons, either because we don't want to or

22   they don't want to, we don't partner and they just do it in our jurisdiction.    They have all

23   kinds of questions -- because they don't prosecute here -- about the practicalities.    Like,

24   what do the templates look like?    Who do you contact in the clerk's office?    Like, all of

25   those things are the questions that come up.    Just as, if I went into Delaware, like, I

1   would have no clue.    I couldn't just go in and say, "Hey, I'm a U.S. attorney from D.C.    I

2   want to enter in a grand jury."    I would need Delaware to facilitate that.

3          Chairman Jordan.    I just want to -- you told the Delaware U.S. attorneys that "we

4   don't want to join, but we'll assist with the grand jury."    Does that cut to the chase?

5          Mr. Graves.    No.    Cutting to the chase is, "We'll do whatever you need done to

6   bring this case.    And we're kind of withdrawing our request or our interest -- the

7   question we asked about whether you want local counsel, we're kind of tabling that issue

8   and not interested in pursuing that."

9          Mr. Castor.    So you weren't willing to offer your AUSAs to sit at the table?

10          Mr. Graves.    So -- I want to be clear on this.    I had raised -- and let me take a

11   step back --

12          Chairman Jordan.    Is there a distinction between not being local counsel and

13   joining the case, or are those one and the same?

14          Mr. Graves.    Those are one and the same, in response to your question.

15          Chairman Jordan.    Okay.

16          Mr. Graves.    Going back a question, I want to be clear about this from, like, what

17   is happening here.

18          So, in general, putting this case aside, U.S. Attorney's Offices don't partner with

19   other U.S. Attorney's Offices.    Each U.S. attorney is the chief law enforcement officer in

20   his or her jurisdiction.    They generally stick in their jurisdiction.

21          If there is something that happens where we have, kind of, these venue problems

22   or you realize a case initiated in one jurisdiction has to be brought in another, usually it is

23   the AUSAs from those jurisdictions going to the other jurisdiction and handling it that

24   way.

25          When our office, in general, decides to join with another Department of Justice

1    component, that's usually done at the beginning of an investigation.    It's exceedingly

2    rare for an ongoing investigation for someone to join as a partner afterwards.

3         There are a lot of issues.    First of all, the component that has been conducting

4    the investigation generally doesn't want another component coming on at the 11th hour.

5         Mr. <u>Castor.</u>    Fair enough.

6         Mr. <u>Graves.</u>    The challenge is -- particularly when you're talking about U.S.

7    attorney and U.S. attorney -- is you're bringing in another chain of command.    And once

8    you're partnered, you have to reach consensus.    So, as a manager, in general, we don't

9    want to do that.

10         And on our end of it, if it's an ongoing investigation, there is no way, whether it's 3

11    weeks, 3 months, if it's been a multiyear investigation, that we can get up to speed on

12    everything that has occurred beforehand.    So you're kind of buying a mansion without

13    an inspection, and whatever problems exist, you are buying those.

14         Chairman <u>Jordan.</u>    I understand.

15         But you said earlier, U.S. attorneys don't partner with other U.S. attorneys.    But

16    that's not what the Attorney General told us; that's not what David Weiss told us.

17    We've got all kinds of correspondence that uses that exact language, that you do partner.

18    And that was the question.    And that's why we're asking the questions we're asking.

19         Mr. <u>Graves.</u>    So I've seen some of the correspondence.    I don't quite read it the

20    way that you do.    I'm telling you, just in general, it would be difficult to find a single

21    prosecution where there are two U.S. attorneys operating in one of their jurisdictions.

22           BY MR. CASTOR:

23       Q    So what happened next after the March 19th meeting, to the best of your

24    knowledge?    Your staff went and communicated the decision to --

25       A    The staff went and communicated the decision that we weren't going to

1    seek to join but would continue to support whatever they needed in the jurisdiction.

2    And I don't recall any other subsequent calls.

3         Q    Okay.

4              Did your staff, before the March 19th meeting, have any communications that

5    you're aware of with Main Justice?

6         A    Who do you mean by "Main Justice"?

7         Q    Anybody in the Tax Division, anybody in the DAG's Office, anybody in the

8    AG's Office, anybody in any other office at Main Justice.

9         A    So the Tax Division, potentially, though I don't know.

10        Q    Uh-huh.

11        A    The AG's Office, certainly not.

12             And I am not aware of the Deputy Attorney General's Office.    But, at that point in

13   time, I would point out that we were kind of, as I said before, in daily contact with them

14   related to some other prosecutions, so it's possible that it came up.

15        Q    Okay.    So it's possible.

16             Now, of all the people in the meeting -- the principal assistant; the Criminal

17   Division chief; the head of the fraud, civil division; the head of the public corruption

18   division; or the line assistant -- of that universe of people, who would be the individual

19   having communications with the DAG's Office?

20        A    So, after myself, the person who had the most independent -- at that point

21   in time, the most independent conversations with the DAG's Office would've been the

22   Criminal Division chief.

23        Q    Okay.    So, if anyone was having communications with the DAG's Office on

24   this issue, it was either you or the Criminal Division chief?

25        A    I'd be speculating -- I'm speculating now.

1      Q      Right.

2      A      But I'm just telling you who had the most contact with the Office of --

3      Q      Okay.

4      A      -- the Deputy Attorney General at that point in time.

5      Q      And do you know if the Criminal Division chief -- and you won't give us the

6   name of that person?   Is that right?

7      A      In the context of the transcribed interview, I am requesting not to.

8      Q      Okay.

9      A      If this is something that you're interested in, we can work through OLC.

10      Ms. Zdeb.    OLA.

11      Mr. Graves.    Oh, sorry.    Sorry.    OLA.

12      Mr. Castor.    Okay.    OLC definitely doesn't want to do this.

13      Mr. Graves.    Yeah.    That would be a very slow process, if we worked through

14   OLC.

15                BY MR. CASTOR:

16      Q      So the Criminal Division chief, what do you know about the

17   communications -- can we -- is it a he or she?    Can we --

18      A      Sure.    At that point in time, it was a he.

19      Q      Okay.    So do you know what communications he had with the DAG's Office

20   on this case?

21      A      I am not aware of him having any communications.    I am just not

22   foreclosing the possibility that the subject --

23      Q      Okay.

24      A      -- maybe came up.

25      Q      Okay.    So, to the best of your knowledge, nobody on your team, including

1      yourself, had any communications with the DAG's Office on the Hunter Biden case.

2            A      Correct.

3            Q      Or anybody at Main Justice, other than the Tax Division.

4            A      Correct.

5            Q      And who from your office was working with the Tax Division at Main Justice?

6            A      So I'm not aware.    Given the -- it is possible that individuals, either career

7      supervisors or the career prosecutor, had communications.    I just don't know.

8            Q      Okay.

9            Now, are you aware that the whistleblower testimony from the IRS

10     whistleblowers -- Mr. Shapley, Mr. Ziegler -- tell of a conversation that Mark Daly -- Mark

11     Daly is a Tax Division lawyer.    Mark Daly related to Mr. Ziegler that he had conversations

12     with -- it was described as your first assistant, but presumably it was the principal

13     assistant.

14           Are you aware of that testimony?

15           A      I've generally seen some public reporting around that testimony.

16           Q      And do you know if that's accurate?

17           A      So, again --

18           Q      At the time, was your principal assistant -- is it a he or a she?

19           A      A she.

20           Q      Okay.    So do you know if your principal assistant had communications with

21     Mark Daly on this topic?

22           A      So, again, we're kind of straying very close to the subject matter of the

23     investigation.    What I can say at a high level with respect to the principal assistant:    I do

24     not recall her doing anything other than attending meetings that I happened to be at in

25     connection with this case.

1    Q    Okay.    So you're not aware of her having a conversation with Mark Daly on

2    this issue?    That wasn't reported back to you?

3    A    That is correct.

4    Q    Okay.    Is it possible the Criminal Division chief was the one talking with

5    Mark Daly?

6    A    So, sure, anything is possible.    And this is why I was saying earlier the

7    principal assistant versus first assistant wasn't, like, a distinction without a meaning.

8    Q    Okay.

9    A    I do not think the principal assistant was involved.    So if whoever this

10   conversation --

11   Q    But who do you think was talking to Mark Daly?

12   A    I don't know.    It could've been -- with the people that were involved, I think

13   there could've been a lot of assumptions that they were the first assistant when they

14   weren't the first assistant.    I don't know.    I'm --

15   Q    Fair enough.

16   A    -- speculating.

17   Q    But it was someone from your office.

18   A    Someone from my office, sure.

19   Q    Like, who do you think that was?

20   A    One of the people that I just described --

21   Q    Okay.

22   A    -- that was at that March 19th meeting.

23   Q    Okay.

24   Chairman Jordan.    One of those five to six people --

25   Mr. Graves.    Yeah.

1          Chairman <u>Jordan.</u>    -- at the March 19th --

2          Mr. <u>Graves.</u>    Yes.

3          Chairman <u>Jordan.</u>    -- meeting?    Okay.

4          Mr. <u>Graves.</u>    Yes.

5                    BY MR. CASTOR:

6          Q     And did you learn about that communication from them?    Or did you learn

7     about that apparent communication from Mr. Ziegler's testimony or Mr. Shapley's

8     testimony?

9          A     The first time I heard about the communication was the public reporting.

10         Q     Okay.    And did you go back and circle up with your staff to see what they

11    remembered when that became public?

12         A     No.

13         Q     You did not.

14         A     No.

15         Q     Okay.

16               After the whistleblower testimony became public and there was news stories

17    about it, did you read the whistleblower testimony?

18         A     The whole testimony?    No.    I've seen news coverage.

19         Q     Okay.    So you didn't read any of the transcripts?

20         A     I mean, I might have seen portions of transcripts in news --

21         Q     In news stories.

22         A     -- coverage, but I did not, like, pull a transcript and read it from beginning to

23    end.

24         Q     Okay.

25               And did you talk with any of the people that were in this meeting about what the

1       public reporting was?

2               A       Not in any great substance.

3               Q       I mean, were you surprised by the public reporting?

4               A       Yes.

5               Q       And why is that?

6               A       I'm trying to think of how to best answer this without getting into the

7       substance.

8               So let me take a step back and talk about why I was surprised and why I was not

9       surprised.

10              So why I was not surprised is that I have worked, personally, a number of

11      whistleblower investigations and kind of understand how these things can unfold and the

12      garble that can happen when you layer hearsay on top of hearsay on top of hearsay.

13      And when you look at a lot of this, it's someone said that someone said that someone

14      said.   So, not surprised that these things can happen.

15              Q       Uh-huh.

16              A       But definitely surprised by the allegation, because it's not consistent with my

17      recollection.

18              Q       Which allegation?

19              A       Well, the allegations, as I understand them, have evolved over time.

20              Q       Okay.   So what do you understand are the allegations?

21              A       So, in the first, it was that the U.S. Attorney's Office in the District of

22      Columbia blocked charges.

23              Q       Okay.

24              A       I understand from the public reporting that that has shifted --

25              Q       Uh-huh.

1      A      -- and I've seen the letters from USA Weiss denying that that occurred.

2   So -- so there's that.

3      Q      Okay.

4          I mean, witnesses have phrased it, you know, in different ways -- that the U.S.

5   Attorney's Office in D.C. declined to partner, that they rejected the case.     But, at the end

6   of the day, it's consistent that your office didn't want to move forward as a partner on the

7   case.

8      A      I would describe those as radically different, right?    If we are taking steps to

9   stop an investigation from going forward, that is markedly different from whether we are

10  facilitating --

11     Q      Uh-huh.

12     A      -- whatever another U.S. attorney wants to do and giving them all of the

13  logistical support they would need to do that.

14     Q      Okay.    And so you maintain here today that your office was willing to give

15  the Delaware U.S. Attorney's Office all the logistical support they needed to come into

16  your district and prosecute that case.

17     A      Yes.

18     Q      Now, did you ever follow up to make sure something wasn't lost in

19  translation between your office and the Delaware U.S. Attorney's Office?

20     A      No.

21     Q      Okay.    I mean, is it possible that after the March 19th meeting your staff

22  communicated to Mr. Weiss's staff and something got lost in translation, that they

23  interpreted the message incorrectly?

24     A      I mean, anything is possible.

25     Q      Uh-huh.

1   A  I was very clear in my initial conversation with U.S. Attorney Weiss that we

2  would provide support.

3   Q  Uh-huh.

4   A  I know that we took steps that would signal that we were very clear in that

5  commitment. And I was very clear with my staff about what they should communicate

6  about our decision about whether we would seek to join the investigation and the basis

7  for our decision to their counterparts.

8   Q  Okay.

9  This is in March of 2022. As it reached, like, later parts in the year 2022, did you

10  ever have any followups with your staff, like, "Hey, are you sure that we haven't assured

11  the Delaware U.S. Attorney's Office that they have the green light to walk into our

12  jurisdiction and we'll help them with the logistical aspects?"

13   A  I did have a conversation or two along those lines. I can't really get into the

14  specifics of the conversation.

15   Q  When were they?

16   A  Best of my recollection, that spring.

17   Q  Okay. Like, April/May?

18   A  That timeframe, yes.

19   Q  Okay. And who were they with?

20   A  The Criminal Division chief and potentially the principal assistant.

21   Q  Okay. And what do you remember saying to them, at a high level?

22   A  So I can't get into the specifics of, or even at a high level, what it was,

23  because it would implicate ethical rules that we operate --

24  Chairman Jordan. What did you say to them? "Hey, what's going on with this

25  case that David Weiss called me about a month ago? What's happening? I know we

1    made a decision on the 19th that we were going to say, you guys can come on in but we

2    ain't joining."    Was that the nature of the conversation?

3            Mr. Graves.    It was them flagging an issue for me.

4            Chairman Jordan.    So they brought up to you that there was still a concern

5    with --

6            Mr. Graves.    Not a --

7            Chairman Jordan.    -- what was decided on the 19th?

8            Mr. Graves.    No, not a concern.

9            Chairman Jordan.    Okay.

10            Mr. Graves.    Not a concern with what was decided on the 19th.    Just kind

11   of -- I'm trying to think of how to do this.

12            I could just say at a high level, they alerted me to something about the status of

13   Delaware's investigation.

1    [11:00 a.m.]

2              BY MR. CASTOR:

3        Q    Did they say that the investigation was moving forward, or not moving

4    forward?

5        A    So --

6        Q    Obviously they mentioned it to you that they needed to raise it to your

7    level?

8        A    So -- yeah.    And, again, I can't get into the specifics.    The reason they

9    raised it with me had nothing to do with the investigation itself and more in terms of my

10   situational awareness for managing relationships with the court.

11       Chairman Jordan.    Can we go back to the initial call from U.S. Attorney Weiss,

12   now Special Counsel Weiss?    Tell me what happened in that call again exactly.

13       Mr. Weiss calls you and says:    We want to bring charges in D.C.

14       Tell me what happens.

15       Mr. Graves.    Sure.    So Mr. Weiss said that he had an investigation that he had

16   been conducting.    Some of the charges related to that investigation needed to be

17   venued out of the District, and he described the logistical support that he needed.

18       I told him we would provide the logistical support and asked him if he was also

19   interested in us joining the investigation as effectively local counsel once charges are

20   brought.

21       Chairman Jordan.    You said a couple times you brought that up.

22       Mr. Graves.    Yes.

23       Chairman Jordan.    Okay.    And then what did he say again?

24       Mr. Graves.    He said:    Definitely need the logistical support, and we can talk

25   about joining the investigation.

1       Chairman Jordan.   But then you never talked to him about that.    But you and

2   your team, your chief of the Criminal Division, the principal assistant, and one other

3   individual in the next 3 weeks, looked at whether you're going to become local counsel

4   and join.    And then, on the 19th, you have a meeting, and you decide you're not going to

5   do that?

6       Mr. Graves.    So trying to -- there was a lot in the question.    I just want to make

7   sure.

8       So let me just state it to make sure that we're on the same page.

9       Chairman Jordan.    Sure.

10      Mr. Graves.    I tasked our Criminal Division chief with immediately taking steps to

11  provide the logistical support, asked him to assign the section leadership and an AUSA

12  from the relevant section to do a quick assessment because time was of the essence, and

13  we had to make a decision quickly, and --

14      Chairman Jordan.    Why did you have to make a decision quickly?

15      Mr. Graves.    For a variety -- I can say, at a high level, we needed to make a

16  decision quickly.    I understand your question about the 3-week timeframe --

17      Mr. Castor.    He can't answer that.

18      Mr. Graves.    -- but why specifically, I can't get into.

19      Chairman Jordan.    I get it.

20      Mr. Graves.    So we had to make a decision quickly, and I instructed my team to

21  move with all speed, and they did.

22      Chairman Jordan.    And then, on the 19th, the day you decided, is that the day

23  you also communicated?

24      Mr. Graves.    I don't know if it was the exact day.    And I'm saying the 19th.    I'm

25  relying on my calendar for that being the day.    It's possible that I'm looking at the wrong

1    meeting, but it would have been sometime then, like mid- to late March.

2                     BY MR. CASTOR:

3          Q     Were you aware around that time that the White House Communications

4    Office was issuing public statements --

5          A     No.

6          Q     -- about this case, that -- so you don't remember anything that was said from

7    the podium at the White House?

8          A     Sorry.    I should have let you finish your question.

9          No, I do not.

10         Q     Okay.    Do you remember anything that was said on the Sunday shows?

11         A     No.

12         Q     Okay.    Were you aware of the President's position that, you know, he didn't

13   think his son had done anything wrong?

14         A     I don't -- I actually don't think so.    Yeah.

15         Q     Did you hear him at the debate?

16         A     Which debate?

17         Q     You know, during the debate.

18         A     Oh, like during the --

19         Chairman Jordan.    Campaign.

20         Mr. Graves.    -- campaign?

21         Chairman Jordan.    Yeah.

22         Mr. Castor.    Yeah.

23         Mr. Graves.    I watched the debates, so I'm sure that I did.    That's not something

24   that sticks out in my mind.

25                     BY MR. CASTOR:

1      Q      So, after March 19th, your office communicates to Weiss' office that you're

2      not going to join the case.      You said that there were two other times that this case sort

3      of was brought to your attention by the Criminal Division chief, right, in the spring of

4      2022?

5      A      No.      I was saying there were two times total that I recall --

6      Q      After the 19th?

7      A      Not after the 19th.      Including the 19th.      The 19th and the original

8      conversation --

9      Q      Okay.

10     A      -- were the two meetings that I recall.      I'm sure there was intervening

11     where we talked about it.

12     Q      But didn't you say -- and maybe I misunderstood, but didn't you say

13     subsequent to the 19th --

14     A      Oh --

15     Chairman Jordan.      The conversation with the Criminal Division and during the --

16     Ms. Zdeb.      Can we go off the record for one second?

17     [Discussion off the record.]

18     Mr. Castor.      Go ahead.

19     Mr. Graves.      Yes.      So yes.      They were not full-blown meetings.      It was in the

20     context of another conversation or meeting, something that I was told for my situational

21     awareness about aspects of the support that we had agreed to provide to Delaware and,

22     in fact, had provided to Delaware.

23                    BY MR. CASTOR:

24     Q      And did you instruct anyone to call Weiss' office and say, "Hey, to be sure,

25     you can do whatever you need, and we will assist you"?

1    A    I did not because I was incredibly clear in my conversation -- and I know the

2    subsequent steps that we took would have left no doubt that they knew they had all the

3    support they needed in D.C.

4    Q    My time is up, but the subsequent steps you took, you're not willing to tell

5    us what they are?

6    A    I'm not able to tell you what they are.

7    Q    Okay.

8    Mr. Castor.    Our time is up, so we'll --

9    Ms. Nabity.    Off the record.

10    [Recess.]

11    ▇▇▇▇▇.    All right.    It is 11:15.    We can go back on the record.

12                    EXAMINATION

13    BY ▇▇▇▇▇:

14    Q    Mr. Graves, before we get into our case in chief, or most of our questioning,

15    I wanted to clarify.    In the prior hour, you had previously referenced the Criminal

16    Division.    Do you recall that?

17    A    Yes.

18    Q    Was that a reference to the Criminal Division at Main Justice, or was that a

19    reference to the Criminal Division at the U.S. Attorney's Office?

20    A    Thank you for clarifying that.    That was a reference to the Criminal Division

21    within the D.C. U.S. Attorney's Office, not Main Justice.

22    Q    Okay.    And, just to put a finer point on this, the head of the Criminal

23    Division at Main Justice at that time period would have been Kenneth Polite.    It wasn't

24    Kenneth Polite that you were having conversations with, correct?

25    A    That is correct.

1      Q    Okay.   In the prior hour, we also talked about the Tax Division's

2    responsibility over certain matters and the way that you would consult with Tax Division

3    in certain instances, and I want to return to that discussion.

4         The responsibility that you're referring to is actually -- it's laid out in the Justice

5    Manual, correct?

6      A    Correct.

7      Q    So it's not specific to any particular case.   It's guidance that applies to any

8    case?

9      A    That is correct.

10      Q    Okay.   What's your understanding of why the Justice Manual grants the Tax

11    Division responsibility over these matters?

12      A    So, at a high level, my understanding is that the Tax Code is one of the most

13    complicated criminal regimes that we have.   It has, among the various levels of scienter,

14    kind of mental intent, the highest mental intent.   There are all kinds of violations of the

15    Tax Code that don't rise to the criminal level.   And you want a centralized group that is

16    very much steeped in these issues and able to make sure that tax prosecutions across the

17    country are being implemented uniformly.

18      ████.  I want to introduce -- I think this is actually exhibit 1, Justice Manual

19    section 6-1.000, which is entitled "Department of Justice Policy and Responsibilities, Tax

20    Division."

21               [Graves Exhibit No. 1

22               Was marked for identification.]

23      ████████.  There is a couple copies.

24      ████.  Oh, I think you have a couple copies there.

25    Mr. <u>Graves.</u>   Oh, I have a couple copies.   Sorry.

1          ████.   If you can pass them down.

2              BY ██████:

3      Q    Have you had a minute to review?

4      A    I have reviewed exhibit No. 1, yes.

5      Q    And have you seen this before?

6      A    I have, yes.

7      Q    So I want to look at specifically the very first sentence here.   It reads:   The

8  Assistant Attorney General for the Tax Division, subject to the general supervision of the

9  Attorney General and under the direction of the Associate Attorney General, is

10  responsible for conducting, handling, or supervising the following matters, correct?

11     A    Correct.

12     Q    And it specifically uses the word "responsible," correct?

13     A    Correct.

14     Q    It doesn't say "has authority over."   It says "he's responsible for doing these

15  things"?

16     A    Correct.

17     Q    And then there is a list of seven bullet points?

18     A    Yes.

19     Q    Okay.   So, while the Tax Division is responsible for conducting, handling, or

20  supervising these matters, the entire division is actually directed by the Associate

21  Attorney General, correct?

22     A    Correct.

23     Q    And the Attorney General himself, or herself, I guess, has supervisory

24  authority over all the matters, correct?

25     A    Yes.

1      Q      And that's true actually for everything the Department of Justice does, right?

2      A      Correct.

3      Q      So, if a U.S. attorney disagrees with the decision that the Tax Division makes,

4      they can appeal that to the Attorney General, correct?

5      A      Correct.

6      Q      And, if the Attorney General has, for example, assured a U.S. attorney that

7      that U.S. attorney will have full authority over a matter, then the Attorney General could

8      overrule the Tax Division and grant the U.S. attorney whatever it is he's seeking?

9      A      Yes.    That is correct.

10     Q      Okay.

11            BY ███████████:

12     Q      I mean, just to be clear, prosecuting authority in the Department of Justice

13     ultimately lies with the Attorney General in all cases.    Is that fair to say?

14     A      Correct.

15     Q      And he can delegate -- he or she can delegate that authority as he wishes

16     within the Department of Justice or the U.S. Attorney's Offices as he chooses?

17     A      That's my understanding.

18     Q      Okay.    So, when we had some discussion in the previous hour about

19     approvals or responsibilities of the Tax Division, all of that authority is ultimately derived

20     from the Attorney General himself, correct?

21     A      That's correct.

22     Q      And, if the Attorney General says that someone -- in this case,

23     Mr. Weiss -- has the authority to make charging decisions, do you have any reason to

24     believe that Mr. Weiss did not have that authority?

25     A      I have no reason to believe Mr. Weiss did not have that authority, and, yes,

1    the Attorney General can supersede anything in terms of the structure that's laid out in

2    the Justice Manual.

3          Q    Okay.

4               BY ██████████:

5          Q    Thank you.

6               I want to take a step back.    You talked a little bit about your background in the

7    first hour, but I want to talk about that in a little more depth.    So I understand that you

8    were appointed U.S. attorney in 2021, but way back in the 2000s, you actually worked at

9    the U.S. Attorney's Office as a career employee, correct?

10         A    That is correct.

11         Q    When did you actually first join the District of Columbia U.S. Attorney's

12   Office?

13         A    May 2007.

14         Q    And what was your role at that time?

15         A    I was a line assistant in our Superior Court Division.

16         Q    What type of cases did you prosecute in that role?

17         A    Started off prosecuting misdemeanors.    We have a rotation system in the

18   U.S. Attorney's Office for the District of Columbia because we are responsible for

19   prosecuting local crimes as well as Federal crimes, and you kind of work your way up from

20   misdemeanors all the way up to very serious felonies.

21         Q    You stayed at the D.C. U.S. Attorney's Office for a fair number of years,

22   correct?

23         A    Yes.    I left in October 2016, so 9.5 years.

24         Q    So almost a decade.    Is that fair --

25         A    Yes.

1          Q        -- to say?

2                   And, during that entire time, you were a career prosecutor?

3          A        That's correct.

4          Q        During that time, did you have the opportunity to try cases before a jury?

5          A        Yes.

6          Q        How many cases did you try before a jury?

7          A        Roughly two dozen.

8          Q        Okay.    And, during your time as a line prosecutor, did you hold any

9     supervisory positions?

10         A        Yes, I did.

11         Q        So I guess at that point you're not a line prosecutor; you're a supervisory --

12         A        Yes.

13         Q        -- prosecutor?

14                  Could you describe those positions?

15         A        I was an acting assistant chief of our Fraud and Public Corruption Section in

16    our Criminal Division, which is what we refer to as our division that prosecutes Federal

17    crimes as opposed to local crimes.    And then I ultimately became the acting chief of that

18    section.

19         Q        And when did you become the acting assistant chief?

20         A        Acting assistant chief, I believe that was in 2015.

21         Q        Okay.    And then when did you become the acting chief?

22         A        That would have been early spring of 2016.

23         Q        Okay.    What type of cases did you oversee as a supervisor?

24         A        The whole gamut of fraud, public corruption, and civil rights cases.    So,

25    in -- I can expand on that if you want, or --

1    Q    Yeah.    I mean, I think what I'm -- did you oversee white-collar crime cases

2    specifically?

3    A    Yeah.    It was exclusively what -- well, it was almost exclusively what people

4    would call white-collar crime cases.    The only one that was different is civil rights, which

5    involved officer -- which a component of that involved use of force and use of deadly

6    force by officers, which we conceptualize as a public corruption crime.

7    Q    And did your duties sometimes involve overseeing or prosecuting tax fraud

8    cases specifically?

9    A    Yes.

10    Q    Okay.    And, in fact, you were the lead prosecutor in United States v. Jesse

11    Jackson, Jr., and Sandra Stevens Jackson, correct?

12    A    That is correct.

13    Q    Who was Jesse Jackson, Jr., or who is Jesse Jackson, Jr.?

14    A    Jesse Jackson, Jr., is a prominent political figure and, at the time of the

15    investigation, was an elected Member of Congress.

16    Q    What political party does he belong to?

17    A    Democrat.

18    Q    And, in that case, Sandra Jackson actually pleaded guilty to filing false tax

19    returns, didn't she?

20    A    That is correct.

21    Q    So that was actually a tax fraud case involving a Democratic politician that

22    you prosecuted?

23    A    Two Democratic politicians.    She was a local alderman.

24    Q    A Democratic alderman?

25    A    Correct.

1      Q      And you also prosecuted Neil Rodgers, correct?

2      A      That is correct.

3      Q      Who was Mr. Rodgers?

4      A      Mr. Rodgers was a staffer to a D.C. Council member, D.C. Council member

5  Harry Thomas.

6      Q      And what political party was Mr. Thomas a member of?

7      A      Mr. Thomas was a member of the Democratic Party.

8      Q      And can you briefly describe the facts of that case?

9      A      Yes.    Mr. Thomas, who I also was part of that prosecution team, because he

10  also was prosecuted, had directed city funds to charitable organizations that he was

11  affiliated with and then had conduits at those charitable organizations who funneled the

12  money back to him.

13      Q      And was that around the time of President Obama's first inaugural?

14      A      Yes.    That would -- the conduct occurred around the time of the first

15  inaugural.

16      Q      And was some of the money actually used to fund an event of the first

17  inaugural?

18      A      Yes.    He had like -- yes.    There are -- obviously a number of people have

19  events associated with the inaugurals that might not be official inaugural event but in

20  honor of the inauguration, and some of the money was used to fund an inaugural party,

21  celebrating President Obama's first inaugural.

22      Q      So these were Democratic political figures who were using money to fund an

23  event around President Obama's first inauguration, correct?

24      A      That's correct.

25      Q      And you were the -- you prosecuted that case?

1      A      That is correct.

2      Q      Okay.    So, taking a step back, it's fair to say you've had experience

3      overseeing white-collar cases and, specifically, tax fraud cases, both as a line prosecutor

4      and as a supervisor, correct?

5      A      Yes.    And if I could just add one thing --

6      Q      Sure.

7      A      -- to your finer point, I also was part of the prosecution team that

8      prosecuted another Democratic member of the D.C. Council for bank fraud.

9      Q      Who was that?

10     A      Kwame Brown.

11     Q      And what timeframe was that?

12     A      The same timeframe as the -- it happened around the exact same time as

13     the Harry Thomas, so kind of the 2012-2013 timeframe.

14     Q      Thank you for that?

15     A      Yeah.

16     Q      Is it fair to say, talking about white-collar cases specifically, that they can be

17     complex in nature?

18     A      Yes.

19     Q      Are you familiar with the complexities that are associated with white-collar

20     cases?

21     A      Yes.

22     Q      And with tax fraud cases as well?

23     A      Yes.

24     Q      Okay.    And so you are familiar specifically with the considerations that

25     might arise when deciding whether to bring charges in a white-collar case, correct?

1      A      Yes.

2      Q      And in tax fraud cases specifically?

3      A      Yes.

4      Q      So I want to turn to some of those considerations and the considerations

5      that prosecutors take into account when deciding whether to bring charges in any matter,

6      but especially in complex matters like white-collar case and tax fraud cases.

7              We discussed the Justice Manual earlier.    Are you familiar with the principles of

8      Federal prosecution in the Justice Manual?

9      A      Yes.

10      Q      Okay.    It's section 9-27.

11      A      Yes.

12      Q      Okay.

13              ████.    Let me introduce as exhibit 2 section 9-27.220.

14                                  [Graves Exhibit No. 2

15                                  Was marked for identification.]

16      Mr. <u>Graves.</u>    Okay.    Thank you.

17              BY ████:

18      Q      And this is the section entitled "Grounds for Commencing or Declining

19      Prosecution."

20      A      Yes.

21      Q      And I believe it's on the second page.

22      A      I'm very familiar, yes.

23      Q      Okay.    And I'm actually -- we're going to look at the very first paragraph

24      under 9-27.220.    That section reads:    The attorney for the government, which is the

25      prosecutor, right?

1      A      Uh-huh.

2      Q      -- should commence or recommend Federal prosecution if he or she believes

3      that the person's conduct constitutes a Federal offense and that the admissible evidence

4      will probably be sufficient to obtain and sustain a conviction unless, number one, the

5      prosecution would serve no substantial Federal interest; number two, the person is

6      subject to effective prosecution in another jurisdiction; or, number three, there exists an

7      adequate, noncriminal alternative to prosecution.

8              Did I read that correctly?

9      A      Yes.    I'm very -- I know that off the top of my head, but I was struggling to

10     find exactly where you were reading from at first, but yes.    You --

11     Q      But -- so I read that correctly?

12     A      You read it correctly, yes.

13     Q      So, under these principles, prosecutors should only bring charges when,

14     among other considerations, they believe that the admissible evidence will probably be

15     sufficient to obtain and sustain a conviction, correct?

16     A      Correct.

17     Q      In layperson's terms, what does "admissible evidence" mean?

18     A      "Admissible evidence" means that, when you get to trial, you're going to be

19     able to introduce witness statements or documents that a court is going to say:    Yes, this

20     can come in at this trial.

21     Q      And it's evidence that meets the standards of the Federal Rules of Evidence.

22     Is that fair to say?

23     A      Correct.    Yes.

24     Q      Okay.    What type of considerations might a prosecutor take into account

25     when weighing whether the admissible evidence will probably be sufficient to obtain and

1     sustain a conviction?

2         A     Their experiences with similar cases comparing it to other cases.    They'll

3     look at defenses, particularly in the white collar context, where usually, unlike the violent

4     crime context, in the white collar context, there is actually a complete agreement on

5     what factually occurred and it's all about what is in a person's head, which is what makes

6     white-collar cases so difficult, but kind of what the defenses might be and how you're

7     going to prove beyond a reasonable doubt the significant scienter or mens rea

8     requirements.

9         Q     And are you familiar with the term "sufficiency of the evidence"?

10        A     Yes.

11        Q     What does that term refer to?

12        A     So, I mean, in general, "sufficiency of the evidence" is whether you have a

13    sufficient -- whether you have enough evidence to get over whatever the evidentiary

14    burden is at that point in the process.

15        Q     Is that something that prosecutors would take into account when

16    considering whether to bring charges?

17        A     Yes.    It's whether you have sufficient evidence to prove the case beyond a

18    reasonable doubt, which is obviously the highest standard in the legal system.

19        Q     Okay.    And I want to turn back to that in a minute.    But, along with

20    sufficiency of the evidence, does a prosecutor also consider the ability to explain the

21    charges and the evidence to a jury?

22        A     Yes.

23        Q     Why is that important?

24        A     Because of the nature of the trial process, you don't get to often kind of

25    cleanly put in, from beginning to end in a logical fashion:    This is what happens.

1          You have to introduce evidence through witnesses, and witnesses usually only

2   know a portion.    So, as you're talking about, in the white collar context, a complex fraud

3   scheme, you're constantly thinking through how am I going to prove this in a way that a

4   lay jury is going to understand, assuming as -- you know, take the same approach that the

5   journalism industry takes, that you're talking to people with a middle school education.

6          Q     And that's because jurors are any -- they're anybody, right?    They're drawn

7   from the people of the community, right?

8          A     Correct.

9          Q     And they maybe are not lawyers?

10         A     Correct.

11         Q     They maybe aren't accountants?

12         A     That is correct.

13         Q     They may not be familiar with the rules of evidence, for example?

14         A     That is correct.

15         Q     Okay.

16         A     Or, because we actually do tend to have a lot of lawyers and accountants in

17  this jurisdiction in particular that practice in areas other than the area that is the subject

18  of the case, they think they know things about the law that they actually don't know --

19         Q     And that's --

20         A     -- which is another complication for trying these cases.

21         Q     In a tax case specifically, might it be relevant if the potential defendant had

22  actually paid the taxes due?

23         A     Yes.

24         Q     Why would that be relevant?

25         A     So, in tax cases, as I was saying earlier, the Tax Code, as we probably know

1    through all of our limited experiences and then jurors would know from their limited

2    experiences, is incredibly complex, so there is lots of room for good-faith mistakes.    And

3    that's why people have all kinds of experience with people who either come under audit

4    or get a notice of tax deficiency, just paying it and it never amounting to a crime.

5         So, when someone immediately turns around and pays, you have to deal with the

6    defense, as soon as they're alerted to an issue, that this was a good-faith mistake that

7    does not rise to the level of intentionality required for a criminal violation.

8         Q    Again, speaking of things that a prosecutor might consider with respect to

9    bringing a case before a jury, might it be something to consider if the potential defendant

10   has a sympathetic personal story?

11        A    Yes.

12        Q    How can that impact a prosecutor's thinking?

13        A    So it can impact on at least two levels in the context of a tax prosecution.

14        One, you're always worried in these kinds of cases, where no one was actually

15   hurt, about juror nullification, and you have to guard against that, just because they feel

16   bad for the defendant.    But, more importantly, depending on what the sympathetic

17   nature of the story might be, that can get intertwined with the intent issue.

18        Q    How so?

19        A    So, like, hypothetically speaking, the person is going through some kind of

20   trauma or some -- or there is documented evidence of substance abuse, right?    Now

21   you're getting into defenses of:    My client was so distracted by X, or my client was under

22   the influence of Y, that, when they were filling out -- when they were working with their

23   return preparer, they just were, like, not focused on this.    That's why this was wrong,

24   not because they were trying to be evasive.

25        Q    And, to obtain a conviction in a tax fraud case, for example, is the prosecutor

1    required to prove intent?

2         A    Yes.

3         Q    And can you briefly describe in layperson's terms what that means?

4         A    It's that you knew exactly what the Tax Code required and you intentionally

5    didn't do that, which is exceedingly hard to prove in tax cases because of how complex

6    the Tax Code is.

7         Q    Thank you for that.

8         We just talked through many concerns or many issues that prosecutors should

9    consider when deciding whether to bring charges.    How do prosecutors learn to assess

10   and evaluate these types of concerns?

11        A    Some of it is through experience and supervisors who have been through

12   these cases before who will say, you know:    Well, this is how I would defend this case.

13   What are you going to do in response if that's the defense, and kind of talking through

14   those kinds of issues.

15        But, in my view, there is nothing -- no greater teacher than experience, which is

16   why, like, the supervisory chain is so important, because they've seen these cases before.

17        Q    And prosecutors -- you don't start out prosecuting white-collar crime, right?

18        A    That is correct.    Well, I mean, I should say that, in our office, you don't start

19   off prosecuting white-collar crime.    There are places within the Department you can go

20   where you can specialize in white-collar crime.

21        Q    But, in the U.S. Attorney's Office in particular, you might start off

22   prosecuting misdemeanors, right?

23        A    Yes.

24        Q    And you learn from experience doing misdemeanors, right?

25        A    Yes.

1    Q    And then you may be assigned to progressively more complex cases,

2    correct?

3    A    Yes.

4    Q    And you may be paired up with a more senior attorney to have them mentor

5    you on a more complex case, right?

6    A    Yes.

7    Q    And so my point is that there is learning -- there is a learning process that is

8    garnered through experience as a prosecutor?

9    A    That is correct, and that's just on the violent crime.    And then, when you

10   get over to the fraud and public corruption, you're not immediately by yourself doing

11   multimillion-dollar fraud cases.    It's like 100,000, 200,000, $300,000 embezzlement.

12   And then you kind of start the process all over again in the white collar context of learning

13   those cases, because prosecuting white collar is like a different animal than violent crime.

14   Q    So it's fair to say that prosecutors have fairly unique training, learn on the

15   job, and experience in assessing things like the sufficiency of admissible evidence?

16   A    That is correct.

17   Q    And it's fair to say that prosecutors have unique training and experience in

18   assessing the likelihood that the admissible evidence will be persuasive to a jury, correct?

19   A    Correct.

20   Q    So it's fair to say that prosecutors have unique training and experience in

21   assessing whether the admissible evidence is reasonably likely to result in a conviction

22   ultimately, correct?

23   A    Yes.

24   Q    In your experience, is it fair to say that investigators, whether they're from

25   the FBI or from the IRS or some other investigative entity, don't have the same

1    experience specifically with regard to assessing the admissible evidence and whether it

2    would be persuasive to a jury?

3         A    Yes.

4         Q    And is it fair to say that one unique difference between investigators and

5    prosecutors is that investigators generally do their work -- so investigators do their work

6    before the stage when the evidence is tested by trial, and prosecutors are looking at it

7    specifically with respect to the trial itself?

8         A    In general, yes.

9         Q    In some cases, the investigation might continue?

10        A    Yes.    So, I mean, just to expand on your point, I agree with the premise

11   behind the question.    So the investigators are gathering evidence and often don't see

12   how the evidence plays out in court.    Even when they themselves are called to testify,

13   they're only there for their period of when they're testifying and maybe closing

14   arguments.    So they don't see the trial process and how all this plays out, with the

15   limited exception of sometimes, in Federal cases and white-collar cases, you can have an

16   agent sitting with you -- a law enforcement agent sitting with you for the entire trial.

17        And I only raise that because that is one of the best experiences that a law

18   enforcement officer can get, because sometimes they sit through the whole trial and they

19   say:    Oh, now I see why we were having those conversations before that I didn't

20   understand.

21        Q    And, if they don't sit through that, or if they haven't had the opportunity to

22   sit through that, they might not really understand how the trial process works?

23        A    Correct.

24        Q    And they might not really understand the prosecutor's thinking?

25        A    Correct.

1    Q    Given the difference in roles between investigators and prosecutors, it's not

2    surprising that there might be differences in opinion among investigators and prosecutors

3    about the strength of the evidence and the likelihood of success at trial, correct?

4    A    Not only is it not surprising, but, in my experience, in Federal charges, blue

5    collar or white collar, it's kind of more often than not that there is some disagreement,

6    with the agents usually thinking that more charges should be brought than the attorneys.

7    Q    And, in those cases where the agents think more charges should be brought

8    than the attorneys do, the prosecutors have the final say, correct?

9    A    They have -- yes.    Well, yes.    I -- in my office, we try to do things

10   collaboratively because the agents have spent so much time and we try to talk through

11   the issues and explain to them, like:    This is -- these are the challenges we see.

12   And you hope to be able to get and we often do get to a consensus of:    Yeah, I

13   wanted to do A, B, C, X, Y, and Z before, but now I understand A, B, C.

14   There are some times where they are like:    I still think X, Y, Z, but I respect the

15   decision that you're making.

16   Q    And I appreciate that.

17   A    Yeah.

18   Q    But, ultimately, if there is -- if you can't get them to see your point of view,

19   at the end of the day, it is the prosecutors whose word goes, right?

20   A    Yes.

21   Q    And that's because prosecutors have that specialized experience we talked

22   through, correct?

23   A    Yes.    And that's our role in the process.

24   Q    Right.    They're the ones that have to present the case to the jury?

25   A    Yes.    Yes.

1      Q      So, when Mr. Weiss approached you at the end of February in 2022 and

2      asked you to consider or asked you to support -- provide administrative support in the

3      potential tax-related or potential prosecution of Hunter Biden and you asked if he wanted

4      you to join the case, he said, "We can talk about that," and then you went back and had

5      some further conversations, right, or your investigator -- your staff looked into the case a

6      little bit more, correct?

7      A      Yes.

8      Q      As they were doing that additional look into the case, was there examination

9      guided by the consideration of the Justice Manual principles we just talked through, so

10     sufficiency of the evidence, the ability to present the charge to the jury, for example?

11     A      Yeah.    I think, at a high level, I can say -- I can say yes to that.

12     Q      Okay.    Without revealing any of the actual deliberations, realizing this is an

13     ongoing case, did they consider whether there was sufficient admissible evidence such

14     that prosecutors could probably sustain a conviction from a jury in the District -- in your

15     district.

16     Ms. Zdeb.    And I think, before he answers, he can certainly talk in general about

17     the types of considerations in any case, but obviously not the specifics.

18     ██████.    Understood.

19     BY ██████:

20     Q      And I'm asking, you know, if these are considerations that apply to every

21     case, were they applied here?

22     A      So I am trying to thread this needle.    I think I am authorized to say, in any

23     case, we are going to go through these Justice Manual factors, like sufficiency of the

24     evidence.    In terms of making an assessment about whether we should proceed with the

25     case, join a case, whatever, is kind of like the process, and the normal order is that starts

1   at the line level, and that recommendation makes its way up the supervisory chain.

2   Q   And, in this case, like in any case, the prosecutors would have to show that

3   the evidence was probably sufficient to convince a D.C. jury of the defendant's guilt

4   beyond a reasonable doubt, correct?

5   A   Correct.

6   Q   So the burden of proof, we've said earlier, is beyond a reasonable doubt.

7   That's actually the highest evidentiary standard in the law, correct?

8   A   That is correct.

9   Q   Can you briefly describe what beyond a reasonable doubt is?

10   A   Yes.   It's not beyond any doubt, not beyond imagined or a fantastical

11   doubt, but beyond any doubt that any reasonable person would have about the outcome;

12   as our very good public defender service says, it's a higher standard than what you need

13   to take a child away from his or her mother.

14   Q   And it's also a higher standard than probable cause, correct?

15   A   Much higher than probable cause.

16   Q   So what's the standard for probable cause?

17   A   Probable cause is, is it likely?

18   Q   And beyond a reasonable doubt is a higher standard than the

19   preponderance of the evidence standard that's needed to obtain a judgment in a civil

20   case, correct?

21   A   Yes.   It -- yes.   Exactly.

22   Q   And --

23   A   Probable cause, preponderance of the evidence, reasonable doubt.

24   Q   And so preponderance -- what is preponderance of the evidence?

25   A   Preponderance means majority.

1      Q    So it's more than 50 percent?

2      A    Yeah.

3      Q    In your experience as a Federal prosecutor, is it fair to say that it can be

4    difficult to convince a jury, quote, "beyond a reasonable doubt," even when you have a

5    significant amount of evidence that a defendant may have actually committed a crime?

6      A    It certainly can be, yes.

7      Q    And, in order to obtain a criminal conviction, you need to not only establish

8    that the defendant is guilty beyond a reasonable doubt, but you also have to convince 12

9    jurors that you've met that standard, correct?

10      A    Correct.

11      Q    And that jury's decision has to be unanimous, correct?

12      A    Correct.

13      Q    That means that, if even one single juror has a doubt or has what he or she

14    considers to be a reasonable doubt about the sufficiency of the evidence that you've

15    presented, then that juror will be instructed to find your defendant not guilty, correct?

16      A    So what will happen is, if the jury cannot reach unanimity, if 11 jurors agree

17    a conviction and one doesn't, eventually a mistrial will be declared.

18      Q    Have you ever had the experience as a prosecutor where you felt very

19    strongly that you had presented the jury with sufficient evidence to prove a case beyond

20    a reasonable doubt, but there was one juror who didn't agree, and so the defendant

21    wasn't convicted?

22      A    Yes.

23      Q    Can you describe broadly the circumstances of that case --

24      A    Yes.

25      Q    -- or cases?

1        A       Yes.    I can.    Case or cases.    One that comes to mind, one of my first jury

2    trials, an individual was riding in the back of a car that got stopped.    Officers see in plain

3    sight a bag that contains 20 Ziplocks of an illicit substance by his feet.    They step him out

4    of the car, and they search him, and they find additional illegal drugs on him.    That was

5    an 11-1 hang for conviction.

6        Q       And, in that case, there had been evidence found in the car?

7        A       Yes.

8        Q       There had been --

9        A       Two officers testified in basically unimpeached fashion that:    I saw drugs

10   sitting next to the person.    I stepped him out of the car and found additional drugs.

11   The jury was shown those drugs.    The jury was shown photos from the scene of where

12   the drugs were, and there was one juror who held out.

13       Q       So it can be difficult to convince 12 jurors to convict a defendant?

14       A       That is correct.

15       Q       Okay.    And prosecutors, as we talked through a couple minutes ago, have

16   to consider the perspective of jurors when they make charging decisions?

17       A       That's correct.

18       Q       How do those considerations play out in your experience when prosecutors

19   are making those decisions?

20       A       I'm sorry.    In what sense?

21       Q       So, for example, might prosecutors have discussions with other prosecutors

22   to assess how the evidence might play out before a jury?

23       A       Yes.    Particularly in the white collar context, you'll have discussions with

24   your supervisors, in our office, at both the indictment phase and at the trial phase.

25   We'll assemble other people who haven't worked on the case.    We try to -- really try to

1  bring in professional staff who are not lawyers, particularly at the trial phase, to say:

2  Hey, is this all making sense?

3      Q     And, among other things, the prosecutors might discuss what's happened in

4  other similar cases, right?

5      A     That is correct.

6      Q     So, using the drug case as an example, you might say:    Well, I had a case

7  where the officers found drugs on the person of this defendant, and we still had an 11-1

8  split.

9      Right?

10     A     Yes.

11     Q     And that would inform the prosecutors as to their charging decisions?

12     A     Yes.

13     Q     Okay.    In addition to the probability of obtaining a conviction at trial, the

14  Justice Manual's principles of Federal prosecution also instruct that prosecutors must

15  consider whether there exists an adequate noncriminal alternative to prosecution,

16  correct?

17     A     That's correct.

18     Q     Was this something that you were required to consider or that your career

19  prosecutors were required to consider when deciding whether to join Mr. Weiss' case?

20     A     So it's in the Justice Manual, so on any case -- I wouldn't limit it to

21  Mr. Weiss' -- we would be required to consider that.

22     Q     And so they would be required to consider the fact that, in tax-related cases,

23  there are alternatives to criminal prosecution that are routinely pursued, such as the

24  payment of civil penalties?

25     A     So what I -- yeah.    What I can say in general is this is a regular conversation

1    that we have in the context of tax cases and other cases where there is a regulatory or

2    civil remedy.    Why are we doing this criminally as opposed to regulatory or civil?

3              █████████.   And I want to introduce as exhibit No. 3 the civil complaint in a case.

4    It's United States of America v. Robert J. Shaughnessy and Susan J. Shaughnessy.

5                                            [Graves Exhibit No. 3

6                                            Was marked for identification.]

7              BY █████████:

8         Q    And this is a 2022 civil case from the United States District Court for the

9    District of Columbia.

10        A    Okay.

11        Q    Do you recall this case?

12        A    I don't, and I don't think that this is a case that our office brought.

13        Q    So this was actually brought by the Tax Division, correct?

14        A    I believe so, although, as luck would have it, we have a member of our team

15    who is also named Emily Miller, but I believe it is a different Emily Miller.

16        Q    And we'll ask to redact that from the transcript --

17        A    Yeah.

18        Q    -- because I believe that's a line attorney.

19        A    Okay.

20        Q    But it is a tax case --

21        A    Yes.

22        Q    -- that was brought in the District of Columbia Federal district court, correct?

23        A    Yes, correct.

24        Q    In 2022?

25        A    Correct.

1        Q    And, if you look at page 2 of this complaint, the civil complaint, there is a

2   table, right?

3        A    Yes.

4        Q    And, at the table, it says that the total outstanding balance or -- refers to the

5   total outstanding tax balance as of April 18th, 2022, was almost $7 million, correct?

6        A    Yes.

7        Q    And then, on page 3, paragraph No. 8, it says that the defendants in this

8   case, despite being given notice of those taxes due, they neglected or refused to make full

9   payments of those assessments to the United States, correct?

10       A    Yes.

11       Q    And then, further down on page 3, under the prayer for relief, it says that

12   the United States respectfully prays that this court enter judgment in favor of the United

13   States.   And then it says in the amount of roughly $7 million, plus interest, correct?

14       A    Yes.   Yes.

15       Q    So this is an example of a tax case where taxes were not paid, correct?

16       A    Correct.

17       Q    And the government did bring a case, but it brought a civil case?

18       A    Correct.

19       Q    And the demand for relief was that the defendants pay the taxes due?

20       A    Correct.

21       Q    All right.   So you've explained that, when Mr. Weiss first contacted you in

22   February of 2022 and that you raised the possibility of joining the case, that your team's

23   consideration as they were evaluating that was guided, as in all cases, by consideration of

24   the Justice Manual's principles of Federal prosecution, correct?

25       A    Yes.

1      Q     Was their consideration influenced in any way by personal or political or

2  partisan considerations?

3      A     I -- it's across the board, no.    In none of our cases does that ever come up.

4      Q     Was the evaluation of the case influenced in any way by people outside of

5  your office, such as individuals at Main Justice, the White House, or elsewhere, who

6  sought to impact your decision?

7      A     No.

8      Q     And you said that you did offer to provide any and all logistical support,

9  correct?

10     A     Correct.

11     Q     And you instructed your team to provide any and all logistical support?

12     A     Correct.

13     Q     In light of that, what impact do you believe that your decision not to actually

14  join the case would have had on Mr. Weiss' efforts to prosecute Mr. Biden in the District

15  of Columbia if he chose to do so?

16     A     I, at the time, believed that my decision had no impact, and the first time

17  that I heard concerns about the decision that we reached was in the public reporting

18  around the whistleblowers' allegation.

19     Q     So in the past couple months?

20     A     Yes.

21     Q     And, if anything, your determination that you would provide him with any

22  and all administrative and logistical support actually would have made it easier for him to

23  bring the case if he so chose?

24     A     Yes.    I believe we had done everything we needed to do in order for him to

25  bring a case if he chose to bring a case.

1     Q     Okay.    And it was never your intent to block Mr. Weiss from pursuing

2     charges that he, meaning Mr. Weiss, wished to pursue against Hunter Biden, correct?

3     A     Absolutely not.

4     Q     Okay.

5            BY ███████:

6     Q     Mr. Graves, Mr. Weiss never actually asked you directly to be local counsel in

7     the Hunter Biden case.    Is that fair to say?

8     A     That's my recollection, that I was the first one to raise it.    And that kind of

9     informed my thinking that that was an ask from me as opposed to an ask from him.

10    Q     Okay.    So it's fair to say that Mr. Weiss, no one on his staff, as far as you

11    know, asked anyone at the U.S. Attorney's Office in D.C. to be a local prosecutor and was

12    denied that request?

13    A     As far as I am aware, yes.

14    Q     Okay.

15    ████.    Yes, that's accurate, what ████ said?

16    Mr. Graves.    Yes.    What you said is accurate as far as I am aware.

17    ████.    Thank you for that clarification.

18           BY ███████:

19    Q     And, also to be clear, you personally, in your position as the United

20    States attorney for the District of Columbia, never took any action to block Mr. Weiss or

21    anyone from his office from bringing any charges against Hunter Biden within the District

22    of Columbia?

23    A     No.

24    Q     And you indicated that you had some familiarity based on press reporting of

25    what the whistleblower allegations in this case have suggested, and that is generally that

1    you did block Mr. Weiss in some manner from bringing charges in the District against

2    Hunter Biden.

3           Are you aware of that allegation generally?

4    A    I am generally aware of that allegation.

5    Q    Okay.    And what is your response to it as you sit here today based on

6    everything that you know and you can share with us?

7    A    So my -- allegation or my response or my position is that that is not accurate.

8    I want to be careful and respectful, because I've worked with whistleblowers my entire

9    career.   I believe these people are saying what they believe to be true.    But, if you look

10   at a lot of the communications, it's second or thirdhand, never direct communication with

11   us after a decision was made.

12   Q    Is it fair to say that you think there may be some confusion on the part of the

13   whistleblowers as to what you did in this case in your communications with Mr. Weiss?

14   A    So I don't want to get into the specifics of this case, but I have been around

15   large institutions -- and the Department is a large institution enough -- to see the garbles

16   that can occur when there are communications across different components and people

17   aren't talking directly to each other.

18   Q    Okay.    But, to the extent that there has been public reporting that the

19   whistleblowers have said that you blocked Mr. Weiss in some manner in bringing charges

20   against Mr. Biden in the District, that is incorrect.    Is that fair to say?

21   A    The -- I'm just -- there is -- constitutionally, I don't like taking issue with what,

22   like, whistleblowers are saying.   I'd rather speak directly.   I did not take steps to block

23   any investigation by Mr. Weiss in the District of Columbia.    I offered to help.

24   Q    Okay.    And, Mr. Graves, do you know who Ken Wainstein is?

25   A    Yes, I do.

1          Q      How do you know him?

2          A      He was the U.S. attorney for the District of Columbia during the kind of -- the

3    early part of the George W. Bush administration.

4          Q      Did he happen to hire you when you became a prosecutor at the

5    U.S. Attorney's Office?

6          A      So it's -- it's funny.    He was the U.S. attorney when I started the process.    I

7    knew him from before.    We had multiple rounds of interviews.

8          He saw me at the first-round interview, and he asked what I was doing there.

9          And I told him I was interviewing.

10         And he asked if he wanted me to hire him on the spot.

11         And I said, I don't think it works that way.    I think we have to go through this

12   process.

13         By the time I got to the third round, which is the interview with the U.S. attorney,

14   he had actually transitioned out of that role, and Jeff Taylor was in that role.

15         Q      Okay.    Mr. -- sorry.    Go ahead.

16         A      Yeah.    Mr. Taylor is a lifelong Republican, had worked in the White House

17   and had worked in Senate Judiciary Committee, and so I had my final interview with him.

18         Q      And Mr. Taylor hired you then?

19         A      Yes.

20         Q      Did you have any concerns about becoming a prosecutor under a Republican

21   U.S. attorney?

22         A      So not necessarily, but a little bit of context and a story that I think goes to

23   your question.    So this was right around the period of the point when there were a lot of

24   inquiries into whether there was political influence on career hires.    And we were kind

25   of the first U.S. attorney class coming up, and the person who had just put in this -- been

1    put in this role and had no connection to D.C. -- and Mr. Wainstein had had a connection

2    to D.C. and had all of this political background in addition to being a career

3    prosecutor -- was the person I was interviewing with.

4         So I didn't quite know what to expect.    I tell this story all the time.    We got in.

5    He saw my resume, saw that I had done advance for Clinton-Gore and started asking

6    about politics.

7         And I was like:    Oh, no, here we go.

8         And he said:    I don't care about your political background.    I'm a lifelong

9    Republican.    When we do this job as prosecutors, we prosecute.    Can you check politics

10   at the door whenever you do anything?

11        I said:    Absolutely.

12        He's like:    You're hired.

13        So -- well, he didn't say it in the interview, but, like, that was the question -- the

14   real question he wanted to ask.    And he was one of the greatest U.S. attorneys I served

15   under, and it's a conversation that I remember and I repeat often.

16        Q    And so, when you became a prosecutor at the U.S. Attorney's Office, it was

17   your intention to be a career prosecutor and not to be influenced in any way by politics of

18   the person who was at the head of the office.    Is that fair to say?

19        A    That is correct.

20        Q    And, in your experience in that office for 10 years as a career prosecutor, is

21   that the way you were allowed to do your work?

22        A    Absolutely.

23        Q    Nonpartisan?

24        A    Absolutely.

25        Q    And, as a U.S. attorney currently, do you have anything that you would like

1    to share about how partisanship does or doesn't influence the decisions that you make?

2          A    It doesn't influence in any way whatsoever.    As you pointed out in the

3    earlier questioning, every elected official that we've ever ultimately prosecuted was a

4    Democrat.    That is irrelevant to us.    It is simply these Justice Manual requirements and

5    whether they are met.

6          Q    Okay.    So there has been an allegation made that Mr. Weiss, quote, "went

7    to D.C. U.S. Attorney's Office in early summer to request to charge there," and the, quote,

8    "Biden-appointed U.S. attorney," end quote, said that you couldn't charge in the district.

9          Do you have any response to being referred to in that context as the, quote,

10   "Biden-appointed United States Attorney"?

11         A    I mean, it is true, like every other presidentially appointed, Senate-confirmed

12   U.S. attorney that is currently serving, that I was appointed by the President.    But the

13   fact that I was appointed by the President, if this is the insinuation, has absolutely nothing

14   to do with the charging decisions that we make in any case.

15         Q    I'm sorry.    Mr. Graves, let me just -- one last set of questions.

16         You were asked a little bit about your experience as a prosecutor when there was

17   a disagreement between what investigators saw in the evidence and what prosecutors

18   might see in the evidence.    Do you have any opinion based on your experience as to why

19   investigators tend to sometimes overvalue evidence as compared to what prosecutors

20   might think?

21         A    It's because they're looking at it -- in my experience, first, they're kind of not

22   seeing how all this plays out in trial.    Second, their job is to kind of assemble facts and

23   build a narrative, and they do a great job of that in general, by the way.    But they

24   don't -- because this isn't their job or their training, they don't see the ways in which that,

25   you know, house they assembled can be taken apart brick by brick.

1      Q      Does it surprise you when investigators complain that prosecutors are trying

2      to block them, for example, or not allowing them to take investigative steps that they

3      think that they should be able to take?

4      A      That can happen from time to time, for sure, in all kinds of different cases.

5      Q      It's not that uncommon for that kind of complaint to happen, right, in the

6      context of a criminal investigation, that an investigator might think that the prosecutor is

7      holding them back in a sense?

8      A      Yes.    That can happen, particularly in complex cases.    There are all kinds

9      of really complex strategy decisions you have to make, and looking at a proposed action

10     in isolation, you might have one view of it.    But, if you're the attorney and you're

11     thinking about how this might play out before a court or before a jury, you might have a

12     different view of it.

13     Q      And often the investigators are not lawyers.    Is that right?

14     A      That is correct.    They are often not.    They are typically not.

15     Q      And they may not have the same responsibility as prosecutors to consider a

16     defendant's constitutional rights, for example?

17     A      I think they have a duty to consider the constitutional rights, but I don't think

18     they are as necessarily attuned to all the nuances because they're not attorneys.

19     Q      Understood.

20     ███████.    Thank you.    We can go off the record.

21     [Recess.]

22              BY MR. CASTOR:

23     Q      I want to go back to that 3-week period that you testified about, in March

24     of 2022.

25              First, Mr. Weiss called you, and you told him that you'd be able to assist with

1    whatever he needed, correct?

2         A    That is correct.    And I just want to clarify.    I'm going off my best of my

3    recollection.    Roughly 3 weeks.

4         Q    Okay.    And then you went through a process where your principal assistant,

5    the Criminal Division chief, the head of the Fraud Civil Division and the Public Corruption

6    Division, and your line AUSAs evaluated something, correct?

7         A    Correct.

8         Q    And do you know if those meetings occurred in person that they had?

9         A    I do not know.

10        Q    Do you know if Lesley Wolf, the AUSA in Delaware, came to D.C.?

11        A    I don't know.    But, just to reorient, that's at a time when we are still under

12    maximal telework, so that would -- I could speculate.    That would -- a lot was probably

13    done virtually.

14        Q    Okay.    Do you know if any of your personnel went to Delaware?

15        A    I am not aware of that.

16        Q    And do you know what type of paper was exchanged?

17        A    I do not know.

18        Q    Do you know if your team reviewed the special agent report prepared by

19    Agent Ziegler?

20        A    So I know they have reviewed investigative material.    What investigative

21    material specifically, I don't know.

22        Q    And were you aware that DOJ Tax had also prepared a report recommending

23    charges?

24        A    Not aware.

25        Q    Okay.    So you didn't review that report?

1      A    I did not review any underlying case material.

2      Q    Okay.   And you didn't review any PowerPoint presentations that may or

3  may not have been made?

4      A    No.

5      Q    Okay.   So you didn't evaluate any paper?

6      A    No.   My briefing from my team was oral.

7      Q    Okay.   Now, there is a little bit of a disconnect.   I mean, during the last

8  hour, there was some back and forth about how D.C. juries are very tough, and you

9  walked us through a case that I believe you said you were involved with where they found

10  all the evidence you would ordinarily need to --

11     A    Yes.

12     Q    -- convict somebody, and yet you were unable to get that conviction.

13     A    Correct.

14     Q    Did your team communicate that to the Delaware U.S. Attorney's Office, that

15  D.C. juries are real tough?

16     A    I think what I can say at a high level was that I told my team to explain why

17  we weren't going to seek to join the investigation.

18     Q    Now, earlier this morning, you said that joining an investigation after it's

19  already started, like halfway through, would be very unusual, correct?

20     A    In my experience, yes.   Usually, if you join or partner, it's at the beginning

21  of an investigation, not the end.

22     Q    Right.   So the Hunter Biden investigation began in -- at least the IRS portion

23  of it began in 2018, and then the Justice Department portion began in 2019.   So several

24  years had unfolded by the time you evaluated whether to join, correct?

25     A    So I am not tracking all those details.   What I can say at a high level --

1          Q      Right.

2          A      -- was that I was aware that U.S. Attorney Weiss had been a U.S. attorney in

3      the prior administration, and he was one of two of those U.S. attorneys held over because

4      he had an ongoing investigation involving Hunter Biden.      But, prior to him calling me, I

5      think I don't know much -- I didn't know much more than that.      So whether it started

6      in -- by definition, it would have had to have started before the current administration

7      came in.      How long he was doing it, I don't know.

1       [12:12 p.m.]

2                   BY MR. CASTOR:

3       Q       Now, the fact that he was held over, was it your understanding that he was

4       held over particularly for this case?

5       A       So I'm just going off of public reporting, nothing internal, but that was my

6       understanding from public reporting.

7       Q       And why do you think whoever made that decision wanted to hold Mr.

8       Weiss over?

9       A       I couldn't -- I mean, I could only speculate.

10      Q       Is it because he was a Republican-appointed U.S. attorney and the

11      investigation involved the son of a Democrat Presidential --

12      A       So, I mean, anything is possible.    It's also, if there is a long-running

13      investigation, there's continuity in keeping the entire --

14      Q       Uh-huh.

15      A       -- supervisory chain in place.

16      Q       Right.    Have you heard the Attorney General state, though, that the reason

17      he was kept was that he was a Republican-appointed U.S. attorney?

18      A       I certainly haven't heard the Attorney General say that, and I haven't seen

19      that in any of the reporting.

20      Q       So, no?

21      A       Yeah, no.    I mean, like, I've had no conversations with the Attorney General

22      about this issue generally, and in public reporting I don't recall seeing anything along

23      those lines.

24      Q       Have you recalled anyone at the Justice Department touting the fact that

25      Weiss was a Trump appointee that made him a good prosecutor for this case, because

1   he's supposedly not aligned with President Biden?

2          A      No, I don't -- no.    No.

3          Q      No?

4          A      No.

5          Q      So the only reason, in your mind, that Mr. Weiss was held over was because

6   he had this investigation ongoing.

7          A      So that's the thing I knew for certain.    I could speculate about other

8   reasons.    I'm not saying what you're saying is necessarily unreasonable.    I just don't

9   know that.    I've never heard that.

10         Q      Do you think there's a perception that maybe Weiss could be viewed as

11  more fair because he's not a Democrat-appointed U.S. attorney to begin with?

12         A      Um --

13         Q      It's a good look, isn't it?    It's certainly a good look.

14         A      I understand what you're saying.    I understand what you're saying.

15         Q      You knew it was a good look, right?

16         A      I mean, kind of in the way "good look" -- I mean, I understand the optics

17  issue there, yes.

18         Q      And it's a good look optically, right?

19         A      Well, you're leaving in place the person who was in charge of the

20  investigation before you were -- before the administration changed.

21         Q      Okay.

22                And along the same lines, I mean, you can certainly understand how some

23  Republicans might have concerns that a U.S. attorney appointed by President Biden might

24  have some conflict-of-interest types of issues, weighing in on a case against the

25  President's son.

1          A      I mean, people can have whatever concerns they might have.    I do not view

2    it that way.    And I'm not aware of any ethical canon that says that U.S. attorneys have

3    an obligation to recuse whenever --

4          Q      But you can --

5          A      -- a family member of the President is implicated.

6          Q      But you can certainly understand a reasonable person might wonder

7    whether a U.S. attorney appointed by President Biden can fairly make a decision on a

8    case involving his son.

9          A      So, kind of -- I mean, I wouldn't -- I don't even know that I would necessarily

10   go that narrow.    I understand that people have questions when we make

11   determinations about matters of significant public consequence all the time about the

12   basis.

13         Q      What would be the process in your office today if you did have a conflict of

14   interest?    Who would be the decision-maker?

15         A      So we have an ethics officer within our office who is the first line that we run

16   potential conflicts of interest past.    That can lead to -- from there, it can go to the

17   General Counsel's Office of the Executive Office for United States Attorneys.    And the

18   Associate Deputy Attorney General who's responsible for ethical matters can also become

19   involved when there are questions about whether recusal is required.

20         Q      So, hypothetically, let's say you did have a conflict of interest.    You ran it

21   through that process --

22         A      Yes.

23         Q      -- and it was determined that, in fact, you did have a conflict of interest.

24   Who would then be the decision-maker in your office?

25         A      So --

1          Q      Who would you defer to?

2          A      -- I mean, it depends.    I mean, sometimes the conflict is resolved by -- it

3    could be deemed a district-wide conflict, and it's taken away from the district and

4    assigned to another U.S. Attorney's Office.

5          Q      Uh-huh.

6          A      In other instances, it could be -- you know, within our office, it

7    would typically become -- the Principal Assistant United States Attorney would be the

8    final decision-maker.    And if she had a conflict like me, then it would go --

9          Q      Okay.

10         A      -- to one of our division chiefs.

11         Q      So, in your office, is the principal assistant considered the number two?

12         A      The principal assistant is the number two, yes.

13         Q      Okay.    And did you ever contemplate deferring this matter to her?

14         A      No.

15         Q      Why not?

16         A      Because there was no conflict of interest and no reason for me to do so.

17         Q      You may have felt that way, but others looking from the outside optically

18   might have felt differently, that a U.S. attorney appointed by President Biden wasn't a fair

19   arbiter of a case involving President Biden's son.

20         A      So --

21         Q      I mean, that's not an outlandish thing to suggest.

22         A      I understand what you're saying.

23         Q      Uh-huh.

24         A      I am saying there is no ethical reason for me to put this decision on someone

25   else.    And, in my experience, when you start trying to do things that aren't required to

1    placate people on the outside --

2        Q      Uh-huh.

3        A      -- you still wind up with those accusations despite what you did.

4        Q      Okay.    Do you think U.S. Attorney Weiss was kept in his position to placate

5    people on the outside?

6        A      No.

7        Q      No?

8        Do you know who kept U.S. Attorney Weiss on, whose decision that was?    Was

9    that the decision of the Justice Department, or was that the decision of the White House?

10       A      I don't know.

11       Q      Now, during the last hour, counsel asked you questions about the types of

12   considerations that you went through, citing the Justice Manual.    And I was a little, I

13   guess, confused, because it seemed like you were walking us through potentially the

14   decision-making process that your office made with respect to this particular case.

15       And that just struck me as a little bit different than what you had said in the first

16   hour when we were speaking with you, that this was a decision for the U.S. attorney in

17   Delaware to make.    Could you help us resolve that?

18       A      So what I was trying to do in the last hour when I was getting asked

19   questions about specifically was this factor considered in the context of this case, to say,

20   in general, in all cases, the principles of Federal prosecution, factors like sufficiency of the

21   evidence, are things that we are considering at all points, and taking it out of the context

22   of an assessment about whether we should seek to join this particular case.

23       Q      Right.    But you also have said that the decision whether you would join this

24   case would be unusual, because the case had been ongoing for a number of years.

25       And so I took -- and maybe you can correct me if I misunderstood what you were

1    saying.    But I took what you said this morning, in the first hour, that after the case had

2    been up and running for a couple years, it would be very unusual for you to join.    In your

3    experience, you hadn't had any case in your experience where after a number of years

4    had unfolded that you would decide to join it.

5         A    It would be -- so, yes, it would be unusual to -- in my experience, it would be

6    unusual to join an investigation, just in general, that is late in the process.    In my

7    experience, if a component has been conducting an investigation for a period of time,

8    they, in general, don't want to bring in another supervisory chain, because they've

9    already gotten all the sweat equity and now you're just adding additional layers of

10    supervision.

11        Q    So --

12        A    In --

13        Q    Go ahead.    I'm sorry.

14        A    In terms of the jurisdiction in which the case is gonna be brought, it's a really

15    complicated analysis.    There's, in general, all the concerns I was talking about before

16    about, kind of, buying an investigation largely sight unseen.    On the other side, people

17    are gonna be in your jurisdiction litigating potentially complex issues that could result in

18    case authority that you are then subsequently stuck with.

19        So there's, like, a whole host of complications that weigh for and against in any of

20    these cases where you're considering getting involved.

21        Q    Right.    But, you know, you told us about that you spent 3 weeks going

22    through this analysis.    And I'm just confused, why you didn't tell Mr. Weiss from the

23    beginning, hey, whatever you need, you just come into D.C. and we will help you get the

24    grand jury set up and we'll give you a copy of the local rules, that type of stuff.    Like, you

25    went through a 3-week process that ended in either a declination or a decision not to

1    partner.

2        So I'm just trying to reconcile those two things.

3        A    That's a good question that it's hard to get into without case-specific, but I

4    think you are absolutely right.    If one were inclined not to join from the outset, that

5    conversation could've gone a very different way.

6        Q    Right.

7        A    I could've not even brought up joining, and I could have simply said, we'll

8    provide you whatever support you need.

9        Q    Right.    So don't you think going through the process, the 3-week process,

10    you know, sends the message to Delaware that this is a loser of a case and you shouldn't

11    bring it?

12        A    No.    I mean, I've told you I didn't know anything factually about the case

13    before that call.

14        Q    But I'm talking about the end of the 3-week process.

15        A    I'm sorry.    Can you repeat the question then?

16        Q    At the end of the 3-week process, you told Delaware that you didn't want to

17    partner or you didn't want to join, whatever words you want to use.    Don't you think

18    that may have had the effect of trying to convince them not to bring the case?

19        A    No, not -- no.    No, I don't.    And that certainly, just to be clear, was not the

20    intent of why we went through the 3-week process.

21        Q    Okay.

22        A number of witnesses -- and it's not just Ziegler and Shapley.    We've heard from

23    two FBI officials.    We've heard from IRS officials.    If there's one thing that's clear,

24    nobody thinks that your office was willing or interested to partner on this case.    You

25    know, whatever semantics you want to use -- you either denied the case, you didn't want

1    to partner, you neglected to join, like, whatever.    And Shapley and Ziegler testified that

2    Weiss himself, you know, characterized your decision as, you know, a failure to partner.

3         And that's very different than, "Hey, you can have anything you need, and you're

4    welcome to bring a prosecution, and we'll help you."

5         A    So, I mean, I can't get into and I'm not tracking the details of what everyone

6    said.    I can just tell you -- and lay out the chronology again.

7         And one thing I want to be clear on:    A lot of your questions are assuming that

8    the conclusion of that process was known at the outset.    And --

9         Q    Right.

10        A    -- that's not the case.

11        Chairman Jordan.    Why'd you --

12        Mr. Castor.    Go ahead, sir.    Sorry.

13        Chairman Jordan.    Well, why'd you offer it on the front end, then?

14        You said earlier that U.S. attorneys don't like to partner, you don't want two cooks

15    in the kitchen.    But this is a -- they'd already done 3 years of investigation.    And he calls

16    you and says, hey, we're looking to bring this case.    And then he said you volunteered to

17    partner with him or potentially partner with him.

18        So why'd you offer it on the front end?

19        Mr. Graves.    So I just want to clarify something you said.    In general, if you're

20    the U.S. attorney who has been conducting an investigation for a long period of time, you,

21    in general, don't want to bring another U.S. attorney into the decision-making chain.

22    The calculus is different if you're the recipient of the request, if the investigation is

23    coming to your jurisdiction.

24        And, I mean, what I can say at a high level, I think, is, I made the ask because it

25    was something I wanted to explore.

1          BY MR. CASTOR:

2          Q    And at the end of the 3-week process, you communicated to Delaware,

3    through your staff, that you didn't want the case to be brought.    Is that correct?

4          A    I had my staff reach out and explain that we weren't going to seek to join

5    and explain why.

6          One other point that hasn't come up:    I did follow up to confirm that that

7    conversation occurred, and I asked if --

8          Q    Which conversation?

9          A    The conversation I just described, my staff communicating our decision --

10         Q    Okay.

11         Chairman Jordan.    After the 19th meeting.

12         Mr. Graves. -- to them --

13         Chairman Jordan.    Got it.

14         Mr. Graves.    -- to ask how the meeting went or if any additional information was

15    learned.

16          BY MR. CASTOR:

17         Q    And what did they tell you?

18         A    They told me how the meeting went.    And I did not receive any additional

19    information.

20         Q    And that communication you had was with your first assistant or who -- head

21    of the Criminal --

22         A    I can't remember whether it was the head of the Criminal Division or --

23         Q    Or your principal assistant?

24         A    -- lower-level supervisors.    It might've been directly with the lower-level

25    supervisors.

1          Chairman Jordan.   And how did that meeting go?   What was the feedback?

2          Mr. Graves.   I can't get into specifics, but, like, at a high level, I think I am

3    authorized to say that they conveyed that we weren't going to seek to join, our rationale

4    and our thought process about why we weren't going to seek to join, and we did not

5    receive any information back that would cause us to change our analysis.

6                BY MR. CASTOR:

7          Q     And, during the course of that, did your staff communicate to Delaware that

8    they were welcome to bring the case themselves, that you would do everything possible

9    to facilitate that?

10         A     So I don't know if that happened during the course of that conversation,

11   because I didn't participate in that conversation.   Based on what I know was occurring at

12   that time in terms of what we were facilitating, there is no doubt in my mind that they

13   understood they could bring whatever charges they wanted in the District.

14         Q     And do you know why they later characterized your decision as blocking the

15   case?

16         Ms. Zdeb.   Who is "they"?   The whistleblowers?

17         Mr. Graves.   So I think -- and this is what I was referring to earlier.   I think I have

18   seen the whistleblowers initially use language of "blocking."   I've definitely seen

19   correspondence from now-Special Counsel Weiss saying there was no blocking, and then

20   this shifting to "partnering" and "not partnering."

21                BY MR. CASTOR:

22         Q     What was your understanding of Mr. Weiss's authority to bring this case?

23         A     So, from my perspective, I never thought about it in terms of his authority.

24   It's a fellow U.S. attorney that has a matter that he believes needs to be brought.

25         Q     Uh-huh.

1    A    I'm not saying, "What is your basis for doing so in D.C.?"    I'm immediately

2  shifting to, "What do you need from us?"

3    Q    Uh-huh.    Did he ever communicate to you that the Attorney General had

4  given him authority to bring the cases he needs?

5    A    I don't recall if that came up in our conversation.    And, again, that would be

6  of no significance to me.    The last thing I'm thinking when he's calling is, "Well, what is

7  your basis for doing these charges in D.C.?"    It's, "You're doing an investigation that you

8  say you've realized you have to bring charges in D.C.    Let's talk about how you get it

9  done."

10    Q    Uh-huh.    So you didn't have a discussion with Mr. Weiss about special

11  counsel authority?

12    A    No.

13    Q    When was the first time you learned that he was interested in special

14  counsel authority?

15    A    Through the public reporting of the Attorney General naming him to be

16  special counsel.

17    Q    Okay.    But before that, there was -- I mean, the Attorney General testified

18  on a couple different occasions.    I'm sure you were watching the letter exchange that

19  Mr. Weiss sent to the Hill, correct?

20    A    That is correct.    And, like, at a high level, my understanding was, the

21  Attorney General was of the position that then-U.S. Attorney Weiss had not asked to be

22  special counsel.    And I hadn't seen anything from then-U.S. Attorney Weiss saying that,

23  at a point in time earlier to him being named special counsel, he needed to be named

24  special counsel.

25    Q    Right.    But, during that letter exchange, didn't it strike you as maybe a

1      point in time that you needed to call and clarify to Mr. Weiss that if he needed to bring

2      anything in D.C. that he would have your support?

3              A      During the letter exchange?    No.    And my chronology could be off,

4      because I am following this as a recipient of news, but, like, in the middle of all this, there

5      was a negotiated resolution as well.

6              Q      Uh-huh.

7              Well, in June of this year -- that was before any negotiated resolution -- Weiss

8      wrote to Mr. Jordan and stated, "I've been granted ultimate authority over this matter,

9      including responsibility for deciding where, when, and whether to file charges and for

10     making decisions necessary to preserve the integrity of the prosecution."

11             Is that, like, accurate?

12             A      To my understanding, yes.

13             Q      Because before getting special counsel authority, for Mr. Weiss to bring

14     some of these charges, he would've needed, as we discussed this morning, the approval

15     of the Tax Division.

16             A      So, again, I don't know the specifics of this case.    The way the Justice

17     Manual is set up, certainly Tax Division approval would be required.

18             Q      Uh-huh.

19             A      But the Justice Manual exists under the Attorney General's authority.    So, if

20     he wants to say in a particular case that consultation and approval is not going to be

21     required, he can say consultation and approval is not required.

22             Q      But doesn't he have to go through the 28 United States Code 515 process?

23             A      Well, I guess that's a process one could go through.    I'm not sure that 515

24     would necessarily take you out of Tax Division approval necessarily.

25             Q      Is there another way the Attorney General can grant Weiss ultimate

1    authority?

2           A     So I'm not sure of all the ways.    I mean, from my perspective -- because I

3    can tell you, as U.S. attorney, 515 is not something that I have ever dealt with --

4           Q     Right.

5           A     -- these are just worked out more informally, which is my frame of reference

6    of, "Okay, you have charges you want to bring.    We'll work it out.    You'll get charges

7    brought here."

8           Q     When Weiss said, "I've been granted ultimate authority over this matter,

9    including responsibility for deciding where, when, and whether to file charges," did that

10   strike you as a little odd?    I mean, he's essentially saying he can walk right into D.C. and

11   file charges without your input.

12          A     In the context of the investigation, no, it didn't strike me as odd.    And, like I

13   said, it's an -- it was a preexisting investigation, and I understand the reasons for having

14   him continue to run it.

15          Q     But as of June 7th, that's a totally untrue statement, what Weiss said here.

16   I mean, he did not have ultimate authority.    He had to go through the Tax Division.

17   And if he was going to bring charges in Los Angeles or D.C., he had to go through the U.S.

18   attorney.

19          A     So I don't know that that's -- again, I don't know that that's an untrue

20   statement.    I mean, again, I never got to the intellectual point of what happens if I just

21   say, no, we're not going to facilitate you doing anything in here, what's going to happen

22   next, because it never crossed my mind to do that.

23          Q     Right.

24                But then he follows up on June 30th, okay -- this is well before the special counsel

25   status in August -- and he essentially acknowledges that his June 7th letter was incorrect.

1       And he writes, "I stand by what I wrote" -- which, of course, is an euphemism for

2    "I need to correct it" -- "but wish to expand.    As the U.S. Attorney for the District of

3    Delaware, my charging authority is geographically limited to my home district."    Okay?

4       So, going back to what he said on June 7th, he did not have ultimate authority to

5    bring cases in D.C.    Isn't that correct?

6       A    I'm not sure.

7       Q    He didn't have the ultimate authority to bring cases in Los Angeles, right?

8       A    I don't know.

9       Q    Well, I mean, he now, on June 30th, he's saying that is, in fact, the case,

10   which totally contradicts the June 7th letter.

11      "If venue for a case lies elsewhere, common departmental practice is to contact

12   the United States Attorney's Office for the district in question and determine whether it

13   wants to partner on the case."

14      Now, you've testified that you went through a 3-week process and determined

15   that you did not want to partner on the case, correct?

16      A    So I'm not sure what he means by "partner" in that context, but, yes, we

17   weren't going to join.

18      Q    Right.

19      A    Now, if he means, by "partner," are they going to support us, then we'd

20   already said in the initial call, we'll support you guys returning whatever charges you want

21   to return in our district.

22      Q    Right.

23      "If not, I may request special attorney status," which, as of June 30th, he didn't

24   request special attorney status, pursuant to 28 United States Code 515.

25      "Here I have been assured that, if necessary, after the above process, I would be

1    granted 515 authority in the District of Columbia."

2        So isn't he saying that, for him now to bring charges, he needs 515 authority in

3    D.C.?

4        A    So I'm -- I can hear the words you're saying as you're reading it.   I have no

5    firsthand knowledge, so I can just kind of surmise, in the way that you can surmise, what

6    he is saying.

7        Q    But what he says in the June 30th letter, in fairness, contradicts what he said

8    in the June 7th letter and contradicts what you've told us.

9        A    So, I don't see it that way.

10       Q    Okay.

11       A    I mean, I see the June 30th letter as a clarification of the June 7th letter,

12    which is consistent with --

13       Q    Uh-huh.

14       A    -- my understanding of where things were, which is that he is running an

15    investigation and he has authority to bring the charges, and the Attorney General is going

16    to work to make sure, if it comes to it, that he can bring charges in whatever jurisdiction

17    he wants.

18       Q    But --

19       Chairman Jordan.   Could you tell him "no"?

20       Mr. Graves.   So, could I have told him, "No, we're not going to support you, I'm

21    not going to make my grand jury available"?   I mean, I never considered it, but I guess I

22    could've told him "no."

23       Chairman Jordan.   Okay.   So, then, where's the authority coming from?

24       Mr. Graves.   Because I could get a call from the Office of Attorney General

25    saying, "You are going to."

1          Chairman Jordan.    Well, based on what Steve just read you, what authority does

2    he have that says he can bring the case when, where, and whether he decides to bring

3    charges at all?    What authority is that?

4          Mr. Graves.    So, as I --

5          Chairman Jordan.    And how does he get that authority?    Because you said it's

6    not 515, so what is it?

7          Mr. Graves.    So, as I understand the letters and the public reporting, he was

8    given assurance by the Attorney General, who heads our department, that he is going to

9    be able to bring whatever charges wherever he wants to bring charges that he thinks are

10    appropriate.

11          So, I mean, I can -- this has never happened, but I can make all kinds of

12    determinations I want to make on my own.    If the Deputy Attorney General or the

13    Attorney General calls me up and says, you are going to do the opposite of what you said,

14    I am going to do the opposite of what I said.    That's the way the Department works.

15                BY MR. CASTOR:

16          Q    If this was real, if this was actually the case, don't you think the Deputy

17    Attorney General's Office or the Attorney General's Office would've looped you in before

18    these letters were sent?

19          Like, if Weiss was really going to bring a case in D.C., okay, if that was a genuine

20    possibility, okay, don't you think they would've looped you in, rather than just, like, have

21    you learn about this in the letter exchange?

22          A    No, not really.    I mean, I think this is --

23          Q    No?

24          A    Again, while the situation is unique, it is not uncommon for cases to start in

25    one jurisdiction and venue to lie in another jurisdiction, and we all just work it out

1    amongst each other.    We're not saying, what authority are you acting pursuant to?

2    We are one Department.    And if we have someone else who is, you know, the head of

3    an office, and in this case a Presidentially appointed Senate confirmed head of his office,

4    that wants to bring charges --

5         Q    Uh-huh.

6         A    -- the immediate mindset is, we're going to support it.

7              And I think the Attorney General and the Deputy Attorney General know that's

8    out there, and they don't need to kind of lay the groundwork for the request that's

9    coming in.

10        Q    Right.

11             But isn't it likely that your office, when you communicated back in March of '22,

12   on March 19th -- subsequent to March 19th, that the message received from Mr. Weiss

13   was, no, you can't do it in D.C.?

14        A    I cannot -- I don't know, since I didn't have conversations with him, what

15   message he heard when he got briefed.

16        Q    Right.

17        A    I'm presuming he got briefed by his team.

18        Q    Right.

19        A    It would be hard for me to believe that, given the steps that we had taken,

20   but anything is possible.

21        Q    Okay.

22             Weiss sent another letter in July, July 10th --

23        A    Uh-huh.

24        Q    -- a couple weeks later, and he asserted to Senator Graham, "I have not

25   requested special counsel designation pursuant to 28" -- the CFR -- "CFR section 600.

1    Rather, I had discussions with departmental officials regarding potential appointment

2    under 28 U.S.C. 515, which would have allowed me to file charges in a district outside my

3    own without the partnership of a local U.S. attorney."

4        So Weiss is now saying that, for him to bring a case outside of the District of

5    Delaware, he needed to go through, you know, 515 or at least through senior officials of

6    the Department.

7        A    Sorry, what's the question?

8        Q    So this -- I mean, these words indicate, in Weiss's own mind, he didn't have

9    the ability to bring the case in D.C. like you've testified.

10       A    So I don't read the correspondence that way.

11       Q    Okay.    So your testimony is, if Weiss wanted to bring a case in D.C., he

12   could've done it and you would've assisted, without 515 authority.

13       A    So let me take a couple steps back.

14       My understanding, which was largely informed by public statements, is that the

15   Attorney General had given his assurance to U.S. Attorney Weiss that he would get

16   whatever he needed from the Department in order to bring the charges that he thought

17   was appropriate in the venue that he thought was appropriate.

18       Which would include, from my reading of the public statements and what I've

19   heard, if he ultimately needed it, a grant of 515 authority to act outside of Delaware.

20   There are all kinds of ways short of 515 that these charges could have been brought in

21   D.C.

22       Q    Right.    But, according to your testimony, he didn't need 515 authority,

23   because you were gonna let him come into D.C. and do it if he really wanted to.    You

24   weren't gonna partner --

25       A    So we didn't --

1       Q      -- but you were gonna facilitate.

2       A      Yeah, so we didn't have conversations along those lines.    But, like, what

3   one could do, right, if you wanted to proceed, is, he could ask to have all of his trial team

4   designated as special assistant United States attorneys in D.C., and they would be

5   designated as such, and --

6       Q      And did you tell him you were willing to do that?

7       A      Never -- that never came up.    But they would be designated as such, and

8   then a grand jury indictment would be returned under my name.

9       Q      Right.    But your conversation in March of 2022, you said you told him that

10  he could have whatever he needed to bring the charges.    And there was a question of

11  whether you'd officially partner or join --

12      A      Uh-huh.

13      Q      -- but, regardless of whether you'd officially partner or join, you'd still

14  facilitate him bringing a case.

15      A      Correct.

16      Q      Okay.    But that's, like, totally different than what he says in the July 2023

17  letter and these letters where he says, if I need to bring charges outside of my district,

18  without the partnership of a local U.S. attorney, you know, I had to go through either 515

19  authority or some other, you know, process.

20          So does he misunderstand, like, what you communicated to him?

21      A      I mean, I can only speculate as to what is going on in his mind.

22      Q      Uh-huh.

23      A      The solution that I just laid out, if we weren't going to put our own AUSAs on

24  the trial team, he might've deemed that inadequate and he might've preferred 515 over

25  that solution.

1          Q     Uh-huh.

2          A     I don't know.     We never had that conversation.

3          Q     Okay.

4                How frequently, in your experience, do you decline to partner when a U.S.

5     attorney from -- you know, AUSA from Maryland or AUSA from Virginia or some other

6     State asks you to partner?

7          A     So it doesn't happen -- it happens; it doesn't happen all that -- well, let me

8     strike that.

9                It's not framed that way.     It is framed as -- and, again, this doesn't happen all that

10    often -- "We have this case that we need to bring," and they're usually not looking for us,

11    in those instances, to staff the cases.     They're usually looking to figure out a way of

12    getting the cases charged in our district.     And we work with them on that, as we offered

13    to work with --

14         Q     Okay.

15         A     -- U.S. Attorney Weiss here.

16         Q     So is it fair to say there's, sort of, two tracks when venue lies outside of your

17    district?    Track one is you join, you partner, you team up; and then, if you join, if you

18    partner, if you team up, you put your AUSAs on the trial team.     Correct?

19         A     No.   I thought you were going to describe two different tracks.

20         Q     Okay.   Well, what are the two tracks, in your mind?

21         A     The two tracks, in my mind, are the AUSAs from the other jurisdiction just

22    come in and handle everything themselves --

23         Q     Okay.

24         A     -- or the other jurisdiction just transfers the case to us and then we

25    prosecute it.

1     Q     Okay.

2     A     I can't think of a situation where it's the hybrid model that you just --

3     Q     Okay.

4     A     -- described, where it's two offices joining --

5     Q     So what was Weiss looking for here?

6     Chairman Jordan.     Yeah.     Was he track one, track two, or hybrid?

7     Mr. Graves.     So, again, this wasn't explicitly said, but he was talking about -- my

8     recollection of the conversation was, he was immediately talking about what he needed

9     to do and the support that he needed to complete that.     So my frame of --

10    Chairman Jordan.     Was it track one or track two?

11    Mr. Graves.     -- my frame of reference, how I'm hearing it, is, he is most focused

12    on getting his charges brought by his people in the District.

13    I am the one that introduces the idea of, "Hey, can we maybe join up with this?"

14    And he says, "We can discuss that."

15    Chairman Jordan.     Well, why would you do that?     If that's not one of the two

16    tracks, why would you do that?

17    And you just told us earlier that U.S. Attorney's Offices, when they're on the

18    receiving end, someone's coming in, they don't like that.     The investigation's been going

19    for 3 years; you've got, as I said before, two cooks in the kitchen then.

20    Why would you offer that?

21    Mr. Graves.     So the giving end, in my experience, rarely -- the end that already

22    has the case very rarely wants to do that, for all of the reasons you just articulated.

23    Chairman Jordan.     Right.

24    Mr. Graves.     The end that's on the receiving end of it is looking at things

25    differently.     And I laid out some of the considerations before.

1       Like, you know, particularly in complex matters where there's gonna be a lot of

2   litigation, you can have authority generated in the course of those cases that you're stuck

3   with.    And if you have a bunch of people who aren't from the jurisdiction litigating those

4   issues -- and this has happened to us with Main Justice components before -- that can

5   have massive programmatic consequences for you.

6       Chairman Jordan.    And 3 weeks later, you decided you didn't want to go that

7   route.

8       Mr. Graves.    Yes, that is correct.

9       Chairman Jordan.    Okay.    So you can't have it -- I guess the point we're making

10  is, you can't have it every way.    You can't say there's two tracks, but then you

11  offered -- and you don't like the second track, necessarily, or you do like the second track

12  because it's gonna be in your district and you're gonna work with them, and then 3 weeks

13  later decide you don't want to do it and there's this hybrid model.

14      I mean, that's what's creating all the confusion, not to mention the three different

15  things we got from U.S. Attorney Weiss in the correspondence to Congress.

16      Mr. Graves.    So let me try to unpack everything.    So what I'm talking

17  about -- because we are talking about two tracks in a different context.

18      Putting aside this investigation, the cases that I've typically seen where there has

19  been a venue issue -- a gun case where someone is going back and forth over Eastern

20  Avenue, which is the dividing line between us and Maryland in one quadrant, and the

21  case actually should've been brought in a different jurisdiction -- those cases, the

22  conversations are, are we gonna bring people in as SAUSAs, special assistant United

23  States attorneys, or are we going to transfer the case to the right jurisdiction?    Like, how

24  are we logistically gonna make it work?

25      I agree that, in general, I can't think of a time where in an ongoing case U.S.

1    Attorney's Offices have teamed up.

2         As a career prosecutor, I had a case where I had an investigation, the Southern

3    District of New York had an investigation; the same company was the target of the

4    investigation.   We ultimately agreed that we should do it in one jurisdiction and we

5    would team up and have our resolution together.   But that wasn't talking about trying a

6    case together, which is a different animal.

7         There are a host of reasons not to join an existing -- any existing investigation.

8    There are also countervailing reasons to join an investigation that is gonna come into your

9    jurisdiction that might be of some significance and likely will lead to the creation of

10   binding authority.   And those weigh against each other.   And that's what we had to

11   weigh against each other on an incredibly short and compressed timeframe.

12              BY MR. CASTOR:

13   Q    It's very unusual for Weiss to call you directly, right?   You've only had one

14   conversation during this saga, right?

15   A    So, I mean, I don't know that I'd characterize it as unusual.   I would say, in

16   the past, that when these issues have come up, they've kind of started at the line level

17   and worked their way up.   There are some obvious sensitivities around this one --

18   Q    But, clearly, Weiss called you because he wanted to bring a case in D.C.,

19   right?

20   A    Yes.

21   Q    So he wanted to bring a case in D.C.   And, you know, as I understand what

22   you're saying, there are two tracks:   Either you take over the case for him, or you

23   facilitate him prosecuting the case.

24   A    Yes.

25   Q    So that 3-week process, was that an evaluation of whether you were gonna

1    take the case over for him?

2    A    It was an evaluation of whether we would continue the conversation that I

3    started about whether he'd be open to us joining the case.

4    Q    Okay.    And so would that have been a hybrid model?

5    A    That would've been the rare hybrid model that we were proposing --

6    Q    Okay.

7    A    -- yes.

8    Q    So there are three tracks.

9    A    I've never seen track three before, in all candor.

10    Q    Okay.

11    So Weiss wanted, though -- Weiss wanted to bring the case.    Did he tell you he

12    needed your help, your partnership?    Did he need that hybrid model?

13    A    No.    And that was after our communication -- after we communicated that

14    we were not gonna explore potentially joining the investigation, I never heard anything

15    about that decision.

16    Q    So I think we're just wondering why you couldn't have just facilitated track

17    one and let Weiss bring the case himself with his own U.S. attorneys.

18    A    We could have started in that position.    And that's where we ultimately

19    landed of what we were going to do.    From my perspective, we were back in what we

20    are now calling track one.

21    Q    Uh-huh.    But, unquestionably, I mean, Weiss believed that you had denied

22    him the ability to bring a case in D.C.

23    A    I don't know what he believed, and that's not my read of the letters,

24    necessarily.

25    Q    It's not just what he wrote in the letters.    It's what was related to the

1    witnesses that we have subsequently spoken with -- I mean, all the witnesses, from, you

2    know, the two FBI officials, who aren't whistleblowers by any stretch --

3        A    Uh-huh.

4        Q    -- you know, in addition to the two whistleblowers, and then the IRS officials

5    who are more senior than the whistleblowers, who had direct communication with Weiss.

6        A    Uh-huh.

7        Q    I mean, universally, their understanding was, the D.C. U.S. Attorney's Office

8    denied us the ability to bring the case, or declined to partner, or whatever word you want

9    to use.

10        Ms. Zdeb.    I think those are two separate things.    And I am concerned that what

11    you just said mischaracterizes at least some of the testimony that witnesses have

12    provided.

13        Mr. Graves.    So I have never heard that the ability to go forward was predicated

14    on our decision of whether we should assign one of our own AUSAs to the case or not.

15    Which is essentially what we're talking about:    Are we gonna have an assistant United

16    States attorney from the District of Columbia on the case?

17        Chairman Jordan.    I just want to make -- we can simplify this.    Like, it's either

18    they bring the case or you take over the case.    That's how it's always worked, until this

19    one.

20        And, in this one, there was this hybrid model put forward where -- and it was

21    offered by you.    And you said, we can partner with you, you know, like we're a partner,

22    whatever, we can join with you, we can -- this different model than what's ever been

23    used, this different model.    And then you take 3 weeks to discuss it and decide, no,

24    we're not gonna do that, and it's back to they bring the case.

25        Mr. Graves.    So --

1          Chairman Jordan.    Is that summarizing it?

2          Mr. Graves.    Yeah, so let me clarify.    When I'm saying "not used," it's not

3    something we typically do with other U.S. attorneys -- it's not something we do generally

4    with other U.S. Attorney's Offices, because, in general, U.S. Attorney's Offices don't work

5    together.

6          What I had in the back of my mind and what I've definitely seen before is, when

7    Main Justice components come into our jurisdiction, special counsel's offices come into

8    our jurisdiction, it's not uncommon for us to assign an assistant if that component wants

9    an assistant on those cases as special counsel.

10          Chairman Jordan.    But that wasn't this case.    This is just another U.S. attorney.

11    This wasn't Main Justice; this wasn't a special counsel.

12          Mr. Graves.    It is another U.S. attorney, but it is another U.S. attorney -- this isn't

13    some gun case that happened to go across Eastern Avenue.    This is a white-collar case

14    where they're -- this is a white-collar case where, based on the nature of the charges

15    contemplated, you could expect that there is gonna be a lot of litigation and litigation

16    that might create binding precedent in our jurisdiction.

17              BY MR. CASTOR:

18      Q    Were you aware that a statute of limitations was about to expire?

19      A    I don't think I'm allowed to get into that, given the contours of what I've

20    been authorized to discuss.

21      Q    Were you aware of the nature of the 2014 and 2015 income at issue here

22    that was not reported?

23      A    Yeah, I don't think I'm allowed to get into that, given the contours of what I

24    have been allowed to discuss.

25      Q    But do you know the answer?

1      A    So, again, if I get into that I know the answer, then that's a backdoor way of

2   getting into --

3      Q    I don't think so.    You either know the answer or you don't know the

4   answer, but that doesn't get into the substance.

5      A    Um --

6      Q    If all the restrictions the Justice Department has imposed on you were lifted,

7   would you be able to answer my question?

8      A    So, to be clear, the reason the restrictions exist is because we are trying to

9   protect the integrity of an investigation that is very much ongoing.    Like, what is and is

10   not in that investigation I don't know, and I, candidly, in my role, should not know.

11      So I'm trying to be very careful not to say anything which we acknowledged at the

12   outset might become public that could be deleterious to that investigation.

13      Q    Okay.

14      Can I have that exhibit?

15      This is exhibit 4?

16      The <u>Reporter.</u>    Uh-huh.

17      Mr. <u>Graves.</u>   Well, this is convenient.

18      Mr. <u>Castor.</u>   Yeah.

19                       [Graves Exhibit No. 4

20                       Was marked for identification.]

21       BY MR. CASTOR:

22      Q    This is an email from Eric Schwerin, one of Hunter Biden's business

23   associates.

24      A    Uh-huh.

25      Q    In the fourth paragraph -- take your time reading it.    I'm gonna direct your

1 attention to the fourth paragraph, though, when you're ready.

2  A Okay, I've read it.

3  Q Page 2 is an easier one to read.

4  A Yes, page 2 was very easy to read.

5  Q Were you aware that, in 2014 and 2015, in the Hunter Biden case -- we're

6 talking about the Burisma income. I mean, he's making, like, a million bucks a year for

7 doing nothing except, potentially, political favors.

8  Were you aware that the 2014 and 2015 income hadn't been captured for tax

9 purposes?

10  A So, again, I appreciate -- and I'm reviewing the exhibit. Again, I can't get

11 into the ongoing investigation and facts that were considered and not considered during

12 the course of it, because it gets into our internal deliberations.

13  Q Last hour, Democratic counsel asked you -- you know, you were talking

14 about how intent is very tricky with tax cases sometimes. Is that right?

15  A Yes, it can be, in general.

16  Q Okay. But if you have an email from your business partner whose -- you

17 know, Eric Schwerin's job was to manage this money for Hunter Biden. If you have an

18 email to the potential defendant which states, "In 2014" -- this is the fourth paragraph

19 down, second sentence of the fourth paragraph.

20  "In 2014 you joined the Burisma board and we still need to amend your 2014

21 returns to reflect the unreported Burisma income. That is approximately $400,000 extra

22 so your income in 2014 was closer to [$1.2 million]."

23  This is a pretty good piece of evidence that goes to intent, isn't it?

24  A So what I can say in general, in the context of -- in general about tax returns

25 is, in my experience, individuals who have businesses and complicated taxes are not

1    preparing their tax returns themselves.    There is a tax-return preparer.    So, in tax cases

2    in general, it often comes down to what was and was not communicated to the tax

3    preparer --

4         Q    Okay.

5         A    -- and what the taxpayer directed others to tell.

6         Q    Uh-huh.

7         A    So it could be that you have a communication where someone is talking

8    about income.    Well, then you have to trace down, did the taxpayer expect that person

9    to tell the tax preparer?    Did the person actually forward the --

10        Q    Okay.

11        A    -- document to the tax preparer and it --

12        Q    I mean, you sound --

13        A    -- got lost?

14        Q    -- like a defense attorney for Hunter Biden.

15        A    No, but this is -- but, like, this is very serious.    This is what you have to do as

16    a prosecutor.

17        Q    Right.

18        A    You have to think through all the defenses and how we're going to disprove

19    it.

20             I have to go down and deal with, if I'm in a tax case like this, saying, "In addition,

21    you reported a million dollars of income that all went to RSB, and you report 180,616 --

22        Q    Right.

23        A    -- in income that also went to RSB.    You didn't receive this in cash, and it is

24    really phantom income.    So, like, I have questions about, did you over-report?"    And all

25    of that gets complicated in a tax-evasion scheme.

1      So that's just one example of --

2      Q      But Schwerin is telling Hunter Biden, "You didn't report your Burisma

3    income."   He's getting a million bucks a year -- you know, $83,000, I think, a month.   I

4    mean, isn't this at least a good piece of evidence that goes to intent?

5      A      I can't judge from the outside of the investigation.   I'd also note that this is

6    in 2017, so it's clearly some retrospective.   I'd have questions about whether the taxes

7    were paid, because that could be consistent with a good-faith mistake.   So it's very

8    complicated.

9      Q      Okay.

10      During your discussions with your team in March of 2022, was statute of

11    limitations brought up?

12      A      Again, I can't get into internal deliberations.   What I can say at a very high

13    level -- and I have acknowledged today, we were -- I instructed my team to operate on a

14    very tight and compressed timeframe and to do the best we could do.   And that wasn't

15    arbitrary, that we were doing that.

16      Q      Do you think Weiss and his team believed you had a gatekeeper role here?

17      A      I don't know.   I had always assumed not, because of the steps we were

18    taking to facilitate the bringing of charges.

19      Q      What did your team tell you about the result of the -- you had your meeting

20    March 19th.   Your team then communicated to the U.S. Attorney's Office in Delaware

21    the outcome of that meeting, that you weren't gonna join, you weren't gonna partner.

22    What feedback did you get from your team about how Weiss reacted?

23      A      So, to my understanding, U.S. Attorney Weiss was not part of that

24    conversation that occurred at the career level.

25      Q      Okay.

1      A      At a high level, what I can say is, there certainly weren't concerns raised

2    about an inability to go forward if we didn't assign an assistant to the case.

3      Q      Uh-huh.

4      A      And to the extent substance of the investigation and that kind of stuff was

5    discussed, there was nothing that I learned that was new --

6      Q      Okay.

7      A      -- that was from that conversation.

8      Q      Do you think Weiss thought he needed a D.C.-based U.S. attorney from your

9    office on the trial team?

10     A      So I'd always been under the impression -- my belief was, no, he didn't think

11   that.

12     Q      Okay.

13     A      Because, remember, when I raised, would you be open to us adding

14   someone, he said that's something we would discuss.    It wasn't, like, "Absolutely.    We

15   can't go forward without you adding someone."

16     Q      Right.

17     A      That was not the response that I recall.

18     Q      Okay.    So, then, were you surprised when you saw his letters, which -- you

19   know, the plain language of the letters indicates that he thought he needed you.

20     A      I don't read the letters that way, necessarily, collectively.    I read the letters

21   as saying either I was gonna partner with them, whatever partnership looks like --

22     Q      Uh-huh.

23     A      -- whether that's just them kind of making my people special assistants or

24   them adding an assistant to the case so that we're full-fledged partners --

25     Q      Uh-huh.

1        A       -- or I was gonna get authority under 515.    And I knew that I would get

2   authority under 515, because the Attorney General told me, if it came to that, he would

3   do that.

4        Q       Uh-huh.

5        Who is J.P. Cooney?

6        A       He is a career prosecutor who was in our office.

7        Q       Is he one of the people involved with the March 19th meeting?

8        A       So, again, I'm gonna go through Office of Legislative Affairs in, kind of,

9   providing specific names.

10       Q       I mean, I just want to know if he was involved with this particular meeting.

11   Was he one of the four -- he was not the principal assistant, we know that, right?

12       A       So --

13       Ms. Zdeb.    I'm sorry.    I think what Mr. Graves has said a couple of times now is

14   that, to the extent you have questions about individuals --

15       Mr. Castor.    I do.

16       Ms. Zdeb.    -- who participated, that we are happy to discuss those with you

17   offline, but, given the concerns he has expressed about the safety of his prosecutors, that

18   we would prefer not to discuss names --

19       Mr. Castor.    Yeah.    I'm very sensitive --

20       Ms. Zdeb.    -- in a transcript -- in a transcript.

21              BY MR. CASTOR:

22       Q       I'm very sensitive to safety concerns, but come on.    I'm asking you whether

23   J.P. Cooney was in the March 19th meeting.    Let's get real.    That's not going to, you

24   know, invoke safety concerns here.

25       A       What I can tell you is, I've unfortunately had way too many instances of

1    documents getting into the public domain that have our prosecutors' names in them and

2    me receiving what we call urgent reports about security concerns because of threatening

3    or harassing behavior that they're receiving --

4        Q    Uh-huh.

5        A    -- and that we've had to take steps for a number of people in our office to

6    mitigate the risk.

7        Q    Okay.    So you're refusing to acknowledge whether he was in this March

8    19th meeting?

9        A    I am laying forward what I would believe to be a very reasonable

10   accommodation, not to have this in a transcript which we all acknowledge might become

11   public at some point in time.

12       Q    Okay.    Do you want to go off the record and tell us?

13       Ms. Zdeb.    Are you going to redact his name?

14       Mr. Castor.    I said go off the record and you can tell us.

15       Ms. Zdeb.    Why don't we take this question back, Steve?

16       Mr. Castor.    So you're not willing to go off the record and tell us; then it wouldn't

17   be in the transcript.    And then -- so it's like a totally different answer now.

18       Mr. Graves.    So --

19       Mr. Castor.    I'm inviting you to go off the record, and then it's not in the

20   transcript.

21       Ms. Zdeb.    The scope of what he's here to talk about and --

22       Mr. Castor.    That's a whole different topic.

23       Ms. Zdeb.    Well, I understand, but he has been here for some time now

24   discussing --

25       Mr. Castor.    It's 1 o'clock.    It's not been that long.

1          Ms. <u>Zdeb.</u>   -- the scope of Mr. Weiss's authority and --

2          Mr. <u>Castor.</u>   Right.

3          Ms. <u>Zdeb.</u>   -- the issue of the perception or lack thereof of him being blocked in

the District.

5          Mr. <u>Castor.</u>   Uh-huh.

6          Ms. <u>Zdeb.</u>   It does not explicitly include the name and identity of every person in

his office or any other office that may have participated in that process.

8          Mr. <u>Castor.</u>   But when I first started asking about the 3/19 meeting, I was told

that, yeah, you can have the names, you just can't do it on the record.

10         So now I'm inviting everyone to go off the record to give us the name, and now I'm

getting a different answer, correct?

12         Ms. <u>Zdeb.</u>   I think what he said was, let's confer -- why don't you confer with the

Office of Legislative Affairs.

14         Mr. <u>Castor.</u>   I'm conferring with you right now.

15         Ms. <u>Zdeb.</u>   And we are happy to continue conferring after the interview is done.

16         Mr. <u>Castor.</u>   Okay.   So you're not willing to go off the record and tell us.

17         Ms. <u>Zdeb.</u>   I'm not willing to do that right now, given the concerns that have

been expressed.

19         Mr. <u>Castor.</u>   Okay.

20         We've got, like, a minute left, boss.   Got anything else?

21         Chairman <u>Jordan.</u>   Off the record.

22         Mr. <u>Castor.</u>   Okay.   We're done with our hour.

23         Mr. <u>Graves.</u>   Great.

24         [Recess.]

25         ███████<u>.</u>   It is 1:16.   We can go back on the record.

1          BY ████████ :

2          Q     U.S. Attorney Graves, we had talked through the letters that Mr. Weiss sent

3     to Congress in the prior hour pretty extensively, but I don't think the letters were actually

4     put in front of you at any stage.    So I want to walk through the letters themselves and

5     just ask you if you have any information that contradicts them.

6          So we will start with the June 7, 2023, letter from Mr. Weiss to Chairman Jordan.

7     We'll mark that as exhibit 5.

8                              [Graves Exhibit No. 5

9                              Was marked for identification.]

10         Mr. Graves.    Okay, I'm prepared.

11         BY ████████ :

12         Q     Have you seen this letter before?

13         A     I have.

14         Q     Okay.    And so you know that this letter, it's actually -- it's a response that

15    Mr. Weiss sent to a May 25th letter from Chairman Jordan.

16         A     I see that in the body of the letter.    I have not seen the May 25th letter.

17         Q     Okay.    And this letter is a response to Chairman Jordan's letter about the

18    matter involving, among others, Robert Hunter Biden, correct?

19         A     That is my understanding from reading the June 7th letter, correct.

20         Q     Okay.

21         The second paragraph of this letter reads, quote, "While your letter does not

22    specify by name the ongoing investigation that is the subject of the Committee's

23    oversight, its content suggests your inquiry is related to an investigation in my District.

24    If my assumption is correct, I want to make clear that, as the Attorney General has stated,

25    I have been granted ultimate authority over this matter, including responsibility for

1    deciding where, when, and whether to file charges and for making decisions necessary to

2    preserve the integrity of the prosecution, consistent with federal law, the Principles of

3    Federal Prosecution, and Departmental regulations."

4          Did I read that correctly?

5          A    You read that correctly.

6          Q    Are you aware of any information which contradicts Mr. Weiss's statement

7    that he was granted ultimate authority over this matter?

8          A    No.

9          Q    Are you aware of any information that contradicts Mr. Weiss's statement

10   that his authority over this matter includes responsibility to decide where, when, and

11   whether to file charges?

12         A    No.

13         Q    And are you aware of any information that contradicts Mr. Weiss's

14   statement that his authority over this matter includes making all decisions necessary to

15   preserve the integrity of the prosecution?

16         A    No.

17         Q    And I want to turn to the last paragraph of this letter, which is actually on

18   page 3 of the letter.

19         That paragraph reads, quote, "In February 2021, I was asked to remain as United

20   States Attorney for the District of Delaware to continue my oversight of the matter.

21   Since that time, I have fulfilled my responsibilities, consistent with Department practices

22   and procedures, and will continue to do so.    Throughout my tenure as U.S. Attorney my

23   decisions have been made -- and with respect to the matter must be made -- without

24   reference to political considerations."

25         Did I read that correctly?

1          A     You read that correctly.

2          Q     Are you aware of any information that contradicts Mr. Weiss's statement

3    that his decisions in this matter have been made without reference to political

4    considerations?

5          A     I am not aware of any such information.

6          Q     Okay.

7          So, following Mr. Weiss's June 7, 2023, letter, Chairman Jordan wrote to Mr. Weiss

8    directly.    Mr. Weiss responded on June 30, 2023, and I'm going to introduce that letter

9    as exhibit 6.

10                              [Graves Exhibit No. 6

11                              Was marked for identification.]

1     [1:21 p.m.]

2          Mr. Graves.    All right.

3               BY ▮▮▮▮▮▮:

4     Q     Have you seen this letter before?

5     A     I have.

6     Q     Okay.    The third paragraph of this letter reads:    First, the Department of

7     Justice did not retaliate against, quote, an Internal Revenue Service, IRS, criminal

8     supervisory special agent and whistleblower, as well as his entire investigative team, for

9     making protected disclosures to Congress.

10          Are you aware of any information that contradicts this statement?

11    A     I am not.

12    Q     The June 30th letter then quotes his June 7th letter.    That's at the bottom

13    of the first page.

14    A     Yeah.

15    Q     And then it continues on, on the second page.    As the U.S. attorney -- I'm

16    sorry.

17          It says that:    I stand by what I wrote and wish to expand on what this means.

18          And then it continues:    As the U.S. attorney for the district of Delaware, my

19    charging authority is geographically limited to my home district.    If venue for a case lies

20    elsewhere, common departmental practice is to contact the United States Attorney's

21    Office for the district in question and determine whether it wants to partner on the case.

22    If not, I may request special attorney status from the Attorney General pursuant to 28

23    U.S.C., section 515.    Here, I have been assured that, if necessary after the above process,

24    I would be granted section 515 authority in the District of Columbia, the Central District of

25    California, or any other district where charges could be brought in this matter.

1       Did I read that correctly?

2      A    You read that correctly.

3      Q    Are you aware of any information that contradicts Mr. Weiss' statement that

4    he was assured that he would be granted by section 515 authority if another U.S.

5    Attorney's Office declined to partner with him on the case?

6      A    I am not aware of anything that contradicts that statement.

7      Q    And, finally, Senator Lindsey Graham, who is the Republican senior ranking

8    member on the Senate Judiciary Committee, wrote to Mr. Weiss on June 28, 2023, and

9    Mr. Weiss responded on July 10th, 2023.

10          █████.  We'll introduce that as exhibit 7.

11                    [Graves Exhibit No. 7

12                    Was marked for identification.]

13    Mr. <u>Graves.</u>   Okay.

14      Q    The first sentence of the third paragraph on the first page of this letter

15    reads, quote:   To clarify an apparent misperception and to avoid future confusion, I wish

16    to make one point clear.   In this case, I have not requested special counsel designation

17    pursuant to 28 C.F.R., section 600, et seq.

18          28 C.F.R., section 600, et seq, gives the Attorney General authority to appoint a

19    special counsel, correct?

20      A    Yes.

21      Q    Okay.   Are you aware of any information that contradicts Mr. Weiss'

22    statement that, as of July 10th, 2023, the date of this letter, he had not requested special

23    counsel designation pursuant to 28 C.F.R., section 600, et seq?

24      A    I am not.

25      Q    Okay.   The July 10 letter continues, quote:   Rather, I had discussions with

1    departmental officials regarding potential appointment under 28 U.S.C., section 515,

2    which would have allowed me to file charges in a district outside my own without the

3    partnership of the local U.S. attorney.    I was assured that I would be granted this

4    authority if it proved necessary.    And this assurance came months before the October 7,

5    2022, meeting referenced throughout the whistleblower's allegations.    In this case, I've

6    followed the process outlined in my June 30 letter and have never been denied the

7    authority to bring charges in any jurisdiction.

8            Did I read that correctly?

9        A    Yes, you did.

10       Q    To the best of your knowledge, is it accurate that Mr. Weiss was never

11   denied the authority to bring charges in any jurisdiction?

12       A    Yes.

13       Q    And is it true specifically with respect to the District of Columbia that Mr.

14   Weiss was never denied authority to bring charges in the District of Columbia?

15       A    Yes.

16       Q    Okay.

17           BY ██████████:

18       Q    Okay.    Mr. Graves, on September 20th of this year, Attorney General

19   Garland testified before the House Judiciary Committee, and he told the committee that,

20   quote:    Mr. Weiss has full authority to conduct his investigation however he wishes,

21   unquote.

22           Do you have any information to contradict that portion of the Attorney General's

23   statement?

24       A    No.

25       Q    The Attorney General also said, quote:    Mr. Weiss had, as I said from the

1    beginning -- at the very beginning -- that he had authority over all matters that pertain to

2    Hunter Biden, end quote.

3         Do you have any information to contradict the Attorney General's statement in

4    that respect?

5         A    No.

6         Q    To sum up, do you have any reason to believe that David Weiss lied to

7    Congress about the extent of the authority -- excuse me, not Weiss -- but that the

8    Attorney General had lied to Congress about the extent of the authority he had been

9    granted?

10        A    Absolutely not.

11        Q    I want to ask you just a little bit -- there's some confusion, I think, on this

12   committee and in the public about the authority that Mr. Weiss had.

13        And do you understand, just generally as a prosecutor, the difference between a

14   factual question and a legal question?

15        A    Yes.

16        Q    And generally, witnesses who are involved in testimony like you are today

17   are asked factual questions, correct?

18        A    Correct.

19        Q    But we may have to ask you a legal question, if you wouldn't mind giving me

20   a little bit of latitude here, because it seems to me that the confusion is a legal question

21   and not so much a factual question.

22        There, in the previous hour, were suggestions that the Attorney General may not

23   have had the authority in some respect under statutes to allow Mr. Weiss to bring

24   charges in the District of Columbia.    Do you recall those questions or suggestions from

25   the previous hour?

1          A     Yes.

2          Q     Okay.

3          A     Yes.

4          Q     And, I mean, as you sit here before us, you don't have a statute in front of

5    you, but you do have the experience of being a United States attorney in the District of

6    Columbia, correct?

7          A     Correct.

8          Q     Okay.

9          ████████.    I'm going to show you what we're going to mark as exhibit 8, and this

10   is a statute.

11                              [Graves Exhibit No. 8

12                              Was marked for identification.]

13               BY ███████:

14         Q     It's 20 U.S.C., section 509.    Just the first page, I think, is what you'll have in

15   front of you.

16               Let me ask you first, are you familiar with this statute, Mr. Graves?

17         A     I am not.

18         Q     Okay.    Just direct your attention to section 509, which is the bold part of

19   the first column.    It's entitled "Functions of the Attorney General."

20               If you just want to review that brief section.

21         A     Yes.

22         Q     Let me know when you've had a chance to see it.

23         A     Yes.

24         Q     Okay.    Now, this statute says, quote:    All functions of other officers of the

25   Department of Justice and all functions of agencies and employees of the Department of

1    Justice are vested in the Attorney General except these functions.

2         And then it lists, under paragraph 1 there, vested -- those vested by subchapter 2

3    of chapter 5 of title 5, administrative law judges?

4    A    Yes.

5    Q    And then it accepts certain responsibilities in the Federal Prisons Industries,

6    correct?

7    A    Correct.

8    Q    And, finally, it accepts certain responsibilities in the board of directors and

9    offices of the Federal Prison Industries, Inc., correct?

10   A    Correct.

11   Q    But everything else, at least according to this statute, is vested in the

12   Attorney General by 28 U.S.C 509, correct?

13   A    Correct.

14   Q    Okay.    Based on your experience as a lawyer and particularly a United

15   States attorney in your reading of the statute, is there any reason that you would have to

16   believe that Attorney General Garland did not have the authority to delegate to Mr.

17   Weiss the ability to bring any criminal charges against Hunter Biden anywhere in the

18   United States in any venue he chose?

19   A    I'd have no reason to doubt that the Attorney General has that authority,

20   and it is my belief that the Attorney General has that authority.    We all act at the

21   direction of the Attorney General unless the Attorney General directs us to do something

22   illegal, immoral, or unethical.    We have an obligation to file.    And, to be clear, the

23   Attorney General has never directed me or anyone else, to my knowledge, to do anything

24   illegal, immoral, or unethical.

25   Q    Okay.    So we talked at length about certain policies of the Department of

1    Justice and certain, I guess, procedures that are outlined in the Justice Manual.    For

2    example, in tax cases that you might have to go to the Tax Division to get certain

3    approvals or permissions.

4          All of that approval or permission of policy, those are policies that are at the

5    discretion of the Attorney General of the United States.    Is that fair to say?

6          A    That is my understanding, yes.

7          Q    Okay.    So, if he promises to Congress -- the Attorney General, that is -- that

8    Mr. Weiss is going to have the authority to bring any charge anywhere in the United

9    States in any district, there's no reason, as far as you understand it, that that was not the

10   case here?

11         A    Correct.    And he has the authority to deliver on that -- he uniquely has the

12   authority to deliver on that commitment.

13         Q    Okay.    And I think that when Mr. Castor earlier was going through his

14   interpretation of Weiss' letters before we had entered them into the record, he was

15   suggesting to you that Attorney General Garland couldn't have promised Weiss the

16   authority that he said he did because of section 515, for example, or because of these

17   policies in the Justice Manual that talk about approvals from the Tax Division.

18         But Mr. Garland has explained that what he meant was:    Mr. Weiss had the

19   authority because I said I would give it to him.

20         Do you have any reason to believe that Mr. Garland was being insincere in that

21   respect when he said that Mr. Weiss did have that authority?

22         A    Absolutely not.

23         Q    Okay.

24              BY ███████:

25         Q    There was discussion earlier about option one, option two, option three.

1    And I lost a little track of it, but I think option one was just offering administrative

2    assistance, and that's it.

3         And there was a statement made that, ultimately, you did offer administrative

4    assistance, but it came at the end of this 3-week period.    But that wasn't accurate, right?

5    A    That is -- that is correct that that was inaccurate.

6    Q    Okay.    So when did you agree to provide any logistical or administrative

7    support that Mr. Weiss could need?

8    A    From the first call that Mr. Weiss made to me, we immediately began taking

9    steps on providing support.

10   Q    And he was aware that you were doing that?

11   A    My understanding is, yes, his people were made aware of what we were

12   doing and -- yes, of what we were doing.

13   Q    Okay.    And I think you said you could have declined to do that, correct?

14   A    Yes.

15   Q    And you used the phrase:    You could have said I wasn't going to give him

16   my grand jury, for example.

17   A    Yes.    Yes.    In theory, yes.

18   Q    Okay.    Can you explain broadly how it works when you let another U.S.

19   Attorney's Office or somebody or a Main Justice component use the grand jury?

20   A    So we often refer to the grand jury.    In actuality, at least in the District,

21   there are multiple grand juries sitting at any point in time.    We maintain a schedule of

22   the grand jury.    So, if you want time before a grand jury, you have to go to the

23   scheduler.    If you're coming from our office and they know who you are, you can

24   request your time, and that's how you get authority to enter the grand jury.

25        If you're coming from a Main Justice component and we've what we call

1    deconflicted with them, and they're going it alone in our jurisdiction, they can reach out

2    to our coordinator, and our coordinator knows that it is a case that has been authorized

3    to be brought in our district.    That's generally the process you have to follow.

4          You can't just show up at the Federal courthouse and say:    I'm a Federal

5    prosecutor and I'd like to go into a grand jury now.

6          Q     So, in addition to potentially making it possible for Mr. Weiss to schedule

7    time before the grand jury, was there any other logistical or administrative support that

8    you were offered to provide or, you know, could have provided?

9          A     So I can't get into the specifics here.    I think one thing I could generally note

10   is the extremely high number of Federal district court cases that were being brought in

11   that period of time.    There were a lot of logistical demands on the court.    So taking

12   steps to find available time is not -- was not necessarily an easy thing.

13         Q     Okay.    And so by saying "I will give you whatever support you need," what

14   you meant is:    If you need time before a grand jury, we will make that happen.    If you

15   need trial time or if you need time before a judge, we can make that happen.    Right?

16         Ms. Zdeb.    And I'm sorry.    But I think he can answer that hypothetically with

17   respect to such a conversation with any prosecutor looking to come into here, but I want

18   to be very careful not to get into specific steps that he may or may not or that his team

19   may or may not have offered to make available in this case.

20         Mr. Graves.    Yeah.    And so -- and I think I can clear this up even without going

21   to the hypothetical to more just, like, general.

22         As I recall the conversation, my question is -- was:    What do you need?

23         And my attitude was:    Of course we're going to provide it to you.

24         So, you know, how he heard it, what he expected, and the long litany of things

25   one could need in returning, I don't know, but I could just say my immediate response is,

1   "What do you need"; I was trying to signal we will give you whatever you need logistically.

2           BY ▓▓▓▓▓▓▓:

3       Q       And you never heard anything from Mr. Weiss directly suggesting that he

4   thought he would not get the support that he needed from your office?

5       A       I never heard anything from him directly, and I never indirectly heard they

6   thought that something we were doing in D.C. was preventing them from taking some

7   step that they wanted to take.

8       Q       Okay.    And you said that, after the March 19th meeting or the meeting that

9   took place approximately on March 19th -- after your team made the decision not to join

10  the case, that was relayed back to Mr. Weiss?

11      A       So I didn't get into the specifics because I'm precluded of what happened at

12  the March 19th and what the decision was.

13          I said what my direction to the team was when they were tasked.    I said that

14  there was a conversation.    And then after that meeting was when we conveyed to the

15  District that we would not be looking -- when we conveyed to Delaware that we wouldn't

16  be looking to add our own prosecutor to the case.

17      Q       Thank you for that clarification.

18      A       Yeah.

19      Q       So that information was relayed back to Delaware late March 2023

20  approximately?

21      A       I believe so.

22      Q       Or 2022.    I'm sorry.

23      A       2022.    Yes.    I believe so.    And I'm kind of going off of a calendar entry for

24  the March 19th date to help me kind of -- whatever it is -- a year and a half after the

25  fact -- kind of repiece together the chronology.

1      Q      Okay.   And you said, based on what was occurring at that time -- again,

2      getting back to the question of logistical support.

3             You said, based on what was occurring at that time, there could be no doubt that

4      Weiss knew he had the administrative and logistical support that he needed?

5      A      So, from my perspective, based on what we were doing, I would be surprised

6      if he didn't think he had -- I would be surprised if he didn't know that we were serious

7      about providing the support that he needed to get the case indicted if he wanted to indict

8      the case.

9      Q      And is that because support had been provided at that stage?

10     A      It was because of specific steps that we had taken, yes.

11     Q      Okay.   Have you ever had a case where -- and I'm sorry.   I'm talking about

12     grand juries broadly, not with respect to this or any other case.

13            Grand juries serve a number of functions, right?

14            So they can return a true bill?

15     A      Correct.

16     Q      But grand juries can also authorize certain investigative steps to be taken,

17     right?

18     A      So you would technically need to have an open grand jury matter to cut

19     grand jury subpoenas, for instance.   Yes.

20     Q      Okay.   Have you ever had a case where a grand jury has declined to issue

21     an indictment?

22     A      I am sure, at some point in time, I've seen a no-true bill.   I can't think of a

23     specific instance off the top of my head.

24     Q      But it does happen?

25     A      It does happen.

1   Q And if the grand jury declines to take that step, then the case is effectively

2 over, right?

3   A It's a little bit more complicated than that, but that would be a serious

4 impediment to overcome.

5   Q And short of returning a true bill, as you said, you have to have an open

6 grand jury to take certain investigative steps, correct?

7   A Yes. You are supposed to have an open grand jury before you issue any

8 grand jury subpoenas in connection with that investigation.

9   Q And so, if a grand jury subpoena -- sometimes those grand jury subpoenas

10 are issued, and that brings back returns with relevant information for the case, correct?

11   A Correct.

12   Q And that can help inform whether to move forward with the case, correct?

13   A That is correct.

14   Q Okay. All right. I want to move on to something else that you've referred

15 to a couple times over the course of today.

16   In the very first hour, you said that you were already dealing with enough threats

17 to your career prosecutors?

18   A Yes.

19   Q And, in the last hour, you referenced urgent concerns being brought to your

20 attention about threats to the prosecutors. And I want to go through both of those

21 statements in a little bit of detail.

22   What is an urgent concern?

23   A So we have a mechanism within the Department for filing what we call

24 urgent reports, which is when something of significance needs to be elevated. And one

25 of those things is when there is a threat on prosecutors.

1   Q  And, when you receive an urgent concern, what's the response in your

2 office?

3   A  So we have a district office security manager -- DOSM is what we call

4 them -- who helps to ensure our safety.  We also have Federal 1811 agents who are in

5 our office.  We, in general --

6   Q  Sorry to interrupt you, but what is an 1811 agent?

7   A  Sorry.  They are agents who are authorized to -- with arrest authority and

8 to carry firearms.

9   Q  Thank you.

10   A  They will often be alerted -- an assessment will be done of a security

11 situation in terms of, like, how credible the threat is, and then there will be mitigation

12 measures that are put in place depending on how credible the threat is.

13   Q  When you previously served in the U.S. Attorney's Office as a line attorney,

14 were you aware of urgent concerns being brought to the office?

15   A  Yes.  I mean, we prosecute -- in, like, violent crime context -- cartels and

16 gang members, and there have been times when people who have done violent crime

17 cases where an assessment has been done that security measures had to be

18 implemented.

19   Q  In your time now as a U.S. attorney, would you say that there are more

20 urgent concern matters being brought to your attention than in your time previously as a

21 line attorney?

22   A  So, in my prior role, I wouldn't have had visibility into the totality and all of

23 that.  I mean, from what I hear from those that did, though, yes, there are

24 greater -- there are a greater number of threats, and the nature of the threat is more

25 pervasive than what we've seen in the past.

1        Q       What do you mean by "more pervasive"?

2        A       So, in what I was used to and what I saw before, if you were prosecuting a

3    gang, a threat potentially could emanate from that gang, right?     And so there is one set

4    of mitigation measures for that.

5                What we're seeing now is individuals from across the country who are not directly

6    affiliated with any of the subjects of our investigation engaging in threatening and

7    harassing conduct, which is harder to get your arms around because you know you're

8    seeing effectively the tip of the iceberg.     You know that this is -- the sentiment is out

9    there.     That people are trying to fuel the sentiment of stoking ire against these

10   dedicated civil servants.     And you really don't even know the extent of it because it's not

11   group-affiliated.

12               If I am prosecuting a crew, I know the people -- you generally know who is in the

13   crew, and it's easier to take mitigation measures there.

14       Q       Have you had to take specific mitigation measures to protect the

15   prosecutor -- and I don't want to get into specific cases, but have you had to take broadly

16   mitigation measures to protect the prosecutors in your office?

17       A       Yes.     We've had to do that, and I personally have had to do that.

18       Q       For yourself?

19       A       Yes.

20       Q       Do you have concerns sitting here today for the safety of your office's

21   employees?

22       A       Yes.     Yes.     Absolutely, which is why I am so hesitant to put on a public

23   record of a document -- that we all acknowledged at the outset might become

24   public -- individual names because, given the subject matter, the trajectory I've seen is as

25   soon as those individual names get out in the public, there's immediately, at a minimum,

1    harassing, if not legally threatening conduct that ensues.

2        Q    And, sitting here today, do you have concerns for your own personal safety?

3        A    Less of concerns for my safety than for my people's safety.    More concerns

4    for my family's safety than my safety.

5        ████.   Okay.    All right.

6    We can go off the record.    Thank you.

7        [Discussion off the record.]

8        Mr. Castor.    Back on the record.    It's 1:45.

9            BY MR. CASTOR:

10       Q    A couple questions about January 6 cases.

11       How many prosecutors do you have working on January 6 cases?

12       A    So we have less than 3 percent of our full-time prosecutors working on

13   January 6 cases currently.

14       Q    What's that number?    3 percent of 400?

15       A    So it's 3 percent of, like, 370.    We have less -- we have fewer than 10

16   people who all they do full time is work on January 6.    There are a number of term

17   AUSAs who are specially designated for a brief period of time who we otherwise wouldn't

18   have and people who are on detail from other components that are prosecuting those

19   cases.

20       Q    Can you give us any insight into the Ray Epps case and why he's only been

21   charged with one count of disorderly -- or disruptive conduct?

22       A    So I obviously can't get into an ongoing investigation.

23       Q    Okay.    There's been some public outcry over some of the defendants, little

24   old ladies, that have been sentenced to long prison terms.    What's your response to

25   that?

1          A     So, without getting into any specific case, what I can say is, to my knowledge,

2 every sentence that we have asked for in the context of our January 6 cases has been

3 compliant with the United States sentencing guidelines, which is where we start our

4 analysis and, in this context, end our analysis.

5          Q     So the age of a defendant isn't something you consider?

6          A     So you, under what we call the 3553 factors, can consider personal

7 characteristics of a defendant, but the sentencing guidelines themselves -- which is where

8 we're supposed to begin our sentencing analysis -- do not take into account the

9 individual's age.

10          Q     January 6 defendants haven't been awarded time served.    Why is that?

11          A     I am not aware of that.    I think they have.

12          Q     They have been awarded time served?

13          A     Yes.

14          Q     So they've been held pending trial?

15          A     Yes.    It should be automatic.    Yes.

16          Q     Okay.    How many individuals are you currently trying to hunt down for

17 January 6-related crimes that you haven't indicted yet?

18          A     So the FBI has received numerous tips about individuals who illegally -- not

19 only illegally entered the Capitol Grounds that day because the grounds outside the

20 Capitol are restricted, but the building itself -- and/or engaged in acts of violence or

21 destruction.    There are estimates that there were thousands of individuals who might

22 fall into that category.

23          The Attorney General said we will seek to hold individuals accountable for their

24 conduct.    Those -- FBI continues to investigate those leads, and we continue to assess

25 the results of their investigative fruits.

1       Q    So how many people are you currently in the process of hunting down or

2  collecting that you haven't indicted yet?

3       A    So there's no, like, set figure out there of we have to get this many people.

4  We are getting cases and considering cases as they're being presented to us, and if we

5  think -- consistent with the principles of Federal prosecution that we discussed

6  today -- the prosecution is warranted, we're going to go forward.

7       Q    Okay.   Have you been prosecuting individuals that were on the Capitol

8  Grounds but not -- that did not enter the building?

9       A    Usually, for those prosecutions, it's only if there is some type of what we

10  would call aggravating factor:    assaultive conduct, destructive conduct, interfering with

11  police officers, inciting others to enter the building even if you haven't yourself entered

12  the building.

13       Q    And what's the charge for somebody that is accused of inciting others to

14  enter the building?

15       A    So everybody -- to be clear, everybody who was on Capitol Grounds in the

16  context of January 6 -- there is probable cause that they have violated 18 U.S.C. 1752, and

17  we are exercising our prosecutorial discretion not to charge most of them.

18       Q    But there's an intent element, if they didn't know the Capitol Grounds were

19  closed?

20       A    Oh, absolutely.   We have to prove that in all the cases.   But in those

21  cases -- and it is the most photographed crime scene ever.   There are bike racks that are

22  overturned, snow fencing that's overturned, officers that are trying to restrict, alarms

23  blaring.   It's not that difficult to prove.

24       Q    What's the charge for inciting others to enter the building?

25       A    So, again, we're choosing to -- I mean, you can charge a number of different

1    of things, but you have to come back to the first principle of, just by being out there, even

2    if you weren't inciting anyone else, there is a valid 1752 charge there.

3         Q    But what are some of the charges one could be charged with for inciting

4    others to enter the building?

5         A    It depends on the evidence.    It could be -- depending on the fact-specific

6    evidence, you could have an 18 U.S.C. 231.    You could also have an 18 U.S.C. 1512.    It

7    just depends.

8         Q    And what are they?    What are those two?

9         A    1512 is obstruction of an official proceeding, and 231 is civil disorder.

10        Q    And what are the penalties for those?

11        A    Well, there are statutory maximums, and then there's guidelines.    The 231,

12   the statutory maximum is a 5-year penalty.    18 U.S.C. 1512 is a 20-year maximum.    But

13   the guidelines in general are nowhere near the maximums, particularly for the 1512.

14        Q    Mr. Epps was, you know, photographed on video -- captured on video

15   encouraging people to go into the Capitol.    It's pretty demonstrative.    Have you seen

16   that video?

17        A    I believe I've seen some video, but to where your ultimate question is, I can't

18   get into the specifics of Mr. Epps' prosecution.

19        Q    Have you seen the public video, though, about Mr. Epps?

20        A    I believe I've seen some at some point in time.

21        Q    But he hasn't been charged with 1512 obstruction?

22        A    No.    That is not the current charge.    That is not the charge.

23        Q    And he hasn't been charged with 231, has he?

24        A    No.    That is not the charge.

25        Q    Okay.    So he's not facing a 5-year penalty or a 20-year penalty?

1       A       No.    That's not the statutory maximum.

2       Q       But others in similar circumstances have been facing those?

3       A       Again, I can't get into the specifics of his prosecution.    But I would say, in

4    general, we take great pains to try -- even though there was collective action that was

5    engaged on in that day -- to look at the individual and what they specifically did because

6    there's a pretty wide range of conduct, and it's a fact-intensive inquiry as to where people

7    should fall on the spectrum.

8       Q       There's been a lot of criticisms from our Members that the January 6

9    defendants have been held pending trial unfairly.    What's your response to that?

10      A       We seek detention where we're lawfully able to do so and we believe it is

11   appropriate.    I'd also note, in terms of our overall Federal prosecutions -- and I could get

12   you the specific numbers, but just kind of knowing our docket -- the percentage of

13   January 6 defendants that are detained or have been detained pretrial is greatly smaller

14   than, in general, our Federal defendants who are detained pretrial.

15      Q       Okay.    I mean, there's no bail in the Federal system.    But what is the

16   analysis that goes through to determine whether someone is held over to trial?

17      A       In general, it comes down to, are they at risk of flight, or are they a danger?

18      Q       Okay.    And everyone that's been held is either one or the other?

19      A       Correct.

20      Q       Is there any opportunity for those defendants waiting trial to appeal?

21      A       Yes.    And, to be clear, we don't unilaterally make the determination.    We

22   seek detention.    It goes to a magistrate judge.    A magistrate judge makes the

23   determination.    That magistrate judge's determination can be appealed by either party

24   to the Article III district court judge.    The district court judge then can hear an appeal.

25              And defendants who are still detained after that process have the ability to take

1 an expedited appeal to the D.C. Circuit, which several defendants have done in the

2 January 6 context.

3   Q Do you believe some of the reporting on the January 6 cases and some of

4 the criticism you've received has been unfair?

5   A I'm not sure what you're talking about, like, with the reporting generally.

6   Q Just about individuals being treated more harshly because of their role in

7 January 6 than they would in a similarly situated crime.

8   A What I can say generally is I am not aware of a similarly situated crime to

9 January 6.

10   Q I want to call your attention to exhibit 5.

11   A Is that the June 7 letter?

12   Q Yeah. I just wanted to point out for the record the procedural history for

13 this letter is remarkably odd.

14   Mr. Weiss responds to Mr. Jordan -- he responds to -- Mr. Jordan writes the

15 Attorney General in May, and apparently, the Attorney General forwarded it to Mr. Weiss

16 to respond. Have you ever seen anything like that before?

17   A I mean, I don't know, with the caveat that I, in general, don't track filings

18 going back and forth between Congress and the Department.

19   Q No, but has the Attorney General ever asked you to respond to a letter

20 directly?

21   A Me to directly respond? No.

22   Q To Congress?

23   A Yeah.

24   Q The first sentence of the second paragraph states: While your letter does

25 not specify by name the ongoing investigation that is the subject of the committee's

1      oversight, its content suggests your inquiry is related to an investigation in my district.

2              Isn't that a weird sentence?

3      A      I don't know.

4      Q      It's sort of jumping to a conclusion that, although your letter doesn't specify

5      by name an ongoing investigation, I'm going to answer it anyway.    I'm going to answer a

6      letter that's not written to me.

7      A      [Nonverbal response.]

8      Q      The letter goes on to -- are you familiar with the Linder letter?

9      A      Not the letter itself.

10     Q      The concept of it?

11     A      The principle, yeah.

12     Q      And the Linder letter lays out all the reasons Congress doesn't want to -- or

13     the executive branch and Justice Department doesn't want to give information to

14     Congress, right?

15     A      I mean, I think specifically, it's about the dangers of ongoing investigations,

16     as I understand it.    But I haven't reviewed the letter.

17     Q      But there are other -- I mean, I can represent to you there's other topics in

18     there --

19     A      Yeah.    Okay.

20     Q      -- that sort of covers the whole list of reasons why DOJ doesn't cooperate

21     with Congress.    And a lot of that is included in this letter.

22             And I was just curious as to whether letters of this sort -- do you have any idea

23     who prepares them?    Is it drafted by somebody in Main Justice?

24     A      These kinds of letters, I have no -- I don't know.

25     Q      You've been on the receiving end of letters from Congress?

1      A      Yes.

2      Q      How does the process normally work to respond?

3      A      So, as with all things with elected Representatives, our responses are

4   coordinated through the Office of Legislative Affairs.

5      Q      And do they just take that off your plate and handle it for you?

6      A      I mean, no.    I mean, while they take the lead on it, by definition, there's

7   information that only the component knows, so they have to work with the component

8   sometimes.

9      Q      So how does it ordinarily work?    Would you or your staff draft the response

10   for the Office of Legislative Affairs?

11      A      So I don't know that I can speak to how it ordinarily works because, while

12   I've gone through this, my experience has been pretty limited.

13      Q      Okay.    In the limited experience that you do have, how has it worked?

14      A      It was a collaborative effort in the limited experience I do have.

15      Q      And who writes the first draft?

16      A      I can't recall --

17      Q      Okay.

18      A      -- about who -- I can't recall.

19      Q      During your prep for today, how many prep sessions did you have before

20   you came here today?

21      A      I think that we had three sessions where the subject of the meeting was

22   today's appearance.

23      Q      Okay.    And were you shown any documents?

24      A      I was not shown any documents in those meetings.

25      Q      Okay.    And did Department counsel tell you the types of questions we have

1    asked other witnesses?

2         A    No.

3         Q    Okay.    Did they give you any guidance as to whether the interview would

4    proceed if there was a government shutdown?

5         A    We did discuss that at one point in time.    We did discuss that at a couple

6    points in time last week.

7         Q    Okay.    And what was the plan?    Were you going to be appearing?

8         A    Well, I was ready to follow the direction.    I understood, I mean, like --

9         Q    What was the direction, I guess?

10        A    Whatever ultimately was reached with the committee.    I mean, I think

11   there were practical questions about, if we were going to shut down, whether, for

12   instance, we'd be authorized to have a court reporter here.    Things like that.

13        Q    We would.    We would.

14        A    Yeah.    So I think those were the kinds of practical things that people were

15   wondering about, but it wasn't -- I mean, I was ready to appear one way or another.

16        Q    Of course.    I appreciate that.

17             But, if there was a government shutdown, was it your -- did you believe you would

18   not be appearing today?

19             Ms. Zdeb.    This is getting into internal deliberations at the Department around

20   the impacts of a potential shutdown that didn't ultimately materialize.    He's here today

21   voluntarily, and beyond that --

22             Mr. Castor.    It's not a hard question.    He can either answer it or not.    It's a

23   voluntary question.    A voluntary interview.

24             Mr. Graves.    I agree with the scope.    I hope this puts it to an end.    I thought it

25   was a possibility, like all of us, up until late Saturday night.    It was uncertain as to what

1    was going to happen this week on a number of different fronts.

2                    BY MR. CASTOR:

3        Q    So there was a possibility if there was a shutdown you wouldn't be able to

4    come?

5        A    I thought that that was a possibility.    I thought it was a possibility that I

6    would be able to come.    You're asking, like, my view.

7        Q    Okay.    But you didn't receive ultimate guidance before the shutdown?

8        A    To my recollection, it was still -- we were trying to work through the issue

9    over the weekend.

10       Q    Okay.    I think I understood what you were saying before that you have

11   worked with special counsels in your role as U.S. attorney.    Probably not Mueller, but

12   Durham.    Is that right?

13       A    I can't get into --

14       Q    Well, the Durham matter is over with.

15       A    Yeah.    So -- but, again, it would be internal deliberations.

16       Q    Okay.    Any other special counsels?    How many special counsels have you

17   worked with?    The number, not names.

18       A    So, I mean, it depends.    I've had interactions with, I guess, now four special

19   counsel's offices.

20       Q    And would that be Hur, Durham, Smith, and what's the fourth?

21       A    We're getting into, like, specifics now, and this is so far beyond my

22   conversations with then-U.S. Attorney Weiss about proceeding in my jurisdiction.

23       Q    Okay.    I mean, it has a relationship here because of Weiss' special counsel

24   status.

25       A    Yes.

1       Q     So I'm just asking for your experience, like -- okay.     So it's four or five

2    special counsels that you've worked with?

3       A     Yes.     To my best recollection, it was four that I've had interactions -- I want

4    to be very clear --

5       Q     Right.

6       A     -- that I or my office have had interactions with.

7       Q     And so how does it work with the special counsels?     Do they have their

8    own prosecution teams, or do they use AUSAs from D.C.?

9       A     Special counsels, in general, form their own prosecution teams.     But, I

10   mean, they often go to preexisting people who are already prosecutors within the

11   Department to form their teams.

12      Q     Okay.     And so what types of coordination has to happen with your office

13   for a special counsel to bring a case?

14      A     That is -- well, coordination to bring a case?

15      Q     You know, you used the grand jury.

16      A     A special counsel in general?     They don't have to coordinate --

17      Q     Well, the ones you've worked with.

18      A     They don't have to do anything with our office to bring a case.     That's the

19   virtue of special counsel in terms of --

20      Q     So they have to coordinate with the grand jury?

21      A     They have to coordinate with grand jury, yes.

22      Q     Okay.     Have you proposed with any of the special counsels you worked

23   with -- other than Weiss -- that they should form a hybrid type of prosecution team?

24      A     So I'm not going to get into the deliberation and the ongoing -- and the

25   communications we've had with the special counsel in the ongoing investigations.

1     Q    Okay.   So the situation that you were working through with Weiss'

2    office -- which I guess we resolved after a bunch of back-and-forth -- that it was a bit of a

3    hybrid that you were evaluating?

4    A    I think it is fair to say that -- I think the easiest way to say it to get past, like,

5    the labeling issues that we're all struggling with -- is whether we were going to cross-staff

6    the investigation or the investigation would just be his existing investigators.

7    Q    Are you cross-staffing any other investigation with special counsels?   Or

8    have you?

9    Ms. Zdeb.   That's a little outside the scope of what he's authorized to talk about,

10    staffing of other special counsel investigations.

11        BY MR. CASTOR:

12    Q    So you're not going to answer?

13    A    I agree it's outside the scope.   I could say it's a matter of public record that

14    the office has cross-staffed with other special counsels.

15    Q    Okay.   Have you ever recommended to another special counsel that they

16    shouldn't move forward with a case?

17    A    I could say, in general, I don't recall weighing in or opining on a matter that is

18    not in my office what that component head should or should not do, special counsel or

19    regardless.   That's for them to decide.

20    Q    Okay.   Do you recall any discussions about a campaign finance charge

21    related to the Hunter Biden tax matter?

22    Ms. Zdeb.   Just even answering yes or no to that question, as I think you know,

23    gets into questions associated with the ongoing investigation and prosecution, and it's

24    outside the scope of what he's authorized to discuss.

25        BY MR. CASTOR:

1     Q     And do you know the answer to the question?

2     A     So, again, if I said I knew the answer to the question, that would be a

3     backdoor way of answering a question I have not been authorized to cover.

4     Q     No, it wouldn't because your answer might be no.    So your answer to my

5     subsequent question is, do you know the answer, is yes.    And so I don't think that is a

6     backdoor way of getting information here.

7     A     So, I mean, I guess we just see it differently.

8     Q     So you're not willing to testify whether you're aware of a campaign finance

9     allegation that some -- you know, a Democrat donor paid off Hunter Biden's taxes?

10    Whether that was a campaign finance issue?

11    A     I am not authorized to discuss anything substantively to the case because

12    this is an ongoing investigation, and none of us want to do anything that in any way

13    compromises the ongoing investigation.

14         Mr. Castor.    Okay.    I think we're done.

15         We can go off the record.

16         [Discussion off the record.]

17         ████.  It is 2:08.    We can go back on the record.

18              BY ████████:

19    Q     I actually want to clarify my own line from the previous round.

20         We were talking about grand jury and steps that they might take, and you said you

21    didn't actually know if you'd ever been in a situation where a grand jury had declined to

22    indict, correct?

23    A     I was saying I couldn't recall a specific case.    I generally recall that having

24    happened and having to deal with it.    I don't think it was -- I mean, it was not one of my

25    cases.

1      Q     So it's pretty rare that a grand jury doesn't indict somebody when a true bill

2   is sought?

3      A     That is correct.

4      Q     Okay.    And we also said that grand juries can issue subpoenas.    There can

5   be grand jury subpoenas that bring back relevant information?

6      A     That is correct.

7      Q     And it may be the case that a grand jury subpoena produces relevant

8   information that could help the prosecutors decide not to move forward and seek a true

9   bill, correct?

10     A     That is correct.

11     Q     And so just the process of having the grand jury can help to inform the

12  investigation?

13     A     Yes.    The grand jury, in most investigations, is the main investigative tool.

14     Q     Okay.    Thank you.

15        You were asked some questions just now about the potential for a government

16  shutdown and what may or may not have happened.

17        You're appearing today willfully of your own accord, correct?

18     A     That is correct.

19     Q     Voluntarily, I should say.

20     A     Voluntarily, yes.    Correct.

21     Q     And you've sat here for 5, 6 hours and answered, to the best of your ability

22  and consistent with your authorization, every question presented to you?

23     A     That's correct.    I think we're -- what are we -- a shade over 4 now.    Yes.

24     Q     I'm terrible at math.

25     A     Yes.

1    Q    Okay.    And so it was never your intent to obstruct this investigation,

2    correct?

3    A    That is correct.

4    Q    Okay.    The fact of the matter is, there was a lot of news about a

5    government shutdown, and nobody really knew what might happen?

6    A    That is correct.

7    Q    Okay.    You were asked a number of questions just now about Ray Epps?

8    A    Yes.

9    ███████.    I want to introduce as exhibit 9 an AP News article dated September

10    20th, 2023.

11                              [███  Exhibit No. 9

12                              Was marked for identification.]

13                    BY ███████:

14    Q    It's entitled "Ray Epps, Trump supporter targeted by January 6 conspiracy

15    theory, pleads guilty to Capitol riot charge."

16    A    Yes.

17    Q    Have you seen this before?

18    A    I have not seen this article before.

19    Q    I'll give you a minute to review it.

20    A    Do you want me to read the whole --

21    Q    I can tell you, I'm going to focus on -- actually, I'll just ask the question.

22    A    Okay.

23    Q    On page 2 of this article, the -- I guess it's the third full paragraph down, it

24    says:    After the riot, Epps -- meaning Ray Epps -- became the focus of a conspiracy

25    theory echoed by right wing news outlets that he was a secret government agent who

1    incited the Capitol attack.

2          Are you familiar with that conspiracy theory?

3          A    I am familiar with that conspiracy theory.

4          Q    Do you have any information to suggest that Mr. Epps is, in fact, a secret

5    government agent who incited the Capitol attack?

6          A    No.    And, in fact, at his plea hearing, we put on the record that he -- and in

7    as a clear and unambiguous fashion as we could -- that he has never been a source,

8    government agent, or anything of that nature.

9          Q    And, in fact, that's reflected in this article at the bottom of this page,

10   correct?

11         It says:    Assistant U.S. Attorney -- it provides the name of the U.S. attorney --

12         A    Yeah.

13         Q    -- said during the hearing that Epps was not a confidential source for the FBI

14   or any other law enforcement agency.

15         A    Yes.    That's correct.

16         Q    And that is a true statement that was made by that assistant U.S. attorney?

17         A    Yes.    That's correct.

18         Q    And, in fact, on the next page, about halfway down, it says:    A barrage of

19   death threats would force Epps and his wife to sell their home in Mesa, Arizona, and live

20   in a recreational vehicle in the Rocky Mountains, he said in an interview this year on CBS'

21   60 Minutes.

22         Are you aware of the fact that Mr. Epps has had to sell his home because of the

23   conspiracy theory and the impact that's had on him?

24         A    I was not aware that he had to sell his home.    I was aware that he was the

25   subject of harassment and threats.

1        Q    Okay.   And, in fact, as reflected here, he has said publicly that, because of

2  those threats which resulted from that conspiracy theory, he's had to sell his home, and

3  it's had a pretty profound impact on him and his wife, correct?

4        A    I am generally aware that he has made public statements describing the

5  impact that these false allegations have had on his life.

6        Q    Okay.   Thank you.

7        I don't have any further questions, but I did want to ask, do you have anything

8  that you wanted to add based on the questions that you have not been able to address?

9        A    I don't think there's anything else that we want to add that we haven't

10  covered in the last 4 or so hours.

11        ██████.   Great.   All right.   Thank you.

12  We can go off the record.

13        [Whereupon, at 2:13 p.m., the interview was concluded.]

1                        Certificate of Deponent/Interviewee

2

3

4              I have read the foregoing _____ pages, which contain the correct transcript of the

5       answers made by me to the questions therein recorded.

6

7

8

9                                   _____

10                                          Witness Name

11

12

13                                  _____

14                                              Date

15

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

*Defendants*.

Case No. 1:24-cv-815

# Exhibit S

1

2

3

4

5    COMMITTEE ON THE JUDICIARY,

6    U.S. HOUSE OF REPRESENTATIVES,

7    WASHINGTON, D.C.

8

9

10

11

12

13    INTERVIEW OF:    DAVID WEISS

14

15

16

17

18                              Tuesday, November 7, 2023

19

20                              Washington, D.C.

21

22

23            The interview in the above matter was held in room 5480, O'Neill House Office

24    Building, commencing at 10:03 a.m.

25            Present:    Representatives Jordan, Armstrong, Gaetz, Biggs, Fry, McClintock,

1        Tiffany, Spartz, Nadler, Lieu, Scanlon, Neguse, Dean, Ivey, Balint, and Goldman.

1    Appearances:

2

3

4

5    For the COMMITTEE ON THE JUDICIARY:

6

7    CLARK ABOURISK, COUNSEL

8    STEVE CASTOR, GENERAL COUNSEL

9    DILLON CHEPP, COUNSEL

10    SEAN CLERGET, COUNSEL

11    RUSSELL DYE, COMMUNICATIONS DIRECTOR AND COUNSEL

12    BETSY FERGUSON, DEPUTY GENERAL COUNSEL

13    BRITTANY HAVENS, PROFESSIONAL STAFF MEMBER

14    RACHEL JAG, COUNSEL

15    LILLIAN MEADOWS, COUNSEL

16    CAROLINE NABITY, CHIEF COUNSEL FOR OVERSIGHT

17    ███████████, MINORITY OVERSIGHT COUNSEL

18    ███████████, MINORITY CHIEF OVERSIGHT COUNSEL

19    ██████████, MINORITY INTERN

20    ███████████, MINORITY CHIEF COUNSEL

21    AND DEPUTY STAFF DIRECTOR

22    ███████████, MINORITY LEGAL INTERN

23    ████████████, MINORITY STAFF ASSISTANT

24    ███████████, MINORITY OVERSIGHT COUNSEL

25    █████████████, MINORITY PROFESSIONAL STAFF MEMBER

1    For the SUBCOMMITTEE ON CRIME AND

2    FEDERAL GOVERNMENT SURVEILLANCE:

3

4    ███████████, MINORITY DETAILEE

5

6    For the U.S. DEPARTMENT OF JUSTICE:

7

8    GRETA GAO, SPECIAL COUNSEL,

9    OFFICE OF LEGISLATIVE AFFAIRS

10   SARA ZDEB, DEPUTY ASSISTANT ATTORNEY GENERAL,

11   OFFICE OF LEGISLATIVE AFFAIRS

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          Mr. <u>Castor.</u>    Good morning.    This is a transcribed interview of Special Counsel

2     David Weiss.    Chairman Jordan has requested this interview as part of the committee's

3     oversight of the Justice Department's commitment to impartial justice in its handling of

4     the Hunter Biden investigation.

5          We're also investigating protected disclosures made by two whistleblowers who

6     were an integral part of the investigative team before, as we understand it, you asked for

7     their removal.

8          Would the witness please state your name for the record?

9          Mr. <u>Weiss.</u>    David Weiss.

10         Mr. <u>Castor.</u>    And you're joined here with agency counsel?

11         Mr. <u>Weiss.</u>    Correct.

12         Mr. <u>Castor.</u>    State your name for the record.

13         Ms. <u>Zdeb.</u>    Sarah Zdeb, Department of Justice.

14         Ms. <u>Gao.</u>    Greta Gao, Department of Justice.

15         Mr. <u>Castor.</u>    And, Mr. Weiss, you understand that agency counsel has a legal duty

16     to protect the interests of the Department and not you personally?

17         Mr. <u>Weiss.</u>    I do.

18         Mr. <u>Castor.</u>    And you've decided to go forward with that arrangement?

19         Mr. <u>Weiss.</u>    I have.

20         Mr. <u>Castor.</u>    Okay.    On behalf of the committee, I would like to thank you for

21     appearing here today to answer our questions, and we appreciate you coming down from

22     Delaware voluntarily.

23         My name is Steve Castor.    I'm with Chairman Jordan's Judiciary Committee staff.

24         I'll have the staffers in the room introduce themselves, starting with my colleague

25     Ms. Nabity.

1          Ms. <u>Nabity.</u>    Caroline Nabity with Chairman Jordan's staff.

2          Chairman <u>Jordan.</u>    Jim Jordan.

3          Mr. <u>Armstrong.</u>    Kelly Armstrong.

4          Mr. <u>Nadler.</u>    Jerry Nadler.    Not staff.

5          ██████    ████████, Ranking Member Nadler's staff.

6          ████████    ██████████, Ranking Member Nadler's staff.

7          ███████    █████████, Ranking Member Nadler's staff.

8          Ms. <u>Scanlon.</u>    Mary Gay Scanlon, PA-5.

9          Mr. <u>Ivey.</u>    Glenn Ivey, member of the committee.

10          Ms. <u>Havens.</u>    Brittany Havens, Chairman Jordan's staff.

11          Ms. <u>Ferguson.</u>    Betsy Ferguson, Chairman Jordan's staff.

12          Mr. <u>Chepp.</u>    Dillon Chepp, Chairman Jordan's staff.

13          Ms. <u>Meadows.</u>    Lillian Meadows, Chairman Jordan's staff.

14          Mr. <u>Clerget.</u>    Sean Clerget, Chairman Jordan's staff.

15          Mr. <u>Abourisk.</u>    Clark Abourisk, Chairman Jordan's staff.

16          ██████████████    ████████████████, with Ranking Member Nadler's staff.

17          ███████    █████████, Ranking Member Nadler's staff.

18          ███████    ████████, with Mr. Nadler.

19          Mr. <u>Castor.</u>    Now there's going to be a quiz about each of their names.

20          Mr. <u>Weiss.</u>    I'll fail miserably.

21          Mr. <u>Ivey.</u>    Read the transcript.

22          Mr. <u>Castor.</u>    I would like to go over the interview process that we'll follow today.

23          Our questioning will proceed in rounds.    The majority will ask questions first for

24    an hour, and then the minority will have a chance to ask questions for an hour as well.

25    We'll alternate back and forth until we're done.

1    We often take a short break at the end of each hour, but if you need to take a

2    break apart from that to confer with counsel or for any other reason, let us know.

3    As you can see, there's an official House reporter taking down everything we say

4    to make a written record, so we will do our best to go slowly and give verbal responses.

5    Are you comfortable with that?

6    Mr. Weiss.    Yes, I am.

7    Mr. Castor.    We'll do our best to limit the number of people directing questions

8    to you during any given hour.    Usually, it's just one staffer.    But, of course, the

9    members -- and we're joined here by five members.    The Republican members may

10    jump in during my questioning, and the Democratic members may jump in during their

11    hour as well.

12    We want you to answer our questions in the most complete and truthful manner

13    possible.    If you honestly don't know the answer to a question or don't remember, it's

14    best not to guess.    Please do give us your best recollection.    And it's okay to tell us if

15    you learned something from a third party.    The rules of hearsay don't apply in this

16    setting.    Just indicate how you came to know the information.

17    And, if there are things you don't know or can't remember, just say so.    And we

18    would appreciate it if you, to the extent you don't remember an entire set of facts, that

19    you just help us with as much as you do remember.

20    You also understand that, by law, you are required to answer questions before

21    Congress truthfully.    Do you understand that?

22    Mr. Weiss.    I do understand that.

23    Mr. Castor.    And this applies to questions posed by congressional staffers in an

24    interview.    Do you understand that as well?

25    Mr. Weiss.    Yes.

1          Mr. <u>Castor.</u>    Witnesses that knowingly provide false testimony could be subject

2    to criminal prosecution for making false statements under 18 United States Code 1001.

3    Do you understand that?

4          Mr. <u>Weiss.</u>    I am familiar with that.

5          Mr. <u>Castor.</u>    Thank you.    Is there any reason you're unable to provide complete

6    and truthful answers to today's questions?

7          Mr. <u>Weiss.</u>    There is not.

8          Mr. <u>Castor.</u>    Okay.    That's the end of my opening remarks.

9          Ms. Zdeb, do you have anything?

10         Ms. <u>Zdeb.</u>    I don't, but Mr. Weiss has a couple of brief remarks.

11         Mr. <u>Castor.</u>    Okay.    Let me ask ███████ if she wants to --

12         ███████.    Yeah.    We just thank the Special Counsel for taking time out of your

13    very busy schedule to come in and join us today.

14         Mr. <u>Weiss.</u>    Thank you.

15         Mr. <u>Castor.</u>    Or any of the members, did you have anything you would like to

16    say?

17         Okay, sir.

18         Mr. <u>Weiss.</u>    Thank you.

19         I have voluntarily agreed to appear before this committee.    To my knowledge, I

20    am the first Special Counsel to testify before the submission of the special counsel's

21    report.    I have done so out of respect for the committee's oversight responsibilities and

22    to respond to questions raised about the scope of my authority.

23         I am in the midst of conducting an ongoing investigation and prosecution and will

24    be limited as to what I can say at this point.    I will prepare a report at the conclusion of

25    the work by the Special Counsel's Office and will be able to share more information at

1    that time.

2          Today, I am prepared to address misunderstandings about the scope of my

3    authority to decide where, when, and whether to bring charges in this matter.    I do not

4    intend to answer questions that could jeopardize the ongoing litigation, our

5    investigations, or the rights of defendants or other individuals involved in these matters.

6          I am and have been the decisionmaker in this case.    I do not, however, make

7    these decisions in a vacuum.    I am bound by Federal law, the principles of Federal

8    prosecution, and DOJ guidelines.

9          As a result, there are processes that I must adhere to in making investigative and

10   charging decisions.    These processes did not interfere with my decisionmaking authority.

11   At no time was I blocked or otherwise prevented from pursuing charges or taking the

12   steps necessary in the investigation by other U.S. Attorneys, the Tax Division, or anyone

13   else in the Department of Justice.

14         As I have said previously, I did not request Special Counsel status until August of

15   2023.    When I made that request, it was promptly granted.    Throughout this

16   investigation, the career prosecutors on my team and I have made decisions based on the

17   facts and the law.    Political considerations played no part in our decisionmaking.

18         Our analysis has been moored to the principles of Federal prosecution, and going

19   forward, my team and I will continue to abide by these same principles as we try to bring

20   this matter to a just conclusion.    Thanks.

21         Mr. Castor.    Thank you.

22         Just at the top, I'm going to mark three letters that you sent to Congress.

23         The first is exhibit 1, a June 7th letter.

24                              [Weiss Exhibit No. 1

25                              Was marked for identification.]

1          Mr. <u>Castor.</u>   Exhibit 2 is a June 30th letter, both to Chairman Jordan.

2                              [Weiss Exhibit No. 2

3                              Was marked for identification.]

4          Mr. <u>Castor.</u>   And the third is a July 10th letter.

5                              [Weiss Exhibit No. 3

6                              Was marked for identification.]

7          Mr. <u>Castor.</u>   We'll get into the specifics of these later, but I just thought it would

8    be helpful to have it marked as exhibits 1, 2, and 3 right at the top.

9          Mr. <u>Weiss.</u>   Thank you.

10         Mr. <u>Castor.</u>   I'll start the clock.    It's 10:11.

11                              EXAMINATION

12              BY MR. CASTOR:

13         Q     When were you nominated to be the U.S. Attorney for the District of

14   Delaware?

15         A     I believe in late 2000- -- sometime in 2017, I believe, to the best of my

16   recollection.

17         Q     Okay.   And you were confirmed by the Senate?

18         A     I was.

19         Q     And when was that?

20         A     That was several months thereafter.    2018.

21         Q     Okay.   And then you began your tenure as U.S. Attorney when?

22         A     I was acting for some time since the spring, I believe, of 2017.    And I was

23   confirmed, as I said, in the spring of 2018, I believe, or there so.

24         Q     Okay.   And you were supported by both Democratic Senators from

25   Delaware.   Is that correct?

1          A     That is correct.

2          Q     Are you familiar with the Blue Slip Process?

3          A     Generally.

4          Q     Okay.    What's your understanding of that?

5          A     My understanding is you -- in all jurisdictions, you are typically

6      recommended or not by your local Senators.

7          Q     Okay.

8          A     And the Senators -- my understanding is the senators supported my position

9      as U.S. Attorney.

10         Q     Okay.    So both Senators Coons and Carper recommended you to the White

11     House?

12         A     That's my understanding.

13         Q     Okay.    Now, after the conclusion of the previous administration in January

14     of 2021, you were asked to stay on?

15         A     I believe it was end of January, early February.    And, yes, I was asked to

16     stay on.

17         Q     And who asked you to stay?

18         A     It was a telephone call, and it was the Acting Attorney General at that point

19     in time that asked me to stay.

20         Q     And was that Mr. Wilkinson?

21         A     Yes, it was.

22         Q     And what do you remember from that call?

23         A     Just that.    That he asked if I would be willing to continue to serve as U.S.

24     Attorney for the District of Delaware.

25         Q     And did you expect that call?

1       A       I wouldn't say that I expected it, nor would I say I was shocked by it.

2       Q       Okay.    So you had prepared your resignation just like the rest of the U.S.

3   Attorneys?

4       A       I don't know that I had actually prepared my resignation.

5       Q       Okay.

6       A       I mean, I understood the process that was going on, and there were other

7   U.S. Attorneys that either resigned or would be asked to end their tenure at some point.

8   But I had not prepared a resignation letter.

9       Q       So you generally didn't know what was going to happen?

10      A       I didn't know what was going to happen.

11      Q       Okay.    But you suspected maybe they'd ask you to stay on?

12      A       I suspected that it was a possibility.

13      Q       Okay.    Before Mr. Wilkinson called you and asked you to stay on, had you

14  had any conversations with Department officials or White House officials or transition

15  team officials about staying on?

16      A       I had not.

17      Q       Okay.    So, when Mr. Wilkinson called you, that was the first time that you

18  were talking to somebody in a position of authority about staying on?

19      A       In the new administration, yes.

20      Q       Okay.    And these decisions are ultimately made by the President, correct?

21      A       I don't know who made this decision, to tell you the truth.    I know what

22  was communicated to me during that conversation.

23      Q       But U.S. Attorneys serve at the pleasure of the President, correct?

24      A       U.S. Attorneys serve at the pleasure of the President.    That is correct.

25      Q       So currently you serve at the pleasure of President Biden, correct?

1          A      I do.

2          Q      And, when the decision was made to ask you to stay on, that was a decision

3     made by President Biden, correct?

4          A      Again, I can't speak to that.    All I can say is, as I have said before, that it was

5     communicated to me by the Acting Attorney General.

6          Q      Okay.    But certainly, if President Biden didn't want you to stay on, you

7     would have been removed like all U.S. Attorneys are when a President wants that to

8     happen, correct?

9          A      As we discussed a moment ago, I serve at the pleasure of the President.

10         Q      Okay.    How many attorneys are in your office?

11         A      Approximately --

12         Q      I know, obviously, it changes.

13         A      Yeah.    We just had two additions.    So I think we're at 24, 25, including the

14     U.S. Attorney.

15         Q      Okay.    And how many work on criminal matters?

16         A      So I have six in the Civil Division.    About 14.

17         Chairman Jordan.    Did Mr. Wilkinson give you any specific reason why he wanted

18     you to stay?

19         Mr. Weiss.    He did not.

20              BY MR. CASTOR:

21         Q      When you have interactions with Justice Department Headquarters or Main

22     Justice, how does that ordinarily happen?    Who is your primary point of contact?

23         A      I don't know that there is an ordinary.    I don't know that I would designate

24     anyone in particular.

25         Q      Under the reporting structure, though, you report up through the Deputy

1       Attorney General.    Is that correct?

2              A      That's correct.

3              Q      And how often do you talk with Ms. Monaco?

4              A      I have never spoken with Ms. Monaco.

5              Q      You've never spoken to her?

6              A      Never.

7              Q      Okay.    And do you have communications with someone else in the office?

8       Maybe the PADAG?

9              A      I have -- my point of contact for the last year, year and a half has been

10      Associate Deputy Attorney General Weinsheimer.

11             Q      Okay.    So you're not in contact on a regular basis with the PADAG, Mr.

12      Miller?

13             A      I am not.

14             Q      Have you ever had communications with him?

15             A      I have not.

16             Q      Okay.    So you've never had any communications with Marshall Miller or

17      Lisa Monaco?

18             A      I have not.

19             Q      Okay.    And how often do you have communications with

20      Mr. Weinsheimer?

21             A      It varies depending upon what's going on.    But I would say we've spoken,

22      before August of 2023, approximately once a month, sometimes more frequently.

23             Q      And was it related to the Hunter Biden case, or was it related to your

24      ordinary duties?

25             A      Generally, it was related to the Hunter Biden case investigation.

1      Q      Okay.    And when did Mr. Weinsheimer first start having communications

2      with you about the Hunter Biden case?

3      A      I think we first spoke about the case in the spring of 2022.

4      Q      And, to the extent you can tell us, what were the nature of those

5      discussions?

6      A      In 2022?

7      Q      Yeah.

8      A      Actually, more accurately, February of 2022, I think, was the first time we

9      spoke.    And I would have reached out because we were looking to bring certain portions

10     of our investigation to either D.C. or L.A.    At that time, D.C.

11     Q      Okay.    Did you call him, or did he call you?

12     A      I reached out by email to the Principal Deputy Attorney General at that time,

13     John Carlin.

14     Q      Okay.    So he was the PADAG before Mr. Barr?

15     A      Correct.

16     Q      And how often had you spoken with Mr. Carlin?

17     A      Before this?    Never.

18     Q      Okay.    So you initiated email contact with Mr. Carlin, and he referred you

19     to Mr. Weinsheimer?

20     A      I initiated email contact with Mr. Carlin, and I subsequently had a

21     conversation with John Carlin, and I believe Brad Weinsheimer was on the call.

22     Q      Okay.    And what did they tell you about bringing the case in D.C. or

23     different jurisdictions from yours?

24     A      We discussed the fact that I would -- they wanted me to proceed in the way

25     it would typically be done, and that would involve ultimately reaching out to the U.S.

1      Attorney in the District of Columbia.

2              I raised the idea of 515 authority at that time because I had been handling the

3      investigation for some period of time.    And, as I said, they suggested let's go through the

4      typical process and reach out to D.C. and see if D.C. would be interested in joining or

5      otherwise participating in the investigation.

6              Q      Okay.    And you mentioned 515 authority, and in your June 30th letter, you

7      refer to that as Special Attorney status?

8              A      I don't know that I referred to it as Special Attorney status at that time.    I

9      typically referred to it as 515 authority.

10             Q      Okay.

11             A      For whatever reason, that's the way -- my recollection is that's the way I

12     referenced it.

13             Q      Okay.    I mean, the text of the statute talks about Special Attorney.

14             A      Special Attorney.    That's correct.

15             Q      So, from your point of view, is there a difference between being a Special

16     Attorney under 515 and being a Special Counsel?

17             A      Yes, there is a difference.

18             Q      And what's that difference, as you understand it?

19             A      As I understand it, the Special Attorney under 515 was for the purpose of

20     allowing me, as a U.S. Attorney in one jurisdiction, to possibly proceed with charges in

21     another jurisdiction.

22             Q      Okay.

23             A      It has to be approved by the Attorney General or his designee.

24             Q      Okay.    And what's your understanding then of Special Counsel authority?

25             A      Special Counsel is permitted to bring charges in any jurisdiction in which

1    Special Counsel determines -- which Special Counsel determines is appropriate,

2    consistent with the order and the authority bestowed on Special Counsel through that

3    order.

4         Q    Okay.

5         A    You know, which describes, in general terms, my investigative authority.

6         Q    Okay.    But it's all 515 authority, right?

7         A    It's all 515 authority?

8         Q    Are both the Special Attorney and the Special Counsel status that we've

9    been discussing here flow from the 28 United States Code 515?

10        A    I think perhaps in -- there's the 500 series, but there are also regulations that

11   attend these Special Counsel --

12        Q    Okay.

13        A    -- authority.

14        Q    Okay.    So, when you initially were pursuing or discussing 515 authority or

15   considering it, you know, when you were speaking with Mr. Weinsheimer, in your mind,

16   that was different from Special Counsel authority?

17        A    Absolutely.

18        Q    Okay.    And what did Mr. Weinsheimer or Mr. Carlin say about 515

19   authority?

20        A    As I said, they said let's proceed as we would in the normal process.    We

21   talked a bit about the fact that it's often the case in D.C. that a DOJ component, whether

22   it's Tax Division or Public Integrity, would develop a case and reach out to the U.S.

23   Attorney's Office in D.C. and give them an opportunity to participate.    So the discussion

24   was let's proceed in a typical fashion.

25             And, as you know, ultimately -- this didn't happen in this conversation, but down

1    the road -- I was given the authority to proceed if I chose to do so.

2        Q    Okay.    Are you familiar with the term "SAUSA"?

3        A    I am familiar with the term "SAUSA."

4        Q    Okay.    What does that term mean to you?

5        A    It's a special assistant United States attorney.

6        Q    Okay.    And what's the difference between, you know, SAUSA status and

7    515 status?

8        A    You know, to the extent -- I want to make sure I fully understand it.

9        Q    Of course.

10        A    Look, SAUSA doesn't have to be part and parcel of a 515 authority situation.

11        For instance, if we have a case in Delaware -- a drug investigation, let's say -- that,

12    during the course of the investigation takes us to a neighboring jurisdiction, and both

13    jurisdictions -- we'll start talking with agents and AUSAs in that other jurisdiction to

14    ensure we're deconflicting, proceeding in a safe fashion.

15        And, if we ultimately -- so we'll pursue that investigation in conjunction with one

16    another, and if there comes a time when we're talking about charges, we'll decide how

17    we're going to proceed in the case.    We might both move forward.    Delaware might

18    take it.    It could proceed in any number of fashions.

19        If we chose to continue to play a role in prosecuting a piece of that case in, let's

20    say, the Eastern District of Pennsylvania, we could have an attorney designated as a

21    SAUSA to allow that attorney to participate in the case in the Eastern District of

22    Pennsylvania.

23        Q    Okay.    So, after your discussion with Mr. Weinsheimer and Mr. Carlin in

24    February of 2022, what was your next step in terms of initiating contact with the D.C. U.S.

25    Attorney's Office?

1    A    Ultimately -- and I think it was in early March -- I reached out to Matt Graves,

2    who was the U.S. Attorney in D.C. at that time.

3    Q    And, before you reached out to Mr. Graves, had your staff been working

4    with Mr. Graves' staff?

5    A    No.

6    Q    Okay.    So the first contact Mr. Graves' office had from your office was when

7    you telephoned him?

8    A    That's my understanding, yes.

9    Q    And what's your recollection of that call?

10    A    It was about, I think, a 5-, 10-minute call.    I had never met or spoken with

11    Mr. Graves before.    I explained the situation.    I talked a little bit about the

12    investigation, some of the background of the investigation.

13         I mentioned that I had a conversation with the Office of the Deputy Attorney

14    General, that I had raised 515 authority, because I wanted him to know, you know, what I

15    was thinking and that I intended to proceed in any event.

16         And we agreed that we would -- I think we first talked about putting the criminal

17    chiefs together and our staffs so that we would proceed from there.

18    Q    And what did Mr. Graves say to that?

19    A    He was -- you know, he was receptive.    Like I said, we agreed that my

20    criminal chief, I think, would reach out to his, and we would move forward.

21    Q    And then what happened next?

22    A    I know that the teams met, but ultimately, I received word from my staff

23    that the U.S. Attorney's Office in the District of Columbia had decided not to join the case

24    as a partner or co-counsel moving forward.

25    Q    Okay.    And what did that mean for the case proceeding?

1      A    That meant that I would follow up with respect to the 515 authority --

2      Q    Okay.

3      A    -- which, ultimately, I did.    And I had a conversation with -- again, this

4  conversation, I believe, was with John Carlin and Brad Weinsheimer.

5      Q    Okay.

6      A    I think it was, best of my recollection, in early May.

7      At that time, we were talking about where we would proceed.    There were

8  questions about where we would proceed.    I mentioned before that we were

9  considering D.C., which is where we went first, and the Central District of California in L.A.

10      I told Messrs. Carlin and Weinsheimer that D.C. had decided not to join the

11  investigation, that we were reviewing matters, and had not decided whether we would

12  proceed in D.C.    And my recollection is that John Carlin at that time said, "Look, if you

13  decide to proceed in D.C., you have the authority to do so, and you have the authority

14  to -- under 515, to bring whatever charges you deem appropriate."

15      Q    Mr. Carlin said that?

16      A    Mr. Carlin said that.

17      Q    And did you have any discussion with Mr. Graves about SAUSA status?

18  About having your lawyers from the District of Delaware come to D.C. and just get a

19  special assistant United States attorney designation?

20      A    I don't recall.    It may have been.    I just don't recall the specifics of that.

21      Q    And, at this point in time, we're talking about the 2014 and 2015 tax years

22  for Mr. Biden; is that correct?

23      A    I'm not going to comment on, you know, what we were talking about.    No.

24  I'm sorry.    I'm not going to talk about the merits, the investigation, or any aspect of that.

25      Q    Okay.    But the 2014 and 2015 tax years, the statute of limitations was

1     about to expire, correct?

2          A     Again, I'm not going to talk about something that touches on the

3     investigation.

4          Q     Okay.    It's our understanding that the statute of limitations had been tolled

5     by a tolling agreement.    Is that your understanding?

6          A     Again, I'm not going to talk about any aspect of the investigation or what

7     could crop up in the litigation that we're currently involved in.

8          Q     Okay.    And that the tolling agreement was set to expire in September of

9     2022.    Is that your understanding?

10         A     Again, I'm not at liberty to discuss the particulars of the investigation or what

11    could impact the litigation.    However, look, there will come a time at the preparation

12    and submission of the report when I expect I would address matters such as that.

13         Chairman Jordan.    What was the date that you had the conversation with the

14    U.S. Attorney in the District of Columbia?

15         Mr. Weiss.    I believe that conversation was in early March of 2022.

16         Chairman Jordan.    And then when did he decline to partner with you?    Same

17    time?

18         Mr. Weiss.    I think we received their feedback within a month.

19         Chairman Jordan.    So late March, early April?

20         Mr. Weiss.    Yes.

21         Chairman Jordan.    And then you had a subsequent conversation with

22    Mr. Weinsheimer and Mr. Carlin?

23         Mr. Weiss.    I had a subsequent conversation with Mr. Weinsheimer and

24    Mr. Carlin.

25         Chairman Jordan.    So you wanted to partner with him, and he said no.    Why

1    didn't you just ask for 515 status right then?

2            Mr. Weiss.    I did.    In my next conversation with Carlin and Weinsheimer, I did

3    ask for 515 authority.

4            Chairman Jordan.    And then why didn't they give it?

5            Mr. Weiss.    They did.    They said if I intended to proceed -- as I just described,

6    John Carlin told me that if I intended to or was interested in moving forward in D.C., I had

7    the authority to do so, and I had the authority to bring whatever charges I determined

8    were appropriate.

9            Chairman Jordan.    But you didn't want to proceed?

10           Mr. Weiss.    Excuse me?

11           Chairman Jordan.    But you didn't want to proceed, then, in D.C.?

12           Mr. Weiss.    I'm not going to talk about what matters are clearly part of the

13    investigation and the deliberative process.

14                    BY MR. CASTOR:

15           Q      What type of paper flow occurred between your staff and Mr. Graves' staff?

16    I mean, was there an exchange of documents, paper?

17           A      We provided them with information so that they could make an informed

18    judgment on deciding whether to participate in the investigation.    But I'm not going to

19    get into particulars of documentation.    All of that would be matters that are part of the

20    investigation and relevant to the merits of the ongoing litigation.

21           Q      Okay.    Can you at least tell us, you know, what types of documents were

22    shared?

23           A      No.

24           Q      Or can you identify them at a privileged level?

25           A      No.    I can't get into the particulars of documentation that was shared.

1    Again, these would have been part of an ongoing investigation, and this would deal with

2    the deliberative process between ourselves and D.C.

3         Q    Okay.    Did your staff have in-person meetings with Mr. Graves' staff?

4    Was it all done over the telephone?

5         A    I'm not sure.    I know they had a detailed discussion at some point in time.

6         Q    Was it more than one?

7         A    I don't know for sure.

8         Q    And was it essentially your staff trying to convince Mr. Graves' staff to

9    partner or to co-counsel?

10        A    No.    I don't think it was an effort in persuasion.    I think it was just an

11   attempt to appropriately inform them.

12        Q    Okay.    But, obviously, you had an interest in prosecuting a case in D.C.    I

13   mean, you wouldn't have called the DAG's office and you wouldn't have initiated contact

14   with Mr. Graves if you didn't want to move forward with the prosecution, correct?

15        A    I think it's fair to say there was an interest in moving forward in either D.C.

16   or L.A. or wherever the facts and the law took us.

17        Q    Right.    Or both, correct?    I mean, if you're looking at a tax case, the venue

18   is --

19        A    Again, I don't want to get too far into investigation, deliberative process, or

20   the merits.    But certainly these were things that were being contemplated.

21        Q    Okay.    But, if a taxpayer failed to pay the taxes willfully, I mean, the venue

22   for that is where?

23        A    If a taxpayer --

24        Q    If there's a potential tax -- a criminal tax charge for failure to file, where is

25   venue for that?

1       A    It depends where -- you know, where the taxpayer is residing, where the

2   returns are filed, where the returns are prepared.   I know there are all kinds of

3   considerations that one has to evaluate in determining appropriate venue.

4       Q    But the team had evaluated that and had decided where venue was

5   appropriate for the different tax years, correct?

6       A    Again, I'm not going to get into, you know, merits, deliberative process, or

7   matters that are clearly part of the investigation.   I'll speak to my authority.

8       Q    We're dealing with the tax years of 20- -- for Mr. Biden, 2014 through 2019;

9   is that correct?

10      A    You're asking me matters that are not part of the question of authority and

11   clearly go to the merits of the investigation and the litigation.

12      Q    Okay.   But you know the answer to my question, correct?   If you were

13   free from the Department's admonishment that you can't talk about this, you would

14   know the answer to my question; is that correct?

15      A    Look, Counsel, I appreciate the question.   It's not an admonishment.   I am

16   very sensitive to a matter that we are currently investigating.   The last thing I want to do

17   here while I am trying to provide answers -- the last thing I want to do is to say or suggest

18   anything that's going to be used against the government in our ongoing litigation or in

19   any investigation.

20      You know, I'm trying to tiptoe and provide what information I can relative to my

21   authority, but I'm not going to get into the other matters.

22      Q    In 2022, after a man in Delaware was sentenced to 6 months in prison for tax

23   evasion, you stated, "Tax dodging represents an affront to every member of the taxpaying

24   public, and we will continue to prosecute tax cheats aggressively."

25      Do you remember making that statement?

1          A     I don't have a specific recollection.

2          Q     Okay.    But do you believe in that?

3          A     I believe that the laws of the United States, including tax laws, should be

4     enforced.

5          Q     In 2021, after a man was sentenced to 1 year in prison in order to pay

6     $192,529 in restitution for tax evasion, you made the following statement in conjunction

7     with announcing that:    "The financial loss in tax cases is shared by every member of the

8     taxpaying public.    Our Nation's ability to operate and serve its citizenry depends on

9     voluntary compliance with its tax obligations."

10          Do you remember making that statement?

11          A     I don't have a specific recollection, but nor would I divorce myself from any

12     statement of that nature.

13          Q     Do you still believe that financial loss in tax cases is shared by every member

14     of the taxpaying public?

15          A     I still believe that, yes.

16          Q     Do you believe that public figures are exceptions to that?

17          A     Nobody is an exception to the tax laws.    We have a system that's built on

18     the notion of voluntary compliance.

19          Q     All right.    Shifting gears a little bit, on politically-sensitive investigations,

20     what policies does DOJ have to prevent a politically-motivated employee from being

21     involved with an investigation that might touch on political sensitivities?

22          A     I am not aware of a policy that you're referring to.    So, if you could show

23     me something, I'm happy to review it.

24          Q     I guess the question is, is there such a policy?

25          A     I'm not aware of such a policy, and I haven't run into this situation.

1      Q      Okay.    Now, if your office was prosecuting, hypothetically, a political figure

2   in Delaware, say an elected official, and someone on your staff, you know, demonstrated

3   a political ideology consistent with the person you're prosecuting, what would be the

4   process to sideline them or --

5      A      It's a hypothetical with all kinds of variables, and it's not something I'm going

6   to speculate about.

7      Q      Okay.    If you're aware, on a politically-sensitive investigation, what

8   protocols does DOJ have to prevent politically-motivated decisions from being made on a

9   particular investigation?

10      A      I'm not aware of protocols.    And look, my interest and the interest of

11   prosecutors in my office is pursuing cases, and we should be pursuing cases based on the

12   laws and the facts, period.

13      Q      But you're not aware of any Department processes or protocols for dealing

14   with --

15      A      Look, no, I'm not aware of any policies, and I haven't experienced, to my

16   knowledge, a situation in which I had to deal with the hypothetical that you're describing.

17      Q      Okay.    On a politically-sensitive investigation, if an investigator or

18   prosecutor makes what is believed to be a politically-motivated statement or decision,

19   how is that reviewed in your office?

20      A      There is no policy or practice or procedure.    And, again, I'm not aware of

21   such a situation.

22      Q      For example, on the Hunter Biden case, if one of your assistant United States

23   attorneys was exhibiting favoritism towards the Biden family or towards Hunter Biden,

24   and that was brought to your attention, what would be the process to sort that out?

25      A      Again, I'm not going to comment on any aspect of the investigation or a

1   prosecution, and from my perspective, the prosecutors who participated in this case

2   followed the law and the facts.    That was the motivation.

3        Q    So your office doesn't have a process or protocol for dealing with that?

4        A    My office has no process or protocol for dealing with something like that.

5   It's not something we have engaged in, participated in, or that I have experienced.

6        Q    Okay.    If a member of the investigative team believes such a thing has

7   occurred, what is their course of action?

8        A    Again, you're talking about hypotheticals, and I'm not going to speculate on

9   what their course of action might be.

10        Q    Is there an independent review within DOJ that can address that?    If a

11   member of the investigative team believes that a politically-motivated decision is being

12   made to protect a target of investigation or a potential defendant, is there somebody in

13   DOJ that can review that?

14        A    Again, I don't have an answer for the question, and it calls for a hypothetical

15   or a speculative response on my part.    I'm just not going to express an opinion on it.

16        Q    Well, it's not that speculative.    I mean, we have two whistleblowers that

17   testified about what they asserted was political -- politically-motivated decisions made in

18   the Hunter Biden case, correct?

19        A    I am aware that you have two whistleblowers who have testified.    That's

20   correct.

21        Q    So you're not aware of any independent review within DOJ that can evaluate

22   concerns raised by members of the investigative team?

23        A    As I sit here today, I'm not aware of any such reviews.

24        Q    Okay.    If a special agent assigned to an investigation had concerns with the

25   objectivity of the Justice Department, unethical conduct of DOJ employees assigned to a

1    case, or DOJ employees who have provided preferential treatment to a taxpayer, how

2    would that agent or employee raise those concerns?

3         A    Again, that calls for speculation on my part.    You're talking about agents or

4    agency-related matters.    It's not something I'm going to speculate about.

5         Q    I mean, it's not that hypothetical.    I mean, we have two senior, you know,

6    criminal investigators that have bravely come forward to Congress and identified what

7    they consider is preferential treatment that was afforded to Hunter Biden.

8         And, you know, I'm just asking you what the process would ordinarily be when a

9    member of the investigative team believes that that's occurred.    What's the process

10   inside your office or inside of DOJ?    Is there any process?

11        A    I've told you.    I have no such process.    We haven't experienced it in our

12   office.    And to generally -- I don't have an answer.    I don't --

13        Q    Okay.

14        A    It's not something I experienced.    I understand what your representation is

15   with respect to these whistleblowers, and that would have me commenting on specifics

16   relative to this investigation and this case.

17        Q    Okay.    What's your understanding of the word "retaliation"?

18        A    In the context of retaliation vis-a-vis whistleblowers?

19        Q    Uh-huh.

20        A    I'm not going to get into anything along those lines.

21        Q    Okay.    Are you familiar with what a protected disclosure to Congress is?    If

22   a whistleblower believes that they've exhausted all avenues and they'd like to come to

23   Congress?

24        A    Again, that's not something for me to speak to.    I'm here to talk about my

25   authority.    I'm not going to get into these other matters.

1    Q    Okay.    But you are aware that there are avenues for whistleblowers to

2    come to Congress and to make legally-protected disclosures, correct?

3    A    As I think I indicated in my first letter to the chairman, I am aware of and

4    appreciate the whistleblower rights.    I do.    I understand them generally, and I

5    appreciate the importance of those rights.

6    Q    Prior to the March of 2022 discussion that you had with Mr. Graves -- and it

7    was March of 2022.    Did I get that date right?

8    A    That's correct.

9    Q    Had the matters that you had brought to Mr. Graves' office -- had they

10   already been approved by the Tax Division?

11   A    My recollection is that -- Tax Division?

12   Q    Yes.

13   A    Right.    I'm not going to comment on Tax Division approvals relative to this

14   case.    It would entail the deliberative process.

15   Q    I mean, you're aware that the Tax Division needs to okay criminal tax

16   charges, right?

17   A    I am aware of the Tax Division responsibilities under title -- under the Code

18   of Federal Regulations and the manual.

19   Q    Okay.    So, under the manual, the final authority for the prosecution or

20   declination of all criminal matters arising under the Internal Revenue laws rest with the

21   Tax Division, correct?

22   A    I am aware that Tax Division approves the charging of title 26 offenses.

23   Q    Okay.    How do you reconcile what the manual says?    I mean, the Tax

24   Division also has to approve if you're going to issue, you know, a search warrant and if

25   you're going to go to a grand jury.    Before you do that, the Tax Division needs to okay

1    that, correct?

2         A    There are certain types of search warrants that require Tax Division

3    approval, to my understanding.

4         Q    Okay.   But, if you're working a tax case, there's specific investigative steps

5    that need the okay or approval of the Tax Division before you can initiate, correct?

6         A    That's my understanding.

7         Q    Okay.   Would you agree that someone who has ultimate authority does not

8    require someone else's permission to act with regard to the matter over which they have

9    ultimate authority?

10        A    Again, I didn't need anybody's permission.   I made the decision.   From my

11   perspective, the Tax Division was more than comfortable with me making the decision.

12        Q    Okay.

13        A    I think they wanted me to be the one making the decision.

14        Q    Okay.

15        A    And, in this case, I never experienced a situation where I ran into any issues

16   with respect to Tax Division approval.   If I had, I would have dealt with it.

17        Q    Okay.   So you believe you had the ultimate authority over the Tax Division

18   officials in this instance?

19        A    I believe I was the decisionmaker in the case, as I said in my opening

20   statement.

21        Q    Okay.   So, even if the Tax Division disagreed, you felt that you could have

22   proceeded anyway?

23        A    If Tax Division -- if we came to an impasse -- which, as I said, didn't happen in

24   this case -- and I felt that my position was the one I wanted to pursue, and I felt that my

25   course of action was the appropriate one, I could have appealed to the Deputy Attorney

1    General or the Attorney General.

2         Q    I mean, the whistleblowers testified that there were a series of

3    disagreements over, you know, whether the 2014 and 2015 -- the 2014 and 2015 tax

4    years, by the way, with Hunter Biden are pretty crucial years because that's all the

5    Burisma income.    That's all the income that flowed from the official acts of the former

6    Vice President.

7         And so, 2014 and 2015, those tax years were crucial to the Hunter Biden

8    prosecution.    Isn't that correct?

9         A    Again, that's a matter you know I can't comment on, and I shouldn't be

10   commenting on because it implicates the investigation and my ongoing litigation.

11        Q    And we heard from the whistleblowers that, during the course of the

12   investigative work, the Tax Division and everyone prosecuting it that was on the

13   prosecution team was in favor of moving forward on the 2014 and 2015 tax years until

14   they weren't.    Are you aware of that?

15        A    I'm not going to comment on that.    That's deliberative process.    There will

16   come a time, however, when I look forward to having the opportunity in the submission

17   of a report to address matters such as the one you just spoke to.

18        Q    Okay.    Are you aware of the special agent report that was prepared by

19   Mr. Ziegler?

20        A    I am aware that IRS prepared a report.

21        Q    And do you remember when that was?

22        A    I believe the report was completed in early 2022, I believe.    That's my best

23   recollection.

24        Q    And, as we understand it, there was a series of meetings in the fall of 2021

25   with everyone on the prosecution team -- the assistant United States attorneys in your

1    office, you were involved, the Tax Division officials were involved, FBI officials were

2    involved, IRS investigators were involved -- in the fall of 2021 about how to proceed on

3    charging Mr. Biden.    Do you remember that?

4         A    No, I don't.

5         Q    Okay.    And, from that, the special agent report resulted -- and Mr. Ziegler

6    testified that, after meetings in October of 2021, he left that meeting with the

7    understanding that he was to prepare the first draft of the special agent report, and he

8    began that over the November timeframe of 2021.    Is that your understanding?

9         A    I have no idea what Mr. Ziegler's understanding was, nor could I speak to it,

10   nor should I be speaking to it, given the scope of my testimony and the implications to the

11   investigation and the deliberative process.

12        Q    But you're aware a special agent report was prepared in this case, correct?

13        A    As I said a moment ago, yes, I am aware a special agent report was prepared,

14   and as you have suggested, that's something that apparently should be prepared by the

15   special agent.

16        Q    Okay.    And you indicated that it was finalized in the beginning part of 2022,

17   correct?

18        A    That's the best of my recollection.

19        Q    Which was right around the same time that you initiated communications

20   with Mr. Carlin and Mr. -- and ultimately Mr. Weinsheimer, right, and then Mr. Graves?

21        A    It is right about the time, or I initiated contact sometime after that.

22        Q    Okay.    So, before you initiated contact with Mr. Carlin and

23   Mr. Weinsheimer, the team had reached a consensus that that was what it was going to

24   do, correct?

25        A    Before I reached out, as I mentioned a moment ago, the special agent's

1    report had been completed.

2        Q    Okay.    What was the next step after the special agent report was

3    completed?

4        A    What do you mean what was the next step?    I'm not sure -- I want to make

5    sure I fully understand your question.

6        Q    Well, the special agent -- the IRS prepared a special agent report, correct?

7        A    Yes.

8        Q    And the next step, as we understand it, was that report was analyzed by DOJ

9    officials both in the Tax Division and in your office, correct?

10        A    I'm not going to talk about the review, analysis of that report, or any other

11    report that would necessarily get into the deliberative process.    That's something I

12    shouldn't be addressing.

13        Q    Okay.    Was a memo prepared subsequent to the receiving of the special

14    agent report by the Tax Division lawyers?

15        A    I'm not going to talk about any memoranda that was prepared during the

16    course of this investigation.    That would entail deliberative process.

17        Q    Okay.    But, before you called Mr. Graves, was there any disagreement

18    about your plan to call Mr. Graves and to proceed in D.C.?

19        A    Again, that would entail discussions regarding deliberative process among

20    prosecutors, agents, others.    So, no, it's not a matter I can discuss.

21        Q    Okay.    At that point in time, had the Tax Division given you discretion to

22    move forward on all the tax years or just 2014 and 2015?

23        A    Again, those are matters that are related to the deliberative process, go to

24    the investigation, and are matters that, at this point in time, I'm just not in a position to

25    discuss.    I would expect that I would be in a position at the conclusion of our

1    investigation where I can address it in the submission of the report.

2        Q    Okay.   I'm going to turn to the letter that we marked as exhibit 1, the June

3    7th letter.   And this is your first letter to Mr. Jordan.

4        Initially, Mr. Jordan had written the Department, and we were a little surprised

5    that you replied to Mr. Jordan's initial letter.   Could you help us understand how that

6    came to be?

7        A    Mr. Jordan's letter -- I can't really get into the particulars -- the who, what,

8    when, and where -- because, again, that gets into deliberative process in responding to

9    the chairman's letter.

10       But I'd say that these were matters that clearly addressed circumstances, given

11   the case I thought was being referenced, and the questions posed matters within my

12   purview.   So it seemed appropriate for me to respond.

13       Q    Okay.   So did the Department ask you to respond, or did you ask the

14   Department if you could respond?

15       A    There were discussions.   Again, I don't want to get into the particulars, but

16   there were discussions with members of the Department about the response.

17       Chairman <u>Jordan.</u>   We actually sent two letters.   We sent a letter in February to

18   the Attorney General, who didn't respond.   He didn't respond.   You didn't respond.

19   No one responded.   And then we sent the letter on May 25th to the Attorney General

20   that you responded to.

21       And I guess what Steve is asking is, did the Attorney General call you up and say,

22   "Hey, David, I want you to respond to this letter"?   How did that work?

23       Mr. <u>Weiss.</u>   He did not.

24       Chairman <u>Jordan.</u>   Who told you to respond?

25       Mr. <u>Weiss.</u>   No one told me to respond.   As I said --

1          Chairman <u>Jordan.</u>   Well, how did you know -- if the letter didn't go to you, how

2   did you find out?

3          Mr. <u>Weiss.</u>   The letter was shared with me because -- well, I shouldn't say.   I

4   don't know.   The letter was shared with me because it seemed to concern a matter with

5   the Hunter Biden investigation.   So it was shared with me.

6          And there were discussions with members from ODAG and others.   And I agreed

7   to send the letter -- I agreed to sign the letter.   And --

8              BY MR. CASTOR:

9   Q    So you didn't write the letter?

10   A    Look, I --

11   Q    Your office didn't write it, though?

12   A    No, that's not true.   I'm not going to get into the particulars because it's a

13   deliberative process.

14          But, as you guys have noted, I had never previously responded to a letter from the

15   chairman.   I wasn't going to sign off on any communication with Congress that I didn't

16   fully endorse.   So these are matters that I addressed that I was comfortable saying in

17   response to the chairman's letter.

18   Q    Okay.   Are you familiar with the Linder Letter?

19   A    Am I familiar with it?

20   Q    Yeah.

21   A    I mean, I know it's referenced here.

22   Q    But, before this, did you know anything about the Linder Letter?   I mean,

23   this is pretty arcane.

24   A    I wasn't intimately familiar with the Linder Letter.

25   Q    Of course not.   Of course not.   Unless you're involved with congressional

1    investigations, the Linder Letter is not something that really anybody knows about, right?

2    You know, it's --

3        A    I don't know that.    But I'm telling you, I wasn't intimately familiar with the

4    Linder Letter.

5        Q    Okay.    And there's all sorts of, you know, text in here about the Linder

6    Letter stuff.

7        Is that the first time you became familiar with the Linder Letter?

8        A    I'm not going to get into the deliberative process.

9        But my understanding was, whether it was the Linder Letter or any other aspect

10    referenced here, these are matters that speak to investigative oversight, congressional

11    responsibilities.    It was certainly part of the education and something that is

12    appropriately addressed when responding to --

13        Q    I mean, the Linder Letter is a list of, like, every reason the Department can

14    think of not to reply to Congress.    Is that a fair assessment?

15        A    I'm not going to characterize it.    My intention wasn't -- look, I was

16    responding for the first time.

17        Q    Right.

18        A    I wasn't intending to offer a response that was nonresponsive.

19        Q    Right.    I mean, anytime Congress asks the Department something, they've

20    got, like, a menu of, like, a million reasons they can't give us the answers we want.    Are

21    you aware of that?

22        A    I am not -- I am not fully conversed in the exchange of the letters Congress

23    writes and the back-and-forth between the Department and Congress, and I shouldn't

24    say.

25        Chairman Jordan.    Our letter goes to the Main Justice.    It goes to the Attorney

1    General, and then someone shares it with you.    Who shared it with you?    How did you

2    find out?

3        Mr. <u>Weiss.</u>    I can say that I had -- I spoke to others, but, again, I don't want to get

4    into the particulars because it will get in -- necessarily get into the deliberative process.

5        Chairman <u>Jordan.</u>    Well, someone had to -- like, it just didn't, like, appear.

6    Someone had to say, like, "Hey, Mr. Weiss, we have this letter regarding a case that we

7    think you're dealing with," and then there's a response put together that you sign off on.

8        Mr. <u>Weiss.</u>    There's a response that was prepared that I signed --

9        Chairman <u>Jordan.</u>    Was it prepared by Main Justice, or was it prepared by the

10    U.S. Attorney's Office in Delaware?

11        Mr. <u>Weiss.</u>    I will say, globally, it was prepared by the U.S. Attorney's Office in

12    Delaware.

13        Chairman <u>Jordan.</u>    What does that mean?

14        Mr. <u>Weiss.</u>    That means that it was generated by the U.S. Attorney's Office in

15    Delaware.

16        Chairman <u>Jordan.</u>    With consultation from the people at Main Justice?

17        Mr. <u>Weiss.</u>    People -- again, now we're getting further and further into the

18    deliberative process, and I'm not going to do that.

19        I'm saying that it was, as I said, prepared primarily in my office, and I signed the

20    letter.    The first time signing a letter to the chairman or anyone else affiliated with

21    Congress, so I wasn't going to do it until and unless I was fully comfortable.

22        Chairman <u>Jordan.</u>    You know, the first sentence sort of says it all:    "The May

23    25th letter to Attorney General Garland was forwarded to me."

24        Mr. <u>Weiss.</u>    Yes.

25        Chairman <u>Jordan.</u>    So someone gave it to you.

1          Mr. Weiss.    Yes.

2          Chairman Jordan.    "With a request that I respond."

3          So they said you're going to -- so Main Justice said, "Hey, Mr. Weiss, we got this

4    letter.    We don't want to respond.    We're giving it to you.    You write them back."

5          Mr. Weiss.    Forwarded to me with the request that I respond.    I was asked to

6    respond.    Nobody directed me.    Nobody ordered me.    Nobody -- you know, so I can't

7    endorse that aspect of things.

8          Chairman Jordan.    Okay.

9                BY MR. CASTOR:

10         Q    And did they give you all the Linder Letter lingo?

11         A    Again, as part of the deliberative process, I became more familiar than I

12   historically had been with the Linder Letter.

13         Q    Right.    I mean, ordinarily, U.S. Attorneys don't engage with us.    I mean, we

14   frequently will write U.S. Attorneys and ask them questions about important matters,

15   and --

16         Mr. Ivey.    That was the old days.

17               BY MR. CASTOR:

18         Q    -- you know, almost uniformly, we get a letter back, or we don't get a letter

19   back.    Like, you know, in February, we didn't get a letter back.    We get a letter back

20   from the Justice Department thanking us for our interests and so forth.

21         So the fact that you responded to this letter was remarkable, and so we're just

22   curious how that came to be.

23         A    Again, I think I've tried to address it as best I can.

24         Q    Okay.    In the letter, you asserted, "I have been granted ultimate authority

25   over this matter, including responsibility for deciding where, when, and whether to file

1    charges and for making decisions necessary to preserve the integrity of the prosecution

2    consistent with Federal law, the principles of Federal prosecution, and departmental

3    regulations."

4            Was that something that you added in the letter or your staff, or was that

5    something that emanated from Main Justice?

6        A    That came from us.    The District of Delaware.

7        Q    Okay.    Can you tell us at least what offices were involved with the

8    preparation of that?    We have the Office of Legislative Affairs; you said the Office of

9    Deputy Attorney General, your office in the District of Delaware.    Any other components

10   of the Department involved in that?

11       A    No, not -- no.

12       Q    Okay.    So nobody from OLC?

13       A    I'm unaware of anyone else being involved in this.

14       Q    Okay.    And did you have telephone calls about it?    Was it email

15   exchanges?

16       A    I'm not going to get into particulars.

17       Q    Okay.    Were there email exchanges?

18       A    I don't recall, and I'm not going to get into specifics.

19       Q    Okay.    So you don't even know the answer if you were allowed to answer?

20       A    I'm allowed to answer.

21       Q    Okay.

22       A    But it doesn't mean that it's appropriate that I answer.    But I'm permitted

23   to answer, but it goes to deliberative process.    So nobody is precluding me from

24   responding.

25       Q    So you can answer my question.

1    Were there emails?

2    A    No.    I can't answer it because it gets into the deliberative process of

3    responding to the letter.

4    Q    Okay.    So you're saying that you know the answer to the question, but you

5    just are not going to give me the answer?

6    A    I'm saying that it's part of the deliberative process, and I'm not going to dive

7    into the particulars.

8    Q    All right.    You sent a subsequent letter to us on June 30th.    We marked

9    that as exhibit 2.

10    Did the decision to have you send a second letter to Congress on June 30th -- did

11    that follow the same process as the first letter in terms of the Department forwarding you

12    information?    Or how did it come to be that you responded on June 30th to the

13    chairman?

14    A    I don't have the letter that the chairman issued the second time.    I don't

15    know if it was directed to me.    I just don't recall off the top of my head.    But, certainly,

16    yeah, in the general sense, without getting into particulars --

17    Q    I can give it -- it's in response to the June 22nd letter?

18    A    All I was interested in was whether it was addressed to me.

19    Q    Right.

20    Chairman Jordan.    It was.

21        BY MR. CASTOR:

22    Q    It was.

23    A    Yeah.    So it would have sort of short-circuited a bit.    But otherwise, yes.

24    Mr. Castor.    So we'll mark it as exhibit 4 for you.

25        [Weiss Exhibit No. 4

1          Was marked for identification.]

2          BY MR. CASTOR:

3      Q    Your June 30th letter states -- this is in response to your June 22nd letter,

4  and this is responding to Mr. Jordan.

5          The second paragraph -- I'll call your attention to the second paragraph:    "At the

6  outset, I would like to reaffirm the contents of the June 7 letter drafted by my office and

7  reiterate that I'm not at liberty to provide the materials you seek.    The whistleblowers'

8  allegations relate to a criminal investigation that is now being prosecuted in the United

9  States District Court for the District of Delaware."

10          And the question I have for you is, as of June 30th, 2023, you had decided to pivot

11  back to Delaware for prosecuting this case?

12      A    As of June 30th --

13      Q    2023.

14      A    -- 2023, there had been a filing in the District of Delaware.

15      Q    Okay.    And what was that filing?

16      A    A filing of a -- an information and plea agreement with respect to the tax

17  matters and a diversion agreement with respect to the firearm charges.

18      Q    Okay.    Going down to the last paragraph on the first page, starting with the

19  last sentence on the page, "I stand by what I wrote and wish to expand on what this

20  means."

21      A    Yes.

22      Q    And flipping over to the second page, "As the United States Attorney for the

23  District of Delaware, my charging authority is geographically limited to my home district.

24  If venue for a case lies elsewhere, common departmental practice is to contact the United

25  States Attorney's Office for the district in question and determine whether it wants to

1    partner on the case.    If not, I may request Special Attorney status from the Attorney

2    General pursuant to 28 United States Code 515.    Here, I have been assured that, if

3    necessary after the above process, I would be granted 515 authority in the District of

4    Columbia, Central District of California, or any other district where charges could be

5    brought in this matter."

6            Isn't it also true that your lawyers could have been afforded SAUSA status?

7        A    SAUSA status solely as -- in a supporting way to the District of Columbia?

8        Q    Well, it's our understanding -- and maybe I misunderstood what you said

9    earlier -- that one of the ways you could have prosecuted a case in D.C. was to have

10   Mr. Graves appoint your lawyers Special Assistant United States Attorneys for the District

11   of Columbia to prosecute the case?

12       A    I don't know -- I don't recall describing it that way.

13       Q    Okay.

14       A    You know, I didn't envision a circumstance in which this would proceed

15   without me continuing to be involved in a supervisory way.    Regardless of whether D.C.

16   chose to partner or not, my expectation and intention was that I would continue to

17   participate in a supervisory capacity as the case moved forward.

18       Q    Okay.    Do you agree that the June 7th letter and the June 30th letter are

19   sort of describing two separate situations?

20       A    No, I don't.

21       Q    Okay.    Because, in the June 7th letter, you indicate that you've been

22   granted ultimate authority over this matter, including the responsibility for deciding

23   where, when, and whether to file charges.

24       A    Uh-huh.

25       Q    But, in the June 30th letter, you walk us through how you have got to confer

1    with, you know, the various U.S. Attorneys in the different districts.

2          A     Yeah.

3          Q     Could you help us understand the difference there?

4          A     Yeah.    I don't see it as an inconsistency.    It doesn't mean I don't have the

5    authority.    And, again, you read it the first time.    You didn't this last time.

6          In the June 7th letter, I say -- I talk about my authority, and I say "consistent with

7    Federal law, the principles of Federal prosecution, and departmental regs," which means

8    I'm not operating in a vacuum.

9          There's a basic structure and a framework that, as a U.S. Attorney, I'm operating

10   within.    And that means that, if I go outside my jurisdiction, I've got to do certain things.

11   And, in this situation, if I go outside the jurisdiction, I'm describing in the second letter the

12   process that I adhered to.

13         It doesn't mean that anybody blocked my authority or prevented me from

14   pursuing charges.    I'm just trying to describe the process that references the consistent

15   language in the June 7 letter.

16         Q     But, in the June 7th letter, if you had been granted indeed ultimate

17   authority, you didn't need to ask Matthew Graves whether he wanted to partner with

18   you, correct?

19         A     There would have never been a situation where I'm granted ultimate

20   authority and all the processes that are part of DOJ's framework and the Department

21   within which I operate are -- suddenly disappear.    I had the authority, but still, I had to

22   proceed consistent with departmental processes.    I'm describing one of those processes

23   here.

24         Nobody blocked me.    Nobody prevented me.    I still had the authority, and I had

25   the ability to make the decision.

1     [11:04 a.m.]

2            BY MR. CASTOR:

3        Q    But on June 7th you hadn't been afforded 515 authority.    And so you didn't

4    have ultimate authority to bring a case in D.C., correct?

5        A    On June 7th, I knew, because I had the conversations that I've previously

6    described with Carlin and Weinsheimer where they said --

7        Q    Right.

8        A    -- if you want to proceed in D.C., you have the authority to do so, and you

9    can file whatever charges you deem appropriate.

10       Q    Right.

11       A    To me, it didn't require that I then do it.    It had been represented to me

12   that I had the authority.    So it was a done deal, as far as I was concerned.

13       Q    Right.    But the Attorney General would've had to confer that authority to

14   you.    I mean, you didn't have it at that time.

15       A    The Attorney General --

16       Q    You were advised that you'd be getting that authority if you really wanted it.

17       A    No.    I was advised at that time, if I decided to proceed in D.C., I had the

18   authority to do so.    That's the way -- I'm telling you what I understand, what I believed.

19       Q    So you didn't need a 515 designation from the Attorney General?

20       A    No.    In order to put this into place, in order to execute on the

21   representation that I've just described a couple times --

22       Q    Right.

23       A    -- that would've required an order signed, and that would've ultimately

24   conferred the authority.    Yes, there would've been a documentation of the --

25            Chairman Jordan.    So you go to D.C., you ask them to partner, and they say no.

1     Then you have the meeting with Carlin and Weinsheimer at Main Justice, and they said,

2     you can have the authority if you want it.    But you never asked for it.    And yet you

3     conveyed to us you had it all along.

4          Mr. Weiss.    Yeah, they con- -- first of all, it wasn't a meeting in D.C.; it was a

5     phone call.    And I had -- the conver- --

6          Chairman Jordan.    But after you had the conversation with Weinsheimer and

7     Carlin -- you meet with them, phone call, email, whatever -- phone call, you meet with

8     them, or you talked to them --

9          Mr. Weiss.    I talk to them.    They say, if you want to proceed in D.C., you have

10    the authority to move forward.    That's correct.

11         Mr. Armstrong.    Is there any written affirmation of that, or just the phone call?

12         Mr. Weiss.    At that time?

13         Mr. Armstrong.    Yeah.

14         Mr. Weiss.    No.

15              BY MR. CASTOR:

16    Q     Before our hour's up, I want to refer you to exhibit 3, which is the third

17    letter.    This is a letter you sent to Senator Lindsey Graham.

18    A     Yes.    Yes.

19    Q     You state, "To clarify an apparent misperception and avoid future confusion,

20    I wish to make one point clear:    in this case, I have not requested Special Counsel

21    designation pursuant to" the CFR -- I'm paraphrasing here.    "Rather, I had discussions

22    with Departmental officials regarding...appointment under...515, which would have

23    allowed me to file charges in a district outside my own without the partnership of the

24    local U.S. Attorney."

25         What did you mean when you wrote that you would be granted this authority if it

1    proved necessary?    And this is on July 10th.

2         A    Again, this is the same back-and-forth we've been having -- I had with you,

3    counsel --

4         Q    Right.

5         A    -- and with the chairman, where, if I decided to move forward -- it was just a

6    question of whether I decided to move forward --

7         Q    Right.

8         A    -- and where that would occur.

9         Q    Right.

10        A    That's all that the focus was, in my mind.

11        Q    Uh-huh.

12        A    I wasn't -- the authority, to the best of my belief, that had been resolved.    I

13   was going to have the authority; just a question of where I was going to move forward

14   with respect to that.

15        Q    Right.    But you agree that the term "would be" refers to a plan or intention

16   to do something in the future, correct?

17        A    I hadn't made a decision as to where the case would proceed or how the

18   case would proceed.    The focus --

19        Q    And if it --

20        A    The focus was on the case.

21        Q    Okay.    And the words "if it proved necessary" refers to a condition that had

22   not been fulfilled at the time you wrote the letter, correct?

23        A    The "if it proves necessary" refers to the fact that, as I've described on

24   multiple occasions now, I had the conversation, I had previously requested the authority,

25   and it was made clear to me, if you decide to move forward, you have the authority to do

1    so and to bring whatever charges you deem appropriate.

2    Q    Right.

3    A    So, to me, as I said a moment ago, that issue had been resolved.

4    Q    By the time we had this letter series, though, you had already asked

5    Matthew Graves to partner, you had asked Martin Estrada to partner, and both had said

6    no.

7         And so, at that point in time, it's hard for us to understand, as we sit here today,

8    how didn't it prove necessary?    I mean, this is before you were afforded, you know,

9    Special Counsel status in August of 2023.    You write, you know, "if it proved necessary."

10   A    Yes, if -- as I said, if the decision was made to proceed, I knew I had the

11   authority to do so.    So, you know, why didn't it prove necessary?    The question speaks

12   to deliberations --

13   Q    Right.

14   A    -- charging decisions.    Those are things I just can't get into.

15   Q    But in, you know, July of 2023 and at the end of this letter series that we're

16   discussing, you know, over a year had elapsed since you'd gone to D.C. and D.C. said no,

17   you'd gone to Los Angeles and Los Angeles said no.

18        And so it's just hard for us, as we sit here today, to understand how, in fact, you

19   did have ultimate authority to bring a case wherever you, you know, deemed fit.

20   A    Yeah.    I appreciate your question.    I can't get into the specifics of the

21   charging decision or the deliberative process.    I reaffirm what I've said about my

22   authority --

23   Q    Uh-huh.

24   A    -- and that's all I can --

25   Q    Okay.

1       A       I don't want to be too repetitive.

2       Q       But you do understand that a potential appointment -- a potential

3  appointment as of July of 2023 indicates that you had not been afforded that authority,

4  correct, under 515?

5       A       I'm sorry.    Could you -- I didn't understand your question.    A potential?

6       Q       A potential appointment as a Special Attorney or as a Special Counsel, as you

7  reference in the Lindsey Graham letter, that is -- you know, indicates that you had not

8  been actually appointed at that point in time.

9       A       I had not -- the execution of the authority had not taken place, that's correct.

10  But it wasn't a function of the authority or lack thereof; it was the decision as to where or

11  how to proceed.

12      Q       Okay.

13      The hour's up.

14      Chairman Jordan.    We'll take a 5-minute break, 10-minute break, whatever you

15  guys need.

16      The Reporter.    Off the record?

17      Ms. Nabity.    Yes.

18      Mr. Castor.    Yes.

19      [Recess.]

20      ██████.    It is 11:27.    We can go back on the record.

21      Special Counsel Weiss, thank you again for joining us today.

22      Mr. Weiss.    Sure.

23                              EXAMINATION

24          BY ██████:

25      Q       At the start, I just want to clarify a couple things from the last round.

1          You're appearing here today voluntarily, correct?

2          A     I am.

3          Q     And nobody from the Department is preventing you from answering any

4     question, correct?

5          A     They are not.

6          Q     Okay.

7          At the end of the last round, there was some conversation about whether it would

8     prove necessary for you to seek 515 authority.    Do you recall that conversation?

9          A     I do.

10          Q     Okay.    I want to explore that a little bit further.

11          Before I do, could you briefly describe in layperson's terms what the term "venue"

12     means?

13          A     "Venue" is where -- there has to be a nexus with jurisdiction to file charges.

14     And, in any given case, there are -- depending upon the nature of the case, there are

15     certain facts that tell you where venue lies.

16          And, as counsel for the majority explored, there are a number of factors that will

17     determine appropriate venue in a tax case.    It could be the residence of the taxpayer, it

18     could be where the tax returns are filed, things of that sort.

19          Q     And if prosecutors do not bring a case or a charge in an appropriate

20     jurisdiction or an appropriate venue, then the court can dismiss the charges, correct?

21          A     Certainly, I would expect, as a general matter, a defense counsel to seek

22     dismissal.    I don't know that that would terminate the prosecution, but certainly could

23     give rise to motion to dismiss.

24          Q     Understood.

25          And all of that said, though, a defendant can waive his or her right to challenge

1   venue as part of a plea agreement, correct?

2        A    A defendant can waive venue.

3        Q    And if a defendant has agreed to waive venue as part of a plea agreement,

4   then the prosecutor would not need to seek authority to bring charges in any other

5   jurisdiction.   Is that correct?

6        A    A prosecutor would not seek to, yeah, to receive approval to bring charges in

7   that jurisdiction in which venue had been waived, yes.

8        Q    All right.

9        I want to move on.   And we talked about your background at the very beginning

10  of the last hour.   I want to go through that in a little bit more detail.

11       So can you say again, when did you first join the District of Delaware United States

12  Attorney's Office?

13       A    I started -- originally?   A long time ago.   I started at the U.S. Attorney's

14  Office in Delaware in '86.

15       Q    And what was your role?   What kind of cases did you prosecute?

16       A    I was an Assistant United States Attorney, and I prosecuted drug cases,

17  firearm cases, public corruption cases, economic crime cases, tax cases.   Whatever the

18  district had to offer I was more than happy to work on.

19       Q    And how long were you a career prosecutor during your first stint with the

20  District of Delaware's office?

21       A    About 3-1/2 years.

22       Q    Okay.   And then you left the U.S. Attorney's Office, correct?

23       A    I did.

24       Q    And at some point did you return to the U.S. Attorney's Office?

25       A    I did.

1   Q When was that?

2   A That was in 2007.

3   Q And what led you to return to the U.S. Attorney's Office in 2007?

4   A I had been in private practice for some time, and then I went with a client of

5 mine and was in private industry -- both positive experiences, experiences that I enjoyed.

6 But public service is different.

7   Q And when you returned in 2007, who was the U.S. Attorney in the District of

8 Delaware?

9   A Colm Connolly.

10   Q And who was Mr. Connolly an appointee of?

11   A Mr. Connolly was -- he was an appointee -- I don't know which President. A

12 Republican -- a Republican President.

13   Q Is it fair to say, if he was the U.S. Attorney in 2007, he was likely an

14 appointee of President George W. Bush?

15   A Yes.

16   Q Okay.

17   A I wasn't tracking.

18   Q When you returned to the District of Delaware in 2007, what was your role?

19   A When I returned, I was FAUSA and I was chief of the Civil Division.

20   Q And, for the record, what is FAUSA?

21   A First Assistant United States Attorney. Sorry for that.

22   Q And what is the role of the FAUSA?

23   A The FAUSA is the number-two -- at least as our office is structured and has

24 historically been structured, the FAUSA is the number-two in the District of Delaware.

25   Q Okay.

1          And then you stayed at the District of Delaware for a period of time, correct?

2          A     Until now.

3          Q     Okay.    So, in fact, you returned to the District of Delaware under President

4     George W. Bush; you stayed throughout President Obama; and now you've stayed

5     through President Trump and, again, President Biden, correct?

6          A     That is correct.

7          Q     Okay.

8          In the earlier hour, you were asked about the blue-slip process and whether you

9     had been recommended by the Senators from Delaware.

10         As part of the process for being nominated as U.S. Attorney, did you have any

11     conversations with the White House Counsel's Office?

12         A     I don't recall whether I did, in all candor.

13         Q     Did you have conversations with the Justice Department?

14         A     Yes, I did.

15         Q     And do you recall who you had conversations with?

16         A     I would've been interviewed by -- I was definitely interviewed by Rod

17     Rosenstein.    I was interviewed by Scott Schools, I believe, and a group of folks in a

18     conference room.

19         Q     And Mr. Rosenstein and Mr. Schools were both Republican appointees,

20     correct?

21         A     Mr. Rosenstein was.    I just don't know about Scott Schools.    I thought

22     Mr. Schools was the senior career official in the Department at that time.    I have no idea

23     who he was appointed by.

24         Q     Okay.

25         And then you were ultimately nominated to serve as U.S. Attorney by

1    President Trump, correct?

2         A    I was.

3         Q    Okay.

4    I want to introduce as exhibit 5 -- is that right? -- exhibit 5, the November 17,

5    2017, statement from President Trump announcing your appointment.

6                             [Weiss Exhibit No. 5

7                             Was marked for identification.]

8              BY ██████████:

9         Q    And I'll give you a minute to review.    I can tell you, we're going to look at

10   the first paragraph on the first page.    And I think your nomination is actually on the

11   second page.

12        A    Okay.

13        Q    Are you ready to proceed?

14        A    I think so.    It appears that I got most of my background information correct.

15        Q    So this statement from President Trump actually announces the nominations

16   of four U.S. Attorneys and four U.S. Marshals.    And, as I said, your name is on the second

17   page of this announcement as printed.

18             I want to read from the first paragraph, which relates to all of the individuals who

19   are nominated on November 17th, you and the others.

20             In relevant part, it says, "The United States Attorney serves as the chief Federal

21   law enforcement officer within his or her Federal judicial district."    It then describes the

22   role of the U.S. Marshals.    And then it says, "These candidates share the President's

23   vision for 'Making America Safe Again.'"

24             Is this consistent with your recollection of why you were nominated for this role

25   by President Trump?

1      A    I can't really speak to that.    From -- I can't say why I was nominated.    I

2    really don't know, I mean, other than I believe I was a credible candidate in whom the

3    folks that I interacted with had confidence that I could perform the job.    That's all I could

4    say, based on my understanding.

5      Q    Okay.

6      Is it fair to say that you've served under both Republican and Democratic

7    administrations?

8      A    I have.

9      Q    And, in fact, for the majority of your time at the U.S. Attorney's Office, you

10    were a career prosecutor, not a political appointee, correct?

11      A    That is correct.    I consider myself first and foremost a prosecutor.

12      Q    Okay.    During the course of your career, have you tried cases before a jury?

13      A    Yes.

14      Q    Approximately how many cases have you tried before a jury?

15      A    I think, the best I can recall, as I described in my background work-up,

16    somewhere in the neighborhood of 17 or so cases.

17      Q    Okay.    And you've supervised many more cases that have been tried before

18    juries; is that fair to say?

19      A    I have.

20      Q    And so you have a good understanding of the considerations a prosecutor

21    might take into account when considering whether to bring a case before a jury.    Is that

22    fair to say?

23      A    I hope that I do.

24      Q    Okay.

25      I want to move on to your interactions with the U.S. Attorney's Office in D.C.

1    and -- yeah, focus on the U.S. Attorney's Office in D.C.

2         You said that you first approached Mr. Graves in either late February or early

3    March of 2022, correct?

4         A    The conversation I had with Mr. Graves, I believe, was in early March, yes.

5         Q    Okay.    And when you approached Mr. Graves, did you ask him to provide

6    administrative support as you were exploring the possibility of bringing charges in the

7    District of Columbia?

8         A    I don't know whether I did or not, to tell you the truth.    It was one

9    conversation, 5 or 10 minutes, and I don't recall the particulars with respect to the need

10   for administrative support.

11        Q    Was it ever a concern of yours that Mr. Graves might not provide you with

12   administrative support if you chose to move forward in the District of Columbia?

13        A    Ultimately, no, it wasn't.    I understood, at the conclusion of the process,

14   not necessarily from Mr. Graves, but that we would have a logistical support if we were to

15   proceed.

16        Q    And what do you mean by "logistical support"?

17        A    I mean that we were -- we were interested in someone who could work with

18   us from an administrative standpoint, somebody who could help us in working with the

19   court and the processes that are required, the practices, local practice, things of that

20   nature -- provide some guidance as to the local logistics.

21        Q    And was it your impression that Mr. Graves and his team would, in fact,

22   provide you with that support?

23        A    It was my understanding that D.C. would've supported us in that regard

24   generally.

25        Q    Okay.

1       There were some questions earlier about Mr. Graves's decision not to join the

2   case, or not to have his office join the case.

3       You said that you provided him with the information -- or your team provided him

4   with the information they needed so he could make an informed decision.    Do you recall

5   saying that?

6       A    I recall saying something along those lines, yes.

7       Q    And can you explain what you mean by "so he could make an informed

8   decision"?

9       A    Well, not -- I wasn't directing this to Mr. Graves per se.    I don't know

10   who -- I mean, I know that career folks in Mr. Graves's office and my own office

11   interacted and discussed things.    I don't know anything about the particular

12   decision-making process itself.

13       Q    Understood.    But when you're saying "informed decision," that means that

14   you thought that it was up to Mr. Graves to make the choice, right?    It wasn't -- you

15   weren't directing him to make any particular decision.

16       A    I wasn't directing him to make a decision.    My folks were trying to provide

17   them with what we determined -- what information was necessary in order to make a

18   decision.    Of course, that couldn't have been anything like the information that we had

19   in our possession that we had developed over the course of 2-plus years or more.

20       Q    What do you mean by that?

21       A    I mean that we had been conducting an investigation for an extended period

22   of time, so we weren't about to share everything that we had.

23       Q    Okay.

24       When you approached Mr. Graves, were you under the impression that you

25   needed Mr. Graves to join the case in order to proceed in the District of Columbia?

1    A    I was not under the impression either way that I needed -- no.    I wasn't

2    asking for his permission or anything along those lines.

3    Q    Okay.

4    Did Mr. Graves tell you why he didn't want to join the case?

5    A    I never had a conversation with Mr. Graves about that.    I had the one

6    conversation when I reached out, told him what we were interested in doing, and

7    basically inquired as to whether his office would be willing to join us or participate in this

8    case.    We never had a subsequent conversation.    That was done at the line level.

9    Q    Okay.

10    When the decision was relayed to the line officials, did you have any reason or did

11    your team have any reason to believe that Mr. Graves's decision not to join the case was

12    motivated in any way based on partisan, political considerations?

13    A    I don't have -- I have -- I don't know what the basis of the decision was in

14    that regard, no.    I understand that they chose not to proceed.    I don't want to get into

15    particulars, as I said to counsel.    That involves deliberative-process types of

16    consideration, so I'm not going to speak to that.

17    Q    Did Mr. Graves take any steps to block or prevent you from bringing charges

18    in the District of Columbia?

19    A    No.    He wasn't in a position to block me.

20    Q    Did anyone on Mr. Graves's staff take any steps to block or prevent you from

21    bringing such charges?

22    A    No.

23    Q    And I think you said you did not believe that you needed permission from

24    Mr. Graves to move forward in the District of Columbia, correct?

25    A    That's correct.

1       Q    In the earlier hour, you were asked some questions about your interactions

2  with the Tax Division, and I want to return to those questions.

3       In this case, did you welcome the Tax Division's assistance?

4       A    I did.

5       Q    Why was that?

6       A    Because they're the experts in tax matters.    They have the experience; they

7  have the expertise.    And, from my perspective, the prosecution team would only benefit

8  from their input.

9       Q    Is it fair to say that tax cases can be uniquely complicated?

10      A    Yeah.    I'm not a tax expert, but yes.    They're a particular type of

11  white-collar case, and, like other white-collar cases, they can be complicated, involving

12  extensive documentations, tax returns, things of that nature.    So, yes, they can be

13  complicated.

14      Q    Okay.    And the Tax Division handles these kind of cases all the time,

15  correct?

16      A    That's my understanding, yes.

17      Q    Okay.

18      Are you familiar with the term "sufficiency of the evidence"?

19      A    Yes.

20      Q    In layman's terms, what does that mean?

21      A    That means that you have to have a certain modicum of evidence in order to

22  proceed with charges.    There has to be sufficient evidence to move forward.

23      Q    Is it fair to say that, in tax cases, in particular, which can, as you've just said,

24  be uniquely complicated, Tax Division prosecutors tend to have more experience in

25  understanding when evidence is likely to be sufficient for purposes of convincing a jury

1    that they've proven charges beyond a reasonable doubt?

2          A     I expect that Tax Division prosecutors, because this is the only type of work

3    that they do, would be uniquely qualified to weigh in on all aspects of a tax prosecution,

4    whether it's sufficiency of the evidence or other matters.

5          Q     And would that include Tax Division prosecutors having unique expertise in

6    the viability of potential defenses to charges?

7          A     Yeah.    All aspects of the case.    Yes.

8          Q     Okay.

9          The comment was made earlier about, I think, Tax Division could approve or deny

10   charges.    In fact, the Tax Division has three options, correct?    It can approve charges, it

11   can deny charges, or it can grant discretion.

12         A     That -- I'm not intimately familiar with all the intricacies of the Tax Division

13   process, but that's my understanding.

14         Q     Okay.    And when charges are approved, the U.S. Attorney's Office doesn't

15   have any discretion; it has to bring the charges that have been approved, correct?

16         A     My understanding -- and, again, I'm no expert -- is, if charges are approved

17   by the Tax Division, the charges are going to proceed.    If the U.S. Attorney's Office

18   decides not to be part of the case, Tax Division, on its own, will proceed with charges.

19         Q     Okay.    And when charges are denied, that means the U.S. Attorney's Office

20   absolutely cannot proceed with charges, correct?

21         A     That would be my understanding.

22         Q     Unless, obviously, the -- the U.S. Attorney's Office could appeal that decision.

23         A     Yeah, I mean -- yes.    Again, as I discussed with majority counsel, that's not

24   something that I experienced in this case, but, yes, I was always aware of the fact that if

25   there was a difference of opinion with respect to the appropriateness of charges, that

1    ultimately it's either the ODAG or the AG that makes the call as to whether a case would

2    proceed if there's an impasse between a U.S. Attorney's Office and a component.

3        Q    Okay.

4        And, finally, what does it mean when the Tax Division grants "discretion" to a

5    U.S. Attorney's Office over whether to bring charges?

6        A    My understanding would be, it's telling the U.S. Attorney's Office that it can

7    decide whether to proceed or not.    And then Tax Division, on its own, will decide

8    whether to be part of that case or not.

9        Q    Okay.    So, in effect, granting discretion gives a U.S. Attorney full

10    decision-making authority over whether to bring those charges.    Is that right?

11        A    That's my understanding, that, yes, then the U.S. Attorney's Office can

12    decide whether to move forward.

13        Q    Okay.    In this case, the Tax Division granted your office discretion, correct?

14        A    I'm not going to talk about what Tax Division did or did not do in this case.

15        Q    Okay.

16        You alluded to this just a minute ago, but if there had been a dispute over whether

17    to bring charges, for example, between line prosecutors at the District of Delaware and

18    line prosecutors from the Tax Division, how do you expect that might've been resolved?

19        A    Again, that calls for speculation, and, the way I understood the question, it

20    gets into the particulars of this case, which, for reasons I've discussed previously, I'm just

21    not at liberty to discuss at this point in time.    Perhaps at the time of the submission of a

22    report I could address some things like that.

23        Q    Okay.    But you've said that, ultimately, nothing rose to the level that you

24    felt you needed to intervene.    Is that fair to say?

25        A    Nothing rose to the level that I felt I needed to intervene in what respect?

1        Q       Or that you needed to seek approval from the Deputy Attorney General or

2   the Attorney General to move forward, correct?

3        A       I've mentioned -- I have stated that I don't recall a situation in this case

4   where I was at an impasse with Tax Division and we required the participation of the

5   Office of the Deputy Attorney General in order to resolve a difference of opinion as to

6   how to proceed.

7        Q       Okay.

8        I want to move on and talk about the letters that you sent to Congress.     I know

9   we went through them in some detail in the last hour, but I think we're going to take

10  another spin through them.

11       Before I get into them, though, I do want to introduce the Linder letter.     We'll

12  introduce that as exhibit 6.

13       Voice.    It's already introduced.

14       ██████.   Is it introduced?

15       Mr. Castor.   No, I --

16       ████████.    I don't think it was introduced.

17       Mr. Weiss.    No.

18                              [Weiss Exhibit No. 6

19                              Was marked for identification.]

20               BY ███████:

21       Q       You've seen this letter before, correct?

22       A       Which letter?

23       Q       The Linder letter.

24       A       I have -- I have seen it before.

25       Q       Okay.

1          And I just want to make the record clear, this is a letter from Robert Raben, who

2    was the Assistant Attorney General for the Office of Legislative Affairs at the Department

3    of Justice, to the Honorable John Linder, who at that time was the chairman of the

4    Subcommittee on Rules and Organization of the House for the House Committee on

5    Rules.

6          That's what it says on the face of the letter, correct?

7          A     That is what it says on the face of the letter.

8          Q     What is the date on the Linder letter?

9          A     January 27, 2000.

10         Q     Okay.    So this letter has actually been in effect for 23 years at this point.

11   Is that fair to say?

12         A     This letter was written on January 27, 2000.    The effectiveness I can't really

13   speak to.

14         Q     So my point is, it's not something that was given to you as a new product

15   when you were looking at responding to these letters, correct?

16         A     It does not appear to be a new product.    As I suggested to counsel, I don't

17   know that I had previously reviewed the Linder letter.

18         Q     Okay.

19         Looking at your June 7th letter, which is marked as exhibit 1, you said earlier you

20   wrote -- you signed this letter.

21         A     I signed this letter, yes.

22         Q     And, in doing so, these are your words, correct?

23         A     These -- I am -- yes, these are my words.

24         Q     Okay.

25         The first paragraph reads -- I'm sorry, the first full paragraph; I guess it's actually

1    the second paragraph -- reads, "I want to make clear that, as the Attorney General has

2    stated, I have been granted ultimate authority over this matter, including responsibility

3    for deciding where, when, and whether to file charges and for making decisions necessary

4    to preserve the integrity of the prosecution, consistent with federal law, the Principles of

5    Federal Prosecution, and Departmental regulations."

6         Correct?

7         A    Correct.

8         Q    Your letter specifically notes that your decision and authority are, quote,

9    "consistent with federal law, the Principles of Federal Prosecution, and Departmental

10   regulations."   Why was it important for you to include this language in this letter?

11        A    As I said previously, it was important because I wanted to make it clear that I

12   have the authority but, like other U.S. Attorneys, I am subject to certain processes.

13   There's a framework within the Department of Justice.   I'm not operating in a vacuum,

14   and there are certain requirements that exist with respect to particular actions.

15        Q    The reference here to the Principles of Federal Prosecution is a reference to

16   the Principles of Federal Prosecution in the Justice Manual, correct?

17        A    Yes.

18        Q    And, briefly, for the record, could you explain what the Justice Manual is?

19        A    The Justice Manual is a set of rules, regulations, procedures that basically

20   provides guidance to Department of Justice personnel.

1    [11:49 a.m.]

2                    BY ███████:

3         Q    Okay.    And what are the Principles of Federal Prosecution themselves?

4         A    The Principles of Federal Prosecution provide guidance with respect to, in

5    particular, charging decisions.    They speak to the proof, that if you're going to proceed

6    with charges, there are certain guidelines that you should look to.    And the first section

7    of that deals with sufficiency.    The second part of it deals with whether the matter

8    you're pursuing is an appropriate Federal case.    And there are factors that attend

9    Federal case analysis.

10        Q    Okay.

11             I'm going to introduce as exhibit 7 an excerpt from the Justice Manual, section

12   9-27.000.    This is the Principles of Federal Prosecution.

13                             [Weiss Exhibit No. 7

14                             Was marked for identification.]

15                    BY ███████:

16        Q    And we're going to look at the preface, which is section 9-27.001.

17             You've seen this before?

18        A    I suspect that I have.

19        Q    Under the preface, the fourth paragraph down, it states that the purpose of

20   the Principles of Federal Prosecution -- sorry -- that there are two important purposes for

21   the Principles of Federal Prosecution:    quote, "ensuring the fair and effective exercise of

22   prosecutorial discretion...by attorneys for the government, and promoting confidence on

23   the part of the public and individual defendants that important prosecutorial decisions

24   will be made rationally and objectively based on an individualized assessment of the facts

25   and circumstances of each case."

1          Did I read that correctly?

2          A     Yes.

3          Q     Okay.    Taking this clause by clause, what is your understanding of what

4    "ensuring the fair and effective exercise of prosecutorial discretion...by attorneys for the

5    government" means?

6          A     It means that we're charged with making decisions based on the applicable

7    facts and the law.

8          Q     Okay.    In layman's terms, what does "prosecutorial discretion" mean?

9          A     All prosecutors have discretion, so they are required to exercise their best

10   judgment based on their experience and expertise in trying to seek a just conclusion of

11   the matter that's before them.

12         Q     Why is it important for prosecutorial discretion to be exercised fairly and

13   effectively?

14         A     Because prosecutors have tremendous authority whether to pursue a matter

15   that curtails someone's liberty.    I mean, we send people to jail.    That's a huge

16   responsibility.    And prosecutors are required to exercise that discretion in a judicious

17   fashion.

18         Q     And so is it fair to say that the Principles of Federal Prosecution, which you

19   cite in your June 7th letter, part of the purpose is to ensure that defendants are treated

20   fairly under the law by prosecutors?

21         A     Absolutely.    We're trying to defeat -- "defeat" -- to treat everyone, the

22   person in this case or people that we're dealing with in this case and all other matters

23   that we prosecute in my district -- you're trying to treat everyone equally and fairly under

24   the law, yes.

25         Q     Okay.

1        And the second clause in the sentence I read earlier says "promoting confidence

2   on the part of the public and individual defendants that important prosecutorial decisions

3   will be made rationally and objectively based on an individualized assessment of the facts

4   and circumstances of each case."

5        What's your understanding of why it's important to promote confidence in the

6   public and in individual defendants in this way?

7        A     Well, the rule of law is key.    And the rule of law only survives and flourishes

8   if the public believes that folks responsible for enforcing the law are doing that in a fair

9   fashion.

10       Q     So is it fair to say that, by noting in your June 7th letter that your authority

11  would be exercised consistent with all relevant laws and regulations and the Principles of

12  Federal Prosecution, you were actually noting that you would be treating this matter in

13  accordance with the guidelines applicable to all Federal cases in order to ensure that

14  prosecutorial discretion would be fairly exercised and the public could have confidence in

15  your decision-making?

16       A     That's what we're trying to accomplish, yes.

17       Q     Okay.    And, in fact, if you were not adhering to the Principles of Federal

18  Prosecution and Federal law and Departmental regulations, you would've actually been

19  treating this matter different than other Federal prosecutions, correct?

20       A     Yes.    We would only -- we would adhere to the Principles of Federal

21  Prosecution.    We're required to.    It would be inappropriate to diverge from those basic

22  principles.

23       Q     Okay.

24       I want to move on to your June 30th letter, which is exhibit 2.

25       In the prior hour, it was suggested that the June 30th letter and the June 7th letter

1    were somehow inconsistent, and you said you did not agree with that assessment,

2    correct?

3         A    I did say that.

4         Q    Okay.    And, in fact, your June 7th letter states that your authority is to be

5    exercised consistent with Federal law, Principles of Federal Prosecution, and

6    Departmental regulations, and then you reiterate that on your June 30th letter at the

7    bottom of the first page, correct?

8         A    I did.

9         Q    Okay.

10        And, then, at the top of page 2 of your June 30th letter, you state that your

11   "charging authority is geographically limited to my home district."

12        Can you briefly explain what you meant by that?

13        A    Yes.    There are 94 U.S. Attorneys around the country.    We can't just go

14   gallivanting around and prosecute cases wherever we decide we'd like to do so.    We're

15   responsible for our home districts.    You know, I am U.S. Attorney for the District of

16   Delaware only, and if I have an interest in pursuing a matter elsewhere, there are certain

17   procedures that have to be followed.

18        Q    Okay.    And that's true for all U.S. Attorneys, correct?

19        A    Yes.

20        Q    And that is set by statute and also by Departmental regulations, correct?

21        A    Yes.

22        Q    Okay.

23        I want to introduce -- actually -- so I want to introduce as exhibit 8 section

24   515 -- sorry.    We're going to introduce 28 U.S.C. 515.

25                                    [Weiss Exhibit No. 8

1          Was marked for identification.]

2          BY ███████:

3    Q    Have you seen this before?

4    A    I have.

5    Q    Paragraph (a) -- section 515(a) reads, "The Attorney General or any other

6    officer of the Department of Justice, or any attorney specifically appointed by the

7    Attorney General under law, may, when specifically directed by the Attorney General,

8    conduct any kind of legal proceeding, civil or criminal, including grand jury proceedings

9    and proceedings before committing magistrate judges, which United States attorneys are

10   authorized by law to conduct, whether or not he is a resident of the district in which the

11   proceeding is brought."

12         Did I read that correctly?

13   A    Yes, I believe you did.

14   Q    Okay.    28 U.S.C. section 515 is a Federal statute, correct?

15   A    Yes.

16   Q    And it describes the process by which a U.S. Attorney, or any other attorney

17   for that matter, can be granted authority to bring charges outside of their district,

18   correct?

19   A    Yes.

20   Q    Okay.

21         So, in your June 7th letter, you referred to "subject to applicable statutes."    You

22   said that it's statute and regulation that limited your geographical charging authority, but

23   also it's section 515, which is a Federal statute, which is the process by which you can

24   obtain authority to charge outside your district, correct?

25   A    Yes.

1    Q    So that is, in fact -- so the reference in your June 30th letter to section 515

2    authority is fully consistent with the reference to Federal statute and regulation in your

3    June 7th letter, correct?

4    A    I thought it was consistent.    And that's what I intended to do -- refer back

5    to the language in my prior letter.

6    Q    Okay.

7         And before we move on from your June 30th letter, the third paragraph on the

8    first page reads, "First, the Department of Justice did not retaliate against 'an Internal

9    Revenue Service ("IRS") Criminal Supervisory Special Agent and whistleblower, as well as

10   his entire investigative team...for making protected disclosures to Congress.'"

11        Was that a true and accurate statement at the time that you signed this letter?

12   A    Yes.

13   Q    And is it true and accurate to this day?

14   A    Yes.

15   Q    Okay.

16        And I want to turn, to complete the record, to the July 10th letter to Senate

17   Judiciary Committee Ranking Member Lindsey Graham.    This is exhibit 3.

18        You said that, as of July 10, 2023, you had not asked to be designated Special

19   Counsel.    Was that an accurate statement?

20   A    Yes.

21   Q    Do you recall when you first requested to be made Special Counsel?

22   A    The only time was in August of 2023.

23   Q    Do you recall the date?

24   A    I think it's August 11th, as best I can recall, but that's my best recollection.

25   Q    Okay.    And when you made the request, you were made Special Counsel

1    within days, correct?

2         A     In fact, I'm not sure whether I'm confusing the date on which I made the

3    request with the date on which the request was granted.    So it was in proximity to

4    August 11th.

5         Q     Is it fair --

6         A     So, yes, once I made the request, in response to your question, it was, I

7    believe, 2 days later that the request was granted.

8         Q     Okay.

9              On September 20th of this year, Attorney General Garland testified before the

10   House Judiciary Committee.    He told the committee that, quote, "Mr. Weiss has

11   authority to conduct his investigation however he wishes."

12             Is it true that you have full authority to conduct your investigation however you

13   wish?

14        A     I believe I have the authority to conduct the investigation as I determine is

15   appropriate, yes.

16        Q     And the Attorney General said that you have authority over all matters that

17   pertain to Hunter Biden.    Is it accurate that you have authority over all matters

18   pertaining to Hunter Biden?

19        A     I believe that I have the authority to proceed with respect to my

20   investigation or any charging decisions with respect to the Hunter Biden matter as I deem

21   appropriate, yes.

22        Q     Okay.    Has the Attorney General ever blocked you from taking any step that

23   you wish to take in this investigation?

24        A     No one has ever blocked me with respect to taking any step that I perceived

25   was appropriate.

1   Q Has the Deputy Attorney General ever blocked you from taking any step you

2 wish to take in this investigation?

3   A No one has blocked me from taking appropriate steps.

4   Q Okay.

5   Are you familiar with an individual named Lesley Wolf?

6   A I am.

7   Q Who is Ms. Wolf?

8   A Ms. Wolf is an AUSA who works in my office.

9   Q There have been allegations that Lesley Wolf acted out of bias or was

10 motivated by political considerations.    What's your response to that allegation?

11   A Yeah, I'm not going to discuss any particular allegations.    Lesley Wolf has

12 been a dedicated public servant for more than 16 years.    I believe she is an excellent

13 lawyer and is a person of integrity.

14   Q There have been arguments made in other transcribed interviews we've held

15 that the Biden family is, quote/unquote, "royalty in Delaware" and that it would,

16 therefore, be impossible for your office to be impartial in matters related to the Biden

17 family.

18   What is your response to those allegations?

19   A Look, our responsibility as prosecutors is to follow the evidence and the law,

20 regardless of the circumstances, regardless of the defendant.    And that's what

21 we're responsible for doing, and that's the only way the public is going to have confidence

22 in the process, if we proceed in accordance with that principle.

23   Q In the earlier hour, you were asked about a special agent report supposedly

24 prepared by Special Agent Ziegler.

25   Without getting into the specifics of that report itself, are you familiar generally

1     with what special agent reports are?

2         A    I'm familiar with -- I mean -- with reports that are prepared by agents who

3     work on Federal cases, yes.    I am generally familiar with those, yes, reports.

4         Q    And are you familiar with prosecution memos?

5         A    I am familiar with prosecution memos.

6         Q    Can you describe what a prosecution memo is?

7         A    At least in the District of Delaware, as a general matter, a prosecution memo

8     sets out the basis to proceed in a prosecution and will address key components that are

9     required in the decision-making process.

10        Q    Are special agent reports or memos prepared by investigators different than

11    prosecution memos?

12       A    Well, I want to make sure we're clear on, I don't know if you're talking about

13    the report in this case that was prepared in early 2022 versus reports or memoranda of

14    interview or in the FBI 302s that are prepared in the course of an investigation.

15       Q    Fair.    So what I'm looking at -- and I don't want to get into the specifics of

16    this case necessarily, but I wanted --

17       A    I would be unable to do so.

18       Q    I understand that.    I want to explore the differences between what might

19    be contained in an investigative memo and a prosecution memo, because they're

20    different, right?

21       A    Well, if we're talking about the typical report, the typical report prepared by

22    an agent describes the facts that he or she has developed on a particular matter.    It

23    might be based on an interview, a surveillance that the agent conducted, or something of

24    that nature, and that's always reduced to a report in the course of an investigation.

25       Q    And that's different than a prosecution memo, correct?

1        A    Yeah.    A prosecution memo serves a different function; that's correct.

2        Q    And what's the function of a prosecution memo?

3        A    To evaluate the evidence and to explain to the reader why there's a basis to

4 proceed with a prosecution.

5        Q    Okay.    And a prosecution memo actually analyzes the facts against the law,

6 correct?

7        A    Absolutely, yes.

8        Q    And it also looks at potential defenses?

9        A    Yes.    If it's done appropriately, it takes into account potential defenses and

10 the risks/reward and the -- and handicapping the case.

11        Q    Okay.    And those are the type of things that wouldn't be in a special agent

12 report, which just describes the pure facts that have been developed, correct?

13        A    From my perspective, no, they wouldn't be in an investigative report; that's

14 correct.

15        Q    Okay.

16        And I want to look at some of the considerations that prosecutors take into

17 account that might be included in a prosecution memo or might just be things they take

18 into account when they're considering whether to charge a case.

19        I want to turn back to the Principles of Federal Prosecution and look at section

20 9-27.220, which is the section entitled "Grounds for Commencing or Declining

21 Prosecution."

22        The section reads, "The attorney for the government should commence or

23 recommend federal prosecution if he/she believes that the person's conduct constitutes a

24 federal offense, and that the admissible evidence will probably be sufficient to obtain and

25 sustain a conviction, unless (1) the prosecution would serve no substantial federal

1    interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3)

2    there exists an adequate non-criminal alternative to prosecution."

3          Did I read that correctly?

4          A     You did.

5          Q     Okay.    So, under these principles, prosecutors should only bring charges

6    when, among other considerations, they believe that the admissible evidence will

7    probably be sufficient to obtain and sustain a conviction, correct?

8          A     That's correct.

9          Q     And in layperson's terms, what does "admissible evidence" mean?

10         A     It means evidence that you're going to get to the jury.

11         Q     Okay.

12         The burden of proof for a criminal prosecutor to obtain a conviction at trial is

13   "beyond a reasonable doubt," correct?

14         A     Correct.

15         Q     "Beyond a reasonable doubt" is the highest evidentiary standard in law,

16   correct?

17         A     Correct.

18         Q     It's higher than the "probable cause" standard that is needed to obtain an

19   indictment, correct?

20         A     Yes.

21         Q     And it's higher than the "preponderance of the evidence" standard that's

22   often needed to obtain a judgment in a civil case, correct?

23         A     It is.

24         Q     In your experience as a Federal criminal prosecutor, is it fair to say that it can

25   be very difficult to convince a jury beyond a reasonable doubt to convict even when you

1    have a significant amount of evidence that a defendant has violated a law?

2         A    At times it can be, yes.

3         Q    In fact, in order to obtain a criminal conviction, you need not only to

4    establish the defendant's guilt beyond a reasonable doubt but you actually have to

5    convince 12 jurors that you've met that very high standard of proof, correct?

6         A    You do.    Jurors have to make these decisions unanimously.

7         Q    And when you say they have to make the decision unanimously, that means

8    that if even one single jury has what he or she considers to be a reasonable doubt, that

9    juror will be instructed to find your defendant not guilty, correct?

10        A    If that juror cannot reconcile his or her differences with the majority of the

11   jury, yes.

12        Q    Okay.

13             I want to talk through some of the considerations that a prosecutor might take

14   into account when weighing whether the admissible evidence will probably be sufficient

15   to obtain and sustain a conviction beyond a reasonable doubt.

16             We talked through sufficiency of the evidence earlier.    Is sufficiency of the

17   evidence something that a prosecutor might take into account?

18        A    In deciding?

19        Q    In deciding whether to bring charges?

20        A    Yeah, absolutely.

21        Q    Okay.

22             Does the ability to explain the charges effectively to a jury matter?

23        A    Yeah, even if you have the evidence, you have to be able to convey the

24   significance of that evidence to the jury.    And most good lawyers, good prosecutors, if

25   you've got sufficient evidence, they'll figure out a way to articulate the basis for a

1    conviction.

2         Q    But it can be challenging, because facts can be complicated, correct?

3         A    Can be challenging, particularly in more complicated cases, yes.

4         Q    Are defenses to a charge something that a prosecutor would take into

5    account when deciding whether or not to charge?

6         A    Defenses are something that good prosecutors should be very mindful of

7    when deciding whether to proceed, yes.

8         Q    And taking all of these things into account, a prosecutor can only bring

9    charges if, based on those considerations, the prosecutor is confident that they can

10   obtain and sustain a conviction, correct?

11        A    You're going to recommend a charge when you think you can prevail and

12   persuade a jury, yes.

13        Q    Okay.

14            How do you prosecutors learn how to assess and evaluate the type of concerns we

15   just talked through?

16        A    They read.   They listen to others.   They watch cases.   They develop by

17   their own experiences.   And they -- look, most folks that come to a U.S. Attorney's Office

18   have some level of experience, but the more you work as a prosecutor, the more you

19   appreciate making these judgment calls.

20        Q    And is it fair to say that prosecutors, therefore, have kind of unique

21   experience in making those judgment calls?

22        A    Yes.   Especially, you know, the experienced prosecutors have unique

23   experience in making these decisions, yes.

24        Q    And is it fair to say that investigators who are working on the case probably

25   don't have that same experience making the judgment calls about whether to bring

1    charges?

2         A    I mean, it's fair to say that investigators, by virtue of their responsibilities,

3    aren't called upon to make these decisions.    Some investigators who have experience

4    and have been around a while and are really good understand and appreciate

5    prosecutorial determination, some more than others.

6         Q    In general, is it fair to say that one unique difference between investigators

7    and prosecutors is that investigators generally do their work before trial and before the

8    stage where the evidence is actually contested and prosecutors have to think about

9    presenting the evidence to a jury in a contested setting?

10        A    Yeah, now, that's generally the case, but the fact is, agents continue to work

11   not only before trial -- or, the bulk of their work is done before trial, but they continue to

12   do all kinds of things during the course of a trial.

13        And prosecutors -- the best prosecutors do the bulk of their work before trial.

14   The presentation then takes over.    So it's the actual responsibility, then, to present your

15   case to the jury.    But the presentation doesn't go well if you haven't done your

16   homework well in advance.

17        Q    Understood.    My point is just that prosecutors, as opposed to investigators,

18   have to consider how the facts and the evidence will play out in an adversarial setting.

19   Is that fair to say?

20        A    They have to consider that if they're going to be successful and persuade a

21   jury, yes.

22        Q    Okay.

23        Given the difference in roles between investigators and prosecutors, is it

24   surprising that there are sometimes differences in opinion between investigators and

25   prosecutors about, for example, the strength of the evidence and the likelihood of

1  success at trial?

2      A      Yeah, I can say that it is not unusual for prosecutors and agents to, at times,

3  disagree as to strength of the case, investigative decisions, things of that nature.      It does

4  happen from time to time.

5      Q      And in the course of your career as a prosecutor and as a supervisor of

6  prosecutors, have you experienced these disagreements?

7      A      Sure.      Part of my responsibilities entail running into those and trying to

8  resolve those.

9      Q      And how do you work to resolve those differences?

10      A      You make sure that everyone has an opportunity to be heard.      You hash it

11  out; you talk it through.      And, you know, if the parties are unable to -- that is, the agents

12  and the prosecutors -- to persuade or come to a consensus, you make a decision as to

13  how you're going to proceed.      And hopefully everybody gets on board, and then you

14  proceed.

15      Q      And if everybody doesn't get on board, though, it's prosecutors that have

16  the final say, correct?

17      A      Typically, the prosecutors -- especially when it comes to charging decisions

18  and how the case is going to move forward, prosecutors are ultimately making that

19  decision.

20      Q      And that's because prosecutors are responsible for actually bringing the case

21  to trial, correct?

22      A      The prosecutor is responsible for -- yes, for putting together the evidence

23  and presenting the case at trial, yes.

24      Q      And it's ultimately the prosecutor's decision as to whether the strength of

25  the evidence will be sufficient to convince 12 jurors beyond a reasonable doubt, correct?

1          A      It is.

2          Mr. <u>Goldman.</u>     Could I just add something on this line of questioning?

3          Is it common for prosecutors to meet with defense counsel to get a presentation

4    from them prior to making a charging decision?

5          Mr. <u>Weiss.</u>     In the run-of-the-mill case, it certainly will happen that prosecutors

6    will hear from defense counsel.    In tax cases, my understanding is, it's sort of part of the

7    process.    Taxpayer conferences are generally built into the tax process, as I understand

8    it.   I'm not an expert.    That's my understanding.

9          Mr. <u>Goldman.</u>    Well, you can confirm that Hunter Biden's lawyers made

10   presentations to your office as part of this investigation, correct?

11         Mr. <u>Weiss.</u>    I'm not going to confirm those kinds of discussions, because it

12   wouldn't be appropriate for me to comment on those kinds of discussions.    But I've

13   certainly participated in cases generally where defense counsel has made a pitch to the

14   prosecutors.

15         Mr. <u>Goldman.</u>    I'm not asking for the discussions.    I'm just asking about the fact

16   of the matter, that defense counsel for Hunter Biden made a presentation or multiple

17   presentations to your office.    I don't want you to get into the details; just whether it

18   happened or not.

19         Mr. <u>Weiss.</u>    I can say that Hunter Biden's counsel made a -- made a pitch.

20         Mr. <u>Goldman.</u>    Right.    And that pitch was to the prosecutors, correct?

21         Mr. <u>Weiss.</u>    That pitch was -- again, I'm not going to get into the particulars.    I

22   will acknowledge that it happened.

23         Mr. <u>Goldman.</u>    But it wasn't to -- it wasn't with IRS agents.

24         Mr. <u>Weiss.</u>    No.    No.

25         Mr. <u>Goldman.</u>    It would just be to the prosecutors?

1          Mr. <u>Weiss.</u>   Again, I'm not going to get into the particulars.     The pitch was

2     made.

3          Mr. <u>Goldman.</u>   All I'm just trying to figure --

4          Mr. <u>Weiss.</u>   Any prosecutor would want to hear -- I mean, if defense counsel

5     wants to talk to me about his case and tell me why we shouldn't move forward, I'm just

6     hearing additional input with respect --

7          Mr. <u>Goldman.</u>   Very common.   I agree.   I'm just trying to make sure we

8     understand who that pitch is made to.

9          Mr. <u>Weiss.</u>   I don't want to --

10          Mr. <u>Goldman.</u>   It was made to the prosecutors, not to the investigators, because

11     the prosecutors are ultimately responsible for making the charging decision, correct?

12          Mr. <u>Weiss.</u>   I don't want to get into the particulars in this case, but it would -- as a

13     general matter, it would be -- it would typically be the case, as I understand it, that

14     prosecutors and defense counsel would be the ones participating in such a scenario.

15          Mr. <u>Goldman.</u>   Thank you.

16          Mr. <u>Weiss.</u>   Sure.

17          ▬▬▬.   Mr. Ivey, do you have --

18          Mr. <u>Ivey.</u>   No.

19          Mr. <u>Goldman.</u>   I have more, if we have time.   I just thought you were -- if you

20     want to continue, go.

21          ▬▬▬.   We have about 5 minutes.

22          Mr. <u>Goldman.</u>   Do you have any more?   You can go.

23          ▬▬▬.   I'm at a stopping point.

24          Mr. <u>Goldman.</u>   Okay.

25          I just wanted to follow up on a couple of things from the Republican side, their

1    questions.

2          When you say you had ultimate authority if it proved necessary, that meant, am I

3    correct, that you were assured that if there was any point when you needed additional

4    authority to charge what you thought you had sufficient evidence to charge, that you

5    would be able to do that, correct?

6          Mr. <u>Weiss.</u>    I was assured that if I needed to proceed in another jurisdiction and I

7    chose to do so, I had the authority to do those things.

8          Mr. <u>Goldman.</u>    Okay.    And so the fact that you may not have sought particular

9    authority has no bearing on whether you had that authority.

10          Mr. <u>Weiss.</u>    No, I had -- that's correct.    I had the authority; I just hadn't

11    exercised the authority, is what you're speaking to.

12          Mr. <u>Goldman.</u>    Yes.    So the fact of not exercising doesn't mean you do not have

13    it.

14          Mr. <u>Weiss.</u>    That's the way I see it, yes.

15          Mr. <u>Goldman.</u>    Okay.

16          And is it also fair to say that the decision for a different U.S. Attorney's Office to

17    agree to join or partner with an investigation from another U.S. Attorney's Office

18    considers many, many factors, not just the substance of the investigation?

19          Mr. <u>Weiss.</u>    Again, not discussing this case, but generally they could consider any

20    number of factors --

1    [12:18 p.m.]

2         Mr. Goldman.   Right.   And in part because the local U.S. Attorney's Office, if

3    partnering with an outside Attorney's Office would necessarily want to put their own staff

4    and their own resources in that case if it's in their own district?

5         Mr. Weiss.   Sure.   They're considering their resource constraints, their

6    priorities, all kinds of factors in deciding whether they want to throw additional resources

7    at the matter you're presenting.

8         Mr. Goldman.   Right.   And in a case of a 4-year investigation with more than 60

9    witnesses and hundreds of thousands of documents, it would require a lot of effort from

10   a local U.S. Attorney's Office to get up to speed on such an investigation.   Is that fair to

11   say?

12        Mr. Weiss.   And again, that sounds like you're getting into the case at hand, so I

13   can't get into that decision-making process.   But I can say that I would expect, generally

14   speaking, that the more complicated the case, the more resource-intensive the case,

15   perhaps the more difficult the decision is for the district who was receiving this

16   information.

17        Mr. Goldman.   And I may have missed this at the beginning.   Did you ever ask

18   for 515 Special Attorney authority?

19        Mr. Weiss.   I did ask for 515 Special Attorney authority.

20        Mr. Goldman.   When did you do that?

21        Mr. Weiss.   In the spring of 2022.

22        Mr. Goldman.   Were you granted that?

23        Mr. Weiss.   And at the -- I asked for it, and then in -- I think I've described it in or

24   around February, March of 2022, and at the conclusion of the process in D.C., as was

25   discussed with majority counsel, I was informed by the Principal Deputy Attorney General

1   that if I decided to proceed in the District of Columbia, I had the authority to proceed and

2   the authority to move forward with whatever charges I deemed appropriate.

3          Mr. Goldman.   And that the first step would be to see if you could partner with

4   that U.S. Attorney.   Is that right?

5          Mr. Weiss.   The first step was just to contact the U.S. Attorney's Office to see if

6   they wanted to join in the prosecution.

7          Mr. Goldman.   Okay.   And you ultimately requested Special Counsel authority?

8          Mr. Weiss.   I requested Special Counsel authority upfront.

9          Mr. Goldman.   What do you mean "upfront"?

10          Mr. Weiss.   In preliminary -- in my first conversations with the Principal Deputy

11   Attorney General, and in my conversation in February of 2022, I raised the specter of 515

12   authority at that time.

13          Mr. Goldman.   Not Special Attorney.   I'm asking about Special Counsel

14   authority.

15          Mr. Weiss.   Oh, I'm sorry.   I'm sorry.

16          Mr. Goldman.   Yeah.

17          Mr. Weiss.   I misunderstood.   Hopefully the record reflects I misunderstood.   I

18   was speaking to Special Attorney.

19          I never requested Special Counsel authority -- I'm sorry -- until August of 2023.

20          Mr. Goldman.   And why did you request Special Counsel authority in August?

21          Mr. Weiss.   I'm not going to discuss that.   That's a matter -- those are privileged

22   communications between myself and the executives at the Department.

23          Mr. Goldman.   But you were granted Special Counsel authority?

24          Mr. Weiss.   I was granted Special Counsel authority.

25          Mr. Goldman.   And that means that you can charge whatever you believe you

1    have sufficient evidence to charge wherever you need to charge it?

2            Mr. Weiss.    That means, consistent with the AG's order, I can charge -- I can

3    discharge my responsibilities and charge the -- bring forth the charges in whatever

4    jurisdiction is appropriate.

5            Mr. Goldman.    And I believe this is a matter of public record, but isn't it true that

6    Hunter Biden's attorneys waived venue as part of that proposed plea agreement in

7    Delaware?

8            Mr. Weiss.    The plea documents are there.    And as part of that resolution, my

9    recollection is, yes, there was a waiver -- there was a venue waiver as part of those

10    materials.

11            Mr. Goldman.    Thank you.

12            ██████.    Did you ever have any doubt that you would be granted 515 authority

13    if you sought it from the Deputy Attorney General's Office?

14            Mr. Weiss.    From the time I received the assurance from PADAG John Carlin I

15    didn't really concern myself with authority moving forward.    I understood that I had the

16    authority to proceed, you know, and to prosecute the charges I thought appropriate.

17            ██████.    Okay.

18            Mr. Lieu.    So I'm just a little confused.    I just want to understand.    You can't

19    talk about the particular aspects of the case today, right?

20            Mr. Weiss.    Right.

21            Mr. Lieu.    All right.    So you testified that you have had whatever authority you

22    believe you needed to take the appropriate steps, right?

23            Mr. Weiss.    I have.

24            Mr. Lieu.    And you said that no one at Department of Justice has stopped you

25    from taking steps you deemed appropriate, right?

1          Mr. Weiss.   Yes.

2          Mr. Lieu.   I don't know what we're doing here today.   We should just end this.

3   This is totally stupid.   He can't talk about the facts of the case.   He said he had all the

4   authority he needs.   So I'm asking the Republicans why don't we just shut this down?

5   We're just wasting everybody's time.   I don't understand why we're all here.   What's

6   the point of this?

7          I yield back.

8          ███████.   On that note, we can go off the record.

9          Thank you.

10          [Recess.]

11          Chairman Jordan.   Let's go back on the record.

12          Thanks, Mr. Weiss.

13          In your last hour, Mr. Goldman asked you, Did you ever ask for 515 authority?

14   And you said, Yes, in the spring of 2022.

15          Did you ask for that authority before meeting with Mr. Graves -- or talking with

16   Mr. Graves about partnering with him or after?

17          Mr. Weiss.   Before.

18          Chairman Jordan.   You asked for it before.

19          And you asked -- this was the PADAG, right?

20          Mr. Weiss.   This was the PADAG and Brad Weinsheimer.

21          Chairman Jordan.   So Mr. Carlin and Mr. Weinsheimer?

22          Mr. Weiss.   Yes.

23          Chairman Jordan.   And they told you no at the time, that you should go talk to

24   Mr. Graves in D.C.?

25          Mr. Weiss.   No.   They never said no.   They never said no.   I asked for it.

1    They said, Let's follow the process.    Go talk -- let's talk to Mr. Graves, see if they're going

2    to join.    We're going to take it step by step.    No one ever said no.

3          Chairman <u>Jordan.</u>    Okay.    And in the course of your investigation, from when

4    you started all the way until August 8th when you asked for Special Counsel status and

5    then were granted Special Counsel status on August 11th, did you ever have 515

6    authority throughout that time?

7          Mr. <u>Weiss.</u>    I never -- as we've discussed, I never executed on that assurance that

8    I would have the authority.

9          Chairman <u>Jordan.</u>    So you asked for it before you talked to Mr. Graves.    Mr.

10   Graves -- you asked for it, and PADAG said, No.    Go talk to Mr. Graves first.    You go talk

11   to him.    He says that he doesn't want to partner with you, and you never subsequently

12   asked for it.    And the only time that you've been given any special counsel/515 authority

13   is when you asked for it in August of this year?

14         Mr. <u>Weiss.</u>    No.    The premise of your question I can't endorse.    You said, I

15   asked for it, the PADAG said, No.    As I said a moment ago, no one ever said no.    He

16   didn't say no.

17         Chairman <u>Jordan.</u>    Okay.

18         Mr. <u>Weiss.</u>    They said to follow the process, talk to Graves, give him the

19   opportunity to join.    When I completed that process, I returned to 515, and I was

20   assured you had the authority to proceed in D.C. and to file any charges you deem

21   appropriate.

22         Chairman <u>Jordan.</u>    Again, I just want to be clear, though.    Mr. Goldman asked

23   last hour, Did you ever ask for 515 authority?    You said, Yes, in the spring of 2022.

24         And what I'm asking is did you ever have 515 authority throughout this

25   investigation?

1        Mr. Weiss.   I was assured I had the authority necessary to move forward, yes.

2        Chairman Jordan.   Let me ask it this way --

3        Mr. Weiss.   I didn't request an order that ultimately gave me the authority that

4   would have been required if I had, in fact, filed the charges.

5        Chairman Jordan.   Okay.   Did you ask for it?   You said, Yes, in the spring of

6   2022.   What I want to know is, were you ever granted 515 authority?

7        Mr. Weiss.   As I said a couple of times, I was assured at the conclusion of the

8   process in D.C. that I had 515 authority to proceed if I determined it was appropriate.

9        Chairman Jordan.   Okay.   And what you wrote to Senator Graham is -- on

10  July 10th of this year, you said, You would be granted this authority if it proved necessary.

11  Is that right?

12       Mr. Weiss.   I'm looking at the letter.

13       Chairman Jordan.   This is the July 10th letter to Ranking Member Graham.

14       Mr. Weiss.   I'm sure you're reading it accurately.

15       Yes, that's what it says.

16       Chairman Jordan.   Now, in this letter you say:   I have not requested Special

17  Counsel designation.

18       Was that something different than 28 U.S.C. 515?

19       Mr. Weiss.   Yes.   That was --

20       Chairman Jordan.   Okay.

21       Mr. Weiss.   Yes.

22       Chairman Jordan.   And you didn't request that again until August 8th and were

23  granted that on August 11th of this year.   Is that right?

24       Mr. Weiss.   I think your question was you didn't request it again.   I only

25  requested it in --

1          Chairman Jordan.    No.    I meant again -- I wasn't referring to that.

2          Okay.    And then the next sentence:    When I had the discussion with

3  Department officials regarding judicial appointment under 28 U.S.C. 515, which we've

4  been talking about, which would allow me to file charges in a district outside my own

5  without the partnership of the U.S. local attorney, I was assured I would be granted

6  authority if it proved necessary.

7          When Mr. Graves turned you down, wasn't it necessary?

8          Mr. Weiss.    If I chose to proceed.    If I chose to move forward in D.C., it would

9  have been necessary, yes.

10         Chairman Jordan.    But you went to Mr. Graves and asked him to partner.    I

11  assume that meant you wanted to proceed in D.C.    He says:    No, we're not going to

12  partner.    And I'm asking, that wasn't proof enough to be necessary to ask for 515?

13         Mr. Weiss.    Again, I don't want to get into deliberative process or case merits.

14  But as I think I mentioned previously, we were thinking about D.C. and L.A., and at this

15  time, I was assured that if I wanted to proceed in D.C., I had the authority, and I was not

16  prepared at that time to make a decision as to where we would proceed.

17         Chairman Jordan.    Okay.

18         Mr. Biggs.    Can I ask a question?

19         You keep saying you were assured that you had the authority.

20         Mr. Weiss.    Uh-huh.

21         Mr. Biggs.    Who assured you?

22         Mr. Weiss.    The Principal Deputy Attorney General told me that I would have the

23  authority to proceed in the District of Columbia and file whatever charges I deemed

24  appropriate.

25         Mr. Biggs.    Was it conditional in any way?

1          Mr. Weiss.   No.

2          Mr. Biggs.   You just flat out had the authority.   He assured you -- I don't know

3    who it was that assured you that you would have that authority.   In fact, did you take

4    that as a granting of authority?

5          Mr. Weiss.   From -- I understood that -- based on that assurance, I understood

6    that I could charge in that jurisdiction and proceed and that, yes, I could determine what

7    charges were appropriate.

8          Mr. Biggs.   Regardless of Mr. Graves?

9          Mr. Weiss.   Yes.

10          Mr. Biggs.   Okay.

11          Mr. Weiss.   Yes.

12          Mr. Biggs.   Thank you.

13          Mr. Weiss.   Sure.   You're welcome.

14                              EXAMINATION

15          BY MR. CASTOR:

16     Q     I want to go back to, in 2020, were you aware that the U.S. Attorney out in

17    the Western District of Pennsylvania, Scott Brady, was asked by the Department to vet all

18    incoming Ukraine-related information?

19     A     I was aware that the U.S. Attorney in the Western District of Pennsylvania

20    had been assigned that vetting responsibility.

21     Q     And how frequently did you interact with Mr. Brady regarding information

22    his office received during his tenure?

23     A     I'm not going to discuss that process at all.   That's still ongoing.   It's still

24    the subject of ongoing investigative matters.

25     Q     Mr. Brady testified to the committee that it was a challenge for his office to

1    obtain information from you and your investigative team, so much so that at one point,

2    he had to submit written interrogatories to your office.

3         Can you help us understand what happened there?

4    A    No.    I'm sorry.    At this time I can't help you understand what happened

5    there.    I'm not going to discuss matters that concern ongoing investigations.    At the

6    appropriate time, I'll prepare a report, and I expect that this will be something that will be

7    addressed in the report.

8    Q    Okay.    So you're not denying that Mr. Brady had to send you

9    interrogatory-style questions to get information out of you?

10    A    I'm not commenting either way on the process at all.    I want to make that

11    clear.    It would be inappropriate for me to do so.

12                              [Weiss Exhibit No. 9

13                              Was marked for identification.]

14         BY MR. CASTOR:

15    Q    Are you familiar -- let's mark this as the next exhibit -- with an FD-1023 dated

16    June 30, 2020, summarizing a confidential human sources meeting with Burisma

17    executives during which they discussed bribes allegedly paid to Joe Biden and Hunter

18    Biden?

19    A    I'm sorry.    What was your question about this document?

20    Q    Are you familiar with this?

21    A    I'm not going to comment on that.    I appreciate your question, but it

22    concerns a matter that is subject to an outstanding investigation.    It's something that I

23    absolutely cannot comment on either way.

24    Q    The FBI has consistently reviewed the confidential human source in question

25    and found them to be highly credible.

1          Is that your understanding?

2          A     As I said a moment ago, this is a matter about which I absolutely cannot

3     comment.   It would be inappropriate for me to do so, although at the appropriate time,

4     I hope to address this matter and all aspects of this process.

5          Q     Brady told us that he had such trouble getting ahold of you and your office,

6     that he had to go through the PADAG, and basically the PADAG had to intervene and

7     instruct your office to take a meeting with him.

8          A     Is that a question?

9          Q     Yes.    Why wouldn't you meet with Mr. Brady?

10         A     I'm not at liberty to discuss that at this time.    I look forward to the

11    opportunity to addressing this in the special counsel's report at the appropriate time.

12         Q     Yeah.   Whether you had a meeting with Mr. Brady or not, I mean, you

13    certainly can tell us at a privilege log level the number of communications you had with

14    Mr. Brady.

15         A     No, I'm not going to get into this topic at all.    It would be inappropriate,

16    absolutely inappropriate to do so while this matter is outstanding.

17         Q     Did your office conduct any further investigation after you became aware of

18    the 1023?   Did you interview the confidential human source in question?

19         A     Counsel, you know I can't discuss outstanding investigative matters.    It's

20    inappropriate for me to do so.

21         Q     Okay.   I want to mark the two Delaware cases as the next exhibits.

22         Last hour I referenced some comments you made in some different tax cases.

23    Just for your benefit, I wanted to mark them just so we could close that loop.

24         A     I recall that.

25         Mr. Castor.    Number 10 and 11.

1              [Weiss Exhibits Nos. 10 and 11

2              Were marked for identification.]

3          BY MR. CASTOR:

4      Q      Number 10 is the "Sussex County Photographer Bruce Kevin Fleming

5   Sentenced for Federal Tax Evasion."     The fifth paragraph is your comment that "The

6   financial loss in tax cases is shared by every member of the tax-paying public.     Our

7   Nation's ability to operate and serve its citizenry depends on voluntary compliance with

8   tax obligations.     The defendant not only willfully evaded his personal income tax

9   obligations, but he failed to pay over taxes withheld from his employees' paychecks,

10  demonstrating a complete disregard for their individual tax liabilities."

11         Do you remember making that statement?

12     A      I don't recall making the statements, but I don't doubt that I did.

13     Q      Okay.    And you still stand by that, correct?

14     A      Sure.

15     Q      The same with the next exhibit, the last paragraph is:     "Tax dodging

16  represents an affront to every member of the tax-paying public, and we will continue to

17  prosecute tax cheats aggressively."

18         Do you remember making that?

19     A      I don't recall the specific statement, but I'm satisfied that those are the

20  words that were used, and I stand by that statement.

21     Q      If over -- in 2014 and 2015, it's been well-established by the whistleblowers,

22  Hunter Biden had in excess of over $1 million in revenue coming in from Burisma that has

23  avoided tax entirely.

24         Do you think it's fair that he is able to avoid paying tax on that gigantic sum of

25  money?

1    A    Again, that's something I can't comment on.    That pertains to the ongoing

2    litigation and our outstanding investigation.    I'm just not at liberty to comment at this

3    time, but there will come a time.

4    Q    Even though the statute of limitations has lapsed?

5    A    Yes, yes.

6    Q    When is the appropriate time to address why the statute of limitations was

7    allowed to lapse?

8    A    I'll address it in the report, but even though the statute of limitations has

9    lapsed and even though charges won't be filed, if there were to be an outstanding tax

10    prosecution, there is no reason to believe that evidence pertaining to prior years, or

11    witnesses involved in prior years, wouldn't be part of that litigation.

12    Q    Okay.    But you can still I think -- without compromising a potential

13    prosecution that cannot be had for 2014 and 2015, you ought to be able to tell us about

14    the decision to let the statute lapse.

15    A    I understand and appreciate the question and what you're suggesting.    I'm

16    just not at liberty to do so.    What I can say is, because it's akin to a charging

17    decision -- and making charging decisions in any matter, you're considering the proof.

18    You're considering your witnesses.    You're considering legal challenges.    If it's a

19    multi-charge situation, you're considering the effect of certain charges on other charges,

20    and whether those charges enhance or detract from your prosecution.

21    So, as a general matter, I'm just offering that there are any number of

22    considerations that would go into account --

23    Q    Okay.

24    A    -- in deciding whether to pursue them or not.

25    Q    Did you make a decision to affirmatively let the statute lapse, or did it

1    happen by accident?

2         A     I'm not going to address that at this time, but I will address it in the report.

3         Q     Okay.

4         Mr. Biggs.    Can I weigh in just for a second on that?

5         Because I appreciate what you're saying about it might have bearing on future

6    cases or any potential for future prosecution, but the question here is distinctly different

7    from that.    This is, was this an accidental lapsing?    Was this an intentional lapsing?    It

8    really has no connection or bearing on any potential outcome of prosecution going

9    forward.    So I'm struggling to understand your position on that.

10        Mr. Weiss.    Yeah, I respect the question, Congressman.    I understand it, but it

11   gets into deliberative process in this case, decision making processes, and those are

12   things that I'm not at liberty to discuss at this time.    But as I said, I will address it.    I will

13   address it in the report.

14        Mr. Castor.    I want to mark the next exhibit, exhibit 12.

15                                    [Weiss Exhibit No. 12

16                                    Was marked for identification.]

17             BY MR. CASTOR:

18        Q     This is the special agent report we've had some discussion about.    It was

19   produced in limited form.    But this is the special agent report prepared by the IRS

20   criminal investigative agent at the end -- he began writing it at the end of 2021 and

21   wrapped it up in the beginning of 2022.

22        A     You're telling me that this is the report or a portion of the report?

23        Q     This is a portion of the report.

24        A     Got it.

25        Q     Fair enough.    It contains the cover page and then the last two pages.    It's

1    an 85-page document.    Is this the first time -- you've seen this report before, correct?    I

2    think you told us that this morning.

3        A    I believe I have, yes.    I believe I --

4        Q    You saw the whole 85 pages?

5        A    I believe I have.

6        Q    Okay.    Was there anything in the 85-page report that you or your Assistant

7    U.S. Attorneys disagreed with?

8        A    I wouldn't comment on that now because it pertains to the case and the

9    investigation, and I don't recall.

10        Q    Okay.    If you would go to the second page, which is page 84 of the special

11    agent report.    It states:    "The recommendation for prosecution is based on the facts

12    above" -- that's the prior 83 pages -- "and recommends that RHB," Hunter Biden, "be

13    prosecuted under the provisions of Title 26, United States Code, Sections 7201 and 7206

14    for the tax years 2014, 2018, and 2019, and under the provisions of Title 26, United States

15    Code, Section 7203 for the tax years 2015, 2016, 2017, 2018, and 2019.

16        "A draft of this special agent report has been given to DOJ tax senior attorney

17    Mark Daly, as well as AUSA Lesley Wolf.    AUSA Wolf has reviewed the appendices and

18    the charges cited in this report and agrees with the prosecution recommendation of the

19    above cited charges against RHB."    That is Hunter Biden.

20        Is that consistent with your understanding of what was in this special agent report

21    when you reviewed it?

22        A    Yeah.    I'm not going to comment on any aspect or substance of the

23    investigative report, but I will acknowledge that you read the paragraph accurately.

24        Q    Okay.    But I guess what my question is, this isn't a doctored document.

25    This is what --

1      A      I have no reason to believe that this is a doctored document.

2      Q      Okay.    And if Lesley Wolf and Mark Daly didn't agree with this stuff,

3   presumably the criminal investigator who prepared the report wouldn't put that on the

4   conclusions and recommendations page, correct?    In fact, it was ultimately signed and

5   executed.

6      A      Again, I can't speak to that.    But, like I said, I agree that what you have

7   represented is stated in the report, and I believe this is --

8      Q      Okay.

9      A      -- an authentic version, subject to the redactions, of what I would have seen.

10      Q      Okay.    But a criminal investigative agent wouldn't make false

11   representations, correct, in the ordinary course of business?

12      A      I'm not going to get into the substance of this particular report.    But, as a

13   general matter, I wouldn't expect any agent to make false representations in a report of

14   any kind.

15      Q      Okay.    Shortly after the special agent report was prepared we have been

16   told through -- in sworn testimony that the DOJ Tax Division drafted a 99-page report

17   regarding the charging decisions in the matter.

18          Are you familiar with that document?

19      A      I'm not going to get into the preparation of that document or any other

20   attorney-driven document in this case.

21      Q      Okay.    But you read the 99-page report that the Tax Division prepared,

22   right?

23      A      I'm not going to get into the particulars of the documents that were

24   prepared, other than to say if something was presented to me in this case, I read it.

25      Q      Okay.    Certainly something as significant as a 99-page memo?

1      A      Well, generally speaking, the fact that something is 99 pages doesn't

2  necessarily mean it's significant, but --

3      Q      Well --

4      A      -- as I said, I reviewed appropriate materials during the course of this case.

5      Q      Okay.    But it --

6      A      I'm not going to get into the substance of those materials.

7      Q      Okay.    But if the DOJ Tax Division did draft a 99-page report related to the

8  Hunter Biden matter, you certainly would have reviewed it in the ordinary course,

9  correct?

10     A      Again, I'm not going to get into the particulars of this case because it

11  necessarily gets into the deliberative process and case materials.    As a supervisor of this

12  case, I would have read the key documents, absolutely.

13     Q      Okay.    Do you know who authored it?

14     A      I'm not going to -- no, I'm not going to get into the particulars of any report

15  in this case or discuss the authors.

16     Q      Okay.    And do you know if it was -- I'm going to ask you, do you know if it

17  was authored in part by your AUSAs in the Tax Division?

18     A      Again, I'm not going to get into the particulars of those matters because it

19  necessarily involves deliberative process and prosecutorial decisionmaking,

20  recommendations, and the like, all those kinds of things.

21     Q      Let's take it up a level.    Ordinarily, would this type of memo be prepared

22  jointly with the U.S. Attorney's Office in the Tax Division, or would it ordinarily be a Tax

23  Division document?

24     A      Based on my experience -- and the fact is, I'm unfamiliar with a case in which

25  I participated where the U.S. Attorney's Office in Delaware has partnered with tax

1    divisions.   So I can't draw on that frame of reference that you allude to.

2         Q      Actually, this type of memo, in your experience, would be a DOJ Tax Division

3    product?

4         A      I'm not saying either way.    I'm not going to get into the particulars here.

5    What I'm suggesting is what happened here, that's the basis of the full sum of my

6    experience --

7         Q      Okay.

8         A      -- in the sort of hypothetical that you're presenting.

9         Q      Okay.   If the case had concluded and you had issued your report, would you

10   be able to tell me the answer to that question --

11        A      Okay.

12        Q      -- or are you withholding it because of the ongoing investigation, the

13   deliberative process or --

14        A      It's part of the deliberative process, and for that reason, I can't comment.

15        Q      But do you know the answer, I guess, of who wrote the memo?

16        A      Again, I'm not going to get into whether I know the answer or not.    This is

17   at all part of the deliberative process.

18        Mr. Biggs.   You're not saying there wasn't a memo like this?

19        Mr. Weiss.   Like what?

20        Mr. Biggs.   He's referenced this specific memo.    I'm asking you, do you agree

21   that that certain memo exists?

22        Mr. Weiss.   I'm not going to acknowledge -- I'm not going to talk about memos

23   that were prepared during the course of this case.    It's part of the deliberative process.

24   I'm not going to talk about --

25        Mr. Biggs.   I'm asking you if the memo was created.

1      Mr. Weiss.    Again, I understand that you're going to draw from my answer, which

2    is why I'm going to be very careful in what I respond to and what I don't.    And I'm

3    unable, because it delves into the deliberative process, to say anything in this regard.

4           BY MR. CASTOR:

5      Q    Okay.    Did you attend a meeting on June 15th at Main Justice about this

6    case where the players involved included the entire investigative -- representatives from

7    the investigative team, including Gary Shapley; his supervisor, Darrell Waldon; Mark Daly

8    from the Tax Division; Stuart Goldberg from the Tax Division; Jack Morgan from the Tax

9    Division?    Does this jog your memory?    I can give you additional participants if that's

10    helpful.

11      A    I don't want to discuss particular meetings, but I will say that I participated in

12    several meetings, and that some of those meetings involved virtually all of the folks who

13    were involved in this case at a leadership level.

14      Q    Okay.    The June 15th meeting happened here in Washington, D.C.    So can

15    you tell us, did you travel down here for the meeting?

16      A    Again, I'm not going to talk about those kinds of things.    I'm not going to

17    get into the particulars of our investigation, particular meetings, who participated.    I'm

18    here to talk about my authority, decision-making authority.

19      Q    Okay.    Did you meet with Gary Shapley the day before?

20      A    As I mentioned a moment ago, I met with agents and the investigative and

21    leadership team on several occasions during the course of this process, and I did so out

22    of -- in an effort to make sure -- and I mentioned this in reference to a question

23    previously -- an effort to make sure that the agents were heard, and that their views on

24    this investigation, their view of the case and appropriate charges was part of the

25    decision-making process, but I can't get into the particulars.

1      Q      Okay.    We've received testimony, not just from the IRS whistleblowers, but

2      also from other witnesses, that at the June 14th -- or sorry -- the June 15th meeting, DOJ

3      Tax had a presentation.

4             Do you remember that presentation?

5      A      I'm not going to get into the particulars of any presentation or the

6      circumstances surrounding this meeting.    This, again, would be something that I would

7      expect and I'd be more than happy to address in the special counsel's report.

8      Q      The testimony shows that at the June 15th meeting the Tax Division lawyers

9      presented complications and all the difficulties they would have with bringing a case, but

10     yet, FBI personnel piped up and disputed that characterization.

11            Do you remember that?

12     A      I'm not at liberty to discuss any particulars concerning this meeting or other

13     meetings, other than meetings at which my decision-making authority was discussed.

14     Q      When did you decide to contact the Central District of California, the Los

15     Angeles U.S. Attorney's Office about this case?

16     A      I contacted the Central District of California in August of '22.

17     Q      And did that -- was that preceded by a discussion with the DAG's Office?

18     A      I would have had a discussion with the DAG's Office -- I mean, at this point in

19     time, as I think I alluded to previously, I was having monthly conversations, or about each

20     month with the Office of the Deputy Attorney General.

21     Q      Okay.    And those monthly conversations were with Mr. Weinsheimer?

22     A      Primarily, yes.

23     Q      Was Mr. Carlin and then, subsequently, Mr. Miller involved with that?

24     A      No.    As I told you, I never spoke to Miller, and I believe Mr. Carlin had left

25     the Department at -- you know, somewhere during this time, the summer of 2022.

1    Q    And were your Weinsheimer telephone calls monthly, was that a regularly

2    scheduled call or did it just happen to turn out to be monthly based on --

3    A    It happened to be monthly.

4    Q    Okay.

5    A    Based on -- you know, I'm estimating the frequency of the meetings.

6    Q    Okay.    Fair enough.

7         And so before you decided to contact the Los Angeles U.S. Attorney's Office, you

8    had a conversation with Mr. Weinsheimer?

9    A    I don't know -- I don't know if it was before or shortly thereafter.    I don't

10   know what preceded what, but -- so I don't recall the particulars.

11   Q    Did he need to grease the skids for that meeting?

12   A    No, he did not.

13   Q    Did you ask for 515 authority before or after going to Los Angeles?

14   A    I just -- no.    I described my conversations with respect to 515 authority in

15   the context of the D.C. discussions.

16   Q    Okay.

17   A    And so in my mind, from my perspective, I didn't need to raise it, and I didn't

18   raise it any further.

19   Q    Okay.    So as we understand it, the U.S. Attorney in Los Angeles wasn't

20   installed until September of 2022, but you had made contact with that office during the

21   month of August.    Is that correct?

22   A    I had contact with --

23   Q    His predecessor?

24   A    -- his predecessor, the Acting U.S. Attorney at that time.

25   Q    Okay.    And as we understand it, according to Mr. Estrada, some SAUSAs

1    were established.    Is that correct?

2        A    Again -- and you asked that about D.C.    I just don't recall the particulars of

3    whether SAUSAs were established and exactly what that meant, but I don't necessarily

4    dispute it.    I just don't recall the particulars.

5        Q    Okay.    So if Mr. Estrada told us there are officials from your office in

6    Delaware, AUSAs, that have been granted Special Assistant U.S. Attorney authority under

7    the SAUSA regime, you don't know if that's correct or not?

8        A    I just can't -- I can't recall.    I can't recall the particulars of that process.    I

9    know the conversations in which I participated and, you know, what we were doing

10    vis-à-vis the Central District of California.

11        Q    What was the -- do you remember the name of the person you were talking

12    to, the predecessor, the acting, before Mr. Estrada was installed?

13        A    Stephanie Christensen.

14        Q    And did Ms. Christensen -- did she urge you to wait until Estrada was on

15    board?

16        A    No.

17        Q    What was the nature of your conversation with her in August of 2022?

18        A    Similar to my conversation with U.S. Attorney Graves.

19        Q    Okay.

20        A    Basically that this is the case.    These are the circumstances.    I'm reaching

21    out to see if you wanted to join or participate in this case.    I have requested 515

22    authority.    And it went from there with line personnel having communications.

23        Q    Okay.    Did Ms. Christensen ever present you with a decision from their

24    office about whether they wanted to partner, co-counsel, or whatever?

25        A    She did not.

1     Q     Okay.    And so then when was your next interaction with the office?    Was

2     that after Mr. Estrada was installed?

3     A     I believe it was.

4     Q     And what do you remember from that?

5     A     I had a brief conversation with U.S. Attorney Estrada.    It was in October

6     of '22, and Mr. Estrada informed me that his office was -- declined to participate with us

7     or to join us in that case.

8     Q     Okay.    So he shot you down, too, just like Mr. Graves?

9     A     I'm not going to use the words "shot me down" --

10    Q     Okay.

11    A     -- but he declined to participate in the case.

12    Q     Okay.    And so what was your move from there?

13    A     Same as it had been before, to proceed to moving forward.

14    Q     Okay.

15    A     To focus on the decision-making process.

16    Q     Okay.    But you said that you felt confident that had you asked for it, you

17    would have had 515 authority to take a case and bring it in Los Angeles?

18    A     Yes.    It wasn't a question of my authority.    It was just a question of

19    deciding to move forward.

20    Chairman Jordan.    Just tell me the timeline again.    So in August of '22 you

21    talked to Ms. Christensen, I think you said, and said, Do you want to partner with the

22    Central District of California?    And was there any conversations between that August

23    contact and October when Mr. Estrada who became the U.S. Attorney told you no?

24    Mr. Weiss.    Not by me.

25    Chairman Jordan.    But your office had subsequent contacts in that time frame

1 between August and October?

2   Mr. <u>Weiss.</u> My office and Tax Division were working with folks in L.A.

3   Chairman <u>Jordan.</u> And the first contact you had with Mr. Estrada is when you got

4 on the phone and he told you no?

5   Mr. <u>Weiss.</u> That's the first and only contact with respect to this matter that I had

6 with Mr. Estrada.

7   Chairman <u>Jordan.</u> Okay.

8    BY MR. CASTOR:

9  Q Just one call that you remember with him?

10  A One call about this, yes.

11  Q Okay. If he remembers more than one call, is it possible that there was

12 more than one call?

13  A If he remembers more than one call, it wasn't at this time about this issue.

14 That's my recollection.

15  Q Okay. So D.C. didn't want to partner, correct?

16  A D.C. chose not to participate in this case as a partner, that's correct.

17  Q Okay. And Los Angeles, the Central District of California, they didn't want

18 to partner either, correct?

19  A L.A. chose not to join us in this case, that's correct.

20  Q Okay. DOJ Tax, while at first they wanted to -- they were enthusiastic

21 about moving forward, then they moved -- at the June 15th meeting, we learned that DOJ

22 Tax was reluctant to proceed?

23  A I'm not going to embrace that characterization, nor can I comment on any

24 discussions that were had with the Tax Division in June of 2022, or at any other time.

25  Q Okay.

1      A      I'm just not going to get into that.

2      Q      We've been told -- Scott Brady testified that every time he tried to talk to

3      your office he was basically turned down and had to go to the PADAG to set up some

4      meetings with you in your office.

5      A      Counsel, in all candor, I don't know that I would accept that representation

6      under any circumstances.    But in any event, I'm not going to get into particulars of

7      communications with Mr. Brady on the matter that you're referring to.

8      Q      At this point did you feel like you were on an island?

9      A      No, no.

10     Q      I mean, D.C. didn't want to prosecute and partner with you; L.A. didn't want

11     to partner with you; DOJ Tax was expressing reservations.    I mean, did you feel like you

12     had -- you know, you were getting isolated?

13     A      No.    I thought that -- as I said repeatedly, I thought I had the authority and

14     then it was a question of making the decisions.

15     Chairman Jordan.    What was it going to take to prove necessary to ask for and

16     get 515 status?    You're 0 for 2.    You had asked before you ever went to the initial

17     contact with the D.C. Attorney, Mr. Graves, and you say in your letter, if it proved

18     necessary, you would request and get that authority.    What was it going to take if you

19     were already 0 for 2?

20     Mr. Weiss.    Chairman, I mean, your question presumes that I'm asking the U.S.

21     Attorneys in L.A. and in D.C. for their approval with respect to 515 status.    That wasn't

22     happening at all.    I wasn't asking them for anything in that regard.

23     Chairman Jordan.    I'm not saying you were.

24     Mr. Weiss.    I had it if I wanted.

25     Chairman Jordan.    You asked them to partner with the case.

1         Mr. Weiss.   I asked them --

2         Chairman Jordan.    Both of them told you no.    You were told by Main Justice,

3    prior to your initial ask of the U.S. Attorney in the District of Columbia, that if you needed

4    515 authority -- you asked for 515 authority.    He said, No.    Go talk to them.    You're 0

5    for 2, and you still don't ask for it.    You still don't get it.

6         Mr. Weiss.    The only -- I still don't get it.    The only question is did I ask for it.

7    So I knew that when or if I asked for it, I was going to get it.    That wasn't at the forefront

8    of my mind.    What I was concentrating on now was the case, the strength of the case

9    and whether we bring the case.    That's all that was -- that was the focus of my attention,

10   not the authority issue.

11        Mr. Castor.    Do we have in the exhibits the August 7, 2020 email?

12        Ms. Nabity.    Yes.

13        Mr. Castor.    I'm going to mark as the next exhibit -- we're up to number 13.

14                             [Weiss Exhibit No. 13

15                             Was marked for identification.]

16        BY MR. CASTOR:

17        Q    On August 2nd, AUSA Lesley Wolf sent FBI Special Agent Joshua Wilson an

18   email in which she wrote:    There should be nothing about Political Figure 1 -- and that

19   refers to Joe Biden -- in the draft search warrant.

20        Are you familiar with that?

21        Are you familiar with that?

22        A    Can I look at what you're referring to?

23        Q    I referenced an August 2nd email.    Now the marked email is August 7th.

24        But there should be nothing about Political Figure 1 in the search warrant.    And

25   the question is do you know who Political Figure 1 is?    And I think by all accounts, it's Joe

1     Biden.

2     A    I don't know if -- because there are redactions on the below email, whether I

3     was copied.    But, in any event, this clearly pertains to aspects of the investigation, and

4     I'm not going to comment on any aspect of the investigation.

5     Q    In your experience, for ordinary cases, is it normal for prosecutors to order

6     investigators to remove references to key figures that could potentially be implicated in a

7     search warrant?

8     A    Again, there are so many variables in that hypothetical, and it's not

9     something I -- it wouldn't be appropriate for me to speculate or offer an opinion on a set

10     of circumstances such as those.

11     Q    Whistleblowers have testified that during a prosecution team meeting on

12     September 3, 2020, that Lesley Wolf stated that there was enough probable cause for

13     search warrants, but optics were a driving factor in the decision of whether to execute

14     that search warrant.

15     Do you remember that?

16     A    No, I don't, and nor would I comment on particulars of the investigation.

17     It's just not appropriate now, and perhaps it will be appropriate at the time I prepare the

18     report.

19     Q    But for an investigation that doesn't involve the son of a President, or the

20     future President at that time, would that -- regular case, not involving the son of a future

21     President or the son of a former Vice President, would that type of driving factor be

22     appropriate optics?

23     A    Again, I'm not going to comment on a question that necessarily is a

24     hypothetical.    Prosecutors will consider any number of factors in deciding whether to

25     proceed with certain investigative techniques.    And I just -- there are so many variables

1    that might go into that decision-making process, it just wouldn't be productive or

2    constructive for me to get into those circumstances.

3         Q    Are you aware of the day of action that was planned on December 8, 2020?

4         A    I am aware as a general matter to that eventuality.    But, again, because it's

5    an investigative technique as part of our overall investigation into this matter, I'm not at

6    liberty to get into the particulars.

7         Q    Do you know how many interviews were planned for that day?

8         A    Just not going to get into the particulars of that matter.

9         Q    And do you know how many interviews were actually conducted?

10        A    I'm not at liberty to get into the particulars of that matter.    I would say that

11   as a general matter in white-collar investigations, when you're dealing with persons who

12   are represented by counsel, you never accept as a fait accompli that folks will be available

13   for you and will be willing participants in interviews.

14        So as a general matter, I don't know that there are expectations in that regard

15   when you're dealing with certain types of cases and investigations.

16        Q    But they had success with Rob Walker, didn't they?

17        A    Again, I can't get into the particulars of this case, because it involves the

18   investigation.

19        Q    And the transcript of the Rob Walker interview, I mean, that was made

20   public as a part of the whistleblower proceedings, correct?

21        A    I can't get into the particulars of this investigation.    It would be

22   inappropriate for me to comment on any aspect of it or any witness who has or has not

23   spoken.

24        Q    Do you know if Mr. Walker was represented by counsel?

25        A    I'm just not at liberty to discuss the particulars of the investigation at this

1    time.

2    Q    Do you know who made the decision to tip off the presidential transition

3    team about the day of action, and that the investigators wanted to try to speak with

4    Hunter Biden?

5    A    That's, again, another -- that's a part of the investigation, and it is something

6    that I would expect to address in the submission of my report, but it wouldn't be

7    appropriate for me to comment on that matter until that time.

8    Q    Okay.    So you acknowledge that that was an issue that occurred?

9    A    Again, I am -- that's something that I will address -- it's something -- if -- I'm

10    not going to comment on the investigation, but investigative techniques and certain other

11    aspects of the investigation would be topics I would expect to address at the time I

12    prepare the report.

13    Q    Are you familiar with investigators' plan to search Hunter Biden's storage

14    unit around this time period?

15    A    Again, I'm not going to get into the particulars of any particular investigative

16    technique or what was or was not done during the course of the investigation.    It will be

17    addressed at a later time.

18    Q    How many taxpayer conferences -- Mr. Goldman raised this with you, that

19    there were a series of taxpayer conferences with lawyers for Hunter Biden.    The

20    question is how many were there?

21    A    I believe we talked about defense counsel, and I mentioned that, as a

22    general rule, there are -- my understanding, not being a tax expert, but part of the

23    process afforded in tax cases is that the putative defendant taxpayer may be afforded a

24    conference with Tax Division counsel or the attorneys assigned to the case.

25    Q    And ordinarily that's one, right?    There's, like, one?

1      A    In all candor, Counsel, I don't know what the normal course is.    I'm not an

2    expert in Tax Division processes in this regard and how many conferences are typically

3    afforded.

4      Q    Do you remember Mr. Clark suggesting that it would be career suicide to

5    bring a case involving Hunter Biden?

6      A    I'm not going to talk about the particulars of any conversations with defense

7    counsel or whatever representations Mr. Clark may have made.

8      Q    But you're aware Mr. Clark took a volume of information and he handed it

9    over to the press, correct?

10      A    I'm aware of Mr. Clark.    I'm just not going to talk about anything he has said

11    or anything he has done.    He can address that if he so desires.

12      Q    Okay.    But there was a big long New York Times article and a Politico story

13    about this, correct?

14      A    I try to stay away from press reports so that I can focus on the case and --

15      Q    Okay.    So you haven't read The New York Times article?

16      A    I don't recall either way.

17    Mr. Castor.    Okay.    Do you want to mark the next exhibit?    We'll mark it then.

18                     [Weiss Exhibit No. 14

19                     Was marked for identification.]

20        BY MR. CASTOR:

21      Q    So The New York Times reported that Mr. Clark wrote to your office and

22    basically raised the prospect that President Biden would be called as a witness, and

23    because of that, that would be a reason that you should not bring the case.

24        Do you remember that allegation?

25      A    I'm not going to comment on that, what Mr. Clark may have said or

1    represented to us.

2         Q    Uh-huh.

3         A    But I'd say, as a general matter, decisions in the case are going to be based

4    on the facts and the law, not any representation --

5         Q    Okay.

6         A    -- by the defense counsel or -- I'm not going to call them threats, but

7    whatever he may have said in that regard.

8         Q    So surely you remember this New York Times article coming out, right?    I

9    mean, this is a pretty significant article against the backdrop of your case.    You can flip

10   through it.   It's pretty --

11        Do you remember reading the article when it came out?

12        A    I don't know that I recall reading the article.    I'm not going to

13   discuss -- whatever Mr. Clark chose to share with the press, that's for him to speak to.

14   I'm not going to comment on it either way.    It would be inappropriate -- to the extent

15   this is discussing plea negotiations, absolutely inappropriate for a prosecutor to talk

16   about that process.

17        Q    Okay.    Stuart Goldberg testified that he went to Delaware for one of these

18   taxpayer conference meetings.

19        Do you remember that?

20        A    Do I remember Stuart Goldberg coming to Delaware?

21        Q    Yeah.

22        A    I'm not going to get into the meetings.

23        Q    I mean, he did.    I don't know what the difference is.

24        A    Well, I understand that he -- I don't know, but I'm not going to discuss

25   meetings with defense counsel.    I just don't think it's appropriate for this process, and it

1    doesn't go to my authority.

2        Q    Okay.    I mean, it's a little confusing for us.    I mean, witnesses come in with

3    the same DOJ lawyers and, you know, some witnesses are talking about one thing, and

4    then now you're saying you're not going to talk about it.

5        Do you -- I guess the question is, do you remember the meeting?

6        A    Look, I can only make decisions on behalf of myself and the integrity of the

7    investigation and the process moving forward.    That's what I'm focused on.    I can't

8    speak to why Mr. Goldberg did or did not address something that I'm handling differently.

9    I understand the frustration, but I'm not in a position to address it.

10        Q    During this meeting, Mr. Clark said that your legacy was on the line, how you

11    handled this case.

12        Do you remember that?

13        A    Again, I'm not going to talk about the meeting or any particulars with respect

14    to the meeting.

15        Q    I'm going to turn your attention to the Attorney General statements about

16    your authority.    In April of 2022, he stated:    The Hunter Biden investigation is being run

17    and supervised by the United States Attorney for the District of Delaware.    He's in

18    charge of that investigation.    There will not be any interference of any political or

19    improper kind.

20        Do you remember hearing the Attorney General's comments in April of 2022?

21        A    I can't -- I can't recall when or if I heard specific comments.    What I can say

22    is I believe -- with respect to what you've just represented to me, I believe I'm in charge of

23    the investigation, and I don't believe I was interfered with in the exercise of my

24    responsibilities in this case.

25        Q    So the Attorney General has had a couple of silent appearances where this

1    topic has come up, and I guess the question is, did you have direct communications with

2    the Attorney General?

3         A    I've never had any direct communications with the Attorney General, save

4    my communication in requesting Special Counsel authority in August of 2023.

5         Q    When you did request Special Counsel authority in August of 2023, how did

6    you request it?    Was it in writing or on the telephone?

7         A    It was in writing, and that's about all I'm going to say about that process.

8         Q    Okay.    Did you reach out directly to the Attorney General, or did you go

9    through Mr. Weinsheimer?

10        A    I'm not going to get into anything further.    I requested it, and it was

11   granted.

12        Q    Okay.    So the Attorney General, Mr. Garland's testimony before the Senate

13   in April of 2022, did Mr. Weinsheimer tip you off that the Attorney General was going to

14   be making those statements, or did he follow up after they were made to alert you to

15   them?

16        A    I don't recall ever being tipped off or alerted to anything the Attorney

17   General was or was not going to say.

18        Q    Okay.

19        A    -- to Congress or anyone else.

20        Q    Okay.

21        A    I don't recall anything that resembles such a process.

22        Q    Okay.    So to the extent you are familiar with them, you just heard about

23   them in the news?

24        A    I'm not sure where I heard about them.    All I can say and all I'd address is

25   what I understand the situation to be with respect to anything that was said that

1    pertained to me, the investigation, my authority, anything in that nature.

2         Q      In March of 2023, the Attorney General stated:   "The U.S. Attorney in

3    Delaware has been advised that he has the full authority to make those kind of referrals,"

4    referring to other U.S. Attorney's Offices, "or bring cases in other jurisdictions if he feels

5    it's necessary, and I've not heard anything from that office to suggest they're not able to

6    do everything that the U.S. Attorney wants to do."

7         Do you remember the Attorney General making that comment?

8         A      I don't know if I have a specific recollection of that comment or the others.

9         Q      Okay.

10        A      What I'd say is I've testified to you folks is that -- or I've described for you

11   folks is that I had the ability to pursue charges in the jurisdiction I determined was

12   appropriate.

13        Q      But as of March of 2023, I mean, you tried to bring a case in D.C.    He

14   decided not to partner.    You tried to bring a case in the Central District of California, in

15   Los Angeles.    He decided not to partner.    So how do you reconcile that?

16        A      How do I reconcile that with what?

17        Q      That, on one hand, the Department is saying, yeah, we're going to give you

18   515 authority.    The Attorney General is saying you have the full authority.    But, on the

19   other hand, when you actually try to implement any of these things, you're told no.

20        A      Again, you're putting one fact together with another that don't go together.

21   I had the authority.    I was satisfied I had the authority.    I wasn't concerned about my

22   authority.    The only issue I was concerned with was the decisionmaking on the case, the

23   strength of the case, and whether to bring the case.    That was the focus of my thought

24   process, not the authority.

25        Q      And in your letter you talk about requesting Special Attorney status?

1        A        In exhibits 1, 2, or 3?

2        Q        Correct.

3        A        Yes.

4        Q        And then ultimately, you requested Special Counsel status.    Why the

5    difference?    Like, why didn't you just request Special Attorney status as you had

6    indicated?

7        A        I'm not going to get into the particulars as to why I requested Special

8    Counsel status --

9        Q        Okay.

10        A        -- as opposed to Special Attorney status.

11        Q        Okay.

12        A        That's just --

13        Chairman Jordan.    The whole premise here is on your authority.    That gets to

14    the heart of the matter.    What is the distinction your authority -- you requested Special

15    Attorney status clear back in March of '22 -- actually February of '22 before you went to

16    Mr. Graves.    That's the heart of what we're trying to get at, and you won't answer the

17    question.

18        Mr. Weiss.    No, I'm not going to get into the particulars of why I requested

19    Special Counsel status.    That's beyond the scope of this, in my mind.

20        Mr. Castor.    Okay.

21        Mr. Weiss.    Those are executive communications and inappropriate for me to

22    disclose.    I had the authority that I thought was appropriate as U.S. Attorney to bring the

23    charges under 515 as I've discussed, and I continue to have the authority to move forward

24    in my current status.

25                    BY MR. CASTOR:

1       Q    What were the differences, though, in Special Attorney status and in Special

2    Counsel status?   Like, you were making your decision in August to request Special

3    Counsel status.   Surely, you mulled whether Special Attorney status would do it for you.

4         And so the question is, in August of 2023, when you're thinking this over, you're

5    mulling it, what are the differences in your mind between those two?

6       A    Yeah.   That gets right back to the question that was posed by the chairman

7    and yourself previously, and it necessarily gets into particular executive conversations

8    that I'm not at liberty to discuss, would be inappropriate for me to discuss at this time,

9    certainly would be the subject, and should be the subject, of my Special Counsel report

10    when that's submitted.

11       Q    Okay.   If you're giving a lecture then -- let's say hypothetically you're giving

12    a lecture to a bunch of law students, and you're trying to help law students understand

13    the difference between the two, what would you tell them?

14       A    The difference between --

15       Q    Special Counsel authority and Special Attorney.

16       A    Well, there are differences, and we discussed some of the processes that

17    one must follow.   I mean, as a U.S. Attorney, I've got to go through the 515 process that

18    we've been discussing extensively.   As Special Counsel, that process doesn't exist.   I

19    have the authority, consistent with my mandate as ordered by the Attorney General, to

20    prosecute and to bring the case wherever circumstances dictate.

21         So I don't have to go through that step-by-step process.   But that's one example

22    of the differences between the two.

1      [1:34 p.m.]

2                    BY MR. CASTRO:

3      Q      And, if you were told that you would have been able to have 515 authority if

4      you asked for it, like, why wouldn't you just go that route?

5      A      Again, that necessarily gets into the issue that we've been looking at, and it's

6      just not appropriate for me to get into at this time.

7           Mrs. <u>Spartz.</u>    Are there key differences that are significant in the statuses, any

8      other difference except processes for 515?

9           Mr. <u>Weiss.</u>    I mean, generally speaking, the idea is you don't report -- you know,

10     the reporting requirements aren't as demanding as Special Counsel, but I'm trying to

11     think of other differences.    Resource availability might be different under the two

12     processes.    But, again, I would return to the idea that, whether I was Special Counsel or

13     whether I was a U.S. Attorney, you know, I had the authority I needed to proceed as I

14     deemed appropriate.

15                   BY MR. CASTRO:

16     Q      Since you've been appointed Special Counsel, did you get more staff?

17     A      I don't want to get into the particulars of the staff, and I continue to work on

18     building the team, but I'm not going to get into the particulars.

19     Q      Do you have separate office space?

20     A      I do have separate office space.

21     Q      Okay.    And you're housed in Delaware?

22     A      I am housed in Delaware.

23     Q      Okay.    So it's totally separate office as Special Counsel from the U.S.

24     Attorney?

25     A      It is.

1       Q    Okay.   And you're performing both functions?   You're performing the

2   functions of the United States Attorney for the District of Delaware, and the Special

3   Counsel?

4       A    I have help as U.S. Attorney, but I'm doing the best I can in each of the roles,

5   yes.

6       Q    Okay.   And I'm sorry if I just asked this, but how large is your team on the

7   Special Counsel's Office?   I think I asked a slightly different question, but I'm not trying

8   to be repetitive here.

9       A    I don't know that you have.   I don't want to get into particulars of numbers,

10   individuals, and the team, so -- and determine that we will have the team necessary to

11   pursue the case as we assess it.

12       Chairman Jordan.   I just want to read from the Attorney General's statement on

13   August 11th of this year announcing U.S. Special Counsel.   Bottom of the first page of

14   what's been marked, it says:   "On Tuesday of this week, Mr. Weiss advised me" -- this is

15   a Friday, August 11th, so Tuesday would have been August 8th.   "On Tuesday of this

16   week, Mr. Weiss advised me that, in his judgment, his investigation reached a stage in

17   which he should continue his work as Special Counsel, and he asked to be so appointed."

18       And you said that was the only contact you've had with the Attorney General, was

19   when you asked him for this?

20       Mr. Weiss.   That's my professional --

21       Chairman Jordan.   And just refresh my memory.   Was that a phone call, email?

22   How was that?   A letter?

23       Mr. Weiss.   I didn't get into the particulars, but that is the only communication

24   that I had with the Attorney General that I recall, yes.

25       Chairman Jordan.   Did you talk with anyone else at Main Justice prior to the

1    communication directly with the Attorney General?

2          Mr. Weiss.   With respect to that request?

3          Chairman Jordan.   Yes.

4          Mr. Weiss.   No.

5          Chairman Jordan.   Okay.

6            BY MR. CASTRO:

7        Q    During your discussions with Mr. Weinsheimer about 515 authority, was

8    there any discussion about the conflict-of-interest rules and whether they would be

9    applicable here?

10       A    For conflict-of-interest rules for me?

11       Q    Correct.

12       A    No.   Not as it pertained to my -- oh, wait.   They would be applicable here

13    with respect to what?   Special Counsel, Special Attorney?   I just want to make sure I

14    understand.

15       Q    The fact that you're handling, you know, the Hunter Biden case, that you're

16    the Delaware U.S. Attorney, you know, Hunter Biden is the son of the President, who is

17    from Delaware, who is certainly a very influential person and comes from a very

18    influential family in Delaware.

19       A    No.   I had been with the case for a couple of years, and, no, we never

20    discussed whether it was appropriate for me to continue to handle the case, because I

21    was the U.S. Attorney in Delaware.

22       Q    Okay.   There has been some reporting that, during President Biden's son

23    Beau Biden's tenure as attorney general in Delaware, you had some interactions with

24    him.

25        What can you tell us about those?

1          A     I don't know what that has to do with my authority, but I --

2          Q     Were you friends with Beau Biden?

3          A     No, I wasn't friends with Beau Biden.    I barely had a relationship with

4    Beau Biden.

5          Q     Okay.

6          A     I was the Acting U.S. Attorney.    He was the attorney general, so our paths

7    crossed.    That was the extent of this relationship.

8          Q     Okay.    Any relationship with any other Biden family members?

9          A     Nope.

10         Ms. Zdeb.    Steve, can we go off the record for one quick second?

11         Mr. Castro.    Sure.

12         [Discussion off the record.]

13         Mr. Castro.    Back on the record.

14              BY MR. CASTRO:

15         Q     Did you have anything to add after conferring with counsel?

16         A     No, no, no.    I -- no.

17         Q     Okay.    When Graves and Estrada told you that they didn't want to partner

18    on the case, did they give you any specific feedback about why?

19         A     I never had a conversation with Graves about not partnering, and I had a

20    conversation with Estrada.    I don't want to get into particulars.    It goes to the merits,

21    and --

22         Mr. Biggs.    It goes to the merits of what?

23         Mr. Weiss.    It goes to merits of the case, views of the case, discussions about the

24    case, and I'm not going to discuss those discussions because it does bear on the merits of

25    the case and the investigation.

1          Mr. Biggs.   The phrase is interesting.   I -- "goes to the merits of the case."   All

2    right.

3                    BY MR. CASTRO:

4          Q     So the Graves people, that was all staff to staff?   You learned that

5    Mr. Graves didn't want to partner via staff?

6          A     That's correct.   I learned via the folks on my side of the aisle, yes.

7          Q     And you never had a subsequent follow-up with him?

8          A     No.   I wasn't -- it wasn't necessary.   It wasn't like I was looking to

9    persuade anyone.   I wasn't concerned about my ability to go forward, so there was no

10   need to say, "Do you want to reconsider," or anything of that nature.   They said it.   I

11   accepted it, and I had conversations with the Office of Deputy Attorney General and

12   understood what my options were.

13         Q     Okay.   Did Graves or Estrada -- did their offices offer you anything?   Did

14   they offer you office space or access to their grand juries?

15         A     As I said earlier, I specifically recall feedback from Mr. Graves' office that

16   would have afforded us those logistical assists, yes.

17         Q     But you didn't take him up on that offer?

18         A     Well, I didn't proceed in the jurisdiction, so I didn't take him up on that offer.

19         Q     Did Mr. Weinsheimer ever tell you that he met with Chris Clark?

20         A     He -- if -- no.   If he met with Chris Clark, I would have been at that meeting.

21         Q     Okay.   So there were no one-on-one meetings or telephone calls between

22   Mr. Clark and Brad Weinsheimer?

23         A     I am unaware of any such meeting, and I don't think any such meeting would

24   have occurred.

25         Q     Was Mr. Weinsheimer -- did he attend all the meetings, the taxpayer

1      conference meetings?

2            A      Well, there are two types of meetings.    I didn't attend taxpayer

3      conferences to the -- you know, I didn't participate in any taxpayer conference.

4            Q      But you attended some meetings with Mr. Clark, correct?

5            A      As I acknowledged earlier, there was a meeting, or

6      there -- meeting -- meetings with defense counsel took place.    Just can't get into the

7      particulars of any meeting.

8            Mr. Castro.    Okay.    Our hour is up, so I'll stop there.

9            [Recess.]

1      [2:19 p.m.]

2      ███████.   All right.   It is 2:20.   We can go back on the record.

3      BY ███████:

4      Q      Special Counsel Weiss, in the last hour of questioning, the majority counsel

5      asked you a number of questions about supposed investigative steps, and you repeatedly

6      declined to comment.

7      In declining to comment, you did not intend to confirm or deny that any

8      investigative steps were or were not taken, correct?

9      A      I do not, that's correct.

10     Q      Okay.   And so, for example, you were asked about a 1023 form that I think

11     was marked as exhibit 9.   In declining to comment, you did not intend to suggest that

12     your office had, had not seen the form, had or had not taken any steps with regard to the

13     form.   You were declining to comment entirely as to the question, correct?

14     A      Yes.   I don't want to communicate anything in that regard so as not to

15     jeopardize anything that we have that is ongoing.

16     Q      Okay.   And one more question:   The comment was made that you agree

17     that the transition team was tipped off before a supposed interview of Hunter Biden.

18     You did not mean to confirm or deny that that actually took place, correct?

19     A      That's correct.   I did not mean to confirm or deny that fact.

20     Q      Okay.   I want to look at exhibit 12, which is the Special Counsel Report.

21     Realizing that there are a number of redactions and that this may be redacted,

22     there is no date on this report, correct?

23     A      This -- oh, yes.   It is 12.   I'm sorry.   There is a sticker that says 2, but I do

24     not see a date on exhibit 12.

25     Q      Okay.   And you realize it says pages 84 and 85, but you have not been

1    presented with the pages preceding pages 84 and 85, correct?

2        A    That's correct.

3        Q    Okay.   So, given that there is no date on this, you don't know, for example,

4    what steps might have been taken, what evidence might have been developed after this

5    report was presented, correct?

6        A    Whether I do or not, I am not at liberty to comment on any steps or

7    investigative avenues that were pursued after the submission of the report.

8        Q    Understood.   And this is not the entire report, correct, as it exists?

9        A    Exhibit 12 does not represent the entire report.

10       Q    Okay.   The statement was made in the prior hour that Matt Graves and/or

11   Martin Estrada, quote, "shot you down" or told you no.   Is that an accurate

12   representation of your interactions with them?

13       A    It is not.   As I explained on several occasions, I did not ask them for their

14   permission to proceed.   That wasn't the question that was posed.

15       I asked whether they were interested in joining in or participating in the case, and

16   they declined to do so, but I still had the ability to move forward if and when I chose to do

17   so.

18       Q    Okay.   And that pertains to both the Central District of California and the

19   District of Columbia, correct?

20       A    That is correct.

21       Q    Okay.   Were you denied 515 authority in spring 2022?

22       A    I was not denied 515 authority at any time, no.

23       Q    Okay.   And, in fact, you said earlier that -- I'm sorry.   Withdraw that.

24       You don't need section 515 authority to take investigative steps in another

25   jurisdiction, correct?

1    A    You do not need 515 authority to pursue investigative steps wherever they

2    may be, yes.

3    Q    Okay.   You've said in your letters and you reiterated again today that you

4    were assured that you would be granted 515 authority if it proved necessary.

5         At what point would you need to formally go through the process to obtain

6    section 515 authority?

7    A    I would execute on that authority at the time we were ready to bring the

8    charges, to file.

9    Q    Okay.   And, accordingly, if you were not ready to bring charges, you would

10   not formally go through the process to obtain 515 authority.   Is that correct?

11   A    That's correct.

12   Q    Okay.   In the prior hour, you were asked about some statement supposedly

13   made by Mr. Clark.   I think there was a reference to career suicide and your legacy being

14   on the line.   I don't want to get into those statements specifically, and I understand you

15   can't comment on them, but at a high level based on your many years of experience as a

16   prosecutor, it's accurate to say that defense attorneys have an obligation to vigorously

17   defend their clients, correct?

18   A    As a general matter, absolutely.

19   Q    And, as part of that defense, defense attorneys might sometimes use what

20   some people could consider to be aggressive language in their conversations with

21   prosecutors.   Is that fair?

22   A    Certainly there are times when defense counsel may choose to use

23   aggressive language.

24   Q    And have you been in situations in which defense counsel has used

25   aggressive language with prosecutors?

1    A    I believe that I have, although I don't find it -- personally, I don't find it very

2    effective for what that's worth, but I suspect that I have witnessed such tactics.

3    Q    Okay.    When you say you don't find it very effective, in your experience, are

4    prosecutors easily intimidated by defense tactics like aggressive language?

5    A    I mean, I can't -- no.    I wouldn't expect that most prosecutors would be

6    intimidated by such tactics.

7    Q    And, when you say you don't find it very effective for defense attorneys to

8    use those kind of aggressive tactics, why do you say that?

9    A    Because we're bound to make our decisions based on the facts and the law,

10   so, if -- I find, as a general matter, defense counsel is most effective when he focuses -- he

11   or she focuses on the facts and law and demonstrates why my case isn't what I think it is.

12   Q    Okay.    Thank you.

13        I want to turn to the release of information in cases.    Are you familiar with the

14   term "law enforcement sensitive information"?

15   A    I am generally, yes.

16   Q    What's your understanding of what that term means?

17   A    It means that it's information that is part of the investigation, and, therefore,

18   our preference would be that such information not be released, at least -- well, I wouldn't

19   even limit it to the pendency of the investigation, yes.

20   Q    Are you familiar with what I mean when I refer to 6(e) material?

21   A    I certainly am.

22   Q    What is 6(e) material?

23   A    It's grand jury material.

24   Q    Are there particular safeguards around 6(e) material, or grand jury material?

25   A    Sure.

1    Q    What are they?

2    A    There are statutes that provide that the knowing release of grand jury

3    material could be a criminal offense under certain circumstances depending upon the

4    surrounding circumstances.

5    Q    Is it fair to say that the Justice Department works to keep both information

6    about ongoing matters and law enforcement sensitive information and 6(e) material from

7    being released?

8    A    Yes.

9    Q    Why is that?

10    A    Because release of such material could jeopardize any ongoing investigation,

11    and perhaps be used by an adversary to undermine the ongoing investigation or the case

12    if it's ultimately prosecuted.

13    Q    Okay.    Could it actually impair prosecutors' ability to move forward with a

14    case?

15    A    It could impair an ability to move forward.    It certainly doesn't do it any

16    good.

17    Q    Okay.    And it could actually prevent prosecutors from obtaining a

18    conviction, right?

19    A    Under certain circumstances.    I mean, it's a hypothetical, but, as I said, it's

20    not a good development for prosecution.

21    Q    Okay.    Is it also a concern that the release of information about ongoing

22    investigations could create a risk of damaging the reputation of individuals who might not

23    ultimately be charged, for example?

24    A    Certainly that's -- you know, that's a fair concern, yes.    That's why we don't

25    talk about ongoing matters.

1        Q        In this case, there have been allegations that, on at least two occasions,

2        information about the ongoing investigation, including potentially 6(e) material, was

3        leaked to the press.

4                 Are you familiar with these allegations?

5        A        I'm not familiar with the particulars that you're discussing.

6        Q        Okay.    Would it be concerning if information about this case was leaked to

7        the press?

8        A        Absolutely.    Any case for any prosecutor, the release of information to the

9        press would be of concern, yes.

10       Q        Moving on, we've been keeping a loose tally, and, by our count so far today,

11       the majority has asked you more than 75 times questions about the ongoing

12       investigation, and you've repeatedly declined to answer.

13                It was made clear to the majority in advance of your testimony that you would

14       only be able to discuss the scope of your authority over this case, correct?

15       A        My understanding, as I said in my opening statement, was that I was coming

16       in here to discuss the scope of the authority, but I have no comment with respect to the

17       number of times that the question has been raised.    I've tried to be consistent in my

18       responses to the best of my ability.

19       Q        Okay.    Can you talk a little bit about why you are concerned about

20       discussing the underlying case in this format as opposed to putting the information into a

21       report to be released later?

22       A        I don't want to say or do anything to jeopardize the ongoing case.    We're

23       doing our best to gather the evidence and to make informed decisions.    There are

24       people working very hard on that exercise, and the last thing I want to do is to say

25       anything here -- while I am mindful of oversight responsibilities, I'm doing my best to

1    respond to questions.   I am really sensitive to the idea that I don't do anything to

2    jeopardize what we're working on otherwise with respect to the investigation or any

3    prosecution.

4         Q     And can you explain why discussing that information here might jeopardize a

5    prosecution or might impact the ongoing case?

6         A     Certainly, you know, there are any number of ways in which that could

7    manifest itself, but whether a court takes exception to something I say, whether defense

8    counsel uses something I say to attack the prosecution or the merits of the prosecution,

9    these are all things that I'm trying to be mindful of so as to not undermine what we're

10   working hard on the investigative front.

11        Q     Okay.   And so, to the extent that you have declined to respond to questions

12   about the underlying case, that is a decision that you yourself are making based on

13   protecting that case, correct?

14        A     Yes.

15        Q     It's not a directive from Mr. Weinsheimer, for example?

16        A     No one has directed me.   I'm doing my best.   I'm responsible for the case

17   and for the investigation, as I've tried to communicate, and I'm trying my best on my own,

18   without direction, to preserve the integrity of the case.

19        Q     Compared to other matters that you've worked on during your career at the

20   Department of Justice, has this matter attracted more public attention than others?

21        A     I think that's fair.

22        Q     Has this outsized attention led to increased attention on your office

23   specifically?

24        A     It's led to increased attention for everyone who has touched the case.   I

25   think that's correct.

1      Q      Has the outsized attention given to this case resulted in threats and

2   harassment against members of your office?

3      A      Yes.      Members of my office, agents assigned to the case, both from the IRS

4   and from the FBI, doxing family members of members of my office.      So, yeah, it's part

5   and parcel of this case.

6      Q      Do you have concerns for the safety of individuals working in your office?

7      A      Sure.      I have safety concerns for everybody who has worked on the case,

8   and we want to make sure that folks -- yeah, folks are encouraged to do what they need

9   to do with respect to the pursuit of justice generally and they not be intimidated in any

10   way from performing their responsibilities.

11      Q      Do you have concerns that the threats and harassment employees have

12   received are intended to intimidate them into not doing their jobs?

13      A      I really can't speak to the intention of any actor in this realm.      I just know

14   that these -- that certain actions have been taken by individuals, doxing, and, you know,

15   threats that have been made, and that gives rise to concern.      We've got to be able to do

16   our jobs.

17      And, sure, people shouldn't be intimidated, threatened, or in any way influenced

18   by others who -- again, I don't know what their motives are, but we're just trying to do a

19   public service here, so --

20      Q      Have you yourself been the subject of any threats or harassment?

21      A      I've certainly received messages, calls, emails from folks who have not been

22   completely enamored of my -- with my role in this case.

23      Q      Do you have concerns for your safety or that of your family because of these

24   threats?

25      A      You know, I'm not -- for myself, I'm not particularly concerned.      Certainly I

1     am concerned, as any parent or spouse would be for -- yeah, for family, yep.

2          Q     Are you familiar with threats that have been targeting Lesley Wolf?

3          A     I am aware that Lesley Wolf has received threats, yes.

4          Q     Is it fair to say that she's been the particular target for threats?

5          A     I think that Lesley has received more than others for the most part in this

6     case, yes.

7          Q     Do you have confidence in Ms. Wolf as a prosecutor?

8          A     Yeah.   I have confidence in Ms. Wolf as a prosecutor.

9          Q     Okay.   Are you confident that she did her work on the Hunter Biden matter

10    in a professional and unbiased manner without partisan or political considerations?

11         A     I believe she did.   As I said, she served the Department for more than

12    16 years, and I believe her to be a prosecutor with integrity.

13         █████████.   Okay.   All right.   Thank you.   We can go off the record.

14         [Recess.]

15         Mr. Castro.   We can go back on the record.   It's 2:36.

16              BY MR. CASTRO:

17         Q     Did you have any interactions with FBI official Timothy Tebow?

18         A     I don't know a Timothy Tebow, so I'd say no.

19         Q     Okay.

20         A     Not that I know of.

21         Q     Are you aware that FBI agents from the Washington Field Office interviewed

22    a gentleman by the name of Tony Bobulinski?

23         A     I am aware of investigative steps in this case generally, but I'm not going to

24    discuss any particular investigative step that was taken.

25         Q     Mr. Bobulinski has -- I don't know what the right word is -- maybe

1    complained that he tried to give the FBI information, but they didn't seem willing to take

2    it, and the U.S. Attorney's Office in Delaware didn't follow up with him.

3        What can you say with regard to that?

4        A    Counsel, as you might surmise, I can't say anything in that regard, because it

5    pertains to the investigation.    And, at this time, I'm just not at liberty to comment on

6    any aspect of the investigation, although I suspect I could comment on that and probably

7    would at the conclusion of our investigation and submission of the report.

8        Q    Okay.    Have you had any issues getting the information you needed from

9    Mr. Bobulinski?

10       A    Again, I'm not going to comment on the investigation.

11       Q    Have you interacted with an FBI agent named Eric Miller?

12       A    Can you tell me the agency?

13       Q    With the FBI.    The Washington Field Office of the FBI.

14       A    No.    Not that I recall.

15       Q    Okay.    Are you aware of the role of the Washington Field Office in

16    suppressing information related to the Hunter Biden case?

17       A    I have no particular knowledge about such a matter.    I mean, not really.

18       Q    Okay.    Your primary FBI office is the Baltimore Field Office?

19       A    Our -- the SAC, the special agent in charge, is located in the Baltimore Field

20    Office.    That's correct.

21       Q    Okay.    And who is the special agent in charge that you interact with in

22    Baltimore?

23       A    During -- currently?

24       Q    Currently.

25       A    As of today, it's Tom Sobocinski.

1     Q     Okay.    And what other FBI officials in that office do you interact with?

2     A     His assistant special agent in charge is Ryeshia Holley, and those are the folks

3   I recall off the top of my head.

4     Q     Okay.    As far as the IRS personnel, how frequently does your office utilize

5   the supervisory or the special agents from the IRS in your cases?

6     A     We utilize special agents from the IRS in any tax case, and, at a minimum, a

7   support capacity in many other cases.

8     Q     Okay.    So it's not uncommon for your office to work with the IRS agents?

9     A     No.    Hopefully not.    If we're -- you know, no, because they're a

10   tremendous tool.    So, no, we work with the IRS on a number of cases.

11     Q     Okay.    I'm going to mark the plea agreement.

12     Mr. Castro.    What number are we up to?

13     Ms. Nabity.    Fifteen.

14     Mr. Castro.    Fifteen.

15                              [Weiss Exhibit No. 15

16                              Was marked for identification.]

17               BY MR. CASTRO:

18     Q     This is the copy of the plea agreement dated July 26th of this year.

19           What's the current status of this plea agreement?

20     A     The plea agreement has been withdrawn, and that's all I'd say about it at this

21   moment.    There is ongoing litigation in this matter, as you know, and, therefore, I'm not

22   going to say anything that's going to compromise the prosecution in the district of

23   Delaware.

24     Q     Okay.    But we certainly can talk about the public plea agreement, can't we?

25     A     I'm not going to talk about the public plea agreement because I don't know

1    how or when or if it will be utilized by defense counsel to advance the defense in this

2    case.

3         Q      Okay.   Do you know who drafted the statement of facts and the plea

4    agreement?

5         A      Again, I'm not going to get into this.    This is the subject of ongoing

6    litigation, an indicted case, so there is no way I'm going to comment on this matter.

7         Q      Okay.   Let me just ask you generally, though:    If the defense attorney

8    drafted it, would that give you concern?

9         A      I review with skepticism anything that is prepared by another party, so you

10   have to critically review documents you received drafted from an adversary, certainly.

11        Q      Okay.   So it would be uncommon for a defense attorney to draft a

12   statement of facts and plea agreement?

13        A      Plea agreements and statement of facts accompanying plea agreements, as

14   a general matter, are part of the prosecution's efforts.

15        Q      Could you turn to page 2?    And I'll call your attention to 5(a).

16        Pursuant to the United States Sentencing Guidelines, section 2T1.1, the amount of

17   loss as to count 1 and 2, including relevant conduct as defined in the Sentencing

18   Guidelines, is no less than 1.1 million and no greater than 1.5 million.

19        Is this true and correct?

20        A      You've rounded the numbers, but otherwise you've accurately read the

21   provision in the plea agreement.

22        Q      Okay.   And this was a plea agreement that was submitted to the court and

23   was, you know, attempted to be implemented, correct?

24        A      This was a plea agreement that was submitted to the court.

25        Q      Okay.   So the information contained in here is accurate to the best of your

knowledge?

A Yeah, I'm not going to say anything about the contents of the plea agreement or anything else about the process.

Q And your office signed this, correct, on page 6?

A There is a signature on the signature line on behalf of the United States, yes.

Q So, based on that, we can deduce that everything in here is something that is true and correct to the best of your knowledge?

A Again, I'm not going to comment on anything that implicates the contents of this document.

Q Okay. I'll refer you to page 7 of exhibit 1. It's exhibit 1. It's page 7 of the --

A I got it.

Q -- document, the paragraph that states, during calendar year 2017, Biden earned a substantial income, including just under 1 million from a company he formed with the CEO of a Chinese business conglomerate, 666,666 -- that's an unusual number -- "from his domestic business interests; approximately 664,000 from a Chinese -- another Chinese infrastructure investment company, 500,000 in director's fees from a Ukrainian energy company, 70,000 relating to a Romanian business, and 48,000 from the multinational law firm.

Is this all true and correct to the best of your understanding?

A Again, all I'm going to say is that you've accurately read the paragraph. Otherwise, I'm not going to comment on the document or the exhibit attached thereto.

Q Okay. Do you know who drafted this part, exhibit 1?

A Again, I'm not going to get into the contents or the drafting process with respect to this.

1   Q  Who would ordinarily draft these types of documents?

2   A  I'm not -- won't comment on it as it applies to this case.   Generally, the

3 statement of facts that accompany a plea are the province of the prosecution as a general

4 matter.

5   Q  Okay.

6   A  However, that's not to say there have been -- I am aware of circumstances in

7 which, you know, the other side has had comment or had input into a document.

8   Q  Would it be common for defense counsel to draft something and then send

9 it to the prosecution and have the prosecutors basically use the document --

10   A  Again, that --

11   Q  -- and edit it?

12   A  That sounds like we're suggesting such with respect to this case, and, again,

13 it's -- we're litigating this, so I'm not going to get into anything that could be utilized in a

14 way that's contrary to the government's interests on this topic.

15   Q  Yeah.   I was just asking from a general matter.

16   A  I understand.

17   Q  Do you take documents that defense attorneys send you and then just work

18 from there?

19   A  Again, I'm just --

20   Q  Not in the case.   Just generally.

21   A  I'm giving you what I can, you know, on this kind of -- on this situation.   I

22 mean, this is active litigation.   We're involved in motions practice as we speak.

23   Q  Flipping the page to page 8, the third paragraph, the paragraph that begins

24 with "despite"?

25   A  I see it.

1      Q      Direct your attention to the second sentence.      On or about March 22nd,

2      2018, Biden received a $1 million payment into his Owasco, LLC bank account as a

3      payment for legal fees for Patrick Ho and 939,000 remained available as of tax day.

4             Is that true and correct to the best of your knowledge?

5      A      As I've stated previously, counsel, I'm just not going to comment on any

6      aspect of the contents of this document or the plea agreement in general.

7      Q      But this was a plea agreement accompanied by a statement of facts that

8      your office signed?

9      A      This is a plea agreement that was signed by someone in my -- I believe in my

10     office.

11     Q      Okay.      And this isn't the first time you've seen this, right?

12     A      This --

13     Q      We're talking about the right plea agreement, right?

14     A      This is not the first time I have seen this.

15     Q      Okay.      Did you have any involvement with this particular document --

16     A      Not going to talk about it.

17     Q      -- or was it just the AUSAs in your office?

18     A      Not going to talk about the process, as I've said before.      Just not going to

19     talk about the process that underlies this, that led to the completion of the report, or any

20     of the contents thereof.

21     Q      Okay.      Ordinarily, are you involved in it?

22     A      Again, I'm not -- I'm just not going to get into that.

23     Q      Outside of this case, is, like, the U.S. Attorney ordinarily involved in revising

24     plea agreements that your AUSAs are handling?

25     A      I have -- we're a small office, so it wouldn't be the craziest thing for me to

1    review and have questions or suggestions with respect to a plea agreement.

2         Q    Okay.    On July 26th, the date of this plea agreement, Judge Noreika of U.S.

3    District Court for the District of Delaware declined to accept the Department's plea and

4    pretrial diversion agreements, correct?

5         A    I'm not going to comment on Judge Noreika's decision at all.    I'm just not

6    going to offer any comment in that regard.

7         Q    Okay.    But she declines to -- I mean, I don't mean to be difficult here, but --

8         A    The plea agreement did not go forward.

9         Q    Okay.    Because of the judge?

10        A    I'm not going to comment on why, who said what, the judge's comments.

11   We're in the matter before the judge as we speak, so I'm not going to say anything in that

12   regard.

13        Q    Okay.

14        Mr. Castro.    Can we get a copy of the pretrial diversion agreement?    We'll mark

15   that as the next exhibit.

16        We can go off the record for a second.

17        [Discussion off the record.]

18        Mr. Castro.    All right.    We're up to exhibit 16.    This is the pretrial diversion

19   agreement.

20                          [Weiss Exhibit No. 16

21                          Was marked for identification.]

22             BY MR. CASTRO:

23        Q    Paragraph 15 -- I'm sure you've seen this document before, correct?

24        A    I've seen this document before.

25        Q    This is the pretrial diversion agreement.    On page 9 of the document, it's

1     signed by Mr. Wise of your office under your authority.    It's signed by the defendant,

2     Robert Hunter Biden, and his attorney, Chris Clark.    And there is also a signature block

3     for the United States probation officer.

4            Is the probation officer needed to make this document effective?

5        A    Not going to comment on that.    It's the subject of ongoing litigation.

6        Q    Is there ordinarily a spot for the probation officer to sign?

7        A    Not going to comment on that at all.    It's subject of ongoing litigation.    I'm

8     not going to say or do anything to jeopardize the litigation or the rights of either the

9     government or defense in pursuing that litigation.

10       Q    You've seen pretrial diversion agreements in your district before?

11       A    I have seen pretrial diversion agreements in my district before.

12       Q    Okay.    And is ordinarily the probation office one of the parties that has to

13    sign?

14       A    In our district, the probation office is a party to the agreement.

15       Q    Okay.    And they sign it?

16       A    They are party to the agreement.    I can't recall specific circumstances.    I

17    don't review all the pretrial diversion agreements, but the probation office is absolutely a

18    party to a pretrial diversion agreement.

19       Q    Okay.    Now, is that not the case in other districts to your knowledge?

20       A    I can't speak to other districts.

21       Q    Okay.    Paragraph 15 of this document, which I believe is on page 7, states,

22    "The United States agrees not to criminally prosecute Biden outside the terms of this

23    agreement for any Federal crimes encompassed by the attached statement of facts and

24    the statement of facts attached as exhibit 1 to the memorandum of plea agreement filed

25    the same day.    This agreement does not provide any protection against prosecution for

1    any future conduct by Biden or by any of his affiliated businesses."

2          Did I get that right?    Did I read it accurately?

3          A    You read it well.

4          Q    Okay.    Thank you.

5          Other than the Hunter Biden case, how many times has your office included, you

6    know, in a pretrial diversion agreement, an agreement not to prosecute crimes that are

7    unrelated to the crime being diverted?

8          A    I'm not going to comment on that.    Again, I'm not going to comment on the

9    substance of this document.    Subject of ongoing litigation, and I don't want to in any

10   way influence that litigation.

11         Q    Okay.    Well, what is the status of the litigation?    Maybe you could just

12   help us understand that and that would alleviate the need to ask.

13         A    The government has filed charges in the district of Delaware, and

14   we're -- motions practice is -- will be underway.

15         Q    Okay.    And are these agreements -- the plea agreement, are they subject to

16   litigation specifically?

17         A    They haven't filed their motions, but --

18         Q    Okay.

19         A    -- there are documentation -- there is documentation that suggests that it

20   will certainly be the subject of litigation.

21         Q    Okay.    Did you personally sign off on both of these agreements?

22         A    Again, I'm not going to get into the particulars of my sign-off or any other

23   aspect of the preparation of the documents or the content of the documents.

24         Q    Okay.    Well, then who is Leo Wise and Derek Hines?

25         A    They are -- they were persons who were authorized to sign the document on

1    my behalf.

2        Q     Okay.    Are they AUSAs in the district of Delaware?

3        A     They are -- they are AUSAs who are -- they're AUSAs.    That's all -- they

4    were, I think, SAUSAs on this matter.

5        Q     They were SAUSAs?

6        A     Special Assistant United States Attorneys.

7        Q     Okay.    Are they part of your office now?    Are they still part of the --

8        A     I'm not going to comment on personnel.

9        Q     Okay.    Well, why wasn't -- I mean, Lesley Wolf, as far as -- you know, we're

10   aware and the whistleblower testified Lesley Wolf was the lead prosecutor on this.    Why

11   isn't she signing these documents?

12       A     I'm not going to -- I'm not going to speak to personnel -- anyone's role in our

13   prosecution or who participated and who did not participate and why that may be.

14       Q     Was she benched in the wake of the whistleblower testimony?

15       A     Not going to discuss personnel matters.    It's not -- it's certainly outside the

16   scope of the intended topic that we're here to discuss.

17       Q     Well, your intended topic, but, I mean, you know, we're obviously following

18   up on what we believe is credible testimony provided by whistleblowers via protected

19   disclosures?

20       A     I understand that you have a role to perform and a job to do, as I do.    And,

21   yes, I'm here to discuss my authority and all aspects of that question, but not the case,

22   the personnel on the case, or anything associated with the investigation.

23       Q     Okay.    Is Ms. Wolf still working the case?

24       A     I'm not going to comment on personnel that's part of the case.    Just not

25   going to do it for the reasons we've previously discussed.    Just not helpful in that regard.

1      Q      What's the Delaware way?

2      A      I don't really know what the Delaware way is.   I've heard the phrase.   I'm

3   not from Delaware, but I've heard the phrase, so I don't pretend to be intimately familiar

4   with the connotation.

5      Q      Have you ever used the term "the Delaware way"?

6      A      No.   I don't think -- I don't believe I've ever used the term "the Delaware

7   way."

8      Q      Are you aware of a prosecution of a gentleman by the name of Christopher

9   Tigani?

10     A      I am, yes.

11     Q      And you prosecuted him?

12     A      I was -- I don't recall my status at the time, whether I was acting or -- but I

13   am aware of the prosecution for Mr. Tigani.

14     Q      Okay.   At the time, I believe you were the interim head of the office?

15     A      I may have been.

16     Q      Okay.

17     A      If it was, you know, 2009, 2010, I was acting or interim U.S. Attorney during

18   that timeframe.

19     Q      And you had stated at the time that Tigani had become the embodiment of

20   the Delaware way.

21     A      Okay.

22     Q      Do you know what you meant when you said that?

23     A      You know, I can't -- I can't specifically recall.   I recall Mr. Tigani's case, and I

24   know that it pertained to -- or my recollection is that it pertained to campaign violations.

25     Q      Okay.

1       A    Bundling, I believe.    Bundling campaign contributions.

2       Q    In the presentencing memo for that case, it was written, "The defendant

3  himself, Mr. Tigani, best described the pervasive nature of his conduct to Federal agents.

4  Over a 6-year period, defendant became the embodiment of the Delaware way, a

5  concept described uniformly by defendant and others as a form of soft corruption

6  intersecting business and political interests which has existed in the State for years."

7       Does that refresh your recollection?

8       A    The idea of soft corruption?    I wouldn't -- I don't -- I don't recall.    That was

9  submitted -- I think I was the supervisor at the time.    You can tell me if I'm wrong, if the

10  AUSA -- my name is under the AUSAs.    I certainly wouldn't retreat from the description

11  in that sentencing memorandum --

12       Q    Okay.

13       A    -- with respect to Mr. Tigani's role and what it represented.

14       Q    Okay.    Would you characterize the Delaware legal community as a small,

15  tight-knit legal community?

16       A    I would characterize the Delaware community as a small community, yes, for

17  sure.

18       Q    And, for the most part, all the key players who litigate in Federal court know

19  one another?

20       A    I think that's fair that folks get to know one another pretty quickly, yes.

21       Q    Okay.    Did you ever have any concerns that you were responsible for

22  bringing a case against the President's son and, yet, you're part of this close-knit

23  community?

24       A    No, I didn't.    No.    Yes, I just -- I just acknowledge that the Delaware,

25  particularly in Federal courts -- you know, there is only a certain number of practitioners

1    locally --

2         Q    Right.

3         A    -- and there is extensive base that comes in from outside of Delaware.

4         Q    Right.

5         A    But there is a certain limited number of practitioners that regularly appear in

6    Federal court, but that fact, as far as I'm concerned, and nor did any other fact give pause,

7    as far as I was concerned, with respect to my ability to pursue the facts and the law and

8    go where they led in this investigation or the prosecution.

9         Q    Was there any discussion that you ever were a part of that maybe it would

10   be best to have a Special Counsel over this case that was not connected to this small,

11   tight-knit legal community of Delaware?

12        A    I don't recall any discussion that was had along those lines.    That is,

13   perhaps Special Counsel would be appropriate because this is a small, tight-knit legal

14   community.    No, I don't recall any conversation of that length or of that nature.

15        Q    Or, like, maybe for this case, the best type of Special Counsel would be

16   somebody from outside the Delaware legal community?

17        A    A conversation which -- that I was privy to, or participated in?

18        Q    Right.    I mean, either/or, yes.

19        A    I don't recall that, no.    No.    I don't recall a conversation that suggested

20   that someone from Delaware having responsibility of this case could not fulfill his or her

21   responsibilities.

22        Q    Do you think, from an outsider's perspective, that a reasonable outsider

23   could perceive that potentially there could be a conflict of interest there worthy of

24   addressing?

25        A    You know, I can't speak to that.    You know, it's speculation, but -- so I really

1    can't address it.

2         Q      I mean, one of the principles under the Special Counsel regime is that, if the

3    President needs to be investigated or the President's, you know, close family member of

4    the President, that that be handled -- if a Special Counsel is going to be appointed, that it

5    be detached from the authority of the President, correct?

6         A      Yeah.    I don't know about being detached from the authority of the

7    President.    What I would say is, at least as it pertains to me, that I wouldn't have

8    requested an appointment of Special Counsel if I didn't think I could fulfill the

9    responsibilities that attached thereto, which are significant.    I fully appreciate it, and I

10   wouldn't have asked for it if I didn't think I could do it.

11        Q      Right.    Do you see any conflict of interest that you serve at the pleasure of

12   President Joe Biden, yet, at the same time, you're in the midst of a prosecution of his

13   son?

14        A      I understand what you're suggesting.    The fact is that Special Counsel

15   ultimately reports to the Attorney General, who reports to the President of the United

16   States, regardless of who it is.    That's the way it works.    So you could -- one could

17   frame the same question with respect to anybody that might operate in this role.

18        Q      Are you familiar with Robert Hur?

19        A      I am familiar with Robert Hur, yes.

20        Q      And he's another Special Counsel currently?

21        A      He is another Special Counsel.

22        Q      And, to your understanding, what is he examining?

23        A      He's examining the document case.

24        Q      Okay.

25        A      The classified document situation.

1       Q   Is he somebody with experience in Delaware, or is he from the Delaware

2  legal community?

3       A   Rob Hur was the U.S. Attorney in the District of Maryland when I was U.S.

4  Attorney in -- and I still am -- in Delaware.

5       Q   Okay.   Do you know why Mr. Hur was selected?

6       A   I don't.

7       Q   And he was brought in from outside the Department?   That's correct?

8       A   Rob was -- my understanding is that Rob Hur was not part of the Department

9  of Justice at the time.   That's my understanding.

10      Q   In August of 2023, when you requested Special Counsel authority, did you

11  have a recommendation that maybe the Department ought to consider somebody other

12  than yourself, or were you the only person that you thought could do this job?

13      A   I'm not going to get into the particulars of my request for the reasons I

14  discussed previously.

15      Q   Okay.   Was there any discussion with the Department about whether you

16  were the best person for the job, or whether they ought to go outside the Department

17  like they did with Mr. Hur, like they did in other Special Counsel situations?

18      A   No.   As I mentioned previously, I -- you know, I submitted the request.

19  That was the only request that I am aware of.   I don't know -- I have no idea whether the

20  Department considered other options.

21      Q   And, when you submitted the request, was that through Mr. Weinsheimer?

22      A   No.   No, it wasn't.

23      Q   Did you have communications with Mr. Weinsheimer before you submitted

24  the request?

25      A   I did not have communications with Mr. Weinsheimer about the request

1    before I submitted it.

2         Q    Okay.    You just went right to the Attorney General?

3         A    I submitted the request on my own initiative, and, otherwise, I really can't

4    get into the particulars at all.

5         Q    Right.    Have you had subsequent conversations with Mr. Weinsheimer?    Is

6    he the individual that you reported to, or --

7         A    After I was appointed?

8         Q    Correct.

9         A    Yes.    I continue to discuss the matter with Mr. Weinsheimer.

10        Q    So he's your primary point of contact still?

11        A    He continues to be my primary point of contact, yes.

12        Q    Okay.    And do you still consider yourself as reporting into the DAG as a

13   Special Counsel like a U.S. Attorney would?

14        A    Ultimately, whether I'm Special Counsel or as U.S. Attorney, yes, you

15   have -- it's still the Attorney General that --

16        Q    Right.

17        A    -- runs the Department, whether -- and that applies whether I am Special

18   Counsel or U.S. Attorney, absolutely.

19             Chairman Jordan.    Have you kept up the rhythm?    You said earlier today that

20   you had monthly contacts with the key people at the Justice Department.    Have you

21   kept up that same protocol?    Has it increased or decreased as Special Counsel?

22             Mr. Weiss.    I guess it's been, I guess, 3 months.    I don't know that there is much

23   of a practice or that I could say, you know, circumstances.    You know, I've had several

24   conversations in the last 3 months with Mr. Weinsheimer.    I can say that.

25             Chairman Jordan.    So it's picked up?

1        Mr. Weiss.   It's -- I've had probably -- yes, several conversations.    Whether that

2    will continue or it was unique to the initial stages of the project, I really can't speak to.

3        Chairman Jordan.    Okay.

4            BY MR. CASTRO:

5        Q    If you're going to indict somebody, would you need to alert

6    Mr. Weinsheimer in advance?    Would you need to alert the DAG or alert the Attorney

7    General?

8        A    I don't -- it's expected and my recollection of the regulations that attend to a

9    Special Counsel would require to apprise the AG, I expect, through the Office of the

10    Deputy Attorney General of significant developments in the case.

11        Q    So, if you were going to indict somebody, you would presumably go through

12    Mr. Weinsheimer and then --

13        A    The regulations provide for keeping the AG and his designee apprised of

14    significant developments.    That's my understanding of the regs.

15        Q    Right.    But, in practice, Mr. Weinsheimer is your primary contact?

16        A    Historically, that's been the case, correct.

17        Q    Okay.    So, if you were going to indict someone, you'd probably alert

18    Mr. Weinsheimer and determine whether any other communications were needed with

19    the DAG individually or the AG?

20        A    If I were to take a significant step in the case, I expect, as you've suggested,

21    that, yes, I would have contact with Mr. Weinsheimer.

22        Q    Okay.    Has Mr. Weinsheimer given you any guidance or limiting instructions

23    about things you can or can't do?

24        A    No.

25        Q    You mentioned earlier this morning in a previous round that you had -- we

1 asked you about discussions that you had with Mr. Estrada, and I believe you told us that,

2 with respect to bringing a case in the, you know, Los Angeles U.S. Attorney's Office, the

3 Central District of California, you had one conversation with Mr. Estrada?

4 A    Yes.   Yes.   At that time, I had one -- yes.   I had one conversation relevant

5 to our pursuit of the case in 2022, that's correct.

6 Q    Okay.   And then I take it by that that you potentially have had additional

7 communications with Mr. Estrada?

8 A    Yeah, I don't want to get into those communications, but I was trying to

9 address -- I don't know who said what, but the notion that there may have been another

10 conversation.

11 Q    Mr. Estrada testified that there was another conversation in September

12 of 2023.   Do you remember that one?

13 A    Yeah, I don't want to get into the particulars of any further conversations.   I

14 mean, the first one -- and I'm not trying to be cute.   The first one spoke to my authority.

15 The second one, I just -- it would not be appropriate for me to comment on.

16 Q    Okay.   If you were going to bring an indictment in the Central District of

17 California as Special Counsel, what would you need to do with respect to Mr. Estrada?

18 Would you need to let him know you're doing it?   Would you --

19 A    Again, I don't want to get into the particulars here, but, as Special Counsel,

20 just as U.S. Attorney, there should be some communication to another district so that

21 someone -- you can't just appear and be there.   There has to be some --

22 Q    Of course.

23 A    -- coordination.

24 Q    So you would expect to alert Mr. Estrada if you were bringing in --

25 A    I've said as much as I can say without in any way compromising or giving -- or

1    speaking to what now may be transpiring.    I just don't want to get into that at all.

2    Q    Okay.    Do you have any indictments that are on the horizon?

3    A    I'm not going to speak to indictments that may be on the horizon or

4    deliberative process or anything in that regard, as I'm sure you know.

5    Chairman Jordan.    Do you have any idea when you will complete your task as

6    Special Counsel?

7    Mr. Weiss.    I do not as I sit here today, but we will try to move it as quickly as

8    possible without compromising the investigation or the prosecution of any case that

9    might be brought.

10    BY MR. CASTRO:

11    Q    Do you have any goal as to when you'd like to bring it to conclusion?

12    A    Two weeks ago.    No, I say -- again, I say that in jest, but no.    Look, I

13    recognize that it's never good for cases to linger, so I am interested in efficiency to the

14    extent possible.

15    Chairman Jordan.    It's been 5 years.

16    Mr. Weiss.    I understand that, Chairman.    I really do.    I absolutely do.

17    Chairman Jordan.    So that doesn't -- you just used the term "linger."    That

18    doesn't fit the definition of "linger"?

19    Mr. Weiss.    I understand your question and appreciate it.

20    BY MR. CASTRO:

21    Q    Are you familiar with an individual by the name of Alexander Mackler?

22    A    I am familiar with an individual by the name of Alexander Mackler.

23    Q    And how do you know him?

24    A    Mr. Mackler was an AUSA in U.S. Attorney's Office in the District of

25    Delaware.

1          Q     And do you know how long?

2          A     I believe for a couple years, but I can't speak with any specificity as to his

3     tenure, but that's my general recollection.

4          Q     Okay.    Do you remember what timeframe?

5          A     I don't know specifically.    2017, 2018 --

6          Q     Okay.

7          A     -- I think, generally.

1    [3:12 p.m.]

2                    BY MR. CASTOR:

3        Q    Okay.    Did you know that he also had served at one point as Joe Biden's

4    press secretary?

5        A    I didn't know, and -- I didn't know Mr. Mackler's role vis-à-vis now-President

6    Biden.    I knew that Mr. Mackler had worked for now-President Biden.

7        Q    Are you aware that he served as Beau Biden's campaign manager during his

8    reelection campaign?

9        A    I was not aware of that, not to the best of my knowledge.

10       Q    Were you aware that in 2014 through 2016 he served as deputy counsel to

11   then-Vice President Biden?

12       A    I was not aware of that.

13       Q    Were you aware that in November of 2021 Mr. Mackler was named to

14   President Biden's transition team?

15       A    I do think I learned of that.

16       Q    Okay.    And when did you learn of that, or under what circumstances?

17       A    I don't know.    I don't know.    I don't know when or what the circumstances

18   were, but I think I heard that.

19       Q    When Mr. Mackler was with the U.S. Attorney's Office in Delaware, what

20   was his role?

21       A    He was an AUSA.

22       Q    And, as I understand it, he was an AUSA from August of 2016 through May of

23   2019?    Is that --

24       A    Again, you have dates.    I was estimating.    Apparently, I wasn't that far off.

25   But --

1    Q    Okay.

2    A    -- I'm not going to challenge that.

3    Q    Okay.    And during his time as an AUSA, did you have any interactions with

4    him?

5    A    Sure.    We're a small office.    I have interactions --

6    Q    Okay.

7    A    -- with everybody in my office.

8    Q    Okay.

9    A    At least if I'm doing my job.

10    Q    Do you remember under what circumstances Mr. Mackler left the U.S.

11    Attorney's Office?

12    A    I know that he went to be the chief deputy for the Attorney General's Office

13    for the State of Delaware.

14    Q    Okay.    And that was in 2019, when he left?

15    A    Again, I can't recall the particulars, but that sounds within the realm of

16    reason.

17    Q    When you subsequently found out that he was part of the transition team,

18    did that give you any concern that it might create an optics issue?

19    A    No.

20    Q    Did you or anyone in your office have any communications with him when

21    he was working with the transition team?

22    A    I don't know when he worked with the transition team.    I don't know if I

23    would've had any conversations with him.    I certainly wouldn't have had any

24    conversations with him about his work as a member of the transition team.

25    Q    Okay.

1        A       I don't -- I'm very confident I had no conversations with him about it.

2        Q       Would you or any member of your staff have had a conversation with

3   Mr. Mackler about the Hunter Biden case?

4        A       I have not spoken to Mr. Mackler ever about the Hunter Biden case.

5        Q       Okay.

6        A       I have no idea whether anyone else has spoken to Alex Mackler period or

7   about the case.

8        Q       Okay.    So you don't know if any of your AUSAs had any communications

9   with Mr. Mackler?

10       A       I do not know.

11       Q       Okay.

12               Earlier, I had asked you about the transition team being tipped off as far as the

13   day of action in December of 2020.

14       A       You said the transition team was tipped off?

15       Q       Yeah.

16       A       Yeah, I'm unaware of the transition team -- I'm unaware of that, and I

17   can't -- I'm just not going to -- as I said before, I can't comment on it, because it pertains

18   to the investigation.    But I'm unaware of that.

19       Q       Would that concern you, if somebody in your office tipped off the transition

20   team about something related to the day of action?

21       A       I think as part of minority counsel's questions, I would be concerned with

22   anything that comes out pertaining to an investigation for which I'm responsible and

23   anyone hears of it.    It shouldn't happen --

24       Q       Okay.

25       A       -- and it does the investigation no good.

1     Q     Okay.   So, if some investigative actions were planned for the day of action

2     in December of 2020 and, before that occurred, the transition team was tipped off about

3     it, that would give you concern.

4     A     I'm not going to talk about the particulars in this case.   I will acknowledge

5     that, to the extent, as a general matter, anything of that nature occurred, it's a problem.

6     Q     And if you found out that something like that did occur, what would you do

7     to address it?

8     A     That's a hypothetical.   I'm not going to speculate on that.   I'm just saying,

9     as a general matter, it's problematic.   I'm not going to talk about anything that might

10    touch on this case or this investigation.

11    Q     Do any of the attorneys on your team, whether it's a Special Counsel team or

12    before the Special Counsel team was stood up, have any ties which you would consider

13    close to the Biden family?

14    A     I'm not going to get -- I don't know relationships.   I don't delve into those

15    kinds of things, as a general matter, and it's just not something I'm particularly

16    comfortable speaking about.   But I will say, I'm unaware of any such thing.

17    Q     Do you remember, during the Special Counsel Robert Mueller's probe,

18    advocates or allies of President Trump raised a concern that members of the Special

19    Counsel team had a lot of contributions to Democrats?   Do you remember that?

20    A     I remember allegations about a leaning by --

21    Q     Okay.

22    A     -- members of Mr. Mueller's team.   I do recall that coming up in a repeated

23    fashion.

24    Q     Is that something you've considered as you've built your team, to examine

25    the political contributions of the people on the team so it doesn't give the impression that

1    they're aligned with one party or another?

2         A     I understand the question, and for the reasons we just mentioned, I

3    understand why you ask it.    But the fact is, I looked for people who were the best

4    qualified and were interested in participating in this effort.    That's what I asked about.

5    That's what I focused --

6         Q     Okay.

7         A     -- my recruitment efforts on.

8         Q     Okay.    And, in any way, have you examined whether you've got folks on

9    your staff that are big-time political contributors to Democrats?

10        A     I'm not going to speak to it, because I don't want to discuss personnel,

11   and -- but I understand the question, the sensitivity, but it's not something I'm in a

12   position to address.

13        Chairman Jordan.    You may have answered this earlier.    The Special Counsel

14   staff, was it selected from your team in Delaware's U.S. Attorney's Office and/or from

15   outside?

16        Mr. Weiss.    It wasn't limited.

17        Chairman Jordan.    Okay.    So you went outside the office to get staff for this

18   task.

19        Mr. Weiss.    I don't want to get too far into the process or the particulars, but I

20   was not restricted in any way; I'll say that.    I was able --

21        Chairman Jordan.    Are there folks --

22        Mr. Weiss.    -- to go outside.

23        Chairman Jordan.    -- on the team from -- are there folks on the Special Counsel

24   team who were already working in the Delaware U.S. Attorney's Office?

25        Mr. Weiss.    Yeah, I'm not -- I don't want to get into the particulars of who's on it,

1    for the reasons we've previously discussed.    I just don't want to get into personnel.

2         Chairman Jordan.    Is it fair to say that there could be members from the

3    Delaware U.S. Attorney's Office and people from outside the Delaware's U.S. Attorney's

4    Office?    Is it fair to say that that could be the makeup of the team?

5         Mr. Weiss.    There is nothing in the regulations that would prohibit such a thing.

6         Chairman Jordan.    Okay.

7              BY MR. CASTOR:

8         Q    One of the big questions I think a lot of our members have is that, as of last

9    July, you know, heading into July 26th, you know, we saw the plea agreement and the

10   pre-trial diversion agreement; you know, we thought this matter was coming to a close,

11   and then it didn't.

12         How do you address the fact that this was on the verge of being completely over

13   and wrapped up on July 26th and then, boom, in August, you have to request Special

14   Counsel status, now you're standing up a whole new office, and we've got an

15   investigation that could go on for some time?

16        A    Yeah.    I understand the question and the members' curiosity.

17        Q    Uh-huh.

18        A    Because I've got ongoing litigation in Delaware, I'm not at liberty to discuss

19   it.    But --

20        Q    Uh-huh.

21        A    -- I can say that at no time was it coming to a close.    I think, as I stated in

22   the one statement I made at the time --

23        Q    Uh-huh.

24        A    -- the investigation was continuing.    So it wasn't ending there in any event.

25         Chairman Jordan.    When the judge would've accepted the agreement, it wasn't

1    over?

2         Mr. Weiss.    Our efforts were not concluded; that's correct.

3              BY MR. CASTOR:

4    Q    I mean, if that's the case, though, why would Chris Clark sign the agreement?

5    I mean, you know, the agreement seems pretty comprehensive.    I mean, the statement

6    of facts, like, goes way beyond just the matters at hand.

7    A    Counsel, you know, just by virtue of the question, I'm not in a position to

8    address what Mr. Clark may or may not have been thinking.    I don't know, and --

9    Q    Uh-huh.

10    A    -- I'm not going to presume to guess.

11    Q    Are you aware of a referral that was made regarding a potential campaign

12    finance violation by the individual that paid Hunter Biden's taxes?

13    A    I'm not familiar with the matter you're describing.

14    Q    So Mr. Morris, right, paid off Hunter Biden's tax debt, right?

15    A    I'm not going to discuss --

16    Q    Do you know who he is?

17    A    I'm not going to discuss those particulars.

18    Q    Do you know who he is?

19    A    I'm not going to discuss any particulars that pertain to ongoing investigative

20    matters.

21    Q    Right.    But my question is, do you know who Kevin Morris is?

22    A    I understand your question, but it's not something I'm in a position to discuss

23    at this time, because it --

24    Q    Okay.

25    A    -- references or it pertains to matters that are outstanding.

1      Q      Okay.

2      A      It's something I suspect I will very much address in the report.

3      Q      Right.

4             Did you find it surprising or unusual that somebody wanted to come in and just,

5      like, pay off a taxpayer's tax bill?    I mean, isn't that unusual?    Does that happen in

6      ordinary cases?

7      A      I don't know, and nor would I comment on that.

8      Q      Right.    Okay.    And, if so, you know, if someone hypothetically did do that,

9      is there a campaign finance violation that might be worthy of investigating?

10     A      Again, I'm not going to comment on what may or may not be worthy of

11     investigation.

12     Q      Okay.

13            I want to turn our attention to the October 7th meeting.

14            The October 7th meeting, of course, was described by Mr. Shapley as his red line,

15     as his red-line moment, that the experience he had in the October 7th meeting was so

16     shocking to him that he felt the only honorable thing he could do next would be to seek

17     avenues to so-called blow the whistle.

18            What do you remember about the October 7th meeting?

19     A      I remember that the meeting occurred in Delaware, in a conference room.

20     I recall the participants, some of whom I believe you have spoken to.    And I recall that,

21     in advance of the meeting, The Washington Post and I believe The Wall Street Journal --

22     Q      Uh-huh.

23     A      -- had published articles that discussed the investigation, the fact that the

24     U.S. Attorney in Delaware was sitting on charges that were available as of that summer,

25     and that the source of that information was someone close to the investigation; I don't

1    recall the particulars.

2           But I remember that happening, I believe, the day before the articles came out, so

3    I know that I addressed that up front with the participants in the meeting.    And I

4    discussed other things, including -- I mean, the purpose of the meeting was to discuss the

5    process and to share with IRS and FBI where we were in that process.

6           And I -- given that the leak had occurred, given that I knew I was going into this

7    meeting discussing what was clearly deliberative process, I was purposefully trying to be

8    cautious and limited in my description of that process, and I believe that I was.

9           But I described the fact that I had been in D.C., that I had -- I believe I referenced

10   the 515 authority that we have discussed today, that I sought it, and that I was now

11   proceeding down the same path in the Central District of California.

12          Q    Do you believe that any of the participants in the meeting were the source of

13   the leak?

14          A    I don't know who is the source of the leak.    And if I knew, I wouldn't discuss

15   it here.

16          Q    Okay.    But the individuals in the meeting -- let's just go over them.    Was

17   Ms. Holley there?

18          A    I don't want to get into the particulars, but I know Ms. Holley has been here

19   and has testified.    So --

20          Q    Right.

21          A    -- yes, Ryeshia Holley was there and Tom Sobocinski --

22          Q    Right.

23          A    -- from the FBI were there.

24          Q    And Gary Shapley was in attendance?

25          A    Gary Shapley was in attendance.

1        Q      And was Mr. Ziegler?

2        A      I don't recall Mr. Ziegler being there, no.

3        Q      Okay.

4               Now, as it comes to the criminal investigators, was there anyone else from IRS

5     present that you know?

6        A      The SAC was there.

7        Q      Okay.    Mr. Waldon?

8        A      Mr. Waldon.

9        Q      Okay.    Anybody else?

10       A      Anybody else from IRS?

11       Q      IRS or FBI.

12       A      No, not that I recall.

13       Q      And then -- so those individuals, if they are leaking to the press, I mean, that

14    is a high crime, right, for a criminal investigator?

15       A      It's a major problem, for anybody to be --

16       Q      Right.

17       A      -- leaking to the press --

18       Q      So --

19       A      -- that's affiliated with the case either directly or indirectly.    Absolutely --

20       Q      Right.

21       A      -- a major problem.

22       Q      So, I mean, if the FBI officials or the IRS officials were the source of this leak,

23    they would be in big trouble, wouldn't they?

24       A      If it can be proved, they would be in big trouble.

25       Q      And as far as we know, the TIGTA has been investigating this, correct?    Do

1        you know about TIGTA?

2                A        I know what TIGTA is --

3                Q        Yeah.

4                A        -- but I'm not going to speak to any investigative efforts by TIGTA or

5        otherwise.

6                Q        And why is that?

7                A        Because it's inappropriate for me to comment on that.

8                Q        Okay.     Has TIGTA interviewed you?

9                A        I'm not going to discuss that.

10               Q        Okay.

11               Are you aware -- Mr. Shapley has been blamed for this leak, and he has

12       strenuously objected, that he was not the source of this leak.     He has taken affirmative

13       measures to release the reporter from any confidentiality -- you know, source reporter

14       confidentiality agreement.     He's told the reporter that, if I'm your source, you are free to

15       disclose that.

16               Are you aware of that?

17               A        I'm not -- I don't know -- I don't recall it, but I'm not going to comment on it

18       either way.     I'm not going to --

19               Q        Okay.

20               A        -- I'm not going to assess --

21               Q        Do you think Mr. Shapley was the source?

22               A        I'm not going to comment on that either.

23               Q        Who else was in attendance for the October 7th meeting?

24               A        Folks from my office.

25               Q        Mr. Weede?

1      A      I'm not going to identify people who haven't appeared, for the reasons we

2   have discussed.

3      Q      Uh-huh.

4      A      I just don't want to disclose names of participants.

5      Q      Okay.    And Ms. Hanson?    That's our understanding of the -- were there

6   any other officials as part of that meeting?

7      A      Folks from my office and the people we've previously discussed.

8      Q      Okay.    Was Ms. Wolf there?

9      A      Ms. Wolf was not in attendance at the meeting.

10      Q      How come?

11      A      Because this was a leadership meeting.

12      Q      Gary Shapley was there.

13      A      He's in IRS leadership, as I understand it.    He was the ASAC, I believe.

14      Q      Okay.

15      A      That's my recollection of his title.

16      Q      So that counts as leadership?

17      A      He was a participant in the meeting.

18      Q      Okay.    Do you know who arranged the meeting?

19      A      My recollection is that Mr. Shapley sent me an email asking for a meeting to

20   get an update.    And I think that communication was followed up on by his SAC.

21      Q      Okay.

22      A      And I agreed to sit down with those guys and the FBI and to say what I could,

23   even though we were still engaged in the deliberative process --

24      Q      Uh-huh.

25      A      -- to say what I could about where things stood.

1    Q    Uh-huh.    And what do you remember about what you said during that

2    meeting?

3    A    I mean, I've described it in general terms, and I can't get into the particulars.

4    But, as to my authority, I recall describing the process in a very general, somewhat

5    cryptic way probably -- that it had taken place in D.C., that I had sought 515 authority, I

6    followed a process, and that now I was in the Central District of California --

7    Q    Uh-huh.

8    A    -- to see whether they would join us or participate in the prosecution moving

9    forward.    That's my best recollection.

10    Q    Okay.

11    We'll mark as exhibit 17 an email that Mr. Shapley sent to Mr. Batdorf, who is Mr.

12    Waldon's boss.

13                              [Weiss Exhibit No. 17

14                              Was marked for identification.]

15          BY MR. CASTOR:

16    Q    So he CC'ed Waldon, who was at the meeting.

17    Item 1 from -- this isn't the first time you've seen this, right?

18    A    I've seen this before.

19    Q    Okay.    Did you see it in conjunction with the whistleblower testimony

20    coming out, or did you see it back when it was written?

21    A    I don't remember seeing this when it was written, no.

22    Q    Okay.    So Mr. Waldon didn't forward this to you?

23    A    I'm not --

24    Q    To the best of your knowledge, obviously.

25    A    I recall seeing this after the whistleblower testified.

1  Q Okay.

2  So item number 1 on here is "Discussion about the agent leak," as you mentioned,

3 that the "DOJ IG will be notified," that "FBI headquarters is notified and they refer it to

4 their Counter Intelligence squad in a field office for investigation," and IRS CI indicated

5 that "we need to make a referral to TIGTA."

6  So is it fair to say that all the participants in the meeting were fairly enthusiastic

7 about pursuing the leak?

8  A Oh, I don't know about that. No, I'm not going to characterize whether

9 they were enthusiastic about pursuing a leak.

10  Q Uh-huh.

11  A I wanted to communicate that this was damn serious stuff --

12  Q Right.

13  A -- and that I was enthusiastic about putting a stop to it.

14  Q Okay. But the DOJ IG was notified. Did you ask them --

15  A I'm not going to get into particulars, but my office made the notifications

16 that were appropriate under the circumstances.

17  Q Okay. And then you asked IRS to make a referral to TIGTA?

18  A That's what I read here.

19  Q Okay. And do you remember if that happened?

20  A I don't re- -- I suspect that it did, but --

21  Q Okay.

22  A -- I don't have a specific recollection. But I would have no reason --

23  Q Okay.

24  A -- to question whether it did or not.

25  Chairman <u>Jordan.</u> But you did these; you did A, B, and C? This came from your

1    office?    You notified Horowitz, and then you worked with the FBI -- "headquarters is

2    notified and they refer it to their Counter Intelligence squad" -- you were the instigator of

3    all that?

4         Mr. Weiss.    I'm not saying that.    All I'm saying is that my office made the

5    appropriate notifications given what I had read, heard, and learned about a leak relevant

6    to our ongoing investigation.

7         Chairman Jordan.    And the "appropriate notifications," one of those would've

8    been to let the inspector general know at DOJ?

9         Mr. Weiss.    The notifications would be to let the responsible authorities, who

10   would be, you know, required to investigate --

11        Chairman Jordan.    Uh-huh.

12        Mr. Weiss.    -- such an allegation.

13        Chairman Jordan.    Okay.

14        Mr. Weiss.    Yes.

15             BY MR. CASTOR:

16   Q         Number 2 on this email:    "Weiss stated that he is not the deciding person

17   on whether charges are filed."

18        What's your reaction to that?

19   A         It's not what I said, nor is it what I believed, as I've told you guys repeatedly

20   today.

21   Q         What do you think you did say at that meeting that would give Gary Shapley

22   the -- and, subsequently, Shapley, I think, has released his, you know, contemporaneously

23   handwritten notes.    Because, you know, people are calling Gary Shapley a liar, and so

24   he's trying to defend himself.

25   A         I believe people have called me a liar.

1      Q      So I'm asking you what your -- I mean, what's your reaction?   Like, do you

2   think you may have said something that was interpreted -- misinterpreted?

3      A      Counsel, in all candor, I don't know.   That's possible.   It's possible

4   that -- as I said, I was trying to be careful.   I wasn't trying to be -- I was trying to be

5   careful in what I said.   Because I had a leak --

6      Q      Uh-huh.

7      A      -- that had just transpired, and I'm talking about deliberative process, which

8   is something unique to what prosecutors discuss.   We usually don't go through those

9   kinds of things with agents.   But, here, I thought it was appropriate to give them an

10   update.   So I would have generally described that process.

11      Q      Okay.

12      A      I don't know -- it certainly -- perhaps somebody misunderstood what I said in

13   that regard.

14      Q      Okay.

15      And then number 2 -- under 2(b), Mr. Shapley has notes about the process.   The

16   first is, "Needs DOJ Tax approval first - stated that DOJ Tax will give 'discretion' (We

17   explained what that means and why that is problematic)."

18      Does that sync with your memory of what you --

19      A      Not exactly.   I don't doubt that I mentioned DOJ Tax --

20      Q      Uh-huh.

21      A      -- and, you know, a general reference to the role and the process.

22      Q      Right.

23      A      Not that -- I don't recall saying anything about DOJ Tax approval being

24   required first --

25      Q      Okay.

1        A      -- second, third, or anything --

2        Q      Okay.

3        A      -- of that nature.

4        Q      But, as we've discussed, under the Justice Manual, DOJ Tax has to approve

5    felony charges, right?

6        A      DOJ Tax has approval -- is required to approve Title 26 charges.    Yes, we

7    have discussed that.    And I welcomed DOJ Tax's input in this case.    Never felt that I had

8    an issue in that regard.

9        Q      Right.    But whether you had Special Counsel authority or 515 authority, no

10   matter what kind of authority you had, you still had to have DOJ Tax's approval for tax

11   charges.

12       A      You're still consulting with DOJ Tax --

13       Q      Right.

14       A      -- absolutely.

15       Q      Okay.    So, when Mr. Shapley writes, "Needs DOJ Tax approval first," I mean,

16   that is consistent with the facts of life, correct?

17       A      I'm not -- look, I'm not challenging the DOJ Tax.    And I believe I would've

18   said, as I've said here today, I'm not operating in a vacuum.    There are processes here.

19   And others need to be involved.

20       Q      Right.

21       A      And DOJ Tax was performing its due diligence.    And I welcomed that.

22       Q      Okay.

23   I'm at the end of my hour, so I have to unfortunately stop.

24   [Recess.]

25       ██████.    All right.    It is 3:52.    We can go back on the record.

1              BY ███████ :

2      Q    Special Counsel Weiss, did you have any conversations with Attorney

3    General Barr about whether you should be appointed Special Counsel?

4      A    I had conversations with Attorney General Barr, and I don't want to get into

5    the content of those conversations, because they're with the AG.

6      Q    Okay.    But you did have conversations to that effect with Attorney General

7    Barr?

8      A    I had conversations with the Attorney General, yes.

9      Q    I want to introduce as exhibit 18 an NPR article entitled "Barr Says No Need

10   for Special Counsel for Hunter Biden Probe, Election Fraud Claims," dated December 21,

11   2020.

12                     [Weiss Exhibit No. 18

13                     Was marked for identification.]

14             BY ███████ :

15   Q    Have you seen this before?

16   A    I don't recall.

17   Q    Okay.

18      On the bottom of the second page of this article -- I'm just going to read it out

19   loud -- it says, "Some Republicans are pushing for the Justice Department to name a

20   Special Counsel to handle the probe, which would add an extra layer of protection from

21   potential political influence in a sensitive case involving the president-elect's son.    Asked

22   whether he agreed with the idea, Barr said no."

23      Quote, "'I think it's being handled responsibly and professionally currently within

24   the department, and to this point I have seen no reason to appoint a Special Counsel, and

25   I have no plan to do so before I leave,' he told reporters."

1          Did I read that correctly?

2     A     You did read it correctly.

3     Q     So it is accurate that Attorney General Barr did not see a reason to appoint a

4   Special Counsel in this case, correct?

5     A     According to what you read.    I don't know -- according to what you read,

6   that's correct.    Otherwise, I wouldn't comment on any aspect of that.

7     Q     And Attorney General Barr was an appointee of President Trump, correct?

8     A     I understand that -- that is correct.

9     Q     Okay.

10         Moving on, just a few quick questions about Alexander Mackler.    Did

11   Mr. Mackler play any role in this case?

12    A     He did not.

13    Q     Did he provide any input into this case?

14    A     He did not.

15    Q     To the best of your recollection, did he have any conversations with anybody

16   involved in this case?

17    A     I just don't -- I know nothing about any conversations he may have had with

18   anybody involved with this case.

19    Q     Based on your --

20    A     He had no conversations with me about this case.

21    Q     Okay.    And based on your interactions with Mr. Mackler as a former

22   employee of the Delaware U.S. Attorney's Office, do you have any reason to question

23   Mr. Mackler's integrity?

24    A     I do not.

25    Q     Do you have any reason to question Mr. Mackler's prosecutorial ethics?

1          A     I do not.

2          Q     Are you aware that Mr. Mackler was a -- or, actually, still is a member of the

3     Army JAG National Guard?

4          A     I am.    I believe he served in that capacity -- perhaps started in that capacity

5     as he left the U.S. Attorney's Office, if I recall.

6          Q     And so he actually was on Active Duty and away from the office throughout

7     2019, correct?

8          A     I don't know about throughout 2019, but my recollection is, the last several

9     months of his -- I think he was still on our rolls --

10         Q     Uh-huh.

11         A     -- but the last several months he was serving in the National Guard.    And

12    the Department makes provisions for that, or did in this circumstance.    I don't recall the

13    particulars.

14         Q     Okay.    Thank you.

15         All right.    We can go off the record.    Thank you.

16         [Recess.]

17         Mr. Castor.    We'll go back on the record.    It's 3:58.

18         Mrs. Spartz has some questions.

19         Mrs. Spartz.    Thank you so much.    Thank you for being here.    And I apologize if

20    I haven't been here all the time.    I tried to do my best.

21         But I just have a few clarifications.    I'm not an attorney in this committee, but

22    just trying to understand procedurally.    And then one question related to your

23    biography.

24         It looks like you worked at a financial services firm.    Can you state which one?

25         Mr. Weiss.    It was a firm called The Siegfried Group.

1          Mrs. Spartz.    Okay.    And what did you do, what kind of financial --

2          Mr. Weiss.    I am not a financial expert at all.    I actually helped the folks run the

3     business.    So --

4          Mrs. Spartz.    Okay.    So it wasn't -- okay.

5          Mr. Weiss.    -- it was in a business capacity.    I used to represent those folks as a

6     lawyer, and I got involved in the business.

7          Mrs. Spartz.    Okay.    Okay.

8          Well, talking about statute of limitations, you know, I'm just trying to understand,

9     you know, from -- and I am -- you know, I was a CPA and did public accounting, but I

10    didn't deal with taxes, but I understand the processes in taxes.

11         And it looks like, just to clarify -- so, based on, you know, that you have this memo

12    that I think earlier was exhibit 2 that was provided to you, regarding to IRS conclusions

13    and recommendations, which was stated that, you know, success (ph), you know,

14    prosecute targets for years '14, '15, '16, '17, '18, and '19.

15         So, just procedurally, so the statute of limitations for the '14 and '15 has expired;

16    is that correct?

17         Mr. Weiss.    Yeah.    I'm -- the statute of limitations for '14 and '15 has expired.

18         Mrs. Spartz.    Yes.    What about '16?

19         Mr. Weiss.    I'm not going to comment on anything --

20         Mrs. Spartz.    Well, I'm just talking from theoretical standpoint, like, just in

21    general, how the law works, not specifically for this case from this specific situation, you

22    know, like, if you did based on the law.    You know, I'm not talking about this situation,

23    what is it this time.    Because I'm not an attorney on this case.    But '16, would that be

24    expired by now too?

25         Mr. Weiss.    I'm not going to speak to -- I don't know the particulars about the

1      statute of limitations generally.    It would depend upon, I think, the given charges.

2              However, I am familiar with the statute of limitations as it pertains to potential

3      charges in this case, and that's not something I'm going to speak to.

4              Mrs. Spartz.    But with the general statute of limitations on tax, you know, fraud

5      and anything else, what is generally it is?    I mean, you don't know the law, but I'm just

6      trying to find out, because I don't familiar.    What is the statute of limitations?

7              Mr. Weiss.    I'm not a tax practitioner, but my understanding --

8              Mrs. Spartz.    But you're a prosecutor, right?

9              Mr. Weiss.    I am a prosecutor, yes.

10             Mrs. Spartz.    Yeah.    So you need to know that, right?

11             Mr. Weiss.    No, I don't need to know all the statute of limitations applicable to all

12     Federal offenses.    No, I don't know that that's required for me.    But to the best of my --

13             Mrs. Spartz.    But --

14             Mr. Weiss.    -- to the best of my recollection, I think in tax cases it's a 6-year

15     statute of limitations.    And I'm saying that's the best of my recollection.

16             Mrs. Spartz.    Okay.    So it's about 6 years.    So do you usually look at that and

17     have a sense of urgency when you investigate anything with statute of limitations, or do

18     you actually look at that as a prosecutor?

19             Mr. Weiss.    Prosecutors are aware of the statute of limitations.

20             Mrs. Spartz.    So you have a sense of urgency.

21             Mr. Weiss.    Prosecutors are aware of the statute of limitations as a general

22     matter, yes.

23             Mrs. Spartz.    So when did you start to investigate this?    In which year did you

24     start investigate this?

25             Mr. Weiss.    We -- I think I've discussed that we got a referral in 2019.

1        Mrs. <u>Spartz.</u>   2019.   So it took you several years to figure out until statute of

2    limitations.

3        Do you think you don't have enough resources?   Because I've been in this -- I

4    understand Tax Code.   It doesn't seem -- or you don't have enough resources to figure

5    out?   Why does the investigation take so long?

6        I mean, because it seems to be very simple.   You have a tax return.   People

7    report stuff.   This is not a complicated, convoluted scheme, you know, where people

8    doing some evaluations and try to do offshore things.   It's very simple.

9        You know, you either have things that -- if you don't have enough resources or you

10    don't have people that have enough knowledge?   It seems like that shouldn't be

11    complicated tax case taking 4 to 5 years to figure it out.   What is happening --

12        Mr. <u>Weiss.</u>   Yeah.   I mean --

13        Mrs. <u>Spartz.</u>   -- in the Department?

14        Mr. <u>Weiss.</u>   -- was that a question?

15        Mrs. <u>Spartz.</u>   Yeah, it's a question.   Why take --

16        Mr. <u>Weiss.</u>   I don't understand the question.

17        Mrs. <u>Spartz.</u>   The question is why it takes you 4 to 5 years to figure out -- until

18    you figure out what to do, when the tax statute of limitation expires on this case, to deal

19    with simple tax transaction.   Why is that?   Is it a lack of resources in Department?

20        Mr. <u>Weiss.</u>   Again, I'm not going to discuss the investigation.   Your question, no

21    matter how you phrase it, asks as to the particulars of the investigation, and I'm not going

22    to discuss it.

23        Mrs. <u>Spartz.</u>   Well, I'm not asking you.   I'm just saying, every case I've seen, it

24    takes the Department special prosecutor that I've seen years to figure out something that

25    I probably can do it within half an hour, I'll be honest with you.

1        So you don't have enough professionals?    Or -- this seems to me very strange, as

2   a professional.    I can claim myself being a CPA professional in that business.    I'm not

3   sure I understand what's happening there.    And that is my question.

4        So what do you believe you'll be able to complete in the current investigation?

5   Are you planning to do it urgently, or are you going to spend another 5 years?    What is

6   your -- like, do you have a sense of urgency when you deal with these cases at all?

7        Mr. Weiss.    Yeah, I'm not going to put a timeframe on it.    As I said previously in

8   response to counsel's questions, we plan to move as efficiently as possible.

9        Mrs. Spartz.    Okay.

10       What about when you have a designation -- so I think earlier there was a question

11   of Special Counsel versus anything else, like Special Attorney.    Is your accountability and

12   level of responses to Congress different, or is it exactly the same?    Is there any

13   procedural difference, in general, Special Counsel than anyone -- other, you know,

14   attorney in the Department of Justice?    Is it there is a different level of how you should

15   report to Congress?

16       It should be the same.    So the only differences would be on jurisdiction, on what

17   kind of reporting, but there is no formalities, what you have to be telling us.    Is there a

18   difference between that or not?

19       Mr. Weiss.    If I understand your question, no, I'm not aware of any difference.    I

20   am accountable for my actions and for the cases under my supervision whether I'm a

21   U.S. Attorney or whether I'm Special Counsel.

22       Mrs. Spartz.    So all your responses for us would not be any different, right?    So

23   you pretty much would not be able to say anything to us that you consider in the

24   investigation, doesn't matter how long, no matter in which capacity you work, either as

25   Special Attorney or Special Counsel?    There is no difference, right?    You would be

1    responding to us "no" on pretty much anything we ask you about an investigation.    Is

2    there a level differentiation?

3          Mr. Weiss.    No, there is no differentiation.    As I've said before, I've tried to

4    answer --

5          Mrs. Spartz.    Yeah.

6          Mr. Weiss.    -- the questions as best I could, particularly with respect to my

7    authority.    And it was my understanding that that was the primary purpose of my

8    appearance here today.

9          But I am unable to answer questions about ongoing litigation or the investigation,

10   yes.    I understand your frustration, but I'm unable to address that.

11         Mrs. Spartz.    No, I'm just trying to understand, because this is not just you; it's

12   every Special Counsel.

13         Mr. Weiss.    Yeah.

14         Mrs. Spartz.    I in my short time on this committee that has very slow

15   investigations, statute of limitation expires, and no one recalls anything by the time it's

16   done.

17         And I'm just trying to see procedurally -- you've been in this department for very

18   long.    I mean, if we'd be doing in business like that, as an attorney, you'd be out of

19   practice if you would do that.    You would go bankrupt.    But it seems that we continue

20   this.    And I'm just trying to figure out what is going on with the Department in general,

21   because this is a very -- you know, the story is always the same.

22         What is any consequences to the Department right now for, you understand, you

23   know, if you fail -- you know, you're talking about, you know, your duties and

24   having -- you know, which is important, you know, for the public and proper due

25   processes and rule of law -- if there is any generally consequences?    If you believe that

1   there is something you do it, it is not?    Is there any consequences or -- except, you

2   know, someone lets you go -- if there is any consequences in general.

3        How does the Department work if you do something to violate how the

4   prosecution happens or, like, any ethics or any other concerns?    How does it happen in

5   the Department?    Do you know the rules?

6        Mr. Weiss.    Congresswoman, if I understand your question, it is -- I think it is, if I

7   do something that is inappropriate or unethical --

8        Mrs. Spartz.    Ill intent.

9        Mr. Weiss.    -- are there -- ill intent -- are there consequences?    Absolutely, just

10   as with any other attorney practicing on behalf of or within the Department.

11        Mrs. Spartz.    So what is the consequences?

12        Mr. Weiss.    I'm not --

13        Mrs. Spartz.    No, what is the -- like, what is the process for that, if somebody -- or

14   if somebody under you would do something like that, what is the processes for that?

15        Mr. Weiss.    It depends what's done.    And I'm not going to explore all kinds of

16   scenarios.    But, you know, we are responsible to act professionally and to abide by rules

17   of conduct.

18        Mrs. Spartz.    But are there internal processes or they're external?    Is

19   Department of Justice can only --

20        Mr. Weiss.    It depends what a prosecutor's actions are, with respect to what

21   consequences derive from that conduct.    I can't -- there are any number of things that

22   could happen that could lead to problems for a prosecutor.    We have responsibilities to

23   act in a certain way.

24        Mrs. Spartz.    What is the incentive for you -- or what is internal incentive for you

25   to have a completion of the cases?    Do you have internal incentives at Department once

1    you have productivity?    Do you have internal incentives to actually do things fast, or you

2    don't generally?

3          Mr. Weiss.    You have incentives -- all prosecutors have incentives.    I certainly

4    have an incentive to prosecute this case as best I can.    I know, am very much aware, that

5    people are watching this case.    We're having a discussion about the case today.    I'm

6    mindful of that.

7          So I am trying to perform my responsibilities as best I can and fulfill those

8    responsibilities to follow the facts and the law.    That's the best I can do.

9          Mrs. Spartz.    But if you would have something that -- not collaboration internal

10   to the Department, who would you address it with?    Would you come to Congress?

11   And how would you address it, if you believe there is no collaboration internally and you

12   don't -- what is the process for you to -- would you let us know?    Or who would you

13   know?

14         Mr. Weiss.    I would -- if I wasn't satisfied with something -- this is a hypothetical,

15   so I shouldn't speculate, but I would stay within the Department and try to resolve it

16   there.

17         Mrs. Spartz.    So generally it's internal.    You generally don't come externally to

18   Congress or anything.    This is internal.

19         Mr. Weiss.    I would expect to get it resolved in Congress -- I'm sorry, not in

20   Congress.    I would expect to get it resolved within the Department.    Everyone in the

21   Department knows that, in my current capacity, I'm going to prepare a report at the end

22   of the day, and I'm going to describe what I've experienced along the way.

23         Mrs. Spartz.    Okay.    Just one last question.

24         Mr. Weiss.    Sure.

25         Mrs. Spartz.    So, generally, you know, theoretically, if we look at some of this

1       stuff, you know, when Vice President Biden was in office, which was '14, '15, and '16,

2       theoretically it would be that all of the years could be potentially -- two of them for sure

3       are statute of limitations -- theoretically all of the years would be statute of limitations,

4       unless something else happened would expire statute of limitations, all of the years with

5       what happened with Hunter, with his situation, with Burisma and any other transaction

6       during the time of the Vice President was in office.

7              Is that correct, based on -- assessment?

8              Mr. Weiss.   I don't -- I'm not drawing a connection between charges in this case

9       versus the now-President's status as a Vice President.    Our responsibility is to make

10      decisions based on the evidence before us.    And that's what we've done in this case.

11             Mrs. Spartz.   Okay.   Thank you.

12             Mr. Weiss.   Sure.   Thank you.

13                     BY MR. CASTOR:

14      Q       I just have one more question on Mr. Mackler.    Just to clarify, when was

15      the last time you spoke to him?    I know you said you didn't speak about this case, but --

16      A       I don't know.   I don't know.   I can't recall.

17      Q       Was it when he was with your office, or was it after?

18      A       No, no.   I've spoken to him since he's left my office, which I think we

19      established was in 2019, so --

20      Q       Okay.

21      A       I just -- I don't know.

22      Q       Okay.

23      A       Don't recall it.

24      Q       Certainly wasn't about this case?

25      A       No.   I never discussed this case with him that I can recall.   No.

1        Q    I'll go back to exhibit 12 -- I'm sorry.    Mrs. Spartz was discussing exhibit 12.

2    Exhibit 17.

3        You had the right one, I think.

4        A    This one?

5        Q    It says exhibit 10 on the bottom, but that's from a different proceeding.

6        A    Yeah.    Sorry.

7        Q    Where we last left off was on the first page, 2(b)(i), "Needs DOJ Tax approval

8    first."    And then I think that's where we concluded our discussion.

9        So the next item on that page is "No venue."    This is 2(b)(ii).    "No venue in

10    Delaware has been known since at least June 2021."

11        Do you recall if that was discussed, venue in Delaware wasn't an option?

12        A    I don't recall if it was discussed.    But I discussed the fact that I had pursued

13    the process in D.C. and in L.A.

14        Q    Okay.    Obviously, if you could've pursued it in Delaware, that would've

15    been your first choice, certainly, right?

16        A    Again, I discussed that we were, you know, in D.C. and that -- or we had

17    been in D.C. and, at this time, we were in the Central District of California.

18        Q    Okay.

19        (iii):    "Went to D.C. U.S. Attorney in early summer."

20        Of course, we know that that was in March, correct, when you went to --

21        A    That's correct.

22        Q    -- Mr. Graves?

23        A    That's correct.

24        Q    "-- to request to charge there."    The U.S. Attorney "said they could not

25    charge in his district."

1        And then (1) underneath that was, "Weiss requested Special Counsel authority

2    when it was sent to D.C. and Main DOJ denied his request and told him to follow the

3    process."

4        And the way Shapley, you know, records this in his notes, it seems similar to the

5    way you described your interactions with Main Justice, in that you told us that you asked

6    for 515 authority -- that is, Special Counsel authority -- and that Main Justice -- I mean,

7    Shapley writes "denied his request," and you said that your request was never denied,

8    but Main Justice did tell you to follow the process, correct?

9        A    I described that I had a conversation with Main Justice about following the

10    process.   No one ever said -- no one ever denied --

11        Q    Right.

12        A    -- my authority.   And I didn't request Special Counsel authority.   I

13    requested what I characterized as 515 authority --

14        Q    Right.

15        A    -- and what we agreed was Special Attorney authority.

16        And I would also take issue with, I think, what's under, if I can read it correctly,

17    (iii):   "Went to D.C. USAO in early summer to request to charge there -- Biden appointed

18    USA said they could not charge in his district."

19        As I've said on several occasions, I wasn't asking the Biden-appointed U.S.

20    Attorney in D.C. whether I could or could not charge in his district.   I didn't present that

21    question for his consideration.

22        Q    But these notes were prepared from the meeting.   Is it possible

23    Mr. Shapley misunderstood what you were -- you were obviously, during the course of

24    this meeting, you were walking through some of these issues, correct?   And he's making

25    notes about it?

1      A    I can't speak to what Mr. Shapley -- clearly, he was -- "clearly" -- I suspect he

2    was taking notes.   I don't know.   I don't know why the notes came about this way.

3    But if he misheard or misunderstood something, the fact that he reduced it to notes

4    doesn't change the misunderstanding or --

5      Q    Right.

6      A    -- whether he misheard it.   I know what I believe to be the case and what I

7    believe I said, you know, in that regard.

8      Chairman <u>Jordan.</u>   Well, he got it exactly right in 2(b)(iii)(1), the next sentence

9    down, other than the term "counsel" versus "attorney":   "USA Weiss requested Special

10    counsel authority when it was sent to D.C. and Main DOJ denied his request and told him

11    to follow the process."

12      That's exactly what you told us earlier, other than the word "denied."   They

13    didn't grant your request.   So it seems to me he got it exactly right there.

14      Mr. <u>Weiss.</u>   Well, "denied" is a key word in that phrase.   It wasn't -- it wasn't

15    denied.   I --

16      Chairman <u>Jordan.</u>   But it wasn't granted, right?

17      Mr. <u>Weiss.</u>   Yes.   We have been over this.   It wasn't granted.   They said,

18    follow the process.   I followed the process.   And in completing the process --

19      Chairman <u>Jordan.</u>   But, Mr. Weiss, when you ask for something and they don't

20    give it to you, what is that?

21      Mr. <u>Weiss.</u>   I asked for something, and in that conversation they didn't give it to

22    me, but at the --

23      Chairman <u>Jordan.</u>   All right.   It's a simple question.

24      Mr. <u>Weiss.</u>   -- at the conclusion --

25      Chairman <u>Jordan.</u>   When you ask for something and they didn't give it to you,

1   what is that?

2          Mr. Weiss.   I'm not -- you want me to say it's a denial, but it's not.   Not when I

3   know that, weeks later, I was specifically told, "You can proceed."   So it's the same

4   question, it's the same request --

5          Chairman Jordan.   Maybe weeks later, but at that point what is it?

6          Mr. Weiss.   It's, "Proceed, with this process.   We're asking you to go through

7   this process."   From my mind, it's a sequencing event.   It's not a denial in any way,

8   shape, or form.   That's the way I interpreted it.

9          Chairman Jordan.   Okay.

10                 BY MR. CASTOR:

11      Q     Flipping over the page to (iv):   "Mid-September they sent the case to

12   central district of California -- coinciding with the confirmation of the new biden

13   appointed USA -- decision is still pending."

14         And that's pretty much an accurate assessment, right?

15      A     Inaccurate?   Or accurate?

16      Q     Accurate.

17      A     No.   I didn't bring this -- as we discussed, I didn't bring this about in

18   mid-September.   I contacted the U.S. Attorney's Office in mid-August.

19      Q     Right.   But --

20      A     It had nothing to do with coinciding with the appointment of a new Biden

21   appointee.

22      Q     But your first communication with the U.S. Attorney out there, with Estrada,

23   was right after he was confirmed, correct?

24      A     No.   My understanding -- and I didn't track the dates -- was that he was

25   confirmed sometime in the month of September, mid-September.   My first

1    communication with him was in mid-October.

2         Q    Okay.

3         "If California doesn't" -- this is (v):    "If California does not support charging USA

4    Weiss has no authority to charge in California."

5         Is that something that was discussed at the October 7th meeting?

6         A    No.    I would not have said that.    It's not what I believed; it's not what I

7    said.

8         Q    "He would have to request permission to bring charges in California from the

9    Deputy Attorney General/Attorney General."

10        Isn't that -- I mean, if Estrada said, no, I don't want to partner, I don't want to

11   co-counsel, whatever the word is, then you go and request 515 authority, correct?

12        A    That's consistent with the process I've described --

13        Q    Right.

14        A    -- in most respects in D.C.    But by this point in time, as we have discussed, I

15   had been through the process, I knew that the ultimate decision was, you can proceed in

16   D.C. and pursue charges.    So I wasn't asking here.

17        Then the question at the conclusion of this process was simply deciding the

18   merits.

19        Q    This meeting happened, like, right around the same time that you were

20   engaging with Mr. Estrada, correct?

21        A    I engaged with Mr. Estrada after this conversation.

22        Q    Okay.    So, as of the October 7th meeting, you didn't have a final

23   determination from his office about whether they wanted to --

24        A    As best I recall, I did not have a final determination.

25        Q    Okay.

1          A      I had not had that conversation with the U.S. Attorney.

2          Q      But if they had said no, as it turns out they did, then your next move is to get

3    Special Counsel authority or 515 authority, whichever, if you're going to prosecute in the

4    Central District of California?

5          A      As I think I mentioned, as it was in my mind, that issue had been resolved.

6    So my next move is to decide, okay, is this case moving forward?    We've gotten

7    feedback from D.C.    Now we've gotten feedback from L.A.    We're deciding the case;

8    we're going to decide --

9          Q      Right.

10         A      -- how to proceed in the case.    It's not asking for permission or resolving

11   any questions about whether I have authority to proceed.

12         Q      Okay.

13         Then, 3:    "They are not going to charge 2014/2015 tax years."

14         By this point in time of October of 2022 -- I mean, I believe the statute lapsed in

15   September.    So, by this meeting, the statute had lapsed for the 2014 and 2015 tax

16   years?

17         A      Yeah, I'm not going to discuss the statute, when it lapsed, or the

18   circumstances surrounding that.    Nor am I going to discuss any conversations I had with

19   them about 2014.

20         Q      Okay.

21         A      I'll discuss authority, but I'm just not going to go beyond that.

22         Q      But, I mean, it's my understanding that, you know, part of your -- I mean, we

23   didn't agree to a scope, because we obviously have questions --

24         A      I understand.

25         Q      -- that you're not willing to answer.

1       A     I understand the committee has questions well beyond that, but -- and I

2    hope at the appropriate time I'll be able to answer them.

3       Q     But I did think -- pardon me for suggesting this, but I did think that the

4    content of the October 7th meeting was all fair game.

5       A     The content of the October 7 meeting as it pertains to authority is certainly

6    fair game.   And I've tried to --

7       Q     But --

8       A     I've tried to discuss other aspects that I think inform the authority issue.

9    But that's the extent of what --

10      Q     Okay.

11      A     -- of the scope of what I'm authorized to discuss.

12      Q     Okay.    So can you confirm that the decision not to charge 2014 and 2015

13   was discussed at that meeting?

14      A     I can't get into -- I can't get into the merits of that discussion.    I can't get

15   into that discussion.

16      Q     Okay.    You don't have any reason to believe that Shapley is lying, correct?

17      A     I don't -- I can't speak to Mr. Shapley.    I'm not saying anything about

18   whether he's lying.    I'm not suggesting that he's lying.    I don't know the basis for his

19   statements or what he's committed to his notes.

20      Q     Okay.

21            Do you remember Mr. Shapley stating that he did not concur with the decision to

22   not charge 2014 and 2015, as he writes in his notes here?

23      A     Again, if I commented on that, it would speak to the decision itself, which I'm

24   not going to discuss.

25            I remember Mr. Shapley's body language at the meeting at various times.    I do

1   remember that.

2       Q     Okay.    But do you remember him asserting, stating for the record that he

3   didn't concur with any particular decision?

4       A     It's not something I'm going to discuss, because it would necessarily go

5   into -- be it a reaction to something I said about the merits of the case or the

6   investigation, and I just can't get into that at this point in time.

7       Q     Okay.

8       And Special Agent Holley, the assistant special agent in charge, she testified, too,

9   that she remembers Burisma being discussed, the fact that if you don't charge 2014 and

10  2015, that all the Burisma income is tax-free.

11      Do you remember that being discussed?

12      A     I'm not going to discuss the case, the investigation, or those kinds of details.

13      Q     Okay.    Did you have any concerns that, if you didn't charge 2014 and 2015,

14  all the Burisma income just goes tax-free?

15      A     Again, I'm not going to discuss the case, the investigation, or those

16  particulars.    I understand the question, and I appreciate why you ask the question.

17      Q     Okay.    So you could understand why members, our members at least, are

18  concerned about that issue, about the 2014 and 2015, specifically the Burisma years, you

19  know, that Hunter Biden is getting off scot-free here.

20      A     Yeah, I understand why you're asking the questions on behalf of the

21  committee.    And it's certainly something that I would intend to address and would plan

22  to address in the Special Counsel report.

23      Q     Okay.

24      Number 5 on this document states that "no major investigative actions remain."

25      Is that something you remember being discussed at the October 7th meeting?

1          A      Again, I'm not going to talk about investigative actions --

2          Q      Okay.

3          A      -- or what had been done and what remained at that time.

4          Q      Right.

5          And when Shapley testified in May of 2023 to the committees -- or he testified

6    before the Ways and Means Committee, he told us that nothing had happened, you

7    know, that there weren't any -- and, by that time, he didn't know he'd been removed

8    from the case.    He stated in May of 2023 that no investigative actions had occurred on

9    the Hunter Biden case.

10         So that is consistent with number 5 here, that "no major investigative actions

11   remain."    Is that something you can concur with?

12         A      No, it's not something I can comment on as of today.    It's something I hope

13   to be able to comment on in the report.

14         Q      Okay.

15         Do you remember that meeting -- and this relates to 6(c).    Do you remember the

16   meeting as being contentious?

17         A      There, you mean his reference to "communication issues" or "update

18   issues," that these issues were surprisingly contentious?

19         Q      Well, the way I interpret number 6 -- and this is informed, obviously, by

20   Mr. Shapley's testimony -- that, at the end of the meeting, IRS -- and "us" meaning the

21   IRS -- and the FBI brought up some general issues, and they included communication

22   issues, update issues, which, as we understand them, are sort of -- you know, you can

23   conflate those.    But (c), his observation that these were "surprisingly contentious."

24         A      Yeah.    I can't -- I don't know that I'm going to characterize whether these

25   issues were surprisingly contentious.    I remember -- I do recall communication issues

1      and updates from this point forward coming up.

2          Q      Okay.

3          A      I remember Mr. Shapley talking about communications from this point

4      forward.

5          Q      Uh-huh.

6          A      And I'm at a meeting where, the day before, The Post and The Wall Street

7      Journal reported leaks that were purported to be coming from someone close to my

8      investigation and, I think, mentioned an agent.    So I was unwilling to make any

9      commitments --

10         Q      Okay.

11         A      -- about further communication.    I wanted to better understand, to the

12     extent possible, what had transpired, rather than making commitments to how

13     frequently --

14         Q      Uh-huh.

15         A      -- I was going to meet with Mr. Shapley or anybody else associated with the

16     team at that particular time.

17         Q      Okay.    So it sounds like it was contentious.

18         A      You know, I'm just saying I was very sensitive to the issue and I was --

19         Q      Right.

20         A      -- concerned about the issue, because I am concerned about the

21     investigation --

22         Q      Right.

23         A      -- and trying to preserve the integrity of the investigation moving forward.

24         Q      Right.

25                And just so you know, from our perspective -- and I think I mentioned this

1    earlier -- you know, we're sensitive to any allegation that Mr. Shapley was the leaker for

2    the story, because he has denied that he's done it.    And, you know, if you're an IRS

3    agent or FBI agent and you leak to a reporter, I mean, that is a high crime.    I mean, you

4    would lose your job.    I mean, the stakes are super-high.

5         So, to the extent -- you know, I hope we can establish that, you know, there's no

6    evidence, there's zero evidence that Mr. Shapley was involved with any leaks.

7         A    I can't comment on that.    I don't pretend to be familiar with the evidence --

8         Q    Right.    But you don't have any evidence that Mr. Shapley was involved

9    with --

10         A    I'm not going to say anything about that.

11         Chairman Jordan.    When did you learn that Mr. Shapley and Mr. Ziegler were

12    coming to Congress under whistleblower status?    And how did you learn that?

13         Mr. Weiss.    I think -- I don't know whether I heard it in news media or from

14    somebody with the Department.    But I think it was in, I don't know, somewhere around

15    April, that it cropped up in April of 2023 --

16         Chairman Jordan.    Right.

17         Mr. Weiss.    -- something of that nature.

18         Chairman Jordan.    Right.

19         Mr. Weiss.    I didn't know any of the particulars at that time.    I don't think I

20    learned them until I saw the testimony.

21         Chairman Jordan.    Who was the somebody from the Department who told you

22    that, if it wasn't the press?

23         Mr. Weiss.    I don't know.

24         Chairman Jordan.    You said it was one or the other.

25         Mr. Weiss.    If it was somebody from the Department, it would've been

1      Mr. Weinsheimer.

1    [4:27 p.m.]

2        Chairman Jordan.    Do you remember if he called you or emailed you or what?

3        Mr. Weiss.    I don't recall.    I believe I was on -- I was on what was supposed to

4    be a vacation at the time.

5        Chairman Jordan.    When you go to another U.S. Attorney and ask them to

6    partner, what are you asking them to partner on?

7        Mr. Weiss.    I'm asking them to -- to decide whether they're willing to be part of

8    the investigation, whether they're willing to assign someone to be co-counsel in the

9    investigation.

10       Chairman Jordan.    Is it -- are you asking them to partner on investigation only

11   and/or prosecution?

12       Mr. Weiss.    To the extent there were further investigative steps, they wouldn't

13   be precluded, but I was primarily focused on -- I mean, in my mind, prosecution piece of

14   the investigation.

15       Chairman Jordan.    So you were ready to prosecute, you wanted to prosecute in

16   D.C.    When you all go to Mr. Graves and you go to him and ask him to partner, you're

17   actually asking him to partner not so much on the investigation but on the decision that

18   you've already made in your mind to prosecute in that venue?

19       Mr. Weiss.    No.    No decision had been made at that point in time, but we -- this

20   is where we wanted to proceed.    There were still -- still things that had to happen, but I

21   was thinking -- and I knew what resources we had available to us, so the discussion, in my

22   mind, with Mr. Graves is more -- when I'm asking about partnering, at least in my mind,

23   I'm thinking more about his office.

24       Chairman Jordan.    Well, I'll go back to the original question.    What are you

25   asking him to partner on?

1          Mr. <u>Weiss.</u>   I'm asking whether they want to be --

2          Chairman <u>Jordan.</u>   Partner on the prosecution?

3          Mr. <u>Weiss.</u> -- they want to be part of the case, and in my mind, I'm thinking more

4   about from an attorney standpoint, whether -- whether --

5          Chairman <u>Jordan.</u>   Part of the case, to do what, to prosecute?

6          Mr. <u>Weiss.</u>   Prosecutors, they're -- prosecutors perform both, you know,

7   prosecutorial aspects of their job and investigatory aspects of their job, depending upon

8   what they're doing.

9          Chairman <u>Jordan.</u>   Okay.   Because I just want to be clear, because you said you

10   were primarily -- I thought you said earlier, you were primarily asking -- when you went to

11   ask him to partner, you were asking them to partner on prosecuting the case?

12          Mr. <u>Weiss.</u>   I was asking him to join in the prosecution of the case, whether they

13   wanted to be part of it.

14          Chairman <u>Jordan.</u>   Got it.

15          Mr. <u>Castor.</u>   Did you need them?   Did you need their help?

16          Mr. <u>Weiss.</u>   No.   Well, did I need them -- as I said, we were prepared to

17   proceed.   We were prepared to go forward if they chose not to participate.

18          Mr. <u>Castor.</u>   But did you need extra bodies?

19          Mr. <u>Weiss.</u>   I wouldn't -- I'm not going to talk about whether I needed more

20   resources or the particulars of those kinds of things.

21          Chairman <u>Jordan.</u>   But you would only ask them to partner on prosecuting the

22   case if you felt that the case needed to be prosecuted, fair?

23          Mr. <u>Weiss.</u>   I would only ask them to partner in the case if I was contemplating

24   prosecution in that jurisdiction, if that was part of the consideration.   That's the only

25   reason it would be asked.   Not that a decision had been made, just that it was being

1    considered.

2        Chairman Jordan.    Well, that sort of brings us back to where we were, I guess,

3    earlier today.    So you're asking Mr. Graves and the D.C. U.S. Attorney to partner with

4    you on the prosecution of the case.    They declined.

5        Why didn't you then request 515 status so you could prosecute the case in D.C.?

6        Mr. Weiss.    Again, because we -- there was still -- can't get into something that

7    would go into deliberative process, case discussions, and things of that nature.    But

8    the --

9        Chairman Jordan.    But did the discussion with Mr. Graves cause you to change

10    your mind on what you initially asked him to partner with you on?

11        Mr. Weiss.    My discussion with Mr. Graves did not change my mind in any

12    respect, no.

13        Chairman Jordan.    That's amazing.    Okay.

14        Mr. Castor.    Both Mr. Graves and Mr. Estrada testified that your request to

15    partner on the case was a difficult -- was difficult for them because they felt they were

16    stretched too thin.    Did they communicate that to you?

17        Mr. Weiss.    I'm not going to get into the specifics of the discussion.

18            BY MR. CASTOR:

19        Q    Mr. Estrada said that he was dealing with -- and he really went into how

20    they've got just a terrible fentanyl problem, and they've got just -- they're overrun with

21    problems relating to the border.

22        And he talked about how they don't have enough attorneys in his office to handle

23    their own business, and so, he indicated to us the idea that he would be able to lend his

24    limited personnel -- he also said he's got a gigantic office, but, you know, his limited

25    resources to you was a real issue.    Did he let you know about that?

1          A      I'm not going to talk about the particulars of what he discussed in that

2     regard.

3          Chairman Jordan.    But you didn't ask for additional help, said when you went to

4     Mr. Graves you weren't looking for people to help.    You were just looking for him to

5     partner with the prosecution.    You weren't actually asking him to give you attorneys to

6     help with the investigation.

7          Mr. Weiss.    We were -- we were giving him the opportunity to join in the

8     investigation.    If we decided to proceed in D.C., we would've proceeded with or without

9     assistance from Mr. Graves.

10               BY MR. CASTOR:

11         Q      Did it surprise you that two Biden appointees didn't want to participate in a

12     case to prosecute the son of the President?

13         A      I understand the question.    I'm just not going to comment on whether I was

14     or was not surprised.

15         Mr. Castor.    Okay.

16         Go off the record briefly.

17         [Discussion off the record.]

18               BY MR. CASTOR:

19         Q      We'll go back on the record?

20         It's our understanding you filed a statement of interest on behalf of DOJ in a

21     patent infringement suit between Moderna and Arbutus relating to a COVID vaccine.

22     Does this ring any bells for you?

23         A      No.    I can't -- I can't speak to it.    I'm sorry.

24         Q      Okay.    To the extent your office would file a statement of interest in a

25     matter such as this, what would be the process?    Would you have communications with

1    Main Justice, or would you handle that without the --

2           Mr. Ivey.   Could I ask though, the statement of interest that was filed by the

3    U.S. Attorney's Office in Delaware?

4           Mr. Castor.   Yes.

5           Mr. Ivey.   Okay.   And the case then is related to what we're investigating in

6    some way or something totally different?

7           Chairman Jordan.   Totally different.   Let's go off the record.

8           Mr. Castor.   This is -- we'll go off the record for a second.

9           [Discussion off the record.]

10          Mr. Ivey.   Let's go back on the record.

11          Mr. Castor.   Okay.

12                 BY MR. CASTOR:

13          Q    So when your office files a statement of interest, is it customary that

14   Main Justice be involved in that process?

15          A    Again, I can't speak to the usual pattern when my office files a statement of

16   interest and the participation of DOJ and the component.   It's so dependent upon the

17   particular circumstances, and because I'm not familiar with the circumstances here, I'm

18   just unable to intelligently comment on the matter.

19          Q    Okay.   Fair enough.

20          Does the name Brian Boynton ring any bells?   He's a Principal Deputy Associate

21   Attorney General in the Civil Division.

22          A    It does not.

23          Q    Okay.   So as you sit here today, you're not -- you don't have any

24   recollection of filing a statement of interest with this Moderna vaccine issue?

25          A    Yeah, and, Counsel, I'm not saying we didn't or we did.   I just don't -- I just

1    don't have a recollection.

2         Q      Okay.    Fair enough.    All right.

3         Mr. <u>Ivey.</u>    Could I -- I just want to --

4         Mr. <u>Castor.</u>    You want me to go off the record, or you want to put this on the

5    record?

6         Mr. <u>Ivey.</u>    No, I want this to be on the record.

7         Mr. <u>Castor.</u>    All right.

8         ███████.    And then I actually have, like, maybe three questions.

9         Mr. <u>Ivey.</u>    Oh, well, go ahead.

10        ███████.    Yeah.

11        Mr. <u>Ivey.</u>    Go ahead.

12        ███████.    Can you hear me if I stay here?

13        Mr. <u>Castor.</u>    Yes.

14        ███████.    Okay.

15        Mr. <u>Castor.</u>    So we're starting a whole new -- we're starting a new round?

16        ███████.    It's almost five o'clock.    I don't think we're --

17        Mr. <u>Ivey.</u>    No.    Another hour, though, right?

18        Mr. <u>Castor.</u>    All right.    We're going to --

19        Mr. <u>Ivey.</u>    Last round, but --

20        ████████.    I'm not going to be constrained.

21        Mr. <u>Ivey.</u>    All right.

22        Mr. <u>Castor.</u>    We're going to go back on the record.

23        ███████.    We'll go back on the record.

24        Mr. <u>Castor.</u>    It's 4:38.

25        ███████?

1                    ██████.   Did you want to make a statement first?

2         Mr. Ivey.   No, go ahead.

3                    ██████.   Okay.

4                    BY ████████:

5         Q     I want to turn back to exhibit 10 -- or I'm sorry, it's exhibit 17 -- it's the back

6    of exhibit 10, yeah -- the reference to communication issues, it's 6A on page 2.

7              Is it fair to say that communication can often be a challenge when you're pursuing

8    a case?

9         A     You know, I'm -- sorry, I'm stumbling right now.

10        Q     Let me rephrase it differently.

11        A     Perhaps it can be a challenge.    It's important -- it's incredibly important that

12   you have open communication.    At least I believe it's important to a successful

13   prosecution, especially in a long-term case.    People have a lot invested in the case,

14   so -- so I think it's an important part of partnering with agencies and with co-counsel.

15        Q     And in this particular case, you had prosecutors and investigators who were

16   situated in different offices -- different physical offices, correct?

17        A     That's correct.

18        Q     And that can potentially make communication challenging as well?

19        A     That can -- that can complicate things, but again, it's still important, yeah.

20        Q     And you said you had a number of meetings -- you said this, I think, much

21   earlier today -- you had a number of meetings with supervisors and with various

22   members of the team, and that was an effort to make sure that they were heard and that

23   they were hearing from you, correct?

24        A     I did -- I did speak to that, yes.

25        Q     Okay.    And that's an attempt to address communication, correct, to

1     improve communication?

2          A     I was certainly interested in, yes, maintaining communications.

3          Q     You said that you recall Mr. Shapley's body language during this meeting.

4     Can you describe what Mr. Shapley's body language was?

5          A     I don't know that I could describe the particulars, but I knew at various

6     points in time, based on the nature of Mr. Shapley's reaction, that I suspected he wasn't

7     happy with something I was saying.    Whatever that might've been -- and I don't recall

8     what it was in reaction to, but I do recall times in which he wasn't pleased with whatever

9     it was that was coming out of my mouth.

10          Mr. Ivey.   Mr. Weiss, I wanted to thank you for coming and testifying today, and I

11     know it's been a long, difficult day.   I appreciated your statement at the beginning

12     where you reference that this was unprecedented and that -- because you're in the

13     middle of a prosecution, and you did reference not only at the beginning, but over

14     multiple occasions, that you're going to produce a report.

15          And I just wanted to flag for the chairman and the committee that this is exactly

16     why I objected to him being brought in previously or that -- the committee doing

17     investigations in the middle of prosecutions like this.

18          So I'm a little concerned that what's going to happen at the hearing is, statements

19     will be made that he wasn't answering questions or he was being evasive or anything like

20     that.   The only reason he's here is because we required him to come in.   And because,

21     as he pointed out, he's in the middle of an investigation, there's a lot of stuff he can't

22     answer.

23          So hopefully when we get to the hearing, nobody will be making allegations like

24     that directly.

25          Chairman Jordan.   Well, he's here voluntarily, and DOJ offered to have him to

1    come in to talk to us about the three different letters that we -- that was the focus of

2    our -- the primary focus of our asking questions.

3         Obviously, we think things flow from that, and that's why Mr. Castor and others

4    asked the questions we did, and Mr. Weiss made the determination not to answer most

5    of those.

6         Mr. <u>Ivey.</u>   Well, I think he was right not to answer them.   I think he's sort of

7    stuck in the --

8         Chairman <u>Jordan.</u>   I'm just saying, DOJ offered to have him come talk to us

9    because of the various letters were sent this summer --

10        Mr. <u>Castor.</u>   Yeah.

11        Chairman <u>Jordan.</u>   -- and the concern about the different positions that the

12   letters seem to indicate that the Department was taking.

13        Mr. <u>Castor.</u>   In July, DOJ offered a number of dates, I think four dates, two in

14   September, two in October.   We were working with the Department, you know, for that.

15   So this was not a voluntary transcribed interview that was conducted under the threat of

16   subpoena or anything.   It was -- it was voluntary.

17        Mr. <u>Ivey.</u>   I appreciate that.   I don't think we should be doing these for the

18   reasons I stated, but fair enough.

19        Chairman <u>Jordan.</u>   You can take that up with the Attorney General.

20        Mr. <u>Ivey.</u>   Will do.

21        ████.   We can go off the record.

22        Ms. <u>Nabity.</u>   We're off the record.

23        [Whereupon, at 4:41 p.m., the interview was concluded.]

1                               Certificate of Deponent/Interviewee

2

3

4           I have read the foregoing _____ pages, which contain the correct transcript of the

5      answers made by me to the questions therein recorded.

6

7

8

9                                    _____

10                                          Witness Name

11

12

13                                   _____

14                                              Date

15

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

*Defendants*.

Case No. 1:24-cv-815

# Exhibit T



**U.S. Department of Justice**

Office of Legislative Affairs

---

*Office of the Assistant Attorney General*                    *Washington, DC 20530*

The Honorable Jim Jordan
Chairman
Committee on Judiciary
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Jordan:

This responds to your letter of June 29, 2023, to the Department of Justice (Department) expressing interest in an individual ongoing criminal investigation and prosecution conducted by David Weiss, the U.S. Attorney for the District of Delaware. U.S. Attorney Weiss has consistently made clear in his letters to the House Judiciary Committee (Committee) and Members of Congress that he has ultimate authority over the matter, including the authority to bring a case in any jurisdiction, consistent with federal law, the Principles of Federal Prosecution, and Department regulations. U.S. Attorney Weiss said he welcomes the opportunity to meet with the Committee at an appropriate time, consistent with the law and Department policy. The Department, with this letter, affirms that commitment. The Office of Legislative Affairs will reach out to your staff tomorrow to discuss the appropriate timeline and scope of such an appearance.

### *Interest in an individual ongoing criminal investigation*

The Department respects and gives due weight to your interest in this matter, and we can provide the following information at this time. Your letter refers generally to assertions made by two Internal Revenue Service investigators regarding U.S. Attorney Weiss's investigation. U.S. Attorney Weiss was appointed by President Donald J. Trump. He began this investigation during the previous administration. After the change in administrations, U.S. Attorney Weiss was asked to remain in his position to continue his leadership of the investigation.[1]

U.S. Attorney Weiss brought charges in this case for two misdemeanor tax offenses and for a felony firearms offense. Mr. Robert Hunter Biden agreed to enter a plea of guilty to the tax offenses and to enter into a pre-trial diversion agreement with regard to the firearm charge.[2] A hearing is scheduled for July 26, 2023, in the U.S. District Court for the District of Delaware to

---

[1] Letter from U.S. Attorney David Weiss to Chairman Jim Jordan (June 7, 2023) ("June 7 Letter").
[2] Press Release, United States Attorney's Office for the District of Delaware, Tax and Firearm Charges Filed Against Robert Hunter Biden (June 20, 2023), https://www.justice.gov/usao-de/pr/tax-and-firearm-charges-filed-against-robert-hunter-biden.

The Honorable Jim Jordan
Page 2

consider a plea agreement between the United States and Mr. Robert Hunter Biden. Sentencing will follow upon entry of a guilty plea.

U.S. Attorney Weiss has clearly stated that he has been "granted ultimate authority over this matter, including responsibility for deciding where, when and whether to file charges and for making decisions necessary to preserve the integrity of the prosecution, consistent with federal law, the Principles of Federal Prosecution, and Departmental regulations."[3] He has said he has "never been denied the authority to bring charges in any jurisdiction."[4] U.S. Attorney Weiss has assured that his "decisions have been made—and with respect to the matter must be made—without reference to political considerations."[5]

U.S. Attorney Weiss also made clear that he has "not requested Special Counsel designation pursuant to 28 CFR § 600 *et seq.*"[6] U.S. Attorney Weiss further explained that if he wanted to bring charges outside the District of Delaware, he could either "partner" with the U.S. Attorney's Office for the other district, or seek "Special Attorney" status pursuant to 28 U.S.C. § 515.[7] Section 515 provides that "any attorney specially appointed by the Attorney General under law, may, when specifically directed by the Attorney General, conduct any kind of legal proceeding, civil or criminal . . . which United States attorneys are authorized by law to conduct, whether or not he is a resident of the district in which the proceeding is brought." As U.S. Attorney Weiss explained, he was assured that he "would be granted this authority if it proved necessary."[8] That assurance "came months before the October 7, 2022, meeting referenced throughout the whistleblowers' allegations."[9] As Attorney General Garland has testified, U.S. Attorney Weiss "has full authority" to make "referrals" to other districts "or to bring cases in other jurisdictions if he feels it's necessary."[10]

The Office of Legislative Affairs will work with your staff to discuss the appropriate timing and scope for providing further information from U.S. Attorney Weiss.[11] In determining the timing and scope, the Department must consider the integrity of the ongoing criminal investigation and prosecution and the Department's longstanding policy that we seek "whenever possible to provide information about closed, rather than open, matters."[12] Indeed, legal barriers

---

[3] June 7 Letter.
[4] Letter from U.S. Attorney David Weiss to Senator Lindsey Graham (July 10, 2023) ("July 10 Letter").
[5] June 7 Letter.
[6] July 10 Letter. Attorney General William Barr also addressed questions about whether to appoint a special counsel in the matter. In December 2020, Attorney General Barr said, "I think it's being handled responsibly and professionally currently within the department, and to this point I have seen no reason to appoint a special counsel, and I have no plan to do so before I leave." *See* Ryan Lucas, *Barr Says No Need For Special Counsel For Hunter Biden Probe, Election Fraud Claims*, NPR (Dec. 21, 2020), https://www.npr.org/2020/12/21/948787251/barr-says-no-need-for-special-counsel-for-hunter-biden-probe-election-fraud-clai.
[7] Letter from U.S. Attorney David Weiss to Chairman Jim Jordan (June 30, 2023) ("June 30 Letter").
[8] July 10 Letter.
[9] *Id.*
[10] March 1, 2023, Senate Judiciary Committee Hearing ("March 1, 2023 Testimony"); April 26, 2022, Senate Appropriations Subcommittee Hearing. *See also* February 22, 2021, Senate Judiciary Committee Hearing ("February 22, 2021 Testimony").
[11] June 30 Letter.
[12] Letter from Assistant Attorney General Robert Raben to Chairman John Linder (Jan. 27, 2000) ("Linder Letter") at 3.

The Honorable Jim Jordan
Page 3

and ethics obligations prevent the Department from discussing the particulars of a criminal prosecution while it remains pending in court.

### *Oversight of the Department's programs and operations*

Your letter also identifies general areas where the Committee may have legislative oversight authority: the Department's "programs and operations" within the "jurisdiction" of the Committee. The Department respects that the Rules of the 118th Congress grant the Committee jurisdiction to initiate legislative inquiries regarding a range of the Department's work and administration.[13] We also respect the scope of Congress's oversight authorities in service of its legislative responsibilities.[14]

As the Department explained in its letter of January 20, 2023, courts have long held that the Constitution "requires each Branch to engage in a 'realistic evaluation of [one another's] needs'" when Congress seeks Executive Branch information, and that "[t]he Committee can assist the Department in making this process as efficient as possible by helping the Department understand the scope of its interests."[15] The Office of Legislative Affairs is available to meet with your staff so we can understand the legislative purpose and scope of your inquiry into the Department's programs and operations, which your letter does not specify.[16] Providing that information is a necessary first step to enable the Department and the Committee to begin a process of accommodation, as appropriate.

In any accommodation process, the Department applies its longstanding policies and practices to protect the integrity of our work, as the Department conveyed to the Committee at the outset of this Congress.[17] Subject to the necessary discussions referenced above, those principles apply to your requests for transcribed interviews with several Department personnel, including line agents and prosecutors. As noted, the Department safeguards non-public information about open investigations, sensitive law enforcement information, and internal deliberations.[18] Moreover, the longstanding policy of the Department is to "ensur[e] that

---

[13] *See* H.R. Rules, 118th Cong., Rule X, cl. 1(*l*) (identifying nineteen subjects over which the Committee has been delegated "legislative jurisdiction"); *id.* Rule X, cl.2 (assigning standing committees "general oversight responsibilities" on the subjects within the scope of their legislative jurisdiction).

[14] *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (The Supreme Court has "held that each House has power 'to secure information in order to legislate,'" and that this "power is 'broad' and 'indispensable.'" (quoting *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927), and *Watkins v. United States*, 354 U.S. 178, 187 (1957)). *See also* U.S. CONST. art. I, § 1.

[15] Letter from Assistant Attorney General Carlos Uriarte to Chairman Jim Jordan (Jan. 20, 2023) ("January 20 Letter") (quoting *United States v. AT&T Co.*, 567 F.2d 121, 127 (D.C. Cir. 1977)).

[16] *See Trump*, 140 S. Ct. at 2031 – 32 ("Because this power [to conduct investigations] is 'justified solely as an adjunct to the legislative process,'" it is subject to several limitations, including that a congressional request for information "must serve a 'valid legislative purpose,'" that it cannot be "for the purpose of 'law enforcement'" or other "powers are assigned under our Constitution to the Executive or the Judiciary," and also that recipients of such requests retain protections such as constitutional rights as well as certain "common law and constitutional privileges." (cleaned up)).

[17] January 20 Letter.

[18] *See generally* Linder Letter. *See also, e.g.*, letter from Deputy Attorney General Rod Rosenstein to Senator Chuck Grassley (June 27, 2018) ("Regardless of political affiliation, thoughtful former Department leaders recognize that departures from our confidentiality policies pose an extraordinary threat to the Department's independence and

The Honorable Jim Jordan
Page 4

appropriate supervisory personnel, rather than line attorneys and agents, answer Congressional questions about Department actions."[19] Where a congressional committee has requested the testimony of the Department's line personnel pursuant to a legitimate oversight inquiry, the Department has historically been able to meet a committee's informational needs by providing documents, testimony or briefings from supervisory personnel, or written responses.

***Conclusion***

We hope you find this response helpful, and we hope you will accept our invitation to meet with your staff. Please do not hesitate to contact this office if we can provide further assistance regarding this or any other matter.

Sincerely,

CARLOS URIARTE

Digitally signed by
CARLOS URIARTE
Date: 2023.07.13
16:59:53 -04'00'

Carlos Felipe Uriarte
Assistant Attorney General

cc:

The Honorable Jerrold L. Nadler
Ranking Member
Committee on Judiciary
U.S. House of Representatives
Washington, DC 20515

The Honorable James Comer
Chairman
Committee on Oversight and Reform
U.S. House of Representatives
Washington, DC 20515

---

integrity . . . Requiring the Department of Justice to disclose details about criminal investigations would constitute a dangerous departure from important principles."); *Position of the Executive Department Regarding Investigative Reports*, 40 Op. Att'y Gen. 45, 46 (1941) ("It is the position of this Department, restated now with the approval of and at the direction of the President, that all investigative reports are confidential documents of the executive department of the Government, to aid in the duty laid upon the President by the Constitution to 'take care that the laws be faithfully executed,' and that congressional or public access to them would not be in the public interest." (quoting U.S. CONST. art. 2, § 3)); Memorandum for Edward L. Morgan, Deputy Counsel to the President from Thomas E. Kauper, Deputy Assistant Attorney General, Office of Legal Counsel (Dec. 19, 1969)) ("[T]he Executive cannot effectively investigate if Congress is, in a sense, a partner in the investigation. If a congressional committee is fully apprised of all details of an investigation as the investigation proceeds, there is a substantial danger that congressional pressures will influence the course of the investigation.").
[19] Linder Letter at 3, 6.

The Honorable Jim Jordan
Page 5

The Honorable Jamie Raskin
Ranking Member
Committee on Oversight and Reform
U.S. House of Representatives
Washington, DC 20515

The Honorable Jason Smith
Chairman
House Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

The Honorable Richard Neal
Ranking Member
House Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit U



**U.S. Department of Justice**

Office of Legislative Affairs

_____

*Office of the Assistant Attorney General*                    *Washington, DC 20530*



The Honorable Jim Jordan
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515


Dear Chairman Jordan:

     This responds to your letter to the Attorney General, dated July 21, 2023, expressing continued interest in an individual ongoing criminal investigation and prosecution led by the U.S. Attorney for the District of Delaware, David Weiss. The Department of Justice (Department) appreciates the Committee on the Judiciary's (Committee's) acceptance of our offer for U.S. Attorney Weiss to testify at a public hearing before the Committee. The Department is ready to offer U.S. Attorney Weiss to testify shortly after Congress returns from the August district work period, as described more fully below.

     Across administrations, the Department has long recognized its obligation to protect law enforcement work from even the perception of political interference, including from Congress.[1] Our longstanding principles and duty to take care that the law be faithfully executed require us to maintain the confidentiality of sensitive law enforcement information and to protect line attorneys and agents so they can do their jobs for the American people free from improper political pressures. These concerns are heightened while a matter is open and investigative steps, prosecutorial decisions, or judicial proceedings are ongoing. At the same time, we are deeply concerned by any misrepresentations about our work—whether deliberate or arising from misunderstandings—that could unduly harm public confidence in the evenhanded administration of justice, to which we are dedicated. The Department, therefore, reaffirms U.S. Attorney Weiss's commitment to providing public testimony, consistent with law and Department policy, to protect these principles.

     Your letter refers to assertions made by two Internal Revenue Service investigators regarding U.S. Attorney Weiss's authority and asks additional questions about U.S. Attorney Weiss's recent letters explaining the scope of his authority. U.S. Attorney Weiss is the appropriate person to speak to these issues, as he is both the senior Department official

---

[1] *See, e.g.*, Letter from Assistant Attorney General Robert Raben to Chairman John Linder (Jan. 27, 2000) ("Congressional inquiries during the pendency of a matter pose an inherent threat to the integrity of the Department's law enforcement and litigation functions.").

The Honorable Jim Jordan
Page 2

responsible for the investigation as well as the person with direct knowledge of the facts necessary to respond to the assertions in which you have expressed interest.

The Department believes it is strongly in the public interest for the American people and for Congress to hear directly from U.S. Attorney Weiss on these assertions and questions about his authority at a public hearing. To address these issues, U.S. Attorney Weiss is available to appear at a public hearing before the Committee, consistent with the law and Department policy, after the House returns from its August district work period. U.S. Attorney Weiss is available on September 27, September 28, October 18, and October 19. To be clear, the most appropriate time for any testimony on these subjects is after the matter is closed, especially under the circumstances where the matter is pending before a court and subject to judicial supervision, not to mention legal and ethical bars that limit what the Department can say while the matter is pending in court. While testimony at this early juncture must be appropriately limited to protect the ongoing matter and important confidentiality interests, the Department acknowledges your stated interest in addressing aspects of this matter in the near term, such as U.S. Attorney Weiss's authority and jurisdiction to bring charges wherever he deems appropriate.

As the Department has repeatedly stated, we remain committed to working with you to address the Committee's expressed interests consistent with the Department's duties and policies. We are, therefore, deeply concerned by your notification today that the Committee has authorized deposition subpoenas for the individuals identified in your letter. Any attempts at compulsory process are unjustified and premature. The Committee authorized subpoenas less than a business day after your July 21 letter and *before* the stated deadline in that letter. It has been less than a month since the Committee's original requests, and little more than a week since the Department responded to that letter on the date requested by the Committee. During a staff discussion last week, the Department and Committee agreed to continue discussions. Such discussions would ensure we understand the Committee's interests and that you understand the Department's longstanding approach across administrations regarding such requests, including those that seek information about ongoing aspects of our work and testimony from line personnel. We remain available to discuss your interests further.

We hope this information is helpful. Please do not hesitate to contact this office if we may provide additional assistance regarding this or any other matter.

Sincerely,

CARLOS
URIARTE

Digitally signed by
CARLOS URIARTE
Date: 2023.07.24
18:22:43 -04'00'

Carlos Felipe Uriarte
Assistant Attorney General

The Honorable Jim Jordan
Page 3

cc:

The Honorable Jerrold L. Nadler
Ranking Member
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

The Honorable James Comer
Chairman
Committee on Oversight and Accountability
U.S. House of Representatives
Washington, DC 20515

The Honorable Jamie Raskin
Ranking Member
Committee on Oversight and Accountability
U.S. House of Representatives
Washington, DC 20515

The Honorable Jason Smith
Chairman
House Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

The Honorable Richard Neal
Ranking Member
House Committee on Ways and Means
U.S. House of Representatives
Washington, DC 20515

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

            *Plaintiff*,

       v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

            *Defendants*.

Case No. 1:24-cv-815

# Exhibit V

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Mark F. Daly, Senior Litigation Counsel, Tax Division, U.S. Department of Justice ☐

You are hereby commanded to be and appear before the

Committee on the Judiciary

of the House of Representatives of the United States at the place, date, and time specified below.

☐ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: _____

Date: _____     Time: _____

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: 2237 Rayburn House Office Building

Date: September 27, 2023     Time: 10:00 a.m.

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____     Time: _____

*To* The U.S. Marshals Service, or any authorized Member or congressional staff

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 14 day of September , 20 23.

*Chairman or Authorized Member*

Attest: Kevin F. McCabe

*Clerk*

## PROOF OF SERVICE

Subpoena for

Mark F. Daly, Senior Litigation Counsel, Tax Division, U.S. Department of Justice

Address  U.S. Department of Justice, 950 Pennsylvania Avenue, N.W. Washington, DC 20530

before the  Committee on the Judiciary

*U.S. House of Representatives*
*118th Congress*

Served by (print name) _____

Title _____

Manner of service _____

_____

Date _____

Signature of Server _____

Address _____

_____

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit W

# SUBPOENA

## BY AUTHORITY OF THE HOUSE OF REPRESENTATIVES OF THE CONGRESS OF THE UNITED STATES OF AMERICA

*To* Jack Morgan, Trial Attorney, Tax Division, U.S. Department of Justice  ⊞

You are hereby commanded to be and appear before the

Committee on the Judiciary  ▼

of the House of Representatives of the United States at the place, date, and time specified below.

☐ **to produce the things identified on the attached schedule** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of production: _____

Date: _____                     Time: _____

☑ **to testify at a deposition** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: 2237 Rayburn House Office Building _____

Date: September 28, 2023 _____             Time: 10:00 a.m. _____

☐ **to testify at a hearing** touching matters of inquiry committed to said committee or subcommittee; and you are not to depart without leave of said committee or subcommittee.

Place of testimony: _____

Date: _____                     Time: _____

*To* The U.S. Marshals Service, or any authorized Member or congressional staff _____

_____ to serve and make return.

Witness my hand and the seal of the House of Representatives of the United States, at

the city of Washington, D.C. this 14 day of September , 20 23.

_____
*Chairman or Authorized Member*

Attest: *Kevin F. McCumber*

*Clerk*

## PROOF OF SERVICE

Subpoena for

Jack Morgan, Trial Attorney, Tax Division, U.S. Department of Justice

Address  U.S. Department of Justice, 950 Pennsylvania Avenue, N.W. Washington, DC 20530

before the  Committee on the Judiciary

*U.S. House of Representatives*
*118th Congress*

Served by (print name) _____

Title _____

Manner of service _____

Date _____

Signature of Server _____

Address _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES, | |
| 2138 Rayburn House Office Building Washington, D.C. 20515, | |
| *Plaintiff*, | |
| v. | Case No. 1:24-cv-815 |
| MARK DALY, in his official capacity, U.S. Department of Justice, and | |
| JACK MORGAN, in his official capacity, U.S. Department of Justice, | |
| 950 Pennsylvania Avenue, N.W. Washington, D.C. 20530, | |
| *Defendants*. | |

# Exhibit AA



**Robert N. Driscoll**
Attorney at Law



T (202) ███  F (202) ███
███ @mcglinchey.com

McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004

October 24, 2023

**_By Email Only_**

The Honorable Jim Jordan
Chairman, Committee on the Judiciary
US House of Representatives
2138 Rayburn House Building
Washington, DC 20515
c/o Caroline Nabity, Chief Counsel (*via email at* ███ @mail.house.gov)
Betsy Ferguson, Deputy General Counsel (*via email at* ███ @mail.house.gov).

     RE:    Mark Daly

Dear Chairman Jordan,

This firm represents Mark Daly, a career attorney and long-time civil servant of the Department of Justice in the Tax Division and senior litigation counsel in the Office of Special Counsel headed by the US Attorney for the District of Delaware David C. Weiss. We are in possession of the subpoena directing Mr. Daly to appear before your committee for a transcribed interview currently scheduled for October 26, 2023. I have also held brief conversations with your staff, who were exceedingly gracious and professional regarding the subpoena and Mr. Daly's appearance.

As you are aware and as I have been informed, the Department of Justice—as Mr. Daly's employer—has asserted various equities in the matters the committee would like to discuss. Among other things, I have been informed that the Justice Department has raised constitutional objections to the subpoena in question relating to both the subpoena power of the committee and its ability to subpoena a DOJ line attorney regarding an active matter in light of statutory issues related to taxpayer privacy, grand jury secrecy issues under Fed.R.Crim.P. 6(e), and other things.

It is also clear to me from my conversations with congressional staff the that the committee asserts weighty constitutional interests of its own relating to its oversight responsibilities and the enforcement of its subpoenas.

The constitutional and statutory questions raised by the competing claims of the executive and legislative branches of government in instances like this are thorny, complex, and in many instances unresolved by the third branch of government—the courts. But these issues are not necessarily novel. In my career, I have been on both sides of these intra-branch disputes with respect to various clients. Both sides have good faith arguments and can find support for them in precedent, case law, or constitutional theory. The answers to the questions raised are often far from clear or certain.

**mcglinchey.com**

Albany  Baton Rouge  Birmingham  Boston  Cleveland  Dallas  Fort Lauderdale  Houston  Irvine
Jackson  Jacksonville  Nashville  New Orleans  New York City  Providence  Seattle  **Washington, DC**

The Honorable Jim Jordan
October 24, 2023
Page 2 of 2

What is clear to me, however, is that this dispute is not Mr. Daly's dispute. It is a dispute between the legislative and executive branches—specifically his employer and the committee—and it should be worked out between those two parties, which should both want to avoid forcing a long-time apolitical career tax lawyer into a Hobson's choice where he must choose to comply with either his employer or a congressional subpoena. I urge a negotiated resolution between the committee and DOJ regarding whether Mr. Daly is an appropriate witness at all, what the appropriate scope of questioning will be given the statutory restrictions on sharing taxpayer information and the ongoing nature of the investigation about which the committee seeks information, and who should be present at any questioning to protect the various interests asserted by the Justice Department. It is not up to Mr. Daly, nor me as his lawyer representing his personal interests, to resolve those issues or to weigh in with our independent analysis. I merely urge you to come to some type of accommodation with the Justice Department and to postpone Mr. Daly's scheduled testimony if necessary to do so to allow more time for negotiation.

For planning purposes, given that the committee has issued a subpoena, it is my current intention to appear with Mr. Daly on Thursday, as discussed with your staff. However, it is also my advice to Mr. Daly that, if the constitutional dispute between the legislative and executive  branches of government is unresolved, his interests are best protected by following the instructions of the branch that employs him. Thus, we will follow whatever instructions are clearly given by the Justice Department, in writing, regarding any restrictions on his testimony, up to and including an instruction that he not appear, and I will instruct him not to answer questions as directed by the DOJ to preserve any bona fide disputes for future resolutions by the federal judiciary or otherwise. I will let you know promptly if I receive any such communication that directs Mr. Daly not to appear.

Thank you for your consideration.

Sincerely,

Robert N. Driscoll
*Counsel for Mark Daly*

cc:  The Honorable Jerrold L. Nadler, Ranking Member
     c/o ███████, Minority Staff (*via email at* ███████@mail.house.gov)

     Bradley Weinsheimer, Associate Deputy Attorney General, DOJ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

*Plaintiff*,

v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

*Defendants*.

Case No. 1:24-cv-815

# Exhibit BB



**U.S. Department of Justice**

Office of the Deputy Attorney General

_Bradley Weinsheimer_
Associate Deputy Attorney General

_Washington, D.C. 20530_

October 25, 2023

Mr. Robert Driscoll
McGlinchey Stafford
1275 Pennsylvania Avenue NW, Suite 420
Washington, D.C. 20004
Via Email

Dear Mr. Driscoll:

I write concerning your client Mark Daly. I serve as the senior career official at the Department of Justice (Department). Consistent with this role, in which I have served since 2018, I possess and exercise delegated authority to provide current and former Department employees with direction concerning the disclosure and protection of Department information, including with respect to congressional requests for testimony. I write to you in that capacity.

On September 14, 2023, the House Committee on the Judiciary (Committee) issued a deposition subpoena to your client for testimony regarding the work of the Department of Justice (Department) on an ongoing individual criminal investigation and prosecution led by Special Counsel David Weiss.[1] The Committee's correspondence, including the letter accompanying the subpoena to your client, states that it seeks testimony about meetings and conversations among investigators and prosecutors about the weight of evidence and charging decisions in this open matter. The Department offered voluntary appearances by three senior officials on appropriate topics as an alternative to the Committee pursuing such testimony from line-level attorneys, including your client. Although the Committee accepted the Department's offered alternative and these officials have appeared for interviews, the Committee has continued to pursue testimony from your client. Pursuant to the Rules of the House of Representatives, incorporated by reference in the Committee Rules transmitted with the subpoena, agency counsel is prohibited from attending the deposition.

The Department has written to the Committee explaining that principles and policies for safeguarding the confidentiality of the Department's work further the public interest in the integrity of law enforcement investigations.[2] These principles and policies have been followed across administrations and are grounded in constitutional concerns. As discussed in that letter, excluding agency counsel in these circumstances undermines the Executive Branch's ability to

---

[1] Letter from Hon. Jim Jordan to Mark Daly (Sept. 14, 2023).
[2] Letter from Asst. Attorney General Carlos Uriarte to Hon. Jim Jordan (Oct. 25, 2023). The concerns expressed in this letter are incorporated here by reference.

1

protect its confidentiality interests in the course of the constitutionally mandated accommodation process.[3] In addition, the exclusion of agency counsel interferes with the Executive Branch's ability to protect potentially privileged information.[4] The underlying principles that inform the Department's position are longstanding across administrations. Here, the subpoena issued by the Committee prohibits the attendance of agency counsel at an appearance where the Committee has indicated it will ask questions regarding information Mr. Daly learned within the scope of his official duties, including potentially privileged information.[5] On the basis of a 2019 Office of Legal Counsel opinion, the Department has determined that the exclusion of agency counsel means that the subpoena lacks legal effect and cannot constitutionally be enforced.

Having carefully considered the relevant facts and authority, Department and Executive Branch precedents and longstanding principles, and the Department's determination that not appearing would be lawful because this subpoena lacks legal effect, I recommended to the Deputy Assistant Attorney General serving as the Head of the Tax Division and to the Attorney General that Mr. Daly be directed not to appear before the Committee pursuant to this subpoena. The Attorney General and the Head of the Tax Division approved my recommendation. Accordingly, the Department directs Mr. Daly not to appear before the Committee pursuant to the subpoena.

This directive is consistent with longstanding principles of the Justice Department regarding congressional requests for information, as well as the Department's respect for Congress's authority to conduct legitimate oversight of the Executive Branch and our mutual obligations under the constitutionally mandated accommodation process. Department witnesses are expected to abide by their obligations under the law and Department policy, including the Justice Manual, to refrain from disclosing information that has not been authorized for public release. This includes information about ongoing investigations and prosecutions, sensitive law enforcement information, and Executive Branch deliberative processes, such as those that underlie investigative and prosecutorial decisions. The presence of agency counsel during congressional interviews is essential to ensure, among other things, that Department witnesses fully understand and abide by their obligations and that the Department has the ability to raise objections or assert privileges or other Executive Branch confidentiality interests.

This directive is also consistent with our continuing commitment to good-faith negotiations with the Committee in response to its interest in this matter. The Department remains willing to discuss with the Committee appropriate requests for information and the circumstances under which the Department may be able to provide that information. Nothing in this directive shall be understood to waive or limit, on behalf of Mr. Daly or of the Department, any potentially applicable privileges, objections, or confidentiality interests regarding this or other congressional requests for information.

---

[3] *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019).

[4] *Id.* at *8 (quoting *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 81 (2004)).

[5] *Id.* at *2.

Pursuant to 5 U.S.C § 2302(b)(13), the provisions of this letter are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection.  The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are controlling.

Sincerely,

Bradley Weinsheimer

3

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

            *Plaintiff*,

    v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

            *Defendants*.

Case No. 1:24-cv-815

# Exhibit CC



**U.S. Department of Justice**

Office of Legislative Affairs

---

*Office of the Assistant Attorney General*          *Washington, DC 20530*

The Honorable Jim Jordan
Chairman
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

Dear Chairman Jordan:

This is a further response to the Committee's September 14, 2023, deposition subpoenas issued to line-level attorneys in the Department of Justice's (Department) Tax Division about an ongoing individual investigation and prosecution led by Special Counsel David Weiss.

The Department is committed to upholding the American people's strong interest in appropriate accountability and transparency regarding our work. This commitment is reflected by the significant resources we invest in responding to congressional requests, including this one.[1] Indeed, we have made extraordinary efforts to provide appropriate information on this matter through voluntary testimony by seven current and former senior Department officials, including Special Counsel Weiss. The Department remains committed to transparency regarding Special Counsel Weiss's investigation. As the Attorney General testified, he intends to make public as much of Mr. Weiss's final report as possible, consistent with law and Department policy.

The Department is also dedicated to protecting the American people's strong interest in public safety, the integrity of law enforcement investigations, and the evenhanded administration of justice. This dedication informs the times when we must decline to disclose information, in order to safeguard law enforcement work. The Committee is seeking to depose, under threat of criminal contempt, line-level attorneys for information inextricably intertwined with an ongoing criminal investigation and prosecution. The Committee's subpoenas encompass information Department attorneys are duty-bound not to disclose, including information protected by statutes such as 26 U.S.C. § 6103 and Federal Rule of Criminal Procedure 6(e). You have continued to pursue testimony from line-level attorneys even when reasonable and responsive alternatives have already been offered and provided. These demands implicate the very core of the Executive Branch's constitutionally assigned authority to enforce the law, as well as statutory restrictions, potential privileges, and other important confidentiality interests. It is extraordinary for Congress to attempt to compel testimony that would intrude upon so many aspects of the public's interest in the confidentiality and integrity of law enforcement work.

---

[1] *See generally* Letter from Carlos Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. Jim Jordan (Jan. 20, 2023) ("January 20th Letter").

The Honorable Jim Jordan
Page 2

The Department will continue to protect the integrity of law enforcement work, on this matter and others, as we have done for decades across administrations of both political parties.[2] In light of these important interests and the extraordinary efforts we have made to provide appropriate information to the Committee, we urge the Committee to end its pursuit of additional testimony from line-level career attorneys.

### *The Department's Extraordinary Efforts*

The Department has made exceptional efforts to provide appropriate information to the Committee out of the respect and due weight the Department has given your interest in this ongoing matter.[3] Among other things, with the Department's authorization the Committee received testimony from two current U.S. Attorneys, a former U.S. Attorney, a current Tax Division Acting Deputy Assistant Attorney General, and two current senior supervisory Federal Bureau of Investigation (FBI) agents. Special Counsel Weiss himself is scheduled to testify on November 7. Although the Department has not authorized any witness to provide nonpublic, sensitive information regarding the ongoing matter, the work we have done to identify information that *can* be shared—for example, about Mr. Weiss's scope of authority—and the fact that the Department has authorized such appearances at all is extraordinary.

The Department offered testimony from three of these senior officials as an *alternative* to the Committee's continued pursuit of testimony from line-level Tax Division attorneys.[4] The Department's policy of declining to provide line attorneys for congressional testimony is longstanding and protects their safety and the integrity of their work. Our offer was, therefore, a reasonable compromise—senior officials providing responsive testimony on appropriate topics such as Mr. Weiss's authority—to avoid unnecessary conflict over line-level attorneys' testimony that could risk the integrity of an open matter. Yet you have persisted in seeking such testimony, including about meetings and conversations among investigators and prosecutors on the weight of evidence and charging decisions. This could result in exactly the kinds of disclosures that could undermine an ongoing investigation and prosecution. Indeed, as Attorney General Robert Jackson explained more than 80 years ago, disclosure of this kind of information could be of tremendous value to a defendant or prospective defendant, as it would allow counsel to know "how much or how little information the Government has, and what witnesses or sources of information it can rely upon."[5] This is in addition to risking dangerous chilling effects, statutory violations, and constitutional concerns discussed below.

---

[2] *See* Letter from Rod Rosenstein, Deputy Att'y Gen., to U.S. Sen. Charles Grassley at 6–7 (June 27, 2018) ("Rosenstein Letter") ("It may seem tempting to depart from Department policies and traditions in an effort to deflect short-term criticism, but such deviations ultimately may cause a loss of public confidence in the even-handed administration of justice. . . . I urge you and your colleagues to support us in following the rules.").

[3] *See* Letter from Carlos Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. Jim Jordan (Sept. 22, 2023) ("Sept. 22 Letter"); Letter from Carlos Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. Jim Jordan (Sept. 11, 2023); Letter from Carlos Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. Jim Jordan (July 24, 2023); Letter from Carlos Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. Jim Jordan (July 13, 2023).

[4] Sept. 22 Letter at 3.

[5] 40 Op. Att'y Gen. 45, 46 (1941) ("Jackson Opinion").

The Honorable Jim Jordan
Page 3

In any event, it is not clear why you need to speak to these particular line-level attorneys.[6] "While fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events," as may be necessary for law enforcement or judicial functions.[7] Moreover, these line attorneys did not exercise any authority over whether, where, or when to bring charges in this matter; that authority lies with Mr. Weiss, who is scheduled to appear in front of the Committee days from now. And to the extent you had questions about the role of the Tax Division, a Deputy Assistant Attorney General—one of the most senior career officials in the Tax Division—was made available to speak on that topic.

### Confidentiality Protects Public Safety and the Fair Administration of Justice

Keeping the American people safe from criminal and national security threats often requires confidentiality. Among other things, the Department must protect information that could reveal law enforcement sources and methods, or that could discourage witnesses from coming forward.[8] These principles are consistent and longstanding. More than 80 years ago, Attorney General Robert Jackson declined to provide FBI investigative files to Congress because "much of this information is given in confidence and can only be obtained upon pledge not to disclose its sources."[9] We have since reiterated that "[t]o demand the prosecutor's documents while the case is in progress would irreversibly taint our principles of justice," and that disclosing such information to Congress "could harm the reputations of innocent people or even place witnesses in danger of retaliation."[10] Protecting such information also avoids the serious consequences of revealing investigative methods or signaling that the Department will not keep sources confidential.

Confidentiality is also critical to ensuring that cases are prosecuted effectively and that justice is done for victims and communities. As the Department explained decades ago, "the disclosure of documents from our open files could also provide a 'road map' of the Department's ongoing investigations," including to suspects and defendants.[11] Disclosing investigative information about a suspect or defendant outside the guardrails of Department policies or the rules of evidence and due process that apply in court—with an apolitical judge as gatekeeper—

---

[6] *See Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731–32 (D.C. Cir. 1974).
[7] *Id.* at 732; *see also* Jackson Opinion at 50 ("The information here involved was collected, and is chiefly valuable, for use by the executive branch of the Government in the execution of the laws. It can be of little, if any, value in connection with the framing of legislation or the performance of any other constitutional duty of the Congress.").
[8] *See, e.g.*, *Mandatory Disclosure of Civil Rights Cold Case Records*, 43 Op. O.L.C. __, at *10 (Feb. 4, 2019) ("Investigative files often contain factual information that could, if disclosed, compromise an investigation or prosecution, reveal sensitive investigative techniques, or endanger confidential sources.").
[9] Jackson Opinion at 46.
[10] Letter from Janet Reno, U.S. Att'y Gen, to U.S. Rep. Dan Burton at 2 (Aug. 4, 1998). *See also* Memorandum from Thomas E. Kauper, Deputy Assistant Att'y Gen., U.S. Dep't of Just., to Edward L. Morgan, Deputy Counsel to the Pres. at 3 (Dec. 19, 1969) ("Kauper Memorandum") ("The protection of individuals from the prejudicial effects of unsubstantiated information collected by the government itself has long been recognized as a major reason for the refusal to give Congress access to open investigative files.").
[11] Letter from Robert Raben, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. John Linder at 4 (Jan. 27, 2000) ("Linder Letter").

The Honorable Jim Jordan
Page 4

may risk creating claims of undue prejudice and undermine the ability of the Department to obtain an otherwise appropriate conviction.[12]

Further, as the Department observed during the Reagan Administration, producing law enforcement files to Congress could mean that "a person who is ultimately not prosecuted may be subjected to unfair and prejudicial publicity—and thus suffer substantial and lasting damage to his professional and community standing—based on unfounded allegations."[13] In addition, providing confidential law enforcement files in an ongoing matter would place Congress in a position to exert pressure over or attempt to influence the prosecution and could create the appearance of undue political influence. These concerns may be heightened in the context of certain congressional requests. As Attorney General Janet Reno asked in response to a congressional demand for nonpublic law enforcement information and prosecutorial deliberations in an open matter: "Suppose, for example, a Congressional committee wants to stop us from prosecuting someone the committee supports. What's to stop the committee from threatening Department lawyers with contempt, forcing them to produce their internal memos and making them public to everyone including the defendant's legal team?"[14]

The Committee's subpoenas directly implicate these concerns. The record is clear that the Committee seeks testimony on evidence in the case and meetings about "recommending charges" or "reasons why the Department should not charge."[15] To produce such information to Congress risks the kinds of outside influences or appearances of selective decision-making that could undermine the fair and effective administration of justice. It could also prospectively chill decision-making by Department personnel and our law enforcement partners, as well as undermine confidence in the Department's ability to protect sources, methods, and other sensitive law enforcement information from improper influence or disclosure.

### *Protecting Line Personnel and Their Work*

Across administrations, the Department has supported its personnel and safeguarded the integrity of their work by ensuring that when the Department speaks to Congress it does so through an appropriately senior official. This is true for routine as well as high-profile oversight matters. When the Department produces internal documents to Congress, it discloses the names of senior officials but protects the privacy of line personnel. When the Department appears at a hearing or sends a letter to Congress, it does so through a senior and appropriately accountable official. This policy of protecting line personnel is standard Department practice, and it has been so for decades.

---

[12] *See, e.g.*, *Response to Congressional Requests for Information Regarding Decisions Under the Independent Counsel Act*, 10 Op. O.L.C. 68, 77 (1986) (citing *Delaney v. United States*, 199 F.2d 107, 114 (1st Cir. 1952)).
[13] *Id.*
[14] Letter from Janet Reno, U.S. Att'y Gen, to U.S. Rep. Dan Burton at 2 (Aug. 4, 1998). *See also* Rosenstein Letter at 7 ("Regardless of political affiliation, thoughtful former Department leaders recognize that departures from our confidentiality policies pose an extraordinary threat to the Department's independence and integrity. . . . [D]isclosing information about criminal investigations constitutes 'real-time, raw-take transparency taken to its illogical limit, a kind of reality TV of federal criminal investigation' that is 'antithetical to the interests of justice.'").
[15] *See* Letter from U.S. Rep. Jim Jordan to U.S. Dep't of Just. Tax Division Attorney at 2 (Sept. 14, 2023).

The Honorable Jim Jordan
Page 5

     Exceptions are extraordinarily rare and fact-specific. As Attorney General Garland said last year, the Department's "institutional backbone, and its historical memory, is our talented and dedicated career workforce."[16] The Department explained to Congress during the Bush Administration that we must "ensure that our line attorneys and agents can exercise the independent judgment essential to the integrity of our law enforcement activities and to public confidence in those activities."[17] We remain steadfastly committed to enabling our line personnel to do their work free from political pressures or improper influence of any kind, from any source. And because senior officials responsible for the Department's operations are the ones who "make the decisions that are the subjects of Congressional review," they "should be the ones to explain the decisions."[18]

     The wisdom of this enduring approach is clear today from the very real threat of "doxing," harassment, and even physical violence against public servants and their families after being identified as working on high-profile matters.[19] As Attorney General Garland testified to the Committee last month, "what is dangerous is when anyone singles out a career prosecutor or a career FBI agent. And we know, as a matter of fact, that that kind of singling out has led to threats."[20] Indeed, the Committee has received testimony about threats and harassment of Department employees working on Mr. Weiss's investigation, specifically, as well as on other high-profile matters.[21]

     The Department also must guard against the chilling effect of prosecutors and investigators being singled out as a result of their work on a high-profile matter. No one is above the law, and like cases must be treated alike. As Attorney General Garland recently testified to the Committee, "[t]here is not one set of laws for the powerful and another for the powerless, one for the rich and another for the poor, one for Democrats and another for Republicans, or different rules, depending upon one's race, or ethnicity, or religion."[22] Our line personnel must not be chilled from working on a matter, taking an appropriate investigative step, or making the right decision based on the facts and the law and nothing more.[23]

---

[16] Merrick Garland, U.S. Att'y Gen, Address to Conference of U.S. Att'ys  (Oct. 31, 2022).

[17] Letter from William E. Moschella, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Sen. Susan Collins at 1 (Mar. 23, 2005) ("Moschella Letter").

[18] *Id.*

[19] *See, e.g.*, Press Release, U.S. Dep't of Just., Two Tennessee Men Arrested for Planning Attacks on Law Enforcement Personnel and the FBI's Knoxville Field Office (Dec. 16, 2022), https://www.justice.gov/opa/pr/two-tennessee-men-arrested-planning-attacks-law-enforcement-personnel-and-fbi-s-knoxville.

[20] *Oversight of the Dep't of Just.: Hearing before the H. Comm. on the Judiciary*, 118th Cong. (2023) (statement of Merrick Garland, U.S. Att'y Gen.) ("Garland Testimony").

[21] *See* Ken Dilanian, *Threats Mount Against Prosecutors and FBI Agents Working on Hunter Biden Probe*, NBC News (Sept. 14, 2023) https://www.nbcnews.com/politics/justice-department/prosecutors-fbi-agents-hunter-biden-investigation-threatened-rcna104932; Betsy Woodruff Swan, *Chief Prosecutor of Jan. 6 Rioters Describes 'Pervasive' Threats to His Office*, Politico (Oct. 20. 2020), https://www.politico.com/news/2023/10/20/jan-6-prosecutor-pervasive-threats-00122733.

[22] *See* Garland Testimony.

[23] *See* 10 Op. O.L.C. at 77 ("Employees of the Department would likely be reluctant to express candidly their views and recommendations on controversial and sensitive matters if those views could be exposed to public scrutiny by Congress upon request.").

The Honorable Jim Jordan
Page 6

### *Respect for Congress's Important Role in Our Democracy*

The Department respects that "[t]he oversight process is, of course, an important underpinning of the legislative process."[24] Legitimate legislative oversight is necessary to Congress's constitutional role of legislating on behalf of, and being directly democratically responsive to, the American people. The Department respects that the Rules of the 118th Congress grant the Committee jurisdiction to initiate legislative inquiries regarding a range of our work.[25] Indeed, in our first letter to the current Committee we reiterated that we "share your belief that congressional oversight is vital to our functioning democracy."[26]

But legislative investigations and law enforcement investigations serve different purposes under our system of government. Our constitutional system requires that each person receive equal justice under the general laws enacted by Congress. Decisions in specific cases must be based on the law and the facts, not political factors or popular opinion. Considerations that may appropriately inform legislative policymaking must remain irrelevant to how any individual is treated in our justice system. Law enforcement authority is thus "assigned under our Constitution to the Executive and the Judiciary."[27] As the Office of Legal Counsel explained nearly forty years ago, "[t]he Framers intended that Congress not be involved in such prosecutorial decisions or in questions regarding the criminal liability of specific individuals."[28] This separation of "the power to enact laws" from "the power to execute laws" is not a mere formality, but is a constitutional protection for individual liberty.[29] Therefore, Congress's authority to conduct legislative investigations "does not lead inexorably to the conclusion that the Executive must supply the fruits of its own investigation efforts to Congress."[30]

---

[24] Linder Letter at 1.

[25] The Department's prior correspondence has noted the scope of Congress's oversight authorities in service of its legislative responsibilities. *See* Letter from Carlos Uriarte, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. Jim Jordan at 3 (July 13, 2023) (noting the scope of legislative oversight authority delegated to the Committee pursuant to House Rules). The Department continues to reserve all objections to the Committee's oversight requests regarding this matter, including but not limited to the scope of, or authority for, the Committee's investigation or any particular request. *See, e.g.*, Linder Letter at 3 & nn.13–16.

[26] January 20th Letter at 2.

[27] *Trump v. Mazars LLP*, 140 S. Ct. 2019, 2032 (2020) (quoting *Quinn*, 349 U.S. at 161); *Watkins v. United States*, 354 U.S. 178, 187 (1957) (explaining that Congress is not "a law enforcement or trial agency," as those "are functions of the executive and judicial departments of government."); *Kilbourne v. Thompson*, 103 U.S. 168, 192 (1881) (concluding that the "House of Representatives not only exceeded the limit of its own authority, but assumed a power which could only be properly exercised by another branch of the government, because it was in its nature clearly judicial"); *Fletcher v. Peck*, 10 U.S. 87, 136 (1810) ("It is the peculiar province of the legislature to prescribe general rules for the government of society; the application of those rules to individuals in society would seem to be the duty of other departments.").

[28] *See Legislation Providing for Court-Ordered Disclosure of Grand Jury Materials to Congressional Comm.s*, 9 Op. O.L.C. 86, 88 (1985) ("A legislative effort to require prosecution of specific individuals would seem to be inconsistent with many of the policies upon which the Constitution's prohibition against bills of attainder was based.") (citing *United States v. Brown*, 381 U.S. 437, 447 (1965) and *United States v. Lovett*, 328 U.S. 303, 315 (1946)).

[29] *Id.*; *see also Prosecution for Contempt of Congress of an Exec. Branch Official Who Has Asserted a Claim of Exec. Privilege*, 8 Op. O.L.C. 101, 110–12 & nn.16, 17 (1984) ("The Framers did not wish the Legislative Branch to have excessive authority over the individual decisions respecting the execution of the laws.").

[30] Kauper Memorandum at 2.

The Honorable Jim Jordan
Page 7

The Department must therefore decline to facilitate disclosures that would interfere with its investigations or prosecutions. The Committee's demands for information about charging decisions and weighing evidence pose exactly that risk. As Attorney General William French Smith explained early in the Reagan Administration, our policy against disclosing to Congress the sensitive information in law enforcement files is premised on the Executive's constitutionally assigned "responsibility to 'take Care that the Laws be faithfully executed,'"[31] and "courts have repeatedly held that 'the Executive Branch has exclusive authority and absolute discretion to decide whether to prosecute a case.'"[32] Our policy against producing line prosecutors for testimony is grounded in significant part on this concern. Across administrations of both political parties, the Department has made clear that "congressional efforts to subpoena line prosecutors 'pose a long-term constitutional threat by impinging upon the core, judicially-unreviewable, Executive Branch function of rendering independent decisions concerning the undertaking or forbearance of criminal prosecutions.'"[33]

The American people must also have confidence that the law is being executed in an evenhanded, apolitical manner. Nearly fifty years ago Attorney General Edward Levi explained, "[n]either the law in general nor the criminal law in particular can be entirely enforced by the government. Ultimately, enforcement must spring from the faith of citizens . . . . People must believe, if not in the wisdom of a particular law, at least in the fairness and honesty of the enforcement process."[34] Congressional intrusion into ongoing Department investigations "inescapably create[s] the risk that the public and the courts will perceive undue political and Congressional influence over law enforcement and litigation decisions."[35]

In light of these principles, the Committee's subpoenas are particularly problematic given that under the relevant House and Committee Rules, Department counsel are barred from attending the depositions. The public's strong interest in the integrity of law enforcement work is one critical reason counsel for the Department must be present when agency witnesses testifying on those matters appear before Congress. Excluding agency counsel in these circumstances undermines the Executive Branch's ability to protect its confidentiality interests in the course of the constitutionally mandated accommodation process.[36] In addition, the exclusion of agency counsel interferes with the Executive Branch's ability to protect potentially privileged information, including law enforcement sensitive information.[37] The underlying principles that inform the Department's position are longstanding across administrations. Therefore, as the Office of Legal Counsel explained under Attorney General William Barr, "Congress may not

---

[31] *Assertion of Exec. Privilege in Response to Congressional Demands for Law Enforcement Files,* 6 Op. O.L.C. 31, 33 (1982) (quoting U.S. Const., Art. II, § 3).

[32] *Id.* (quoting *United States v. Nixon*, 418 U.S. 683, 693 (1974)).

[33] Letter from Ron Weich, Assistant Att'y Gen., U.S. Dep't of Just., to U.S. Rep. Darrell Issa and U.S. Sen. Charles Grassley at 5 (Dec. 6, 2011) (quoting Stuart Gerson, *The Legislative Politicization of the U.S. Department of Justice*, Washington Legal Foundation at 1 (Nov. 18, 1994)). *See also, e.g.*, Moschella Letter at 1.

[34] Edward Levi, U.S. Att'y Gen, Address to the Graduating Class of the FBI Academy at 9 (Mar. 20, 1975).

[35] Linder Letter at 3.

[36] *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Emps.*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019).

[37] *See also id.* at *8 (explaining that the authority to control disclosure of this information "extend[s] to *all* . . . information protected by [executive] privilege,' including . . . law enforcement files[.]" (quoting *Authority of Agency Officials to Prohibit Emps. from Providing Information to Congress*, 28 Op. O.L.C. 79, 81 (2004))).

The Honorable Jim Jordan
Page 8

compel an executive branch witness to appear without agency counsel."[38] Here, the subpoenas issued by the Committee prohibit the attendance of agency counsel at appearances by line-level attorneys where the Committee has indicated it will ask questions regarding information they learned within the scope of their official duties, including regarding the ongoing criminal investigation.[39] Because these subpoenas demand deposition testimony without agency counsel present, they lack legal effect and cannot constitutionally be enforced.[40]

### *Protecting the Public Interest by Adhering to Longstanding Principles*

In a 1940 speech to U.S. Attorneys, Attorney General Jackson explained that "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America[,]" and that "the greatest danger of abuse in prosecuting power lies" in the possibility that it will be used against "some person whom he dislikes or desires to embarrass," or that the prosecutor "selects some group of unpopular persons and then looks for an offense."[41] Thus, "[o]nly by extreme care can we protect the spirit as well as the letter of our civil liberties, and to do so is a responsibility of the federal prosecutor."[42] We continue to adhere to these principles today. In a speech to U.S. Attorneys last year, Attorney General Garland said of the need for confidentiality in law enforcement: "The health of our democracy requires that we speak through our work and our filings in court, because anything else jeopardizes the viability of our investigations and the civil liberties of our citizens. And the health of our democracy requires that we adhere to these norms even when—especially when—the circumstances we face are not normal."[43]

The Department remains willing to continue providing appropriate information to the Committee voluntarily, consistent with these principles. We urge the Committee to work with us to avoid unnecessary conflict, including by ceasing to pursue this testimony from line attorneys.

Sincerely,

CARLOS
URIARTE

Digitally signed by
CARLOS URIARTE
Date: 2023.10.25
15:46:02 -04'00'

Carlos Felipe Uriarte
Assistant Attorney General

---

[38] *Id.* at *2.

[39] *See id.*

[40] *See id.*

[41] Robert Jackson, U.S. Att'y Gen., Address to the Conference of U.S. Att'ys entitled "The Federal Prosecutor" at 4 (1940).

[42] *Id.* at 2.

[43] Merrick Garland, U.S. Att'y Gen., Address to the Conference of U.S. Att'ys (2022). *See also* Rosenstein Letter at 6 ("It is important for the Department of Justice to follow established policies and procedures, especially when the stakes are high . . . We should be most on guard when we believe that our own uncomfortable present circumstances justify ignoring timeless principles respected by our predecessors.").

The Honorable Jim Jordan
Page 9


cc:

The Honorable Jerrold L. Nadler
Ranking Member
Committee on the Judiciary
U.S. House of Representatives
Washington, DC 20515

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

        *Plaintiff*,

    v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

        *Defendants*.

Case No. 1:24-cv-815

# Exhibit EE

| | |
|---|---|
| **From:** | Duval, Kate |
| **To:** | Ferguson, Betsy; Nabity, Caroline |
| **Cc:** | Bidelman, Kiley; Murphy, Bill; Moore, M; Castor, Stephen |
| **Subject:** | RE: Morgan Subpoena |
| **Date:** | Friday, November 3, 2023 1:52:28 PM |
| **Attachments:** | image001.png |
| | Morgan Direction Letter 11022023.pdf |

Caroline and Betsy,

Thank you for our call this afternoon. This email confirms that as we discussed, although our client Jack Morgan has no per se objection to testifying, given the competing constitutional claims and interests expressed by his employer the Department of Justice, he will be following his employer's directive.

You asked for a copy of the letter I received from the Department with that directive. It is attached.

Best,
Kate

**Catherine Duval**
**Zuckerman Spaeder LLP**
██████@zuckerman.com

1800 M STREET NW, SUITE 1000 •  WASHINGTON,  DC 20036-5807

202 ████████ direct • 202 ████████ mobile • 202 ████████ fax

► **Download vCard** | **zuckerman.com**

This transmission (including any attachments) from the law firm of Zuckerman Spaeder LLP may contain information that is confidential and/or subject to the attorney-client privilege or the work product doctrine. Use or dissemination of this information by anyone other than the intended recipient is prohibited and may be unlawful.  If you have received this transmission in error, please immediately notify the sender by return email or contact us by telephone at 202 ████████ and permanently delete all copies.

**From:** Ferguson, Betsy <██████████@mail.house.gov>
**Sent:** Thursday, November 2, 2023 7:30 PM
**To:** Duval, Kate <██████@zuckerman.com>
**Cc:** Bidelman, Kiley <████████@mail.house.gov>; Nabity, Caroline <██████████@mail.house.gov>; Murphy, Bill <████████@zuckerman.com>; Moore, M <██████@zuckerman.com>; Castor, Stephen <████████@mail.house.gov>
**Subject:** Re: Morgan Subpoena

**EXTERNAL**

How about a call at 1:30pm?

Betsy Ferguson
Committee on the Judiciary
Chairman Jim Jordan
U.S. House of Representatives
(202)███████ (cell)

Sent from my iPhone


On Nov 2, 2023, at 5:58 PM, Duval, Kate <███@zuckerman.com> wrote:

Hi Betsy,

This afternoon was full, but we could talk sometime between 12:30-2pm tomorrow.
Does that work on your end?

Best,
Kate

-----Original Message-----
From: Ferguson, Betsy <███████@mail.house.gov>
Sent: Thursday, November 2, 2023 1:48 PM
To: Duval, Kate <███@zuckerman.com>
Cc: Bidelman, Kiley <███████@mail.house.gov>; Nabity, Caroline
<███████@mail.house.gov>; Murphy, Bill <███████@zuckerman.com>;
Moore, M <███@zuckerman.com>; Castor, Stephen
<███████@mail.house.gov>
Subject: RE: Morgan Subpoena


 EXTERNAL

Hi Kate,

Thanks for confirming receipt. It would be helpful to connect before Monday. Please let
us know your availability for a call later this afternoon or tomorrow before 3pm.

-Betsy

-----Original Message-----
From: Duval, Kate <███@zuckerman.com>
Sent: Wednesday, November 1, 2023 6:25 PM
To: Castor, Stephen <███████@mail.house.gov>

Cc: Bidelman, Kiley <███████████ @mail.house.gov>; Ferguson, Betsy
<███████████ @mail.house.gov>; Nabity, Caroline
<███████████ @mail.house.gov>; Murphy, Bill <████████ @zuckerman.com>;
Moore, M <████████ @zuckerman.com>
Subject: Re: Morgan Subpoena

Hi Steve,

Confirming receipt of the subpoena and copying my colleagues. We appreciate your
accommodation on scheduling, thank you.

We understand that, because Mr. Morgan is a career civil servant at the Department of
Justice being subpoenaed to testify about his work there, the Department has interests
and equities in this matter. As discussed on our call with Committee counsel, although
we are not parties to the Committee's dialogue with the Department about such
equities, we do anticipate needing to be cognizant and respectful of concerns raised by
his employer and superiors.

If it would be helpful, always happy to have a call with you and/or other Committee
staff.

Best,
Kate Duval
Zuckerman Spaeder LLP
202-████████

Sent from my iPad

On Nov 1, 2023, at 10:40 AM, Castor, Stephen <████████████ @mail.house.gov>
wrote:


EXTERNAL

Ms. Duval,

Attached is a new deposition subpoena for your client Mr. Morgan.  I trust this manner
of service is acceptable to you, but if that is not the case, we can make alternative
arrangements to serve him.

Best Regards,

Steve Castor
General Counsel
House Judiciary Committee

Rep. Jim Jordan, Chairman

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit FF



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

*Bradley Weinsheimer*
Associate Deputy Attorney General

*Washington, D.C. 20530*

November 2, 2023

Ms. Catherine Duval
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, D.C. 20036
Via Email

Dear Ms. Duval:

I write concerning your client Jack Morgan.  I serve as the senior career official at the Department of Justice (Department).  Consistent with this role, in which I have served since 2018, I possess and exercise delegated authority to provide current and former Department employees with direction concerning the disclosure and protection of Department information, including with respect to congressional requests for testimony.  I write to you in that capacity.

On September 14, 2023, the House Committee on the Judiciary (Committee) issued a deposition subpoena to your client for testimony regarding the work of the Department on an ongoing individual criminal investigation and prosecution led by Special Counsel David Weiss.[1]  On November 1, 2023, the Committee issued an additional deposition subpoena to your client with a return date of November 6, 2023.[2]  The Committee's correspondence, including the letters accompanying the subpoenas to your client, states that the Committee seeks testimony about meetings and conversations among investigators and prosecutors about the weight of evidence and charging decisions in this open matter.  The Department offered voluntary appearances by three senior officials on appropriate topics as an alternative to the Committee pursuing such testimony from line-level attorneys, including your client.  Although the Committee accepted the Department's offered alternative and these officials have appeared for interviews, the Committee has continued to pursue testimony from your client.  Pursuant to the Rules of the House of Representatives, incorporated by reference in the Committee Rules transmitted with the subpoenas, agency counsel is prohibited from attending the deposition.

The Department has written to the Committee explaining that principles and policies for safeguarding the confidentiality of the Department's work further the public interest in the integrity of law enforcement investigations.[3]  These principles and policies have been followed

---

[1] Letter from Hon. Jim Jordan to Jack Morgan (Sept. 14, 2023).
[2] Letter from Hon. Jim Jordan to Jack Morgan (Nov. 1, 2023).
[3] Letter from Asst. Attorney General Carlos Uriarte to Hon. Jim Jordan (Oct. 25, 2023).  The concerns expressed in this letter are incorporated here by reference.

1

across administrations and are grounded in constitutional concerns. As discussed in that letter, excluding agency counsel in these circumstances undermines the Executive Branch's ability to protect its confidentiality interests in the course of the constitutionally mandated accommodation process.[4] In addition, the exclusion of agency counsel interferes with the Executive Branch's ability to protect potentially privileged information.[5] The underlying principles that inform the Department's position are longstanding across administrations. Here, the subpoena issued by the Committee prohibits the attendance of agency counsel at an appearance where the Committee has indicated it will ask questions regarding information Mr. Morgan learned within the scope of his official duties, including potentially privileged information.[6] On the basis of a 2019 Office of Legal Counsel opinion, the Department has determined that the exclusion of agency counsel means that the subpoena lacks legal effect and cannot constitutionally be enforced.

Having carefully considered the relevant facts and authority, Department and Executive Branch precedents and longstanding principles, and the Department's determination that not appearing would be lawful because this subpoena lacks legal effect, I recommended to the Deputy Assistant Attorney General serving as the Head of the Tax Division and to the Attorney General that Mr. Morgan be directed not to appear before the Committee pursuant to these subpoenas. The Attorney General and the Head of the Tax Division approved my recommendation. Accordingly, the Department directs Mr. Morgan not to appear before the Committee pursuant to the subpoenas.

This directive is consistent with longstanding principles of the Justice Department regarding congressional requests for information, as well as the Department's respect for Congress's authority to conduct legitimate oversight of the Executive Branch and our mutual obligations under the constitutionally mandated accommodation process. Department witnesses are expected to abide by their obligations under the law and Department policy, including the Justice Manual, to refrain from disclosing information that has not been authorized for public release. This includes information about ongoing investigations and prosecutions, sensitive law enforcement information, and Executive Branch deliberative processes, such as those that underlie investigative and prosecutorial decisions. The presence of agency counsel during congressional interviews is essential to ensure, among other things, that Department witnesses fully understand and abide by their obligations and that the Department has the ability to raise objections or assert privileges or other Executive Branch confidentiality interests.

This directive is also consistent with our continuing commitment to good-faith negotiations with the Committee in response to its interest in this matter. The Department remains willing to discuss with the Committee appropriate requests for information and the circumstances under which the Department may be able to provide that information. Nothing in this directive shall be understood to waive or limit, on behalf of Mr. Morgan or of the

---

[4] *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019).

[5] *Id.* at *8 (quoting *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 81 (2004)).

[6] *Id.* at *2.

2

Department, any potentially applicable privileges, objections, or confidentiality interests regarding this or other congressional requests for information.

Pursuant to 5 U.S.C § 2302(b)(13), the provisions of this letter are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection.  The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are controlling.

Sincerely,

Bradley Weinsheimer

3

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| COMMITTEE ON THE JUDICIARY, UNITED STATES HOUSE OF REPRESENTATIVES,<br><br>2138 Rayburn House Office Building<br>Washington, D.C. 20515,<br><br>*Plaintiff*,<br><br>v.<br><br>MARK DALY, in his official capacity, U.S. Department of Justice, and<br><br>JACK MORGAN, in his official capacity, U.S. Department of Justice,<br><br>950 Pennsylvania Avenue, N.W.<br>Washington, D.C. 20530,<br><br>*Defendants*. | Case No. 1:24-cv-815 |

# Exhibit HH

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

February 22, 2024

Mr. Mark F. Daly
Senior Litigation Counsel
Tax Division
U.S. Department of Justice
c/o Robert Driscoll
McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, D.C. 20004

Dear Mr. Daly:

Attached to this letter please find a subpoena issued by the Committee on the Judiciary (the Committee) compelling your appearance for a deposition.

The Committee requires your deposition testimony to further several of its critical investigative and oversight interests. As an initial matter, your testimony is necessary to assist the Committee in determining whether sufficient grounds exist to draft articles of impeachment against President Joseph R. Biden. In addition, your deposition testimony is relevant to the Committee's ongoing oversight of the Executive Branch's commitment to impartial justice, as well as its investigation into the veracity of statements made in response to congressional inquiries related to the Department of Justice's (DOJ) investigation of Hunter Biden, President Biden's son.

On December 13, 2023, the House of Representatives adopted House Resolution 918, which directed the Committee, along with the Committees on Oversight and Accountability and Ways and Means, to continue the House's ongoing impeachment inquiry.[1] As part of its impeachment inquiry, the Committee is investigating, among other things, whether President Biden "abuse[d] his power as President to impede, obstruct, or otherwise hinder investigations or the prosecution of Hunter Biden."[2] As background, for years, the Internal Revenue Service (IRS)

---

[1] H. Res. 918, 118th Cong. (2023).
[2] Memorandum from Chairmen Jim Jordan, James Comer, and Jason Smith, to Members of the H. Comm. on the Judiciary, H. Comm. on Oversight & Accountability, and H. Comm. on Ways & Means, at 29 (Sept. 27, 2023).

Mark F. Daly
February 22, 2024
Page 2

and DOJ have been investigating Hunter Biden for tax crimes.[3] In spring 2023, two IRS whistleblowers who were intimately involved in that investigation came forward and exposed several ways that DOJ had deviated from its standard processes during the Hunter Biden investigation.[4] Some of the information the Committee has uncovered suggest that political interference may have impeded the Hunter Biden investigation and prosecution, and the Committee is investigating whether President Biden (directly or through his political appointees) has in any way attempted to meddle in the investigation.

As a member of the team that was assigned to work on the Hunter Biden matter, you have firsthand knowledge of the investigation's day-to-day operations. Your testimony is thus critical to the impeachment inquiry. For example, you were present at an October 2021 "tax summit" where you, along with other members of the team, agreed to move forward with generating a prosecution memorandum that would recommend bringing criminal charges against Hunter Biden for tax years 2014 to 2019.[5] Months later, however, on June 15, 2022, you gave a presentation and argued just the opposite: that Hunter Biden should *not* be charged for the 2014 and 2015 tax years.[6] Although Hunter Biden's counsel was willing to agree to toll the statute of limitations for charges related to those tax years, DOJ ultimately allowed the statute of limitations to lapse without bringing charges.[7] The Committee must understand why DOJ decided not to bring these charges, and, given your personal knowledge of this aspect of the investigation, the Committee believes you can shed important light on that decision, including whether it was impacted by political interference.

The Committee also believes that you may be able to shed light on why the U.S. Attorney for the District of Columbia and the U.S. Attorney for the Central District of California refused to partner with the prosecution team to bring charges against Hunter Biden. Because tax charges must be filed in the judicial district where the defendant resides or where the tax return is prepared or filed, charges against Hunter Biden related to the 2014 and 2015 tax years would have needed to be filed in the District of Columbia, where Hunter Biden lived until 2017, and for later years, in the Central District of California, where Hunter Biden moved in 2017. The lead prosecutor assigned to the Hunter Biden case, David Weiss, the U.S. Attorney for the District of Delaware, could not have filed charges outside of his district before his Special Counsel appointment on August 11, 2023.[8] Thus, Weiss would have needed to partner with Matthew Graves, the U.S. Attorney for the District of Columbia, and/or Martin Estrada, the U.S. Attorney for the Central District of California, to bring charges against Hunter Biden in those districts. However, both refused to partner with him.

---

[3] Transcribed Interview of Gary Shapley, Supervisory Special Agent, Internal Revenue Serv. at 12 (May 26, 2023) [hereinafter "Shapley Interview"].

[4] *See Id.; see also* Transcribed Interview of Joseph Ziegler, Special Agent, Internal Revenue Serv. (Jun. 1, 2023) [hereinafter "Ziegler Interview"].

[5] Ziegler Interview at 32-33.

[6] Shapley Interview at 142; *see also* Ziegler Interview at 163-164.

[7] Transcribed Interview of Hon. David Weiss, Special Counsel, U.S. Dep't of Justice at 92-94 (Nov. 7, 2023).

[8] Letter from Hon. David Weiss, U.S. Atty, U.S. Dep't of Justice, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Jun. 30, 2023).

Mark F. Daly
February 22, 2024
Page 3

According to one of the IRS whistleblowers, DOJ's Tax Division authored an extensive prosecution memo recommending charges for the 2014 and 2015 tax years and presented this memorandum to the U.S. Attorney's Office for the District of Columbia during a meeting in March 2022.[9] It has been reported that you then informed the other IRS whistleblower that the first assistant in that office, a non-presidentially-appointed career prosecutor, was optimistic about bringing charges and stated she would assign a prosecutor to assist. However, just a couple of days later, according to the first IRS whistleblower, you told the other IRS whistleblower that U.S. Attorney Graves personally reviewed the report and indicated that he did not support the charges or the investigation as a whole and would not allow charges to proceed in his district.[10] Given your role on the prosecution team, and the fact that you were present at the meeting where members of the Tax Division presented the issue to the office, the Committee believes that you may be able to shed light on these events, including whether political interference played any role in U.S. Attorney Graves's failure to partner with the prosecution team.

Likewise, the Committee believes that you may have insight into why the U.S. Attorney's Office for the Central District of California did not work with Weiss's team to bring charges against Hunter Biden for later tax years.[11] According to one of the IRS whistleblowers, you gave a presentation to that office in mid-September 2022 about bringing charges against Hunter Biden for the 2016 through 2019 tax years. The Committee believes you may be able to shed light on this meeting, including what was discussed and whether political interference played any role in U.S. Attorney Estrada's failure to partner with the prosecution team.

The Committee has attempted to get this information from other sources but has been unable to do so. For example, witnesses, including Weiss and Lesley Wolf, a former senior member of the prosecution team, have refused to discuss with the Committee the decision to allow the statute of limitations for the 2014 and 2015 tax years to lapse, often citing concerns about revealing information related to an ongoing investigation or the deliberative process privilege. These concerns and purported privileges have no factual or legal basis.

For starters, there is no ongoing investigation related to the 2014 and 2015 tax years because the statute of limitations for those charges has lapsed. Thus, questions about DOJ's decision not to bring charges related to those years—including U.S. Attorney Graves's failure to partner with Weiss—necessarily do not involve an ongoing investigation. Beyond that, concerns about an ongoing investigation "rest[] on no constitutional privilege or case law authority," but rather on self-serving opinions issued unilaterally by the DOJ's Office of Legal Counsel (OLC).[12] These authorities are not binding on Congress and are ultimately unpersuasive. In fact, the Supreme Court has noted, contrary to DOJ's position, that "a congressional committee. . .

---

[9] Transcribed Interview of Hon. Matthew Graves, U.S. Atty, U.S. Dep't of Justice at 16-17 (Oct. 3, 2023).
[10] *Id.* at 24-25 & 32.
[11] The Committee also intends to ask you about these topics: the sweetheart plea deal offered to Hunter Biden; Weiss's authority, and his requests for special attorney and special counsel status; the IRS investigation involving whistleblowers Gary Shapley and Joseph Zieglar; and other issues.
[12] *Obstruction of Justice: Does the Justice Department have to Respond to Lawfully Issued and Valid Congressional Subpoenas: Hearing Before the H. Comm. on Oversight and Government Reform,* 112th Congress (2011) (statement of Morton Rosenberg, Fellow, Const. Project).

Mark F. Daly
February 22, 2024
Page 4

engaged in legitimate legislative investigation need not grind to a halt" in the face of an ongoing criminal investigation.[13] In short, there is no "ongoing investigation" privilege in statutory or common law,[14] and the historical record is replete with examples of DOJ providing congressional committees with information related to ongoing criminal investigations.[15] Accordingly, there is no legal basis to withhold information from the Committee on the basis of an "ongoing" investigation,[16] especially in the context of an impeachment inquiry.

Nor does a purported deliberative process privilege prevent you from testifying before the Committee.[17] The U.S. Court of Appeals for the District of Columbia Circuit has held that "the privilege disappears altogether when there is any reason to believe government misconduct occurred."[18] As the Committee has detailed, there is substantial evidence of governmental misconduct; namely, that DOJ deviated from standard investigative procedures (including by declining to bring charges that the prosecution team originally recommended bringing) in its investigation of Hunter Biden such that he received special treatment than otherwise afforded to similarly situated Americans.[19] In short, there is no valid basis to withhold information from the Committee on the basis of the deliberative process privilege.

You have firsthand knowledge that is critical to the Committee's impeachment inquiry, and the Committee has been unable to get that information from other sources. No privilege

---

[13] *Hutcheson v. United States*, 369 U.S. 599, 618 (1962).

[14] *See* William McGurn, Opinion, *The 'Ongoing Investigation' Dodge on Hunter Biden*, WALL ST. J. (July 10, 2023) (quoting former Assistant U.S. Attorney Andrew McCarthy as stating, "The executive branch response of 'ongoing investigation' is really a political objection, rather than a real one. There is no 'ongoing investigation' privilege."). *See also* Christopher R. Smith, *I Fought the Law and the Law Lost: The Case for Congressional Oversight Over Systemic DOJ Discovery Abuse in Criminal Cases*, 9 CARDOZO PUB. L. POL'Y & ETHICS J. 85, 107 (2010) ("To preclude Congress from investigating prosecutorial misconduct because of open investigations would completely undermine Congress's constitutional duty to investigate government misconduct, an important legislative branch check on the executive branch.").

[15] See MORTON ROSENBERG, WHEN CONGRESS COMES CALLING: A STUDY ON THE PRINCIPLES, PRACTICES, AND PRAGMATICS OF LEGISLATIVE INQUIRY, CONST. PROJECT, at 75-82 (2017) (listing numerous examples of Congress obtaining testimony related to an ongoing criminal investigation); *Obstruction of Justice: Does the Justice Department Have to Respond to Lawfully Issued and Valid Congressional Subpoenas, Hearing Before the H. Comm. on Oversight and Gov't Reform*, 112th Cong. (2011) [hereinafter *Hearing on Obstruction of Justice*] (statement of Louis Fisher, Scholar in Residence, Const. Project) ("Congress has often obtained records related to ongoing criminal investigations.").

[16] Even assuming that an "ongoing" investigation is an appropriate basis on which to withhold information from the Committee, it is certainly inapplicable with respect to your testimony relating to the 2014 and 2015 tax year charges because the statute of limitations for these charges has expired. The Department conducts investigations to determine whether sufficient evidence exists to pursue prosecution. If the Department is barred from pursuing prosecution by the expiration of the statute of limitations, it follows that any related investigation would no longer be "ongoing."

[17] *See,* Letter from Bradley Weinsheimer, Associate Deputy Attorney General, U.S. Dept. of Justice to Robert Driscoll, Manager, McGlinchey Stafford PLLC (Oct. 25, 2023) ("Department witnesses are expected to… refrain from disclosing information that has not been authorized for public release. This includes information about ongoing investigations and prosecutions, sensitive law enforcement information, and Executive Branch deliberative processes, such as those that underlie investigative and prosecutorial decisions.").

[18] *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997).

[19] *See generally* H. COMM. ON THE JUDICIARY ET AL., 118TH CONG., THE JUSTICE DEPARTMENT'S DEVIATIONS FROM STANDARD PROCESSES IN ITS INVESTIGATION OF HUNTER BIDEN (2023).

Mark F. Daly
February 22, 2024
Page 5

prevents you from sharing this information with the Committee. You must appear and testify so that the Committee has the facts it needs as it investigates whether President Biden committed an impeachable offense.

The information you possess is also related to several of the Committee's legislative and oversight objectives. Pursuant to the Rules of the House of Representatives, the Committee is authorized to conduct oversight of DOJ as well as criminal justice matters in the United States to inform potential legislative reforms.[20] The Committee believes that information from your deposition will inform potential legislation including, but not limited to, reforms to the "special attorney" statute,[21] codifying regulations related to special counsels,[22] reforming DOJ's Tax Division, and strengthening laws protecting whistleblowers from retaliation.

When we subpoenaed you to appear for a deposition in the fall,[23] DOJ instructed you to not appear.[24] The primary basis for DOJ's instruction was that, pursuant to an OLC opinion, the Committee's subpoena was unlawful because under House rules, agency counsel could not accompany you to your deposition. DOJ's position is unpersuasive, and you have a legal obligation to appear before the Committee.

At the outset, after you are served with this legally valid and enforceable subpoena, you have a legal obligation to comply by appearing before the Committee.[25] Concerns about who can, and who cannot, attend the deposition do not affect the legality or enforceability of the subpoena itself and the legal duty to comply that flows from it. The OLC opinion cites no support for its leap that excluding agency counsel renders the subpoena itself invalid and unenforceable. On the merits of excluding agency counsel, the Constitution clearly specifies that each chamber of Congress "may determine the Rules of its Proceedings."[26] A rule that dictates who may attend committee depositions is a rule that governs House proceedings and thus easily falls within its rulemaking authority under the Constitution.

Moreover, as an extraordinary accommodation, the Committee is willing to allow agency counsel to remain physically present just outside the Committee room in which the deposition will occur and will permit a recess at any time for you and/or your personal counsel to consult with agency counsel about any matters that may arise during the deposition. The Committee believes that this accommodation will allow you to consult with agency counsel as necessary and alleviates the concerns that DOJ has articulated about proceeding without agency counsel.

To sum up, the Committee requires your testimony, and you have a legal obligation to provide it. Most importantly your testimony is directly relevant to the House's impeachment

---

[20] Rules of the U.S. House of Representatives, R. X (2023).

[21] *See* 28 U.S.C. § 515.

[22] *See* 28 C.F.R. § 600 *et seq.*

[23] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Mark F. Daly, Senior Litigation Counsel, Dep't of Justice (Sept. 14, 2023).

[24] Letter from Bradley Weinsheimer, Associate Deputy Attorney General, U.S. Dept. of Justice to Catherine Duval, Partner, Zuckerman Spaeder LLP (Nov. 2, 2023).

[25] *See. e.g.*, *Watkins v. United States*, 354 U.S. 178, 187–88 (1957)

[26] U.S. Const. art. I, § 5, cl. 2.

Mark F. Daly
February 22, 2024
Page 6

inquiry. Specifically, your testimony is critical to the question of whether President Biden abused his power to directly or indirectly impede, obstruct, or hinder DOJ's investigation or prosecution of Hunter Biden. Congress's authority to access information is broadest during an impeachment investigation,[27] a fact which even Presidents and other Executive Branch officials have traditionally recognized.[28] Indeed, conducting an impeachment inquiry based on anything less than all pertinent evidence would be an affront to the Constitution and irreparably damage public faith in the impeachment process.[29]

Additionally, the Supreme Court has recognized that Congress has a "broad and indispensable" power to conduct oversight that "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys in our social, economic or political system for the purpose of enabling Congress to remedy them."[30] It is also well established that Congress may seek information from the Executive Branch about "corruption, maladministration or inefficiency in agencies of the Government."[31] Here, the Committee has documentary and testimonial evidence, obtained from whistleblowers, of corruption (e.g., preferential treatment for the President's son), maladministration (e.g., retaliation against whistleblowers), and inefficiency (e.g., frequent delays in the investigation due to unprecedented approval requirements to conduct basic investigative tasks). These are among the matters about which the Committee requires your testimony to inform potential legislative reforms.

---

[27] TODD GARVEY, CONG. RSCH. SERV., LSB11083, IMPEACHMENT INVESTIGATIONS, PART II: ACCESS, at 1 (2023) ("[T]here is reason to believe that invocation of the impeachment power could improve the committees' legal claims of access to certain types of evidence relevant to the allegations of misconduct against President Biden."). *See also In re Application of Comm. on Judiciary*, 414 F. Supp. 3d 129, 176 (D.D.C. 2019) ("[D]enying [the House Judiciary Committee] evidence relevant to an impeachment inquiry could pose constitutional problems."), *aff'd*, 951 F.3d 589 (D.C. Cir. 2020*), vacated and remanded sub nom. on other grounds DOJ v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021); *In re Request for Access to Grand Jury Materials*, 833 F.2d 1438, 1445 (11th Cir. 1987) (concluding that "limit[ing] the investigatory power of the House in impeachment proceedings . . . would clearly violate separation of powers principles.").

[28] *See* TODD GARVEY, CONG. RSCH. SERV., LSB11083, IMPEACHMENT INVESTIGATIONS, PART II: ACCESS, at 2 (2023) ("As a historical matter, all three branches have suggested that the House possesses a robust right of access to information when it is investigating for impeachment purposes."); Jonathan David Schaub, *The Executive's Privilege*, 70 DUKE L.J. 1, 87 (2020) ("[P]residents and others have recognized throughout the history of the country that their ability to withhold information from Congress disappears in the context of impeachment.").

[29] *See In re Application of Comm. on Judiciary* at 176 ("In authorizing disclosure of grand jury material for use in impeachment investigations of judges and of a President, courts have found this interest in conducting a full and fair impeachment inquiry to be sufficiently particularized. . . . Impeachment based on anything less than all relevant evidence would compromise the public's faith in the process."); *In re Request for Access to Grand Jury Materials* at 1445 ("Public confidence in a procedure as political and public as impeachment is an important consideration justifying disclosure."); *In re Report and Recommendation of June 5, 1972 Grand Jury*, 370 F. Supp. 1219, 1230 (D.D.C. 1974) ("It would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair [impeachment] inquiry based on all the pertinent information.").

[30] *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (internal quotation marks omitted).

[31] *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957).

Mark F. Daly
February 22, 2024
Page 7

     For the reasons above, there is no valid legal basis for you to defy this subpoena. Accordingly, please find the attached subpoena compelling your appearance at a deposition.

     Sincerely,

     Jim Jordan
     Chairman

cc:    The Honorable Jerrold L. Nadler, Ranking Member

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit II

JIM JORDAN, Ohio
CHAIRMAN

JERROLD NADLER, New York
RANKING MEMBER

ONE HUNDRED EIGHTEENTH CONGRESS

# Congress of the United States

## House of Representatives

COMMITTEE ON THE JUDICIARY

2138 RAYBURN HOUSE OFFICE BUILDING

WASHINGTON, DC 20515–6216

(202) 225–6906
judiciary.house.gov

February 22, 2024

Mr. Jack Morgan
U.S. Department of Justice
c/o Catherine S. Duval
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, DC 20036

Dear Mr. Morgan:

Attached to this letter please find a subpoena issued by the Committee on the Judiciary (the Committee) compelling your appearance for a deposition.

The Committee requires your deposition testimony to further several of its critical investigative and oversight interests. As an initial matter, your testimony is necessary to assist the Committee in determining whether sufficient grounds exist to draft articles of impeachment against President Joseph R. Biden. In addition, your deposition testimony is relevant to the Committee's ongoing oversight of the Executive Branch's commitment to impartial justice, as well as its investigation into the veracity of statements made in response to congressional inquiries related to the Department of Justice's (DOJ) investigation of Hunter Biden, President Biden's son.

On December 13, 2023, the House of Representatives adopted House Resolution 918, which directed the Committee, along with the Committees on Oversight and Accountability and Ways and Means, to continue the House's ongoing impeachment inquiry.[1] As part of its impeachment inquiry, the Committee is investigating, among other things, whether President Biden "abuse[d] his power as President to impede, obstruct, or otherwise hinder investigations or the prosecution of Hunter Biden."[2] As background, for years, the Internal Revenue Service (IRS) and DOJ have been investigating Hunter Biden for tax crimes.[3] In spring 2023, two IRS whistleblowers who were intimately involved in that investigation came forward and exposed

---

[1] H. Res. 918, 118th Cong. (2023).

[2] Memorandum from Chairmen Jim Jordan, James Comer, and Jason Smith, to Members of the H. Comm. on the Judiciary, H. Comm. on Oversight & Accountability, and H. Comm. on Ways & Means, at 29 (Sept. 27, 2023).

[3] Transcribed Interview of Gary Shapley, Supervisory Special Agent, Internal Revenue Serv. at 12 (May 26, 2023) [hereinafter "Shapley Interview"].

Jack Morgan
February 22, 2024
Page 2

several ways that DOJ had deviated from its standard processes during the Hunter Biden investigation.[4] Some of the information the Committee has uncovered suggest that political interference may have impeded the Hunter Biden investigation and prosecution, and the Committee is investigating whether President Biden (directly or through his political appointees) has in any way attempted to meddle in the investigation.

      As a member of the team that was assigned to work on the Hunter Biden matter, you have firsthand knowledge of the investigation's day-to-day operations. Your testimony is thus critical to the impeachment inquiry. For example, you were present at an October 2021 "tax summit" where you, along with other members of the team, agreed to move forward with generating a prosecution memorandum that would recommend bringing criminal charges against Hunter Biden for tax years 2014 to 2019.[5] Months later, however, on June 15, 2022, you gave a presentation and argued just the opposite: that Hunter Biden should *not* be charged for the 2014 and 2015 tax years.[6] Although Hunter Biden's counsel was willing to agree to toll the statute of limitations for charges related to those tax years, DOJ ultimately allowed the statute of limitations to lapse without bringing charges.[7] The Committee must understand why DOJ decided not to bring these charges, and, given your personal knowledge of this aspect of the investigation, the Committee believes you can shed important light on that decision, including whether it was impacted by political interference.

      The Committee also believes that you may be able to shed light on why the U.S. Attorney for the District of Columbia and the U.S. Attorney for the Central District of California refused to partner with the prosecution team to bring charges against Hunter Biden. Because tax charges must be filed in the judicial district where the defendant resides or where the tax return is prepared or filed, charges against Hunter Biden related to the 2014 and 2015 tax years would have needed to be filed in the District of Columbia, where Hunter Biden lived until 2017, and for later years, in the Central District of California, where Hunter Biden moved in 2017. The lead prosecutor assigned to the Hunter Biden case, David Weiss, the U.S. Attorney for the District of Delaware, could not have filed charges outside of his district before his Special Counsel appointment on August 11, 2023.[8] Thus, Weiss would have needed to partner with Matthew Graves, the U.S. Attorney for the District of Columbia, and/or Martin Estrada, the U.S. Attorney for the Central District of California, to bring charges against Hunter Biden in those districts. However, both refused to partner with him.

      According to one of the IRS whistleblowers, DOJ's Tax Division authored an extensive prosecution memo recommending charges for the 2014 and 2015 tax years and presented this memorandum to the U.S. Attorney's Office for the District of Columbia in March 2022.[9] It has

---

[4] *See Id.; see also* Transcribed Interview of Joseph Ziegler, Special Agent, Internal Revenue Serv. (Jun. 1, 2023) [hereinafter "Ziegler Interview"].

[5] Ziegler Interview at 32-33.

[6] Shapley Interview at 142; *see also* Ziegler Interview at 163-164.

[7] Transcribed Interview of Hon. David Weiss, Special Counsel, U.S. Dep't of Justice at 92-94 (Nov. 7, 2023).

[8] Letter from Hon. David Weiss, U.S. Atty, U.S. Dep't of Justice, to Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary (Jun. 30, 2023).

[9] Transcribed Interview of Hon. Matthew Graves, U.S. Atty, U.S. Dep't of Justice at 16-17 (Oct. 3, 2023).

Jack Morgan
February 22, 2024
Page 3

been reported that the first assistant in that office, a non-presidentially-appointed career prosecutor, was optimistic about bringing charges and stated she would assign a prosecutor to assist. However, just a couple of days later, according to IRS whistleblower testimony, U.S. Attorney Graves personally reviewed the report and indicated that he did not support the charges or the investigation as a whole and would not allow charges to proceed in his district.[10] Given your role on the prosecution team, and the fact that members of the Tax Division (where you worked at the time) presented the issue to the office, the Committee believes that you may be able to shed light on these events, including whether political interference played any role in U.S. Attorney Graves's failure to partner with the prosecution team. Likewise, the Committee believes that you may have insight into why the U.S. Attorney's Office for the Central District of California did not work with Weiss's team to bring charges against Hunter Biden for later tax years.[11]

The Committee has attempted to get this information from other sources but has been unable to do so. For example, witnesses, including Weiss and Lesley Wolf, a former senior member of the prosecution team, have refused to discuss with the Committee the decision to allow the statute of limitations for the 2014 and 2015 tax years to lapse, often citing concerns about revealing information related to an ongoing investigation or the deliberative process privilege. These concerns and purported privileges have no factual or legal basis.

For starters, there is no ongoing investigation related to the 2014 and 2015 tax years because the statute of limitations for those charges has lapsed. Thus, questions about DOJ's decision not to bring charges related to those years—including U.S. Attorney Graves's failure to partner with Weiss—necessarily do not involve an ongoing investigation. Beyond that, concerns about an ongoing investigation "rest[] on no constitutional privilege or case law authority," but rather on self-serving opinions issued unilaterally by the DOJ's Office of Legal Counsel (OLC).[12] These authorities are not binding on Congress and are ultimately unpersuasive. In fact, the Supreme Court has noted, contrary to DOJ's position, that "a congressional committee. . . engaged in legitimate legislative investigation need not grind to a halt" in the face of an ongoing criminal investigation.[13] In short, there is no "ongoing investigation" privilege in statutory or common law,[14] and the historical record is replete with examples of DOJ providing

---

[10] *Id.* at 24-25 & 32.

[11] The Committee also intends to ask you about these topics: the sweetheart plea deal offered to Hunter Biden; Weiss's authority, and his requests for special attorney and special counsel status; the IRS investigation involving whistleblowers Gary Shapley and Joseph Zieglar; and other issues.

[12] *Obstruction of Justice: Does the Justice Department have to Respond to Lawfully Issued and Valid Congressional Subpoenas: Hearing Before the H. Comm. on Oversight and Government Reform,* 112th Congress (2011) (statement of Morton Rosenberg, Fellow, Const. Project).

[13] *Hutcheson v. United States,* 369 U.S. 599, 618 (1962).

[14] *See* William McGurn, Opinion, *The 'Ongoing Investigation' Dodge on Hunter Biden*, WALL ST. J. (July 10, 2023) (quoting former Assistant U.S. Attorney Andrew McCarthy as stating, "The executive branch response of 'ongoing investigation' is really a political objection, rather than a legal one. There is no 'ongoing investigation' privilege."). *See also* Christopher R. Smith, *I Fought the Law and the Law Lost: The Case for Congressional Oversight Over Systemic DOJ Discovery Abuse in Criminal Cases,* 9 CARDOZO PUB. L. POL'Y & ETHICS J. 85, 107 (2010) ("To preclude Congress from investigating prosecutorial misconduct because of open investigations would completely undermine Congress's constitutional duty to investigate government misconduct, an important legislative branch check on the executive branch.").

Jack Morgan
February 22, 2024
Page 4

congressional committees with information related to ongoing criminal investigations.[15] Accordingly, there is no legal basis to withhold information from the Committee on the basis of an "ongoing" investigation,[16] especially in the context of an impeachment inquiry.

Nor does a purported deliberative process privilege prevent you from testifying before the Committee.[17] The U.S. Court of Appeals for the District of Columbia Circuit has held that "the privilege disappears altogether when there is any reason to believe government misconduct occurred."[18] As the Committee has detailed, there is substantial evidence of governmental misconduct; namely, that DOJ deviated from standard investigative procedures (including by declining to bring charges that the prosecution team originally recommended bringing) in its investigation of Hunter Biden such that he received special treatment than otherwise afforded to similarly situated Americans.[19] In short, there is no valid basis to withhold information from the Committee on the basis of the deliberative process privilege.

You have firsthand knowledge that is critical to the Committee's impeachment inquiry, and the Committee has been unable to get that information from other sources. No privilege prevents you from sharing this information with the Committee. You must appear and testify so that the Committee has the facts it needs as it investigates whether President Biden committed an impeachable offense.

The information you possess is also related to several of the Committee's legislative and oversight objectives. Pursuant to the Rules of the House of Representatives, the Committee is authorized to conduct oversight of DOJ as well as criminal justice matters in the United States to inform potential legislative reforms.[20] The Committee believes that information from your deposition will inform potential legislation including, but not limited to, reforms to the "special

---

[15] See MORTON ROSENBERG, WHEN CONGRESS COMES CALLING: A STUDY ON THE PRINCIPLES, PRACTICES, AND PRAGMATICS OF LEGISLATIVE INQUIRY, CONST. PROJECT, at 75-82 (2017) (listing numerous examples of Congress obtaining testimony related to an ongoing criminal investigation); *Obstruction of Justice: Does the Justice Department Have to Respond to Lawfully Issued and Valid Congressional Subpoenas, Hearing Before the H. Comm. on Oversight and Gov't Reform*, 112th Cong. (2011) [hereinafter *Hearing on Obstruction of Justice*] (statement of Louis Fisher, Scholar in Residence, Const. Project) ("Congress has often obtained records related to ongoing criminal investigations.").

[16] Even assuming that an "ongoing" investigation is an appropriate basis on which to withhold information from the Committee, it is certainly inapplicable with respect to your testimony relating to the 2014 and 2015 tax year charges because the statute of limitations for these charges has expired. The Department conducts investigations to determine whether sufficient evidence exists to pursue prosecution. If the Department is barred from pursuing prosecution by the expiration of the statute of limitations, it follows that any related investigation would no longer be "ongoing."

[17] *See*, Letter from Bradley Weinsheimer, Associate Deputy Attorney General, U.S. Dept. of Justice to Robert Driscoll, Manager, McGlinchey Stafford PLLC (Oct. 25, 2023) ("Department witnesses are expected to… refrain from disclosing information that has not been authorized for public release. This includes information about ongoing investigations and prosecutions, sensitive law enforcement information, and Executive Branch deliberative processes, such as those that underlie investigative and prosecutorial decisions.").

[18] *In re Sealed Case*, 121 F.3d 729, 746 (D.C. Cir. 1997).

[19] *See generally* H. COMM. ON THE JUDICIARY ET AL., 118TH CONG., THE JUSTICE DEPARTMENT'S DEVIATIONS FROM STANDARD PROCESSES IN ITS INVESTIGATION OF HUNTER BIDEN (2023).

[20] Rules of the U.S. House of Representatives, R. X (2023).

Jack Morgan
February 22, 2024
Page 5

attorney" statute,[21] codifying regulations related to special counsels,[22] reforming DOJ's Tax Division, and strengthening laws protecting whistleblowers from retaliation.

When we subpoenaed you to appear for a deposition in the fall,[23] DOJ instructed you to not appear.[24] The primary basis for DOJ's instruction was that, pursuant to an OLC opinion, the Committee's subpoena was unlawful because under House rules, agency counsel could not accompany you to your deposition. DOJ's position is unpersuasive, and you have a legal obligation to appear before the Committee.

At the outset, after you are served with this legally valid and enforceable subpoena, you have a legal obligation to comply by appearing before the Committee.[25] Concerns about who can, and who cannot, attend the deposition do not affect the legality or enforceability of the subpoena itself and the legal duty to comply that flows from it. The OLC opinion cites no support for its leap that excluding agency counsel renders the subpoena itself invalid and unenforceable. On the merits of excluding agency counsel, the Constitution clearly specifies that each chamber of Congress "may determine the Rules of its Proceedings."[26] A rule that dictates who may attend committee depositions is a rule that governs House proceedings and thus easily falls within its rulemaking authority under the Constitution.

Moreover, as an extraordinary accommodation, the Committee is willing to allow agency counsel to remain physically present just outside the Committee room in which the deposition will occur and will permit a recess at any time for you and/or your personal counsel to consult with agency counsel about any matters that may arise during the deposition. The Committee believes that this accommodation will allow you to consult with agency counsel as necessary and alleviates the concerns that DOJ has articulated about proceeding without agency counsel.

To sum up, the Committee requires your testimony, and you have a legal obligation to provide it. Most importantly your testimony is directly relevant to the House's impeachment inquiry. Specifically, your testimony is critical to the question of whether President Biden abused his power to directly or indirectly impede, obstruct, or hinder DOJ's investigation or prosecution of Hunter Biden. Congress's authority to access information is broadest during an impeachment investigation,[27] a fact which even Presidents and other Executive Branch officials have

---

[21] *See* 28 U.S.C. § 515.

[22] *See* 28 C.F.R. § 600 *et seq.*

[23] Letter from Rep. Jim Jordan, Chairman, H. Comm. on the Judiciary, to Jack Morgan, Assistant U.S. Atty, U.S. Dep't of Justice (Nov. 1, 2023).

[24] Letter from Bradley Weinsheimer, Associate Deputy Attorney General, U.S. Dept. of Justice to Catherine Duval, Partner, Zuckerman Spaeder LLP (Nov. 2, 2023).

[25] *See. e.g.*, *Watkins v. United States*, 354 U.S. 178, 187–88 (1957)

[26] U.S. Const. art. I, § 5, cl. 2.

[27] TODD GARVEY, CONG. RSCH. SERV., LSB11083, IMPEACHMENT INVESTIGATIONS, PART II: ACCESS, at 1 (2023) ("[T]here is reason to believe that invocation of the impeachment power could improve the committees' legal claims of access to certain types of evidence relevant to the allegations of misconduct against President Biden."). *See also In re Application of Comm. on Judiciary*, 414 F. Supp. 3d 129, 176 (D.D.C. 2019) ("[D]enying [the House Judiciary Committee] evidence relevant to an impeachment inquiry could pose constitutional problems."), *aff'd*, 951 F.3d 589 (D.C. Cir. 2020), *vacated and remanded sub nom. on other grounds DOJ v. House Comm. on the Judiciary*, 142 S. Ct. 46 (2021); *In re Request for Access to Grand Jury Materials*, 833 F.2d 1438, 1445 (11th Cir. 1987) (concluding

Jack Morgan
February 22, 2024
Page 6

traditionally recognized.[28] Indeed, conducting an impeachment inquiry based on anything less than all pertinent evidence would be an affront to the Constitution and irreparably damage public faith in the impeachment process.[29]

Additionally, the Supreme Court has recognized that Congress has a "broad and indispensable" power to conduct oversight that "encompasses inquiries into the administration of existing laws, studies of proposed laws, and surveys in our social, economic or political system for the purpose of enabling Congress to remedy them."[30] It is also well established that Congress may seek information from the Executive Branch about "corruption, maladministration or inefficiency in agencies of the Government."[31] Here, the Committee has documentary and testimonial evidence, obtained from whistleblowers, of corruption (e.g., preferential treatment for the President's son), maladministration (e.g., retaliation against whistleblowers), and inefficiency (e.g., frequent delays in the investigation due to unprecedented approval requirements to conduct basic investigative tasks). These are among the matters about which the Committee requires your testimony to inform potential legislative reforms.

For the reasons above, there is no valid legal basis for you to defy this subpoena. Accordingly, please find the attached subpoena compelling your appearance at a deposition.

Sincerely,

Jim Jordan
Chairman

cc:     The Honorable Jerrold L. Nadler, Ranking Member

---

that "limit[ing] the investigatory power of the House in impeachment proceedings . . . would clearly violate separation of powers principles.").

[28] *See* TODD GARVEY, CONG. RSCH. SERV., LSB11083, IMPEACHMENT INVESTIGATIONS, PART II: ACCESS, at 2 (2023) ("As a historical matter, all three branches have suggested that the House possesses a robust right of access to information when it is investigating for impeachment purposes."); Jonathan David Schaub, *The Executive's Privilege*, 70 DUKE L.J. 1, 87 (2020) ("[P]residents and others have recognized throughout the history of the country that their ability to withhold information from Congress disappears in the context of impeachment.").

[29] *See In re Application of Comm. on Judiciary* at 176 ("In authorizing disclosure of grand jury material for use in impeachment investigations of judges and of a President, courts have found this interest in conducting a full and fair impeachment inquiry to be sufficiently particularized. . . . Impeachment based on anything less than all relevant evidence would compromise the public's faith in the process."); *In re Request for Access to Grand Jury Materials* at 1445 ("Public confidence in a procedure as political and public as impeachment is an important consideration justifying disclosure."); *In re Report and Recommendation of June 5, 1972 Grand Jury*, 370 F. Supp. 1219, 1230 (D.D.C. 1974) ("It would be difficult to conceive of a more compelling need than that of this country for an unswervingly fair [impeachment] inquiry based on all the pertinent information.").

[30] *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (internal quotation marks omitted).

[31] *Watkins v. United States*, 354 U.S. 178, 200 n.33 (1957).

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                *Defendants*.

Case No. 1:24-cv-815

---

# Exhibit JJ



**Robert N. Driscoll**
Attorney at Law

T (202) ████ F (202) ████
████ @mcglinchey.com

McGlinchey Stafford PLLC
1275 Pennsylvania Avenue NW, Suite 420
Washington, DC 20004

February 24, 2024

**_By Email Only_**

The Honorable Jim Jordan
Chairman, Committee on the Judiciary
US House of Representatives
2138 Rayburn House Building
Washington, DC 20515
c/o Stephen Castor, General Counsel (*via email at* ████ @mail.house.gov)
Betsy Ferguson, Deputy General Counsel (*via email at* ████ @mail.house.gov)
Kiley Bidelman, Republican Chief Clerk (*via email at* ████ @mail.house.gov).

　　　　　RE:　　Mark Daly

Dear Chairman Jordan,

Thank you for your February 22 letter and subpoena directed to Mark Daly. This confirms their receipt and my acceptance of the subpoena on behalf of Mr. Daly. Thank you as well for thoroughly explaining the committee's rationale for seeking testimony from Mr. Daly.

As you know, Mr. Daly is an apolitical line career attorney in the Justice Department's Tax Division. As you may not know, Mr. Daly is also currently assigned to David Weiss's Special Counsel team that indicted Hunter Biden and is actively prosecuting that case in the U.S. District Court for the Central District of California.

Through counsel, Mr. Biden has moved to dismiss the indictment due to "selective" and "vindictive" prosecution theories based on an assertion that the prosecution is the product of political pressure placed on the Department by the Committee on the Judiciary of the House of Representatives. Thus, Mr. Daly is currently a career DOJ employee prosecuting a case that the defendant claims was brought because of political pressure from Republican elected officials, including members of the Judiciary Committee, while at the same time the Judiciary Committee seeks his testimony to investigate its theory that the pending case was unduly narrowed or delayed due to political pressure or influence from the current President or his Democratic political appointees.

Under the circumstances, I respectfully suggest that attempting to compel testimony from a line lawyer during a pending prosecution to elicit testimony about the facts and deliberations surrounding that very prosecution would set a dangerous precedent, as future congressional leaders and committees could subpoena prosecuting attorneys in any high-profile prosecution that is the subject of intense political debate. It is one thing to attempt to question the Attorney General or a Senate-confirmed political appointee with decision-making authority about a decision to prosecute or decline to prosecute a particular matter as part of congressional oversight. However, it is quite another to attempt to compel testimony from a line lawyer who is handling a case while that case is actively being litigated.

**mcglinchey.com**

Albany  Baton Rouge  Birmingham  Boston  Cleveland  Dallas  Fort Lauderdale  Houston  Irvine
Jackson  Jacksonville  Nashville  New Orleans  New York City  Providence  Seattle  **Washington, DC**

The Honorable Jim Jordan
February 24, 2024
Page 2 of 3

While I have not attempted to create an exhaustive list of potential hazards of such an approach, one particular risk bears mention: Partisans on the committee (of either party) or their staff could attempt to create a record, or essentially take extrajudicial discovery outside the strictures of the Federal Rules of Criminal Procedure, which could weaken a criminal prosecution and possibly create appellate issues or defenses that might not otherwise exist—potentially undermining the government's case or the defendant's right to a fair trial. Of course, this concern is beyond clear issues related to Fed. R. Crim. P. 6(e), 26 U.S.C. § 6103, or applicable rules of professional conduct that will arise with any testimony of a line prosecutor in a criminal tax case.

Your letter acknowledges that the committee has already interviewed Acting Deputy Assistant Attorney General Goldberg, U.S. Attorney (and now Special Counsel) Weiss, and other Justice Department political appointees who had final decision-making authority in the Biden prosecution. And your letter acknowledges that the Department has not permitted these employees to answer questions related to certain charging decisions and deliberative processes regarding a pending prosecution. While I do not yet know what position the Department will take here, I fully expect the Department to take the same position with respect to Mr. Daly. Thus, the committee's investigative goals will not be advanced in the least should Mr. Daly be permitted to appear for testimony.  Rather, all that will be achieved is that a career lawyer in the Department who is in the midst of a high-profile prosecution will be caught in the cross-fire of a bitter interbranch constitutional dispute that he has no ability to resolve.

If the committee wishes to challenge the Department's position on the legal issues that arise when there is oversight of a pending prosecution (and to be clear, there are legitimate and valid interests to be protected by both the Executive and Legislative branches in a circumstance such as this), I suggest that can be accomplished via civil litigation to compel testimony of a senior DOJ official who has already, at the instruction of agency counsel, declined to answer specific questions the committee finds crucial. Subpoenaing a line lawyer and subjecting him to questioning about an active prosecution under threat of contempt of Congress, or future protracted federal litigation, creates unnecessary stress and potential collateral issues for a career line lawyer who asked for none of this. Moreover, we should all want Mr. Daly to be focusing on his current mission and pending case before him, not spending his time distracted by an interbranch constitutional dispute that is not his to resolve.

In light of the foregoing, I respectfully suggest that Mr. Daly is not the appropriate witness to serve as a vehicle to resolve the committee's dispute with DOJ over the validity of DOJ's legal positions.

I therefore request that the committee withdraw its subpoena and find another path to achieve its objectives. Should the subpoena remain outstanding, please know that the most likely outcome is that—as I did this fall with respect to a prior subpoena—I will counsel Mr. Daly to follow any instructions from his employer, the Department of Justice, with respect to whether to appear or whether to limit his testimony in any respect due to the pending prosecution. Until I receive any such instructions and evaluate them, I will plan on appearing with Mr. Daly on March 1

The Honorable Jim Jordan
February 24, 2024
Page 3 of 3

Thank you for your consideration.

Sincerely,

Robert N. Driscoll
*Counsel for Mark Daly*

cc:     The Honorable Jerrold L. Nadler, Ranking Member
        c/o █████████, Minority Staff (*via email at* ███████@mail.house.gov)

        Bradley Weinsheimer, Associate Deputy Attorney General, DOJ

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit KK



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

*Bradley Weinsheimer*                                    *Washington, D.C. 20530*
Associate Deputy Attorney General

February 29, 2024

Mr. Robert Driscoll
McGlinchey Stafford
1275 Pennsylvania Avenue NW, Suite 420
Washington, D.C. 20004
Via Email

Dear Mr. Driscoll:

    I write concerning your client Mark Daly. I serve as the senior career official at the Department of Justice (Department). Consistent with this role, in which I have served since 2018, I possess and exercise delegated authority to provide current and former Department employees with direction concerning the disclosure and protection of Department information, including with respect to congressional requests for testimony. I write to you in that capacity.

    I write regarding a deposition subpoena issued to your client by the House Committee on the Judiciary (Committee) on February 22, 2024.[1] As background, on September 14, 2023, the Committee issued a deposition subpoena to your client for testimony regarding the work of the Department on an ongoing individual criminal investigation and prosecution led by Special Counsel David Weiss.[2] On November 1, 2023, the Committee issued an additional deposition subpoena to your client with a return date of November 6, 2023.[3] The Committee's correspondence at that time, including the letters accompanying the subpoenas to your client, stated that the Committee sought testimony about meetings and conversations among investigators and prosecutors about the weight of evidence and charging decisions in an open matter. Pursuant to the Rules of the House of Representatives, incorporated by reference in the Committee Rules transmitted with the subpoenas, agency counsel was prohibited from attending the deposition. The Department offered voluntary appearances by three senior officials on appropriate topics as an alternative to the Committee pursuing such testimony from line-level attorneys, including your client. Although the Committee accepted the Department's offered alternative and these officials appeared for interviews last fall, the Committee continued to pursue testimony from your client via the November 1, 2023 subpoena.

    On November 2, 2023, I wrote to you to convey that the Department had determined, on the basis of a 2019 Office of Legal Counsel (OLC) opinion, that the exclusion of agency counsel

---

[1] Letter from Hon. Jim Jordan to Mark Daly (Feb. 22, 2024).
[2] Letter from Hon. Jim Jordan to Mark Daly (Sept. 14, 2023).
[3] Letter from Hon. Jim Jordan to Mark Daly (Nov. 1, 2023).

meant that the subpoenas lacked legal effect and could not constitutionally be enforced. My letter explained that, having carefully considered the relevant facts and authority, Department and Executive Branch precedents and longstanding principles, and the Department's determination that not appearing would be lawful because this subpoena lacks legal effect, I recommended to the Deputy Assistant Attorney General serving as the Head of the Tax Division and to the Attorney General that Mr. Daly be directed not to appear before the Committee pursuant to this subpoena. The Attorney General and the Head of the Tax Division approved my recommendation. Accordingly, my November 2, 2023 letter conveyed that the Department was directing Mr. Daly not to appear before the Committee pursuant to the subpoena. Mr. Daly complied with the Department's direction.

Several months passed before the Committee communicated again with the Department regarding any interest in seeking your client's testimony.[4] As noted, last week the Committee issued an additional deposition subpoena to your client seeking testimony on the same topics regarding the same criminal investigation and prosecution, which remains ongoing and in which there are currently multiple public indictments filed in multiple districts. Furthermore, as explained in correspondence from the Department to the Committee today, although the Committee has described this subpoena as part of an impeachment inquiry into whether President Biden "abuse[d] his power as President to impede, obstruct, or otherwise hinder investigations (including Congressional investigations) or the prosecution of Hunter Biden," the factual record the Committee developed in its own investigation demonstrated that this matter has been handled without improper interference; other information the Committee is requesting is not pertinent to the impeachment inquiry; and, in any event, the Committee has not explained how your client would have any relevant personal knowledge of such conduct by President Biden or the White House.[5] Pursuant to the Rules of the House of Representatives, incorporated by reference in the Committee Rules transmitted with this additional subpoena, agency counsel is prohibited from attending this deposition, as well.

As discussed in my letter of November 2, 2023, the Department has written to the Committee explaining that principles and policies for safeguarding the confidentiality of the Department's work further the public interest in the integrity of law enforcement investigations.[6] These principles and policies have been followed across administrations and are grounded in constitutional concerns. As discussed in the Department's prior correspondence with the Committee, excluding agency counsel in these circumstances undermines the Executive Branch's ability to protect its confidentiality interests in the course of the constitutionally mandated accommodation process.[7] In addition, the exclusion of agency counsel interferes with

---

[4] In the interim, on December 13, 2023, the House of Representatives passed a resolution purporting to authorize the Committee to seek civil enforcement of the November 1, 2023 subpoena to your client. As of the date of this letter, the Department is unaware of any action by the Committee or the House to pursue such an effort.

[5] Letter from Asst. Attorney General Carlos Uriarte to Hon. Jim Jordan (Feb. 29, 2024). A copy of this correspondence is enclosed.

[6] Letter from Asst. Attorney General Carlos Uriarte to Hon. Jim Jordan (Oct. 25, 2023). The concerns expressed in this letter are incorporated here by reference.

[7] *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019).

2

the Executive Branch's ability to protect potentially privileged information.[8]  The underlying principles that inform the Department's position are longstanding across administrations.  Here, the subpoena issued by the Committee prohibits the attendance of agency counsel at an appearance where the Committee has indicated it will ask questions regarding information Mr. Daly learned within the scope of his official duties, including potentially privileged information.[9]  On the basis of 2019 Office of Legal Counsel opinions, the Department has determined that the exclusion of agency counsel means that the subpoena is invalid and lacks legal effect.[10]  It therefore cannot constitutionally be enforced by civil or criminal means or through any inherent contempt power of Congress.[11]  Accordingly, the Department has determined that Mr. Daly cannot be subject to criminal prosecution for declining to appear or to answer questions pursuant to this subpoena.[12]

Furthermore, having carefully considered the relevant facts and authority (including developments since November 2, 2023), Department and Executive Branch precedents and longstanding principles; and the Department's determination that not appearing would be lawful because this subpoena lacks legal effect, I recommended to the Deputy Assistant Attorney General serving as the Head of the Tax Division and to the Attorney General that Mr. Daly be directed not to appear before the Committee pursuant to the February 22, 2024 subpoena.  The Attorney General and the Head of the Tax Division approved my recommendation.  Accordingly, the Department directs Mr. Daly not to appear before the Committee pursuant to the subpoena.

This directive is consistent with longstanding principles of the Justice Department regarding congressional requests for information, as well as the Department's respect for Congress's authority to conduct legitimate oversight of the Executive Branch and our mutual obligations under the constitutionally mandated accommodation process.  Department witnesses are expected to abide by their obligations under the law and Department policy, including the Justice Manual, to refrain from disclosing information that has not been authorized for public release.  This includes information about ongoing investigations and prosecutions, sensitive law enforcement information, and Executive Branch deliberative processes, such as those that underlie investigative and prosecutorial decisions.  The presence of agency counsel during congressional interviews is essential to ensure, among other things, that Department witnesses fully understand and abide by their obligations and that the Department has the ability to raise objections or assert privileges or other Executive Branch confidentiality interests. Under the

---

[8] *Id.* at *8 (quoting *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 81 (2004)).

[9] *Id.* at *2.

[10] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019); *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __ (Nov. 1, 2019).

[11] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *14; *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at*4-*5.

[12] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *14; *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at*4-*5.

circumstances here, such as the specific requests to your client for information learned within the scope of his official duties, including information that is potentially privileged, following the Department's directive not to appear would protect the confidentiality interests of the Executive Branch and the separation of powers.

This directive is also consistent with our continuing commitment to good-faith negotiations with the Committee in response to its interest in this matter.  The Department remains willing to discuss with the Committee appropriate requests for information and the circumstances under which the Department may be able to provide that information.  Nothing in this directive shall be understood to waive or limit, on behalf of Mr. Daly or of the Department, any potentially applicable privileges, objections, or confidentiality interests regarding this or other congressional requests for information.

Pursuant to 5 U.S.C § 2302(b)(13), the provisions of this letter are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection.  The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are controlling.

Sincerely,

*Bradley Weinsheimer*
Bradley Weinsheimer

4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

      *Plaintiff*,

  v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

      *Defendants*.

Case No. 1:24-cv-815

# Exhibit LL



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

*Bradley Weinsheimer*
Associate Deputy Attorney General

*Washington, D.C. 20530*

February 29, 2024

Ms. Catherine Duval
Zuckerman Spaeder LLP
1800 M Street NW, Suite 1000
Washington, D.C. 20036
Via Email

Dear Ms. Duval:

I write concerning your client Jack Morgan. I serve as the senior career official at the Department of Justice (Department). Consistent with this role, in which I have served since 2018, I possess and exercise delegated authority to provide current and former Department employees with direction concerning the disclosure and protection of Department information, including with respect to congressional requests for testimony. I write to you in that capacity.

I write regarding a deposition subpoena issued to your client by the House Committee on the Judiciary (Committee) on February 22, 2024.[1] As background, on September 14, 2023, the Committee issued a deposition subpoena to your client for testimony regarding the work of the Department on an ongoing individual criminal investigation and prosecution led by Special Counsel David Weiss.[2] On November 1, 2023, the Committee issued an additional deposition subpoena to your client with a return date of November 6, 2023.[3] The Committee's correspondence at that time, including the letters accompanying the subpoenas to your client, stated that the Committee sought testimony about meetings and conversations among investigators and prosecutors about the weight of evidence and charging decisions in an open matter. Pursuant to the Rules of the House of Representatives, incorporated by reference in the Committee Rules transmitted with the subpoenas, agency counsel was prohibited from attending the deposition. The Department offered voluntary appearances by three senior officials on appropriate topics as an alternative to the Committee pursuing such testimony from line-level attorneys, including your client. Although the Committee accepted the Department's offered alternative and these officials appeared for interviews last fall, the Committee continued to pursue testimony from your client via the November 1, 2023 subpoena.

On November 2, 2023, I wrote to you to convey that the Department had determined, on the basis of a 2019 Office of Legal Counsel (OLC) opinion, that the exclusion of agency counsel

---

[1] Letter from Hon. Jim Jordan to Jack Morgan (Feb. 22, 2024).
[2] Letter from Hon. Jim Jordan to Jack Morgan (Sept. 14, 2023).
[3] Letter from Hon. Jim Jordan to Jack Morgan (Nov. 1, 2023).

1

meant that the subpoenas lacked legal effect and could not constitutionally be enforced. My letter explained that, having carefully considered the relevant facts and authority, Department and Executive Branch precedents and longstanding principles, and the Department's determination that not appearing would be lawful because this subpoena lacks legal effect, I recommended to the Deputy Assistant Attorney General serving as the Head of the Tax Division and to the Attorney General that Mr. Morgan be directed not to appear before the Committee pursuant to this subpoena.  The Attorney General and the Head of the Tax Division approved my recommendation.  Accordingly, my November 2, 2023 letter conveyed that the Department was directing Mr. Morgan not to appear before the Committee pursuant to the subpoena. Mr. Morgan complied with the Department's direction.

Several months passed before the Committee communicated again with the Department regarding any interest in seeking your client's testimony.[4] As noted, last week the Committee issued an additional deposition subpoena to your client seeking testimony on the same topics regarding the same criminal investigation and prosecution, which remains ongoing and in which there are currently multiple public indictments filed in multiple districts. Furthermore, as explained in correspondence from the Department to the Committee today, although the Committee has described this subpoena as part of an impeachment inquiry into whether President Biden "abuse[d] his power as President to impede, obstruct, or otherwise hinder investigations (including Congressional investigations) or the prosecution of Hunter Biden," the factual record the Committee developed in its own investigation demonstrated that this matter has been handled without improper interference; other information the Committee is requesting is not pertinent to the impeachment inquiry; and, in any event, the Committee has not explained how your client would have any relevant personal knowledge of such conduct by President Biden or the White House.[5] Pursuant to the Rules of the House of Representatives, incorporated by reference in the Committee Rules transmitted with this additional subpoena, agency counsel is prohibited from attending this deposition, as well.

As discussed in my letter of November 2, 2023, the Department has written to the Committee explaining that principles and policies for safeguarding the confidentiality of the Department's work further the public interest in the integrity of law enforcement investigations.[6] These principles and policies have been followed across administrations and are grounded in constitutional concerns.  As discussed in the Department's prior correspondence with the Committee, excluding agency counsel in these circumstances undermines the Executive Branch's ability to protect its confidentiality interests in the course of the constitutionally mandated accommodation process.[7]  In addition, the exclusion of agency counsel interferes with

---

[4] In the interim, on December 13, 2023, the House of Representatives passed a resolution purporting to authorize the Committee to seek civil enforcement of the November 1, 2023 subpoena to your client. As of the date of this letter, the Department is unaware of any action by the Committee or the House to pursue such an effort.

[5] Letter from Asst. Attorney General Carlos Uriarte to Hon. Jim Jordan (Feb. 29, 2024). A copy of this correspondence is enclosed.

[6] Letter from Asst. Attorney General Carlos Uriarte to Hon. Jim Jordan (Oct. 25, 2023).  The concerns expressed in this letter are incorporated here by reference.

[7] *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019).

the Executive Branch's ability to protect potentially privileged information.[8]  The underlying principles that inform the Department's position are longstanding across administrations.  Here, the subpoena issued by the Committee prohibits the attendance of agency counsel at an appearance where the Committee has indicated it will ask questions regarding information Mr. Morgan learned within the scope of his official duties, including potentially privileged information.[9]  On the basis of 2019 Office of Legal Counsel opinions, the Department has determined that the exclusion of agency counsel means that the subpoena is invalid and lacks legal effect.[10]  It therefore cannot constitutionally be enforced by civil or criminal means or through any inherent contempt power of Congress.[11]  Accordingly, the Department has determined that Mr. Morgan cannot be subject to criminal prosecution for declining to appear or to answer questions pursuant to this subpoena.[12]

Furthermore, having carefully considered the relevant facts and authority (including developments since November 2, 2023), Department and Executive Branch precedents and longstanding principles; and the Department's determination that not appearing would be lawful because this subpoena lacks legal effect, I recommended to the Deputy Assistant Attorney General serving as the Head of the Tax Division and to the Attorney General that Mr. Morgan be directed not to appear before the Committee pursuant to the February 22, 2024 subpoena.  The Attorney General and the Head of the Tax Division approved my recommendation. Accordingly, the Department directs Mr. Morgan not to appear before the Committee pursuant to the subpoena.

This directive is consistent with longstanding principles of the Justice Department regarding congressional requests for information, as well as the Department's respect for Congress's authority to conduct legitimate oversight of the Executive Branch and our mutual obligations under the constitutionally mandated accommodation process.  Department witnesses are expected to abide by their obligations under the law and Department policy, including the Justice Manual, to refrain from disclosing information that has not been authorized for public release.  This includes information about ongoing investigations and prosecutions, sensitive law enforcement information, and Executive Branch deliberative processes, such as those that underlie investigative and prosecutorial decisions.  The presence of agency counsel during congressional interviews is essential to ensure, among other things, that Department witnesses fully understand and abide by their obligations and that the Department has the ability to raise objections or assert privileges or other Executive Branch confidentiality interests. Under the

---

[8] *Id.* at *8 (quoting *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 81 (2004)).

[9] *Id.* at *2.

[10] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19 (May 23, 2019); *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __ (Nov. 1, 2019).

[11] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *14; *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at*4-*5.

[12] *See Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *14; *Exclusion of Agency Counsel from Congressional Depositions in the Impeachment Context*, 43 Op. O.L.C. __, at*4-*5.

circumstances here, such as the specific requests to your client for information learned within the scope of his official duties, including information that is potentially privileged, following the Department's directive not to appear would protect the confidentiality interests of the Executive Branch and the separation of powers.

This directive is also consistent with our continuing commitment to good-faith negotiations with the Committee in response to its interest in this matter.  The Department remains willing to discuss with the Committee appropriate requests for information and the circumstances under which the Department may be able to provide that information.  Nothing in this directive shall be understood to waive or limit, on behalf of Mr. Morgan or of the Department, any potentially applicable privileges, objections, or confidentiality interests regarding this or other congressional requests for information.

Pursuant to 5 U.S.C § 2302(b)(13), the provisions of this letter are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection.  The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are controlling.

Sincerely,

*Bradley Weinsheimer*
Bradley Weinsheimer

4

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

        *Plaintiff*,

    v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

        *Defendants*.

Case No. 1:24-cv-815

# Exhibit RR

IV

100TH CONGRESS
1ST SESSION

# H. RES. 12

Creating a Select Committee to Investigate Covert Arms Transactions with Iran.

---

## IN THE HOUSE OF REPRESENTATIVES

JANUARY 6, 1987

Mr. FOLEY (for himself, Mr. MICHEL, Mr. HAMILTON, and Mr. CHENEY)
submitted the following resolution; which was referred to the Committee on Rules

JANUARY 7, 1987

The Committee on Rules discharged; considered and agreed to

---

# RESOLUTION

Creating a Select Committee to Investigate Covert Arms
Transactions with Iran.

1     *Resolved,* That (1) There is hereby created a Select
2 Committee to Investigate Covert Arms Transactions with
3 Iran, to be composed of fifteen Members of the House to be
4 appointed by the Speaker, one of whom he shall designate as
5 chairman, and one of whom he shall designate as vice chair-
6 man. Any vacancy occurring in the membership of the select
7 committee shall be filled in the same manner in which the
8 original appointment was made. The select committee is au-
9 thorized and directed to conduct a full and complete investi-

2

1   gation and study, and to make such findings and recommen-

2   dations to the House as the select committee deems appropri-

3   ate, including those concerning the amendment of existing

4   legislation or the enactment of new legislation, regarding the

5   following matters:

6       (a) Direct or indirect sale or transfer of arms, tech-

7       nology or intelligence information to Iran or Iraq in-

8       volving United States Government officers, employees,

9       consultants, agents, or persons acting in concert with

10      them, or occurring with their approval, condonation,

11      acquiescence, or knowledge; the relation of such sale

12      or transfer to efforts to obtain the release of hostages

13      and to United States policy regarding dealings with na-

14      tions supporting terrorism; the United States' relation-

15      ship with the Iran-Iraq war, including the impact of

16      such sale or transfer; and such sale or transfer either

17      made to any other country for which such action is

18      against the expressed policy of the United States, or

19      generating proceeds used or disposed of apart from de-

20      posit in the Treasury.

21      (b) Diversion or intended diversion of the funds real-

22      ized in connection with the sale or transfer in para-

23      graph (a), for financing assistance to anti-Government

24      forces in Nicaragua or any other disposition apart from

25      deposit in the Treasury; and other assistance to such

3

1   forces from any sources when, in the judgment of the

2   select committee, information about such other assist-

3   ance may aid in understanding the nature, mechanisms,

4   extent, legality, and significance of assistance financed

5   or intended to be financed by such sale or transfer;

6   "assistance" includes provision of supplies, soliciting of

7   third-party funds, training, advising, planning, procur-

8   ing, or encouraging, or by the United States Govern-

9   ment providing diplomatic, military, paramilitary,

10  covert, or intelligence support or monitoring.

11      (c) In connection with the matters described in this

12  section, the violation of any law, agreement, promise

13  or understanding regarding reporting to, and informing

14  of, the Congress, or the circumvention or violation of

15  any Act of Congress or administrative order, regula-

16  tion, or procedure, including those governing covert ac-

17  tions, restricting arms sales, regulating appropriations,

18  withholding authority from departments and agencies,

19  and protecting the United States from conspiracy to

20  violate the laws, unauthorized disposition of things of

21  value, fraud, false statements, and obstruction of pro-

22  ceedings.

23      (d) Operational activities and the conduct of foreign

24  and national security policy by the staff of the National

25  Security Council or other White House personnel, in-

4

1    cluding the involvement of such staff or other executive

2    branch personnel or persons acting in concert with

3    them, or the use of any funds under the control of such

4    staff or persons, in political advocacy or campaigns or

5    efforts to influence public opinion or legislation relating

6    to the subjects described in this section including as-

7    sistance to anti-Government forces in Nicaragua; and

8    the participation, coordination, and awareness, or lack

9    thereof, regarding such activities and conduct by the

10    Departments of State and Defense, the Department of

11    Justice in both its advisory and law enforcement func-

12    tions, the intelligence community, and other govern-

13    mental entities.

14    (e) Authorization and supervision or lack thereof of

15    the matters in this section by the President and other

16    White House personnel.

17    (f) The role of individuals and entities outside the

18    government, including foreign countries, entities, and

19    persons, in connection with the matters in this section,

20    including their own assistance, their parallel activities,

21    United States efforts to encourage or to prevent such

22    parallel activities, and the use of domestic and foreign

23    financial or other entities as intermediaries in the mat-

24    ters in this section.

1    (g) Inquiries regarding the matters in this section,

2    including actions based on those inquiries, by the At-

3    torney General, the Departments of Justice, State, and

4    Defense, the intelligence community, the White House,

5    and other governmental entities; actions of individuals

6    in destroying, concealing, or failing to provide any evi-

7    dence or information of possible value to those inquir-

8    ies; and the timing, adequacy, and any conflicts of in-

9    terest in those inquiries.

10    (h) The impact of the matters in this section on

11    public and international confidence in the United States

12    Government and on United States policy objectives,

13    both internationally and domestically, and the adequacy

14    of the steps taken to reduce such impact.

15    (i) All matters relating directly or indirectly to the

16    foregoing.

17    (2) One-third of the members of the select committee

18    shall constitute a quorum for the transaction of business other

19    than the reporting of a matter, which shall require a majority

20    of the committee to be actually present, except that the select

21    committee may designate a lesser number, but not less than

22    two, as a quorum for the purpose of holding hearings to take

23    testimony. When a quorum for any particular purpose is

24    present, general proxies may be counted for that purpose.

25    The select committee may sit while the House is reading a

1   measure for amendment under the five-minute rule. The rules

2   of the House shall govern the select committee where not

3   inconsistent with this resolution. The select committee shall

4   adopt additional written rules, which shall be public, to

5   govern its procedures, which shall not be inconsistent with

6   this resolution or the rules of the House. Such rules may

7   govern the conduct of the depositions, interviews, and hear-

8   ings of the select committee, including the persons present.

9       (3) The select committee is authorized to sit and act

10  during the present Congress at such times and places within

11  the United States, including any Commonwealth or posses-

12  sion thereof, or in any other country, whether the House is in

13  session, has recessed, or has adjourned; to require, by sub-

14  poena or otherwise, the attendance and testimony of such

15  witnesses, the furnishing of information by interrogatory, and

16  the production of such books, records, correspondence,

17  memoranda, papers, documents, calendars, recordings, data

18  compilations from which information can be obtained, tangi-

19  ble objects, and other things and information of any kind as it

20  deems necessary, including all intelligence materials however

21  classified, White House materials, and materials pertaining

22  to unvouchered expenditures or concerning communications

23  interceptions or surveillance; and to obtain evidence in other

24  appropriate countries with the cooperation of their govern-

25  ments. Unless otherwise determined by the select committee

7

1 the chairman, upon consultation with the ranking minority

2 member, or the select committee, shall authorize and issue

3 subpoenas. Subpoenas shall be issued under the seal of the

4 House and attested by the Clerk, and may be served by any

5 persons designated by the chairman or any member. Provi-

6 sions may be included in the rules and process of the select

7 committee to prevent the disclosure of committee demands

8 for information. The select committee may request investiga-

9 tions, reports, and other assistance from any agency of the

10 executive, legislative, and judicial branches of the Federal

11 Government.

12     (4) The chairman, or in his absence the vice chairman,

13 or in their absence a member designated by the chairman,

14 shall preside at all meetings and hearings of the select com-

15 mittee. All meetings and hearings of the committee shall be

16 conducted in open session, unless a majority of members of

17 the select committee voting, there being in attendance the

18 requisite number required for the purpose of hearings to take

19 testimony, vote to close a meeting or hearing. Pursuant to

20 rule XI(3)(f)(2), coverage of testimony of subpoenaed wit-

21 nesses will be limited at their request, unless a majority of

22 members of the select committee voting, there being in at-

23 tendance the requisite number required for the conduct of

24 business, vote otherwise.

8

1    (5) The chairman, upon consultation with the ranking

2  minority member, may employ and fix the compensation of

3  such clerks, experts, consultants, technicians, attorneys, in-

4  vestigators, and clerical and stenographic assistants as it con-

5  siders necessary to carry out the purposes of this resolution.

6  No more than three such staff may receive compensation cor-

7  responding to Executive Level IV. The select committee

8  shall be deemed a committee of the House for all purposes of

9  law, including rule XI(2)(n), and sections 6005, 1505, and

10  1621 of title 18, section 192 of title 2, 1754(b)(1)(B)(ii) of

11  title 22, and section 734(a) of title 31, United States Code.

12  The select committee may reimburse the members of its staff

13  for travel, subsistence, and other necessary expenses incurred

14  by them in the performance of the duties vested in the select

15  committee, other than expenses in connection with meetings

16  of the select committee held in the District of Columbia. Staff

17  of the House or joint committees, at the direction of their

18  Members, committee chairmen, or the Speaker, as appropri-

19  ate, and upon request of the select committee, may serve as

20  associate staff to the select committee for designated pur-

21  poses. Associate staff shall be deemed staff of the select com-

22  mittee to the extent necessary for those designated purposes.

23    (6) Unless otherwise determined by the select committee

24  the chairman, upon consultation with the ranking minority

25  member, or the select committee, may authorize the taking of

9

1  affidavits, and of depositions pursuant to notice or subpoena,

2  by a Member or by designated staff, under oath administered

3  by a Member or a person otherwise authorized by law to

4  administer oaths. Deposition and affidavit testimony shall be

5  deemed to have been taken in Washington, DC, before the

6  select committee once filed there with the clerk of the com-

7  mittee for the committee's use. Unless otherwise directed by

8  the committee, all depositions, affidavits, and other materials

9  received in the investigation shall be considered nonpublic

10  until received by the select committee, except that all such

11  material shall, unless otherwise directed by the committee, be

12  available for use by the Members of the select committee in

13  open session.

14      (7) Pursuant to sections 6103(f)(3) and 6104(a)(2) of title

15  26, United States Code, for the purpose of investigating the

16  subjects set forth in this resolution and since information nec-

17  essary for this investigation cannot reasonably be obtained

18  from any other source, the select committee shall be specially

19  authorized to inspect and receive for the tax years 1980–

20  1986 any tax return, return information, or other tax-related

21  material, held by the Secretary of the Treasury, related to

22  individuals and entities named by the select committee as

23  possible participants, beneficiaries, or intermediaries in the

24  transactions under investigation. As specified by section

10

1  6103(f)(3) of title 26, United States Code, such materials and

2  information shall be furnished in closed executive session.

3      (8) The select committee shall be authorized to respond

4  to any judicial or other process, or to make any applications

5  to court, upon consultation with the Speaker consistent with

6  rule L.

7      (9) The select committee may submit to standing com-

8  mittees, including the Permanent Select Committee on Intel-

9  ligence, specific matters within their jurisdiction, and may

10  request that such committees pursue such matters further.

11  Committees pursuing such requested inquiries may, in turn,

12  receive the continuing assistance, consistent with the select

13  committee's own jurisdiction, of the select committee's legal

14  process, personnel, and records. Committees which pursue or

15  have pursued inquiries, during the previous or current Con-

16  gress, within the subjects of the select committee investiga-

17  tion shall furnish the select committee with copies of all testi-

18  mony and documents.

19      (10) The select committee shall provide other commit-

20  tees and Members of the House with access to information

21  and proceedings, consistent with rule XLVIII(7)(c)(2): *Pro-*

22  *vided,* That the select committee may direct that particular

23  matters or classes of matter shall not be made available to

24  any person by its members, staff, or others, or may impose

25  any other restriction. The select committee may require its

11

1 staff to enter nondisclosure agreements, and its chairman, in

2 consultation with the ranking minority member, may require

3 others, such as counsel for witnesses, to do so. The Commit-

4 tee on Standards of Official Conduct may investigate any un-

5 authorized disclosure of such classified information by a

6 Member, officer, or employee of the House or other covered

7 person upon request of the select committee. If, at the con-

8 clusion of its investigation, the Committee on Standards of

9 Official Conduct determines that there has been a significant

10 unauthorized disclosure, it shall report its findings to the

11 House and recommend appropriate sanctions for the Member,

12 officer, employee, or other covered person consistent with

13 rule XLVIII(7)(e) and any committee restriction, including

14 nondisclosure agreements.

15    (11) Authorized expenses of the select committee for in-

16 vestigations and studies, including for the procurement of the

17 services of individual consultants or organizations thereof,

18 and for training of staff, shall be paid from the contingent

19 fund of the House upon vouchers signed by the chairman and

20 approved by the Speaker.

21    (12) The select committee shall report to the House the

22 final results of its investigation and study, together with such

23 recommendations for legislation or other matters as it deems

24 advisable, as soon as practicable during the present Con-

25 gress, and in no event later than October 30, 1987, unless

12

1 the House directs otherwise. Following the filing of its final

2 report, it shall have one month before the authority herein

3 shall expire in order to close its affairs, including provision of

4 assistance to committees pursuing remaining inquiries, trans-

5 mittal of records to other committees, and storage of its re-

6 maining records by the Clerk of the House, who may, as

7 directed by the select committee, store records in secure fa-

8 cilities of the intelligence community pursuant to agreement

9 retaining control of access by the House.

O

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

                *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

                *Defendants*.

Case No. 1:24-cv-815

# Exhibit SS

IV

# House Calendar No. 81

102D CONGRESS
1ST SESSION

# H. RES. 258

## [Report No. 102–296, Parts I and II]

Creating a Task Force of Members of the Foreign Affairs Committee To Investigate Certain Allegations Concerning the Holding of Americans as Hostages by Iran in 1980.

---

# IN THE HOUSE OF REPRESENTATIVES

### OCTOBER 23, 1991

Mr. HAMILTON (for himself, Mr. GEPHARDT, Mr. FASCELL, and Mr. DERRICK) submitted the following resolution; which was referred to the Committee on Rules

### NOVEMBER 8, 1991

Reported from the Committee on Rules with an amendment and referred to the Committee on House Administration for a period ending not later than November 15, 1991, for consideration of such provisions of the resolution and amendment as fall within the jurisdiction of that committee pursuant to clause 1(k) of rule X.

[Strike out all after the resolving clause and insert the part printed in italic]

### NOVEMBER 15, 1991

Referral to the Committee on House Administration extended for a period ending not later than November 19, 1991

### NOVEMBER 19, 1991

Reported from the Committee on House Administration with an amendment, referred to the House Calendar, and ordered to be printed

[Omit the part in black brackets and insert the part printed in boldface roman]

[For text of introduced resolution, see copy of resolution as introduced on October 23, 1991]

2

# RESOLUTION

Creating a Task Force of Members of the Foreign Affairs Committee To Investigate Certain Allegations Concerning the Holding of Americans as Hostages by Iran in 1980.

1     *Resolved, That (1) There is hereby created a Task*
2   *Force of Members of the House Committee on Foreign Af-*
3   *fairs to Investigate Certain Allegations Concerning the*
4   *Holding of Americans as Hostages by Iran in 1980, to be*
5   *composed of thirteen Members of the House Committee on*
6   *Foreign Affairs to be appointed by the Speaker, one of*
7   *whom he shall designate as chairman. The Speaker shall,*
8   *with respect to the Republican Members of the Task Force,*
9   *make such appointments upon consultation with the Repub-*
10   *lican Leader. Any vacancy occurring in the membership of*
11   *the Task Force shall be filled in the same manner in which*
12   *the original appointment was made. The Task Force is,*
13   *with respect to the matters described below, authorized and*
14   *directed to conduct a full and complete investigation and*
15   *study, and to make such findings as are warranted, includ-*
16   *ing, where appropriate, a finding that no credible evidence*
17   *can be found to support particular allegations. The Task*
18   *Force is further authorized and directed to make such rec-*
19   *ommendations to the Committee on Foreign Affairs as the*
20   *Task Force deems appropriate, including those concerning*
21   *the amendment of existing legislation or the enactment of*

3

1    *new legislation. The Task Force shall fulfill these functions*

2    *with respect to the following matters:*

3        *(a) Communications by or on behalf of the 1980*

4        *Reagan Presidential Campaign, or individuals rep-*

5        *resenting or associated with that campaign, with any*

6        *person or persons representing or associated with the*

7        *Iranian Government or those persons with Iran hold-*

8        *ing Americans as Hostages during 1979 and 1980;*

9        *(b) Any attempt or proposal to attempt, by the*

10       *1980 Reagan Presidential Campaign or persons rep-*

11       *resenting or associated with that campaign, to delay*

12       *the release of the Americans held as hostages in Iran;*

13       *(c) Any activity by the 1980 Reagan Presi-*

14       *dential Campaign to acquire or disseminate any in-*

15       *formation relating to actions being taken or consid-*

16       *ered by the United States Government in an effort to*

17       *obtain the release of the Americans being held as hos-*

18       *tages in Iran;*

19       *(d) Any sale or other transmittal of arms, spare*

20       *parts or other assistance to Iran, in 1980 or there-*

21       *after, by any person or nation, intended to delay the*

22       *release of the American held as Hostages by Iran, and*

23       *any approval, acquiescence or knowledge of such sales*

24       *or transmittals by the 1980 Reagan Presidential*

4

1      *Campaign or persons representing or associated with*

2      *that campaign; and*

3           *(e) Any actions taken to keep any communica-*

4      *tions or actions as described above, if any such com-*

5      *munications or actions took place, from being re-*

6      *vealed to the Government of the United States or the*

7      *American people.*

8           *(2) One-third of the members of the Task Force shall*

9      *constitute a quorum for the transaction of business other*

10      *than the reporting of a matter, which shall require a major-*

11      *ity of the Task Force to be actually present, except that the*

12      *Task Force may designate a lesser number, but not less than*

13      *two, as a quorum for the purpose of holding hearings to*

14      *take testimony. When a quorum for any particular purpose*

15      *is present, general proxies may be counted for that purpose.*

16      *The Task Force may sit while the House is reading a meas-*

17      *ure for amendment under the five-minute rule. The rules*

18      *of the House shall govern the Task Force where not incon-*

19      *sistent with this resolution. The Task Force shall adopt ad-*

20      *ditional written rules, which shall be public, to govern its*

21      *procedures, which shall not be inconsistent with this resolu-*

22      *tion or the rules of the House. Such rules may govern the*

23      *conduct of the depositions, interviews, and hearings of the*

24      *Task Force, including the persons present. Such rules shall*

5

1 *provide for the protection of classified information from un-*

2 *authorized disclosure.*

3     *(3) The Task Force is authorized to sit and act during*

4 *the present Congress at such times and places within the*

5 *United States, including any Commonwealth or possession*

6 *thereof, or in any other country, whether the House is in*

7 *session, or has adjourned; to require, by subpoena or other-*

8 *wise, the attendance and testimony of such witnesses, the*

9 *furnishing of information by interrogatory, and the produc-*

10 *tion of such books, records, correspondence, memoranda, pa-*

11 *pers, documents, calendars, recordings, data compilations*

12 *from which information can be obtained, tangible objects,*

13 *and other things and information of any kind as it deems*

14 *necessary, including all intelligence materials however clas-*

15 *sified, White House materials, campaign materials, mate-*

16 *rials of present and former government officials and mate-*

17 *rials pertaining to unvouchered expenditures or concerning*

18 *communications interceptions or surveillance; and to obtain*

19 *evidence in other appropriate countries with the coopera-*

20 *tion of their governments and by letters rogatory, commis-*

21 *sions, field depositions and other appropriate mechanisms.*

22 *Unless otherwise determined by the Task Force the chair-*

23 *man, upon consultation with the ranking Republican mem-*

24 *ber, on the Task Force, shall authorize and issue subpoenas.*

25 *Subpoenas shall be issued under the seal of the House and*

6

1  attested by the Clerk, and may be served by any person des-

2  ignated by the chairman or any member. The Task Force

3  may request investigations, reports, and other assistance

4  from any agency of the executive, legislative, and judicial

5  branches of the Federal Government.

6      (4) The chairman, or in his absence a member des-

7  ignated by the chairman, shall preside at all meetings and

8  hearings of the Task Force. All meetings and hearings of

9  the Task Force shall be conducted in open session, unless

10  a majority of members of the Task Force voting, there being

11  in attendance the requisite number required for the purpose

12  of hearings to take testimony, vote to close a meeting or

13  hearing.

14      (5) The Chairman, upon consultation with the ranking

15  Republican member, may employ and fix the compensation

16  of such clerks, experts, consultants, technicians, attorneys,

17  investigators, and clerical and stenographic assistants as

18  it considers necessary to carry out the purposes of this reso-

19  lution. The Task Force shall be deemed a committee of the

20  House for all purposes of law, including House Rule XI

21  (2)(n), and sections 6005, 1505, and 1621 of title 18, section

22  192 of title 2, 1754(b)(1)(B)(ii) of title 22, and section

23  734(a) of title 31, United States Code. The Task Force may

24  reimburse the members of its staff for travel, subsistence,

25  and other necessary expenses incurred by them in the per-

7

1 *formance of the duties vested in the Task Force, other than*

2 *expenses in connection with meetings of the Task Force held*

3 *in the District of Columbia.*

4 *(6) Unless otherwise determined by the Task Force the*

5 *chairman, upon consultation with the ranking Republican*

6 *member, or the Task Force, may authorize the taking of*

7 *affidavits, and of depositions pursuant to notice or sub-*

8 *poena, by a Member or by designated staff, under oath ad-*

9 *ministered by a Member or a person otherwise authorized*

10 *by law to administer oaths. Disposition and affidavit testi-*

11 *mony shall be deemed to have been taken in Washington,*

12 *DC, before the Task Force once filed there with the clerk*

13 *of the Task Force for the Task Force's use. Depositions shall*

14 *be deemed to be taken in Executive Session.*

15 *(7) The Task Force shall be authorized to respond to*

16 *any judicial or other process, or to make any applications*

17 *to court, upon consultation with the Speaker consistent with*

18 *rule L.*

19 *(8) The Task Force shall provide other committees and*

20 *Members of the House with access to information and pro-*

21 *ceedings, consistent with rule XLVIII(7)(c): Provided, That*

22 *the Task Force may direct that particular matters or classes*

23 *of matter shall not be made available to any person by its*

24 *members, staff, or others, or may impose any other restric-*

25 *tion. The Task Force may require its staff to enter*

8

1 *nondisclosure agreements and its chairman, in consultation*

2 *with the ranking Republican member, may require others,*

3 *such as counsel for witnesses, to do so: Provided further,*

4 *That the Task Force shall, as appropriate, provide access*

5 *to information and proceedings to the Speaker, the Majority*

6 *Leader, the Republican Leader, and their appropriately*

7 *cleared and designated staff.*

8 *(9) Authorized expenses of the Task Force for investiga-*

9 *tions and studies, including for the procurement of the serv-*

10 *ices of individual consultants or organizations thereof, and*

11 *for training of staff, shall be paid from the contingent fund*

12 *of the House upon vouchers signed by the chairman and*

13 *approved by the [Speaker]* **Chairman of the Com-**

14 **mittee on House Administration***.*

15 *(10) By July 1, 1992, the Task Force shall report to*

16 *the House the status of its investigation. With respect to*

17 *this and any other report of the Task Force, including its*

18 *final report, the report shall be accompanied by supple-*

19 *mental or additional minority views.*

20 *(11) At the conclusion of the existence of the Task Force*

21 *all records of the Task Force shall become the records of*

22 *the Committee on Foreign Affairs except for those records*

23 *relating to intelligence matters which shall, upon the Task*

24 *Force's designation, become the records of the House Perma-*

25 *nent Select Committee on Intelligence.*

**House Calendar No. 81**

102D CONGRESS
1ST SESSION

# H. RES. 258

[Report No. 102–296, Parts I and II]

# RESOLUTION

Creating a Task Force of Members of the Foreign
Affairs Committee To Investigate Certain Allega-
tions Concerning the Holding of Americans as
Hostages by Iran in 1980.

NOVEMBER 19, 1991

Reported from the Committee on House Administration
with an amendment, referred to the House Calendar,
and ordered to be printed

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

$\qquad$ *Plaintiff*,

v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

$\qquad$ *Defendants*.

Case No. 1:24-cv-815

# Exhibit TT

| 100th Congress<br>1st Session } | COMMITTEE PRINT |
| --- | --- |

# R U L E S

### of the

# SELECT COMMITTEE TO INVESTIGATE COVERT ARMS TRANSACTIONS WITH IRAN

Adopted January 21, 1987 as amended April 29, 1987



Printed for the use of the Select Committee to Investigate Covert Arms Transactions with Iran

———

U.S. GOVERNMENT PRINTING OFFICE

72-871

WASHINGTON : 1987

For sale by the Superintendent of Documents, Congressional Sales Office
U.S. Government Printing Office, Washington, DC 20402

H962-8

## SELECT COMMITTEE TO INVESTIGATE COVERT ARMS TRANSACTIONS WITH IRAN

LEE H. HAMILTON, Indiana, *Chairman*
DANTE B. FASCELL, Florida, *Vice Chairman*

THOMAS S. FOLEY, Washington
PETER W. RODINO, Jr., New Jersey
JACK BROOKS, Texas
LOUIS STOKES, Ohio
LES ASPIN, Wisconsin
EDWARD P. BOLAND, Massachusetts
ED JENKINS, Georgia

DICK CHENEY, Wyoming
WM. S. BROOMFIELD, Michigan
HENRY J. HYDE, Illinois
JIM COURTER, New Jersey
BILL McCOLLUM, Florida
MICHAEL DeWINE, Ohio

(II)

# RULES OF PROCEDURE OF THE HOUSE SELECT COMMITTEE TO INVESTIGATE COVERT ARMS TRANSACTIONS WITH IRAN

## RULE 1. RULES

1.1   The provisions of House Resolution 12, 100th Congress, 1st Session, establishing this committee, and the Rules of the House of Representatives where not inconsistent therewith, are the rules of the committee, together with these Rules.

1.2   These Rules may be modified, amended, or repealed by the committee, provided that a notice in writing of the proposed changes has been given to each member at least 48 hours prior to the meeting at which action thereon is to be taken. Notwithstanding the provisions of Rule 8, proxies may not be used in any vote to modify, amend, adopt, or repeal any rule of the committee. The changes shall become effective immediately and shall be published in the Congressional Record.

## RULE 2. CONVENING OF MEETINGS

2.1   The committee may schedule a regular day and hour to meet.

2.2   The chairman shall have authority, upon proper notice, to call such additional meetings of the committee as he may deem necessary, and to dispense with regular meetings when, in his judgment, there is no need therefor, and may delegate such authority to the vice chairman or to any other member of the committee.

2.3   A majority of the members of the committee may call a special meeting for a specific matter pursuant to the procedures specified in House Rule XI(2)(c)(2).

2.4   In the case of any meeting of the committee, other than a regularly scheduled meeting, the clerk of the committee shall notify every member of the committee of the time and place of the meeting and shall give reasonable notice which, except in extraordinary circumstances, shall be at least 24 hours in advance of any meeting held in Washington, D.C., and at least 48 hours in the case of any meeting held outside Washington, D.C.

## RULE 3. MEETING PROCEDURES

3.1   Five members of the select committee shall constitute a quorum for the transaction of business other than the reporting of a matter, which shall require a majority of the committee to be actually present, except that two members shall constitute a quorum for the purpose of hearings to take testimony.

3.2   All meetings or hearings of the committee shall be conducted in open session, unless a majority of members of the select com-

2

mittee voting, there being in attendance at least two members of the committee, vote to close a meeting or hearing.

8.3   When a quorum for any particular purpose is present, general proxies may be counted for that purpose. Proxies may be general or may be limited to specific matters. A vote by any member of the committee with respect to any matter being considered may be cast by proxy if the proxy authorization is in writing, asserts that the member is absent on official business or is otherwise unable to be present, and designates the member or alternate member who is to execute the proxy authorization. Each proxy to be effective shall be signed by the member assigning his vote and shall contain the date and time that the proxy is signed. Proxies shall be effective at the session for which they are provided, or if that session is rescheduled, at the rescheduled session. Proxies shall not reduce the quorum required for reporting contempt matters and will not be counted towards the two-thirds minimum requirement pursuant to 18 U.S.C. § 6005 needed to seek an immunity order.

8.4   It shall be the duty of a staff officer designated by the chairman to keep or cause to be kept a stenographic record of all committee proceedings. All transcripts, affidavits, and depositions, *and copies and extracts thereof,* shall be the property of the select committee, and not of the witnesses.

8.5   The chairman, or in his absence the vice chairman, or in their absence a member designated by the chairman, shall preside over all meetings and hearings of the committee.

### RULE 4. SUBPOENAS

4.1   Unless otherwise determined by the select committee the chairman, upon consultation with the ranking minority member, shall authorize and issue subpoenas. In addition, the select committee may itself vote to authorize and issue subpoenas. Subpoenas shall be issued under the seal of the House and attested by the Clerk, and may be served by any persons designated by the chairman or any member. Subpoenas shall be issued upon the chairman's signature or that of a member designated by him or by the committee.

4.2   Orders for the furnishing of information by interrogatory, the inspecting of locations and systems of records upon notice except in exigent circumstances, the obtaining of evidence in other countries by means of letters rogatory or otherwise, and the other process for obtaining information available to the committee, shall be authorized and issued by the chairman, upon consultation with the ranking minority member, or by the select committee. Requests for investigations, reports, and other assistance from any agency of the executive, legislative, and judicial branches of the federal government, shall be made by the chairman, upon consultation with the ranking minority member, or by the committee.

4.3   Provisions may be included in the process of the committee to prevent the disclosure of committee demands for information, when deemed necessary for the security of information or the progress of the investigation by the chairman or member designated by him or the committee, such as requiring that companies re-

8

ceiving subpoenas for financial or toll records make no disclosure to customers regarding the subpoena for ninety days or prohibiting the revelation by witnesses and their counsel of committee inquiries.

4.4  A subpoena duces tecum may be issued whose return shall occur at a time and place other than that of a regularly scheduled meeting. Upon the return of such a subpoena, the chairman or vice chairman, or in their absence the ranking member of the majority party who is present, on two hours' telephonic notice to all other committee members, may convene a hearing for the sole purpose of elucidating further information about the return on the subpoena and deciding any objections to the subpoena.

## RULE 5. BROADCASTING, TELEVISION, AND PHOTOGRAPHY

5.1  Whenever any hearing or meeting conducted by the committee is open to the public, the committee may permit that hearing or meeting to be covered, in whole or in part, by television broadcast, radio broadcast, and still photography, or by any of such methods of coverage, under the following rules:

(1) If the television or radio coverage of the hearing or meeting is to be presented to the public as live coverage, that coverage shall be conducted and presented without commercial sponsorship.

(2) Broadcast and photographic coverage of testimony of subpoenaed witnesses will, at their request, not be permitted, unless a majority of members of the committee voting, there being in attendance the requisite number required for the conduct of business, vote otherwise.

(3) The chairman may set limits on the number of television cameras, all operating from fixed positions, that shall be permitted in a hearing room. The allocation among the television media of the positions of the number of television cameras permitted in a hearing room shall be in accordance with fair and equitable procedures devised by the Executive Committee of the Radio and Television Correspondents' Galleries.

(4) Television cameras shall be placed so as not to obstruct in any way the space between any witness giving evidence or testimony and any member of the committee, or the visibility of that witness and that member to each other.

(5) Television cameras shall not be placed in positions which obstruct unnecessarily the coverage of the hearing or meeting by the other media.

(6) Equipment necessary for coverage by the television and radio media shall not be installed in, or removed from, the hearing room while the committee is in session.

(7) Floodlights, spotlights, and flashguns shall not be used in providing any method of coverage of the hearing or meeting, except that the television media may install additional lighting in the hearing room, without cost to the Government, in order to raise the ambient lighting level in the hearing room to the lowest level necessary to provide adequate television coverage of the hearing at the current state of the art of television coverage.

4

(8) The chairman may set limits on the number of press photographers permitted to cover a hearing or meeting by still photography. In the selection of these photographers, preference shall be given to photographers from Associated Press Photos and United Press International Newspictures. If request is made by more than the limit set by the chairman for coverage of the hearing by still photography, that coverage shall be made on the basis of a fair and equitable pool arrangement devised by the Standing Committee of Press Photographers.

(9) Photographers shall not position themselves, at any time during the course of the hearing or meeting, between the witness table and the committee members.

(10) Photographers shall not place themselves in positions which obstruct unnecessarily the coverage of the hearing or meeting by the other media.

(11) Personnel providing coverage by the television and radio media shall be then currently accredited to the Press Photographers' Gallery.

(12) Personnel providing coverage by still photography shall be then currently accredited to the Press Photographers' Gallery.

(13) Personnel providing coverage by the television and radio media and by still photography shall conduct themselves and their coverage activities in an orderly and unobtrusive manner.

## RULE 6. TAKING OF TESTIMONY AT HEARINGS

6.1   Witnesses required to appear before the committee shall be given, absent extraordinary circumstances, at least forty-eight hours' notice and all witnesses shall be furnished with a copy of these rules.

6.2   All witnesses at public or executive hearings who testify to matters of fact shall be sworn unless the committee provides otherwise.

6.3   Members of the committee who so desire shall have not to exceed five minutes to interrogate each witness until such time as each member has had an opportunity to interrogate such witness. The presiding member, in consultation with the ranking minority member present, may establish a format for additional or sustained questioning of any witness by the chair or otherwise.

6.4   Personal counsel retained by any witness and accompanying such witness shall be permitted to be present during the testimony of such witness at any public or executive hearing, and to advise such witness while he is testifying on his legal rights. The presiding member may require that the witness not be accompanied by anyone except such personal counsel.

6.5   The chairman, upon consultation with the ranking minority member, if he deems it necessary to maintain the security of classified subjects being discussed at closed hearings, may require that any personal counsel be qualified by having appropriate clearance, and that the witness or counsel, or both, execute nondisclosure agreements with the committee.

5

6.6  A witness who is unable to obtain counsel, or to obtain counsel with requisite clearance, may inform the committee of such fact, and if, consistent with the notice given under section 6.1 hereof the committee is so informed at least 24 hours prior to the witness' appearance, the committee shall then endeavor to obtain voluntary counsel for the witness. Such counsel shall act solely for the witness and not the committee. Failure to obtain qualified counsel will not excuse the witness from appearing and testifying.

6.7  Counsel shall conduct themselves in an ethical and professional manner. The presiding member may punish breaches of order and decorum, and of professional ethics on the part of counsel, by censure and exclusion from the hearings, and the committee may cite the offender to the House for contempt. If counsel is excluded, the provisions of Rule 6.6 hereof for a witness who is unable to obtain qualifed counsel shall apply.

6.8  Any witness desiring to make an introductory statement in executive or public hearings shall file a copy of such statement with the chairman or clerk of the committee 48 hours in advance of the hearings at which the statement is to be presented unless the presiding member waives this requirement. The presiding member shall reduce the 48 hours proportionately for witnesses who receive less than 72 hours' notice of the hearing. The presiding member shall determine whether such statement may be read or placed in the record of the hearing.

6.9  An accurate stenographic record shall be kept of the testimony of all witnesses in executive and public hearings. A witness may obtain a transcript copy of his testimony given at a public session. If the witness testified at an executive session, the record of his testimony shall be made available for inspection by the witness and his counsel, and the chairman may authorize provision of a copy to the witness or his counsel if such testimony does not include classified information.

6.10  Whenever it is asserted that the evidence or testimony at any investigatory hearings may tend to defame, degrade, or incriminate any person, the committee shall afford such person an opportunity voluntarily to appear as a witness, and receive and dispose of requests from such person to subpoena additional witnesses. Otherwise, the chairman shall receive and the committee shall dispose of requests to subpoena additional witnesses. In the case of persons so mentioned or identified at public sessions, a request to appear personally or to subpoena additional witnesses before the committee shall be considered untimely if it is not received by the chairman in writing on or before fifteen days subsequent to the day on which said person's name was mentioned or otherwise specifically identified during a public hearing held before the committee, unless the chairman waives this requirement.

6.11  No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the committee, which shall require a vote, counting proxy votes, of a majority of the members of the committee.

6.12  In the presiding member's discretion, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The presiding member may condition the filing of such a sworn statement upon the offeror's agreeing to appear

6

personally before the committee and to testify concerning the matters contained in his sworn statement, as well as any other matters related to the subject of the investigation before the committee.

## RULE 7. AFFIDAVITS AND DEPOSITIONS

7.1   Unless otherwise determined by the select committee the chairman, upon consultation with the ranking minority member, or the select committee, may authorize the taking of affidavits, and of depositions pursuant to notice or subpoena. Such authorization may occur on a case-by-case basis, or by instructions to take a series of affidavits or depositions. The chairman may either issue the deposition notices himself, or direct the chief counsel to do so. Notices for the taking of depositions shall specify a time and place for examination. Affidavits and depositions shall be taken under oath administered by a member or a person otherwise authorized by law to administer oaths.

7.2   The committee shall not initiate procedures leading to contempt proceedings in the event a witness fails to appear at a deposition unless the deposition notice was accompanied by a committee subpoena authorized and issued by the chairman or the committee pursuant to Rule 4 hereof regarding subpoenas.

7.3   Witnesses may be accompanied at a deposition by personal counsel to advise them of their rights, subject to the provisions of Rules 6.4, 6.5, 6.6 and 6.7 hereof. Absent special permission or instructions from the chairman, no one may be present in depositions except members, staff designated by the chairman, an official reporter, the witness and any personal counsel; observers or counsel for other persons or for the agencies under investigation may not attend.

7.4   Witnesses shall be examined in depositions by a member or members or by staff designated by the chairman. Objections by the witness as to the form of questions shall be noted for the record. If a witness objects to a question and refuses to answer, the members or staff may proceed with the deposition, or may obtain, at that time or at a subsequent time, a ruling on the objection by telephone or otherwise from the chairman or his designee. The committee shall not initiate procedures leading to contempt for refusals to answer questions at a deposition unless the witness refuses to testify after his objection has been overruled and after he has been ordered and directed to answer by the chairman or his designee upon consultation with the ranking minority member or his designee.

7.5   The committee staff shall insure that the testimony is either transcribed or electronically recorded, or both. If a witness' testimony is transcribed, he shall be furnished with an opportunity to review a copy. No later than five days thereafter, the staff shall enter the changes, if any, requested by the witness, with a statement of the witness' reasons for the changes, and the witness shall be instructed to sign the transcript. The individual administering the oath, if other than a Member, shall certify on the transcript that the witness was duly sworn in his presence, the transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording,

7

with the clerk of the committee in Washington, D.C. Affidavits and depositions shall be deemed to have been taken in Washington, D.C. once filed there with the clerk of the committee for the committee's use.

7.6  Unless otherwise directed by the committee, all depositions, affidavits, and other materials received in the investigation shall be considered nonpublic until received by the select committee. Once received by the select committee, use of such materials shall be governed by the select committee rules. All such material shall, unless otherwise directed by the committee, be available for use by the members of the select committee in open session; provided, that classified information or material shall not be used in open session except as permitted by the committee, which shall require a vote, counting proxy votes, of a majority of the members of the committee.

### RULE 8. PROCEDURES FOR HANDLING OF CLASSIFIED OR SENSITIVE MATERIALS

8.1  Committee staff offices shall operate under strict security precautions. The chairman shall request the Permanent Select Committee on Intelligence and the Clerk and Sergeant at Arms to provide assistance necessary to insure strict security. Sensitive or classified documents and material shall be segregated and stored in an appropriately secure storage area. They may be examined only at secure reading facilities. Copying, duplicating, or removal from the committee offices of such documents and other materials are prohibited except as is necessary for authorized use in, or preparation for, interviews, depositions, or committee meetings or hearings.

8.2  Each member of the committee shall at all times have access to all papers and other materials received from any source. The chief counsel or staff director, as designated by the chairman, shall be responsible for the control, under appropriate security procedures, of all classified papers and other classified materials in the possession of the committee, and for the maintenance, under such procedures, of a registry which will number and identify all such materials. Such registry shall be available to any member of the committee.

8.3  Access by staff to classified information supplied to the committee shall be limited on a need-to-know basis, pursuant to instructions of the chairman, acting in consultation with the ranking minority member, either on a case-by-case basis or by general instructions to the chief counsel or staff director. All staff with such access shall be required to have appropriate security clearance. The chief counsel or staff director shall maintain a list of those staff, including associate staff, who may attend executive sessions and have access to classified materials. The names of such associate staff shall be entered by the chief counsel or staff director on the list only after the committee member has designated the staff members in writing, and the staff members have been determined by the chairman, in consultation with the ranking minority member, to have an appropriate security clearance.

8

8.4  The chairman, in consultation with the ranking minority member, may limit staff attendance at certain executive sessions, and staff access to certain categories of classified materials, which involve matters of particularly high sensitivity.

8.5  Members who are not members of the committee shall be granted access to such hearings, records, data, charts and files of the committee and shall be admitted on a nonparticipatory basis to hearings of the committee which involve classified material, apart from material otherwise restricted by the committee, on the basis of the following provisions:

(1) Members who desire to examine materials in the possession of the committee or to attend committee hearings on a nonparticipatory basis should notify the clerk of the committee in writing.

(2) Each such request by a member must be considered by the committee, a quorum for the reporting of a matter being present, at the earliest practicable opportunity. The committee must determine by record vote whatever action it deems necessary in light of all the circumstances of each individual request. The committee shall take into account in its deliberations, such considerations as the sensitivity of the information sought to the national defense or the confidential conduct of the foreign relations of the United States, the likelihood of its being directly or indirectly disclosed, the jurisdictional interest of the member making the request and such other concerns—constitutional or otherwise—as affect the public interest of the United States. Such actions as the committee may take include, but are not limited to: (i) approving the request, in whole or part; (ii) denying the request; (iii) providing in different form than requested information or material which is the subject of the request.

(3) In matters touching on such requests, the committee may, in its discretion, consult the Director of Central Intelligence and such other officials as it may deem necessary.

(4) In the event that the member making the request in question does not accede to the determination or any part thereof of the committee as regards the request, that member should notify the committee in writing of the grounds for such disagreement. The committee shall subsequently consider the matter and decide, by record vote, what further action or recommendation, if any, it will take.

(5) Members examining material pursuant to this rule shall be prohibited to disclose the material further, and every member shall be furnished a copy of this rule prior to examining such material.

8.6  The committee may direct that particular matters or classes of matter shall not be made available to any person by its members, staff, or others, or may impose any other restriction. Classified information or classified material possessed or controlled by the committee, or information deemed sensitive by the committee shall not be made available to any person by its members or staff except by vote of the committee, which shall require a vote, counting proxy votes, of a majority of the members of the committee.

8.7  The chairman and ranking minority member shall be authorized to insure that the Speaker and Minority Leader are fully informed regarding the investigation, any other provisions of these rules notwithstanding.

### RULE 9. STAFF, DETAILEES, AND CONSULTANTS

9.1  All staff of the committee shall be appointed by the chairman, either by hiring, contracting, detailing, or pursuant to Rule 9.4. Upon termination of employment by the committee, each member of the staff, or consultant, shall surrender all classified and other material relating to the work of the committee which came into his possession while in the employ of the committee.

9.2  In the event of an unauthorized release of information or other violation the chairman or the committee may refer the matter to the House Committee on Standards of Official Conduct. Nothing in these rules shall be construed to abridge the right of a Member to make or transmit a complaint to the Committee on the Standards of Official Conduct, or shall be construed to expand the authority of that committee, over matters related to the conduct of this committee's investigation pursuant to House Resolution 12, beyond what that resolution provides. The employment of any member of the staff or consultant who fails to conform to any of these Rules may be immediately terminated.

9.3  The chairman shall have the authority to utilize the services, information, facilities, and personnel of the departments and agencies of the government, including personnel of the General Accounting Office pursuant to section 734(a) of Title 31, United States Code. Requests by the chairman may specify by name, or describe otherwise, the personnel to be detailed.

9.4  Upon request of the chairman, staff of the House, or of House or joint committees, at the direction of their members, committee chairmen, or the Speaker, as appropriate, may serve as associate staff to the select committee for designated purposes starting with their appointment by the chairman.

9.5  All travel, including foreign travel, shall be approved by the chairman.

9.6  The chairman shall have the authority to procure the temporary or intermittent services of experts or consultants or organizations thereof to make studies or assist or advise the subcommittee with respect to any matter under investigation. Associate staff, government personnel detailed to the subcommittee, and consultants, shall be deemed staff of the select committee to the extent necessary for the purposes of their designated association, detail, or consultancy, including the purposes of interrogation of witnesses and security of information under Rules 5, 6, 7, 8 and 9 hereof.

9.7  The chairman, upon consultation with the ranking minority member, may establish such additional personnel, physical, communications, and document security procedures, not inconsistent with these rules, as he deems necessary to safeguard classified information or materials possessed or controlled by the select committee.

9.8  No member of the committee staff shall be employed by or detailed or otherwise assigned to the committee unless and until he

agrees in writing, as a condition of employment, with regard to any classified information which comes into such person's possession either while a member of the committee staff or by virtue of such position:

 (a) not to disclose such information oither while a member of the committee staff or at any time thereafter;

 (b) in response to any request for testimony about such information, to provide notice to, and not to disclose such information

except as directed by the committee in accordance with these rules, or after the committee's termination, in such manner as may be determined by the House.

## RULE 10. JOINT HEARINGS

10.1  The Select Committee may conduct hearings jointly with the Senate Select Committee on Secret Military Assistance to Iran and the Nicaraguan Opposition.

10.2  Rules 1.3, 2, and 5 of the Senate Select Committee, to the extent that they are inconsistent with the rules of this Committee, shall govern hearings conducted jointly by the two Committees, when such hearings are held in facilities provided by the Senate.

10.3  Notwithstanding Rule 10.2, all such joint hearings shall for all purposes be considered hearings of the House Select Committee.

O

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

          *Plaintiff*,

    v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

          *Defendants*.

Case No. 1:24-cv-815

# Exhibit UU

| 102D CONGRESS 2d Session | TASK FORCE PRINT |
|---|---|

# U.S. HOUSE OF REPRESENTATIVES

---

# RULES

### OF THE

# TASK FORCE TO INVESTIGATE CERTAIN ALLEGATIONS CONCERNING THE HOLDING OF AMERICAN HOSTAGES BY IRAN IN 1980 ("OCTOBER SURPRISE TASK FORCE")



## ADOPTED MARCH 11, 1992

Printed for the use of the October Surprise Task Force

---

**U.S. GOVERNMENT PRINTING OFFICE**

54-461

**WASHINGTON : 1992**

For sale by the U.S. Government Printing Office
Superintendent of Documents, Congressional Sales Office, Washington, DC 20402
ISBN 0-16-038390-0

H382-17

TASK FORCE TO INVESTIGATE CERTAIN ALLEGATIONS CONCERNING THE HOLDING OF AMERICAN HOSTAGES BY IRAN IN 1980 ("OCTOBER SURPRISE TASK FORCE")

LEE H. HAMILTON, Indiana, *Chairman*
HENRY J. HYDE, Illinois, *Ranking Republican Member*

STEPHEN J. SOLARZ, New York
SAM GEJDENSON, Connecticut
MERVYN M. DYMALLY, California
ROBERT G. TORRICELLI, New Jersey
HOWARD L. BERMAN, California
EDWARD F FEIGHAN, Ohio
TED WEISS, New York

JIM LEACH, Iowa
OLYMPIA J. SNOWE, Maine
DOUG BEREUTER, Nebraska
PORTER J. GOSS, Florida

E. LAWRENCE BARCELLA, JR, *Chief Counsel*
RICHARD J. LEON, *Chief Minority Counsel*

(II)

# CONTENTS

————

|  | Page |
|---|---|
| Part 1—House Resolution 258 | 1 |
| Part 2—Rules of procedure of the task force of members of the House Committee on Foreign Affairs to investigate certain allegations concerning the holding of Americans as hostages by Iran in 1980 | 9 |
| Rule 1. Rules | 9 |
| Rule 2. Convening of Meetings | 9 |
| Rule 3. Meeting Procedures | 9 |
| Rule 4. Subpoenas | 10 |
| Rule 5. Broadcasting, Television, and Photography | 11 |
| Rule 6. Taking of Testimony at Hearings | 12 |
| Rule 7. Affidavits and Depositions | 14 |
| Rule 8. Procedures for Handling of Classified or Sensitive Materials | 15 |
| Rule 9. Staff, Detailees, and Consultants | 17 |
| Part 3—Selected Rules of the House of Representatives | 19 |

(III)

IV

# House Calendar No. 81

102D CONGRESS
1ST SESSION

# H. RES. 258

## [Report No. 102–296, Parts I and II]

Creating a Task Force of Members of the Foreign Affairs Committee To Investigate Certain Allegations Concerning the Holding of Americans as Hostages by Iran in 1980.

---

## IN THE HOUSE OF REPRESENTATIVES

### OCTOBER 23, 1991

Mr HAMILTON (for himself, Mr. GEPHARDT, Mr. FASCELL, and Mr. DERRICK) submitted the following resolution, which was referred to the Committee on Rules

### NOVEMBER 8, 1991

Reported from the Committee on Rules with an amendment and referred to the Committee on House Administration for a period ending not later than November 15, 1991, for consideration of such provisions of the resolution and amendment as fall within the jurisdiction of that committee pursuant to clause 1(k) of rule X.

[Strike out all after the resolving clause and insert the part printed in italic]

### NOVEMBER 15, 1991

Referral to the Committee on House Administration extended for a period ending not later than November 19, 1991

### NOVEMBER 19, 1991

Reported from the Committee on House Administration with an amendment, referred to the House Calendar, and ordered to be printed

[Omit the part in black brackets and insert the part printed in boldface roman]

[For text of introduced resolution, see copy of resolution as introduced on October 23, 1991]

(1)

2

2

# RESOLUTION

Creating a Task Force of Members of the Foreign Affairs Committee To Investigate Certain Allegations Concerning the Holding of Americans as Hostages by Iran in 1980.

1    *Resolved, That (1) There is hereby created a Task*
2    *Force of Members of the House Committee on Foreign Af-*
3    *fairs to Investigate Certain Allegations Concerning the*
4    *Holding of Americans as Hostages by Iran in 1980, to be*
5    *composed of thirteen Members of the House Committee on*
6    *Foreign Affairs to be appointed by the Speaker, one of*
7    *whom he shall designate as chairman. The Speaker shall,*
8    *with respect to the Republican Members of the Task Force,*
9    *make such appointments upon consultation with the Repub-*
10   *lican Leader. Any vacancy occurring in the membership of*
11   *the Task Force shall be filled in the same manner in which*
12   *the original appointment was made. The Task Force is,*
13   *with respect to the matters described below, authorized and*
14   *directed to conduct a full and complete investigation and*
15   *study, and to make such findings as are warranted, includ-*
16   *ing, where appropriate, a finding that no credible evidence*
17   *can be found to support particular allegations. The Task*
18   *Force is further authorized and directed to make such rec-*
19   *ommendations to the Committee on Foreign Affairs as the*
20   *Task Force deems appropriate, including those concerning*
21   *the amendment of existing legislation or the enactment of*

**HRES 258 RH**

3

3

1 *new legislation. The Task Force shall fulfill these functions*

2 *with respect to the following matters:*

3       *(a) Communications by or on behalf of the 1980*

4       *Reagan Presidential Campaign, or individuals rep-*

5       *resenting or associated with that campaign, with any*

6       *person or persons representing or associated with the*

7       *Iranian Government or those persons with Iran hold-*

8       *ing Americans as Hostages during 1979 and 1980;*

9       *(b) Any attempt or proposal to attempt, by the*

10       *1980 Reagan Presidential Campaign or persons rep-*

11       *resenting or associated with that campaign, to delay*

12       *the release of the Americans held as hostages in Iran;*

13       *(c) Any activity by the 1980 Reagan Presi-*

14       *dential Campaign to acquire or disseminate any in-*

15       *formation relating to actions being taken or consid-*

16       *ered by the United States Government in an effort to*

17       *obtain the release of the Americans being held as hos-*

18       *tages in Iran;*

19       *(d) Any sale or other transmittal of arms, spare*

20       *parts or other assistance to Iran, in 1980 or there-*

21       *after, by any person or nation, intended to delay the*

22       *release of the American held as Hostages by Iran, and*

23       *any approval, acquiescence or knowledge of such sales*

24       *or transmittals by the 1980 Reagan Presidential*

4

4

1    *Campaign or persons representing or associated with*

2    *that campaign; and*

3        *(e) Any actions taken to keep any communica-*

4    *tions or actions as described above, if any such com-*

5    *munications or actions took place, from being re-*

6    *vealed to the Government of the United States or the*

7    *American people.*

8        *(2) One-third of the members of the Task Force shall*

9    *constitute a quorum for the transaction of business other*

10   *than the reporting of a matter, which shall require a major-*

11   *ity of the Task Force to be actually present, except that the*

12   *Task Force may designate a lesser number, but not less than*

13   *two, as a quorum for the purpose of holding hearings to*

14   *take testimony. When a quorum for any particular purpose*

15   *is present, general proxies may be counted for that purpose.*

16   *The Task Force may sit while the House is reading a meas-*

17   *ure for amendment under the five-minute rule. The rules*

18   *of the House shall govern the Task Force where not incon-*

19   *sistent with this resolution. The Task Force shall adopt ad-*

20   *ditional written rules, which shall be public, to govern its*

21   *procedures, which shall not be inconsistent with this resolu-*

22   *tion or the rules of the House. Such rules may govern the*

23   *conduct of the depositions, interviews, and hearings of the*

24   *Task Force, including the persons present. Such rules shall*

5

5

1  *provide for the protection of classified information from un-*
2  *authorized disclosure.*

3      *(3) The Task Force is authorized to sit and act during*
4  *the present Congress at such times and places within the*
5  *United States, including any Commonwealth or possession*
6  *thereof, or in any other country, whether the House is in*
7  *session, or has adjourned; to require, by subpoena or other-*
8  *wise, the attendance and testimony of such witnesses, the*
9  *furnishing of information by interrogatory, and the produc-*
10  *tion of such books, records, correspondence, memoranda, pa-*
11  *pers, documents, calendars, recordings, data compilations*
12  *from which information can be obtained, tangible objects,*
13  *and other things and information of any kind as it deems*
14  *necessary, including all intelligence materials however clas-*
15  *sified, White House materials, campaign materials, mate-*
16  *rials of present and former government officials and mate-*
17  *rials pertaining to unvouchered expenditures or concerning*
18  *communications interceptions or surveillance; and to obtain*
19  *evidence in other appropriate countries with the coopera-*
20  *tion of their governments and by letters rogatory, commis-*
21  *sions, field depositions and other appropriate mechanisms.*
22  *Unless otherwise determined by the Task Force the chair-*
23  *man, upon consultation with the ranking Republican mem-*
24  *ber, on the Task Force, shall authorize and issue subpoenas.*
25  *Subpoenas shall be issued under the seal of the House and*

6

1   *attested by the Clerk, and may be served by any person des-*

2   *ignated by the chairman or any member. The Task Force*

3   *may request investigations, reports, and other assistance*

4   *from any agency of the executive, legislative, and judicial*

5   *branches of the Federal Government.*

6       *(4) The chairman, or in his absence a member des-*

7   *ignated by the chairman, shall preside at all meetings and*

8   *hearings of the Task Force. All meetings and hearings of*

9   *the Task Force shall be conducted in open session, unless*

10   *a majority of members of the Task Force voting, there being*

11   *in attendance the requisite number required for the purpose*

12   *of hearings to take testimony, vote to close a meeting or*

13   *hearing.*

14       *(5) The Chairman, upon consultation with the ranking*

15   *Republican member, may employ and fix the compensation*

16   *of such clerks, experts, consultants, technicians, attorneys,*

17   *investigators, and clerical and stenographic assistants as*

18   *it considers necessary to carry out the purposes of this reso-*

19   *lution. The Task Force shall be deemed a committee of the*

20   *House for all purposes of law, including House Rule XI*

21   *(2)(n), and sections 6005, 1505, and 1621 of title 18, section*

22   *192 of title 2, 1754(b)(1)(B)(ii) of title 22, and section*

23   *734(a) of title 31, United States Code. The Task Force may*

24   *reimburse the members of its staff for travel, subsistence,*

25   *and other necessary expenses incurred by them in the per-*

7

7

1 formance of the duties vested in the Task Force, other than

2 expenses in connection with meetings of the Task Force held

3 in the District of Columbia.

4     (6) Unless otherwise determined by the Task Force the

5 chairman, upon consultation with the ranking Republican

6 member, or the Task Force, may authorize the taking of

7 affidavits, and of depositions pursuant to notice or sub-

8 poena, by a Member or by designated staff, under oath ad-

9 ministered by a Member or a person otherwise authorized

10 by law to administer oaths. Disposition and affidavit testi-

11 mony shall be deemed to have been taken in Washington,

12 DC, before the Task Force once filed there with the clerk

13 of the Task Force for the Task Force's use. Depositions shall

14 be deemed to be taken in Executive Session.

15     (7) The Task Force shall be authorized to respond to

16 any judicial or other process, or to make any applications

17 to court, upon consultation with the Speaker consistent with

18 rule L.

19     (8) The Task Force shall provide other committees and

20 Members of the House with access to information and pro-

21 ceedings, consistent with rule XLVIII(7)(c): Provided, That

22 the Task Force may direct that particular matters or classes

23 of matter shall not be made available to any person by its

24 members, staff, or others, or may impose any other restric-

25 tion. The Task Force may require its staff to enter

8

8

1  *nondisclosure agreements and its chairman, in consultation*

2  *with the ranking Republican member, may require others,*

3  *such as counsel for witnesses, to do so: Provided further,*

4  *That the Task Force shall, as appropriate, provide access*

5  *to information and proceedings to the Speaker, the Majority*

6  *Leader, the Republican Leader, and their appropriately*

7  *cleared and designated staff.*

8      *(9) Authorized expenses of the Task Force for investiga-*

9  *tions and studies, including for the procurement of the serv-*

10  *ices of individual consultants or organizations thereof, and*

11  *for training of staff, shall be paid from the contingent fund*

12  *of the House upon vouchers signed by the chairman and*

13  *approved by the [Speaker]* **Chairman of the Com-**

14  **mittee on House Administration**.

15      *(10) By July 1, 1992, the Task Force shall report to*

16  *the House the status of its investigation. With respect to*

17  *this and any other report of the Task Force, including its*

18  *final report, the report shall be accompanied by supple-*

19  *mental or additional minority views.*

20      *(11) At the conclusion of the existence of the Task Force*

21  *all records of the Task Force shall become the records of*

22  *the Committee on Foreign Affairs except for those records*

23  *relating to intelligence matters which shall, upon the Task*

24  *Force's designation, become the records of the House Perma-*

25  *nent Select Committee on Intelligence.*

## PART 2—RULES OF PROCEDURE OF THE TASK FORCE OF MEMBERS OF THE HOUSE COMMITTEE ON FOREIGN AFFAIRS TO INVESTIGATE CERTAIN ALLEGATIONS CONCERNING THE HOLDING OF AMERICANS AS HOSTAGES BY IRAN IN 1980

### ["October Surprise Task Force"]

### Rule 1. Rules

1.1 The provisions of House Resolution 258, 102nd Congress, 2nd Session, establishing this Task Force, and the Rules of the House of Representatives where not inconsistent therewith, are the rules of the Task Force, together with these Rules.

1.2 These Rules may be modified, amended, or repealed by the Task Force, provided that a notice in writing of the proposed changes has been given to each member at least 48 hours prior to the meeting at which action thereon is to be taken. Notwithstanding the provisions of Rule 3, proxies may not be used in any vote to modify, amend, adopt, or repeal any rule of the Task Force. The changes shall become effective immediately and shall be published in the Congressional Record.

### Rule 2. Convening of Meetings

2.1 The Task Force may schedule a regular day and hour to meet.

2.2 The chairman shall have authority, upon proper notice, to call such additional meetings of the Task Force as he may deem necessary, and to dispense with regular meetings when, in his judgment, there is no need therefore, and may delegate such authority to any other member of the Task Force.

2.3 A majority of the members of the Task Force may call a special meeting for a specific matter pursuant to the procedures specified in House Rule XI(2)(c)(2).

2.4 In the case of any meeting of the Task Force, other than a regularly scheduled meeting, the clerk of the Task Force shall notify each member of the Task Force of the time and place of the meeting and shall give reasonable notice which, except in extraordinary circumstances, shall be at least 24 hours in advance of any meeting held in Washington, D.C., and at least 48 hours in the case of any meeting held outside Washington, D.C.

### Rule 3. Meeting Procedures

3.1 One-third of the members of the Task Force shall constitute a quorum for the transaction of business other than the reporting of a matter, which shall require a majority of the Task Force, except that two members shall constitute a quorum for hearing testimony.

3.2 All meetings or hearings of the Task Force shall be conducted in open session, unless a majority of members of the Task Force voting, there being in attendance at least two members of the Task Force, vote to close a meeting or hearing.

3.3 When a quorum for any particular purpose is present, general proxies may be counted for that purpose. Proxies may be general or may be limited to specific matters. A vote by any member of the Task Force with respect to any matter being considered may be cast by proxy if the proxy authorization is in writing, asserts that the member is absent on official business or is otherwise unable to be present, and designates the member or alternate member who is to execute the proxy authorization. Each proxy to be effective shall be signed by the member assigning his vote and shall contain the date and time that the proxy is signed. Proxies shall be effective at the session for which they are provided, or if that session is rescheduled, at the rescheduled session. Proxies shall not reduce the quorum required for reporting contempt matters and will not be counted towards the two-thirds minimum requirement pursuant to 18 U.S.C. § 6005 needed to seek an immunity order.

3.4 It shall be the duty of a staff officer designated by the chairman to keep or cause to be kept a stenographic record of all Task Force proceedings. All transcripts, affidavits, and depositions, *and copies and extracts thereof*, shall be the property of the Task Force, and not of the witnesses, unless the Task Force determines otherwise.

3.5 The Chairman, or in his absence a member designated by the chairman, shall preside over all meetings and hearings of the Task Force.

### Rule 4. Subpoenas

4.1 The chairman, upon consultation with the ranking Republican member, shall authorize and issue subpoenas. In addition, the Task Force may itself vote to authorize and issue subpoenas. Subpoenas shall be issued under the seal of the House and attested by the Clerk, and may be served by any persons designated by the chairman. Subpoenas shall be issued upon the chairman's signature or that of a member designated by him or by the Task Force.

4.2 Orders for the furnishing of information by interrogatory, the inspecting of locations and systems of records upon notice except in exigent circumstances, the obtaining of evidence in other countries by means of letters rogatory or otherwise, and other processes for obtaining information available to the Task Force, shall be authorized and issued by the chairman, upon consultation with the ranking Republican member, or by the Task Force. In addition to the procedures provided for in Rule 4.1 and 4.4, requests for investigations, reports, and other assistance from any agency of the executive, legislative, and judicial branches of the federal government, may be made by the chairman, upon consultation with the ranking Republican member, or by the Task Force.

4.3 Provisions may be included in the process of the Task Force to prevent the disclosure of Task Force demands for information, when deemed necessary for the security of information or the progress of the investigation by the chairman or member designat-

ed by him or the Task Force, such as requiring that companies receiving subpoenas for financial or toll records make no disclosure to customers regarding the subpoena for ninety days or prohibiting the revelation by witnesses and their counsel of Task Force inquiries.

4.4 A subpoena duces tecum for documents may be issued whose return shall occur at a deposition or at another time and place other than at a hearing or meeting. When a return on such a subpoena or order is incomplete or accompanied by an objection, the chairman, upon consultation with the ranking Republican member or, if unavailable, the senior Republican member, may convene a meeting or hearing on shortened notice to determine the adequacy of the return and to rule on the objection or may refer the issues raised by the return for decision by poll of the Task Force. At a meeting or hearing for testimony on such a return, two members shall constitute a quorum.

### Rule 5. Broadcasting, Television, and Photography

5.1 Whenever any hearing or meeting conducted by the Task Force is open to the public, the Task Force may permit that hearing or meeting to be covered, in whole or in part, by television broadcast, radio broadcast, and still photography, or by any of such methods of coverage, under the following rules:

(1) If the television or radio coverage of the hearing or meeting is to be presented to the public as live coverage, that coverage shall be conducted and presented without commercial sponsorship.

(2) The chairman may set limits on the number of television cameras, all operating from fixed positions, that shall be permitted in a hearing room. The allocation among the television media of the positions of the number of television cameras permitted in a hearing room shall be in accordance with fair and equitable procedures devised by the Executive Committee of the Radio and Television Correspondents' Galleries.

(3) Television cameras shall be placed so as not to obstruct in any way the space between any witness giving evidence or testimony and any member of the committee, or the visibility of that witness and that member to each other.

(4) Television cameras shall not be placed in positions which obstruct unnecessarily the coverage of the hearing or meeting by the other media.

(5) Equipment necessary for coverage by the television and radio media shall not be installed in, or removed from the hearing room while the Task Force is in session.

(6) Floodlights, spotlights, and flashguns shall not be used in providing any method of coverage of the hearing or meeting, except that the television media may install additional lighting in the hearing room, without cost to the Government, in order to raise the ambient lighting level in the hearing room to the lowest level necessary to provide adequate television coverage of the hearing at the current state of the art of television coverage.

(7) The chairman may set limits on the number of press photographers permitted to cover a hearing or meeting by still photography. In the selection of these photographers, preference shall be given to photographers from Associated Press Photos and United Press International Newspictures. If request is made by more than the limit set by the chairman for coverage of the hearing by still photography, that coverage shall be made on the basis of a fair and equitable pool arrangement devised by the Standing Committee of Press Photographers.

(8) Photographers shall not position themselves, at any time during the course of the hearing or meeting, between the witness table and the Task Force members.

(9) Photographers shall not place themselves in positions which obstruct unnecessarily the coverage of the hearing or meeting by the other media.

(10) Personnel providing coverage by the television and radio media shall be then currently accredited to the Press Photographers' Gallery.

(11) Personnel providing coverage by still photography shall be then currently accredited to the Press Photographers' Gallery.

(12) Personnel providing coverage by the television and radio media and by still photography shall conduct themselves and their coverage activities in an orderly and unobtrusive manner.

## Rule 6. Taking of Testimony at Hearings

6.1 Witnesses required to appear before the Task Force shall be given, absent extraordinary circumstances, at least forty-eight hours' notice and all witnesses shall be furnished with a copy of these rules, House Rules X and XI and H. Res. 258.

6.2 All witnesses at public or executive hearings who testify to matters of fact shall be sworn unless the chairman authorizes waiver of the oath.

6.3 Members of the Task Force who so desire shall have not to exceed five minutes to interrogate each witness until such time as each member has had an opportunity to interrogate such witness. The presiding member, in consultation with the ranking Republican member present, may establish a format for additional or sustained questioning of any witness by the chair or by another member.

6.4 Counsel representing any witness and accompanying such witness shall be permitted to be present during the testimony of such witness at any public or executive hearing, and to advise such witness while he is testifying on his legal rights; provided, however, that in the case of any witness who is an officer or employee of the government, or of a corporation or association, or represented by counsel representing other witnesses, the chairman of the Task Force, upon consultation with the ranking Republican member, may rule that such representation creates a conflict of interest, and that the witness shall be represented by other counsel without

13

such conflict. Counsel shall not be permitted to make a statement, unless authorized to do so by the chairman.

6.5 The chairman, upon consultation with the ranking Republican member, if he deems it necessary to maintain the security of classified subjects being discussed at closed hearings, may require that any personal counsel be qualified by having appropriate clearance, and that the witness or counsel, or both, execute nondisclosure agreements with the Task Force.

6.6 A witness who is unable to obtain counsel, or to obtain counsel with requisite clearance, may inform the Task Force of such fact, and if, consistent with the notice given under section 6.1 hereof the Task Force is so informed at least 24 hours prior to the witness' appearance, the Task Force shall then endeavor to obtain voluntary counsel for the witness. Such counsel shall act solely for the witness and not the Task Force. Failure to obtain qualified counsel will not excuse the witness from appearing and testifying.

6.7 Counsel shall conduct themselves in an ethical and professional manner. The presiding member may punish breaches of order and decorum, and of professional ethics on the part of counsel, by censure and exclusion from the hearing, and the Task Force may cite the offender to the House for contempt. If counsel is excluded, the provisions of Rule 6.6 hereof for a witness who is unable to obtain qualified counsel shall apply.

6.8 Any witness desiring to make an introductory statement in executive or public hearings shall file a copy of such statement with the chairman or clerk of the Task Force 48 hours in advance of the hearings at which the statement is to be presented unless the Task Force by majority vote waives this requirement. The presiding member shall reduce the 48 hours proportionately for witnesses who receive less than 72 hours' notice of the hearing The presiding member shall determine whether such statement may be read or placed in the record of the hearing. Unless the Task Force determines otherwise, a witness who appears before the Task Force under a grant of immunity shall not be permitted to make a statement or testify except to respond directly to questions posed by members or staff.

6.9 An accurate stenographic record shall be kept of the testimony of all witnesses in executive and public hearings. A witness may obtain a transcript copy of his testimony given at a public session. If the witness testified at an executive session, the record of his testimony shall be made available for inspection by the witness and his counsel, and the chairman may authorize provision of a copy to the witness or his counsel if such testimony does not include classified information.

6.10 No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the Task Force.

6.11 In the presiding member's discretion, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The presiding member may condition the filing of such a sworn statement upon the offeror's agreeing to appear personally before the Task Force and to testify concerning the matters contained in his sworn statement, as well as any other matters related to the subject of the investigation before the Task Force.

14

## Rule 7. Affidavits and Depositions

7.1 The chairman, upon consultation with the ranking Republican member, or the Task Force, may authorize the taking of affidavits, and of depositions pursuant to notice or subpoena. Such authorization may occur on a case-by-case basis, or by instructions to take a series of affidavits or depositions. The chairman may either issue the deposition notices himself, or direct the chief counsel to do so. Notices for the taking of depositions shall specify a time and place for examination. Affidavits and depositions shall be taken under oath administered by a member or a person otherwise authorized by law to administer oaths. Such depositions may, if deemed necessary by the chairman in consultation with the ranking Republican member, be taken by telephone.

7.2 The Task Force shall not initiate procedures leading to contempt proceedings in the event a witness fails to appear at a deposition unless the deposition notice was accompanied by a Task Force subpoena authorized and issued by the chairman or the Task Force pursuant to Rule 4 hereof regarding subpoenas.

7.3 Witnesses may be accompanied at a deposition by counsel representing the witness to advise them of their rights, subject to the provisions of Rules 6.4, 6.5, 6.6 and 6.7 hereof. Absent special permission or instructions from the chairman, no one may be present in depositions except members, chief counsel, chief minority counsel, staff designated by the chief counsel and chief minority counsel, an official reporter, the witness and counsel representing the witness; observers or counsel for other persons or for agencies may not attend.

7.4 Witnesses shall be examined in depositions by a member or members or by the chief counsel, chief minority counsel or staff designated by the chairman. Objections by the witness as to the form of questions shall be noted for the record. If a witness objects to a question and refuses to answer, the members or staff may proceed with the deposition, or may obtain, at the time or at a subsequent time, a ruling on the objection by telephone or otherwise from the chairman or his designee. The Task Force shall not initiate procedures leading to contempt for refusals to answer questions at a deposition unless the witness refuses to testify after his objection has been overruled and after he has been ordered and directed to answer by the chairman or a member designated by the chairman, upon consultation with the ranking Republican member or his member designee.

7.5 The staff shall insure that the testimony is either transcribed or electronically recorded, or both. If a witness' testimony is transcribed, he shall be furnished with an opportunity to review a copy. No later than five days thereafter, the staff shall enter the changes, if any, requested by the witness, with a statement of the witness' reasons for the changes, and the witness shall be instructed to sign the transcript. The individual administering the oath, if other than a Member, shall certify on the transcript that the witness was duly sworn in his presence, the transcriber shall certify that the transcript is a true record of the testimony, and the transcript shall be filed, together with any electronic recording, with the clerk of the Task Force in Washington, D.C. Affidavits and

depositions shall be deemed to have been taken in Washington, D.C. once filed there with the clerk of the Task Force for the Task Force's use.

7.6 All depositions, affidavits, and other materials received in the investigation shall be considered nonpublic until received by the Task Force. Once received by the Task Force, use of such materials shall be governed by the Task Force rules. Classified information or material shall not be used in open session except as permitted by the Task Force, which shall require a vote of a majority of the members of the Task Force.

7.7 Written interrogatories and requests for admission may be authorized and issued by the Task Force or chairman, in consultation with the ranking Republican member, and shall specify a date for filing an answer with the chief clerk. Written interrogatories and requests for admissions shall be answered under oath.

### Rule 8. Procedures for Handling of Classified or Sensitive Materials

8.1 Staff offices shall operate under strict security precautions. The chairman may request the Clerk and Sergeant at Arms to provide assistance necessary to insure strict security. Sensitive or classified documents and material shall be segregated and stored in an appropriately secure storage area. They may be examined only at secure reading facilities. Copying, duplicating, or removal from the offices of such documents and other materials are prohibited except as is necessary for authorized use in, or preparation for, interviews, depositions, or meetings or hearings.

8.2 The Task Force may direct that particular matters or classes of matter shall not be made available to any person by its members, staff, or others, or may impose any other restriction. Classified information or classified material possessed or controlled by the Task Force, or information deemed sensitive by the Task Force, shall not be made available to any person by its members or staff or anyone who has access to the material except by vote of the Task Force, which shall require a vote of the majority of the members of the Task Force.

8.3 Each member of the Task Force shall at all times have access to all papers and other materials received from any source. The chief counsel, as designated by the chairman, shall be responsible for the control, under appropriate security procedures, of all classified papers and other classified materials in the possession of the Task Force, and for the maintenance, under such procedures, of a registry which will number and identify all such classified materials. Such registry shall be available to any member of the Task Force.

8.4 Access by staff to classified information shall be limited on a need-to-know basis, pursuant to instructions of the chairman, acting in consultation with the ranking Republican member, either on a case-by-case basis or by general instructions to the chief counsel and chief minority counsel. All staff with such access shall be required to have appropriate security clearance. The chief counsel shall maintain a list, available to chief minority counsel, of those

staff who may attend executive sessions and have access to classified materials.

8.5 The chairman, in consultation with the ranking Republican member, may limit staff attendance at certain executive sessions, and staff access to certain categories of classified materials, which involve matters of particularly high sensitivity.

8.6 Members who are not members of the Task Force shall be granted access to such hearings, records, data, charts and files of the Task Force and shall be admitted on a nonparticipatory basis to hearings of the Task Force, as the chairman deems appropriate, which involve classified material, apart from material otherwise restricted by the Task Force, on the basis of the following provisions:

(1) Members who desire to examine materials in the possession of the Task Force or to attend Task Force hearings on a nonparticipatory basis should notify the clerk of the Task Force in Writing.

(2) Each such request by a member must be considered by the Task Force, a quorum for the reporting of matter being present, at the earliest practicable opportunity. The Task Force must determine by record vote whatever action it deems necessary in light of all the circumstances of each individual request. The Task Force shall take into account in its deliberations, such considerations as the sensitivity of the information sought to the national defense or the confidential conduct of the foreign relations of the United States, the likelihood of its being directly or indirectly disclosed, the jurisdictional interest of the member making the request and such other concerns—constitutional or otherwise—as affect the public interest of the United States. Such actions as the Task Force may take include, but are not limited to: (i) approving the request, in whole or part; (ii) denying the request; (iii) providing in different form than requested information or material which is the subject of the request.

(3) In matters touching on such requests, the Task Force may, in its discretion, consult the Director of Central Intelligence and such other officials as it may deem necessary.

(4) In the event that the member making the request in question does not accede to the determination or any part thereof of the Task Force as regards the request, that member should notify the Task Force in writing of the grounds for such disagreement. The Task Force shall subsequently consider the matter and decide, by record vote, what further action or recommendation, if any, it will take.

(5) Members examining material pursuant to this rule are prohibited to disclose the material further, and every member shall be furnished a copy of this rule prior to examining such material.

8.7 Other than as provided for in rule 8.8 and 6.10, no member of the Task Force or its staff shall disclose, in whole or in part or by way of summary, to any person, governmental agency or official, outside the Task Force and its staff, for any purpose or in connection with any proceeding, judicial or otherwise, any testimony taken, including the identity of witnesses who have testified or will testify, or material presented or discussions had, in depositions or

1

at meetings and hearings held in executive session, or other materials or information designated as sensitive by the chairman, unless otherwise authorized by Task Force or the chairman. All members of the Task Force and its staff shall agree in writing to abide by the conditions of a non-disclosure oath promulgated by the Task Force consistent with that used by the House Permanent Select Committee on Intelligence.

8.8 The chairman and ranking Republican member shall be authorized to insure that the Speaker and Republican Leader are fully informed regarding the investigation, any other provisions of these rules notwithstanding.

## Rule 9. Staff, Detailees, and Consultants

9.1 The chairman, upon consultation with the ranking Republican member, may employ and fix the compensation of such clerks, experts, consultants, technicians, attorneys, investigators and clerical and stenographic assistants as are considered necessary to carry out the purposes of the Resolution. In addition, the chairman, upon consultation with the ranking Republican member, may designate various staff of the Congress, at the written recommendation of members of the Task Force, as associate staff to the Task Force. Upon termination of employment by the Task Force, each member of the staff, or consultant, shall surrender all classified and other material relating to the work of the Task Force which came into his possession while in the employ of the Task Force.

9.2 In the event of an unauthorized release of information or other violation, the chairman or the Task Force may refer the matter to the House Committee on Standards of Official Conduct. Nothing in these rules shall be construed to abridge the right of a Member to make or transmit a complaint to the Committee on the Standards of Official Conduct, or shall be construed to expand the authority of that committee, over matters related to the conduct of this Task Force's investigation pursuant to House Resolution 258, beyond what that resolution provides. The employment of any member of the staff or consultant who fails to conform to any of these Rules may be immediately terminated by the chairman upon consultation with the ranking Republican member.

9.3 The chairman, upon consultation with the ranking Republican member, shall have the authority to utilize the services, information, facilities, and personnel of the departments and agencies of the government. Requests by the chairman may specify by name, or describe otherwise, the personnel to be detailed.

9.4 For purposes of these Rules, Task Force staff shall include all employees hired pursuant to rule 9.1, all associate staff designated pursuant to Rule 9.1, and all staff of the Speaker, Majority Leader and the Republican Leader who are appropriately cleared and designated in writing.

9.5 The chairman, upon consultation with the ranking Republican member, shall have the authority to procure the temporary or intermittent services of experts or consultants or organizations thereof to make studies or assist or advise the Task Force with respect to any matter under investigation. Government personnel detailed to the Task Force, and consultants, shall be deemed staff of

18

the Task Force to the extent necessary for the purposes of their designated association, detail, or consultancy, including the purposes of interrogation of witnesses and security of information under Rules 5, 6, 7, 8 and 9 hereof.

9.6 The chairman, upon consultation with the ranking Republican member, may establish such additional personnel, physical, communications, and document security procedures, not inconsistent with these rules, as he deems necessary to safeguard classified information or materials possessed or controlled by the Task Force.

## PART 3—SELECTED RULES OF THE HOUSE OF REPRESENTATIVES

Following are selected Rules of the House of Representatives which are also a part of the Task Force rules and which affect its organization, administration, and operation. The Rules cited are not exclusive of other Rules of the House of Representatives applicable to the Task Force.

### Rule X. Establishment and Jurisdiction of Standing Committees

### The Committees and Their Jurisdiction

1. There shall be in the House the following standing committees, each of which shall have the jurisdiction and related functions assigned to it by this clause and clauses 2, 3, and 4; and all bills, resolutions, and other matters relating to subjects within the jurisdiction of any standing committee as listed in this clause shall (in accordance with and subject to clause 5) be referred to such committees, as follows:

(a) **Committee on Agriculture.**

(1) Adulteration of seeds, insect pests, and protection of birds and animals in forest reserves.

(2) Agriculture generally.

(3) Agricultural and industrial chemistry.

(4) Agricultural colleges and experiment stations.

(5) Agricultural economics and research.

(6) Agricultural education extension services.

(7) Agricultural production and marketing and stabilization of prices of agricultural products, and commodities (not including distribution outside of the United States).

(8) Animal industry and diseases of animals.

(9) Crop insurance and soil conservation.

(10) Dairy industry.

(11) Entomology and plant quarantine.

(12) Extension of farm credit and farm security.

(13) Forestry in general, and forest reserves other than those created from the public domain.

(14) Human nutrition and home economics.

(15) Inspection of livestock and meat products.

(16) Plant industry, soils, and agricultural engineering.

(17) Rural electrification.

(18) Commodities exchanges.

(19) Rural development.

(b) **Committee on Appropriations.**

(1) Appropriation of the revenue for the support of the Government.

(2) Rescissions of appropriations contained in appropriation Acts.

(3) Transfers of unexpended balances.

(4) The amount of new spending authority (as described in the Congressional Budget Act of 1974) which is to be effective for a fiscal year, including bills and resolutions (reported by other committees) which provide new spending authority and are referred to the committee under clause 4(a).

The committee shall include separate headings for "Rescissions" and "Transfers of Unexpended Balances" in any bill or resolution as reported from the committee under its jurisdiction specified in subparagraph (2) or (3), with all proposed rescissions and proposed transfers listed therein; and shall include a separate section with respect to such rescissions or transfers in the accompanying committee report. In addition to its jurisdiction under the preceding provisions of this paragraph, the committee shall have the fiscal oversight function provided for in clause 2(b)(3) and the budget hearing function provided for in clause 4(a).

**(c) Committee on Armed Services.**

(1) Common defense generally.

(2) The Department of Defense generally, including the Departments of the Army, Navy, and Air Force generally.

(3) Ammunition depots; forts; arsenals; Army, Navy, and Air Force reservations and establishments.

(4) Conservation, development, and use of naval petroleum and oil shale reserves.

(5) Pay, promotion, retirement, and other benefits and privileges of members of the armed forces.

(6) Scientific research and development in support of the armed services.

(7) Selective service.

(8) Size and composition of the Army, Navy, and Air Force.

(9) Soldiers' and sailors' homes.

(10) Strategic and critical materials necessary for the common defense.

(11) Military applications of nuclear energy.

In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its general oversight function under clause 2(b)(1)), the committee shall have the special oversight function provided for in clause 3(a) with respect to international arms control and disarmament, and military dependents education.

**(d) Committee on Banking, Finance and Urban Affairs.**

(1) Banks and banking, including deposit insurance and Federal monetary policy.

(2) Money and credit, including currency and the issuance of notes and redemption thereof; gold and silver, including the coinage thereof; valuation and revaluation of the dollar.

(3) Urban development.

(4) Public and private housing.

(5) Economic stabilization, defense production, renegotiation, and control of the price of commodities, rents, and services.

(6) International finance.

(7) Financial aid to commerce and industry (other than transportation).

(8) International Financial and Monetary organizations.

(e)(1) **Committee on the Budget,** consisting of the following Members:

(A) Members who are members of other standing committees, including five Members who are members of the Committee on Appropriations, and five Members who are members of the Committee on Ways and Means;

(B) one Member from the leadership of the majority party; and

(C) one Member from the leadership of the minority party.

No Member other than the representative from the leadership of the majority party and the representative from the leadership of the minority party, shall serve as a member of the Committee on the Budget during more than three Congresses in any period of five successive Congresses (disregarding for this purpose any service performed as a member of such committee for less than a full session in any Congress), except that an incumbent chairman having served on the committee for three Congresses and having served as chairman of the committee for not more than one Congress shall be eligible for reelection to the committee as chairman for one additional Congress. Previous service on the Committee before the One Hundred Second Congress shall be disregarded, for the purposes of this prohibition during the One Hundred Second Congress, for the ranking minority member of the Committee (who is not the Member designated as the Member from the leadership of the minority party). A minority Member having served on the committee for three Congresses and having served as the ranking minority member in the last such Congress shall be eligible for reelection to the committee as ranking minority Member for one additional Congress. All selections of Members to serve on the committee shall be made without regard to seniority.

(2) All concurrent resolutions on the budget (as defined in section 3 of the Congressional Budget Act of 1974) and other matters required to be referred to the committee under titles III and IV of that Act.

(3) The committee shall have the duty—

(A) to report the matters required to be reported by it under titles III and IV of the Congressional Budget Act of 1974;

(B) to make continuing studies of the effect on budget outlays of relevant existing and proposed legislation and to report the results of such studies to the House on a recurring basis;

(C) to request and evaluate continuing studies of tax expenditures, to devise methods of coordinating tax expenditures, policies, and programs with direct budget outlays, and to report the results of such studies to the House on a recurring basis; and

(D) to review, on a continuing basis, the conduct by the Congressional Budget Office of its functions and duties.

(f) **Committee on the District of Columbia.**

(1) All measures relating to the municipal affairs of the District of Columbia in general, other than appropriations therefor, including—

(2) Adulteration of foods and drugs.

(3) Incorporation and organization of societies.

(4) Insurance, executors, administrators, wills, and divorce.

(5) Municipal code and amendments to the criminal and corporation laws.

(6) Municipal and juvenile courts.

(7) Public health and safety, sanitation, and quarantine regulations.

(8) Regulation of sale of intoxicating liquors.

(9) Taxes and tax sales.

(10) St. Elizabeths hospital.

**(g) Committee on Education and Labor.**

(1) Measures relating to education or labor generally.

(2) Child labor.

(3) Columbia Institution for the Deaf, Dumb, and Blind; Howard University; Freedmen's Hospital.

(4) Convict labor and the entry of goods made by convicts into interstate commerce.

(5) Labor standards.

(6) Labor statistics.

(7) Mediation and arbitration of labor disputes.

(8) Regulation or prevention of importation of foreign laborers under contract.

(9) Food programs for children in schools.

(10) United States Employees' Compensation Commission.

(11) Vocational rehabilitation.

(12) Wages and hours of labor.

(13) Welfare of miners.

(14) Work incentive programs.

In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its general oversight function under clause 2(b)(1)), the committee shall have the special oversight function provided for in clause 3(c) with respect to domestic educational programs and institutions, and programs of student assistance, which are within the jurisdiction of other committees.

**(h) Committee on Energy and Commerce.**

(1) Interstate and foreign commerce generally.

(2) National energy policy generally.

(3) Measures relating to the exploration, production, storage, supply, marketing, pricing, and regulation of energy resources, including all fossil fuels, solar energy, and other unconventional or renewable energy resources.

(4) Measures relating to the conservation of energy resources.

(5) Measures relating to the commercial application of energy technology.

(6) Measures relating to energy information generally.

(7) Measures relating to (A) the generation and marketing of power (except by federally chartered or Federal regional power marketing authorities), (B) the reliability and interstate transmission of, and ratemaking for, all power, and (C) the siting of generation facilities; except the installation of interconnections between Government waterpower projects.

(8) Interstate energy compacts.

23

(9) Measures relating to general management of the Department of Energy, and the management and all functions of the Federal Energy Regulatory Commission.

(10) Inland waterways.

(11) Railroads, including railroad labor, railroad retirement and unemployment, except revenue measures related thereto.

(12) Regulation of interstate and foreign communications.

(13) Securities and exchanges.

(14) Consumer affairs and consumer protection.

(15) Travel and tourism.

(16) Public health and quarantine.

(17) Health and health facilities, except health care supported by payroll deductions.

(18) Biomedical research and development.

Such committee shall have the same jurisdiction with respect to regulation of nuclear facilities and of use of nuclear energy as it has with respect to regulation of nonnuclear facilities and of use of nonnuclear energy. In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its general oversight functions under clause 2(b)(1)), such committee shall have the special oversight functions provided for in clause (3)(h) with respect to all laws, programs, and Government activities affecting nuclear and other energy.

(i) **Committee on Foreign Affairs.**

(1) Relations of the United States with foreign nations generally.

(2) Acquisition of land and buildings for embassies and legations in foreign countries.

(3) Establishment of boundary lines between the United States and foreign nations.

(4) Foreign loans.

(5) International conferences and congresses.

(6) Intervention abroad and declarations of war.

(7) Measures relating to the diplomatic service.

(8) Measures to foster commercial intercourse with foreign nations and to safeguard American business interests abroad.

(9) Neutrality.

(10) Protection of American citizens abroad and expatriation.

(11) The American National Red Cross.

(12) United Nations Organizations.

(13) Measures relating to international economic policy.

(14) Export controls, including nonproliferation of nuclear technology and nuclear hardware.

(15) International commodity agreements (other than those involving sugar), including all agreements for cooperation in the export of nuclear technology and nuclear hardware.

(16) Trading with the enemy.

(17) International education.

In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its general oversight function under clause 2(b)(1)), the committee shall have the special oversight functions provided for in clause 3(d) with respect to customs administration, intelligence activities relating to foreign policy, international financial and monetary organizations, and international fishing agreements.

**(j) Committee on Government Operations.**

(1) Budget and accounting measures, other than appropriations.

(2) The overall economy and efficiency of Government operations and activities, including Federal procurement.

(3) Reorganizations in the executive branch of the Government.

(4) Intergovernmental relationships between the United States and the States and municipalities, and general revenue sharing.

(5) National archives.

(6) Measures providing for off-budget treatment of Federal agencies or programs.

(7) Measures providing exemption from reduction under any order issued under part C of the Balanced Budget and Emergency Deficit Control Act of 1985.

In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its oversight functions under clause 2(b) (1) and (2)), the committee shall have the function of performing the activities and conducting the studies which are provided for in clause 4(c).

**(k) Committee on House Administration.**

(1) Appropriations from the contingent fund.

(2) Auditing and settling of all accounts which may be charged to the contingent fund.

(3) Employment of persons by the House, including clerks for Members and committees, and reporters of debates.

(4) Except as provided in clause 1(p)(4), matters relating to the Library of Congress and the House Library; statuary and pictures; acceptance or purchase of works of art for the Capitol; the Botanic Gardens; management of the Library of Congress, purchase of books and manuscripts; erection of monuments to the memory of individuals.

(5) Except as provided in clause 1(p)(4), matters relating to the Smithsonian Institution and the incorporation of similar institutions.

(6) Expenditure of contingent fund of the House.

(7) Matters relating to printing and correction of the Congressional Record.

(8) Measures relating to accounts of the House generally.

(9) Measures relating to assignment of office space for Members and committees.

(10) Measures relating to the disposition of useless executive papers.

(11) Measures relating to the election of the President, Vice President, or Members of Congress; corrupt practices; contested elections; credentials and qualifications; and Federal elections generally.

(12) Measures relating to services to the House, including the House Restaurant, parking facilities and administration of the House Office Buildings and of the House wing of the Capitol.

(13) Measures relating to the travel of Members of the House.

(14) Measures relating to the raising, reporting and use of campaign contributions for candidates for office of Representative in the House of Representatives and of Resident Commissioner to the United States from Puerto Rico.

(15) Measures relating to the compensation, retirement and other benefits of the Members, officers, and employees of the Congress. In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its general oversight function under clause 2(b)(1)), the committee shall have the function of performing the duties which are provided for in clause 4(d).

**(l) Committee on Interior and Insular Affairs.**

(1) Forest reserves and national parks created from the public domain.

(2) Forfeiture of land grants and alien ownership, including alien ownership of mineral lands.

(3) Geological Survey.

(4) Interstate compacts relating to apportionment of waters for irrigation purposes.

(5) Irrigation and reclamation, including water supply for reclamation projects, and easements of public lands for irrigation projects, and acquisition of private lands when necessary to complete irrigation projects.

(6) Measures relating to the care and management of Indians, including the care and allotment of Indian lands and general and special measures relating to claims which are paid out of Indian funds.

(7) Measures relating generally to the insular possessions of the United States, except those affecting the revenue and appropriations.

(8) Military parks and battlefields; national cemeteries administered by the Secretary of the Interior, and parks within the District of Columbia.

(9) Mineral land laws and claims and entries thereunder.

(10) Mineral resources of the public lands.

(11) Mining interests generally.

(12) Mining schools and experimental stations.

(13) Petroleum conservation on the public lands and conservation of the radium supply in the United States.

(14) Preservation of prehistoric ruins and objects of interest on the public domain.

(15) Public lands generally, including entry, easements, and grazing thereon.

(16) Relations of the United States with the Indians and the Indian tribes.

(17) Regulation of the domestic nuclear energy industry, including regulation of research and development reactors and nuclear regulatory research.

In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its general oversight function under clause 2(b)(1)), the committee shall have the special oversight functions provided for in clause 3(e) with respect to all programs affecting Indians and nonmilitary nuclear energy and research and development including the disposal of nuclear waste.

**(m) Committee on the Judiciary.**

(1) Judicial proceedings, civil and criminal generally.

(2) Apportionment of Representatives.

(3) Bankruptcy, mutiny, espionage, and counterfeiting.

(4) Civil liberties.

(5) Constitutional amendments.
(6) Federal courts and judges.
(7) Immigration and naturalization.
(8) Interstate compacts generally.
(9) Local courts in the Territories and possessions.
(10) Measures relating to claims against the United States.
(11) Meetings of Congress, attendance of Members and their acceptance of incompatible offices.
(12) National penitentiaries.
(13) Patent Office.
(14) Patents, copyrights, and trademarks.
(15) Presidential succession.
(16) Protection of trade and commerce against unlawful restraints and monopolies.
(17) Revision and codification of the Statutes of the United States.
(18) State and territorial boundary lines.
(19) Communist and other subversive activities affecting the internal security of the United States.

**(n) Committee on Merchant Marine and Fisheries.**
(1) Merchant marine generally.
(2) Oceanography and Marine Affairs, including coastal zone management.
(3) Coast Guard, including lifesaving service, lighthouses, lightships, and ocean derelicts.
(4) Fisheries and wildlife, including research, restoration, refuges, and conservation.
(5) Measures relating to the regulation of common carriers by water (except matters subject to the jurisdiction of the Interstate Commerce Commission) and to the inspection of merchant marine vessels, lights and signals, lifesaving equipment, and fire protection on such vessels.
(6) Merchant marine officers and seamen.
(7) Navigation and the laws relating thereto, including pilotage.
(8) Panama Canal and the maintenance and operation of the Panama Canal, including the administration, sanitation, and government of the Canal Zone; and interoceanic canals generally.
(9) Registering and licensing of vessels and small boats.
(10) Rules and international arrangements to prevent collisions at sea.
(11) United States Coast Guard and Merchant Marine Academies, and State Maritime Academies.
(12) International fishing agreements.

**(o) Committee on Post Office and Civil Service.**
(1) Census and the collection of statistics generally.
(2) All Federal Civil Service, including intergovernmental personnel.
(3) Postal-savings banks.
(4) Postal service generally, including the railway mail service, and measures relating to ocean mail and pneumatic-tube service; but excluding post roads.
(5) Status of officers and employees of the United States, including their compensation, classification, and retirement.
(6) Hatch Act.

(7) Holidays and celebrations.

(8) Population and demography.

**(p) Committee on Public Works and Transportation.**

(1) Flood control and improvement of rivers and harbors.

(2) Measures relating to the Capitol Building and the Senate and House Office Buildings.

(3) Measures relating to the construction or maintenance of roads and post roads, other than appropriations therefor; but it shall not be in order for any bill providing general legislation in relation to roads to contain any provision for any specific road, nor for any bill in relation to a specific road to embrace a provision in relation to any other specific road.

(4) Measures relating to the construction or reconstruction, maintenance, and care of the buildings and grounds of the Botanic Gardens, the Library of Congress, and the Smithsonian Institution.

(5) Measures relating to the purchase of sites and construction of post offices, customhouses, Federal courthouses, and Government buildings within the District of Columbia.

(6) Oil and other pollution of navigable waters.

(7) Public buildings and occupied or improved grounds of the United States generally.

(8) Public works for the benefit of navigation, including bridges and dams (other than international bridges and dams).

(9) Water power.

(10) Transportation, including civil aviation except railroads, railroad labor and pensions.

(11) Roads and the safety thereof.

(12) Water transportation subject to the jurisdiction of the Interstate Commerce Commission.

(13) Related transportation regulatory agencies, except (A) the Interstate Commerce Commission as it relates to railroads; (B) Federal Railroad Administration; and (C) Amtrak.

**(q) Committee on Rules.**

(1) The rules and joint rules (other than rules or joint rules relating to the Code of Official Conduct), and order of business of the House.

(2) Recesses and final adjournments of Congress.

(3) The Committee on Rules is authorized to sit and act whether or not the House is in session.

**(r) Committee on Science, Space, and Technology.**

(1) Astronautical research and development, including resources, personnel, equipment, and facilities.

(2) Bureau of Standards, standardization of weights and measures and the metric system.

(3) National Aeronautics and Space Administration.

(4) National Aeronautics and Space Council.

(5) National Science Foundation.

(6) Outer space, including exploration and control thereof.

(7) Science Scholarships.

(8) Scientific research, development, and demonstration, and projects therefor, and all federally owned or operated nonmilitary energy laboratories.

(9) Civil aviation research and development.

(10) Environmental research and development.

(11) All energy research, development, and demonstration, and projects therefor, and all federally owned or operated nonmilitary energy laboratories.

(12) National Weather Service.

In addition to its legislative jurisdiction under the preceding provisions of this paragraph (and its general oversight function under clause 2(b)(1)), the committee shall have the special oversight function provided for in clause 3(f) with respect to all nonmilitary research and development.

(s) **Committee on Small Business.**

(1) Assistance to and protection of small business, including financial aid.

(2) Participation of small-business enterprises in Federal procurement and Government contracts.

In addition to its legislative jurisdiction under the preceding provisions of this paragraph and (its general oversight function under clause 2(b)(1)), the committee shall have the special oversight function provided for in clause 3(g) with respect to the problems of small business.

(t) **Committee on Standards of Official Conduct.**

(1) Measures relating to the Code of Official Conduct.

In addition to its legislative jurisdiction under the preceding provision of this paragraph (and its general oversight function under clause 2(b)(1)), the committee shall have the functions with respect to recommendations, studies, investigations, and reports which are provided for in clause 4(e), and the functions designated in titles I and V of the Ethics in Government Act of 1978 and sections 7342, 7351, and 7353 of title 5, United States Code.

(u) **Committee on Veterans' Affairs.**

(1) Veterans' measures generally.

(2) Cemeteries of the United States in which veterans of any war or conflict are or may be buried, whether in the United States or abroad, except cemeteries administered by the Secretary of the Interior.

(3) Compensation, vocational rehabilitation, and education of veterans.

(4) Life insurance issued by the Government on account of service in the Armed Forces.

(5) Pensions of all the wars of the United States, general and special.

(6) Readjustment of servicemen to civil life.

(7) Soldiers' and sailors' civil relief.

(8) Veterans' hospitals, medical care, and treatment of veterans.

(v) **Committee on Ways and Means.**

(1) Customs, collection districts, and ports of entry and delivery.

(2) Reciprocal trade agreements.

(3) Revenue measures generally.

(4) Revenue measures relating to the insular possessions.

(5) The bonded debt of the United States (subject to the last sentence of clause 4(g) of this rule).

(6) The deposit of public moneys.

(7) Transportation of dutiable goods.

(8) Tax exempt foundations and charitable trusts.

(9) National social security, except (A) health care and facilities programs that are supported from general revenues as opposed to payroll deductions and (B) work incentive programs.

## General Oversight Responsibilities

2. (a) In order to assist the House in—

(1) its analysis, appraisal, and evaluation of (A) the application, administration, execution, and effectiveness of the laws enacted by the Congress, or (B) conditions and circumstances which may indicate the necessity or desirability of enacting new or additional legislation, and

(2) its formulation, consideration, and enactment of such modifications of or changes in those laws, and of such additional legislation, as may be necessary or appropriate,

the various standing committees shall have oversight responsibilities as provided in paragraph (b).

(b)(1) Each standing committee (other than the Committee on Appropriations and the Committee on the Budget) shall review and study, on a continuing basis, the application, administration, execution, and effectiveness of those laws, or parts of laws, the subject matter of which is within the jurisdiction of that committee and the organization and operation of the Federal agencies and entities having responsibilities in or for the administration and execution thereof, in order to determine whether such laws and the programs thereunder are being implemented and carried out in accordance with the intent of the Congress and whether such programs should be continued, curtailed, or eliminated. In addition, each such committee shall review and study any conditions or circumstances which may indicate the necessity or desirability of enacting new or additional legislation within the jurisdiction of that committee (whether or not any bill or resolution has been introduced with respect thereto), and shall on a continuing basis undertake future research and forecasting on matters within the jurisdiction of that committee. Each such committee having more than twenty members shall establish an oversight subcommittee, or require its subcommittees, if any, to conduct oversight in the area of their respective jurisdiction, to assist in carrying out its responsibilities under this subparagraph. The establishment of oversight subcommittees shall in no way limit the responsibility of the subcommittees with legislative jurisdiction from carrying out their oversight responsibilities.

(2) The Committee on Government Operations shall review and study, on a continuing basis, the operation of Government activities at all levels with a view to determining their economy and efficiency.

(3) The Committee on Appropriations shall conduct such studies and examinations of the organization and operation of executive departments and other executive agencies (including any agency the majority of the stock of which is owned by the Government of the United States) as it may deem necessary to assist it in the determination of matters within its jurisdiction.

(c) Each standing committee of the House shall have the function of reviewing and studying on a continuing basis the impact or prob-

able impact of tax policies affecting subjects within its jurisdiction as described in clauses 1 and 3.

## Special Oversight Functions

3. (a) The Committee on Armed Services shall have the function of reviewing and studying, on a continuing basis, all laws, programs, and Government activities dealing with or involving international arms control and disarmament and the education of military dependents in schools.

(b) The Committee on the Budget shall have the function of—

(1) making continuing studies of the effect on budget outlays of relevant existing and proposed legislation, and reporting the results of such studies to the House on a recurring basis; and

(2) requesting and evaluating continuing studies of tax expenditures, devising methods of coordinating tax expenditures, policies, and programs with direct budget outlays, and reporting the results of such studies to the House on a recurring basis.

(c) The Committee on Education and Labor shall have the function of reviewing, studying, and coordinating, on a continuing basis, all laws, programs, and Government activities dealing with or involving domestic educational programs and institutions, and programs of student assistance, which are within the jurisdiction of other committees.

(d) The Committee on Foreign Affairs shall have the function of reviewing and studying, on a continuing basis, all laws, programs, and Government activities dealing with or involving customs administration, intelligence activities relating to foreign policy, international financial and monetary organizations, and international fishing agreements.

(e) The Committee on Interior and Insular Affairs shall have the function of reviewing and studying, on a continuing basis, all laws, programs, and Government activities dealing with Indians and nonmilitary nuclear energy and research and development including the disposal of nuclear waste.

(f) The Committee on Science, Space, and Technology shall have the function of reviewing and studying, on a continuing basis, all laws, programs, and Government activities dealing with or involving nonmilitary research and development.

(g) The Committee on Small Business shall have the function of studying and investigating, on a continuing basis, the problems of all types of small business.

(h) The Committee on Energy and Commerce shall have the function of reviewing and studying on a continuing basis, all laws, programs and Government activities relating to nuclear and other energy.

(i) The Committee on Rules shall have the function of reviewing and studying, on a continuing basis, the congressional budget process, and the committee shall, from time to time, report its findings and recommendations to the House.

## Additional Functions of Committees

4. (a)(1)(A) The Committee on Appropriations shall, within 30 days after the transmittal of the Budget to the Congress each year, hold hearings on the Budget as a whole with particular reference to—

    (i) the basic recommendations and budgetary policies of the President in the presentation of the Budget; and

    (ii) the fiscal, financial, and economic assumptions used as bases in arriving at total estimated expenditures and receipts.

(B) In holding hearings pursuant to subdivision (A), the committee shall receive testimony from the Secretary of the Treasury, the Director of the Office of Management and Budget, the Chairman of the Council of Economic Advisers, and such other persons as the committee may desire.

(C) Hearings pursuant to subdivision (A), or any part thereof, shall be held in open session, except when the committee, in open session and with a quorum present, determines by roll call vote that the testimony to be taken at that hearing on that day may be related to a matter of national security: *Provided, however,* That the committee may by the same procedure close one subsequent day of hearing. A transcript of all such hearings shall be printed and a copy thereof furnished to each Member, Delegate, and the Resident Commissioner from Puerto Rico.

(D) Hearings pursuant to subdivision (A), or any part thereof, may be held before joint meetings of the committee and the Committee on Appropriations of the Senate in accordance with such procedures as the two committees jointly may determine.

(2) Whenever any bill or resolution which provides new spending authority described in section 401(c)(2)(C) of the Congressional Budget Act of 1974 is reported by a committee of the House and the amount of new budget authority which will be required for the fiscal year involved if such bill or resolution is enacted as so reported exceeds the appropriate allocation of new budget authority reported as described in clause 4(h) in connection with the most recently agreed to concurrent resolution on the budget for such fiscal year, such bill or resolution shall then be referred to the Committee on Appropriations with instructions to report it, with the committee's recommendations and (if the committee deems it desirable) with an amendment limiting the total amount of new spending authority provided in the bill or resolution, within 15 calendar days (not counting any day on which the House is not in session) beginning with the day following the day on which it is so referred. If the Committee on Appropriations fails to report the bill or resolution within such 15-day period, the committee shall be automatically discharged from further consideration of the bill or resolution and the bill or resolution shall be placed on the appropriate calendar.

(3) In addition, the Committee on Appropriations shall study on a continuing basis those provisions of law which (on the first day of the first fiscal year for which the congressional budget process is effective) provide spending authority of permanent budget authority, and shall report to the House from time to time its recommendations for terminating or modifying such provisions.

32

(b) The Committee on the Budget shall have the duty—

(1) to review on a continuing basis the conduct by the Congressional Budget Office of its functions and duties;

(2) to hold hearings, and receive testimony from Members of Congress and such appropriate representatives of Federal departments and agencies, the general public, and national organizations as it deems desirable, in developing the concurrent resolutions on the budget for each fiscal year;

(3) to make all reports required of it by the Congressional Budget Act of 1974, including the reporting of reconciliation bills and resolutions when so required;

(4) to study on a continuing basis those provisions of law which exempt Federal agencies or any of their activities or outlays from inclusion in the Budget of the United States Government, and to report to the House from time to time its recommendations for terminating or modifying such provisions; and

(5) to study on a continuing basis proposals designed to improve and facilitate methods of congressional budget-making, and to report to the House from time to time the results of such study together with its recommendations.

(c)(1) The Committee on Government Operations shall have the general function of—

(A) receiving and examining reports of the Comptroller General of the United States and of submitting such recommendations to the House as it deems necessary or desirable in connection with the subject matter of such reports;

(B) evaluating the effects of laws enacted to reorganize the legislative and executive branches of the Government; and

(C) studying intergovernmental relationships between the United States and the States and municipalities, and between the United States and international organizations of which the United States is a member.

(2) In addition to its duties under subparagraph (1), the Committee on Government Operations may at any time conduct investigations of any matter without regard to the provisions of clause 1, 2, or 3 (or this clause) conferring jurisdiction over such matter upon another standing committee. The committee's findings and recommendations in any such investigation shall be made available to the other standing committee or committees having jurisdiction over the matter involved (and included in the report of any such other committee when required by clause 2(l)(3) of Rule XI).

(d) The Committee on House Administration shall have the function of—

(1) examining all bills, amendments, and joint resolutions after passage by the House and, in cooperation with the Senate, examining all bills and joint resolutions which shall have passed both Houses to see that they are correctly enrolled, forthwith presenting those which originated in the House to the President of the United States in person after their signature by the Speaker of the House and the President of the Senate and reporting the fact and date of such presentation to the House;

(2) reporting to the Sergeant-at-Arms of the House concerning the travel of Members of the House; and

(3) providing, through the House Information Systems, a scheduling service which shall be used by all the committees and subcommittees of the House to eliminate, insofar as possible, any meeting and scheduling conflicts.

(e)(1) The Committee on Standards of Official Conduct is authorized: (A) to recommend to the House from time to time such administrative actions as it may deem appropriate to establish or enforce standards of official conduct for Members, officers, and employees of the House, and any letter of reproval or other administrative action of the committee pursuant to an investigation under subdivision (B) shall only be issued or implemented as a part of a report required by such subdivision; (B) to investigate, subject to subparagraph (2) of this paragraph, any alleged violation, by a Member, officer, or employee of the House, of the Code of Official Conduct or of any law, rule, regulation, or other standard of conduct applicable to the conduct of such Member, officer, or employee in the performance of his duties or the discharge of his responsibilities, and after notice and hearing (unless the right to a hearing is waived by the Member, officer, or employee), shall report to the House its findings of fact and recommendations, if any, upon the final disposition of any such investigation, and such action as the committee may deem appropriate in the circumstances; (C) to report to the appropriate Federal or State authorities, with the approval of the House, any substantial evidence of a violation, by a Member, officer, or employee of the House, of any law applicable to the performance of his duties or the discharge of his responsibilities, which may have been disclosed in a committee investigation; (D) to give consideration to the request of any Member, officer, or employee of the House for an advisory opinion with respect to the general propriety of any current or proposed conduct of such Member, officer, or employee and, with appropriate deletions to assure the privacy of the individual concerned, to publish such opinion for the guidance of other Members, officers, and employees of the House; and (E) to give consideration to the request of any Member, officer, or employee of the House for a written waiver in exceptional circumstances with respect to clause 4 of rule XLIII.

(2)(A) No resolution, report, recommendation, or advisory opinion relating to the official conduct of a Member, officer, or employee of the House shall be made by the Committee on Standards of Official Conduct, and no investigation of such conduct shall be undertaken by such committee, unless approved by the affirmative vote of a majority of the members of the committee.

(B) Except in the case of an investigation undertaken by the committee on its own initiative, the committee may undertake an investigation relating to the official conduct of an individual Member, officer, or employee of the House of Representatives only—

(i) upon receipt of a complaint, in writing and under oath, made by or submitted to a Member of the House and transmitted to the committee by such Member, or

(ii) upon receipt of a complaint, in writing and under oath, directly from an individual not a Member of the House if the committee finds that such complaint has been submitted by such individual to not less than three Members of the House

who have refused, in writing, to transmit such complaint to the committee.

(C) No investigation shall be undertaken by the committee of any alleged violation of a law, rule, regulation, or standard of conduct not in effect at the time of the alleged violation; nor shall any investigation be undertaken by the committee of any alleged violation which occurred before the third previous Congress unless the committee determines that the alleged violation is directly related to any alleged violation which occurred in a more recent Congress.

(D) A member of the committee shall be ineligible to participate, as a member of the committee, in any committee proceeding relating to his or her official conduct. In any case in which a member of the committee is ineligible to act as a member of the committee under the preceding sentence, the Speaker of the House shall designate a Member of the House from the same political party as the ineligible member of the committee to act as a member of the committee in any committee proceeding relating to the official conduct of such ineligible member.

(E) A member of the committee may disqualify himself from participating in any investigation of the conduct of a Member, officer, or employee of the House upon the submission in writing and under oath of an affidavit of disqualification stating that he cannot render an impartial and unbiased decision in the case in which he seeks to disqualify himself. If the committee approves and accepts such affidavit of disqualification, the chairman shall so notify the Speaker and request the Speaker to designate a Member of the House from the same political party as the disqualifying member of the committee to act as a member of the committee in any committee proceeding relating to such investigation.

(F) No information or testimony received, or the contents of a complaint or the fact of its filing, shall be publicly disclosed by any committee or staff member unless specifically authorized in each instance by a vote of the full committee.

(f)(1) Each standing committee of the House shall, in its consideration of all bills and joint resolutions of a public character within its jurisdiction, insure that appropriations for continuing programs and activities of the Federal Government and the District of Columbia government will be made annually to the maximum extent feasible and consistent with the nature, requirements, and objectives of the programs and activities involved. For the purposes of this paragraph a Government agency includes the organizational units of government listed in clause 7(c) of Rule XIII.

(2) Each standing committee of the House shall review, from time to time, each continuing program within its jurisdiction for which appropriations are not made annually in order to ascertain whether such program could be modified so that appropriations therefor would be made annually.

(g) Each standing committee of the House shall, on or before February 25 of each year, submit to the Committee on the Budget (1) its views and estimates with respect to all matters to be set forth in the concurrent resolution on the budget for the ensuing fiscal year which are within its jurisdiction or functions, and (2) an estimate of the total amounts of new budget authority, and budget outlays resulting therefrom, to be provided or authorized in all bills

and resolutions within its jurisdiction which it intends to be effective during that fiscal year. The views and estimates submitted by the Committee on Ways and Means under the preceding sentence shall include a specific recommendation, made after holding public hearings, as to the appropriate level of the public debt which should be set forth in the concurrent resolution on the budget referred to in such sentence and serve as the basis for an increase or decrease in the statutory limit on such debt under the procedures provided by rule XLIX.

(h) As soon as practicable after a concurrent resolution on the budget for any fiscal year is agreed to, each standing committee of the House (after consulting with the appropriate committee or committees of the Senate) shall subdivide any allocations made to it in the joint explanatory statement accompanying the conference report on such resolution, and promptly report such subdivisions to the House, in the manner provided by section 302 or section 602 (in the case of fiscal years 1991 through 1995) of the Congressional Budget Act of 1974.

(i) Each standing committee of the House which is directed in a concurrent resolution on the budget to determine and recommend changes in laws, bills, or resolutions under the reconciliation process shall promptly make such determination and recommendations, and report a reconciliation bill or resolution (or both) to the House or submit such recommendations to the Committee on the Budget, in accordance with the Congressional Budget Act of 1974.

### Referral of Bills, Resolutions, and Other Matters to Committees

5. (a) Each bill, resolution, or other matter which relates to a subject listed under any standing committee named in clause 1 shall be referred by the Speaker in accordance with the provisions of this clause.

(b) Every referral of any matter under paragraph (a) shall be made in such manner as to assure to the maximum extent feasible that each committee which has jurisdiction under clause 1 over the subject matter of any provision thereof will have responsibility for considering such provision and reporting to the House with respect thereto. Any precedents, rulings, and procedures in effect prior to the Ninety-Fourth Congress shall be applied with respect to referrals under this clause only to the extent that they will contribute to the achievement of the objectives of this clause.

(c) In carrying out paragraphs (a) and (b) with respect to any matter, the Speaker may refer the matter simultaneously to two or more committees for concurrent consideration or for consideration in sequence (subject to appropriate time limitations in the case of any committee), or divide the matter into two or more parts (reflecting different subjects and jurisdictions) and refer each such part to a different committee, or refer the matter to a special ad hoc committee appointed by the Speaker with the approval of the House (from the members of the committees having legislative jurisdiction) for the specific purpose of considering that matter and reporting to the House thereon, or make such other provision as may be considered appropriate.

## Election and Membership of Committees; Chairman; Vacancies; Select and Conference Committees

6. (a)(1) The standing committees specified in clause 1 shall be elected by the House within the seventh calendar day beginning after the commencement of each Congress, from nominations submitted by the respective party caucuses. It shall always be in order to consider resolutions recommended by the respective party caucuses to change the composition of standing committees.

(2) One-half of the members of the Committee on Standards of Official Conduct shall be from the majority party and one-half shall be from the minority party. No Member shall serve as a member of the Committee on Standards of Official Conduct during more than 3 Congresses in any period of 5 successive Congresses (disregarding for this purpose any service performed as a member of such committee for less than a full session in any Congress).

(b) Membership on standing committees during the course of a Congress shall be contingent on continuing membership in the party caucus or conference that nominated Members for election to such committees. Should a Member cease to be a member of a particular party caucus or conference, said Member shall automatically cease to be a member of a standing committee to which he was elected on the basis of nomination by that caucus or conference. The chairman of the relevant party caucus or conference shall notify the Speaker whenever a Member ceases to be a member of a party caucus or conference and the Speaker shall notify the chairman of each standing committee on which said Member serves, that in accord with this rule, the Member's election to such committee is automatically vacated.

(c) One of the members of each standing committee shall be elected by the House, from nominations submitted by the majority party caucus, at the commencement of each Congress, as chairman thereof. In the temporary absence of the chairman, the member next in rank in the order named in the election of the committee, and so on, as often as the case shall happen, shall act as chairman; and in case of a permanent vacancy in the chairmanship of any such committee the House shall elect another chairman.

(d) Each standing committee of the House of Representatives, except the Committee on the Budget, that has more than twenty members shall establish at least four subcommittees.

(e) All vacancies in standing committees shall be filled by election by the House from nominations, submitted by the respective party caucus or conference.

(f) The Speaker shall appoint all select and conference committees which shall be ordered by the House from time to time. In appointing members to conference committees the Speaker shall appoint no less than a majority of members who generally supported the House position as determined by the Speaker. The Speaker shall name Members who are primarily responsible for the legislation and shall, to the fullest extent feasible, include the principal proponents of the major provisions of the bill as it passed the House.

(g) Membership on select and joint committees during the course of a Congress shall be contingent on continuing membership in the

party caucus or conference the Member was a member of at the time of his appointment to a select or joint committee. Should a Member cease to be a member of that caucus or conference, said Member shall automatically cease to be a member of any select or joint committee to which he is assigned. The chairman of the relevant party caucus or conference shall notify the Speaker whenever a Member ceases to be a member of a party caucus or conference and the Speaker shall notify the chairman of each select or joint committee on which said Member serves, that in accord with this rule, the Member's appointment to such committee is automatically vacated.

(h) The Speaker may appoint the Resident Commissioner from Puerto Rico and Delegates to the House to any select committee and to any conference committee that is considering legislation reported from a committee on which they serve.

(i) There shall be in the House the permanent Select Committee on Aging, which shall not have legislative jurisdiction but which shall have jurisdiction—

(1) to conduct a continuing comprehensive study and review of the problems of the older American, including but not limited to income maintenance, housing, health (including medical research), welfare, employment, education, recreation, and participation in family and community life as self-respecting citizens;

(2) to study the use of all practicable means and methods of encouraging the development of public and private programs and policies which will assist the older American in taking a full part in national life and which will encourage the utilization of the knowledge, skills, special aptitudes, and abilities of older Americans to contribute to a better quality of life for all Americans;

(3) to develop policies that would encourage the coordination of both governmental and private programs designed to deal with problems of aging; and

(4) to review any recommendations made by the President or by the White House Conference on Aging relating to programs or policies affecting older Americans.

### Rule XI. Rules of Procedure for Committees

#### In General

1. (a)(1) The Rules of the House are the rules of its committees and subcommittees so far as applicable, except that a motion to recess from day to day, and a motion to dispense with the first reading (in full) of a bill or resolution, if printed copies are available, are nondebatable motions of high privilege in committees and subcommittees.

(2) Each subcommittee of a committee is a part of that committee, and is subject to the authority and direction of that committee and to its rules so far as applicable.

(b) Each committee is authorized at any time to conduct such investigations and studies as it may consider necessary or appropriate in the exercise of its responsibilities under Rule X, and (subject

to the adoption of expense resolutions as required by clause 5) to incur expenses (including travel expenses) in connection therewith.

(c) Each committee is authorized to have printed and bound testimony and other data presented at hearings held by the committee. All costs of stenographic services and transcripts in connection with any meeting or hearing of a committee shall be paid from the contingent fund of the House.

(d) Each committee shall submit to the House, not later than January 2 of each odd-numbered year, a report on the activities of that committee under this rule and Rule X during the Congress ending at noon on January 3 of such year.

## Committee Rules

### Adoption of written rules

2. (a) Each standing committee of the House shall adopt written rules governing its procedure. Such rules—

    (1) shall be adopted in a meeting which is open to the public unless the committee, in open session and with a quorum present, determined by roll call vote that all or part of the meeting on that day is to be closed to the public;

    (2) shall be not inconsistent with the Rules of the House or with those provisions of law having the force and effect of Rules of the House; and

    (3) shall in any event incorporate all of the succeeding provisions of this clause to the extent applicable.

Each committee's rules specifying its regular meeting days, and any other rules of a committee which are in addition to the provisions of this clause, shall be published in the Congressional Record not later than thirty days after the committee is elected in each odd-numbered year. Each select or joint committee shall comply with the provisions of this paragraph unless specifically prohibited by law.

### Regular meeting days

(b) Each standing committee of the House shall adopt regular meeting days, which shall be not less frequent than monthly, for the conduct of its business. Each such committee shall meet, for the consideration of any bill or resolution pending before the committee or for the transaction of other committee business, on all regular meeting days fixed by the committee, unless otherwise provided by written rule adopted by the committee.

### Additional and special meetings

(c)(1) The Chairman of each standing committee may call and convene, as he or she considers necessary, additional meetings of the committee for the consideration of any bill or resolution pending before the committee or for the conduct of other committee business. The committee shall meet for such purpose pursuant to that call of the chairman.

(2) If at least three members of any standing committee desire that a special meeting of the committee be called by the chairman, those members may file in the offices of the committee their written request to the chairman for that special meeting. Such request

shall specify the measure or matter to be considered. Immediately upon the filing of the request, the clerk of the committee shall notify the chairman of the filing of the request. If, within three calendar days after the filing of the request, the chairman does not call the requested special meeting, to be held within seven calendar days after the filing of the request, a majority of the members of the committee may file in the offices of the committee their written notice that a special meeting of the committee will be held, specifying the date and hour of, and the measure or matter to be considered at, that special meeting. The committee shall meet on that date and hour. Immediately upon the filing of the notice, the clerk of the committee shall notify all members of the committee that such special meeting will be held and inform them of its date and hour and the measure or matter to be considered; and only the measure or matter specified in that notice may be considered at that special meeting.

### Vice chairman or ranking majority member to preside in absence of chairman

(d) The member of the majority party on any standing committee or subcommittee thereof ranking immediately after the chairman shall be vice chairman of the committee or subcommittee, as the case may be, and shall preside at any meeting during the temporary absence of the chairman. If the chairman and vice chairman of the committee or subcommittee are not present at any meeting of the committee or subcommittee, the ranking member of the majority party who is present shall preside at that meeting.

### Committee records

(e)(1) Each committee shall keep a complete record of all committee action which shall include a record of the votes on any question on which a roll call vote is demanded. The result of each such roll call vote shall be made available by the committee for inspection by the public at reasonable times in the offices of the committee. Information so available for public inspection shall include a description of the amendment, motion, order, or other proposition and the name of each Member voting for and each Member voting against such amendment, motion, order, or proposition, and whether by proxy or in person, and the names of those Members present but not voting.

(2) All committee hearings, records, data, charts, and files shall be kept separate and distinct from the congressional office records of the Member serving as chairman of the committee; and such records shall be the property of the House and all Members of the House shall have access thereto, except that in the case of records in the Committee on Standards of Official Conduct respecting the conduct of any Member, officer, or employee of the House, no Member of the House (other than a member of such committee) shall have access thereto without the specific, prior approval of the committee.

(3) Each committee shall include in its rules standards for availability of records of the committee delivered to the Archivist of the United States under rule XXXVI. Such standards shall specify procedures for orders of the committee under clause 3(b)(3) and clause

4(b) of rule XXXVI, including a requirement that nonavailability of a record for a period longer than the period otherwise applicable under that rule shall be approved by vote of the committee.

### *Proxies*

(f) No vote by any member of any committee or subcommittee with respect to any measure or matter may be cast by proxy unless such committee, by written rule adopted by the committee, permits voting by proxy and requires that the proxy authorization shall be in writing, shall assert that the member is absent on official business or is otherwise unable to be present at the meeting of the committee, shall designate the person who is to execute the proxy authorization, and shall be limited to a specific measure or matter and any amendments or motions pertaining thereto; except that a member may authorize a general proxy only for motions to recess, adjourn or other procedural matters. Each proxy to be effective shall be signed by the member assigning his or her vote and shall contain the date and time of day that the proxy is signed. Proxies may not be counted for a quorum.

### *Open meetings and hearings*

(g)(1) Each meeting for the transaction of business, including the markup of legislation, of each standing committee or subcommittee thereof shall be open to the public except when the committee or subcommittee, in open session and with a majority present, determines by roll call vote that all or part of the remainder of the meeting on that day shall be closed to the public: *Provided, however,* That no person other than members of the committee and such congressional staff and such departmental representatives as they may authorize shall be present at any business or markup session which has been closed to the public. This paragraph does not apply to open committee hearings which are provided for by clause 4(a)(1) of Rule X or by subparagraph (2) of this paragraph, or to any meeting that relates solely to internal budget or personnel matters.

(2) Each hearing conducted by each committee or subcommittee thereof shall be open to the public except when the committee or subcommittee, in open session and with a majority present, determines by roll call vote that all or part of the remainder of that hearing on that day shall be closed to the public because disclosure of testimony, evidence, or other matters to be considered would endanger the national security or would violate any law or rule of the House of Representatives. Notwithstanding the requirements of the preceding sentence, a majority of those present, there being in attendance the requisite number required under the rules of the committee to be present for the purpose of taking testimony,

(A) may vote to close the hearing for the sole purpose of discussing whether testimony or evidence to be received would endanger the national security or violate clause 2(k)(5) of Rule XI; or

(B) may vote to close the hearing, as provided in clause 2(k)(5) of Rule XI.

No Member may be excluded from nonparticipatory attendance at any hearing of any committee or subcommittee, with the exception of the Committee on Standards of Official Conduct, unless the House of Representatives shall by majority vote authorize a par-

ticular committee or subcommittee, for purposes of a particular series of hearings on a particular article of legislation or on a particular subject of investigation, to close its hearings to Members by the same procedures designated in this subparagraph for closing hearings to the public: *Provided, however,* That the committee or subcommittee may by the same procedure vote to close one subsequent day of hearing except that the Committee on Appropriations, the Committee on Armed Services, and the Permanent Select Committee on Intelligence and the subcommittees therein may, by the same procedure, vote to close up to five additional consecutive days of hearings.

(3) Each committee of the House (except the Committee on Rules) shall make public announcement of the date, place and subject matter of any committee hearing at least one week before the commencement of the hearing. If the committee determines that there is good cause to begin the hearing sooner, it shall make the announcement at the earliest possible date. Any announcement made under this subparagraph shall be promptly published in the Daily Digest and promptly entered into the committee scheduling service of the House Information Systems.

(4) Each committee shall, insofar as is practicable, require each witness who is to appear before it to file with the committee (in advance of his or her appearance) a written statement of the proposed testimony and to limit the oral presentation at such appearance to a brief summary of his or her argument.

(5) No point of order shall lie with respect to any measure reported by any committee on the ground that hearings on such measure were not conducted in accordance with the provisions of this clause; except that a point of order on that ground may be made by any member of the committee which reported the measure if, in the committee, such point of order was (A) timely made and (B) improperly overruled or not properly considered.

(6) The preceding provisions of this paragraph do not apply to the committee hearings which are provided for by clause 4(a)(1) of Rule X.

### *Quorum for taking testimony and certain other action*

(h)(1) Each committee may fix the number of its members to constitute a quorum for taking testimony and receiving evidence which shall be not less than two.

(2) Each committee (except the Committee on Appropriations, the Committee on the Budget, and the Committee on Ways and Means) may fix the number of its members to constitute a quorum for taking any action other than the reporting of a measure or recommendation which shall be not less than one-third of the members.

### *Prohibition against committee meetings during five-minute rule and during joint sessions and joint meetings*

(i)(1) No committee of the House (except the Committee on Appropriations, the Committee on the Budget, the Committee on House Administration, the Committee on Rules, the Committee on Standards of Official Conduct, and the Committee on Ways and Means) may sit, without special leave, while the House is reading a measure for amendment under the five-minute rule. For purposes

of this subparagraph special leave will be granted unless 10 or more Members object.

(2) No committee of the House may sit during a joint session of the House and Senate or during a recess when a joint meeting of the House and Senate is in progress.

*Calling and interrogation of witnesses*

(j)(1) Whenever any hearing is conducted by any committee upon any measure or matter, the minority party members on the committee shall be entitled, upon request to the chairman by a majority of them before the completion of the hearing, to call witnesses selected by the minority to testify with respect to that measure or matter during at least one day of hearing thereon.

(2) Each committee shall apply the five-minute rule in the interrogation of witnesses in any hearing until such time as each member of the committee who so desires has had an opportunity to question each witness.

*Investigative hearing procedures*

(k)(1) The chairman at an investigative hearing shall announce in an opening statement the subject of the investigation.

(2) A copy of the committee rules and this clause shall be made available to each witness.

(3) Witnesses at investigative hearings may be accompanied by their own counsel for the purpose of advising them concerning their constitutional rights.

(4) The chairman may punish breaches of order and decorum, and of professional ethics on the part of counsel, by censure and exclusion from the hearings; and the committee may cite the offender to the House for contempt.

(5) Whenever it is asserted that the evidence or testimony at an investigatory hearing may tend to defame, degrade, or incriminate any person,

(A) such testimony or evidence shall be presented in executive session, notwithstanding the provisions of clause 2(g)(2) of this Rule, if by a majority of those present, there being in attendance the requisite number required under the rules of the committee to be present for the purpose of taking testimony, the committee determines that such evidence or testimony may tend to defame, degrade, or incriminate any person; and

(B) the committee shall proceed to receive such testimony in open session only if a majority of the members of the committee, a majority being present, determine that such evidence or testimony will not tend to defame, degrade, or incriminate any person.

In either case the committee shall afford such person an opportunity voluntarily to appear as a witness, and receive and dispose of requests from such person to subpoena additional witnesses.

(6) Except as provided in subparagraph (5), the chairman shall receive and the committee shall dispose of requests to subpoena additional witnesses.

(7) No evidence or testimony taken in executive session may be released or used in public sessions without the consent of the committee.

(8) In the discretion of the committee, witnesses may submit brief and pertinent sworn statements in writing for inclusion in the record. The committee is the sole judge of the pertinency of testimony and evidence adduced at its hearing.

(9) A witness may obtain a transcript copy of his testimony given at a public session or, if given at an executive session, when authorized by the committee.

### Committee procedures for reporting bills and resolutions

(1)(1)(A) It shall be the duty of the chairman of each committee to report or cause to be reported promptly to the House any measure approved by the committee and to take or cause to be taken necessary steps to bring a matter to a vote.

(B) In any event, the report of any committee on a measure which has been approved by the committee shall be filed within seven calendar days (exclusive of days on which the House is not in session) after the day on which there has been filed with the clerk of the committee a written request, signed by a majority of the members of the committee, for the reporting of that measure. Upon the filing of any such request, the clerk of the committee shall transmit immediately to the chairman of the committee notice of the filing of that request. This subdivision does not apply to the reporting of a regular appropriation bill by the Committee on Appropriations prior to compliance with subdivision (C) and does not apply to a report of the Committee on Rules with respect to the rules, joint rules, or order of business of the House or to the reporting of a resolution of inquiry addressed to the head of an executive department.

(2)(A) No measure or recommendation shall be reported from any committee unless a majority of the committee was actually present.

(B) With respect to each roll call vote on a motion to report any bill or resolution of a public character, the total number of votes cast for, and the total number of votes cast against, the reporting of such bill or resolution shall be included in the committee report.

(3) The report of any committee on a measure which has been approved by the committee (A) shall include the oversight findings and recommendations required pursuant to clause 2(b)(1) of Rule X separately set out and clearly identified; (B) the statement required by section 308(a)(1) of the Congressional Budget Act of 1974, separately set out and clearly identified, if the measure provides new budget authority (other than continuing appropriations), new spending authority described in section 401(c)(2) of such Act, new credit authority, or an increase or decrease in revenues or tax expenditures; (C) the estimate and comparison prepared by the Director of the Congressional Budget Office under section 403 of such Act, separately set out and clearly identified, whenever the Director (if timely submitted prior to the filing of the report) has submitted such estimate and comparison to the committee; and (D) a summary of the oversight findings and recommendations made by the Committee on Government Operations under clause 4(c)(2) of Rule X separately set out and clearly identified whenever such findings and recommendations have been submitted to the legislative committee in a timely fashion to allow an opportunity to consider such

findings and recommendations during the committee's deliberations on the measure.

(4) Each report of a committee on each bill or joint resolution of a public character reported by such committee shall contain a detailed analytical statement as to whether the enactment of such bill or joint resolution into law may have an inflationary impact on prices and costs in the operation of the national economy.

(5) If, at the time of approval of any measure or matter by any committee, other than the Committee on Rules, any member of the committee gives notice of intention to file supplemental, minority, or additional views, that member shall be entitled to not less than three calendar days (excluding Saturdays, Sundays, and legal holidays) in which to file such views, in writing and signed by that member, with the clerk of the committee. All such views so filed by one or more members of the committee shall be included within, and shall be a part of, the report filed by the committee with respect to that measure or matter. The report of the committee upon that measure or matter shall be printed in a single volume which—

(A) shall include all supplemental, minority, or additional views which have been submitted by the time of the filing of the report, and

(B) shall bear upon its cover a recital that any such supplemental, minority, or additional views (and any material submitted under subdivisions (C) and (D) of subparagraph (3)) are included as part of the report.

This subparagraph does not preclude—

(i) the immediate filing or printing of a committee print unless timely request for the opportunity to file supplemental, minority, or additional views has been made as provided by this subparagraph; or

(ii) the filing by any such committee of any supplemental report upon any measure or matter which may be required for the correction of any technical error in a previous report made by that committee upon that measure or matter.

(6) A measure or matter reported by any committee (except the Committee on Rules in the case of a resolution making in order the consideration of a bill, resolution, or other order of business), shall not be considered in the House until the third calendar day, excluding Saturdays, Sundays, and legal holidays on which the report of that committee upon that measure or matter has been available to the Members of the House, or as provided by section 305(a)(1) of the Congressional Budget Act of 1974 in the case of a concurrent resolution on the budget: *Provided, however,* That it shall always be in order to call up for consideration, notwithstanding the provisions of clause 4(b), Rule XI, a report from the Committee on Rules specifically providing for the consideration of a reported measure or matter notwithstanding this restriction. If hearings have been held on any such measure or matter so reported, the committee reporting the measure or matter shall make every reasonable effort to have such hearings printed and available for distribution to the Members of the House prior to the consideration of such measure or matter in the House. This subparagraph shall not apply to—

(A) any measure for the declaration of war, or the declaration of a national emergency, by the Congress; or

(B) any decision, determination, or action by a Government agency which would become or continue to be, effective unless disapproved or otherwise invalidated by one or both Houses of Congress.

For the purposes of the preceding sentence, a Government agency includes any department, agency, establishment, wholly owned Government corporation, or instrumentality of the Federal Government or the government of the District of Columbia.

(7) If, within seven calendar days after a measure has, by resolution, been made in order for consideration by the House, no motion has been offered that the House consider that measure, any member of the committee which reported that measure may be recognized in the discretion of the Speaker to offer a motion that the House shall consider that measure, if that committee has duly authorized that member to offer that motion.

### Power to sit and act; subpoena power

(m)(1) For the purpose of carrying out any of its functions and duties under this rule and Rule X (including any matters referred to it under clause 5 of Rule X), any committee, or any subcommittee thereof, is authorized (subject to subparagraph (2)(A) of this paragraph)—

(A) to sit and act at such times and places within the United States, whether the House is in session, has recessed, or has adjourned, and to hold such hearings, and

(B) to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of such books, records, correspondence, memorandums, papers, and documents as it deems necessary.

The chairman of the committee, or any member designated by such chairman, may administer oaths to any witness.

(2)(A) A subpoena may be authorized and issued by a committee or subcommittee under subparagraph (1)(B) in the conduct of any investigation or series of investigations or activities, only when authorized by a majority of the members voting, a majority being present. The power to authorize and issue subpoenas under subparagraph (1)(B) may be delegated to the chairman of the committee pursuant to such rules and under such limitations as the committee may prescribe. Authorized subpoenas shall be signed by the chairman of the committee or by any member designated by the committee.

(B) Compliance with any subpoena issued by a committee or subcommittee under subparagraph (1)(B) may be enforced only as authorized or directed by the House.

### Use of committee funds for travel

(n)(1) Funds authorized for a committee under clause 5 are for expenses incurred in the committee's activities; however, local currencies owned by the United States shall be made available to the committee and its employees engaged in carrying out their official duties outside the United States, its territories or possessions. No appropriated funds, including those authorized under clause 5,

shall be expended for the purpose of defraying expenses of members of the committee or its employees in any country where local currencies are available for this purpose; and the following conditions shall apply with respect to travel outside the United States or its territories or possessions:

(A) No member or employee of the committee shall receive or expend local currencies for subsistence in any country for any day at a rate in excess of the maximum per diem set forth in applicable Federal law, or if the Member or employee is reimbursed for any expenses for such day, then the lesser of the per diem or the actual, unreimbursed expenses (other than for transportation) incurred by the Member or employee during that day.

(B) Each member or employee of the committee shall make to the chairman of the committee an itemized report showing the dates each country was visited, the amount of per diem furnished, the cost of transportation furnished, any funds expended for any other official purpose and shall summarize in these categories the total foreign currencies and/or appropriated funds expended. All such individual reports shall be filed no later than sixty days following the completion of travel with the chairman of the committee for use in complying with reporting requirements in applicable Federal law and shall be open for public inspection.

(2) In carrying out the committee's activities outside of the United States in any country where local currencies are unavailable, a member or employee of the committee may not receive reimbursement for expenses (other than for transportation) in excess of the maximum per diem set forth in applicable Federal law, or if the member or employee is reimbursed for any expenses for such day, then the lesser of the per diem or the actual unreimbursed expenses (other than for transportation) incurred, by the member or employee during any day.

(3) A member or employee of a committee may not receive reimbursement for the cost of any transportation in connection with travel outside of the United States unless the member or employee has actually paid for the transportation.

(4) The restrictions respecting travel outside of the United States set forth in subparagraphs (2) and (3) shall also apply to travel outside of the United States by Members, officers, and employees of the House authorized under clause 8 of Rule I, clause 1(b) of this rule, or any other provision of these Rules of the House of Representatives.

(5) No local currencies owned by the United States may be made available under this paragraph for the use outside of the United States for defraying the expenses of a member of any committee after—

(A) the date of the general election of Members in which the Member has not been elected to the succeeding Congress; or

(B) in the case of a Member who is not a candidate in such general election, the earlier of the date of such general election or the adjournment sine die of the last regular session of the Congress.

## Broadcasting of Committee Hearings

3. (a) It is the purpose of this clause to provide a means, in conformity with acceptable standards of dignity, propriety, and decorum, by which committee hearings, or committee meetings, which are open to the public may be covered, by television broadcast, radio broadcast, and still photography, or by any of such methods of coverage—

(1) for the education, enlightenment, and information of the general public, on the basis of accurate and impartial news coverage, regarding the operations, procedures, and practices of the House as a legislative and representative body and regarding the measures, public issues, and other matters before the House and its committees, the consideration thereof, and the action taken thereon; and

(2) for the development of the perspective and understanding of the general public with respect to the role and function of the House under the Constitution of the United States as an organ of the Federal Government.

(b) In addition, it is the intent of this clause that radio and television tapes and television film of any coverage under this clause shall not be used, or made available for use, as partisan political campaign material to promote or oppose the candidacy of any person for elective public office.

(c) It is, further, the intent of this clause that the general conduct of each meeting (whether of a hearing or otherwise) covered, under authority of this clause, by television broadcast, radio broadcast, and still photography, or by any of such methods of coverage, and the personal behavior of the committee members and staff, other Government officials and personnel, witnesses, television, radio, and press media personnel, and the general public at the hearing or other meeting shall be in strict conformity with and observance of the acceptable standards of dignity, propriety, courtesy, and decorum traditionally observed by the House in its operations and shall not be such as to—

(1) distort the objects and purposes of the hearing or other meeting or the activities of committee members in connection with that hearing or meeting or in connection with the general work of the committee or of the House; or

(2) cast discredit or dishonor on the House, the committee, or any Member or bring the House, the committee, or any Member into disrepute.

(d) The coverage of committee hearings and meetings by television broadcast, radio broadcast, or still photography is a privilege made available by the House and shall be permitted and conducted only in strict conformity with the purposes, provisions, and requirements of this clause.

(e) Whenever any hearing or meeting conducted by any committee of the House is open to the public, that committee may permit, by majority vote of the committee, that hearing or meeting to be covered, in whole or in part, by television broadcast, radio broadcast, and still photography, or by any of such methods of coverage, but only under such written rules as the committee may adopt in accordance with the purposes, provisions, and requirements of this

clause: *Provided, however,* Each committee or subcommittee chairman shall determine, in his discretion, the number of television and still cameras permitted in a hearing or meeting room.

(f) The written rules which may be adopted by a committee under paragraph (e) of this clause shall contain provisions to the following effect:

(1) If the television or radio coverage of the hearing or meeting is to be presented to the public as live coverage, that coverage shall be conducted and presented without commercial sponsorship.

(2) No witness served with a subpoena by the committee shall be required against his or her will to be photographed at any hearing or to give evidence or testimony while the broadcasting of that hearing, by radio or television, is being conducted. At the request of any such witness who does not wish to be subjected to radio, television, or still photography coverage, all lenses shall be covered and all microphones used for coverage turned off. This subparagraph is supplementary to clause 2(k)(5) of this rule, relating to the protection of the rights of witnesses.

(3) The allocation among the television media of the positions of the number of television cameras permitted by a committee or subcommittee chairman in a hearing or meeting room shall be in accordance with fair and equitable procedures devised by the Executive Committee of the Radio and Television Correspondents' Galleries.

(4) Television cameras shall be placed so as not to obstruct in any way the space between any witness giving evidence or testimony and any member of the committee or the visibility of that witness and that member to each other.

(5) Television cameras shall operate from fixed positions but shall not be placed in positions which obstruct unnecessarily the coverage of the hearing or meeting by the other media.

(6) Equipment necessary for coverage by the television and radio media shall not be installed in, or removed from, the hearing or meeting room while the committee is in session.

(7) Floodlights, spotlights, strobelights, and flashguns shall not be used in providing any method of coverage of the hearing or meeting, except that the television media may install additional lighting in the hearing or meeting room, without cost to the Government, in order to raise the ambient lighting level in the hearing or meeting room to the lowest level necessary to provide adequate television coverage of the hearing or meeting at the then current state of the art of television coverage.

(8) In the allocation of the number of still photographers permitted by a committee or subcommittee chairman in a hearing or meeting room, preference shall be given to photographers from Associated Press Photos and United Press International Newspictures. If requests are made by more of the media than will be permitted by a committee or subcommittee chairman for coverage of the hearing or meeting by still photography, that coverage shall be made on the basis of a fair and equitable pool arrangement devised by the Standing Committee of Press Photographers.

(9) Photographers shall not position themselves, at any time during the course of the hearing or meeting, between the witness table and the members of the committee.

(10) Photographers shall not place themselves in positions which obstruct unnecessarily the coverage of the hearing by the other media.

(11) Personnel providing coverage by the television and radio media shall be then currently accredited to the Radio and Television Correspondents' Galleries.

(12) Personnel providing coverage by still photography shall be then currently accredited to the Press Photographers' Gallery.

(13) Personnel providing coverage by the television and radio media and by still photography shall conduct themselves and their coverage activities in an orderly and unobtrusive manner.

## Privileged Reports and Amendments

4. (a) The following committees shall have leave to report at any time on the matters herein stated, namely: The Committee on Appropriations—on general appropriation bills and on joint resolutions continuing appropriations for a fiscal year if reported after September 15 preceding the beginning of such fiscal year; the Committee on the Budget—on the matters required to be reported by such committee under Titles III and IV of the Congressional Budget Act of 1974; the Committee on House Administration—on enrolled bills, contested elections, and all matters referred to it of printing for the use of the House or the two Houses, and on all matters of expenditure of the contingent fund of the House, and on all matters relating to preservation and availability of noncurrent records of the House under rule XXXVI; the Committee on Rules—on rules, joint rules, and the order of business; and the Committee on Standards of Official Conduct—on resolutions recommending action by the House of Representatives with respect to an individual Member, officer, or employee of the House of Representatives as a result of any investigation by the committee relating to the official conduct of such Member, officer, or employee of the House of Representatives.

(b) It shall always be in order to call up for consideration a report from the Committee on Rules on a rule, joint rule, or the order of business (except it shall not be called up for consideration on the same day it is presented to the House, unless so determined by a vote of not less than two-thirds of the Members voting, but this provision shall not apply during the last three days of the session), and, pending the consideration thereof, the Speaker may entertain one motion that the House adjourn; but after the result is announced the Speaker shall not entertain any other dilatory motion until the report shall have been fully disposed of. The Committee on Rules shall not report any rule or order which provides that business under clause 7 of Rule XXIV shall be set aside by a vote of less than two-thirds of the Members present; nor shall it report any rule or order which would prevent the motion to recommit from being made as provided in clause 4 of Rule XVI.

(c) The Committee on Rules shall present to the House reports concerning rules, joint rules, and order of business, within three legislative days of the time when the bill or resolution involved is ordered reported by the committee. If any such rule or order is not considered immediately, it shall be referred to the calendar and, if not called up by the Member making the report within seven legislative days thereafter, any member of the Rules Committee may call it up as a question of privilege (but only on the day after the calendar day on which such Member announces to the House his intention to do so) and the Speaker shall recognize any member of the Rules Committee seeking recognition for that purpose. If the Committee on Rules makes an adverse report on any resolution pending before the committee, providing for an order of business for the consideration by the House of any public bill or joint resolution, on days when it shall be in order to call up motions to discharge committees it shall be in order for any Member of the House to call up for consideration by the House such adverse report, and it shall be in order to move the adoption by the House of such resolution adversely reported notwithstanding the adverse report of the Committee on Rules, and the Speaker shall recognize the Member seeking recognition for that purpose as a question of the highest privilege.

(d) Whenever the Committee on Rules reports a resolution repealing or amending any of the Rules of the House of Representatives or part thereof it shall include in its report or in an accompanying document—

(1) the text of any part of the Rules of the House of Representatives which is proposed to be repealed; and

(2) a comparative print of any part of the resolution making such an amendment and any part of the Rules of the House of Representatives to be amended, showing by an appropriate typographical device the omissions and insertions proposed to be made.

## Committee Expenses

5. (a) Whenever any committee, commission or other entity (except the Committee on Appropriations and the Committee on the Budget) is to be granted authorization for the payment, from the contingent fund of the House, of its expenses in any year, other than those expenses to be paid from appropriations provided by statute, such authorization initially shall be procured by one primary expense resolution for the committee, commission or other entity providing funds for the payment of the expenses of the committee, commission or other entity for that year from the contingent fund of the House. Any such primary expense resolution reported to the House shall not be considered in the House unless a printed report on that resolution has been available to the Members of the House for at least one calendar day prior to the consideration of that resolution in the House. Such report shall, for the information of the House—

(1) state the total amount of the funds to be provided to the committee, commission or other entity under the primary ex-

pense resolution for all anticipated activities and programs of the committee, commission or other entity; and

(2) to the extent practicable, contain such general statements regarding the estimated foreseeable expenditures for the respective anticipated activities and programs of the committee, commission or other entity as may be appropriate to provide the House with basic estimates with respect to the expenditure generally of the funds to be provided to the committee, commission or other entity under the primary expense resolution.

(b) After the date of adoption by the House of any such primary expense resolution for any such committee, commission or other entity for any year, authorization for the payment from the contingent fund of additional expenses of such committee, commission or other entity in that year, other than those expenses to be paid from appropriations provided by statute, may be procured by one or more supplemental expense resolutions for that committee, commission or other entity as necesssary. Any such supplemental expense resolution reported to the House shall not be considered in the House unless a printed report on that resolution has been available to the Members of the House for at least one calendar day prior to the consideration of that resolution in the House. Such report shall, for the information of the House—

(1) state the total amount of additional funds to be provided to the committee, commission or other entity under the supplemental expense resolution and the purpose or purposes for which those additional funds are to be used by the committee, commission or other entity; and

(2) state the reason or reasons for the failure to procure the additional funds for the committee, commission or other entity by means of the primary expense resolution.

(c) The preceding provisions of this clause do not apply to—

(1) any resolution providing for the payment from the contingent fund of the House of sums necessary to pay compensation for staff services performed for, or to pay other expenses of, any committee, commission or other entity at any time from and after the beginning of any year and before the date of adoption by the House of the primary expense resolution providing funds to pay the expenses of that committee, commission or other entity for that year; or

(2) any resolution providing in any Congress, for all of the standing committees of the House, additional office equipment, airmail and special delivery postage stamps, supplies, staff personnel, or any other specific item for the operation of the standing committees, and containing an authorization for the payment from the contingent fund of the House of the expenses of any of the foregoing items provided by that resolution, subject to and until enactment of the provisions of the resolution as permanent law.

(d) From the funds provided for the appointment of committee staff pursuant to primary and additional expense resolutions—

(1) The chairman of each standing subcommittee of a standing committee of the House is authorized to appoint one staff member who shall serve at the pleasure of the subcommittee chairman.

(2) The ranking minority party member of each standing subcommittee on each standing committee of the House is authorized to appoint one staff person who shall serve at the pleasure of the ranking minority party member.

(3) The staff members appointed pursuant to the provisions of subparagraphs (1) and (2) shall be compensated at a rate determined by the subcommittee chairman not to exceed (A) 75 per centum of the maximum established in paragraph (c) of clause 6 or (B) the rate paid the staff member appointed pursuant to subparagraph (1) of this paragraph.

(4) For the purpose of this paragraph, (A) there shall be no more than six standing subcommittees of each standing committee of the House, except for the Committee on Appropriations, and (B) no member shall appoint more than one person pursuant to the above provisions.

(5) The staff positions made available to the subcommittee chairman and ranking minority party members pursuant to subparagraphs (1) and (2) of this paragraph shall be made available from the staff positions provided under clause 6 of Rule XI unless such staff positions are made available pursuant to a primary or additional expense resolution.

(e) No primary expense resolution or additional expense resolution of a committee may provide for the payment or reimbursement of expenses incurred by any member of the committee for travel by the member after the date of the general election of Members in which the Member is not elected to the succeeding Congress, or in the case of a Member who is not a candidate in such general election, the earlier of the date of such general election or the adjournment sine die of the last regular session of the Congress.

(f)(1) For continuance of necessary investigations and studies by—

(A) each standing committee and select committee established by these rules; and

(B) except as provided in subparagraph (2), each select committee established by resolution;

there shall be paid out of the contingent fund of the House such amounts as may be necessary for the period beginning at noon on January 3 and ending at midnight on March 31 of each year.

(2) In the case of the first session of a Congress, amounts shall be made available under this paragraph for a select committee established by resolution in the preceding Congress only if—

(A) a reestablishing resolution for such select committee is introduced in the present Congress; and

(B) no resolution of the preceding Congress provided for termination of funding of investigations and studies by such select committee at or before the end of the preceding Congress.

(3) Each committee receiving amounts under this paragraph shall be entitled, for each month in the period specified in subparagraph (1), to 9 percentum (or such lesser percentum as may be determined by the Committee on House Administration) of the total annualized amount made available under expense resolutions for such committee in the preceding session of Congress.

(4) Payments under this paragraph shall be made on vouchers authorized by the committee involved, signed by the chairman of such committee, except as provided in subparagraph (5), and approved by the Committee on House Administration.

(5) Notwithstanding any provision of law, rule of the House, or other authority, from noon on January 3 of the first session of a Congress, until the election by the House of the committee involved in that Congress, payments under this paragraph shall be made on vouchers signed by—

(A) the chairman of such committee as constituted at the close of the preceding Congress; or

(B) if such chairman is not a Member in the present Congress, the ranking majority party member of such committee as constituted at the close of the preceding Congress who is a Member in the present Congress.

(6)(A) The authority of a committee to incur expenses under this paragraph shall expire upon agreement by the House to a primary expense resolution for such committee.

(B) Amounts made available under this paragraph shall be expended in accordance with regulations prescribed by the Committee on House Administration.

(C) The provisions of this paragraph shall be effective only insofar as not inconsistent with any resolution, reported by the Committee on House Administration and adopted after the date of adoption of these rules.

### Committee Staffs

6. (a)(1) Subject to subparagraph (2) of this paragraph and paragraph (f) of this clause, each standing committee may appoint, by majority vote of the committee, not more than eighteen professional staff members. Each professional staff member appointed under this subparagraph shall be assigned to the chairman and the ranking minority party member of such committee, as the committee considers advisable.

(2) Subject to paragraph (f) of this clause, whenever a majority of the minority party members of a standing committee (except the Committee on Standards of Official Conduct and the Permanent Select Committee on Intelligence) so request, not more than six persons may be selected, by majority vote of the minority party members, for appointment by the committee as professional staff members from among the number authorized by subparagraph (1) of this paragraph. The committee shall appoint any persons so selected whose character and qualifications are acceptable to a majority of the committee. If the committee determines that the character and qualifications of any person so selected are unacceptable to the committee, a majority of the minority party members may select other persons for appointment by the committee to the professional staff until such appointment is made. Each professional staff member appointed under this subparagraph shall be assigned to such committee business as the minority party members of the committee consider advisable.

(3) The professional staff members of each standing committee—

(A) shall not engage in any work other than committee business during congressional working hours; and

(B) shall not be assigned any duties other than those pertaining to committee business.

(4) Services of the professional staff members of each standing committee may be terminated by majority vote of the committee.

(5) The foregoing provisions of this paragraph do not apply to the Committee on Appropriations and to the Committee on the Budget and the provisions of subparagraphs (3) (B) and (C) do not apply to the Committee on Rules.

(b)(1) The clerical staff of each standing committee shall consist of not more than twelve clerks, to be attached to the office of the chairman, to the ranking minority party members, and to the professional staff, as the committee considers advisable. Subject to subparagraph (2) of this paragraph and paragraph (f) of this clause, the clerical staff shall be appointed by majority vote of the committee. Except as provided by subparagraph (2) of this paragraph the clerical staff shall handle committee correspondence and stenographic work both for the committee staff and for the chairman and the ranking minority party member on matters related to committee work.

(2) Subject to paragraph (f) of this clause, whenever a majority of the minority party members of a standing committee (except the Committee on Standards of Official Conduct and the Permanent Select Committee on Intelligence) so request, four persons may be selected, by majority vote of the minority party members, for appointment by the committee to positions on the clerical staff from among the number of clerks authorized by subparagraph (1) of this paragraph. The committee shall appoint to those positions any person so selected whose character and qualifications are acceptable to a majority of the committee. If the committee determines that the character and qualifications of any person so selected are unacceptable to the committee, a majority of the minority party members, may select other persons for appointment by the committee to the position involved on the clerical staff until such appointment is made. Each clerk appointed under this subparagraph shall handle committee correspondence and stenographic work for the minority party members of the committee and for any members of the professional staff appointed under subparagraph (2) of paragraph (a) of this clause on matters related to committee work.

(3) Services of the clerical staff members of each standing committee may be terminated by majority vote of the committee.

(4) The foregoing provisions of this paragraph do not apply to the Committee on Appropriations and the Committee on the Budget.

(c) Each employee on the professional, clerical and investigating staff of each standing committee shall be entitled to pay at a single gross per annum rate, to be fixed by the chairman, which does not exceed the maximum rate of pay, as in effect from time to time, under applicable provisions of law.

(d) Subject to appropriations hereby authorized, the Committee on Appropriations and the Committee on the Budget may appoint such staff, in addition to the clerk thereof and assistants for the minority, as it determines by majority vote to be necessary, such

personnel, other than minority assistants, to possess such qualifications as the committee may prescribe.

(e) No committee shall appoint to its staff any experts or other personnel detailed or assigned from any department or agency of the Government, except with the written permission of the Committee on House Administration.

(f) If a request for the appointment of a minority professional staff member under paragraph (a), or a minority clerical staff member under paragraph (b), is made when no vacancy exists to which that appointment may be made, the committee nevertheless shall appoint, under paragraph (a) or paragraph (b), as applicable, the person selected by the minority and acceptable to the committee. The person so appointed shall serve as an additional member of the professional staff or the clerical staff, as the case may be, of the committee, and shall be paid from the contingent fund, until such a vacancy (other than a vacancy in the position of head of the professional staff, by whatever title designated) occurs, at which time that person shall be deemed to have been appointed to that vacancy. If such vacancy occurs on the professional staff when seven or more persons have been so appointed who are eligible to fill that vacancy, a majority of the minority party members shall designate which of those persons shall fill that vacancy.

(g) Each staff member appointed pursuant to a request by minority party members under paragraph (a) or (b) of this clause, and each staff member appointed to assist minority party members of a committee pursuant to an expense resolution described in paragraph (a) or (b) of clause 5, shall be accorded equitable treatment with respect to the fixing of his or her rate of pay, the assignment to him or her of work facilities, and the accessibility to him or her of committee records.

(h) Paragraphs (a) and (b) of this clause shall not be construed to authorize the appointment of additional professional or clerical staff members of a committee pursuant to a request under either of such paragraphs by the minority party members of that committee if six or more professional staff members or four or more clerical staff members, provided for in paragraph (a)(1) or paragraph (b)(1) of this clause, as the case may be, who are satisfactory to a majority of the minority party members, are otherwise assigned to assist the minority party members.

(i) Notwithstanding paragraphs (a)(2) and (b)(2), a committee may employ nonpartisan staff, in lieu of or in addition to committee staff designated exclusively for the majority or minority party, upon an affirmative vote of a majority of the members of the majority party and a majority of the members of the minority party.

○

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit YY

1

2

3

4

5

6

7      COMMITTEE ON THE JUDICIARY,

8      U.S. HOUSE OF REPRESENTATIVES,

9      WASHINGTON, D.C.

10

11

12

13

14

15      INTERVIEW OF:    LESLEY WOLF

16

17

18

19

20                                    Thursday, December 14, 2023

21

22                                         Washington, D.C.

23

24

25             The interview in the above matter was held in room 6220, O'Neill House Office

1      Building, commencing at 10:01 a.m.

2                Present:    Representatives Jordan, Spartz, and Ivey.

1    <u>Appearances:</u>

2

3

4

5    For the COMMITTEE ON THE JUDICIARY:

6

7    CLARK ABOURISK, COUNSEL

8    STEVE CASTOR, GENERAL COUNSEL

9    SEAN CLERGET, COUNSEL

10   RUSSELL DYE, COMMUNICATIONS DIRECTOR AND COUNSEL

11   MATT ESGUERRA, SENIOR COMMUNICATIONS ADVISER

12   BETSY FERGUSON, DEPUTY GENERAL COUNSEL

13   BRITTANY HAVENS, PROFESSIONAL STAFF MEMBER

14   JOEY HUNGERFORD, DIGITAL DIRECTOR

15   RACHEL JAG, COUNSEL

16   LILLIAN MEADOWS, COUNSEL

17   CAROLINE NABITY, CHIEF COUNSEL FOR OVERSIGHT

18   LUKE ZARO, COUNSEL

19   ███████████████, MINORITY CHIEF OVERSIGHT COUNSEL

20   ███████████████, MINORITY LEGAL INTERN

21   ███████████████, MINORITY STAFF ASSISTANT

22   ███████████████, MINORITY OVERSIGHT COUNSEL

23   ███████████████████, MINORITY PROFESSIONAL STAFF MEMBER

24

25

1    For the SUBCOMMITTEE ON CRIME AND

2    FEDERAL GOVERNMENT SURVEILLANCE:

3

4    ███████████, MINORITY DETAILEE

5

6

7    For LESLEY WOLF:

8

9    JENNY KRAMER

10   STEPHEN SIMRILL

11   Alston & Bird

12

1

2          Mr. Castor.    Good morning.    This is a transcribed interview of Ms. Lesley Wolf,

3    former Assistant United States Attorney for the District of Delaware.    Chairman Jordan

4    has requested this interview as part of the committee's oversight of the Justice

5    Department's handling of the Hunter Biden investigation and the impeachment inquiry.

6          Would the witness please state your name for the record?

7          Ms. Wolf.    Lesley Wolf.

8          Mr. Castor.    And we encourage witnesses who appear before the committee to

9    freely consult with counsel if they so choose.    It's my understanding you're appearing

10    here today with personal counsel.

11          Would you identify yourself for the record.

12          Ms. Kramer.    Of course.    Jenny Kramer.    I'm with the firm of Alston & Bird.

13    And with me here today is Stephen Simrill, also with Alston & Bird --

14          Mr. Castor.    Okay.

15          Ms. Kramer.    -- on behalf of Ms. Wolf.

16          Mr. Castor.    Okay.    On behalf of the committee and Chairman Jordan, I want to

17    thank you for appearing here today and agreeing to participate in what is now a

18    transcribed interview.

19          And my name is Steve Castor.    I'm a staffer on the House Judiciary Committee.

20    I'll now have the other staffers here in the room introduce themselves.

21          Ms. Nabity.    Caroline Nabity with Chairman Jordan.

22          Mr. Clerget.    Sean Clerget, Chairman Jordan.

23          ███████   ████████████   with Ranking Member Nadler.

24          ████████   ████████, oversight counsel with Ranking Member Nadler's

25    staff.

1  ██████  ████████, Ranking Member Nadler's staff.

2  ████████  ████████████ with Ranking Member Nadler's staff.

3  ██████  ████████ with Ranking Member Nadler.

4  ██████  ████████ with Ranking Member Nadler.

5  Ms. <u>Havens.</u>  Brittany Havens, Chairman Jordan's staff.

6  Mr. <u>Zaro.</u>  Luke Zaro, Chairman Jordan's staff.

7  Mr. <u>Abourisk.</u>  Clark Abourisk, Chairman Jordan's staff.

8  Mr. <u>Hungerford.</u>  Joey Hungerford, Chairman Jordan's staff.

9  Mr. <u>Esguerra.</u>  Matthew Esguerra, Chairman Jordan's staff.

10  Ms. <u>Jag.</u>  Rachel Jag, Chairman Jordan's staff.

11  Ms. <u>Meadows.</u>  Lillian Meadows, Chairman Jordan's staff.

12  Mr. <u>Castor.</u>  Mr. Jordan issued two deposition subpoenas to Ms. Wolf, one for

13  last Thursday, December 7th.  Based on scheduling conflicts we issued a second one for

14  today.  We've agreed to withdraw that subpoena in lieu of a voluntary transcribed

15  interview.

16  That being said, there may be questions that we ask today and in a voluntary

17  setting you choose not to answer, and we just want to make clear that it's likely we will

18  follow up with the list of questions that you didn't answer, identifying ones that are

19  important to us, and that'll start a second process, and we can go from there.

20  I'll go over the ground rules and guidelines that we'll follow during today's

21  interview.  Our questioning will proceed in rounds.  The majority will ask questions for

22  an hour, then we'll switch around; the minority staff will come over and they'll have a

23  chance to answer [sic] questions for an hour as well.

24  We can take breaks whenever you need to if you need to confer with counsel or

25  for whatever reason or no reason.  Often we do that at the end of the hour.  If you

1  need to take a lunch break, if we're going long, you just let us know.   We really -- it's

2  whatever the witness wants to do.   Many witnesses don't want lunch.   They want to

3  plow through.   That's fine.   So you let us know.

4        So the court reporter can take down a clear record and everyone around the room

5  can hear each other, we'll do our best to limit the number of people asking you questions

6  to just one at a time.   Sometimes others may chime in if they didn't hear something or

7  they need clarification.

8        We want you to answer our questions in the most complete and truthful manner

9  as possible.   I'm sure you understand that it's a criminal offense to knowingly make false

10  statements to Congress.   You're aware of that?

11        Ms. Wolf.   Yes.

12        Mr. Castor.   And 18 United States Code 1001 deals with that, and that statute is

13  the statute that is often used when individuals fail to tell the truth.   Are you aware of

14  that?

15        Ms. Wolf.   Yes, I'm familiar with 1001.

16        Mr. Castor.   We might use some exhibits -- of course we'll use some exhibits

17  today.   We'll keep those as part of our record.   So to the extent there are exhibits that

18  we share with you, we'd ask that you leave them here in the room.

19        That's the end of my welcoming remarks.

20        Ms. Kramer.   If you will --

21        Mr. Castor.   Of course.

22        Ms. Kramer.   -- just briefly, I'll just remind everyone here that Ms. Wolf is here

23  voluntarily.   We have provided to you the authorization letter that the Department

24  provided to us.   So I think it comes as no surprise that she will be severely limited in the

25  scope of what she can and cannot provide information about today.

1       Having said that, Ms. Wolf would like to give some opening remarks, so --

2       Mr. <u>Castor.</u>   Okay.

3       Ms. <u>Kramer.</u>   -- if you'll allow her to do so, we do appreciate that.

4       Mr. <u>Castor.</u>   We will.   And I just want to defer to -- I'm sorry.

5       Chairman <u>Jordan.</u>   No, I just want to thank you for being here today.   I'm going

6   to have to run out here in a few minutes to go vote on the House floor, but then I'll be

7   back.   And thank you for coming.

8       Mr. <u>Castor.</u>   And before that, I wanted to ask ███████ if she has anything.

9       ███████.   We thank the witness for joining us today.   I do want to note, I think

10  there is a vote on the House floor.   I think once that wraps, we will have a couple

11  members coming in.   It's a little odd setting here, so I didn't want them to surprise you.

12      Ms. <u>Wolf.</u>   Thank you.

13      Ms. <u>Kramer.</u>   Great.   All right.

14      Ms. <u>Wolf.</u>   I would like to thank you for the opportunity to speak briefly this

15  morning.

16      Only a few short weeks ago, I left the Department of Justice after serving as an

17  Assistant United States Attorney for more than 16 years.   It is because of my work as an

18  Assistant United States Attorney that I find myself sitting here today.

19      During my tenure with DOJ, and in particular with the United States Attorney's

20  Office for the District of Delaware, I took great pride in being part of the work done and

21  the mission of the Department to seek justice, exercise reason judgment, and to do so in

22  a fair and even-handed manner.

23      When I started with the Department, Alberto Gonzales was the attorney general.

24  I served through Attorneys General Mukasey, Holder, Lynch, Sessions, Barr, and finally

25  Garland.   My time in the office spanned four different Presidential administrations and

1    three different United States Attorneys.

2         Despite these changes and at times evolving priorities of the Department and the

3    district, the core mission did not waver, nor did my own commitment to the fair and just

4    administration of Federal criminal laws.    At no time did politics play a role in or in any

5    way impact my work as a Federal prosecutor.

6         Guided by the Principles of Federal Prosecution and the Justice Manual, as well as

7    steadfastly complying with my statutory mandates and my ethical obligations, throughout

8    my career, I followed the facts and applied the law in each and every case I handled.

9    When there were decisions to be made, I sought the input of and collaborated with my

10   colleagues, attorneys and investigators alike, and made the decisions that I believed

11   would best serve the investigation while still complying with law and policy.    This was

12   not always an easy task.

13        There is no one size fits all for Federal prosecutions.    Each case presents its own

14   unique circumstances and challenges.    Different and, at times, evolving policies,

15   guidelines, and statutory and ethical obligations are often at play due to the particular

16   nature of an investigation.    And against this backdrop, there is room for disagreement.

17   A proper and appropriate decision and course of action did not always please everyone.

18   But, again, such decisions were never made in a vacuum and were always guided by the

19   principles of justice and fairness, as I've described.    Throughout my career, I've prided

20   myself on being able to adeptly navigate those challenges and to maintain positive

21   relationships with investigators, even in times when we may not have seen eye to eye.

22        I have worked with so many wonderful people, many of whom I consider to be the

23   truest of friends.    Having spent the majority of my career as a Federal prosecutor, the

24   people with whom I have collaborated over the years have become like family.

25   Together we have celebrated marriages and the arrival of children, reluctantly cheered

1    retirements, and grieved the losses of loved ones.

2         While it may seem odd to those outside of the DOJ, this closeness is not

3    uncommon when you have a unified dedication to such a critically important

4    mission -- the pursuit of justice.

5         In each and every case, I maintained a professional and collaborative relationship,

6    because doing so is in the best interest of an investigation, and it enabled me to be the

7    best I could as a Federal prosecutor.

8         Just as politics have no place in the work of the Justice Department, neither do

9    personal feelings, unchecked emotions, or ego.    And I don't think there's any mystery

10   surrounding the fact that sleepless nights tend to accompany serving as an AUSA.    One

11   thing, however, that has never kept me awake is wondering whether I deviated from my

12   own moral compass, ethical obligations, or, critically, what I genuinely believed to be in

13   the best interest of an investigation.

14        As I was reminded daily by the words of Justice Sutherland in Berger

15   v. United States, which remain prominently posted on the wall of the U.S. Attorney's

16   Office in Delaware, the end goal was not to win at all costs and by any means, but instead

17   to vigorously and fairly pursue justice.

18        My voluntary appearance here today is not without an overwhelming feeling of

19   frustration and disappointment, because as much as I would invite the opportunity to

20   explain the decisions made and accurately describe the actions taken, I will not be

21   permitted to answer most of the questions you have for me.    It should come as no

22   surprise to the committee that as a former DOJ employee, I am significantly constrained

23   by and must strictly adhere to the authorization provided by the Department of Justice,

24   as well as those obligations independently imposed by the Federal Rule of Criminal

25   Procedure, including rule 6(e), and the relevant laws governing disclosure of tax

1    information.

2        I am here voluntarily precisely because I respect the law.    I loved being an AUSA

3    and have always taken enormous pride in doing the right thing.

4        The allegations made against my colleagues and me have had a profound impact

5    on me both professionally and personally.    In light of the ongoing nature of the

6    investigation, I am legally obligated at this time to largely remain silent as to those

7    allegations, beyond stating the truth, which is, at all times while serving as an AUSA, I

8    acted consistently with the Justice Manual, DOJ policy directives, and my statutory legal

9    and ethical obligations.

10        I followed the facts where they led and made decisions in the best interests of the

11    investigation.    This includes, but is by no means limited to, policies and rules governing

12    politically sensitive investigations, election-year sensitivities, attorney search warrants,

13    search warrant filter requirements, and professional conduct rules barring contact with

14    represented parties.

15        My desire to serve my community and my country, such a great source of pride,

16    has recently come at significant cost.    As a private person, the once routine and

17    mundane details of my life have become the subject of public interest in an invasive and

18    disturbing manner.    Far worse, I've been threatened and harassed, causing me to fear

19    for my own and my family's safety.

20        I mentioned earlier that I recently left the U.S. Attorney's Office.    My decision to

21    do so long predated and was unconnected to the baseless allegations made against me.

22    In fact, I agreed to stay with the office months longer than planned because of my belief

23    that my family and I were safer while I remained an AUSA.

24        I have no doubt that after today the threats of harassment and my own fear

25    stemming from them will heighten.    This not only scares me, but as someone who loves

1   this country, it also breaks my heart.

2         We are living in a day and age where politics and winning seem to be paramount,

3   and the truth has become collateral damage.

4         It is my sincere hope that at least by my voluntary appearance here today, I can

5   convey that, as far as I'm aware, any narrative that suggests, much less insists, that

6   political influence played a role in any matter I handled is a false one.

7         Nonetheless, I am here today, again, voluntarily, and sincerely hope that the

8   limited information I am permitted to share with you provides some reassurance, if not to

9   the committee, then at least to the American people whom I have been so proud to have

10  served for the majority of my professional life.

11        Mr. Castor.   Thank you.

12        We'll go on the record.   It's 10:14.   We'll go on the first round.   We'll start.

13        And I'll note at the outset that we may have, as I indicated, questions that you're

14  not going to answer today.   And if you would just bear with us while we ask the

15  question, and you can tell us -- you know, you can give us your response.

16        We are going to go through most of the questions that we'd like to ask for

17  purposes of making a record and outlining the information we seek so we can go back to

18  the Department and pursue it.

19        So just wanted to alert you to that.   We're not trying to badger you in any way,

20  okay?

21        Ms. Wolf.   Yes.

22                                    EXAMINATION

23              BY MR. CASTOR:

24        Q    So you indicated that you joined the Department of Justice during the tenure

25  of Attorney General Gonzales.   Was that in 2007?

1      A    Yes.   I joined the Department in August 2007.

2      Q    And have you always been in the District of Delaware U.S. Attorney's Office?

3      A    Yes.

4      Q    Okay.   And in that office, have you always been a Assistant United States

5  Attorney?

6      A    Yes.

7      Q    Did you have any specific leadership role in the office?

8      A    I had, since 2018, a designation as a section chief for economic crimes, which

9  was not an official supervisory role but one that allowed me to assist the criminal chief

10  help supervise AUSA's handling financial crime and economic case matters.

11      Q    So you've been with the Department, what -- how many years total?

12  Sixteen?

13      A    Sixteen.

14      Q    Sixteen years.   And during that time, how many tax cases have you

15  worked?

16      A    I can give you an approximate number.

17      Q    Of course.

18      A    I would say, during that time, somewhere between 12 and 25.

19      Q    Fair enough.   So you have a fairly good understanding of the ordinary

20  process for dealing with the Tax Division at headquarters?

21      A    To the extent there's an ordinary process, yes --

22      Q    Okay.

23      A    -- I'm familiar with -- I have dealt with Tax Division in --

24      Q    Okay.   I mean, the Tax Division has to approve investigative activities, you

25  know, under certain circumstances, correct?

1      A      Correct.    And Tax Division has to approve grand juries for Title 26 tax cases

2      at the outset of an investigation.    And depending on the particulars of a case, also there

3      are additional approval requirements, as well as an approval of charges.

4      Q      And if you're going to bring charges, Tax Division has to green-light them,

5      correct?

6      A      In the first instance, that's the normal mechanism.

7      Q      Okay.    And how often have you had cases in your career that have touched

8      on other districts?    You know, the Hunter Biden case involved potentially a case in the

9      District of Columbia or the Central District of California.

10      How often have you worked on cases that touched on other districts or raised the

11      prospect of bringing charges in a different district?

12      A      So I think there's two separate questions there.    So the first question is,

13      how often sort of do you deal with or handle matters that touch on other districts?    I

14      would say it's probably more common than not that something that we're doing and that

15      I was working on would touch upon another district.

16      It's the nature and sort of the essence of Federal prosecution is that there's

17      elements of it that are interstate in nature.    I think that's sometimes particularly true

18      when you're in a geographically small district that borders a number of other -- you know,

19      three other States.

20      So it's fairly common to have things that touch and concern other districts.

21      Something as simple as needing to execute a search warrant over the State line in

22      New Jersey, that has to go through and you have to work with the district of New Jersey

23      on that.    At other times, fugitives are arrested in a district, so I may be handling an

24      arrest in the District of Delaware for a case out of the District of Vermont.    And those

25      types of contacts are routine.

1          In investigations, I think it is also not at all unusual that you will run across -- and

2     usually your investigators will figure this out -- either common schemes or common

3     players, and you work with the other districts, depending on whether those people are

4     witnesses, whether those people are subjects, whether those people are targets, to figure

5     out a path forward and to either work together and decide to work together or to

6     deconflict in order to -- to move forward.

7          But it is routine to work with other districts.

8     Q     Okay.    So we may have some questions about how your office interacted

9     with the District of Columbia's U.S. Attorney's Office and how your office interacted with

10    the Central District of California.    So we may ask you to, you know, compare that to your

11    greater experience.

12    A     Okay.

13    Q     The Hunter Biden case, was this the first time that you worked with Special

14    Agent Ziegler or Supervisory Special Agent Shapley?

15    A     I don't want to -- I think the answer to that's yes.    I think --

16    Q     Okay.

17    A     -- I can answer that.

18    Q     So you hadn't really met them before --

19    A     I had not me either of them before.

20    Q     -- before this case?

21         And this is the only case you've worked with them on?

22    A     That is true.

23    Q     And when did that -- when did you begin working on the Hunter Biden case?

24         Ms. Kramer.    I think at this point, you know, if you want to go ahead and discuss

25    the restrictions that --

1          Ms. <u>Wolf.</u>   Yeah.   So I -- I'm not authorized to discuss particular aspects of an

2     ongoing investigation.

3          Mr. <u>Castor.</u>   Okay.   Well, I'm just asking to try to understand the timeframe that

4     we're dealing with.   So --

5          Ms. <u>Kramer.</u>   We understand the question, yes.

6          Ms. <u>Wolf.</u>   Yeah.

7          Mr. <u>Castor.</u>   Okay.   You're not able to tell us when you started working on the

8     Hunter Biden case?

9          Ms. <u>Kramer.</u>   You can repeat your answer.

10         Ms. <u>Wolf.</u>   Yeah.   I'm not authorized to discuss --

11         Mr. <u>Castor.</u>   Okay.   I'm not trying to be --

12         Ms. <u>Wolf.</u>   -- particular matter.

13         Ms. <u>Kramer.</u>   Understood.

14             BY MR. CASTOR:

15     Q     I'm not trying to be tricky or badgering here.

16     <u>A</u>     Yeah.

17     Q     I'm just trying to -- when's the first time you met Shapley and Ziegler?

18     A     I -- in person or -- I met Mr. Ziegler at some point in 2019.   I did not meet

19     Mr. Shapley until some point in 2020.

20     Q     Okay.   As your office was handling the Hunter Biden matter, did you -- you

21     were the lead AUSA on the case?

22     A     I'm not going to discuss particular aspects of an ongoing investigation.

23     Q     Okay.   How many AUSAs were involved in the case?

24     A     Again, I'm not able to talk about the particulars --

25     Q     Okay.

1        A       -- of an ongoing investigation.

2        Q       How does it work in your office generally?

3        A       Sure.    That I'm happy to talk about it.

4        Q       You have an -- do you ordinarily have an AUSA that is the lead on a case?

5        A       It depends on the particular case, but within the District of Delaware,

6    throughout my career in the Department, the staffing would differ obviously based on the

7    nature of the matter.

8              I would say that it's pretty typical in any case that something other than a very

9    routine, sometimes reactive case, like a simple -- a simple reactive gun arrest or drug

10    arrest or something as base- -- like a bank robbery, something along those lines.

11              Almost all investigative cases which are proactive investigations are in the District

12    of Delaware, staffed with at least two AUSAs.    And depending on the case, it might be

13    someone more senior who is helping someone more junior as a training exercise, or it

14    could be two co-equal partners working on a case without one particularly being lead.

15    And a lot of that will just depend on the sort of vagaries of staffing at any given moment

16    and who has capacity and who has timing and who comes and who goes from the office.

17        Q       Okay.    And how does the supervisory structure work ordinarily?

18        A       So in sort of any case within the Criminal Division is under the supervision of

19    the chief of the Criminal Division in any case.    The criminal chief reports up and I believe

20    reports, I think, in the chain of command, directly to the U.S. Attorney.    Although the

21    first assistant also at times plays a role and is involved in the supervision of cases.

22              I mentioned that I had served as a section chief, and that was more -- in economic

23    crimes -- that is more of an informal arrangement.    There were at various points other

24    section chiefs for things like violent crime and cyber and national security who performed

25    similar functions, although that was not consistent through my tenure.    And that is more

1    of an informal supervisory role, so that it is a place if, for example, someone's working a

2    case on their own or more junior people have some questions, and it helps sort of achieve

3    uniformity and just relieve some of the work and the burden on the criminal chief so that

4    by the time he or she was reviewing a cross memo or an indictment, it had sort of already

5    been through various iterations.

6         Q     During the year 2022, what position did Shannon Hanson hold?

7         A     I think that's a matter of public record that Shannon Hanson was the First

8    Assistant U.S. Attorney.

9         Q     Okay.    And during that time period, what position did Shawn Weede hold?

10        A     I think similarly it's a matter of public record that Shawn Weede was the

11   criminal chief.

12        Q     How often in your work do you have interaction with Main Justice?

13        A     In -- typically, in the breadth of my experience?

14        Q     Yeah.

15        A     Again, it depends on the case.    You always have -- you know, they're always

16   in the background because you're always required to comply with the policies and

17   procedures in the Justice Manual and the directives of DOJ.

18             Depending on what you're doing and the nature of the investigation, you may be

19   partnering with a litigating component, for example, Tax Division, or National Security

20   Division, or the fraud section, or the Civil Rights Division.    And that happens on occasion,

21   either when you need help on a case, either with staffing or substantive expertise, or

22   sometimes they will come to you in your district and be looking to work a case and you

23   would partner with them.    And that is a routine part of the practice.

24             There are other areas that touch and concern Main Justice that in any case you

25   may have.    So, for example, if you're getting a wiretap in any case, right, that's required

1    to be approved through the Office of Enforcement Operations, Policy and Statutory

2    Enforcement Unit.    If you're getting an attorney search warrant, similarly, that needs to

3    go through the Policy and Statutory Enforcement Unit.

4          So in almost every case you're going to run into some aspect of Main Justice at

5    some point in time.

6          Q      In the last couple years, have you had interactions with the Deputy Attorney

7    General's Office?

8          A      As a general matter, without talking about any particular investigation, I

9    think a line assistant such as myself would have far more limited interaction with the

10   Office of the Deputy Attorney General than people above me in the chain of command.

11         Q      Okay.    On the Hunter Biden case, what DOJ components did you interact

12   with?

13         A      I'm unable to talk about any particular investigation.

14         Q      Other than the Tax Division?

15         Who in the Tax Division did you interact with other than Mark Daly and Jeff

16   Morgan.

17         A      I'm unable to discuss the particulars of any ongoing criminal investigation.

18         Q      Did you have -- sorry.

19         Ms. Kramer.    Mr. Castro, right, I would ask you, would you please let Ms. Wolf

20   finish her answers before asking your next question?

21         Mr. Castor.    Indeed.

22         Ms. Kramer.    Thank you.

23               BY MR. CASTOR:

24         Q      Did you have interactions with Stuart Goldberg?

25         A      I'm not able to discuss any particular matters related to an ongoing

1    investigation.

2         Q      So we discussed earlier, it's fair to say that in Federal criminal tax cases,

3    approval from DOJ Tax is required before a U.S. Attorney's Office may issue subpoenas

4    and undertake other investigative actions.    Is that correct?

5         A      The Criminal Tax Manual -- all right.    There's the Justice Manual, and

6    criminal tax has its own manual, and I believe that is an accurate description of their

7    authorization requirements.

8         Q      And if a U.S. Attorney's Office is going to bring criminal tax charges, what

9    types of approval are necessary from the Tax Division?

10        A      In my experience in general cases, the Tax Division will, in the first instance,

11   have approved, as I indicated, if it's a grand jury -- it's not always a grand jury

12   investigation.    There are other ways tax cases can come through.    But if it's been a

13   grand jury investigation, they will have approved it as a grand jury matter.    They will

14   have approved it -- if a tax case grows out of another investigation, they will approve the

15   expansion of the grand jury to include Title 26 offenses.

16        And then there will be an authorization that comes through their chain.    And

17   most typically there is an assigned Tax Division trial attorney who reviews the submission

18   of a special agent report by an agent that is then -- and makes a recommendation to their

19   assistant chief.    And then the assistant chief makes a recommendation, in the District

20   of Delaware situation, to the chief of the Northern section.    And I believe that it's signed

21   off on by the chief of the section and not by the AAG for the Tax Division.

22        Q      Okay.    With respect to the Hunter Biden case, Stuart Goldberg testified that

23   even though David Weiss has said he has ultimate charging authority, that the

24   Tax Division still was required to approve any tax charges.    Was that your

25   understanding?

1      A      I am not authorized to speak on the particulars of any ongoing matter.

2      Q      Okay.    So you're not authorized to speak on David Weiss' charging

3   authority?    I mean, that's been one of the areas that the justice Department has allowed

4   witnesses to address.

5      A      It is my understanding that because you have heard directly from others on

6   this issue who are in a far better position than I am to speak to the actual scope of his

7   authority, that I am not authorized to speak on that.

8      Q      So you're not authorized to speak on Weiss' authority?

9      A      That's correct.

10     Q      Okay.

11     Ms. Kramer.    I think -- I think you can respond with what your understanding --

12     Ms. Wolf.    Right.

13     Ms. Kramer.    -- of his authority was.

14     Ms. Wolf.    Okay.    Yes.

15     It was always my understanding, without the particulars, was that

16   U.S. Attorney Weiss would have the necessary authority to bring charges that he believed

17   were appropriate, to bring in any jurisdiction that he felt it was appropriate to bring said

18   charges in.

19     So I wasn't -- it's fair to say I was never focused on authority because it was not an

20   issue in my day-to-day experience.

21     Mr. Castor.    Ordinarily, if an AUSA or U.S. Attorney wants to bring tax charges

22   and the Tax Division declines, how does that work itself out?

23     Ms. Wolf.    So in an ordinary case -- I don't know that I've ever dealt with that.    I

24   believe there is a process for an appeal of that, but I don't actually know what that

25   process is.

1          Mr. Castor.    Is there a distinction between a Tax Division approval and

2    Tax Division discretion?

3          Ms. Kramer.    If you know.

4          Ms. Wolf.    Yeah.    Again, I think without -- I think there probably is, but I don't

5    know, and without really looking at the tax manual and understanding the particulars of

6    it, that they would be something different.    Though I would also, I think, regard them

7    both as authorization to proceed.

8                BY MR. CASTOR:

9          Q     Have you ever worked a tax case where the Tax Division provided discretion

10    as opposed to approval?

11          A     I'm not going to speak to any particular matters.

12          Q     Fair enough.

13          A     It's possible.    It's possible as -- because as you indicated, there is -- some

14    possibility exists, and, again, I would refer you to the Criminal Tax Manual.

15          Q     Yeah, I guess my question was, have you ever worked a case -- I'm not asking

16    you the name of the case -- where the Tax Division afforded a discretion as opposed to

17    approval?

18          A     And I'm not going to speak as to any particular matters.

19          Q     Have there ever been, during the course of your career, other districts that

20    you brought cases in, maybe as a Special Assistant United States Attorney?

21          A     I have brought cases, at least at some point in time, in other districts as a

22    special.

23          Q     Okay.    How many?

24          A     There's certainly one that was in court and, I guess, there may have been

25    others that didn't culminate in charges or proceeded in another matter at various points

1    in time.

2         Q    Okay.   But you have been deemed a SAUSA, as they call it?

3         A    I have been.

4         Q    Okay.   What's the process for that ordinarily?

5         A    As a general matter, it sort of depends on why you're being, what they call

6    being SAUSA'd in to a different district.   So it can be, for example, because another

7    district has a recusal, a districtwide recusal, and they can't handle an investigation.

8         In that case, typically that comes from, usually I believe, the general counsel's

9    office of the Executive Office of the United States Attorney, communicates the need to do

10   that.   And then you may get some ministerial help from the district into which you're

11   moving, but it involves completing some paperwork, signing off.   You may need to

12   present a certificate of good standing, depending on the jurisdiction or what the situation

13   is.   But those are -- those are one kind.

14        If it's a case where you're coming in on a sort of a more voluntary basis to

15   participate in a case and help prosecute a case, usually, right, it won't be like suddenly

16   you're going to be a special assistant.   You've been working usually alongside of people.

17   It reaches a point where that becomes necessary, and those are discussions, you know,

18   where usually, in the first instance, a criminal chief would agree to that, and they'd talk

19   about the process and what was necessary.   I'm not sure if ultimately you need sign-off

20   from a U.S. Attorney to do it.   Some paperwork, from my perspective, but --

21        Q    In the last instance, 2018, have you served as a SAUSA?

22        A    I don't believe I have since 2018.

23        Q    Okay.   So you were not a Special Assistant United States Attorney in the

24   District of Columbia at any point in time?

25        A    I have not been.

1        Q     Or the Central District of California?

2        A     Since 2018, I have not, but I've been a special assistant in the Eastern District

3    of Pennsylvania.

4        Q     Has anyone in your office been a SAUSA in the Central District of California

5    since 2018?

6        A     I can't speak to -- I can't speak to that.    First of all, I don't know --

7        Q     Okay.

8        A     -- and I would hesitate to answer in relation to any particular investigation of

9    which I am aware.    I'm not authorized to speak to that.

10        Q     Okay.    U.S. Attorney Martin Estrada testified that there were some SAUSAs

11    from Delaware in the Central District of California.    Were you aware of that?

12        A     So I'm not authorized to comment on particular things.    Sometimes you

13    may start and -- as a general matter, you may start a process and things may change

14    along the way, and you may not follow through or complete the necessary paperwork.

15    But while you're -- while things are hot and heavy or you're trying to make decisions,

16    someone may start to do something, but, again, I can't speak with regard to any

17    particular investigation.

18        Q     He testified there was a SAUSA from Delaware that had been onboarded

19    prior to his taking over as the U.S. Attorney.    Are you aware of that?

20        A     I can't speak to any particular information related to ongoing matters.

21        Q     Fair enough.    And if you were able to speak, do you know the answer to

22    that question, or is this one of the questions you just don't know the answer to, whether

23    you're allowed to tell us or not?

24        A     I'd like -- I just want to talk with my counsel about that, so we can do it

25    now or I can --

1        Q        Of course.

2        A        -- talk about it on a break.

3        Q        You can do it now.

4        A        Okay.

5        [Recess.]

6        Ms. Kramer.    Before we go any further, Ms. Wolf just wanted to clarify for the

7    record that she doesn't believe and doesn't recall having been SAUSA'd anywhere from

8    2018 forward, just to make sure that's clear.    She just doesn't have recollection --

9        Mr. Castor.    Yeah.

10        Ms. Kramer.    -- of that.

11        Okay.    But back to the question that you had asked as to whether or not you

12    specifically knew if someone had been SAUSA'd in Central District of California.

13        Ms. Wolf.    Right.    And to the extent that that relates to an ongoing

14    investigation, I am not able or not authorized by the Department to speak to that.

15                BY MR. CASTOR:

16        Q        Okay.    And I ask this follow-up question because if the answer is you don't

17    know the answer to begin with, then it's not worth our time to pursue it.    And so the

18    question is, if you were permitted to give us an answer, do you know?

19        A        And sitting here, definitively, I would not be able to answer that question.

20        Q        Okay.    Fair enough.

21        Under what -- this is related to David Weiss' authority.    Under what authority

22    could he have brought charges outside the District of Delaware without the approval of

23    the local U.S. Attorney?

24        A        So without speaking to any particular investigation or in this particular

25    context?

1       Q      In this, the Hunter Biden case.

2       A      Then I'm not able or authorized to speak as to the manner in which

3    U.S. Attorney Weiss would have been able to proceed.

4       Q      Okay.    And were you aware of what he had to do to bring a case in the

5    District of Columbia?    Did he communicate that to you?

6       A      Again, I'm not authorized to comment on the deliberative process associated

7    with an ongoing investigation.

8       Q      Okay.    And if you were able to communicate to us on that, would you -- I

9    mean, would you be able to?

10      A      I think --

11      Ms. Kramer.    Our understanding --

12      Ms. Wolf.    Go ahead.

13      Ms. Kramer.    Our understanding is that U.S. Attorney Weiss has already

14   appeared before this committee, and I believe he indicated that he intends to file a very

15   comprehensive report that will likely address most, if not all, of your questions.

16      So with that as the backdrop, go ahead.

17      Ms. Wolf.    I think it -- it will depend on the particulars of a question, and I think

18   to get to whether or not I'm able to answer it essentially would override the sort of

19   nonauthorization to speak on particular points.

20      Mr. Castor.    I guess the question then is, was it handled at his level only or did he

21   involve the whole team in those decisions?

22      Ms. Kramer.    I think this kind of line of questioning has been sufficiently asked

23   and answered.    Any questions about his authority and Ms. Wolf, you know, as

24   a prior -- again, as a line assistant -- a line assistant -- sitting here today, she has made

25   clear she is not able to opine on his authority.

1      So questions along those lines, you're going to get the same answer.    You can

2  feel free to keep asking them, but just so you all know, it's going to be unsatisfying for you

3  moving forward.    Sorry about that.

4              BY MR. CASTOR:

5      Q    Are you aware that in February of 2022, David Weiss requested special

6  attorney authority from Main Justice?

7      A    Again, I'm not authorized to answer questions related to the deliberative

8  process in an ongoing matter.

9      Q    Okay.    Are you aware of the three letters that David Weiss sent to the Hill,

10  two to Mr. Jordan and one to Senator Lindsey Graham?

11      A    Those are --

12      Q    They're public.    Yeah, we can mark them.

13      A    Yeah, I just want to make sure that I know what letters we're --

14      Q    Yeah.

15      A    -- talking about.

16          Ms. Kramer.    The question is if you're generally aware.

17          Ms. Wolf.    I'm generally aware that there was communications sent to the Hill,

18  yes.

19          Mr. Castor.    And we'll mark them -- there's three letters.    We'll mark them

20  exhibits 1, 2, and 3.    The first is a June 7th letter, the second's a June 30th letter, and the

21  third is a July 10th letter.

22                              [Wolf Exhibit Nos. 1, 2, and 3.

23                              were marked for identification.]

24          Ms. Kramer.    Would you like us to pass these down to others at the table?

25          Mr. Castor.    Do you guys need them or did you bring your own copy?    This is a

1    frequently used exhibit, so I'm not sure whether -- you got them?

2    ███████.    Yeah.    We have our own copies.    We don't need exhibits -- or we

3    do need exhibits but not these exhibits.

4              Ms. <u>Kramer.</u>   Those are all June 30th?

5              Ms. <u>Wolf.</u>   Yeah.

6              Ms. <u>Kramer.</u>   Okay.   So there's July.

7              Ms. <u>Wolf.</u>   So there's three, just so I'm tracking, June 7th, June 30th, and July

8    10th?

9              Mr. <u>Castor.</u>   Yes.

10             Ms. <u>Wolf.</u>   Okay.

11             Mr. <u>Castor.</u>    Starting with exhibit 1, the June 7th letter.

12             Ms. <u>Wolf.</u>   Yes.

13             Mr. <u>Castor.</u>    The procedural history of this is Mr. Jordan wrote to the

14   Attorney General and, in response, we received a letter from David Weiss, which was

15   somewhat unusual to have a U.S. Attorney outside of, you know, Washington to respond

16   to us.

17             Did you have any role in helping David Weiss prepare this letter?

18             Ms. <u>Kramer.</u>   Take your time to look through it.

19             Ms. <u>Wolf.</u>   As far as I recall, no, I did not.

20             Mr. <u>Castor.</u>   I want to refer you in the second paragraph to the sentence that

21   reads, "I have been granted ultimate authority."

22             Ms. <u>Kramer.</u>   Is there a question?

23             Mr. <u>Castor.</u>   I'm just referring her to that.    Then I'm going to read it --

24             Ms. <u>Kramer.</u>   Okay.

25             Mr. <u>Castor.</u>   -- and then I'm going to ask a question.

1          BY MR. CASTOR:

2     Q     "I've been granted ultimate authority over this matter, including

3 responsibility for deciding where, when, and whether to file charges and for making

4 decisions necessary to preserve the integrity of the prosecution."

5          You see that sentence?

6     A     I do.

7     Q     Okay.    Do you take this sentence as a -- you know, being granted ultimate

8 authority, do you take that sentence as meaning that he had unfettered authority to

9 proceed without the Tax Division's approval?

10    A     So I think that U.S. Attorney or Special Counsel Weiss is probably the better

11 witness --

12    Q     Okay.

13    A     -- to answer that question.    I didn't write the letter --

14    Q     Okay.

15    A     -- and as far as I recall did not even participate or review the letter --

16    Q     Okay.

17    A     -- so I'm probably not your witness for that.

18    Q     Okay.    Would you agree that the phrase "ultimate authority" indicates that

19 the special counsel -- the now special counsel then -- just the standard U.S. Attorney, the

20 phrase "ultimate authority" meant that he could bring a case over the objection of the

21 Tax Division?

22         Ms. Kramer.    Asked and answered.

23         Go ahead.

24         Ms. Wolf.    I -- I'm not able to agree or disagree with what Special Counsel Weiss,

25 and at the time U.S. Attorney Weiss, intended to indicate with this.

1        Mr. Castor.    I'll turn your attention to exhibit 2, dated June 30th.    Are you

2    aware of when this letter was sent at the time?    Did you have any role in -- or help

3    preparing it?

4        Ms. Kramer.    Compound question.

5        Ms. Wolf.    Yeah.

6        Ms. Kramer.    Maybe break that down.    Are you asking Ms. Wolf if she's aware

7    of the date that appears prominently on the first page when you say "when this letter

8    was sent," or are you asking her a more specific question about her knowledge at the

9    time?

10        Mr. Castor.    Fair enough.    I'll rephrase.

11        Ms. Kramer.    Thank you.

12            BY MR. CASTOR:

13        Q    Did you have a role in helping Mr. Weiss prepare this letter?

14        A    I do not believe that I did.    As far as I recall, I had no role in helping to

15    prepare this letter.

16        Q    Did you read the letter when it was sent?

17        A    I'm sure I read it at some point in time, but I have no specific recollection of

18    doing so prior to it being included in documents that were forwarded for preparation in

19    today's interview.

20        Q    Okay.    It states, "I stand by what I wrote" -- and he's referring to his

21    June 7th letter -- "and wish to expand on what this means."

22        Ms. Kramer.    I'm sorry.    Can you point us --

23        Mr. Castor.    Yeah.

24        Ms. Kramer.    -- to the -- oh, thank you.    I'm there.    Thank you.

25        Mr. Castor.    Okay.

1          Ms. Kramer.   Sorry.   Was there a question pending about that?

2          Mr. Castor.   I'm going to read it --

3          Ms. Kramer.   Okay.

4          Mr. Castor.   -- and then ask a question.

5          Ms. Kramer.   Great.

6                BY MR. CASTOR:

7          Q     "As the U.S. Attorney for the District of Delaware, my charging authority is

8    geographically limited to my home district.   If venue for a case lies elsewhere, common

9    departmental practice is to contact the United States Attorney's Office for the district in

10   question, determine whether it wants to partner on the case.   If not, I may request

11   special attorney status from the Attorney General, pursuant to 28 United States Code,

12   Section 515.   Here, I have been assured that, if necessary after the above process, I

13   would be granted Section 515 authority in the District of Columbia, the Central District of

14   California, or any other district where charges could be brought in this matter."

15         A     Okay.

16         Q     Do you believe the June 30th letter is consistent with the June 7th letter

17   where he professed to have ultimate authority?

18         A     I think that the documents speak for themselves.   I think, as I indicated

19   previously, the paragraph that you just read in the June 30th letter was generally

20   consistent with what my understanding was as to the scope of his authority.

21         Q     But, again, you didn't have any involvement in the preparation of this letter?

22         A     I did not.

23         Q     Do you know if anyone outside of Mr. Weiss in your office did have a role?

24         A     I do not.

25         Q     Lastly, exhibit 3, the July 10th letter to Senator Lindsey Graham.   The

1    second -- the third paragraph.    "To clarify an apparent misperception and to avoid

2    future confusion."    Do you see that part of the letter?

3          A    Yes.

4          Q    Okay.    "I wish to make one point clear:    In this case, I have not requested

5    special counsel designation pursuant to the 28 CFR, section 600 et seq.    Rather, I had

6    discussions with departmental officials regarding potential appointment under 28 United

7    States Code, Section 515, which would have allowed me to file charges in a district

8    outside my own without the partnership of the local U.S. Attorney.    I was assured that I

9    would be granted this authority if it proved necessary."

10          How do you reconcile Mr. Weiss' statement that he would be granted authority to

11    bring charges outside of his district with his previous assertion that he already had that

12    authority?

13          Ms. Kramer.    Just for the record, I'm going to again state this whole line of

14    questioning has, in my opinion, been asked and answered.

15          Ms. Wolf has said a number of times that the proper witness is not her.    The best

16    witness to discuss the contents of a letter of which she had no dealings or role in

17    preparing would be the author himself.

18          Having said that, go ahead and answer.

19          Ms. Wolf.    I think, again, to the extent I'm authorized to speak on the scope of

20    U.S. Attorney Weiss' authority, I indicated it was my understanding that he would have

21    the authority he needed.    The particulars of that and what it looked like, I do not have

22    either authorization to speak to or, quite frankly, the knowledge thereof.

23          So I do think, having had the opportunity to speak with U.S. Attorney Weiss about

24    this, that's probably going to be the best witness to be able to answer your question

25    about how to reconcile the various statements.

1          BY MR. CASTOR:

2          Q      Are you familiar with the former U.S. Attorney for the Western District of

3    Pennsylvania, Scott Brady?

4          A      When you say familiar, I'm aware that Scott Brady was the former

5    U.S. Attorney for the Western District of Pennsylvania, but I don't know Mr. Brady.

6          Q      Okay.    Did you have any meetings with him?

7          A      I'm not going to speak to -- I'm not authorized to speak with regard to

8    particular matters.

9          Q      Okay.    Were you aware that he had been charged by Main Justice to

10   evaluate certain matters related to the Hunter Biden case and Ukraine, Burisma

11   generally?

12         A      It's my understanding as a matter of public record and published news

13   articles that that was, in fact, the case.

14         Q      Mr. Brady testified that his role was limited to vetting the information that

15   he was able to review and compile and send it if he deemed it to have some credibility, to

16   send it to the U.S. Attorney's Offices around the country with grand jury investigations

17   going on.

18         Was that your understanding of his role?

19         A      I'm not able to speak to what the particulars were more broadly of his role.

20   And to the extent it's related to any particular matter, I'm not authorized to speak on

21   that.

22         Q      Mr. Brady testified that it was a regular challenge for his office to obtain

23   information from the U.S. Attorney's Office in Delaware, so much so at one point he had

24   to submit written interrogatories to your office.

25         Can you tell us about that episode?

1          A      I'm unable to answer questions about the particulars of an

2    ongoing -- connected to an ongoing matter.

3          Q      Mr. Brady testified that he had such trouble connecting with the

4    U.S. Attorney's Office in Delaware, he had to ask the DAG's office to run some

5    interference and facilitate communications.    Is that something you can tell us about?

6          A      I'm not authorized to speak to that.

7          Q      In your experience, have you ever had a situation where the DAG's office had

8    to broker a meeting between two U.S. Attorney's Offices?

9          A      More generally?

10          Q      Yeah.

11          A      I think the DAG's office regularly engages in that kind of contact.    I think the

12    DAG's office is the decider essentially where there's any question or conflict between

13    various U.S. Attorney's Offices.

14          Q      Have you ever dealt with a situation where the DAG's office had to require

15    your office to meet with a different office?

16          Ms. Kramer.    Can you clarify?

17          Ms. Wolf.    Yeah.

18          Ms. Kramer.    I'm sorry.    I don't understand that question.

19          Ms. Wolf.    And I want to make sure that --

20          Mr. Castor.    Mr. Brady testified that to have meetings with the U.S. Attorney's

21    Office in Delaware, he had to go through the DAG, and the DAG basically had to,

22    according to his testimony, had to make that happen.

23          Ms. Wolf.    So --

24          Ms. Kramer.    Wait.    Is there a question pending?    This is a series of statements

25    you're making about someone else's testimony.    So what's the question related to the

1    last statement you just made, please?

2         Mr. Castor.    The question is, in your experience, has the DAG's office ever had to

3    do that?

4         Ms. Kramer.    Asked and answered.

5         Chairman Jordan.    Did you ever talk to Mr. Brady yourself?

6         Ms. Wolf.    Again, I'm not authorized to speak to any particulars of an ongoing

7    investigation.

8         Chairman Jordan.    We're not asking about particulars.    We're just asking, did

9    you talk to the guy?

10        Ms. Wolf.    I think that that is -- exceeds the scope of my authorization to discuss.

11             BY MR. CASTOR:

12        Q    Are you familiar with the 1023 form dated June 30th, summarizing a

13   confidential human sources meeting with Burisma executives that U.S. Attorney Brady

14   was able to uncover?

15        A    I am familiar generally with it as it's been reported and discussed.

16        Q    And did you become familiar with it in the course of your official duties?

17        A    I'm unable to discuss the particulars.

18        Q    Did you become familiar with it like reading it in the press, I guess is my

19   question, or was it sent to your office?

20        A    I'm not authorized to discuss that.

21        Chairman Jordan.    When did you become familiar with it?

22        Ms. Wolf.    The form itself?

23        Mr. Castor.    The June 30th, 2020, 1023.

24        Ms. Kramer.    Would it be helpful to present her with the document so that we

25   know more clearly and specifically what you're addressing?

1    Mr. <u>Castor.</u> Do you have the 1023?

2    Ms. <u>Kramer.</u> Thank you.

3    Mr. <u>Castor.</u> This will be exhibit 4.[[]]

4    Ms. <u>Kramer.</u> It just helps the process to look at the document she's being asked

5 about.

6    Mr. <u>Castor.</u> It will not become exhibit 4 because we need to go get the

7 document.

8    Ms. <u>Kramer.</u> Okay. That's fine. Great.

9    Mr. <u>Castor.</u> We'll come back to it later.

10    Ms. <u>Kramer.</u> We appreciate that. Thank you.

11    BY MR. CASTOR:

12   Q Mr. Brady testified that your office only accepted a briefing from his office

13 after the DAG's office got involved. And, again, I know I've asked this maybe a couple

14 different times, and I'm not trying to badger, but had that ever happened in your

15 experience before?

16   A So I'm not authorized to speak to the particulars of a matter and to either

17 confirm or -- even confirm or deny Mr. Brady's testimony.

18   Q Okay.

19   A So that, I think is -- to the extent it presupposes it happened in that

20 particular instance, I'm just not able to answer the question.

1    [11:01 a.m.]

2              BY MR. CASTOR:

3        Q      And during the course of your career, have you ever had a situation where

4    you were reluctant to cooperate with a different U.S. Attorney's Office?    And by

5    cooperate, I mean have meetings, take telephone calls.

6         Ms. Kramer.    I know this is almost too formal for this process, but I'm going to

7    object to form.

8         What does that mean, unwilling to cooperate?    I'm just not clear on what exactly

9    you're trying to ask.

10         Mr. Castor.    Unwilling to take meetings?

11         Ms. Kramer.    Generally?

12         Mr. Castor.    With a different U.S. Attorney's Office.

13         Ms. Wolf.    I can answer those questions, generally.

14              BY MR. CASTOR:

15        Q      Sure, sure.

16        A      I think as a general matter, the idea would be that you are coming from a

17    place of cooperation and the common mission of the Department of Justice and what it is

18    you're trying to accomplish.    But there may well be very, very valid means, reasons for a

19    desire and an interest to keep investigations separate and apart.    And in those

20    circumstances, you would -- and it wouldn't be unusual to say, you know what, we're not

21    going to need to share information, we're not going to do this.    And it would just

22    depend, again, on the particulars of an investigation and what the needs and what the

23    various interests were at play.

24        Q      Okay.    Are you familiar with Supervisory Special Agent Gary Shapley's

25    testimony where he indicated you were unwilling to interact with Scott Brady?

1          A      I'm generally familiar with Special Agent Shapley's testimony, yes.

2          Q      Okay.    Are you familiar with that particular aspect of it?

3          A      I mean, I've read his testimony.

4          Chairman Jordan.    Would there be a reason not to interact and meet with Mr.

5    Brady and his team?

6          Ms. Wolf.    As that relates to a particular investigation, I'm not authorized to

7    speak to that.

8          Chairman Jordan.    You said there were some situations that -- the general way of

9    doing things is to, you know, "cooperate," I think, is the word you used.    And you said

10   there are times that we're not going to do that.    Why would there be a reason not to do

11   it in this situation?

12         Ms. Kramer.    Chairman, respectfully, I think you had left the room when I had

13   asked Mr. Castor earlier, please allow Ms. Wolf to finish her answers to the questions

14   before --

15         Chairman Jordan.    Okay, sure.    I apologize.

16         Ms. Kramer.    -- and me as well, number one.    And number two, I believe you

17   mischaracterized her very recent answer.

18         I don't believe you said that there were times that you would refuse to cooperate,

19   unless I misheard.

20         So let's break that down.    I think your first question, Chairman Jordan, is what

21   again, if you don't mind repeating it?

22         Chairman Jordan.    Would there be a reason not to cooperate with Mr. Brady's

23   office?

24         Ms. Wolf.    As to this particular case, I'm not authorized to speak to that.    As a

25   general matter, and I think to potentially recast and just reframe, the infusion on the

1    point, there are valid investigative reasons in any given case that would need to be

2    evaluated before joining, overlapping, even taking in information, and that would all be

3    factored in, in any case, to deciding how to move forward in a matter, all in the spirit of

4    advancing and the best interest of the investigation.

5        Chairman Jordan.   I understand.   That's the general.   But this is a little

6    different situation, right?

7        Ms. Wolf.   I'm not authorized to speak to the particular situation.

8        Chairman Jordan.   Mr. Rosen in the Attorney

9    General's Office tasked Scott Brady with being the key clearinghouse for any information

10   related to Ukraine and Hunter Biden.   This is a unique situation.

11       So it would seem to me that your answer was the norm is to cooperate when you

12   have the Attorney General of the United States designating the U.S. Attorney's Office as

13   being that clearinghouse.   That would even tend to be more focused on we need to

14   cooperate.

15       Ms. Kramer.   I believe this has been asked and answered.   And I am not even

16   sure, Chairman Jordan, there is a question pending in that statement that you just made.

17       Mr. Castor.   In your experience, have you dealt with U.S. Attorneys that have

18   been the recipient of an assignment from Main Justice to examine a particular matter

19   that then subsequently touches on one of the cases you're working on?

20       Ms. Wolf.   As a general matter, in my 16 years in the Department of Justice,

21   might that have happened, possibly.

22       Mr. Castor.   Okay.   But you can't recall anything specific?

23       Ms. Wolf.   I can't -- I'm not authorized to discuss specific investigations.

24       Chairman Jordan.   Well, he's asked a general question.   Was this unique or did

25   this situation happen before?

1        Ms. <u>Wolf.</u>    Again, I can't speak to -- so I want to be very clear.    I can't speak to

2    what the scope of Mr. Brady's authority was, either as he understood it or as it was

3    provided by, I believe you said Mr. Rosen.    I do know that at times U.S. Attorneys are

4    tasked with particular projects and particular requests on behalf of the Deputy Attorney

5    General or on behalf of the Attorney General.    I don't think there's anything particularly

6    extraordinary about that undertaking.

7        You know, to the extent that it then subsequently touches on an investigation or a

8    matter in your district, I would expect that would be something that you would be aware

9    of and usually the kind of thing that would probably take place above the line level.    And

10    that's part of, you know, a sort of lack of clarity or understanding on how this sort of what

11    is and isn't typical.    I hesitate to answer.    And, quite frankly, I think in answering

12    whether this was typical or atypical, it runs afoul of what I am authorized to discuss,

13    because it essentially acknowledges or will be interpreted as acknowledging or denying or

14    endorsing what may or may not have happened.

15            BY MR. CASTOR:

16    Q    Do you have a recollection of Mr. Brady's office sending your office written

17    questions?

18    A    That exceeds the scope of what I'm authorized to discuss.

19    Q    And if you were authorized to discuss that, do you know the answer to the

20    question?

21    A    I think that by answering it I would -- even by answering your subsequent

22    question, I would be exceeding the scope of the authority.

23        I would again reiterate that I think Special Counsel Weiss has indicated, and I think

24    it's required or at least as I understand it under special counsel statute, that he's going to

25    issue a fulsome report at the appropriate time.    And I would expect that a number of the

1      questions that you're asking here today will be addressed within that document.

2            Mr. <u>Castor.</u>   I'll mark exhibit 4.

3                                    [Wolf Exhibit No. 4.

4                                    was marked for identification.]

5            BY MR. CASTOR:

6      Q     This is an email chain between you and FBI Special Agent Joshua Wilson.      In

7      the last sentence of the email that you sent, it states, "There should be nothing about

8      political figure 1 in here."

9            Can you tell us who political figure 1 is?

10     A     Looking at page 2 of the document, it would be, well, who's described as

11     former Vice President Joseph Robinette Biden, Jr., now President Biden.

12     Q     And can you tell us why you wrote "There should be nothing about political

13     figure 1 in here"?

14     A     So I am not able to answer questions about this particular search warrant or

15     this particular draft, but I can speak to the process of search warrants and drafting search

16     warrants and the process associated with that, if that would be helpful.

17     Q     Okay.

18     A     So in any given case, while you're seeking a search warrant, there are a

19     number of requirements.    The first is that you demonstrate probable cause, and not that

20     a crime has been committed, but it's not simply enough to say there has been a crime

21     that a search warrant is probable cause for a particular crime.    So just because I have

22     probable cause to look for guns in your house doesn't mean I can go in and take all your

23     bank records, for example.    That's as a general matter.

24           And then the second link to it is there not only needs to be probable cause to

25     believe that a crime has been committed but that evidence or fruits of the crime will be

1    discovered at the location to be searched.    The way in which -- so that is what's

2    articulated in the affidavit accompanying a search warrant or in support of a search

3    warrant.

4        The warrant itself requires specificity both of the area to be searched, and that's

5    attachment A, and then attachment B, which is a list of the items to be seized.    And that

6    is where you describe the evidence that you expect to find and that you are seeking court

7    authorization to be able to take as a result of that and to seize within the scope of the

8    warrant.    All of those things need to line up and need to speak to each other.

9        There is sort of a drafting, I think -- it's not uncommon that special agents will

10   spend a lot of time with an affidavit, and that's obviously where it will -- and you may get

11   a draft where no one has yet really looked at attachment B or even attachment A when it

12   comes over to make sure things marry up.

13       So in order, in any given case, you're first making sure that both your probable

14   cause lines up for both the crimes, the evidence, and what you're seeking authorization to

15   take as a result of that.    It's not a carte blanche.    And I think that's important.    I think

16   that's important for people to understand that search warrants don't let you -- they're

17   limited.    They're intrusions on people's rights.    And the default is an intrusion on

18   someone's rights.    So that there are protections built into the process by the

19   Constitution that the magistrates are responsible for enforcing.

20       So as a search warrant goes through, you need to be careful.    If you're presenting

21   a warrant to a magistrate, you don't want to overstate your case.    You don't want to be

22   too broad, so you need to line things up.    So in any given case as you're revising both an

23   affidavit and the accompanying attachments to the warrant, you're working through all of

24   that.    And you will frequently take things out more often.    It's actually usually a process

25   of removing certain things, as often as it is a process of adding in other things.    So it's

1    kind of an iterative process to get to the point where everything lines up as best it could

2    for what you have probable cause to believe you can fairly present to the court, both as a

3    matter of getting it approved by the court and also as a matter of what your sort of

4    ethical and, you know, responsibilities are as an attorney.

5        Q    So in this instance, you stand by your statement that there should be

6    nothing about political figure 1 in here?

7        A    I'm not able to speak to this particular warrant.

8        Q    Okay.    But in your opening statement, I think you indicated that none of

9    these decisions were made for political reasons.    Is that fair to say?

10        A    That is reflected in my opening statement, and I agree with that.

11        Q    Okay.    So to extent you didn't -- you asked the agents to take out political

12    figure 1, there was no political motivation in requesting that?

13        A    I refer back to my opening statement where I said at no time there was

14    politics playing a role in those decisions.

15        Mr. Castor.    I think my time's up on the first hour.

16        [Discussion off the record.]

17        ███████.    We can go on the record, please.

18                         EXAMINATION

19           BY █████████:

20        Q    Good morning again, Ms. Wolf.

21        A    Good morning.

22        Q    You went through your background with a good deal of detail, but I just want

23    to bring out a little bit more, if you don't mind.    You indicated you came into the U.S.

24    Attorney's Office in Delaware for the first time in 2007 under Attorney General Gonzales,

25    correct?

1        A      That is correct.

2        Q      And who was the President at that time that appointed Attorney General

3    Gonzales?

4        A      I believe that it was George W. Bush.

5        Q      Okay.    You indicated that you worked through several Presidential

6    administrations.    Those included both Republican administrations and Democrats.    Is

7    that correct?

8        A      That is correct.

9        Q      And was there any meaningful change in the role that you had as a line

10   assistant during a Republican versus a Democratic administration?

11       A      Absolutely not.

12       Q      You have also indicated that you were a career, you call, line assistant.    Can

13   you explain what a line assistant is in terms of your career?

14       A      It is a nonsupervisory role.    You're the person on the front line, essentially,

15   prosecuting all the ins and out of cases.

16       Q      And that's not a political-appointed position, correct?

17       A      No, to the contrary.

18       Q      What do you mean by to the contrary?

19       A      Well, it can't be essentially that you are, both officially under the Hatch Act,

20   limited in what you can do, but also more importantly the very nature of the work should

21   not be and can't be political.

22       Q      You referred to the Hatch Act.    Why do you refer to the Hatch Act when

23   you explain that your job is not political?

24       A      The Hatch Act, I guess, places certain restriction on political activity by

25   Justice Department -- government employees generally, but applicable to the line on up

1    within DOJ.    And as a part of that I think it is to -- I've always understood it to be to

2    create confidence from the public and the people that the individuals such as myself

3    making these decisions are not doing so with political motives or biases in mind.

4         Q    And fair to say you've never held a political appointee position within the

5    Department of Justice?

6         A    I have not.

7         Q    And would you say that in your experience as an AUSA, you have made an

8    effort throughout your career to remain apolitical in your job?

9         A    Absolutely.    It's require -- I mean, it's not -- I would anyway, but it's

10   required.

11        Q    Okay.    During your career as an Assistant U.S. Attorney, about how many

12   cases, criminal cases, have you prosecuted?

13        A    Prosecuting like that culminated in charges or investigations that may have

14   gone different directions at just --

15        Q    Yeah.    Just to start with, if you could answer it in whatever way is

16   meaningful to you in terms of investigations.

17        A    Right.    Because oftentimes information will come in and a very preliminary

18   investigation will be conducted, and it will be determined that, for whatever reason,

19   either no crime has been committed or it's not appropriate for Federal prosecution.

20   Others, some work is done -- well, work is done before a decision like that is or isn't

21   made, and it may be referred either to another district or to another body like the State

22   Attorney General's Office.

23        But in terms of actual charged cases over the 16 years that I served as an AUSA, I

24   should know the number, but I would expect that it would be approximately a hundred.

25        Q    Those are all criminal cases?

1   A  They are.  Though at various points, I did also handle some civil cases early

2 in my career, as well as some asset forfeiture cases as well, which are civil in nature.

3   Q  How many cases have you tried before a jury, if you know?

4   A  Seven or eight, I believe.

5   Q  And if you know, how many cases have you indicted before a grand jury?

6   A  I would say most of those hundred were grand jury indictments.

7 Occasionally, as you may be aware, you can charge a matter by an information, which is

8 essentially where a pre-indictment, there is an agreement to enter a plea of guilty.  That

9 would be the only circumstance in which you wouldn't indict a case before a grand jury.

10   Q  So in addition to those approximately 100, you may have also been involved

11 in cases that were resolved before indictment?

12   A  Well, that's included within the hundred matters.

13   Q  Okay.  You indicated also that you had some unofficial supervisory position

14 within the Department.  Were you ever a FOUSA or in the -- I guess they're called front

15 office in the U.S. Attorney's Office?

16   A  I was not, but I did sit in on senior staff and I had an SLC designation.  And

17 the reason I was invited into senior staff was in part because of my seniority in the office,

18 in part because of my role with economic crime.  In some ways, it was, I think, to

19 represent a line.  And I think I may have been designated in connection with that as

20 counsel to the U.S. Attorney.  But again, those are sort of unofficial roles that largely

21 relate, quite honestly, to an ability to give a pay bump rather than sort of a meaningful

22 supervisory role.  It's not technically a supervisory role.

23   Q  Okay.  Throughout your career as an AUSA, have you received any awards

24 from the Department of Justice for your work?

25   A  I have.  From the Department itself I received a Director's Award, which I

1 think is the second highest -- you know, sort of regarded as the second highest form of

2 recognition for some work with a team as part of a litigative team for trial work I did in

3 one matter, as well as recognition at various points in time from Federal agencies,

4 including FBI and IRS.

5   Q And just a little bit about that.   The Director's Award, do you recall when

6 that was given to you?

7   A So the award I think came in 2020, because there was no ceremony that

8 year.

9   Q And can you explain anything -- is that matter closed?

10   A The matter is closed.   It was connected to the Wilmington Trust trial, which

11 I handled with two of my colleagues and an incredible team of agents, as well as great

12 support staff within our office.   And it was essentially one of the few prosecutions of

13 individuals and senior bank executives arising in connection with the 2008 financial crisis

14 and the bailout.

15   It breaks my heart to say that it was reversed on appeal.   The convictions were

16 reversed on appeal on a technical legal matter relating to a jury instruction.   And

17 although the Supreme Court, I think, has since said we had it right, so that's little comfort

18 at present time.   But we were recognized for -- it was about a 6-week trial, and we were

19 recognized by the Department for the work we did in that investigation and in the trial.

20   Q And would you say that that case, in the context of the other work that you

21 did at the U.S. Attorney's Office throughout your career, was one of the larger cases that

22 you had worked on?

23   A Yes.

24   Q And would you say it was impactful in your career in a way that was more

25 significant than other cases that were not run of the mill?

1       A       Yes.   I don't want to -- and sometimes -- you know, I don't want to sort of

2   overstate it, because I think even the little cases, right, matter, and are important, and

3   they certainly are important to the people on the other side who are being prosecuted

4   and their families.   And they're important to the victims, and they're important to the

5   law enforcement agents who are investigating them.   And sometimes you learn as

6   much, if not more, from the little cases as the big ones.

7       But, yes, you know, there are over a span of years taking a case from the earliest

8   stages of an investigation through trial, through appeal is just as a matter of right with

9   complicated legal issues and multiple defendants and everything else along the way, it's

10  going to be impactful.

11      Q       Okay.   You indicated that you retired from the Department of Justice in, I

12  think you said November of '23.   Is that right?

13      A       Yeah.   I wish I retired, but I left the Department.   I separated from the

14  Department.

15      Q       Oh, understood.   You didn't yet retire?

16      A       No.

17      Q       Okay.   And those plans to separate or to leave the Department of Justice

18  were in place years ago or months ago?

19      A       So it was -- it was a process.   It was probably about a year ago where I first

20  started speaking with people about my intent to consider moving on from the

21  Department.   And it takes a little while to figure out exactly what that looks like.   But

22  those plans were in place, and I had sort of figured it all out by mid-June of this year.

23      Q       Fair to say that when you chose to leave the Department, it had nothing at

24  all to do with performance as an AUSA?

25      A       No, it didn't.   I was -- had received outstanding ratings for I think every year

1    except the first, or maybe a first or second year when -- as an AUSA when I was merely

2    satisfactory.

3         Q    Merely.    Understood.    And just real generally with what you're willing to

4    share with us today, can you tell us, are you proud of the work that you did as a Federal

5    prosecutor for 16 years?

6         A    I'm enormously proud of it.    I think for anyone who's done it, they can

7    appreciate the fact.    And it sounds sort of trite to say, but it's more than a job.    And it is

8    an incredibly -- it serves an important function.    And you just learn to care about your

9    work.    I think I alluded to the impact it has on the community, on the people that you

10   are dealing with on both sides of the occasion.    And it feels like the kind of thing that

11   matters.    And you work with people who share that belief and share that view in

12   attempting to seek justice.

13        So it is -- you know, you leave the job with a heavy heart because I don't think

14   there are a lot of jobs that offer that, though there are other things out there to do.    But

15   I feel very confident the very little I will do moving forward will mean quite as much to me

16   as it did to be an AUSA for 16 years.

17        Q    Okay.    I'm going to move a little bit away from your personal background.

18   I did want to ask too, was there anything from the first hour that you needed to clarify or

19   say before I get into some more specific questions?

20        A    I don't believe so.

21        Q    Okay.    I'm going to ask you some general questions.    Not specifically

22   about the Hunter Biden matter or others, but all of these are just aimed at your

23   experience generally as an AUSA, about what kind of considerations prosecutors have

24   when they're making charging decisions or other decisions about how to lead an

25   investigation.

1          But before I even get into some of that, you indicated clearly that your position

2    was a line career assistant throughout your time at the Department, correct?

3          A     Yes.

4          Q     And as a line assistant, is it fair to say that you actually personally never had

5    the authority to charge people criminally; that authority instead lies with the United

6    States Attorney at whose direction you're working?

7          A     Yes.

8          Q     And so your role, is it fair to say, as a line assistant, as Assistant U.S.

9    Attorney, is to make recommendations about charging and other investigative steps that

10   the United States Attorney then has to authorize?

11         A     Yes, it is.    I have no independent authority to decide to charge a matter.

12         Q     Okay.    And that applies to every single case that you have ever touched at

13   the District of Delaware and elsewhere in the Department?

14         A     That is every single case.

15         Q     Okay.    No -- sorry.    Are you familiar with the Justice Manual and the

16   Principles of Federal Prosecution?

17         A     I am.

18         Q     And how are you familiar with it?

19         A     The Justice Manual and the Principles of Federal Prosecution, which I think

20   are actually included as sections within the Justice Manual, they're your playbook, they're

21   your go-to as an AUSA.    And you may hear me call it the USAM, or the U.S. Attorney's

22   Manual, because for a long time that's what it was.    But it is the policies and procedures

23   that are applicable to all cases and in some areas are sort of specific and technical

24   requirements that need to be followed.    And others like, for example, as they embody

25   the Principles of Federal Prosecution, just a little more aspirational and amorphous to

1   provide some guidance and bumpers, so to speak, to sort of remind people, I think, of

2   what the obligations are and what the relevant considerations are.

3       Q    Okay.    I'm going to admit as -- I think it's exhibit 5.    This is a portion of the

4   Justice Manual that includes the Principles of Federal Prosecution.

5                                     [Wolf Exhibit No. 5.

6                                     was marked for identification.]

7       BY ███████████:

8       Q    If you can take a minute to look at the portion I've provided to you.    Are

9   you familiar with this generally?

10       A    Yes.

11       Q    Okay.    I'm going to direct you to just first the preface, which is section

12   9-27.000 and 01.    I guess it starts on the second page, as is printed here.

13       Directing your attention to the last paragraph on that page.    The first sentence of

14   the paragraph describes the Principles of Federal Prosecution serve two purposes.    Do

15   you see that portion?

16       A    Yes.

17       Q    Okay.    And according to this, it says that the two purposes of the Principles

18   of Federal Prosecution are, one, quote, "Ensuring the fair and effective exercise of

19   prosecutorial discretion," unquote.    And then it says the second is, quote, "Promoting

20   confidence on the part of the public and individual defendants that prosecutorial

21   decisions will be made rationally and objectively based on individualized assessment of

22   the facts and circumstances of the case."

23       I've omitted some language, but did I read it correctly as far as you can tell?

24       A    Yes.

25       Q    Okay.    Are you familiar with this language and the purposes that underlie

1       the Principles of Federal Prosecution?

2               A       I am.

3               Q       Based on your experience and expertise, what do you think it means, this

4       language, quote, "ensuring the fair and effective exercise of prosecutorial discretion," end

5       quote?

6               A       I think it's just creating a baseline to, as I said, remind people of the

7       obligation to -- because you do have discretion and you're making decisions all of the

8       time.    And that the principles of fairness are vital to that, as well as being effective in

9       enforcing -- not only just enforcing the criminal laws, but also enforcing them in a matter

10      so as to achieve justice.

11              Q       And you already referred to prosecutorial discretion, but can you give us a

12      few words about what that means?

13              A       Sure.    In speaking right, Federal criminal laws are statutory; that there are

14      elements to each offense.    And as a baseline matter, you have to determine that there's

15      proof available to support all of those -- all of those things in order to bring a case.    It's

16      improper to bring a case if you don't believe that you can prove that case.    But, more

17      importantly, is just because you can doesn't mean you should.

18              And this is a constant in -- and I don't think it's unique to being an AUSA, though

19      it's certainly heightened as an AUSA.    You are authorized to do a lot of things, right; that

20      there's a relatively low threshold for approaching witnesses or subpoenaing documents.

21      A lot of times you can articulate probable cause to serve something.    In other instances,

22      you can definitely meet the legal requirements and probably convict someone before a

23      jury.    But that doesn't mean you should.

24              In each circumstance, and really every day, there's like a million decisions, right.

25      I think there's some research out there about how many decisions people make on a daily

1   basis, and it's something like 62,000, or something ridiculous.    It's probably twice that

2   for an AUSA.    Because you're constantly evaluating, okay, I can do this.    Does this sort

3   of big picture, right, satisfy and work towards achieving and moving towards justice?

4   Whereas on the back side of it, also just at an individual level, the question is, is how does

5   this serve the best interest of the investigation?

6           And those are all the things that you're required to think about and do in every

7   single case, sort of every single day.

8           Q      Okay.    Do you broadly agree that one of the main objectives of the

9   Principles of Federal Prosecution is to ensure that prosecutors treat defendants fairly and

10   equally under the law?

11          A      Yes.

12          Q      And I don't want to put words in your mouth, but would you agree that

13   prosecutors have somewhat unique role in the criminal justice system because it's not

14   just their job to win a case, but also to simultaneously respect the rights of the defendant

15   that's being charged?

16          A      Absolutely.    And I think I alluded to the quotes from Berger v. United

17   States, right, that it is -- you have to strike fair blows.    And it is not simply about winning

18   or burying the other side.    It is about working hard, vigorously pursuing the truth, and

19   doing so in a way that is still within the limitations and the boundaries of the Constitution.

20          Q      And you as a prosecutor actually have legal obligations to the defendant, not

21   just under the law to prosecute a case.    For example, Brady obligations?

22          A      That is correct.

23          Q      And you have ethical obligations as a prosecutor as well to the defendant.

24   Is that correct?

25          A      That is correct.

1   Q During your long career as a Federal prosecutor, have you scrupulously

2 adhered to the principle articulated in the Principles of Federal Prosecution in order to

3 ensure that you've treated defendants fairly and equally under the law?

4   A I think as I said sort of out of the gate in my opening comments and opening

5 remarks, yes, I have.

6   Q And just, if you can give any color to that, can you explain in any way, like,

7 how is it that you're able to do that, and how are you confident that you're able to do

8 that in your work?

9   A So I think the most basic way in which I'm confident that I was able to do it is

10 because I believe in it. And it's not just something that I've signed on to in conjunction

11 with taking a job or as a condition of employment, but it is important to the system of

12 justice and to sort of rule of law, which I have enormous respect for, that it's done so.

13 And I think that part of the reason for me that my work, and in particular at the United

14 States Attorney's Office for the District of Delaware, was so meaningful was because that

15 was very much a shared mission. It is a smaller office, and I think it's one of the smallest

16 U.S. Attorney's Offices. And as a part of that, there are periods where -- there's always

17 people that come and go from U.S. Attorney's Offices, but there was, for most of my

18 career, a core group of people who were not just passing through and who fostered that

19 and shared that vision and that role moving forward. And constantly because

20 you're -- and then just lastly, you're always mindful of it because you are trying to do the

21 right thing, and I think you are guided by what internally you believe is the right thing.

22 You have these principles backing you up. And then you have usually terrific colleagues,

23 when you're not sure what to do, you can talk to and bounce ideas off of and encourage

24 you to think about things in new ways and in a new light.

25   Q Okay. The second part of that preface it talked about fairness to the

1    defendant.    And it also talks about the need to promote the perception in the public

2    that there is fairness, or not to undermine the perception of fairness in the public.    Do

3    you agree that that is also important as the prosecutor exercises her discretion, to make

4    sure that the public is not looking on this system as unfair?

5          A    It is.    It's very important.    It's also very challenging to do.    And in part it's

6    because you -- partially, you're trying to do your best, but you -- and you have reasons.

7    And often they are reasons you can't share for a variety of reasons as to why you've made

8    a particular decision.    And you have to be willing.    You know, I think that sometimes

9    can be undermining to public confidence, but it is sort of a necessary part of the process

10   to protect people's individual rights and really the integrity of the system.

11         But -- and partially you don't control every aspect of that in, right -- the courts are

12   charged with sentencing.    And sometimes the end result of a sentence will be different

13   than either what you expected or what it was in a way.    And while they're tasked with

14   not imposing unwarranted sentencing disparities, sometimes it feels like those are not,

15   you know, always equal.    So you don't always have control over the process, and it is

16   difficult.

17         And then it's a public-facing role as well.    So you have a lot of people, and

18   depending on the type of case or investigation that you're doing, more or less sort of

19   commentary and scrutiny on the decisions you're making and the work you're doing,

20   which can have the effect essentially of undermining confidence in what you're doing

21   along the way.

22         Q    I'm going to have you move a little bit past this preface.    Turn to page 5, if

23   you would, and we're going to look at the portion of the Justice Manual, section 9-27.220,

24   which is entitled, "Grounds for Commencing or Declining Prosecution."    It should be on

25   the bottom of page 5.

1        Do you see that section, Ms. Wolf?

2        A     Yes.

3        Q     It's kind of small print, I apologize.

4        A     I've got my glasses.     I can see it.

5        Q     Okay.    I'm going to read first that portion.     That portion reads, "Grounds

6   for Commencing or Declining Prosecution.     The attorney for the government should

7   commence or recommend Federal prosecution if he or she believes that the person's

8   conduct constitutes a Federal offense, and that the admissible evidence will probably be

9   sufficient to obtain and sustain a conviction, unless, one, the prosecution would serve no

10  substantial Federal interest; two, the person is subject to effective prosecution in another

11  jurisdiction; or three, there exists an adequate noncriminal alternate to prosecution."

12        First of all, have I read that correctly?

13        A     Yes.

14        Q     Have your actions as a Federal prosecutor been guided by these principles as

15  we've articulated them here from the Justice Manual?

16        A     Yes, they have.

17        Q     And let's walk through them one by one.     First, the prosecutor is guided to

18  recommend charges when they believe the admissible evidence will probably be

19  sufficient to obtain and sustain a conviction.     What does admissible evidence mean?

20        A     It means essentially that it satisfies both constitutional requirements and the

21  Federal Rules of Evidence so that there's a whole structure, for the nonlawyers in the

22  room, as to what can and cannot come in in a courtroom.

23        Q     And it's not that uncommon in an investigation for you to have knowledge or

24  hear information that may not be able to be submitted to the jury because it doesn't

25  comply with those rules.    Is that fair to say?

1      A      It is.    And part of the reason also that investigations, for example, we

2    were -- I was describing the process for search warrants, part of the reason it's important

3    to get that and make sure it's correct is to do everything you can to make sure as much

4    evidence as possible that you're gathering will, in fact, be admissible at trial.

5      Q      And that refers to what a trial judge might do if you were to, say, obtain

6    evidence from a search warrant illegally.    Could the judge limit the introduction of that

7    evidence or in some way --

8      A      Yes.

9      Q      -- punish you as a prosecutor?

10      A      It's not punishment, but yes, it could be deemed inadmissible.

11      Q      Okay.    So the Principles of Federal Prosecution also refer to the amount of

12    admissible evidence that is, quote, "sufficient to obtain and sustain a conviction,"

13    unquote.

14          In a criminal case, the amount of evidence sufficient to obtain or sustain a

15    conviction is an amount sufficient to prove the defendant's guilt beyond a reasonable

16    doubt, correct?

17      A      Yes.

18      Q      Sorry that was long.

19          Now, beyond a reasonable doubt is the highest evidentiary standard in the law.

20    Fair to say?

21      A      Yes.

22      Q      Beyond a reasonable doubt is higher standard than probable cause standard,

23    which is often used -- well, which is used to indict people in the grand jury?

24      A      It is.    And that's sort of the difference I think we were talking about, the can

25    versus should.    That you can charge a case based on probable cause alone, that is the

1    legal standard that goes before a grand jury.    But in making the decision whether to

2    present that basis for probable cause to a grand jury and seek to charge a case, you are

3    looking at the threshold as articulated in the 9-27.220.

4           Q       Okay.    That's beyond a reasonable doubt?

5           A       It's a reasonable likelihood or substantial likelihood of prevailing of the

6    merits, which is substantial likelihood that you could prove your case beyond a

7    reasonable doubt.

8           ███████.   I'm sorry, when you're considering whether to charge, can you

9    explain why you specifically take into account beyond a reasonable doubt, even though

10   you could charge just based on a probable cause standard?

11          Ms. Wolf.    In part because, ultimately, that's the burden you're held to at trial.

12   And you, as a general matter without -- you like to feel like you've got a good sense of

13   what your evidence is before you make that decision precisely for these reasons and for

14   an understanding.

15          We also are in a world of finite resources, and you can't do every single case.

16   That is a violation of Federal criminal law as a case.    It's time-consuming.    And as you're

17   trying to figure out how to allocate resources, it's a relevant consideration as to whether

18   or not you can do it.    But more broadly, there is a question as to where you have no

19   shortage of matters to pursue, to proceed against those who most warrant, deserve the

20   scrutiny and attention, which is largely based on the seriousness of the conduct.    But

21   also it does little to inspire confidence in the system to go after people who are

22   wishy-washy.    It doesn't help to lose cases.    In some ways, right, there's always a risk of

23   emboldening other people to engage in similar conduct.

24          So these are all really important considerations.    And it is -- it goes beyond the

25   technical probable cause requirement as you're thinking through it.

1          BY ████████:

2          Q      And continuing with this part of the Principles of Federal Prosecution, the

3    prosecutor's obligation under the principles to present sufficient evidence to prove a case

4    beyond a reasonable doubt, that's sometimes referred to as burden of proof at trial,

5    correct?

6          A      Beyond a reasonable doubt is the burden.    That is the burden of proof, yes.

7          Q      And it's the government who bears that burden in a criminal case, correct?

8          A      At all times.

9          Q      A defendant, by contrast, does not have to present any defense or any

10    evidence at trial if they choose not to, right?

11          A      That is correct.

12          Q      But if the defendant chooses to present their own evidence and to put on a

13    defense, in order for the government to then meet its burden, it must overcome that

14    defense and still present enough evidence beyond a reasonable doubt to prove guilt.    Is

15    that true?

16          A      Yes, it does -- if a defendant puts on a case, it still doesn't change that the

17    ultimate burden of proof lies with the government to prove the case beyond a reasonable

18    doubt.

19          Q      Okay.    Because, ultimately, the evidence must be sufficient in light of all

20    defenses presented at trial, if one is presented, for the government to show beyond a

21    reasonable doubt the defendant has been guilty?

22          A      Yeah.    It's not enough to simply understand what your evidence will be in

23    evaluating whether or not to bring a prosecution.    And, typically, right, there's a process

24    of writing what's a prosecution memo where you analyze your position and your

25    argument and what's going on.    But part of that is also understanding and articulating

1    and talking through what the likely defenses will be and how that impacts what proof.

2    You can't simply assume that your theory of the case and the evidence you have will be

3    uncontroverted or that it's unequivocally supported by all of the facts in the case.

4           There is often, in particular in fraud cases, where the issue is more commonly

5    mental state than anything else.     There's not a lot of dispute about what happened.

6    There's more dispute about what it means; that there will be conflicting evidence or

7    counternarratives that you expect to present at trial, and you need to think through how

8    that impacts your ultimate ability to prove your case.

9           Q      You mentioned the prosecution, and I'm going to get to that in just a second.

10          A      Okay.

11          Q      But just continuing along a little bit, when the prosecutor is under the rules

12   of -- or under the Principles of Federal Prosecution, considering whether they have

13   enough evidence and the beyond the reasonable doubt standard, in your experience as a

14   Federal prosecutor, is it fair to say that it can be difficult to convince a jury beyond a

15   reasonable doubt, even when you have a significant amount of evidence that the

16   defendant has violated the law?

17          A      So --

18          Q      I guess what I'm emphasizing is the jury itself.     Like, one other challenge

19   that a prosecutor has often in a criminal case is that you not only have to present enough

20   evidence to get beyond a reasonable doubt in that standard, but you have to prove that

21   to a jury, which is 12 citizens who unanimously have to agree that you've met your

22   burden.     Is that correct?

23          A      That is correct.

24          Q      And if even one person on that jury decides that they have a reasonable

25   doubt with respect to something that you've proven in your case, they'll be instructed

1    not -- to find the defendant not guilty?

2         A    That is correct.    And, you know, this is commonly a factor we think about in

3    shop as jury appeal of a case.    And it's really both sort of proactively, like, why should a

4    jury care about this, and why should they care enough to say, we're going to convict

5    someone and revoke their liberty for this particular thing?

6         So there's that matter.    And then there are sort of the particulars of any

7    individual defendant and whether there's an expectation that there are particular factors

8    or circumstances associated with the defendant that will come out at trial that may

9    impact -- as you said, it only takes one, but more broadly, the potential for unanimity of a

10   jury verdict.

11        Q    Okay.    So, again, just focusing a little bit more on this challenge that a

12   prosecutor has, when they are looking at charging a case, they're looking down the road

13   at what's going to happen at trial, correct?

14        A    You should be.

15        Q    Well, according to the Principles of Federal Prosecution, you should be,

16   right?

17        A    Yes.    Yes.

18        Q    And you have to overcome the beyond a reasonable doubt standard,

19   correct?

20        A    At the --

21        Q    You have to present evidence at trial.    And you also have to convince 12

22   citizens who are not legal experts that your evidence is sufficient, correct?

23        A    Yes.

24        Q    And could one of the problems, in your experience, be overcoming a

25   vigorous defense?    For example, if the defendant on the other side has a good argument

1    or a vigorous defense attorney, could that be a problem sometimes at trial to convince

2    the jury that you have something to overcome that?

3          A     Certainly.    And it doesn't even have to be a good defense.    It can be

4    very -- I think as you alluded to, it can be a very good lawyer.    And because there's so

5    much, right.    We need 12.    They only need one.    And you see people -- and because I

6    think the safeguards -- and it's not necessarily inappropriate to do so, right.    The

7    safeguards are there for the people who you're trying to convict of a crime.    It

8    sometimes feels like the system is -- you know, I won't say stacked against you because

9    that's not fair.    But you are held to a much, much higher standard and burden along the

10   way.

11         So, obviously, I think it is -- you know, there's litigation risk involved, and you have

12   to think through what a defense is going to look like.

13         Q     Okay.    In addition to the vigorousness of the defense or the quality of the

14   defense attorney, another difficulty might be explaining a complex series of crimes to a

15   jury of lay citizens.    Is that fair to say?

16         A     It is.    Although, if you do your job right, it shouldn't be.    But it's one of the

17   most -- it can be one of the most challenging things, and you have to figure out how to

18   explain it.

19         Q     Okay.    And the complexity of charges is something that you would have to

20   consider on the front end when you're considering whether you're likely to succeed at

21   trial, correct?

22         A     Yes.    I think there's also, as you're working through things, right, that there

23   can be very convoluted theories and more straightforward theories.    And you working

24   both with your own team and with your supervisors and everything else, you focus on the

25   sort of storytelling and how you're going to accurately and truthfully convey to the jury

1    both what happened, why that matters, and why they should care.

2        Q    Okay.    And another difficulty or challenge that a prosecutor might face in

3    convincing a jury is the defendant's intent if the crime requires proving willfulness.    Is

4    that fair to say?

5        A    Intent is almost always the hot button issue in most fraud or white-collar

6    economic crime prosecutions, yes.

7        Q    Can it sometimes be difficult to convince a jury of the defendant's guilt

8    where there's evidence that the defendant is in a very troubled state of mind at the time

9    that the crimes were alleged to have occurred?

10       A    I mean, that would be one factor.

11       Q    In order to obtain a criminal conviction, you not only need to establish the

12   defendant's guilt beyond a reasonable doubt; we indicated that you also have to have a

13   unanimous verdict, correct?

14       A    Yes.

15       Q    Okay.    Have there been times when you, guided by the Principles of Federal

16   Prosecution, have recommended declining to bring charges against the defendant?

17       A    In my 16 years?

18       Q    Yes, in your entire career.

19       A    Yes.

20       Q    Okay.    Have there been times when your investigation may have yielded a

21   significant amount of evidence that this defendant was guilty but where the evidence was

22   still not sufficient, in your judgment, to convince a jury of the defendant's guilt beyond a

23   reasonable doubt?

24       A    Yes.

25       Q    Why might you recommend declining to bring charges, hypothetically, in

1    cases like that?

2              A       I mean, there's any number of reasons why you would do that.

3    Certainly -- a lot of times, right, it would -- I think -- and this goes back to the original -- is

4    there sort of an adequate noncriminal recourse here.     So if the way things have shaped

5    all over, like several years, right, does it feel -- even though you could prove it, right, does

6    it feel maybe like it's more of a civil case.     Or just in terms of feeling like there's a sense

7    of feeling of like justice as to what has happened and how this has all gone out, maybe

8    that's a factor.

9              You may have a defendant against who you have a great case against but they're

10   in, you know, terminal kidney failure.     And you may have, you know, a husband and wife

11   who have committed crimes together, where one is substantially more culpable than the

12   other and you could probably prove the case against both, but there might be, you know,

13   young children left at home without, you know, either par- -- these are not specific to any

14   case, but these are the kinds of things that you're thinking about.

15             It may be a case where an agent who knows all the information and ran

16   everything through retires.     And that's just a huge knowledge gap that's going to make

17   the case, like, so much -- you have to basically do it all over.     And depending on what it

18   is -- it's a constant balancing of factors and decisions.     And there's no sort of right, wrong

19   way to do it.

20             Q       Okay.   And you said that, you know, you have had circumstances where

21   you've seen a significant amount of evidence against a defendant, where you have

22   recommended declining charges, for whatever reason, as some of them you've described,

23   right?

24             A       Yes.

25             Q       And when you've done that, you're not just acting on your own without

1    consulting people in your office.    Fair to say?

2         A    That is correct.    I don't believe that I have ever, in my recollection, sort of

3    issued that type of declination without having a conversation with at least one supervisor.

4         Q    And also, you're not making those decisions in a vacuum.    You are doing it

5    because you're bound by many factors, including prosecutorial ethics, the Federal

6    prosecution guidelines that we've just discussed, and other considerations that bind

7    prosecutors in these decisions.    Is that fair to say?

8         A    That's correct.    It's never in a vacuum.    And it's never just what I think.

9    It's what I think in relation to all of these things.

10        Q    Okay.    I'm going to move beyond the Principles of Federal Prosecution.    I

11    think you've given us a good understanding of how they operate and how they worked in

12    your career.

13        You mentioned before that there's a -- I think you called it a prosecution memo.

14    Is that the term you used?

15        A    Yes.

16        Q    Okay.    Can you tell us a little bit -- I'm going to focus on the stages of a

17    prosecution, sort of distinguishing between the investigative stage, and as you get closer

18    to potential charges in a trial, what the process looks like.

19        Now, with respect to the prosecution memo, can you just tell us, what is that, in

20    your experience?

21        A    In my experience, it's a requirement -- I don't know if it's a requirement in

22    the Justice Manual or just in that District of Delaware Criminal Manual, but for every case

23    before indictment, you're required to, in written form, present -- essentially, you talk

24    generally about the case, you talk about the law, you talk about the punishment, you talk

25    about the elements of the offense, you talk about the proof, and you talk about the

1    defendant.    And you sort of wrap that up and present that in the first -- and make a

2    recommendation.

3           And it's usually -- usually you don't write a full declination memo.    But for any

4    case you're prosecuting, you request essentially to present the indictment to a grand jury.

5    That goes to the criminal chief.    And you've drafted a proposed charging document

6    along with -- that goes to the criminal chief in the first instance, who then sends it up for

7    U.S. Attorney approval.

1      [12:02 p.m.]

2              BY ███████████:

3      Q     And in cases that -- you referred to earlier that you have reactive cases and

4   then you also have proactive cases.    Can you just briefly explain what the difference is in

5   terms of the U.S. Attorney's Office generally?

6      A     Sure.    So, you know, the easiest example of a reactive case is they pull

7   somebody over for a traffic stop and they discover a whole bunch of, you know, drugs in a

8   vehicle.

9              Or that, you know, they show up, they are called to the scene of an argument or

10   crime and somebody has a gun, and when they run that person, they have a felony

11   conviction precluding them from lawfully presenting the firearm.

12             Those are more reactive cases.

13             Proactive cases are things where -- they can be both sort of moving forward.

14   They can be like wiretap cases.    So not all like drug and gun cases are reactive where

15   you're doing affirmative steps to investigate.    There is still work to be done, essentially,

16   to be able to prove or make the case along the way.

17             And they can be -- but they can be retrospective, right.    It's a proactive

18   investigation if doing things, marshaling materials.    They don't lend themselves to sort of

19   a simple like three-sentence narrative.    You have to talk to witnesses.    You have to get

20   documents.    You have to kind of piece together what happened.

21      Q     So focusing a little bit on the proactive cases, these usually are cases that

22   you start as an AUSA working with an investigator, some kind of Federal investigator.    Is

23   that fair to say?

24      A     Yes.

25      Q     What kind of agencies would you work with throughout your career?

1   A Probably most frequently FBI. They just have the broadest jurisdiction and

2 sort of largest local presence. I worked with FBI. I worked with IRS CI, DEA, ATF, postal

3 inspectors. Secret Service has criminal jurisdiction as well.

4   And then there are all of these sort of little OIGs, like Social Security OIG, USDA

5 OIG, all who have responsibility for fraud within their programs. So we worked a lot

6 with them as well.

7   And sometimes those agencies will partner also with like State and local

8 authorities. So we worked not infrequently with the Delaware State Police or New

9 Castle County Police Department or Wilmington Police Department on our matters in

10 Delaware.

11   Q A lot of those investigations, is it usually the case that the investigators will

12 come to you with information that they have begun to gather or is it the other way

13 around or both?

14   A It's both, but more typically it is driven or initiated by the investigative

15 agency.

16   Q Okay. And can you talk a little bit about what the difference is, if there is

17 one, between the role of the investigator at that stage and the role of the prosecutor as

18 you come together to work an investigation?

19   A I'm sorry, at which stage?

20   Q At the beginning, when the investigator comes to you with some

21 information.

22   A So typically -- or the most -- there is no real typical because it's one of those

23 things that varies greatly, and there are a lot of ways that an investigation can come in or

24 be opened.

25   But a, for example -- and I'll use the FBI here because they are here -- someone, a

1    citizen, they have an internet complaint system where people can file and just let people

2    know something has happened online, and that gets routed to sort of the most

3    appropriate jurisdiction.

4          So they may say -- somebody reported that their bookkeeper embezzled

5    $43 million from their company.    Usually that would be a phone call, but nonetheless

6    they've come in.

7          Usually, sort of baseline, they do some very basic work before they even reached

8    out to the U.S. Attorney's Office.    Most notably, they'd sort of run in the system to see

9    like, "Oh, does somebody else already have this open?    Is there something already going

10   on in that?"

11         They might look for news articles or just do some very basic things to make sure

12   it's not a frivolous complaint or that it's something that they're worth looking into.    And

13   they can either open an assessment or a full case.

14         The stage at which they will definitely come to the U.S. Attorney's Office is the

15   point at which they want to issue process or take some sort of affirmative step in

16   connection with the matter.

17         So I'll get -- and I got a lot of these, both directly and then as the supervisor for

18   economic crimes -- you get a phone call.    "Hey, we got this information.    We'd like to

19   open a case.    What's your position on it?"    And I will often, more often than not say,

20   "Yeah, let's open it up."

21         The threshold for opening an investigation is relatively low.    And then sometimes

22   you do some very preliminary work, kick some subpoenas.    You get information back

23   and suddenly it makes sense.    So you close that case down.

24         Other times that's just the start of the process.

25         Q    Is it fair to say that the investigators, as they come to you, have a different

1    role than you have when you're examining, for example, whether to open a matter at the

2    U.S. Attorney's Office or to issue a subpoena or give them some other kind of approval for

3    a legal process?

4         A     Yes, there's different roles.    There's a team approach and people talk

5    through and work through.    But ultimately the decision to determine the legal

6    sufficiency or present a document to the court or anything else is the prosecutor's

7    decision, not the investigator's.

8         Q     And why is that decision made by the prosecutor and not the investigator, in

9    your opinion?

10        A     In my opinion?    I think it's -- I mean, some of it is it's various legal

11   processes.    It's sort of a requirement.    I don't think it's because we're magically smarter

12   or better than anyone.    It's just we're trained to do it, so to speak.

13        You know, I often -- like, you know, I don't tell ATF how to go out and execute a

14   search warrant once we've gotten the search warrant, but I do help them get to a point

15   where the search warrant we're presenting to the court states probable cause for

16   whatever they want to do.

17        There's just different lanes.    Maybe that's the best way to say it.

18        Q     Okay.    Fair to say that a lot of the investigators are not lawyers?

19        A     Mostly that's true.

20        Q     And they're not trained as prosecutors are to consider what we've gone

21   through, like with the Federal Prosecution Principles, for example, how to decline or

22   approve charges?    They're not trained in that respect?

23        A     That's correct.

24        Q     Okay.

25        So have you in your career had differences of opinion with agents generally in

1    cases when it comes to either investigative steps they would like to take or charges that

2    they would like to bring?    Have you ever had a difference of opinion with an

3    investigative team with respect to that generally?

4          A    I mean, at the smallest level.    I can't remember a case when at some point

5    there wasn't if not ultimately a disagreement at least a discussion or a consideration of

6    two different approaches to something.    It is the norm.

7          Q    Okay.    And generally, is it fair to say that investigators tend to overvalue

8    the evidence and prosecutors tend to be a little more cautious?    Is that a fair

9    characterization in some cases?

10         A    I wouldn't necessarily say that.    But I think sort of in line with what you

11   were saying about the differing role and lane, there is often, at least in an initial

12   approach, and it varies from person to person, there is a huge variation in this.

13         The investigators tend to be a little more aggressive in their first pitch as to what

14   they'd like to do.    That is a generalization.    I have worked with some very, very

15   measured and careful investigators who do not take that.

16         But if you were going to stereotype it, yes, in varying degrees, investigators tend

17   to be advocating more aggressive positions.

18         Q    In those cases, when you've had a disagreement, how do you handle those,

19   in general?

20         A    So it depends.    You know, sometimes it's not uncommon that an

21   investigator can convince me of the merits of what they want to do and that not

22   only -- you know, that it is, what they're proposing, first and foremost, is compliant with

23   legal and ethical obligations, but then also is in the best interest of the investigation; or

24   not sort of appreciably different or meaningfully different than the approach that I would

25   prefer.

1          So sometimes we resolve it that way and do that.    Usually everybody, you know,

2     talks it through, communicates about it, and it's done, and everybody continues working

3     in the best interests of the investigation in a collaborative manner.

4          There are times where people take, you know, decisions to their supervisors and

5     then their supervisors call my supervisors.

6          But almost always it gets resolved.    And I think at the end of the day, almost

7     always people genuinely believe, even if you agree to disagree, that you're all trying to

8     work towards the same goal.

9          Q      Okay.    I'm going to shift gears now a little bit away from the process.    And

10     you've testified repeatedly in your opening statement and in response to questions that

11     you were not influenced by any personal or political bias in your role on the Hunter Biden

12     prosecution team or in any prosecution that you've handled.    Is that fair to say?

13          A      Yes.

14          Q      Okay.    And all of your actions in that case and in all others, your

15     recommendations to your superiors were guided by your statutory and ethical obligations

16     as a Federal prosecutor.    Is that fair?

17          A      Yes.

18          Q      Do you agree that it would be inappropriate for a Federal prosecutor to

19     make or recommend charging decisions in order to influence the results of an election or

20     to favor one political official or candidate over another?

21          A      Yes, I do agree.

22          Q      In your career as a Federal prosecutor, have you ever been asked to act in

23     such an inappropriate manner?

24          A      No, I have not.

25          Q      How would you have responded if you had been asked to take an action or

1    make a recommendation for political purposes?

2         A    I mean, I would not have, right, in the first instance.    And I, in all likelihood,

3    would have gone to a supervisor to discuss and report because there are

4    sometimes -- there are reporting obligations for professional responsibility, obligations

5    both within the Department and more generally within the bar.    So if it was a lawyer or

6    depending on what it was.

7         But I certainly would not try to navigate that point on my own.    I would want to

8    make sure that others were aware and that everyone understood what I understood had

9    happened and to be a part of the decision.

10        It wouldn't be something I would like sweep under the rug and be like, "Oh, we're

11   just going to forget they said that."    That wouldn't be the way to go here.

12        Q    What is your response to those who have accused you of acting based on

13   political considerations or bias?

14        A    I think I alluded to this in my opening statement.    It's hurtful.    It's difficult

15   to listen to even knowing that it's not true.    It's frustrating not to be able to respond

16   meaningfully to it, although I think there are very good reasons for that.

17        And, you know, the response is, I think to the extent that I said in my opening

18   statement, it's just not true.

19        Q    Would you agree that your work on the Hunter Biden matter has gotten

20   more public attention than work on other matters that you've handled?

21        A    Yes.

22        Q    And do you think that that has resulted in negative repercussions for you

23   personally?

24        A    It's been really not pleasant.    So there is the just sort of emotional aspects

25   of it.    There is having people you know sort of asking about things.    There's people you

1    don't know who track down -- you know, my work email is easy to find.   But, you know,

2    there were people who tracked down my personal phone number, both home and cell,

3    who would, you know, feel free to share their view.

4          And, again, as much as you know the hateful things people are saying are not true,

5    it's still unpleasant to hear, especially when they strike against sort of the core of

6    something you've been so proud to not be along the way.

7          You know, at times it has made me feel and worry about the safety of my family.

8    We've changed the way we do some things at home because of that.

9          And then I think I alluded -- you know, just professionally, I delayed my departure

10    from the office as a part of that.   You know, I think that's probably a minimal

11    repercussion, but nonetheless it's had an influence of my professional life and the start of

12    a sort of new chapter of my career.

13       Q    Do you have any concerns for others who have been in a similar position in

14    terms of what that harassment and threats and outside interest in cases like this could

15    mean for prosecutors who are trying to do their jobs?

16       A    I think it's -- you know, obviously I do, as someone who cares about the

17    mission of the Department.   People should feel safe and secure in doing their work.

18          And certainly, as it relates to this case, right, the people with whom I worked on

19    this case, some of whom are in similar circumstances, who I care about deeply personally,

20    you know, I think that.

21          But there's no question that attempts to hash things out publicly and in the public

22    discourse, there may be a time and a place for that in connection with any matter.   But

23    while something is still ongoing or pending and before people have an opportunity to

24    really understand, it's very, very disheartening.

25          ██████████.   My colleague has a question.

1          ███.   Thank you.

2                 BY ███████:

3          Q     Ms. Wolf, how long have you known David Weiss?

4          A     David Weiss was on the -- he was at the time the civil chief and first assistant

5    and was on the panel of people who interviewed me in June of 2007 to join the U.S.

6    Attorney's Office.

7          Q     To the best of your knowledge, has David Weiss made decisions as U.S.

8    Attorney and now as special counsel without reference to political considerations?

9          A     Yes.

10         Q     And has he made decisions -- all decisions -- consistent with his statutory and

11   ethical obligations as a Federal prosecutor?

12         A     To my knowledge, absolutely.

13         Q     And then I just want to restate some of the things that you said earlier to

14   make sure I have it right.

15               You were asked about Mr. Weiss' authority generally?

16         A     Yes.

17         Q     And you said that it was your understanding that U.S. Attorney Weiss had

18   the necessary authority to bring charges he deemed appropriate in any jurisdiction.    Is

19   that correct?

20         A     Yes.

21         Q     And you stand by that?

22         A     Yes, that was my general understanding.

23         Q     Okay.    And I think you actually said, from your perspective as the line

24   prosecutor, you never thought about authority because it was just your understanding

25   that the authority was there, correct?

1   A Yes. I assumed that whatever was going to get worked out was going to

2 get worked out above my pay grade, in essence, and I was proceeding in a manner that I

3 would in an investigation, working towards determining whether it was appropriate to

4 bring charges.

5   Q Okay. So you were not concerned about whether you, as Mr. Weiss'

6 subordinate, might be able to take the steps you needed to take?

7   A Consistent with my understanding of his authority, yes.

8   Q Okay, thank you.

9   █████. Mr. Ivey, do you have any questions.

10  Mr. Ivey. Not at this time.

11  █████. We can go off the record.

12  [Recess.]

13  Mr. Castor. We're back on the record. It's 12:38.

14  I'm going to mark as exhibit 6 the authorization letter from the Department, just

15 as a matter of completeness.

16          [Wolf Exhibit No. 6.

17           was marked for identification.]

18  Ms. Kramer. Six, you said?

19  Mr. Castor. No. 6, yeah.

20  Ms. Kramer. Okay.

21  Mr. Castor. And Mr. Jordan is going to -- he has a question. He's going to refer

22 you back to exhibit 4.

23  Chairman Jordan. Yes, exhibit 4, Ms. Wolf.

24  So who is Josh Wilson and Carly Hudson that you sent the email to, you returned

25 the email to?

1      Ms. <u>Wolf.</u>   I am not authorized to identify line personnel who were involved in

2    the case.

3      Chairman <u>Jordan.</u>   But you worked with them on the case.   Is that right?   I

4    mean, Mr. Wilson sent you the email 5:30 p.m., Wednesday, August 5th, 2020, and you

5    responded back a couple hours later.

6      Ms. <u>Wolf.</u>   Yeah.   The document I think speaks to itself.   It's an email originally

7    sent from Special Agent Wilson to me and Ms. Hudson and copying several others.   And

8    I responded to Special Agent Wilson, as well as Ms. Hudson with the cc's.

9      Chairman <u>Jordan.</u>   And so had you worked with Mr. Wilson and Ms. Hudson?   I

10    mean, you worked with them for -- on numerous cases?   Is that common that you

11    worked -- I mean, he's a Baltimore office field agent and she's U.S. Attorney Delaware.

12    You worked with them a lot?

13      Ms. <u>Wolf.</u>   Generally, without speaking to any particular case, we had a relatively

14    small office in Delaware.   We frequently -- and you may not have been here when we

15    discussed -- our cases are frequently staffed -- any of our cases -- are mostly staffed with

16    more than one AUSA.

17      And in terms of investigating cases, the Wilmington Resident Office is part of the

18    Baltimore field division of the FBI.

19      Chairman <u>Jordan.</u>   Right.   Right.

20      Ms. <u>Wolf.</u>   So that is where our FBI agents assigned to investigations almost

21    always came from, although sometimes they'd come from other places.

22      Chairman <u>Jordan.</u>   And your first sentence, you said, in your response email, you

23    said, "Someone needs to redraft attachment B," which implies there was an attachment A

24    and maybe multiple other attachments.

25      How many attachments typically accompany a search warrant?

1          Ms. <u>Wolf.</u>   Typically, a search warrant has, in every search warrant, an

2  attachment A and an attachment B.    They're required parts of the search warrant.

3          Chairman <u>Jordan.</u>   Okay.   And are there more?   Is there C, D, E?   Is there

4  multiple?

5          Ms. <u>Wolf.</u>   Those are the only two that are required.

6          Chairman <u>Jordan.</u>   But I'm asking are there others or just these two?

7          Ms. <u>Wolf.</u>   With regard to this particular warrant or --

8          Chairman <u>Jordan.</u>   Yes.

9          Ms. <u>Wolf.</u>   -- in general?

10          Chairman <u>Jordan.</u>   Both.

11          Ms. <u>Wolf.</u>   With regard to this particular warrant, I'm not going to speak to it.

12          In general, there may be other things that get attached, usually the affidavit, as

13  exhibits.   But attachment A is always a description of the location or premises to be

14  searched, and attachment B is the list of items to be seized.

15          Chairman <u>Jordan.</u>   Okay.   And is it common to have those -- is it common

16  practice to have those redrafted?   When your staff puts together or other attorneys or

17  agents put it together, is it common to have this redrafted?

18          Ms. <u>Wolf.</u>   Yes.   I think I -- again, you may not have been present when I spoke

19  about the process associated with search warrants, but they're vitally important pieces of

20  the document.

21          Chairman <u>Jordan.</u>   We understand that.

22          Ms. <u>Wolf.</u>   And they need to be in line, the affidavit and the attachments need to

23  line up and really speak to each other --

24          Chairman <u>Jordan.</u>   Sure.

25          Ms. <u>Wolf.</u>   -- and be consistent across the board.

1       And I think sometimes, just in the rush to get an affidavit out, not as much in the

2   initial drafting, not as much attention is paid to attachment B.

3       So it's not at all uncommon to get an attachment B sometimes that's completely

4   like cut and pasted from something else and it's just a placeholder, but that isn't

5   communicated.    And sometimes it's just a quick job.

6       So it's not at all uncommon that I would go to an attachment B or any prosecutor

7   would go to an attachment B and say, "Wait, this doesn't look right.    Like, while I'm

8   working on the affidavit, then looking at the affidavit, can you go back and send me a new

9   draft of that?"

10      Chairman Jordan.    And is this the kind of language you would typically use where

11  you said, "None of it is appropriate and within the scope of this warrant"?    I'm not sure

12  who cut and pasted this.    That sounds like pretty strong language, like, "Hey, this stinks.

13  You've got to change it."

14      Ms. Kramer.    I think this has been asked and answered a number of times.

15  Ms. Wolf is not going to discuss anything around the document itself or the specifics of

16  the case --

17      Chairman Jordan.    I'm just asking if that's customary, how you would --

18      Ms. Kramer.    May I please finish, Chairman Jordan.

19      Chairman Jordan.    Sure.

20      Ms. Kramer.    Thank you.

21      Or the specifics of the case.

22      Despite this being asked and answered so many times, feel free to tell the

23  chairman what your answer is.

24      Chairman Jordan.    Well, let me go back.    In the initial email from Mr. Wilson, he

25  says, "Hello all.    See attached draft BS SW.    Thanks to Sue and Michelle who

1    contributed fully to this, we talked enough for one week during a single day."

2        So it sounds like they spent a lot of time on it.    And then you respond back, "I'm

3    not sure who put this together" -- I'm paraphrasing -- "I'm not sure" -- well, I'll just read it.

4        "I am not sure what this is cut and pasted from but other than the attribution,

5    location, and identity stuff at the end, none of it is appropriate and within the scope of

6    the warrant."

7        I'm just asking is that normal, how you would say to people who spent all day

8    working on something, "Hey, this stinks.    You've got to change it."

9        Ms. Wolf.    So that's your interpretation of what a document says.    I'm neither

10   agreeing or disagreeing with that in the context of a particular warrant.

11       I should also just say that typically spending a single day on an affidavit in support

12   of a search warrant in any substantial sort of white collar or complex case is not a long

13   time to have spent on something.

14       Chairman Jordan.    Yeah.    Well, I'm sure they spent more time.    They said we

15   talked enough for one day about it.

16       Okay.    On the subject line, it says, "BS SW Draft."    I assume it's SW, search

17   warrant, stands for search warrant.

18       Just for the record, can you tell us what BS represents?

19       Ms. Wolf.    No, I can't.

20       Chairman Jordan.    Is it Blue Star --

21       Ms. Wolf.    I'm not authorized to do -- I should say I'm not authorized to do so.

22       Chairman Jordan.    Is it Blue Star Strategies?    Is that what it refers to?

23       Ms. Wolf.    I'm not authorized --

24       Ms. Kramer.    Objection.    Asked and answered.

25       Chairman Jordan.    Okay.

1        Was the search warrant executed?

2        Ms. Wolf.   Again, I'm not authorized to speak as to the particulars of an ongoing

3    investigation.

4        Chairman Jordan.   Okay.

5        Mr. Castor.   I'll mark as exhibit 7 the 1023 that we were discussing.

6                              [Wolf Exhibit No. 7.

7                              was marked for identification.]

8            BY MR. CASTOR:

9    Q    Is this the first time you've seen the 1023?

10   A    I am not able to -- I'm not authorized to answer whether I have or have not

11   previously seen the 1023.

12   Q    I'll refer you to the third paragraph that begins, "During the meeting,

13   Pojarskii asked CHS whether CHS was aware of Burisma's Board of Directors.   CHS

14   replied 'no', and Pojarskii advised the board members included" -- number one deals with

15   the Prime Minister of Poland, number two, Joe Biden's son, Hunter Biden -- "for

16   prospective oil and gas deals, and they hired Hunter Biden to 'protect us, through his dad,

17   from all kinds of problems.'"

18       Is that type of fact, would that be probative to the matter you were pursuing?

19   A    I'm not authorized to discuss the particulars.

20   Q    Flip the page.   The first paragraph, the penultimate sentence, beginning

21   "CHS told Zlochevsky --"   Do you see where I am there?

22   A    Yes.

23   Q    Okay.   "CHS told Zlochevsky that due to Shokin's investigation into Burisma,

24   which was made public at the time" -- or "this time" -- "it would have a substantial

25   negative impact on Burisma's prospective IPO in the United States.   Zlochevsky replied

1    something to the effect of, 'Don't worry, Hunter will take care of it'" -- sorry -- "'Hunter

2    will take care of all these issues through his dad.'    CHS did not ask any further questions

3    about what that specifically meant."

4         Is this something that would be probative to the investigation?

5         Ms. Kramer.    Objection.    Asked and answered.

6         Ms. Wolf has repeatedly said she cannot discuss the particulars or details about

7    anything relating to an ongoing investigation or matter, in particular this document.

8              BY MR. CASTOR:

9         Q    The last sentence of the next paragraph.

10        "Zlochevsky also laughed at CHS's number of $50,000 (not because of the small

11   amount, but because the number contained a '5') and said 'It cost 5 (million) to pay one

12   Biden and 5 (million) to pay another Biden.'    CHS noted that at this time, it was unclear

13   to CHS whether these alleged payments were already made."

14        Do you remember reading this part of the 1023 prior to today?

15        Ms. Kramer.    Same objection.

16        Ms. Wolf.    Again, I'm not authorized to either confirm or deny that I have or I

17   haven't read or have any memory associated with the 1023.

18        Mr. Castor.    Can you tell us whether this is something that U.S. Attorney Brady

19   forwarded to your office?

20        Ms. Wolf.    I am not authorized to answer that question.

21        Mr. Castor.    I'm going to mark as exhibit 8 a statement, an affidavit, that Gary

22   Shapley provided.    It's been made public.

23                        [Wolf Exhibit No. 8.

24                        was marked for identification.]

25             BY MR. CASTOR:

1       Q       Have you ever seen this document before?

2       A       I have.

3       Q       Okay.    When did you see it before today?

4       A       I certainly reviewed it in preparation for today.    I don't actually know if I

5    reviewed it at any prior time.

6       Q       Okay.

7       I understand it turns out most of my questions you are telling us that you're not

8    able to answer based on the instruction from the Department.

9       So with that in mind, we have taken testimony from two whistleblowers,

10   Mr. Shapley and Mr. Ziegler.    So we do have an obligation to pursue the facts that they

11   provided to us.    I mean, that's part of what a congressional investigation does.

12      So I just say that as background.    Certainly I'm not trying to badger you with

13   these questions.

14      On page 2 of the document, Mr. Shapley writes, "I am providing additional

15   facts" -- this is the second sentence on page 2 -- "I am providing additional facts to help

16   place this issue in context.    The prosecution team discussed the Hunter Biden-related

17   work of the Pittsburgh U.S. Attorney" -- USAO -- "on several occasions, and it was a line

18   item on the recurring prosecution team call agenda for a long period of time.

19      "Assistant United States Attorney Lesley Wolf told us the Pittsburgh U.S. Attorney

20   and the U.S. Attorney Scott Brady requested to brief the Delaware U.S. Attorney's Office

21   Hunter Biden's investigative team on multiple occasions, but they were turned down by

22   AUSA Wolf and the Delaware U.S. Attorney."

23      Is that a statement that you consider to be true?

24      A       I'm not able to comment on the statements that relate to the pending

25   investigation.

1     Q    "AUSA Wolf's comments made clear that she did not want to cooperate with

2    the Pittsburgh USAO and that she had already concluded no information from that office

3    could be credible, stating her belief that it all came from Rudy Giuliani."

4     Do you have a reaction to that?

5     A    I have a reaction, but I'm not allowed to comment, so I won't.

6     Q    Okay.

7     Are you aware that Mr. Brady, when he testified, indicated that the evidence he

8    obtained he was able to verify independently of any relation to Rudy Giuliani?   Are you

9    aware that he testified to that?

10     A    I am not aware of Mr. Brady's testimony.

11     Q    And I take it you're not able to talk about whether that matter was worked

12    on?

13     Ms. Kramer.   I'm sorry.   What matter was worked on?

14     Mr. Castor.   The Rudy Giuliani issue.

15     Ms. Wolf.   There are I think and have been, potentially.   That could refer to any

16    number of things.

17      BY MR. CASTOR:

18     Q    In the document, Mr. Shapley states that "AUSA Wolf's comments made

19    clear that she did not want to cooperate with the Pittsburgh U.S. Attorney's Office and

20    that she had already concluded no information from that office could be credible," stating

21    her belief that it all came from Rudy Giuliani.

22     And so I guess the question is -- and it wasn't clear, so I'll rephrase -- was it your

23    belief that everything Scott Brady was providing was generated from Rudy Giuliani?

24     A    I'm not able to comment on that.

25     Q    Okay.   And if you were able to comment, do you know the answer to that

1    question?

2    A    I lost the thread of the question.    If you could repeat it.    If I were able to --

3    Q    If you were able to testify to that, do you know the answer to the question?

4    A    Which is the question as to whether or not I said that --

5    Q    Whether everything from --

6    A    -- or that everything from Mr. Brady -- that Mr. Giuliani was the only --

7    Q    Yes.

8    A    -- source of information from --

9    Q    Correct.

10    A    -- that provided information to Mr. Brady?

11    I'm just not authorized to comment on that, and I think answering that question

12    would necessarily be the exception that followed the rule.

13    Q    Okay.

14    I'm going to mark exhibit 9, a document that was made public by the Ways and

15    Means Committee through whistleblower testimony.

16                                        [Wolf Exhibit No. 9.

17                                        was marked for identification.]

18            BY MR. CASTOR:

19    Q    It's a memorandum of conversation dated September 3rd, 2020.

20    Is this the type of document that was shared with the U.S. Attorney's Office or is

21    this an IRS-only document, to your knowledge?

22    A    Again, in the ordinary course -- as it relates to this specific case, I'm not able

23    to comment on whether or not this was shared with the U.S. Attorney's Office.

24    Typically certain memos and information would be provided at some point to the

25    U.S. Attorney's Office so that we could prepare to produce what was required to be

1    produced in discovery or pursuant to Jencks or to our Brady obligations.

2         But it wouldn't be a type of -- interview reports of internal conversations and

3    discussions are typically not sort of provided and immediately generated and sent over,

4    but there may be situations where there are if they're particularly pertinent to

5    something.

6         Q    And you're not able to comment on the --

7         A    This particular one, no, I'm not.

8         Q    Number two.    There's a statement attributed to you that said the

9    decision -- "She stated that there is more than enough probable cause.    She stated that

10   the decision was whether the 'juice was worth the squeeze.'"

11        What does that term or the phrase "juice worth" -- you know, "whether the juice

12   was worth the squeeze" mean?

13        A    And, again, without talking particularly about these circumstances, I think

14   this harkens back to what I was discussing with minority counsel and the difference

15   between, right -- just because you can do something doesn't mean you should.

16        And there are a lot of things that go into that.    And sometimes the reason you

17   shouldn't do something is because of justice or fairness or there is some detriment.    And

18   sometimes the reason you don't do something is because it's going to be an incredibly

19   heavy lift, and there are 87 other things that you want to tackle before you do that on any

20   given day.

21        Q    Okay.

22        Number three.    "AUSA Wolf stated that it's likely that a lot of the evidence

23   sought in the T26 investigation" -- maybe for the record you could just identify what's a

24   T26?

25        A    Again, I can't.    This is not a document that I wrote or authored, so I would

1    be guessing as to what a -- I don't even know who wrote it.

2        Q    It's written by Shapley.

3        A    Okay.

4        Q    Page 2.

5        A    Then Mr. Shapley would be --

6        Q    Okay.

7            "AUSA Wolf stated that it's likely that a lot of the evidence sought in the T26

8    investigation would be found in the guest house of Joe Biden's residence and she stated,

9    'There is no way we will get that approved.'"

10           Why didn't you think it would get approved?

11           Ms. Kramer.    Again, I'm going to object yet again to all of these lines of

12    questioning.

13           And I also want to remind those here today we do understand that U.S. Attorney

14    Weiss has indicated his intention, and he's required to do so, to provide a report that will,

15    I would imagine, comprehensively address each and every one of these questions when

16    the time is proper and appropriate, which is not now, as Ms. Wolf has said repeatedly

17    throughout the course of today.

18           So again, Mr. Castor, if you want to continue to ask questions about a document

19    that she has already told you several times she cannot opine about, feel free to do so, but

20    her answer is not going to change.

21               BY MR. CASTOR:

22        Q    Number four.    There was a discussion about removing the subject's name

23    from a search warrant.    Generally speaking, when would that be appropriate?

24        A    So, again, without -- I'm not authorized to speak as to any particulars of this

25    investigation.    As a general matter, and I think as I've indicated multiple times and

1   during my opening, all of the decisions surrounding all of these things are being made

2   against the background of applicable Department policies and procedures.

3        So if, for example, there was a policy or a memo -- and it's not hypothetical -- in

4   May of 2020, Attorney General William Barr issued a memorandum discussing election

5   year sensitivity and reminding prosecutors of the sort of longstanding rule and obligation

6   that we are not to take actions that are intended to influence the outcome of an election

7   and significantly -- or that create the appearance that you are attempting to influence,

8   right.

9        There is a memo saying nobody is really looking -- nobody thinks, right -- taking

10   the Rosa view -- nobody thinks you're going to do these things because you're actually

11   trying to influence.    But if the public or others may think that there is an appearance

12   that you are trying to do so, that also falls within the scope of policy and that -- and to be

13   mindful of that.

14        And as those issues arise, that there are consultation requirements and

15   discussions with what is originally vested in the Public Integrity Section of the Department

16   of Justice.

17        Q    So if a search warrant was appropriate for a candidate for office and it was

18   inside the 90-day window, would that search warrant be delayed pending the outcome of

19   an election?

20        A    Again, it would vary on the particular circumstances of the case.    There

21   might be other policies that were at play.    For example, the February Barr memo which

22   talked about the requirements for opening any investigation into a candidate for public

23   office.

24        So there's a lot of different things.    Would things be delayed?    Maybe.    Maybe

25   not.    It would just be a question of particular circumstances in any given case.    But

1    there would be a requirement to consult and essentially discuss and let somebody well

2    above my pay grade make that call ultimately.

3        Q    In a tax investigation that involves potential improper deductions, would it

4    be appropriate to interview beneficiaries of a particular deduction?

5        So, for example, if an individual deducted college tuition and claimed it was an

6    ordinary and necessary business expense, would it be ordinary to go interview the

7    beneficiary of the college tuition?

8        A    It might be.    So it might be ordinary in the sense that if you needed to

9    establish that it wasn't a legitimate expense and the only mechanism to do that was by

10   interviewing someone and you needed to do that, sure.

11       Now, there are boundaries and professional responsibility rules that govern when

12   you can and can't interview and approach certain individuals.    So if an individual is

13   represented by counsel, and you're aware that they're represented by counsel, you, as a

14   prosecutor and attorney, or your agents who are underneath your authority in that,

15   cannot go out and simply approach and interview witnesses who are represented.

16       Q    Can you think of something that if an individual deducts college tuition for a

17   son or daughter as an ordinary and necessary business expense, can you think of a

18   situation where that would be appropriate?

19       A    I think that's just hard to answer in a vacuum without knowing the

20   particulars of any case.

21       I think it's fair to say it would be something that would be looked at in the course

22   of an investigation in an attempt to discern whether or not it was or wasn't a proper

23   deduction.

24       Q    But you'd concede on its face it raises questions, correct?

25       A    I think, without speaking about any specific deduction or anything along

1    those lines, it would raise -- I think it would probably raise questions.

2         Q      And from a general matter, if it raises questions to the prosecutor, that

3    would be the type of thing that the investigative agents would follow up on, correct?

4         A      I think there are many ways to follow up and pursue, and there is also, I

5    think, you know, just, again, prioritization and anything else.

6         So if you're asking was it an unreasonable request or would it be an unreasonable

7    request for someone to say, "Hey, I'd like to go do this interview," no, it wouldn't be an

8    unreasonable ask, nor would it be an unreasonable response from the prosecutor to say,

9    "Hey, I like my law license, and I know this person has a lawyer, so we're going to have to

10   work through counsel to get that interview you want."

11        Ms. <u>Kramer.</u>   Generally speaking.

12        Ms. <u>Wolf.</u>   Generally speaking.

13        Mr. <u>Castor.</u>   I'll mark exhibit 10, email thread, Mr. Ziegler and you, involving also

14   Carly Hudson, Mark Daly, and Jack Morgan of the Tax Division.

15                          [Wolf Exhibit No. 10.

16                          was marked for identification.]

17        Mr. <u>Castor.</u>   Carly Hudson, what was her title in the U.S. Attorney's Office?

18        Ms. <u>Wolf.</u>   She's on pleadings.   I think you could look her up.   She's an AUSA in

19   the District of Delaware.

20        Mr. <u>Castor.</u>   Okay.   But she's not a supervisor?

21        Ms. <u>Wolf.</u>   No.

22        Ms. <u>Kramer.</u>   This is 10?

23        Mr. <u>Castor.</u>   No. 10.

24        Ms. <u>Kramer.</u>   Thank you.

25        Mr. <u>Castor.</u>   This is a document provided by whistleblowers that deals with an

1    episode they testified about regarding the search of a storage unit.    Have you seen this

2    document before?

3           Ms. Wolf.   I have -- I'm on the document.    I think I was shown this document.

4    You sent it over in anticipation of today.

5           Mr. Castor.   Okay.    But prior to me sending it over, you hadn't seen it lately?    I

6    know you're on the email.

7           Ms. Kramer.    I mean, to the extent -- I just have to interrupt -- you're asking

8    about prep sessions with her lawyers in advance of today, I'm going to instruct Ms. Wolf

9    to not answer how the prep was conducted, what she reviewed.

10           Mr. Castor.   I didn't ask that.    I didn't ask that.

11           Ms. Kramer.    Well, you did.

12           Mr. Castor.   No, I didn't.    I asked her if she's seen it before.

13           Ms. Kramer.    Why don't you reframe the question for my comfort, please?

14                  BY MR. CASTOR:

15           Q     Have you seen this document before?    I'm not asking about any

16    preparation you had with your lawyer.    I'm talking about when it was released publicly

17    by the Ways and Means Committee or prior to that.

18           A     I probably looked through what was released to Ways and Means, but I don't

19    have any specific recollection of like, "Oh, this document or" --

20           Q     Okay.

21           A     Nothing --

22           Q     You're aware that the whistleblowers raised the issue of the storage unit

23    search, correct?

24           A     I am.

25           Q     Okay.    Was there anything in their testimony that you found to be false?

1        A    I'm not able to address -- I'm not authorized to address the particular

2    allegations.

3        I would go back to my opening where I indicated that all departmental policies

4    and procedures would have been followed.

5        So if some of those -- if some policies and procedures associated with attorney

6    search warrants and filter requirements were implicated in any particular case, those

7    policies and procedures would have been followed.

8        Q    In working with Mr. Shapley and Ziegler, it seems like, obviously, there was a

9    disconnect.   Is that something you can acknowledge on many of these investigative

10    questions?

11        Ms. Kramer.   Objection to the characterization of your interpretation of the

12    email.

13        Go ahead and answer that.

14        Ms. Wolf.   I'm not authorized to comment on the nature of the relationship with

15    investigators in an ongoing investigation.

16        Mr. Castor.   Okay.   So I take it there is nothing about the storage unit incident

17    that Shapley and Ziegler testified about that you can help us with here today?

18        Ms. Wolf.   I think that's a fair characterization.

19        Mr. Castor.   I'll mark as exhibit 11 a document made public as part of the

20    whistleblowers' testimony.   It's a monthly significant case report into the Hunter Biden

21    matter dated May of 2021.

22                      [Wolf Exhibit No. 11.

23                      was marked for identification.]

24         BY MR. CASTOR:

25        Q    In the "Results & Challenges" portion of this document there's a sentence

1    about the middle of that paragraph beginning with, "FBI is actively investigating potential

2    [redacted] violations."    Do you see that sentence?

3         A     I do.

4         Q     "Through interviews and review of evidence obtained via [redacted] and

5    search warrant, it appears there may be campaign finance criminal violations.    AUSA

6    Wolf stated on the last prosecution team meeting that she did not want any of the agents

7    to look into the allegation."

8         Is there any testimony you can provide about this document?

9         A     So I'm not authorized to provide any testimony about this document.

10    I can speak generally to some of the policies that were applicable during this time

11   frame that existed within the Department of Justice and to say at all times I acted in

12   compliance with those policies.

13        And those include -- I previously mentioned the February 5th, 2020, Barr memo

14   discussing the requirements and mechanisms for opening even a preliminary criminal

15   investigation into a candidate or a public official, as well as the longstanding

16   departmental requirements that all campaign finance investigations be routed in

17   consultation with the Public Integrity Section, which then is also -- your obligations

18   require sort of regular and consistent consultation with that section.

19        Q     Okay.    I'll mark the next exhibit, exhibit No. 12.    It's an email between you,

20   Mr. Ziegler, cc'd Mark Daly and Jack Morgan from the Tax Division, and Ms. Hudson.

21                                    [Wolf Exhibit No. 12.

22                                    was marked for identification.]

23             BY MR. CASTOR:

24        Q     Drawing your attention to the email you sent to Mr. Ziegler at 5:26 on

25   September 9th.    It begins with, "I do not think you are going to be able to do these

1     interviews as planned.    The document requests require approvals from the Tax

2     Division."

3              Were you indicating to Mr. Ziegler that the Tax Division needed to approve this

4     type of investigative activity?

5              A     The document speaks for itself.    I'm not able to comment or elaborate on

6     that.

7              Q     Okay.    Can you tell us whether the delays here related to the 90-day

8     window before an election?

9              A     I'm unable to comment on that.

10             Q     Okay.    Is there anything about this document that you're able to testify

11    about?

12             A     I'm not authorized to do so, no.

13             Q     Okay.    We've received testimony that in October of 2021 there was a

14    meeting of the investigative team that involved Mark Daly, Jack Morgan, Ms. Hudson,

15    Mr. Ziegler, and yourself to talk about the charges in the Hunter Biden case.

16             Do you remember the date of this meeting?

17             A     Again, I'm not authorized to discuss --

18             Q     I know you're not going to --

19             A     -- whether a meeting took place or didn't take place on any particular date.

20             Q     Okay.    Can you tell us whether -- it's been provided to the committee that

21    felony tax charges were recommended unanimously by the team.    Can you tell us

22    anything about that decision?

23             A     I'm not authorized to do so, no.

24             Q     And it's our understanding, based on Mr. Ziegler's testimony, that following

25    that meeting, he began the process of drafting a special agent report.    Is that something

1    you can testify about?

2         A    I'm not authorized to testify with regard to that.

3         Q    From a process perspective, when would an IRS criminal investigator draft a

4    special agent report?

5         A    As a general matter --

6         Q    Yes.

7         A    -- and not connected to any particular investigation, it would depend a little

8    bit on the case.    But as a general matter, it would take place at a point where they were

9    nearing the completion of the investigation.

10        It can take some time for the special agent report to move through the various

11   layers of approval in the first instance through IRS criminal investigations and through

12   criminal tax counsel even before it reaches the Tax Division.

13        So sometimes they will just build in time for that, and the investigation will not be

14   fully complete, but you want to have it be substantially complete or you would hope that

15   it would be substantially complete and that there wouldn't be any sort of lingering

16   dispositive questions, just sort of things you might want to clean up along the way.

17        But it's a substantial step in the investigation.

18        Q    Okay.    Mr. Ziegler's special agent report that he subsequently prepared, it

19   was a long document.    It was about 85 pages.    Is that ordinary in tax cases, that a

20   special agent report be that comprehensive?

21        A    To the extent you're characterizing this particular report as comprehensive

22   or otherwise, I can't comment on that.    The length of them will depend and vary case to

23   case.    They can be quite lengthy, and in the regular, quite honestly, it's the nature of tax

24   cases.

25        Q    Okay.    And what's the role of the U.S. Attorney's Office in the preparation

1    and review of the special agent report?

2         A    Typically?

3         Q    As a general matter.

4         A    Again, there's some variation.    So in some instances, if the case has been

5    worked administratively by an agent, there is no involvement whatsoever, and we won't

6    have seen it or done it.

7         Sometimes we will request that they start the process in order to be able to move

8    the matter forward.    Sometimes you'll see a draft.    Sometimes you won't see a draft.

9         And, you know, it's a useful document ultimately in terms of drafting a pros memo

10   because it's got a lot of good information, if done correctly, right there at your

11   fingerprints and indexes like exhibits and witnesses so you know who said what.

12        So there's no like sort of one-size, you know, fits-all for it.

13        Q    After the special agent report is prepared by IRS, what happens next in an

14   ordinary tax case?    Does it go to the Tax Division, or does it go to the U.S. Attorney's

15   Office?

16        Ms. Kramer.    If you know.

17        Ms. Wolf.    If I know.

18        So my understanding -- and there may be witnesses who can give you a better

19   answer than I on this -- but the -- it goes -- in the first instance, the special agent writes a

20   report.    I believe a supervisor signs it.    It then goes to what's called CT counsel, which is

21   criminal tax counsel, which is I believe internal to IRS CI.    They review the report and

22   make a recommendation.

23        You know, a line attorney sort of reviews the report and makes a

24   recommendation.    And then somebody at a slightly higher level either signs off or

25   doesn't.    And they can recommend to concur, nonconcur.    There's different

1    designations they can.

2           That sort of legal determination isn't dispositive in a case.    It goes with that

3    determination then in the next instance to Tax Division where it's assigned if it's not

4    somebody -- if Tax hasn't been actively participating on the case or otherwise or hasn't

5    previously been assigned, it goes to the line attorney within the Tax Division who reviews

6    it and writes sort of a comprehensive internal to tax pros memo, which then goes to an

7    assistant chief who writes a review note.

8           And it then goes up to the chief for sign-off and authorization before it comes

9    back to the U.S. Attorney's Office in official form.

10                 BY MR. CASTOR:

11    Q    What were Mark Daly and Jack Morgan's titles in the Tax Division or their

12    role?

13    A    Mark Daly was a senior litigation counsel, which is, again, I think more of a

14    designation of pay than supervisor.    He wasn't a supervisor.

15    Q    Okay.

16    A    And Jack Morgan was a trial attorney.

17    Q    Okay.    Was Daly more senior than Morgan?

18    A    I'm not going to discuss the particulars of that.    I think Mr. Goldberg

19    probably would have been a good witness to answer that.

20    Q    Were they colleagues or were they-- was one supervising the other?    I'm

21    sorry to ask the question again.

22    A    Yeah, no, and I just am not able, within the scope of the authorization, I'm

23    not comfortable.    As much as it seems noncontroversial, I'm not comfortable within the

24    scope of the authorization to answer that.

25           Chairman Jordan.    When did the Justice Department tell you what you were

1      authorized to answer, what type of questions you were authorized to answer in the scope

2      of this?     When did they give you instructions?

3            Ms. Kramer.     I can answer that on your behalf.

4            We were provided with the authorization letter -- what's today, Thursday? -- just

5      the other day, and we provided it to Mr. Castor upon receipt.

6            Chairman Jordan.     And was there any communication from the Justice

7      Department after yesterday's vote by the House of Representatives on the majority of the

8      House on record supporting an official impeachment inquiry?

9            Ms. Kramer.     Is that a question directed to me about my dealings with the

10     Department?

11           Chairman Jordan.     Was the -- did the Department do any supplemental

12     communication with you regarding the scope of what Ms. Wolf could talk about after the

13     vote yesterday on the House floor?

14           Ms. Kramer.     The letter that we received from the Department has remained

15     unchanged, and the committee has exactly what we received.

16           Chairman Jordan.     Okay.     Thank you.

17           Ms. Kramer.     Yep.

18           Mr. Castor.     Do you remember when the decision was made to bring charges in

19     the District of Columbia on the Hunter Biden case?

20           Ms. Wolf.     I am not authorized to discuss or comment or -- again, there's a

21     premise baked in that I'm not authorized to either -- to answer any questions, nor should

22     it be interpreted as signifying that the assertion is or is not accurate.

23           Mr. Castor.     I think it's a matter of public record that Mr. Weiss brought the case

24     to Mr. Graves and asked him to partner.

25           Ms. Kramer.     If it's a matter of public record and you know the answer to the

1      question, I think you have the answer to your question.

2                      BY MR. CASTOR:

3           Q      Okay.    And what was your involvement with that?

4           A      Again, I'm not authorized to speak to that.

5           Q      Can you tell us about the tolling agreement for the statute of limitations on

6      2014 and 2015?

7           A      I'm not authorized to speak to that.

8           Q      Can you tell us how many times the tolling agreement was extended?

9           A      I'm not authorized to speak to that.

10          Q      Was that something handled by your office, or was that handled by a

11     different entity?

1        [1:23 p.m.]

2              Ms. Wolf.    I'm not -- I'm not authorized to speak to that.

3                    BY MR. CASTOR:

4        Q      Okay.    Are you aware that prior to asking the U.S. Attorney's Office in D.C.

5    to partner, that U.S. Attorney Weiss requested special attorney authority under 28

6    United States Code 515?

7        A      I'm not authorized to speak to that.

8        Q      Okay.    Referring you to exhibit 3, the letter that Mr. Weiss sent to Senator

9    Graham.

10       A      On what date?

11       Q      July 10th.

12       A      July 10th.

13       Q      Are you aware of the -- I'm looking at the third paragraph, the last paragraph

14   on the first page.

15       A      Okay.

16       Q      Are you aware of what the distinction is between special counsel designation

17   and special attorney designation?

18       A      As a general matter, not in any particular case, I'm actually not.

19       Q      Okay.    And do you know the difference between any of those two and the

20   authority Mr. Weiss has currently?

21       A      Again, I'm not authorized to speak to, you know -- I know that they are

22   different than being special counsel, but -- and so I -- there's a distinction, but I have not

23   paid any particular attention or studied or have any understanding of the distinction

24   between those three designations.

25       Q      The decision to seek special counsel authority, were you involved as a staffer

1      with Mr. Weiss in deciding how to approach the Justice Department on that issue?

2            A      I'm not authorized to speak to that.

3            Q      Does the Justice Department have any procedures in place to avoid

4      accidental statute of limitations -- if you're working on a case and the statute of

5      limitations is coming up, are there any procedures DOJ has to help everyone avoid that?

6            A      Generally speaking?

7            Q      Yeah.

8            A      Not that I'm aware of.    As a general matter, as a prosecutor, you have some

9      sense of what the statute is, and if you're coming up on a statute of limitations, you're

10     aware of it.

11           Q      Okay.    Whose responsibility, as a general matter, is it to manage that

12     question, that is, the statute's expiring?

13           A      Sorry, just so I understand the question, are you asking who's supposed to

14     know that the statute is expiring, who's tasked with that?

15           Q      Right.

16           A      It would be the line prosecutors handling the case to be aware of the statute

17     of limitations.

18           Q      And are there any policies or procedures that require a line prosecutor to

19     confer with the U.S. Attorney or with supervisory personnel as the statute is coming up

20     on its deadline?

21           A      So I actually am not sure.    I don't believe -- I'm not aware of any certainly in

22     the Justice Manual.    I do not know whether or not there are formal policies that are

23     included in the District of Delaware Criminal matter -- Criminal Manual.    But as a general

24     matter, it would be unusual for someone to just unilaterally make that decision.

25           Q      So if the statute of limitations is about to expire and it does expire, it's not by

1    mistake.    Is that a fair thing to say?

2           Ms. Kramer.    I think she's answered the question.

3           Ms. Wolf.    I think -- yeah.    As a general matter, I would say that is accurate.    I

4    am quite sure that on occasion it happens.    But as a general matter, you're aware of the

5    statute and when it's due to run.

6           Chairman Jordan.    Were you part of the -- when David Weiss was named special

7    counsel back in August, and prior to leaving a few weeks ago, were you part of the special

8    counsel investigative team?

9           Ms. Wolf.    I'm just not authorized to discuss that.

10          Chairman Jordan.    Well, you're obviously a key player in the investigation for the

11   first 4 and a half years.    We just want to know -- and then it went from U.S. Attorney

12   David Weiss investigating, you had to keep clearing that investigation, took on a different

13   status.    And I'm just asking if you knew that new special counsel status and were part of

14   that investigative team?

15          Ms. Wolf.    I think as a matter of public record, I remained an Assistant

16   United States Attorney at all times prior to --

17          Chairman Jordan.    I'm not disputing that.    I know that.

18          Ms. Kramer.    Please let her finish the answer.

19          Chairman Jordan.    I'm sorry.

20          Ms. Kramer.    Thank you.

21          Ms. Wolf.    So to the extent I'm able to answer the question, I did not give up an

22   AUSA role in order to join the special counsel team.

23          Chairman Jordan.    Wait.    Say that again, please.

24          Ms. Wolf.    I did not -- I remained an AUSA.    I did not give up an AUSA role to

25   join the special counsel team.    That's just a matter of public record, as I continued to

1    appear as an AUSA on pleadings in a variety of cases and matters.

2            Beyond that, I'm not authorized to comment on the scope of the staffing of special

3    counsel's office.

4                    BY MR. CASTOR:

5        Q    Are the AUSAs that do work for the special counsel's office, do they have

6    different titles or -- are they not AUSAs, I guess, is the question?

7        A    I believe -- and, again, this isn't entirely accurate, but if you looked at a

8    pleading, there would be, depending on what it was, it would be reflective of what their

9    actual titles are.

10       Q    Were there -- to the extent you are aware, were there people who were on

11   the special counsel team but also performing duties in the U.S. Attorney's Office for

12   Delaware on other matters?

13       A    I'm not authorized to speak on the staffing of special counsel's office.

14       Q    Are there any Department policies or procedures that were implicated

15   because the subject of the investigation was the son of the former Vice President 2018,

16   2019, 2020, and then a candidate for office, and then the President of the United States?

17       A    Sorry.    Can you just repeat the question?

18       Q    Were there any DOJ policies or procedures because the subject of the

19   investigation was the son of the President?

20       A    Just merely by virtue of that?    I'm not going to speak to any particular DOJ

21   policies or procedures.    All -- but except to say, all of the relevant and applicable policies

22   and procedures were followed by me at all times in my work as an AUSA.

23       Q    Was there ever any discussion that maybe this investigation should've been

24   handled by a different U.S. Attorney's Office that wasn't so geographically connected to

25   the President?

1     A    I'm not authorized to speak to that.

2     Q    Okay.    Have you ever met Joe Biden, the President?

3     A    No.

4     Q    Have you ever met Beau Biden, or did you ever work with Beau Biden?

5     A    No.

6     Q    And have you ever met Hunter Biden, other than through the course of this

7  investigation?

8     A    No.

9     Q    How about somebody named Alexander Mackler?

10     A    Do I -- have I met Alexander Mackler?

11     Q    Yeah.

12     A    Yes.

13     Q    He's a former colleague of yours?

14     A    Yes, he is.

15     Q    And Mr. Mackler was a staffer for Senator Biden, I believe?

16     A    I don't know his full work history.    I -- I know that he at some point worked

17  for, I guess, then Senator Biden, but I don't know in what capacity and whether it was as a

18  staffer or in connection with campaigns or what his particular role was.

19     Q    Okay.    What was Mr. Mackler's role in the U.S. Attorney's Office?

20     A    He was an Assistant U.S. Attorney.

21     Q    Do you know for how long?

22     A    I don't know exactly.    Somewhere between 3 and 5 years is just a ballpark.

23     Q    Do you know when he left the U.S. Attorney's Office?

24     A    So there -- that's -- he left at some point in I think the spring of 2019.    But

25  he actually finished his tenure and was gone from the office like at the very beginning of

1 2019, because I believe he was doing military duty. So he was an AUSA sort of on the

2 payroll and anything else but was absent from the office for months before that time.

3  Q Okay. And do you know if he worked on the Hunter Biden investigation at

4 all?

5  Ms. Wolf. Can I answer?

6  Ms. Kramer. I --

7  Ms. Wolf. I'm not authorized to answer that question.

8   BY MR. CASTOR:

9  Q And are you aware that Mr. Mackler then went to work for the transition

10 team -- Presidential transition team for --

11  A I believe that was publicly reported that he was part of the transition team.

12  Q And while he was on the transition team, did you have any communications

13 with him?

14  A With regard to the transition or did I see him perhaps at a going-away party

15 for another colleague or anything else?

16  Q Official work duties, not social.

17  A No, I had no communications with him in that capacity.

18  Q Martin Estrada testified that -- I mentioned this earlier this morning -- there

19 were some SAUSAs from Delaware in the Central District of California, and I believe you

20 weren't able to comment on that. And I just have one follow-up question --

21  A Sure.

22  Q -- on that, and that's whether the name Stephanie Christensen is a name

23 that rings a bell for you?

24  A So --

25  Q She was the Acting U.S. Attorney before Mr. Estrada was sworn in.

1          A     The name rings a bell.

2          Q     Okay.     Did you have any communications with her?

3          A     I'm not able to comment on a particular -- I'm not able to comment as it

4    relates to a particular investigation.

5          Q     Ordinarily when your office is seeking to partner with a different

6    U.S. Attorney's Office, who's involved in the presentation of the evidence or the making

7    the case that your office should partner with a different office?

8          A     I think it would vary.     You know, it -- depending on the jurisdiction.

9    Sometimes there's personal relationships already between AUSAs and districts, so there

10   might be a direct reach-out.

11         I think on sort of a cold call, the most typical way in which I would expect it to

12   happen would be criminal chief to criminal chief, who then might say, you know, okay,

13   let's have our line folks connect and talk and discuss with -- yeah.

14         Q     Were there any special considerations for this case, since it was the son of

15   the President, in terms of liaising with the different offices?

16         A     I'm not authorized to discuss that.

17         Q     And by different offices, I mean the U.S. Attorney's Office for D.C. and the

18   U.S. Attorney's Office for the Central District of California.

19         A     Again, I'm not authorized to answer that.

20         Q     Seems like in testimony from both Mr. Graves and Mr. Estrada, neither one

21   wanted a piece of this case.     Was that your sense too?

22         A     Again, I'm not authorized to answer that.

23         Ms. Kramer.     Can we get a time check, please?

24         Mr. Castor.     Fifty-eight minutes.

25         Ms. Kramer.     120 seconds left.

1          Mr. Castor.   Okay.   Would you like to stop here?

2          Ms. Kramer.   It's up to you.   Just asking for the time check.   Carry on.

3          Mr. Castor.   We can stop here.   I'm ready to head into a different topic, so --

4          Ms. Kramer.   Okay.   All right.

5          Mr. Castor.   Off the record.

6          [Recess.]

7          Mr. Castor.   We're back on the record.   It's 1:57.

8          Ms. Kramer.   Mr. Castro, before you begin with your questions again, can I make

9     one very small clarification?   It's kind of like a reclarification if you will.

10          Mr. Castor.   Sure.

11          Ms. Kramer.   Thank you very much for the opportunity to do that.

12          So earlier today when we went back on the record, I think we previously clarified

13     when Ms. Wolf was being asked questions about whether or not she served as a SAUSA in

14     other districts.   I just want to make clear that all of her testimony here today is, she's

15     providing it, you know, truthfully obviously but to the best of her recollection.   And just

16     wanted to be clear that the prior testimony, I believe, was that Ms. Wolf said that she had

17     not, again to the best of her recollection, served as a SAUSA in any other district

18     post-2018.

19          Just want to clear up that it is to the best of her recollection.   Oftentimes, I think

20     she had testified the process of becoming a SAUSA can be something that involves

21     paperwork.   I think there's usually a swearing-in.

22          But to the extent she testified about, you know, in an absolute way that she was

23     never a SAUSA post-2018, to the extent there's information out there that shows

24     otherwise, she is testifying to the best of her recollection.

25          Is that clear?   I just want to --

1          Mr. <u>Castor.</u>   Of course.

2          Ms. <u>Kramer.</u>    -- make sure --

3          Mr. <u>Castor.</u>   Yes.

4          Ms. <u>Kramer.</u>    -- it's very important to her to be very clear in the testimony so that

5   nothing is twisted or turned and, you know, distorted at a later time.    Is that --

6          Ms. <u>Nabity.</u>   That's fair.

7          Ms. <u>Kramer.</u>   Okay.

8          Mr. <u>Castor.</u>   I appreciate that.

9          Ms. <u>Kramer.</u>   Of course.    Thank you for allowing us the opportunity to do that.

10         Mr. <u>Castor.</u>   And if after your testimony is complete and you depart and review

11   the transcript, there's things that you want to advise us of, that's fine as well.

12         Ms. <u>Kramer.</u>   Great.    Thank you.

13         Mr. <u>Castor.</u>   Nobody's trying to catch a witness in a ticky-tacky slip-up here.

14         Ms. <u>Kramer.</u>   Sure.

15         Mr. <u>Castor.</u>   We have a job to do to try to get as much information about the

16   core facts here, and so to the extent you need to supplement, we are happy to have you

17   do that.

18         Ms. <u>Kramer.</u>   Thank you.    We appreciate it.

19            BY MR. CASTOR:

20      Q    I'm going to turn your attention to interactions that you had with Chris Clark,

21   lawyer for Hunter Biden.    Was he the only defense lawyer that you dealt with or were

22   there other lawyers on the Hunter Biden team?

23      A    I'm not authorized to discuss interactions with defense counsel.

24      Q    At one point there was an allegation, I think made by Chris Clark, that there

25   were leaks to the news media.    Is that something you can confirm?

1        He expressed concern about leaks.    So he was, in essence, complaining about

2    leaks.    Is that something you can confirm?

3        A    Sorry.    Just to be clear, you're not asking me to confirm that there was or

4    was not a leak but that Mr. Clark complained about a leak --

5        Q    Yes.

6        A    -- to us.    Yeah, I'm not authorized to discuss communications with defense

7    counsel.

8        Q    Okay.    Subsequently, after the plea deal went south in July, somebody from

9    the Hunter Biden defense counsel camp, like, dumped all their documents to The New

10   York Times and Politico.    Are you familiar with that?

11       A    I am aware that there were documents that were provided to The New York

12   Times and Politico because I saw the articles.

13       Q    Right.

14       A    But I'm not -- I'm not aware of who dumped them.

15       Q    Do you find that to be a little ironic that the gentleman who was complaining

16   about leaks and, you know, wanted them investigated and so forth was then supplying

17   The New York Times and Politico with like hundreds of -- I think it's like 300 pages of

18   material?

19       A    So, again, I'm not authorized to -- whether or not, in fact, Mr. Clark had ever

20   made such a complaint, so I'm not going to be able to answer that question.

21       Q    Okay.    But you would agree, if that was the case, that would be certainly

22   ironic or rich?

23       A    I'm not going to comment on that.

24       Q    Okay.    On the plea deal -- and we can make it a exhibit if we need to, but

25   on the plea deal and diversion agreement from July --

1        Ms. <u>Kramer.</u>   Can you make -- if Ms. Wolf is going to be asked questions about a

2   document, we would ask that you mark it.

3        Mr. <u>Castor.</u>   We absolutely can.

4        Ms. <u>Kramer.</u>   Thank you.   I appreciate it.

5        Mr. <u>Castor.</u>   We'll make the next exhibit No. 13, the plea agreement, and we'll

6   make exhibit 14, the diversion agreement.

7        Ms. <u>Wolf.</u>   Thank you.

8                                    [Wolf Exhibit Nos. 13 and 14.

9                                    were marked for identification.]

10        BY MR. CASTOR:

11        Q     There was some email traffic that was made public that the U.S. Attorney's

12   Office in Delaware suggested to the defense attorney that they put together a draft of the

13   plea agreement.   Is that customary?

14        A     I'm not -- so -- sorry.   You're asking -- you're asking about a specific related

15   to a particular investigation that I'm not authorized to comment on --

16        Q     Okay.

17        A     -- so --

18        Q     In your experience, is it customary to have defense counsel take the first

19   crack at a potential plea agreement, in terms of drafting?

20        A     I don't -- in sort of a mine-run, you know, basic case, more typically a plea

21   agreement would go out as a proposed plea agreement from the government.

22        Q     Okay.

23        A     When it's a longer investigation, when there are particular things that matter

24   to both parties or otherwise, I don't think that it's -- it's extraordinary that in any

25   particular case an agreement, whether it be a plea agreement or an NPA or a DPA, or

1    whatever it ends up being, would be drafted in the first instance by another party.

2        Q    As a general matter, do you think it gives an advantage to a defense attorney

3    if they get to take the first crack at a draft of a plea agreement?

4        A    As a general matter, I don't think it's an advantage or disadvantage one way.

5    If both parties are doing their job and doing what they're supposed to do, they're paying

6    attention to the things that matter to them and attempting to make sure they're included

7    in any agreement.

8        Q    Okay.    The plea agreement from the government side was signed by Leo

9    Wise, Derek Hines, and Benjamin Wallace.    Those are three names that, you know, do

10   not come up in the materials that -- that's on page 6 of the plea agreement.    They're

11   three lawyers that don't come up in the voluminous, you know, information and

12   testimony, both documentary and testimonial evidence that the whistleblowers provided.

13       Can you help us understand why the prosecution team was swapped out?

14       A    I think I already indicated I'm not authorized to discuss staffing matters

15   associated with the investigation.

16       Q    If you look at the exhibit 1 attached to the plea agreement --

17       A    Yes.

18       Q    -- do you know who drafted this?

19       A    I'm not authorized to discuss who drafted documents in connection with the

20   matter.

21       Q    And I guess you can't help us understand the decisionmaking behind all the

22   information that's included in exhibit 1?

23       A    That's correct.    I think that would be core deliberative process, and I'm

24   not authorized --

25       Q    Okay.

1          A     -- to speak to --

2          Q     But you can state that this is a document that the government -- the

3    government should be drafting, correct --

4          A     I'm not going to answer --

5          Q     -- from an ordinary standpoint?

6          A     -- as to any particular case, nor -- nor is there sort of a should or shouldn't as

7    a general matter or rule associated with this.

8          Q     The diversion agreement, which is the next exhibit, it's the diversion

9    agreement for the gun charge.    Is that correct?

10         A     That's what the agreement says.

11         Q     Is it customary to have -- you know, if there's a diversion agreement for a

12   gun charge, is it customary to bring in a statement of facts that encompasses a long list of

13   other factual matters that have no involvement to the gun charge?

14         Ms. Kramer.    Objection to form.    I --

15         Ms. Wolf.    Yeah, I'm not -- I -- I -- sorry.

16         Ms. Kramer.    No.    That's -- it's compound.    It's vague.    Can you break that

17   down into clearer questions, please?

18              BY MR. CASTOR:

19         Q     The diversion agreement relates to the gun charge, but it involves, you

20   know, a statement of facts that exceeds simply the gun charge.    Is that customary?

21         A     So, again, without discussing the particulars of any particular matter or

22   document, I think when it comes to diversion agreements, it's difficult to talk about what

23   is or isn't customary, so I'm hesitant to do so.    But there is an element in a diversion

24   agreement that is always tailored to the specifics of any case.    So the decisions made in

25   connection with any particular case are going to relate to what's going on and what's

1    attempting to be accomplished, and the reasons for the diversion agreement, et cetera,

2    et cetera, et cetera, et cetera, which can't really be talked about or thought about in a vacuum.

3        Q    Are diversion agreements usually seen or presented to a judge?

4        A    It varies.

5        Q    Okay.

6        A    And they can proceed in either way.

7        Q    Are they usually involved in the enforcement of the alleged breach of the

8    diversion agreement?

9        Ms. Kramer.   Who's they?

10       Mr. Castor.   The judge.

11       Ms. Kramer.   If you know.

12       Ms. Wolf.   I think that that's sort of a -- so to the extent there is a breach of a

13   diversion agreement and charges are filed, yes, then a judge is typically involved in -- well,

14   definitely involved in a case.   With regard to the role in -- that I think is what you're

15   getting to that relates to this particular diversion agreement, it says I am not authorized

16   to discuss that.

17           BY MR. CASTOR:

18       Q    Okay.   I'd like to refer you to paragraph 14 of the diversion agreement.   It

19   begins, "If the United States believes that a knowing material breach of this agreement

20   has occurred, it may seek a determination by the United States district judge for the

21   District of Delaware with responsibility for the supervision of the agreement."

22           Have you ever had a case before that had a similar provision in it?

23       A    Again, I'm not going to comment on this particular document.   As a general

24   matter, there are, for example, supervised release violations in the Federal system.   So if

25   you -- or once you come out of jail, you're often sentenced to a term of supervised

1    release.    The probation office will at times bring a petition to determine if someone is in

2    violation of supervised release.

3        Sometimes those violations are admitted before the court, and other times a

4    court, in fact, makes a factual finding in the first instance as to whether or not.    So

5    it -- that, as a general matter, is a type of provision that's sort of seen, but without

6    commenting on the specifics of this agreement, I'm not able to get into that here.

7        Q    It seems like the plea agreement came together pretty quickly after the

8    whistleblowers came forward.    Is there anything you can help us with that?

9        A    I'm not authorized to discuss that, but I would go back to my opening

10   statement and harken back to the idea that at no time did politics play a role in the

11   decisions that were made in any matter I handled at the Department of Justice.

12       Q    Okay.    And were you handling the matter at this time?

13       A    I'm not authorized to discuss staffing.

14       Q    Okay.    I'm going to mark the next exhibit.    Number 15 is the December

15   7th indictment in the Central District of California.

16                    [Wolf Exhibit No. 15.

17                    was marked for identification.]

18       BY MR. CASTOR:

19       Q    It's a public document.    Have you had an occasion to read this document or

20   seen it before?

21       A    So I looked sort of very generally at the document and -- but did not read it.

22   I think I sort of flipped through to see what counts were included and otherwise, but I did

23   not read the document.

24       Q    Okay.    Is there anything new in the document since you had left the case?

25       A    I'm not authorized to discuss an indictment in a pending matter.

1    Q    And if I understand correctly, you can't tell us when you stopped working on

2    the case?    We understand you left the Department at the end of November.

3    A    I'm not authorized to discuss that.

4    Q    Did you have an awareness that the investigative team from the IRS side of

5    things, Mr. Shapley and Mr. Ziegler, were removed from the case?

6    A    I'm not authorized to discuss that.

7    Q    Did you know that there was a period of time between when they were

8    removed from the case and when they found out they were removed from the case?

9    And that period of time was -- was a long period.    You know, it was several months.

10    A    Again, I'm not authorized to discuss that.

11    Q    Okay.    There was a meeting that Mr. Shapley characterized as his red-line

12    meeting with the prosecution team on October 7th, 2022.    And I understand you

13    were -- you were not a part of that meeting.    Do you know which meeting I'm referring

14    to?

15    A    Through Mr. Shapley's testimony I'm aware of what meeting you're

16    discussing.

17    Q    Okay.    And I'm just curious why you weren't at that meeting.    The

18    attendees seemed like all the -- all the key players except you.

19    A    I'm not authorized to discuss that.

20    Q    Okay.    Did you get any readouts from that meeting in real time?

21    A    I'm not authorized to discuss that.

22    Q    Okay.    The October 7th meeting is one of the topics DOJ has authorized

23    witnesses to testify to, so --

24    A    It was not included.    Again, I don't believe it was within the scope of my

25    authorization.

1          Q      Okay.    So --

2          A      Yeah.    Okay.    So I am not included in that authorization.    If you look at

3    page 4 of the authorization letter, it notes that others have been authorized to provide

4    515, but as an -- I am -- Tax Division's been provided by appropriate supervisory officials

5    with knowledge, and then it says, your client, me, is not an appropriate witness, as a

6    longstanding matter of Department policy.

7          Ms. Kramer.    So for clarification of the record, Ms. Wolf's answer was indeed

8    correct, she is not authorized pursuant to the letter provided by the Department which

9    we also provided to you.

10          Ms. Wolf.    Sorry.    It's hard to be a witness and not a lawyer.

11          BY MR. CASTOR:

12          Q      On a politically sensitive investigation, what policies does DOJ have that

13    prevent political motivations from seeping into them on the part of their employees?

14          A      As a general matter?

15          Q      Yeah.

16          A      So I think very basically on the most fundamental level, there are the

17    Principles of Federal Prosecution, which explicitly in one section -- and it wasn't one of

18    the ones we discussed today -- says, you know, there's no place for politics and that can't

19    be the basis for pursuing any investigation.    In other matters, it is things along the lines

20    of requiring high-level approvals, as I indicated, for example, in the February 5th Barr

21    memo, for opening of certain investigations.    I believe more recently there was guidance

22    that was pushed out related to opening investigations into Members of Congress and

23    staffers.

24          There is other guidance, again, that relates to election-year sensitivities, which

25    vests and relates not only to actual influence and bias, but, again, the appearance

1    thereof, that that's articulated in the February -- or not the February, but in the May Barr

2    memo and then sort of reiterated over the course of the summer.    There was

3    subsequent guidance in the summer of 2020 from the head of the public integrity section,

4    again, just reminding everybody of those obligations.

5            Q    Okay.

6            A    There may be other provisions, but those are of which I'm chiefly and

7    principally aware.

8            Q    Was the Hunter Biden investigation deemed a politically sensitive

9    investigation?

10           A    I'm not at liberty to discuss any particular investigation and any designations

11   that might apply to one.

12           Q    Were there any special precautions taken with the Biden investigation given

13   that his father was the President and he's from Delaware?

14           Ms. Kramer.    Asked and answered many, many times.

15           Go ahead.

16           Ms. Wolf.    I would just say, again, without commenting on the particulars of any

17   investigation, all appropriate policies and procedures and professional responsibility

18   obligations were followed in the case.

19           Mr. Castor.    Somebody like Alexander Mackler who worked for Joe Biden, would

20   he be permitted under the Department's guidelines to work on a case against Joe Biden's

21   son?    Just as a theoretical standpoint.

22           Ms. Wolf.    I'm sort of uncomfortable with the hypothetical -- the specific

23   hypothetical because I think it does relate to a particular investigation.

24           As a more general matter, though, I think all attorneys have separate -- whether

25   they're with the Department or otherwise, have ethical obligations associated with

1    conflicts of interest, and some of those run to apparent conflicts of interest versus actual

2    conflicts of interest.    And without -- I don't know the sort of ins and outs of them, but

3    those certainly, people's ethical obligations and ethical rules, and professional

4    responsibility obligations associated with the State that they're in, all of which would be

5    in play.

6         You don't sort of lose or suspend those requirements simply because you work for

7    the Department of Justice, and there are various organizations within the Department,

8    both the general counsel for Executive Office of AUSA, deals with ethics information, and

9    then there's a professional responsibility advisory office who is available in certain

10   instances to provide guidance along those lines.

11        Mr. Castor.    As a practical matter, though, wouldn't need too much guidance to

12   figure out that Mr. Mackler couldn't work on a case relating to his former boss, right?

13        Ms. Kramer.    Objection to form.    Also --

14        Ms. Wolf.    Again, I'm unable to answer or agree or disagree with your statement

15   as it relates to a particular person or investigation.

16        Mr. Castor.    Okay.    If a special agent assigned to an investigation, whether it be

17   an IRS supervisory special agent, or criminal investigator, or FBI agent, had concerns with

18   the objectivity of the Justice Department, what is the appropriate path for that agent to

19   communicate his concerns -- his or her concerns?

20        Ms. Kramer.    If you know.

21        Ms. Wolf.    Yeah.    So as a formal matter, I presume -- and again, I don't know

22   the ins and outs, but I assume, as in most jobs and places, there are sort of official kind of

23   whistleblower-type challenges -- or not challenges but pathways available to people and

24   that they would be able to avail themselves of those.

25        There is also the sort of old school, you know, as a general matter, like,

1    conversations between people or at lower level without formalizing complaints or

2    allegations that there are opportunities for, but whatever path people choose, there are

3    mechanisms in place.

4         I am -- while I'm not sure exactly what they are, I'm a hundred percent there are

5    mechanisms in place for people to raise them.

6              BY MR. CASTOR:

7         Q    Were you aware of Shapley and Ziegler's concerns before they came to

8    Congress?

9         A    I'm not authorized to discuss the particulars of that matter.

10        Q    Okay.    Were you surprised that they felt the need to come to Congress?

11        A    Again, I'm not authorized to discuss that.

12        Q    There was reportedly a meeting in August of 2022 with Chris Clark where he

13   suggested to the prosecutors that moving forward on the Hunter Biden case would be

14   career suicide.    Is that something you remember?

15        A    I'm not authorized to discuss what I remember in connection to this

16   particular investigation.

17        As a general matter in cases, defense counsel comes in all the time

18   and -- attempting to convince you not to bring charges, and makes comments similar

19   about how challenging the case will be and throws every possible reason why you

20   shouldn't do something.    They don't work, at least with this prosecutor, so --

21        Q    Did you participate in a January meeting, this January, with Stuart Goldberg,

22   U.S. Attorney Weiss, and Chris Clark?

23        A    I'm not authorized to discuss participation in any particular meeting.

24        Q    During this meeting, it's reported that Clark advised Weiss that his legacy

25   would be defined how he handled the Hunter Biden case.

1        A    I'm not authorized to comment on that.

2        Q    Have you been contacted by any inspectors' general office about

3 participating in any sort of matter related to this?

4        A    I'm not authorized to speak to underlying matters.

5        Q    If you were contacted by an inspector general, would you be able to

6 cooperate, or how would that work now that you've left the Department?

7        A    I'm -- I'm not sure.

8        Q    Okay.

9        A    I would seek guidance as appropriate.

10        Mr. Castor.    We can go off the record here.

11        [Discussion off the record.]

12        Mr. Castor.    We'll go back on the record.

13            BY MR. CASTOR:

14        Q    Did you attend a meeting on or about June 15th, 2022, at Main Justice to

15 discuss this case?

16        A    I'm not authorized to discuss that.

17        Q    We've been told there were participants from the IRS, Mr. Shapley,

18 Mr. Waldon, the Tax Division, Mr. Daly, Mr. Goldberg, Mr. Morgan, and the FBI.    Do you

19 know who from the U.S. Attorney's Office in Delaware were there?

20        A    I'm not authorized to discuss that.

21        Q    I give you those list of people in case it helps jog your memory, but it sounds

22 like you're not willing to discuss that meeting.    Is that correct?

23        A    I'm not authorized to discuss it.

24        Q    Okay.

25        Mr. Castor.    We'll go off the record.

1            [Whereupon, at 2:27 p.m., the interview was adjourned.]

1                           Certificate of Deponent/Interviewee

2

3

4           I have read the foregoing _____ pages, which contain the correct transcript of the

5   answers made by me to the questions therein recorded.

6

7

8

9                           _____

10                                      Witness Name

11

12

13                          _____

14                                          Date

15

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

2138 Rayburn House Office Building
Washington, D.C. 20515,

               *Plaintiff*,

      v.

MARK DALY, in his official capacity,
U.S. Department of Justice, and

JACK MORGAN, in his official capacity,
U.S. Department of Justice,

950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530,

               *Defendants*.

Case No. 1:24-cv-815

# Exhibit AAA



**U.S. Department of Justice**

Office of the Deputy Attorney General

---

*Bradley Weinsheimer*
Associate Deputy Attorney General

*Washington, D.C. 20530*

December 12, 2023

Ms. Jenny Kramer
Alston & Bird
90 Park Avenue, 15th Floor
New York, NY 10016
Via Email

Dear Ms. Kramer:

I write concerning your client Lesley Wolf, who served until recently as an Assistant United States Attorney in the District of Delaware. I serve as the senior career official at the Department of Justice (Department). Consistent with this role, in which I have served since 2018, I possess and exercise delegated authority to provide current and former Department employees with direction concerning the disclosure and protection of Department information, including with respect to congressional requests for testimony. I write to you in that capacity.

On November 21, 2023, the House Committee on the Judiciary (Committee) issued a deposition subpoena to your client for testimony on December 7, 2023, regarding the work of the Department on an ongoing individual criminal investigation and prosecution led by Special Counsel David Weiss. Prior to its issuance of this subpoena, the Committee had been advised by the Department that your client had longstanding plans to complete her federal service on November 24, 2023. On December 1, 2023, the Committee issued a superseding deposition subpoena for the same testimony with a return date of December 14, 2023. Pursuant to the Rules of the House of Representatives, incorporated by reference in the Committee Rules transmitted with the subpoenas, agency counsel is prohibited from attending the deposition.[1]

I understand your client has requested guidance from the Department regarding this subpoena. Any appearance or testimony by Ms. Wolf pursuant to subpoenas issued by the

---

[1] The Committee's letter to your client states its subpoena is "part of the impeachment inquiry," and, as a basis for seeking your client's testimony, it cites a September 27, 2023 "Impeachment Inquiry" memorandum, also transmitted with the subpoena, that references your client by name. However, the House of Representatives did not authorize the Committee to issue a subpoena in relation to such an inquiry. According to a 2020 opinion of the Office of Legal Counsel, the House of Representatives must expressly authorize a committee to conduct an impeachment investigation and to use compulsory process in that investigation before the committee may constitutionally compel the production of documents or testimony in support of the House's power of impeachment. See *House Committees' Authority to Investigate for Impeachment*, 44 Op. O.L.C. __, at *11 (Jan. 19, 2020). The Department reserves all available objections should the Committee seek to do so, including but not limited to the scope of or authority for the Committee's investigation or any particular request.

Committee would not be under compulsion, as the Department has determined on the basis of a 2019 Office of Legal Counsel opinion that the subpoenas lack legal effect and cannot constitutionally be enforced.  As the Department has explained in prior correspondence with the Committee, excluding agency counsel in these circumstances undermines the Executive Branch's ability to protect its confidentiality interests in the course of the constitutionally mandated accommodation process,[2] and the exclusion of agency counsel interferes with the Executive Branch's ability to protect potentially privileged information.[3]  The underlying principles that inform the Department's position are longstanding across administrations.[4]  Here, the subpoena issued by the Committee prohibits the attendance of agency counsel at an appearance where the Committee has indicated it will ask questions regarding information Ms. Wolf learned within the scope of her official duties, including potentially privileged information.[5]  Any appearance or testimony by Ms. Wolf would be voluntary, as the subpoena cannot be enforced by civil or criminal means or through any inherent contempt power of Congress.[6]  Accordingly, the Department has determined that Ms. Wolf cannot be subject to criminal contempt of Congress for declining to appear or to answer questions pursuant to this subpoena.[7]

The Department has already taken significant and extraordinary steps to provide substantial information to the Committee to respond to its stated interests, while protecting the integrity of the ongoing investigation and prosecutions.  The Department has produced appropriate information through voluntary testimony by seven current and former supervisory Department officials.  This includes Special Counsel Weiss—your client's supervisor in his capacity as United States Attorney for the District of Delaware, and the decisionmaker on the matter in which the Committee is interested.  Like other witnesses, the Special Counsel's testimony was appropriately limited because he was, and remains, in "the midst of conducting an ongoing investigation and prosecution."[8]  While committing to sharing additional information in the future in a final report, the Special Counsel declined to answer questions that could "jeopardize the ongoing litigation, our investigations, or the rights of defendants or other individuals involved in these matters."[9]

Specifically, the Department has produced responsive information on subject matter that was appropriate for testimony from individuals who acquired direct personal knowledge of that subject matter while serving as senior supervisory officials at the Department.  For example, the Department authorized testimony from Special Counsel Weiss and others regarding allegations

---

[2] *See, e.g.*, Letter from Asst. Att'y Gen. Carlos Uriarte to Hon. Jim Jordan 7-8 (Oct. 25, 2023) (quoting *Attempted Exclusion of Agency Counsel from Congressional Depositions of Agency Employees*, 43 Op. O.L.C. __, at *2, *19) ("October 25th Letter").  The concerns expressed in the October 25th Letter are incorporated here by reference.

[3] *Attempted Exclusion of Agency Counsel* at *8 (explaining that the authority to control disclosure of this information "extend[s] to *all* . . . information protected by [executive] privilege,' including . . . law enforcement files[.]" (quoting *Authority of Agency Officials to Prohibit Employees from Providing Information to Congress*, 28 Op. O.L.C. 79, 81 (2004)).

[4] *See generally* October 25th Letter.

[5] *Attempted Exclusion of Agency Counsel*, 43 Op. O.L.C. __, at *2.

[6] *Id.* at *14.

[7] *See id.*

[8] Testimony of David Weiss (Nov. 7, 2023).

[9] *Id.*

about the scope of Mr. Weiss's authority. The Department determined that the public interest justified this extraordinary step because of deep concern that misrepresentations about our work—whether deliberate or arising from misunderstandings—could unduly harm public confidence in the evenhanded administration of justice, to which we are dedicated.[10] The Department also produced information responsive to the Committee's interest in the role of the Tax Division by authorizing the testimony of a Tax Division Deputy Assistant Attorney General. This supervisory official, and Special Counsel Weiss, provided information to the Committee on that topic and also responded to the Committee's interest in authorities under 28 U.S.C. § 515. Two senior FBI officials likewise were authorized by the Department to discuss the scope of Mr. Weiss's authority. Consistent with the law and longstanding Department policies, with respect to each of these witnesses the Department did not authorize testimony about meetings and conversations concerning the substance of the matter among investigators and prosecutors, specific investigative steps taken or contemplated, the weight of evidence, and other deliberative prosecutorial and investigative decisions and discussions, including about charges in the ongoing criminal matter.

The Department's decision to make information available from appropriate supervisory personnel reflects its commitment to safeguarding the public's strong interest in the integrity of our investigations and prosecutions, and to furthering the Executive Branch's duty to ensure that the law be faithfully executed. Our obligation to protect the government's ability to prosecute fully and fairly is vital to the Executive Branch's core constitutional function to investigate and prosecute criminal matters. In keeping with these principles—which have been longstanding across administrations—we must continue to protect the Department's criminal law enforcement decisions and legal judgments from even the appearance of political or other inappropriate influences. These concerns are heightened while a matter is open and investigative steps, prosecutorial decisions, or judicial proceedings are ongoing.

Relatedly, the Department generally does not authorize congressional testimony from line-level personnel, especially relating to an ongoing investigation with charges pending in court. The Department has declined to do so in connection with this matter. The Department has written to the Committee explaining that principles and policies for declining to provide testimony from line personnel, followed for decades across administrations, further the public interest in the integrity of law enforcement investigations.[11] As the Department has explained to the Committee, our longstanding principles and policies are grounded in constitutional concerns and the separation of powers.[12]

By contrast to this testimony by supervisory officials on appropriate and responsive subject matter, the Committee's correspondence, including the letters accompanying the subpoenas to your client, states that the Committee seeks testimony from a line prosecutor about meetings and conversations among investigators and prosecutors concerning the weight of evidence and charging decisions in an individual ongoing criminal matter. As the Department noted in prior correspondence on this subject, line personnel such as your client do not exercise

---

[10] *See* Letter from Asst. Att'y Gen. Carlos Uriarte to Hon. Jim Jordan (July 24, 2023).

[11] *See* October 25th Letter at 3-5.

[12] *See* October 25th Letter at 7.

any authority over whether, where, or when to bring charges in this matter—that authority resides with Special Counsel Weiss, who was the appropriate witness to speak to his authority including under special counsel regulations. Authority over staffing and personnel matters regarding this investigation also resides with appropriate supervisory officials at the Department and the IRS, from whom the Committee has already received testimony. Further, as noted, information regarding 28 U.S.C. § 515 and the role of the Tax Division has been provided by appropriate supervisory officials with knowledge of these issues. Your client is not an appropriate witness as a matter of longstanding Department policy, Executive Branch confidentiality interests, or personal knowledge to speak to these topics, on which the Department has already produced significant information from multiple appropriate witnesses through authorized, voluntary testimony.[13]

The guidance provided below is entirely consistent with the guidance the Department provided to other Department witnesses who have appeared before the Committee. Should your client choose to appear or answer questions voluntarily, be advised that Department witnesses, including former employees, are expected to abide by their obligations under the law, the Rules of Professional Responsibility, and Department policy, including the Justice Manual, to refrain from disclosing information that has not been authorized for public release. This includes information about ongoing investigations and prosecutions, sensitive law enforcement information, and Executive Branch deliberative processes, such as those that underlie investigative and prosecutorial decisions. It also includes classified information, sources and methods, grand-jury information protected by Federal Rule of Criminal Procedure 6(e), and tax information protected by 26 U.S.C. § 6103. Discussion of pending criminal cases and possible charges also could violate court rules. Deliberations related to investigations are likely covered by one or more components of executive privilege, Federal Rule of Criminal Procedure 6(e), 26 U.S.C. § 6103, or other significant confidentiality interests. Disclosing non-public information about such matters, including investigative and prosecutorial deliberations, without authorization would compromise the confidentiality and integrity of the law enforcement process, could create the appearance of unfairness to a defendant or subject of an investigation, could have a chilling effect on Department personnel going forward, and could reveal confidential sources and investigative techniques.

Accordingly, current and former Department employees are obligated not to disclose non-public information potentially prohibited by law from disclosure or covered by one or more components of executive privilege or other significant confidentiality interests, including those identified above. This includes information about the ongoing investigation, such as investigative information and deliberations discussed between your client, law enforcement partners and members of the investigative team, and other senior Department officials, or between their staffs. In addition, the Department generally identifies by name only senior supervisory personnel. Otherwise, we identify individuals by their titles. If the names of non-supervisory personnel, including non-SES personnel, are provided during congressional testimony, we request that the Committee refrain from publishing their identities to protect their safety and the integrity of their work. The presence of agency counsel during congressional

---

[13] *See* October 25th Letter at 2-3 & n.6 (citing *See Senate Select Committee on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731-32 (D.C. Cir. 1974)).

interviews is essential to ensure, among other things, that Department witnesses fully understand and abide by their obligations and that the Department has the ability to raise objections or assert privileges or other Executive Branch confidentiality interests.

The limits on disclosure described above also apply to confirming or denying factual assertions involving Executive Branch information that has not been officially acknowledged or authorized for public release. Consistent with longstanding practice, referring such information to the Office of Legislative Affairs will afford the Department the full opportunity to consider particular questions and determine what information could be provided consistent with applicable legal obligations, Department policy, and the public interest.

The guidance I am providing here is consistent with the Department's continuing commitment to good-faith negotiations with the Committee in response to its interest in this matter. Under the circumstances here, such as the specific requests to your client for information learned within the scope of her officials duties including information that is potentially privileged, a decision by Ms. Wolf to decline to appear or answer questions on the basis of the guidance provided by the Department would protect the confidentiality interests of the Executive Branch and the separation of powers. The Department remains willing to discuss with the Committee appropriate requests for information and the circumstances under which the Department may be able to provide that information. Nothing in this guidance shall be understood to waive or limit, on behalf of Ms. Wolf or of the Department, any potentially applicable privileges, objections, or confidentiality interests regarding this or other congressional requests for information.

Pursuant to 5 U.S.C § 2302(b)(13), the provisions of this letter are consistent with and do not supersede, conflict with, or otherwise alter the employee obligations, rights, or liabilities created by existing statute or Executive order relating to (1) classified information, (2) communications to Congress, (3) the reporting to an Inspector General or the Office of Special Counsel of a violation of any law, rule, or regulation, or mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety, or (4) any other whistleblower protection. The definitions, requirements, obligations, rights, sanctions, and liabilities created by controlling Executive orders and statutory provisions are controlling.

Sincerely,

Bradley Weinsheimer

5