**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

COMMITTEE ON THE JUDICIARY,
UNITED STATES HOUSE OF
REPRESENTATIVES,

         *Plaintiff*,

    v.

MARK DALY, *et al.*,

         *Defendants*.

Case No.  1:24-cv-815-ACR

---

## DECLARATION OF MATTHEW B. BERRY IN RESPONSE TO COURT ORDER

I, Matthew B. Berry, declare as follows:

1.      I am the General Counsel of the U.S. House of Representatives.  I have served in this capacity since February 2023.  In this matter, I am lead counsel for the Committee on the Judiciary of the U.S. House of Representatives (Committee).

2.      On August 12, 2024, the Court ordered the parties to simultaneously "submit … sworn declarations from … each side's lead attorney and … one additional attorney for each side."  *See* Aug. 12, 2024 Minute Order.  The Court's order specified that

> [t]he declarations must describe the parties' efforts to reach a negotiated resolution, including (1) the dates when negotiations took place, (2) the locations where negotiations took place, (3) the participants in the negotiations, (4) the number of calls and emails in furtherance of the negotiations, and (5) the duration of any conversations.  The declarations do not need to describe the substance of the negotiations; only the information identified above.  The declarations must also include estimates for the total number of attorney hours required to litigate this case and any potential appeal, broken out by (1) approximate attorney hours spent to date, (2) expected attorney hours to draft and finalize briefing in district court, (3) expected attorney hours to prepare for and attend oral argument in district court, (4) expected attorney hours to draft and finalize briefing on appeal, and (5) expected

1

attorney hours to prepare for and attend oral argument on appeal.  The declarations
must also estimate the cost of each category of attorney hours.

*Id.*  As lead counsel, I submit this declaration in response to the Court's order.  I will first

generally describe the parties' negotiations.  I will then provide the discrete categories of

information required by the Court's order.

### General description of the parties' negotiations

3.     Negotiations began when counsel for both the Committee and the Department of

Justice (DOJ), which is representing Defendants here, met and conferred for more than four

hours on April 10, 2024.  During that negotiating session, counsel for the Committee and DOJ

discussed different approaches to resolving the dispute and exchanged various proposals that the

other party did not accept.  The Committee strongly preferred to focus the discussion on the

safeguards and procedures that would allow Defendants' depositions to take place in a manner

that both accommodated the specific concerns raised by DOJ and complied with House Rules.

But this effort was unsuccessful.  So, in the interest of making every effort to reach a settlement,

the Committee agreed by the end of the session to explore instead whether witnesses other than

Defendants could provide the information that the Committee needs.

4.     The parties then worked together over several days to finalize a framework that

would allow them to assess whether this would be a viable solution.  That framework, which the

parties memorialized and signed on April 16, focused on fleshing out (a) whom DOJ would

designate as its alternative witnesses, (b) what additional information DOJ witnesses could

provide, and (c) when DOJ witnesses could provide that information.  The parties followed that

framework and exchanged detailed proposals through email and written letters.  I discussed those

detailed proposals with several individuals, including Committee representatives and other

attorneys in the Office of General Counsel.  My understanding is that DOJ also discussed the

proposals with several principals.  Because the parties were exchanging detailed proposals and

consulting with several people, I believe that our decision to communicate largely in writing best

met the needs of this particular negotiation.  I found that our written communication was both

efficient and effective, and we supplemented it with a phone call and in-person meeting when it

was helpful to do so.

5.      On April 16, I emailed DOJ a list of topics and a non-exhaustive list of questions

on which the Committee wished to question DOJ witnesses.  On May 2, DOJ emailed me a

detailed offer that included the questions that DOJ witnesses could answer, the names of the

witnesses whom DOJ would designate to answer those questions, and the timeframe in which

DOJ would make each of those witnesses available.  I discussed that offer with Committee

representatives, and they concluded that it did not meet the Committee's needs.

6.      Thus, on May 7, I emailed a detailed counterproposal from the Committee to

DOJ, substantially scaling back its April 16 list of questions.  On May 15, DOJ rejected the

Committee's counterproposal and emailed me a modified offer that I believe did not reflect

significant movement from its initial May 2 offer.  I discussed this offer with Committee

representatives, and they concluded that the offer would not provide the information the

Committee needs to execute its investigation.

7.      Thus, on May 21, I emailed DOJ another substantive counterproposal from the

Committee, moving closer to DOJ's May 15 offer.  On June 5, DOJ did not accept it and emailed

me another offer that lacked clarity with respect to priorities identified by the Committee.  On

June 10, the parties' counsel discussed DOJ's response by phone to make sure that both sides

had a common understanding of it.  Then, on June 20, counsel met in person, and DOJ

elaborated on what information DOJ witnesses could provide, whom DOJ would designate as its

witnesses, and when DOJ would allow those witnesses to appear before the Committee. This meeting was designed to ensure that both sides had a common understanding of the offer that was on the table. On June 28, DOJ emailed me substantive answers to questions that arose during our June 20 meeting. At this point, I believe the parties shared a detailed understanding of what information DOJ, pursuant to its June 5 offer, would provide and when it would be provided. Unfortunately, DOJ's June 5 offer, in my view, did not reflect significant movement from its prior May 15 offer, particularly with respect to the Committee's priorities. I discussed this with Committee representatives, and they concluded that the information DOJ would provide failed to meet the Committee's investigative needs.

8.      On July 17, I conveyed the Committee's position to DOJ in a letter, and noted that, unless DOJ changed its position, the Committee would need to restart the litigation. On July 24, DOJ elaborated on its position in a letter and discussed the logistics of restarting the litigation but did not substantively change its offer. On August 2, I responded with a letter that conveyed the Committee's response to certain claims that DOJ made in its July 24 letter and advanced the discussion regarding the logistics of restarting the litigation. On August 6, DOJ emailed me a letter that restated DOJ's perspective on the negotiations and set forth DOJ's views on the logistics of restarting the litigation.

9.      I believe that the parties negotiated in good faith over the course of nearly four months. My view, based on what I observed during the parties' negotiations, is that the parties were unable to reach an agreement because they have fundamentally incompatible interests. That is why the Committee ultimately decided, after months of negotiations, that it was necessary to restart the litigation.

**Discrete responses to the Court's order**

10.     Number of emails and calls in furtherance of the negotiations; duration of any conversations; negotiation dates, locations, and participants.  As I mentioned above, the parties largely communicated in writing, which I believe was the most effective and efficient way to meet the parties' negotiating needs in this situation.  To that end, I believe that the parties exchanged 57 emails in furtherance of the negotiations.[1]  I understand the Court's order to be asking for the number of emails the parties' counsel exchanged and thus did not include internal emails in our count.  As I alluded to above, many emails between counsel included letter attachments that set out detailed and substantive offers and counteroffers.  The parties had one call in furtherance of the negotiations, on June 10, that I believe lasted roughly fifteen or twenty minutes.  I participated in this call on the Committee's behalf; Todd Tatelman, Bradley Craigmyle, and Andy Wang of the Office of General Counsel did so as well.  Elizabeth Shapiro and Jim Gilligan participated on DOJ's behalf.  The in-person negotiations took place on April 10 and June 20.  The April 10 negotiation took place at the House Office of General Counsel. Todd Tatelman and I participated on behalf of the Committee.  Elizabeth Shapiro and Jim Gilligan participated on behalf of DOJ.  A Committee representative and another DOJ official were on site and consulted, but they did not directly participate in the negotiations.  This negotiation lasted more than four hours.  The June 20 negotiation took place at the office of the Federal Programs Branch of DOJ's Civil Division.  Todd Tatelman, Bradley Craigmyle (remotely), and I participated on behalf of the Committee.  Elizabeth Shapiro, Jim Gilligan, and

---

[1] Many of these emails were not substantive (e.g., they involved scheduling or confirming receipt of offers).

another DOJ attorney whom I believe was Indraneel Sur participated on DOJ's behalf.  I believe that this negotiation lasted between 75 and 90 minutes.

11.     <u>Estimates for the total number of attorney hours required to litigate this case and any potential appeal and cost estimates.</u>  Attorneys in the Office of General Counsel do not track or document the time they spend on any given project, including this litigation.  As a result, the time estimates below are rough approximations.  Likewise, attorneys in the Office of General Counsel do not have an established hourly rate because they are salaried employees who do not bill clients.  Thus, to compute the cost estimate for the categories below, we used the Fitzpatrick Matrix, which the Civil Division of the U.S. Attorney's Office for the District of Columbia uses "in cases in which a fee-shifting statute permits the prevailing party to recover 'reasonable' attorney's fees."[2]  However, this litigation has not had any impact on the number of attorneys employed by the Office of General Counsel and has therefore not increased the Office's personnel expenses.

a.     We estimate that we have spent 485 attorney hours to date litigating this case.  The cost estimate for this hour estimate is $339,850.

b.     We estimate that we would spend 135 attorney hours finalizing briefing in the district court.  The cost estimate for this hour estimate is $94,150.

c.     We estimate that we would spend 70 attorney hours preparing for and attending oral argument in the district court.  The cost estimate for this hour estimate is $53,790.

d.     We estimate that we would spend 145 attorney hours drafting and finalizing briefing on appeal.  The cost estimate for this hour estimate is $102,255.

---

[2] *The Fitzpatrick Matrix*, justice.gov (last visited Sept. 5, 2024) (citation omitted), https://www.justice.gov/usao-dc/media/1353286/dl?inline.

e.      We estimate that we would spend 60 attorney hours preparing for and attending oral argument on appeal.  The cost estimate for this hour estimate is $45,530.

I declare under penalty of perjury that the foregoing is true and correct, to the best of my knowledge.  Executed on September 16, 2024, in Washington, DC.

_/s/ Matthew B. Berry_
MATTHEW B. BERRY